Charles S. LiMandri, SBN 110841
  cslimandri@limandri.com
Paul M. Jonna, SBN 265389
  pjonna@limandri.com
Mark D. Myers, SBN 235719
  mmyers@limandri.com
Jeffrey M. Trissell, SBN 292480
  jtrissell@limandri.com
Milan L. Brandon II, SBN 326953
  mbrandon@limandri.com
LiMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Telephone: (858) 759-9930
Facsimile: (858) 759-9938

Thomas Brejcha, *pro hac vice**
  tbrejcha@thomasmoresociety.org
Peter Breen, *pro hac vice**
  pbreen@thomasmorsociety.org
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680
*Application forthcoming

*Attorneys for Plaintiffs Elizabeth
Mirabelli and Lori Ann West*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

ELIZABETH MIRABELLI, an individual, and
LORI ANN WEST, an individual,

            Plaintiffs,

    v.

MARK OLSON, in his official capacity as
President of the EUSD Board of Education;
FRANK HUSTON, in his official capacity as
Vice President of the EUSD Board of
Education; JOAN GARDNER, in her official
capacity as a member of the EUSD Board of
Education; DOUG PAULSON, in his official
capacity as a member of the EUSD Board of
Education; ZESTY HARPER, in her official
capacity as a member of the EUSD Board of
Education; LUIS RANKINS-IBARRA, in his
official capacity as Superintendent of EUSD;
JOHN ALBERT, both in his personal
capacity and in his official capacity as
Assistant Superintendent of EUSD; TRENT

Case No.:   **'23CV0768 BEN WVG**

**VERIFIED
COMPLAINT FOR:**

1. **Violation of Free Speech
   Clause of First Amendment
   to U.S. Constitution:
   Compelled Speech &
   Viewpoint Discrimination**

2. **Violation of Free Exercise
   Clause of First
   Amendment to U.S.
   Constitution: Not
   Generally Applicable due
   to Categorical Exemptions**

3. **Violation of Free Exercise
   Clause of First
   Amendment to U.S.**

1
VERIFIED COMPLAINT

SMITH, both in his personal capacity and in his official capacity as Director of Integrated Student Services for EUSD; TRACY SCHMIDT, both in her personal capacity and in her official capacity as Director of Integrated Student Supports for EUSD; STEVE WHITE, both in his personal capacity and in his official capacity as Principal of Rincon Middle School at EUSD; TONY THURMOND, in his official capacity as the California State Superintendent of Public Instruction; LINDA DARLING-HAMMOND, in her official capacity as President of the California State Board of Education; CYNTHIA GLOVER WOODS, in her official capacity as Vice President of the California State Board of Education; FRANCISCO ESCOBEDO, in his official capacity as a member of the California State Board of Education; BRENDA LEWIS, in her official capacity as a member of the California State Board of Education; JAMES J. MCQUILLEN, in his official capacity as a member of the California State Board of Education; SHARON OLKEN, in her official capacity as a member of the California State Board of Education; GABRIELA OROZCO-GONZALEZ, in her official capacity as a member of the California State Board of Education; KIM PATTILLO BROWNSON, in her official capacity as a member of the California State Board of Education; HAYDEE RODRIGUEZ, in her official capacity as a member of the California State Board of Education; ALISON YOSHIMOTO-TOWERY, in her official capacity as a member of the California State Board of Education; and NAOMI PORTER, in her official capacity as a member of the California State Board of Education,

Defendants.

**Constitution: Not Generally Applicable due to Discretionary Exemptions**

4. **Declaratory Relief**

## INTRODUCTION

1.    Public schools should never hide information from or lie to parents about a child's mental health or personal circumstances. And schools should never compel teachers to perpetrate such a deception. Yet, the Escondido Union School District ("EUSD"), a K-8 school district, has done just that—implementing a series of new policies on the treatment of transgender or gender diverse K-8 students. Those new policies force teachers to aid in a student's "social transition" by using any pronouns or a gender-specific name requested by the student during school, while reverting to biological pronouns and legal names when speaking with parents in order to actively hide information about their child's gender identity from them.[1]

2.    According to EUSD's policies, all elementary and middle school teachers must unhesitatingly accept a child's assertion of a transgender or gender diverse identity, and must "begin to treat the student immediately" according to their asserted gender identity. "There's no requirement for parent or caretaker agreement or even for knowledge." (Ex. 4, p.3.) There is absolutely no room for discussion, polite disagreement, or even questioning whether the child is sincere or acting on a whim.

3.    Once a child's social transitioning has begun, EUSD elementary and middle school teachers must ensure that parents do not find out. EUSD's policies state that "revealing a student's transgender status to individuals who do not have a legitimate need for the information, without the student's consent" is prohibited, and "parents or caretakers" are, according to EUSD, individuals who "do not have a legitimate need for the information," irrespective of the age of the student or the specific facts of the situation. (Ex. 4, p.7.)

///

---

[1] "Social transition" is the use of a new name and pronouns to "validate" a gender identity that is not consistent with the person's sex. *See* Leor Sapir, *The School-to-Clinic Pipeline*, City J. (Autumn 2022) https://www.city-journal.org/gender-transitions-school-to-clinic-pipeline.

VERIFIED COMPLAINT

4.      If a suspicious parent asks a teacher about whether their child has socially transitioned at school, the teacher must simply respond that "the inquiry is outside of the scope of the intent of their interaction" and that they can only discuss "information regarding the student's behavior as it relates to school, class rules, assignments, etc." (Ex. 9, pp.2-4.) Even if a parent expresses concern, teachers are specifically "directed to refrain from elaborating on their personal beliefs" regarding the child's gender confusion. (Ex. 9, p.2.)

5.      If a parent discovers that their child has socially transitioned at school and objects to the social transition, EUSD's policies flatly prohibit teachers from respecting parents' wishes. According to EUSD, "we shall use a student's preferred name and pronoun based upon student request," and so "a parent [is not] allowed to override a student's request for different pronouns/alternate names." (Ex. 5.)

6.      Only the K-8 students themselves may make the determination of whether they are transgender or gender diverse, and which names and pronouns they would prefer their teachers to use. But, of course, in reality, K-8 students do not and cannot make these decisions on their own. In reality, EUSD teachers and counselors make this decision for the students, reinforcing both the medical self-diagnoses of gender-dysphoric children and the whims of gender-confused children—while denying parents any say.

7.      In response to these new policies, two middle-school teachers, Mrs. Elizabeth Mirabelli and Mrs. Lori Ann West, sought a religious accommodation. Mrs. Mirabelli and Mrs. West have had exemplary, decades-long teaching careers in K-8 public schools. From their decades of teaching experience, they both know that these policies are completely unworkable. Morally and religiously, they know that the complex issues of gender dysphoria and gender identity are not issues best left for children to figure out on their own, with no parental involvement whatsoever.

8.      Mrs. Mirabelli has taught middle-school English with EUSD for over 25 years. During that time, she repeatedly received outstanding evaluations, has been

named Teacher of the Year, and even became certified by the National Board for Professional Teaching Standards. Mrs. Mirabelli is also a devout Roman Catholic. She lives her entire life in accordance with the teachings of her faith and will not abandon them for any reason. Since 1997, Mrs. Mirabelli has taught at EUSD's Rincon Middle School, teaching English to seventh graders.

9.     Mrs. Lori Ann West's contributions to education have been no less commendable. For nearly thirty years, she has taught physical education to middle schoolers at EUSD. Mrs. West obtained a juris doctorate degree but decided to go into teaching instead of law to inspire disadvantaged children with her story as a competitive athlete in her youth. She has always received outstanding evaluations and has twice been named "Teacher of the Year." Mrs. West is also a devout Christian, who strives to follow the teachings of Jesus Christ in everything that she does. Mrs. West has been at Rincon Middle School since 1999.

10.     Faced with EUSD's immoral policies deceiving parents, both Mrs. Mirabelli and Mrs. West sought an accommodation that would allow them to act in the best interests of the children in their care—as required by their moral and religious convictions. Both Mrs. Mirabelli and Mrs. West consider it a moral and religious duty to provide such care for every child in their charge, regardless of personal differences.

11.     But EUSD has remained firm. Mrs. Mirabelli and Mrs. West explained that deceiving parents is wholly unacceptable and requested an outright exemption from doing so. In all communications with parents, they should be permitted to use students' legal names and biological pronouns, while also explaining that the student is referred to differently at the school—using preferred pronouns and a gender-specific name.

12.     Mrs. Mirabelli's and Mrs. West's request was flatly denied. The elementary and middle school district reiterated that all teachers must participate in the deception of parents. The parties reached an accommodation regarding how Mrs. Mirabelli and Mrs. West may address students during the school day, and that issue is not part of this case. But EUSD made clear that Mrs. Mirabelli and Mrs. West must

modify their speech, and may not use a student's preferred name or pronouns, when speaking with parents to ensure that the deception continues.

13. The problem is that, as explained below, EUSD's policies are both dangerous for the students in their care and unconstitutional. The policies endanger the children in EUSD's care through recklessly disregarding or ignoring the real harm that can occur through transitioning to another gender during childhood, while removing the key parental oversight that could protect the mental and physical well-being of EUSD's students.

14. EUSD's requirements—that teachers participate in the exclusion of parents from any decision-making regarding a child's "social transition"—also violate teachers' free speech and free exercise of religion rights, violates parents' rights, and are antithetical to the "cardinal" constitutional command that "the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) (plurality) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)).

15. Accordingly, Plaintiffs Mirabelli and West bring this complaint for injunctive and declaratory relief, and for nominal and actual damages.

## JURISDICTION AND VENUE

16. This action arises under 42 U.S.C. §§ 1983 in relation to Defendants' deprivation of Plaintiffs' constitutional rights to freedom of religion and freedom of speech under the First Amendment to the U.S. Constitution. Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343.

17. This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202; the requested injunctive relief and damages under 28 U.S.C. § 1343(a); and attorneys' fees and costs under 42 U.S.C. §§ 1988.

18. The Southern District of California is the appropriate venue for this action pursuant to 28 U.S.C. § 1391 because Plaintiffs reside here and because it is the

District in which EUSD maintains its offices.

## THE PARTIES

19.     Plaintiff ELIZABETH MIRABELLI is and was, at all times mentioned herein, a resident of the County of San Diego. She is and was, at all times mentioned herein, a devout Roman Catholic and a seventh-grade English teacher at Rincon Middle School. She has worked at Escondido Union School District for 25 years.

20.     Plaintiff LORI ANN WEST is and was, at all times mentioned herein, a resident of the County of San Diego. She is and was, at all times mentioned herein, a devout Christian and middle school physical education teacher at Rincon Middle School. She has worked at Escondido Union School District for 29 years.

21.     The Escondido Union School District ("the School District" or "EUSD") is a public entity established and organized under California law and subject to the restrictions of the United States Constitution. EUSD is an educational agency and public school district (*see* Cal. Educ. Code § 56026.3) responsible for providing school children with full and equal access to public education programs, in addition to other activities offered by the agency. EUSD's responsibilities include making and implementing educational decisions for the schools in its jurisdiction.

22.     EUSD is located in San Diego County, California and headquartered at 2310 Aldergrove Avenue, Escondido, California 92029. EUSD is a K-8 school district. It has seventeen elementary schools (grades K-5), one intermediate school (grades 4-8), and five middle schools (grades 6-8).[2] The School District serves over 17,000 students and has over 1,000 certificated teachers, over 115 credentialed administrative staff, and over 740 classified support staff.[3] The School District is a feeder to a separate school district, named the Escondido Union High School District ("EUHSD").

---

[2] Escondido Union Sch. Dist., *Explore Our Schools*, https://www.eusd.org/o/eusd/page/schools.

[3] Ed-Data, *District Summary: Escondido Union*, http://www.ed-data.org/district/San-Diego/Escondido-Union.

VERIFIED COMPLAINT

Neither EUSD nor EUHSD is a named defendant. EUSD's governing body is its 5-member Board of Trustees, sometimes alternatively referred to as the Board of Education ("the Board").

23.    Defendant MARK OLSON, at all relevant times, was a member of the Board of Education for EUSD acting under color of state law. Mr. Olson is the President of the Board, representing the School District's Region 3. Defendant Olson is sued in his official capacity only.

24.    Defendant FRANK HUSTON, at all relevant times, was a member of the Board of Education for EUSD acting under color of state law. Mr. Huston is the Vice President of the Board, representing the School District's Region 5. Defendant Huston is sued in his official capacity only.

25.    Defendant JOAN GARDNER, at all relevant times, was a member of the Board of Education for EUSD acting under color of state law. Ms. Gardner is the Clerk of the Board, representing the School District's Region 2. Defendant Gardner is sued in her official capacity only.

26.    Defendant DOUG PAULSON, at all relevant times, was a member of the Board of Education for EUSD acting under color of state law. Mr. Paulson is a Member of the Board, representing the School District's Region 1. Defendant Paulson is sued in his official capacity only.

27.    Defendant ZESTY HARPER, at all relevant times, was a member of the Board of Education for EUSD acting under color of state law. Ms. Harper is a Member of the Board, representing the School District's Region 4. Defendant Harper is sued in her official capacity only.

28.    Defendant LUIS RANKINS-IBARRA, at all relevant times, was the Superintendent for EUSD acting under color of state law. Defendant Rankins-Ibarra is responsible for creating, adopting, and implementing EUSD policies, practices, customs, and acts, including the challenged policies, practices, and procedures set forth in this Complaint. Defendant Rankins-Ibarra is sued in his official capacity only.

29.     Defendant JOHN ALBERT, at all relevant times, was the Assistant Superintendent of Human Resources for EUSD acting under color of state law. Defendant Albert is responsible for creating, adopting, and implementing EUSD policies, practices, customs, and acts, including the challenged policies, practices, and procedures set forth in this Complaint. Defendant Albert is sued in both his official and personal capacities, alternatively, for his role both in creating the challenged policies and refusing to extend an exemption or accommodation to Plaintiffs.

30.     Defendant TRENT SMITH, at all relevant times, was the Director of Integrated Student Services for EUSD acting under color of state law. Defendant Smith is responsible for creating, adopting, and implementing EUSD policies, practices, customs, and acts, including the challenged policies, practices, and procedures set forth in this Complaint. Defendant Smith is sued in both his official and personal capacities, alternatively, for his role both in creating the challenged policies and refusing to extend an exemption or accommodation to Plaintiffs.

31.     Defendant TRACY SCHMIDT, at all relevant times, was the Director of Integrated Student Supports for EUSD acting under color of state law. Defendant Schmidt is responsible for creating, adopting, and implementing EUSD policies, practices, customs, and acts, including the challenged policies, practices, and procedures set forth in this Complaint. Defendant Schmidt is sued in both her official and personal capacities, alternatively, for her both in creating the challenged policies and refusing to extend an exemption or accommodation to Plaintiffs.

32.     Defendant STEVE WHITE, at all relevant times, was the Principal of Rincon Middle School for EUSD acting under color of state law. Defendant White is responsible for creating, adopting, and implementing EUSD policies, practices, customs, and acts, including the challenged policies, practices, and procedures set forth in this Complaint. Defendant White is sued in both his official and personal capacities, alternatively, for his role both in creating the challenged policies and refusing to extend an exemption or accommodation to Plaintiffs.

33.     The California Department of Education ("the Department" or "CDE") is the department of the California government responsible for administering and enforcing the laws related to education. Pursuant to Cal. Educ. Code §§ 33300-33316, the California Department of Education is responsible for revising and updating budget manuals, forms, and guidelines; cooperating with federal and state agencies in prescribing rules and regulations, and instructions required by those agencies; and assessing the needs and methods of collecting and disseminating financial information. CDE is not a named defendant. The officers of the CDE are sued here solely under Fed. R. Civ. P. 19(a)(1)(B), to the extent that they claim an interest relating to the subject matter of the action for which their joinder is practically important.

34.     Defendant TONY THURMOND, at all relevant times, was the California State Superintendent of Public Instruction for CDE acting under color of state law. Defendant Thurmond is CDE's main executive officer responsible for creating, adopting, and implementing CDE policies and guidance documents, including the challenged policies and guidance documents set forth in this Complaint. Defendant Thurmond is sued in his official capacity only.

35.     The CDE's main policy-making body is the 11-member California State Board of Education ("State Board" or "SBE"). The SBE is responsible for creating, adopting, and implementing CDE policies and guidance documents, including the challenged policies and guidance documents set forth in this Complaint. The SBE is not a named defendant. The members of the SBE are sued here solely under Fed. R. Civ. P. 19(a)(1)(B), to the extent that they claim an interest relating to the subject matter of the action for which their joinder is practically important.

36.     Defendant LINDA DARLING-HAMMOND, at all relevant times, was a member of the California State Board of Education for CDE acting under color of state law. Dr. Darling-Hammond is the President of the State Board. Defendant Darling-Hammond is sued in her official capacity only.

///

37.     Defendant CYNTHIA GLOVER WOODS, at all relevant times, was a member of the California State Board of Education for CDE acting under color of state law. Dr. Glover Woods is the Vice President of the State Board. Defendant Glover Woods is sued in her official capacity only.

38.     Defendant FRANCISCO ESCOBEDO, at all relevant times, was a member of the California State Board of Education for CDE acting under color of state law. Defendant Escobedo is sued in his official capacity only.

39.     Defendant BRENDA LEWIS, at all relevant times, was a member of the California State Board of Education for CDE acting under color of state law. Defendant Lewis is sued in her official capacity only.

40.     Defendant JAMES J. MCQUILLEN, at all relevant times, was a member of the California State Board of Education for CDE acting under color of state law. Defendant McQuillen is sued in his official capacity only.

41.     Defendant SHARON OLKEN, at all relevant times, was a member of the California State Board of Education for CDE acting under color of state law. Defendant Olken is sued in her official capacity only.

42.     Defendant GABRIELA OROZCO-GONZALEZ, at all relevant times, was a member of the California State Board of Education for CDE acting under color of state law. Defendant Orozco-Gonzalez is sued in her official capacity only.

43.     Defendant KIM PATTILLO BROWNSON, at all relevant times, was a member of the California State Board of Education for CDE acting under color of state law. Defendant Pattillo Brownson is sued in her official capacity only.

44.     Defendant HAYDEE RODRIGUEZ, at all relevant times, was a member of the California State Board of Education for CDE acting under color of state law. Defendant Rodriguez is sued in her official capacity only.

45.     Defendant ALISON YOSHIMOTO-TOWERY, at all relevant times, was a member of the California State Board of Education for CDE acting under color of state law. Defendant Yoshimoto-Towery is sued in her official capacity only.

46.     Defendant NAOMI PORTER, at all relevant times, was a member of the California State Board of Education for CDE acting under color of state law. Defendant Porter is sued in her official capacity only.

## FACTUAL ALLEGATIONS

## I.   BACKGROUND ON GENDER THEORY & SCHOOLS

47.     Across the United States, a debate is raging about the very nature of human identity and existence. Medical ethicists, doctors, psychologists, politicians, philosophers, activists, and average citizens are all engaged in a fraught conversation about the essence of sex and gender, manhood and womanhood—and "nonbinaryhood"—and whether those categories should even be accorded social meaning at all.

48.     Unfortunately, on the very front lines of this debate are teachers, parents, and children. Public schools have been, and presumably always will be, the front lines for pushing social change. Thus, spurred by activists, many policymakers and school boards have already made their own substantive value judgment on the matter, and seek to impose that judgment on the children in their charge. Doing so, however, is both unconstitutional and dangerous.

### A.   *The New Shift in Gender Theory*

49.     Recently, the concepts of "transgender" and "gender identity" within gender theory have undergone a metamorphosis. Traditionally, incongruence between an individual's biological sex and gender identity has been viewed through a medical lens. With its scientific underpinnings, the "classic understanding of what it means to be transgender," holds to a "traditional understanding that we are a sexually dimorphic species." Because of its medical emphasis, this traditional understanding focuses on "gender dysphoria" which "refers to an incongruence between natal sex [*i.e.*, biological sex] and gender identity that is deeply distressing."[4]

---

[4] Patrick Parkinson, *Gender Identity Discrimination and Religious Freedom*, 38 J.L. & Religion 10, 12-13 (2023).

50.     This dysphoria is recognized as a mental disorder by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders. It is characterized by severe and persistent dysphoria, and can be treated variously by therapeutic counseling or physical interventions.[5]

51.     Separate from this traditional understanding, there has emerged a view of gender identity that is not seen through a medical lens, but through the lens of an "individual's dignity and human rights." Under this view, as stated by one policy group, "[e]ach person's self-defined … gender identity is integral to their personality and is one of the most basic aspects of self-determination, dignity and freedom."[6]

52.     Under this view, individuals have the "right" to use "whatever terminology about themselves that they consider best describes their inward reality."[7] Being ideological in nature, this view is essentially "a new belief system" and a "quasi-religious notion" that asserts a "sexed soul."[8]

53.     Because this understanding is not based on "established medical and scientific knowledge," it "does not accept sexual dimorphism as core to the understanding of the human species." Rather, this understanding advocates that "there are multiple genders and a myriad of terms to define those genders," such that individuals "may identify as nonbinary or agender" even though "[t]here is no anatomical presentation of a nonbinary gender identity to which a person could be medically assisted to transition."[9]

---

[5] AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: DSM-5 at 454 (5th ed., 2013).

[6] Parkinson, *supra* n.4, at 26 (quoting The Yogyakarta Principles, https://yogyakartaprinciples.org/.)

[7] *Id.* at 24.

[8] *Id.* at 12-13, 24-26.

[9] *Id.* at 13, 26.

VERIFIED COMPLAINT

54. This new "dignity and human rights" lens also treats gender as fluid, such that it can change over time. Because it views gender as fluid, it focuses less on medical transition because such transitions are generally not reversible. Finally, this view rejects the medical emphasis on "reliev[ing] suffering." It asserts that the emphasis should not be on "gender dysphoria"—*i.e.*, distress caused by incongruence between sex and gender identity. Rather, regardless of any distress, individuals should have the right to engage in a personal journey exploring and discovering their true and unique gender identity, what is sometimes alternately termed "gender euphoria."[10]

55. Under this view, "focusing solely on dysphoria would miss an essential component of why some trans people want to alter their bodies." Under the dignity lens, gender diverse individuals "see[] the body as a gendered art piece that can be made ours through transition-related interventions."[11]

56. The emergence of this new view of gender identity has very quickly been adopted by many young people. According to the Trevor Project, 1.8% of youth identified as "transgender" in 2019—more than double the 0.7% of five years earlier.[12] Two years later, in 2021, up to 9.2% of youth were identifying as "gender diverse."[13]

57. The terms "transgender" and "gender diverse" are generally accepted as distinct concepts, but they are often defined differently. Sometimes, "transgender" simply means that an individual is identifying as the opposite-sex—whether they

---

[10] *Id.* at 25-28.

[11] Florence Ashley, *Gatekeeping Hormone Replacement Therapy for Transgender Patients is Dehumanising*, 45 J. of Med. Ethics 480, 481 (2019).

[12] Laura Edwards-Leeper & Erica Anderson, *The mental health establishment is failing trans kids*, The Wash. Post (Nov. 24, 2021), https://www.washingtonpost.com/ outlook/2021/11/24/trans-kids-therapy-psychologist/ (citing *Data on Transgender Youth*, The Trevor Project (Feb. 22, 2019), https://www.thetrevorproject.org/ research-briefs/data-on-transgender-youth/.).

[13] Kacie M. Kidd, et al., *Prevalence of Gender-Diverse Youth in an Urban School District*, 147 Pediatrics e2020049823 (2021), https://doi.org/10.1542/peds.2020-049823.

adhere to the traditional medical lens of gender identity or the new dignity and human rights lens of gender identity.

58. Other times, "transgender" refers to the traditional understanding of gender identity, where individuals adhere to the scientific understanding of sexual dimorphism, and who wish to transition to the opposite sex. In contrast, the term "gender diverse" or "gender nonconforming" is almost always used by individuals following the new model. These individuals identify with non-traditional genders, such as "nonbinary," even though there is no biological or scientific "nonbinary" gender.[14]

59. As anecdotally confirmed by the experiences of Mrs. Mirabelli and Mrs. West, the vast majority of these new instances of gender incongruence are among biological girls.[15] Yet, in most cases (up to 88%), the gender identity incongruence will resolve by puberty.[16] In contrast, if a minor begins gender-affirming social and medical transitions, they are far more likely to persist in transgender identification and pursue further gender affirming treatment.[17]

60. There has also emerged an increasing number of "detransitioners"— teenagers and young adults who had transitioned and lived in a transgender or gender diverse identity for a number of years, and then "detransitioned" back to a gender identity matching their sex.[18] For these individuals, many have suffered the negative

---

[14] Parkinson, *supra* n.4, at 12-13.

[15] Luke Berg, *How Schools' Transgender Policies Are Eroding Parents' Rights*, 1 Am. Enter. Inst. 3 (Mar. 2022), https://www.aei.org/wp-content/uploads/2022/03/How-Schools'-Transgender-Policies-Are-Eroding-Parents'-Rights.pdf.

[16] Devita Singh, et al., *A Follow-Up Study of Boys With Gender Identity Disorder*, Front. Psychiatry (Mar. 29, 2021), https://www.frontiersin.org/articles/10.3389/fpsyt.2021.632784/full.

[17] Polly Carmichael, et al., *Short-term outcomes of pubertal suppression in a selected cohort of 12 to 15 year old young people with persistent gender dysphoria in the UK*, PloS One (Feb. 2, 2021), https://pubmed.ncbi.nlm.nih.gov/33529227/.

[18] *See, e.g.,* Jesse Singal, *When Children Say They're Trans*, The Atlantic (July/Aug.

effects of social or medical transition—including physical risks to fertility, bone, and cardiovascular health, as well as significant psychosocial risks[19]—with no later benefit.

### B.   Activists Coopt School Districts to Push Gender Theory

61.     As stated above, various school districts across the country are enacting a series of gender identity policies that require adherence to the ideological views of gender theory activists. These policies generally require teachers to participate in and actively facilitate a child's exploration of their gender identity by unhesitatingly accepting a student's pronouncement of a new gender identity (however many times it occurs) and using the student's preferred pronouns and new gender-specific name. Under the Free Speech Clause of the First Amendment, policies requiring use of preferred pronouns are generally unconstitutional.[20]

62.     But more egregiously, school districts across the country are even going so far as to exclude parents from decision-making when gender identity is involved. "In the past few years, school districts nationwide have quietly adopted policies requiring staff to facilitate and 'affirm' gender identity transitions at school without parental notice or consent—and even in secret from parents."[21] This despite the fact that a child's gender

---

2018), https://www.theatlantic.com/magazine/archive/2018/07/when-a-child-says-shes-trans/561749/; Charlie McCann, *When girls won't be girls,* The Economist (Sep. 28, 2017), https://www.economist.com/1843/2017/09/28/when-girls-wont-be-girls; Keith Zubrow, *Inside the 60 Minutes report on transgender health care issues*, CBS (May 23, 2021), https://www.cbsnews.com/news/60-minutes-transgender-health-care-issues-2021-05-23/.

[19] Stephen B. Levine, et al., *Reconsidering Informed Consent for Trans-Identified Children*, *Adolescents, and Young Adults*, Journal of Sex & Marital Therapy (Mar. 17, 2022), https://pubmed.ncbi.nlm.nih.gov/35300570/.

[20] *See Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021), *cited approvingly by Green v. Miss United States of Am., LLC*, 52 F.4th 773, 784 n.12 (9th Cir. 2022); *Taking Offense v. State*, 66 Cal. App. 5th 696, 712 (2021), *review granted, not depublished by Taking Offense v. State*, 498 P.3d 90 (Cal. 2021).

[21] Berg, *supra* n.15, at 1.

identity concerns the most fundamental issues about a child, including the child's religion, medical care, mental health, sense of self, philosophical worldview, and more.

63.     For example, the Washington Post reported how one anonymous mother in California "went two years without knowing her sixth grader had transitioned at school." As she stated, "[b]asically, I was the last one to find out… They were all saving my kid from me." The mother only made the discovery "when she took her child to the hospital one day and a doctor told her. She was stunned."[22]

64.     Under these policies, "[e]ducators and staff," not parents, "work closely with the student to determine what changes are necessary … to ensure their safety and well-being." Often, that process is formalized in a "Gender Support Plan" created by the school for the child.[23]

65.     These policies are dangerous. "Parents across many political beliefs argue that they can't be supportive if no one tells them that their child came out." According to Dr. Erica Anderson, a clinical psychologist who identifies as a transgender woman and is the former president of the U.S. Professional Association for Transgender Health, "leaving parents in the dark is not the answer. 'If there are issues between parents and children, they need to be addressed.'" Such secrecy "only postpones … and aggravates any conflict that may exist." In a world in which schools "routinely send notes home to parents about lesser matters," such as "playground tussles, missing homework, and social events," there is absolutely no justification for withholding such fundamentally important information from their parents.[24]

---

[22] Donna St. George, *Gender transitions at school spur debates over when, or if, parents are told*, The Wash. Post (July 18, 2022), https://www.washingtonpost.com/education/2022/07/18/gender-transition-school-parent-notification/.

[23] GLSEN & Nat'l Ctr. for Transgender Equal., *Model Local Education Policy on Transgender & Non-Binary Students*, 7-8 (Sep. 2018), https://transequality.org/sites/default/files/images/resources/trans_school_district_model_policy_FINAL.pdf.

[24] St. George, *supra* n.22.

66.     Dr. Anderson is not alone. Although teachers, coaches, and school staff are often the first to learn of a child's gender confusion or gender dysphoria, the World Professional Association for Transgender Health (WPATH) states that "involving the parent(s) or primary caregiver(s) in the assessment process is recommended in almost all situations," with limited exceptions for when "an adolescent is in foster care, child protective services, or both."[25]

67.     Children who express a gender identity inconsistent with their sex are more likely to have experienced personal trauma and are more likely to suffer from other forms of mental health problems. They are frequently diagnosed with serious comorbidities, including mental developmental disabilities, autism, ADHD, and prior psychiatric illness. A recent study reported that 87.7% of children and adolescents diagnosed with gender dysphoria had comorbid psychiatric diagnoses, and many had a "history of self-harm, suicidal ideation, or symptoms of distress."[26] Only with the direct involvement of their parents can the best results for these children be achieved.

## C.   *The New Gender Policies Are Unconstitutional*

68.     Whether viewed through the traditional medical lens, or the new dignity and human rights lens, policies excluding parents from decision-making are unconstitutional. It should go without saying that public schools should never hide information from or lie to parents about their children.

69.     Schools are partners with parents in the child rearing process—*not* substitutes. "[T]he interest of parents in the care, custody, and control of their children[] is perhaps the oldest of the fundamental liberty interests recognized by [the

---

[25] Eli Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, World Prof'l Ass'n for Transgender Health (WPATH) 57-59 (2022), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644.

[26] Kasia Kozlowska, et al., *Attachment Patterns in Children and Adolescents With Gender Dysphoria*, Front Psychol. (Jan. 12, 2021), https://www.frontiersin.org/articles/10.3389/fpsyg.2020.582688/full.

1   Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality).

2      70.    Children are "not the mere creature of the state," *Pierce v. Soc'y of the*

3   *Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925), and the "right[] …

4   to raise one's children ha[s] been deemed 'essential'" and one of the "'basic civil

5   rights of man.'" *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). These parental rights are

6   rooted in the "historical[] … recogni[tion] that natural bonds of affection lead parents

7   to act in the best interests of their children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979).

8      71.    Thus, "'[i]t is cardinal'" that "'the custody, care and nurture of the child

9   reside first in the parents, whose primary function and freedom include preparation for

10   obligations the state can neither supply nor hinder.'" *Troxel*, 530 U.S. at 65-66 (quoting

11   *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)). "This primary role of the parents in

12   the upbringing of their children is now established beyond debate as an enduring

13   American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972).

14      72.    In the Ninth Circuit, the quintessential right that parents have is "a

15   fundamental right to decide *whether* to send their child to a public school." *Fields v.*

16   *Palmdale Sch. Dist.*, 427 F.3d 1197, 1206 (9th Cir. 2005) ("*Fields I*"), *amended by*, 447

17   F.3d 1187 (9th Cir. 2006) ("*Fields II*"). This right "extend[s] beyond the threshold of

18   the school door." *Fields II*, 447 F.3d at 1190-91. Yet, by school districts withholding

19   information from parents precisely because the parents may want to know about it,

20   school districts are intentionally interfering with this quintessential right. "It is not

21   educators, but parents who have primary rights in the upbringing of children. School

22   officials have only a secondary responsibility and must respect these rights." *Gruenke*

23   *v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000). "Public schools must not forget that '*in loco*

24   *parentis*' does not mean displace parents." *Id.*

25      73.    Parents have the right to disagree with a school district's view on gender

26   identity. The Constitution guarantees a freedom of thought and expression that

27   includes a freedom to differ. "[F]reedom to differ is not limited to things that do not

28   matter much. That would be a mere shadow of freedom. The test of its substance is the

right to differ as to things that touch the heart of the existing order." *West Va. Bd. of Educ. v. Barnette,* 319 U.S. 624, 642 (1943). No questions, perhaps, "touch the heart of the existing order" more powerfully than those that concern the very nature of human existence and personhood.

74.     The Constitution stalwartly defends this freedom by, in part, prohibiting policymakers from adopting and enforcing a set of approved views on these matters in our public schools. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id.* "Free speech serves many ends. It is essential to our democratic form of government, and it furthers the search for truth. Whenever the Federal Government or a State prevents individuals from saying what they think on important matters or compels them to voice ideas with which they disagree, it undermines these ends." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018) (citations omitted).

## II.   Plaintiffs Elizabeth Mirabelli & Lori Ann West

75.     As stated above, Mrs. Elizabeth Mirabelli and Mrs. Lori Ann West have had exemplary, decades-long teaching careers in K-8 public schools. They are both devout adherents of their religious traditions—Roman Catholic and Christian respectively—and have been a boon to EUSD and the students they have taught.

### A.     *Plaintiff Elizabeth Mirabelli*

76.     Mrs. Mirabelli has taught middle-school English with EUSD for 25 years. She received her Master's Degree of Education from the University of California at San Diego. She has also received two certifications as a National Board Certified Teacher by the National Board for Professional Teaching Standards, which is the highest level of teacher certification available, and has become a Master Teacher as understood by federal law. *See* 20 U.S.C. § 9905(3).

///

77.     Mrs. Mirabelli also became a District Trainer for EUSD and served for five years as the Department Chair for Rincon Middle School's English Language Arts Department. Her leadership roles during her tenure with EUSD have included mentoring new teachers, training experienced teachers, and heading up important teams such as the School Leadership Team. At Rincon Middle School, she has consistently received outstanding evaluations, has been named Teacher of the Year, and is a respected member of the faculty.

78.     Beyond her teaching duties Mrs. Mirabelli has sought to make a positive contribution to the community by sponsoring community projects with students, such as volunteering at a nearby retirement home and serving meals at the local homeless shelter.

79.     In accordance with her Catholic faith, Mrs. Mirabelli sincerely holds the religious belief that God designed the human race male and female, each with a distinct and innate masculine and feminine nature. Mrs. Mirabelli believes that the human species is inherently binary—there is no gender spectrum—and that an individual's male or female nature can never be changed.

80.     She also holds the sincere religious belief that the parent-child relationship was ordained by God and that parents have the ultimate right and responsibility to care for and guide their children.

81.     Mrs. Mirabelli's beliefs are quintessentially Catholic and are reflected in guidance documents issued by her Church. This includes both her views of man and woman, her views on lying, and her views on the primacy of parents.

82.     The Catholic Church firmly recognizes that issues of gender confusion are complex and troubling: "To be sure, many people are sincerely looking for ways to respond to real problems and real suffering," and "[t]he search for solutions to problems of human suffering must continue."[27]

---

[27] Committee on Doctrine, *Doctrinal Note on the Moral Limits to Technological*

83.     But, as stated by the Vatican, primary responsibility for dealing with the complex issues of gender confusion must rest with parents. Under the "principle of subsidiarity," it is very important that educators not preempt the role of parents:

> Across this educational alliance, pedagogical activity should be informed by the *principle of subsidiarity*: "All other participants in the process of education are only able to carry out their responsibilities *in the name of the parents, with their consent* and, to a certain degree, *with their authorization*". If they succeed in working together, family, school and the broader society can produce educational programmes on affectivity and sexuality that respect each person's own stage of maturity regarding these areas and at the same time promote respect for the body of the other person. They would also take into account the physiological and psychological specificity of young people, as well as the phase of neurocognitive growth and maturity of each one, and thus be able to accompany them in their development in a healthy and responsible way. (italics in original)[28]

84.     Mrs. Mirabelli believes that in order for her to live in accordance with her duty to God as a Catholic, she is required to follow the directions of her religious leaders and is prevented from directly participating in anything contrary to her faith. This involves interfering with the parent-child relationship that was ordained by God as an inherently sacred and life-long bond.

## B.     Plaintiff Lori Ann West

85.     Mrs. Lori Ann West's contributions to education have been no less commendable. For twenty-nine years, she has taught Physical Education and Adapted Physical Education to elementary, middle, and high school students in San Diego

---

*Manipulation of the Human Body*, U.S. Conf. of Cath. Bishops 12-13 (Mar. 20, 2023), https://www.usccb.org/resources/Doctrinal%20Note%202023-03-20.pdf.

[28] Giuseppe Cardinal Versaldi, *"Male and Female He Created Them": Towards a Path of Dialogue on the Question of Gender Theory in Education*, Congregation Cath. Educ. (Feb. 2, 2019), http://www.educatio.va/content/dam/cec/Documenti/19_0997_INGLESE.pdf.

County. She has been teaching P.E. at Rincon Middle School since 1999. She is a two-time Escondido Elementary Educators Association (EEEA) Teacher of the Year.

86.     Mrs. West has served her community with distinction as Department Chair in the Physical Education Department and was named Teacher of The Year for her innovative program for adaptive P.E. She also won the California Teachers Association WHO Award for her contributions to advance the teaching profession.

87.     After starting her family, Mrs. West obtained her B.A. in Physical Education and a J.D. from Thomas Jefferson School of Law. However, instead of practicing law, Mrs. West decided to go into teaching to inspire disadvantaged children with her story as a competitive athlete in her youth. For Mrs. West, choosing teaching was an easy option over law. She loves children, sports, and the outdoors—and inspiring youth to be active and competitive.

88.     In high school, Mrs. West was a competitive gymnast, but she broke her back in two places and was told by doctors that she would never compete again. Against all the odds, she came back from that injury to compete as a collegiate gymnast with Grossmont College and to join her team in placing 1st in the California state championships.

89.     In accordance with her Christian faith, Mrs. West sincerely holds the religious belief that God created two sexes: male and female, and that the relationship between parents and children was created by God with the intent for the parents to raise and guide their children. Although Mrs. West is Christian, not Roman Catholic, her faith beliefs correspond with those of Mrs. Mirabelli discussed above.

90.     Also as a result of her faith, Mrs. West fully supports efforts to ensure that transgender or gender diverse students are treated kindly, with respect, and are not discriminated against or gossiped about. But, her religious beliefs preclude her from facilitating any student's transgender or gender diverse social transition by withholding information about it from the student's parents or guardians.

///

### C.    *Joint Statement of Faith & Beliefs*

91.    Mrs. Mirabelli and Mrs. West are both professing Christians who strive to live out their faith daily. According to their Christian faith, Mrs. Mirabelli and Mrs. West have sincerely held religious beliefs that govern their views about human nature, marriage, gender, sexuality, morality, politics, and social issues. Their faith informs their convictions concerning what it means to be human, the purpose and meaning of life, and ethical and moral standards that should govern human conduct.

92.    Although Mrs. Mirabelli and Mrs. West come from different religious backgrounds and traditions, for purposes of this action, they have devised the following joint statement of faith.

93.    Plaintiffs' faith teaches that God immutably creates each person as male or female; these two distinct, complementary sexes reflect the image of God; and rejection of one's biological sex is a rejection of the image of God within that person.

94.    Plaintiffs also believe that they cannot affirm as true those ideas and concepts that they believe are not true, nor can they aid and abet the deception of others. Doing so, they believe, would violate biblical commands against dishonesty and lying.

95.    Plaintiffs' faith does not command them to affirmatively communicate their religious beliefs at school, and they do not seek to do so. However, their faith requires them to refrain from speaking in a manner that their faith instructs as immoral, dishonest, or harmful.

96.    Plaintiffs' faith does command them to affirmatively communicate their religious beliefs outside of school, and they wish to communicate freely on other matters of public concern, including human identity, sex, and gender consistent with those beliefs.

97.    Plaintiffs endeavor to treat every person with dignity, love, and care because they believe all people are created in the image of God. Plaintiffs endeavor to model and uphold respectful behavior toward others regardless of an individual's

identity, race, ethnicity, culture, religion, or physical and personal characteristics.

98.   Plaintiffs abhor physical, verbal, or social bullying, or any other form of harassment, for any reason whatsoever.

99.   In addition to the above broad religious-principles, Plaintiffs have their own opinions and views on how those principles apply to gender theory. These views are largely derived from guidance documents from Christian leaders. Each of the below beliefs are rooted in Plaintiffs' religious beliefs and constitutes the application of those religious beliefs to concrete situations.

100.   Plaintiffs understand, based on scientific evidence, religious teaching, and their own experiences as educators, that children do not have a fully developed capacity to understand the long-term consequences of their decisions.

101.   Plaintiffs also understand, based on scientific evidence, that consistent with all sexually reproductive species, human sex is defined with reference to gamete production and that there are only two sexes, which are male and female.[29]

102.   Plaintiffs want the best for all of their students and wish to refrain from doing anything that would be harmful to them or create an unreasonable risk of harm to them.

103.   In particular, Plaintiffs are aware of an increase in students expressing a gender identity that is inconsistent with their biological sex and an accompanying request to be addressed with a different name consistent with the new identity and pronouns that are inconsistent with their biological sex.

104.   Plaintiffs are aware that using the new name and pronouns that a student requests as a part of expressing a new gender identity is called "social transition." Social transition "is not a neutral act"—it is an "active intervention" that can have

---

[29] Michael Artigues & Michelle Cretella, *Sex is a Biological Trait of Medical Significance*, Am. Coll. Pediatrics (Mar. 2021), https://acpeds.org/position-statements/sex-is-a-biological-trait-of-medical-significance.

"significant effects on the child or young person in terms of their psychological functioning."[30]

105.   Plaintiffs understand that many children who at some point express a gender identity inconsistent with their biological sex will eventually return to expressing an identity in harmony with their sex. For these children, all forms of treatment—whether psychosocial or medical—that "validate" the gender identity inconsistent with the child's biological sex are harmful, but irreversible forms of treatment are the most harmful.

106.   Plaintiffs want to protect children from making potentially irreversible and life-changing decisions that they may later regret. Plaintiffs believe that because of the difficulty of assessing matters of gender identity and the long-term irreversible consequences of certain treatments for transgender-identifying people, including puberty blockers, hormone replacement therapy, and sex-reassignment surgery, any decision about how to address a child's gender incongruence should be made by parents, not children.

107.   Plaintiffs understand that, during middle school, children often build strong relationships with their teachers, coaches, and other school staff. Because of this, school staff can be among the first adults with whom a child will talk about gender confusion or gender dysphoria.

108.   Nevertheless, Plaintiffs understand that their role as teachers is complementary to, and not a substitute for, the parents' role as the primary caregivers for their children. Plaintiffs further understand that parents are and should be provided full information about the status of their child, as well as information regarding any health or mental concerns that manifest while the child is in the care of the educator.

---

[30] Hilary Cass, *Independent review of gender identity services for children and young people: Interim report* 62 (Feb. 2022), https://cass.independent-review.uk/wp-content/uploads/2022/03/Cass-Review-Interim-Report-Final-Web-Accessible.pdf.

109.    Although teachers, coaches, and school staff are often the first to learn of a child's gender confusion or gender dysphoria, Plaintiffs understand that the World Professional Association for Transgender Health (WPATH) has recommended that health professionals defer to parents "as they work through the options and implications," even if they ultimately "do not allow their young child to make a gender-role transition."[31]

110.    Plaintiffs want to continue teaching as they always have while refraining from violating their conscience and harming their students.

111.    Plaintiffs do not discriminate against any of their students on the basis of race, religion, sex, gender identity, sexual orientation, or any other basis that their school or applicable law prohibits. Plaintiffs treat all students equally, with dignity and respect.

## III.   EUSD's Policies on Gender Identity

### A.    EUSD's Original Policies

112.    Since 2003, EUSD has maintained a "Nondiscrimination in District Programs and Activities" policy, numbered BP 0410. In its current form, that policy states that "District programs, activities, and practices shall be free from unlawful discrimination, including discrimination against an individual or group based on … gender, gender identity, gender expression…"

113.    Similarly, since 2003, EUSD has enforced a board policy that "prohibits, at any district school or school activity, unlawful discrimination, including discriminatory harassment … targeted at any student by anyone, based on the student's actual or perceived … gender identity…" That policy is numbered BP 5145.3. True and correct copies of BP 0410 and BP 5145.3 are attached as

---

[31] Eli Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 7*, World Prof'l Ass'n for Transgender Health (WPATH) 17 (2012), https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English.pdf.

**Exhibits 1 and 2.**

114.    Neither of these policies provide any further explanation of what constitutes "discrimination," or provide examples of actions that could or would constitute discrimination on the basis of "gender identity." Thus, the policies are reasonably interpreted to prevent solely pure discrimination on the basis of gender identity. *See Texas v. EEOC*, No. 2:21-CV-194, 2022 WL 4835346, at *5-7 (N.D. Tex. Oct. 1, 2022) (Title VII prohibits discrimination "*for being* transgender;" does not prohibit disparate treatment for correlated conduct) (original italics).

115.    However, in August 2020, EUSD enacted an Administrative Regulation expanding upon BP 5145.3. This type of regulation is not passed by the Board of Trustees, but authorized by executive staff at a school district, such as the superintendent or a deputy superintendent. As a result, it is not discussed at a public board meeting where the public has the opportunity to provide input.

116.    AR 5145.3 expanded on what it would mean to "discriminate" on the basis of gender identity through a lengthy series of detailed examples. This regulation required certificated EUSD staff to unquestioningly accept a students' transgender or gender nonconforming self-identification, begin referring to transgender or gender nonconforming students by their preferred names and pronouns, and hide that information from parents or caretakers, among other requirements. However, this AR 5145.3 was not widely circulated to staff. A true and correct copy of AR 5145.3 is attached as **Exhibit 3**.

### B.     *The "Rights of Gender Diverse Students" Presentation*

117.    In November 2021, an EUSD teacher addressed various issues relating to gender identity with several of her students. During that discussion, the teacher questioned various of her transgender or gender nonconforming students about their request that she use their preferred pronouns and newly identified gender-specific names. Those students then reported the teacher to various EUSD staff, who held a conference with the teacher on December 14, 2021. During that conference, EUSD

2e35be3797bef984

staff laid out the requirements of BP 5145.3 and AR 5145.3 and informed the teacher that failure to comply with them would result in the issuance of a Letter of Warning or a Letter of Reprimand.

118.   Apparently in response to this incident, EUSD decided to begin enforcing its AR 5145.3. To that end, on February 3, 2022, EUSD held a district-wide staff meeting via an online videoconferencing platform. All certificated staff (and only certificated staff) were required to attend. As part of that meeting, EUSD explained AR 5145.3 through a video presentation narrated by EUSD Director of Integrated Student Supports, Tracy Schmidt and EUSD Director of Certificated HR, Albert Ngo. The goal of the presentation, entitled "Rights of Gender Diverse Students," was to "dive into the rights of gender diverse students and staff and specific systems we have in place at EUSD to create safe and inclusive campuses." A true and correct copy of a certified transcript of the presentation, with the corresponding slideshow inserted, is attached as **Exhibit 4**.

119.   Ms. Schmidt explained that EUSD was now defining discrimination on the basis of gender identity very broadly for the purpose of "creat[ing] safe and inclusive campuses," and "upholding a positive and diverse culture in our District." (Ex. 4, p.1:11-12.) Ms. Schmidt described EUSD's intention as being to outline "the most effective process for ensuring our students understand their rights and that they are applied in the school setting." (Ex. 4, pp.1:28-2:1.)

120.   Ms. Schmidt also underlined that these rights "are very specific to this community of students, and that is because they are in need of these protections." (Ex. 4, p.2:1-2.) She defined a "protected student" for the purposes of the policies: "If you have a student whose gender identity differs from that traditionally associated with the students' physiological or assigned sex at birth, they are a protected student. If any aspect of their gender identity is disparate from that assigned sex at birth, they're eligible for these protections." (Ex. 4, p.2:23-26.)

///

121. Ms. Schmidt explained that, through its general nondiscrimination policies, EUSD was mandating that all teachers comply with six specific sub-policies. As stated by Ms. Schmidt, these included:

122. *First*, with respect to "Determining Gender Identity … [t]he school/district shall accept the student's assertion of their gender identity and begin to treat the student consistent with their gender identity." Ms. Schmidt elaborated upon this requirement, stating that "[t]he student's assertion is enough. There is no need for a formal declaration. There's no requirement for parent or caretaker agreement or even for knowledge for us to begin treating that student consistent with their gender identity." (Ex. 4, p.3:26-28.)

123. *Second*, EUSD outlined a "Right to Privacy," stating that "[a] student's status is their private information and the district shall only disclose the information to others with the student's prior consent. When disclosure of a student's gender identity is made to a district employee by a student, the employee shall seek the student's permission to share with others, including parent/caretakers." In Ms. Schmidt's words: "It always comes back to the student's comfort. If one wants to take any action to share a student's status, they must be granted that permission, and that includes parents, caretakers, other teachers, administrators, even support staff. You have to seek out that permission first." (Ex. 4, pp.4:1-9, 6:6-11, 7:15-19.)

124. *Third*, the presentation stated that it would now be required that the student be offered "Gender Support Planning," or "an opportunity to participate in a structured meeting with student identified supportive individuals to review a gender support plan." (Ex. 4, p.5:23-25.)

125. *Fourth*, the presentation outlined student's rights with respect to "Accessibility to Facilities/Programs," meaning that "[w]hen the school/district maintains sex-segregated facilities, such as restrooms or locker rooms, or offers sex-segregated programs and activities, students shall be permitted to access facilities and participate in programs and activities consistent with their gender identity. To address

any student's privacy concerns in using sex-segregated facilities, the school/district shall offer available options. However, the school/district shall not require a student to utilize these options." (Ex. 4, pp.4:27-5:4.)

126. ***Fifth***, the presentation imposed new rules on certificated staff as to "Names and Pronouns." Specifically, "[i]f a student so chooses, school/district personnel shall be required to address the student by a name and the pronouns consistent with their gender identity, without the necessity of a court order or a change to their official district record. However, inadvertent slips or honest mistakes by district personnel in the use of the student's name and/or consistent pronouns will, in general, not constitute a violation." Ms. Schmidt summarized this requirement as meaning "if the student asks us to use a name or pronoun that is associated with their gender identity, then we shall." (Ex. 4, pp. 3:24-28, 5:21-28, 6:24-26.)

127. ***Sixth***, the presentation set forth rules with respect to Student Records, stating that "[a] student's legal name or gender as entered on the mandatory student record shall only be changed pursuant to a court order. However, at the request of a student or, if appropriate, his/her parents/caretakers, the district shall use the student's preferred name and pronouns consistent with his/her gender identity on all other district-related documents." Here, Ms. Schmidt observed that EUSD "find[s] that many students, when they're at school … feel safe enough to ask for the use of the name and pronoun that feels affirming for them. They might not have that same feeling or sentiment with their family. So, they'll want to be referred to the preferred name at school but they will not want their record to be changed because of the likelihood that their family members may then become aware." (Ex. 4, p.6:6-11.)

128. Of the above six sub-policies, only the fourth one—the right of transgender students to use sex-segregated facilities (bathrooms and locker rooms) and to participate in sex-segregated programs (such as sports) based on their gender identity—is directly supported by statutory authority. *See* Cal. Educ. Code § 221.5(f); Cal. Stats. 2013, ch. 85, § 1 (eff. Jan. 1, 2014). The remaining sub-policies are not

1   required by any provision in either California or federal law.

2        129.   After outlining the above-described sub-policies, the presentation continued to explain that failure to comply with them would constitute "Discrimination/Harassment." (Ex. 4, pp.6:15-17, 7:6-9.) Thus, "revealing a student's transgender status to individuals who do not have a legitimate need for the information, without the student's consent" would be a basis for discipline. (*Id.*) Ms. Schmidt further clarified that individuals who "do not have a legitimate need for the information" include "parents or caretakers" and that consent is required regardless of the age of the student. (*Id.*)

130.   In response to a Public Records Act request, EUSD also produced what appears to be an internal Q&A portal for Mission Middle School in Ramona.[32] In that document, a teacher asked: "**Is a parent allowed to override a student's request for different pronouns/alternate names?**" The answer provided was: "**No, we shall use a student's preferred name and pronoun based upon student request,**" and "[t]eachers will use a student's preferred pronouns and name here at school. But might need to use their original name and pronouns when contacting family" because "[u]sing the student's school preferred name and pronouns might out the students to the parents." A true and correct copy of that Q&A page is attached as **Exhibit 5**.

131.   Ms. Schmidt and her ISS department also published a "Preferred Name/Gender Request Form" that specifically gathers information regarding whether parents are aware of the student's transgender or gender diverse identity. A true and correct copy of that form is attached as **Exhibit 6**.

132.   After this policy was announced, Mrs. Mirabelli and Mrs. West requested a religious accommodation under Title VII and the California Fair Employment and Housing Act. Through that process, EUSD clarified both the

---

[32] The document appears to come from Mission Middle School because the only name that appears in it is that of a teacher at that school.

contours and requirements of its policies. That clarification occurred in the form of three letters exchanged by the parties dated February 8, March 1, and March 10, 2023, true and correct copies of which are attached as **Exhibits 7, 8, and 9**.

133.    EUSD clarified what it meant by unhesitating acceptance of a transgender or gender diverse child's self-identification. Even if directly asked, teachers may *never* question that identity or share "their personal beliefs" or viewpoints with students or parents. (Ex. 9, p.2.) These clarifications make clear that these policies are not aimed solely at protecting transgender or gender diverse students, but are also aimed at enforcing ideological conformity regarding gender identity.

134.    Neither the "Rights of Gender Diverse Students" presentation nor the "Preferred Name/Gender Request Form" appear on the EUSD website. Nor is there any page on the website detailing those policies. BP 5145.3 appears on the "Board Policies" page of EUSD's website, but not AR 5145.3, which only appears in a searchable online database on a different website. EUSD did nothing to notify parents about its new gender identity policies; EUSD did not afford any opportunity for public discussion or parental input regarding those policies.

### C.    *The Loose Nature of the Policies*

135.    EUSD's gender identity policies are framed in the manner of a transgender or gender diverse student's "rights." (Ex. 4, p.1:2.) Nevertheless, *in practice*, the policies solely bind certificated staff (*i.e.*, teachers)—not students and administrative staff. This despite the fact that, as noted above, EUSD has over 17,000 students and hundreds of administrative or support staff. Attached as **Exhibit 10** is a document containing true and correct copies of screengrabs of the webpage, *District Summary: Escondido Union*, published by Ed-Data, and referenced *supra*, at n.3.

136.    The reason why the policies do not bind non-certificated staff such as office administration or support staff ("classified staff"), substitute teachers, or other students is for the simple reason that they have not been made aware of the policies.

///

137.   ***First***, the February 3, 2022 presentation was only given to teachers—not support staff. Following the presentation, several teachers submitted questions to EUSD through the "Questions Parking Lot" portal. The teachers asked when office staff would be made aware of the requirements, but EUSD equivocated. A true and correct copy of that Q&A document is attached as **Exhibit 11**. (*See* Ex. 11, p.6.)

138.   On April 7, 2022, EUSD finally did respond. On that date, EUSD Director of Integrated Student Services Trent Smith sent out an email confirming that support staff would not be given the training—nor would parents or guardians be informed of it. A true and correct copy of the email is below and attached as **Exhibit 12**.



Trent Smith < ██████ @eusd.org>                                    Thu, Apr 7, 2022 at 8:05 PM

██████████

There is no plan for all classified to have to view it at this time. There have been conversations about using the training as part of mandated trainings at the start of each year. At this time, parents/guardians will not receive it. But that is possible in the future.

*Trent Smith*
*Director*
*Integrated Student Supports*
████████ *Telephone*
████████ *Fax*

139.   Further, in practice, Mrs. Mirabelli and Mrs. West have noticed that the office administration uses students' legal names on forms such as an "Office Pass." When students receive GPA award certificates, their legal names are also used. And when the library provides a notice of overdue books, legal names are used. Presumably this is because the student's name is not changed in any official record, *lest parents inadvertently discover it*, and so office staff generally do not know if a student is transgender or gender diverse and entitled to specific rights. (Photos of these office passes, GPA awards, and overdue notices with legal names can be submitted under seal to protect students' privacy.)

140.   ***Second***, during her presentation, Ms. Schmidt explained that there would be no way for substitute teachers to know of students' preferred names or

pronouns, and so they could not be bound by the policies. (Ex. 4, p.11:23-12:1.)

141.    This was confirmed in a real-world situation in one of Mrs. Mirabelli's classes that was reported to her. In March 2023, a guest teacher was handling Mrs. Mirabelli's classes due to her absence. During Period 7, one transgender student (female-to-male) received a call slip to go home early. That call slip had the student's legal name and the guest teacher read it in front of the class. Many students then immediately erupted in anger at the guest teacher, yelling: "That is not *his* name— it's [redacted]." The guest teacher was very shaken by the reaction and quickly apologized, saying that she did not know their preferred names. Apparently, some students then reported the uproar to the administrative office and the guest teacher received a call from an assistant principal seeking an explanation.

142.    ***Third***, students have not been given a similar training to the February 3, 2022 presentation for teachers. This issue arose in a Del Dios Academy Middle School Q&A forum following the training. During that Q&A session, teachers asked whether students would be apprised of this policy, but received no response. A true and correct copy of a certified transcript of that Q&A session is attached as **Exhibit 13**. (*See* Ex. 13, pp.1:27-2:20.)

143.    Thus, even if classified staff and students are technically bound by EUSD's gender identity policies, because it does not exist in writing anywhere on the EUSD website, and classified staff and students have never been informed of them, EUSD has created *de facto* exemptions for all of them. There is no way for classified staff and students to comply if they do not know about the policies, and no fair way to discipline them for failing to comply if they do not know about the policies.

144.    In addition to these practical limitations, EUSD's policies define "revealing a student's transgender status or gender diverse status to individuals who do not have a legitimate need for the information without the student's consent, and this includes parents or caretakers," as "*harassment* of our gender diverse students." (Ex. 4, pp.6:25-26, 7:15-17 (emphasis added).)

145.   Because the policies are defined as "harassment," whenever a EUSD official investigates whether a violation has occurred, they have to individually determine whether the conduct was *harassing*. Definitionally, "harassment" is "a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no *legitimate* purpose." Cal. Code Civ. Proc. § 527.6(b)(3) (emphasis added); *accord* 18 U.S.C. § 1514.

146.   "Legitimate" means "conforming to recognized principles or *accepted rules and standards*." 2 WEBSTER'S THIRD NEW INT'L DICTIONARY UNABRIDGED 1291 (1976) (emphasis added). It also means "[h]aving the sanction of law or custom; *authorized*; lawful; also, *genuine*." 1 FRANK & WAGNALLS NEW PRACTICAL STANDARD DICTIONARY 764 (1946) (emphasis added).

147.   In other words, the policies invite EUSD officials to decide which reasons for not complying with the policy are worthy of solicitude. For example, it will not be considered a violation of a student's privacy rights if the teacher believed that individuals "have a legitimate need for the information" (Ex. 4, p.7:16), for example, because "disclosure is necessary to preserve the student's physical or mental well-being." (Ex. 3, p.6.) The policies also state that they do not cover unintentional violations, such as "inadvertent slips or honest mistakes." (Ex. 4, p.5:24-26.)

148.   The loose nature of EUSD's policies was summarized by Ms. Schmidt at the conclusion of her presentation. She explained that EUSD's inability to perfectly adhere to its policies needed to be explained to students:

> We also have an opportunity to really talk about the aspect of what does it mean when parents or caretakers may not be involved in the process, might not be aware of this plan that we're putting together at school? So we share with them [the students], you know, a, a teacher may be regularly referring to you as your preferred name and if your parent doesn't know, there is a chance that your parent will hear this name and, and will want to know what's, what's happening. And it's not that they've provided your private status; it's just because of the fact that

that's the name that's been the most common here at school.

(Ex. 4, p.11:16-23.)

## IV.  EUSD's Gender Identity Policies Go Into Effect

### A.  *The New Regulations Conflict with Longstanding Board Policies*

149.   Mrs. Mirabelli and Mrs. West attended the February 3, 2022 staff meeting, at which EUSD's presentation, "Rights of Gender Diverse Students," outlined EUSD's new regulations. As stated above, they viewed many of the issues discussed during that presentation as praiseworthy, including specifically the insistence on preventing transgender or gender diverse students from being bullied or harassed.

150.   But Mrs. Mirabelli and Mrs. West were particularly distressed by the requirements to deceive parents (*i.e.*, the "Parental Exclusion Policies"), which were woven throughout all of the gender identity policies and violated their sincerely held religious and moral beliefs. The Parental Exclusion Policies also appeared to directly contradict other policies regarding parents' rights, including BP 4119.21 and BP 0100.

151.   BP 4119.21, subd. (9), states that "[b]eing dishonest with students, parents/guardians, staff, or members of the public, including, but not limited to, falsifying information in employment records or other school records" is "[i]nappropriate employee conduct." BP 0100, subd. (7), states that "[p]arents/guardians have a right and an obligation to be engaged in their child's education and to be involved in the intellectual, physical, emotional, and social development and well-being of their child." A true and correct copy of both of those policies are attached as **Exhibits 14 and 15**.

152.   Accordingly, that same day, Mrs. Mirabelli (and two other teachers) used EUSD's "Parking Lot" portal to lodge questions with the EUSD Administration regarding its enforcement of the Parental Exclusion Policies. In particular, Mrs. Mirabelli asked whether "the EUSD video presentation 'The Rights of Gender Diverse Individuals' [will] be available for review by staff and other EUSD community

1  members" and whether parents would be informed of the Parental Exclusion Policies.
2  (*See* Ex. 11, pp.4-6.)

3  153.  EUSD demurred with an inconclusive answer, stating that "The 'Rights
4  of Gender Diverse Individuals' presentation was viewed by all EUSD staff in
5  attendance at yesterday's staff meetings at all school sites. Direction regarding how
6  other EUSD staff members (e.g. Classified Staff) will be made aware of this
7  presentation content will be sought by the Rincon Admin Team. Additionally, the
8  question will be asked by the Rincon Admin Team whether other EUSD stakeholders
9  (e.g. Parents/Guardians) will have the content of the presentation shared with them
10  in some format (how and when?)." (*See* Ex. 11, p.6.)

11  154.  EUSD's prohibition on teachers frankly discussing issues of gender
12  identity with parents also conflicts with other written policies. EUSD policy BP 6144
13  provides that "[t]here should be serious consideration of controversial issues on
14  public problems in our public schools since respect for facts and an impartial search
15  for truth are inherent in our American democratic society." To further expound upon
16  this, AR 6144 states that, with respect to "any public problem which society, or
17  segment thereof, is in the process of debating and for which more than one solution
18  may be offered and supported by individuals or any group of individuals"—any issue
19  for which "controversy exists or may exist"—"the teacher has the obligation and the
20  right to provide for dispassionate, impartial, and objective study" and "the right to
21  express his/her own opinion." A true and correct copy of BP 6144 and AR 6144 are
22  attached as **Exhibit 16.**

23  155.  EUSD's form contract with certificated staff—which applies to both
24  Mrs. Mirabelli and Mrs. West—also states: "The exercise of the right to free speech
25  shall not be a subject for evaluation except as it may affect the employee in the
26  performance of his/her assigned functions. The evaluation process recognizes that
27  academic freedom is essential to the fulfillment of the purpose of the District and it
28  acknowledges the fundamental need to protect employees from censorship or

restraint, which might interfere with their obligation to pursue truth in the performance of their job role in the District." A true and correct copy of the relevant portions of that contract is attached as **Exhibit 17**. (*See* Ex. 17, art. XIV, § E.2.)

156.   Under these policies, various Rincon Middle School teachers have felt perfectly free to display on their doors and windows pro-LGBT political messaging, with the band teacher even passing out pride flags to students. Students identified the pride flags passed out by the band teacher as the traditional pride flag, the transgender pride flag, and the asexual pride flag. Gender identity is undoubtedly a topic covered by these policies. A true and correct copy of photographs taken of these expressions of political and philosophical views is attached as **Exhibit 18**.[33]

### B.    *EUSD Pressures Plaintiffs to Comply*

157.   On April 1, 2022, EUSD sent Mrs. Mirabelli and Mrs. West its first written direction to comply with the new Parental Exclusion Policies. On that day, Rincon Middle School Social Worker Ida Batiste sent various Rincon Middle School teachers an email informing them that a biologically female, gender diverse seventh grade student would continue to use a traditionally female name, but had identified preferred male and nonbinary pronouns ("he/they"). The email then stated in bold: "**Only use she/her pronouns for school-home communications**," because "Student said 'If mom asks about it first, you can tell her … **but do not tell anyone else in the family in any circumstance**.'" A true and correct copy of that email is attached as **Exhibit 21**.

---

[33] Another EUSD policy, BP 6142.3, states that "[w]henever civic education includes topics that may be controversial due to political beliefs or other influences, instruction shall be presented in a balanced manner that does not promote any particular viewpoint." A true and correct copy of BP 6142.3 is attached as **Exhibit 19**. And these academic freedom policies also apply to students through BP 5145.2 (and AR 5145.2), which states that "[t]he Board of Education believes that free inquiry and exchange of ideas are essential parts of a democratic education." A true and correct copy of BP 5145.2 and AR 5145.2 is attached as **Exhibit 20**.

158.   The student referenced in Ms. Batiste's email was not in Mrs. Mirabelli's class, so the instruction did not directly affect her. Nevertheless, the instruction to deceive the child's family was concerning to Mrs. Mirabelli. Mrs. West did not have any transgender or gender diverse students in her classes during the Spring 2022 semester.

159.   The following Fall, however, both Mrs. Mirabelli and Mrs. West began to routinely encounter situations that implicated EUSD's Parental Exclusion Policies. Mrs. Mirabelli had five transgender or gender diverse students in her various English classes. Mrs. West had one transgender or gender diverse student in a P.E. class and two students in her after-school Cardio & Weights Class. Mrs. West also oversees the girls locker room all day, interacting with every female at Rincon Middle School.

160.   To begin, on August 9, 2022, a gender diverse student (female-to-nonbinary/ male) approached Mrs. Mirabelli and requested to be referred to using a traditionally male name, nonbinary "they/them" pronouns, and to withhold this information from the student's parents.

161.   The next day, on August 10, 2022, Mrs. Mirabelli received an email from Rincon Middle School Counselor Gloria Torres instructing her to use a name for another transgender child (female-to-male) (hereafter "Child A") that did not match the name listed on Mrs. Mirabelli's roster and to use "he/him" pronouns that did not reflect the student's biological sex.

162.   The email further instructed Mrs. Mirabelli to deceive the student's father by using the student's biological name and "she/her" pronouns when communicating with him. Ms. Torres' email stated that "**Mom is aware of preferred name/pronouns but dad is not**, but student is okay with you using [legal name] with both parents to make it as easy for you as possible when communicating home." A true and correct copy of that email is attached as **Exhibit 22.**

163.   On August 12 and 15, 2022, Mrs. Mirabelli received emails from Rincon Middle School Counselor Torres with a list of seven additional transgender or gender

diverse students and their specific instructions. For six of the seven students, Mrs. Mirabelli was required to deceive parents.

164. A true and correct copy of that email chain is attached as **Exhibit 23**, and an image is below:



Gloria Torres <███@eusd.org>                                    Mon, Aug 15, 2022 at 2:40 PM
To: ███

Cc: ███

Hi All,

Here is a full list with one addition highlighted below.

I have also added a few updates to our team doc based on the meetings I had with students. View the doc here.

██████ ): Preferred name is ███ (pronouns are he/it). The parents are **NOT** aware so please use ███ and she/her when calling home.

██████ ): Preferred name is ████ (pronouns are he/him). Mom is aware but dad is **NOT** aware, but student is okay with you using ███ (she/her) with both parents to make it as easy for you as possible when communicating home.

██████ ): Preferred name is ███ (pronouns are they/them). Parents are **NOT** aware so please use ███ and she/her when calling home.

██████ ): Preferred name is ███ (pronouns are he/him). Adults at home **NOT** aware, please use ███ and she/her when calling home.

██████ ): Preferred name is ███ (pronouns are they/she). Mom is **NOT** aware so please use ███ and she/her when calling home.

██████ ): Preferred name is ███ (pronouns are he/him). Dad and stepmom are **NOT** aware, please use ███ and she/her when calling home.

██████ ): Preferred name is ███ (pronouns they/them). Mom IS aware and supportive :)

165. Not all of these students are in Mrs. Mirabelli's or Mrs. West's classes. And both Mrs. Mirabelli and Mrs. West have additional transgender or gender diverse students who are not on the above list.

166. Since the school year began, students have also sometimes flip-flopped. In the email instructions dated August 10, 12, and 15, Child A requested male "he/him" pronouns through Counselor Torres. But then on August 16, Child A verbally requested partially nonbinary "he/they" pronouns. Later, during a parent-teacher conference, life-long family friends of Child A—who knew of the child's transgender identity—repeatedly referred to the student by the student's legal and

female name, leaving Mrs. Mirabelli at a loss as to how to refer to the student.

### C.  *The Policies Prove Unworkable*

167.   In practice, compliance with EUSD's gender identity policies has been extremely difficult and has led to frustrating situations. As noted above, *all* of the transgender or gender diverse students are biologically female. Many continue to wear makeup and dresses to school despite identifying as either nonbinary or male. This has led to missteps by various students who use female pronouns and are then shouted down with statements such as "No, it's they/their!" or "She is actually a he!"

168.   The situation with Child A has been particularly confusing and distressing. As stated above, on August 10, 2022, Mrs. Mirabelli was instructed by a school counselor to use: (1) "he/him" pronouns for the student and a preferred male name during school; (2) "he/him" pronouns and the legal name when speaking with the mother; and (3) "she/her" pronouns and the legal name when speaking with the father. Just one week later, on August 16, 2022, Child A changed the preferred pronouns from "he/him" to "he/they." Then, in November, another gender diverse student who is best friends with Child A—Child B (pronouns "they/them")— referred to Child A as "she."

169.   Later, in January 2023, Mrs. Mirabelli was informed that Rincon Middle School's online database, "PowerSchool," would be updated to reflect Child A's preferred male name—instead of the legal name. Then, in February 2023, Mrs. Mirabelli had to call the parents of Child A multiple times due to behavior problems (leaving class without permission, failing to follow directions). During these calls, it became clear that, since August 2022, the father had become aware of Child A's transgender identification. However, both parents repeatedly referred to their child as a girl—instead of a transgender boy—using Child A's legal name and female pronouns.

170.   The parents expressed their disapproval of their child's transgender identity, disapproval of the social transitioning, and disapproval of the change of the child's name in "PowerSchool" (they had been informed of the decision, but their

consent was not requested). Like any parent, they were primarily concerned with their child's well-being and were going along with the school's instructions out of concern for their child's happiness, but were generally unhappy with the situation.

171. Similarly, in March 2023, Mrs. Mirabelli had a meeting to prepare an IEP ("Individual Education Plan") with the parents of Child B and many Rincon Middle School staff. (An assistant principal, a school counselor, a social worker, a math teacher, and Mrs. Mirabelli).

172. As stated above, Child B and Child A are life-long best friends and have been for many years. It was clear that the parents knew that both Child B and Child A identified as transgender or gender diverse. During the meeting, the parents of Child B referred multiple times to both children using "she/her" pronouns and their legal names. During the meeting, the Rincon Middle School staff went along with this and used the same names and pronouns as the parents. But after the parents left, the staff immediately transitioned back to the students' preferred names and preferred pronouns.

173. In both of these situations, it was unclear how Mrs. Mirabelli should refer to the students. Since the parents knew of the children's transgender or gender diverse identification, staff should have insisted on using preferred names and pronouns, and it was unclear why they did not. However, it appeared that using biological pronouns and legal names may have been a continuation of the deception.

174. Throughout this time, both Mrs. Mirabelli and Mrs. West have experienced anxiety and panic episodes, insomnia, and stomach pain due to the stress of attempting to navigate EUSD's gender identity policies while also adhering to their religious beliefs. During the Fall 2022 semester, Mrs. Mirabelli had to take 17 sick days due to her extreme stress.

175. With respect to the Parental Exclusion Policies, both Mrs. Mirabelli and Mrs. West are currently in compliance. They have not raised any student's transgender or gender diverse identification with parents. When, as above, a parent

clearly knows about their child's transgender or gender diverse identity but refers to them using a legal name and biological pronouns, Mrs. Mirabelli and Mrs. West have continued to steer clear of the topic as best they can.

176.    But this creates immense anxiety and stress for them. As teachers caring for children, they believe they have a very specific relationship with parents. They believe they have a religious and moral duty to provide parents with all information that is needed to properly care for and raise their children. They also believe that parents would expect that all such information would be shared and would feel betrayed if their child's gender identity was specifically withheld.

## V.    RAMP UP TO THE LITIGATION

### A.    *Plaintiffs Request a Religious Accommodation*

177.    Despite Mrs. Mirabelli's efforts to reconcile complying with EUSD's gender identity policies with the requirements of her faith, she was verbally admonished by Counselor Torres for her failure to comply with them to Counselor Torres' satisfaction. Therefore, in light of the burgeoning situation, Mrs. Mirabelli and Mrs. West separately submitted formal requests for religious accommodations on October 11, 2022.

178.    Mrs. Mirabelli objected to EUSD's gender identity policies on the grounds that they violate her Roman Catholic faith. She informed EUSD that she "sincerely hold[s] the religious belief that God designed the human race male and female, each with a distinct and innate masculine and feminine nature…. [I]n order for me, as a Catholic, to live in accordance with my duty to God, I am prevented from directly participating in anything contrary to my Faith."

179.    She also identified "[t]he parent-child relationship [as being] ordained by God" and asserted that "parents have the ultimate right and responsibility to care for and guide their children…. To cooperate with a policy which prevents a parent from knowing their child's gender identity status, and services being provided to the child, is a violation of my deeply held religious beliefs, ethics, and moral standards."

180.   She further explained that, "in order for me, as a Catholic, to live in accordance with my duty to God, I am prevented from directly participating in anything contrary to my faith." This involves both "bearing of false witness" regarding gender and sex, and interfering with the parent-child relationship that was "ordained by God" "as an inherently sacred and life-long bond."

181.   Mrs. Mirabelli specifically identified her request for accommodation as seeking an exemption from *only* the preferred names and pronouns policy and the Parental Exclusion Policies because "I support efforts to ensure that all students are treated with kindness, respect, and are not harassed, bullied, or discriminated against." Her request ended with options for accommodation, including using "surnames" when referring to transgender or gender diverse students.

182.   Mrs. West's request for accommodation was based on similar grounds and relied, as a basis, on her Christian faith, including her "religious belief that God created 2 sexes: male and female" and her "religious belief that the relationship between parents and children was created by God with the intent for the parents to raise and guide their children."

183.   Mrs. West also fully supported EUSD's "efforts to ensure that transgender students are treated kindly, with respect, and are not discriminated against or gossiped about." But, she concluded, "[m]y religious beliefs preclude me from participating in any student's transgender identity."

184.   Like Mrs. Mirabelli, Mrs. West did not object to the entirety of EUSD's policy, but was only seeking a religious accommodation as to the preferred names and pronouns policy and the Parental Exclusion Policies.

185.   As stated above, Mrs. Mirabelli's and Mrs. West's religious beliefs are supported by guidance documents issued by various Catholic and Christian leaders. Those documents are referenced above in footnotes 27-28 and attached hereto as **Exhibits 24 and 25.**

///

**B.     *EUSD Engages in the Religious Accommodation Process***

186.   On November 15, 2022, EUSD held separate religious accommodation meetings with Mrs. Mirabelli and Mrs. West. Present at the meetings were EUSD Assistant Superintendent of Human Resources John Albert, EUSD Director of Integrated Student Services Trent Smith, Rincon Middle School Principal Steve White, outside mediator Dr. Debra Dupree, and outside counsel Daniel Shinoff.

187.   Neither meeting resulted in a definitive decision as to whether to grant the accommodation or not. Nevertheless, during the meeting Attorney Shinoff and Dr. Dupree suggested that EUSD's gender identity policies may be required by California or federal law. However, they could provide no statutory or case law citation in support. Instead, they referenced only two federal guidance documents, neither of which addressed the issues at all and both of which had been formally revoked regardless.

188.   As stated above, through this process EUSD ultimately acceded that Mrs. Mirabelli and Mrs. West could continue their practice of strict neutrality. They would refer to all students using their last names and without using gendered pronouns. As stated above, requiring them to affirmatively endorse a student's transgender or gender diverse identity would violate the Free Speech clause of the First Amendment. The only issue that remained was how to address EUSD's Parental Exclusion Policies.

189.   For California law, EUSD could identify only one document in support of its suggestion that *any* of its gender identity policies may be necessary. That document was a Frequently Asked Questions (FAQ) page from the website of the California Department of Education, interpreting Cal. Educ. Code § 221.5(f) and Cal. Const., art. 1, § 1. This type of FAQ page is not a formal agency interpretation subject to any judicial deference. *See Am. Nurses Assn. v. Torlakson*, 57 Cal. 4th 570, 588 (2013). A true and correct copy of the FAQ page is attached as **Exhibit 26**.

190.   Cal. Educ. Code § 221.5(f) concerns solely bathrooms and sports teams. It states: "A pupil shall be permitted to participate in sex-segregated school programs and activities, including athletic teams and competitions, and use facilities consistent

with his or her gender identity, irrespective of the gender listed on the pupil's records." Although the statute concerns "gender identity" broadly, it only concerns transgender students and not gender diverse students, because there are no nonbinary or agender athletic teams. It is irrelevant to the issue of deceiving parents.

191.    The provision of the California Constitution referenced on the California Department of Education website solely notes that all Californians have a constitutional right to privacy, without elaborating on its contours. This is the sole basis for the contention that EUSD must or should enact and enforce a policy requiring teachers to deceive parents about a child's gender identity.

192.    California's constitutional privacy clause protects against "the dissemination or misuse of sensitive and confidential information." *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 35 (1994). The claim requires the satisfaction of three elements: (1) the identification of a "legally protected privacy interest;" (2) the existence of a "reasonable expectation of privacy;" and (3) facts showing an invasion of the privacy interest that is "sufficiently serious in [its] nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right." *Id.* at 35-37.

193.    With respect to the first element, minors have legally protected privacy interests in their sexual activity, including their sexual orientation. *People ex rel. Eichenberger v. Stockton Pregnancy Control Med. Clinic, Inc.*, 203 Cal. App. 3d 225, 242 (1988); *Nguon v. Wolf*, 517 F. Supp. 2d 1177, 1195 (C.D. Cal. 2007).

194.    With respect to the second element, it is conceptually difficult to see how a student would have a reasonable expectation of privacy in their public-facing gender identity and expression. Unlike sexual orientation, gender identity is necessarily public-facing and viewed by all who come into contact with an individual. *See Sipple v. Chron. Publ'g Co.*, 154 Cal. App. 3d 1040, 1047 (1984) (plaintiff had no reasonable expectation of privacy in his sexual orientation because it was already publicly known).
///

195.    But most importantly, with respect to the third element, it is simply not an egregious breach of social norms for schools to speak with parents about their children. Even in the *one* non-precedential trial court order where the court found that a high school student had a cognizable privacy interest in preventing her parents from learning about her sexual orientation (first element), there could be no constitutional violation because the school was complying with statutory mandates to disclose information to parents (third element). *See Nguon*, 517 F. Supp. 2d at 1196; *cf. also Wyatt v. Fletcher*, 718 F.3d 496, 505 (5th Cir. 2013).

196.    As applied here, Cal. Educ. Code § 51101(a) unambiguously states that "the parents and guardians of pupils enrolled in public schools have the right and should have the opportunity, as mutually supportive and respectful partners in the education of their children within the public schools, to be informed by the school, and to participate in the education of their children."

197.    This includes (1) the right "[t]o be informed of their child's progress in school," (2) the right "[t]o have access to the school records of their child," (3) the right "[t]o be informed in advance about school rules," (4) the right "[t]o receive information about any psychological testing the school does involving their child and to deny permission to give the test," and (5) the right "[t]o question anything in their child's record that the parent feels is inaccurate or misleading." *Id*. at subd. (a)(9), (10), (12), (13), (15).

198.    The FAQ page thus inferred (without basis) that transgender and gender diverse students have a constitutional privacy right to prevent their parents from learning of their gender identity.[34]

---

[34] As tenuous support for its privacy contentions, the FAQ page also listed provisions which provide that a student's gender identity should not be revealed through a Public Records Act and the federal Family Educational Rights and Privacy Act (FERPA). Neither are relevant to withholding information from a child's parents. In fact, FERPA commands the exact opposite. *See Ricard v. USD 475 Geary County, KS School*

199.   At the end of the religious accommodation meeting, Mediator Dupree stated that she would email a memorandum detailing what occurred within 3-5 days, no later than November 23, 2022. When this failed to occur, employment counsel for Mrs. Mirabelli and Mrs. West repeatedly followed up with Attorney Shinoff and Dr. Dupree. Those summary memoranda were then emailed to Mrs. Mirabelli on January 19, 2023 and Mrs. West on January 26, 2023.

200.   The memoranda were titled "The Interactive Process Meeting (TIPM) Accommodation Assessment Summary" memoranda. They contained Mrs. Mirabelli's and Mrs. West's religious accommodation request letters as attachments. True and correct copies of the summary memoranda sent to Mrs. Mirabelli and Mrs. West are attached as **Exhibits 27 and 28.**

201.   In those TIPM memoranda, EUSD checked the box to conclude that accommodating Mrs. Mirabelli and Mrs. West would create an undue hardship because of its unfounded fear that state or federal law required its gender identity policies: "The nature of [Mrs. Mirabelli's and Mrs. West's] request for exemptions also generate the potential for discrimination and lack of compliance under the various laws described earlier in this IPM Summary." (Ex. 27, p.4; Ex. 28, p.4.) But, EUSD noted, none of the exemptions that Mrs. Mirabelli and Mrs. West sought would mean that they would be "unable to perform essential functions." (Ex. 27, p.4; Ex. 28, p.4 (box not checked).)

202.   Further, for both Mrs. Mirabelli and Mrs. West, EUSD admitted in the TIPM memoranda that it did not contest the sincerity of their religious beliefs. (Ex. 27, p.3; Ex. 28, p.3 ("It was emphasized that the nature of her beliefs is not in question per the First Amendment.").)

203.   In Attorney Shinoff's cover email, he had requested a follow-up religious accommodation meeting. Thus, on January 30, Assistant Superintendent Albert

*Board*, No. 5:22-cv-4015, 2022 WL 1471372, *7 (D. Kan. May 9, 2022) (in addressing similar policy, noting that FERPA requires that parents have access to all school records about their children).

scheduled the two follow-up accommodation meetings to occur on February 16, 2023, "to discuss specific accommodations that will be approved." It appeared that during the intervening months, EUSD had identified specific accommodations that it could and would approve, if acceptable to Mrs. Mirabelli and Mrs. West.

204. During the follow-up religious accommodation meeting, Dr. Albert handed a memorandum to employment counsel for Mrs. Mirabelli and Mrs. West explaining EUSD's accommodation. (*See* Ex. 7.) Although that memorandum is dated February 8, 2023, it was not provided to them until the February 16, 2023 meeting.

205. At Mrs. Mirabelli's meeting, EUSD only asked whether she would comply with the accommodation and did not entertain any discussion or questions. Because EUSD was not accepting questions or discussion, there was no need to hold Mrs. West's religious accommodation meeting scheduled for that same day, and her employment counsel cancelled it.

206. After receiving the memorandum, Mrs. Mirabelli and Mrs. West had to take some time to consider it and the practical issues it might raise. After realizing that some aspects of it might be impractical, on March 1, 2023, counsel for Mrs. Mirabelli and Mrs. West sent a letter to EUSD with questions about how they should respond if certain discrete, but highly likely situations were to arise. (*See* Ex. 8.) On March 10, 2023, Attorney Shinoff responded for EUSD, addressing the specific questions with specific answers. (*See* Ex. 9.)[35]

207. As stated above, EUSD acknowledged that Mrs. Mirabelli and Mrs. West could comply with the preferred names and pronouns policy by referring to transgender or gender diverse students using their last names and without using any pronouns. (Ex. 7, p.2; Ex. 9, p.2.) Presently, both Mrs. Mirabelli and Mrs. West are in compliance

---

[35] The March 10, 2023 letter from counsel for EUSD to employment counsel for Plaintiffs is branded with the label "Confidential Attorney-Client Communication." However, there was no attorney-client relationship between Mr. Shinoff and Plaintiffs and, even if there were, the privilege would be Plaintiffs' to waive.

with this accommodation.

208. However, for the Parental Exclusion Policies, EUSD would not budge. Its final position was that "teachers are required to follow the 'privacy' policy that requires them to not share a student's gender identity status with their parent or guardian without the student's permission." (Ex. 7, p.2.) Apparently to be consistent, EUSD instructed Mrs. Mirabelli and Mrs. West, that even "when speaking with … the parents of transgender students," they must use "last names only" and no pronouns (Ex. 9, p.1.)

209. But this would naturally inspire questions from parents. Thus, EUSD stated that if a parent directly inquires, or instructs Mrs. Mirabelli and Mrs. West to not use a preferred name or pronouns, they must simply respond that "the inquiry is outside of the scope of the intent of their interaction" and that they can only discuss "information regarding the student's behavior as it relates to school, class rules, assignments, etc." (Ex. 9, pp.2-4.)

210. Even though Mrs. Mirabelli and Mrs. West would not be using a student's preferred name or pronouns, this policy remains problematic. In communicating with parents, the issue is not whether Mrs. Mirabelli and Mrs. West are personally bearing false witness regarding gender identity by using preferred pronouns. That is the issue that arises when they use a transgender or gender diverse student's preferred pronouns or preferred gender-specific name.

211. The issue that arises when speaking with parents is that, as agents of EUSD, they would be directly communicating a different false message. According to EUSD, it has approximately five transgender or gender diverse children assigned to Mrs. Mirabelli's classes and three transgender or gender diverse children assigned to Mrs. West's classes. As an agent of EUSD, when speaking with parents, if Mrs. Mirabelli and Mrs. West refer to these students as "girls" without identifying them as "boys" or "nonbinary children" they would be communicating that EUSD does not believe they are boys or nonbinary—which is not what EUSD believes.

212.   The only way to truthfully communicate with parents is to state, at the outset of any communication, the following: "I am calling about [legal name], who EUSD refers to as [preferred name]." Anything else—whether viewed through the lens of fraudulent concealment or affirmative misrepresentation—is a lie. Mrs. Mirabelli and Mrs. West have no desire to call parents to specifically report a child's gender identity, and will only speak with parents about legitimate school business. But when speaking with parents, they cannot conceal relevant information.

## C.   *Plaintiffs Conclude Litigation is Necessary*

213.   In light of the above, Mrs. Mirabelli and Mrs. West ultimately concluded that litigation was necessary. To ensure that they understood the full contours of EUSD's policies, and possessed all relevant documents, Mrs. Mirabelli and Mrs. West submitted a public records request on September 22, 2022. The public records request sought "ALL RECORDS created by EUSD or otherwise within EUSD's possession or control pertaining to EUSD's policy or policies relating to gender identity." EUSD responded to this first request in October 2022, producing numerous documents.

214.   When Mrs. Mirabelli's and Mrs. West's review of the documents revealed that certain additional ones may exist, they submitted a second public records request on February 2, 2023. EUSD responded that same month, producing a few additional documents and confirming that no additional ones existed. Thus, Mrs. Mirabelli and Mrs. West are confident that they fully understood the entirety of EUSD's policies relating to gender identity. True and correct copies of the parties' public records correspondence is attached as **Exhibits 29, 30, 31, and 32**.

215.   Mrs. Mirabelli and Mrs. West remain committed—in light of their faith— to prevent transgender students from being bullied or harassed. They have no intention to, and will not, harass or tolerate harassment of transgender or gender diverse students. But a requirement that Mrs. Mirabelli and Mrs. West actively deceive parents and hide their child's gender confusion from them, and a strict prohibition against Mrs. Mirabelli and Mrs. West even responding to questions from parents about gender

identity, will never be acceptable.[36]

216.   As stated above, it is clear that EUSD's Parental Exclusion Policy, as documented in AR 5145.3, is *not* required by any provision in California law. Thus, Mrs. Mirabelli and Mrs. West do not contend that any provision of California law—whether in the Education Code or the California Constitution—violates the U.S. Constitution. This lawsuit concerns solely whether EUSD's own Parental Exclusion Policies violate the Constitution.

<div align="center">

### CLAIMS FOR RELIEF

**First Claim for Relief:**

**Violation of Free Speech Clause of First Amendment to U.S. Constitution:**

**Compelled Speech & Viewpoint Discrimination**

**(By Both Plaintiffs Against All Defendants)**

</div>

217.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

218.   The First Amendment to the U.S. Constitution provides that "Congress shall make no law … abridging the freedom of speech[.]" U.S. Const., amend. I. This Free Speech clause applies to the states through the Due Process Clause of the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652, 666 (1925).

219.   A compelled speech claim has three elements. "[A] party must establish (1) speech, (2) that is compelled by governmental action, and (3) to which the speaker objects. [citation]. If the three elements are satisfied, strict scrutiny is triggered." *Dep't of Fair Emp't and Hous. v. Cathy's Creations, Inc.*, No. BCV-18-102633, 2022 WL 18232316, at *13 (Cal. Super. Dec. 27, 2022) (citing *Taking Offense v. State*, 66 Cal. App. 5th 696, 709 (2021)).

220.   With respect to speech, the Supreme Court has "held time and again that freedom of speech 'includes both the right to speak freely and the right to refrain from

---

[36] Plaintiffs Mirabelli and West reserve all rights to challenge the constitutionality of EUSD's other policies relating to gender identity, should doing so prove necessary.

<div align="center">

53

</div>

speaking at all.'" *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018). "Compelling individuals to mouth support for views they find objectionable violates [the First Amendment's] cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Id.*

221.   In the public-school setting, teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

222.   The public conversation about gender identity is a matter of public concern. *See Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 723 (9th Cir. 2022) (school district's cancelling of field trips based on farm owner's tweets about gender identity issues was retaliation for speaking on a matter of public concern).

223.   When Plaintiffs discuss matters of public concern, because they are school teachers, everything they discuss is protected by the First Amendment. *Demers v. Austin*, 746 F.3d 402, 411-13 (9th Cir. 2014) (*Garcetti* "does not—indeed, consistent with the First Amendment, cannot—apply to teaching and academic writing that are performed 'pursuant to the official duties' of a teacher and professor," "whether the school in question is a public high school or a university"); (Ex. 17, Employment Contract (ensuring Plaintiffs' "academic freedom" rights).)

224.   Plaintiffs' official duties do not include speech intended to deceive parents about their child's gender identity, nor is such speech curricular speech. (*See* Exs. 14-15.)

225.   Using specific names and pronouns for students in different contexts (*i.e.*, when addressing students or parents) is neither curricular speech nor part of Plaintiffs' official duties. (*See* Exs. 16-20.)

226.   Refraining from expressing their own views on gender identity, including as applied to specific students, when specifically asked by parents is neither curricular speech nor part of Plaintiffs' official duties.

///

VERIFIED COMPLAINT

227.   EUSD's Parental Exclusion Policies, and their enforcement, compels Plaintiffs' speech by requiring them to use different pronouns and names when referring to the same child depending with whom Plaintiffs are speaking. If Plaintiffs are addressing students or teachers, Plaintiffs must use a preferred pronoun or name that matches the child's gender identity. If Plaintiffs are addressing parents, Plaintiffs must use the child's legal name and biological pronouns.

228.   EUSD's Parental Exclusion Policies, and their enforcement, also gags Plaintiffs' speech by prohibiting them from answering truthfully questions asked by parents about their child's gender identity, whether the child has socially transitioned at school, and Plaintiffs' perception of that child as it relates to the child's gender identity.

229.   Plaintiffs' preferred speech contrary to EUSD's policies has not and will not materially and substantially interfere with efficient operation of a school, or prevent EUSD from efficiently providing services to the public.

230.   EUSD has no compelling interest in "creat[ing] safe and inclusive campuses," and "upholding a positive and diverse culture in our District" (Ex. 4, p.1:11-12) through deceiving parents about their children because "there is a presumption that fit parents act in the best interests of their children." *Troxel v. Granville*, 530 U.S. 57, 68 (2000).

231.   EUSD has no compelling interest in enforcing its Parental Exclusion Policies to comply with California or federal law because its Parental Exclusion Policies are not required by California or federal law.

232.   EUSD has no legitimate, let alone compelling, interest in requiring Plaintiffs or parents to adhere to EUSD's own ideological beliefs on a controversial matter of public debate because a policy "'aim[ed] at the suppression' of views" is flatly prohibited. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019). This "lie[s] beyond the government's power," even when the goal is "[a]s compelling as the interest in preventing discriminatory conduct." *Green v. Miss United States of Am., LLC*, 52

F.4th 773, 784, 792 (9th Cir. 2022).

233.    EUSD has no legitimate, let alone compelling, interest in the Parental Exclusion Policies' blanket requirements compelling Plaintiffs to lie to or deceive parents because doing so violates the Fourteenth Amendment rights of parents. *Ricard v. USD 475 Geary County, KS School Board*, No. 5:22-cv-4015, 2022 WL 1471372, *8 & n.12 (D. Kan. May 9, 2022).

234.    Additionally, EUSD's Parental Exclusion Policies are not narrowly tailored to serve a compelling governmental interest. The Policies are underinclusive because EUSD has omitted thousands of individuals from it, including administrative staff, classified staff, and students. The Policies are overinclusive because they prohibit speech that does not "amount to harassing or discriminatory conduct." *Taking Offense v. State*, 66 Cal. App. 5th 696, 720 (2021).

235.    Nor do EUSD's Parental Exclusion Policies serve a compelling governmental interest that cannot be achieved through means significantly less restrictive of Plaintiffs' free speech rights.

236.    Defendants adopted their policies "under color of state law" within the meaning of Section 1983.

237.    EUSD's Parental Exclusion Policies and its enforcement of those policies violates Plaintiffs' right to free speech as guaranteed by the First Amendment to the United States Constitution. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing the policies.

238.    Pursuant to 42 U.S.C. § 1983, Plaintiffs are entitled to nominal and actual damages, declaratory relief, and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of EUSD's policies.

239.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## Second Claim for Relief:

### Violation of Free Exercise Clause of First Amendment to U.S. Constitution:
### Not Generally Applicable due to Categorical Exemptions
### (By Both Plaintiffs Against All Defendants)

240.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

241.   The First Amendment to the U.S. Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. Const., amend. I. This Free Exercise clause applies to the states through the Due Process Clause of the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296 (1940).

242.   Under the Free Exercise clause, if "challenged restrictions are not 'neutral' and of 'general applicability,' they must satisfy 'strict scrutiny,' and this means that they must be 'narrowly tailored' to serve a 'compelling' state interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020).

243.   "A government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022) (quoting *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021)).

244.   "[G]overnment regulations are not … generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (original emphasis). "It is no answer that a State treats some comparable secular … activities as poorly as or even less favorably than the religious exercise at issue." *Id.*

245.   Here, Plaintiffs' religious faith precludes them from observing the Parental Exclusion Policy. (*See* § II, *supra*.)

246.   The sincerity of Plaintiffs' religious beliefs is undisputed. (*See* Ex. 27, p.3; Ex. 28, p.3.)

247.   Compelling Plaintiffs to observe the Parental Exclusion Policies or leave their employment with EUSD is a substantial burden on Plaintiffs' Free Exercise of Religion.

248.   EUSD's policies are not generally applicable due to their categorical exemptions. As outlined above, the policies apply to approximately 1,000 certificated teachers, but do not apply to more than 115 credentialed administrative staff, 740 classified support staff, or 17,000 students. Each of these exemptions presents similar purported harm to EUSD's claimed interest in creating a safe and inclusive environment for all students as would also exempting Plaintiffs from those policies.

249.   As a result, EUSD's policies are not generally applicable, and EUSD must meet strict scrutiny.

250.   EUSD has no compelling interest in "creat[ing] safe and inclusive campuses," and "upholding a positive and diverse culture in our District" (Ex. 4, p.1:11-12) through deceiving parents about their children because "there is a presumption that fit parents act in the best interests of their children." *Troxel v. Granville*, 530 U.S. 57, 68 (2000).

251.   EUSD has no compelling interest in enforcing its Parental Exclusion Policies to comply with California or federal law because its Parental Exclusion Policies are not required by California or federal law.

252.   EUSD has no legitimate, let alone compelling, interest in requiring Plaintiffs or parents to adhere to EUSD's own ideological beliefs on a controversial matter of public debate because a policy "'aim[ed] at the suppression' of views" is flatly prohibited. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019). This "lie[s] beyond the government's power," even when the goal is "[a]s compelling as the interest in preventing discriminatory conduct." *Green v. Miss United States of Am., LLC*, 52 F.4th 773, 784, 792 (9th Cir. 2022).

253.   EUSD has no legitimate, let alone compelling, interest in the Parental Exclusion Policies' blanket requirements compelling Plaintiffs to lie to or deceive parents because doing so violates the Fourteenth Amendment rights of parents. *Ricard v. USD 475 Geary County, KS School Board*, No. 5:22-cv-4015, 2022 WL 1471372, *8 & n.12 (D. Kan. May 9, 2022).

254.   Additionally, EUSD's Parental Exclusion Policies are not narrowly tailored to serve a compelling governmental interest. The Policies are underinclusive because EUSD has omitted thousands of individuals from it, including administrative staff, classified staff, and students. The Policies are overinclusive because they prohibit speech even if the speech is not actually "harassing or discriminatory." *Taking Offense v. State*, 66 Cal. App. 5th 696, 720 (2021).

255.   Nor do EUSD's Parental Exclusion Policies serve a compelling governmental interest that cannot be achieved through means significantly less restrictive of Plaintiffs' free exercise rights.

256.   EUSD's Parental Exclusion Policies and its enforcement of those policies violates Plaintiffs' right to free exercise of religion as guaranteed by the First Amendment to the United States Constitution. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from implementing and enforcing EUSD's policies.

257.   Pursuant to 42 U.S.C. § 1983, Plaintiffs are entitled to nominal and actual damages, declaratory relief, and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of EUSD's policies.

258.   Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

///

///

///

### Third Claim for Relief:

**Violation of Free Exercise Clause of First Amendment to U.S. Constitution: Not Generally Applicable due to Discretionary Exemptions (By Both Plaintiffs Against All Defendants)**

259. Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

260. As stated in the immediately preceding paragraphs of the Second Claim for Relief, Plaintiffs' exercise of their sincerely held religious beliefs regarding gender and sex are being unconstitutionally burdened by EUSD's policies.

261. Under the Free Exercise clause, if "challenged restrictions are not 'neutral' and of 'general applicability,' they must satisfy 'strict scrutiny,' and this means that they must be 'narrowly tailored' to serve a 'compelling' state interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020).

262. Where a policy "incorporates a system of individual exemptions," or "invites the government to decide which reasons for not complying with the policy are worthy of solicitude," strict scrutiny is triggered. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1878-79 (2021) (cleaned up). "The creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given[.]" *Id.* at 1879.

263. Here, Plaintiffs' religious faith precludes them from observing the Parental Exclusion Policies. (*See* § II, *supra*.)

264. The sincerity of Plaintiffs' religious beliefs is undisputed. (*See* Ex. 27, p.3; Ex. 28, p.3.)

265. Compelling Plaintiffs to observe the Parental Exclusion Policies or leave their employment with EUSD is a substantial burden on Plaintiffs' Free Exercise of Religion.

266. EUSD's policies are not generally applicable due to their discretionary exemptions.

267. EUSD has defined in its policies "revealing a student's transgender status or gender diverse status to individuals who do not have a legitimate need for the information without the student's consent, and this includes parents or caretakers," as "*harassment* of our gender diverse students." (Ex. 4, pp.6:25-26, 7:15-17 (emphasis added).)

268. "Harassment" is "a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no *legitimate* purpose." Cal. Code Civ. Proc. § 527.6(b)(3) (emphasis added); *accord* 18 U.S.C. § 1514.

269. "Legitimate" means "conforming to recognized principles or *accepted rules and standards.*" 2 WEBSTER'S THIRD NEW INT'L DICTIONARY UNABRIDGED 1291 (1976) (emphasis added). It also means "[h]aving the sanction of law or custom; *authorized*; lawful; also, *genuine.*" 1 FRANK & WAGNALLS NEW PRACTICAL STANDARD DICTIONARY 764 (1946) (emphasis added).

270. Thus, the Parental Exclusion Policies invite EUSD officials to decide which reasons for not complying with them are worthy of solicitude. For example, it will not be considered a violation of a student's privacy rights if the teacher believed that individuals "have a legitimate need for the information" (Ex. 4, p.7:16), such as when "disclosure is necessary to preserve the student's physical or mental well-being." (Ex. 3, p.6.) The policies also state that they do not cover unintentional violations, such as "inadvertent slips or honest mistakes." (Ex. 4, p.5:24-26.)

271. As a result, EUSD's policies are not generally applicable, and EUSD must meet strict scrutiny.

272. EUSD has no compelling interest in "creat[ing] safe and inclusive campuses," and "upholding a positive and diverse culture in our District" (Ex. 4, p.1:11-12) through deceiving parents about their children because "there is a presumption that fit parents act in the best interests of their children." *Troxel v. Granville*, 530 U.S. 57, 68 (2000).

273.   EUSD has no compelling interest in enforcing its Parental Exclusion Policies to comply with California or federal law because its Parental Exclusion Policies are not required by California or federal law.

274.   EUSD has no legitimate, let alone compelling, interest in requiring Plaintiffs or parents to adhere to EUSD's own ideological beliefs on a controversial matter of public debate because a policy "'aim[ed] at the suppression' of views" is flatly prohibited. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019). This "lie[s] beyond the government's power," even when the goal is "[a]s compelling as the interest in preventing discriminatory conduct." *Green v. Miss United States of Am., LLC*, 52 F.4th 773, 784, 792 (9th Cir. 2022).

275.   EUSD has no legitimate, let alone compelling, interest in the Parental Exclusion Policies' blanket requirements compelling Plaintiffs to lie to or deceive parents because doing so violates the Fourteenth Amendment rights of parents. *Ricard v. USD 475 Geary County, KS School Board*, No. 5:22-cv-4015, 2022 WL 1471372, *8 & n.12 (D. Kan. May 9, 2022).

276.   Additionally, EUSD's Parental Exclusion Policies are not narrowly tailored to serve a compelling governmental interest. The Policies are underinclusive because EUSD has omitted thousands of individuals from it, including administrative staff, classified staff, and students. The Policies are overinclusive because they prohibit speech even if the speech is not actually "harassing or discriminatory." *Taking Offense v. State*, 66 Cal. App. 5th 696, 720 (2021).

277.   Nor do EUSD's Parental Exclusion Policies serve a compelling governmental interest that cannot be achieved through means significantly less restrictive of Plaintiffs' free exercise rights.

278.   EUSD's Parental Exclusion Policies and its enforcement of those policies violates Plaintiffs' right to free exercise of religion as guaranteed by the First Amendment to the United States Constitution. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless

Defendants are enjoined from implementing and enforcing EUSD's policies.

279.   Pursuant to 42 U.S.C. § 1983, Plaintiffs are entitled to nominal and actual damages, declaratory relief, and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of EUSD's policies.

280.   Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### Fourth Claim for Relief:

### Declaratory Relief re: The California Department of Education's FAQ Page
### (By Both Plaintiffs Against All Defendants)

281.   Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth herein.

282.   EUSD has claimed that its Parental Exclusion Policies are consistent with and required by both state and federal law, as elaborated upon in the California Department of Education's FAQ page regarding the rights of transgender and gender diverse students.

283.   However, the legal authority cited in the Department of Education's FAQ page to support its conclusions do not support them. As of this date, EUSD has failed to provide any legal authority supporting the conclusions of the FAQ page, and there is none. Yet, EUSD contends it is bound by the Department of Education's conclusions.

284.   Thus, an actual, justiciable controversy has arisen between Plaintiffs and Defendants concerning whether EUSD's Parental Exclusion Policies are legally mandated by California or federal law.

285.   Plaintiffs seek a declaration from this Court that the conclusions of the Department of Education's FAQ page violate the U.S. Constitution such that EUSD is not required to implement and enforce its Parental Exclusion Policies.

///

286.   Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants according to law and according to proof, for the following:

A. An order and judgment declaring that EUSD's Parental Exclusion Policies, and the CDE's FAQ page, facially and as-applied to Plaintiffs, violate the First Amendment to the U.S. Constitution;

B. An order temporarily, preliminarily, and permanently enjoining and prohibiting Defendants from enforcing their unlawful Parental Exclusion Policies against Plaintiffs, and from engaging in any practices or conduct that chills Plaintiffs' free exercise of religion;

C. Nominal and actual damages;

D. Attorneys' fees and costs; and

E. Such other and further relief as the Court deems appropriate and just.

Respectfully Submitted,

LiMANDRI & JONNA LLP

Dated: April 27, 2023          By: _____

Charles S. LiMandri
Paul M. Jonna
Mark D. Myers
Jeffrey M. Trissell
Milan L. Brandon II
*Attorneys for Plaintiffs*
*Elizabeth Mirabelli and Lori Ann West*

1    **VERIFICATION OF ELIZABETH MIRABELLI**

2    I, Elizabeth Mirabelli, am a plaintiff in this action. I have read the above Verified
3    Complaint and know its contents. The information supplied in the foregoing is based
4    on my own personal knowledge or has been supplied by my co-plaintiff, attorneys, or
5    other agents or compiled from available documents. The information in the foregoing
6    document is true to the extent of my personal knowledge. As to the information
7    provided by my co-plaintiff, attorneys, or other agents or compiled from available
8    documents, including all contentions and opinions, I do not have personal knowledge
9    but made a reasonable and good faith effort to obtain the information by inquiry to
10   other natural persons or organizations, and believe it is true.

11   Thus, I am informed and believe that the matters stated in the foregoing
12   document are true and on that ground certify or declare under penalty of perjury
13   under the laws of the United States and the State of California that the foregoing is
14   true and correct.

15   Executed this 27th day of April 2023, at Escondido, California.

16

17   Elizabeth Mirabelli

18

19

20

21

22

23

24

25

26

27

28

65

**VERIFIED COMPLAINT**

**VERIFICATION OF LORI ANN WEST**

I, Lori Ann West, am a plaintiff in this action. I have read the above Verified Complaint and know its contents. The information supplied in the foregoing is based on my own personal knowledge or has been supplied by my co-plaintiff, attorneys, or other agents or compiled from available documents. The information in the foregoing document is true to the extent of my personal knowledge. As to the information provided by my co-plaintiff, attorneys, or other agents or compiled from available documents, including all contentions and opinions, I do not have personal knowledge but made a reasonable and good faith effort to obtain the information by inquiry to other natural persons or organizations, and believe it is true.

Thus, I am informed and believe that the matters stated in the foregoing document are true and on that ground certify or declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this 27th day of April 2023, at Escondido, California.

_Lori A. West_
Lori Ann West

**EXHIBIT 1**

Board Policy Manual
**Escondido Union School District**

**Policy 0410: Nondiscrimination In District Programs And Activities**                    Status: ADOPTED

**Original Adopted Date:** 10/23/2003 | **Last Revised Date:** 06/07/2018 | **Last Reviewed Date:** 06/07/2018

The Board of Education is committed to providing equal opportunity for all individuals in district programs and activities. District programs, activities, and practices shall be free from unlawful discrimination, including discrimination against an individual or group based on race, color, ancestry, nationality, national origin, immigration status, ethnic group identification, ethnicity, age, religion, marital status, pregnancy, parental status, physical or mental disability, sex, sexual orientation, gender, gender identity, gender expression, or genetic information; a perception of one or more of such characteristics; or association with a person or group with one or more of these actual or perceived characteristics.

All individuals shall be treated equitably in the receipt of district and school services. Personally identifiable information collected in the implementation of any district program, including, but not limited to, student and family information for the free and reduced-price lunch program, transportation, or any other educational program, shall be used only for the purposes of the program, except when the superintendent or designee authorizes its use for another purpose in accordance with law. Resources and data collected by the district shall not be used, directly or by others, to compile a list, registry, or database of individuals based on race, gender, sexual orientation, religion, ethnicity, national origin, or immigration status or any other category identified above.

District programs and activities shall be free of any racially derogatory or discriminatory school or athletic team names, mascots, or nicknames.

The superintendent or designee shall review district programs and activities to ensure the removal of any derogatory or discriminatory name, image, practice, or other barrier that may unlawfully prevent an individual or group in any of the protected categories stated above from accessing district programs and activities. He/she shall take prompt, reasonable actions to remove any identified barrier. The superintendent or designee shall report his/her findings and recommendations to the board after each review.

All allegations of unlawful discrimination in district programs and activities shall be investigated and resolved in accordance with the procedures specified in AR 1312.3 - Uniform Complaint Procedures.

Pursuant to 34 CFR 104.8 and 34 CFR 106.9, the superintendent or designee shall notify students, parents/guardians, employees, employee organizations, applicants for admission and employment, and sources of referral for applicants about the district's policy on nondiscrimination and related complaint procedures. Such notification shall be included in the annual parental notification distributed pursuant to Education Code 48980 and, as applicable, in announcements, bulletins, catalogs, handbooks, application forms, or other materials distributed by the district. The notification shall be posted on the district's web site and social media and in district schools and offices, including staff lounges, student government meeting rooms, and other prominent locations as appropriate.

In addition, the annual parental notification shall inform parents/guardians of their children's right to a free public education regardless of immigration status or religious beliefs, including information on educational rights issued by the California Attorney General. Alternatively, such information may be provided through any other cost-effective means determined by the superintendent or designee. (Education Code 234.7)

The district's nondiscrimination policy and related informational materials shall be published in a format that parents/guardians can understand. In addition, when 15 percent or more of a school's students speak a single primary language other than English, those materials shall be translated into that other language.

**Access for Individuals with Disabilities**

District programs and facilities, viewed in their entirety, shall be in compliance with the Americans with Disabilities Act (ADA) and any implementing standards and/or regulations. When structural changes to existing district facilities are needed to provide individuals with disabilities access to programs, services, activities, or facilities, the superintendent or designee shall develop a transition plan that sets forth the steps for completing the changes.

The superintendent or designee shall ensure that the district provides appropriate auxiliary aids and services when necessary to afford individuals with disabilities equal opportunity to participate in or enjoy the benefits of a service, program, or activity. These aids and services may include, but are not limited to, qualified interpreters or readers, assistive listening devices, assistive technologies or other modifications to increase accessibility to district and school web sites, note takers, written materials, taped text, and Braille or large print materials. Individuals with disabilities shall notify the superintendent or principal if they have a disability that requires special assistance or services.

Reasonable notification should be given prior to the school-sponsored function, program, or meeting.

The individual identified in AR 1312.3 - Uniform Complaint Procedures as the employee responsible for coordinating the district's response to complaints and for complying with state and federal civil rights laws is hereby designated as the district's ADA coordinator.

He/she shall receive and address requests for accommodation submitted by individuals with disabilities, and shall investigate and resolve complaints regarding their access to district programs, services, activities, or facilities.

Deputy Superintendent
2310 Aldergrove Avenue
Escondido, CA
(760) 432-2400

**EXHIBIT 2**

Escondido Union ESD | BP 5145.3 Students

**Nondiscrimination/Harassment**

The Board of Education desires to provide a safe school environment that allows all students equal access and opportunities in the district's academic, extracurricular, and other educational support programs, services, and activities. The board prohibits, at any district school or school activity, unlawful discrimination, including discriminatory harassment, intimidation, and bullying, targeted at any student by anyone, based on the student's actual or perceived race, color, ancestry, nationality, national origin, immigration status, ethnic group identification, ethnicity, age, religion, marital status, pregnancy, parental status, physical or mental disability, sex, sexual orientation, gender, gender identity, gender expression, or genetic information, or association with a person or group with one or more of these actual or perceived characteristics.

(cf. 0410 - Nondiscrimination in District Programs and Activities)

(cf. 5131 - Conduct)

(cf. 5131.2 - Bullying)

(cf. 5137 - Positive School Climate)

(cf. 5145.7 - Sexual Harassment)

(cf. 5145.9 - Hate-Motivated Behavior)

(cf. 5146 - Married/Pregnant/Parenting Students)

(cf. 6164.6 - Identification and Education Under Section 504)

This policy shall apply to all acts related to school activity or to school attendance occurring within a district school, and to acts which occur off campus or outside of school-related or school-sponsored activities but which may have an impact or create a hostile environment at school.

Unlawful discrimination, including discriminatory harassment, intimidation, or bullying, may result from physical, verbal, nonverbal, or written conduct based on any of the categories listed above. Unlawful discrimination also includes the creation of a hostile environment through prohibited conduct that is so severe, persistent, or pervasive that it affects a student's ability to participate in or benefit from an educational program or activity; creates an intimidating, threatening, hostile, or offensive educational environment; has the effect of substantially or unreasonably interfering with a student's academic performance; or otherwise adversely affects a student's educational opportunities.

Unlawful discrimination also includes disparate treatment of students based on one of the categories above with respect to the provision of opportunities to participate in school programs or activities or the provision or receipt of educational benefits or services.

The board also prohibits any form of retaliation against any individual who reports or participates in the reporting of unlawful discrimination, files or participates in the filing of a complaint, or investigates or participates in the investigation of a complaint or report alleging unlawful discrimination. Retaliation complaints shall be investigated and resolved in the same manner as a discrimination complaint.

The superintendent or designee shall facilitate students' access to the educational program by publicizing the district's nondiscrimination policy and related complaint procedures to students, parents/guardians, and employees. He/she shall provide training and information on the scope and use of the policy and complaint procedures and take other measures designed to increase the school community's understanding of the requirements of law related to discrimination. The superintendent or designee shall regularly review the

implementation of the district's nondiscrimination policies and practices and, as necessary, shall take action to remove any identified barrier to student access to or participation in the district's educational program. He/she shall report his/her findings and recommendations to the board after each review.

(cf. 1312.3 - Uniform Complaint Procedures)

(cf. 1330 - Use of Facilities)

(cf. 4131 - Staff Development)

(cf. 4231 - Staff Development)

(cf. 4331 - Staff Development)

(cf. 6145 - Extracurricular and Cocurricular Activities)

(cf. 6145.2 - Athletic Competition)

(cf. 6164.2 - Guidance/Counseling Services)

Regardless of whether a complainant complies with the writing, timeline, and/or other formal filing requirements, all complaints alleging unlawful discrimination, including discriminatory harassment, intimidation, or bullying, shall be investigated and prompt action taken to stop the discrimination, prevent recurrence, and address any continuing effect on students.

Students who engage in unlawful discrimination, including discriminatory harassment, intimidation, retaliation, or bullying, in violation of law, board policy, or administrative regulation shall be subject to appropriate consequence or discipline, which may include suspension or expulsion when the behavior is severe or pervasive as defined in Education Code 48900.4. Any employee who permits or engages in prohibited discrimination, including discriminatory harassment, intimidation, retaliation, or bullying, shall be subject to disciplinary action, up to and including dismissal.

(cf. 4118 - Dismissal/Suspension/Disciplinary Action)

(cf. 4119.21/4219.21/4319.21 - Professional Standards)

(cf. 4218 - Dismissal/Suspension/Disciplinary Action)

(cf. 5144 - Discipline)

(cf. 5144.1 - Suspension and Expulsion/Due Process)

(cf. 5144.2 - Suspension and Expulsion/Due Process (Students with Disabilities))

(cf. 5145.2 - Freedom of Speech/Expression)

Record-Keeping

The superintendent or designee shall maintain a record of all reported cases of unlawful discrimination, including discriminatory harassment, intimidation, or bullying, to enable the district to monitor, address, and prevent repetitive prohibited behavior in district schools.

(cf. 3580 - District Records)

Legal Reference:

EDUCATION CODE

200-262.4 Prohibition of discrimination

48900.3 Suspension or expulsion for act of hate violence

48900.4 Suspension or expulsion for threats or harassment

48904 Liability of parent/guardian for willful student misconduct

48907 Student exercise of free expression

48950 Freedom of speech

48985 Translation of notices

49020-49023 Athletic programs

51500 Prohibited instruction or activity

51501 Prohibited means of instruction

60044 Prohibited instructional materials

CIVIL CODE

1714.1 Liability of parents/guardians for willful misconduct of minor

GOVERNMENT CODE

11135 Nondiscrimination in programs or activities funded by state

PENAL CODE

422.55 Definition of hate crime

422.6 Crimes, harassment

CODE OF REGULATIONS, TITLE 5

432 Student record

4600-4670 Uniform complaint procedures

4900-4965 Nondiscrimination in elementary and secondary education programs

UNITED STATES CODE, TITLE 20

1681-1688 Title IX of the Education Amendments of 1972

12101-12213 Title II equal opportunity for individuals with disabilities

UNITED STATES CODE, TITLE 29

794 Section 504 of Rehabilitation Act of 1973

UNITED STATES CODE, TITLE 42

2000d-2000e-17 Title VI and Title VII Civil Rights Act of 1964, as amended

2000h-2-2000h-6 Title IX of the Civil Rights Act of 1964

6101-6107 Age Discrimination Act of 1975

CODE OF FEDERAL REGULATIONS, TITLE 28

35.107 Nondiscrimination on basis of disability; complaints

CODE OF FEDERAL REGULATIONS, TITLE 34

99.31 Disclosure of personally identifiable information

100.3 Prohibition of discrimination on basis of race, color or national origin

104.7 Designation of responsible employee for Section 504

106.8 Designation of responsible employee for Title IX

106.9 Notification of nondiscrimination on basis of sex

110.25 Prohibition of discrimination based on age

COURT DECISIONS

Donovan v. Poway Unified School District, (2008) 167 Cal.App.4th 567

Flores v. Morgan Hill Unified School District, (2003) 324 F.3d 1130

Management Resources:

CSBA PUBLICATIONS

Updated Legal Guidance: Protecting Transgender and Gender Nonconforming Students Against Sex Discrimination, July 2016

CALIFORNIA OFFICE OF THE ATTORNEY GENERAL PUBLICATIONS

Promoting a Safe and Secure Learning Environment for All: Guidance and Model Policies to Assist California's K-12 Schools in Responding to Immigration Issues, April 2018

FIRST AMENDMENT CENTER PUBLICATIONS

Public Schools and Sexual Orientation: A First Amendment Framework for Finding Common Ground, 2006

U.S. DEPARTMENT OF EDUCATION, OFFICE FOR CIVIL RIGHTS PUBLICATIONS

Examples of Policies and Emerging Practices for Supporting Transgender Students, May 2016

Dear Colleague Letter: Title IX Coordinators, April 2015

Dear Colleague Letter: Harassment and Bullying, October 2010

Notice of Non-Discrimination, Fact Sheet, August 2010

WEB SITES

1/31/23, 3:04 PM    Gamut Online School Policy Manual :: Escondido Union Elementary School District :: Organizational Management BP

Case 3:23-cv-00768-BEN-WMG   Document 1   Filed 04/27/23   PageID.75   Page 75 of 288

CSBA: http://www.csba.org

California Department of Education: http://www.cde.ca.gov

California Safe Schools Coalition: http://www.casafeschools.org

California Office of the Attorney General: http://oag.ca.gov

First Amendment Center: http://www.firstamendmentcenter.org

National School Boards Association: http://www.nsba.org

U.S. Department of Education, Office for Civil Rights: http://www.ed.gov/about/offices/list/ocr

Policy ESCONDIDO UNION SCHOOL DISTRICT

revised: October 23, 2003 Escondido, California

revised: August 14, 2014

revised: April 30, 2015

revised: August 24, 2017

revised: June 21, 2018

**EXHIBIT 3**

**Regulation 5145.3:** Nondiscrimination/Harassment                                    **Status:** ADOPTED

**Original Adopted Date:** 08/13/2020 | **Last Reviewed Date:** 03/16/2021

The district designates the individual(s) identified below as the employee(s) responsible for coordinating the district's efforts to comply with applicable state and federal civil rights laws and to answer inquiries regarding the district's nondiscrimination policies. The individual(s) shall also serve as the compliance officer(s) specified in AR 1312.3 - Uniform Complaint Procedures as the responsible employee to handle complaints alleging unlawful discrimination targeting a student, including discriminatory harassment, intimidation, or bullying, based on the student's actual or perceived race, color, ancestry, nationality, national origin, immigration status, ethnic group identification, ethnicity, age, religion, marital status, pregnancy, parental status, physical or mental disability, medical condition, sex, sexual orientation, gender, gender identity, gender expression, genetic information, or any other legally protected status or association with a person or group with one or more of these actual or perceived characteristics. The coordinator/compliance officer(s) may be contacted at: (Education Code 234.1; 5 CCR 4621)

Deputy Superintendent

Human Resources

Escondido Union School District

2310 Aldergrove Avenue

Escondido, CA 92029

760-432-2114

(cf. 1312.1 - Complaints Concerning District Employees)

(cf. 1312.3 - Uniform Complaint Procedures)

(cf. 5145.7 - Sexual Harassment)

(cf. 5145.71 - Title IX Sexual Harassment Complaint Procedures)

Measures to Prevent Discrimination

To prevent unlawful discrimination, including discriminatory harassment, intimidation, retaliation, and bullying, of students at district schools or in school activities and to ensure equal access of all students to the educational program, the superintendent or designee shall implement the following measures:

1. Publicize the district's nondiscrimination policy and related complaint procedures, including the coordinator/compliance officer's contact information, to students, parents/guardians, employees, volunteers, and the general public by posting them in prominent locations and providing easy access to them through district-supported communications

2. Post the district's policies and procedures prohibiting discrimination, harassment, student sexual harassment, intimidation, bullying, and cyberbullying, including a section on social media bullying that includes all of the references described in Education Code 234.6 as possible forums for social media, in a prominent location on the district's web site in a manner that is easily accessible to parents/guardians and students (Education Code 234.6)

(cf. 0410 - Nondiscrimination in District Programs and Activities)

(cf. 1113 - District and School Web Sites)

(cf. 1114 - District-Sponsored Social Media)

(cf. 5131.2 - Bullying)

(cf. 5145.9 - Hate-Motivated Behavior)

3. Post the definition of sex discrimination and harassment as described in Education Code 230, including the rights set forth in Education Code 221.8, in a prominent location on the district's web site in a manner that is easily accessible to parents/guardians and students (Education Code 234.6)

4. Post in a prominent location on the district web site in a manner that is easily accessible to parents/guardians and students information regarding Title IX prohibitions against discrimination based on a student's sex, gender, gender identity, pregnancy, and parental status, including the following: (Education Code 221.6, 221.61, 234.6)

a. The name and contact information of the district's Title IX coordinator, including the phone number and email address

b. The rights of students and the public and the responsibilities of the district under Title IX, including a list of rights as specified in Education Code 221.8 and web links to information about those rights and responsibilities located on the web sites of the Office for Equal Opportunity and the U.S. Department of Education's Office for Civil Rights (OCR)

c. A description of how to file a complaint of noncompliance under Title IX, which shall include:

(1) An explanation of the statute of limitations within which a complaint must be filed after an alleged incident of discrimination has occurred and how a complaint may be filed beyond the statute of limitations

(2) An explanation of how the complaint will be investigated and how the complainant may further pursue the complaint, including web links to this information on the OCR's web site

(3) A web link to the OCR complaints form and the contact information for the office, including the phone number and email address for the office

d. A link to the Title IX information included on the California Department of Education's (CDE) web site

5. Post a link to statewide CDE-compiled resources, including community-based organizations, that provide support to youth who have been subjected to school-based discrimination, harassment, intimidation, or bullying and to their families. Such resources shall be posted in a prominent location on the district's web site in a manner that is easily accessible to parents/guardians and students. (Education Code 234.5, 234.6)

6. Provide to students a handbook that contains age-appropriate information that clearly describes the district's nondiscrimination policy, procedures for filing a complaint, and resources available to students who feel that they have been the victim of any such behavior.

7. Annually notify all students and parents/guardians of the district's nondiscrimination policy, including its responsibility to provide a safe, nondiscriminatory school environment for all students, including transgender and gender-nonconforming students. The notice shall inform all students and parents/guardians that they may request to meet with the compliance officer to determine how best to accommodate or resolve concerns that may arise from the district's implementation of its nondiscrimination policies. The notice shall also inform all students and parents/guardians that, to the extent possible, the district will address any individual student's interests and concerns in private.

(cf. 5145.6 - Parental Notifications)

8. Ensure that students and parents/guardians, including those with limited English proficiency, are notified of how to access the relevant information provided in the district's nondiscrimination policy and related complaint procedures, notices, and forms in a language they can understand.

If 15 percent or more of students enrolled in a particular district school speak a single primary language other than English, the district's policy, regulation, forms, and notices concerning nondiscrimination shall be translated into that language in accordance with Education Code 234.1 and 48985. In all other instances, the district shall ensure meaningful access to all relevant information for parents/guardians with limited English proficiency.

9. Provide to students, employees, volunteers, and parents/guardians age-appropriate training and/or information regarding the district's nondiscrimination policy; what constitutes prohibited discrimination, including discriminatory harassment, intimidation, retaliation, or bullying; how and to whom a report of an incident should be made; and how to guard against segregating or stereotyping students when providing instruction, guidance, supervision, or other services to them. Such training and information shall include details of guidelines the district may use to provide a discrimination-free environment for all district students, including transgender and gender-nonconforming students.

(cf. 1240 - Volunteer Assistance)

(cf. 4131 - Staff Development)

(cf. 4231 - Staff Development)

(cf. 4331 - Staff Development)

10. At the beginning of each school year, inform school employees that any employee who witnesses any act of unlawful discrimination, including discriminatory harassment, intimidation, or bullying, against a student is required to intervene if it is safe to do so. (Education Code 234.1)

(cf. 4112.9/4212.9/4312.9 - Employee Notifications)

11. At the beginning of each school year, inform each principal or designee of the district's responsibility to provide appropriate assistance or resources to protect students from threatened or potentially discriminatory behavior and ensure their privacy rights.

Enforcement of District Policy

The superintendent or designee shall take appropriate actions to reinforce BP 5145.3 - Nondiscrimination/Harassment. As needed, these actions may include any of the following:

1. Removing vulgar or offending graffiti

(cf. 5131.5 - Vandalism and Graffiti)

2. Providing training to students, staff, and parents/guardians about how to recognize unlawful discrimination, how to report it or file a complaint, and how to respond

3. Disseminating and/or summarizing the district's policy and regulation regarding unlawful discrimination

4. Consistent with laws regarding the confidentiality of student and personnel records, communicating to students, parents/guardians, and the community the school's response plan to unlawful discrimination or harassment

(cf. 4112.6/4212.6/4312.6 - Personnel Files)

(cf. 4119.23/4219.23/4319.23 - Unauthorized Release of Confidential/Privileged Information)

(cf. 5125 - Student Records)

5. Taking appropriate disciplinary action against students, employees, and anyone determined to have engaged in wrongdoing in violation of district policy, including any student who is found to have filed a complaint of discrimination that the student knew was not true

(cf. 4118 - Dismissal/Suspension/Disciplinary Action)

(cf. 4218 - Dismissal/Suspension/Disciplinary Action)

(cf. 5144 - Discipline)

(cf. 5144.1 - Suspension and Expulsion/Due Process)

(cf. 5144.2 - Suspension and Expulsion/Due Process (Students with Disabilities))

(cf. 6159.4 - Behavioral Interventions for Special Education Students)

Process for Initiating and Responding to Complaints

Students who feel that they have been subjected to unlawful discrimination described above or in district policy are strongly encouraged to immediately contact the compliance officer, principal, or any other staff member. In addition, students who observe any such incident are strongly encouraged to report the incident to the compliance officer or principal, whether or not the alleged victim files a complaint.

Any school employee who observes an incident of unlawful discrimination, including discriminatory harassment, intimidation, retaliation, or bullying, or to whom such an incident is reported shall report the incident to the compliance officer or principal within a school day, whether or not the alleged victim files a complaint.

Any school employee who witnesses an incident of unlawful discrimination, including discriminatory harassment,

intimidation, retaliation, or bullying, shall immediately intervene to stop the incident when it is safe to do so. (Education Code 234.1)

When a report of unlawful discrimination, including discriminatory harassment, intimidation, retaliation, or bullying, is made to or received by the principal or compliance officer, the principal or compliance officer shall notify the student or parent/guardian of the right to file a formal complaint in accordance with AR 1312.3 - Uniform Complaint Procedures or, for complaints of sexual harassment that meet the federal Title IX definition, AR 5145.71 - Title IX Sexual Harassment Complaint Procedures. Once notified verbally or in writing, the compliance officer shall begin the investigation and shall implement immediate measures necessary to stop the discrimination and ensure that all students have access to the educational program and a safe school environment. Any interim measures adopted to address unlawful discrimination shall, to the extent possible, not disadvantage the complainant or a student who is the victim of the alleged unlawful discrimination.

Any report or complaint alleging unlawful discrimination by the principal, compliance officer, or any other person to whom a report would ordinarily be made or complaint filed shall instead be made to or filed with the superintendent or designee who shall determine how the complaint will be investigated.

(cf. 5141.4 - Child Abuse Prevention and Reporting)

Transgender and Gender-Nonconforming Students

Gender identity of a student means the student's gender-related identity, appearance, or behavior as determined from the student's internal sense, whether or not that gender-related identity, appearance, or behavior is different from that traditionally associated with the student's physiology or assigned sex at birth.

Gender expression means a student's gender-related appearance and behavior, whether stereotypically associated with the student's assigned sex at birth. (Education Code 210.7)

Gender transition refers to the process in which a student changes from living and identifying as the sex assigned to the student at birth to living and identifying as the sex that corresponds to the student's gender identity.

Gender-nonconforming student means a student whose gender expression differs from stereotypical expectations.

Transgender student means a student whose gender identity is different from the gender assigned at birth.

The district prohibits acts of verbal, nonverbal, or physical aggression, intimidation, or hostility that are based on sex, gender identity, or gender expression, or that have the purpose or effect of producing a negative impact on the student's academic performance or of creating an intimidating, hostile, or offensive educational environment, regardless of whether the acts are sexual in nature. Examples of the types of conduct which are prohibited in the district and which may constitute gender-based harassment include, but are not limited to:

1. Refusing to address a student by a name and the pronouns consistent with the student's gender identity

2. Disciplining or disparaging a student or excluding the student from participating in activities, for behavior or appearance that is consistent with the student's gender identity or that does not conform to stereotypical notions of masculinity or femininity, as applicable

3. Blocking a student's entry to the restroom that corresponds to the student's gender identity

4. Taunting a student because the student participates in an athletic activity more typically favored by a student of the other sex

5. Revealing a student's transgender status to individuals who do not have a legitimate need for the information, without the student's consent

6. Using gender-specific slurs

7. Physically assaulting a student motivated by hostility toward the student because of the student's gender, gender identity, or gender expression

The district's uniform complaint procedures (AR 1312.3) or Title IX sexual harassment procedures (AR 5145.71), as applicable, shall be used to report and resolve complaints alleging discrimination against transgender and gender-nonconforming students.

Examples of bases for complaints include, but are not limited to, the above list, as well as improper rejection by the district of a student's asserted gender identity, denial of access to facilities that correspond with a student's gender identity, improper disclosure of a student's transgender status, discriminatory enforcement of a dress code, and other instances of gender-based harassment.

To ensure that transgender and gender-nonconforming students are afforded the same rights, benefits, and protections provided to all students by law and board policy, the district shall address each situation on a case-by-case basis, in accordance with the following guidelines:

1. Right to privacy: A student's transgender or gender-nonconforming status is the student's private information and the district shall only disclose the information to others with the student's prior written consent, except when the disclosure is otherwise required by law or when the district has compelling evidence that disclosure is necessary to preserve the student's physical or mental well-being. In any case, the district shall only allow disclosure of a student's personally identifiable information to employees with a legitimate educational interest as determined by the district pursuant to 34 CFR 99.31. Any district employee to whom a student's transgender or gender-nonconforming status is disclosed shall keep the student's information confidential. When disclosure of a student's gender identity is made to a district employee by a student, the employee shall seek the student's permission to notify the compliance officer. If the student refuses to give permission, the employee shall keep the student's information confidential, unless the employee is required to disclose or report the student's information pursuant to this administrative regulation, and shall inform the student that honoring the student's request may limit the district's ability to meet the student's needs related to the student's status as a transgender or gender-nonconforming student. If the student permits the employee to notify the compliance officer, the employee shall do so within three school days.

As appropriate given the student's need for support, the compliance officer may discuss with the student any need to disclose the student's transgender or gender-nonconformity status or gender identity or gender expression to the student's parents/guardians and/or others, including other students, teacher(s), or other adults on campus. The district shall offer support services, such as counseling, to students who wish to inform their parents/guardians of their status and desire assistance in doing so.

(cf. 1340 - Access to District Records)

(cf. 3580 - District Records)

2. Determining a Student's Gender Identity: The compliance officer shall accept the student's assertion of gender identity and begin to treat the student consistent with that gender identity unless district personnel present a credible and supportable basis for believing that the student's assertion is for an improper purpose.

3. Addressing a Student's Transition Needs: The compliance officer shall arrange a meeting with the student and, if appropriate, the student's parents/guardians to identify and develop strategies for ensuring that the student's access to educational programs and activities is maintained. The meeting shall discuss the transgender or gender-nonconforming student's rights and how those rights may affect and be affected by the rights of other students and shall address specific subjects related to the student's access to facilities and to academic or educational support programs, services, or activities, including, but not limited to, sports and other competitive endeavors. In addition, the compliance officer shall identify specific school site employee(s) to whom the student may report any problem related to the student's status as a transgender or gender-nonconforming individual, so that prompt action can be taken to address it. Alternatively, if appropriate and desired by the student, the school may form a support team for the student that will meet periodically to assess whether the arrangements for the student are meeting the student's educational needs and providing equal access to programs and activities, educate appropriate staff about the student's transition, and serve as a resource to the student to better protect the student from gender-based discrimination.

4. Accessibility to Sex-Segregated Facilities, Programs, and Activities: When the district maintains sex-segregated facilities, such as restrooms and locker rooms, or offers sex-segregated programs and activities, such as physical education classes, intramural sports, and interscholastic athletic programs, students shall be permitted to access facilities and participate in programs and activities consistent with their gender identity. To address any student's privacy concerns in using sex-segregated facilities, the district shall offer available options such as a gender-neutral or single-use restroom or changing area, a bathroom stall with a door, an area in the locker room separated by a curtain or screen, or use of the locker room before or after the other students. However, the district shall not require a student to utilize these options because the student is transgender or gender-nonconforming. In addition, a student shall be permitted to participate in accordance with the student's gender identity in other circumstances where students are separated by gender, such as for class discussions, yearbook pictures, and field trips. A student's right to participate in a sex-segregated activity in accordance with the student's gender identity shall not render invalid or inapplicable any other eligibility rule established for participation in the activity.

(cf. 6145 - Extracurricular and Cocurricular Activities)

(cf. 6145.2 - Athletic Competition)

(cf. 6153 - School-Sponsored Trips)

(cf. 7110 - Facilities Master Plan)

5. Student Records: A student's legal name or gender as entered on the mandatory student record required pursuant to 5 CCR 432 shall only be changed with proper documentation. When a student presents government-issued documentation of a name and/or gender change or submits a request for a name and/or gender change through the process specified in Education Code 49070, the district shall update the student's records. (Education Code 49062.5, 49070)

(cf. 5125 - Student Records)

(cf. 5125.1 - Release of Directory Information)

(cf. 5125.3 - Challenging Student Records)

6. Names and Pronouns: If a student so chooses, district personnel shall be required to address the student by a name and the pronoun(s) consistent with the student's gender identity, without the necessity of a court order or a change to the student's official district record. However, inadvertent slips or honest mistakes by district personnel in the use of the student's name and/or consistent pronouns will, in general, not constitute a violation of this administrative regulation or the accompanying district policy.

7. Uniforms/Dress Code: A student has the right to dress in a manner consistent with the student's gender identity, subject to any dress code adopted on a school site.

(cf. 5132 - Dress and Grooming)

ESCONDIDO UNION SCHOOL DISTRICT

August 13, 2020 Escondido, California

**EXHIBIT 4**

Mirabelli v. Escondido Union Elementary

**Rights of Gender Diverse Students Presentation**

**(2.3.22 Staff Meeting)**

A. NGO:       Hello, EUSD educators. It is our hope that you are doing well. Take a moment to recognize the great work you, your colleagues and EUSD is doing to manage the current COVID environment. Despite the challenges of the time we are in, together we've kept our classrooms open. Because of you, students have a safe place to learn, think critically, be surrounded by people who care for them, and feel secure in the safety of school routine and predictability. Thank you. Today, we will dive into the rights of gender diverse students and staff, and specific systems we have in place at EUSD to create safe and inclusive campuses, as well as upholding a positive and diverse culture in our District. With that, let's welcome ISS Director Tracy Schmidt.

**[Change Slide]**



T. SCHMIDT:  Thank you, Albert. And thank you to all of you for engaging with us today. This presentation will focus on the rights of our gender diverse students, as well as the most effective process for ensuring our students understand their rights and that they

1   are applied in the school setting. The rights are very specific to this community of
2   students, and that is because they are in need of these protections. Our gender diverse
3   students are an immensely vulnerable group. They have a greater likelihood to
4   experience bullying and harassment, to have reduced academic outcomes and to
5   experience chronic mental health issues. We as a District and school community
6   have to be so purposeful in ensuring that we provide our gender diverse students
7   every opportunity to have a school experience where they feel welcomed, supported
8   and affirmed in who they are.

9   **[Change Slide]**



21   T. SCHMIDT:  The first thing we want to start off with is defining who are our gender diverse
22   students and, therefore, the students who are offered and afforded these protections.
23   It all starts with gender identity. If you have a student whose gender identity differs
24   from that traditionally associated with the students physiological or assigned sex at
25   birth, they are a protected student. If any aspect of their gender identity is disparate
26   from that assigned sex at birth, they're eligible for these protections. That includes
27   a student whose gender expression, meaning their outward appearance and behavior,
28   is different from a stereotypically assigned sex at birth; or a student who's going

2.

through gender transition, meaning they are changing from living and identifying as the sex assigned at birth to the one that aligns with their gender identity; or gender nonconforming students, again whose gender expression differs from those stereotypical expectations as well as students considered as transgender because their gender identity is different from what they were assigned at birth. So you may have a situation where you have a student whose gender expression aligns with the assigned sex at birth, let's say that's male. And you may have a request, then, for that student to be referred to by a pronoun or name that is typically assigned to a female. That is a protected student.

**[Change Slide]**



**Determining Gender Identity**
The school/district shall accept the student's assertion of their gender identity and begin to treat the student consistent with their gender identity.

**Right to Privacy**
A student's status is their private information and the district shall only disclose the information to others with the student's prior consent. When disclosure of a student's gender identity is made to a district employee by a student, the employee shall seek the student's permission to share with others, including parent/caretakers.

T. SCHMIDT: So, now, let's go through what these rights are. And this is taken from our own adopted EUSD policy on discrimination and harassment. So, first off, determining gender identity. The school or District shall accept the students assertion of their gender identity and begin to treat the student immediately, consistently with that gender identity. The student's assertion is enough. There is no need for a formal declaration. There's no requirement for parent or caretaker agreement or even for knowledge for us to begin treating that student consistent with their gender identity.

3.

San Diego
Transcription

1    Students also have a right to privacy. A student's status is their private information,

2    and the District shall only disclose the information to others with the student's prior

3    consent. When disclosure of a student's gender identity is made to a District

4    employee by a student, that employee shall seek the student's permission to share

5    with others including parents or c-, or car-, caretakers. The main take away is this:

6    It always comes back to the student's comfort. If one wants to take any action to

7    share a student's status, they must be granted that permission, and that includes

8    parents, caretakers, other teachers, administrators, even support staff. You have to

9    seek out that permission first.

10   **[Change Slide]**



**Gender Support Planning**
Student shall be offered an opportunity to participate in a structured meeting with student identified supportive individuals to review a gender support plan.

**Accessibility to Facilities/Programs**
When the school/district maintains sex-segregated facilities, such as restrooms and locker rooms, or offers sex-segregated programs and activities, students shall be permitted to access facilities and participate in programs and activities consistent with their gender identity. To address any student's privacy concerns in using sex-segregated facilities, the school/district shall offer available options. However, the school/district shall not require a student to utilize these options.

22   T. SCHMIDT:   Gender support planning. The student shall be offered an opportunity to participate

23   in a structured meeting with student identified supportive individuals to review a

24   gender support plan. This idea of having an opportunity for the student to be guided

25   through their rights and their options and that this is an ever evolving plan that meets

26   the student where they are that point in time. Accessibility to facilities or programs.

27   When the School District maintains sex-segregated facilities such as restrooms,

28   locker rooms or offers sex-segregated programs and activities, students shall be

4.

permitted to access facilities and participate in programs and activities that are consistent with their gender identity. To address any student's privacy concerns, the School District shall offer available options. However, we shall not require a student to utilize those options. So, it's all about student selection from the options that are available. So, for example, we might feel like offering a gender neutral bathroom, such as the nurse's bathroom, might be a good option for a student, and it can be presented as such, but it shall not be that we insist that this is the option they use. The student has the ability to choose.

**[Change Slide]**



**Names and Pronouns**

If a student so chooses, school/district personnel shall be required to address the student by a name and the pronouns consistent with their gender identity, without the necessity of a court order or a change to their official district record. However, inadvertent slips or honest mistakes by district personnel in the use of the student's name and/or consistent pronouns will, in general, not constitute a violation.

**Student Records**

A student's legal name or gender as entered on the mandatory student record shall only be changed pursuant to a court order. However, at the request of a student or, if appropriate, his/her parents/caretakers, the district shall use the student's preferred name and pronouns consistent with his/her gender identity on all other district-related documents.

T. SCHMIDT: Names and pronouns. If a student so chooses, school personnel shall be required to address the student by a name and the pronouns consistent with their gender identity, without the necessity of a court order or a change to the official District record. However, inadvertent slips or honest mistakes by District personnel in the use of the student's name and our consistency in pronouns in general will not constitute a violation. The student understands there are times that there will be an adjustment. Basically, if the student asks us to use a name or pronoun that is associated with their gender identity, then we shall. Now, how that relates to student records. A

5.

**ESCONDIDO UNION SCHOOL DISTRICT—STAFF MEETING 2/3/2022**

1  student's legal name or gender as entered on the mandatory student record shall only

2  be changed pursuant to a court order. That's legal sex. However, at the request of

3  the student or, when appropriate, and a request of the parent or caretaker, the District

4  shall use the student preferred name and pronouns in all District-related

5  documentation. So, if that change to school record is made, the preferred name will

6  then populate all school-related documents. So, we find that many students, when

7  they're at school, they feel safe enough to ask for the use of the name and pronoun

8  that feels affirming to them. They might not have that same feeling or sentiment

9  with their family. So, they'll want to be referred to the preferred name at school but

10  they will not want their record to be changed because of the likelihood that their

11  family members may then become aware.

12  **[Change Slide]**



## Discrimination/Harassment

- Refusing to address a student by a name and the pronouns consistent with their gender identity
- Disciplining or disparaging a student or excluding them from participating in activities for behavior or appearance that is consistent with their gender identity or that does not conform to stereotypical notions of masculinity or femininity, as applicable
- Blocking a student's entry to the bathroom that corresponds to their gender identity
- Taunting a student because they participate in an athletic activity more typically favored by a student of the other sex

24  T. SCHMIDT:  Our EUSD policy also outlines that the following would be considered

25  discrimination or harassment of our gender diverse students: Refusing to address the

26  student by the name and the pronoun consistent with their gender identity; or

27  disciplining or disparaging a student or excluding them from participating in

28  activities that is consistent with their gender identity; blocking a student's entry to

San Diego
Transcription

6.

1    the bathroom that corresponds to their gender identity; or taunting a student because

2    they participate in an activity that's more typically favored by a student of other sex.

3    **[Change Slide]**



**Discrimination/Harassment**
- Revealing a student's transgender status to individuals who do not have a legitimate need for the information, without the student's consent
- Use of gender-specific slurs
- Physical assault of a student motivated by hostility toward their because of their gender, gender identity, or gender expression

15   SCHMIDT:    Furthermore, revealing a student's transgender status or gender diverse status to

16   individuals who do not have a legitimate need for the information without the

17   student's consent, and this includes parents or caretakers, we need that student's

18   consent prior to sharing. And that is not determined by age. All of our students have

19   that right. Use of gender specific sl-, slurs, physical assault of a student that's

20   motivated by hostility towards them because of their gender identity or gender

21   expression.

22   ///
23   ///
24   ///
25   ///
26   ///
27   ///
28   ///

1  [Change Slide]



13  T. SCHMIDT:  So, now let's talk through the communication process. I know that you as an EUSD

14  staff member want to be aware of how you can be a support if it is you that becomes

15  beholden to this information. So let's say it comes to the attention of you as a staff

16  member that a student is identifying as gender diverse. This can come to you in

17  many different ways. First, it could be shared by the parent or caretaker. There's

18  now an addition to our new student registration process that allows parents or

19  caretakers to proactively share if a student has a preferred name or gender that they

20  would want to be utilized in the school setting. Other times, this information might

21  be shared directly by the student, or it might be something that's more of a noticing,

22  you know that there's been a request or the student is actively using a preferred name

23  and pronoun or actively using diverse facilities or requesting to participate in

24  activities that are not typically aligned with their assigned sex at birth. This is our

25  first sense that this is a gender diverse student.

26  ///

27  ///

28  ///

[Change Slide]



**Communication Process**
- Show gratitude for the sharing
- Express that you want to be supportive of them
- Check in on how comfortable or affirmed they are feeling at school
- Ask if there is any other individual(s) who they have felt open to share this with
- Offer the opportunity to connect them with the support team
- Seek permission each time before sharing with another individual, including parent/caretaker

T. SCHMIDT: So, let's say this you are the one who becomes beholden to this information. The student felt safe and connected enough to open themselves up to you. So, first, we want to show gratitude for the sharing. Express that you want to be supportive of them. Check in on how comfortable or, or affirmed are you feeling at school? Is there any-, anyone else that you have felt open to share this information with? We want to kind of start to assess who is that supported network around the student. We want to offer them the opportunity to connect with a support team member. And I want to, I want to share more about this one in particular, because just because a student is gender diverse, you don't want them to feel like we need to refer them to a social worker or counselor; it's more about, hey, you know, we have these individuals on our campus who are aware and knowledgeable about ensuring that you are provided every support available to you; may I connect you to them? And, of course, then seeking permission each time before sharing with another individual. So, hopefully that student does give that permission…

///

///

9.

1    [Change Slide]



13    T. SCHMIDT: …and so you are able to communicate with a support team member who now has

14    the opportunity to connect directly with that student and assess who are the

15    supportive individuals for this student. And we are always encouraging to the best

16    of our abilities that we include the parent and the caretaker as part of that supportive

17    network around the student. Always letting our students know how critical the

18    involvement of their family is in helping them to feel welcomed and supported and

19    have all their needs met at school. So then a support team member offers the

20    opportunity to come together as a team in a guided way to review the student's rights

21    and options in more of a formalized plan. And there are examples that have been

22    provided to support team members they can use as a template that's known as gender

23    support plans. This is all in an effort to provide all of the potential options to our

24    students so they know what f-, they have available to them and they're able to share

25    what feels right to them in terms of the opportunities they have in that moment. So

26    this su-, support team member partners with the student to determine how to best

27    share the plan with relevant individuals. If we have a student who wants to be

28    referred to as a different or preferred name or pronoun, but the other teachers don't

10.

know, we have to work with that student. What does that look like? Who would you want to share that and what would you want to be said? It's just so critical that that is led by the student. And if they don't feel that they can be a part of the conversation, we want to make sure their voice is part of that conversation, and tell them your voice matters the most in terms of sharing. What would, how would you like us to be able to explain that you'd like to take this next step? So, that's the key to the planning process. It allows us to talk through all the inevitable things that might come up, that we need to address when we have a student who is taking advantage of some of these options and rights that they have, in a way that we can handle it, and in a way that honors the way the student would want. So, for example, the teacher may ask, what should I do? What should I say when the other kids start asking me about why am I calling the student another name? So, we always get back to the student themselves: How would you want our teacher to respond to that? What would you want the other students to know? That's very different for each student. Some may say just say that that's the name I prefer, where other students might want to share more about their why. We also have an opportunity to really talk about the aspect of what does it mean when parents or caretakers may not be involved in the process, might not be aware of this plan that we're putting together at school? So we share with them, you know, a, a teacher may be regularly referring to you as your preferred name and if your parent doesn't know, there is a chance that your parent will hear this name and, and will want to know what's, what's happening. And it's not that they've provided your private status; it's just because of the fact that that's the name that's been the most common here at school. Or you might let students know, if we don't make a change to your official record, that that means someone coming into your classroom, like a substitute, is still gonna be referring to a roster that has your legal name and, because of that, may not instantly know to use the preferred name. And so it's important that you as a student advocate for yourself when you have those individuals who don't have the ability to view a record and see

11.

**ESCONDIDO UNION SCHOOL DISTRICT—STAFF MEETING 2/3/2022**

1    that there's a preferred name. So, those are the types of conversations we get to have

2    when we're able to do a gender support plan. And of course, if there is a need for

3    additional resources or referrals, in, all in effort to help our students feel as safe and

4    welcomed, as affirmed as they can be, you have the opportunity to work with our

5    partners as well to meet the needs of our kiddos. So, thank you again for your

6    attention. I'll turn it over to, to Albert to complete our presentation.

7    …

8    [End of recording]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

San Diego
Transcription

12.

**ESCONDIDO UNION SCHOOL DISTRICT—STAFF MEETING 2/3/2022**

**PROOFREADER'S CERTIFICATE**

I, Erica Lowther, owner of San Diego Transcription, certify that on January 21, 2023, I proofread all the transcript of the above-referenced recording, while listening to the recording from which the same was transcribed, and that said transcript as typed accurately reflects the spoken word, to the best of my ability to hear those recorded words and identify the persons speaking.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 21, 2023, at San Diego, California.

ERICA LOWTHER

**EXHIBIT 5**



## RIGHTS OF GENDER DIVERSE STUDENTS PRESENTATION
### Q&A

| QUESTIONS | Answers |
|---|---|
| I have a student who is a "him" now, but I believe still biologically female. Can he participate in the after school running program that was presented yesterday? If so, how can we offer without also offending? (Harris) | If a sex-segregated activity is offered at a school site, a student shall be provided the option to participate in the activity that aligns with the student's gender identity. The student should be provided the option, and can make that decision whether or not to participate at their comfort level. |
| Are subs being given this training? | Not at this time, we are considering utilizing this for future mandated trainings. Some subs may have been present for today's presentation. |
| Is a parent allowed to override a student's request for different pronouns/alternate names? | No, we shall use a student's preferred name and pronoun based upon student request. |
| Do we get a copy of the video to watch for reference/support? (Koller) | Video in the slide deck |
| | |
| | |
| | |
| | |
| | |

**Justin Armbruster**
Teachers will use a student's preferred pronouns and name here at school. But might need to use their original name and pronouns when contacting family.

The student might not be comfortable with sharing their preferred name and pronouns with their parents. Before speaking with a parent, staff should consult the student on what name and pronouns they would like to be used when talking to their parent/guardian. Using the student's school preferred name and pronouns, might out the students to the parents.

**EXHIBIT 6**



# Preferred Name/Gender Request Form

**Name and title of employee submitting this form:**

**Requested by:**

☐ Parent                    ☐ Social Worker

☐ Student                   ☐ Counselor

☐ Administrator             ☐ Office Staff

Student #

**Has the student requested a preferred name change due to their gender identity?**

☐ Yes    ☐ No

Student Legal Name:

Student Preferred Name:

Are the parents aware of this request of name change?

☐ Yes        ☐ No

**Has the student requested a preferred gender change?**

☐ Yes    ☐ No

Student Legal Sex:

Student Preferred Gender:

☐ Male                     ☐ Transgender

☐ Female                   ☐ Gender non-conforming

☐ Non-Binary              ☐ Other

**Has a gender support plan been completed?**

☐ Yes (date completed)              ☐ No

---

To be completed by the Director of Integrated Student Supports

Date Processed:                    Signature:

Revised 9/2022

**EXHIBIT 7**



ArtianoShinoff

3636 Fourth Avenue
Suite 200
San Diego, California 92103
Main: 619-232-3122
Fax: 619-232-3264
as7law.com

**Daniel R. Shinoff**
dshinoff@as7law.com

February 8, 2023

## ESCONDIDO UNION SCHOOL DISTRICT MEMORANDUM

**Re:**   ***EUSD Position on Teachers' Request for Accommodation Regarding Gender Identity Policies***

The Escondido Union School District has considered the request for a "religious work accommodation" and exemption from EUSD's gender identity policies made by two teachers. The teachers requested exemptions from (1) the "Names" policy that requires teachers to refer to a student by a gender-specific name that the student identifies with to match their gender identity, (2) the "Pronouns" policy that requires teachers to refer to a student using the pronouns they identify with, and (3) the "Privacy" policy that prohibits teachers from sharing a student's gender identity status with their parent or guardian without the student's permission. These policies are contained in Administrative Regulation 5145.3: Nondiscrimination/Harassment. One teacher also requested an exemption from participating in any meetings or trainings on the topic of gender identity or gender theory.

The District understands that teachers may have certain views or beliefs which conflict with its gender identity policies. However, gender identity is a protected category under both federal and state law, and the District must follow the law. (Education Code, § 220; 42 USC § 2000d-2000e-17, 2000h-2000h-6.) Gender identity policies vary from state to state, and California has among the most protective laws relating to gender identity in the country. "It is the policy of the State of California to afford all persons in public schools, regardless of their disability, gender, gender identity, gender expression…equal rights, and opportunities in the educational institutions of the state." (Education Code, § 200.) "No person shall be subjected to discrimination on the basis of disability, gender, gender identity, gender expression, nationality, race or ethnicity, religion, sexual orientation, or any other characteristic…in any program or activity conducted by an educational institution." (Education Code, § 220.) In addition, California law requires school districts to adopt policies prohibiting discrimination, harassment, intimidation and bullying based on protected categories including gender identity. (Education Code, § 234.1.)

The EUSD is further guided on this issue by the California Department of Education (CDE) and the California School Boards Association (CSBA). Both the CDE and CSBA explain that a school district should accept and respect a student's assertion of his/her gender identity when they express that identity at school. Essentially, a student's gender identity must be treated as their sex. This means adhering to the EUSD "Names" and "Pronouns" policies.

Artiano Shinoff

February 2, 2023
Page 2

Regarding the "Privacy" policy, because a student's gender identity is a very personal, private issue, the CDE states: "Schools must consult with a transgender student to determine who can or will be informed of the student's transgender status, if anyone, including the student's family. With rare exceptions, schools are required to respect the limitations that a student places on the disclosure of their transgender status, including not sharing that information with the student's parents."
(https://www.cde.ca.gov/re/di/eo/faqs.asp#accordionfaq.)

The District recognizes and respects that public school teachers possess free speech and free exercise rights. However, there are limitations on these rights given their status as public employees. In general, the First Amendment only protects speech by a private citizen on a matter of public concern. The United States Supreme Court has ruled that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." (See *Garcetti v. Ceballos* (2006) 547 U.S. 410, 421.) Especially in the k-12 educational environment, where students are a "captive audience," when teachers address students, they do so pursuant to their official job duties. Therefore, speech inside the classroom – including referring to students by their preferred names or pronouns – is not protected under the First Amendment, or at least much less protected than speech outside the classroom. Therefore, teachers may not refuse to comply with a neutrally applicable gender identity policy that is part of their duties in the classroom.

Nonetheless, the District wishes to accommodate the teachers' request for accommodation to the extent that is appropriate, and accordingly proposes the following: (1) If a teacher addresses students by their first name, the teacher must use the name a student identifies with; (2) if a teacher addresses students by pronouns, the teacher must use the pronoun a student identifies with. Alternatively, (3) a teacher may address *all* students by their last names. Finally, (4) teachers are required to follow the "privacy" policy that requires them to not share a student's gender identity status with their parent or guardian without the student's permission, and (5) teachers are required to participate in District meetings and trainings on the topic of gender identity and are not entitled to an exemption from doing so. It is the District's position that the proposed accommodation strikes an appropriate balance between its respect for teachers' personal views and its obligations under the law.

ARTIANO SHINOFF

*Daniel R. Shinoff*

Daniel R. Shinoff

{AS7 Law San Diego/001290/000002/ME/S0546120.DOCX}

**EXHIBIT 8**



**NORMAN DAVID GRISSOM, ESQ.**
ATTORNEY AT LAW
5060 N. Harbor Drive, #255, San Diego, California 92106
P: (619) 544-8940 • F: (888) 672-4954 • ndglaw2014@gmail.com

March 1, 2023

Daniel Shinoff                                          *Via Email Only*
DShinoff@as7law.com

**Re:** Elizabeth Mirabelli and Lori West's Request for Religious Accommodations

Mr. Shinoff,

We have now had the opportunity to carefully review your memorandum authored on behalf of the Escondido Union School District ("EUSD") regarding my clients Mrs. Elizabeth Mirabelli and Mrs. Lori Ann West's request for a religious work accommodation under the California Fair Employment & Housing Act and Title VII. That memorandum was dated February 8, 2023, but provided to me and my clients on February 16, 2023.

My clients are generally pleased that EUSD accepted their request for a religious work accommodation from the Names Policy and the Pronouns Policy, but have a few practical questions regarding how the accommodation will work. With respect to the Privacy Policy, my clients remain concerned about the fact that an accommodation has not been offered, and similarly have a few questions meant to clarify their understanding.

To begin, the accommodations discussed in your memorandum state in relevant part:

> [T]he District wishes to accommodate the teachers' request for accommodation to the extent that is appropriate, and accordingly proposes the following: (1) If a teacher addresses students by their first name, the teacher must use the name a student identifies with; (2) if a teacher addresses students by pronouns, the teacher must use the pronoun a student identifies with. Alternatively, (3) a teacher may address *all* students by their last names. Finally, (4) teachers are required to follow the "privacy" policy that requires them to not share a student's gender identity status with their parent or guardian without the student's permission, and (5) teachers are required to participate in District meetings and trainings on the topic of gender identity and are not entitled to an exemption from doing so.

Turning to the more practical questions with the Names Policy and Pronouns Policy, we simply wish to avoid any confusion and any potential missteps. If my clients opt to use last names only going forward:

Daniel Shinoff
March 1, 2023
Page 2

(1)     My clients do not have transgender students in all of their classes, only a few. If they opt to use last names, must they refer to all students in all of their classes (even classes without transgender students), by last names only? In other words, if a class roster has no transgender individuals may the teacher refer to students with first names?

(2)     Does the requirement that the teachers use student last names apply outside the presence of students? Most practically, when speaking with other teachers or the parents of transgender students, must my clients continue using last names only?

(3)     The memorandum option (3) does not mention pronouns. We presume this means that my clients should cease using pronouns when referring to students (and hopefully only in the presence of students). Please confirm whether this is the case.

(4)     If a student (whether transgender or not) requests an explanation from my clients for why they are referring to students by last names only, how must my clients respond? (If the policy applies outside the presence of students, what about inquiries from fellow teachers or staff? What about inquiries from parents?)

As for the Privacy Policy, as stated in my clients' initial religious accommodation letters, they do not seek a general exemption from the Privacy Policy such that they could gossip about a student's transgender identity with all parties. However, they are very concerned about interfering with parental rights and what to do if confronted by a parent. Thus, they have the following two questions:

(1)     What if a parent directly asks my clients to reveal a student's gender identity? In other words, how must my clients respond if the parent directly asks: "I am concerned that [my daughter] is confused about her sexuality and gender. Do you know if she has asked anybody at school to address her using a male name or male pronouns?" In that context, instead of merely avoiding the topic, must my clients expressly deny that the student is being treated by the school as transgender? Or would they be permitted to admit that the parent's suspicions are true? Or does EUSD envision some middle ground, such as the teacher being required to say: "I have been directed not to tell you if your child is using a different name and pronoun." Could EUSD assign an administrator to sit in on parent-teacher conferences to respond to parents about any transgender issues?

(2)     What if the suspicious parent instructs my clients to not use their student's transgender name and pronouns, but instead the child's legal name and biological pronouns? In other words, the parent says: "I think that [my daughter] is identifying as transgender, but she isn't really transgender. Please keep calling her [legal name]." In that context, how must my clients proceed? Must they continue denying that the child is identifying as transgender? Do they inform the parent that the child is identifying as transgender in school and that the preferred name/pronouns are being used by everybody else (but not them, due to their religious work accommodation)? Do they honor the parent's wishes?

Daniel Shinoff
March 1, 2023
Page 2

And finally, as requested at our last meeting, below are the errors we found in Dr. Dupree's Summary.

(1)     The spelling of employee name: Mirabelli pg. 2
(2)     Title of employee: Mrs. pg. 1-5
(3)     Proper Acronym: Lesbian, Gay, Bisexual, Transgender, Queer/ Questioning: LGBTQ pg. 1 (written as LGBTB)
(4)     Miscellaneous typos including verb agreement on pg. 3
(5)     Mrs. Mirabelli provided the Model Policy (not Attorney Shinoff as claimed in the Interactive Process Summary).
(6)     Mrs. Mirabelli is not struggling with the policy, she is contesting it to be a violation of her Constitutional rights.
(7)     Mrs. Mirabelli does not see the imposition of transgender pronouns as "simply improper English" but the act of participating in moral wrong-doing.


        Please call or email me to set up a time when we can talk or reply in writing.  We would like to think that clear communication is the best way to proceed.


                              **The Law Offices of Norman David Grissom**

                              _____/S/_____
                              Norman D. Grissom, Esq.

3

**EXHIBIT 9**



3636 Fourth Avenue
Suite 200
San Diego, California 92103
Main: 619-232-3122
Fax: 619-232-3264
as7law.com

**Daniel Shinoff**
(619) 232-3122
dshinoff@as7law.com

March 10, 2023

**<u>CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION</u>**

<u>VIA EMAIL ONLY</u>
*Ndglaw2014@gmail.com*

Norman D. Grissom
Law Offices of Norman D. Grissom
5060 N. Harbor Drive, #225
San Diego, CA 92106

> ***Re:*** *Elizabeth Mirabelli & Lorie West's Request for Religious Accommodation*

Dear Mr. Grissom,

I am in receipt of and thank you for your email dated March 1, 2023. I appreciate the opportunity to continue our dialogue and thank you for your request for clarification. I will utilize your questions as set forth on page 2 of your email, in my effort to provide clarification and to avoid any confusion or potential missteps.

**As you state, "If my clients opt to use last names only going forward:"**

**Question (1):** My clients do not have transgender students in all of their classes, only a few. If they opt to use last names, must they refer to all students in all of their classes [even classes without transgender students], by last names only? In other words, if a class roster has no transgender individuals may the teacher refer to students with first names?
**Clarification**
If your clients opt to use last names, they must refer to all students in their classes and other interactions not limited to the classroom within their scope of duties as Escondido Union School District (EUSD) employees as well as on district property by last names only.

**Question (2):** Does the requirement that the teachers use student last names apply outside the presence of students? Most practically, when speaking with other teachers or the parents of transgender students, must my clients continue using last names only?
**Clarification**
If your clients opt to use last names, they must refer to all students in their classes and other interactions, not limited to the classroom within their scope of duties as a district employee and/or while on district property, by last names only.

Artiano Shinoff

Norman D. Grissom                                                                          Page 2
Law Offices of Norman D. Grissom

**Question (3):** The memorandum option (3) does not mention pronouns. We presume this means that my clients should cease using pronouns when referring to students (and hopefully only in the presence of students). Please confirm whether this is the case.
**Clarification**
Yes, as we discussed in our meeting, if your clients opt to use last names, they must also cease to utilize pronouns when referring to students within the scope of their duties as district employees and/or while on district property.

**Question (4):** If a student (whether transgender or not) requests an explanation from my clients for why they are referring to students by last names only, how must my clients respond?
**Clarification**
Your clients should indicate that it is their right to refer to students by their last name and gender-neutral pronouns, and that they do so with all student interactions. In addition, your clients are directed to refrain from elaborating on their personal beliefs, not limited to the classroom within their scope of duties as district employees and/or while on district property.

**Question:** (If the policy applies outside the presence of students, what about inquiries from fellow teachers or staff? What about inquiries from parents?)
**Clarification on both issues:**
Your clients should indicate that it is their right to refer to students by their last name and gender-neutral pronouns, and that they do so with all student interactions. In addition, your clients are directed to refrain from elaborating on their personal beliefs, not limited to the classroom within their scope of duties as district employees and/or while on district property.

### As for the Privacy Policy

**Question (1):** What if a parent directly asks my clients to reveal a student's gender identity?
**Clarification**
Your clients should respond that that the inquiry is outside of the scope of the intent of their interaction and state that the intent of the communication, may involve behavior as it relates to school and class rules, assignments, etc. If your clients have questions about questions from parents related to gender identification or equity laws/regulations, they should contact the principal, who will provide the necessary guidance.

**Question:** In other words, how must my clients respond if the parent directly asks: "I am concerned that [my daughter] is confused about her sexuality and gender. Do you know if she has asked anybody at school to address her using a male name or male pronouns?"
**Clarification**
Your clients should respond that the inquiry is outside of the scope of the intent of their interaction and state the intent of the communication is, as an example to share information regarding the student's behavior as it relates to school, class rules, assignments, etc. If you have questions about parents' questions related to gender identification or equity laws/regulations, they should contact the principal, who will provide the necessary guidance.

Artiano Shinoff

Norman D. Grissom                                                                         Page 3
Law Offices of Norman D. Grissom

**Question:** In that context, instead of merely avoiding the topic, must my clients expressly deny that the student is being treated by the school as transgender?
**Clarification**
No, your clients should respond that the inquiry is outside of the intent of their interaction and state the intent of the communication, an example is to share information regarding the student's behavior as it relates to school, class rules, assignments, etc. If you have questions about parents' question related to gender identification or equity laws/regulations, they should contact the principal for guidance.

**Question:** Or would they be permitted to admit that the parent's suspicions are true?
**Clarification**
No, your clients should respond that the inquiry is outside of the intent of their interaction and state that the intent of the communication, an example is to share information regarding the student's behavior as it relates to school, class rules, assignments, etc. If you have questions about parents' question related to gender identification or equity laws/regulations, they should contact the school principal for further guidance.

**Question:** Or does EUSD envision some middle ground, such as the teacher being required to say: "I have been directed not to tell you if your child is using a different name and pronoun."
**Clarification**
No, your clients should state that the inquiry is outside of the intent of their interaction and state the intent of the communication, an example is to share information regarding the student's behavior as it relates to school, class rules, assignments, etc. If you have questions about parents' question related to gender identification or equity laws/regulations, they should contact the school principal for further guidance.

**Question:** Could EUSD assign an administrator to sit in on parent-teacher conferences to respond to parents about any transgender issues?
**Clarification**
No, an administrator would not be provided for teacher-parent conferences. Your clients should respond in a parent-teacher conference that the inquiry is outside of the intent of interaction and state the intent of the communication, as an example is to share information regarding the student's behavior as it relates to school, class rules, assignments, etc. If you have questions about parents' question from parents related to gender identification or equity laws/regulations, they may contact the school principal for further guidance.

**Question (2):** What if the suspicious parent instructs my clients to not use their student's transgender name and pronouns, but instead the child's legal name and biological pronouns?
**Clarification**
Your clients should respond that the inquiry is outside of the intent of their interaction and state the intent of the communication, an example is to share information regarding the student's behavior as it relates to school, class rules, assignments, etc. If you have questions about parents' question related to gender identification or equity laws/regulations, they should contact the school principal for further guidance.

Artiano Shinoff

Norman D. Grissom                                                                                      Page 4
Law Offices of Norman D. Grissom

**Question:** In other words, the parent says: "I think that [my daughter] is identifying as transgender, but she isn't really transgender. Please keep calling her [legal name]." In that context, how must my clients proceed?
**Clarification**
Your clients should respond that the inquiry is outside of the intent of their interaction and state the intent of the communication, for example, to share information regarding the student's behavior as it relates to school, class rules, assignments, etc. If your clients have any questions about parents' question related to gender identification or equity laws/regulations, they may contact the school principal for further clarification.

**Question:** Must they continue denying that the child is identifying as transgender?
**Clarification**
Your clients should respond that the inquiry is outside of the intent of their interaction and state the intent of the communication for example to share information regarding the student's behavior as it relates to school, class rules, assignments, etc. If they have questions related to gender identification or equity laws/regulations, they may contact the school principal for further clarification.

**Question:** Do they inform the parent that the child is identifying as transgender in school and that the preferred name/pronouns are being used by everybody else (but not them, due to their religious work accommodation)?
**Clarification**
Your clients should respond that the inquiry is outside of the intent of their interaction and state the intent of the communication for example is to share information regarding the student's behavior as it relates to school, class rules, assignments, etc. If they have any questions about parent questions related to gender identification or equity laws/regulations, they may contact the school principal for further clarification. As a reminder, your clients are directed to not elaborate on their personal beliefs, as it relates to their duties as EUSD employees, while acting in the course and scope of their duties.

**Question:** Do they honor the parent's wishes?
**Clarification**
Your clients should respond that the inquiry is outside of their intent interaction and state the intent of the communication for example is to share information regarding the student's behavior as it relates to school, class rules, assignments, etc. If they have any questions about parent questions related to gender identification or equity laws/regulations, they may contact the school principal for further guidance.

Again, thank you for the opportunity for this dialogue. It is the desire of the district to work with both of your clients to successfully address their questions. We greatly appreciate the efforts by you and your clients to work with the district.

Artiano Shinoff

Norman D. Grissom                                                              Page 5
Law Offices of Norman D. Grissom

                              Very truly yours,

                              ARTIANO SHINOFF

                              Daniel Shinoff

**EXHIBIT 10**

























## Census Day Enrollment

Escondido Union

CDS Code 37-68098-0000000

View by grade, student group, charter status, etc.

View Table Data

| Census Day Enrollment | 2017-18 | 2018-19 | 2019-20 | 2020-21 | 2021-22 |
|---|---|---|---|---|---|
| Total | 18,695 | 18,473 | 18,294 | 17,944 | 17,224 |

Chart Notes | Source

This graph displays the primary enrollment for this district, including all charter schools. Census Day Enrollment is measured by counting the number of students enrolled in school on the first Wednesday in October. *Note:* Prior to 2020-21, these counts did not include short-term enrollments. *Tip: Use the menu above the graph to view the data by race/ethnicity, student group, gender and whether students are enrolled in a traditional district school or in a charter school.*

Close

## Cumulative Enrollment

Escondido Union

CDS Code 37-68098-0000000

View by ethnicity, student group, and charter status

SECOND CATEGORY:

All Students

View Table Data

| Cumulative Enrollment | 2017-18 | 2018-19 | 2019-20 | 2020-21 | 2021-22 |
|---|---|---|---|---|---|
| All Students | 19,541 | 19,322 | 18,963 | 18,601 | N/A |

Chart Notes | Source

*Note: Cumulative enrollment will be updated with end-of-year data.* This graph displays the cumulative enrollment for this district. Unlike the Census Day Enrollment data in the graph on the left, which are recorded in October of each school year and exclude short-term enrollments, Cumulative Enrollment counts are collected at the end of the year and consist of the total number of unduplicated primary and short-term enrollments within the academic year. Cumulative enrollment is used to calculate rates for absenteeism, suspension and expulsion. NOTE: *Because they are two separate data collections and intended for different purposes, Enrollment and Cumulative Enrollment cannot be used interchangeably.*

*Use the menus above the graph to view data by race/ethnicity, program subgroup or by whether the students attend traditional district schools or charter schools.*

Close

## Average Daily Attendance (ADA)

Escondido Union

CDS Code 37-68098-0000000

View Table Data

| Average Daily Attendance (ADA) | 2017-18 | 2018-19 | 2019-20 | 2020-21 | 2021-22 |
|---|---|---|---|---|---|
| ADA | 15,029 | 14,579 | 14,231 | 14,236 | N/A |

Chart Notes | Source

*Note: 2021-22 ADA data will be updated with financial data in April. Also, due to Covid-related school closures, the state did not collect apportionment ADA for 2020–21.* Therefore, other than some small adjustments for LEAs experiencing growth, and a proxy ADA computation for newly operational charter schools, the 2020–21 ADA is the same as 2019–20. Learn more here.

This graph displays the average daily attendance (ADA) for this district. ADA is the total number of days of student attendance divided by the total number of days taught, and is used for a variety of funding purposes. The ADA includes only those charter schools that have their financial data reported in the school district's general fund, without regard to whether the charter school is locally or direct funded. Generally, ADA is lower than enrollment due to such factors as transience, dropouts, and illness. ADA will also be lower than enrollment for districts that have charter schools excluded from the ADA calculation. For information about the impact of attendance, especially chronic absence, on student achievement, see http://www.cde.ca.gov/ls/ai/cw/.

Close

## Teachers

Escondido Union

CDS Code 37-68098-0000000

View by FTE, Race/Ethnicity & Gender

View Table Data

| Teachers | 2017-18 | 2018-19 | 2019-20 | 2020-21 | 2021-22 |
|---|---|---|---|---|---|
| Teachers | 1,050 | 1,059 | N/A | N/A | N/A |

Chart Notes Source

*(2019-20 and 2020-21 data pending)*
This graph displays the total number of teachers in classrooms or specific programs in this district. This count includes itinerant and push-in/pull-out teachers but not adult education, Regional Occupation Programs (ROP), child care, and preschool teachers.

Teachers are certificated staff, meaning they must hold a teaching credential or other certificate, which may include an emergency permit or a waiver of the credential requirement. Note: This represents an unduplicated count of teachers in this district. Because teachers may teach at more than one school, the sum of the number of teachers in all the schools in this district may appear larger than the district total shown here.

Close

## Per Pupil Ratio: Teachers

Escondido Union

CDS Code 37-68098-0000000

Filter graph

View Table Data

| Per Pupil Ratio: Teachers | 2017-18 | 2018-19 | 2019-20 | 2020-21 | 2021-22 |
|---|---|---|---|---|---|
| County | 20.0 | 21.7 | N/A | N/A | N/A |
| District | 18.0 | 18.0 | N/A | N/A | N/A |

Chart Notes Source

*(2019-20 and 2020-21 data pending)*
This graph displays the number of students for each teacher or full-time equivalent. The counts of students and teachers are collected on the first Wednesday of October each year.

## Average Teaching Experience

Escondido Union

CDS Code 37-68098-0000000

Select options

View Table Data

| Average Teaching Experience | 2017-18 | 2018-19 | 2019-20 | 2020-21 | 2021-22 |
|---|---|---|---|---|---|
| County | 12 | 12 | N/A | N/A | N/A |
| District | 11 | 11 | N/A | N/A | N/A |

Chart Notes Source

*(2019-20 and 2020-21 data pending)*
This graph displays the average number of years that the district's teachers have been teaching in the district.

## First & Second Year Teachers

Escondido Union

CDS Code 37-68098-0000000

Select options

View Table Data

| First & Second Year Teachers | 2017-18 | 2018-19 | 2019-20 | 2020-21 | 2021-22 |
|---|---|---|---|---|---|
| First Year | 65 | 99 | N/A | N/A | N/A |
| Second Year | 58 | 50 | N/A | N/A | N/A |

Chart Notes Source

*(2019-20 and 2020-21 data pending)*
This graph displays the number of first- and second-year teachers in this district. A large proportion of first- and second-year teachers may indicate a less experienced teaching force.

**EXHIBIT 11**



Please use this document to ask the admin team a question or raise a concern. Before you type in a question, please review prior questions. Admin will be meeting daily to review your questions and provide an answer to the best of our abilities. Please be aware some questions you have may require clarification from the district office and may take us some time to provide a complete and accurate response.

**\*PLEASE INSERT (right click > add row) MOST RECENT QUESTIONS AT THE TOP\***

| Date of | Staff Member Name | Staff Member Question | Admin Response |
|---------|-------------------|----------------------|----------------|
|  |  |  |  |
| 5/17 | ███ | Would it be possible to move the 8th grade materials (ipad, books, etc.) turn in until after June 7th?<br>Students having to turn in their iPads the same day grades are due; will not allow many students to turn in or complete work that day.  It seems unfair to 8th graders, as they are the only grade level being held to having a 2.0 GPA to attend promotion.<br>I am  accepting late work on June 7th until 5 pm to allow students the opportunity to improve their grades and hopefully attend promotion. | **Dates moved (7th and 8th grade dates swapped)** |



Please use this document to ask the admin team a question or raise a concern. Before you type in a question, please review prior questions. Admin will be meeting daily to review your questions and provide an answer to the best of our abilities. Please be aware some questions you have may require clarification from the district office and may take us some time to provide a complete and accurate response.

**Questions parking lot**

*PLEASE INSERT (right click > add row) MOST RECENT QUESTIONS AT THE TOP*

| | | | |
|---|---|---|---|
| 5/5 | ▬ | I have a lot of instructional materials in my room on my walls, but they are all music related. Do I need to remove these items? Can someone come look at my room and see if any of it can stay? | **They only need to be removed if they are considered to be assistive. See this list to be sure that the content isn't any of these things.** |
| 4/19/22 | ▬ | Can the CAASPP testing bell schedule be shared somewhere? Unable to locate it on google drive and would like to plan for service delivery purposes | **Testing dates and timing for periods/testing block attached here. A printed copy of the schedule will be placed in mailboxes by the end of the week.** |
| 4/7/22 | ▬ | Is there a place for us to sign in to the staff meeting? | **Staff members' attendance at Staff Meetings is accessible through a Zoom setting to query all Zoom meeting participants who have signed on.** |
| 4/7/22 | ▬ | 6th grade is supposed to have Safari Park visits  May 17 and 25. Are "Make UP" pullout days ok to use (we won't have testing block schedules on those days, correct?)<br><br>May I forward the following suggested alternative dates for May 17: May 2,3,4, 6, 13, 20? | **No, district TOSAs have been made aware of the testing date conflicts and they will be looking to move the dates. They will accommodate Rincon the best they can to ensure that the Safari Park visits can still occur around our schedule.** |



Please use this document to ask the admin team a question or raise a concern. Before you type in a question, please review prior questions. Admin will be meeting daily to review your questions and provide an answer to the best of our abilities. Please be aware some questions you have may require clarification from the district office and may take us some time to provide a complete and accurate response.

**\*PLEASE INSERT (right click > add row) MOST RECENT QUESTIONS AT THE TOP\***

| 4/7/22 | ■■■■ | Thought that if we were taking CAASSP that we would NOT take iReady 3 ? iReady Diagostic takes at least 4 periods per test - 2 testing blocks will not be enough | **To honor the space that 8th grade requires for their state tests (CAST), our 6th and 7th graders will work on completing the iReady diagnostic. In a 100 minute testing block, the hope would be that students are able to complete the diagnostic. Perhaps if that is successful, we can use a testing block for iReady diagnostic to embrace a "testing environment" for next school year.** |
|---|---|---|---|
| 4/5/22 | ■■■■■■■■■ | Since protocols have changed, is there any way to move the after school snack back to nutrition time so that students can eat that food during the school day? I have many students who go all morning without eating until lunch. | **EUSD Nutrition sets the nutrition service opportunities during our school day which becomes a part of our bell schedule.  Food service will not resume during our Nutrition period between Pd 2 and Pd 3 this school year.  I have heard discussion of EUSD Nutrition possibly re-implementing food service during Nutrition break on middle school campuses for the 2022-23 school year.  Such a decision will be made at the District level.** |
| 3/24/22 | ■■■■ | When will staff be trained on how to use Apple Classroom. I am having issues adding students to my Apple classroom. Apparently there is a new way to add students. I already sent a help ticket which didn't help. All I received was something to read and a screenshot. I could have found this on the district website. I need guided instruction. | **■■■■, I believe you were able to find resolution to your technology needs by partnering with a colleague.**<br><br>**I'd be happy to help, I use it a lot in class- ■■■■■ ■■■■■** |



Please use this document to ask the admin team a question or raise a concern. Before you type in a question, please review prior questions. Admin will be meeting daily to review your questions and provide an answer to the best of our abilities. Please be aware some questions you have may require clarification from the district office and may take us some time to provide a complete and accurate response.

**\*PLEASE INSERT (right click > add row) MOST RECENT QUESTIONS AT THE TOP\***

| | | | |
|---|---|---|---|
| | | | |
| 3/23/22 | ▨ | My children attend a different CA school district. That district, also, has not made the transgender child rights information available to the members of their community. Do you know if keeping the information quiet is CA SOP? | The Rincon Admin Team does not have a response to your question, ▨. We reiterate what has been stated previously regarding this topic/District presentation that was shared and viewed at a prior staff meeting. Please see responses shared below. |
| 3/9/22 | ▨ | When will Bulldog families view the child-gender-identity rights presentation? | Please see the response to a similar question posed by Elizabeth Mirabelli. This question re: how and when might additional stakeholders (parents/guardians, specifically) be made aware of this EUSD policy has already been forwarded to EUSD Leaders in Human Resources and Integrated Student Supports. Decision making re: this EUSD policy has already been forwarded to EUSD Leaders in Human Resources and Integrated Student Supports. Decision making re: parent/guardian notification will be District Leader led. |



Please use this document to ask the admin team a question or raise a concern. Before you type in a question, please review prior questions. Admin will be meeting daily to review your questions and provide an answer to the best of our abilities. Please be aware some questions you have may require clarification from the district office and may take us some time to provide a complete and accurate response.

**Questions parking lot**

**\*PLEASE INSERT (right click > add row) MOST RECENT QUESTIONS AT THE TOP\***

| | | | |
|---|---|---|---|
| 3/6/22 | ▬ | Will seating charts need to be strictly enforced/adhered to when masks become optional on 3/14/22? Will admin continue to contact trace students and refer to seating charts for positive cases? | EUSD has moved to a group contact tracing model for non-high risk environments (General Education setting).  Our Mod/Severe SPED classroom settings, Bus Transportation, and Extended Care Program/XTRACK are what constitutes our high-risk environments.  <u>When contact tracing with Staff members for all classroom positive situations, having accurate and up-to-date seating charts is required</u> to assist Admin with identifying students who may have had close contact with Staff members based upon positive COVID cases in classrooms. |
| 2/5/22 | ▬ | Are we sharing this EUSD policy "rights of gender identity"  with all parents?  Are parents and caretakers made aware that we have this policy? If so, how are we sharing this policy with our EUSD parents?  Will this be included in the rights and responsibility guide that is provided to parents? | Please see the response to a similar question posed by Elizabeth Mirabelli.  This question re: how and when might additional stakeholders (parents/guardians, specifically) be made aware of this EUSD policy has already been forwarded to EUSD Leaders in Human Resources and Integrated Student Supports.  Decision making re: parent/guardian notification will be District Leader led. |
| 2/3/22 | ▬ | Regarding Gender Presentation: How do we avoid unfortunate experiences like the victimization of a female girl in a Virginia public school bathroom?  I think most of us do our best to help these students feel safe, but this is a slippery slope.  What are we doing to help them feel comfortable with their | ▬:  As is shared repeatedly in the EUSD presentation, the student takes the lead in communication about gender identity.  Trusted adults on campus for each student and Support Team members (often our Counselors/Social Worker), will work with students to identify next steps as outlined in the presentation.  Regarding your reference to a public school |



Please use this document to ask the admin team a question or raise a concern. Before you type in a question, please review prior questions. Admin will be meeting daily to review your questions and provide an answer to the best of our abilities. Please be aware some questions you have may require clarification from the district office and may take us some time to provide a complete and accurate response.

**\*PLEASE INSERT (right click > add row) MOST RECENT QUESTIONS AT THE TOP\***

| | | | |
|---|---|---|---|
| | **Mirabelli** | biological pronouns?  11-14 year olds need a lot of wisdom, are they old enough to declare these decisions on their own? | **bathroom incident in Virginia (I/_____ am not aware of details), I want to reiterate the presentation statement that gender diverse individuals have the right to utilize facilities (e.g. restroom) that corresponds to their gender identity.** |
| | | Will the EUSD video presentation "The Rights of Gender Diverse Individuals" be available for review by staff and other EUSD community members? | **The "Rights of Gender Diverse Individuals" presentation was viewed by all EUSD staff in attendance at yesterday's Staff Meetings at all school sites.  Direction regarding how other EUSD staff members (e.g. Classified Staff) will be made aware of this presentation content will be sought by the Rincon Admin Team.  Additionally, the question will be asked by the Rincon Admin Team whether other EUSD stakeholders (e.g. Parents/Guardians) will have the content of this presentation shared with them in some format (how and when?).** |
| 2/3/22 | ▮▮▮▮ | I review students' grades often.  I feel we are misleading parents when a student is receiving half credit for an assignment they never touched.  A 50% for not doing an assignment is far different than trying to do an assignment and earning 50%.  I have begun to understand that seeing 4 out of 8 points means the student may not have done the assignment…upon | **A 50% is still a failing grade. The 100 point percentage grading scale is skewed to failure. The book says, "Allocating so much of our scale—nearly two-thirds of it—to failure seems wrong on its face, but the real harm occurs when…it becomes nearly impossible for a student to overcome low grades," (p. 82).**<br><br>**"There's no research that finds that failing grades motivate students, and plenty of research that has** |



Please use this document to ask the admin team a question or raise a concern. Before you type in a question, please review prior questions. Admin will be meeting daily to review your questions and provide an answer to the best of our abilities. Please be aware some questions you have may require clarification from the district office and may take us some time to provide a complete and accurate response.

**\*PLEASE INSERT (right click > add row) MOST RECENT QUESTIONS AT THE TOP\***

| | | | |
|---|---|---|---|
| | | checking in with the student, it most often is true. ▮▮▮▮▮ - agrees with ▮▮▮▮ here.  Giving them a way to recover via teacher communication is essential.  Understanding why the work is not being done needs to be communicated to the teacher for grading to be meaningful and understood by all parties. You can add the comment "missing" in powerschool with the click of a button when you fill scores. -▮▮▮▮▮ | found the opposite—that a student who receives 0s and Fs becomes less motivated, not more motivated…No studies support the use of low grades as punishment…low grades cause students to withdraw from learning," (p.75). As one student put it, "Why do anything to improve my grade if my grade is still going to be an F no matter what?" (p. 88). This book dives deeper into the rationale behind not giving zeros. I encourage you to read more about it to fully understand the rationale, that can't be necessarily boiled down to a paragraph or two. Click HERE for your free copy and to learn more about the idea. Let's continue the conversation! |
| 1/12/22 | ▮▮▮▮▮ | I think a video example of how to throw away trash/food waste at lunch would be cool, not sure who could do it though | Agreed!  Anyone interested in promoting this school wide effort? |
| 1/7/22 | ▮▮ | Is there direction from the district about how to handle administering the iReady diagnostic when students are out due to CR absences during the testing window.  I have over 10 students out until 1/18 or later. Is it | The COVID surge in January 2022 has been challenging. During students' QISP placement, District staff members teaching QISP are not administering the iReady Diagnostic.  There is not direction from the District other than sites being responsible for the |



Please use this document to ask the admin team a question or raise a concern. Before you type in a question, please review prior questions. Admin will be meeting daily to review your questions and provide an answer to the best of our abilities. Please be aware some questions you have may require clarification from the district office and may take us some time to provide a complete and accurate response.

**\*PLEASE INSERT (right click > add row) MOST RECENT QUESTIONS AT THE TOP\***

| | | | |
|---|---|---|---|
| | | possible to give the diagnostic over zoom with students (that are well enough and able to) sharing their screens the entire time? | **completion of iReady Diagnostic #2. The window for completion was extended and is soon closing, and Rincon Admin will be communicating the plan for any final make up attempts for students who need to complete iReady Diagnostic #2.** |
| 12/9/2021 | ▇▇▇▇ | **Could we maybe print a color of passes on paper to give as a bathroom pass and print them for all staff?** | **We can use our blue passes attached here and utilize the "Other" line:** <br><br> OFFICE PASS  Room ____  Period ____  Name(s): ____  To: ☐ Office ☐ Asst. Principal's Office ☐ Health Office ☐ Library ☐ Counselor ☐ Room # ____ ☐ Other: ____  When: ☐ **NOW** please ☐ **Before** end of period at your convenience. ☐ At the **END** of this period. ☐ Other: ____ ☐ **Note:** Student will not be returning to your class.  Date: ____  Staff: ____  Time returned to class: ____  Staff: ____ |
| 12/9 | ▇▇▇▇ | **To provide the time needed for TLCs to work, wouldn't we need to go back to grade level dept. common prep?** | **Site Admin has been reflecting on the district focus of the T&LC. Common prep by department would need to be examined through the lens of the master schedule for 22-23.** |



Please use this document to ask the admin team a question or raise a concern. Before you type in a question, please review prior questions. Admin will be meeting daily to review your questions and provide an answer to the best of our abilities. Please be aware some questions you have may require clarification from the district office and may take us some time to provide a complete and accurate response.

**\*PLEASE INSERT (right click > add row) MOST RECENT QUESTIONS AT THE TOP\***

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| 11/3 | ███ | Can students be turned away from the lunch line? I have had a few students recently say that they were turned away from getting lunch because they were "in the wrong line" and by the time they got into the "right" line, they were told they couldn't get food. Does the cafeteria serve food for the entire lunch period? | Yes, Bulldog Cafe is open for the entire lunch. There are two lines to enter the Bulldog Cafe with one for Bullbuck pass (fast pass).  The door closest to the drinking fountain is open the entire time. |



Please use this document to ask the admin team a question or raise a concern. Before you type in a question, please review prior questions. Admin will be meeting daily to review your questions and provide an answer to the best of our abilities. Please be aware some questions you have may require clarification from the district office and may take us some time to provide a complete and accurate response.

**\*PLEASE INSERT (right click > add row) MOST RECENT QUESTIONS AT THE TOP\***

| | | | |
|---|---|---|---|
| 10/14 | ▇▇▇▇ | **Is there a "clear cut" criteria for students to go into ELA and math Intervention...what does the program provide?** | **Our academic intervention elective courses are Tier 2 interventions (for ELA and Math). No clear cut placement criteria per EUSD ... but the following considerations are made for placement recommendation @ Rincon:**<br>**•CSAT recommendation based upon multiple data sources:  iReady, grades, teacher feedback, historic performance, and CAASPP**<br>**•space available in sections of the Intervention courses**<br>**•flexibility in students' schedules for placement in the intervention course offerings**<br>**•parent support re: student's placement in Intervention**<br><br>**Check out this informative video from the CDE about MTSS in the state of CA: quick primer video on MTSS ↗ (Video, 3:27), created by the Orange County Department of Education (OCDE), for an overview of MTSS.** |
| 10/14/21 | ▇▇▇▇ | **Can all teachers have access to iReady scores? Right now elective teachers do not have access.** | **All teachers do have access to iReady data. They have been participating in iReady training- last year with our role out and this year at our startup. For those who are having trouble logging in, please make a help ticket.** |



Please use this document to ask the admin team a question or raise a concern. Before you type in a question, please review prior questions. Admin will be meeting daily to review your questions and provide an answer to the best of our abilities. Please be aware some questions you have may require clarification from the district office and may take us some time to provide a complete and accurate response.

**Questions parking lot**

*PLEASE INSERT (right click > add row) MOST RECENT QUESTIONS AT THE TOP*

| | | | |
|---|---|---|---|
| 10/13 | ███ | During conferences, Several parents mentioned/are concerned about the closures of bathrooms and why students are being monitored (their words) as they enter and exit.  Are all bathrooms open now?  Can a message updating parents on the current bathroom situation be sent? | All bathrooms were opened as of Monday, Oct. 11th. If particular bathrooms have been closed since then, it's due to graffiti or vandalism requiring clean up/attention. We will seek direction about messaging a "bathroom update". |
| 9/21/21 | ███ | Are there translators for BTSN? | Yes … please refer to ███'s email sent on 9/24<br><br>Spanish translator request form is linked **HERE** |
| 9/17 | ███ | If the spreadsheet of zoom links will be public on our website, then how are we to monitor attendees to keep ourselves safe? For example:  mute all participants without ability to unmute, disable the chat - like they do at board meetings. We need more guidance so we are consistent with how we run these zooms. | Thank you ███ for posing this question! Yes, please utilize best practices that were shared last year during distance learning. Resources for zoom tips and tricks can be found on Teacher resources, here's the link to the table of contents regarding **Zoom**. It will be recommended that the following occurs on our Virtual BTSN:<br>1. Parents join using their student's iPad; however it's understandable that some parents might join on their personal devices for various reasons (they're at work, split households, multiple students etc.) Presentations will be shared for parent viewing if they are unable to connect in this |



Please use this document to ask the admin team a question or raise a concern. Before you type in a question, please review prior questions. Admin will be meeting daily to review your questions and provide an answer to the best of our abilities. Please be aware some questions you have may require clarification from the district office and may take us some time to provide a complete and accurate response.

**Questions parking lot**

**\*PLEASE INSERT (right click > add row) MOST RECENT QUESTIONS AT THE TOP\***

| | | | way after the night of the event. It will be updated and posted to our school website.<br>2. **For teacher management, mute all participants and disable chat. Those features and direction for addressing these settings can be found on the same link above, and specifically here on the Complete Zoom Guide for Teachers (see the sections on "Allow participants to remain silent" and** |
|---|---|---|---|
| 9/14 | ▉▉▉▉▉ | Do we have a plan for zoom and parent addresses?  Are parents only logging into zoom on their son/daughters ipad?  I am worried that I will let someone into the room that is a prankster. | It will be recommended that parents use their son or daughter's iPads to attend the BTSN. If parents are not permitted into the room by a teacher, they will be able to view the presentation the teacher has provided during their live session. We want everyone to feel safe and understand your concern! |
| 9/7 | ▉▉▉▉▉ | Are we lending out hot spots this year? Have several students without internet at home, and I know there was a recall of hotspots. | Yes, we have a limited number of hotspots available for check out. Please refer them to ▉▉▉▉ and add Admin on the email. |
| 9/6 | ▉▉▉▉▉ | I have 2 students who will be out for 7 more days but did not qualify for TIS. Will they do iReady testing when they return, or can they do it from home? I don't have any other assignments for my students coming in person, do I assign them work to do from home? | Please consult your grade level AP to discuss/brainstorm a plan for these students. |
| | ▉▉▉▉▉ | Are teachers being notified of _every_ COVID related absence (CR in Power | COVID related emails (students sent home due to symptoms, quarantine related communications, and |



Questions
parking lot
www.teacher.net

Please use this document to ask the admin team a question or raise a concern. Before you type in a question, please review prior questions. Admin will be meeting daily to review your questions and provide an answer to the best of our abilities. Please be aware some questions you have may require clarification from the district office and may take us some time to provide a complete and accurate response.

**\*PLEASE INSERT (right click > add row) MOST RECENT QUESTIONS AT THE TOP\***

| | | | |
|---|---|---|---|
| | | **school) for students? I personally have I students who are absent with CR and I have received ZERO notification or information (Stay home learning plan or TIS).** | **return/clearance emails) are a priority to ensure that all teachers for a student are knowledgeable of a student's absence period. If you have a question about an email OR have not received an email regarding an absent student with CR noted, reach out to Jane. With TIS beginning the week of 9/7/21, some students will be eligible for TIS and the email communication should note this.** |
| | ▆▆▆ | **Could I personally request a one-line email, no named students, when one of my students has Covid? Something like, "▆▆▆I, You have a student that is Covid positive. Admin"** | **No,▆▆▆, such a communication will not be made. The communications that are EUSD protocol will be made.** |
| **9/2** | ▆▆▆▆▆ | **How will we know who is out on COVID for the TIS. How will we know if a student is one that is to quarantine or isolate? Will we get a letter for every student? Currently I have several students out and in Power School it tells me one day COVID Related but then the next day attendance it is blank again? Is is possible to get a list?** | **We will establish a communication protocol at the site level to identify students who have become eligible for TIS following their placement on quarantine and acceptance into TIS for an absence that is imposed quarantine-related for an absence of 3 days or more. I will be asking that ▆▆▆▆▆ take the lead on such communications to teachers of record for the student when a TIS placement is made. Please stay tuned as we develop a communication protocol at Rincon with some guidance from ISS/DO.** |
| | ▆▆▆ | **I had students that were marked as CR but today they aren't. The emails said not to let them in class until we heard from the nurse. How do we keep track of who is out if they aren't still marked in PowerSchool?** | **▆▆, our school nurse, and ▆▆, our attendance clerk, should be able to identify students who are eligible to return to school following a quarantine situation or absence due to symptoms. Begin with ▆▆ as she is our site health employee and will have the most updated health information re: students which will influence attendance reporting.** |



**Questions parking lot**

Please use this document to ask the admin team a question or raise a concern. Before you type in a question, please review prior questions. Admin will be meeting daily to review your questions and provide an answer to the best of our abilities. Please be aware some questions you have may require clarification from the district office and may take us some time to provide a complete and accurate response.

**\*PLEASE INSERT (right click > add row) MOST RECENT QUESTIONS AT THE TOP\***

| | | | |
|---|---|---|---|
| | ▇ | **Will we get a special, or a personal, notification if there is a student who has been in our classroom, who is now Covid positive?** | All in the Rincon community are notified via a general notification whenever there is a COVID+ case on campus, which will indicate the date(s) the individual was on campus in relation to the COVID+ test result.  EUSD policy, in accordance with HIPAA and privacy regulations, does not permit identification of the COVID+ individual (whether student, staff, visitor to campus, etc).  The notification will state that an "individual" tested positive for COVID.  As a Teacher, you will be able to identify students who are impacted by a COVID quarantine (being + OR a close contact and required to quarantine) via their attendance and notifications from ▇ that indicate a need to remain home due to symptoms, + status, or close contact status … <u>without that being explicitly stated to you.</u>  No one should indicate "John Smith is COVID+" to you, as an example.  Admin will contact trace all situations to the best of our ability, and we will discuss with staff details that can be shared in order to identify possible close contacts, staff included, for each situation. |
| 9/2 | ▇ | **Where can we get a molecular covid test in Escondido?** | Through this process which has been in place since last school year, staff testing to return to work with a negative COVID test result when in a COVID-related situation have typically provided results that originate from their primary health care provider.  I do not have a list of molecular/lab-resulted COVID test locations to share. |
| 9/2 | ▇ | **Covid booster shots, when will they be made available for teachers. Are we getting letters from district like last year?** | Human Resources will continue to establish EUSD policy that is created at the Cabinet level related to all facets of COVID-19 policies and protocols.  ALL Rincon staff will be kept aware of new information once it has been |



Please use this document to ask the admin team a question or raise a concern. Before you type in a question, please review prior questions. Admin will be meeting daily to review your questions and provide an answer to the best of our abilities. Please be aware some questions you have may require clarification from the district office and may take us some time to provide a complete and accurate response.

**\*PLEASE INSERT (right click > add row) MOST RECENT QUESTIONS AT THE TOP\***

| | | | created and shared by District Leaders. |
|---|---|---|---|
| **9/2** | ▆▆▆ | **I-Ready: Are students being required to do minutes each week, and how much? Is this required to be completed at home? Will this be part of student grades?** | **Yes, it is encouraged that students are to complete iReady lessons weekly. In regards to the amount of time spent on iready, that is TBD. If you opt to use it for a grade, calibrate with your team as to what that would look like.** |
| **9/2** | ▆▆▆ | **i-Ready: headphones?** | **We have headphones available for check out. We do not have enough for every student, but a class set can be shared amongst the team. You can also ask students to bring their own headphones.** |
| **9/1** | ▆▆▆▆ | **I have a few students that are out due to covid. They are asking for classwork while they are out. Are we supposed to supply them with work? It was mentioned that they would have some kind of independent study, but on the covid letters ▆▆ sent it doesn't say if they qualify for that.** | **Temporary Independent Study will start next week (more info to come at Staff Meeting), in the meantime, please provide quarantined students with classwork via Google Classroom, Clever, etc. so they can keep up as much as possible until TIS starts.** |
| **8/31** | ▆▆▆ | **How do students get water? I'm out of bottles.** | **We are no longer passing out water bottles. Students are welcome to bring their own refillable bottle and fill up at the water fountains, or just use the water fountains.** |
| **8/29** | ▆▆▆ | **Many of my students are NOT getting/eating breakfast and weren't aware of the food available to pick up after school for breakfast (neither was I until I spoke to another teacher). Is** | **Students are provided the opportunity to obtain food in a grab & go format in the courtyard area near the MPR each day upon dismissal. This food offering provides "supper" and "breakfast" for the following day. It is students' responsibility to stop to pick up** |



Please use this document to ask the admin team a question or raise a concern. Before you type in a question, please review prior questions. Admin will be meeting daily to review your questions and provide an answer to the best of our abilities. Please be aware some questions you have may require clarification from the district office and may take us some time to provide a complete and accurate response.

*PLEASE INSERT (right click > add row) MOST RECENT QUESTIONS AT THE TOP*

| | | | |
|---|---|---|---|
| | | there another option available for students who don't get breakfast afterschool?<br><br>Also, many students can't find where to get snacks at nutrition and/or weren't aware there snacks available to them during this time. Is there a specific location I can tell students where to find snacks at nutrition? | this food offering should they choose.<br><br>**The grab & go after school provides breakfast for the next day before school or at nutrition.Student is responsible to bring the grab & go breakfast.  No snacks are provided on campus during nutrition.** |
| 8/29 | ▇▇▇ | **How is Clever being used for communication this year. How will the parent messaging (new feature) be used? I saw** ▇▇▇ **Q below, and have specific questions since students won't need to log on through Clever anymore.** | **Clever is currently having issues messaging emergency contacts, not parents. I have submitted a Help Desk ticket (**▇▇▇**). You may continue to use any means necessary to communicate with parents—Google Classroom, Class Dojo, etc.** |
| 8/20 | ▇▇▇ | **Will we be given extra masks for our classrooms? ( for when they break or forget)** | **Yes, Teachers may request available PPE for their classrooms.** |
| 8/18 | ▇▇▇ | **For seating charts: can we change them or should the seating charts be the same all year?** | **You may change them, but please record the dates of each seating chart and keep old seating charts so we will have the necessary information if we need to do contact tracing.** |
| 8/18 | ▇▇▇ | **Who is the AP for Electives?** | ▇▇▇ **is the AP for Electives.** |



Please use this document to ask the admin team a question or raise a concern. Before you type in a question, please review prior questions. Admin will be meeting daily to review your questions and provide an answer to the best of our abilities. Please be aware some questions you have may require clarification from the district office and may take us some time to provide a complete and accurate response.

**Questions parking lot**

**\*PLEASE INSERT (right click > add row) MOST RECENT QUESTIONS AT THE TOP\***

| | | Yearbook? | |
|---|---|---|---|
| 8/18 | ▆▆▆▆▆▆ | **What is the status of after-school programs this year? (clubs, homework helpers, interventions)** | **Planning is still in the works and we will send out information once it is finalized.** |
| 8/18 | ▆▆▆▆▆▆ | **Are we still utilizing Clever?**<br><br>▆▆▆-I plan on using it. I used it to launch test links each period so one had an early look at a test in Google Classroom.  I have Mega Classes in Google Classrooms so using Clever was helpful.<br><br>▆▆▆: They added a Parent messaging option too so I thought of using that in addition to posting on GC | **Yes, you may still use Clever.** |
| 8/18 | ▆▆▆▆▆▆ | **Will students still have access to Zoom this year? (as well as Clever, as ▆▆▆ asked) I was thinking of using Zoom as a check-in tool at the beginning of class (as I did last year) and use it with students who might have to check in via Zoom from home if they are absent.**<br><br>▆▆▆-I plan on using Zoom during class.  It helps control what everyone is | **Yes, students will still have Zoom access for now.** |



Please use this document to ask the admin team a question or raise a concern. Before you type in a question, please review prior questions. Admin will be meeting daily to review your questions and provide an answer to the best of our abilities. Please be aware some questions you have may require clarification from the district office and may take us some time to provide a complete and accurate response.

**Questions parking lot**

*PLEASE INSERT (right click > add row) MOST RECENT QUESTIONS AT THE TOP*

|  |  |  |  |
|---|---|---|---|
|  |  | seeing on their screen with Apple Classroom being problematic last year. |  |
| 8/18 | ▮▮▮▮▮ | **Vista Duty: Are there any changes to the Vista Duty? I have not done it in a few years. When I did it for a few years at RMS I reported several issues to our admin. Example: Observing cars zooming down the alley and almost hitting students. ▮▮ from the DO also supported us on this topic.**<br><br>**▮▮ - do we get a visible vest to wear and a stop/slow sign? How should we control traffic. As Ms. ▮▮ said, parents speed down that road every morning and afternoon, and saw this myself last year.** | **We will order safety vests for the 5 people who are assigned to this duty. The expectation is to supervise that area- ensuring safety, not to control traffic. This would include cueing students to use the sidewalk and watch for cars. We will contact ▮▮ (no longer ISS) and ▮▮▮ (ISS) to see how EPD could support our efforts to keep our staff and students safe in walking to and from school. That road is an access road and cannot be blocked off.** |
| 8/18 | ▮▮ | **How will the added 6/7the staff be incorporated into grade level teams (▮▮ and ▮▮) for WOW planning? Are their students separate or commingled with one of each grade level teams?** | **▮▮ and ▮▮ share the same students, so they will be collaborating on activities to do with their shared students. For ▮▮, it would be helpful to reach out to ▮▮▮ about AVID ideas for engaging students during the week of welcome.** |
| 8/18 | ▮▮ | **Have classes with more than 24 students, are they still being balanced?** | **The average class size is 24:1. Class lists are still being finalized.** |



Please use this document to ask the admin team a question or raise a concern. Before you type in a question, please review prior questions. Admin will be meeting daily to review your questions and provide an answer to the best of our abilities. Please be aware some questions you have may require clarification from the district office and may take us some time to provide a complete and accurate response.

**==*PLEASE INSERT (right click > add row) MOST RECENT QUESTIONS AT THE TOP*==**

| | | | |
|---|---|---|---|
| 8/18 | ██████ | What do we do with our FOBs? | Keep them as you will need them to visit the D.O. or if you ever visit another school. We may revert to using them at some point. |
| 8/18 | ██████ | Where do we turn in our Mandated training certs? | We will share the link during the Mandated Trainings presentation and you may also find it **HERE**. You will submit to HR when all your trainings are completed. |
| 8/18 <br><br> 8/20 | ██████ | When can we sign up for adjunct duties? There is no access. <br><br> Will our students get water this year? <br><br> Will staff get the spray bottles for our tables. I know that we don't have to do this. But I would like to have a bottle for my tables. | Now. **HERE** is the link. |
| 8/18 | ██████ | If our team wants to, can we do iPad set up in 1st period instead of through ELA? <br><br> ██████- remember many students on your team have PE or Explore per. 1... Also, expect that students are hyper focused on schedules - who do I have, who is in my class, how do I get there | Will do iPad setup in ELA |



Please use this document to ask the admin team a question or raise a concern. Before you type in a question, please review prior questions. Admin will be meeting daily to review your questions and provide an answer to the best of our abilities. Please be aware some questions you have may require clarification from the district office and may take us some time to provide a complete and accurate response.

**Questions parking lot**

*==PLEASE INSERT (right click > add row) MOST RECENT QUESTIONS AT THE TOP*==

| 8/18 | ▮▮▮▮▮ | To follow up my question about after school clubs, etc. I see that the description on the adjunct duty list says "unpaid." However, in the past, we have been paid for after-school hour-long activities (such as clubs, interventions, etc.). Has that changed this year? | Clubs are currently on a pause until approved by Cabinet. |
|------|-------|---|---|
| 8/18 | ▮▮▮▮▮ | Is there a way to have two CCAE Liaisons on the adjunct duty list? I've held that position in the past and I see ▮▮▮▮ signed up for it which is great. I think this would be a great collaborative opportunity for us representing two VAPA classes at those meetings. | Yes, we can have 2 CCAE liaisons. Please sign up. |
| 8/18 | ▮▮▮▮ | Are we supposed to complete any of the mandated trainings before our 2-3pm mandated training tomorrow?  Or will all of the district mandated trainings be completed together? | All mandated trainings will be completed together as a Rincon staff, split between two sessions: Thursday, 8/19 2-3pm AND Friday, 8/20 1-3pm. Zoom links are identified on our opening 3 day Agenda(s).  District leaders have identified two other trainings (A.L.I.C.E./Active Shooter scenario) and Integrated Germ Management as "TBD." |
| 8/18 | ▮▮▮▮ | Is there a folder/location to submit team notes? | I would suggest/recommend that Admin create a folder/location on the S.O.S. page.  Let us discuss, please, and we will then share out a decision re: location. |

**EXHIBIT 12**



**Trent Smith** < ▓▓▓ @eusd.org>                                      Thu, Apr 7, 2022 at 8:05 PM

There is no plan for all classified to have to view it at this time. There have been conversations about using the training as part of mandated trainings at the start of each year. At this time, parents/guardians will not receive it. But that is possible in the future.

*Trent Smith*
*Director*
*Integrated Student Supports*
▓▓▓▓▓▓▓ *Telephone*
▓▓▓▓▓▓▓ *Fax*

**EXHIBIT 13**

Mirabelli v. Escondido Union Elementary

**Rights of Gender Diverse Students Presentation**

**(2.3.22 Staff Meeting)**

…

L. PITARD:     All right. Skip out of that. Does anyone have any questions?

B. ALDANA:   I do.

L. PITARD:     Okay.

B. ALDANA:   So, these laws have been on the books for, for a while. I know we've had some, you know, like nondiscrimination videos, uh, PDs. So I'm wondering, um, is there something new? A new law? A new – because, uh, unless this is just to, uh, uh, I mean, I'm just trying to understand that these laws have been on the books for a long time. Is it just because it's actually, um, now being direct to our, uh, uh, um, LGBTQ, um, plus community? Is that what it is? Is that what's going on? Because, I mean, I get it. The laws have been there! I'm just, is that, am I on the right track?

L. PITARD:     Um, yeah. I think it's because of, um, how much more we're seeing it now, how much more comfortable kids are being about, you know, either coming out or, you know, identifying in different ways than -- you know, before they kind of kept it all in and, and things. I know that we also have had, um, um, some problems with people not being accepting of kids wanting to, or that kids that identify as, as, you know, something other than what they were born or wanting to change their names. And, and so I think that they were just trying to put it up there, like, you know, everybody's hearing the same, um, uh, thing today across this, across the District. This is -- and that's why they didn't have us present it; they made the video so that everybody's just hearing it and, and understanding that it does, it's not just protections for adults but it protects kids all the way, you know, down. So, and just in how we can then support.

B. ALDANA:   Okay, so I just have one or two more questions, just really quick. Um, this I've, this is actually the most empowering time, I believe, for, um, for our community. And

| | | |
|---|---|---|
| 1 | | so I, I, I agree with all of the education that we're getting. But I was wondering, will |
| 2 | | the kids be getting this type of lessons, too? Because, you know, I think it's gonna |
| 3 | | be tough for kids going into the restroom they feel comfortable with and the, and |
| 4 | | let's say a girl, uh, someone who identifies as a male goes into the boys restroom |
| 5 | | and then the boys need the lessons, too, right? So are we gonna be getting those? |
| 6 | | Because I, I mean, I, I don't have a, an issue with any of this, but I will have an issue |
| 7 | | if the kids, um, discriminate or harass other students. But if they don't get this type |
| 8 | | of education, then we're kind of in square one. So – |
| 9 | L. PITARD: | Um, Greg or Carla, do you remember if they talked about any kind of, um, education |
| 10 | | or, or even maybe counseling? Do you guys know of anything that's coming down |
| 11 | | the pike for, um, educating kids to this? 'Cause I don't remember them saying |
| 12 | | anything in our admin meeting. |
| 13 | B. ALDANA: | Because see, that's, that's, that's huge. Because we as staff, I think we understand |
| 14 | | and wha-, um, what we need to do. But if the kids are not educated in how to be |
| 15 | | respectful, with maybe, you know, what they do not understand. |
| 16 | L. PITARD: | Yeah. |
| 17 | B. ALDANA: | You see what I'm saying? What they [inaudible/crosstalk]. |
| 18 | L. PITARD: | No, I, I hear, I hear what you're saying, and, and you brought up some valid points, |
| 19 | | and, and I'll make a note to inquire about that. |
| 20 | B. ALDANA: | Okay, thank you. |
| 21 | L. PITARD: | Uh-huh. |
| 22 | G. FRYAN: | I know that Carlon also has some, some great lessons already on appreciating |
| 23 | | diversity and creating a more inclusive just classroom and campus environment. So |
| 24 | | we can go ahead and start those, putting some of those into our weekly PBIS lessons. |
| 25 | | Let's just get through [inaudible] first, and the get those in there. Um, but I know |
| 26 | | we do have some site based stuff that we've done in the past that can for sure be |
| 27 | | used. |
| 28 | L. PITARD: | Carla, anything in the chat? |

**ESCONDIDO UNION SCHOOL DISTRICT—STAFF MEETING 2/3/2022**

1  C. CARDONA-GIBBS:  Let me check.

2  B. ALDANA:   Well, actually, G br-, brings up a really good point where the kids themselves don't

3  know what their rights are.

4  C. CARDONA-GIBBS:  And that's in the chat. Uh, G says a lot of students aren't aware of their

5  rights. I had several conversations with students who don't know about their rights,

6  um, regarding disclosure and expression and facilities used.

7  [Knocking]

8  L. PITARD:   Sorry, knock at my door. Um, well, I'm writing the note down right now. And

9  Miss Whelan says that we do cover to some extent in our eighth grade health unit.

10  And it looks like Mr. Carlon is, uh, asking [inaudible] to collaborate on some PBIS

11  lessons for our site.

12  L. PITARD:   Oh, that would be great. Okay. Anyone else? I thought it was a very, very well done

13  presentation. Um, very thorough. And it was a lot shorter than the one that we, when,

14  than the one that we got at, uh, admin level. It was a little bit longer. So, all right, if

15  no one has anything else, then I will -- oops, I don't want to play it again! No, no,

16  [inaudible], no! To the next slide.

17  …

18  [End of recording]

19

20

21

22

23

24

25

26

27

28

3.

**PROOFREADER'S CERTIFICATE**

I, Erica Lowther, owner of San Diego Transcription, certify that on February 2, 2023, I proofread all the transcript of the above-referenced recording, while listening to the recording from which the same was transcribed, and that said transcript as typed accurately reflects the spoken word, to the best of my ability to hear those recorded words and identify the persons speaking.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on February 2, 2023, at San Diego, California.

ERICA LOWTHER

**ESCONDIDO UNION SCHOOL DISTRICT—STAFF MEETING 2/3/2022**

**EXHIBIT 14**

**Board Policy Manual**
**Escondido Union School District**

| Policy 4119.21: Professional Standards | Status: ADOPTED |
|---|---|

**Original Adopted Date:** 10/23/2003 | **Last Revised Date:** 03/08/2018 | **Last Reviewed Date:** 03/08/2018

The Board of Education expects district employees to maintain the highest ethical standards, behave professionally, follow district policies and regulations, abide by state and federal laws, and exercise good judgment when interacting with students and other members of the school community. Employees shall engage in conduct that enhances the integrity of the district, advances the goals of the district's educational programs, and contributes to a positive school climate.

The board encourages district employees to accept as guiding principles the professional standards and codes of ethics adopted by educational or professional associations to which they may belong.

Each employee is expected to acquire the knowledge and skills necessary to fulfill his/her responsibilities and to contribute to the learning and achievement of district students.

**Inappropriate Conduct**

Inappropriate employee conduct includes, but is not limited to:

1. Engaging in any conduct that endangers students, staff, or others, including, but not limited to physical violence, threats of violence, or possession of a firearm or other weapon

2. Engaging in harassing or discriminatory behavior towards students, parents/guardians, staff, or community members, or failing or refusing to intervene when an act of discrimination, harassment, intimidation, or bullying against a student is observed

3. Physically abusing, sexually abusing, neglecting, or otherwise willfully harming or injuring a child

4. Engaging in inappropriate socialization or fraternization with a student or soliciting, encouraging, or maintaining an inappropriate written, verbal, or physical relationship with a student

5. Possessing or viewing any pornography on school grounds, or possessing or viewing child pornography or other imagery portraying children in a sexualized manner at any time

6. Using profane, obscene, or abusive language against students, parents/guardians, staff, or community members

7. Willfully disrupting district or school operations by loud or unreasonable noise or other action

8. Using tobacco, alcohol, or an illegal or unauthorized substance, or possessing or distributing any controlled substance, while in the workplace, on district property, or at a school-sponsored activity

9. Being dishonest with students, parents/guardians, staff, or members of the public, including, but not limited to, falsifying information in employment records or other school records

10. Divulging confidential information about students, district employees, or district operations to persons or entities not authorized to receive the information

11. Using district equipment or other district resources for the employee's own commercial purposes or for political activities

12. Using district equipment or communications devises for personal purposes while on duty, except in an emergency, during scheduled work breaks, or for personal necessity

    Employees shall be notified that computer files and all electronic communications, including, but not limited to, email and voice mail, are not private. To ensure proper use, the superintendent or designee may monitor employee usage of district technological resources at any time without the employee's consent.

13. Causing damage to or engaging in theft of property belonging to students, staff, or the district

14. Wearing inappropriate attire

**Reports of Misconduct**

An employee who observes or has evidence of another employee's inappropriate conduct shall immediately report such conduct to the principal or superintendent or designee. An employee who has knowledge of or suspects child abuse or neglect shall file a report pursuant to the district's child abuse reporting procedures as detailed in AR 5141.4 - Child Abuse Prevention and Reporting.

Any reports of employee misconduct shall be promptly investigated. Any employee who is found to have engaged in inappropriate conduct in violation of law or board policy shall be subject to disciplinary action and, in the case of a certificated employee, may be subject to a report to the Commission on Teacher Credentialing. The superintendent or designee shall notify local law enforcement as appropriate.

An employee who has knowledge of but fails to report inappropriate employee conduct may also be subject to discipline.

The district prohibits retaliation against anyone who files a complaint against an employee or reports an employee's inappropriate conduct. Any employee who retaliates against any such complainant, reporter, or other participant in the district's complaint process shall be subject to discipline.

**Notifications**

The section(s) of the district's employee code of conduct addressing interactions with students shall be provided to parents/guardians at the beginning of each school year and shall be posted on school and/or district web sites. (Education Code 44050)

**EXHIBIT 15**

**Board Policy Manual**
**Escondido Union School District**

**Policy 0100: Philosophy**                                                   Status: ADOPTED

Original Adopted Date: 10/23/2003 | Last Revised Date: 08/10/2017 | Last Reviewed Date: 08/10/2017

In order to establish and support a guiding vision for the district, the Board of Education shall develop, articulate, and regularly review an overarching set of fundamental principles which describe the district's core beliefs, values, and tenets. The board and district staff shall incorporate these principles into all programs, activities, and operations of the district.

It is the philosophy of the district that:

1. All students can learn and succeed.

2. Every student should have an opportunity to receive a quality education regardless of his/her social, cultural, or economic background.

3. Every student in the district has a right to be free from discrimination, harassment, intimidation, and bullying, as prohibited by law or district policy.

4. The future of our nation and community depends on students possessing the skills to be lifelong learners, collaborative and creative problem solvers, and effective, contributing members of a global and technologically advanced society.

5. Highly skilled and dedicated teachers and educational support staff have the capacity to guide students toward individual achievement and growth, and have a direct and powerful influence on student learning and life experiences.

6. A safe, nurturing environment and positive school climate are necessary for learning, academic achievement, and student development.

7. Parents/guardians have a right and an obligation to be engaged in their child's education and to be involved in the intellectual, physical, emotional, and social development and well-being of their child.

8. The needs of the whole child must be addressed, as the ability of children to learn is affected by social, health, and economic conditions and other factors outside the classroom.

9. Early identification of learning and behavioral difficulties and timely and appropriate support and intervention contribute to student success.

10. Students and staff are encouraged and motivated by high expectations and recognition for their accomplishments.

11. School improvement is a dynamic process requiring flexibility and innovation to meet the needs of students in a changing world.

12. Professional development for the board and district staff is essential for the growth and success of the district and its students.

13. The diversity of the student body and school staff enriches the learning experience, promotes cultural awareness and acceptance, and serves as a model for citizenship in a global society.

14. A common set of norms and protocols is crucial to effective governance.

15. Communication, trust, respect, collaboration, and teamwork strengthen the relationship among Board members and between the board and superintendent, and contribute to the effectiveness of the governance team.

16. The community and district are inextricably connected partners, wherein the community's engagement in issues that impact the schools enhances the district's programs and student learning.

17. Two-way communication with all stakeholders is essential for establishing continuity, support, and shared goals

both within the district and with the surrounding community.

18. The board has a responsibility to advocate on behalf all students, keep current on legislative issues affecting education, and build positive relationships with local, state, and federal representatives.

19. A fiscally sound budget which is reflective of the district's vision is imperative to the financial stability of the district and to the attainment of its goals.

20. Responsibility for district programs and operations is shared by the entire educational community, with ultimate accountability resting with the board as the basic embodiment of representative government.

**EXHIBIT 16**

**Board Policy Manual**
**Escondido Union School District**

**Policy 6144: Controversial Issues**                                        Status: ADOPTED

**Original Adopted Date:** 11/20/1989 | **Last Reviewed Date:** 11/20/1989

The Board of Education recognizes that only through an understanding of antecedent facts and values that shape our society, and an understanding of issues and unsolved problems currently confronting society, can students be afforded an opportunity to acquire the fundamental qualifications for citizenship in a growing, changing society.

The district has a responsibility to teach students to be concerned about finding possible answers to problems of concern to students and society. The board believes that:

1. Students should be taught to be willing to take a stand on questions which citizens must decide, and yet to maintain an attitude of open-mindedness toward new facts which may lead to new conclusions.

2. Students should be taught to respect the rights of others to differ in their opinions and beliefs.

3. Accurate information and critical thinking will discourage the uncritical acceptance of unsound proposals for solving controversial issues, and will focus the experience of history upon possible solutions.

There should be serious consideration of controversial issues on public problems in our public schools since respect for facts and an impartial search for truth are inherent in our American democratic society. Problems and issues selected for discussion and investigation should be significant and of interest to students and add to the overall curriculum.

In the district schools, policy concerning controversial issues shall be defined both in terms of the rights of students and in terms of the rights of teachers.

**Board Policy Manual**
**Escondido Union School District**

**Regulation 6144: Controversial Issues**                                Status: ADOPTED

Original Adopted Date: 11/20/1989 | Last Reviewed Date: 11/20/1989

### Definition

A controversial issue is defined as any public problem which society, or segment thereof, is in the process of debating and for which more than one solution may be offered and supported by individuals or any group of individuals.

The fact that controversy exists or may exist with regard to an issue, is considered to be prima facie evidence that there is argument to support opposing views.

### Rights and Responsibilities of Teachers

1. The teacher has the obligation and the right to provide for dispassionate, impartial, and objective study of controversial issues in a classroom atmosphere void of partisanship and bias.

2. The teacher has the obligation and the right to provide sufficient materials on both sides of an issue so that alternatives can be discussed and evaluated on an equitable basis.

3. The teacher has the obligation to consider the appropriate- ness and acceptability to the parents/guardians and to the community of any controversial topic that may be discussed in the classroom. If, after the consideration of all aspects involved, the teacher feels that discussion of the issue will benefit the intellectual growth of the student, he/she has the right to proceed within the bounds set by other sections of this policy.

4. The teacher has the obligation and the right to judge the amount of time needed for a satisfactory study of a controversial issue, and allot only that amount of time deemed sufficient for students to reach valid judgments and conclusions or hypotheses.

5. The teacher has the right to express his/her own opinion on controversial issues without thereby jeopardizing his/her relations with his/her students, his/her colleagues, or his/her administrative supervisors. In expressing this opinion, the teacher has the obligation to avoid an undue influence upon his/her students' decisions, and should state that he/she is expressing his/her own opinion.

6. The teacher has the obligation to keep the principal or other designated school administrator aware of those controversial issues which are under study or which are planned for study.

### Rights and Responsibilities of Students

1. The student has the right to express his/her own opinion on controversial issues under consideration without thereby jeopardizing relationships with classmates or the teacher, nor shall his/her opinions be used as a basis for evaluation of academic or citizenship standing.

2. The student has the obligation to undertake the study of a controversial issue in the same objective manner that the teacher pursues.

### Resource Persons

1. The teacher, with the approval of the principal or other designated administrator, may invite representatives of different points of view to appear before the class to discuss their opinions.

2. No group or individual may present arguments for or against any issue under study to students or to the class without authorization from the teacher and the principal.

**EXHIBIT 17**

2022-2024

# CERTIFICATED CONTRACT



Escondido Union School District

and

Escondido Elementary Educators Association (EEEA)

## **TABLE OF CONTENTS**

| | | |
|---|---|---|
| Article I | Agreement | 1 |
| Article II | Recognition | 2 |
| Article III | Definitions | 3 |
| Article IV | Employee Rights | 4 |
| Article V | Association Rights | 5 |
| Article VI | District Rights | 8 |
| Article VII | Negotiation Procedures | 9 |
| Article VIII | Grievance Procedures | 10 |
| Article IX | | 14 |
| Article X | Work Hours/Work Year | 15 |
| Article XI | Leaves | 19 |
| Article XII | Class Size | 30 |
| Article XIII | Transfers | 31 |
| Article XIV | Evaluation | 34 |
| Article XV | Safety | 54 |
| Article XVI | Employee Benefits | 58 |
| Article XVII | Salaries | 63 |
| Article XVIII | Early Retirement | 71 |
| Article XIX | Miscellaneous | 72 |
| Article XX | Contract Provisions | 73 |
| Article XXI | Suspension | 74 |
| Article XXII | Peer Assistance and Review (PAR) | 76 |
| Article XXIII | MultiTrack | 80 |
| | Evaluation Side Letter of Agreement | 83 |
| | Full-day Transitional Kindergarten MOU | 102 |
| | Uncovered Teacher Absence MOU | 103 |
| | Outdoor Education: Camp Cuyamaca MOU | 105 |
| | School Schedules | 107 |
| | Draft Payroll Hourly/Daily Chart | 109 |

## ARTICLE XIV
## EVALUATION

A.   Evaluation Program

    1.   Frequency of Evaluation

        a.   Probationary and temporary employees shall be evaluated each year based on the current California Standards for the Teaching Profession.

        b.   Permanent employees who have been employed by the district for less than ten (10) years shall be evaluated at least every other year based on the current California Standards for the Teaching Profession.  If the most recent evaluation reflects an unsatisfactory ranking in any element, the employee may be evaluated the subsequent year.

        c.   Permanent employees who have been employed by the District for at least ten (10) years may be evaluated every five (5) years based on the current California Standards for the Teaching Profession instead of every other year if:

            1)   The employee received a satisfactory evaluation during the previous evaluation cycle.

            2)   The employee is deemed highly qualified under the No Child Left Behind Act.

            3)   The evaluator and the employee consent to the five (5) year cycle.

By request of the evaluator or the employee, the employee will be returned to the evaluation cycle of every other year.  Upon receipt of a non-satisfactory evaluation, the employee will be returned to the annual evaluation cycle.

    2.   Evaluation Standards, Elements, and Ratings – Temporary and Probationary Employees

        a.   SPERS 166a and 166b, Certificated Professional Evaluation: Objectives and Observations/Probationary and Temporary employees, shall be used by all employees in probationary or temporary status.

        b.   All Elements in each Standard shall be addressed during the evaluation period.

        c.   The evaluator shall determine, in consultation with the employee, the order and timing of the introduction of elements as the year progresses.

        d.   The Elements are the foundation of the observations and feedback, and cumulatively, for the Summative evaluations. They are intended to be observed in the classroom and other appropriate observational environments, and do not constitute projects for the employee to develop outside of the instructional process.

        e.   At the mid-point of the employee's school year, the evaluator shall meet with the employee to discuss the status of progress in achieving elements, standards, and other evaluative criteria.  The midyear assessment will be formalized using SPERS 166a.

        f.   The parties agree to form a joint committee to draft a new evaluation process with a goal to pilot it at a minimum of one elementary school and one middle school for the 2020-2021 school year.  The committee shall not exceed 10 members and shall consist of 50 percent bargaining unit members appointed by the association and 50 percent non- bargaining unit members of the District's choosing. Any new evaluation system including a pilot will be subject to the negotiation and ratification process of the bargaining unit.

        g.   For the final evaluation, the evaluator shall rate each element in each Standard.  The summary of such ratings shall constitute the rating of each Standard.

        h.   Ratings consist of the following, which are defined on Rubrics which shall be given to each employee:  1. Practice Not Consistent with Standard Expectations, 2. Developing Beginning Practice, 3. Maturing Beginning Practice, 4. Experienced Practice that Exemplifies the Standard.

        i.   A rating of one (1) (Practice Not Consistent with Standard Expectations) in two (2) elements in a Standard will result in a rating of Practice Not Consistent with Standard Expectation in the overall Standard.  SPERS 166a shall be used for the Midyear/Final Evaluations.

34

3. <u>Evaluation Standards, Elements, and Ratings – Permanent Employees</u>

a. SPERS 166a and 166b, Certificated Professional Evaluation: Objectives and Observations/Permanent Employee, shall be used by all employees in permanent status except XIV D.

b. Elements 5.6, 6.5 and 6.6 are mandatory for all evaluatees.  In addition, each evaluatee shall be responsible for selecting a minimum of one (1) element within Standards 1 through 4.  In specific situations, based upon an individual evaluatee's performance, nothing herein shall prevent the evaluator, after collaboration with the employee, from including additional elements.  Under those circumstances a maximum of 15 elements which includes the 3 mandatory elements 5.6, 6.5, and 6.6 may be identified on which the Summative evaluation will take place.

c. The Elements are the foundation of the observations and feedback, and cumulatively for the Summative evaluations.  They are intended to be observed in the classroom and other appropriate observational environments, and do not constitute projects for the teacher to develop outside of the instructional process.

d. During the course of the evaluation period, mitigating circumstances may arise which require modification of the Elements selected (i.e., adding additional Elements to reflect exemplary practice or areas of need for focus.)  The evaluator may determine additional elements after collaboration with the evaluatee.

e. At the mid-point of the employee's school year, the evaluator may meet with the employee to discuss the status of progress in achieving Elements and Standards and other evaluative criteria.

f. When a permanent employee experiences performance difficulties the supervisor may suggest to the employee the option of voluntarily participating in PAR.

g. In the development of the Summative, year-end evaluation, the evaluator shall rate the employee's performance on the Elements selected, including those required and those added during the year, and shall use those ratings to rate each Standard.

h. Ratings consist of:  1.  Unsatisfactory, 2.  Need Improvement, 3.  Meets District Standards, 4.  Exemplifies Standards.

i. A rating of Unsatisfactory in two Elements in a Standard shall result in the overall Standard being rated as unsatisfactory.

j. An unsatisfactory rating of three or more Standards shall result in an overall unsatisfactory evaluation. If the three unsatisfactory ratings are in Standards one through five for a total of any six elements in Standards one through five are rated as unsatisfactory, the evaluation shall be referred to the Peer Assistance and Review Panel for required participation in PAR the following year.

4. <u>Evaluation Timelines</u>:

a. Each employee who is to be evaluated shall be furnished a copy of the evaluation forms and procedures, including the Rubrics which describe the Elements in each Standard and the ratings thereof, and be notified of the identity of their primary evaluator, no later than the tenth (10th) contractual day of the year in which the evaluation is to take place. In case of a multiple-campus assignment, the District shall designate an evaluator for such employee.  Such employees may be observed by the supervisor at any site served, and said observation shall be included in the year-end evaluation.

b. Within fifteen (15) contractual working days of the beginning of the individual employee's school year, each employee who is being evaluated shall propose to the evaluator specific Elements within each Standard to begin with (probs and temps) or to be the foundation for the evaluation (permanent teachers).

c. Within thirty (30) contractual days of the beginning of the individual employee's school year, the evaluator and evaluatee shall meet to discuss and finalize the Elements as discussed in (3c) above.

d. The evaluator and evaluatee shall confer about problem areas in the employee's performance within ten (10) contractual days of said problem identification and prior to any negative comments or judgments related to routine classroom deficiencies being included in the final evaluation.

e. Not later than forty-five (45) calendar days prior to the end of the employee's school year, the evaluatee shall verify the status of achieving a demonstration of the Elements identified for that year.

In preparing the final evaluation rating for placement in the employee's personnel file, the evaluator shall rely primarily upon data collected and documented through classroom observations and observation/evaluation or performance conferences that have been previously presented to the unit member in writing in either memo or letter form or on the copy of the "Objectives and Observation" form.  Any deficiencies, which may have been presented to the employee in writing, may be reflected in the rating of the relevant Elements.  Those that have been corrected or improved shall be so reflected in the ratings.

f. Final evaluation ratings shall be summarized and presented to the employee at an evaluation conference no later than thirty (30) calendar days prior to the end of the instructional school year.

5. The Association and the District will meet outside of negotiations to address changes to evaluation documents for nurses and counselors.

The revised evaluation forms for School Psychologist, Resource Specialists, Designated Instruction Service Providers, Itinerant Teachers, and Teachers on Special Assignment will be implemented beginning with the 2005-06 school year.  The Association and District agree to review and modify outside of current negotiations, during the 2004-05 school year, evaluation documents currently utilized by Nurses and Counselors.

B. <u>Observations</u>

1. Probationary and temporary employees shall be formally observed at least twice annually.  Permanent employees who are being formally evaluated shall be formally observed at least one (1) time annually.  Formal observations shall be based on no fewer than twenty (20) minutes of consecutive classroom time.

2. In the event that deficient performance is noted in an observation of fewer than twenty (20) minutes, such circumstances will be quickly brought to the employee's attention. If deemed serious, the matter shall be provided in writing to the employee and shall result in a formal observation by the administrator within five (5) contractual days.

3. In the case of a negative observation(s), the evaluator shall meet with the employee within five (5) contractual days to discuss the observation.  If deemed serious, the matter shall be provided in writing to the employee. This written statement shall include but not be limited to the following:

a. Specific recommendations for improvement.

b. Direct assistance to implement such recommendations including additional observations.

c. Techniques to measure improvement.

d. Released time to visit and observe other employees.

e. A time schedule to monitor progress.

The employee shall be entitled to one (1) formal follow-up observation.  Such follow-up observation shall be scheduled by the evaluator to occur no sooner than seven (7) contractual days after the conference and no later than twenty (20) contractual days after the conference.  By mutual consent of the evaluator and the evaluatee, this timeline may be adjusted.

C. <u>Alternative Evaluation Program</u>

1. Participation is strictly voluntary and is available to employees who have completed at least three (3) years consecutive experience in the Escondido Union School District and have achieved permanent status.  This is in lieu of the standard evaluation form.

a. The discussion regarding an employee's participation may originate with either the immediate supervisor or the employee.

b. The decision as to whether or not the employee may voluntarily participate in the alternative evaluation program is solely that of the immediate supervisor, and is not subject to grievance.

c. Alternative Evaluation form, see Article XIV.

2. Alternate evaluation goals and objectives may be limited to a specific area in which the employee has a desire to focus in order to enhance professional growth and positively impact student learning.

    a.    The Alternative Objectives form will be filled out by the employee and will reflect the mutual agreement of the employee and the immediate supervisor as to the focus, criteria, and means of evaluation of the employee's objectives.

    b.    The time lines for the development of the Goals and Objectives as well as the number of observations, midyear and final evaluations shall remain the same as the standard evaluation.

3.    An employee who participates in the Alternative Evaluation Program will be encouraged to meet and share their project with other district employees at least once during the evaluation procedure.

D.    <u>Maintenance of Data Related to Evaluation</u>

1.    The District shall not base any adverse action against an employee upon derogatory materials which are not contained in such employee's personnel file.  Moreover, the District shall not base any adverse action against an employee upon materials which are contained in such employee's personnel file or evaluation folder unless the employee has been notified in writing at such time that the materials were being placed in his/her file or folder.

2.    Employees shall not have the right to review personnel file *materials, which* include ratings, reports or records which:

    a.    were obtained prior to the employment of the employee,

    b.    were prepared by identifiable examination committee members, or

    c.    were obtained in connection with a promotional examination.

3.    Before information of a negative or derogatory nature is placed in his/her personnel file, the employee shall be given notice.  The employee shall be provided reasonable release time, without salary reduction to review and to prepare a written response to such material.  The written response shall be attached to the material.

4.    Upon written authorization by the employee, a representative shall be permitted to examine and/or obtain copies of materials in such employee's personnel file.

5.    The person or persons who draft and/or place material in an employee's personnel file shall sign the material signifying the date on which such material was drafted for placement in the file.

6.    District administration access to personnel files shall be limited to the Superintendent and the employee's immediate or prospective supervisor(s) unless otherwise agreed to by the employee.  Board of Education members may request the review of an employee's file at a personnel session of the Board of Education.  The contents of all personnel files shall be kept in the strictest confidence.

7.    The District shall maintain the employee's personnel files at the District's central office.  The evaluator may maintain anecdotal information at the job site in between summative evaluations and will annually review anecdotal information that may be removed from the file.   Anecdotal information not included in the year-end evaluation following the incident, may not be used in a subsequent year-end evaluation.

E.    <u>Personal Freedom and the Freedom to Teach Related to Evaluation</u>

1.    The personal life of an employee shall not be a subject for evaluation except as it may directly affect the employee's job performance.

2.    The exercise of the right to free speech shall not be a subject for evaluation except as it may affect the employee in the performance of his/her assigned functions.  The evaluation process recognizes that academic freedom is essential to the fulfillment of the purpose of the District, and it acknowledges the fundamental need to protect employees from censorship or *restraint, which* might interfere with their obligation to pursue truth in the performance of their job role in the District.

F.    <u>Public Charges</u>

1.    No public charge against an employee shall be considered unless it is in writing by the identified complainant.
Such charge shall be provided to the employee within ten (10) contractual days.

2.    The Superintendent or designee shall determine if an investigation of the complaint is warranted.  Should the Superintendent or designee decide an investigation is warranted, the employee shall be entitled to offer evidence in his/her own defense.

3. The unit member may be accompanied by another unit member or CTA representative of his/her choice at any meeting he/she attends during the investigation.

4. Complaints shall not be placed in the *employee's personnel* file without first being investigated by the District.  The complaint shall not be placed in the employee's personnel file unless the District confirms the accuracy of the alleged facts.

5. The employee shall be notified if the complaint is to be placed in the personnel file and given an opportunity to attach a written statement thereto.

G. <u>Commission of Professional Competence</u>

The District shall release employees who are chosen to serve on the Commission of Professional Competence in accordance with the Education Code.  Such service shall be considered a professional responsibility and the rights and duties of the employee rendering such service shall be those contained in the Education Code.

**EXHIBIT 18**

Images From Rincon Middle School Campus Generally







## Images from Rincon Middle School Band Room

















## Pride Flags Handed Out by Teachers to Students





**EXHIBIT 19**

**Policy 6142.3: Civic Education**                                   Status: ADOPTED

**Original Adopted Date:** 10/08/2009 | **Last Revised Date:** 11/15/2018 | **Last Reviewed Date:** 11/15/2018

The Board of Education recognizes that citizen involvement in civic and political institutions is essential to a democratic government and desires to provide a comprehensive civic education program to help students acquire the knowledge, skills, and principles essential for informed, engaged, and responsible citizenship.

The board shall approve, upon the recommendation of the superintendent or designee, academic standards and curriculum in civics and government that are aligned with state academic standards and curriculum frameworks.

The superintendent or designee shall determine specific courses within the K-8 curriculum in which civic education and government may be explicitly and systematically taught. He/she shall also encourage the integration of civic education into other subjects as appropriate.

The district's civic education program shall provide students with an understanding of the rights and responsibilities of citizens in American democracy and the workings of federal, state, and local governments. As appropriate, instruction should include an examination of fundamental American documents, including, but not limited to, the Declaration of Independence, the United States Constitution, the Federalist Papers, and other significant writings and speeches. Instruction should also promote a student's understanding of shared democratic principles and values, such as personal responsibility, justice, equality, respect for others, civic-mindedness, and patriotism, and enable students to make their own commitment to these civic values.

Service learning, extracurricular and cocurricular activities, class and school elections, and observation of local government processes may be used to reinforce classroom instruction by linking civic knowledge to practical experience and encouraging civic involvement.

Whenever civic education includes topics that may be controversial due to political beliefs or other influences, instruction shall be presented in a balanced manner that does not promote any particular viewpoint. Students shall not be discriminated against for expressing their ideas and opinions and shall be encouraged to respect different points of view.

**Constitution/Citizenship Day**

Each year on or near September 17, in commemoration of Constitution and Citizenship Day, the district shall hold an educational program for students in grades K-8 pertaining to the United States Constitution, which shall include exercises and instruction in the purpose, meaning, and importance of the Constitution, including the Bill of Rights. (Education Code 37221; 36 USC 106 Note)

**EXHIBIT 20**

**Board Policy Manual**
**Escondido Union School District**

**Policy 5145.2: Freedom Of Speech/Expression**                                   **Status:** ADOPTED

**Original Adopted Date:** 03/16/2021 | **Last Revised Date:** 03/12/2009 | **Last Reviewed Date:** 03/12/2009

The Board of Education believes that free inquiry and exchange of ideas are essential parts of a democratic education. The board respects students' rights to express ideas and opinions, take stands on issues, and support causes, even when such speech is controversial or unpopular.

**On-Campus Expression**

Students shall have the right to exercise freedom of speech and of the press including, but not limited to, the use of bulletin boards; the distribution of printed materials or petitions; the wearing of buttons, badges, and other insignia; and the right of expression in official publications. (Education Code 48907)

Student expression on district or school Internet web sites and on-line media shall generally be afforded the same protections as print media.

Students' freedom of expression shall be limited only as allowed by law in order to maintain an orderly school environment and to protect the rights, health, and safety of all members of the school community.

Students are prohibited from making any expressions or distributing or posting any materials that are obscene, libelous, or slanderous. Students also are prohibited from making any expressions that so incite students as to create a clear and present danger of the commission of unlawful acts on school premises, the violation of school rules, or substantial disruption of the school's orderly operation. (Education Code 48907)

The use of "fighting words" or epithets is prohibited if the speech is abusive and insulting, rather than a communication of ideas, and the speech is used in an abusive manner in a situation that presents an actual danger that it will cause a breach of the peace. School officials shall not engage in prior restraint of material prepared for official school publications except insofar as the content of the material violates the law. (Education Code 48907)

The superintendent or designee shall not discipline any student solely on the basis of speech or other communication that would be constitutionally protected when engaged in outside of school, but may impose discipline for harassment, threats, or intimidation unless constitutionally protected. (Education Code 48950)

**Off-Campus Expression**

A student shall be subject to discipline for off-campus expression, including expression on off-campus Internet web sites, when such expression poses a threat to the safety of other students, staff, or school property, or substantially disrupts the educational program. The superintendent or designee shall document the impact the expression had or could be expected to have on the school program.

| | |
|---|---|
| **Regulation 5145.2: Freedom Of Speech/Expression** | **Status:** ADOPTED |
| **Original Adopted Date:** 03/12/2009 | **Last Reviewed Date:** 03/16/2021 | |

School-Sponsored Publications

Students shall have the right to exercise freedom of speech and of the press in official school publications except for expression that is obscene, libelous, slanderous, or so incites students as to create a clear and present danger of the commission of unlawful acts on school premises, the violation of lawful school regulations, or the substantial disruption of the orderly operation of the school. (Education Code 48907)

Official school publications includes material produced by students in journalism, newspaper, yearbook, or writing classes and distributed to the student body either for a fee or free. (Education Code 48907)

All student submissions shall be held to professional standards of English and journalism. (Education Code 48907)

If the principal considers material submitted for publication to violate Education Code 48907, he/she shall notify the student, without undue delay, and give specific reasons why the submitted material may not be published. Absent extraordinary circumstances, such notice should be given in sufficient time to allow the student time to either modify the material or to seek review of the principal's determination from the superintendent or designee. Prior to any restriction of student speech, school officials shall consider any feasible alternative options to restricting the speech.

Distribution of Printed Materials and Petitions by Students

The principal or designee may provide bulletin boards on which students and student organizations may post materials of general interest. Students also may post or distribute handbills, leaflets, and other printed material, whether produced within or outside of the school. Students may collect signatures on petitions concerning school or nonschool issues.

(cf. 1325 - Advertising and Promotion)

Printed materials or petitions may be distributed only:

1. Before or after school or during lunch time

2. In locations that do not obstruct the normal flow of traffic within school or at entrances

No student shall use coercion to induce students or any other persons to accept printed matter or to sign petitions. No funds shall be collected for any material distributed.

Clothing, Buttons, and Badges

Buttons, badges, armbands, and clothing bearing slogans or sayings may be worn unless their message falls into the categories prohibited by law and Board of Education policy. No employee shall interfere with this practice on the grounds that the message may be unpopular with students or faculty.

(cf. 5132 - Dress and Grooming)

(cf. 5136 - Gangs)

Appeals

The following procedures shall be used to address disputes regarding student freedom of expression:

1. The student and faculty member shall first attempt to resolve the problem themselves as quickly as possible.

2. If the student and faculty member are unable to resolve the dispute, the student and/or faculty member may bring the matter to the principal or designee, who shall hear both sides and strive to resolve the dispute as quickly as possible.

3. If the principal or designee is unable to resolve the dispute, the student and/or faculty member may bring the matter to the superintendent or designee, who shall hear both sides and strive to resolve the dispute as quickly as possible.

4. If the superintendent or designee is unable to resolve the dispute, the student and/or faculty member may ask for a hearing to determine whether a deprivation of freedom of expression was justified under the above regulations. This hearing shall be held before the board as soon as possible after it is requested. Both sides shall be given an opportunity to demonstrate that board policy and administrative regulations were properly applied.

ESCONDIDO UNION SCHOOL DISTRICT

March 12, 2009 Escondido, California

**EXHIBIT 21**

Escondido Union School District Mail - Preferred Pronouns for Student ▮▮▮    5/8/22, 11:5...


**Escondido**
UNION SCHOOL DISTRICT

Elizabeth Mirabelli ▮▮▮▮▮▮▮

## Preferred Pronouns for Student ▮
1 message

**Ida Batiste** ▮▮▮@eusd.org>                                Fri, Apr 1, 2022 at 1:26 PM
To: ▮▮▮▮▮▮▮

Cc: ▮▮▮▮▮▮▮

Hello Rincon Staff,

Please refer to the following student by he/they pronouns or by their first name ▮▮▮.

▮▮▮▮▮▮▮▮▮▮▮  **7** ▮▮▮

Here are details on how to navigate these changes:

**Only use she/her pronouns for school-home communications.** Student said "If mom asks about it first, you can tell her...but do not tell anyone else in the family in any circumstance".

If any students or staff members ask about student's gender please respond to them by saying:

"He/they are ▮▮▮'s preferred pronouns. please refer to them by he/they or their name"

If mom asks about the student's gender, please involve the student first. After approval from the student you may say ▮▮▮ communicated with us that they are no longer comfortable with she/her pronouns, and they now prefer he/they".

If you have any questions or concerns, please don't hesitate to reach out.

Thank you,

**Ida Batiste, LICSW, PPSC-SW**
Preferred Pronouns: she/her/ella (what and why?)
School Social Worker, Rincon Middle School
Phone: ▮▮▮▮▮▮
Fax: ▮
Email: ▮▮▮@eusd.org


Rincon Middle School

CONFIDENTIALITY NOTICE: This email message, including any attachments, is for the sole use of the intended recipient(s), are confidential, and

may be privileged. If you are not the intended recipient, you are hereby notified that any review, use, copying, disclosure, or distribution of this message or any of the information contained in this message is strictly prohibited. If you are not the intended recipient, please contact the sender by **reply** mail and destroy all copies of this message and any attachments from your system. Thank you.

**EXHIBIT 22**

Escondido Union School District Mail - Student Update - Preferred Name and Pronouns                    3/7/22, 3:46 PM

                                          Elizabeth Mirabelli

---

## Student Update - Preferred Name and Pronouns

1 message

---

**Gloria Torres** ▓▓▓▓@eusd.org>                                   Wed, Aug 10, 2022 at 3:39 PM
To: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Cc: Ida Batiste ▓▓▓▓▓ @eusd.org>, Katelyn Sylvester ▓▓▓▓▓ @eusd.org>

Hi Team,

I wanted to update you on this student's preferred name and pronouns:

▓▓▓▓▓▓▓▓▓▓    7   ▓▓▓▓▓

This student goes by "he/him" pronouns and his preferred name is ▓▓▓▓▓.

Please continue using ▓▓▓▓▓ and she/her pronouns when communicating with parents and in the community outside of school. (Mom is aware of preferred name/pronouns but dad is not, but student is okay with you using ▓▓▓▓▓ with both parents to make it as easy for you as possible when communicating home.)

Please let me know if you have any questions!

Thank you,
Gloria

---

**Gloria Torres, M.S., PPS**
School Counselor
Rincon Middle School
925 Lehner Ave, Escondido, CA 92026

Counseling website: https://sites.google.com/eusd.org/rms-counseling/home

**EXHIBIT 23**

Escondido Union School District Mail - 7th Grade Student Preferred Names and Pronouns    9/7/22, 3:4? P



Elizabeth Mirabelli

## ***7th Grade Student Preferred Names and Pronouns***

4 messages

**Gloria Torres** < ████ @eusd.org>                    Fri, Aug 12, 2022 at 2:40 PM
To: 
████████████████████████████████████████████████████████████

Cc: ████████████████████████████████████

Hi Team,

I know I've sent a few emails about this, but I don't want any of this info to get lost so I am putting it all into one email. Students have requested I share this information with you (though there may be some students on this list that you don't work with). This list also includes students I've already sent emails about.

████████████): Preferred name is ████ (pronouns are he/it). The parents are **NOT** aware so please use ████████ and she/her when calling home.

████████████): Preferred name is ████████ (pronouns are he/him). Mom is aware but dad is **NOT** aware, but student is okay with you using ████████ (she/her) with both parents to make it as easy for you as possible when communicating home.

████████████): Preferred name is ████ (pronouns are he/him). Adults at home **NOT** aware, please use ████████ and she/her when calling home.

████████████): Preferred name is ████ (pronouns are they/she). Mom is **NOT** aware so please use ████████ and she/her when calling home.

████████████): Preferred name is ████ (pronouns are he/him). Dad and stepmom are **NOT** aware, please use ████████ and she/her when calling home.

████████████): Preferred name is ████ (pronouns they/them). Mom IS aware and supportive :)

I will continue checking in with students next week so will send an update with any additions within this same thread.

Thank you all,
Gloria

**Gloria Torres, M.S., PPS**
School Counselor
Rincon Middle School
925 Lehner Ave, Escondido, CA 92026

Counseling website: https://sites.google.com/eusd.org/rms-counseling/home

████████  ████████                                          Sat, Aug 13, 2022 at 11:20 AM



[Quoted text hidden]

Teacher
Rincon Middle School

---

To:                                                                      Sat, Aug 13, 2022 at 11:31 AM
Cc:

[Quoted text hidden]

---

**Gloria Torres** <          @eusd.org>                              Mon, Aug 15, 2022 at 2:40 PM
To:

Cc:

Hi All,

Here is a full list with one addition highlighted below.

• I have also added a few updates to our team doc based on the meetings I had with students. View the doc here.

        : Preferred name is        (pronouns are he/it). The parents are **NOT** aware so please use

Escondido Union School District Mail 6th-8th Grade Student Preferred Names and Pronouns                          2022, 3:44 PM

and she/her when calling home.

███████████): Preferred name is ███████████ (pronouns are he/him). Mom is aware but dad is **NOT** aware, but student is okay with you using ███████ (she/her) with both parents to make it as easy for you as possible when communicating home.

███████████): Preferred name is ██████ (pronouns are they/them). Parents are **NOT** aware so please use ██████ and she/her when calling home.

███████████): Preferred name is ████ (pronouns are he/him). Adults at home **NOT** aware, please use ██████ and she/her when calling home.

███████████): Preferred name is ██████ (pronouns are they/she). Mom is **NOT** aware so please use ██████ and she/her when calling home.

███████████): Preferred name is ██████ (pronouns are he/him). Dad and stepmom are **NOT** aware, please use ██████ and she/her when calling home.

███████████): Preferred name is ██████ (pronouns they/them). Mom IS aware and supportive :)

[Quoted text hidden]

**EXHIBIT 24**

*20 March 2023*

### DOCTRINAL NOTE ON THE MORAL LIMITS TO TECHNOLOGICAL MANIPULATION OF THE HUMAN BODY

*Committee on Doctrine*
*United States Conference of Catholic Bishops*

1.      Modern technology offers an ever-increasing range of means—chemical, surgical, genetic—for intervening in the functioning of the human body, as well as for modifying its appearance.  These technological developments have provided the ability to cure many human maladies and promise to cure many more.  This has been a great boon to humanity.  Modern technology, however, produces possibilities not only for helpful interventions, but also for interventions that are injurious to the true flourishing of the human person.  Careful moral discernment is needed to determine which possibilities should be realized and which should not, in order to promote the good of the human person.  To do this discernment, it is necessary to employ criteria that respect the created order inscribed in our human nature.

### THE NATURAL ORDER

2.      A fundamental tenet of the Christian faith is that there is an order in the natural world that was designed by its Creator and that this created order is good (Gen 1:31; Ps 19:1ff.).  The Church has always affirmed the essential goodness of the natural order and called on us to respect it. The Second Vatican Council taught: "From the fact of being created, every thing possesses its own stability, truth and goodness, and its own laws and order, which should be respected by us in recognizing the methods which are appropriate to the various sciences and arts."[1]  Pope Benedict XVI explained that the natural world has an "inbuilt order," a "grammar" that "sets forth ends and

---

[1] Second Vatican Council, Pastoral Constitution *Gaudium et Spes*, no. 36; in *Decrees of the Ecumenical Councils*, ed. Norman P. Tanner, S.J. (Washington, D.C.:  Georgetown University Press, 1990).

1

*20 March 2023*

criteria for its wise use, not its reckless exploitation."[2]   Pope Francis has warned against a "technological paradigm" that treats the natural world as "something formless, completely open to manipulation."[3] He observes that human beings have always been intervening in nature,

> but for a long time this meant being in tune with and respecting the possibilities offered by the things themselves. It was a matter of receiving what nature itself allowed, as if from its own hand. Now, by contrast, we are the ones to lay our hands on things, attempting to extract everything possible from them while frequently ignoring or forgetting the reality in front of us.[4]

3.     What is true of creation as a whole is true of human nature in particular:  there is an order in human nature that we are called to respect.  In fact, human nature deserves utmost respect since humanity occupies a singular place in the created order, being created in the image of God (Gen. 1:27).  To find fulfillment as human persons, to find true happiness, we must respect that order. We did not create human nature; it is a gift from a loving Creator.  Nor do we "own" our human nature, as if it were something that we are free to make use of in any way we please.  Thus, genuine respect for human dignity requires that decisions about the use of technology be guided by genuine respect for this created order.

4.     A crucial aspect of the order of nature created by God is the body-soul unity of each human person.  Throughout her history, the Church has opposed dualistic conceptions of the human person that do not regard the body as an intrinsic part of the human person, as if the soul were essentially complete in itself and the body were merely an instrument used by the soul.[5]  In opposition to dualisms both ancient and modern, the Church has always maintained that, while

---

[2] Pope Benedict XVI, Encyclical Letter *Caritas in Veritate* (2009), no. 48 (https://www.vatican.va/content/benedict-xvi/en/encyclicals/documents/hf_ben-xvi_enc_20090629_caritas-in-veritate.html).

[3] Pope Francis, Encyclical Letter *Laudato Si'* (2015), no. 106  (https://www.vatican.va/content/francesco/en/encyclicals/documents/papa-francesco_20150524_enciclica-laudato-si.html).

[4] Pope Francis, *Laudato Si'*, no. 106.

[5] While in ancient and medieval thought dualism was typically expressed in terms of soul and body, in modern thought it is often expressed in terms of mind and body.

there is a distinction between the soul and the body, *both* are constitutive of what it means to be human, since spirit and matter, in human beings, "are not two natures united, but rather their union forms a single nature."[6]  The soul does not come into existence on its own and somehow happen to be in this body, as if it could just as well be in a different body.  A soul can never be in another body, much less be in the wrong body.  *This* soul only comes into existence together with *this* body.  What it means to be a human person necessarily includes bodiliness.  "Human beings are physical beings sharing a world with other physical beings." [7]

5.      Human bodiliness is, in turn, intrinsically connected with human sexual differentiation.  Just as every human person necessarily has a body, so also human bodies, like those of other mammals, are sexually differentiated as male or female:  "Male and female he created them" (Gen 1:27).[8]  Saint John Paul II reminded us that, in the Book of Genesis, we learn that "Man is created 'from the very beginning' as male and female: the life of all humanity—whether of small communities or of society as a whole—is marked by this primordial duality."[9]  The *Catechism of the Catholic Church* affirms:  "Man and woman have been *created*, which is to say, *willed* by God: on the one hand, in perfect equality as human persons; on the other, in their respective beings as man and woman. 'Being man' or 'being woman' is a reality which is good and willed by God."[10]

---

[6] *Catechism of the Catholic Church*, no. 365  (https://www.vatican.va/archive/ENG0015/__P1B.HTM): "The unity of soul and body is so profound that one has to consider the soul to be the 'form' of the body: i.e., it is because of its spiritual soul that the body made of matter becomes a living, human body; spirit and matter, in man, are not two natures united, but rather their union forms a single nature."

[7] International Theological Commission, *Communion and Stewardship: Human Persons Created in the Image of God* (2002), no. 26  (https://www.vatican.va/roman_curia/congregations/cfaith/cti_documents/rc_con_cfaith_doc_20040723_communion-stewardship_en.html).

[8] Persons affected by Disorders of Sexual Development do not fall outside the two categories of male and female, but they do exhibit ambiguous or abnormal indicators of sexual difference, so that the sex of their bodies is difficult to determine, though not impossible for modern medical and genetic techniques.

[9] Saint Pope John Paul II, *Letter to Families* (1994), no. 6  (https://www.vatican.va/content/john-paul-ii/en/letters/1994/documents/hf_jp-ii_let_02021994_families.html). Cf. *Catechism of the Catholic Church*, no. 2333.

[10] *Catechism of the Catholic Church*, no. 369.

3

Just as bodiliness is a fundamental aspect of human existence, so is either "being a man" or "being a woman" a fundamental aspect of existence as a human being, expressing a person's unitive and procreative finality.  The Congregation for the Doctrine of the Faith insists that

> the importance and the meaning of sexual difference, as a reality deeply inscribed in man and woman, needs to be noted. "Sexuality characterizes man and woman not only on the physical level, but also on the psychological and spiritual, making its mark on each of their expressions." It cannot be reduced to a pure and insignificant biological fact, but rather "is a fundamental component of personality, one of its modes of being, of manifestation, of communicating with others, of feeling, of expressing and of living human love." This capacity to love – reflection and image of God who is Love – is disclosed in the spousal character of the body, in which the masculinity or femininity of the person is expressed.[11]

6.      In our contemporary society there are those who do not share this conception of the human person.  Pope Francis has spoken about an ideology that promotes "a personal identity and emotional intimacy radically separated from the biological difference between male and female," in which "human identity becomes the choice of the individual, one which can also change over time."[12] In response to this, Pope Francis affirmed:

> It needs to be emphasized that "biological sex and the socio-cultural role of sex (gender) can be distinguished but not separated." … It is one thing to be understanding of human weakness and the complexities of life, and another to accept ideologies that attempt to sunder what are inseparable aspects of reality. Let us not fall into the sin of trying to replace the Creator. We are creatures, and not omnipotent. Creation is prior to us and must be received as a gift. At the same time, we are called to protect our humanity, and this means, in the first place, accepting it and respecting it as it was created.[13]

---

[11] Congregation for the Doctrine of the Faith, *Letter on the Collaboration of Men and Woman in the Church and in the World* (2004), no. 8 (https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_20040731_collaboration_en.html);  quotations from Congregation for Catholic Education, *Educational Guidance in Human Love:  Outlines for Sex Education* (1983), no. 5 and no. 4, respectively.

[12] Pope Francis, Post-Synodal Apostolic Exhortation *Amoris Laetitia* (2016), no. 56; quoting the *Relatio Finalis* of the Synod on the Family (2015), no. 8 (https://www.vatican.va/content/francesco/en/apost_exhortations/documents/papa-francesco_esortazione-ap_20160319_amoris-laetitia.html).

[13] Pope Francis, *Amoris Laetitia*, no. 56; quoting the *Relatio Finalis*, no. 58.

TECHNOLOGICAL INTERVENTIONS

7.      The human person, body and soul, man or woman, has a fundamental order and finality whose integrity must be respected. Because of this order and finality, neither patients nor physicians nor researchers nor any other persons have unlimited rights over the body; they must respect the order and finality inscribed in the embodied person.  Pope Pius XII taught that the patient "is not the absolute master of himself, of his body, of his mind.  He cannot dispose of himself just as he pleases."[14]  The Pope went on to affirm that, with regard to the faculties and powers of one's human nature, a patient "is the user and not the owner" and thus "does not have an unlimited power to effect acts of destruction or of mutilation of a kind that is anatomical or functional."[15]  The body is not an object, a mere tool at the disposal of the soul, one that each person may dispose of according to his or her own will, but it is a constitutive part of the human subject, a gift to be received, respected, and cared for as something intrinsic to the person.  As Pope Francis affirmed:  "The acceptance of our bodies as God's gift is vital for welcoming and accepting the entire world as a gift from the Father and our common home, whereas thinking that we enjoy absolute power over our own bodies turns, often subtly, into thinking that we enjoy absolute power over creation."[16]

8.      There are essentially two scenarios recognized by the Church's moral tradition in which technological interventions on the human body may be morally justified:  1) when such

---

[14] Pope Pius XII, "Discours aux participants au Congrès International d'Histopathologie du Système Nerveux," 14 September 1952 (https://www.vatican.va/content/pius-xii/fr/speeches/1952/documents/hf_p-xii_spe_19520914_istopatologia.html).  See also his "Discours à la VIIIᵉ Assemblée de l'Association Médicale Mondiale," 30 September 1954 (https://www.vatican.va/content/pius-xii/fr/speeches/1954/documents/hf_p-xii_spe_19540930_viii-assemblea-medica.html).

[15] Pope Pius XII, "Discours," 14 September 1952.

[16] Pope Francis, *Laudato Si'*, no. 155.  In the same paragraph, Pope Francis quotes Pope Benedict XVI, who asserted:  "Man too has a nature that he must respect and that he cannot manipulate at will" (Address to the Bundestag, 22 September 2011 (https://www.vatican.va/content/benedict-xvi/en/speeches/2011/september/documents/hf_ben-xvi_spe_20110922_reichstag-berlin.html).

interventions aim to repair a defect in the body; 2) when the sacrifice of a part of the body is necessary for the welfare of the whole body.  These kinds of technological interventions respect the fundamental order and finality inherent in the human person.  However, there are other technological interventions that aim neither to repair some defect in the body nor to sacrifice a part for the sake of the whole but, rather, aim to alter the fundamental order of the body.  Such interventions do not respect the order and finality inscribed in the human person.

<div align="center">REPAIRING A DEFECT IN THE BODY</div>

9.      Much of the practice of medicine involves using the available technology to repair defects in the body, usually when it has been affected by some injury or ailment.[17]  The intention to repair defects in the body shows respect for the fundamental order of the body, which is commendable. In fact, each of us has a duty to care for our bodies.  The *Ethical and Religious Directives for Catholic Health Care Services* affirm that "every person is obliged to use ordinary means[18] to preserve his or her health."[19]  This obligation no longer holds, however, when the benefits of the intervention are no longer proportionate to the burdens involved.[20]  Thus, judging whether or not

---

[17] Sometimes the technology is used not to return the body to a previous state but to compensate for some lack of normal development in the body.

[18] Use of extraordinary means is never morally obligatory. Cf. Pope Pius XII, "Discours du Pape Pie XII en réponse à trois questions de morale médicale sur la réanimation," 24 November 1957 (https://www.vatican.va/content/pius-xii/fr/speeches/1957/documents/hf_p-xii_spe_19571124_rianimazione.html); Congregation for the Doctrine of the Faith, "Commentary on the Responses to Certain Questions of the United States Conference of Catholic Bishops Concerning Artificial Nutrition and Hydration," 1 August 2007 (https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_20070801_nota-commento_en.html).

[19] United States Conference of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services,* Sixth Edition (2018), no. 32 (https://www.usccb.org/about/doctrine/ethical-and-religious-directives/upload/ethical-religious-directives-catholic-health-service-sixth-edition-2016-06.pdf); cf. no. 56. See also Congregation for the Doctrine of the Faith, *Declaration on Euthanasia* (1980), Pt. IV (https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_19800505_euthanasia_en.html).

[20] USCCB, *Ethical and Religious Directives*, no. 32: "…no person should be obliged to submit to a health care procedure that the person has judged, with a free and informed conscience, not to provide a reasonable hope of benefit without imposing excessive risks and burdens on the patient or excessive expense to family or community".

*20 March 2023*

a reparative medical intervention is morally licit requires a consideration not only of the object of the act and of the intention in undertaking it, but also of the consequences of the action, which would include an evaluation of the likelihood of discernible benefit to the person and a comparison of expected benefits with expected burdens. Sometimes the expected benefits (such as improved health or function) will outweigh the expected burdens (such as cost or physical pain involved in the procedure), but sometimes they will not.

10. A similar analysis is involved in considering the morality of interventions undertaken to improve the body not in terms of its functioning but rather in terms of its appearance, which can involve either restoring appearance or improving it. In this regard, Pope Pius XII acknowledged that the physical beauty of a person "is in itself a good, though subordinated to others that are much higher, and consequently precious and desirable."[21] He goes on to point out that physical beauty "does not stand at the summit of the scale of values, for it is a good that is neither spiritual nor essential"; indeed, it is "a good, but a corporal one … As a good and a gift from God, it must be esteemed and cared for, without, however, requiring recourse to extraordinary means as a duty."[22] Since the moral analysis requires that the expected benefits of a procedure be proportionate to the expected burdens and risks, a higher level of burden and risk can be justified in the case of someone who seeks to repair defects in order to achieve a normal appearance than in the case of someone who already has a normal appearance and who, as Pope Pius XII put it, seeks "the perfection of

---

[21] Pope Pius XII, "Discorso ai partecipanti al X Congresso Nazionale della Società Italiana di chirurgia plastica," 4 Oct. 1958, III (https://www.vatican.va/content/pius-xii/it/speeches/1958/documents/hf_p-xii_spe_19581004_chirurgia-plastica.html).

[22] Pope Pius XII, "Discorso," 4 October 1958, III.

his or her features."[23]    Still, both of these could be morally licit, if undertaken with the correct intention and in the correct circumstances.[24]

<div align="center">THE SACRIFICE OF A PART FOR THE SAKE OF THE WHOLE</div>

11.    Pope Pius XII's predecessor, Pope Pius XI, also stressed the need to respect the fundamental order of the body, affirming that, as a rule, one is not allowed "to destroy or mutilate" members of one's body. At the same time, however, he affirmed that there can be exceptions when the welfare of the body as a whole is at stake.

> Christian doctrine establishes, and the light of human reason makes it most clear, that private individuals have no other power over the members of their bodies than that which pertains to their natural ends; and they are not free to destroy or mutilate their members, or in any other way render themselves unfit for their natural functions, *except when no other provision can be made for the good of the whole body*.[25]

 This teaching was further developed by Pope Pius XII, who explained that

> each particular organ is subordinated to the body as a whole and must yield to it in case of conflict.  Therefore, the one who has been given the use of the whole organism has the right to sacrifice a particular organ, if its retention or its functioning causes significant harm to the whole, harm that cannot possibly be avoided any other way.[26]

12.    Pope Pius XII stipulated three conditions that must be fulfilled for a medical intervention "that involves anatomical or functional mutilation" to be morally permissible:

> First, the retention or functioning of a particular organ in the organism as a whole causes serious damage to it or constitutes a threat.

---

[23] Pope Pius XII, "Discorso," 4 October 1958, III.

[24] Pope Pius XII provides some examples of incorrect intentions, such as increasing one's power of seduction or protecting a guilty party from justice.  He also gives as an example of an illicit cosmetic intervention one "that causes damage to the regular functions of the physical organs" ("Discorso," 4 October 1958, III).

[25] Pope Pius XI, Encyclical Letter *Casti Connubii* (1930), no. 71 (https://www.vatican.va/content/pius-xi/en/encyclicals/documents/hf_p-xi_enc_19301231_casti-connubii.html). Emphasis added.

[26] Pope Pius XII, "Discours aux Participants au XXVIe Congrès Organisé par la Société Italienne d'Urologie," 8 October 1953, I (https://www.vatican.va/content/pius-xii/fr/speeches/1953/documents/hf_p-xii_spe_19531008_congresso-urologia.html). Cf. St. Thomas Aquinas, *Summa theologiae* II-II, q. 65, a. 1; I-II, q. 90, a. 2.

Second, this damage cannot be avoided, or at least appreciably diminished, otherwise than by the mutilation in question and the effectiveness of the mutilation is well assured.

Finally, it can reasonably be expected that the negative effect, i.e., the mutilation and its consequences, will be compensated for by the positive effect: removal of the danger for the whole organism, lessening of suffering, etc.[27]

These conditions ensure proper respect for the fundamental order of the human person in that they establish that the sacrifice of the part of the body is not itself what is sought, that this is truly a last resort that is necessary for the welfare of the body, there being no other options for securing the welfare of the body as a whole.

ATTEMPTS TO ALTER THE FUNDAMENTAL ORDER OF THE HUMAN BODY

13.    While the foregoing two types of technological interventions take the basic order of the human person as a given and do not intend to alter it, there is another type of intervention that regards this order as unsatisfactory in some way and proposes a more desirable order, a redesigned order.  Some proposals for genetic engineering fit into this category: not those that aim to repair some defect, but those that are non-therapeutic manipulations of human genetic material.  The Congregation for the Doctrine of the Faith has explained that "procedures used on somatic cells for strictly therapeutic purposes are in principle morally licit" since these procedures "seek to restore the normal genetic configuration of the patient or to counter damage caused by genetic anomalies or those related to other pathologies."[28]  By contrast, genetic engineering "for purposes other than medical treatment" is not morally permissible.[29]  Here the intention is to replace the

---

[27] Pope Pius XII, "Discours," 8 October 1953, I.

[28] Congregation for the Doctrine of the Faith, *Instruction on Certain Bioethical Questions* (*Dignitas Personae*) (2008), no. 26 (https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_20081208_dignitas-personae_en.html).  The Congregation adds the qualifications that the patient must not be "exposed to risks to his health or physical integrity which are excessive or disproportionate to the gravity of the pathology for which a cure is sought" and that the patient or his legitimate representative must give informed consent.

[29] Congregation for the Doctrine of the Faith, *Instruction on Certain Bioethical Questions* (*Dignitas Personae*), no. 27.

natural order with what is imagined to be a new and better order.  The Congregation warns that "in the attempt to create *a new type of human being* one can recognize *an ideological element* in which man tries to take the place of his Creator." [30]   In a similar way, some proposals for "cybernetic enhancement" also aim to redesign the fundamental order of the human being and to produce a new type of human being by replacing some or all[31] bodily organs with artificial devices. These kinds of technological interventions are, in most cases, currently in the developmental stage or are under theoretical consideration.

14.     What is widely in practice today, however, and what is of great concern, is the range of technological interventions advocated by many in our society as treatments for what is termed "gender dysphoria" or "gender incongruence." [32]   These interventions involve the use of surgical or chemical techniques that aim to exchange the sex characteristics of a patient's body for those of the opposite sex or for simulations thereof.   In the case of children, the exchange of sex characteristics is prepared by the administration of chemical puberty blockers, which arrest the natural course of puberty and prevent the development of some sex characteristics in the first place.

15.     These technological interventions are not morally justified either as attempts to repair a defect in the body or as attempts to sacrifice a part of the body for the sake of the whole.  First, they do not repair a defect in the body: there is no disorder in the body that needs to be addressed; the bodily organs are normal and healthy.  Second, the interventions do not sacrifice one part of

---

[30] Congregation for the Doctrine of the Faith, *Instruction on Certain Bioethical Questions* (*Dignitas Personae*), no. 27

[31] Some even envision transferring what they imagine to be the essence of the human person from the brain into a computer, thereby leaving bodily existence behind altogether.

[32] The term "gender dysphoria" was introduced in 2013 in the fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders* (Arlington, VA: American Psychiatric Association, 2013), 452-53.  The term "gender incongruence" was introduced in 2022 in the eleventh revision of the *International Classification of Diseases* published by the World Health Organization (https://icd.who.int/browse11/l-m/en#/http%3a%2f%2fid.who.int%2ficd%2fentity%2f411470068).

the body for the good of the whole.  When a part of the body is legitimately sacrificed for the sake of the whole body, whether by the entire removal or substantial reconfiguration of a bodily organ, the removal or reconfiguring of the bodily organ is reluctantly tolerated as the only way to address a serious threat to the body.  Here, by contrast, the removal or reconfiguring is itself the desired result.[33]

16.     Instead, rather than to repair some defect in the body or to sacrifice a part for the sake of the whole, these interventions are intended to transform the body so as to make it take on as much as possible the form of the opposite sex, contrary to the natural form of the body.  They are attempts to alter the fundamental order and finality of the body and to replace it with something else.

17.     There is a wide range of interventions used for this purpose, corresponding to the variety of ways in which sexual differentiation affects various parts of the body.  Currently, not all persons who seek this kind of treatment undergo all the interventions available, either because they are unable to do so, or they choose not to do so for some reason; instead, they typically undergo some limited selection of the available interventions.  These interventions differ in the magnitude of the changes brought about in the body.  They are alike, however, in that they all have the same basic purpose: that of transforming sex characteristics of the body into those of the opposite sex.

18.     Such interventions, thus, do not respect the fundamental order of the human person as an intrinsic unity of body and soul, with a body that is sexually differentiated.  Bodiliness is a fundamental aspect of human existence, and so is the sexual differentiation of the body.  Catholic health care services must not perform interventions, whether surgical or chemical, that aim to

---

[33] With some procedures of this category, the removal of the organ is directly intended in order to allow for its replacement with a simulation of the corresponding organ of the opposite sex; in other procedures, the removal of the organ is directly intended because the absence of the organ is a characteristic of the opposite sex; in still others, the reconfiguring of the organ is directly intended in order to make the organ resemble as much as possible the corresponding organ of the opposite sex.

transform the sexual characteristics of a human body into those of the opposite sex or take part in the development of such procedures.  They must employ all appropriate resources to mitigate the suffering of those who struggle with gender incongruence, but the means used must respect the fundamental order of the human body.  Only by using morally appropriate means do healthcare providers show full respect for the dignity of each human person.

CONCLUSION:  MORAL LIMITS TO THE TECHNOLOGICAL MANIPULATION OF THE HUMAN BODY

19.     The use of technology in order to manipulate the natural world has a history that goes back to the earliest use of tools.  What is different in our day is the greatly expanded capabilities that modern technology offers and the rapid development of ever-new possibilities.  As the boundaries of what is technologically possible continue to expand, it is imperative to identify moral criteria to guide our use of technology.  As the range of what we *can* do expands, we must ask what we *should* or *should not* do.  An indispensable criterion in making such determinations is the fundamental order of the created world.  Our use of technology must respect that order.

20.     To be sure, many people are sincerely looking for ways to respond to real problems and real suffering.[34]  Certain approaches that do not respect the fundamental order appear to offer solutions.  To rely on such approaches for solutions, however, is a mistake.  An approach that does not respect the fundamental order will never truly solve the problem in view; in the end, it will only create further problems.  The Hippocratic tradition in medicine calls upon all healthcare providers first and foremost to "do no harm."  Any technological intervention that does not accord with the fundamental order of the human person as a unity of body and soul, including the sexual difference inscribed in the body, ultimately does not help but, rather, harms the human person.

---

[34] With regard to those who identify as transgender or non-binary, there is a range of pastoral issues that need to be addressed, but that cannot be addressed in this document.

12

21.     Particular care should be taken to protect children and adolescents, who are still maturing and who are not capable of providing informed consent. As Pope Francis has taught, young people in particular

> need to be helped to accept their own body as it was created, for "thinking that we enjoy absolute power over our own bodies turns, often subtly, into thinking that we enjoy absolute power over creation… An appreciation of our body as male or female is also necessary for our own self-awareness in an encounter with others different from ourselves. In this way we can joyfully accept the specific gifts of another man or woman, the work of God the Creator, and find mutual enrichment."[35]

22.     The search for solutions to problems of human suffering must continue, but it should be directed toward solutions that truly promote the flourishing of the human person in his or her bodily integrity.  As new treatments are developed, they too should be evaluated according to sound moral principles grounded in the good of the human person as a subject with his or her own integrity.  Catholic health care services are called to provide a model of promoting the authentic good of the human person.  To fulfill this duty, all who collaborate in Catholic health care ministry must make every effort, using all appropriate means at their disposal, to provide the best medical care, as well as Christ's compassionate accompaniment, to all patients, no matter who they may be or from what condition they may be suffering.   The mission of Catholic health care services is nothing less than to carry on the healing ministry of Jesus, to provide healing at every level, physical, mental, and spiritual.[36]

---

[35] Pope Francis, Encyclical Letter *Amoris Laetitia*, no. 285; quotation from his Encyclical Letter *Laudato Si'*, no. 155.

[36] See USCCB, *Ethical and Religious Directives for Catholic Health Care Services*, General Introduction.

*20 March 2023*

USCCB Committee on Doctrine

Most Reverend Daniel E. Flores
*Bishop of Brownsville*
*Chairman*

Most Reverend Michael C. Barber, S.J.
*Bishop of Oakland*

Most Reverend Richard G. Henning
*Auxiliary Bishop of Diocese of Rockville Centre*

Most Reverend Steven J. Lopes
*Bishop of the Personal Ordinariate of the Chair of St. Peter*

Most Reverend James Massa
*Auxiliary Bishop of Brooklyn*

Most Reverend Robert J. McManus
*Bishop of Worcester*

Most Reverend Michael F. Olson
*Bishop of Fort Worth*

Most Reverend Kevin C. Rhoades
*Bishop of Fort Wayne-South Bend*

Most Reverend William E. Lori
*Archbishop of Baltimore*
*Bishop Consultant*

*Doctrinal Note on the Moral Limits to Technological Manipulation of the Human Body* is a statement of the Committee on Doctrine. It was authorized by the USCCB Administrative Committee at its March 2023 meeting. It has been directed for publication by the undersigned.

Rev. Michael J. K. Fuller
General Secretary, USCCB

14

**EXHIBIT 25**

CONGREGATION FOR CATHOLIC EDUCATION
(for Educational Institutions)

# "MALE AND FEMALE HE CREATED THEM"

TOWARDS A PATH OF DIALOGUE

ON THE QUESTION OF GENDER THEORY

IN EDUCATION

VATICAN CITY
2019

**INTRODUCTION**

1.   It is becoming increasingly clear that we are now facing with what might accurately be called an *educational crisis*, especially in the field of affectivity and sexuality. In many places, curricula are being planned and implemented which "allegedly convey a neutral conception of the person and of life, yet in fact reflect an anthropology opposed to faith and to right reason".[1] The disorientation regarding anthropology which is a widespread feature of our cultural landscape has undoubtedly helped to destabilise the family as an institution, bringing with it a tendency to cancel out the differences between men and women, presenting them instead as merely the product of historical and cultural conditioning.

2.   The context in which the *mission of education* is carried out is characterized by challenges emerging from varying forms of an ideology that is given the general name 'gender theory', which "denies the difference and reciprocity in nature of a man and a woman and envisages a society without sexual differences, thereby eliminating the anthropological basis of the family. This ideology leads to educational programmes and legislative enactments that promote a personal identity and emotional intimacy radically separated from the biological difference between male and female. Consequently, human identity becomes the choice of the individual, one which can also change over time".[2]

3.   It seems clear that this issue should not be looked at in isolation from the broader question of education in the call to love,[3] which should offer,

---

[1]   BENEDICT XVI, *Address to Members of the Diplomatic Corps,* 10 January 2011.

[2]   FRANCIS, Post-Synodal Apostolic Exhortation *Amoris Laetitia,* 19 March 2016, 56.

[3]   Cf. JOHN PAUL II, Post-Synodal Apostolic Exhortation *Familiaris Consortio,* 22 November 1981, 6; Cf. JOHN PAUL II, Letter to Families *Gratissimam Sane,* 2 February 1994,

3

as the Second Vatican Council noted, "a positive and prudent education in sexuality" within the context of the inalienable right of all to receive "an education that is in keeping with their ultimate goal, their ability, their sex, and the culture and tradition of their country, and also in harmony with their fraternal association with other peoples in the fostering of true unity and peace on earth".[4] The Congregation for Catholic Education has already offered some reflections on this theme in the document 'Educational Guidance in Human Love: Outlines for Sex Education'.[5]

4.   The Christian vision of anthropology sees sexuality as a fundamental component of one's personhood. It is one of its mode of being, of manifesting itself, communicating with others, and of feeling, expressing and living human love. Therefore, our sexuality plays an integral part in the development of our personality and in the process of its education: "In fact, it is from [their] sex that the human person receives the characteristics which, on the biological, psychological and spiritual levels, make that person a man or a woman, and thereby largely condition his or her progress towards maturity and insertion into society".[6] As each person grows, "such diversity, linked to the complementarity of the two sexes, allows a thorough response to the design of God according to the vocation to which each one is called".[7] In the light of this, "affective-sex education must consider the totality of the person and insist therefore on the integration of the biological, psycho-affective, social and spiritual elements".[8]

5.   The Congregation for Catholic Education, as part of its remit, wishes to offer in this document some reflections which, it is hoped, can

16; Cf. JOHN PAUL II, *General Audience,* 8 April 1981 in *Insegnamenti*, IV/1 (1981), pp. 903-908.

[4]   SECOND VATICAN ECUMENICAL COUNCIL, Decl. On Christian Education, *Gravissimum Educationis*, 28 October 1965, 1.

[5]   CONGREGATION FOR CATHOLIC EDUCATION, *Educational Guidance in Human Love, Outlines for Sex Education*, 1 November 1983.

[6]   CONGREGATION FOR THE DOCTRINE OF THE FAITH, *Persona Humana, Declaration on Certain Questions Concerning Sexual Ethics,* 29 December 1975, 1.

[7]   *Educational Guidance in Human Love, Outlines for Sex Education*, 5.

[8]   *Ibid.,* 35.

4

guide and support those who work in the education of young people, so as to help them address in a methodical way (and in the light of the universal vocation to love of the human person) the most debated questions around human sexuality.[9] The methodology in mind is based on three guiding principles seen as best-suited to meet the needs of both individuals and communities: to *listen*, to *reason* and to *propose*. In fact, listening carefully to the needs of the other, combined with an understanding of the true diversity of conditions, can lead to a shared set of rational elements in an argument, and can prepare one for a Christian education rooted in faith that "throws a new light on everything, manifests God's design for man's total vocation, and thus directs the mind to solutions which are fully human".[10]

6.   If we wish to take an approach to the question of gender theory that is based on the path of dialogue, it is vital to bear in mind the distinction between the ideology of gender on the one hand, and the whole field of research on gender that the human sciences have undertaken, on the other. While the ideologies of gender claim to respond, as Pope Francis has indicated, "to what are at times understandable aspirations", they also seek "to assert themselves as absolute and unquestionable, even dictating how children should be raised",[11] and thus preclude dialogue. However, other work on gender has been carried out which tries instead to achieve a deeper understanding of the ways in which sexual difference between men and women is lived out in a variety of cultures. It is in relation to this type of research than we should be open to listen, to reason and to propose.

7.   Against this background, the Congregation for Catholic Education has seen fit to offer this text to all who have a special interest in education, and to those whose work is touched by the question of gender theory. It is intended for the educational community involved in Catholic

---

[9] Cf. *Ibid.*, 21-47, in which the Christian vision of sexuality is set out.

[10] Second Vatican Ecumenical Council, Pastoral Constitution on the Church in the Modern World, *Gaudium et Spes*, 7 December 1965, 11.

[11] *Amoris Laetitia,* 56.

5

schools, and for all who, animated by the Christian vision of life, work in other types of school. The document is offered for use by parents, students, school leaders and personnel, bishops, priests, religious, ecclesial movements, associations of the lay faithful, and other relevant bodies.

6

**LISTENING**

*Brief Overview*

8.   The primary outlook needed for anyone who wishes to take part in *dialogue* is *listening*. It is necessary, above all, to listen carefully to and understand cultural events of recent decades. The 20th century brought new anthropological theories and with them the beginnings of gender theory. These were based on a reading of sexual differentiation that was strictly sociological, relying on a strong emphasis on the freedom of the individual. In fact, around the middle of the last century, a whole series of studies were published which accentuated time and again the role of external conditioning, including its influence on determining personality. When such studies were applied to human sexuality, they often did so with a view to demonstrating that sexuality identity was more a social construct than a given natural or biological fact.

9.   These schools of thought were united in denying the existence of any original given element in the individual, which would precede and at the same time constitute our personal identity, forming the necessary basis of everything we do. According to such theories, the only thing that matters in personal relationships is the affection between the individuals involved, irrespective of sexual difference or procreation which would be seen as irrelevant in the formation of families. Thus, the institutional model of the family (where a structure and finality exist independent of the subjective preferences of the spouses) is bypassed, in favour of a vision of family that is purely contractual and voluntary.

10.  Over the course of time, gender theory has expanded its field of application. At the beginning of the 1990's, its focus was upon the possibility of the individual determining his or her own sexual tendencies without having to take account of the reciprocity and complementarity of male-female relationships, nor of the procreative end of sexuality. Furthermore,

it was suggested that one could uphold the theory of a radical separation between gender and sex, with the former having priority over the latter. Such a goal was seen as an important stage in the evolution of humanity, in which "a society without sexual differences" could be envisaged.[12]

11.  In this *cultural context*, it is clear that *sex* and *gender* are no longer synonyms or interchangeable concepts, since they are used to describe two different realities. Sex is seen as defining which of the two biological categories (deriving from the original feminine-masculine dyad) one belonged to. Gender, on the other hand, would be the way in which the differences between the sexes are lived in each culture. The problem here does not lie in the distinction between the two terms, which can be interpreted correctly, but in *the separation of sex from gender*. This separation is at the root of the distinctions proposed between various "sexual orientations" which are no longer defined by the sexual difference between male and female, and can then assume other forms, determined solely by the individual, who is seen as radically autonomous. Further, the concept of gender is seen as dependent upon the subjective mindset of each person, who can choose a gender not corresponding to his or her biological sex, and therefore with the way others see that person (*transgenderism*).

12.  In a growing contraposition between nature and culture, the propositions of gender theory converge in the concept of 'queer', which refers to dimensions of sexuality that are extremely fluid, flexible, and as it were, nomadic. This culminates in the assertion of the complete emancipation of the individual from any *a priori* given sexual definition, and the disappearance of classifications seen as overly rigid. This would create a new range of nuances that vary in degree and intensity according to both sexual orientation and the gender one has identified oneself with.

13.  The duality in male-female couples is furthermore seen as in conflicting with the idea of "polyamory", that is relationships involving more than two individuals. Because of this, it is claimed that the duration of relationships, as well as their binding nature, should be flexible, depending on the shifting desires of the individuals concerned. Naturally, this has consequences for the sharing of the responsibilities and obligations

---

[12] *Idem.*

8

inherent in maternity and paternity. This new range of relationships become 'kinship'. These are: based upon desire or affection, often marked by a limited time span that is determined, ethically flexible, or even (sometimes by explicit mutual consent) without any hope of long-term meaning. What counts is the absolutely free self-determination of each individual and the choices he or she makes according to the circumstances of each relationship of affectivity.

14.  This has led to calls for public recognition of the right to choose one's gender, and of a plurality of new types of unions, in direct contradiction of the model of marriage as being between one man and one woman, which is portrayed as a vestige of patriarchal societies. The ideal presented is that the individual should be able to choose his or her own status, and that society should limit itself to guaranteeing this right, and even providing material support, since the minorities involved would otherwise suffer negative social discrimination. The claim to such rights has become a regular part of political debate and has been included in documents at an international level, and in certain pieces of national legislation.

### Points of Agreement

15.  From the whole field of writing on gender theory, there have however emerged some positions that could provide points of agreement, with a potential to yield growth in mutual understanding. For instance, educational programmes on this area often share a laudable desire to combat all expressions of unjust discrimination, a requirement that can be shared by all sides. Such pedagogical material acknowledges that there have been delays and failings in this regard.[13] Indeed, it cannot be denied that through the centuries forms of unjust discrimination have been a sad fact of history and have also had an influence within the Church. This has brought a certain rigid *status quo*, delaying the necessary and progressive inculturation of the truth of Jesus' proclamation of the *equal dignity of men and women*, and has provoked accusations of a sort of masculinist mentality, veiled to a greater or lesser degree by religious motives.

---

[13]  Cf. FRANCIS, *Address to the Participants in the General Assembly of the Members of the Pontifical Academy for Life,* 5 October 2017.

16. Another position held in common is the need to educate children and young people *to respect every person* in their particularity and difference, so that no one should suffer bullying, violence, insults or unjust discrimination based on their specific characteristics (such as special needs, race, religion, sexual tendencies, etc.). Essentially, this involves educating for active and responsible citizenship, which is marked by the ability to welcome all legitimate expressions of human personhood with respect.

17. A further positive development in anthropological understanding also present in writing on gender has centred on *the values of femininity*. For example, women's 'capacity for the other' favours a more realistic and mature reading of evolving situations, so that "a sense and a respect for what is concrete develop in her, opposed to abstractions which are so often fatal for the existence of individuals and society".[14] This is a contribution that enriches human relationships and spiritual values "beginning with daily relationships between people". Because of this, society owes a significant debt to the many women "who are involved in the various *areas of education* extending well beyond the family: nurseries, schools, universities, social service agencies, parishes, associations and movements".[15]

18. Women have a unique understanding of reality. They possess a capacity to endure adversity and "to keep life going even in extreme situations" and hold on "tenaciously to the future".[16] This helps explain why "wherever the work of education is called for, we can note that women are ever ready and willing to give themselves generously to others, especially in serving the weakest and most defenceless. In this work they exhibit a kind of *affective, cultural and spiritual motherhood* which has inestimable value for the development of individuals and the future of society. At this point, how can I fail to mention the witness of so many Catholic women and Religious Congregations of women from every continent who have made education, particularly the education of boys and girls, their principal apostolate?".[17]

---

[14] Congregation For The Doctrine Of The Faith, *Letter to Bishops of the Catholic Church on the Collaboration of Men and Women in the Church and in the World*, 31 May 2004, 13.

[15] John Paul II, *Letter to Women*, 29 June 1995, 9.

[16] Congregation For The Doctrine Of The Faith, *Letter to Bishops,* 13.

[17] John Paul II, *Letter to Women,* 9.

*Critique*

19.  Nonetheless, real life situations present gender theory with some valid *points of criticism*. Gender theory (especially in its most radical forms) speaks of a gradual process of denaturalisation, that is a move away from *nature* and towards an absolute option for the decision of the feelings of the human subject. In this understanding of things, the view of both sexuality identity and the family become subject to the same 'liquidity' and 'fluidity' that characterize other aspects of post-modern culture, often founded on nothing more than a confused concept of freedom in the realm of feelings and wants, or momentary desires provoked by emotional impulses and the will of the individual, as opposed to anything based on the truths of existence.

20.  The underlying presuppositions of these theories can be traced back to a *dualistic anthropology*, separating body (reduced to the status of inert matter) from human will, which itself becomes an absolute that can manipulate the body as it pleases. This combination of physicalism and voluntarism gives rise to relativism, in which everything that exists is of equal value and at the same time undifferentiated, without any real order or purpose. In all such theories, from the most moderate to the most radical, there is agreement that one's gender ends up being viewed as more important than being of male or female sex. The effect of this move is chiefly to create a cultural and ideological revolution driven by relativism, and secondarily a juridical revolution, since such beliefs claim specific rights for the individual and across society.

21. In practice, the advocacy for the different identities often presents them as being of completely *equal value* compared to each other. This, however, actually negates the relevance of each one. This has particular importance for the question of sexual difference. In fact, the generic concept of "non-discrimination" often hides an ideology that denies the difference as well as natural reciprocity that exists between men and women. "Instead of combatting wrongful interpretations of sexual difference that would diminish the fundamental importance of that difference for human dignity, such a proposal would simply eliminate it by proposing procedures and practices that make it irrelevant for a person's

11

development and for human relationships. But the utopia of the 'neuter' eliminates both human dignity in sexual distinctiveness and the personal nature of the generation of new life".[18] The anthropological basis of the concept of family is thus emptied of meaning.

22. This ideology inspires educational programmes and legislative trends that promote ideas of personal identity and affective intimacy that make a radical break with the actual *biological difference* between male and female. Human identity is consigned to the individual's choice, which can also change in time. These ideas are the expression of a widespread way of thinking and acting in today's culture that confuses "genuine freedom with the idea that each individual can act arbitrarily as if there were no truths, values and principles to provide guidance, and everything were possible and permissible".[19]

23. The Second Vatican Council, wishing to express the Church's view of the human person, stated that "though made of body and soul, man is one. Through his bodily composition he gathers to himself the elements of the material world; thus they reach their crown through him, and through him raise their voice in free praise of the Creator".[20] Because of this dignity, "man is not wrong when he regards himself as superior to bodily concerns, and as more than a speck of nature or a nameless constituent of the city of man".[21] Therefore, "the expressions 'the order of nature' and 'the order of biology' must not be confused or regarded as identical, the 'biological order' does indeed mean the same as the order of nature but only in so far as this is accessible to methods of empirical and descriptive natural science, and not as a specific order of existence, with an obvious relationship to the First Cause, to God the Creator God".[22]

---

[18] Francis, *Address to the Participants in the General Assembly of the Members of the Pontifical Academy for Life,* 5 October 2017, 3.

[19] *Amoris Laetitia,* 34.

[20] *Gaudium et Spes,* 14.

[21] *Idem.*

[22] K. Wojtyła, *Love and Responsibility,* London 1981, pp.56-57.

12

**REASONING**

*Rational Arguments*

24. Taking into account our historical overview, together with certain points of agreement identified, and the critique that has been made of gender theory, we can now move to some considerations on the issue based on the light of reason. In fact, there are rational arguments to support the *centrality of the body* as an integrating element of personal identity and family relationships. The body is subjectivity that communicates identity of being.[23] In the light of this reality, we can understand why the data of biological and medical science shows that 'sexual dimorphism' (that is, the sexual difference between men and women) can be demonstrated scientifically by such fields as genetics, endocrinology and neurology. From the point of view of genetics, male cells (which contain XY chromosomes) differ, from the very moment of conception, from female cells (with their XX chromosomes). That said, in cases where a person's sex is not clearly defined, it is medical professionals who can make a therapeutic intervention. In such situations, parents cannot make an arbitrary choice on the issue, let alone society. Instead, *medical science* should act with purely therapeutic ends, and intervene in the least invasive fashion, on the basis of objective parameters and with a view to establishing the person's constitutive identity.

25. The *process of identifying sexual identity* is made more difficult by the fictitious construct known as "gender neuter" or "third gender", which has the effect of obscuring the fact that a person's sex is a structural determinant of male or female identity. Efforts to go beyond the con-

---

[23] Cf. JOHN PAUL II, Encyclical Letter *Veritatis Splendor*, 6 August 1993, 48.

stitutive male-female sexual difference, such as the ideas of "intersex" or "transgender", lead to a masculinity or feminity that is ambiguous, even though (in a self-contradictory way), these concepts themselves actually presuppose the very sexual difference that they propose to negate or supersede. This oscillation between male and female becomes, at the end of the day, only a 'provocative' display against so-called 'traditional frameworks', and one which, in fact, ignores the suffering of those who have to live situations of sexual indeterminacy. Similar theories aim to annihilate the concept of 'nature', (that is, everything we have been given as a pre-existing foundation of our being and action in the world), while at the same time implicitly reaffirming its existence.

26. Philosophical analysis also demonstrates that *sexual difference* between male and female is constitutive of human identity. Greek and Roman thinkers posit *essence* as the aspect of being that transcends, brings together and harmonizes male-female difference within the unity of the *human person*. Within the tradition of hermeneutical and phenomenological philosophy, both sexual distinction and complementarity are interpreted in symbolic and metaphorical terms. Sexual difference in relationships is seen as constitutive of personal identity, whether this be at the level of the horizontal (in the *dyad* "man-woman") or vertical (in the *triad* "man-woman-God"). This applies equally to interpersonal "I-You" male-female relationships and to family relationships (You-I-We).

27. The *formation of one's identity* is itself based on the principle of otherness, since it is precisely the direct encounter between another "you" *who is not me* that enables me to recognise the essence of the "I" who is me. Difference, in fact, is a condition of *all cognition*, including cognition of one's identity. In the family, knowledge of one's mother and father allows the child to construct his or her own sexual identity and difference. Psychoanalytic theory demonstrates the *tri-polar value* of child-parent relationships, showing that sexual identity can only fully emerge in the light of the synergetic comparison that sexual differentiation creates.

28. The physiological *complementarity* of male-female sexual difference assures the necessary conditions for procreation. In contrast, only re-

14

course to reproductive technology can allow one of the partners in a relationship of two persons of the same sex to generate offspring, using 'in vitro' fertilization and a surrogate mother. However, the use of such technology is not a replacement for natural conception, since it involves the manipulation of human embryos, the fragmentation of parenthood, the instrumentalization and/or commercialization of the human body as well as the reduction of a baby to an object in the hands of science and technology.[24]

29.  In so far as this issue relates to the world of education, it is clear that by its very nature, education can help lay the foundations for peaceful dialogue and facilitate a fruitful meeting together of peoples and a meeting of minds. Further, it would seem that the prospect of a broadening of reason to include the *dimension of the transcendent* is not of secondary importance. The dialogue between Faith and Reason, "if it does not want to be reduced to a sterile intellectual exercise, it must begin from the present concrete situation of humanity and upon this develop a reflection that draws from the ontological-metaphysical truth".[25] The evangelizing mission of the Church to men and women is carried out within this horizon.

---

[24] Cf. Congregation For The Doctrine Of The Faith, Instruction on Respect for Human Life in its Origin and the Dignity of Procreation, *Donum Vitae*, 22 February 1987, 4.

[25] Benedict XVI, *Address to the Participants of the sixth European Symposium of University Professors,* Rome, 7 June 2008.

**PROPOSING**

*Christian Anthropology*

30. The Church, mother and teacher, does more than simply listen. Remaining rooted in her original mission, and at the same time always open to the contribution of reason, she puts herself at the service of the community of peoples, offering it a way of living. It is clear that if we are to provide well-structured educational programmes that are coherent with the true nature of human persons (with a view to guiding them towards a full actualisation of their sexual identity within the context of the vocation of self-giving), it is not possible to achieve this without a clear and convincing *anthropology* that gives a meaningful foundation to sexuality and affectivity. The first step in this process of throwing light on anthropology consists in recognising that "man too has a nature that he must respect and that he cannot manipulate at will".[26] This is the fulcrum on which to support a human ecology that moves from the "respect for our dignity as human beings" and from the necessary relationship of our life to "moral law, which is inscribed into our nature".[27]

31. Christian anthropology has its roots in the narrative of human origins that appears in the Book of Genesis, where we read that "God created man in his own image […] male and female he created them." (Gen. 1,27) These words capture not only the essence of the story of creation but also that of the life-giving relationship between men and women, which brings them into intimate union with God. The *self* is completed

---

[26] BENEDICT XVI, *Address at the Reichstag Building, Berlin*, 22 September 2011.

[27] FRANCIS, Encyclical Letter on Care for Our Common Home *Laudato Si'*, 24 May 2015, 154-155.

by the one who is *other than the self*, according to the specific identity of each person, and both have a point of encounter forming a dynamic of reciprocity which is derived from and sustained by the Creator.

32.  The Holy Scripture reveals the wisdom of the Creator's design, which "has assigned as a task to man his body, his masculinity and femininity; and that in masculinity and femininity he, in a way, assigned to him as a task his humanity, the dignity of the person, and also the clear sign of the interpersonal communion in which man fulfils himself through the authentic gift of himself".[28] Thus, *human nature* must be understood on the basis of the *unity of body and soul*, far removed from any sort of phys-icalism or naturalism, since "in the unity of his spiritual and biological inclinations and of all the other specific characteristics necessary for the pursuit of his end".[29]

33. This "unified totality"[30] integrates the vertical dimension (human communion with God) with the horizontal dimension constituted by the interpersonal communion that men and woman are called to live.[31] One's identity as a human person comes to authentic maturity to the extent that one opens up to others, for the very reason that "in the configuration of our own mode of being, whether as male or female, is not simply the result of biological or genetic factors, but of multiple elements having to do with temperament, family history, culture, experience, education, the influence of friends, family members and respected persons, as well as other formative situations".[32] In reality, "the essential fact is that the

---

[28] John Paul II, *General Audience,* 8 April 1981 in *Insegnamenti*, IV/1 (1981), p. 904.

[29] *Veritatis Splendor*, 50.

[30] Cf. *Idem.*

[31] "Man and woman constitute two modes of realising, on the part of the human creature, a determined participation in the Divine Being: they are created in the 'image and likeness of God' and they fully accomplish such vocation not only as single persons, but also as couples, which are communities of love. Oriented to unity and fecundity, the married man and woman participate in the creative love of God, living in communion with Him through the other." *Educational Guidance in Human Love: Outlines for Sex Education*, 26. See also Congregation for Catholic Education, *Educating to Intercultural Dialogue in Catholic Schools: Living in Harmony for a Civilization of Love,* 28 October 2013, 35-36.

[32] *Amoris Laetitia*, 286.

18

human person becomes himself only with the other. The 'I' becomes itself only from the 'thou' and from the 'you'. It is created for dialogue, for synchronic and diachronic communion. It is only the encounter with the 'you' and with the 'we' that the 'I' opens to itself".[33]

34. There is a need to reaffirm the metaphysical roots of sexual difference, as an anthropological refutation of attempts to negate the male-female duality of human nature, from which the family is generated. The denial of this duality not only erases the vision of human beings as the fruit of an act of creation but creates the idea of the human person as a sort of abstraction who "chooses for himself what his nature is to be. Man and woman in their created state as complementary versions of what it means to be human are disputed. But if there is no pre-ordained duality of man and woman in creation, then neither is the family any longer a reality established by creation. Likewise, the child has lost the place he had occupied hitherto and the dignity pertaining to him".[34]

35. Seen from this perspective, education on sexuality and affectivity must involve each person in a process of learning "with perseverance and consistency, the meaning of his or her body"[35] in the full original truth of masculinity and femininity. It means "learning to accept our body, to care for it and to respect its fullest meaning […] Also, valuing one's own body in its femininity or masculinity is necessary if I am going to be able to recognise myself in an encounter with someone who is different […] and find mutual enrichment".[36] Therefore, in the light of a *fully human and integral ecology*, women and men will understand the real meaning of sexuality and genitality in terms of the intrinsically relational and communicative intentionality that both informs their bodily nature and moves each one towards the other mutually.

[33] BENEDICT XVI, *Address to the General Assembly of the Italian Episcopal Conference,* 27 May 2010.

[34] BENEDICT XVI, *Address to the Roman Curia,* 21 December 2012.

[35] *Amoris Laetitia,* 151.

[36] *Laudato Si',* 155.

### The Family

36. The family is the natural place for the relationship of reciprocity and communion between man and woman to find its fullest realisation. For it is in the family that man and woman, united by a free and fully conscious *pact of conjugal love*, can live out "a totality in which all the elements of the person enter - appeal of the body and instinct, power of feeling and affectivity, aspiration of the spirit and of will".[37] The family is "an anthropological fact, and consequently a social, cultural fact". On the other hand, to "qualify it with ideological concepts which are compelling at only one moment in history, and then decline"[38] would mean a betrayal of its true significance. The family, seen as a natural social unit which favours the maximum realisation of the reciprocity and complementarity between men and women, precedes even the socio-political order of the State whose legislative freedom must take it into account and give it proper recognition.

37. Reason tells us that two fundamental rights, which stem from the very nature of the family, must always be guaranteed and protected. Firstly, the family's right to be recognised as the primary pedagogical environment for the educational formation of children. This "primary right" finds its most concrete expression in the "most grave duty"[39] of parents to take responsibility for the "well-rounded personal and social education of their children",[40] including their sexual and affective education, "within the broader framework of an education for love, for mutual self-giving"[41]. This is at once an *educational right and responsibility* that is "essential, since it is connected with the transmission of human life; it is original and primary with regard to the educational role of others, on ac-

---

[37] CATECHISM OF THE CATHOLIC CHURCH, 1643

[38] FRANCIS, *Address to Participants in the International Colloquium on the Complimentarity Between Men and Women Sponsored by the Congregation for the Doctrine of the Faith*, 17 November 2014, 3.

[39] *Code of Canon Law*, can. 1136; cf. *Code of Canons of the Oriental Churches,* can. 627.

[40] *Gravissimum Educationis*, 3.

[41] *Amoris Laetitia*, 280.

20

count of the uniqueness of the loving relationship between parents and children; and it is irreplaceable and inalienable, and therefore incapable of being entirely delegated to others or usurped by others".[42]

38. Children enjoy another right which is of equal importance: to "grow up in a family with a father and a mother capable of creating a suitable environment for the child's development and emotional maturity" and "continuing to grow up and mature in a correct relationship represented by the masculinity and femininity of a father and a mother and thus preparing for affective maturity".[43] It is precisely within the *nucleus of the family unit* that children can learn how to recognise the value and the beauty of the differences between the two sexes, along with their equal dignity, and their reciprocity at a biological, functional, psychological and social level. "Faced with a culture that largely reduces human sexuality to the level of something common place, since it interprets and lives it in a reductive and impoverished way by linking it solely with the body and with selfish pleasure, the educational service of parents must aim firmly at a training in the area of sex that is truly and fully personal: for sexuality is an enrichment of the whole person - body, emotions and soul - and it manifests its inmost meaning in leading the person to the gift of self in love".[44] Of course, such rights exist hand in hand with all the other fundamental rights of the human person, especially those concerning freedom of thought, conscience and religion. Wherever such things are held in common, those involved in education can find room for collaboration that is fruitful for all.

### The School

39. The primacy of the family in educating children is supplemented by the subsidiary role of schools. Strengthened by its roots in the Gospel, "The Catholic school sets out to be a school for the human person and

---

[42] *Familiaris Consortio*, 36.

[43] FRANCIS, *Address to Members of the Delegation of the International Catholic Child Bureau,* 11 April 2014.

[44] *Familiaris Consortio*, 37.

of human persons. 'The person of each individual human being, in his or her material and spiritual needs, is at the heart of Christ's teaching: this is why the promotion of the human person is the goal of the Catholic school'. This affirmation, stressing man's vital relationship with Christ, reminds us that it is in His person that the fullness of the truth concerning man is to be found. For this reason the Catholic school, in committing itself to the development of the whole man, does so in obedience to the solicitude of the Church, in the awareness that all human values find their fulfilment and unity in Christ. This awareness expresses the centrality of the human person in the educational project of the Catholic school".[45]

40. The Catholic school should be an educating community in which the human person can express themself and grow in his or her humanity, in a process of relational dialogue, interacting in a constructive way, exercising tolerance, understanding different points of view and creating trust in an atmosphere of authentic harmony. Such a school is truly an "*educating community,* a place of differences living together in harmony. The school community is a place for encounter and promoting participation. It dialogues with the family, which is the primary community to which the students that attend school belong. The school must respect the family's culture. It must listen carefully to the needs that it finds and the expectations that are directed towards it".[46] In this way, girls and boys are accompanied by a community that teaches them "to overcome their individualism and discover, in the light of faith, their specific vocation to live responsibly in a community with others".[47]

41. Christians who live out their vocation to educate in schools which are not Catholic can also offer witness to, serve, and promote the truth about the human person. In fact, "the integral formation of the human person, which is the purpose of education, includes the development of all the human faculties of the students, together with preparation for

---

[45] CONGREGATION FOR CATHOLIC EDUCATION, *The Catholic School on the Threshold of the Third Millennium,* 28 December 1997, 9.

[46] *Educating to Intercultural Dialogue in Catholic Schools,* 58.

[47] CONGREGATION FOR CATHOLIC EDUCATION, *The Catholic School*, 19 March 1977, 45.

22

professional life, formation of ethical and social awareness, becoming aware of the transcendental, and religious education".[48] *Personal witness*, when joined with professionalism, contributes greatly to the achievement of these objectives.

42. *Education in affectivity* requires language that is appropriate as well as measured. It must above all take into account that, while children and young people have not yet reached full maturity, they are preparing with great interest to experience all aspects of life. Therefore, it is necessary to help students "to develop a critical sense in dealing with the onslaught of new ideas and suggestions, the flood of pornography and the overload of stimuli that can deform sexuality".[49] In the face of a continuous bombardment of messages that are ambiguous and unclear, and which end up creating emotional disorientation as well as impeding psycho-relational maturity, young people "should be helped to recognise and seek out positive influences, while shunning the things that cripple their capacity for love".[50]

### Society

43. An overall perspective on the situation of contemporary society must form a part of the educational process. The *transformation of social and interpersonal relationships* "has often waved 'the flag of freedom', but it has, in reality, brought spiritual and material devastation to countless human beings, especially the poorest and most vulnerable. It is ever more evident that the decline of the culture of marriage is associated with increased poverty and a host of other social ills that disproportionately affect women, children and the elderly. It is always they who suffer the most in this crisis".[51]

---

[48] Congregation for Catholic Education, *Lay Catholics in School: Witnesses to Faith,* 15 October 1982, 17.

[49] *Amoris Laetitia*, 281.

[50] *Idem.*

[51] Francis, *Address to Participants in the International Colloquium on the Complementarity Between Men and Women Sponsored by the Congregation for the Doctrine of the Faith,* 17 November 2014, 2.

23

44. In the light of all of this, the family must not be left to face the challenges of educating the young on its own. The Church, for its part, continues to support families and young people within communities that are open and welcoming. Schools and local communities are called, in particular, to carry out an important mission here, although they do not substitute the role of parents but complement it.[52] The notable urgency of the challenges faced by the work of human formation should act as stimulus towards reconstructing the *educational alliance between family, school and society.*

45. It is widely acknowledged that this educational alliance has entered into crisis. There is an urgent need to promote a new alliance that is genuine and not simply at the level of bureaucracy, a shared project that can offer a "positive and prudent sexual education"[53] that can harmonise the primary responsibility of parents with the work of teachers. We must create the right conditions for a constructive encounter between the various actors involved, making for an atmosphere of transparency where all parties constantly keep others informed of what each is doing, facilitating maximum involvement and thus avoiding the unnecessary tensions that arise through misunderstandings caused by lack of clarity, information or competency.

46. Across this educational alliance, pedagogical activity should be informed by *the principle of subsidiarity*: "All other participants in the process of education are only able to carry out their responsibilities *in the name of the parents, with their consent* and, to a certain degree, *with their authorization*".[54] If they succeed in working together, family, school and the broader society can produce educational programmes on affectivity and sexuality that respect each person's own stage of maturity regarding these areas and at the same time promote respect for the body of the other

---

[52] Cf. *Amoris Laetitia,* 84.

[53] *Gravissimum Educationis,* 1.

[54] John Paul II, Letter to Families *Gratissimam Sane,* 2 February 1994, 16; cf. Pontifical Council for the Family, *Human Sexuality: Truth and Meaning. Educational Guidelines in the Family,* 8 December 1995, 23.

24

person. They would also take into account the physiological and psycho-
logical specificity of young people, as well as the phase of neurocognitive
growth and maturity of each one, and thus be able to accompany them in
their development in a healthy and responsible way.

### Forming Formators

47.  All who work in human formation are called to exercise great respon-
sibility in the work of effectively implementing the pedagogical projects
in which they are involved. If they are people of personal maturity and
balance who are well-prepared, this can have a strongly positive influence
on students.[55] Therefore, it is important that their own formation in-
cludes not only professional qualifications but also cultural and spiritual
preparedness. The *education of the human person*, especially developmentally,
requires great care and ongoing formation. Simply repeating the standard
points of a discipline is not enough. Today's educators are expected to be
able "to accompany their students towards lofty and challenging goals,
cherish high expectations for them, involve and connect students to each
other and the world".[56]

48.  School managers, teaching staff and personnel all share the respon-
sibility of both guaranteeing delivery of a high-quality service coherent
with the Christian principles that lie at the heart of their educational
project, as well as interpreting the challenges of their time while giving
the daily witness of their understanding, objectivity and prudence.[57] It is
a commonly-accepted fact that "modern man listens more willingly to
witnesses than to teachers, and if he does listen to teachers, it is because
they are witnesses".[58] The *authority of an educator* is therefore built upon
the concrete combination "of a general formation, founded on a positive

---

[55] Cf. *Educational Guidance in Human Love: Outlines for Sex Education,* 79.
[56] CONGREGATION FOR CATHOLIC EDUCATION, *Educating Today and Tomorrow. A Renewing Passion,* Vatican City, 2014, Chapter II, 7.
[57] Cf. CONGREGATION FOR CATHOLIC EDUCATION, *Educating Together in the Catholic School. A Mission Shared by Consecrated Persons and the Lay Faithful,* 8 September 2007, 34-37.
[58] PAUL VI, Apostolic Exhortation *Evangelii Nuntiandi,* 8 December 1975, 41.

25

and professional constructive concept of life, and of constant effort in realising it. Such a formation goes beyond the purely necessary professional training and addresses the more intimate aspects of the personality, including the religious and the spiritual".[59]

49. When the 'formation of formators' is undertaken on the basis of the Christian principles, it has as its objective not only the formation of individual teachers but the building up and consolidation of an entire *educational community* through a fruitful exchange between all involved, one that has both didactic and emotional dimensions. Thus, dynamic relationships grow between educators, and professional development is enriched by well-rounded personal growth, so that the work of teaching is carried out at the service of humanization. Therefore, Catholic educators need to be sufficiently prepared regarding the intricacies of the various questions that gender theory brings up and be fully informed about both current and proposed legislation in their respective jurisdictions, aided by persons who are qualified in this area, in a way that is balanced and dialogue-orientated. In addition, university-level institutes and centres of research are called to offer their own specific contribution here, so that adequate, up-to-date and life-long learning on this topic is always made available to educators.

50. Regarding the specific task of education in human love, undertaken "with the aid of the latest advances in psychology and the arts and science of teaching",[60] formators need to have "a suitable and serious psycho-pedagogic training which allows the seizing of particular situations which require a special solicitude".[61] As a consequence, "a clear vision of the situation is required because the method adopted not only gradually conditions the success of this delicate education, but also conditions co-operation between the various people in responsibility".[62]

---

[59] *Educational Guidance in Human Love,* 80.
[60] *Gravissimum Educationis*, 1.
[61] *Educational Guidance in Human Love,* 81.
[62] *Ibid.*, 83.

26

51. The autonomy and freedom of teaching is recognised today in many legal systems. In such a context, schools can collaborate with Catholic institutes of higher education to develop a deepened understanding of the various aspects of education in sexuality, with the further aim of creating new teaching materials, pedagogic reference works and teaching manuals that are based on the "Christian vision of man and women".[63] To this end, pedagogues, those who work in teacher-training and experts on literature for children and adolescents alike can all contribute to the creation of a body of innovative and creative tools that, in the face of other visions that are partial or distorted, offer a solid and integrated education of the human person from infancy onwards. Against the background of the renewal of the education alliance, collaboration at local, national and international level between all parties involved must not limit itself to sharing of ideas or useful swapping of best practice but should be made available as a key means of permanent formation of educators themselves.

[63] *Ibid.,* 22.

27

## CONCLUSIONS

52. In conclusion, the *path of dialogue*, which involves listening, reasoning and proposing, appears the most effective way towards a positive transformation of concerns and misunderstandings, as well as a resource that in itself can help develop a network of relationships that is both more open and more human. In contrast, although ideologically-driven approaches to the delicate questions around gender proclaim their respect for diversity, they actually run the risk of viewing such difference as static realities and end up leaving them isolated and disconnected from each other.

53. The Christian educational proposal fosters deeper dialogue, true to its objective "to promote the realisation of man and woman through the development of all their being, incarnate spirits, and of the gifts of nature and of grace by which they are enriched by God".[64] This requires a sincere effort *to draw closer to the other* and it can be a natural antidote to the "throw-away" and isolation culture. In this way, we restate that "the original dignity of every man and woman is therefore inalienable and inaccessible to any power or ideology".[65]

54. Catholic educators are called to go beyond all ideological reductionism or homologizing relativism by remaining faithful to their own gospel-based identity, in order *to transform positively the challenges of their times into opportunities* by following the path of listening, reasoning and proposing the Christian vision, while giving witness by their very presence, and by

---

[64] *Educational Guidance in Human Love,* 21.

[65] FRANCIS, *Address to the Delegation from the 'Dignitatis Humanae' Institute,* 7 December 2013.

29

the consistency of their words and deeds[66]. Formators have the attractive educational mission to "teach them sensitivity to different expressions of love, mutual concern and care, loving respect and deeply meaningful communication. All of these prepare them for an integral and generous gift of self that will be expressed, following a public commitment, in the gift of their bodies. Sexual union in marriage will thus appear as a sign of an all-inclusive commitment, enriched by everything that has preceded it".[67]

55. The culture of dialogue does not in any way contradict the legitimate aspirations of Catholic schools to maintain their own vision of human sexuality, in keeping with the right of families to freely base the education of their children upon *an integral anthropology*, capable of harmonizing the human person's physical, psychic and spiritual identity. In fact, a democratic state cannot reduce the range of education on offer to a single school of thought, all the more so in relation to this extremely delicate subject, which is concerned on the one hand with the fundamentals of human nature, and on the other with natural rights of parents to freely choose any educational model that accords with the dignity of the human person. Therefore, every educational institute should provide itself with organizational structures and didactic programmes that ensure these parental rights are fully and concretely respected. If this is the case, the Christian pedagogy on offer will be able to provide a solid response to anthropologies characterized by fragmentation and provisionality.

56. The programmes dealing with formation in affectivity and sexuality offered by Catholic centres of education must take into consideration the age-group of the students being taught and treat each person with the maximum of respect. This can be achieved through a *way of accompanying* that is discrete and confidential, capable of reaching out to those who are experiencing complex and painful situations. Every school should therefore make sure it is an environment of trust, calmness and openness, particularly where there are cases that require time and careful discernment.

[66] Cf. *Educating to Intercultural Dialogue in Catholic Schools*, conclusion.
[67] *Amoris Laetitia*, 283.

It is essential that the right conditions are created to provide a patient and understanding ear, far removed from any unjust discrimination.

57. The Congregation for Catholic Education is well aware of the daily effort and unstinting care shown by those who work in schools and in the whole range of formal and informal pedagogic endeavour. The Congregation wishes to encourage them in their pursuit of the work of forming young people, especially those among them who are affected by any form of poverty, and those in need of the love shown them by their educators, so that, in the words of St. John Bosco, young people are not only loved, but know they are loved. This Dicastery would also like to express its warmest gratitude to all Christians who teach in Catholic schools or other types of school, and, in the words of Pope Francis, encourages them "to stimulate in the pupils the openness to the other as a face, as a person, as a brother and sister to know and respect, with his or her history, merits and defects, riches and limits. The challenge is to cooperate to train young people to be open and interested in the reality that surrounds them, capable of care and tenderness".[68]

Vatican City, 2 February 2019, Feast of the Presentation of the Lord.

GIUSEPPE Cardinal VERSALDI
*Prefect*

Archbishop ANGELO VINCENZO ZANI
*Secretary*

---

[68] FRANCIS, *Address to the Italian Catholic Primary School Teachers Association,* 5 January 2018.

31

**EXHIBIT 26**



Home  /  Resources  /  Department Information  /  Equal Opportunity & Access

# Frequently Asked Questions

School Success and Opportunity Act (Assembly Bill 1266) Frequently Asked Questions.

---

Consistent with our mission to provide a world-class education for all students, from early childhood to adulthood, the California Department of Education issues the following Frequently Asked Questions (FAQs) in an effort to (a) foster an educational environment that is safe and free from discrimination for all students, regardless of sex, sexual orientation, gender identity, or gender expression, and (b) assist school districts with understanding and implementing policy changes related to AB 1266 and transgender student privacy, facility use, and participation in school athletic competitions.

These FAQs are provided to promote the goals of reducing the stigmatization of and improving the educational integration of transgender and gender nonconforming students, maintaining the privacy of all students, and supporting healthy communication between educators, students, and parents to further the successful educational development and well-being of every student.

Expand All | Collapse All

1. What is Assembly Bill (AB) 1266?

    AB 1266, also known as the "School Success and Opportunity Act," was introduced by Assemblyman Tom Ammiano on February 22, 2013. It requires that pupils be permitted to participate in sex-segregated school programs, activities, and use facilities consistent with their gender identity, without respect to the gender listed in a pupil's records. AB 1266 was approved by Governor Brown on August 12, 2013.

    According to Assemblyman Ammiano, "This bill is needed to ensure that transgender students are protected and have the same opportunities to participate and succeed as all other students." "AB 1266 clarifies California's student nondiscrimination laws by specifying that all students in K-12 schools must be permitted to participate in school programs, activities, and facilities in accordance with the student's gender identity."

    As part of the analysis of AB 1266, Assemblyman Ammiano also stated, "Athletics and physical education classes, which are often segregated by sex, provide numerous well-documented positive effects for a student's physical, social, and emotional development. Playing sports can provide student athletes with important lessons about self-discipline, teamwork, success, and failure, as well as the joy and shared excitement that being a member of a sports team can bring. When transgender students are denied the opportunity

to participate in physical education classes in a manner consistent with their gender identity, they miss out on these important benefits and suffer from stigmatization and isolation. In addition, in many cases, students who are transgender are unable to get the credits they need to graduate on time when, for example, they do not have a place to get ready for gym class."

2. <u>When did this law go into effect?</u>

AB 1266 became a provision within California Education Code, Section 221.5(f), on January 1, 2014. It is important to note that prior to the enactment of AB 1266, both state and federal law have prohibited gender-based discrimination for some time.

**Federal Protection**:

Title IX prohibits sexual harassment and discrimination based on gender or sex stereotypes in every jurisdiction. While Title IX does not specifically use the terms "transgender" or "gender identity or expression," courts have held that harassment and other discrimination against transgender and gender nonconforming people constitutes sex discrimination. This position has also been supported by the U.S. Department of Education. These rights were clarified in the October 26, 2010, "Dear Colleague Letter" and the April 29, 2014, guidance issued by the U.S. Department of Education, Office for Civil Rights, described in the "Recent Developments and Resources" section at the end of this document.

**California Law**:

It is the policy of the State of California to afford all persons in public schools, regardless of their disability, gender, gender identity, gender expression, nationality, race or ethnicity, religion, sexual orientation, or any other characteristic that is contained in the definition of hate crimes set forth in Section 422.55 of the Penal Code, equal rights and opportunities in the educational institutions of the state. (Education Code Section 200.)

No person shall be subjected to discrimination on the basis of disability, gender, gender identity, gender expression, nationality, race or ethnicity, religion, sexual orientation, or any other characteristic that is contained in the definition of hate crimes set forth in Section 422.55 of the Penal Code in any program or activity conducted by an educational institution that receives, or benefits from, state financial assistance or enrolls pupils who receive state student financial aid. (Education Code Section 220.)

3. <u>What specifically does AB 1266 provide?</u>

Pre-existing state law prohibits public schools from discriminating on the basis of several characteristics, including sex, sexual orientation, and gender identity. Pre-existing state law also requires that participation in a particular physical education activity or sport, if required of pupils of one sex, be available to pupils of each sex.  AB 1266 requires a pupil be

permitted to participate in sex-segregated school programs, activities, and facilities including athletic teams and competitions, consistent with his or her gender identity, regardless of the gender listed on the pupil's records.

As amended, Education Code Section 221.5(f) provides that "a pupil shall be permitted to participate in sex-segregated school programs and activities, including athletic teams and competitions, and use facilities consistent with his or her gender identity, irrespective of the gender listed on the pupil's records."

4. How should a school district, teacher, school administrator or other employee define gender, transgender, or gender identity?

There are a number of developing terms used to describe transgender characteristics and experiences, which may differ based on region, age, culture, or other factors. Many of these terms are not currently defined by law. However, several common definitions have been used by the courts, the U.S. Department of Education, and a number of groups with educational equity expertise, including the Gay, Lesbian, Straight, Education Network, and the California School Boards Association. Any definitions provided in these materials are provided to facilitate the process of providing safe and nondiscriminatory learning environments and are not provided for the purpose of labeling any students.

"Gender" means sex, and includes a person's gender identity and gender expression. "Gender expression" means a person's gender-related appearance and behavior whether or not stereotypically associated with the person's assigned sex at birth. (*Education Code* Section 210.7.)

"Gender identity" refers to a person's gender-related identity, appearance or behavior whether or not different from that traditionally associated with the person's physiology or assigned sex at birth.

"Gender expression" refers to external cues that one uses to represent or communicate one's gender to others, such as behavior, clothing, hairstyles, activities, voice, mannerisms, or body characteristics.

"Transgender" describes people whose gender identity is different from that traditionally associated with their assigned sex at birth. "Transgender boy" and "transgender male" refer to an individual assigned the female sex at birth who has a male gender identity. "Transgender girl" and "transgender female" refer to an individual assigned the male sex at birth who has a female gender identity. An individual can express or assert a transgender gender identity in a variety of ways, which may but do not always include specific medical treatments or procedures. Medical treatments or procedures are not considered a prerequisite for one's recognition as transgender.

"Gender nonconformity" refers to one's gender expression, gender characteristics, or gender identity that does not conform to gender stereotypes "typically" associated with one's legal sex assigned at birth, such as "feminine" boys, "masculine" girls and those who are perceived as androgynous. Sexual orientation is not the same as gender identity. Not all transgender youth identify as gay, lesbian or bisexual, and not all gay, lesbian and bisexual youth display gender-nonconforming characteristics.

5. How can a teacher or school administrator determine whether a student is transgender or not?

The first and best option is always to engage in an open dialogue with the student and the student's parent or parents if applicable (but see FAQs 6 and 7). Gender identity is a deeply rooted element of a person's identity. Therefore, school districts should accept and respect a student's assertion of their gender identity where the student expresses that identity at school or where there is other evidence that this is a sincerely held part of the student's core identity. Some examples of evidence that the student's asserted gender identity is sincerely held could include letters from family members or healthcare providers, photographs of the student at public events or family gatherings, or letters from community members such as clergy.

If a student meets one or more of those requirements, a school may not question the student's assertion of their gender identity except in the rare circumstance where school

personnel have a credible basis for believing that the student is making that assertion for some improper purpose. The fact that a student may express or present their gender identity in different ways in different contexts does not, by itself, undermine a student's assertion of their gender identity.

A school cannot require a student to provide any particular type of diagnosis, proof of medical treatment, or meet an age requirement as a condition to receiving the protections afforded under California's antidiscrimination statutes. Similarly, there is no threshold step for social transition that any student must meet in order to have his or her gender identity recognized and respected by a school.

6. <u>May a student's gender identity be shared with the student's parents, other students, or members of the public?</u>

A transgender or gender nonconforming student may not express their gender identity openly in all contexts, including at home. Revealing a student's gender identity or expression to others may compromise the student's safety. Thus, preserving a student's privacy is of the utmost importance. The right of transgender students to keep their transgender status private is grounded in California's antidiscrimination laws as well as federal and state laws. Disclosing that a student is transgender without the student's permission may violate California's antidiscrimination law by increasing the student's vulnerability to harassment and may violate the student's right to privacy.

- A. Public Records Act requests - The Education Code requires that schools keep student records private. Private information such as transgender status or gender identity falls within this code requirement and should not be released. (Education Code Section 49060.)

- B. Family Educational and Privacy Rights (FERPA) - FERPA is federal law that protects the privacy of students' education records. FERPA provides that schools may only disclose information in school records with written permission from a student's parents or from the student after the student reaches the age of 18. (20 U.S.C. Section 1232g.) This includes any "information that . . . would allow a reasonable person in the school community . . . to identify the student with reasonable certainty." (34 C.F.R. Section 99.3.)

- C. California Constitution - Minors enjoy a right to privacy under Article I, Section I of the California Constitution that is enforceable against private parties and government officials. The right to privacy encompasses the right to non-disclosure (autonomy privacy) as well as in the collection and dissemination of personal information such as medical records and gender identity (informational privacy).
Even when information is part of a student's records and therefore covered by FERPA, the law provides several exceptions that permit appropriate communications under

circumstances in which the student or others may be at risk of harm. Transgender or gender nonconforming students are often subject to stressors which can place them at risk of self-harm. FERPA expressly permits the disclosure of information from a student's records "…to appropriate parties in connection with an emergency if knowledge of the information is necessary to protect the health or safety of the student or other individuals." (34 C.F.R. Section 99.36(a).) "If the educational agency or institution determines that there is an articulable and significant threat to the health or safety of a student or other individuals, it may disclose information from education records to any person whose knowledge of the information is necessary to protect the health or safety of the student or other individuals." (*Id.* Section 99.36(c).)

Moreover, although FERPA restricts disclosures of information obtained from a student's records, it was never intended to act as a complete prohibition on all communications. One threshold point that is often overlooked is that FERPA limits only the disclosure of records and information from records about a student. It does not limit disclosure or discussion of personal observations.

In other words, if a school employee develops a concern about a student based on the employee's observations of or personal interactions with the student, the employee may disclose that concern to anyone without violating, or even implicating, FERPA. Of course, in most cases, the initial disclosure should be made to professionals trained to evaluate and handle such concerns, such as school student health or welfare personnel, who can then determine whether further and broader disclosures are appropriate.

7. <u>What steps should a school or school district take to protect a transgender or gender nonconforming student's right to privacy?</u>

To prevent accidental disclosure of a student's transgender status, it is strongly recommended that schools keep records that reflect a transgender student's birth name and assigned sex (e.g., copy of the birth certificate) apart from the student's school records. Schools should consider placing physical documents in a locked file cabinet in the principal's or nurse's office. Alternatively, schools could indicate in the student's records that the necessary identity documents have been reviewed and accepted without retaining the documents themselves. Furthermore, schools should implement similar safeguards to protect against disclosure of information contained in electronic records.

Pursuant to the above protections, schools must consult with a transgender student to determine who can or will be informed of the student's transgender status, if anyone, including the student's family. With rare exceptions, schools are required to respect the limitations that a student places on the disclosure of their transgender status, including not sharing that information with the student's parents. In those very rare circumstances where a school believes there is a specific and compelling "need to know," the school should inform the student that the school intends to disclose the student's transgender status, giving the

student the opportunity to make that disclosure her or himself. Additionally, schools must take measures to ensure that any disclosure is made in a way that reduces or eliminates the risk of re-disclosure and protects the transgender student from harassment and discrimination. Those measures could include providing counseling to the student and the student's family to facilitate the family's acceptance and support of the student's transgender status. Schools are not permitted to disclose private student information to other students or the parents of those students.

A transgender student's right to privacy does not restrict a student's right to openly discuss and express their gender identity or to decide when or with whom to share private information. A student does not waive his or her right to privacy by selectively sharing this information with others.

8. <u>What is a school or school district's obligation when a student's stated gender identity is different than the student's gender marker in the school's or district's official records?</u>

A school district is required to maintain a mandatory permanent student record which includes the legal name of the student and the student's gender. If and when a school district receives documentation that such legal name or gender has been changed, the district must update the student's official record accordingly.

If the school district has not received documentation supporting a legal name or gender change, the school should nonetheless update all unofficial school records (e.g. attendance sheets, school IDs, report cards) to reflect the student's name and gender marker that is consistent with the student's gender identity. This is critical in order to avoid unintentionally revealing the student's transgender status to others in violation of the student's privacy rights, as discussed above in section 6.

If a student so chooses, district personnel shall be required to address the student by a name and the pronouns consistent with the student's gender identity, without the necessity of legal documentation or a change to the student's official district record. The student's age is not a factor. For example, children as early as age two are expressing a different gender identity. It is strongly suggested that teachers privately ask transgender or gender nonconforming students at the beginning of the school year how they want to be addressed in class, in correspondence to the home, or at conferences with the student's parents.

In addition to preserving a transgender student's privacy, referring to a transgender student by the student's chosen name and pronouns fosters a safe, supportive and inclusive learning environment. To ensure that transgender students have equal access to the programs and activities provided by the school, all members of the school community must use a transgender student's chosen name and pronouns. Schools should also implement safeguards to reduce the possibility of inadvertent slips or mistakes, particularly among temporary personnel such as substitute teachers.

If a member of the school community intentionally uses a student's incorrect name and pronoun, or persistently refuses to respect a student's chosen name and pronouns, that conduct should be treated as harassment. That type of harassment can create a hostile learning environment, violate the transgender student's privacy rights, and increase that student's risk for harassment by other members of the school community. Examples of this type of harassment include a teacher consistently using the student's incorrect name when displaying the student's work in the classroom, or a transgender student's peers referring to the student by the student's birth name during class, but would not include unintentional or sporadic occurrences. Depending on the circumstances, the school's failure to address known incidents of that type of harassment may violate California's antidiscrimination laws.

9. <u>How does a school or school district determine the appropriate facilities, programs, and activities for transgender students?</u>

A school may maintain separate restroom and locker room facilities for male and female students. However, students shall have access to the restroom and locker room that corresponds to their gender identity asserted at school. As an alternative, a "gender neutral" restroom or private changing area may be used by any student who desires increased privacy, regardless of the underlying reason. The use of such a "gender neutral" restroom or private changing area shall be a matter of choice for a student and no student shall be compelled to use such restroom or changing area.

If there is a reason or request for increased privacy and safety, regardless of the underlying reason, any student may be provided access to a reasonable alternative locker room such as:

- A. Use of a private area in the public area of the locker room facility (i.e., a nearby restroom stall with a door, an area separated by a curtain, or a P.E. instructor's office in the locker room).

- B. A separate changing schedule (either utilizing the locker room before or after the other students).

- C. Use of a nearby private area (i.e., a nearby restroom or a health office restroom). It should be emphasized that any alternative arrangement should be provided in a way that keeps the student's gender identity confidential.

Schools cannot, however, require a transgender student to use those alternatives. Requiring a transgender student to be singled out by using separate facilities is not only a denial of equal access, it also may violate the student's right to privacy by disclosing the student's transgender status or causing others to question why the student is being treated differently.

Some students (or parents) may feel uncomfortable with a transgender student using the same sex-segregated restroom or locker room. This discomfort is not a reason to deny access to the transgender student. School administrators and counseling staff should work with students and parents to address the discomfort and to foster understanding of gender identity, to create a school culture that respects and values all students.

10. How should a school or district determine the appropriate placement for transgender students related to sports and physical education classes?

Transgender students are entitled to and must be provided the same opportunities as all other students to participate in physical education and sports consistent with their gender identity. Participation in competitive athletic activities and contact sports are to be addressed on a case-by-case basis. For additional guidance, the California Interscholastic Federation issued new bylaws in 2013, which provide a detailed process for gender identity participation in interscholastic sports. (See, Recent Developments section below.)

11. May a school district or school enforce a gender-based dress code?

Nondiscriminatory gender segregated dress codes may be enforced by a school or school district pursuant to district policy. Students shall have the right to dress in accordance with their gender identity, within the constraints of the dress codes adopted by the school. School staff shall not enforce a school's dress code more strictly against transgender and gender nonconforming students than other students.

12. How should school districts and schools address harassment, bullying and abuse of transgender students?

California law requires that schools provide all students with a safe, supportive and inclusive learning environment, free from discrimination, harassment, and bullying. Examples of harassment and abuse commonly experienced by transgender students include, but are not limited to, being teased for failing to conform to sex stereotypes, being deliberately referred to by the name and/or pronouns associated with the student's assigned sex at birth, being deliberately excluded from peer activities, and having personal items stolen or damaged. School district efforts to prevent and address harassment must include strong local policies and procedures for handling complaints of harassment, consistent and effective implementation of those policies, and encouraging members of the school community to report incidents of harassment. Beyond investigating incidents, schools should implement appropriate corrective action to end the harassment and monitor the effectiveness of those actions.

13. Should a school district or school generally review its gender-based policies?

As a general matter, schools should evaluate all gender-based policies, rules, and practices and maintain only those that have a clear and sound pedagogical purpose. Examples of policies and practices that should be reconsidered include: gender-based dress code for graduation or senior portraits and asking students to line up according to gender. Gender-

based policies, rules, and practices can have the effect of marginalizing, stigmatizing, and
excluding students, whether they are gender nonconforming or not. In some circumstances,
these policies, rules, and practices may violate federal and state law. For these reasons,
schools should consider alternatives to them.

Whenever students are separated by gender in school activities or are subject to an
otherwise lawful gender-specific rule, policy, or practice, students must be permitted to
participate in such activities or conform to such rule, policy, or practice consistent with their
gender identity.

## RECENT DEVELOPMENTS AND RESOURCES

The California School Boards Association's (CSBA) Final Guidance Regarding Transgender
Students, Privacy, and Facilities ☑

CSBA has also promulgated a model board policy and administrative regulation that can be adopted
by districts:

Board Policy 5145.3 ☑ (PDF; Posted 29-Jan-2016)

Administrative Regulation 5145.3 ☑ (PDF; Posted 29-Jan-2016)

CSBA also issued a policy brief ☑ (PDF) on the issue of how schools can support transgender and
gender nonconforming students

# Office for Civil Rights Complaint and Resolution Agreement

On July 24, 2013, the U.S. Department of Education's Office for Civil Rights and the U.S.
Department of Justice's Civil Rights Division entered into a Resolution Agreement with the Arcadia
Unified School District to resolve a complaint alleging violations of Title IX. The case was brought on
behalf of a transgender student who was denied access to the boys' restrooms and locker rooms,
and required to sleep in a separate facility during an overnight field trip. The agreement requires the
school district to treat the student in a manner consistent with his gender identity for all purposes.
Moreover, the school district agreed to retain a consultant to revise their policies to prohibit
discrimination on the basis of gender identity and implement a district-wide training program for staff
and students.

The Resolution Agreement ☑ (PDF; Posted 29-Jan-2016) between the Office for Civil Rights and
Arcadia Unified School District

## California Interscholastic Federation

In February 2013, the California Interscholastic Federation (CIF) issued new bylaws which provide that all students should have the opportunity to participate in CIF activities in a manner that is consistent with their gender identity. CIF Regulation 300 D, Gender Identify Participation, provides:

> Participation in interscholastic athletics is a valuable part of the educational experience for all students. All students should have the opportunity to participate in CIF activities in a manner that is consistent with their gender identity, irrespective of the gender listed on a student's records. The student and/or the student's school may seek review of the student's eligibility for participation in interscholastic athletics in a gender that does not match the gender assigned to him or her at birth, should either the student or the school have questions or need guidance in making the determination, by working through the procedure set forth in the "Guidelines for Gender Identity Participation."

NOTE: The student's school may make the initial determination whether a student may participate in interscholastic athletics in a gender that does not match the gender assigned to him or her at birth.

The new California Interscholastic Federation bylaws ⤢

## Office for Civil Rights, Questions and Answers on Title IX and Sexual Violence, April 29, 2014

In April 2014, the U.S. Department of Education, Office for Civil Rights, issued guidance making clear that federal law prohibits discrimination against students on the basis of transgender status: "Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity or femininity and OCR accepts such complaints for investigation ⤢ (PDF; Posted 29-Jan-2016)."

## Office for Civil Rights Dear Colleague Letter, October 26, 2010

In October 2010, the U.S. Department of Education, Office for Civil Rights, issued a Dear Colleague Letter that, among other things, clarified that although Title IX does not prohibit discrimination on the basis of sexual orientation, harassment directed at a student because that student is gay, lesbian, bisexual, or transgender may constitute sexual harassment and sex discrimination prohibited by Title IX.

The U.S. Department of Education, Office for Civil Rights, Dear Colleague Letter, October 26, 2010 ⤢ (PDF; Posted 29-Jan-2016)

## Other Resources

Gay-Straight Alliance Network/Tides Center, Transgender Law Center and National Center for Lesbian Rights. (2004). Beyond the Binary: A Tool Kit for Gender Identity Activism in Schools. San Francisco, CA: GSA Network ⤢ (PDF; Posted 29-Jan-2016)

Gerald P. Mallon, "Practice with Transgendered Children," in *Social Services with Transgendered Youth* 49, 55-58 (Gerald P. Mallon ed., 1999)

Stephanie Brill & Rachel Pepper, *The Transgender Child*, 61-64 (2008).


**Questions: School Health and Safety Office | shso@cde.ca.gov | 916-319-0914**

Last Reviewed: Thursday, September 16, 2021

---

**EXHIBIT 27**

**RELATIONSHIPS AT WORK**
Dispute Resolution Services

*dr.dupree@relationships-at-work.com -- https://relationships-at-work.com/tip/ -- 619-433-4264*

### *The Interactive Process Meeting (TIPM)*

### *Accommodation Assessment Summary*

### *- CONFIDENTIAL -*

| | |
|---|---|
| Date of IPM: | Tuesday, November 15, 2022 at pm PT (conducted in-person) |
| Employer: | Escondido Union School District (EUSD) |
| Employee: | Elizabeth Mirabelli, Middle School Teacher |

DOB: on file in HR

Is the Accommodation Work-related?     ⦿ Yes   ◯ No

If Yes, Nature of Request:   Exemption from Policy 0410 based on religious beliefs.

## PURPOSE OF THE INTERACTIVE PROCESS:

The employer, EUSD, engaged their employee, Elizabeth Mirabelli, in the interactive process to address her request for accommodation based on religious beliefs.  She requests exemption from a new district policy (0410) requiring employees of EUSD to use gender pronouns identified and preferred by staff and students.

The purpose of the process is to engage the employee and the employer in a cooperative, collaborative, and confidential setting to address the nature and impact of the accommodation request, the guidelines set forth in existing state and federal laws addressing student rights, and what readily achievable, effective accommodations may be implemented, temporarily and/or long-term, to address her request and the work environment.

The parties reviewed the essential functions of the Middle School Teacher position and current work climate given the request for accommodation.

Attorney Daniel Shinoff, for EUSD, provided hard copies of key laws and guidances that apply to Ms. Mirabelli's request for religious accommodation.

The remainder of this summary outlines highlights of the discussion held and is summarized with a plan of action for next steps.

## EMPLOYEE's REQUEST FOR ACCOMMODATION

Ms. Mirabelli acknowledged that she has been employed with EUSD for the last 25 years.

While the nature of her religious beliefs has not changed over time, the new District policy addressing the use of preferred gender pronouns challenges her sincerely held beliefs, adding that this is the first time a policy has been implemented that she finds untenable.

She noted that she is aware of others who are also troubled by the new policy but are remaining quiet and not saying much.  However, she is unwilling to compromise her beliefs.  The new anthropology espoused in the policy represents a different way for viewing human behavior which is diametrically opposed to her sincerely held beliefs.

She expressed concern and confusion as to how her employment may be impacted as a result of this new policy in light of her sincerely held beliefs.  She asked if following the policy is now a condition of employment.  Will she be fired, or reprimanded for not abiding by the policy as she believes others have been?  Who has the right to tell Teachers how to communicate and teach in their classrooms?  She noted that the training about the new policy was developed and presented by School Counselors in response to guidance from Advocacy Groups for LBGTB populations.

As an English Teacher, she is well-grounded in the nuances and meanings of pronouns and feel strongly that the use of the transgender pronouns simply represent improper English.  Details of her specific request are outlined on P. 3 along with specific suggestions for handling her request for religious accommodation.  Her formal request, dated October 11, 2022, is also attached to this IPM Summary, starting on P. 8.

**OVERVIEW OF STATE & FEDERAL GUIDELINES**:

As noted, Attorney Daniel Shinoff provided hard copies of the following legal guidelines to the IPM participants for discussion and guidance; highlights of those four documents are referenced elsewhere in this IPM Summary.

1) United States (U.S.) Department of Education, Office for Civil Rights.
   "Questions and Answers on Title IX and Sexual Violence" (considered a 'significant guidance document' under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (January 25, 2007).

2) U.S. Department of Education, Office for Civil Rights
   "Dear Colleague Letter Harassment and Bullying (October 26, 2010)" - Background, Summary and Fast Facts

3) California Department of Education (now part of California Education Code, Section 221.5(f), (January 1, 2014)
   "School Success and Opportunity Act (Assembly Bill 1266) Frequently Asked Questions"  (February 23, 2013)

4) Virginia Department of Education
   "2022 Model Policies on the Privacy, Dignity, and Respect for All Students and Parents in Virginia's Public Schools"

## REVIEW OF ESSENTIAL FUNCTIONS:

Job Title:   Middle School Classroom Teacher - English, Rincon Middle School

Job Description Available:  ● Yes  ○ No   Job Description attached:  ● Yes ○ No

Work Schedule:   Monday - Friday

Hours of Work:   According to established Rincon Middle School schedule

# Hours/Week:   37.5 hours per week as contracted.

The employment standards for the role of the Middle School Classroom Teacher include both knowledge and ability in the following areas (further details are outlined in the Job Description attached, starting on P. 12):

KNOWLEDGE: A Middle School Teacher must demonstrate an understanding of learning theory, current state content standards, teaching standards, a wide variety of effective teaching strategies, child growth and development and the social/emotional needs thereof, motivation, retention, and transfer theory, effective lesson planning, discipline, working with parents, appropriate SADIE instructional techniques for English learning students, learning disabilities and mainstreaming of students with disabilities into the regular classroom, technology uses in the instructional process, district policies and administrative regulations regarding teaching responsibilities and other areas that affect the organization and delivery of services to students. The Teacher must maintain knowledge of site performance plan and school site and district emergency procedures. And must maintain current knowledge of professional responsibilities regarding any requirements for maintaining valid teaching credentials.

ABILITY: A Middle School Teacher must possess the ability to implement all areas listed under "Knowledge."
1) address the needs of all students, monitor progress, adjust instructional strategies according to students needs and accurately report student progress.
2) plan, organize, and deliver instruction.
3) work as a team member with other staff members, and in a cooperative relationship with supervisor(s).
4) integrate subject areas in instruction to produce meaningful standards-based program.
5) perform other teaching related duties including but not limited to parent conferences, open house, "back to school" night and staff meetings.
6) perform adjunct duties equitably in comparison to other staff members, including but not limited to playground supervision, attendance at PTA meetings, member of emergency preparedness committee, etc.
7) provide for student safety under routine and emergency conditions.
8) engage in professional development provided by the district as well as through individual efforts.
9) utilize resources effectively and follow directions accurately.
10) demonstrate student progress and achievement through on-going assessment and monitoring.

## REASONABLE ACCOMMODATION DISCUSSION:

As noted, EUSD engaged their employee, Middle School Teacher Elizabeth Maribelli, in the interactive process to address the impact of a newly implemented District policy (0410) for use of gender preferred pronouns on the sincerely held beliefs of Ms. Maribelli and her request for accommodation.

Present at the interactive meeting were the employee and her spouse, representatives from EUSD (i.e. human resources, Rincon school site, and program management), and legal representatives for the employee and the employer. (Discussion continued on next page.)

**REASONABLE ACCOMMODATION DISCUSSION (continued):**

Following introductions of the IPM participants, an overview of the interactive process was presented by the Meeting Facilitator, Dr. Debra Dupree.

Ms. Mirabelli was first presented with an opportunity to address her concerns about the new policy, its origins, and the impact on her sincerely held religious beliefs (previously referenced in the earlier section called "Employee's Request for Accommodation").

Dr. John Albert, Assistant Superintendent - Human Resources, first acknowledged that District policy 0410 is the genesis for this change in practice on the use of preferred gender pronouns and that the policy addresses intentional occurrences of misuse. Attorney Shiffoff (for EUSD) put forth that this policy arose in response to more recent laws in 2007, 2010, 2013, and 2014 as well as development of the "2022 Model Policies on the Privacy, Dignity, and Respect for All Students and Parents in Virginia's Public Schools" (now used as a model for other State Departments of Education, including California).

Attorney Shinoff further referenced the California Education Code 221.5 a-f and 231.6 of the Sex Equity Act as examples of the evolution of laws and protections since the First Amendment, most specifically the Title VI Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act of 1990.

While acknowledging that EUSD is committed to protect and respect the religious rights and freedom of speech as afforded under the First Amendment, changes in state or federal laws that affect employment and/or educational rights and responsibilities have also evolved (as in the case of Policy 0410). The District follows guidance from the State of California School Boards Association as to their interpretation of the laws and what those protections mean at the local level. The Constitutional Officers on that Board are sworn in as an oath of office to uphold and interpret changes in the law to the utmost of their ability and to the broadest protection of all concerns.  Local school boards then develop their district policies to be applied.

At the heart of this accommodation request is the balance of sincerely held religious beliefs of Ms. Mirabelli versus the sincerely held gender beliefs held by many in public education settings.  It was emphasized that the nature of her beliefs is not in question per the First Amendment.

### What accommodation suggestions does the employee have?

On October 11, 2022, Ms. Mirabelli submitted a formal request for accommodation (see attached starting on P. 7).  The essence of her request is for EXEMPTION from Policy 0410 relating to use of preferred nouns for gender identity:

"(1) The "Names" policy that requires teachers and staff to refer to a student by a gender-specific name that the student identifies to match his or her gender identity, but that is different from his or her legal name."

"(2) The "Pronouns" policy that requires teachers and staff to refer to a student using pronouns identified by a student, including opposite-sex pronouns and genderless pronouns (e.g. "it" or "they"), regardless of a student's biological sex."

"(3) The "Privacy" policy that prohibits teachers and staff from sharing a student's gender identity status with his or her parent or guardian without the student's permission, thereby requiring teachers to use different names or pronouns depending on with whom the teacher is speaking."

"(4) Directly participate in any staff meeting or training on the topic of gender identity or gender theory."

She outlined specific recommendations to accommodate her (and others') beliefs as follows:
1. "Make the policy recommended rather than mandatory.
2. Exempt teachers and staff with sincere religious objections.
3. Allow teachers and staff to refer to students by names in official records.
4. Recommend teachers and staff refer to students by surnames.
5. Assign students who request transgender names and pronouns to teachers who do not object to deceiving students, parents, and guardians."

### Discussion of specific accommodations identified and if readily achievable and effective:

The parties went through each of the employee's identified areas of exemption and her suggested accommodations.

#1 Participation in professional development and required training is an essential function of a Middle School Teacher job duties.  Removal of an essential function that an employee feels unable to complete is not regarded as a readily achievable or effective accommodation per State and Federal guidelines.

#2 Reassigning students who express sincerely held beliefs for preferred gender pronouns away from teachers and staff who have sincerely held religious beliefs generate other legal concerns for the many students impacted by sex-discrimination under the aforementioned state and federal laws, including micro-aggressions, sexualized preferences, and the responsibility of professionals for the protection of innocence of the youth served.

The impact on Master Scheduling would limit and constrain access to classes needed by students, further limiting their fair access to educational services in a public school setting, creating an undue burden on EUSD. (Continued on P. 4.)

#3 Concerns about training content on gender noun preferences and the 0410 policy may be revisited and directed to the District Superintendent for further discussion with the School Board. The employee may confer further with Human Resources for guidance on submitting her concerns to higher authorities (the decision-makers about the policy who were not present at this interactive process meeting).

#4 It was again noted that the California Department of Education has the authority to interpret and define implications for public education.  'Frequently Asked Questions' (FAQs) have been developed to guide local Districts and their school boards in implementing policy. Terms used are not defined in the law but interpreted through various courts and decisions arising from court proceedings.  The intent is not to label but to provide guidance. Given the employee's stated concerns on the impact of this new policy, she was directed to EUSD's Employee Assistance Program (EAP) for support and assistance, as well as to the GAMUT website where all EUSD policies are housed, particularly those that address gender, non-gender, and non-conforming students and their protections.

Employer Comments:      ◯ Yes      ⦿ No      ◯ Pending      ◯ Not applicable

The four areas requested for exemption include actions that are not readily achievable given the legal foundation for the current policy (0410), protecting the sincerely held beliefs of many regarding their gender identity.

The interactive process is designed to address an individual's specific request for accommodation; all accommodation requests are evaluated on a case-by-case basis.  Her requests for exemption have broader application to other teachers/staff and students who may have sincerely held beliefs in same or other areas who are not part of this specific accommodation process. The request for exemptions adversely impact many students as forms of discrimination under relevant laws and represent removal of essential functions.

Employee Comments:      ◯ Yes      ◯ No      ◯ Pending      ⦿ Not applicable

The employee acknowledged that she is struggling with implementation of this new policy and how it impacts her sincerely held religious beliefs. Again, she was referred to EAP for support and guidance to explore her needs and options. Human Resources is also available to guide her in submitting her concerns to the EUSD School Board.

She acknowledges the implications of the various laws and guidance provided to the School Board and Superintendent and their responsibility for developing policies for all in the public education setting.  Through this process, she better understands how laws may conflict and may require further revision through other settings.

**Check one or more applicable items listed below:**

☐ UNABLE TO PERFORM ESSENTIAL FUNCTIONS:

No reasonable accommodation exists that would facilitate the employee's (or candidate) ability to perform the essential job functions.  COMMENTS:

Ms. Mirabelli appears capable of performing all the essential functions of the job.  Her request for accommodation centers on her request for exemption from training that she finds objectionable and her style of communication with students according to their birth name versus their preferred gender pronoun designation.  Removal of essential functions is not an acceptable form of accommodation.

☑ UNDUE HARDSHIP CREATED:

Providing accommodation would impose an undue hardship for the employer based on:

   a. The number of employees and the number of individuals employed at the facility, type and location of facilities.

   b. The impact of accommodation on the operation of the facility, impact on other employees' ability to perform duties, and facility's ability to conduct business.

   c. The overall financial resources and overall size of business.

   d. The nature and cost of accommodation.   COMMENTS:

As noted earlier, the crux of Ms. Mirabelli's request for religious accommodation centers on her sincerely held religious beliefs versus the sincerely held gender beliefs of many.

Attempting to deliver on her request for exemption unduly impacts the operations and delivery of education to students, impacting the Master Scheduling and fostering constraints on EUSD's ability to delivery educational services. The nature of her request for exemptions also generate the potential for discrimination and lack of compliance under the various laws described earlier in this IPM Summary.

❑   DIRECT THREAT TO EMPLOYEE AND/OR OTHERS:

   a. Providing a reasonable accommodation would impose danger to the health and safety of the individual with the medical condition and/or poses a danger to the health and safety of others.

   b. The employee's request prevents him or her from performing the essential job duties over a reasonable length of time without facing identifiable, substantial and immediate harm to his or her own health and safety OR the health and safety of others. No reasonable accommodation exists that

Ms. Mirabelli acknowledged that she is challenged in abiding by Policy 0410 given her religious beliefs.  She is directed to EAP for support in addressing her needs and options available within the current District work climate under the new policy.

HIGHLIGHTS OF IPM and SUMMARY of NEXT STEPS:

1) The employer, EUSD, initiated the interactive process with their employee, Elizabeth Mirabelli, to address her request for accommodation based on changing work practices.

The goal of the process was to create a cooperative, collaborative, and confidential setting to address the employee's request for accommodation for sincerely held religious beliefs, the policy triggering her request, and applicable State and Federal laws governing practices at the local level.

The interactive process was facilitated by Dr. Debra Dupree (in-person) at EUSD on Wednesday, November 15, 2022 at 2:30pm PT.  Those participating are identified in the attached list of attendees (see P. 6).

2) The parties explored and discussed the nature of Ms. Mirabelli's request, the changed District policy, the evolution of laws since the First Amendment, particularly the highlights of the U.S. Department of Education Office for Civil Rights Title IX, and the California Education Code as they serve as the foundation to the District's 0410 policy and her request for accommodation based on religious beliefs.

Input was obtained from the employee as to her perceptions of the changed District policy to better understand the degree of impact on her religious beliefs.  The essential functions of the job and the work environment were also reviewed to understand the context of work and implications on the delivery of services to students protected by the afore mentioned federal and state laws..

3)  The parties mutually discussed options available and the following plan of action was developed:
   a. The request for exemption as outlined in Ms. Mirabelli's recommended accommodations are not readily achievable or effective in ensuring fair and equal access to all students.
   b. As the decision-makers for Policy 0410 were not present at this IPM, she has available to her a course of action to address her concerns about training content and Policy 0410 by submitting them to the School Board and Superintendent for further discussion of her concerns and her religious beliefs impacted by the policy.
   c. A review of the policy and her concerns about termination and/or reprimand can be further addressed through follow-up conversation with her Teachers' Association Representation and/or Human Resources.
   d. Ms. Mirabelli was also directed to EUSD's EAP for further support and guidance on her personal challenges.

4)  The parties are aware that the interactive process may be a one-time event or may require follow-up as needed to address any changes in the employee's request for accommodation and/or to address any changes in business practices.  The conclusion of this IPM is that readily achievable, effective accommodations are not available to meet her request for exemption.

See supporting documents checked here:

☑ List of Attendees participating in the IPM, see P. 6

☑ Employee's formal request for accommodation, starting on P. 7

☑ Job Description, starting on P. 9

☑ Other:  Handout provided on US Dept. of Education Office for Civil Rights on Title IX

☑ Other:  Handout provided on CA Dept. of Education on Assembly Bill 1266

☑ Other:  Handout provided on VA Dept. of Education 2022 Model Policies

☑ Employee Assistance Program (EAP) - free counseling services for employees in transition

**NAMES OF THOSE PARTICIPATING:**

|  | PRINTED NAME | JOB TITLE | DATE |
|---|---|---|---|
| Employee | Elizabeth Mirabelli | Middle School Teacher EUSD | Nov. 15, 2022 |
| Employer | Dr. John Albert | Assistant Superintendent Human Resources EUSD | Nov. 15, 2022 |
| Employer | Steve White | Principal Ricon Middle School EUSD | Nov. 15, 2022 |
| Employer | Trent Smith | Director Integrated Student Support EUSD | Nov. 15, 2022 |
| Other | Norman Grissom, Esq. | Legal Counsel on behalf of Ms. West | Nov. 15, 2022 |
| Other | Daniel Shinoff, Esq. | Legal Counsel on behalf of EUSD | Nov. 15, 2022 |
| Other | Andrew Mirabelli | Spouse of the employee | Nov. 15, 2022 |
| IPM Facilitator | Dr. Debra Dupree | *Debra Dupree*, PsyD | Nov. 15, 2022 |

\*

Employee:  Elizabeth Mirabelli     Employer:  EUSD     Date: Nov. 15, 2022

Relationships at Work, Inc.     1520 First Street, K-306, Coronado, CA  92118     619-433-4264     6 / 6

October 11, 2022

Human Resources Department, Superintendent Luis Rankins-Ibarra
Escondido Union School District
2310 Aldergrove Avenue
Escondido, CA 92029

**REQUEST FOR ACCOMMODATION BASED ON RELIGIOUS CONVICTIONS**

EUSD Human Resources Department & Superintendent Ibarra:

This letter is a formal request to the Escondido Union School District for a Religious Work Accommodation and exemption as a certificated employee, teaching at Rincon Middle School, from certain of EUSD's policies on gender identity outlined in "The Rights of Gender Diverse Individuals" presentation given during a staff meeting held on February 3, 2022. This request is based on Title VII of the *Civil Rights Act* and the *California Fair Employment and Housing Act*.

**Basis for Request**

I am a devout Roman Catholic and adhere to Church teaching and Biblical moral principles regarding the binary nature of man and woman. I sincerely hold the religious belief that God designed the human race male and female, each with a distinct and innate masculine or feminine nature. This unique nature, expounded upon by Pope John Paul II in his *Theology of the Body*, is also evidenced by unique genetics, biology, chemistry, and anatomy. Further, I believe that God permits free will - the freedom of people to choose whether to live in accordance with His plan. Therefore, in order for me, as a Catholic, to live in accordance with my duty to God, I am prevented from directly participating in anything contrary to my Faith. To do so would violate my sincerely held beliefs, and would constitute the bearing of false witness. I also believe that God requires me, as a Catholic, to be respectful, kind, and tolerant of everyone—whatever their personal situation. As a result, I work successfully with a variety of students and colleagues whose beliefs and practices differ from my own. Moreover, I regard some aspects of EUSD's gender identity policies as commendable. I support efforts to ensure that all students are treated with kindness, respect, and are not harassed, bullied, or discriminated against.

As a Catholic I hold that God created the relationship between parents and children as an inherently sacred and life-long bond. The parent-child relationship is ordained by God and parents have the ultimate right and responsibility to care for and guide their children. This vital role of the parent in the raising of their child to adulthood must be respected. I consider it to be a violation of this relationship to leave parents no role in decisions for their children - especially decisions which affect the health and safety of their child. No one has the right to interfere with - or usurp - the relationship between parents and their children. Parents deserve to be informed about all school policies - with no exceptions. To cooperate with a policy which prevents a parent from knowing their child's gender-identity status, and services being provided to the child, is a violation of my deeply held religious beliefs, ethics, and moral standards.

**Request for Accommodation**

1

FORMAL REQUEST FOR ACCOMMODATION BASED ON RELIGIOUS CONVICTIONS

In response to the EUSD policy "The Rights of Gender Diverse Individuals," I respectfully request a *Religious Work Accommodation* and exemption such that I will not be required to use any student's self-identified transgender name or pronoun, or withhold information about any student's transgender or gender identity from his or her parents as a condition of employment with the Escondido Union Elementary School District. More specifically, this request is for an exemption from the following policies relating to gender identity: (1) The "Names" policy that requires teachers and staff to refer to a student by a gender-specific name that the student identifies to match his or her gender identity, but that is different from his or her legal name. (2) The "Pronouns" policy that requires teachers and staff to refer to a student using pronouns identified by a student, including opposite-sex pronouns and genderless pronouns (*e.g.* "it" or "they"), regardless of a student's biological sex. (3) The "Privacy" policy that prohibits teachers and staff from sharing a student's gender identity status with his or her parent or guardian without the student's permission, thereby requiring teachers to use different names or pronouns depending on with whom the teacher is speaking. (4) Directly participate in any staff meeting or training on the topic of gender identity or gender theory.

This request does *not* seek an exemption from the following policies relating to gender identity: (A) The "Discrimination" policy that prohibits discrimination against, disparagement of, or exclusion of students from activities based on their adoption of a transgender identity. (B) The "Facilities" policy that prohibits a student from using sex-segregated school facilities or participating in sex-segregated school activities that correspond to his or her gender identity. (C) The "Privacy" policy that prohibits discussing a student's transgender identity with third-parties, *except* its application to a student's parent or guardian.

### Options for Accommodation

There are a number of options through which my religious beliefs can be accommodated:

1. Make the policy recommended rather than mandatory.
2. Exempt teachers and staff with sincere religious objections.
3. Allow teachers and staff to refer to students by names in official records.
4. Recommend teachers and staff refer to students by surnames.
5. Assign students who request transgender names and pronouns to teachers who do not object to deceiving students, parents, and guardians.

Thank you for your time and consideration.
Sincerely,

Elizabeth Mirabelli, *MA, NBCT*

**ESCONDIDO UNION SCHOOL DISTRICT**
**JOB DESCRIPTION**

**MIDDLE SCHOOL CLASSROOM TEACHER**

ESSENTIAL JOB FUNCTIONS
Plans instruction in all required areas of the curriculum, following the state content and teaching
standards. Prepares the instructional program including teaching strategies to be utilized, assessments to
monitor progress and evaluation of program pieces.

Provides instruction to students in core academics and other required subjects in the assigned classroom.
Designs and implements standards-based curriculum with students in a variety of whole class and small
group settings while utilizing a variety of modalities and instructional strategies. Provides stimulating
learning experiences to ensure academic success and to motivate students. Utilizes technology through
integrated instruction. Provides additional reinforcement, repetition, reteaching, and presentation to
accommodate differentiated needs of students.

Designs and implements effective classroom management strategies to ensure appropriate behavior of
students. Administers disciplinary measures as needed (typically using verbal directions) and coordinates
concerns with site administration.

Identifies and refers to the Student Study Team students who are experiencing difficulties in learning or
behavior. Implements recommendations for Student Study Teams on students referred by the Teacher.

Maintains a safe classroom environment by the reasonable elimination of hazards and control over use of
mechanical and electrical equipment. Ensures that obstacles are removed from classroom walkways for
safe movement throughout the classroom.

Maintains discipline and order of students. Provides for safe supervision of large groups of students in a
variety of settings (walking on campus, before school, after school, field trips, playground, etc.) and
coordinates concerns with site administration.

Completes and maintains student records. Records and maintains accurate student attendance records.
Performs grading of assignments and tests and records results. Completes progress reports and report
cards within designated timelines. Completes other paperwork activities as needed and/or directed by
administration.

Works cooperatively with grade level team members to perform joint planning for instructional activities
and use of resources.

Attends scheduled meetings and conferences. Confers with parents at scheduled conferences. Attends
scheduled staff, grade level and leadership meetings. Participates in curriculum development programs
within the school of assignment and/or on a District level. Increases professional competence through
participation in continued higher education, district and self-selected staff development activities.

On a rotating basis with other staff, the Teacher performs an equitable number of adjunct supervisory duties (includes playground duty, before and after school duty, lead in school/district projects, or detention period).

If working at a "year round" school site, works cooperatively in classroom rotation schedules to include: timely packing of materials for moving by the district "moving team," coordination of efforts with teacher coming into classroom for next track, etc.

Provides leadership to students in emergency preparedness drills and during actual emergencies, following the site emergency preparedness plan. Supervises and leads students during monthly site disaster drills and an annual "districtwide" disaster drill. For fire and other types of drills, evacuates students from the classroom in a safe and orderly manner to the designated areas on the school grounds (Teacher typically identifies a student or other individual to lead the line with the Teacher following at the end of the line to ensure that all students are safely evacuated from the classroom and to close the classroom door). For earthquake drills, provides verbal directions and models position of "drop, hold and cover" under desk or other furniture inside the classroom or other area on campus.

OTHER:
Performs other related tasks without impact to working conditions as assigned, some of which may become essential to the position.

Adheres to all district and school policies.

EMPLOYMENT STANDARDS
Knowledge: Understanding of learning theory, current state content standards, teaching standards, a wide variety of effective teaching strategies, child growth and development and the social/emotional needs thereof, motivation, retention, and transfer theory, effective lesson planning, discipline, working with parents, appropriate SADIE instructional techniques for English learning students, learning disabilities and mainstreaming of students with disabilities into the regular classroom, technology uses in the instructional process, district policies and administrative regulations regarding teaching responsibilities and other areas that affect the organization and delivery of services to students. Knowledge of site performance plan and school site and district emergency procedures. Knowledge of professional responsibilities regarding any requirements for maintaining valid teaching credentials.

Ability: Ability to implement all areas listed under "Knowledge." Ability to address the needs of all students, monitor progress, adjust instructional strategies according to students needs and accurately report student progress. Ability to plan, organize, and deliver instruction. Ability to work as a team member with other staff members, and in a cooperative relationship with supervisor(s). Ability to integrate subject areas in instruction to produce meaningful standards-based program. Ability to perform other teaching related duties including but not limited to parent conferences, open house, "back to school" night and staff meetings. Ability to perform adjunct duties equitably in comparison to other staff members, including but not limited to playground supervision, attendance at PTA meetings, member of emergency preparedness committee, etc. Ability to provide for student safety under routine and

emergency conditions. Ability to engage in professional development provided by the district as well as through individual efforts. Ability to utilize resources effectively. Ability to follow directions accurately. Ability to demonstrate student progress and achievement through on-going assessment and monitoring.

Qualifications: Appropriate California teaching credential that authorizes services in middle school classrooms. Must pass pre-employment physical examination and fingerprint clearance following an offer of employment.

Board Approved: 7/16/2009

**EXHIBIT 28**



*dr.dupree@relationships-at-work.com -- https://relationships-at-work.com/tip/ -- 619-433-4264*

### *The Interactive Process Meeting (TIPM)*

### *Accommodation Assessment Summary*

### *- CONFIDENTIAL -*

| | |
|---|---|
| Date of IPM: | Tuesday, November 15, 2022 at 12:30pm PT (conducted in-person) |
| Employer: | Escondido Union School District (EUSD) |
| Employee: | Lori West, Middle School Teacher     DOB: 06/24/1962 |

Is the Accommodation Work-related?     ● Yes ○ No

If Yes, Nature of Request:     Accommodation for sincerely held religious beliefs

## PURPOSE OF THE INTERACTIVE PROCESS:

The employer, EUSD, engaged their employee, Lori West, in the interactive process to address her request for accommodation based on religious beliefs in response to EUSD Policy 0410.

The purpose of the process is to engage the employee and the employer in a cooperative, collaborative, and confidential setting to address the nature and impact of the accommodation request, the guidelines set forth in existing state and federal laws addressing student rights, and what readily achievable, effective accommodation(s) may be implemented, temporarily and/or long-term, to address her request rights and responsibilities of those impact, and the work/student environment.

The parties reviewed the essential functions of the Middle School Teacher position and current work climate given the request for accommodation.

Attorney Daniel Shinoff, legal representative for EUSD, provided hard copies of key laws and guidances that apply to Ms. West's request for religious accommodation (referenced on P. 2, however, hard copies are not attached to this IPM Summary).

The remainder of this summary outlines highlights of the discussion held and is summarized on P. 5 with a plan of action for next steps given the accommodation request and the outcomes from this discussion.

## EMPLOYEE's REQUEST FOR ACCOMMODATION

Ms. West acknowledged her previous participation in the interactive process in October 2021 given a medical condition impacting her ability to be at work, stay at work, and perform the work of her assigned job. A temporary accommodation was implemented and the situation resolved.  Thus, she is familiar with the process to engage collaboratively with her employer to explore accommodation opportunities.

Ms. West, an employee since 1994, noted that her current request for accommodation is triggered by a change in practices implemented by EUSD in the last year. She voiced concerns about how this new policy is not consistent with the usual practice of conversations among people, including teachers to students, and how this new policy allows students to dictate how they are referenced without their parents' knowledge.  She further requested exemption from training that defines non-use of student preferred gender pronouns as 'harassment' to which she disagrees and is inconsistent with her religious beliefs.

In her letter for request for accommodation dated October 11, 2022, she states the following:
"In the light of my religious beliefs, I believe that some aspects of EUSD's gender identity policies are commendable. I support EUSD's efforts to ensure that transgender students are treated kindly, with respect, and are not discriminated against or gossiped about. My religious beliefs preclude me from participating in any student's transgender identity, and they preclude me from withholding relevant information about a student's transgender identity, or any other issue regarding a student, from the student's parent or guardian."

She emphasized that she is not requesting modification of the new district policy regarding use of preferred gender pronouns but is requesting modification in her approach to the use of pronouns when speaking directly to students, regardless of sexual orientation. Her request is that she will not be required to use a student's self-identified transgender name or pronouns, or withhold information about a student's transgender identity from his or her parents or guardians.

1 / 6

**OVERVIEW OF STATE & FEDERAL GUIDELINES**:

As noted, Attorney Daniel Shinoff provided hard copies of the following legal guidelines for guidance and discussion; highlights of those four documents to be presented elsewhere in this IPM Summary.

1) United States (U.S.) Department of Education, Office for Civil Rights.
   "Questions and Answers on Title IX and Sexual Violence" (considered a 'significant guidance document' under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (January 25, 2007).

2) U.S. Department of Education, Office for Civil Rights
   "Dear Colleague Letter Harassment and Bullying (October 26, 2010)" - Background, Summary and Fast Facts

3) California Department of Education (now part of California Education Code, Section 221.5(f), (January 1, 2014)
   "School Success and Opportunity Act (Assembly Bill 1266) Frequently Asked Questions"  (February 23, 2013)

4) Virginia Department of Education
   "2022 Model Policies on the Privacy, Dignity, and Respect for All Students and Parents in Virginia's Public Schools"

## REVIEW OF ESSENTIAL FUNCTIONS:

Job Title:  | Middle School Classroom Teacher - P.E., Rincon Middle School

Job Description Available: ● Yes ○ No     Job Description attached: ● Yes ○ No

Work Schedule:  | Monday - Friday

Hours of Work:  | According to established Rincon Middle School schedule

# Hours/Week:  | 37.5 hours per week as contracted.

The employment standards for the role of the Middle School Classroom Teacher include both knowledge and ability in the following areas (further details are outlined in the Job Description attached, starting on P. 12):

KNOWLEDGE: A Middle School Teacher must demonstrate an understanding of learning theory, current state content standards, teaching standards, a wide variety of effective teaching strategies, child growth and development and the social/emotional needs thereof, motivation, retention, and transfer theory, effective lesson planning, discipline, working with parents, appropriate SADIE instructional techniques for English learning students, learning disabilities and mainstreaming of students with disabilities into the regular classroom, technology uses in the instructional process, district policies and administrative regulations regarding teaching responsibilities and other areas that affect the organization and delivery of services to students. The Teacher must maintain knowledge of site performance plan and school site and district emergency procedures. And must maintain current knowledge of professional responsibilities regarding any requirements for maintaining valid teaching credentials.

ABILITY: A Middle School Teacher must possess the ability to implement all areas listed under "Knowledge."
1) address the needs of all students, monitor progress, adjust instructional strategies according to students needs and accurately report student progress.
2) plan, organize, and deliver instruction.
3) work as a team member with other staff members, and in a cooperative relationship with supervisor(s).
4) integrate subject areas in instruction to produce meaningful standards-based program.
5) perform other teaching related duties including but not limited to parent conferences, open house, "back to school" night and staff meetings.
6) perform adjunct duties equitably in comparison to other staff members, including but not limited to playground supervision, attendance at PTA meetings, member of emergency preparedness committee, etc.
7) provide for student safety under routine and emergency conditions.
8) engage in professional development provided by the district as well as through individual efforts.
9) utilize resources effectively and follow directions accurately.
10) demonstrate student progress and achievement through on-going assessment and monitoring.

## REASONABLE ACCOMMODATION DISCUSSION:

As noted, EUSD engaged their employee, Middle School P.E. Teacher Lori West, in the interactive process to address the impact of a newly implemented District policy on use of gender preferred pronouns on Ms. West's sincerely held religious beliefs, leading to her request for accommodation by modifying her use and exemption from training.

Present at the interactive meeting were the employee, representatives from EUSD (i.e. human resources, Rincon school site, and integrated support management), along with legal representatives for the employee and the employer.  (Discussion continued on next page.)

**REASONABLE ACCOMMODATION DISCUSSION (continued):**

Following introductions of the IPM participants, an overview for the purpose of the interactive process was presented by the Meeting Facilitator, Dr. Debra Dupree.

Ms. West was first presented with an opportunity to outline her concerns about the new policy and the impact on her sincerely held religious beliefs (outlined on P. 1 under "Employee's Request for Accommodation").

On behalf of EUSD, Legal Representative Daniel Shinoff provided background on addressing sincerely held beliefs under the Freedom of Speech and Freedom of Religion protections under the First Amendment to the United States Constitution. He also referenced the California Education Code 221.5 a-f and 231.6 in reference to the Sex Equity Act. He further noted an evolution of laws and protections since the First Amendment to the U.S. Constitution to include the Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, and Title II of the Americans with Disabilities Act of 1990. CA AB 1266 (2013) was also highlighted in reference to "School Success and Opportunity Act, noting that nomenclature may change over time.

Failure to abide by Title IX Education Amendments may result in a removal of funding to educational institutions. Attorney Shinoff further noted that the Sex Equity Act was intended to address harassment and bullying in educational facilities with case law dating back to 1998. The EUSD policy in question arose in response to more recent laws in 2007, 2010, 2013, and 2014 as well as "2022 Model Policies on the Privacy, Dignity, and Respect for All Students and Parents in Virginia's Public Schools" (now used as a model for other State Departments of Education, including California). The EUSD policy was designed to follow interpretation and guidance from members of the State of California School Boards Association who take an oath to uphold the laws that apply to balance the rights of those protected by various laws. A distinction in the use of "shall" (must) in the laws/policies vs. the use of "may" (discretion) was denoted as significant. Emphasis was also placed on "impact" vs. "intent. Individuals may not be intentional in their behavior as discriminating, however, the impact on the receiver may be perceived as discriminating. "Impact" is evaluated in terms of being factual in nature and respectful in nature.

As preferred names/pronouns must be used according to policy, she inquired as to her options should she 'slip' - will discipline apply? It was acknowledged that the rights of parents vs. students is under 'hot debate' and could lead to further legislative/policy change in the future. At the heart of this accommodation request is the balance of sincerely held religious beliefs of Ms.West versus the sincerely held gender beliefs held by many in public education settings.

It was emphasized that the nature of her beliefs is not in question per the First Amendment.

What accommodation suggestions does the employee have?

On October 11, 2022, Ms. West submitted a formal request for accommodation (see attached starting on P. 7).
"This is a request for an exemption from the following policies related to gender identity:
(1) The "Names" policy that requires teachers and staff to refer to a student by gender-specific name that the student identifies to match their transgender identity, but that is different than their legal name.

(2) The "Pronouns" policy that requires teachers and staff to refer to a student using pronouns identified by the student, including opposite-sex pronouns and genderless pronouns (e.g., "it" or "they"), regardless of the student's biological sex.

(3) The "Privacy" policy that prohibits teachers and staff from sharing a student's transgender identity with his or her parent or guardian without the student's permission, and requires teachers thereby to use different names or pronouns or to refer to the student depending on with whom the teacher is speaking."

She further acknowledged the following in her October 11, 2022 request:
"I am open to discussing creative ways through which my religious beliefs can be accommodated. One option for accommodation is for EUSD to simply make the policy highly recommended, instead of mandatory. Another option is to simply exempt teachers or staff with religious objections.

If an exemption from the "Names" policy is not available, then I would like to propose that I would not object to referring to a transgender student only by their last name. This way would probably avoid any hurt feelings while respecting my religious beliefs.

With respect to the "Pronoun" policy, I would not object to modifying my speech to avoid pronouns whenever possible when referring to transgender students in thier presence. It appears that the reasoning behind this policy is to avoid hurting a student's feelings, so it should not matter if biological pronouns are used outside of their presence. When a transgender student is present, I would be unlikely to use pronouns anyway, and could try to avoid using them altogether.

With respect to the "Privacy" policy, it is difficult for me to understand how I can be required to deceive parents by withholding information from them. This policy exists to withhold information that the parents have the right to know.
I am also requesting that I be exempt from any future training/in-service presentation that has to do with LGBTQ+."

Discussion of specific accommodations identified and if readily achievable and effective:

While acknowledging that EUSD is committed to protect and respect the religious rights and freedom of speech as afforded under the First Amendment, changes in state or federal laws that affect employment or educational rights and responsibilities may evolve which is the case of Policy #0410 for the rights and protections of students served through public educational institutions. The District follows guidance from the State of California School Boards Association (as previously noted) in interpreting what those protections mean at the (discussion continued on P. 4)

local level and to balance the rights of those protected under various laws.

The parties went through each of the employee's identified areas of exemption and suggested accommodations are listed below and summarized accordingly.

It was noted that 'exemption' from following the policy is not available nor is removal of essential functions of the job a viable accommodation, i.e. exemption of required training for professional development.  It was further noted that 'policy' is recommended but not required.  However, the use of the word 'shall' is equal to 'must' while 'may' is equal to 'discretionary.'  If a school is not following the law through their policies when 'shall' is designated in the the law, this creates tremendous legal challenges for a school district.  Discussion ensued about 'intent' vs. 'impact.'  Addressing the impact of a behavior or action includes both what is factual in nature and respectful in nature.  People may not be intentional in discriminating but the impact may be perceived as discriminating.

**Employer Comments:** ◯ Yes   ◯ No   ◯ Pending   ● Not applicable

It was noted that the impact of calling students by their last name or non-use of preferred pronouns may have an unintentional impact on students adverse to their educational development and access to an environment free of discriminatory behavior, particularly important to the role teachers play in student development.  The parent rights vs. student rights is beyond the specific nature of this accommodation process and to be determined in other legal venues.  She has the opportunity to reach out to the Superintendent with her concerns and/or involve the California Teachers Association (CTA) to determine if they wish to pursue injunctive relief from the policy.  Waiver of the policy to exempt her from the designated areas is beyond the scope of those present at this meeting.

**Employee Comments:** ◯ Yes   ◯ No   ◯ Pending   ◯ Not applicable

She acknowledged that she has been using last names when addressing students and it seems to be working.

Given the policy currently in place but that legal challenges do exist, she was advised of the opportunity to engage in a 'leave of absence' for up to six months to allow for legal debate to continue to see if it leads to changes in policy, and if she does not feel capable of remaining at work given the current workplace climate. The employee was also informed of the Employee Assistance Program (EAP) for support and guidance to explore her concerns and options for how she communicates with students and parents given the policy in place.

**Check one or more applicable items listed below:**

☐ UNABLE TO PERFORM ESSENTIAL FUNCTIONS:

No reasonable accommodation exists that would facilitate the employee's (or candidate) ability to perform the essential job functions.  COMMENTS:

Ms. West appears capable of performing all the essential functions of the job but is challenged in how it impacts her ability to effectively communicate with her students and their parents given her religious beliefs.  Her request for accommodation centers on her request to refer to students by their last name and her request for exemption from training (an essential function) that she finds inconsistent with her religious beliefs. EAP is identified as a resource to further work out her personal approach to managing compliance with the current Policy 0410, recognizing that further legislative and policy changes are possible.

☑ UNDUE HARDSHIP CREATED:

Providing accommodation would impose an undue hardship for the employer based on:

a. The number of employees and the number of individuals employed at the facility, type and location of facilities.

b. The impact of accommodation on the operation of the facility, impact on other employees' ability to perform duties, and facility's ability to conduct business.

c. The overall financial resources and overall size of business.

d. The nature and cost of accommodation.   COMMENTS:

As noted earlier, the crux of Ms. West's request for religious accommodation centers on her sincerely held religious beliefs versus the sincerely held gender beliefs of many.

Attempting to deliver on her request for exemption unduly impacts the operations and delivery of education to students, impacting the Master Scheduling and fostering constraints on EUSD's ability to delivery educational services. The nature of her request for exemptions also generate the potential for discrimination and lack of compliance under the various laws described earlier in this IPM Summary.

❏   DIRECT THREAT TO EMPLOYEE AND/OR OTHERS:

a. Providing a reasonable accommodation would impose danger to the health and safety of the individual with the medical condition and/or poses a danger to the health and safety of others.

b. The employee's request prevents him or her from performing the essential job duties over a reasonable length of time without facing identifiable, substantial and immediate harm to his or her own health and safety OR the health and safety of others. No reasonable accommodation exists that would remove this danger.  COMMENTS:

Ms. West acknowledged that she is challenged in abiding by Policy 0410 given her religious beliefs.  As her request for accommodation centers around her beliefs and the new policy, she is directed to EAP to support her in addressing her needs and options available.

HIGHLIGHTS OF IPM and SUMMARY of NEXT STEPS:

1) The employer, EUSD, initiated the interactive process with their employee, Lori West, to address her request for accommodation based on changing work practices and their impact on her sincerely held religious beliefs.

The goal of the process was to create a cooperative, collaborative, and confidential setting to address the employee's request for accommodation for sincerely held religious beliefs, the policy triggering her request, and applicable State and Federal laws governing practices at the local level.

The interactive process was facilitated by Dr. Debra Dupree (in-person) at EUSD on Wednesday, November 15, 2022 at 12:30pm PT.  Those participating are identified in the attached list of attendees (see P. 6).

2) The parties explored and discussed the nature of Ms. West's request, the changed District policy, and highlights of the U.S. Department of Education Office for Civil Rights Title IX, and California Education Code (and other laws referenced on P. 2) as it pertains to the District's policy and her request for exemption.

Input was obtained from the employee as to her perceptions of the changed District policy to better understand the degree of impact on her religious beliefs.  The essential functions of the job and the work environment were also reviewed to understand the context of work and implications on the delivery of services to students protected by the afore mentioned federal and state laws..

3)  The parties mutually discussed the nature of her accommodation request, the laws and policies involved, and the impact of her requested accommodations on the rights of students protected for their sincerely held gender beliefs. A plan of action is outlined as follows:
a. The changes in practice as outlined in Ms. West's recommended accommodations and exemption from training are not readily achievable or effective in ensuring fair and equal access to all students.
b. As the decision-makers for Policy 0410 were not present at this IPM, she is available to her a course of action to address her concerns about training content and Policy 0410 by submitting them to the School Board and Superintendent for further discussion of her concerns and her religious beliefs impacted by the policy.       d.
d. The employee was informed of EUSD's EAP as a free resource for support and guidance in addressing and managing her concerns.
e. Per the employee's report, her use of the students' last names in lieu of their birth name and/or designated pronouns seems to be working, particularly in the physical education environment where she teaches.  She may continue with this self-modified approach unless there is a complaint and/or report of disrespect and/or discrimination.  The parties may return to the interactive process should such arise.

4)  The parties are aware that the interactive process may be a one-time event or may require follow-up as needed to address any changes in the employee's request for accommodation and/or to address any changes in business practices.  The conclusion of this IPM is that readily achievable, effective accommodations are not available to meet her request.

See supporting documents checked here:

- ☑  List of Attendees participating in the IPM, see P. 6
- ☑  Employee's formal request for accommodation, starting on P. 7
- ☑  Job Description, starting on P. 9
- ☑  Other:  Handout provided on US Dept. of Education Office for Civil Rights on Title IX
- ☑  Other:  Handout provided on CA Dept. of Education on Assembly Bill 1266
- ☑  Other:  Handout provided on VA Dept. of Education 2022 Model Policies
- ☑  Employee Assistance Program (EAP) - free counseling services for employees in transition

**NAMES OF THOSE PARTICIPATING:**

|  | PRINTED NAME | JOB TITLE | DATE |
|---|---|---|---|
| Employee | Lori West | Middle School Teacher<br>EUSD | Nov. 15, 2022 |
| Employer | Dr. John Albert | Assistant Superintendent<br>Human Resources<br>EUSD | Nov. 15, 2022 |
| Employer | Steve White | Principal<br>Ricon Middle School<br>EUSD | Nov. 15, 2022 |
| Employer | Trent Smith | Director<br>Integrated Student Support<br>EUSD | Nov. 15, 2022 |
| Other | Norman Grissom, Esq. | Legal Counsel<br>on behalf of Ms. West | Nov. 15, 2022 |
| Other | Daniel Shinoff, Esq. | Legal Counsel<br>on behalf of EUSD | Nov. 15, 2022 |
| Other |  |  |  |
| IPM Facilitator | Dr. Debra Dupree | *Debra Dupree*, PsyD | Nov. 15, 2022 |

*

Employee: _Lori West_      Employer: _EUSD_      Date: Nov. 15, 2022

Relationships at Work, Inc.      1520 First Street, K-306, Coronado, CA  92118      619-433-4264

October 11, 2022

Escondido Union School District
Human Resources Department
2310 Aldergrove Avenue
Escondido, Ca. 92029

## FORMAL REQUEST FOR ACCOMMODATION
## BASED ON RELIGIOUS CONVICTIONS

Dear Human Resources Department,

   This letter is a formal request to the Escondido Union School District for a religious work accomodation for me, a Physical Education teacher at Rincon Middle School from certain EUSD's policies on gender identity outlines in "The Rights of Gender Diverse Individuals" presentation given during a staff meeting held on February 3, 2022.  This request is based on Title VII of the Civil Rights Act and the California Fair Employment and Housing Act.

### Basis for Request

   I am a Christian.  As such, I adhere to biblical principles regarding the binary nature of men and women.  I have the religious belief that God created 2 sexes: male and female.  God created us in his image.  Males created by God have innate masculine characteristics which are evident in their size and strength..  Females created by God have innate feminine characteristics which are also evident in their smaller size and strength.  Genetics, Biology and DNA also say that there are only 2 sexes.  I also have the religious belief that the relationship between parents and children was created by God with the intent for the parents to raise and guide their children. The parent/child relationship is intimate and uniquely special.  I

believe that parents have the ultimate right and responsibility to raise their children as they see fit.  Parents are financially responsible for their children until they reach the age of 18, thus they have the right to know everything about their children.  I believe that E.U.S.D. is usurping the parents' rights to direct the upbringing of their children.

    I also believe that God requires me, as a Christian, to be respectful, kind, and tolerant of every person whatever their personal situation.  I also believe that God gave each person free will and the freedom to choose for themselves whether to live in accordance with his teachings about our nature and how God made us.  I also believe that God forbids me from lying.  I believe that E.U.S.D. is asking employees to check their religious beliefs at the door.

    In the light of my religious beliefs, I believe that some aspects of EUSD's gender identity policies are commendable.  I support EUSD's efforts to ensure that transgeder students are treated kindly, with respect, and are not discriminated against or gossipped about.  My religious beliefs preclude me from participating in any student's transgender identity, and they preclude me from withholding relevant information about a student's transgender identity, or any other issue regarding a student, from the student's parent or guardian.

### Request for Accommodation

    I respectfully request a religious work accommodation such that I will not be required to use a student's self-identified transgender name or pronouns, or withhold information about a student's transgender identity from his or her parents or guardians.  This is a request for an exemption from the following policies related to gender identity: (1) The "Names" policy that requires teachers and staff to refer to a student by gender-specific name that the student identifies to match their transgender identity, but that is different than their legal name.  (2) The "Pronouns" policy that requires teachers and staff to refer to

a student using pronouns identified by the student, including opposite-sex pronouns and genderless pronouns (e.g., "it" or "they"), regardless of the student's biological sex.  (3) The "Privacy" policy that prohibits teachers and staff from sharing a student's transgender identity with his or her parent or guardian without the student's permission, and requires teachers thereby to use different names or pronouns or to refer to the student depending on with whom the teacher is speaking.

This request does not seek an exemption from the following policies relating to gender identity: (A) The "Discrimination" policy that prohibits discrimination against, disparagement of, or exclusion of students from activities based on their adoption of a transgender identity.  (B) The "Privacy" policy that prohibits discussing a student's transgender identity with third-parties, except its application to the student's parent or guardian.

## Options for Accommodation

I am open to discussing creative ways through which my religious beliefs can be accommodated.  One option for accommodation is for EUSD to simply make the policy highly recommended, instead of mandatory.  Another option is to simply exempt teachers or staff with religious objections.

If an exemption from the "Names" policy is not available, then I would like to propose that I would not object to referring to a transgender student only by their last name.  This way would probably avoid any hurt feelings while respecting my religious beliefs.

With respect to the "Pronoun" policy, I would not object to modifying my speech to avoid pronouns whenever possible when referring to transgender students in thier presence.  It appears that the reasoning behind this policy is to avoid hurting a student's feelings, so it should not matter if biological pronouns are

used outside of their presence.  When a transgender student is present, I would be unlikely to use pronouns anyway, and could try to avoid using them altogether.

   With respect to the "Privacy" policy, it is difficult for me to understand how I can be required to deceive parents by withholding information from them. This policy exists to withhold information that the parents have the right to know.

   I am also requesting that I be exempt from any future training/in-service presentation that has to do with LGBTQ+.

Thank you for considering my request,

Lori A. West

**ESCONDIDO UNION SCHOOL DISTRICT**
**JOB DESCRIPTION**

**MIDDLE SCHOOL CLASSROOM TEACHER**

ESSENTIAL JOB FUNCTIONS
Plans instruction in all required areas of the curriculum, following the state content and teaching standards. Prepares the instructional program including teaching strategies to be utilized, assessments to monitor progress and evaluation of program pieces.

Provides instruction to students in core academics and other required subjects in the assigned classroom. Designs and implements standards-based curriculum with students in a variety of whole class and small group settings while utilizing a variety of modalities and instructional strategies. Provides stimulating learning experiences to ensure academic success and to motivate students. Utilizes technology through integrated instruction. Provides additional reinforcement, repetition, reteaching, and presentation to accommodate differentiated needs of students.

Designs and implements effective classroom management strategies to ensure appropriate behavior of students. Administers disciplinary measures as needed (typically using verbal directions) and coordinates concerns with site administration.

Identifies and refers to the Student Study Team students who are experiencing difficulties in learning or behavior. Implements recommendations for Student Study Teams on students referred by the Teacher.

Maintains a safe classroom environment by the reasonable elimination of hazards and control over use of mechanical and electrical equipment. Ensures that obstacles are removed from classroom walkways for safe movement throughout the classroom.

Maintains discipline and order of students. Provides for safe supervision of large groups of students in a variety of settings (walking on campus, before school, after school, field trips, playground, etc.) and coordinates concerns with site administration.

Completes and maintains student records. Records and maintains accurate student attendance records. Performs grading of assignments and tests and records results. Completes progress reports and report cards within designated timelines. Completes other paperwork activities as needed and/or directed by administration.

Works cooperatively with grade level team members to perform joint planning for instructional activities and use of resources.

Attends scheduled meetings and conferences. Confers with parents at scheduled conferences. Attends scheduled staff, grade level and leadership meetings. Participates in curriculum development programs within the school of assignment and/or on a District level. Increases professional competence through participation in continued higher education, district and self-selected staff development activities.

On a rotating basis with other staff, the Teacher performs an equitable number of adjunct supervisory duties (includes playground duty, before and after school duty, lead in school/district projects, or detention period).

If working at a "year round" school site, works cooperatively in classroom rotation schedules to include: timely packing of materials for moving by the district "moving team," coordination of efforts with teacher coming into classroom for next track, etc.

Provides leadership to students in emergency preparedness drills and during actual emergencies, following the site emergency preparedness plan. Supervises and leads students during monthly site disaster drills and an annual "districtwide" disaster drill. For fire and other types of drills, evacuates students from the classroom in a safe and orderly manner to the designated areas on the school grounds (Teacher typically identifies a student or other individual to lead the line with the Teacher following at the end of the line to ensure that all students are safely evacuated from the classroom and to close the classroom door). For earthquake drills, provides verbal directions and models position of "drop, hold and cover" under desk or other furniture inside the classroom or other area on campus.

OTHER:
Performs other related tasks without impact to working conditions as assigned, some of which may become essential to the position.

Adheres to all district and school policies.

EMPLOYMENT STANDARDS
Knowledge: Understanding of learning theory, current state content standards, teaching standards, a wide variety of effective teaching strategies, child growth and development and the social/emotional needs thereof, motivation, retention, and transfer theory, effective lesson planning, discipline, working with parents, appropriate SADIE instructional techniques for English learning students, learning disabilities and mainstreaming of students with disabilities into the regular classroom, technology uses in the instructional process, district policies and administrative regulations regarding teaching responsibilities and other areas that affect the organization and delivery of services to students. Knowledge of site performance plan and school site and district emergency procedures. Knowledge of professional responsibilities regarding any requirements for maintaining valid teaching credentials.

Ability: Ability to implement all areas listed under "Knowledge." Ability to address the needs of all students, monitor progress, adjust instructional strategies according to students needs and accurately report student progress. Ability to plan, organize, and deliver instruction. Ability to work as a team member with other staff members, and in a cooperative relationship with supervisor(s). Ability to integrate subject areas in instruction to produce meaningful standards-based program. Ability to perform other teaching related duties including but not limited to parent conferences, open house, "back to school" night and staff meetings. Ability to perform adjunct duties equitably in comparison to other staff members, including but not limited to playground supervision, attendance at PTA meetings, member of emergency preparedness committee, etc. Ability to provide for student safety under routine and

emergency conditions. Ability to engage in professional development provided by the district as well as through individual efforts. Ability to utilize resources effectively. Ability to follow directions accurately. Ability to demonstrate student progress and achievement through on-going assessment and monitoring.

Qualifications: Appropriate California teaching credential that authorizes services in middle school classrooms. Must pass pre-employment physical examination and fingerprint clearance following an offer of employment.

Board Approved: 7/16/2009

**EXHIBIT 29**



# LiMANDRI & JONNA LLP

CHARLES S. LiMANDRI\*\*
PAUL M. JONNA†

MARK D. MYERS
JEFFREY M. TRISSELL†
ROBERT E. WEISENBURGER
MILAN L. BRANDON II
JOHANNA DELEISSEGUES

BRIAN D. MILLER
GREGORY J. ANTHONY
RICHARD SALPIETRA
        Of Counsel

\*BOARD CERTIFIED CIVIL TRIAL ADVOCATE
    ADMITTED TO THE DISTRICT OF COLUMBIA BAR
    ADMITTED TO THE NEW YORK BAR
†ADMITTED TO THE U.S. SUPREME COURT

MAILING ADDRESS:

POST OFFICE BOX 9120
RANCHO SANTA FE, CALIFORNIA  92067
TELEPHONE:  (858) 759-9930
FACSIMILE:   (858) 759-9938

WEBSITE:  www.limandri.com

PHYSICAL ADDRESS:

16236 SAN DIEGUITO ROAD
BUILDING 3, SUITE 3-15
RANCHO SANTA FE, CA  92091

KATHY DENWORTH
Office Administrator

September 22, 2022

Escondido Union School District
2310 Aldergrove Avenue
Escondido, CA 92029

Re:   **California Public Records Act Request (Gov. Code, § 6250 *et seq.*)**

To Whom It May Concern:

This letter requests documents from the Escondido Union School District ("EUSD") under the California Public Records Act, Government Code section 6250 *et seq.*

## Documents Requested

We request <u>ALL RECORDS</u> created by EUSD or otherwise within EUSD's possession or control pertaining to EUSD's policy or policies relating to gender identity as discussed during a remote videoconference presentation given at a district-wide staff meeting held on February 3, 2022.

The requested records include, but are not limited to:

- Any and all documents relating to the February 3, 2022 staff meeting, including specifically any electronic recording or transcript of the meeting, the slideshow presentation(s) used at the meeting, and any questions asked and answered through the "Parking Lot" portal relating to the meeting or relating to the gender identity policies discussed at the meeting.

Escondido Union School District
**Re:  California Public Records Act Request (Gov. Code, § 6250 *et seq.*)**
September 22, 2022
Page 2
_____

- Any and all internal and external correspondence, including emails, handwritten notes, memoranda, computer data, electronic files, SMS messages, and audio and video recordings, by and between EUSD personnel and agents, concerning the gender identity policies discussed at the February 3, 2022 staff meeting, whether those communications arose before, during or after the meeting.

- Any and all internal and external correspondence, including emails, handwritten notes, memoranda, computer data, electronic files, SMS messages, and audio and video recordings, by and between EUSD personnel and agents, relating to how EUSD developed those gender identity policies and how it has implemented those gender identity policies.

- Any and all internal and external correspondence, including emails, handwritten notes, memoranda, computer data, electronic files, SMS messages, and audio and video recordings, by and between EUSD personnel and agents, relating to staff being disciplined for violations of EUSD's gender identity policies.

- Any and all internal and external correspondence, including emails, handwritten notes, memoranda, computer data, electronic files, SMS messages, and audio and video recordings, by and between EUSD personnel and agents, relating to how and whether EUSD has made stakeholders aware of its gender identity policies, including decisions whether to post the details of those policies online or communicate the details of those policies to parents.

- Any and all internal and external correspondence, including emails, handwritten notes, memoranda, computer data, electronic files, SMS messages, and audio and video recordings by and between EUSD agents and personnel and any other person, institution, business, government agency, or any other entity, relating in any way relate to EUSD's gender identity policies.

**<u>Format of Requested Records</u>**

Please provide the requested records in .pdf format by email to jtrissell@limandri.com and pjonna@limandri.com. Alternatively, hard copies of the records in question may be tendered via U.S. mail to the below address:

LiMandri & Jonna LLP
P.O. Box 9120
Rancho Santa Fe, California 92067

Escondido Union School District
**Re:  California Public Records Act Request (Gov. Code, § 6250 *et seq.*)**
September 22, 2022
Page 3

_____

**Fees**

If any reasonable fees relating to searching and copying records apply, please provide the total cost, a breakdown of charges, and the method by which payment may be remitted.

**Time for Response**

Cal. Gov. Code § 6253(c) sets forth that a response must be submitted within ten (10) business days. If EUSD cannot provide the requested records within this period, please contact us in order to provide an estimate as to when those records will be submitted.

**Denial of Request**

If EUSD denies this request either in part or in its entirety, please specify the nature of the information being withheld and each statutory exemption upon which EUSD bases its refusal. Please also notify us as to EUSD's appeal procedure in such case, as required under the California Public Records Act.

Thank you for your kind cooperation in this matter. If you have any questions, or if your office experiences any issues with accommodating this request, please contact us as soon as possible.

Respectfully submitted,

LiMANDRI & JONNA LLP

Paul M. Jonna

PMJ/jmt

**EXHIBIT 30**



October 19, 2022

**BOARD OF EDUCATION**

Joan Gardner
Frank Huston
Mark Olson
Doug Paulson
Georgine Tomasi

**SUPERINTENDENT**
Luis A. Rankins-Ibarra, Ed.D.

Via E-mail(s): jtrissell@limandri.com, pjonna@limandri.com

LiMandri & Jonna LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067

RE:    Public Records Act Request

Dear Mr. Trissell and Mr. Jonna,

On behalf of the Escondido Union School District, I am responding to your public records request received October 3, 2022.

Request:
*ALL RECORDS created by EUSD or otherwise within EUSD's possession or control pertaining to EUSD's policy or policies relating to gender identity as discussed during a remote videoconference presentation given at a district-wide staff meeting held on February 3, 2022.*

Response:
*The requested records are attached.*

Please do not hesitate to contact me at 760-432-2128 should you have any questions.

Sincerely,

DocuSigned by:

E640E341835944E...
Andrew McGuire
Assistant Superintendent, Business Services

**CARILYN GILBERT
EDUCATION CENTER**

2310 Aldergrove Ave.
Escondido, CA 92029
Tel (760) 432-2400
www.eusd.org

**EXHIBIT 31**



# LiMANDRI & JONNA LLP

CHARLES S. LiMANDRI\*\*
PAUL M. JONNA†

MARK D. MYERS
JEFFREY M. TRISSELL†
ROBERT E. WEISENBURGER
MILAN L. BRANDON II
JOHANNA DELEISSEGUES

BRIAN D. MILLER
GREGORY J. ANTHONY
RICHARD SALPIETRA
    Of Counsel

**\*BOARD CERTIFIED CIVIL TRIAL ADVOCATE**
    **ADMITTED TO THE DISTRICT OF COLUMBIA BAR**
    **ADMITTED TO THE NEW YORK BAR**
**†ADMITTED TO THE U.S. SUPREME COURT**

MAILING ADDRESS:

POST OFFICE BOX 9120
RANCHO SANTA FE, CALIFORNIA 92067
TELEPHONE: (858) 759-9930
FACSIMILE: (858) 759-9938

WEBSITE: www.limandri.com

PHYSICAL ADDRESS:

16236 SAN DIEGUITO ROAD
BUILDING 3, SUITE 3-15
RANCHO SANTA FE, CA 92091

KATHY DENWORTH
Office Administrator

February 2, 2023

**Via Email & U.S. Mail: amcguire@eusd.org**

Andrew McGuire
Assistant Superintendent of Business Services
Escondido Union School District
2310 Aldergrove Avenue
Escondido, CA 92029

   **Re:   California Public Records Act Request (Gov. Code, § 6250 *et seq.*)**

Dear Mr. McGuire:

   This letter requests documents from the Escondido Union School District ("EUSD") under the California Public Records Act, Government Code section 6250 *et seq*. This letter is sent as follow-up to our prior request dated September 22, 2022, received by EUSD on October 3, 2022, and responded to on October 19, 2022.

**Documents Previously Requested**

   We previously requested <u>ALL RECORDS</u> created by EUSD or otherwise within EUSD's possession or control pertaining to EUSD's policy or policies relating to gender identity as discussed during a remote videoconference presentation given at a district-wide staff meeting held on February 3, 2022.

Andrew McGuire, Assistant Superintendent of Business Services
Escondido Union School District
**Re: California Public Records Act Request (Gov. Code, § 6250 *et seq.*)**
February 2, 2023
Page 2

_____

The requested records included, but were not limited to:

- Any and all documents relating to the February 3, 2022 staff meeting, including specifically any electronic recording or transcript of the meeting, the slideshow presentation(s) used at the meeting, and any questions asked and answered through the "Parking Lot" portal relating to the meeting or relating to the gender identity policies discussed at the meeting.

- Any and all internal and external correspondence, including emails, handwritten notes, memoranda, computer data, electronic files, SMS messages, and audio and video recordings, by and between EUSD personnel and agents, concerning the gender identity policies discussed at the February 3, 2022 staff meeting, whether those communications arose before, during or after the meeting.

- Any and all internal and external correspondence, including emails, handwritten notes, memoranda, computer data, electronic files, SMS messages, and audio and video recordings, by and between EUSD personnel and agents, relating to how EUSD developed those gender identity policies and how it has implemented those gender identity policies.

- Any and all internal and external correspondence, including emails, handwritten notes, memoranda, computer data, electronic files, SMS messages, and audio and video recordings, by and between EUSD personnel and agents, relating to staff being disciplined for violations of EUSD's gender identity policies.

- Any and all internal and external correspondence, including emails, handwritten notes, memoranda, computer data, electronic files, SMS messages, and audio and video recordings, by and between EUSD personnel and agents, relating to how and whether EUSD has made stakeholders aware of its gender identity policies, including decisions whether to post the details of those policies online or communicate the details of those policies to parents.

- Any and all internal and external correspondence, including emails, handwritten notes, memoranda, computer data, electronic files, SMS messages, and audio and video recordings by and between EUSD agents and personnel and any other person, institution, business, government agency, or any other entity, relating in any way relate to EUSD's gender identity policies.

Andrew McGuire, Assistant Superintendent of Business Services
Escondido Union School District
**Re:  California Public Records Act Request (Gov. Code, § 6250 *et seq.*)**
February 2, 2023
Page 3

_____

**Follow-Up Documents Requested**

On October 19, 2022, EUSD provided a Google drive hyperlink leading to an online storage folder containing various documents. Review of the documents, however, reveals that some may have been omitted. The video recording of the "Rights of Gender Diverse Students" presentation shows that it was authored and presented by Integrated Student Supports Director Tracy Schmidt. But no emails to or from Ms. Schmidt concerning the presentation were produced.

Further, EUSD produced the video recording of individuals from Del Dios Academy engaging in a Q&A session following the presentation. As part of that Q&A, Principal Lisa Pitard states "I thought it was a very well done presentation, very thorough, and it was a lot shorter than the one we got at the admin level, which was a little bit longer." (0:34:45.) That video is available in the Google Drive at https://drive.google.com/file/d/1IkDGzrYdI2hX3-dSt0gppZyUqDTZa-dd/view?usp=share_link.

In light of the above, the requested follow-up records include:

- All emails sent to or from Integrated Student Supports Director Tracy Schmidt concerning the formation of the policies included within her presentation titled "Rights of Gender Diverse Students" that was given to all EUSD teachers on 2/3/2022.

- Any and all documents relating to the earlier and similar presentation or training given to staff "at the admin level" as referenced by Del Dios Academy Principal Lisa Pitard at the February 3, 2022 staff meeting, including specifically (a) any electronic recording or transcript of the earlier presentation or training, (b) the slideshow presentation(s) used as part of that earlier presentation or training, (c) any questions asked and answered regarding that earlier presentation or training, and (d) all emails exchanged by authors or developers of that earlier presentation or training.

**Format of Requested Records**

Please provide the requested records by uploading the native documents to the previously used Google Drive link. Alternatively, the requested records can be sent in .pdf format by email to jtrissell@limandri.com and pjonna@limandri.com, or hard copies of the records in question may be tendered via U.S. mail to the below address:

LiMandri & Jonna LLP
P.O. Box 9120
Rancho Santa Fe, California 92067

Andrew McGuire, Assistant Superintendent of Business Services
Escondido Union School District
**Re:  California Public Records Act Request (Gov. Code, § 6250 *et seq.*)**
February 2, 2023
Page 4

_____

**Fees**

      If any reasonable fees relating to searching and copying records apply, please provide the total cost, a breakdown of charges, and the method by which payment may be remitted.

**Time for Response**

      Cal. Gov. Code § 6253(c) sets forth that a response must be submitted within ten (10) business days. If EUSD cannot provide the requested records within this period, please contact us in order to provide an estimate as to when those records will be submitted.

      We request production on a rolling basis as soon as the documents are available, with priority given to identification and production of the training given to staff "at the admin level" as referenced by Del Dios Academy Principal Lisa Pitard.

**Denial of Request**

      If EUSD denies this request either in part or in its entirety, please specify the nature of the information being withheld and each statutory exemption upon which EUSD bases its refusal. Please also notify us as to EUSD's appeal procedure in such case, as required under the California Public Records Act.

      Thank you for your kind cooperation in this matter. If you have any questions, or if your office experiences any issues with accommodating this request, please contact us as soon as possible.

      Respectfully submitted,

      LiMANDRI & JONNA LLP

      Paul M. Jonna

PMJ/jmt

cc: Patti Bostwick
    Administrative Assistant
    pbostwick@eusd.org

**EXHIBIT 32**



**BOARD OF EDUCATION**

Joan Gardner
Frank Huston
Mark Olson
Doug Paulson
Georgine Tomasi

**SUPERINTENDENT**
Luis A. Rankins-Ibarra, Ed.D.

February 24, 2023

Via E-mail(s): jtrissell@limandri.com, pjonna@limandri.com

LiMandri & Jonna LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067

RE:   Public Records Act Request

Dear Mr. Trissell and Mr. Jonna,

On behalf of the Escondido Union School District, I am responding to your public records request received February 2, 2023.

Request:
*Documents/information in follow-up to the prior request dated September 22, 2022, received by EUSD on October 3, 2022, and responded to on October 19, 2022.*

*All emails sent to or from Integrated Student Supports Director Tracy Schmidt concerning the formation of the policies included within her presentation titled "Rights of Gender Diverse Students" that was given to all EUSD teachers on 2/3/2022.*

We uploaded the results here (right click to open).

*Any and all documents relating to the earlier and similar presentation or training given to staff "at the admin level" as referenced by Del Dios Academy Principal Lisa Pitard at the February 3, 2022 staff meeting, including specifically (a) any electronic recording or transcript of the earlier presentation or training, (b) the slideshow presentation(s) used as part of that earlier presentation or training, (c) any questions asked and answered regarding that earlier presentation or training, and (d) all emails exchanged by authors or developers of that earlier presentation or training.*

All results were previously provided in the initial PRA request.

Response:
*The requested information is attached.*

Please do not hesitate to contact me at 760-432-2128 should you have any questions.

Sincerely,

DocuSigned by:

E640E341835944E...
Andrew McGuire
Assistant Superintendent, Business Services

**CARILYN GILBERT
EDUCATION CENTER**

2310 Aldergrove Ave.
Escondido, CA 92029
Tel (760) 432-2400
www.eusd.org