Charles S. LiMandri, SBN 110841
 cslimandri@limandri.com
Paul M. Jonna, SBN 265389
 pjonna@limandri.com
Mark D. Myers, SBN 235719
 mmyers@limandri.com
Jeffrey M. Trissell, SBN 292480
 jtrissell@limandri.com
Milan L. Brandon II, SBN 326953
 mbrandon@limandri.com
LiMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Telephone: (858) 759-9930
Facsimile: (858) 759-9938

Thomas Brejcha, *pro hac vice**
 tbrejcha@thomasmoresociety.org
Peter Breen, *pro hac vice**
 pbreen@thomasmorsociety.org
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680
*Application forthcoming


*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH MIRABELLI, an individual, and LORI ANN WEST, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>MARK OLSON, in his official capacity as President of the EUSD Board of Education, et al.,<br><br>Defendants. | Case No.: 3:23-cv-0768-BEN-WVG<br><br>**Memorandum of Points & Authorities in Support of Plaintiffs' Motion for a Preliminary Injunction**<br><br>Judge:          Hon. Roger T. Benitez<br>Courtroom:   5A<br>Hearing Date:  June 26, 2023<br>Hearing Time:  10:30 a.m. |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

FACTUAL & PROCEDURAL BACKGROUND.................................. 2

LEGAL STANDARD ........................................................................... 4

ARGUMENT........................................................................................ 4

    I.    Plaintiffs Are Likely to Succeed on the Merits ............................... 4

        A.    The Parental Exclusion Policies Violate Plaintiffs'
            Free Speech Rights under the *Eng* Analysis for
            Government Employees................................................5

            1.    Plaintiffs' speech is related to the public
                debate over gender identity and parental rights ..............5

            2.    Plaintiffs are speaking as private citizens, not
                public employees, due to the factual nature of
                their jobs and the constitutional limits on the
                government................................................................... 6

                a.    This *Eng* question is skipped in the
                      academic context due to the
                      constitutional protection for academic
                      freedom ............................................... 6

                b.    As a matter of fact and constitutional
                      law, compliance with the parental
                      exclusion policies is not, and cannot be,
                      within Plaintiffs' official job duties........................7

            3.    EUSD lacks a "legitimate administrative
                interest" for treating Plaintiffs' speech
                different from a private party's speech..........................12

        B.    The Parental Exclusion Policies Violate Plaintiffs'
            Free Exercise Rights ................................................14

            1.    The Parental Exclusion Policies Trigger Strict
                Scrutiny Because of their *De Facto* Categorical
                Exemptions for Classified Staff,
                Administrative Staff, and Students. ..............................15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2.     The Parental Exclusion Policies Trigger Strict Scrutiny Because of their Discretionary Exemptions if the Violation Had a "Legitimate" Purpose. ..................................... 17

3.     The Parental Exclusion Policies Cannot Satisfy Any Standard of Review: Rational Basis or Strict Scrutiny ........................................... 18

a.     Legal Background on Strict Scrutiny: The government must show it lacks other means of achieving its interests ................. 19

b.     Legal Background on Rational Basis: The government's interest must be legitimate and logically coherent ....................... 20

c.     Refusing to exempt Plaintiffs from the Parental Exclusion Policies fails any level of scrutiny ................................................. 20

II.   The Other Injunction Factors Favor Plaintiffs .................................. 23

A.    Plaintiffs Are Suffering Irreparable Harm Due to the Loss of their Constitutional Rights and Severe Emotional Stress ........................................................ 23

B.    The Public Interest and the Balance of Harms Favors Plaintiffs: Students Will Be Benefitted and Constitutional Rights Preserved ............................................. 24

III.  The Court Should Dispense with a Bond Requirement ..................... 25

CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*All. for the Wild Rockies v. Cottrell*, ..............................................................4
    632 F.3d 1127 (9th Cir. 2011)

*Am. Beverage Ass'n v. City & County of San Francisco*, ..............................24
    916 F.3d 749 (9th Cir. 2019)

*Arizona Dream Act Coal. v. Brewer*, ..........................................................20
    757 F.3d 1053 (9th Cir. 2014)

*Beathard v. Lyons*, ......................................................................................10
    620 F. Supp. 3d 775 (C.D. Ill. 2022)

*Bible Club v. Placentia-Yorba Linda Sch. Dist.*, ..........................................25
    573 F. Supp. 2d 1291 (C.D. Cal. 2008)

*Boardman v. Pac. Seafood Grp.*, ..................................................................23
    822 F.3d 1011 (9th Cir. 2016)

*Bosarge v. Edney*, ........................................................................................17
    No. 1:22-cv-233, 2023 WL 2998484 (S.D. Miss. Apr. 18, 2023)

*Bowen v. Roy*, ..............................................................................................17
    476 U.S. 693 (1986)

*Brown v. Entertainment Merchs. Ass'n*, .......................................................19
    564 U.S. 786 (2011)

*Burwell v. Hobby Lobby Stores, Inc.*, ...........................................................20
    573 U.S. 682 (2014)

*California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, ............5
    29 F.4th 468 (9th Cir. 2022)

*California v. Azar*, .......................................................................................24
    911 F.3d 558 (9th Cir. 2018)

*Chalk v. U.S. Dist. Ct. Cent. Dist. of California*, ........................................24
    840 F.2d 701 (9th Cir. 1988)

iii

# TABLE OF AUTHORITIES—Continued

## Cases (Cont.)

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* ....................................14, 15
   508 U.S. 520 (1993)

*City of Boerne v. Flores,* .......................................................................... 19
   521 U.S. 507 (1997)

*Dahl v. Bd. of Trustees of W. Michigan Univ.,* .......................................... 17
   15 F.4th 728 (6th Cir. 2021)

*Dahlia v. Rodriguez,* .................................................................................9
   735 F.3d 1060 (9th Cir. 2013)

*Demers v. Austin,* ................................................................................ 6, 7
   746 F.3d 402 (9th Cir. 2014)

*Diamontiney v. Borg,* ............................................................................ 23
   918 F.2d 793 (9th Cir. 1990)

*Doctor John's, Inc. v. Sioux City,* ......................................................... 25
   305 F. Supp. 2d 1022 (N.D. Iowa 2004)

*Dodge v. Evergreen Sch. Dist. #114,* ............................................ 5, 8, 12, 13
   56 F.4th 767 (9th Cir. 2022)

*Doe 1 v. Madison Metro. Sch. Dist.,* ................................................. 2, 10
   976 N.W.2d 584 (Wis. 2022)

*Donovan v. Poway Unified Sch. Dist.,* .................................................13, 14
   167 Cal. App. 4th 567 (2008)

*Drakes Bay Oyster Co. v. Jewell,* ......................................................... 24
   747 F.3d 1073 (9th Cir. 2014)

*Elrod v. Burns,* .................................................................................... 23
   427 U.S. 347 (1976)

*Emp't Div. v. Smith,* ......................................................................... 15, 17
   494 U.S. 872 (1990)

iv

## TABLE OF AUTHORITIES—Continued

### Cases (Cont.)

*Eng v. Cooley*, ................................................... 5, 6, 7, 14
    552 F.3d 1062 (9th Cir. 2009)

*Farrington v. Tokushige*, ........................................... 10
    11 F.2d 710 (9th Cir. 1926)

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, ..........17, 23
    46 F.4th 1075 (9th Cir. 2022)

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, ...............17
    64 F.4th 1024 (9th Cir. 2023)

*Fields v. Palmdale Sch. Dist.*, ....................................... 10
    427 F.3d 1197 (9th Cir. 2005)

*Fields v. Palmdale Sch. Dist.*, ....................................... 10
    447 F.3d 1187 (9th Cir. 2006)

*Foothill Church v. Watanabe*, ................................... 17, 8
    No. 2:15-cv-2165, 2022 WL 3684900 (E.D. Cal. Aug. 25, 2022)

*Fulton v. City of Philadelphia*, ........................15, 17, 19, 20
    141 S. Ct. 1868 (2021)

*Garcetti v. Ceballos*, ............................................. 7, 8
    547 U.S. 410 (2006)

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, ......................5
    546 U.S. 418 (2006)

*Green v. Miss United States of Am., LLC*, ..................... 6, 12, 19
    52 F.4th 773 (9th Cir. 2022)

