Charles S. LiMandri, SBN 110841
 cslimandri@limandri.com
Paul M. Jonna, SBN 265389
 pjonna@limandri.com
Jeffrey M. Trissell, SBN 292480
 jtrissell@limandri.com
LiMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Telephone: (858) 759-9930
Facsimile: (858) 759-9938

Thomas Brejcha, *pro hac vice**
 tbrejcha@thomasmoresociety.org
Peter Breen, *pro hac vice**
 pbreen@thomasmorsociety.org
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680
*Application forthcoming

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ELIZABETH MIRABELLI, an individual, on behalf of herself and all others similarly situated; LORI ANN WEST, an individual, on behalf of herself and all others similarly situated; et al.,

        Plaintiffs,

  v.

MARK OLSON, in his official capacity as President of the EUSD Board of Education, et al.,

        Defendants.

Case No.: 3:23-cv-0768-BEN-VET

**Memorandum of Points & Authorities in Support of Plaintiffs' Motion for
(1) Summary Judgment on Prospective Relief Claims;
(2) Partial Summary Judgment re Liability on Damages Claims;
(3) Entry of a Rule 54(b) Separate Judgment on Prospective Relief Claims and Stay of Damages Claims; and
(4) Entry of a Class-Wide Permanent Injunction or, in the Alternative, a Class-Wide Preliminary Injunction**

Judge:       Hon. Roger T. Benitez
Courtroom:  5A
Hearing Date:  September 23, 2024
Hearing Time:  10:30 a.m.

# TABLE OF CONTENTS

INTRODUCTION .................................................................... 1

FACTUAL & PROCEDURAL BACKGROUND................................ 2

    A.    History of California's Adoption of Parental Exclusion Policies .................................................................... 2

    B.    History of California's Enforcement of Parental Exclusion Policies .................................................................... 4

    C.    The Plaintiffs: Teachers and Parents................................5

LEGAL STANDARD ................................................................ 6

ARGUMENT ......................................................................... 8

    I.    The Court Should Grant Plaintiffs Summary Judgment on their Claims for Prospective Relief ........................................ 9

        A.    Background Legal Principles: The Constitution Protects Against Government Interference with the Right to Have a Family ............................................ 9

            1.    Background on the Right to Freedom of Thought............................................................10

            2.    Background on the Right to Have a Family ................... 11

            3.    Background on the Right to Raise Your Children........................................................ 13

            4.    Background on the Right to Educate Your Children........................................................ 15

            5.    Background on the Right to Direct Healthcare of Children........................................................ 17

            6.    Background on the Rights of Minors as Against their Parents......................................19

        B.    Under the Free Exercise Clause, Both Religious Parents and Teachers Have the Right to Opt Out of Parental Exclusion Policies .................................... 20

            1.    Parental Exclusion Policies Burden Religion ................21

            2.    The Individualized Exemptions Paradigm Triggers Strict Scrutiny .................................... 22

i

|  |  | 3. | The Comparable Exceptions Trigger Strict Scrutiny ................................................................ 23 |
|  |  | 4. | The Intrusion on Parental Rights Triggers Strict Scrutiny ..................................................... 25 |
|  |  | 5. | The Intrusion on Parental Rights Cannot Satisfy Strict Scrutiny ......................................... 26 |
|  | C. | Under the First Amendment Right to Freedom of Speech, and the Fourteenth Amendment Right to Direct the Upbringing of Children, Parental Exclusion Policies Are Unconstitutional ............... 27 | |
|  |  | 1. | Gender Identity is a Matter of Public Concern ............ 28 |
|  |  | 2. | Parental Exclusion Policies Are Unnecessary for the Educational Mission: So Teachers Cannot Be Forced to Apply Them and Parents Have Not Delegated That Authority ............... 31 |
|  |  | 3. | There Is No Legitimate State Administrative or Efficiency Interest Requiring Parental Exclusion Policies ......................................................... 33 |
|  | D. | The Family Educational Rights and Privacy Act ("FERPA") Requires Parent Access to Gender Support Plans ..................................................................... 37 | |
| II. | | The Court Should Grant Plaintiffs Partial Summary Judgment on Liability for the Damages Claims Against EUSD ................................................................................... 39 | |
|  | A. | The Court Should Grant Partial Summary Judgment on Plaintiff West's Title VII Claim for Failure to Accommodate ............................................................................ 39 | |
|  | B. | The Court Should Grant Partial Summary Judgment on the Inapplicability of Sovereign Immunity as an Affirmative Defense for the EUSD Superintendent and EUSD Board of Education ................................ 42 | |
|  | C. | The Court Should Grant Partial Summary Judgment on the Inapplicability of Qualified Immunity as an Affirmative Defense for the EUSD Personal-Capacity Defendants ....................................................... 43 | |

III.   The Court Should Enter a Rule 54(b) Separate Judgment on the Prospective Relief Claims and stay the Rest of the Case ................................................................. 46

IV.   The Court Should Enter a Class-Wide Injunction on the Prospective Relief Claims ..................................................47

CONCLUSION................................................................. 50

# TABLE OF AUTHORITIES

## CASES

*303 Creative LLC v. Elenis*
    600 U.S. 570 (2023) ........................................................................ 10

*Alden v. Me.*
    527 U.S. 706 (1999) ........................................................................ 42

*Am. Acad. of Pediatrics v. Lungren*
    16 Cal. 4th 307 (1997) ..................................................................... 34

*Amoco Prod. Co. v. Vill. of Gambell*
    480 U.S. 531 (1987) ........................................................................... 7

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986) ........................................................................... 7

*Ariz. Dream Act Coal. v. Brewer*
    855 F.3d 957 (9th Cir. 2017) ....................................................... 7, 48

*Ark. v. Dep't of Educ.*
    No. 4:24-cv-636, 2024 WL 3518588 (E.D. Mo. July 24, 2024) .................. 35

*Ashcroft v. al-Kidd*
    563 U.S. 731 (2011) ........................................................................ 44

*Axson-Flynn v. Johnson*
    356 F.3d 1277 (10th Cir. 2004) ....................................................... 44

*Bacon v. Woodward*
    104 F.4th 744 (9th Cir. 2024) ......................................................... 24

*Bauer v. Kincaid*
    759 F. Supp. 575 (W.D. Mo. 1991) .................................................. 39

*Beard v. Falkenrath*
    97 F.4th 1109 (8th Cir. 2024) ......................................................... 34

*Beaver v. Federal Way*
    301 F. App'x 704 (9th Cir. 2008) .................................................... 43

*Belanger v. Madera Unified Sch. Dist.*
    963 F.2d 248 (9th Cir. 1992) .......................................................... 42

*Belanger v. Nashua Sch. Dist.*
    856 F. Supp. 40 (D.N.H. 1994) ................................................... 37, 38

# TABLE OF AUTHORITIES

*Bellotti v. Baird*
  443 U.S. 622 (1979) .............................................................. *passim*

*Berea Coll. v. Ky.*
  211 U.S. 45 (1908) ...................................................................... 11

*Blackhawk v. Penn.*
  381 F.3d 202 (3d Cir. 2004) ....................................................... 22

*Boerne v. Flores*
  521 U.S. 507 (1997) .................................................................... 26

*Boy Scouts of Am. v. Dale*
  530 U.S. 640 (2000) .................................................................... 10

*Brach v. Newsom*
  6 F.4th 904 (9th Cir. 2021) ................................................ 13, 23

*Brach v. Newsom*
  38 F.4th 6 (9th Cir. 2022) .................................................. 13, 23

*Brandt v. Rutledge*
  47 F.4th 661 (8th Cir. 2022) ...................................................... 50

*Brandt v. Griffin*
  No. 23-2681 (8th Cir. July 21, 2023) ........................................ 50

*Brekke v. Wills*
  125 Cal. App. 4th 1400 (2005) ............................................ 13, 19

*Briggs v. Eden Council for Hope & Opportunity*
  19 Cal. 4th 1106 (1999) .............................................................. 31

*Brown v. Ent. Merchs. Ass'n*
  564 U.S. 786 (2011) ................................................................ 14, 16

*Burke v. Walsh*
  No. 3:23-cv-11798, 2024 WL 3548759 (D. Mass. June 5, 2024) ............. 44, 45

*Burwell v. Hobby Lobby Stores, Inc.*
  573 U.S. 682 (2014) ................................................................ 20, 26

*C.N. v. Wolf*
  410 F. Supp. 2d 894 (C.D. Cal. 2005) ...................................... 49

*Calif. v. Azar*
  911 F.3d 558 (9th Cir. 2018) ...................................................... 48

v

# TABLE OF AUTHORITIES

*Callahan v. Woods*
    658 F.2d 679 (9th Cir. 1981) ........................................................................ 40

*Cantwell v. Conn.*
    310 U.S. 296 (1940) .................................................................................... 20

*Capitol Square Rev. & Advisory Bd. v. Pinette*
    515 U.S. 753 (1995) .................................................................................... 20

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986) ...................................................................................... 6

*Cent. Dauphin Sch. Dist. v. Hawkins*
    253 A.3d 820 (Pa. Commw. Ct. 2021) ........................................................ 38

*Cent. Dauphin Sch. Dist. v. Hawkins*
    286 A.3d 726 (Pa. 2022) ............................................................................ 38

*Chappell & Co. v. Frankel*
    367 F.2d 197 (2d Cir. 1966) .......................................................................... 8

*Charlotte-Mecklenburg Bd. of Educ. v. Disability Rts. of N.C.*
    430 F. Supp. 3d 74 (W.D.N.C. 2019) ......................................................... 39

*Church of the Lukumi Babalu Aye, Inc. v. Hialeah*
    508 U.S. 520 (1993) ............................................................................. 22, 23

*Citizens for Parental Rts. v. San Mateo Cnty. Bd. of Educ.*
    51 Cal. App. 3d 1 (1975) ........................................................................... 26

*CMAX, Inc. v. Hall*
    300 F.2d 265 (9th Cir. 1962) ...................................................................... 47

*Cnty. of Los Angeles v. Los Angeles Cnty. Emp. Rels. Comm'n*
    56 Cal. 4th 905 (2013) ......................................................................... 24, 29

*Connick v. Myers*
    461 U.S. 138 (1983) ............................................................................. 28, 29

*Coria v. Garland*
    96 F.4th 11192 (9th Cir. 2024) ................................................................... 32

*Cruzan v. Mo. Dep't of Health*
    497 U.S. 261 (1990) .................................................................................... 17

*Dahl v. W. Mich. Univ.*
    15 F.4th 728 (6th Cir. 2021) ....................................................................... 22

# TABLE OF AUTHORITIES

*Dahlia v. Rodriguez*
 735 F.3d 1060 (9th Cir. 2013) ............................................................ 41

*Dep't of State v. Muñoz*
 144 S. Ct. 1812 (2024) ....................................................................... 13

*Diaz v. Brewer*
 656 F.3d 1008 (9th Cir. 2011) ........................................................... 49

*Dobbs v. Jackson Women's Health Org.*
 597 U.S. 215 (2022) ..................................................... 9, 12, 15, 36

*Dodge v. Evergreen Sch. Dist. #114*
 56 F.4th 767 (9th Cir. 2022) .......................................... 28, 31, 33, 44

*Doe v. Heck*
 327 F.3d 492 (7th Cir. 2003) ............................................................. 12

*Doe v. Madison Metro. Sch. Dist.*
 No. 20-cv-454 (Wis. Cir. Ct., Dane Cnty., Sep. 28, 2020) ............... 27

*Doe v. San Diego Unified Sch. Dist.*
 22 F.4th 1099 (9th Cir. 2022) ........................................................... 23

*Does 1-11 v. Univ. of Colo.*
 100 F.4th 1251 (10th Cir. 2024) ................................................. 22, 40

*Edmo v. Corizon, Inc.*
 935 F.3d 757 (9th Cir. 2019) ....................................................... 36, 48

*Eknes-Tucker v. Gov. of Ala.*
 80 F.4th 1205 (11th Cir. 2023) .......................................................... 50

*Empl't Div. v. Smith*
 494 U.S. 872 (1990) ................................................................... 21, 25

*Espinoza v. Mont. Dep't of Revenue*
 591 U.S. 464 (2020) ..................................................................... 9, 25

*ESPN v. Ohio State Univ.*
 132 Ohio St. 3d 212 (2012) ............................................................... 38

*Farrington v. Tokushige*
 11 F.2d 710 (9th Cir. 1926) ......................................................... 11, 16

*Fay v. S. Colonie Cent. Sch. Dist.*
 802 F.2d 21 (2d Cir. 1986) ................................................................ 38

# TABLE OF AUTHORITIES

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*
   82 F.4th 664 (9th Cir. 2023) ....................................................... 7, 21, 22, 48

*Fields v. Palmdale Sch. Dist.*
   427 F.3d 1197 (9th Cir. 2005) ........................................................ 17

*Fields v. Palmdale Sch. Dist.*
   447 F.3d 1187 (9th Cir. 2006) ........................................................ 17, 26, 27

*Figliola v. Sch. Bd. of Harrisonburg*
   No. CL22-1304 (Va. Cir. Ct., Rockingham Cnty., Dec. 2, 2022) ................ 32

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*
   654 F.3d 989 (9th Cir. 2011) .......................................................... 8

*Foothill Church v. Watanabe*
   623 F. Supp. 3d 1079 (E.D. Cal. 2022) ........................................... 22

*Frankel v. Univ. of Calif.*
   No. 2:24-cv-4702, 2024 WL 3811250 (C.D. Cal. Aug. 13, 2024) ................ 48

*Frazier v. Fairhaven Sch. Comm.*
   276 F.3d 52 (1st Cir. 2002) ............................................................ 37

*Fulton v. Philadelphia*
   593 U.S. 522 (2021) .................................................................... 21, 22, 23, 26

*Garvin County v. Thompson*
   24 Okla. 1 (1909) ....................................................................... 16

*Gelboim v. Bank of Am. Corp.*
   574 U.S. 405 (2015) .................................................................... 46, 47

*Girouard v. United States*
   328 U.S. 61 (1946) ..................................................................... 20

*Gonzaga Univ. v. Doe*
   536 U.S. 273 (2002) .................................................................... 37, 38

*Grants Pass v. Johnson*
   144 S. Ct. 2202 (2024) ................................................................. 36

*Griswold v. Conn.*
   381 U.S. 479 (1965) .................................................................... 11

*Groff v. DeJoy*
   600 U.S. 447 (2023) .................................................................... 41, 42

# TABLE OF AUTHORITIES

*Guernsey v. Pitkin*
    32 Vt. 224 (1859) ................................................................. 16

*Hardwick v. Fruitridge Sch. Dist.*
    54 Cal. App. 696 (1921) ................................................. 16, 25

*Harlow v. Fitzgerald*
    457 U.S. 800 (1982) ............................................................ 43

*Hazelwood Sch. Dist. v. Kuhlmeier*
    484 U.S. 260 (1988) ............................................................ 32

*Health Freedom Def. Fund, Inc. v. Carvalho*
    104 F.4th 715 (9th Cir. 2024) ...................................... 18, 43

*Heller v. EBB Auto Co.*
    8 F.3d 1433 (9th Cir. 1993) .............................................. 40

*Hernandez v. Phoenix*
    43 F.4th 966 (9th Cir. 2022) ....................................... 29, 31

*Hill v. NCAA*
    7 Cal. 4th 1 (1994) ...................................................... 22, 35

*Hodgson v. Minn.*
    497 U.S. 417 (1990) ..............................................12, 19, 20

*Holt v. Hobbs*
    574 U.S. 352 (2015) ........................................................... 26

*Hope v. Pelzer*
    536 U.S. 730 (2002) ...................................................... 43, 44

*In re Antonio C.*
    83 Cal. App. 4th 1029 (2000) ........................................... 15

*In re Custody of Smith*
    137 Wash. 2d 1 (1998) ...................................................... 18

*In re Roger S.*
    19 Cal. 3d 921 (1977) ....................................................... 15

*Jacobson v. Mass.*
    197 U.S. 11 (1905) ............................................................. 17

*Janus v. AFSCME Council 31*
    585 U.S. 878 (2018) .............................................10, 11, 29, 31

ix

# TABLE OF AUTHORITIES

*Johnson v. Poway Unified Sch. Dist.*
  658 F.3d 954 (9th Cir. 2011) ........................................................ 28, 32

*Jones v. Williams*
  791 F.3d 1023 (9th Cir. 2015) ............................................................. 43

*K.L. v. Evesham Bd. of Educ.*
  423 N.J. Super. 337 (App. Div. 2011) ................................................ 38

