1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH MIRABELLI, an individual, et al.,<br><br>                    Plaintiffs,<br><br>v.<br><br>MARK OLSON, in his official capacity as President of the EUSD Board of Education, et al.,<br><br>                    Defendants. | Case No.:  3:23-cv-0768-BEN (VET)<br><br><br><br>**ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS**<br><br>**[ECF Nos. 146, 147, 149, 150, 156, 157]** |

Plaintiffs are teachers in the Escondido Union School District ("EUSD") and parents of students in other California school districts.[1]  In their recently filed Second Amended Complaint ("Complaint") the Plaintiffs bring claims against members of the California State Board of Education and the California Superintendent of Public

---

[1] Plaintiffs John and Jane Doe and John and Jane Poe are parents of school-age students. Plaintiffs Elizabeth Mirabelli, Lori Ann West, Jane Boe, and Jane Roe are teachers in EUSD.  EUSD is a California public school district with approximately 16,000 students in kindergarten through eighth grades.

1

Instruction, members of the EUSD Board of Education and administrative staff (collectively, "EUSD Defendants"), as well as the Attorney General of California. The Plaintiffs contend that a state policy promulgated by the California Department of Education and adopted by local school districts violate their rights under the First and Fourteenth Amendments to the United States Constitution and they seek relief under 42 U.S.C. § 1983. The gravamen of the state policy is that public school teachers are not to reveal to parents a student's announced change of gender identity in order to maintain the student's privacy, except where the student consents to disclosure.

The local school district Defendants say that the state forced it to adopt the policy. The Defendant State Superintendent of Public Instruction has issued at least one threatening letters to a school district demanding the policy be followed.[2] The Defendant Department of Education has filed suit against a school district in Rocklin, California to enforce the policy. Complaint at ¶3, ¶320; *see Cal. Dep't of Educ. v. Rocklin Unified Sch. Dist.*, No. S-CV-0052605 (Cal. Super. Ct., Placer Cnty., Apr. 10, 2024). The Defendant Attorney General has sued a school district in Chino Valley, California contending the school district's parental notice approach violates the state's policy. *Id.,* ¶320-21; Exhibit 38 at 375.

Here, the State Defendants say the Plaintiffs lack standing because there is no harm to parents or teachers because the policy is just a suggestion. Because it is just a suggestion, the Plaintiffs have not been injured, and because there is no injury, the Plaintiffs lack Article III standing to bring suit, according to the State Defendants. Alternatively, the State Defendants argue that even if Plaintiffs do have Article III standing, parents lose much of their federal constitutional rights at the schoolhouse door and whatever parental rights remain are subordinate to the child's newly state-created

---

[2] See Letter from Tony Thurmond, Superintendent of Public Instruction, California Department of Education, to Roger Stock, Superintendent Rocklin Unified School District (dated Mar. 27, 2024), Dkt. 112, at 37-39.

right to privacy and the child's right to be free from gender discrimination. All Defendants move to dismiss.[3] The motions to dismiss are denied.

## I. BACKGROUND

A serious health condition of a child is a matter over which parents have a federal constitutional right and duty to decide how to treat, or whether to treat at all, at any given time. Parents' rights to make decisions concerning the care, custody, control, and medical care of their children is one of the oldest of the fundamental liberty interests that Americans enjoy. However, under California state policy and EUSD policy, if a school student expresses words or actions during class that are visible signs that the child is dealing with gender incongruity or possibly gender dysphoria[4], teachers are ordered not to inform the parents.

_____

[3] The State Defendants also move to dismiss some of the claims under Rule 12(c). However, their arguments are undifferentiated and are better considered on a motion for summary judgment. *See* Rule 12(d).

[4] Gender dysphoria is a clinically diagnosed incongruence between one's gender identity and assigned gender. Put differently, "[g]ender dysphoria is the diagnostic term for the distress a person may feel in response to believing their gender identity does not match their sex." *K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, 121 F.4th 604, 610 (7th Cir. 2024) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 511 (5th ed. text revision 2022) (Untreated gender incongruity may progress into adverse social-emotional health consequences, including, but not limited to, gender dysphoria, depression, or suicidal ideation.). There are different psychological and medical treatments for children experiencing gender incongruity. According to DSM-5, the criteria for Gender Dysphoria is:

A marked incongruence between one's experienced/expressed gender and natal gender of at least 6 months in duration, as *manifested by at least two of the following*:
A.    A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics)
B.    A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics)

All Plaintiffs allege that the State Department of Education has promulgated a new policy that local school districts must adopt. EUSD adopted the policy. The policy requires: (1) teachers to recognize and utilize a student's newly expressed gender identification, and (2) teachers to not disclose to a parent a student's newly expressed gender identification.[5] The EUSD policy is known as AR 5145.3. The EUSD policy is based on guidance from the State Department of Education's official internet web page.[6] A teacher who knowingly fails to comply is considered to have engaged in discriminatory harassment and is subject to adverse employment action.

---

C.   A strong desire for the primary and/or secondary sex characteristics of the other gender

D.   A strong desire to be of the other gender (or some alternative gender different from one's designated gender)

E.   A strong desire to be treated as the other gender (or some alternative gender different from one's designated gender)

F.   A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's designated gender)

The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

[5] The California Education Code recognizes parents' rights to be informed and involved in their student's schooling – rights that are consistent with parents' federal constitutional rights but in tension with the new policy restrictions. For example, California Education Code §51101(a) and (b) recognizes that parents play an integral part in the successful education of a child in the public schools and specifies a variety of ways in which parents have a right to information about their child including sitting in on classes and communicating with teachers.