*Hodge v. Antelope Valley Cmty. Coll. Dist.*, ..................... 6, 7
    No. CV 12-780, 2014 WL 12776507 (C.D. Cal. Feb. 14, 2014)

*Holt v. Hobbs*, ................................................... 20
    574 U.S. 352 (2015)

# TABLE OF AUTHORITIES—CONTINUED

## CASES (CONT.)

*Jackler v. Byrne*, ................................................................................................. 9
    658 F.3d 225 (2d Cir. 2011)

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, .................... 8, 9, 12, 21
    138 S. Ct. 2448 (2018)

*Johnson v. Poway Unified Sch. Dist.*, ...................................................................... 7
    658 F.3d 954 (9th Cir. 2011)

*Jorgensen v. Cassiday*, ........................................................................................ 25
    320 F.3d 906 (9th Cir. 2003)

*Kane v. De Blasio*, ............................................................................................. 17
    19 F.4th 152 (2d Cir. 2021)

*Kennedy v. Bremerton Sch. Dist.*, ..............................................................6, 7, 8, 13, 16
    142 S. Ct. 2407 (2022)

*Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, ........................................ 7
    385 U.S. 589 (1967)

*Klein v. City of San Clemente*, .............................................................................. 23
    584 F.3d 1196 (9th Cir. 2009)

*Loudoun Cnty. Sch. Bd. v. Cross*, ..................................................................... 6, 13, 23
    No. 210584, 2021 WL 9276274 (Va. Aug. 30, 2021)

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, .................................................. 13
    141 S. Ct. 2038 (2021)

*Melzer v. Bd. of Educ. of City Sch. Dist. of City of New York*, ....................................... 13
    336 F.3d 185 (2d Cir. 2003)

*Meriwether v. Hartop*, ...................................................................................... 6, 7
    992 F.3d 492 (6th Cir. 2021)

*Merrifield v. Lockyer*, .................................................................................. 20, 22, 23
    547 F.3d 978 (9th Cir. 2008)

1

## TABLE OF AUTHORITIES—Continued

2

### Cases (Cont.)

3

*Meyer v. Nebraska,* ......................................................................................... 10

4
    262 U.S. 390 (1923)

5

*Miller v. Reed,* ................................................................................................. 15

6
    176 F.3d 1202 (9th Cir. 1999)

7

*Monteiro v. Tempe Union High Sch. Dist.,* ............................................... 9, 10

8
    158 F.3d 1022 (9th Cir. 1998)

9

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.,* ................................................. 24

10
    142 S. Ct. 661 (2022)

11

*NIFLA. v. Becerra,* .......................................................................................... 19

12
    138 S. Ct. 2361 (2018)

13

*Oyama v. Univ. of Hawaii,* ............................................................................... 7

14
    813 F.3d 850 (9th Cir. 2015)

15

*Parham v. J.R.,* ................................................................................................ 17

16
    442 U.S. 584 (1979)

17

*Ramirez v. Collier,* .................................................................................... 19, 20

18
    142 S. Ct. 1264 (2022)

19

*Ricard v. USD 475 Geary County, KS Sch. Bd.,* ...................... 2, 10, 19, 21, 23

20
    No. 5:22-cv-4015, 2022 WL 1471372 (D. Kan. May 9, 2022)

21

*Riley's Am. Heritage Farms v. Elsasser,* ................................................... 5, 13

22
    32 F.4th 707 (9th Cir. 2022)

23

*Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.,* ......................................... 13

24
    605 F.3d 703 (9th Cir. 2010)

25

*Roman Cath. Diocese of Brooklyn v. Cuomo,* .......................................... 15, 19

26
    141 S. Ct. 63 (2020)

27

*Romer v. Evans,* ............................................................................................. 20

28
    517 U.S. 620 (1996)

## TABLE OF AUTHORITIES—Continued

### Cases (Cont.)

*Russo v. Cent. Sch. Dist. No. 1*, ............................................................... 9
  469 F.2d 623 (2d Cir. 1972)

*Sambrano v. United Airlines, Inc.*, ........................................................ 23
  No. 21-11159, 2022 WL 486610 (5th Cir. Feb. 17, 2022)

*Save Our Sonoran, Inc. v. Flowers*, ...................................................... 25
  408 F.3d 1113 (9th Cir. 2005)

*Settlegoode v. Portland Pub. Sch.*, ....................................................... 12
  371 F.3d 503 (9th Cir. 2004)

*Shelton v. Tucker*, .................................................................................. 9
  364 U.S. 479 (1960)

*Sweezy v. New Hampshire*, ...................................................................... 7
  354 U.S. 234 (1957)

*Taking Offense v. State*, ........................................................................ 22
  498 P.3d 90 (Cal. 2021)

*Taking Offense v. State*, ........................................................................ 22
  66 Cal. App. 5th 696 (2021)

*Tandon v. Newsom*, ................................................................................ 16
  141 S. Ct. 1294 (2021)

*Tatel v. Mt. Lebanon Sch. Dist.*, ...................................................... 2, 11
  No. CV 22-837, 2022 WL 15523185 (W.D. Pa. Oct. 27, 2022)

*Thomas v. Review Board of Indiana*, .................................................... 15
  450 U.S. 707 (1981)

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, ................................. 5, 13
  393 U.S. 503 (1969)

*Troxel v. Granville*, ...................................................................... 2, 16, 17
  530 U.S. 57 (2000)

Memorandum of Points & Authorities ISO
Plaintiffs' Motion for a Preliminary Injunction

# TABLE OF AUTHORITIES — CONTINUED

## CASES (CONT.)

*United States v. McAdory*, .......................................................................7
    935 F.3d 838 (9th Cir. 2019)

*United States v. Windsor*, ........................................................................20
    570 U.S. 744 (2013)

*Vill. of Willowbrook v. Olech*, .................................................................20
    528 U.S. 562 (2000)

*W. Virginia State Bd. of Educ. v. Barnette*, .............................................9
    319 U.S. 624 (1943)

*Waln v. Dysart Sch. Dist.*, ........................................................................16
    54 F.4th 1152 (9th Cir. 2022)

*Weiman v. Updegraff*, ....................................................................9, 11, 12
    344 U.S. 183 (1952)

*Winter v. Natural Res. Def. Council*, .........................................................4
    555 U.S. 7 (2008)

## STATUTES & RULES

18 U.S.C. § 1514(d)(1)(B)(ii) ....................................................................18

Cal. Code Civ. Proc. § 527.6(b)(3) ...........................................................18

Cal. Educ. Code § 201(g) ..........................................................................14

Cal. Educ. Code § 51101(a) .......................................................................10

Fed. R. Civ. P. 65(c) .................................................................................25

# INTRODUCTION

Plaintiffs Elizabeth Mirabelli and Lori Ann West are long-time educators at Rincon Middle School within the Escondido Union School District ("EUSD"). (Verif. Compl., ¶¶75-90; Mirabelli Decl., ¶¶1-2; West Decl., ¶¶1-2.) Beginning with the 2022-2023 school year, however, they found their teaching careers threatened when they were confronted with EUSD's Parental Exclusion Policies regarding gender identity. Those policies convert the decision of whether to "socially transition" a gender incongruent child from a reasoned medical one made by families and psychologists, into a haphazard choice made by children pressured by peers and school counselors. (Compl., ¶¶117-48 & Exs.1-5, 7-9; Anderson Decl., ¶¶82-86.)[1]

Under the Parental Exclusion Policies, all EUSD teachers are required to unhesitatingly accept a child's self-medical-diagnosis as gender incongruent, immediately begin referring to the child by any self-identified pronouns and preferred name (including "it") (*see* Compl., ¶164), and actively exclude parents from any aspect of the decision-making process. EUSD teachers must carefully revert to biological pronouns and legal names when speaking with parents to avoid apprising them of the social transition. (*Id.*, ¶¶117-48 & Exs.1-5, 7-9.)

As attested to by Plaintiffs' expert—a transgender woman and expert on child gender incongruence—EUSD's policies are extremely dangerous to the mental and psychological well-being of children. (*See* Anderson Decl., ¶¶3-5, 56-86.) Engaging in a social transition is an active, psychotherapeutic intervention that should not be engaged in lightly. (*Id.* at ¶¶29-43.) Whether a child is gender incongruent may or may not translate to being gender dysphoric, and only with the combined wisdom of parents (who know their children best) and psychologists (who understand gender identity best), can the optimal results be achieved for these children. (*Id.* at ¶¶12-28, 44-86.)