*Kan. v. Dep't of Educ.*
  No. 5:24-cv-4041, 2024 WL 3273285 (D. Kan. July 2, 2024) ..................... 35

*Kane v. De Blasio*
  19 F.4th 152 (2d Cir. 2021) ............................................................... 22

*Keene v. San Francisco*
  No. 22-16567, 2023 WL 3451687 (9th Cir. May 15, 2023) .......................... 40

*Kelley v. Ferguson*
  95 Neb. 63 (1914) ................................................................................ 16

*Kennedy v. Bremerton Sch. Dist.*
  597 U.S. 507 (2022) ................................................................. 9, 20, 21, 32

*Kennedy v. Ridgefield*
  439 F.3d 1055 (9th Cir. 2006) ............................................................. 45

*Klein Indep. Sch. Dist. v. Mattox*
  830 F.2d 576 (5th Cir. 1987) ............................................................... 39

*Kohn v. State Bar of Calif.*
  87 F.4th 1021 (9th Cir. 2023) ............................................................. 42

*L.W. v. Skrmetti*
  83 F.4th 460 (6th Cir. 2023) ......................................................... 36, 50

*La. v. Dep't of Educ.*
  No. 3:24-cv-563, 2024 WL 2978786 (W.D. La. June 13, 2024) ................... 35

*Labrador v. Poe*
  144 S. Ct. 921 (2024) ......................................................................... 50

*Landis v. N. Am. Co.*
  299 U.S. 248 (1936) ........................................................................... 47

*Lee v. York Cnty. Sch. Div.*
  484 F.3d 687 (4th Cir. 2007) .............................................................. 32

# TABLE OF AUTHORITIES

*Leibert v. Transworld Sys., Inc.*
   32 Cal. App. 4th 1693 (1995) .................................................................. 30, 34

*Lewin v. Cooke*
   28 F. App'x 186 (4th Cir. 2002).................................................................38

*Mae M. v. Komrosky*
   No. CVSW2306224 (Cal. Super. Ct., Riverside Cnty., Feb. 23, 2024)........36

*Mahanoy Area Sch. Dist. v. B.L.*
   594 U.S. 180 (2021) ................................................................... *passim*

*Mann v. Cnty. of San Diego*
   907 F.3d 1154 (9th Cir. 2018) .......................................................... 18

*Marquez v. Cable One, Inc.*
   463 F.3d 1118 (10th Cir. 2006) ...............................................................7

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*
   584 U.S. 617 (2018)............................................................................ 49

*Matal v. Tam*
   582 U.S. 218 (2017)..............................................................................34

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
   475 U.S. 574 (1986)............................................................................. 6

*McGinnis v. U.S. Postal Serv.*
   512 F. Supp. 517 (N.D. Cal. 1980) ............................................................ 42

*Meriwether v. Hartop*
   992 F.3d 492 (6th Cir. 2021) .......................................................... 24, 30, 33

*Meyer v. Neb.*
   262 U.S. 390 (1923) ................................................................. 11, 13, 16, 25

*Miller v. Gammie*
   335 F.3d 889 (9th Cir. 2003) ...............................................................32

*Mirabelli v. Olson*
   691 F. Supp. 3d 1197 (S.D. Cal. 2023) ................................................. *passim*

*Moody v. NetChoice LLC*
   144 S. Ct. 2383 (2024) ................................................................... 9, 33

*Moore v. E. Cleveland*
   431 U.S. 494 (1977) ..............................................................................12

xi

# TABLE OF AUTHORITIES

*Morgan v. Swanson*
    659 F.3d 359 (5th Cir. 2011) .......................................................................32

*Morrow v. Wood*
    35 Wis. 59 (1874).......................................................................................16

*Muldrow v. St. Louis*
    144 S. Ct. 967 (2024) .................................................................................41

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*
    595 U.S. 109 (2022) ...................................................................................48

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*
    585 U.S. 755 (2018).......................................................................................9

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*
    597 U.S. 1 (2022) ..........................................................................................9

*Nguon v. Wolf*
    517 F. Supp. 2d 1177 (C.D. Cal. 2007)..............................................25, 34, 35

*Nken v. Holder*
    556 U.S. 418 (2009) ...................................................................................48

*Obergefell v. Hodges*
    576 U.S. 644 (2015)..........................................................................1, 12, 49

*Oliver v. Arnold*
    19 F.4th 843 (5th Cir. 2021) .......................................................................44

*Opuku-Boateng v. Calif.*
    95 F.3d 1461 (9th Cir. 1996) ......................................................................40

*Oregon Cnty. R-IV Sch. Dist. v. LeMon*
    739 S.W.2d 553 (Mo. Ct. App. 1987)............................................................39

*Owasso Indep. Sch. Dist. No. I-011 v. Falvo*
    534 U.S. 426 (2002)...................................................................................38

*Page v. Rotterdam-Mohonasen Cent. Sch. Dist.*
    441 N.Y.S.2d 323 (1981).............................................................................38

*Parents Against Abuse In Schools v. Williamsport Area Sch. Dist.*
    594 A.2d 796 (Pa. Commw. Ct. 1991)............................................................38

*Parents for Priv. v. Barr*
    949 F.3d 1210 (9th Cir. 2020) .....................................................................17

# TABLE OF AUTHORITIES

*Parham v. J.R.*
    442 U.S. 584 (1979) ............................................................... *passim*

*Passarella v. Aspirus, Inc.*
    108 F.4th 1005 (7th Cir. 2024)...................................................... 40

*People v. Chino Valley Unified Sch. Dist.*
    No. CIV SB 2317301 (Cal. Super. Ct., S.B. Cnty., Oct. 9, 2023)................ 49

*Philbrook v. Ansonia Bd. of Educ.*
    757 F.2d 476 (2d Cir. 1985) ......................................................... 40

*Pickering v. Twp. High Sch. Dist. 205*
    391 U.S. 563 (1968) ...................................................... 28, 29, 33

*Pierce v. Soc'y of Sisters*
    268 U.S. 510 (1925)................................................................ *passim*

*Planned Parenthood v. Casey*
    505 U.S. 833 (1992)................................................................. 12

*Prince v. Mass.*
    321 U.S. 158 (1944) ............................................................. 15, 19

*Radu v. Shon*
    62 F.4th 1165 (9th Cir. 2023) ....................................................... 27

*Ramirez v. Collier*
    595 U.S. 411 (2022)................................................................. 26

*Ricard v. Geary Cnty. Unified Sch. Dist. 475*
    No. 5:22-cv-4015, 2022 WL 1471372 (D. Kan. May 9, 2022) ................ 27, 45

*Riley v. Bendix Corp.*
    464 F.2d 1113 (5th Cir. 1972)....................................................... 40

*Riley's Am. Heritage Farms v. Elsasser*
    32 F.4th 707 (9th Cir. 2022)........................................................ 30

*Rim of the World Unified Sch. Dist. v. Superior Ct.*
    104 Cal. App. 4th 1393 (2002)...................................................... 38

*Rochin v. Calif.*
    342 U.S. 165 (1952) ................................................................ 18

*Roe v. San Jose Unified Sch. Dist. Bd.*
    No. 20-cv-2798, 2021 WL 292035 (N.D. Cal. Jan. 28, 2021)..................... 44

# TABLE OF AUTHORITIES

*Roman Cath. Archbishop of Wash. v. Bowser*
    531 F. Supp. 3d 22 (D.D.C. 2021) .................................................................. 24

*Roman Cath. Diocese of Brooklyn v. Cuomo*
    592 U.S. 14 (2020) ...................................................................................... 26

*Rulison v. Post*
    79 Ill. 567 (1875) ........................................................................................ 16

*S. Bay United Pentecostal Church v. Newsom*
    141 S. Ct. 716 (2021) ............................................................................ 23, 26

*Sambrano v. United Airlines, Inc.*
    No. 21-11159, 2022 WL 486610 (5th Cir. Feb. 17, 2022) ............................ 48

*San Diego v. Roe*
    543 U.S. 77 (2004) ................................................................................ 29, 30

*Saucier v. Katz*
    533 U.S. 194 (2001) .................................................................................... 43

*Schall v. Martin*
    467 U.S. 253 (1984) .................................................................................... 18

*SEC v. Stein*
    906 F.3d 823 (9th Cir. 2018) ........................................................................ 7

*Sherbert v. Verner*
    374 U.S. 398 (1963) ................................................................................ 21, 22

*Sipple v. Chron. Publ'g Co.*
    154 Cal. App. 3d 1040 (1984) ............................................................ 30, 31, 34

*Skinner v. Okla.*
    316 U.S. 535 (1942) .................................................................................... 12

*Snyder v. Phelps*
    562 U.S. 443 (2011) ...................................................... 10, 11, 28, 29, 30, 31

*Soc'y of Sisters v. Pierce*
    296 F. 928 (D. Or. 1924) ............................................................................ 12

*Stormans, Inc. v. Wiesman*
    794 F.3d 1064 (9th Cir. 2015) ..................................................................... 23

*T.F. v. Kettle Moraine Sch. Dist.*
    No. 21-cv-1650 (Wis. Cir. Ct., Waukesha Cnty., Oct. 3, 2023) ..................... 27

Memo. of Points & Authorities ISO Plaintiffs'
Motion for Summary Judgment or a Preliminary Injunction

# TABLE OF AUTHORITIES

*Tandon v. Newsom*
    593 U.S. 61 (2021) ................................................................................... 21, 23

*Tatel v. Mt. Lebanon Sch. Dist.*
    637 F. Supp. 3d 295 (W.D. Pa. 2022) ........................................................ 17

*Tatel v. Mt. Lebanon Sch. Dist.*
    675 F. Supp. 3d 551 (W.D. Pa. 2023) ........................................ 17, 43, 45, 46

*Tenn. v. Cardona*
    No. 2:24-cv-72, 2024 WL 3019146 (E.D. Ky. June 17, 2024) ...................... 27

*Tex. v. Cardona*
    No. 4:23-cv-604, 2024 WL 3658767 (N.D. Tex. Aug. 5, 2024) .................. 35

*The Presbyterian Church (U.S.A.) v. United States*
    870 F.2d 518 (9th Cir. 1989) ..................................................................... 43

*Thomas v. Review Bd. of Ind.*
    450 U.S. 707 (1981) ............................................................................ 21, 40

*Tinker v. Des Moines Sch. Dist.*
    393 U.S. 503 (1969) ............................................................................ 16, 17

*Town of Greece v. Galloway*
    572 U.S. 565 (2014) ..................................................................................... 9

*Trinity Lutheran Church of Columbia, Inc. v. Comer*
    582 U.S. 449 (2017) ................................................................................... 21

*Troxel v. Granville*
    530 U.S. 57 (2000) ............................................................... 13, 15, 18, 19, 45

*Ulrich v. San Francisco*
    308 F.3d 968 (9th Cir. 2002) ..................................................................... 29

*United States v. Lanier*
    520 U.S. 259 (1997) ................................................................................... 44

*United States v. Olsen*
    21 F.4th 1036 (9th Cir. 2022) .................................................................... 23

*United States v. Rahimi*
    144 S. Ct. 1889 (2024) ........................................................................... 9, 10

*United States v. Schwimmer*
    279 U.S. 644 (1929) ................................................................................... 34

# TABLE OF AUTHORITIES

*United States v. Ward*
989 F.2d 1015 (9th Cir. 1992) ..................................................................... 40

*Vlaming v. W. Point Sch. Bd.*
302 Va. 504 (2023)................................................. 2, 11, 31, 32, 33

*Vo v. Garden Grove*
115 Cal. App. 4th 425 (2004)................................................. 30, 34

*Vollmar v. Stanley*
81 Colo. 276 (1927) ................................................................. 16

*W. Va. State Bd. of Educ. v. Barnette*
319 U.S. 624 (1943) ........................................................... 11, 16

*Wallis v. Spencer*
202 F.3d 1126 (9th Cir. 2000) ........................................... 18

*Waln v. Dysart Sch. Dist.*
54 F.4th 1152 (9th Cir. 2022) ........................................... 23

*Wash. v. Glucksberg*
521 U.S. 702 (1997) ...................................................... 17, 18

*Willey v. Sweetwater Cnty. Sch. Dist. No. 1*
680 F. Supp. 3d 1250 (D. Wyo. 2023) ............................. 27

*Williams v. Horvath*
16 Cal. 3d 834 (1976) ...................................................... 46

*Winter v. Nat. Res. Def. Council*
555 U.S. 7 (2008) ........................................................... 7

*Wis. v. Yoder*
406 U.S. 205 (1972) .......................................... *passim*

*Wood v. Strickland*
420 U.S. 308 (1975) ...................................................... 43

*Wooley v. Maynard*
430 U.S. 705 (1977)................................................... 10, 11

*Words of Faith Fellowship, Inc. v. Rutherford Cnty. Dep't of Soc. Servs.*
329 F. Supp. 2d 675 (W.D.N.C. 2004)............................ 46

*XPandOrtho, Inc. v. Zimmer Biomet Holdings, Inc.*
No. 3:21-cv-105, 2021 WL 6064036 (S.D. Cal. Dec. 22, 2021) ................ 47

# TABLE OF AUTHORITIES

*Zablocki v. Redhail*
   434 U.S. 374 (1978) ..................................................................... 12

*Zepeda v. INS*
   753 F.2d 719 (9th Cir. 1983) ...................................................... 48

## STATUTES, REGULATIONS, RULES, & CONST. PROVISIONS

20 U.S.C. § 1232g ........................................................................ 37

20 U.S.C. § 1232g(a)(1)(A) ......................................................... 38

20 U.S.C. § 1232g(a)(2) ............................................................... 38

20 U.S.C. § 1232g(a)(4)(A) ......................................................... 37

20 U.S.C. § 1232g(a)(4)(B) ......................................................... 37

20 U.S.C. § 1232g(a)(5)(B) ......................................................... 38

20 U.S.C. § 1232g(e) ................................................................... 38

34 C.F.R. § 99 .............................................................................. 37

34 C.F.R. § 99.7 ........................................................................... 38

34 C.F.R. § 99.37 ......................................................................... 38

34 C.F.R. §§ 99.10-99.12 ............................................................ 38

34 C.F.R. §§ 99.20-99.22 ............................................................ 38

42 U.S.C. § 2000e(j) .................................................................... 40

42 U.S.C. § 2000e-2(a)(1) ........................................................... 40

42 U.S.C. § 1983 ................................................................. *passim*

Cal. Const. art. I, § 1 ..................................................................... 3

Cal. Educ. Code § 220.1 ................................................................ 5

Cal. Educ. Code § 220.3 ................................................................ 5

Cal. Educ. Code § 220.5 ................................................................ 5

Cal. Educ. Code § 221.5(f) ............................................................ 3

Cal. Educ. Code § 49091.12(a) .................................................... 24

Cal. Educ. Code § 51100 ............................................................. 24

1  Cal. Educ. Code § 51101 ................................................................. 45

2  Cal. Educ. Code § 51101(a)(1) .................................................... 24, 25

3  Cal. Educ. Code § 51101(a)(3) ........................................................ 25

4  Cal. Educ. Code § 51101(a)(10) ...................................................... 25

5  Cal. Gov. Code § 825 ...................................................................... 46

6  Cal. Stats. 2013, ch. 85 (AB 1266) ................................................... 3

7  Cal. Stats. 2024, ch. 95 (AB 1955) ................................................... 5

8  Fed. R. Civ. P. 54(b) .......................................................... 46, 47, 50

9  Fed. R. Civ. P. 56(d) ......................................................................... 7

10  U.S. Const. amend. XIV, § 1 ......................................................... 11

11

## OTHER AUTHORITIES

13  120 Cong. Rec. 39,858-59 (1974) .................................................... 37

14  120 Cong. Rec. 39,862 (1974) ......................................................... 37

15  Assem. Bill 1266, 2013-2014 Reg. Sess. (Cal. Feb. 22, 2013) ................. 2

16  Benjamin Franklin, *On Freedom of Speech and the Press*,
17        Pa. Gazette (Nov. 17, 1737) .................................................. 10

18  *Deuteronomy* 5:16 ......................................................................... 14

19  *Ephesians* 6:1-4 ............................................................................ 14

20  *Exodus* 20:12 ............................................................................... 14

21  James Kent, Commentaries on American Law (1826) ........................... 15

22  John Locke, Concerning Civil Government, Second Essay (1689) ........ 13, 14

23  Letter from George Washington to Officers of the Army (Mar. 15, 1783) ....... 10

24  Nicholas Trott Long, *Privacy in the World of Education: What Hath
          James Buckley Wrought?*, 46 R.I.B.J. 9 (Feb. 1998) ....................... 37

25  Patrick Parkinson, *Gender Identity Discrimination and Religious Freedom*
26        38 J.L. & Religion 10, 30 (2023) ........................................... 33

27  Thomas Aquinas, Summa Theologiae, II-II, Q. 10, art. 12 ...................... 14

28  William Blackstone, Commentaries on the Laws of England (1765) .......... 15

# INTRODUCTION

Relying on the "autonomy" privacy right of children to make decisions that "implicate … control over their personal bodily integrity, [and] serious long-term consequences in determining their life choices," both the California Attorney General ("AG") and the California Department of Education ("CDE") have asserted that "schools are required to respect the limitations that a student places on the disclosure of their transgender status, including not sharing that information with the student's parents." *See* Ex.27, p.23:24-27; Ex.20, p.5 (cleaned up).[1] As a result, school districts statewide have adopted "Parental Exclusion Policies"—i.e., a policy requiring schools to socially transition a child to the opposite gender without informing the child's parents—most often based on a model policy promoted by the CDE. *See* Exs.11-12, Exs.17-18; Ex.20. Yet, as noted by this Court last year, "elevating a child's gender-related choices to that of paramount importance, while excluding a parent from knowing of, or participating in, that kind of choice, is as foreign to federal constitutional and statutory law as it is medically unwise." *Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1212 (S.D. Cal. 2023).