[6] EUSD has other formal policies that are consistent with existing law but are in tension with the new policy. For example, BP 0100(7) states that, "Parents/guardians have a right and an obligation to be engaged in their child's education and to be involved in the intellectual, physical, emotional, and social development and well-being of their child." Complaint, Exh. 15(7). And BP 4119.21(9) states that, "Being dishonest with students, parents/guardians, staff, or members of the public, including . . . falsifying information in . . . school records" is inappropriate employee conduct. Complaint Exh. 14(9). Both policies are consistent with federal constitutional rights but appear to be at odds with AR 5145.3.

The Plaintiff parents allege that they have been harmed by the State Department of Education policy imposed on local school districts. The Plaintiff parents allege that they have children who expressed gender incongruence while attending public schools. Each of the Plaintiff parents allege that they asked questions about their child and schoolteachers and administrators intentionally deceived them and did not disclose the truth about their child's gender incongruence. The Plaintiff parents allege that they are likely to be deceived in the future by public school teachers and administrators due to the State Department of Education non-disclosure policy.

The Plaintiff teachers maintain sincere religious beliefs that communications with a parent about a student should be accurate; communications should not be calculated to deceive or mislead a student's parent. The teachers also maintain that parents enjoy a federal constitutional right to make decisions about the healthcare and upbringing of their children. The teachers allege they hold a well-founded fear of adverse employment action if they were to violate the EUSD gender identification confidentiality policy by communicating accurately to a student's parents her own observations or concerns about a student's gender incongruence.

## II. LEGAL STANDARDS

Rule 12 of the Federal Rules of Civil Procedure governs motions to dismiss. Some Defendants contend that Plaintiffs have failed to state a claim for relief. Rule 12(b)(6) permits dismissal for failure to state a claim upon which relief can be granted. Dismissal under Rule 12(b)(6) may occur where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable, plausible claim. In contrast, a complaint may survive a motion to dismiss if, taking all well pled factual allegations as true, it contains enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Some Defendants claim that Plaintiffs lack Article III standing to bring their claims. A party may move to dismiss an action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). Because Article III standing is a necessary component of

subject matter jurisdiction, "[w]hen a plaintiff lacks standing, dismissal under Rule 12(b)(1) is appropriate." *Doe & Roe v. Teachers Council, Inc.*, No. 3:23-cv-1747-AN, 2024 WL 4794293, at *2 (D. Or. Nov. 14, 2024) (citations omitted).  To have standing, a plaintiff must have an injury-in-fact that is fairly traceable to the challenged action of the defendant.[7]

> Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies."
>
> . . .
>
> A proper case or controversy exists only when at least one plaintiff "establishes that she has standing to sue."  She must show that she has suffered, or will suffer, an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."  These requirements help ensure that the plaintiff has "such a personal stake in the outcome of the controversy as to warrant her invocation of federal-court jurisdiction."

*Murthy v. Missouri,* 603 U.S. 43, 56–57 (2024) (citations omitted).  "The second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'  If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury.  So the two key questions in most standing disputes are injury in fact and causation." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380–81 (2024) (citations omitted).  "Government regulations that require or forbid some action by the plaintiff almost invariably satisfy

---

[7] That a suit may be a class action does little to the question of standing.  Named plaintiffs who purport to represent a class must allege that they personally have been injured.  Injury that has been suffered only by unidentified members of the class to which they belong may be insufficient to satisfy Article III standing. *Martinez v. Newsom*, 46 F.4th 965, 970-72 (9th Cir. 2022); *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976); *Warth v. Seldin,* 422 U.S. 490, 502 (1975).

both the injury in fact and causation requirements.  So in those cases, standing is usually easy to establish."  *Id.* at 382 (citations omitted).

At the pleading stage, a plaintiff must allege facts demonstrating each element of Article III standing.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  But a plaintiff need not satisfy the *Iqbal/Twombly* plausibility standard.  An Article III standing inquiry does not touch directly on the merits of the case.

> *Twombly* and *Iqbal* are ill-suited to application in the constitutional standing context because in determining whether plaintiff states a claim under 12(b)(6), the court necessarily assesses the merits of plaintiff's case.  But the threshold question of whether plaintiff has standing (and the court has jurisdiction) is distinct from the merits of his claim.  Rather, "the jurisdictional question of standing precedes, and does not require, analysis of the merits."

*Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (quoting *Equity Lifestyle Props., Inc. v. Cnty. of San Luis Obispo*, 548 F.3d 1184, 1189 n.10 (9th Cir.2008)); *Catholic League for Religious and Civil Rights v. City & Cnty. of San Francisco*, 624 F.3d 1043, 1049 (9th Cir.2010) (*en banc*) ("Standing is emphatically not a doctrine for shutting the courthouse door to those whose causes we do not like.  Nor can standing analysis, which prevents a claim from being adjudicated for lack of jurisdiction, be used to disguise merits analysis, which determines whether a claim is one for which relief can be granted if factually true.").

## III. DISCUSSION

During the COVID-19 pandemic it is alleged that EUSD adopted Administrative Regulation 5145.3.  AR 5145.3 gives definition to what EUSD defines as discriminatory harassment.  AR 5145.3 is not sui generis.  According to the allegations of the Complaint, it is the progeny of a statewide policy promulgated by the California Department of Education.  Details of the policy and how it is intended to work in parent-teacher communications were described in greater detail in earlier orders of this Court and are not vigorously contested at this point in the proceedings.  Thus, it is briefly described next.