---

[1] Exhibits 1-32 are attached to the Verified Complaint; Exhibits 33-37 are attached to the declaration of Plaintiff Mirabelli; Exhibits 38-43 are attached to the declaration of Plaintiff West. Unless otherwise noted, all quotations are "cleaned up" by omitting citations, quotation marks, brackets, ellipses, and emphasis; all emphasis is added.

Further, the policies are egregiously unconstitutional attempts to interfere with parental rights. (Compl., ¶¶69-74.) The Supreme Court has time and again repeatedly affirmed the "fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (collecting cases). As such, these policies are unenforceable against Plaintiffs Mirabelli and West. Although similar policies are being quickly adopted across the Nation (Compl., ¶¶61-67), they are equally quickly being struck down. Courts in Kansas, Wisconsin, and Pennsylvania have already found similar policies unconstitutional, and other courts are poised to soon follow suit. *See Ricard v. USD 475 Geary County, KS Sch. Bd.*, No. 5:22-cv-4015, 2022 WL 1471372 (D. Kan. May 9, 2022); *Doe 1 v. Madison Metro. Sch. Dist.*, 976 N.W.2d 584, 589-90 (Wis. 2022); *Tatel v. Mt. Lebanon Sch. Dist.*, No. CV 22-837, 2022 WL 15523185 (W.D. Pa. Oct. 27, 2022).

Because Plaintiffs Mirabelli and West do not wish to be a party to the violation of parents' fundamental constitutional rights, they initiated the present action and now move for a preliminary injunction. As ordered in *Ricard* and *Madison Metro.*, Plaintiffs seek leave to communicate truthfully with parents about their child's gender identity. When speaking with parents, Plaintiffs wish to identify students by both their legal and preferred names to avoid any hint of deception. Plaintiffs do not challenge any other gender identity policies. (*See* Compl., ¶¶213-16.)[2]

## FACTUAL & PROCEDURAL BACKGROUND

Plaintiffs Elizabeth Mirabelli and Lori Ann West are long-time and devoted educators. They greatly love their work and find inspiring young children to be a fulfilling vocation. As a result they pour themselves into their work, and in their several decades teaching seventh and eighth grade children, they have received numerous accolades. (Compl., ¶¶75-90; Mirabelli Decl., ¶¶1-2; West Decl., ¶¶1-2.)

---

[2] EUSD has contended that its policies simply follow the guidance of the California Department of Education ("CDE"). (Compl., ¶¶187-98 & Exs.26-28.) As a result, Plaintiffs Mirabelli and West named the members of the State Board of Education as defendants and request that their injunction encompass the CDE.

But with the 2022-2023 school year, they discovered for the first time that they were expected to deceive parents by withholding any information about a child's gender identity. (Compl., ¶¶117-48 & Exs.1-5, 7-9.) Presenting as a different gender in public is called a "social transition" and is normally a reasoned medical decision made by families in consultation with psychologists. (Anderson Decl., ¶¶56-86.) However, EUSD ordered that children alone can make the decision whether to "socially transition" and that under the child's "Right to Privacy" teachers had to scrupulously avoid "outing" a child to his parents. (Compl., ¶¶117-48, 208-12 & Exs.1-5, 7-9.) As shown by the discipline of a fellow teacher (*id.*, ¶117), failure to comply with these policies will lead to discipline, including eventually termination. (*Id.*, ¶129.)

This greatly bothered both Plaintiffs Mirabelli and West because, both morally and religiously, they know that keeping this information from parents is wrong. They believe that the relationship between parents and children is sacred and should not be undermined through introducing deception and distrust. (*Id.*, ¶¶75-111 & Exs.24-25.) Moreover, in seeking the best for their gender incongruent students, Plaintiffs believe that life-altering decisions like whether to "socially transition" must be left in the hands of parents, not children alone. (*Id.*) Thus, Plaintiffs sought a religious accommodation under Title VII and the California Fair Employment & Housing Act. EUSD agreed to grant Plaintiffs a partial accommodation, such that they could personally refer to students in a gender-neutral manner. But EUSD held firm on its Parental Exclusion Policies, leading to this lawsuit. (*Id.*, ¶¶177-216 & Exs.7-9, 27-28.)

After the lawsuit was filed, various Rincon Middle School personnel retaliated against and harassed Plaintiffs Mirabelli and West. (Mirabelli Decl., ¶¶6-19 & Exs.33-37; West Decl., ¶¶4-17 & Exs.38-43.) Teachers have begun wearing Rainbow Pride colors to protest this lawsuit, and the band teacher even went so far as to coopt her students into a protest. She filmed a video of her students waving Rainbow Pride flags and singing a protest song. (*Id.*) By roping students into the protest, teachers ultimately caused many students to verbally harass and threaten Plaintiff Mirabelli to the point

that she was forced to go on administrative leave for the rest of the school year. (Mirabelli Decl., ¶¶18-19.) However, both Plaintiffs Mirabelli and West fully intend to resume their teaching duties with the start of the 2023-2024 school year. Thus, they need effective relief from the Court in advance of **August 9, 2023**—the first day that they are required to report for work. (Mirabelli Decl., ¶20; West Decl., ¶¶17-19.)[3]

## LEGAL STANDARD

Plaintiffs seeking a preliminary injunction must establish (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm without injunctive relief, (3) that the balance of harms tips in their favor, and (4) that a preliminary injunction is in the public interest. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citing *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)). Courts in the Ninth Circuit evaluate these factors through a "sliding scale approach." *Id*. So, for example, "a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." *Id*.

## ARGUMENT

### I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

For the reasons discussed below, as applied to Plaintiffs Mirabelli and West, EUSD's Parental Exclusion Policies cannot survive scrutiny under the Free Speech clause or the Free Exercise of Religion clause. Under the Free Speech clause, the Court must weigh EUSD's legitimate interests as employer against Plaintiffs' constitutional interest in being a speaker on a matter of public interest. The balance strongly tips in Plaintiffs' favor because none of EUSD's legitimate interests would be hindered by Plaintiffs' speech, but actually furthered. Under the Free Exercise clause, EUSD's Parental Exclusion Policies are subject to (and cannot survive) strict scrutiny because they are riddled with de facto categorical and discretionary exemptions. In any event, because the policies violate parental rights, they fail even rational basis review.

---

[3] A lengthier recitation of the complex factual and procedural history is laid in the verified complaint, which is expressly incorporated herein.

### A.   The Parental Exclusion Policies Violate Plaintiffs' Free Speech Rights under the *Eng* Analysis for Government Employees

The Free Speech clause protects the rights of government employees, including teachers, but is "applied *in light of* the special characteristics of the school environment." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Thus, in determining the free speech rights of public employees, the Ninth Circuit generally reviews five questions which merge First Amendment and employment law analyses. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

In this context, however, only the First Amendment questions are relevant.[4] Those Questions Nos. 1, 2, and 4 are: "(1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; [and] (4) whether the state had an adequate justification for treating the employee differently from other members of the general public." *Eng*, 552 F.3d at 1070; *accord Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 776 (9th Cir. 2022). It is Plaintiffs' burden to establish the first two questions in their favor, and EUSD's burden as to the last question. *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 721 (9th Cir. 2022).[5]

#### 1.   Plaintiffs' speech is related to the public debate over gender identity and parental rights

The first *Eng* question is whether the "topic" matter of the speech (here, gender identity) is a matter of public concern. Here, the public debate about how to address gender dysphoria, especially among children, is undoubtedly a matter of public concern. *See Riley's*, 32 F.4th at 723 (farm owner's tweets about how planning for a "high school reunion" shows that his "may have been the last generation born with

---

[4] The employment law Questions Nos. 3 and 5 are only relevant after the government takes adverse action against an employee. Here, because Plaintiffs have not violated the policies, these questions are not relevant. (*See* Compl., ¶¶75-90.)

[5] This allocation of burden remains applies because "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006); *accord California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022).

only two genders," was speech related to a matter of public concern).[6]

Importantly, the employee need not be advocating a viewpoint through his speech. For example, in *Kennedy*, the Supreme Court held that Coach Kennedy's private prayer was speech implicating a matter of public concern even though he was privately praying by himself. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2424 (2022). And in *Meriwether*, the refusal to use preferred pronouns was found to satisfy the first *Eng* question because the issue is whether the "speech relates" in any way to a "topic" being debated. *Meriwether v. Hartop*, 992 F.3d 492, 508-09 (6th Cir. 2021).