As explained below, at its core, this case is about the "varied rights as a unified whole" that make up the *right to have a family*: the right to "marry, establish a home and bring up children." *Obergefell v. Hodges*, 576 U.S. 644, 668 (2015). Parental control over decisionmaking for a minor child is a core aspect of this right, *for both the parent and the child*, because "parental authority" is crucial "to the child's chances for the full growth and maturity that make eventual participation in a free society meaningful and rewarding." *Bellotti v. Baird*, 443 U.S. 622, 638-39 (1979) (plurality). Somehow California has forgotten that fundamental right, claimed California children as "the mere creature of the state," *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925), and has

---

[1] Exhibits are attached to the Appendices of Evidence. Secondary authorities and unreported trial court decisions are attached to the Appendix of Authorities. Certain declarations are attached to the Appendix of Previously Submitted Declarations.

unconstitutionally claimed the right "to declare by ipse dixit that controversial ideas are now uncontroversial." *Vlaming v. W. Point Sch. Bd.*, 302 Va. 504, 569 (2023).

This Court's preliminary decision remains as correct today as it was last year. California is unashamedly causing "a trifecta of harm" to thousands of parents, children, and teachers. *Mirabelli*, 691 F. Supp. 3d at 1222. Thus, Plaintiffs—a coalition of teachers and parents—have just filed a motion for class certification. Now, concurrent with that motion, Plaintiffs respectfully move for: (1) summary judgment on all Plaintiffs' 42 U.S.C. § 1983 prospective relief only claims; (2) partial summary judgment as to liability (not damages) on Plaintiffs Mirabelli's and West's 42 U.S.C. § 1983 damages claims and on Plaintiff West's Title VII failure to accommodate claim; (3) entry of a Rule 54(b) Separate Judgment and a class-wide permanent injunction as to the claims seeking solely prospective relief; and (4) in the alternative, a class-wide preliminary injunction as to those claims. Before more damage is caused, this Court should enjoin, either preliminary or permanently, California's unconstitutional activity.

## FACTUAL & PROCEDURAL BACKGROUND

### A. History of California's Adoption of Parental Exclusion Policies

On February 22, 2013, the California Legislature introduced AB 1266, a bill stating that "[a] pupil shall be permitted to participate in sex-segregated school programs and activities, including athletic teams and competitions, and use facilities consistent with his or her gender identity, irrespective of the gender listed on the pupil's records." Assem. Bill 1266, 2013-2014 Reg. Sess. (Cal. Feb. 22, 2013). That same month, individuals from the National Center for Lesbian Rights ("NCLR"), the Gay-Straight Alliance (later renamed the Genders-Sexualities Alliance), and Equality California, met with CDE officials because they wanted the CDE to issue an updated Gender Identity Legal Advisory to replace a prior 2004 one. Exs.1, 2.

On March 18, 2013, the NCLR sent the CDE a draft legal advisory and model policy regarding gender identity. Ex.3. In order to adequately replace the 2004 legal advisory, the NCLR's draft legal advisory surveyed the breadth of law concerning

students presenting as gender incongruent. As relevant here, the draft legal advisory stated that, in light of a child's privacy rights in "medical information" under Cal. Const. art. I, § 1, "schools are required to respect the limitations that a student places on the disclosure of their transgender status, including not sharing that information with the student's parents." Ex.3, p.165. The NCLR's draft model policy included similar language, stating that "school personnel should not disclose a student's transgender status … to others, including, but not limited to … parents …, unless legally required to, the student has authorized such disclosure, or there is a specific and compelling 'need to know.'" Ex.3, p.171.

In August 2013, AB 1266 was signed into law, *see* Cal. Stats. 2013, ch. 85 (AB 1266) (eff. Jan. 1, 2014) (amending Cal. Educ. Code § 221.5(f)), and the CDE began in earnest to review the NCLR's draft legal advisory. Ex.4. The draft was ultimately divided into two parts: a Legal Advisory and a Frequently Asked Questions page, and published by the CDE on January 29, 2016. Ex.5, Interrog. 1; Ex.6, Amend. Interrog. 3; *see* Ex.7, 2016 Legal Advisory; Ex.8, 2016 FAQ Page. At the same time, the FAQ page linked to the California School Boards Association's ("CSBA") 2014 Final Guidance on AB 1266, Model BP 5145.3, Model AR 5145.3, and Policy Brief on Transgender Rights. *See* Exs.9-12. Both the Policy Brief and the Model AR 5145.3 stated that a child's gender transition should not be revealed to the child's parents. *See* Exs.10, 12.

In or around August 2020, EUSD Superintendent Luis Rankins-Ibarra received an updated version of AR 5145.3 from the CSBA, and decided to accept the CSBA's recommendation to use the new guidance. Ex.14, #1, 3, 4, 5; Ex.16, #3. This was the first time that EUSD had updated AR 5145.3 to include the CDE's and CSBA's guidance regarding the privacy rights of gender incongruent students. Ex.14, #2; Ex.15, #5; Ex.16, #18, 19, 25. Believing this guidance was mandatory, Superintendent Rankins-Ibarra adopted it. Ex.15, #7-9, 12-13, 17-19; Ex.16, #7, 10, 11-15. This version of AR 5145.3 was adopted solely on the authority of the Superintendent; the Board did not consider it. Ex.14, #5; Ex.15, #1-4; Ex.16, #2, 5. The new AR 5145.3 provided that a

student's gender transitioning is "the student's private information" that cannot be revealed to "parents/guardians" absent exigent circumstances. Ex.17, p.18. It was later explained to staff in a district-wide staff training. Ex.18.

In October 2022, the CSBA published updated guidance on the rights of students to engage in a gender transition. Ex.19. That guidance stated that

> A student's decision to inform the LEA [school district] that their gender identity differs from their assigned sex at birth is extremely personal and private. At the same time, the decision may potentially involve very public components if, for example, the student starts to go by a different name. Despite this potential for public awareness, LEAs are required to, with rare exceptions, respect the limitations that a student places on the disclosure of the student's transgender status and consider the student's privacy rights and safety associated with this information, including not sharing that information with the student's parents except with the student's authorization. Ex.19, p.6.

On March 14, 2023, the CDE updated its FAQ page to replace the link to the CSBA's 2014 guidance, with a link to the CSBA's 2022 guidance and current model policies. Ex.20. And in June 2023, AG Bonta created a "State of Pride" page on the California Department of Justice website to highlight the actions he is taking for the LGBTQ community. That page included a "Know Your Rights" section which states that "Your school, whether public or private, doesn't have the right to 'out' you as LGBTQ+ to anyone without your permission, including your parents." Ex.21.

**B. History of California's Enforcement of Parental Exclusion Policies**

On July 20, 2023, the Chino Valley Unified School District ("CVUSD") considered whether to adopt BP 5020.1, a Parental Notification Policy requiring school officials to notify a child's parents anytime a child "asks to be identified or treated as a gender 'other than the student's biological sex or gender listed on the student's birth certificate or any other official records.'" Ex.22, Ex.23. On that same day, AG Bonta sent the CVUSD Board a letter advising them that BP 5020.1 likely violated California law. Ex.24. But the Board adopted the policy anyway. Ex.20. The next day, July 21, 2023, the CDE issued a press release stating that "[w]hat CVUSD has done may be in

violation of state law. We will be working closely with the State Attorney General's office to verify and enforce California law." Ex.25.

Shortly thereafter, AG Bonta sued CVUSD, alleging that BP 5020.1 violated both equal protection principles (both constitutional and statutory), and the Privacy Clause of the California Constitution. He also immediately applied for a temporary restraining order. Ex.26; Ex.27. In his briefing, analogizing to reproductive rights, AG Bonta explained that minors have "autonomy" privacy rights in their gender identity because "[a] student's gender identity will … implicate the student's control over their personal bodily integrity, [and] serious long-term consequences in determining their life choices…." Ex.27, p.23:24-27 (cleaned up). Similarly, on September 6, 2023, the Rocklin Unified School District ("RUSD") adopted a Parental Notification Policy. The next day, a teacher filed an administrative complaint with the CDE. After conducting an investigation, the CDE issued a Final Investigation Report in which it ordered RUSD to rescind its policy as a violation of student privacy rights. When RUSD refused to comply, the CDE filed suit. Ex.28.

Lastly, in July 2024, California enacted a new statute creating Education Code sections which state that (1) teachers "shall not be required to disclose any information related to a pupil's … gender identity … to any other person without the pupil's consent unless otherwise required by state or federal law"; and (2) school districts "shall not enact or enforce any policy … that would require an employee or a contractor to disclose any information related to a pupil's … gender identity … to any other person without the pupil's consent, unless otherwise required by state or federal law." As stated in the statute, each of these clarifications "does not constitute a change in, but is declaratory of, existing law." *See* Ex.29, Cal. Stats. 2024, ch. 95 (creating Cal. Educ. Code §§ 220.1, 220.3, 220.5); *see also* Ex.31, Thurmond Press Release.

**C. The Plaintiffs: Teachers and Parents**

The Plaintiffs are a coalition of teachers and parents seeking class-wide injunctive relief on behalf of all teachers and parents. Plaintiffs Jane Boe and Jane Roe

are both full-time teachers employed by the Escondido Union School District ("EUSD"). Plaintiff Lori Ann West is a retired EUSD teacher and current substitute teacher for school districts throughout San Diego County. Plaintiff Elizabeth Mirabelli is an EUSD teacher currently on medical leave. As Christians and Catholics, all have moral/ideological and religious objections to California's Parental Exclusion Policies. Mirabelli Decl., ¶¶5-12; West Decl., ¶¶6-8; Boe Decl., ¶¶2-6; Roe Decl., ¶¶2-7.

Plaintiffs Mr. and Mrs. Poe, as well as Mr. and Mrs. Doe, are parents of gender incongruent students attending California public schools. Their daughters have begun identifying as boys and have used male pronouns and a male preferred name at school. All four parents have found their school districts directly lying to them about their child's gender presentation based on directives from the CDE. All four parents, as Christians and Catholics, have moral/ideological and religious objections to California's Parental Exclusion Policies. Poe Decls., ¶¶1-15; Doe Decls., ¶¶1-28.

### LEGAL STANDARD

Summary judgment should be granted "if the "movant show(s) that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Partial summary judgment is appropriate where no genuine issue of material fact exists regarding a part of a party's claim. *See id.* Parties can move for partial summary judgment on any part of their claims. The purpose of partial summary judgment is "to avoid a useless trial of facts and issues over which there was really never any controversy and which would tend to confuse and complicate a lawsuit." *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, the burden shifts to the person opposing the motion to controvert that showing "with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A dispute about a material fact is "genuine" if the nonmovant presents

evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[M]erely colorable" evidence or evidence that is not sufficiently probative does not create a genuine dispute of material fact. *Id.* at 249-50. "When filing a Motion for Summary Judgment and/or Adjudication, the parties need not file a separate statement of material facts absent prior leave of the court." ECF 108, Scheduling Order, at 5:9-10. "[A] party may file a motion for summary judgment at any time." Fed. R. Civ. P. 56(b). Thus, "no answer need be filed before a … motion for summary judgment may be entertained." *Marquez v. Cable One, Inc.*, 463 F.3d 1118, 1120 (10th Cir. 2006).[2]

Plaintiffs seeking a preliminary injunction must establish (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm without injunctive relief, (3) that the balance of harms tips in their favor, and (4) that a preliminary injunction is in the public interest. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 683-84 (9th Cir. 2023) ("*FCA*") (en banc) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). The Ninth Circuit applies a "sliding scale" approach such that "[w]hen the balance of equities tips sharply in the plaintiff's favor, the plaintiff must raise only serious questions on the merits—a lesser showing than likelihood of success." *Id.* (cleaned up).

"The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987); *see also Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 977 (9th Cir. 2017). Thus, cases applying either one apply with "equal force" to the other.

---

[2] However, the opposing party may request a continuance of the hearing to engage in discovery. Fed. R. Civ. P. 56(d). Such a request "must identify by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment." *SEC v. Stein*, 906 F.3d 823, 833 (9th Cir. 2018) (cleaned up). "The facts sought must be 'essential' to the party's opposition to summary judgment, Fed. R. Civ. P. 56(d), and it must be 'likely' that those facts will be discovered during further discovery." *Id.*

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 996 (9th Cir. 2011). Because of the analytical overlap between the two, "[i]f in a particular case a motion for summary judgment is, on the facts, denied, but there remains a need for relief during the pendency of the litigation, a preliminary injunction may nevertheless be obtained." *Chappell & Co. v. Frankel*, 367 F.2d 197, 203 & n.13 (2d Cir. 1966). "Both motions can be made simultaneously, but in the alternative." *Id.* at 203 n.13.

## ARGUMENT

The Second Amended Complaint contains class claims on behalf of teachers and parents, substantively concerning Substantive Due Process, Free Exercise of Religion, Free Speech, the Family Educational Rights and Privacy Act, and Title VII. However, these claims significantly overlap. Below, in Section I, Plaintiffs request summary judgment on their 42 U.S.C. § 1983 prospective relief only claims against the official-capacity defendants: all Plaintiffs' claims against the AG, the State Superintendent, the State Board of Education, and Plaintiffs Boe's and Roe's claims against the EUSD Superintendent and the EUSD Board.

Next, in Section II, Plaintiffs request partial summary judgment regarding liability with respect to Plaintiffs Mirabelli's and West's damages claims—Plaintiff West's Title VII claim for failure to accommodate (against EUSD itself), and Plaintiffs' 42 U.S.C. § 1983 damages claims against various EUSD personnel. Liability on these claims significantly overlaps with the analysis in Section I.

In Section III, Plaintiffs request entry of an injunction. If the Court grants Plaintiffs' request for a Rule 54(b) judgment on the claims in Section I, then a permanent injunction is warranted. If, however, the Court believes that a factual issue must be tried, then entry of a preliminary injunction is still warranted. Lastly, in Section IV, Plaintiffs request that the Court sever the claims for prospective relief, enter an appealable Rule 54(b) Separate Judgment, and stay the rest of the case pending that appeal. This is the most efficient path forward to have the important issues in this case addressed definitively by the Ninth Circuit.

# I. THE COURT SHOULD GRANT PLAINTIFFS SUMMARY JUDGMENT ON THEIR CLAIMS FOR PROSPECTIVE RELIEF

As stated above, Plaintiffs' class claims for prospective relief concern Substantive Due Process, Free Exercise of Religion, Free Speech, and FERPA. Below, in Section I.A, Plaintiffs first provide an overview of the relevant legal principles. Then, in Section I.B, Plaintiffs address the Free Exercise claims: Claims 2 and 3 (teachers) and Claims 6 and 8 (parents). In Section I.C, Plaintiffs address the Free Speech and Substantive Due Process claims: Claim 1 (teachers) and Claim 7 (parents). Lastly, in Section I.D, Plaintiffs address FERPA.

## A. Background Legal Principles: The Constitution Protects Against Government Interference with the Right to Have a Family

Across the board, the Supreme Court has recently re-focused all constitutional inquiries towards a history and tradition analysis. *See, e.g.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 768 (2018); *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2393 (2024) (Free Speech Clause); *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 482 (2020); *Wis. v. Yoder*, 406 U.S. 205, 227 (1972) (Free Exercise Clause); *Town of Greece v. Galloway*, 572 U.S. 565, 575-77 (2014); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535-36 (2022) (Establishment Clause); *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022); *United States v. Rahimi*, 144 S. Ct. 1889, 1896-97 (2024) (Right to Bear Arms); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 240 (2022) (Substantive Due Process).