Plaintiffs contend that local school district policies like EUSD's AR 5415.3 are required by California law as explained and communicated through the California Department of Education's publication titled *Frequently Asked Questions* about the School Success and Opportunity Act (Assembly Bill 1266) ("FAQs").   Complaint ¶ 308-15.  Page 5 of the FAQs provides an answer to the question: "May a student's gender identity be shared with the student's parents, other students, or members of the public?"  It says,

> A transgender or gender nonconforming student may not express their gender identity openly in all contexts, including at home.  Revealing a student's gender identity or expression to others may compromise the student's safety.  Thus, preserving a student's privacy is of the utmost importance.  The right of transgender students to keep their transgender status private is grounded in California's antidiscrimination laws as well as federal and state laws.  Disclosing that a student is transgender without the student's permission may violate California's antidiscrimination law by increasing the student's vulnerability to harassment and may violate the student's right to privacy.

FAQs page 7 explains that if a student chooses to be addressed by a new name or pronoun all school district personnel are required to use said chosen new name/pronoun.  The student's age is not a factor.  "[C]hildren as early as age two are expressing a different gender identity."

Per the policies of the State Department of Education and EUSD, once a student expresses a desire to be publicly called by a new gender incongruent name or pronoun, school faculty and staff are to refer to that student by the incongruent name.  From that point forward, the student may go through each school day with the faculty and staff addressing the student according to the changed moniker.

However, under the antidiscrimination policy, a teacher is not permitted to inform the parents of this name change without the student's consent.  FAQs page 6 instructs, "schools must consult with a transgender student to determine who can or will be

informed of the student's transgender status, if anyone, including the student's family. With rare exceptions, schools are required to respect the limitations that a student places on the disclosure of their transgender status, including not sharing that information with the student's parents."

## IV. MOTIONS TO DISMISS[8]

### A. Article III Standing

#### 1. *Superintendent of Public Instruction Tony Thurmond*

Defendant Superintendent of Public Instruction Tony Thurmond argues that the Plaintiffs lack Article III standing.

#### a. Parents

Defendant Thurmond begins by contending that the parents have no standing because they have not alleged an injury-in-fact. But the Poes have alleged a substantial injury. The Poes allege that their daughter entered seventh grade at a public school in Fresno. Complaint ¶117. It is alleged that while at school, the child began self-identifying as a male and adopted a new male name and pronouns for the teachers to use. *Id*. The child became president of her school's LGBTQ club. *Id.* However, it is alleged that the Poes were unaware of their child's gender nonconformity at school. *Id.* When their child entered eighth grade, the Poes attended a back-to-school night and met with their child's teachers. *Id*. at ¶118. The Poes allege that none of the teachers said anything about their child presenting as a different gender at school, wanting to use a different name or pronoun, or that their child was president of the school LGBTQ club. *Id*. It is alleged that the teachers referred to the Poes' child by her legal name and her birth gender biological pronouns, not the new name and pronouns being used in school. *Id*. It is alleged that only after their child attempted suicide did a physician tell the Poes that their daughter was identifying as a boy. *Id.* at ¶119. When the Poes contacted the

---

[8] For purposes of a motion to dismiss, facts pled in a complaint are assumed to be true. *Mazarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

school to ask if their child was being called by a different name, it is alleged that the school said, "no." *Id.* at ¶121. The Poes allege that the school's answer was not truthful because teachers' written letters and emails revealed otherwise. *Id.* Upon moving their child to a new (public charter) school, the Poes inquired whether their child was presenting as a male. It is alleged that a school administrator responded by informing the Poes that the school was not permitted to disclose their child's gender identity at school due to the State Department of Education's FAQs guidance and quoted from the FAQs. *Id.* at ¶125. The Poes allege they have other school age children but are afraid to place the children in the public schools because of their experience of teachers and administrators withholding information about gender expression. *Id.* at ¶126-27. It is alleged that the Poes cannot afford to place their children in private schools.

Like the Poe parents, the Doe parents have a child who attends public schools. The Does allege that their child has repeatedly transitioned to and desisted from a transgender identity. Complaint at ¶128-29. The Does allege that their child's public school "has repeatedly directly lied to them and refused to answer their questions," citing to the State Department of Education's FAQ guidance on gender identity. *Id.* at ¶129, ¶146-48.

These allegations sufficiently describe facts that the Poes and the Does have suffered an actual injury that is concrete and particularized, fairly traceable to the Department of Education FAQs on gender identity, and that is redressable by a favorable ruling. *Murthy,* 603 U.S. at 56–57. This suffices to demonstrate the parents' Article III standing.[9]

---

[9] The Plaintiff Parents may also enjoy standing under the "juridical link" doctrine. *See Martinez v. Newsom*, 46 F.4th 965, 970-72 (9th Cir. 2022) (describing the juridical link exception to cases where plaintiffs sue "officials of a single state and its subordinate units of government" who apply a "common rule").