Here, the issues of gender identity, transgender children, and parental rights are currently topics of significant public debate. Indeed, this lawsuit has already triggered further debate at Rincon Middle School. (Mirabelli Decl., ¶¶6-19; West Decl., ¶¶4-17.) Thus, because gender identity and parental rights is currently a topic of public debate, EUSD's requirements regarding how Plaintiffs may speak related to that topic satisfies the first *Eng* question. This is a point EUSD has all but admitted. (*See* Compl., Ex. 28, p.3 (discussing the "debate").)

### 2. Plaintiffs are speaking as private citizens, not public employees, due to the factual nature of their jobs and the constitutional limits on the government

#### a. This Eng question is skipped in the academic context due to the constitutional protection for academic freedom

The second *Eng* question does not apply to teachers due to the constitutional protection for academic freedom. Because "teaching and academic writing are at the core of the official duties of teachers and professors," such speech is "a special concern of the First Amendment" and is exempt from the "public v. private" speech analysis. *Demers v. Austin*, 746 F.3d 402, 411-12 (9th Cir. 2014); *see Hodge v. Antelope*

---

[6] *Meriwether v. Hartop*, 992 F.3d 492, 508-09 (6th Cir. 2021), *cited approvingly in Green v. Miss United States of Am., LLC*, 52 F.4th 773, 784 n.12 (9th Cir. 2022) (refusal to use preferred pronouns is exercising Free Speech rights on a matter of public concern); *Loudoun Cnty. Sch. Bd. v. Cross*, No. 210584, 2021 WL 9276274, at *4 (Va. Aug. 30, 2021) ("*Cross*") (teacher commenting in opposition to proposed gender identity policies at school board meeting was speaking on a matter of public concern)

*Valley Cmty. Coll. Dist.*, No. CV 12-780, 2014 WL 12776507, at *5 & n.4 (C.D. Cal. Feb. 14, 2014) (in the academic context, second *Eng* question should be skipped).

This is because of a long-line of cases which discuss the importance of protecting academic freedom. *See Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967); *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Respecting these Supreme Court cases, the Ninth Circuit has held that the second *Eng* question "does not—indeed, consistent with the First Amendment, cannot—apply to teaching and academic writing that are performed 'pursuant to the official duties' of a teacher and professor." *Demers*, 746 F.3d at 412; *accord Oyama v. Univ. of Hawaii*, 813 F.3d 850, 866 n.13 (9th Cir. 2015) ("[D]ue to considerations of academic freedom, we have declined to extend *Garcetti* to the context of public school teachers.").

Here, under Ninth Circuit case law, this question simply does not apply because of the academic context. *Demers*, 746 F.3d at 412. In this exact factual context, the Sixth Circuit concluded that a professor's refusal to adhere to his university's stated position on gender identity—by refusing to use preferred pronouns—fit within the academia exception such that this question was irrelevant. *Meriwether*, 992 F.3d at 504-06. Rather, the parties' respective interests should simply be weighed as part of Question 4. *See Demers*, 746 F.3d at 413 (noting that weighing must account for "whether the school in question is a public high school or a university").[7]

### b.   As a matter of fact and constitutional law, compliance with the parental exclusion policies is not, and cannot be, within Plaintiffs' official job duties

Even outside the academic context, Plaintiffs Mirabelli's and West's speech with parents on the topic of gender identity has not been, and cannot be, made part of their official job duties. The constitution imposes careful limits on when and how the

---

[7] An earlier school case dealing with the *Eng* five-question analysis did not substantively deal with the question of academic freedom. *See Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954 (9th Cir. 2011), *abrogated by Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022). The Ninth Circuit later addressed this question directly in *Demers*, such that it controls. *See United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019) (substantive analysis, not passing comments, constitute law of the circuit).

government can make speech part of the official job duty of an employee. Those limits are already reflected in many EUSD documents detailing Plaintiffs' job duties. Thus, both factually and for First Amendment purposes, compliance with the Parental Exclusion Policies are not and cannot be made a part of Plaintiffs' official job duties.

### i. *Legal Background: The government cannot force employees to adhere to ideological orthodoxy or violate the law as a condition of employment*

Whether government employee speech *is understood by the First Amendment* as private citizen speech or public employee speech is a highly factual matter. This question first "depends on the scope and content of [the employee's] job responsibilities." *Dodge*, 56 F.4th at 778. But "[t]he proper inquiry is a practical one," *concerning what is core to an employee's job*, such that "the listing of a given task in an employee's written job description is *neither necessary nor sufficient* to demonstrate that conducting the task is within the scope of the employee's professional duties *for First Amendment purposes.*" *Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006).

Under the First Amendment, the key issue is whether "there is [a] relevant analogue to speech by citizens who are not government employees." *Id.* at 424. Thus, because "discussing politics with a co-worker" can be done by a private citizen, a private employee, and a public employee, when it is done by a public employee, it is First Amendment protected speech. *Id.* at 423-24. Only if it is made part of a specific "employee's official duties" to "mouth a message on [the government's] behalf" (*i.e.*, to serve as a spokesperson), will the speech be considered government speech. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2473 (2018).

But, the government *cannot* impose "*a blanket requirement* that all employees subsidize [or engage in] speech with which they may not agree" if they are not spokespersons. *Id.* at 2472. Nor may the government "posit an excessively broad job description," for example, by focusing on a teacher's duty to serve as a "role model," and thereby "treat[] everything teachers and coaches say in the workplace as government speech subject to government control." *Kennedy*, 142 S. Ct. at 2411.

1   These limitations flows from the principle that "no official, high or petty, can prescribe

2   what shall be orthodox in politics, nationalism, religion, or other matters of opinion."

3   *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Thus, unless the

4   government is hiring a spokesperson, the government cannot make it a job requirement

5   that an employee take a side in a matter of public debate. *Janus*, 138 S. Ct. at 2473.[8]

6       Finally, a government employer may only "insist that the employee deliver a

7   *lawful* message." *Id.* Thus, a police department cannot insist that a police officer file a

8   false police report. *See Jackler v. Byrne*, 658 F.3d 225, 240 (2d Cir. 2011), *cited*

9   *approvingly in Dahlia v. Rodriguez*, 735 F.3d 1060, 1075 (9th Cir. 2013). Nor, in light of

10  the Fourteenth Amendment, could a school district require its teachers "to

11  indoctrinate their young charges with racist concepts." *Monteiro v. Tempe Union High*

12  *Sch. Dist.*, 158 F.3d 1022, 1032 (9th Cir. 1998).

13                  *ii.    Deceiving parents is not, and cannot be, within*
                            *Plaintiffs' job duties because it violates parental*
14                          *rights and is a litmus test of holding orthodox beliefs*

15      Here, both *factually* and *for First Amendment purposes*, it is not and cannot be a

16  part of Plaintiffs' official job duties of teaching English and Physical Education to

17  deceive parents. Factually, during the religious accommodation process, EUSD

18  already concluded that compliance with the Parental Exclusion Policies was not an

19  "essential [job] function." (Compl., ¶201; Ex. 27, p.4; Ex. 28, p.4.) That is the only

20  possible conclusion. Other EUSD Board Policies expressly prohibit "[b]eing dishonest

21  with students, parents/guardians, staff, or members of the public." (*Id.*, ¶151; Ex. 14,

22  BP 4119.21(9).) They also provide that "[p]arents/guardians have a right and an

23  obligation to be engaged in their child's education and to be involved in the

24  intellectual, physical, emotional, and social development and well-being of their child."

---

25  [8] *See, e.g., Weiman v. Updegraff*, 344 U.S. 183, 190-91 (1952) (government may not

26  compel prospective employees to swear loyalty oaths as a condition of employment);
    *Shelton v. Tucker*, 364 U.S. 479, 489-90 (1960) (government may not compel teachers

27  to disclose all of their recent associations in order to be hired at a public school); *Russo*
    *v. Cent. Sch. Dist. No. 1*, 469 F.2d 623, 633-34 (2d Cir. 1972) (state violated First

28  Amendment for firing teacher who refused to salute the flag).

1   (*Id.*, ¶151; Ex. 15, BP 0100(7).) This is also mandated by California law. *See* Cal. Educ.