Under this analogical reasoning, the Court looks at whether the "challenged regulation is consistent with the principles that underpin our regulatory tradition," by examining "*[w]hy and how* the regulation burdens the right." *Rahimi*, 144 S. Ct. at 1898 (emphasis added). Thus, if founding era laws burdened constitutional rights "to address *particular problems*," contemporary laws addressing similar problems will likely be permissible, i.e., "the why." *Id.* (emphasis added). But, even if the reason is permissible, the law may be impermissible if it burdens the constitutional right "to *an*

1   *extent beyond* what was done at the founding," i.e., "the how." *Id.* (emphasis added). As

2   applied here, legal precedents going back all the way to the founding make clear that

3   both the "why" and "how" of Parental Exclusion Policies are unconstitutional.

### 1. Background on the Right to Freedom of Thought

5      "The Free Speech Clause of the First Amendment ... protect[s] the 'freedom to

6   think as you will and to speak as you think.'" *303 Creative LLC v. Elenis*, 600 U.S. 570,

7   584 (2023) (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660-61 (2000)). Further,

8   "freedom of speech 'includes both the right to speak freely and the right to refrain

9   from speaking at all.'" *Janus v. AFSCME, Council 31*, 585 U.S. 878, 892 (2018)

10   (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)). "The framers ... [saw] freedom

11   of speech both as an end and as a means. An end because the freedom to think and

12   speak is among our inalienable human rights. A means because the freedom of thought

13   and speech is indispensable to the discovery and spread of political truth." *303*

14   *Creative*, 600 U.S. at 584-85 (cleaned up). Thus, "speech concerning public affairs is

15   more than self-expression; it is the essence of self-government." *Snyder v. Phelps*, 562

16   U.S. 443, 452 (2011).

17      As stated by General George Washington, "if Men are to be precluded from

18   offering their sentiments on a matter, which may involve the most serious and alarming

19   consequences, that can invite the consideration of Mankind; reason is of no use to us—

20   the freedom of Speech may be taken away—and, dumb & silent we may be led, like

21   sheep, to the Slaughter." Letter from George Washington to Officers of the Army

22   (Mar. 15, 1783). Or as stated by Benjamin Franklin, "Freedom of speech is a principal

23   pillar of a free government; when this support is taken away, the constitution of a free

24   society is dissolved, and tyranny is erected on its ruins." Benjamin Franklin, *On*

25   *Freedom of Speech and the Press*, Pa. Gazette (Nov. 17, 1737).

26      In light of this strong protection for freedom of thought, "[i]f there is any fixed

27   star in our constitutional constellation, it is that no official, high or petty, can prescribe

28   what shall be orthodox in politics, nationalism, religion, or other matters of opinion or

1   force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v.*
2   *Barnette*, 319 U.S. 624, 642 (1943). "Indeed, affirmative sponsorship of particular
3   ethical, religious, or political beliefs is something we expect the State not to attempt in
4   a society constitutionally committed to the ideal of individual liberty and freedom of
5   choice." *Bellotti*, 443 U.S. at 638 (plurality).

6       The government's role is primarily teaching "future generations [to] understand
7   the workings in practice of the well-known aphorism, 'I disapprove of what you say, but
8   I will defend to the death your right to say it.'" *Mahanoy Area Sch. Dist. v. B.L.*, 594
9   U.S. 180, 190 (2021). Thus, a governmental "system which secures the right to
10  proselytize religious, political, and ideological causes must also guarantee the
11  concomitant right to decline to foster such concepts." *Vlaming*, 302 Va. at 565 (quoting
12  *Wooley*, 430 U.S. at 714). If certain speech "can be fairly considered as relating to any
13  matter of political, social, or other concern to the community, or when it is a subject of
14  legitimate news interest; that is, a subject of general interest and of value and concern
15  to the public," it cannot be restricted by the government. *Snyder*, 562 U.S. at 453
16  (cleaned up); *accord Janus*, 585 U.S. at 913-14.

17       **2. Background on the Right to Have a Family**

18       Under the Fourteenth Amendment, "[n]o State shall … deprive any person of
19  life, *liberty*, or property, without due process of law." U.S. Const. amend. XIV, §1
20  (emphasis added). "[T]he Framers of the Constitution believed that there are
21  additional fundamental rights, protected from governmental infringement, which exist
22  alongside those fundamental rights specifically mentioned." *Griswold v. Conn.*, 381 U.S.
23  479, 488 (1965) (Goldberg, J., concurring). As the Ninth Circuit recognized a hundred
24  years ago, some rights are simply "given by the Almighty for beneficent purposes."
25  *Farrington v. Tokushige*, 11 F.2d 710, 713 (9th Cir. 1926) (quoting *Berea Coll. v. Ky.*, 211
26  U.S. 45, 67 (1908) (Harlan, J., dissenting)).

27       Under this protection of liberty, every American has the right "to marry,
28  establish a home and bring up children." *Meyer v. Neb.*, 262 U.S. 390, 399 (1923).

"Marriage and procreation are fundamental to the very existence and survival of the race" and thus "one of the basic civil rights of man." *Skinner v. Okla.*, 316 U.S. 535, 541 (1942). Because this constellation of rights complement each other, "[t]he [Supreme] Court has recognized these connections by describing the varied rights as a unified whole: '[T]he right to 'marry, establish a home and bring up children' is a central part of the liberty protected by the Due Process Clause.'" *Obergefell*, 576 U.S. at 668 (quoting *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978)) (original alterations).[3]

Strong protection of these rights is important because "evil or reckless hands" may wish to restrict them for the purpose of "caus[ing] … types which are inimical to the dominant group to wither and disappear." *Skinner*, 316 U.S. at 541. The "fundamental theory of liberty" thus "excludes any general power of the state to standardize its children," *Pierce*, 268 U.S. at 535, or to standardize "family patterns," *Moore v. E. Cleveland*, 431 U.S. 494, 506 (1977) (plurality), or to standardize family "communication" dynamics. *Hodgson v. Minn.*, 497 U.S. 417, 452 (1990) (plurality). While the desire for "a homogeneous people" is understandable, it cannot come at the expense of parents' "natural and inherent right to the nurture, control, and tutorship of their offspring, that they may be brought up according to the parents' conception of what is right and just, decent, and respectable, and manly and noble in life." *Soc'y of Sisters v. Pierce*, 296 F. 928, 936-38 (D. Or. 1924), *aff'd*, 268 U.S. 510 (1925). "Beliefs about such matters [as the meaning of existence] could not define the attributes of personhood were they formed under compulsion of the State." *Planned Parenthood v. Casey*, 505 U.S. 833, 851 (1992).

The Supreme Court has not definitively decided what standard of review applies to the right to raise children. *See, e.g.*, *Doe v. Heck*, 327 F.3d 492, 519 (7th Cir. 2003). But it has stated more generally that "[w]hen a fundamental right is at stake, the

---

[3] In its most recent major discussion of these rights, the Court reaffirmed them, stating that "our conclusion … does not undermine them in any way" since they did not concern "the critical moral question posed by" "what the law at issue in this case regards as the life of an 'unborn human being.'" *Dobbs*, 597 U.S. at 256-57.

Government can act only by narrowly tailored means that serve a compelling state interest," i.e., "strict scrutiny." *Dep't of State v. Muñoz*, 144 S. Ct. 1812, 1821-22 (2024). And the Court has characterized "the interest of parents in the care, custody, and control of their children" as "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality); *see id.* at 80 (Thomas, J., concurring) (stating that court ignored standard of review, but that appropriate standard is strict scrutiny); *see also Brach v. Newsom*, 6 F.4th 904, 931 (9th Cir. 2021) (applying strict scrutiny), *vacated as moot on reh'g en banc*, 38 F.4th 6 (9th Cir. 2022).

### 3. Background on the Right to Raise Your Children

A necessary corollary of the right to have a family is that parents have "the right of control" over their children. *Meyer*, 262 U.S. at 400. "Not only do parents have a constitutional right to exercise lawful control over the activities of their minor children, the law requires parents to do so." *Brekke v. Wills*, 125 Cal. App. 4th 1400, 1410 (2005). Fifty years ago, summarizing its conclusion from fifty years before then, the Supreme Court explained that "[t]he history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established *beyond debate* as an enduring American tradition." *Yoder*, 406 U.S. at 232 (emphasis added) (citing *Meyer*, 262 U.S. 390).

As recognized by the Supreme Court, the historical understanding of parental authority extends back to the beginning of Western civilization. Three hundred years ago, in a treatise that would inspire the founding of the United States, John Locke held:

> Children, I confess, are not born in this full state of equality, though they are born to it. Their parents have a sort of rule and jurisdiction over them when they come into the world, and for some time after, but it is but a temporary one. The bonds of this subjection are like the swaddling clothes they are wrapt up in and supported by in the weakness of their infancy. Age and reason as they grow up loosen them till at length they drop quite off, and leave a man at his own free disposal.

John Locke, Concerning Civil Government, Second Essay, § 55 (1689). The Supreme Court has often recognized that Locke's writings inspired America's founding principles. This applies especially in the context of parental rights: "In general, the most popular books in the Colonies on the eve of the American Revolution were not political discourses but ones concerned with child rearing." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 825 (2011) (Thomas, J., dissenting).

But, of course, Locke was not the originator of these ideas. Before him, in the thirteenth century, Thomas Aquinas wrote: "[A] child is by nature part of its father. Thus, at first, it is not distinct from its parents as to its body, so long as it is enfolded within its mother's womb; and later on after birth, and before it has the use of its free choice, it is enfolded in the care of its parents, which is like a spiritual womb." Thomas Aquinas, Summa Theologiae, II-II, Q. 10, art. 12. "Hence, it would be contrary to natural justice, if a child, before coming to the use of reason, were to be taken away from its parents' custody, or anything done to it against its parents' wishes." *Id.*

And in the first century, the Apostle Paul famously summarized the Commandments provided by God to the Prophet Moses in the thirteenth century B.C., stating: "Children, obey your parents in the Lord, for this is right. 'Honor your father and mother.' This is the first commandment with a promise, 'that it may go well with you and that you may have a long life on earth.' Fathers, do not provoke your children to anger, but bring them up with the training and instruction of the Lord." *Ephesians* 6:1-4 (NABRE) (quoting *Exodus* 20:12 and *Deuteronomy* 5:16).

This right of "parental control over children" flows from concomitant responsibilities: "those who nurture [the child] and direct his destiny have the right, *coupled with the high duty*, to recognize and prepare him for additional obligations." *Bellotti*, 443 U.S. at 637 (plurality) (quoting *Pierce*, 268 U.S. at 535; emphasis added)). "The duty to prepare the child for 'additional obligations,' referred to by the Court, must be read to include the inculcation of moral standards, religious beliefs, and elements of good citizenship." *Yoder*, 406 U.S. at 233. Control of "the child reside[s]

1   first in the parents, whose *primary function and freedom* include preparation for

2   obligations the state can *neither supply*," in light of the First Amendment, "nor hinder."

3   *Prince v. Mass.*, 321 U.S. 158, 166 (1944) (emphasis added).

4   Procedurally, "there is a presumption that fit parents act in the best interests of

5   their children," *Troxel*, 530 U.S. at 68 (plurality), because "historically [the law] has

6   recognized that natural bonds of affection lead parents to act in the best interests of

7   their children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979) (citing 1 William Blackstone,

8   Commentaries on the Laws of England 447 (1765); 2 James Kent, Commentaries on

9   American Law 190 (1826)). Indeed, "[a] parent may curtail a child's exercise of

10  constitutional rights because a parent's own constitutionally protected 'liberty'

11  includes the right to 'bring up children' and to 'direct the upbringing and education of

12  children.'" *In re Antonio C.*, 83 Cal. App. 4th 1029, 1034 (2000) (quoting *In re Roger S.*,

13  19 Cal. 3d 921, 928 (1977)).

14  The Supreme Court, however, has explained that parental control is not a limit

15  on the child's liberty—*but a fulfillment of it*: "[T]he tradition of parental authority is

16  not inconsistent with our tradition of individual liberty [for a child]; rather, the former

17  is one of the basic presuppositions of the latter. Legal restrictions on minors, especially

18  those supportive of the parental role, may be important to the child's chances for the

19  full growth and maturity that make eventual participation in a free society meaningful

20  and rewarding." *Bellotti*, 443 U.S. at 638-39 (plurality). The only exception ever

21  identified by the High Court is the exercise of the right to an abortion, because of its

22  "peculiar nature" and "unique character" that "effectively expires in a matter of

23  weeks from the onset of pregnancy." *Bellotti*, 443 U.S. at 642, 644 n.23, 650 (plurality);

24  *but see Dobbs*, 597 U.S. at 278-79 (explaining that this was an "unrestrained" expansion

25  of the law).

### 4.  Background on the Right to Educate Your Children

27  Preparing one's children for adulthood includes the right and duty to "direct the

28  education of children." *Pierce*, 268 U.S. at 534. "Comprehensive and all-pervading as

the police power is, there are certain rights and certain relations beyond its scope. One of these is the right of a parent to educate his own child in his own way." *Farrington*, 11 F.2d at 714. At the time of the ratification of the Fourteenth Amendment, "[t]he concept of total parental control over children's lives extended into the schools." *Brown*, 564 U.S. at 830 (Thomas, J., dissenting). "The history clearly shows a founding generation that believed parents to have complete authority over their minor children and expected parents to direct the development of those children…. Teachers and schools came under scrutiny, and children's reading material was carefully supervised." *Id.* at 834-35 (Thomas, J., dissenting).

Thus, numerous nineteenth and early twentieth century courts held that parents had a right, whether based on the Constitution or the common-law, to opt their children out of classes. *See, e.g.*, *Vollmar v. Stanley*, 81 Colo. 276 (1927) (objection by Catholics to reading the King James Bible); *Hardwick v. Fruitridge Sch. Dist.*, 54 Cal. App. 696 (1921) (religious objection to dance class).[4] As succinctly explained by the court in *Vollmar*: "The parent has a [state law] right to have his children educated in the public schools of the state. He also has a constitutional right, as we have shown, to direct, within limits, his children's studies. The school board, though with full power to prescribe the studies, cannot make the surrender of the second a condition of the enjoyment of the first." *Vollmar*, 81 Colo. at 282 (citations omitted).

More recently, the Supreme Court has stated that it "has been the unmistakable holding of this Court for almost 50 years" that "students [do not] shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 506 (1969) (citing *Meyer*, 262 U.S. 390; *Pierce*, 268 U.S. 510; *Barnette*, 319 U.S. 624). And most recently, the Supreme Court

---

[4] *See also, e.g.*, *Kelley v. Ferguson*, 95 Neb. 63 (1914) (objection to cooking class as unnecessary); *Garvin County v. Thompson*, 24 Okla. 1 (1909) (objection to singing lessons); *Rulison v. Post*, 79 Ill. 567 (1875) (objection to book-keeping class); *Morrow v. Wood*, 35 Wis. 59 (1874) (objection to geography course); *Guernsey v. Pitkin*, 32 Vt. 224 (1859) (objection to writing compositions).

has reiterated its holding "that students do not 'shed their constitutional rights to freedom of speech or expression,' even 'at the school house gate'," *Mahanoy*, 594 U.S. at 187 (quoting *Tinker*, 393 U.S. at 506), because children's rights generally belong to their parents, such that parents "delegate[] to school officials their own control of [their child]," under the doctrine of *in loco parentis*. *Id.* at 192. But in the modern context of "compulsory" education, parents must *only* be "treated as having relinquished the measure of authority that the schools must be able to exercise in order to carry out their state-mandated educational mission." *Tatel v. Mt. Lebanon Sch. Dist.*, 675 F. Supp. 3d 551, 561 n.7 (W.D. Pa. 2023) ("*Tatel II*") (quoting *Mahanoy*, 594 U.S. at 198-200 (Alito, J., concurring)).