### b. New Plaintiff Teachers' Standing

Defendant Thurmond contends that the newly added Plaintiff teachers have no standing because they have not alleged an injury-in-fact. More specifically, he contends that their alleged injuries are too speculative. However, teachers Boe and Roe have had transgender students in their classes in past years. Complaint at ¶112-13. The new plaintiff teachers allege that in the future they are likely to have middle school students who express gender incongruity in the classroom and announce non-conforming names and pronouns by which they wish to be called. The likelihood Boe or Roe being assigned future students to which the new policies apply is plausibly high. When that occurs, teachers Boe and Roe will be faced with the Department of Education FAQs policy as adopted by EUSD. That policy, it is alleged, will require Boe or Roe to deceive and mislead any parents who ask them about whether their child has expressed gender incongruency. That, in turn, it is alleged will violate their sincerely held religious beliefs or expose them to adverse employment actions.[10] *Id.*

These allegations sufficiently articulate that new teacher Plaintiffs Boe and Roe are likely to suffer an actual injury that is concrete and particularized, fairly traceable to the Department of Education FAQs and EUSD's policy on gender identity, that is redressable by a favorable ruling. *Murthy,* 603 U.S. at 56–57. This suffices for Article III standing.

---

[10] Should a teacher fail to abide by state law their teaching credential could be revoked. *Steinmetz v. California State Board of Education*, 44 Cal.2d 816 (1955) (state board has authority to call teacher before it to answer questions or revoke certificate); *Atwater Elementary Sch. Dist. v. California Dep't of Gen. Servs.*, 41 Cal. 4th 227, 236, (2007) (Kennard, J., dissenting) ("The Legislature has established two separate but interrelated systems for addressing misconduct by a credentialed teacher. The first grants school boards the authority to suspend or dismiss a teacher. (Ed. Code, § 44932 *et seq.*) The second authorizes the Commission to admonish a teacher, to publicly reprove a teacher, or to suspend or revoke a teacher's credential. (*Id.*, § 44242.5 *et seq.*)").

### c. Teachers Mirabelli's and West's Standing

Lastly, Defendant Thurmond contends that the teachers Mirabelli and West no longer have standing because they are not currently teaching.  But Mirabelli and West have allegedly suffered past injuries as teachers due to the policies and allege that they intend to teach in the future where the same policies will likely impose similar injuries.  Thus, teachers Mirabelli and West enjoy Article III standing because they have alleged the suffering of an actual injury that is concrete and particularized and is likely to reoccur and that is fairly traceable to the Department of Education FAQs and EUSD's policies on gender identity.  The alleged injury and is redressable by a favorable ruling.  Moreover, because other teacher Plaintiffs (Boe and Roe) have standing, the suit by teachers Mirabelli and West may also proceed.  *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) ("If at least one plaintiff has standing, the suit may proceed.") (citing *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52, n. 2 (2006)).

### d. The FAQs

The Superintendent also objects that there is no formal policy – that the Department of Education has merely published a suggested way to comply with discrimination law.  That is a merits argument that is better left for later proceedings, rather than an Iqbal/Twombly or Article III standing argument.  *Maya*, 658 F.3d at 1068.

## 2. *Members of the California Board of Education*

The Defendant Members of the California Board of Education make arguments similar to those of the State Superintendent of Public Instruction, Tony Thurmond.  However, the Board of Education Members also distance themselves from responsibility for the Department of Education's FAQs and their enforcement.  For example, the Defendant Members argue that it is a policy-making body while the Superintendent of Public Instruction is responsible for the administration and implementation of policies.  The Members offer that they are not responsible for the content of the California Department of Education's website.  As a result, they argue that they are entitled to be dismissed.  But the separation between the State Defendants is indistinct.

"The California State Board of Education ('SBE') drafts and oversees the policies implemented by the California Department of Education ('CDE'). The SBE is responsible for approving and overseeing statewide curriculum content, creating the curriculum framework for kindergarten through twelfth grade, and adopting instructional materials for kindergarten through eighth grade." *Cal. Parents for the Equalization of Educ. Materials v. Torlakson,* 267 F. Supp. 3d 1218, 1222 (N.D. Cal. 2017). As California courts describe it, "[t]he Legislature . . . delegated certain powers to the Board and Superintendent. Pursuant to section 33030, 'the board shall determine all questions of policy within its powers.' The Board is authorized to 'adopt rules and regulations not inconsistent with the laws of this state (a) for its own government, (b) for the government of its appointees and employees,' and the government of the various schools which receive state funds. (§ 33031.)" *State Bd. of Educ. v. Honig*, 13 Cal. App. 4th 720, 753 (1993). *Honig* explains that at the same time, "[t]he Legislature delegated to the Superintendent the power to 'execute, under direction of the State Board of Education, the policies which have been decided upon by the board and shall direct, under general rules and regulations adopted by the State Board of Education, the work of all appointees and employees of the board.' (§ 33111.)" *Id.*[11] Put another way, "'the Board is authorized under section 33031 to adopt rules and regulations ... for its own government and for the government of its appointees ....' The Superintendent must execute policies decided by the Board." *Honig*, 13 Cal. App. 4th at 758.

---

[11] "[S]ection 33301 describes how the appointed Board and elected Superintendent should divide responsibilities for administration of the Department: 'The Department of Education shall be administered through: (a) The State Board of Education which shall be the governing and policy determining body of the department; (b) The Director of Education [Superintendent] in whom all executive and administrative functions of the department are vested and who is the executive officer of the State Board of Education." Id.