2   Code § 51101(a). (*See id.*, ¶¶196-97.) EUSD cannot both acknowledge that parents

3   have a right to be involved in the development and well-being of their child, and take

4   the position that Plaintiffs' official job duties include deceiving parents and blocking

5   their involvement. *See Beathard v. Lyons*, 620 F. Supp. 3d 775, 782 (C.D. Ill. 2022)

6   (noting clash in policies and interpreting them against the university employer).

7        For First Amendment purposes, just as it cannot be part of a teacher's official

8   job duties to violate the Fourteenth Amendment by "indoctrinat[ing] their young

9   charges with racist concepts," *Monteiro*, 158 F.3d at 1032, it cannot be part of a

10  teacher's official duties to violate parental Fourteenth Amendment rights to direct the

11  upbringing of their children by deceiving parents about their child's transgender status.

12  *Ricard*, 2022 WL 1471372, *8 & n.12; *see Madison Metro.*, 976 N.W.2d at 589-90 (trial

13  court entered injunction against school district "requir[ing] District staff to conceal

14  information or to answer untruthfully in response to any question that parents ask

15  about their child at school, including information about the name and pronouns being

16  used to address their child at school.").

17       In the Ninth Circuit, parents' quintessential right is the "fundamental right to

18  decide *whether* to send their child to a public school." *Fields v. Palmdale Sch. Dist.*, 427

19  F.3d 1197, 1206 (9th Cir. 2005) ("*Fields I*"), *amended on denial of rehearing*, 447 F.3d

20  1187 (9th Cir. 2006) ("*Fields II*"). Parents have a right "to be free from state

21  interference with their choice of the educational forum itself." *Fields I*, 427 F.3d at

22  1207. This right "extend[s] beyond the threshold of the school door." *Fields II*, 447

23  F.3d at 1190-91. Thus, parents may not dictate the content of school curriculum, but

24  they must know what is happening behind school doors so they can choose whether the

25  school is right for their children. *See Meyer v. Nebraska*, 262 U.S. 390, 401 (1923) (state

26  may not "interfere … with the power of parents to control the education of their

27  own"); *Farrington v. Tokushige*, 11 F.2d 710, 714 (9th Cir. 1926) (noting "the right of a

28  parent to educate his own child in his own way").

Thus, by withholding information from parents that is critical to their decisions about the upbringing of their children, including decisions about obtaining physical and psychological health care for their children and where to send their children to school, EUSD is intentionally interfering with that quintessential right and demanding that Plaintiffs participate in the deception. This *cannot* be an official job duty.[9]

Finally, broadly, it is not and cannot be one of Plaintiffs' official job duties to adhere to EUSD's view of gender identity. *Factually*, at the end of the religious accommodation process, EUSD stated that if Plaintiffs are ever asked by a parent about their child's gender identity, they must simply respond that they can only discuss "information regarding the student's behavior as it relates to school, class rules, assignments, etc." (Compl., ¶¶4, 209 & Ex.9.) In other words, the topic of gender identity simply should not be part of Plaintiffs' official job duties at all.

This coheres with other EUSD policies which provide that, for "any public problem which society … is in the process of debating," teachers have "the right to express his/her own opinion." (*Id.*, ¶154; Ex. 16, BP 6144 & AR 6144; *accord* Ex. 19, BP 6142.3 (civics education policy); Ex. 20, BP 5145.2 (student speech policy).) And Plaintiffs' employment contracts state that "academic freedom is essential" such that EUSD employees are protected against "censorship or restraint, which might interfere with their obligation to pursue truth." (*Id.*, ¶155; Ex. 17, art. XIV, §E.2.) As a result of these policies, Rincon Middle School teachers have been allowed to display pro-LGBT political messaging in their classrooms. (*Id.*, ¶156; Ex. 18; West Decl., ¶16 & Ex.43.)

In any event, *for first Amendment purposes*, any attempt to require teachers to adhere to EUSD's new gender orthodoxy would simply be an impermissible litmus test requiring employees to adhere to government orthodoxy. *See Weiman*, 344 U.S. at 190-

---

[9] Notably, a circuit split exists over how much control a parent can exercise regarding what occurs in schools. *See Tatel*, 2022 WL 15523185, at *13-16. But even under the Ninth Circuit's narrow view of parental rights, the government may not actively interfere with those rights by deceiving parents and thereby preclude any ability on the part of a parent to opt their child out of the program. *Id.* at *21-23.

91. If permissible under the First Amendment, it would similarly permit EUSD (or a new Board of Trustees) to order that no teacher may ever affirm a student's gender identity. The First Amendment prohibits the government from compelling or gagging speech in this manner as a condition of employment.

### 3. EUSD lacks a "legitimate administrative interest" for treating Plaintiffs' speech different from a private party's speech

This last question is the most important. The question is—in balancing the legitimate interests of EUSD *as employer* and Plaintiffs' First Amendment rights *as citizens*—does EUSD have a sufficiently compelling interest to make restrictions on Plaintiffs' constitutional rights a condition of employment?

On EUSD's side, the inquiry is limited to a "*legitimate administrative interest.*" *See Dodge*, 56 F.4th at 781. Thus, EUSD—like all employers—has an interest in preventing the disruption of its provision of service. *See id.* at 781-82. It also has an interest in complying with state and federal law. But it does *not* have an interest in enforcing ideological conformity among its employees. *Janus*, 138 S. Ct. at 2473. Further, "[a]s compelling as the interest in preventing discriminatory conduct may be, speech is treated differently under the First Amendment." *Green*, 52 F.4th at 792 (preventing gender identity discrimination not a valid basis for compelling speech).

The disruption analysis proceeds on a sliding scale: "The government's burden in proving disruption varies with the content of the speech. The more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made." *Dodge*, 56 F.4th at 782. Under this analysis, "[s]peech is disruptive only when there is an *actual, material and substantial disruption*, or there are reasonable predictions of disruption in the workplace." *Id.* "Speech that outrages or upsets" but "without evidence of 'any actual injury' to school operations does not constitute a disruption." *Id.* (quoting *Settlegoode v. Portland Pub. Sch.*, 371 F.3d 503, 514 & n.8 (9th Cir. 2004)).[10]

---

[10] With respect to "actual injury," "where hundreds of parents threatened to remove their children from school," due to "a public school teacher who was active in a

On Plaintiffs' side, "the First Amendment affords the broadest protection to political expression," *Dodge*, 56 F.4th at 782, such that discussion about issues of "gender identity" is "entitled to special protection." *Riley's*, 32 F.4th at 716, 727. Because "[p]olitical speech is the quintessential example of protected speech, and it is inherently controversial," the government must show more than "the disruption that necessarily accompanies controversial speech." *Dodge*, 56 F.4th at 782-83.

Indeed, for purposes of qualified immunity, many cases "clearly establish that disagreement with a disfavored political stance or controversial viewpoint, by itself, is not a valid reason to curtail expression of that viewpoint at a public school." *Id.* at 786-87 & n.6 (collecting cases). In contrast, "schools have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2046 (2021).[11]

_____

pedophile association," the school district's legitimate interests in running a school could prevail over the teacher's right to freedom of association. *See Riley's*, 32 F.4th at 726-27 (citing *Melzer v. Bd. of Educ. of City Sch. Dist. of City of New York*, 336 F.3d 185, 199 (2d Cir. 2003)). But the focus must be on actual "substantial disruption" itself—not merely finding a viewpoint offensive—and that finding of actual disruption cannot be based on "rank speculation or bald allegation." *Id.* at 725-27 (a few complaints from parents was insufficient); *accord Cross*, 2021 WL 9276274, at *7.

[11] *Accord, e.g., Kennedy*, 142 S. Ct. at 2416, 2430 ("The Constitution and the best of our traditions counsel mutual respect and tolerance, not censorship and suppression," for "learning how to tolerate speech … of all kinds is part of learning how to live in a pluralistic society, a trait of character essential to a tolerant citizenry."); *Tinker*, 393 U.S. at 509 ("Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk"); *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 710 (9th Cir. 2010) (failure to reprimand professor who sent "racially charged" emails against Dia de la Raza and in favor of Columbus Day could not create hostile educational environment because "emails were pure speech; they were the effective equivalent of standing on a soap box in a campus quadrangle and speaking to all within earshot. Their offensive quality was based entirely on their meaning"); *Donovan v. Poway Unified Sch. Dist.*, 167 Cal. App.