Despite this guidance from the Supreme Court, a Circuit split has emerged regarding the strength of the parental rights "beyond the threshold of the school door." *Tatel v. Mt. Lebanon Sch. Dist.*, 637 F. Supp. 3d 295, 316-18 (W.D. Pa. 2022) ("*Tatel I*") (discussing broad approach taken by Third Circuit and narrow approach taken by First Circuit and Ninth Circuit). Nevertheless, even the narrow approach taken by the Ninth Circuit recognizes that the parental right *does* "extend beyond the threshold of the school door." *Fields v. Palmdale Sch. Dist.*, 447 F.3d 1187, 1190 (9th Cir. 2006) ("*Fields II*") (deleting contrary language from *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197 (9th Cir. 2005) ("*Fields I*")); *Parents for Priv. v. Barr*, 949 F.3d 1210, 1230 n.15 (9th Cir. 2020). Although the Ninth Circuit has rejected attempts to modify curriculum school-wide, the Ninth Circuit has affirmed that "[m]aking intimate decisions and controlling the state's dissemination of information regarding intimate matters are two entirely different subjects," and schools may "not interfere with the right of the parents to make intimate decisions." *Fields II*, 447 F.3d at 1191.

### 5. Background on the Right to Direct Healthcare of Children

The Fourteenth Amendment protects the right to refuse "unwanted medical treatment," *Cruzan v. Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) (citing *Jacobson v. Mass.*, 197 U.S. 11, 24-30 (1905)), and the right "to bodily integrity." *Wash. v.*

*Glucksberg*, 521 U.S. 702, 720 (1997) (citing *Rochin v. Calif.*, 342 U.S. 165 (1952)). This right protects against "'forced medical treatment' for the recipient's benefit." *Health Freedom Def. Fund, Inc. v. Carvalho*, 104 F.4th 715, 725 (9th Cir. 2024).

With respect to the medical care of children, the constitution "permit[s] the parents to retain a substantial, if not the dominant, role in the decision." *Parham*, 442 U.S. at 604. This right includes both "the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000). Indeed, because of youthful impetuosity, "children rely on parents or other surrogates to provide informed permission for medical procedures that are essential for their care." *Mann v. Cnty. of San Diego*, 907 F.3d 1154, 1162 (9th Cir. 2018) (quotations omitted). "Children, by definition, are not assumed to have the capacity to take care of themselves." *Schall v. Martin*, 467 U.S. 253, 265 (1984) (cleaned up).

As a general rule, because of the "presumption that parents act in the best interests of their child," any minimal "risk of error inherent in the parental decision" about a child's medical treatment is ameliorated by the involvement of doctors. *Parham*, 442 U.S. at 606, 610. Thus, alongside parents, "[w]hat is best for a child is an individual medical decision that must be left to the judgment of physicians in each case." *Id.* at 608. "The fact that a child may balk at hospitalization or complain about a parental [medical decision] … does not diminish the parents' authority to decide what is best for the child." *Id.* at 605. This presumption is key: "Some parents and judges will not care if their child is physically disciplined by a third person; some parents and judges will not care if a third person teaches the child a religion inconsistent with the parents' religion; and some judges and parents will not care if the child is exposed to or taught racist or sexist beliefs. But many parents and judges will care, and, between the two, the parents should be the ones to choose whether to expose their children to certain people or ideas." *In re Custody of Smith*, 137 Wash. 2d 1, 21 (1998), *aff'd sub nom. Troxel v. Granville*, 530 U.S. 57 (2000) (plurality).

Of course, "the family itself is not beyond regulation in the public interest," and "neither rights of religion nor rights of parenthood are beyond limitation." *Prince*, 321 U.S. at 166. But, "absent a finding of neglect or abuse, … the traditional presumption that the parents act in the best interests of their child should apply." *Parham*, 442 U.S. at 604. This is particularly important because "the burden of litigating … can itself be so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated." *Troxel*, 530 U.S. at 75 (plurality) (quotations omitted). A regulation interfering with the medical decisions of parents with respect to their children "must fall *unless shown* to be necessary for or conducive to the child's protection against some clear and present danger." *Prince*, 321 U.S. at 167 (emphasis added).

### 6.  Background on the Rights of Minors as Against their Parents

"Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority." *Bellotti*, 443 U.S. at 634 & n.12 (plurality). But, when minors are involved, "constitutional principles [are] applied with sensitivity and flexibility" such that the breadth of a minor's rights depend on the specific right at issue. *Id*. at 634-38 & n.14. "The law does not give to children many rights given to adults, and provides, in general, that children can exercise the rights they do have only through and with parental consent." *Hodgson*, 497 U.S. at 482 (Kennedy, J., concurring). Under that general rule, minors must "wait until the age of majority before being permitted to exercise legal rights independently." *Bellotti*, 443 U.S. at 650 (plurality). For example, "[a] minor not permitted to marry before the age of majority is required simply to postpone her decision." *Id*. at 642. As one court aptly put it: "We categorically reject the absurd suggestion that [the boyfriend's] freedom of association trumps a parent's right to direct and control the activities of a minor child, including with whom the child may associate." *Brekke*, 125 Cal. App. 4th at 1410.

Even when core rights are involved, the Court has explained that requiring parental consent before a minor exercises her rights is constitutionally permissible so

long as there is a "judicial bypass" mechanism. *Hodgson*, 497 U.S. at 479 (Scalia, J., concurring in part). And "[a]lthough the Court has held that parents may not exercise an absolute, and possibly arbitrary, veto over that decision, it has never challenged … that the decision should be made after notification to and consultation with a parent." *Id.* at 445 (Opinion of Stevens, J., joined by O'Connor, J.) (cleaned up); *see also id.* at 496 (Kennedy, J., concurring, joined by Rehnquist, White, Scalia, JJ.) ("The difference between notice and consent was apparent to us before and is apparent now.").

## B. Under the Free Exercise Clause, Both Religious Parents and Teachers Have the Right to Opt Out of Parental Exclusion Policies

"Throughout the ages men have suffered death rather than subordinate their allegiance to God to the authority of the State. Freedom of religion guaranteed by the First Amendment is the product of that struggle." *Girouard v. United States*, 328 U.S. 61, 68 (1946). The Free Exercise Clause of the U.S. Constitution "work[s] in tandem" with both the Free Speech Clause and the Due Process Clause. *Kennedy*, 597 U.S. at 523. When placed next to the Free Speech Clause, the High Court has recognized that "government suppression of speech has so commonly been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince." *Id.* (quoting *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995). And when compared with Substantive Due Process, it has been explained

> In our constitutional tradition, freedom means that all persons have the right to believe or strive to believe in a divine creator and a divine law. For those who choose this course, free exercise is essential in preserving their own dignity and in striving for a self-definition shaped by their religious precepts. Free exercise in this sense implicates more than just freedom of belief. [citation] It means, too, the right to express those beliefs and to establish one's religious (or nonreligious) self-definition in the political, civic, and economic life of our larger community.

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 736-37 (2014) (Kennedy, J., concurring) (citing *Cantwell v. Conn.*, 310 U.S. 296, 303 (1940)). Thus, the Free Exercise Clause "protects not only the right to harbor religious beliefs inwardly and secretly. It does perhaps its most important work by protecting the ability of those who

hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy*, 597 U.S. at 524 (quoting *Empl't Div. v. Smith*, 494 U.S. 872, 877 (1990)).

As relevant here, when government action burdens religious practice, "[d]istilled, Supreme Court authority sets forth [several] bedrock requirements of the Free Exercise Clause that the government may not transgress, absent a showing that satisfies strict scrutiny." *FCA*, 82 F.4th at 686 (en banc). "First, a purportedly neutral 'generally applicable' policy may not have 'a mechanism for individualized exemptions.'" *Id.* (quoting *Fulton v. Philadelphia*, 593 U.S. 522, 533 (2021)). "Second, the government may not 'treat ... comparable secular activity more favorably than religious exercise.'" *Id.* (quoting *Tandon v. Newsom*, 593 U.S. 61, 62 (2021)). And third, the government may not infringe on "the rights of parents to direct the religious upbringing of their children." *Smith*, 494 U.S. at 882 & n.1 (quoting *Yoder*, 406 U.S. at 233). Each of these applies and triggers strict scrutiny.

### 1. Parental Exclusion Policies Burden Religion

To begin, requiring school districts to adopt Parental Exclusion Policies burdens both the Teacher Plaintiffs' and the Parent Plaintiffs' free exercise of religion. "Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists." *Thomas v. Review Bd. of Ind.*, 450 U.S. 707, 717-18 (1981); *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017) ("[T]he Free Exercise Clause protects against indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.") (quotations omitted); *Sherbert v. Verner*, 374 U.S. 398, 404 (1963) ("It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege."). Here, being subject to Parental Exclusion Policies is a condition of government employment for the Teacher

Plaintiffs, and a condition of receiving a free public education for the Parent Plaintiffs. These are severe burdens. *See Mirabelli*, 691 F. Supp. 3d at 1222.

### 2. The Individualized Exemptions Paradigm Triggers Strict Scrutiny

First, the judicially created test for finding a violation of the Privacy Clause of the California Constitution, which is the basis for all Parental Exclusion Policies, itself has a mechanism for "individualized exemptions." *FCA*, 82 F.4th at 686. Under the Privacy analysis, the penultimate consideration is always whether there is a "sufficient countervailing interest" warranting the alleged privacy violation. *Hill v. NCAA*, 7 Cal. 4th 1, 40 (1994). This triggers strict scrutiny. *See, e.g.*, *Fulton*, 593 U.S. at 533 ("good cause"); *Sherbert*, 374 U.S. at 401 ("good cause" test in statute); *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 537 (1993) ("unnecessary"); *Does 1-11 v. Univ. of Colo.*, 100 F.4th 1251, 1273 (10th Cir. 2024) (simply asking "why" exemption was needed); *Dahl v. W. Mich. Univ.*, 15 F.4th 728, 733 (6th Cir. 2021) (decisions will be made on an "individual basis" without explaining standard); *Kane v. De Blasio*, 19 F.4th 152, 169 (2d Cir. 2021) (similar); *Blackhawk v. Penn.*, 381 F.3d 202, 210 (3d Cir. 2004) (Alito, J.) ("consistent with sound" policies); *Foothill Church v. Watanabe*, 623 F. Supp. 3d 1079, 1093 (E.D. Cal. 2022) (health department's "good cause" exemption for requiring health insurance plans to cover elective abortion).

Previously, the CDE Defendants have argued that there is no discretionary exemption from the Privacy "construct." Rather, the "construct" itself always applies, and standards must then be applied within it. ECF No. 75, Hearing Transcript, at pp.3:10-18, 7:21-8:20. Or as the CDE Defendants stated in briefing, "the problem in *Fulton* was that sometimes, at the *complete* discretion of the government, that entire 'rule' could simply be waived and not applied to a particular contractor. So, the 'rule' was not generally applicable, because the discretionary waiver could make it disappear." ECF No. 53-1, Mot. Judg. Pleadings, p.19:20-23 (emphasis added). This misreads *Fulton* and *Sherbert*. The CDE Defendants' "assertion that *Fulton* was only concerned with 'unfettered' discretion, is overly narrow." *FCA*, 82 F.4th at 687. "What

makes a system of individualized exemptions suspicious is *the possibility* that certain violations may be condoned when they occur for secular reasons but not when they occur for religious reasons." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1082 (9th Cir. 2015) (emphasis added). Here, there is precisely that "possibility" because, as explained below, secular reasons for exemption are granted.

### 3.  The Comparable Exceptions Trigger Strict Scrutiny

The existence of secular exemptions from government-created burdens, without offering a religious exemption, triggers strict scrutiny if the secular exemptions undermine the government's interests "in a similar or greater degree" than a religious exemption would. *Lukumi*, 508 U.S. at 542-43; *accord Fulton*, 593 U.S. at 534. Stated differently, government actions are not generally applicable "whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62. In that context, there is no need to assess "whether a law reflects 'subtle departures from neutrality,' 'religious gerrymander[ing],' or 'impermissible targeting' of religion." *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 717 (2021) (Statement of Gorsuch, J.) (quoting *Lukumi*, 508 U.S. at 534-35) (cleaned up).[5]

"[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1159 (9th Cir. 2022) (quoting *Tandon*, 593 U.S. at 62). And "[g]eneral applicability requires, among other things, that the laws be enforced evenhandedly." *Id.* Thus, for example, if the

---

[5] The reasoning in Justice Gorsuch's statement was joined by four other Justices, making it a binding opinion. *See Tandon v. Newsom*, 593 U.S. 61, 63 (2021) (citing Justice Gorsuch's statement and Justice Barrett's concurrence as together binding authority); *accord Brach v. Newsom*, 6 F.4th 904, 933 n.26 (9th Cir. 2021), *vacated as moot on reh'g en banc*, 38 F.4th 6 (9th Cir. 2022); *Doe v. San Diego Unified Sch. Dist.*, 22 F.4th 1099, 1102 (9th Cir. 2022) (Bumatay, J., dissenting from denial of rehearing en banc); *United States v. Olsen*, 21 F.4th 1036, 1066 n.1 (9th Cir. 2022) (Collins, J., dissenting from denial of rehearing en banc); *Roman Cath. Archbishop of Wash. v. Bowser*, 531 F. Supp. 3d 22, 42 n.15 (D.D.C. 2021).

---

1  government's interest is "health and safety," then it can grant solely medical
2  exemptions to vaccine mandates, and not religious exemptions. But if that were its
3  asserted interest, it could not grant exemptions for its own administrative needs while
4  denying religious exemptions. *Bacon v. Woodward*, 104 F.4th 744, 752 (9th Cir. 2024).

5       Here, California's Parental Exclusion Policies are not generally applicable due to
6  their comparable, categorical exemptions. As stated above, the policies flow from the
7  Privacy Clause of the California Constitution, which builds in an exemption for
8  "countervailing interests." *Cnty. of Los Angeles v. Los Angeles Cnty. Emp. Rels. Comm'n*,
9  56 Cal. 4th 905, 926 (2013). In its specific recitation of the requirements of the Privacy
10 Clause, the CDE characterized this as "a specific and compelling 'need to know,'"
11 Ex.20, while EUSD more narrowly characterized the exemption as applying only
12 "when the district has compelling evidence that disclosure is necessary to preserve the
13 student's physical or mental well-being." Ex.15. While the CDE more accurately
14 describes California law, under both, exempting parents with religious objections from
15 these policies is comparable to the existing exemptions—parents always have a
16 compelling "need to know" and informing them will "preserve the student's physical
17 or mental well-being." *Parham*, 442 U.S. at 602 (presumption that giving information
18 to parents will be good for child); Cal. Educ. Code § 51100 (same codified into statute).

19      As applied to teachers, there are numerous other exemptions that exist in the
20 Education Code. For example, "[a] pupil may not be compelled to affirm or disavow
21 any particular personally or privately held world view, religious doctrine, or political
22 opinion." Cal. Educ. Code § 49091.12(a). Thus, no student could be forced to manifest
23 adherence to ideological views on gender identity, including by being forced to use
24 preferred pronouns (or not) with whomever the student is speaking—including
25 another student's parents. *See Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021).

26      Further, under California law, parents have the right to "observe the classroom
27 or classrooms in which their child is enrolled" and the right to "provid[e] assistance in
28 the classroom with the approval, and under the direct supervision, of the teacher." Cal.

Educ. Code § 51101(a)(1), (3). And under both FERPA (discussed below) and California law, parents have the right "[t]o have access to the school records of their child." Cal. Educ. Code § 51101(a)(10). If a parent requested to sit in at class, or to review their child's gender-related records, then attempts to deceive him about his child's gender presentation at school would become moot.[6] These comparable exemptions trigger strict scrutiny.

### 4. The Intrusion on Parental Rights Triggers Strict Scrutiny

Drawing on both *Meyer* and *Pierce*, in *Wisconsin v. Yoder*, the Supreme Court held that a rule impinging on parents' rights to control "the *religious* upbringing and education of their minor children" triggered strict scrutiny under the Free Exercise Clause. 406 U.S. 205, 231 (1972) (emphasis added). Later, the Supreme Court reaffirmed this, describing "rights of parents to direct the religious upbringing of their children" as continuing to receive strict scrutiny protection under the Free Exercise Clause. *Smith*, 494 U.S. at 881-82 & n.1. And more recently, the Supreme Court reaffirmed as an "'enduring American tradition' … the rights of parents to direct 'the religious upbringing' of their children." *Espinoza*, 591 U.S. at 486.