23-cv-00768-BEN-VET

Consequently, while the Members of the Board of Education disclaim responsibility for the policies promulgated by the Department of Education, state law gives the Members of the Board authority to decide policies to be implemented by the Department of Education and adopted by school districts throughout the state, under Education Code §33031.  It is under the direction of the State Board of Education that the Superintendent has the power to execute the policies which have been decided upon by the Board, under Education Code §33111.  *Id.*  At the pleading stage, the Complaint is sufficient to demonstrate that the injuries are fairly traceable to the Defendant Members of the Board of Education and that therefore the Plaintiffs enjoy Article III standing.

### 3.  *The Attorney General*

The Attorney General of California also seeks dismissal contending the Plaintiffs lack standing.  In his present motion the Attorney General maintains his disavowal of enforcement against EUSD.  He argues that the EUSD teacher Plaintiffs lack a threat of actual injury as a result.  His disavowal sufficed previously when EUSD teachers were the sole Plaintiffs.  *See* Order, Dkt. 114 (filed May 10, 2024).  However, there are now parent Plaintiffs who are suffering, or are likely to suffer, injury in other school districts for which the Attorney General has not disavowed enforcement.  Although the Attorney General contends that as a matter of law school non-disclosure to parents "will not tangibly interfere" with their constitutionally grounded parental rights to care for their children, this Court disagrees.

"In a pre-enforcement challenge, a litigant 'satisfies the injury-in-fact requirement by alleging 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.''"  *Matsumoto v. Labrador*, 2024 WL 4927266, at *4 (9th Cir. Dec. 2, 2024) (citation omitted).  The Attorney General contends that there is no threat of prosecution.  The State gender non-disclosure policies are fairly new.  "In challenging a new law whose history of enforcement is negligible or nonexistent, either a 'general warning of enforcement' or a 'failure to disavow enforcement' is sufficient to establish a

credible threat of prosecution in pre-enforcement challenges on First Amendment grounds." *Id*.  At the hearing, the Attorney General did not disavow enforcement against any other school districts.  In fact, the Attorney General has not sat silent.  The Attorney General has actually taken past enforcement action against the Chino Valley Unified School District (*see People v. Chino Valley Unified School District*, Superior Court of San Bernardino Case No. CIV SB 2317301 (filed Aug 28, 2023)).  The Chino Valley action underscores the alleged threat of enforcement by the Attorney General.  In response, the Attorney General insists that enforcement turns on a school district's approach to disclosure.  "Mandatory disclosure is the dividing line," says the Attorney General.  In other words, a school district that adopts a policy of mandatory disclosure to parents when a student displays gender incongruity or dysphoria faces a threat of enforcement.  He implies that a school district that requires something less than mandatory disclosure will not be prosecuted.  This distinction draws too fine a line between the credible threat of enforcement and non-enforcement to undercut the parent Plaintiff's standing.

According to the Complaint, the Plaintiff Parents have suffered actual injuries, and are likely to suffer future injuries traceable to the State Defendants' policies requiring non-disclosure and an injunction against the Attorney General's enforcement of those policies against any California school district will accord relief.  Therefore, the Attorney General's motion to dismiss based on standing is denied.[12]

### 4.  *Escondido Union School District Defendants*

The EUSD Defendants also move to dismiss contending the new teacher Plaintiffs lack standing because the application of AR 5145.3 to teachers Boe and Roe is too speculative.  EUSD argues that neither teacher has a transgender student assigned to their

---

[12] The Attorney General does not move to dismiss any particular claim for relief under Rule 12(b)(6).

class right now. However, the Complaint alleges that Boe and Roe are currently teaching at EUSD. The Complaint plausibly alleges that AR 5145.3 will require their non-disclosure to parents of any student they observe experiencing gender dysphoria or gender non-conformity. It is plausible that whether assigned to their classes, or observed at other times during the school environment, Boe or Roe may observe students and parents may ask questions of Boe or Roe. Even more likely, it is sufficiently alleged that Boe or Roe will be assigned students who prefer names or dress that suggests gender dysphoria or incongruence and Boe or Roe will have to participate in parent-teacher meetings. This is sufficient for purposes of establishing Article III standing against EUSD.

### B. **Failure to State a Claim**

In the new Complaint, Plaintiffs advance eight claims for relief. The teachers assert two claims under the First Amendment's Freedom of Speech Clause and one claim under the Free Exercise of Religion Clause (Claims 1, 2, and 3). West individually advances two claims under Title VII of the Civil Rights Act of 1964 (Claims 4 and 5). The parents assert a single claim for violation of their substantive due process rights under the Fourteenth Amendment (Claim 7) and two claims for violations of their rights under the First Amendment's Free Exercise of Religion Clause (Claims 6 and 8).

The teachers' claims are similar to those asserted in prior versions of the Complaint and this Court adopts its prior reasoning and rulings concerning these claims. The parents' claims expand the reach of the case beyond EUSD to the State Defendants who are adopting and implementing policies animating EUSD's problematic AR 5145.3. The parents' claims have not been addressed before and there is no binding case authority on point. Teacher West's Title VII claims are garden variety employment claims.

### 1.    *Superintendent of Public Instruction Tony Thurmond and the Members of the State Board of Education*

The Superintendent of Public Instruction Tony Thurmond and the Members of the State Board of Education make similar arguments. Both argue that the teachers fail to

state claims for relief under the First Amendment Free Speech Clause and the First Amendment's Free Exercise Clause. As to the parents, they fail to state claims for relief under the Free Exercise Clause or the Substantive Due Process Clause.