Here, EUSD has asserted two interests: (1) compliance with state and federal law (Compl., ¶187; Ex. 27, p.3; Ex. 28, p.3); and (2) "creat[ing] safe and inclusive campuses," to "uphold[] a positive and diverse culture in our District." (*Id.*, ¶119; Ex. 4, p.1:11-12) Neither of those interests, however, is furthered by the policy. Nothing in the California Constitution justifies deceiving parents about their child's gender identity or providing psychological treatment without parental consent (*see id.*, ¶¶189-98), and even if it did, the Fourteenth Amendment prohibits EUSD from doing so. (*See* § I.A.2.b.ii, *supra*.) With respect to student safety, keeping parents in the dark is far more likely to harm students than keep them safe. (*See* Anderson Decl., ¶¶56-86.)

Thus, with Plaintiffs' interests entitled to heightened protection, and EUSD's interests not actually undermined, the question of which side's interests are paramount is answered squarely in Plaintiffs' favor. All of the *Eng* questions are rightly resolved in favor of Plaintiffs Mirabelli and West, so the Court should enter an injunction protecting their Free Speech rights.

### B.   The Parental Exclusion Policies Violate Plaintiffs' Free Exercise Rights

As stated above, in addition to their Free Speech rights, EUSD's transgender policies violate Plaintiffs Mirabelli's and West's Free Exercise of Religion rights. As a result of their faith, Mrs. Mirabelli and Mrs. West seek the absolute best for their transgender or gender diverse students. This includes preventing gender identity-based bullying or harassment. But it also involves including parents in any decision regarding a child's social transition. Mrs. Mirabelli and Mrs. West believe that the parent-child relationship is sacred, and that they cannot come between parents and their children by lying to parents. (Compl., ¶¶91-111, 215.)

Under the Free Exercise clause, if government policies burden religious exercise and are "not neutral or not of general application," *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993), then they "must satisfy 'strict

---

4th 567, 591 (2008) (California Education Code follows Title IX standards, citing Cal. Educ. Code § 201(g)).

scrutiny,' and this means that they must be 'narrowly tailored' to serve a 'compelling' state interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). In contrast, with respect to "a neutral, generally applicable regulatory law," that "merely [has] the incidental effect" of burdening religion, courts only review whether it is "otherwise valid." *Emp't Div. v. Smith*, 494 U.S. 872, 879-81 (1990). In other words, courts review whether or not the law is "rationally related to [the government's] legitimate interests." *Miller v. Reed*, 176 F.3d 1202, 1206 (9th Cir. 1999).

Here, EUSD's requirement that Plaintiffs comply with its Parental Exclusion Policies as a condition of employment burdens their sincere religious beliefs. *Thomas v. Review Board of Indiana*, 450 U.S. 707, 717-19 (1981) (losing job is severe burden); (Compl., ¶202, Ex. 27, p.3; Ex. 28, p.3 (religious sincerity undisputed).) Yet, as discussed below, EUSD's Parental Exclusion Policies are not generally applicable and therefore trigger strict scrutiny. And even under rational basis review, in the unique context of this case, refusing to extend an exemption to Plaintiffs lacks any rational connection to a legitimate government interest.

### 1. The Parental Exclusion Policies Trigger Strict Scrutiny Because of their *De Facto* Categorical Exemptions for Classified Staff, Administrative Staff, and Students.

The existence of secular exemptions from government-created burdens, without offering a religious exemption, triggers strict scrutiny under the Free Exercise Clause if the secular exemptions undermine the government's asserted interests "in a similar or greater degree" than a religious exemption would. *Lukumi*, 508 U.S. at 542-43. This is called the problem of "underinclusiv[ity]." *Id.*; *accord Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021) (a government policy "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way").

Stated differently, "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious

1   exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (original italics). But

2   "whether two activities are comparable for purposes of the Free Exercise Clause must

3   be judged against the asserted government interest that justifies the regulation at

4   issue." *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1159 (9th Cir. 2022) (quoting *Tandon*,

5   141 S. Ct. at 1296). And "[g]eneral applicability requires, among other things, that the

6   laws be enforced evenhandedly." *Id.*

7       Here, although the Parental Exclusion Policy is framed as a student "right," it

8   only binds a very limited group: full-time teachers. (Compl., ¶135; Ex. 4, p.1:2.) It does

9   not bind non-certificated administrative or classified staff, substitute teachers, or

10  students, because the February 3, 2022 presentation was only given to teachers. (*See*

11  *id.*, ¶¶136-43; Ex. 11, p.6; Ex. 12; Ex. 4, p.11:23-12:1; Ex. 13, pp.1:27-2:20.) Even if staff

12  and students were technically bound by the Parental Exclusion Policies, because they

13  do not exist in writing anywhere on the EUSD website, and because EUSD is

14  apparently attempting to hide them, EUSD has created *de facto* exemptions for all of

15  them. There is no practical way for those from whom EUSD has hidden the Parental

16  Exclusion Policies to comply with them. Additionally, the Parental Exclusion Policies

17  have important exemptions for unintentional violations, such as "inadvertent slips or

18  honest mistakes." (*Id.*, ¶147; Ex. 4, p.5:24-26.)

19      As noted above, the issue is whether secular exemptions and a religious

20  exemption are comparable by "judg[ing them] against the asserted government

21  interest that justifies the regulation at issue." *Waln*, 54 F.4th at 1159. Here, the stated

22  purpose of the policies is to "create safe and inclusive campuses," and "uphold[] a

23  positive and diverse culture in our District." (Compl., ¶118; Ex. 4, p.1:11-12.)[12]

24      To be sure, EUSD has an interest in protecting transgender students from

25  physical and emotional abuse from their peers. But "there is a presumption that fit

26  parents act in the best interests of their children," *Troxel v. Granville*, 530 U.S. 57, 68

---

[12] *See Kennedy*, 142 S. Ct. at 2432 n.8 ("Government 'justification[s]' for interfering with First Amendment rights 'must be genuine, not hypothesized or invented *post hoc* in response to litigation.'")

(2000), that originates from the historical recognition that the natural bond between parent and child leads parents to act in the best interests of their children. *Parham v. J.R.*, 442 U.S. 584, 602 (1979). EUSD must presume that, if given information about their children, parents will use that information to the child's benefit—which is a perfectly reasonable presumption. (*See* Anderson Decl., ¶¶61-86.) Thus, Plaintiffs seek to further EUSD's interest, not undermine it.

### 2. The Parental Exclusion Policies Trigger Strict Scrutiny Because of their Discretionary Exemptions if the Violation Had a "Legitimate" Purpose.

EUSD's Parental Exclusion Policies also trigger strict scrutiny because they contain a system of discretionary, "good cause" exemptions. Under this reasoning, "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Smith*, 494 U.S. at 884 (citing *Bowen v. Roy*, 476 U.S. 693, 708 (1986)). Stated differently, where a law "invites the government to decide which reasons for not complying with the policy are worthy of solicitude," strict scrutiny is triggered. *Fulton*, 141 S. Ct. at 1878-79. Importantly, it does not matter whether the system of exceptions has ever been used: "The creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given[.]" *Id.* at 1879. But the formal mechanism is also not required. When the government has an "unspoken and ad hoc exemption practice," that "poses a more insidious and severe danger" because it provides the government "unfettered and silent discretion to make exceptions," thus triggering strict scrutiny. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 46 F.4th 1075, 1096 (9th Cir. 2022) ("*FCA*"), *vacated but injunction granted pending en banc review*, 64 F.4th 1024 (9th Cir. 2023).[13]

---

[13] *Accord Kane v. De Blasio*, 19 F.4th 152, 169 (2d Cir. 2021) (COVID-19 vaccination mandate triggered strict scrutiny due to system of individualized exemptions); *Dahl v. Bd. of Trustees of W. Michigan Univ.*, 15 F.4th 728, 733 (6th Cir. 2021) (same); *Bosarge v. Edney*, No. 1:22-cv-233, 2023 WL 2998484, at *10 (S.D. Miss. Apr. 18, 2023) (same as to public schools); *Foothill Church v. Watanabe*, No. 2:15-cv-2165,

Here, EUSD has defined in its policies "revealing a student's transgender status or gender diverse status to individuals who do not have a legitimate need for the information without the student's consent, and this includes parents or caretakers," as "harassment of our gender diverse students." (Compl., ¶144; Ex. 4, pp.6:25-26, 7:15-17.) Because the policies are defined as "harassment," whenever an EUSD official investigates whether a violation has occurred, they have to individually determine whether the conduct was "harassing."