As applied to schools, California courts have long held that, while this right does not permit an "objection to the [activities] described in the complaint [from occurring] in the school," it does allow an objection to *one's own* "children being coerced by the school authorities into taking part in those exercises contrary to the teachings they have received from their parents upon that subject." *Hardwick*, 54 Cal. App. at 710. As reiterated by California courts fifty years later, the constitutionality of school curriculum or policy turns primarily on whether the government implements an "excusal system" through which "parents or guardians who might object to the

---

[6] Although the California Constitution controls over the Education Code, the Privacy Clause analysis involves reviewing statutory law to see whether there was a serious invasion of privacy. Thus, where an educator, "in making the disclosure[,] … was carrying out his statutory duty under the Education Code," there is no privacy violation. *Nguon v. Wolf*, 517 F. Supp. 2d 1177, 1191 (C.D. Cal. 2007).

program or any part of it on moral or religious grounds to have their children excused." *Citizens for Parental Rts. v. San Mateo Cnty. Bd. of Educ.*, 51 Cal. App. 3d 1, 30 (1975); *cf. Fields II*, 447 F.3d at 1189 ("[I]n light of the appeal presented to this Court neither the Free Exercise nor the Establishment Clause played any part in our holding. Any argument related to these Clauses must be presented in another case."). Here, because Parental Exclusion Policies burden the right of parents to direct the *religious* upbringing of their children, they trigger strict scrutiny.

### 5.  The Intrusion on Parental Rights Cannot Satisfy Strict Scrutiny

To satisfy "strict scrutiny," government policies "must be 'narrowly tailored' to serve a 'compelling' state interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020). Once the plaintiff has made his case, "it is the government that must show its policy is the least restrictive means of furthering [a] compelling governmental interest." *Ramirez v. Collier*, 595 U.S. 411, 432 (2022). "The whole point of strict scrutiny is to test the government's assertions, and our precedents make plain that it has always been a demanding and rarely satisfied standard." *S. Bay United Pentecostal Church*, 141 S. Ct. at 718 (Statement of Gorsuch, J.). Strict scrutiny is "the most demanding test known to constitutional law." *Boerne v. Flores*, 521 U.S. 507, 534 (1997).

The "least-restrictive-means standard is exceptionally demanding" in that it requires the government to show that "it lacks other means of achieving its desired goal." *Burwell*, 573 U.S. at 728. "[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541. "[A]t a minimum," when other jurisdictions "offer an accommodation, [the government] must … offer persuasive reasons why it believes that it must take a different course." *Holt v. Hobbs*, 574 U.S. 352, 369 (2015). The government must "explore any relevant differences between [its] … process and those of other jurisdictions," and explain why it must diverge. *Ramirez*, 595 U.S. at 429.

Here, the whole point of Parental Exclusion Policies is to comply with the Privacy Clause of the California Constitution. But, as this Court recognized last year,

1  those policies are simply not required by the Privacy Clause and, even if they were,
2  they would be preempted by the Fourteenth Amendment right to direct the upbringing
3  of one's own children. *Mirabelli*, 691 F. Supp. 3d at 1212-13. Thus, "[t]he reasons
4  proffered by the defendants for the policy pass neither the strict scrutiny nor the
5  rational basis tests." *Id.* at 1217. In line with the law of the case, the Court should grant
6  summary judgment on the Plaintiffs' Free Exercise claims.

7   **C. Under the First Amendment Right to Freedom of Speech, and the**
8       **Fourteenth Amendment Right to Direct the Upbringing of Children,**
9       **Parental Exclusion Policies Are Unconstitutional**

10  As stated above, the Ninth Circuit has affirmed that schools may "not interfere
11  with the right of the parents to make intimate decisions." *Fields II*, 447 F.3d at 1191.
12  Thus, this Court rightly recognized that a "policy of elevating a child's gender-related
13  choices to that of paramount importance, while excluding a parent from knowing of, or
14  participating in, that kind of choice, is as foreign to federal constitutional and statutory
15  law as it is medically unwise." *Mirabelli*, 691 F. Supp. 3d at 1212.

16  The rights of parents are so fundamental that no application of any specific test
17  has been needed for at least three courts to intuit that parental rights include the right
18  to both notice *and consent* regarding a child's social transition. *T.F. v. Kettle Moraine Sch.*
19  *Dist.*, No. 21-cv-1650 (Wis. Cir. Ct., Waukesha Cnty., Oct. 3, 2023); *Tenn. v. Cardona*,
20  No. 2:24-cv-72, 2024 WL 3019146, at *30-31 (E.D. Ky. June 17, 2024); *Ricard v. Geary*
21  *Cnty. Unified Sch. Dist. 475*, No. 5:22-cv-4015, 2022 WL 1471372, at *8 (D. Kan. May
22  9, 2022) (discussing parental right to "contest[] the use of pronouns for their child").
23  Two other courts have held that parents at least have the right to not be lied to. *Willey v.*
24  *Sweetwater Cnty. Sch. Dist. No. 1*, 680 F. Supp. 3d 1250, 1279-80 (D. Wyo. 2023); *Doe v.*
25  *Madison Metro. Sch. Dist.*, No. 20-cv-454 (Wis. Cir. Ct., Dane Cnty., Sep. 28, 2020).

26  Here, this Court can and should simply restate its preliminary injunction
27  analysis in a final judgment. *See Radu v. Shon*, 62 F.4th 1165, 1176 (9th Cir. 2023) (as a
28  guide to discretion, "the law-of-the-case doctrine … expresses the practice of courts

1   generally to refuse to reopen what has been decided"). However, the Supreme Court

2   has more recently elaborated upon the standards governing when schools can restrict

3   the exercise of constitutional rights. *See Mahanoy*, 594 U.S. at 191-93. This test mirrors

4   the test for when the government can restrict the constitutional rights of its employees.

5   Thus, in *Mahanoy*, the Supreme Court explained that if the exercise of

6   constitutional rights (1) addresses a matter of legitimate public concern, and (2) is not

7   necessary for the educational mission of the school, (3) then it cannot be restricted

8   unless sufficiently necessary for the administrative operation of the school to outweigh

9   First Amendment rights. *Mahanoy*, 594 U.S. at 191-93. Nearly identically, under the

10  Free Speech Clause, the government cannot force employees to engage in speech (1)

11  about an issue of legitimate public concern, (2) that is not necessary for the

12  performance on their actual job duties (i.e., public v. private speech), (3) unless doing

13  so is sufficiently necessary for the effective operation of the government to outweigh

14  First Amendment rights (i.e., *Pickering* balancing). *Dodge v. Evergreen Sch. Dist. #114*,

15  56 F.4th 767, 776-83 (9th Cir. 2022).

16  Last year, this Court held that a teacher's freedom of speech claim would

17  generally be "foreclosed by *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954 (9th Cir.

18  2011)," but that "[t]he teachers could … make out a freedom of speech claim if the

19  policy compels them to violate the law or deliberately convey an illegal message."

20  *Mirabelli*, 691 F. Supp. 3d at 1214-15. Here, as explained below, *Johnson* does not

21  control. But even if it did, because Parental Exclusion Policies violate the Fourteenth

22  Amendment and FERPA, teachers cannot be compelled to comply with them. *See*

23  Second Amend. Compl., ¶355(c).

### 1. Gender Identity is a Matter of Public Concern

25  According to the Supreme Court, "the boundaries of what constitutes speech on

26  matters of public concern are not well defined." *Snyder*, 562 U.S. at 452. The analysis

27  requires an examination of "the content, form, and context of a given statement, as

28  revealed by the whole record," and is a matter of "law, not fact." *Connick v. Myers*, 461

U.S. 138, 147-48 & n.7 (1983). As guideposts, the Supreme Court has explained that "[s]peech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder*, 562 U.S. at 453 (cleaned up). Further, "the standard for determining whether expression is of public concern is the same standard used to determine whether a common-law action for invasion of privacy is present." *San Diego v. Roe*, 543 U.S. 77, 83 (2004) (per curiam).

The Ninth Circuit has similarly explained that the test "remains somewhat hazy," but that "[m]ost speech falling outside that purely private realm will warrant *at least some* First Amendment protection and thus will qualify as speech on a matter of public concern for purposes of the *Pickering* balancing test." *Hernandez v. Phoenix*, 43 F.4th 966, 977 (9th Cir. 2022) (emphasis added). The test is "useful primarily to draw a contrast with speech that is not entitled to constitutional protection in this context—namely, speech on 'matters only of personal interest.'" *Id*. Thus, "[t]he scope of the public concern element is defined broadly in recognition that one of the fundamental purposes of the first amendment is to permit the public to decide for itself which issues and viewpoints merit its concern." *Ulrich v. San Francisco*, 308 F.3d 968, 978 (9th Cir. 2002) (cleaned up). "It is only "when it is clear that ... the information would be of no relevance to the public[] … that speech of government employees receives *no* protection under the First Amendment." *Id*. (cleaned up).

In general, "controversial subjects such as climate change, the Confederacy, sexual orientation and gender identity, evolution, and minority religions" are matters of public concern. *Janus*, 585 U.S. at 913-14 (footnotes omitted). Analogizing to an invasion of privacy claim, even if the matter is private, "the strength of that privacy interest is balanced against countervailing interests." *Cnty. of Los Angeles*, 56 Cal. 4th at 926. Thus, when the "content" "plainly relates to broad issues of interest to society at large," the "context" "cannot by itself transform" the speech into "a matter of private

rather than public concern." *Snyder*, 562 U.S. at 454; *accord San Diego*, 543 U.S. at 84 ("certain private remarks" necessarily "touch on matters of public concern").

Here, the specific speech at issue is speech to and from school districts and their agents (teachers) to parents regarding their child's gender identity. The general topic to which this speech "relates" is "gender identity"—a matter of public concern. *See, e.g.*, *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 723 (9th Cir. 2022); *Meriwether*, 992 F.3d at 508-09. Looking at the specific content of the speech (i.e., "your daughter" v. "your son" "is struggling to complete her English assignments on time"), is too granular. The focus must be on whether, in practical reality, the manner in which the speech is compelled (or restricted) is "an instrument for fostering public adherence to an ideological point of view [the individual] finds unacceptable, and to compel him to speak in ways that align with the government's views in a manner that defies his conscience about a matter of major significance." *Vlaming*, 302 Va. at 568 (cleaned up). In other words, even if a specific instance concerns an individual child, the reason for the objection is that, in the aggregate, the speech the teacher is compelled to utter expresses the government's message on a matter of unquestioned public concern.

This looks at the actual effect of the restriction. Thus, again analogizing to the invasion of privacy context, if revealing someone's sexual orientation is "motivated by a morbid and sensational prying into [her] private life," then it should not be countenanced. *Sipple v. Chron. Publ'g Co.*, 154 Cal. App. 3d 1040, 1049 (1984). But in the context where the individual's sexual identity is already public, he has no privacy rights. *Id.*; *accord Leibert v. Transworld Sys., Inc.*, 32 Cal. App. 4th 1693, 1701-02 (1995); *see also Vo v. Garden Grove*, 115 Cal. App. 4th 425, 448 (2004) ("A person's physical features are not 'confidential,' nor are activities on the premises of a public" location). For example, as this Court noted, "[a] student who announces the desire to be publicly known in school by a new name, gender, or pronoun and is referred to by teachers and students and others by said new name, gender, or pronoun, can hardly be said to have a reasonable expectation of privacy or expect non-disclosure." *Mirabelli*, 691 F. Supp. 3d

at 1212; *accord Sipple*, 154 Cal. App. 3d at 1047-48. Thus, where revealing a child's gender identity was "prompted by legitimate … considerations" (parental rights), *see Sipple*, 154 Cal. App. 3d at 1049, and is not private, the "context" cannot negate the content—gender identity. *See Snyder*, 562 U.S. at 454; *Vlaming*, 302 Va. at 568.

Because "gender identity" is perhaps the preeminent "controversial" issue of the day, *see Janus*, 585 U.S. at 913-14, all of the Plaintiffs' constitutional rights—both teachers and parents—"warrant *at least some* First Amendment protection." *Hernandez*, 43 F.4th at 977. Indeed, as explained by the California Supreme Court, the test "amounts to little more than a message to judges and attorneys that no standards are necessary because they will, or should, know a public concern when they see it." *Briggs v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1122 n.9 (1999). Here, the sheer number of lawsuits makes clear that this issue is one of public concern, and everybody should "know it when they see it."

### 2. Parental Exclusion Policies Are Unnecessary for the Educational Mission: So Teachers Cannot Be Forced to Apply Them and Parents Have Not Delegated That Authority

Like above, for both parents and teachers, the second question is whether the Defendants' Parental Exclusion Policies are necessary for them to conduct their educational mission. On the side of parents, they "delegate[] to school officials their own control of [their child]," under the doctrine of *in loco parentis*. *Mahanoy*, 594 U.S. at 187. But they only "relinquish[] the measure of authority that the schools must be able to exercise in order to carry out their state-mandated educational mission." *Id*. at 198-200 (Alito, J., concurring). Unless explicitly done (i.e., via a sports waiver), "[i]t is unreasonable to infer that parents who send a child to a public school thereby authorize the school to take away … critical right[s]." *Id*. at 206 (Alito, J., concurring).

On the side of teachers, the question is whether the speech at issue is their personal speech, or government speech. At a high level, the question is whether the speech was "required to perform [the teacher's] job." *Dodge*, 56 F.4th at 778. But the

answer must avoid "the error of positing an 'excessively broad job description' by treating everything teachers … say in the workplace as government speech subject to government control." *Kennedy*, 597 U.S. at 530-31. The question is whether the speech is *curricular*, i.e., providing "instruct[ion]," *id.*, or "impart[ing] particular knowledge or skills to student[s]." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988).

As the Virginia Supreme Court aptly put it, "[t]he core of the teacher's job is to speak in the classroom on the *subjects* she is expected to teach. Math teachers must teach math, science teachers must teach science, history teachers must teach history, and so on. But none of them can be compelled into the service of controversial religious, political, or ideological causes." *Vlaming*, 302 Va. at 568 (cleaned up); *accord Figliola v. Sch. Bd. of Harrisonburg*, No. CL22-1304 (Va. Cir. Ct., Rockingham Cnty., Dec. 2, 2022). "This determination—whether the contested speech is curricular in nature—is a question of law for the court." *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 697 (4th Cir. 2007); *accord Morgan v. Swanson*, 659 F.3d 359, 375 n.52 (5th Cir. 2011) (en banc) (collecting cases).[7]

Here, Parental Exclusion Policies are not designed to impart instruction or teach skills. Rather, Parental Exclusion Policies have taken a side in the ideological debate

---

[7] Supreme Court authority, of course, controls over inconsistent Circuit precedent when "the reasoning or theory of our [Ninth Circuit] prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority." *Coria v. Garland*, 96 F.4th 11192, 1195 (9th Cir. 2024); *accord Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). Thus, the reasoning of *Kennedy* and *Mahanoy* control over the stale Ninth Circuit precedent *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 970 (9th Cir. 2011). Nevertheless, there, the Ninth Circuit held that "nothing in our holding today prevents Johnson from himself propounding his own opinion on" various issues outside the classroom. *Id.* at 970 (emphasis omitted). This was a key delimitation because the government cannot extend official job duties in a way that would have the effect of *also* restricting the employee's private speech. *Pickering v. Twp. High Sch. Dist. 205*, 391 U.S. 563, 573 (1968) (official job "duty of loyalty to support his superiors in attaining the generally accepted goals of education" could not restrict right to send letter to newspaper). Here, however, they could not communicate with parents about their child's gender identity even in non-professional capacities.

over whether gender incongruence is a medical condition or an aspect of individual liberty. At their heart, "different viewpoints on transgender identification are, in their nature, political, ideological, ethical, or value-based." *See* Patrick Parkinson, *Gender Identity Discrimination and Religious Freedom*, 38 J.L. & Religion 10, 30 (2023). Emerging gender ideology "concerns a struggle over the social control of language in a crucial debate about the nature and foundation, or indeed real existence, of the sexes." *Meriwether*, 992 F.3d at 508. But, "[w]hether at the highest or lowest level, the government has no inherent power to declare by ipse dixit that controversial ideas are now uncontroversial." *Vlaming*, 302 Va. at 569. Thus, for purposes of the First Amendment, compliance with Parental Exclusion Policies is not part of the Teacher Plaintiffs' core job duties. And, for purposes of the Fourteenth Amendment, the Parent Plaintiffs did not delegate authority over their child's gender identity to the school.

### 3. There Is No Legitimate State Administrative or Efficiency Interest Requiring Parental Exclusion Policies

The final question is, assuming the issue is one of public concern, and not necessary to the government's actual provision of services (i.e., necessary to impart instruction), does the government nevertheless have a "legitimate administrative interest" in its rule? *Dodge*, 56 F.4th at 781. As a provider of services, the government's primary administrative interest is preventing "disruption" of that provision of service. *Id.* at 781-82; *Mahanoy*, 594 U.S. at 192-93. On the flip side, if the government's interest is "related to the suppression of free expression," "it is not valid, let alone substantial." *Moody*, 144 S. Ct. at 2407.