As to the first assertion, the State Defendants argue that the teacher Plaintiffs "are not entitled to First Amendment free speech clause protection in this circumstance." *See e.g.*, Superintendent's Motion to Dismiss, Dkt. 150 at 9. That is an overstatement. The State Defendants' strongest authority may be *Johnson v. Poway Unified School District,* 658 F.3d 954 (9th Cir. 2011). Yet, while *Johnson* stands for the proposition that a teacher's curricular speech is government hired speech, to say that teachers lose their free speech rights at the schoolhouse door carries *Johnson* too far. Here, the teacher Plaintiffs do not complain about curricular speech. Instead, they allege that the state and EUSD non-disclosure policies place a pre-speech gag on them by prohibiting disclosure of a child's evident gender incongruity including truthful answers to questions asked by parents about their child's gender identity. Complaint at ¶351. According to the Complaint, the policies compel teachers to deceive parents and by such deception interfere both with their own free speech rights and with parents' federal constitutional rights to raise their children. *Id*. at ¶356.

While the government may hire teachers to deliver prescribed curricular speech, it may not compel its employees to do so in a way that intentionally abridges parental constitutional rights or in a manner that is unlawful. The teacher Plaintiffs allege that the state and EUSD policies compel them to abridge parental constitutional rights and to do so in a manner that is intentionally deceptive and unlawful. These allegations fairly state a plausible claim for relief that the policies infringe on the teachers' own constitutional rights under the First Amendment Free Speech Clause.

The arguments by the State Defendants against both the teachers' claims, and later the parents' claims, rely on legal suppositions which this Court rejects. For example, in arguing that the teachers fail to state a claim, the State Defendants contend that "parents do not have a constitutional right to be informed of their child's transgender identity."

Superintendent's Motion to Dismiss, Dkt. 150 at 10; Board's Motion to Dismiss, Dkt. 149, at 12. Likewise, in arguing that the parents fail to state a substantive due process claim, the State Defendants assert that parents do not enjoy a fundamental right to be informed about their student. Specifically, the State Defendants assert, that parents "do not have a fundamental right to be informed of their students' gender identity at school, and accommodating a student's social transition at school is not medical care triggering any right to parental involvement." *Id.* at 21; 23.

This cramped definition of parental rights is conclusory and requires the suspension of disbelief. Constitutional rights of parents to bring up a child and decide how to handle health care issues are some of America's oldest foundational rights. "The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). This is especially true with regard to issues of health.

"Surely, [a parent's right] includes a 'high duty' to recognize symptoms of illness and to seek and follow medical advice." *Parham v. J. R.*, 442 U.S. 584, 602 (1979). A child's gender incongruity is a matter of health. Matters of a child's health are matters over which parents have the highest right and duty of care. Parental rights over matters of health continue to be preeminent even where the government may worry about a general possibility of abuse or parental non-acceptance due to their child's exhibition of gender incongruity. The Supreme Court took this approach in *Parham,*

> Appellees argue that the constitutional rights of the child are of such magnitude and the likelihood of parental abuse is so great that the parents' traditional interests in and responsibility for the upbringing of their child must be subordinated at least to the extent of providing a formal adversary hearing prior to a voluntary commitment.
> Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course; our constitutional system long ago

23-cv-00768-BEN-VET

rejected any notion that a child is "the mere creature of the State" and, on the contrary, asserted that parents generally "have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations."

. . . .

The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions.  More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.

. . . .

Simply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state. . . .  Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment.  Parents can and must make those judgments.

442 U.S. at 602-603 (citations omitted).  And although the State Defendants disagree[13], it easily follows that parents *do* have a constitutional right to be accurately informed by public school teachers about their student's gender incongruity that could progress to gender dysphoria, depression, or suicidal ideation, because it is a matter of health.  *Cf. John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 636 (4th Cir. 2023) (Niemeyer, C.J., dissenting) ("The issue of whether and how grade school and high school students choose to pursue gender transition is a family matter, not one to be addressed initially and exclusively by public schools without the knowledge and consent of parents.  Yet, the Montgomery County Board of Education . . . preempts the issue to the exclusion of parents with the adoption of its "Guidelines for Student Gender Identity," which invite all students in the Montgomery County public schools to engage

---

[13] The State Defendants do agree that parents have specific rights with respect to directing their child's medical care.  Superintendent's Mot. to Dism., at 11; Board Mot. to Dism., at 13.

in gender transition plans with school Principals without the knowledge and consent of their parents.  This policy implicates the heartland of parental protection under the substantive Due Process Clause of the Fourteenth Amendment.).  Even *Regino v. Staley,* upon which the State Defendants rely, acknowledges that the parents' constitutional claim is substantial.  *Regino v. Staley*, 2023 WL 4464845 at *4 (E.D. Cal. 2023) ("Plaintiff has raised serious questions that go to the merits of her case, namely what the bounds of the parental right are to direct the upbringing of one's children as they pertain to a child's gender identity and expression in school.").

The Defendants' policies do little to protect a parent's interests in their child's health.  On the contrary, when on occasion these interests collide, the Defendants' policies promote the ascendancy of a child's rights over the child's parents.  The Supreme Court's precedents point the other way toward "permit[ting] the parents to retain a substantial, if not the dominant, role" in a health care decision.  *Id*. at 604.  For example, the Supreme Court points out that "[t]he fact that a child may balk at hospitalization or complain about a parental refusal to provide cosmetic surgery does not diminish the parent's authority to decide what is best for the child."  *Id*.