Definitionally, conduct is only "harassing" if it has no "legitimate purpose." Cal. Code Civ. Proc. § 527.6(b)(3); 18 U.S.C. § 1514(d)(1)(B)(ii). (*See* Compl., ¶¶145-46.) Thus, EUSD's policies inherently invite EUSD officials to decide whether specific reasons for failing to comply with the Parental Exclusion Policies have a "legitimate purpose" and are therefore worthy of solicitude. For example, it will not be considered a violation of the Parental Exclusion Policies if the teacher believed that individuals "have a legitimate need for the information" or if the teacher engaged in "inadvertent slips or honest mistakes." (*Id.*, ¶¶147-48; Ex. 4, pp.5:24-26, 7:16, 11:16-23.) Because EUSD's policies require individualized assessment of "legitimacy," they are not generally applicable, thus triggering strict scrutiny review.

### 3. The Parental Exclusion Policies Cannot Satisfy Any Standard of Review: Rational Basis or Strict Scrutiny

For the reasons discussed above, EUSD's refusal to offer a religious exemption to Plaintiffs, despite its many secular exemptions, triggers strict scrutiny under the Free Exercise clause. But even if the Court were to find that strict scrutiny is not triggered, then EUSD's policies remain subject to rational basis review. In the unique context of this case, where EUSD is pursuing an interest that is not legitimate (let alone compelling), and yet has so many secular exemptions undermining its interest, failing to offer a religious exemption fails to satisfy even rational basis review. *See* 2022 WL 3684900, at *10 (E.D. Cal. Aug. 25, 2022) (department of health's "good cause" exemption for requiring health insurance plans to cover elective abortion triggered strict scrutiny).

1   *Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*, No. 5:22-cv-4015, 2022 WL 1471372, at
2   *7-8 & nn.11-12 (D. Kan. May 9, 2022) (granting analogous injunction to teacher based
3   on Free Exercise clause).

### a.   Legal Background on Strict Scrutiny: The government must show it lacks other means of achieving its interests

6       To satisfy "strict scrutiny," government policies "must be 'narrowly tailored'
7   to serve a 'compelling' state interest." *Diocese of Brooklyn*, 141 S. Ct. at 67. "Once a
8   plaintiff has made out his initial case …, it is the government that must show its policy
9   is the least restrictive means of furthering [a] compelling governmental interest."
10  *Ramirez v. Collier*, 142 S. Ct. 1264, 1281 (2022). In other words, the government must
11  show that "denying an exception" to "particular religious claimants," *Fulton*, 141
12  S. Ct. at 1882, is "'narrowly tailored' to serve a 'compelling' state interest." *Diocese of
13  Brooklyn*, 141 S. Ct. at 66. Strict scrutiny is "the most demanding test known to
14  constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).[14]

15      Even when the government has identified a problem in need of solving, the
16  restriction "must be actually necessary to the solution," for the "government does not
17  have a compelling interest in each marginal percentage point by which its goals are
18  advanced." *Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786, 799, 803 n.9 (2011).
19  The government may not assert generally that it has an interest in preventing "serious
20  mental, financial, and emotional harm on transgender individuals," but must show that
21  denying an exception here is necessary to achieve that goal. *Green*, 52 F.4th at 791-92.
22  "That is a demanding standard," *Brown*, 564 U.S. at 799, and "because [the
23  government] bears the risk of uncertainty, ambiguous proof will not suffice." *Id.* at
24  799-800. "[C]onjecture" and "hypothetical[s]," and other "'[s]uch speculation is
25  insufficient to satisfy' [the government's] burden." *Ramirez*, 142 S. Ct. at 1280.

26      The "least-restrictive-means standard is exceptionally demanding" in that it

---

[14] "This allocation of respective burdens applies in the preliminary injunction context."
*Ramirez*, 142 S. Ct. at 1277; *accord NIFLA. v. Becerra*, 138 S. Ct. 2361, 2376 (2018).

1   requires the government to show that "it lacks other means of achieving its desired
2   goal." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014). "[S]o long as the
3   government can achieve its interests in a manner that does not burden religion, it must
4   do so." *Fulton*, 141 S. Ct. at 1881. "[A]t a minimum," when other jurisdictions "offer
5   an accommodation, [the government] must … offer persuasive reasons why it believes
6   that it must take a different course." *Holt v. Hobbs*, 574 U.S. 352, 369 (2015). The
7   government must "explore any relevant differences between [its] … process and those
8   of other jurisdictions," and explain why it must diverge. *Ramirez*, 142 S. Ct. at 1279.

9
10   **b.    *Legal Background on Rational Basis: The government's interest must be legitimate and logically coherent***

11   A government policy will fail rational basis review if it lacks a legitimate purpose,
12   or if it is not rationally related to achieving the asserted purpose. Thus, ***first***, "[t]o
13   survive rational basis review, Defendants' disparate treatment of [religious objectors]
14   must be 'rationally related to a *legitimate state interest*.'" *Arizona Dream Act Coal. v.
15   Brewer*, 757 F.3d 1053, 1065 (9th Cir. 2014). *See United States v. Windsor*, 570 U.S. 744,
16   775 (2013) ("no legitimate purpose" inspired the federal Defense of Marriage Act).
17   The illegitimacy of the government policy can be shown directly, *Arizona Dream Act
18   Coal.*, 757 F.3d at 1067, or implicitly. *Romer v. Evans*, 517 U.S. 620, 635 (1996).

19   ***Second***, government policies also fail rational basis review if "the statute is
20   [actually] unrelated to the[] [government's] interests," *Merrifield v. Lockyer*, 547 F.3d
21   978, 986 (9th Cir. 2008), such that applying the regulation is "irrational and wholly
22   arbitrary." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564-65 (2000). This can be
23   shown where the government's justification for applying a policy to certain individuals,
24   and its justification for exempting other individuals from compliance, are inherently
25   contradictory. *Merrifield*, 547 F.3d at 988-91.

26
27   **c.    *Refusing to exempt Plaintiffs from the Parental Exclusion Policies fails any level of scrutiny***

28   Here, refusing to grant an exemption from its Parental Exclusion Policies to

Plaintiffs Mirabelli and West fails both strict scrutiny and rational basis review because: (1) EUSD has no legitimate interest in requiring their compliance; and (2) granting an exemption will further, not undermine, EUSD's legitimate interests.

***First***, EUSD's Parental Exclusion Policies fail strict scrutiny and rational basis review because EUSD does not have a *legitimate* interest (rational basis) in enforcing them, let alone a *compelling* one (strict scrutiny). To be sure, preventing harassment and bullying of transgender students is an admirable goal—but Plaintiffs solely wish to not deceive parents and provide psychological treatment to their children without their knowledge or consent. EUSD has *no legitimate interest* in violating parental rights, *see Ricard*, 2022 WL 1471372, at *8 & n.11 ("It is difficult to envision why a school would even claim—much less how a school could establish—a generalized interest in withholding or concealing from the parents of minor children, information fundamental to a child's identity, personhood, and mental and emotional well-being such as their preferred name and pronouns"), or enforcing ideological conformity among its staff. *See Janus*, 138 S. Ct. at 2473 ("[I]t is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree.").

***Second***, EUSD's refusal to grant an exemption to Plaintiffs from its Parental Exclusion Policies fails strict scrutiny because the policies are both underinclusive and overinclusive. The Parental Exclusion Policies are underinclusive because EUSD has omitted thousands of individuals from them, including administrative staff, classified staff, and students. (Compl., ¶¶135-43.) Surely, administrative staff, office staff and students could just as easily "out" a transgender student in violation of the policies.

The Parental Exclusion Policies are overinclusive because, "[r]ather than prohibiting conduct and speech amounting to actionable harassment or discrimination as those terms are legally defined," the policies prohibit all discussions with parents about a student's gender identity, without requiring that the discussion "amount to harassing or discriminatory conduct" or actually "negatively affect" any student.