"The government's burden in proving disruption varies with the content of the speech. The more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made." *Dodge*, 56 F.4th at 782 (cleaned up). Because "[p]olitical speech is the quintessential example of protected speech, and it is inherently controversial," the government must show more than "the disruption that necessarily accompanies controversial speech." *Id.* at 782-83. Indeed, "the proudest

boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'" *Matal v. Tam*, 582 U.S. 218, 246 (2017) (quoting *United States v. Schwimmer*, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting)). Even "vulgar" speech is protected—but the vulgarity must be incorporated into the sliding scale. *Mahanoy*, 594 U.S. at 192; *accord Beard v. Falkenrath*, 97 F.4th 1109, 1117 (8th Cir. 2024) ("If the Constitution offers no protection [to the offended individual] against an insult or vulgar language, then how can it extend to the misuse of a pronoun?").

Here, the primary interest asserted by the government is the student's right to privacy under the California Constitution. Ex.27, p.23:24-27; Ex.20, p.5. But while an individual has privacy interests in his sexual orientation when it is *not* publicly known, *Sipple*, 154 Cal. App. 3d at 1047, *Leibert*, 32 Cal. App. 4th at 1701-02, or knowledge is limited to "five friends," *Nguon v. Wolf*, 517 F. Supp. 2d 1177, 1191 (C.D. Cal. 2007), there can be no objectively reasonable expectation of privacy regarding matters that are known by the entire school community. *See Vo*, 115 Cal. App. 4th at 448; *Sipple*, 154 Cal. App. 3d at 1047-48. Thus, the privacy interest does not apply on its face to the context of minors requesting that school personnel use a preferred name and preferred pronouns for them. *See Mirabelli*, 691 F. Supp. 3d at 1212.

Moreover, like with federal constitutional rights, minors' state constitutional rights must be tailored to their unique circumstances. "As a general matter, parents during a child's minority have the legal right (and obligation) to act on behalf of their child to protect their child's rights and interests, and in most instances this general rule would apply to interests of the minor that are protected by the state constitutional right of privacy as well as to other rights and interests of the minor." *Am. Acad. of Pediatrics v. Lungren*, 16 Cal. 4th 307, 335-36 & nn.19-20 (1997) (plurality).[8] The privacy interests at

---

[8] In *Am. Acad. of Pediatrics v. Lungren*, 16 Cal. 4th 307 (1997), the California Supreme Court adopted the U.S. Supreme Court's approach of recognizing this general rule before accepting a carve out for the right to obtain an abortion as unique because it is "*a decision that cannot be postponed until adulthood.*" *Id.* at 337 (original emphasis) (citing *Bellotti*, 443 U.S. at 642 (plurality)).

issue here belong to the parents—not the children. Thus, in the one factually analogous case, the court held that, although the minor had privacy interests, there was no privacy violation because "[the teacher] was advancing a legitimate state interest with the factually correct and limited disclosure he made to [the parent]." *Nguon*, 517 F. Supp. 2d at 1196 (citing *Hill*, 7 Cal. 4th at 39-40).

Lastly, even if there were a violation of the California constitution, it would be preempted by the federal constitution. As shown above, American history and tradition provide that parents have the right and duty to raise their children through "the inculcation of moral standards, religious beliefs, and elements of good citizenship," *Yoder*, 406 U.S. at 233, and "retain plenary authority to seek [medical] care for their children, subject to a physician's independent examination and medical judgment." *Parham*, 442 U.S. at 604. Here, issues of gender identity and gender transition deal with both morality and medical care.

Indeed, in considering the U.S. Department of Education's attempt to rewrite Title IX via new rules on gender identity, federal courts have enjoined the new rules on the basis that they "allow[] for one political ideology to dominate the educational landscape while either silencing the other or calling the other 'harassment' under these standards." *La. v. Dep't of Educ.*, No. 3:24-cv-563, 2024 WL 2978786, at *12 (W.D. La. June 13, 2024). They "functionally turn recipients of federal funds into federally commandeered censors of speech, forcing schools to require engagement in—or, at a minimum, prohibit—certain kinds of speech, such as the use of preferred pronouns, which in turn repress what has long been regarded as protected forms of expression and religious exercise." *Tex. v. Cardona*, No. 4:23-cv-604, 2024 WL 3658767, at *28 n.119 (N.D. Tex. Aug. 5, 2024); *see also Kan. v. Dep't of Educ.*, No. 5:24-cv-4041, 2024 WL 3273285, at *13-15 (D. Kan. July 2, 2024); *Ark. v. Dep't of Educ.*, No. 4:24-cv-636, 2024 WL 3518588, at *18 (E.D. Mo. July 24, 2024).

Further, because "[s]chool personnel would be forced to abide by the student's wishes if the student chooses not to involve his or her parents," the new rules infringe

on parents' "constitutionally protected right to guide their own children on matters of identity." *Tenn. v. Cardona*, No. 2:24-cv-72, 2024 WL 3019146, at *30-31 (E.D. Ky. June 17, 2024). And although parental rights do not turn on whether a social transition is healthcare, it is noteworthy that "changes in gender expression and role" is an "evidence-based treatment option[] for individuals with gender dysphoria." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 770 (9th Cir. 2019); *accord* Anderson Decl., ¶¶32, 71. That "treatment" decision must be made by parents—not children alone.

*   *   *

In light of the above, the Court should enter a class-wide injunction on behalf of parents and teachers against the AG, the CDE, and EUSD, precluding them from implementing or enforcing any California legal provision in such a manner as to: (1) permit any employee to engage in the social gender transition of a minor absent parental consent; and (2) require any employee to engage in the social gender transition of a minor, without parental consent, over the employee's objection.[9]

///

---

[9] The AG and CDE have also defended California's Parental Exclusion Policies on Equal Protection grounds. Ex.27, pp.17-20; Ex.28, attch. C, p.4. The implicit argument is that a Parental Notification Policy is discriminatory because it only applies to gender incongruent students. But that's not true. If a child is presenting at school as the opposite gender, desists, and begins presenting as their natal sex, a Parental Notification Policy would be triggered as well. *See Mae M. v. Komrosky*, No. CVSW2306224 (Cal. Super. Ct., Riverside Cnty., Feb. 23, 2024) (rejecting equal protection argument because, "[n]otably, the Policy applies equally to all students within the district and does not apply disparately to two or more similarly situated groups"); *see also Dobbs*, 597 U.S. at 236 ("The regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a mere pretext") (cleaned up); *L.W. v. Skrmetti*, 83 F.4th 460, 480 (6th Cir. 2023) (applying *Dobbs* to ban on minor sex-change interventions); *cf. also Grants Pass v. Johnson*, 144 S. Ct. 2202, 2219 (2024) ("this Court has already rejected th[e] view" that the Constitution "prohibit[s] the enforcement of laws that … don't proscribe status as such but that proscribe acts … the defendant cannot help but undertake" on the basis that they "would 'effectively' allow cities to punish a person because of his status").

### D. The Family Educational Rights and Privacy Act ("FERPA") Requires Parent Access to Gender Support Plans

In 1974, Congress enacted the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, 34 C.F.R. § 99, "to condition the receipt of federal funds on certain requirements relating to the access and disclosure of student educational records." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 278 (2002). Its sponsor, Senator James Buckley, "discovered that since students and their parents generally were not permitted to view their school records, students could be victimized by errors that were put into their transcripts and other records." Nicholas Trott Long, *Privacy in the World of Education: What Hath James Buckley Wrought?*, 46 R.I.B.J. 9 (Feb. 1998). Thus, FERPA "assure[s] parents of students ... access to their educational records" and "protect[s] such individuals' rights to privacy by limiting the transferability of their records without their consent." *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67-68 (1st Cir. 2002) (quoting 120 Cong. Rec. 39,862 (1974) (joint statement of Sens. Pell and Buckley explaining major amendments to FERPA) (original ellipses)).

The statute defines "education records" broadly as "records, files, documents, and other materials which—(i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution." 20 U.S.C. § 1232g(a)(4)(A). But it does not include teachers', administrators', or other employees' own records, campus police records, and counseling records for individuals over the age of eighteen. *Id.* at subd. (a)(4)(B). As explained in the legislative history, this definition is intentionally broad:

> The proposed amendments define "education records" in order to make clear what documents and other material parents and students will have access to ... [The] intent to be that, except as provided in the definition, *parents and students should have access to everything in institutional records maintained for each student in the normal course of business and used by the institution in making decisions that affect the life of the student.*

*Belanger v. Nashua Sch. Dist.*, 856 F. Supp. 40, 49 (D.N.H. 1994) (quoting 120 Cong. Rec. 39,858-59 (1974) (original emphasis)); *see also id.* (further legislative history).

Thus, as "education records," courts have ordered schools to provide juvenile court records not created by the school, but kept in a child's file, *Belanger*, 856 F. Supp. at 50, records of a psychologist interviewing children to investigate claims of abuse, *Parents Against Abuse In Schools v. Williamsport Area Sch. Dist.*, 594 A.2d 796, 803 (Pa. Commw. Ct. 1991), a "disciplinary referral" form regarding bullying, *K.L. v. Evesham Bd. of Educ.*, 423 N.J. Super. 337, 363-64 (App. Div. 2011), records regarding an investigation into an athlete trading memorabilia for tattoos, *ESPN v. Ohio State Univ.*, 132 Ohio St. 3d 212, 218 (2012), a video recording showing a student altercation, *Cent. Dauphin Sch. Dist. v. Hawkins*, 253 A.3d 820, 830-31 (Pa. Commw. Ct. 2021), *aff'd*, 286 A.3d 726 (Pa. 2022), and recordings of a meeting discussing potential expulsion of a student, *Lewin v. Cooke*, 28 F. App'x 186, 193 (4th Cir. 2002). In line with this broad interpretation, even noncustodial parents retain the right to examine their child's education records. *Page v. Rotterdam-Mohonasen Cent. Sch. Dist.*, 441 N.Y.S.2d 323, 325 (1981); *cf. also Fay v. S. Colonie Cent. Sch. Dist.*, 802 F.2d 21, 33 (2d Cir. 1986).

Under FERPA, (1) parents have an absolute right to access their child's education records, 20 U.S.C. § 1232g(a)(1)(A); 34 C.F.R. §§ 99.10-99.12; (2) parents have the right to an appeals process and formal hearing to correct inaccuracies in those records, 20 U.S.C. § 1232g(a)(2); 34 C.F.R. §§ 99.20-99.22; (3) parents have the right to opt their child out of directory services (which would include the child's name), 20 U.S.C. § 1232g(a)(5)(B); 34 C.F.R. § 99.37; and (4) parents have the right to be notified by the school district of these and other rights, 20 U.S.C. § 1232g(e); 34 C.F.R. § 99.7. When the California Education Code—or indeed any aspect of California law—conflicts with FERPA, it is preempted. *Rim of the World Unified Sch. Dist. v. Superior Ct.*, 104 Cal. App. 4th 1393, 1399 (2002).

Although a parent or student cannot sue under 42 U.S.C. § 1983 for a violation of FERPA, *Gonzaga Univ.*, 536 U.S. at 284, both parents and school officials can seek declaratory relief regarding their rights and obligations. *See, e.g.*, *Owasso Indep. Sch. Dist. No. I-011 v. Falvo*, 534 U.S. 426, 431 (2002) ("the Court has subject-matter

jurisdiction"); *Charlotte-Mecklenburg Bd. of Educ. v. Disability Rts. of N.C.*, 430 F. Supp. 3d 74, 78 (W.D.N.C. 2019) (declaratory relief action by school district); *Klein Indep. Sch. Dist. v. Mattox*, 830 F.2d 576 (5th Cir. 1987) (declaratory relief action by teacher); *Bauer v. Kincaid*, 759 F. Supp. 575, 591 (W.D. Mo. 1991) (declaratory relief action by student); *see also Oregon Cnty. R-IV Sch. Dist. v. LeMon*, 739 S.W.2d 553 (Mo. Ct. App. 1987) (declaratory relief action by school district).

Here, the CDE's FAQ states that "[t]o prevent accidental disclosure of a student's transgender status, it is strongly recommended that schools keep records that reflect a transgender student's birth name and assigned sex" separate from other records. Ex.20. However, regardless of where a student's gender information is stored by a school, a form listing it is a student's education record. This Court should issue declaratory relief clarifying that schools may not withhold records listing a gender transitioning students' preferred name and pronouns from parents.

## II. The Court Should Grant Plaintiffs Partial Summary Judgment on Liability for the Damages Claims Against EUSD

Plaintiffs Mirabelli and West have asserted several legal theories under which damages are available. Both Plaintiffs Mirabelli and West seek damages with respect to their 42 U.S.C. § 1983 claims. Plaintiff West further seeks damages against Defendant EUSD with respect to its failure to accommodate her religious objection, and its retaliation against her for requesting an accommodation—both under Title VII. Below, Plaintiffs request that this Court enter partial summary judgment with respect to liability on Plaintiff West's failure to accommodate claim (not her retaliation claim), and with respect to EUSD's sovereign immunity and qualified immunity defenses to the 42 U.S.C. § 1983 claims.

### A. The Court Should Grant Partial Summary Judgment on Plaintiff West's Title VII Claim for Failure to Accommodate

Title VII prohibits an employer from discriminating against an employee by failing to reasonably accommodate the employee's religious practices or observances.

*See Keene v. San Francisco*, No. 22-16567, 2023 WL 3451687, at *1 (9th Cir. May 15, 2023); 42 U.S.C. §§2000e(j), 2000e-2(a)(1). In other words, it is "unlawful for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." *Opuku-Boateng v. Calif.*, 95 F.3d 1461, 1467 (9th Cir. 1996) (cleaned up). Even when "the First Amendment likely does not require any religious accommodation, ... a government employer ... must still provide religious accommodations under Title VII, and must abide by the First Amendment in doing so." *Does 1-11*, 100 F.4th at 1280 (cleaned up).

To establish a prima facie claim for failure to accommodate, a plaintiff must present evidence that: "(1) [she] had a bona fide religious belief, the practice of which conflicted with an employment duty; (2) [she] informed [her] employer of the belief and conflict; and (3) the employer threatened [her] with or subjected [her] to discriminatory treatment, including discharge, because of [her] inability to fulfill the job requirements." *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993).

Religious beliefs need only be sincerely held. They do not need to be understandable to others, recognized by any organization, or articulable in a way the employer accepts. *Thomas*, 450 U.S. at 714 ("religious beliefs need not be acceptable, logical, consistent, or comprehensible to others").[10] Religious beliefs are broadly understood to include a person's "moral, ethical, or religious beliefs about what is right and wrong." *United States v. Ward*, 989 F.2d 1015, 1018 (9th Cir. 1992). As such, "a coincidence of religious and secular claims in no way extinguishes the weight appropriately accorded the religious one." *Callahan v. Woods*, 658 F.2d 679, 684 (9th Cir. 1981); *accord Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1010-11 (7th Cir. 2024). With respect to threatened or actual adverse action, "[t]o make out a Title VII

---

[10] *See Riley v. Bendix Corp.*, 464 F.2d 1113, 1116-17 (5th Cir. 1972) (Title VII's legislative history shows that it was "intended to protect the same rights in private employment as the Constitution protects"); *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481-88 (2d Cir. 1985) (courts use same standard for religious sincerity under Title VII as in free exercise cases).

discrimination claim, [an employee] must show some harm respecting an identifiable term or condition of employment. What the transferee does not have to show, according to the relevant text, is that the harm incurred was 'significant.'" *Muldrow v. St. Louis*, 144 S. Ct. 967, 974 (2024); *see also Dahlia v. Rodriguez*, 735 F.3d 1060, 1078 (9th Cir. 2013) ("[P]lacement on administrative leave can constitute an adverse employment action.").

Once the plaintiff has made out his prima facie case, the burden shifts to the employer to show that it could not have reasonably accommodated the plaintiff's religious beliefs without undue hardship. *Groff v. DeJoy*, 600 U.S. 447, 468 (2023). To establish the defense of "undue hardship," the employer must demonstrate that any of the accommodations proposed by the plaintiff would impose a burden that is "substantial in the overall context of an employer's business." *Id.* As for the factors that count toward a determination of undue hardship, the Supreme Court has clarified that "[w]hat matters more than a favored synonym for 'undue hardship' (which is the actual text) is that courts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, 'size and operating cost of [an] employer.'" *Id.* at 470-71 (citation omitted).

The Supreme Court further clarified that co-worker hostility cannot factor at all into a finding of undue hardship. "[A] coworker's [or patron's] dislike of 'religious practice and expression in the workplace' or 'the mere fact [of] an accommodation' is not 'cognizable to factor into the undue hardship inquiry.'" *Id.* at 472. "An employer who fails to provide an accommodation has a defense only if the hardship is 'undue,' and a hardship that is attributable to … animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice cannot be considered 'undue.'" *Id.* Indeed, "[i]f bias or hostility to a religious practice or a religious accommodation provided a defense to a reasonable accommodation claim, Title VII would be at war with itself. *Id.*

Here, Plaintiff West requested a religious accommodation from Defendant EUSD. Although the sincerity of her religious objection was undisputed, she was told no. West Decl., ¶¶9-15; Exs.41-43. But EUSD cannot possibly establish an undue hardship because its Parental Exclusion Policies are illegal. *See McGinnis v. U.S. Postal Serv.*, 512 F. Supp. 517, 523-24 (N.D. Cal. 1980) (granting injunction because government failed to meet its burden of demonstrating undue hardship). At best, EUSD could point to the retaliatory harassment that Plaintiffs received in response to their filing of this lawsuit as an undue burden. But, in light of *Groff,* such animus is an improper basis for asserting an undue hardship to support denial of Plaintiff West's request for a religious accommodation. The Court should thus grant partial summary judgment on EUSD's liability for violating Title VII.

## B. The Court Should Grant Partial Summary Judgment on the Inapplicability of Sovereign Immunity as an Affirmative Defense for the EUSD Superintendent and EUSD Board of Education

A sovereign entity is immune from suit absent its consent. *Alden v. Me.*, 527 U.S. 706, 715 (1999). This immunity does not extend to municipalities, but it does extend to an "arm of the state" (whether sued in its own name, or via its officials) a determination which is a question of law. *Kohn v. State Bar of Calif.*, 87 F.4th 1021, 1026 (9th Cir. 2023) (en banc). Over thirty years ago, the Ninth Circuit held that California school districts are arms of the state because public schooling is a "central government function in California." *Belanger v. Madera Unified Sch. Dist.*, 963 F.2d 248, 253 (9th Cir. 1992). However, in 2023, the Ninth Circuit rejected its prior factors for determining whether an entity is an "arm of the state" and instead adopted the D.C. Circuit's three part test, which uses an "entity-based approach" instead of a "function" approach. *Kohn*, 87 F.4th at 1030-31 (en banc).

Under this new "entity-based approach," because "public education in California [is] … locally funded and educational achievement [is] …locally controlled," school districts should no longer be protected by sovereign immunity. *See*

---

*Health Freedom Def. Fund*, 104 F.4th at 727 (Nelson, J., concurring). Thus, the Court should determine that the EUSD Superintendent and EUSD Board of Education are not protected by sovereign immunity.

### C. The Court Should Grant Partial Summary Judgment on the Inapplicability of Qualified Immunity as an Affirmative Defense for the EUSD Personal-Capacity Defendants

As explained by the Supreme Court, when a government official is sued in their personal capacity, "[l]iability for damages for every action which is found subsequently to have been violative of a student's constitutional rights and to have caused compensable injury would unfairly impose upon the school decisionmaker the burden of mistakes made in good faith in the course of exercising his discretion within the scope of his official duties." *Wood v. Strickland*, 420 U.S. 308, 319 (1975). Thus, the Court created the doctrine of "qualified immunity." Under that doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Qualified immunity is an affirmative defense. *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 527 (9th Cir. 1989). The essence of the defense turns on whether the official had "fair notice" that his conduct was illegal. *Hope v. Pelzer*, 536 U.S. 730, 742 (2002); *Saucier v. Katz*, 533 U.S. 194, 206 (2001). To establish "fair notice," the court may "look to the law of other circuits to determine if a principle is clearly established." *Jones v. Williams*, 791 F.3d 1023, 1034 (9th Cir. 2015). The defense can be overcome "in two ways: (1) by showing that there is clearly established law putting [officials] on notice that their conduct is unlawful; or (2) by showing that the [official's] conduct was a patently offensive violation of an existing right." *Beaver v. Federal Way*, 301 F. App'x 704, 705 (9th Cir. 2008) (cleaned up); *see also Tatel II*, 675 F. Supp. 3d at 575 (discussing "two ways").

---

43

To establish that the "right" was clearly established, "a plaintiff need not produce 'a case directly on point.'" *Dodge*, 56 F.4th at 784 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Rather, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Id.* at 784 (cleaned up) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). But in the absence of "closely analogous preexisting case law," liability can only attach "if the claimed right is defined at an appropriately low 'level of generality.'" *Roe v. San Jose Unified Sch. Dist. Bd.*, No. 20-cv-2798, 2021 WL 292035, at *17 (N.D. Cal. Jan. 28, 2021) (quoting *Hope*, 536 U.S. at 741).

Thus, in reviewing whether the "right" was "clearly established," "[w]e are not to frame the issues presented at too high a level of generality," but "must define the rights implicated here at a level commensurate with the specific factual and legal context of the case." *Dodge*, 56 F.4th at 783-84. Framing the right as "the general right to be free from retaliation for one's speech," is too vague. *Id.* at 784. But an appropriate Free Speech framing would be to find that "it was patently unreasonable for [the government official] to believe that she could restrict [the plaintiff's] speech to quell what was, in reality, nothing more than the natural effect that disfavored political speech often has on those with different viewpoints." *Dodge*, 56 F.4th at 784.

A similar appropriate framing in the Free Speech context is that it is clearly established that "no legitimate pedagogical interest is served by forcing students to agree with a particular political viewpoint, or by punishing those who refuse," which instead "offend[s] the First Amendment." *Oliver v. Arnold*, 19 F.4th 843, 845-46 (5th Cir. 2021) (Ho, J., concurring in denial of reh'g en banc) (collecting cases). In the Free Exercise context, an appropriate framing is to find that "[i]t was clearly established by the Supreme Court that if a defendant has in place a system of individualized exemptions, it must extend that system to religious exemptions." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1300-01 (10th Cir. 2004); *accord Burke v. Walsh*, No. 3:23-cv-

11798, 2024 WL 3548759, at *7 (D. Mass. June 5, 2024).

In the context of parental rights, an appropriate framing is to conclude that "[a] reasonable teacher in [defendant's] position would have known that where no notice or opt out rights are given, the alleged conduct [of instructing children on gender identity and telling them to not tell their parents] would violate the Parents' right to inculcate in their children their values about their own children's gender and identity." *Tatel II*, 675 F. Supp. 3d at 576-77. And in context of the state-created danger doctrine, "it was clearly established that state officials could be held liable where they affirmatively and with deliberate indifference placed an individual in danger she would not otherwise have faced." *Kennedy v. Ridgefield*, 439 F.3d 1055, 1066 (9th Cir. 2006).

Here, in addition to suing the EUSD Superintendent and Board, Plaintiffs named as defendants—in their individual capacities—EUSD Assistant Superintendent John Albert, EUSD Directors Trent Smith and Tracy Schmidt, and Rincon Middle School Principal Steve White, for their specific role in enforcing the Parental Exclusion Policies. Mirabelli Decl., ¶¶13-50; Exs.36-46. While neither the Ninth Circuit nor any other Circuit has directly addressed the propriety of modern Parental Exclusion Policies, as this Court noted, they fail "the rational basis test[]" and are "foreign to federal constitutional and statutory law." *Mirabelli*, 691 F. Supp. 3d at 1212, 1217. Or, as stated by another court, "[i]t is difficult to envision why a school would even claim—much less how a school could establish—a generalized interest in withholding or concealing from the parents of minor children, information fundamental to a child's identity, personhood, and mental and emotional well-being such as their preferred name and pronouns." *Ricard*, 2022 WL 1471372, at *8.

"[T]he interest of parents in the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel*, 530 U.S. at 65 (plurality); *see id.* at 80 (Thomas, J., concurring). This interest has led to a litany of protections for parents. *See, e.g.*, Cal. Educ. Code § 51101. Thus, in various contexts, courts have held that it is clearly established that the state cannot

come between parents and their children. *See, e.g.*, *Words of Faith Fellowship, Inc. v. Rutherford Cnty. Dep't of Soc. Servs.*, 329 F. Supp. 2d 675, 690 (W.D.N.C. 2004) ("[I]nitiating sham investigations motivated by religious animus and enticing children to reject their parents' faith violates a clearly established right to exercise one's religion"). Here, it would be appropriate, in denying qualified immunity, for this Court to "conclude[] that Supreme Court … precedent put a reasonable defendant on notice that the conduct alleged in this case would—absent a compelling interest—plausibly infringe the Parents' Substantive and Procedural Due Process and Free Exercise rights…. The parental rights at issue are fundamental, long-recognized and clearly established." *Tatel II*, 675 F. Supp. 3d at 576.

### III. The Court Should Enter a Rule 54(b) Separate Judgment on the Prospective Relief Claims and stay the Rest of the Case

To perfect the record for appeal, Plaintiffs respectfully request that the Court enter judgment in their favor on their 42 U.S.C. § 1983 official-capacity claims, enter a permanent injunction, and then stay the remainder of the case (primarily concerning damages against EUSD[11]) pending appeal. Federal Rule of Civil Procedure 54(b) allows a court to enter judgment as to "one or more, but fewer than all" claims if it expressly determines that there "is no just reason for delay." The rule is "designed to permit acceleration of appeals in multiple claim-cases" and "avoid the possible injustice of delaying judgment on a distinctly separate claim pending adjudication of the entire case." *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 409-10, 416 (2015). There is "no just reason for delay" here because Plaintiffs will obtain their principally desired remedy— injunctive relief—through success on this motion.

///

---

[11] All damages would be against EUSD itself, since it would indemnify both the official-capacity and individual-capacity defendants. *Williams v. Horvath*, 16 Cal. 3d 834, 843 (1976) (citing Cal. Gov. Code § 825).

In addition, "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). "In determining whether a stay is appropriate, a federal court considers the (1) 'possibility damage may result from the granting of a stay,' (2) 'hardship or inequity which a party may suffer in being required to go forward,' and (3) 'orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay.'" *XPandOrtho, Inc. v. Zimmer Biomet Holdings, Inc.*, No. 3:21-cv-105, 2021 WL 6064036, at *1 (S.D. Cal. Dec. 22, 2021) (quoting *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962)).

Here, should Plaintiffs succeed on this motion, entering judgment on their 42 U.S.C. § 1983 official-capacity claims will "permit acceleration of appeals" on the main constitutional issues. *Gelboim*, 574 U.S. at 409, 416. Those issues will drive any future litigation against EUSD and are not nearly as fact-intensive as the damages claims, thereby "simplifying … issues." *CMAX*, 300 F.3d at 268. There is no conceivable hardship to AG Bonta or the CDE Defendants because the remaining claims do not apply to them, and any hardship to the EUSD Defendants would be greatly outweighed by the benefits of a stay. Further, California's aggressive passage of AB 1955 and lawsuits against various school districts warrant prompt resolution by the Ninth Circuit. Exs.22-31. Finally, if Plaintiffs are unsuccessful in defending the judgment on appeal, they could return to this court to litigate their damages claims. But if Plaintiffs are successful in defending the judgment on appeal, then resolution of the remaining claims would be simple.

## IV. The Court Should Enter a Class-Wide Injunction on the Prospective Relief Claims

Lastly, as stated above, the Court should enter either a permanent class-wide injunction (if it enters a Rule 54(b) judgment), or a preliminary class-wide injunction. In seeking either a preliminary or a permanent injunction, plaintiffs must establish: (1)

irreparable injury, (2) that legal remedies are inadequate, (3) that the balance of hardships favors the plaintiff, and (4) that the public interest favors an injunction. *FCA*, 82 F.4th at 683-84; *Ariz. Dream Act Coal.*, 855 F.3d at 977. Here, like with the initial preliminary injunction, all of these factors favor entry of a new injunction.

To begin, "[i]t is axiomatic that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *FCA*, 82 F.4th at 694 (quoting *Roman Cath. Diocese*, 592 U.S. at 19); *see also Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *8 (5th Cir. Feb. 17, 2022) (quoting and following same in Title VII religious discrimination case). Further, "constitutional violations cannot be adequately remedied through damages." *Edmo*, 935 F.3d at 798.

"Where, as here, the party opposing injunctive relief is a government entity, the third and fourth factors—the balance of equities and the public interest—'merge.'" *FCA*, 82 F.4th at 695 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). On the defense side, "the state 'cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations.'" *Frankel v. Univ. of Calif.*, No. 2:24-cv-4702, 2024 WL 3811250, at *7 (C.D. Cal. Aug. 13, 2024) (quoting *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983)). Alleged adverse consequences are also irrelevant because it is always in the public interest to make sure that the government is following the law. *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 120 (2022) (refusing to weigh allegation that OSHA vaccine mandate "will save over 6,500 lives" because "[i]n our system of government, that is the responsibility of those chosen by the people through the democratic process").

On Plaintiffs' side, "it is always in the public interest to prevent the violation of a party's constitutional rights." *FCA*, 82 F.4th at 695; see also, e.g., *Calif. v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018) ("Protecting religious liberty and conscience is obviously in the public interest."). In any event, in the absence of compelling evidence to the contrary, the Court must presume that an injunction will work to all children's benefit. *See Parham*, 442 U.S. at 602.

In sum, because Plaintiffs and the classes are suffering severe irreparable injury in the form of violations of their constitutional rights, and because it is always in the public interest to vindicate the Constitution, the injunction factors all favor Plaintiffs.[12]

\*     \*     \*

In truth, California's attempt to justify its Parental Exclusion Policies rests almost entirely on its argument that "being transgender itself is not in and of itself a medical or psychiatric [disorder]," such that informing a child's parents that they engaging in a gender transition  at school "is singling them out based on the protected characteristic" of transgender status. *See* ECF No. 75, Hearing Transcript, 18:12-22:13 (General Counsel for CDE). Or as the AG explained in briefing, a policy of informing parents that a child is presenting as the opposite gender at school is unconstitutional for the same reason as would be "a hypothetical policy that required parental notification when staff became aware that a student changed religion, or was dating someone of a different race." *See* Reply Brief re: Prelim. Inj. p.3, *People v. Chino Valley Unified Sch. Dist.*, No. CIV SB 2317301 (Cal. Super. Ct., S.B. Cnty., Oct. 9, 2023).

The analogy, however, is not apt. The Supreme Court has been steadfast in reiterating that philosophical or religious views on human sexuality are "protected views"—*not* akin to racial discrimination. *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 631 (2018) (citing *Obergefell*, 576 U.S. at 679-80). The actual analogy from which Parental Exclusion Policies have emerged is comparison to a hypothetical policy requiring schools to inform parents when a child has begun a same-sex dating relationship. At the pleadings stage, one district court has found that minors have privacy interests in their sexual orientation, even as against their parents. *C.N. v. Wolf*, 410 F. Supp. 2d 894 (C.D. Cal. 2005).

But this analogy also breaks down. Homosexuality and transgenderism are not the same. Twenty-six states have prohibited sex-change medical interventions for

---

[12] If the Court enters a preliminary injunction instead of a permanent one, it should waive the bond requirement. *See Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011).

minors. Two circuit courts have upheld those state laws, and a third (which struck one down), is being reheard en banc. *L.W. v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023); *Eknes-Tucker v. Gov. of Ala.*, 80 F.4th 1205 (11th Cir. 2023); *Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022), *subsequent appeal*, *Brandt v. Griffin*, No. 23-2681 (8th Cir. July 21, 2023) (being initially heard en banc). And when the issue was presented to the Supreme Court on an emergency petition, it also ruled in favor of the state. *Labrador v. Poe*, 144 S. Ct. 921 (2024). To accept that, as a general matter, "being transgender" is not a mental disorder, says little about its etiology, its fluidity, or its implications for the child's future, *in individual cases*. In each specific case, parents have a right to and need to be involved. *See* Anderson Decl., ¶¶61-81.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant the above motion in full, granting: (1) summary judgment on all Plaintiffs' 42 U.S.C. § 1983 prospective relief only claims; (2) partial summary judgment as to liability (not damages) on Plaintiffs Mirabelli's and West's 42 U.S.C. § 1983 damages claims and on Plaintiff West's Title VII failure to accommodate claim; (3) entry of a Rule 54(b) Separate Judgment and a class-wide permanent injunction as to the prospective relief only claims; and (4) in the alternative, a class-wide preliminary injunction as to those claims.

Respectfully submitted,

LiMANDRI & JONNA LLP

Dated: August 16, 2024          By: 

Charles S. LiMandri
Paul M. Jonna
Jeffrey M. Trissell
Attorneys for Plaintiffs