There are no controlling decisions for this Court to follow in this case.  This case presents the question of whether the constitutional rights of parents may be subordinated by a state's imposition of policies that elevate a child's state created and unprecedented rights above or beyond the rights of their parents.  At least as far as decisions on healthcare in school settings are concerned, the long-recognized federal constitutional rights of parents must preponderate and a claim that school policies trench on parents' rights states a plausible claim for relief.  Because this is a lynchpin argument for the State Defendants, an argument with which the Court disagrees, the State Defendants' motion to dismiss the parent Plaintiffs' claim for violation their substantive due process rights (Claim 7) is also denied.

The State Defendants also argue for dismissal of the teachers' and the parents' First Amendment Free Exercise Clause claims (Claims 2 and 3; Claims 6 and 8).  The

gravamen of the defense argument is that neither the teachers nor the parents are suffering, or will suffer, a substantial burden on their exercise of religion.[14] However, the contentions set out in the Complaint allege the burdens placed by the polices on the Plaintiffs are substantial.

The teachers allege that they risk adverse employment consequences up to and including termination. *See e.g.*, Complaint, Exhibits 33-36. They plausibly allege that having to choose between violating their sincerely held religious beliefs by deceiving parents and facing substantial adverse employment consequences is a substantial burden on their free exercise rights. The parents allege that allowing California schools to socially transition their children to a new gender without their knowledge, or involvement, or be forced to withdraw their children from a public school, is a substantial burden on their free exercise of religion. Complaint ¶443-44. The parents allege that the policies must undergo strict scrutiny but that the state has no compelling interest in requiring school staff to deceive parents about their children's incongruent gender expression. *Id*. at ¶453-57. In short, both the teachers and the parents have adequately stated claims upon which relief can be granted in asserting that the non-disclosure policies substantially burden their First Amendment right to the free exercise of religion.

The State Defendants also argue that their policies do not force the parents to act contrary to their religious beliefs. According to the Complaint, the policies force parents to accede to a school's plan to neither acknowledge nor disclose information about their child's gender dysphoria. By concealing a child's gender health issues from the parents, parents are precluded from exercising their religious obligations to raise and care for their child at a time when it may be highly significant, because they are kept uninformed of the need for their child's religious guidance. "Families entrust public schools with the education of their children, but condition their trust on the understanding that the

---

[14] Superintendent's Mot. to Dism., at 15; Board Mot. to Dism., at 17.

classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family.  Students in such institutions are impressionable and their attendance is involuntary." *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987).  For parents who are not rich and have limited financial resources to choose private schooling or homeschooling for their child, there remains only public school placement for satisfying the state truancy law obligation of school attendance.

Whether the teachers and parents can prove their allegations may remain for summary judgment or trial but they have adequately stated plausible free exercise claims. Therefore, the State Defendants' motions to dismiss Claims 2 and 3 (teachers) and Claims 6 and 8 (parents) are denied.

### 2. *EUSD*

EUSD moves to dismiss the teachers' claims.  EUSD argues that the teachers fail to state free speech or free exercise claims.  EUSD separately argues that West has not stated Title VII claims.  EUSD's arguments concerning the teacher's First Amendment claims largely parallel the arguments of the State Defendants and fare no better.  EUSD makes similar arguments that the teachers fail to state a claim for violations of their right to free speech.  EUSD argues (as it did before) that only curricular speech is at issue and that it may control the curriculum.  But as discussed above, the allegations in the Complaint go beyond garden-variety curricular speech.  Teachers do not completely forfeit their First Amendment rights in exchange for public school employment.  To the extent that teachers allege (as they do here) that EUSD has hired their speech to speak falsely or deceptively to parents of students, the teachers make out a plausible claim for relief under the First Amendment's Free Speech Clause.  Likewise, to the extent teachers allege (as they do here) that EUSD's curriculum includes what the teachers sincerely believe to be lies and deceptions for communications with school parents and that such prevarications are religiously or morally offensive, the teachers make out a plausible claim for relief under the First Amendment's Free Exercise Clause.  EUSD contends that it is not a lie to not answer a question.  That the teachers sincerely held religious beliefs

to the contrary cannot be simply dismissed.  It is the allegations of the Complaint that dictate the claim for relief.  Here, Plaintiffs sufficiently allege plausible free exercise claims.  EUSD makes additional arguments for dismissal, but they are in the nature of summary judgment or trial arguments going to the merits and are not suitable for consideration on a motion to dismiss.  Therefore, EUSD' motion to dismiss the teachers' First Amendment claims (Claims 1, 2, and 3) are denied.

EUSD also argues for dismissal of West's Title VII claims.  West asserts a religious discrimination claim based on a failure to accommodate (Claim 4)  and a retaliation claim (Claim 5).  Concerning the failure to accommodate claim, EUSD argues facts to prove that it has engaged in sufficient efforts to accommodate West.  For example, it says "EUSD initiated good food [sic] efforts to accommodate West's religious beliefs through meetings. . . ."  EUSD Mem. of Points and Auth., Dkt. 157, at 10.  And EUSD says, "During this process, EUSD came to an agreement with Mirabelli and West. . . ."  *Id*.  EUSD may be able to prevail on its defenses at summary judgment or trial, but its arguments here are premature.  After all, "[a]n employer who fails to provide an accommodation has a defense only if the hardship [on the employer] is 'undue,' and a hardship that is attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice cannot be considered 'undue.'" *Groff v. DeJoy*, 600 U.S. 447, 472 (2023).

Similarly, for the retaliation claim, EUSD remonstrates that West's allegations have "no supporting factual basis," and then goes on to describe what it sees as favorable facts.  EUSD Mem. of Points and Auth., Dkt. 157, at 11.  EUSD also argues that West is required to allege the "when and what" of actions that her principal should have protected West from.  But the Complaint sufficiently gives notice of the types of retaliation that West alleges EUSD was aware and alleges EUSD took no action.  "To establish a prima facie claim for retaliation under Title VII, the plaintiff must demonstrate that: (1) she engaged in a protected activity; (2) she was subjected to an adverse employment action, and (3) a causal link exists between the protected activity and the adverse action." *Perez*

*v. McDonough*, No. 23-CV-06713-JST, 2024 WL 4844383, at *7 (N.D. Cal. Nov. 20, 2024) (citing *Manatt v. Bank of Am., NA*, 339 F.3d 792, 800 (9th Cir. 2003)). West satisfies this standard. The Complaint alleges EUSD placed her on administrative leave and did not permit her to teach. This suffices to state a claim. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1078 (9th Cir. 2013) ("The district court dismissed Dahlia's suit on the alternative ground that placement on administrative leave is not an adverse employment action. We disagree. We conclude that, under some circumstances, placement on administrative leave can constitute an adverse employment action."). The Complaint also alleges instances of co-worker hostility to West's religious stance. This also suffices to state a claim as Title VII protects an employee from religious hostility by co-workers of whom the employer is aware. *Groff*, 600 U.S. at 472. Ultimately, West has succeeded in stating claims for relief under Title VII (Claims 4 and 5). EUSD's motion to dismiss the West claims is denied.

## C. Indispensable Parties

The State Defendants also argue that the Complaint should be dismissed because the Plaintiffs have not named other indispensable parties as defendants. Specifically, it is argued that the local school districts of the Poe and Doe children must be named as defendants. The Court disagrees. California local school districts are ultimately state agents under state control. *Sato v. Orange Cnty. Dep't of Educ.*, 861 F.3d 923, 933 (9th Cir. 2017) ("We therefore find that the passage of AB 97 did not disturb our longstanding precedent that California law treats public schooling as a statewide or central governmental function. . . . that the state itself has decided to give its local agents more autonomy does not change the fact that the school districts remain state agents under state control.") (citations omitted); *Butt v. State of California*, 4 Cal. 4th 668, 681 (1992) ("Management and control of the public schools is a matter of state, not local, care and supervision. . . . Local districts are the State's agents for local operation of the common school system and the State's ultimate responsibility for public education cannot be delegated to any other entity.") (citations omitted). Consequently, the State Defendants

are able to protect a local district's interests and complete relief can be afforded among
the existing parties.  Thus, other local school districts need not be joined as defendants
under Federal Rule of Civil Procedure 19.  *Cf. Everett H v. Dry Creek Joint Elementary
Sch. Dist.*, No. 2:13-CV-00889-MCE-DB, 2016 WL 5661775, at *7 (E.D. Cal. Sept. 30,
2016) ("The CDE's [indispensable party] argument ignores the fact that the CDE has an
independent obligation to ensure compliance with the IDEA.").

## VI.  CONCLUSION

It is still true that a request to change one's own name and pronouns may be the
first visible sign that a child or adolescent may be dealing with issues that could lead to
gender dysphoria or related health issues.  Yet, for teachers, communicating to a parent
the social transition of a school student to a new gender — by using preferred pronouns
or incongruent dress — is not generally permitted under EUSD's and the State
Defendants' policies.  The Supreme Court has long recognized that parents hold a federal
constitutional Due Process right to direct the health care and education of their children.
The Defendants stand on unprecedented and more recently created state law child rights
to privacy and to be free from gender discrimination.  These rights may compete when it
comes to information about a child's expressed gender incongruence in a public school.
Parents have a right to know about their child gender expression at school.  And a child
has a right to keep gender expressions private and to be protected from discrimination.

The Supreme Court and the Ninth Circuit have clearly and unambiguously
declared parents' rights as they relate to their children.  *Parham*, 442 U.S. at 602-604;
*Mann v. County of San Diego*, 907 F.3d 1154, 1156 (9th Cir. 2018) ("We have long
recognized the potential conflict between the state's interest in protecting children from
abusive or neglectful conditions and the right of the families it seeks to protect to be free
of unconstitutional intrusion into the family unit, *which can have its own potentially
devastating and long lasting effects.*") (emphasis added).  There are no controlling
decisions that would compel this Court to limit or infringe parental rights,
notwithstanding the State's laudable goals of protecting children.  This Court concludes

that, in a collision of rights as between parents and child, the long-recognized federal constitutional rights of parents must eclipse the state rights of the child. Therefore, the Court finds that the Plaintiffs have stated plausible claims upon which relief can be granted and the motions to dismiss are denied.

**THEREFORE, IT IS ORDERED THAT:**

All Plaintiffs enjoy Article III standing. The motion to dismiss of the Superintendent of Public Instruction (Dkt. 150) is denied. The motion to dismiss of the members of the Board of Education (Dkt. 149) is denied. The Attorney General's motion to dismiss (Dkt. 156) is denied. The motion to dismiss of the EUSD Defendants (Dkt. 157) is denied.

**IT IS SO ORDERED.**

Dated: January 7, 2025

**HON. ROGER T. BENITEZ**
United States District Judge

23-cv-00768-BEN-VET