*Taking Offense v. State*, 66 Cal. App. 5th 696, 720 (2021), *not depublished pending grant of review*, 498 P.3d 90 (Cal. 2021) (policy prohibiting all misgendering was overinclusive). A narrowly tailored policy would prohibit *actual harassment*. *See id.*

Separate from strict scrutiny, under the Ninth Circuit's holding in *Merrifield*, the Parental Exclusion Policies' lack of tailoring is so extreme as to preclude satisfaction of even rational basis review. In that case, individuals working in the pest-control industry had to obtain a difficult and expensive "Branch II" license to engage in the removal of "mice, rats or pigeons," even if they *only* used non-pesticide methods to remove them. *Id.* at 980-81. The government explained that, although Branch II licensure was focused on ensuring *pesticide knowledge*, applying it to non-pesticide workers served two important interests: (1) the state created a framework to monitor *all* pest-control workers; and (2) even if a worker did not use pesticides, he should know about its risks and effectiveness in order to protect himself when entering sites where pesticides were used, and in order to advise customers. *Id.* at 988.

However, the government did not require Branch II licensure if the pest-control worker only engaged in non-pesticide removal of "bats, raccoons, skunks, and squirrels." *Id.* at 988-89. Those pest-control workers had lobbied for a unique licensing category for themselves, arguing that Branch II licensure covered too large a field. But instead of creating a new license, the government decided to not license such workers at all, arguing that since such animals are only removed using non-pesticide methods, licensure was not needed. *Id.* at 989-90. The Ninth Circuit noted that this was irrational: that the rationale for *requiring* licensure of non-pesticide mice removal, and the rational for *not requiring* licensure of non-pesticide bat removal, were directly contradictory, and so failed rational basis review. *Id.* at 991.

Here, similarly, the rationale for the various exemptions to the Parental Exclusion Policies—*i.e.*, the teacher's good faith belief that individuals "have a legitimate need for the information" (Compl., ¶144; Ex. 4, p.7:16), and "inadvertent slips or honest mistakes." (*Id.*, ¶147; Ex. 4, pp.5:24-26)—entirely focuses on whether

the conduct would *actually be harassing*. Yet, EUSD refuses to extend a religious exemption because, allegedly, *all* violations of the Parental Exclusion Policies are *per se* harassing. This is simply logically impossible. EUSD "cannot hope to survive *rational* basis review by resorting to irrationality." *Merrifield*, 547 F.3d at 991 (original italics); *see also FCA,* 46 F.4th at 1099 (the interest in preventing "discrimination and exclusion is weighty," "But the School District cannot—and does not—advance its interest in [sexual orientation] non-discrimination by discriminating [on the basis of religion].").

## II.    THE OTHER INJUNCTION FACTORS FAVOR PLAINTIFFS

The remaining preliminary injunction factors are irreparable harm, balance of harms, and the public interest. All three factors tilt strongly in Plaintiffs' favor.

### A.    Plaintiffs Are Suffering Irreparable Harm Due to the Loss of their Constitutional Rights and Severe Emotional Stress

With respect to irreparable harm, the harm need not be ongoing at the time of the motion. That is the key difference between an application for a temporary restraining order and a motion for a preliminary injunction. In the latter, "the injury need not have been inflicted when application is made;" rather, a showing of "irreparable injury *before trial* is an adequate basis." *Diamontiney v. Borg*, 918 F.2d 793, 795 (9th Cir. 1990). Thus, the analysis is not whether there "is *immediate* danger," but whether the plaintiff may suffer irreparable harm before trial and a permanent injunction can be entered. *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) (original italics).

Nevertheless, Plaintiffs Mirabelli and West are currently suffering "[t]he loss of First Amendment freedoms [which], for even minimal periods of time, unquestionably constitutes irreparable injury." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *accord Ricard*, 2022 WL 1471372, at *9 ("Any deprivation of any constitutional right is an irreparable injury."); *Cross*, 2021 WL 9276274, at *5, 9 (quoting and following *Elrod* in factually similar case); *Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *8 (5th Cir. Feb. 17, 2022) (quoting and following *Elrod* in employment religious discrimination case).

1    Plaintiffs Mirabelli and West are also suffering "emotional stress, depression
2    and reduced sense of well-being," as a result of the coercive pressure to violate their
3    religious beliefs or lose their job (Compl., ¶¶174-76; Mirabelli Decl., ¶¶4-19 & Exs.33-
4    37; West Decl., ¶¶4-17 & Exs.38-43), which also constitutes irreparable injury. *Chalk v.*
5    *U.S. Dist. Ct. Cent. Dist. of California*, 840 F.2d 701, 709 (9th Cir. 1988).

6           **B.    The Public Interest and the Balance of Harms Favors Plaintiffs:**
7                  **Students Will Be Benefitted and Constitutional Rights Preserved**

8           When a party seeks a preliminary injunction against the government, the balance
9    of harms and public interest factors merge, because the government's interest is the
10   public interest. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). On
11   EUSD's side, alleged adverse consequences are irrelevant because it is always in the
12   public interest to make sure that the government is following the law. *Nat'l Fed'n of*
13   *Indep. Bus. v. Dep't of Lab.*, 142 S. Ct. 661, 666 (2022) (refusing to weigh allegation that
14   OSHA vaccine mandate "will save over 6,500 lives" because "[i]n our system of
15   government, that is the responsibility of those chosen by the people through the
16   democratic process"). But, in any event, Plaintiffs do not seek to harass or discriminate
17   against any transgender or gender diverse child—simply to be exempted from actively
18   violating the Fourteenth Amendment rights of their parents by lying to them and
19   participating in the psychological medical treatment of their children at school.

20          On Plaintiffs Mirabelli's and West's side, in a case where the plaintiffs "have
21   raised serious First Amendment questions," that "compels a finding that the balance
22   of hardships tips sharply in Plaintiffs' favor." *Am. Beverage Ass'n v. City & County of*
23   *San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019). This is because "it is always in the
24   public interest to prevent the violation of a party's constitutional rights." *Id.*; *see also,*
25   *e.g., California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018) ("Protecting religious liberty
26   and conscience is obviously in the public interest.").

27          In sum, because Plaintiffs are suffering severe irreparable injury in the form
28   having to abandon their constitutional rights to keep their jobs, and severe emotional

distress over the coercion to abandon those rights, in the absence of any actual harm that will be suffered by EUSD, the other injunction factors clearly favor Plaintiffs.

## III.   The Court Should Dispense with a Bond Requirement

Finally, the federal rules provide that a preliminary injunction may be issued only if the plaintiff posts an appropriate bond. Fed. R. Civ. P. 65(c). Even so, this Court has discretion over whether any security is required and, if so, the amount. *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). There is "long-standing precedent that requiring nominal bonds is perfectly proper in public interest litigation," especially "where requiring security would effectively deny access to judicial review." *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) (collecting cases).

Here, Plaintiffs request that the Court waive any bond requirement because enjoining EUSD from unconstitutionally enforcing its Parental Exclusion Policies in the face of First Amendment objections will not financially affect EUSD. A bond would, however, be burdensome on already burdened Plaintiffs under these circumstances. *See, e.g.*, *Bible Club v. Placentia-Yorba Linda Sch. Dist.*, 573 F. Supp. 2d 1291, 1302 n.6 (C.D. Cal. 2008) (waiving requirement of student group to post a bond where case involved "the probable violation of [the club's] First Amendment rights" and minimal damages to the District of issuing injunction); *Doctor John's, Inc. v. Sioux City*, 305 F. Supp. 2d 1022, 1043-44 (N.D. Iowa 2004) ("[R]equiring a bond to issue before enjoining potentially unconstitutional conduct by a governmental entity simply seems inappropriate, because the rights potentially impinged by the governmental entity's actions are of such gravity that protection of those rights should not be contingent upon an ability to pay.").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for a preliminary injunction in full and dispense with a bond requirement.

Respectfully submitted,

LiMANDRI & JONNA LLP

Dated: May 15, 2023          By: _____

Charles S. LiMandri
Paul M. Jonna
Jeffrey M. Trissell
Milan L. Brandon II
Attorneys for Plaintiffs

MEMORANDUM OF POINTS & AUTHORITIES ISO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION