Charles S. LiMandri, SBN 110841
  cslimandri@limandri.com
Paul M. Jonna, SBN 265389
  pjonna@limandri.com
Jeffrey M. Trissell, SBN 292480
  jtrissell@limandri.com
William T. Duke, SBN 361823
  wduke@limandri.com
LiMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Telephone: (858) 759-9930
Facsimile: (858) 759-9938

Thomas Brejcha, *pro hac vice*\*
  tbrejcha@thomasmoresociety.org
Peter Breen, *pro hac vice*\*
  pbreen@thomasmorsociety.org
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680
\*Application forthcoming


*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH MIRABELLI, an individual, on behalf of herself and all others similarly situated; LORI ANN WEST, an individual, on behalf of herself and all others similarly situated; et al.,<br><br>        Plaintiffs,<br><br>     v.<br><br>MARK OLSON, in his official capacity as President of the EUSD Board of Education, et al.,<br><br>        Defendants. | Case No.: 3:23-cv-0768-BEN-VET<br><br>**Memorandum of Points & Authorities in Support of Plaintiffs' Renewed Motion for (1) Summary Judgment on Prospective Relief Claims; (2) Partial Summary Judgment re Liability on Damages Claims; (3) Entry of a Rule 54(b) Separate Judgment on Prospective Relief Claims and Stay of Damages Claims; and (4) Entry of a Class-Wide Permanent Injunction**<br><br>Judge:      Hon. Roger T. Benitez<br>Courtroom:  5A<br>Hearing Date:  August 18, 2025<br>Hearing Time:  10:30 a.m. |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

FACTUAL & PROCEDURAL BACKGROUND.................................5

    A.   Summary of California's Prohibition on Gender Identity
         Discrimination ........................................................................5

    B.   The Role of the State in California's Education System.....................6

    C.   History of California's Adoption of Parental Exclusion
         Policies ............................................................................... 6

    B.   History of California's Enforcement of Parental Exclusion
         Policies ............................................................................... 9

LEGAL STANDARD ..........................................................................10

ARGUMENT...................................................................................... 11

    I.   The Court Should Grant Plaintiffs Summary Judgment on
         their Claims for Prospective Relief ...................................... 11

         A.   Background Legal Principles: The Constitution
              Protects Against Government Interference with
              Certain Inalienable Rights ........................................... 11

              1.   Background on the Right to Freedom of
                   Thought.............................................................. 11

              2.   Background on the Right to Have a Family ................12

              3.   Background on the Right to Raise Your
                   Children..............................................................14

              4.   Background on the Right to Educate Your
                   Children..............................................................16

              5.   Background on the Right to Direct Healthcare
                   of Children..........................................................19

               6.   Background on the Privacy Rights of Minors
                   Against their Parents.......................................... 20

B.    Under the Free Exercise Clause, Both Religious
Parents and Teachers Have the Right to Opt Out of
Parental Exclusion Policies ......................................21

      1.    Parental Exclusion Policies Burden Religion ................21

      2.    The Burden on Parent's Religion Triggers
Strict Scrutiny.......................................................... 22

      3.    The Exemptions Trigger Strict Scrutiny for
Teachers ..................................................................... 22

            a.    The individualized exemptions trigger
strict scrutiny.....................................................23

            b.    The comparable exceptions trigger strict
scrutiny...............................................................23

      4.    Parental Exclusion Policies Cannot Satisfy
Strict Scrutiny...........................................................25

C.    Under the Fourteenth Amendment Right to Direct
the Upbringing of Children, Parental Exclusion
Policies Are Unconstitutional .................................... 28

      1.    Directing a Child's Social Transition is Within
the Parental Right ....................................................... 29

      2.    The Medical Treatment of a Child's Social
Transition is Within the Parental Right........................ 29

D.    Under Teacher's First Amendment Right to
Freedom of Speech, Parental Exclusion Policies Are
Unconstitutional....................................................... 31

      1.    Gender Identity is a Matter of Public Concern.............32

      2.    Parental Exclusion Policies Are Unnecessary
for Education ..............................................................33

      3.    There Is No Legitimate State Administrative
or Efficiency Interest Requiring Parental
Exclusion Policies ......................................................35

ii

E.    The Family Educational Rights and Privacy Act
("FERPA") Requires Parent Access to Gender
Support Plans....................................................37

II.    The Court Should Grant Plaintiffs Partial Summary
Judgment on Liability for the EUSD Damages Claims ......................39

A.    The Court Should Grant Partial Summary Judgment
on Plaintiff West's Title VII Claim for Failure to
Accommodate..........................................................40

B.    The Court Should Grant Partial Summary Judgment
on the Inapplicability of Sovereign Immunity as an
Affirmative Defense for the EUSD Superintendent
and EUSD Board of Education ...............................42

C.    The Court Should Grant Partial Summary Judgment
on the Inapplicability of Qualified Immunity as an
Affirmative Defense for  the EUSD Personal-
Capacity Defendants.................................................45

III.    The Court Should Enter a Rule 54(b) Separate Judgment
on the Prospective Relief Claims and stay the Rest of the
Case, or Enter a Preliminary Injunction ...............................48

A.    The Court Should Enter a Rule 54(b) Separate
Judgment on the Prospective Relief Claims and stay
the Rest of the Case ................................................48

B.    The Court Should Enter a Class-Wide Injunction...................49

CONCLUSION..................................................50

# TABLE OF AUTHORITIES

## CASES

*303 Creative LLC v. Elenis*
  600 U.S. 570 (2023) ...................................................................... 11

*Alden v. Maine*
  527 U.S. 706 (1999) ...................................................................... 43

*Am. Acad. of Pediatrics v. Lungren*
  16 Cal. 4th 307 (1997) .............................................................. 5, 16

*Amoco Prod. Co. v. Vill. of Gambell*
  480 U.S. 531 (1987) ...................................................................... 11

*Ariz. Dream Act Coal. v. Brewer*
  855 F.3d 957 (9th Cir. 2017) ........................................................ 50

*Arkansas v. U.S. Dep't of Educ.*
  742 F.Supp.3d 919 (E.D. Mo. 2024) ............................................ 32

*Ashcroft v. al-Kidd*
  563 U.S. 731 (2011) ...................................................................... 46

*Ass'n of Mex.-Am. Educators v. California*
  231 F.3d 572, 581 (9th Cir. 2000) ................................................. 6

*Axson-Flynn v. Johnson*
  356 F.3d 1277 (10th Cir. 2004) .................................................... 46

*Bacon v. Woodward*
  104 F.4th 744 (9th Cir. 2024) ...................................................... 24

*Bauer v. Kincaid*
  759 F. Supp. 575 (W.D. Mo. 1991) .............................................. 40

*Beaver v. Federal Way*
  301 F. App'x 704 (9th Cir. 2008) ................................................. 46

*Belanger v. Madera Unified Sch. Dist.*
  963 F.2d 248 (9th Cir. 1992) ....................................................... 43

*Belanger v. Nashua Sch. Dist.*
  856 F. Supp. 40 (D.N.H. 1994) .................................................... 39

*Bellotti v. Baird*
  443 U.S. 622 (1979).............................................. 12, 15, 16, 20, 21

# TABLE OF AUTHORITIES

**CASES**

*Blackhawk v. Penn.*
381 F.3d 202 (3d Cir. 2004) ........................................................... 23

*Boerne v. Flores*
521 U.S. 507 (1997) ...................................................... 26

*Boy Scouts of Am. v. Dale*
530 U.S. 640 (2000)...................................................... 12

*Brach v. Newsom*
6 F.4th 904 (9th Cir. 2021) ........................................... 26

*Brach v. Newsom*
38 F.4th 6 (9th Cir. 2022) ............................................. 26

*Brekke v. Wills*
125 Cal. App. 4th 1400 (2005) ......................................14, 21, 29

*Brown v. Ent. Merchs. Ass'n*
564 U.S. 786 (2011) ...................................................15, 17

*Burke v. Walsh*
No. 3:23-cv-11798, 2024 WL 3548759 (D. Mass. June 5, 2024) ...................47

*Burwell v. Hobby Lobby Stores, Inc.*
573 U.S. 682 (2014) ...................................................... 26

*Butt v. California*
4 Cal.4th 668 (1992) ..................................................... 6

*California v. Azar*
911 F.3d 558 (9th Cir. 2018) ........................................ 51

*Callahan v. Woods*
658 F.2d 679 (9th Cir. 1981) ........................................ 42

*Carey v. Population Servs., Int'l*
431 U.S. 678 (1977) ...................................................14

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) ...................................................10

*Cent. Dauphin Sch. Dist. v. Hawkins*
253 A.3d 820 (Pa. Commw. Ct. 2021) ..........................39

# TABLE OF AUTHORITIES

**CASES**

*Cent. Dauphin Sch. Dist. v. Hawkins*
286 A.3d 726 (Pa. 2022) ................................................................. 39

*Chappell & Co. v. Frankel*
367 F.2d 197 (2d Cir. 1966) ............................................................ 11

*Charlotte-Mecklenburg Bd. of Educ. v. Disability Rts. of N.C.*
430 F. Supp. 3d 74 (W.D.N.C. 2019) ............................................ 40

*Church of the Lukumi Babalu Aye, Inc. v. Hialeah*
508 U.S. 520 (1993) ................................................................. 23, 24

*CMAX, Inc. v. Hall*
300 F.2d 265 (9th Cir. 1962) .......................................................... 50

*County of Sacramento v. Lewis*
523 U.S. 833, 846 (1998) ............................................................... 29

*Connick v. Myers*
461 U.S. 138 (1983) ....................................................................... 32

*Crawford v. Trader Joe's Co.*
No. 5:21-cv-1519, 2023 WL 3559331 (C.D. Cal. May 4, 2023) ....... 41

*Cruzan v. Mo. Dep't of Health*
497 U.S. 261 (1990) ....................................................................... 19

*Dahlia v. Rodriguez*
735 F.3d 1060 (9th Cir. 2013) ........................................................ 42

*Dep't of State v. Muñoz*
602 U.S. 899 (2024) ....................................................................... 14

*Diaz v. Brewer*
656 F.3d 1008 (9th Cir. 2011) ........................................................ 51

*Dobbs v. Jackson Women's Health Org.*
597 U.S. 215 (2022) ................................................................. 13, 16

*Dodge v. Evergreen Sch. Dist. #114*
56 F.4th 767 (9th Cir. 2022) .............................. 32, 34, 36, 37, 46

*Doe v. Heck*
327 F.3d 492 (7th Cir. 2003) ......................................................... 14

# TABLE OF AUTHORITIES

## CASES

*Doe v. San Diego Unified Sch. Dist.*
  22 F.4th 1099 (9th Cir. 2022) ....................................................... 26

*Edmo v. Corizon, Inc.*
  935 F.3d 757 (9th Cir. 2019) .................................................. 30, 50

*EEOC v. Abercrombie & Fitch Stores, Inc.*
  575 U.S. 768 (2015) ..................................................................... 41

*Eisenstadt v. Baird*
  405 U.S. 438 (1972) ........................................................................5

*Empl't Div. v. Smith*
  494 U.S. 872 (1990) ..................................................................... 22

*ESPN v. Ohio State Univ.*
  132 Ohio St. 3d 212 (2012) ..........................................................39

*Farrington v. Tokushige*
  11 F.2d 710 (9th Cir. 1926) .....................................................12, 17

*Fay v. S. Colonie Cent. Sch. Dist.*
  802 F.2d 21 (2d Cir. 1986) ...........................................................39

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*
  82 F.4th 664 (9th Cir. 2023) ..................................... 10, 23, 50, 51

*Fields v. Palmdale Sch. Dist.*
  427 F.3d 1197 (9th Cir. 2005) ...................................................... 18

*Fields v. Palmdale Sch. Dist.*
  447 F.3d 1187 (9th Cir. 2006) .........................................18, 19, 30

*Frankel v. Univ. of Calif.*
  744 F. Supp. 3d 1015 (C.D. Cal. 2024) ........................................ 51

*Frazier v. Fairhaven Sch. Comm.*
  276 F.3d 52 (1st Cir. 2002) ...........................................................38

*Free Speech Coal., Inc. v. Paxton*
  606 U.S. ___, 2025 WL 1773625 (U.S. June 27, 2025) ................. 26

*Fulton v. Philadelphia*
  593 U.S. 522 (2021) ...............................................................24, 26

vii

# TABLE OF AUTHORITIES

## Cases

*Garcetti v. Ceballos*
    547 U.S. 410 (2006) ........................................................................ 35

*Garvin County v. Thompson*
    24 Okla. 1 (1909) ............................................................................ 17

*Gelboim v. Bank of Am. Corp.*
    574 U.S. 405 (2015).................................................................... 49, 50

*Geraghty v. Jackson Loc. Sch. Dist. Bd. of Educ.*
    No. 5:22-cv-2237, 2024 WL 3758499 (N.D. Ohio Aug. 12, 2024)............ 32, 35

*Ginsberg v. New York*
    390 U.S. 629 (1968) ........................................................................ 14

*Gonzaga Univ. v. Doe*
    536 U.S. 273 (2002) ........................................................................ 38

*Groff v. DeJoy*
    600 U.S. 447 (2023) .................................................................... 41, 42

*Guernsey v. Pitkin*
    32 Vt. 224 (1859).......................................................................... 17

*H. L. v. Matheson*
    450 U.S. 398 (1981) ........................................................................ 21

*Hall v. Hall*
    3 Atk. 721 (Ch. 1749) ...................................................................... 14

*Hardwick v. Fruitridge Sch. Dist.*
    54 Cal. App. 696 (1921)................................................................. 17

*Harlow v. Fitzgerald*
    457 U.S. 800 (1982) ........................................................................ 46

*Hazelwood Sch. Dist. v. Kuhlmeier*
    484 U.S. 260 (1988) ........................................................................ 35

*Health Freedom Def. Fund, Inc. v. Carvalho*
    104 F.4th 715 (9th Cir. 2024) .......................................................... 44

*Hecox v. Little*
    104 F.4th 1061 (9th Cir. 2024) ........................................................ 28

# TABLE OF AUTHORITIES

## CASES

*Heller v. EBB Auto Co.*
    8 F.3d 1433 (9th Cir. 1993) ............................................................... 41

*Hernandez v. Phoenix*
    43 F.4th 966 (9th Cir. 2022) .................................................... 33, 34

*Hill v. NCAA*
    7 Cal. 4th 1 (1994) .............................................................. 5, 23, 24

*Hodgson v. Minnesota*
    497 U.S. 417 (1990) ................................................................ 13, 21

*Hope v. Pelzer*
    536 U.S. 730 (2002) ..................................................................... 46

*In re Antonio C.*
    83 Cal. App. 4th 1029 (2000) .................................................. 15, 16

*In re M.T.*
    106 Cal. App. 5th 322 (2024) .......................................................... 5

*In re Roger S.*
    19 Cal. 3d 921 (1977) .................................................................... 16

*Janus v. AFSCME, Council 31*
    585 U.S. 878 (2018) ..................................................... 33, 34, 36

*Johnson v. Poway Unified Sch. Dist.*
    658 F.3d 954 (9th Cir. 2011) ..................................................... 33, 34

*Jones v. Williams*
    791 F.3d 1023 (9th Cir. 2015) ...................................................... 46

*Josephson v. Ganzel*
    115 F.4th 771 (6th Cir. 2024) ....................................................... 33

*K.L. v. Evesham Bd. of Educ.*
    423 N.J. Super. 337 (App. Div. 2011) ............................................. 39

*Keene v. San Francisco*
    No. 22-16567, 2023 WL 3451687 (9th Cir. May 15, 2023) ............................. 50

*Kelley v. Ferguson*
    95 Neb. 63 (1914) ......................................................................... 17

1

# TABLE OF AUTHORITIES

2

## CASES

3
4
*Kennedy v. Bremerton Sch. Dist.*
597 U.S. 507 (2022) ....................................................................... 22, 34, 35

5
*Kennedy v. Ridgefield*
439 F.3d 1055 (9th Cir. 2006) ....................................................... 48

6
7
*Klein Indep. Sch. Dist. v. Mattox*
830 F.2d 576 (5th Cir. 1987)......................................................... 40

8
9
*Kohn v. State Bar of Cal.*
87 F.4th 1021 (9th Cir. 2023) ....................................................... 43, 44, 45

10
*L.W. v. Skrmetti*
83 F.4th 460 (6th Cir. 2023) ......................................................... 20

11
12
*Landis v. N. Am. Co.*
299 U.S. 248 (1936) ..................................................................... 49

13
14
*Lee v. York Cnty. Sch. Div.*
484 F.3d 687 (4th Cir. 2007)..........................................................34

15
*Leibert v. Transworld Sys., Inc.*
32 Cal. App. 4th 1693 (1995) ........................................................27

16
17
*Lewin v. Cooke*
28 F. App'x 186 (4th Cir. 2002)......................................................39

18
19
*Little v. Hecox*
No. 24-38, 2025 WL 1829165 (U.S. July 3, 2025).......................... 28

20
*Mahanoy Area Sch. Dist. v. B.L.*
594 U.S. 180 (2021) ..................................................................... 12, 18

21
22
*Mahmoud v. Taylor*
605 U.S. ___, 2025 WL 1773627 (U.S. June 27, 2025)............................ *passim*

23
24
*Mann v. Cnty. of San Diego*
907 F.3d 1154 (9th Cir. 2018) ....................................................... 19, 29, 30

25
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
475 U.S. 574 (1986)......................................................................10

26
27
*McGinnis v. U.S. Postal Serv.*
512 F. Supp. 517 (N.D. Cal. 1980) ................................................43

28

x

# TABLE OF AUTHORITIES

## CASES

*Melzer v. Bd. of Educ. of City Sch. Dist.*
    336 F.3d 185 (2d Cir. 2003)............................................................................36

*Meriwether v. Hartop*
    992 F.3d 492 (6th Cir. 2021) .................................................................. 25, 35

*Meyer v. Nebraska*
    262 U.S. 390 (1923) ..................................................................13, 14, 22, 28

*Mirabelli v. Olson*
    691 F. Supp. 3d 1197 (S.D. Cal. 2023) .............................. 1, 23, 28, 30, 32, 48

*Montana v. Planned Parenthood of Mont.*
    No. 24-745, 2025 WL 1829166 (U.S. July 3, 2025)........................................16

*Moore v. E. Cleveland*
    431 U.S. 494 (1977) ....................................................................................13

*Morgan v. Swanson*
    659 F.3d 359 (5th Cir. 2011) .......................................................................34

*Morrow v. Wood*
    35 Wis. 59 (1874)........................................................................................17

*Muldrow v. City of St. Louis*
    601 U.S. 346 (2024)..................................................................................... 42

*Nguon v. Wolf*
    517 F. Supp. 2d 1177 (C.D. Cal. 2007).............................................. 6, 25, 27

*Nken v. Holder*
    556 U.S. 418 (2009) .................................................................................... 51

*Obergefell v. Hodges*
    576 U.S. 644 (2015).....................................................................................13

*Oliver v. Arnold*
    19 F.4th 843 (5th Cir. 2021) ........................................................................47

*Oregon Cnty. R-IV Sch. Dist. v. LeMon*
    739 S.W.2d 553 (Mo. Ct. App. 1987)........................................................... 40

*Owasso Indep. Sch. Dist. No. I-011 v. Falvo*
    534 U.S. 426 (2002) .................................................................................... 40

# TABLE OF AUTHORITIES

## CASES

*P.R. Ports Auth. v. Fed. Maritime Com'n*
  531 F.3d 86 (D.C. Cir. 2008)............................................................ 44

*Page v. Rotterdam-Mohonasen Cent. Sch. Dist.*
  441 N.Y.S.2d 323 (1981)................................................................39

*Parents Against Abuse In Schools v. Williamsport Area Sch. Dist.*
  594 A.2d 796 (Pa. Commw. Ct. 1991)............................................39

*Parham v. J.R.*
  442 U.S. 584 (1979) ...............................................15, 19, 20, 24, 51

*Passarella v. Aspirus, Inc.*
  108 F.4th 1005 (7th Cir. 2024)...................................................... 42

*Philbrook v. Ansonia Bd. of Educ.*
  757 F.2d 476 (2d Cir. 1985) .......................................................... 41

*Pickering v. Twp. High Sch. Dist. 205*
  391 U.S. 563 (1968) ...................................................................... 32

*Pierce v. Soc'y of Sisters*
  268 U.S. 510 (1925).............................................. 13, 15, 16, 22, 28, 29

*Planned Parenthood of S. Ariz. v. Lawall*
  307 F.3d 783 (9th Cir. 2002)......................................................... 21

*Prince v. Massachusetts*
  321 U.S. 158 (1944) ................................................................ 15, 20

*Ramirez v. Collier*
  595 U.S. 411 (2022)....................................................................... 26

*Regino v. Staley*
  133 F.4th 951 (9th Cir. 2025) ........................................................ 29

*Ricard v. Geary Cnty. Unified Sch. Dist. 475*
  No. 5:22-cv-4015, 2022 WL 1471372 (D. Kan. May 9, 2022) .................30, 48

*Riley v. Bendix Corp.*
  464 F.2d 1113 (5th Cir. 1972)........................................................ 41

*Riley's Am. Heritage Farms v. Elsasser*
  32 F.4th 707 (9th Cir. 2022).......................................................... 33

# TABLE OF AUTHORITIES

## CASES

*Rim of the World Unified Sch. Dist. v. Superior Ct.*
104 Cal. App. 4th 1393 (2002)......................................................................39

*Roach v. Garvan*
1 Ves. 157 (Ch. 1748) ....................................................................................15

*Rochin v. California*
342 U.S. 165 (1952) .......................................................................................19

*Roe v. Critchfield*
137 F.4th 912 (9th Cir. 2025) ....................................................................5, 28

*Roe v. San Jose Unified Sch. Dist. Bd.*
No. 20-cv-2798, 2021 WL 292035 (N.D. Cal. Jan. 28, 2021).......................46

*Roman Cath. Archbishop of Wash. v. Bowser*
531 F. Supp. 3d 22 (D.D.C. 2021) ...............................................................24

*Roman Cath. Diocese of Brooklyn v. Cuomo*
592 U.S. 14 (2020) .........................................................................................50

*Rulison v. Post*
79 Ill. 567 (1875)............................................................................................17

*S. Bay United Pentecostal Church v. Newsom*
141 S. Ct. 716 (2021).....................................................................................26

*San Diego v. Roe*
543 U.S. 77 (2004) .........................................................................................33

*Sato v. Orange Cnty. Dep't of Educ.*
861 F.3d 923 (9th Cir. 2017).........................................................................45

*Saucier v. Katz*
533 U.S. 194 (2001) .......................................................................................46

*Schall v. Martin*
467 U.S. 253 (1984)........................................................................................18

*Sherbert v. Verner*
374 U.S. 398 (1963) .......................................................................................23

*Sipple v. Chron. Publ'g Co.*
154 Cal. App. 3d 1040 (1984) .......................................................................27

1

# TABLE OF AUTHORITIES

2 **CASES**

3   *Skinner v. Oklahoma*
4       316 U.S. 535 (1942) ................................................................. 12, 13

5   *Smith v. Org. of Foster Families for Equal. & Reform*
6       431 U.S. 816 (1977) ...................................................................... 12

    *Snyder v. Phelps*
7       562 U.S. 443 (2011) ........................................................... 12, 32, 33

8   *Soc'y of Sisters v. Pierce*
9       296 F. 928 (D. Or. 1924) ............................................................... 13

10  *Stanley v. Illinois*
        405 U.S. 645 (1972) ...................................................................... 28

11  *Sydney v. Pingree*
12      564 F. Supp. 412 (S.D. Fla. 1982) ................................................. 29

13  *T.F. v. Kettle Moraine Sch. Dist.*
14      No. 21-cv-1650 (Wis. Cir. Ct., Waukesha Cnty., Oct. 3, 2023) ...................... 31

15  *Taking Offense v. State*
        66 Cal. App. 5th 696 (2021) ............................................... 5, 25. 32

16  *Tandon v. Newsom*
17      593 U.S. 61 (2021) .................................................................. 24, 26

18  *Tatel v. Mt. Lebanon Sch. Dist.*
19      637 F. Supp. 3d 295 (W.D. Pa. 2022) ........................................... 18

20  *Tatel v. Mt. Lebanon Sch. Dist.*
        675 F. Supp. 3d 551 (W.D. Pa. 2023) ....................................... 18, 46, 47, 49

21  *Tennessee v. Cardona*
22      No. 2:24-cv-72, 2024 WL 3019146 (E.D. Ky. June 17, 2024) .................. 30, 35

23  *The Presbyterian Church (U.S.A.) v. United States*
24      870 F.2d 518 (9th Cir. 1989) ....................................................... 46

25  *Thomas v. Review Bd. of Ind.*
        450 U.S. 707 (1981) ...................................................................... 22

26  *Tinker v. Des Moines Sch. Dist.*
27      393 U.S. 503 (1969) ...................................................................... 17

28

# TABLE OF AUTHORITIES

## CASES

*Tremain's Case*
    1 Str. 168 (Ch. 1719) ........................................................................ 14

*Troxel v. Granville*
    530 U.S. 57 (2000) ........................................... 14, 15, 20, 28, 48

*Ulrich v. San Francisco*
    308 F.3d 968 (9th Cir. 2002) ....................................................... 33

*United States v. Lanier*
    520 U.S. 259 (1997) ..................................................................... 46

*United States v. Olsen*
    21 F.4th 1036 (9th Cir. 2022) ..................................................... 26

*United States v. Skrmetti*,
    145 S. Ct. 1816 (2025) .............................................................. 5, 28

*United States v. Ward*
    989 F.2d 1015 (9th Cir. 1992) ..................................................... 42

*Vernonia Sch. Dist. 47J v. Acton*
    515 U.S. 646 (1995) ........................................................ 18, 21, 29

*Vlaming v. W. Point Sch. Bd.*
    302 Va. 504 (2023) .............................................. 32, 33, 34, 35, 36

*Vo v. Garden Grove*
    115 Cal. App. 4th 425 (2004) ....................................................... 27

*Vollmar v. Stanley*
    81 Colo. 276 (1927) ...................................................................... 17

*W. Va. State Bd. of Educ. v. Barnette*
    319 U.S. 624 (1943) ..................................................................... 12

*Wallis v. Spencer*
    202 F.3d 1126 (9th Cir. 2000) ................................... 19, 20, 28, 30

*Waln v. Dysart Sch. Dist.*
    54 F.4th 1152 (9th Cir. 2022) ..................................................... 24

*Washington v. Glucksberg*
    521 U.S. 702 (1997) ..................................................................... 19

# TABLE OF AUTHORITIES

## CASES

*Wisconsin v. Yoder*
   406 U.S. 205 (1972) .............................................................. 14, 22

*Wood v. Strickland*
   420 U.S. 308 (1975) ..................................................................... 45

*Words of Faith Fellowship, Inc. v. Rutherford Cnty. Dep't of Soc. Servs.*
   329 F. Supp. 2d 675 (W.D.N.C. 2004) ........................................ 48

*Wyatt v. Fletcher*
   718 F.3d 496 (5th Cir. 2013) .......................................................... 5

*XPandOrtho, Inc. v. Zimmer Biomet Holdings, Inc.*
   No. 3:21-cv-105, 2021 WL 6064036 (S.D. Cal. Dec. 22, 2021) ................... 50

*Zablocki v. Redhail*
   434 U.S. 374 (1978) ..................................................................... 13

*Zepeda v. INS*
   753 F.2d 719 (9th Cir. 1983) ......................................................... 51

## STATUTES, REGULATIONS, RULES, & CONST. PROVISIONS

20 U.S.C. § 1232g ............................................................................ 38

20 U.S.C. § 1232g(a)(1)(A) ............................................................. 39

20 U.S.C. § 1232g(a)(2) .................................................................. 39

20 U.S.C. § 1232g(a)(4)(A) ............................................................. 38

20 U.S.C. § 1232g(a)(5)(B) ............................................................. 39

20 U.S.C. § 1232g(e) ...................................................................... 39

34 C.F.R. § 99 ................................................................................. 38

34 C.F.R. § 99.7 .............................................................................. 39

34 C.F.R. § 99.37 ............................................................................ 39

34 C.F.R. §§ 99.10-99.12 ................................................................ 39

34 C.F.R. §§ 99.20-99.22 ................................................................ 39

42 U.S.C. § 2000e(j) ....................................................................... 41

42 U.S.C. § 2000e-2(a)(1) .............................................................. 41

# TABLE OF AUTHORITIES

**STATUTES, REGULATIONS, RULES, & CONST. PROVISIONS**

42 U.S.C. § 1983 ............................................................................11, 40, 49, 50, 51

Cal. Const. art. I, § 1 ...................................................................................................5

Cal. Const. art. IX, § 14 ...........................................................................................44

Cal. Educ. Code § 220 ...............................................................................................5

Cal. Educ. Code § 220.1 ............................................................................................9

Cal. Educ. Code § 220.3 ............................................................................................9

Cal. Educ. Code § 220.5 ............................................................................................9

Cal. Educ. Code § 221.5(f) ........................................................................................6

Cal. Educ. Code § 250 ...............................................................................................6

Cal. Educ. Code § 33000-33605 ..........................................................................6, 44

Cal. Educ. Code § 35000-35950 ..........................................................................44, 45

Cal. Educ. Code § 49091.12(a) ................................................................................25

Cal. Educ. Code § 51100 .........................................................................................24

Cal. Educ. Code § 51101 .........................................................................................48

Cal. Educ. Code § 51101(a)(1) ................................................................................25

Cal. Educ. Code § 51101(a)(3) ................................................................................25

Cal. Educ. Code § 51101(a)(10) ..............................................................................25

Cal. Educ. Code § 51512 ...........................................................................................4

Cal. Gov. Code § 11135 .............................................................................................6

Cal. Health & Saf. Code § 1439.50(b) ......................................................................5

Cal. Stats. 2007, ch. 569 ............................................................................................5

Cal. Stats. 2013, ch. 85 (AB 1266) ...........................................................................6

Cal. Stats. 2024, ch. 95 (AB 1955) ...........................................................................9

Cal. Welf. & Inst. Code § 15630 .............................................................................26

Fed. R. Civ. P. 56(a) ................................................................................................10

U.S. Const. amend. XIV, § 1 ...................................................................................12

1

# TABLE OF AUTHORITIES

2

**OTHER AUTHORITIES**

3   120 Cong. Rec. 39,858-59 (1974) ...............................................................39

4   120 Cong. Rec. 39,862 (1974)...................................................................17

5   Benjamin Franklin, *On Freedom of Speech and the Press*,
6       Pa. Gazette (Nov. 17, 1737) ...........................................................12

7   David Hartley, *Observations on Man, his Frame, his Duty, and his*
        *Expectations* (London, 1749) ..........................................................16

8   Elizabeth Bristol, *The Laws Respecting Women* (London, 1777)........................ 16, 21

9   Henry W. Disney, *The Law Relating to Schoolmasters* (London, 1893) ....................18

10  James Kent, Commentaries on American Law (1826) ...........................................15

11  John Alleyne, *The Legal Degrees of Marriage Stated and Considered*
12      (London, 1774) .............................................................................. 13

13  John Locke, *Concerning Civil Government, Second Essay* (1689).........................14, 15

14  John Trusler, *A Concise View of the Common and Statute Law of England*
15      (London, 1781) .............................................................................. 21

16  Letter from George Washington to Officers of the Army (Mar. 15,
        1783) ......................................................................................... 12

17  Nicholas Trott Long, *Privacy in the World of Education: What Hath*
18      *James Buckley Wrought?*, 46 R.I.B.J. 9 (Feb. 1998).......................................38

19  Robert Chambers, *A Course of Lectures on the English Law* (1767-1773,
20      Thomas M. Curley ed., 1986) ........................................................... 14, 21

21  *The Citizen's Law Companion* (London, 1794) .......................................... 21

22  William Blackstone, *Commentaries on the Laws of England* (1765) ...........................13

23

24

25

26

27

28

MEMO. OF POINTS & AUTHORITIES ISO PLAINTIFFS' RENEWED
MOTION FOR SUMMARY JUDGMENT OR A PRELIMINARY INJUNCTION

# INTRODUCTION[1]

Since the California Department of Education dictated it by fiat in 2016, California school districts have been required to socially transition any child of any age to the opposite gender, based solely on the child's request, and without parental notice or consent. In defense of this Parental Exclusion Policy, California has analogized to using nicknames—saying it is simply polite to "honor" someone's request to use a preferred name—and can't possibly be considered psychological treatment.[2] But as stated in Plaintiffs' concurrently filed *Daubert* motion to exclude, even California's experts don't believe that. *All* of the experts agree that a transgender identification is something serious for which people need help (calling it an actual "medical condition," Tando Dep., 194:2-195:23), and that a social transition is one of the most stressful activities anybody can go through (calling it "medically recognized treatment," Brady Dep., 197:15-202:22).

This is self-evidently true. A "social transition" involves changing all aspects of oneself in order to take on the role of the opposite-sex—including a name change, changes in appearance, using opposite-sex facilities, and participating in opposite-sex activities. Anderson Rep., ¶¶17, 97-104, 132. Sometimes it even involves chest binders, which can warp a young person's ribcage. *See* Tando Dep., 124:22-135:14. The unconstitutionality of California's Parental Exclusion Policies is painstakingly obvious, and so, in September 2023, this Court preliminarily held as much, while noting that "[f]amilies in middle or lower socio-economic circumstances" do not "have the wherewithal to place their children in private schools or homeschool, or to move to a different public school district." *Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1222 (S.D. Cal. 2023). Echoing this, the Supreme Court recently held that "[i]t is both insulting and legally unsound to tell parents that they must abstain from public education in

---

[1] This brief is 50-pages in accordance with the Court's grant of expanded briefing. *See* ECF Nos. 138, 200.

[2] *See* Faer Dep., 198:15-20; Albert Dep., 22:4-16; Frank Dep., 32:19-23.

order to raise their children in their religious faiths, when alternatives can be prohibitively expensive and they already contribute to financing the public schools." *Mahmoud v. Taylor*, 606 U.S. ___, 2025 WL 1773627, at *21 (U.S. June 27, 2025).

That is precisely the situation here. Long ago, the Poe Family in Fresno County decided that Mrs. Jane Poe would stay home to raise the kids. But this makes money tight—they cannot afford private schooling for their children. When Clovis Unified School District ("CUSD") began secretly transitioning her to a boy beginning in August 2022 (beginning of 7th grade), her mental health quickly deteriorated, and she ultimately attempted suicide in September 2023. It was only at that point, 175 miles away from home, that her doctors told the parents that she was identifying as a boy at school. *See* Poe Decls., ¶¶2-9.

Mr. and Mrs. Poe immediately took her out of her local school and enrolled her in CUSD's online program—until she was hospitalized again—and then they moved her to an online public charter school. Child Poe is doing a little better now that she is under her parents' constant supervision. Unfortunately, her new school refuses to follow the parents' instruction to not use her male name and male pronouns, but they have no other options. They have repeatedly told the school that they *do not consent*, but their instructions are ignored. *See* Poe Decls., ¶¶10-33.

The situation for Mr. and Mrs. Doe is thankfully a little better. For them, Pasadena Unified School District ("PUSD") first began transitioning their daughter, Child Doe, into a boy during fifth grade (2020-2021). For most of that year, her schooling was remote and she used preferred pronouns while online, but Mrs. Doe did not find out until after Child Doe returned to in-person schooling and another mother told her in April 2021. The school itself never contacted either Mr. or Mrs. Doe. But then Child Doe appeared to desist from a transgender presentation over the summer, and re-identify as transgender with the new school year, August 2021 (6th grade). *See* Doe Decls., ¶¶5-13.

At that point, Mr. and Mrs. Doe told Child Doe that they did not agree to a

social transition, and thought that was that. It was not until January 2023 (middle of 7th grade) that Mrs. Doe confronted several teachers and the principal of Child Doe's school to confirm her gnawing suspicion that Child Doe was re-transitioning at school without her or her husband's knowledge or consent. She thought that was that, but at the end of the next school year (8th grade), Mr. Doe discovered that Child Doe was again presenting at school as transgender. *See* Doe Decls., ¶¶14-33.

With an inability to get accurate information from their school, they decided that Child Doe would not stay at her current school (it was a 7-12 school), but would instead transfer to a new high school. They researched private schools but found them unaffordable. So they settled for a different PUSD high school. So far, things seem alright—but they are constantly worrying because they don't know what their school won't tell them. *See* Doe Decls., ¶¶34-49.

At the Escondido Union School District ("EUSD"), things are no better. Despite this Court's preliminary injunction, Mrs. Mirabelli and Mrs. West were essentially run out of school. For her part, after filing this lawsuit, Mrs. West was immediately placed on involuntary paid leave based on frivolous, retaliatory, and serial complaints by colleagues: the Registrar (and parent of a transgender kid) and the Music Teacher (and sponsor of the GSA club).[3] Mrs. West had been a fighter, standing up aggressively for her students, but she had enough and decided to retire and begin substitute teaching at other schools in San Diego County. West Decl., ¶¶24-54; *see* Frank Dep., 92:19-96:22.[4]

For Mrs. Mirabelli, she primarily never felt safe at school after someone broke into her classroom to put up malicious posters and various children verbally harassed her. Mirabelli Decl., ¶¶40-52. EUSD agrees, in principle, that investigations should

---

[3] *See* Terrill Dep., 9:22-14:18, 47:24-62:3; Barlow Dep., 25:17-26:22, 42:12-47:19, 50:19-51:16, 62:4-67:16, 76:18-83:25; *see also* Ibarra Dep., 119:1-131:17, 134:23-135:8, 149:2-15.

[4] Oddly, the Music Teacher circulated an illegal protest video featuring students, but she was never reprimanded. Cal. Educ. Code § 51512; Barlow Dep., 51:18-62:2; White Dep., 69:18-20, 74:9-13.

have occurred, and that Mrs. Mirabelli was reasonable in feeling frightened, *and that her proposed solutions were reasonable*. But after a half-hearted investigation, EUSD took no action.[5] Ultimately, Mirabelli suffered a breakdown to her nervous system, with whole-body neuropathy paralyzing her left arm and making it impossible to drive and very difficult to work. So EUSD terminated her. Mirabelli Decl., ¶¶53-67. Their colleagues—Mrs. Jane Roe and Mrs. Jane Boe—joined this action only reluctantly, and have been stalwart in their efforts to protect their identity. Their fear of retaliation is both severe and justified. *See* Roe Decl., ¶¶18-22; Boe Decl., ¶¶14-18.

Nearly three years since Mirabelli and West first requested a religious accommodation from EUSD, it is time for this case to come to an end. The issues are simple and clear. As Dr. Erica Anderson has explained, "there are *no* studies addressing the benefits or harms of social transition without parental guidance." Anderson Supp. Rep., ¶3. Or as Dr. Nathan Szajnberg testified with respect to the harms caused by Parental Exclusion Policies when considering Child Poe's attempted suicide:

> Here is how I see this, as a physician, now. The school knew in August '22 this girl was struggling with her gender. They did not inform the parents. For 13 months the parents knew nothing about this. And you can see from the record, this girl got sicker and sicker, until she's hospitalized. Had they informed the parents, hypothetically, the parents could have started working with the girl, with the school, with their therapist so there would be no September hospitalization, there would be no series of multiple psychotropic drugs, there would not be a girl who is hallucinating. We could have prevented all of this. We wouldn't be sitting here today.
>
> That's how I see this, as wasted 13 months of this 12-year-old girl's life, wasted because the school didn't just man up and say, "Your daughter is struggling with something. Would you help out with this? We know you're going to—because you're the good parents you are, you're going to work on this. It may not be easy. We'll help you out. We'll support you. But we've got to tell you this."

Szajnberg Dep., 122:25-123:20. Before more damage is caused, this Court should

---

[5] Ibarra Dep., 85:23-91:17, 101:23-102:6, 104:9-105:16, 106:10-113:6; Frank Dep., 44:1-54:12, 62:15-73:4, 77:8-78:3; White Dep., 15:22-16:5, 45:16-52:22; *see also* Terrill Dep., 38:3-39:24, 69:16-71:14.

1  enjoin on a class-wide basis, either preliminary or permanently, California's
2  requirement that schools adopt Parental Exclusion Policies, as a violation of the Free
3  Exercise Clause, Substantive Due Process Rights, and the Free Speech Clause.

## FACTUAL & PROCEDURAL BACKGROUND

### A. Summary of California's Prohibition on Gender Identity Discrimination

6  Under the California Constitution, "[a]ll people … have inalienable rights,"
7  which include "privacy." Cal. Const. art. I, § 1. This Privacy Right has two
8  components: "(1) interests in precluding the dissemination or misuse of sensitive and
9  confidential information ('informational privacy'); and (2) interests in making intimate
10 personal decisions or conducting personal activities without observation, intrusion, or
11 interference ('autonomy privacy')." *Hill v. NCAA*, 7 Cal. 4th 1, 35 (1994). Like any
12 other person, minors have certain autonomy privacy rights, *Am. Acad. of Pediatrics v.*
13 *Lungren*, 16 Cal. 4th 307, 334-36 (1997), and certain informational privacy rights with
14 respect to their gender identity. *In re M.T.*, 106 Cal. App. 5th 322, 338-41 (2024).

15 Further, under the Equal Protection Clause of the California Constitution,
16 transgender status is a suspect characteristic. *Taking Offense v. State*, 66 Cal. App. 5th
17 696, 722-24 (2021), *rev. granted*, 498 P.3d 90 (Cal. 2021), and since 2007, California
18 schools have been expressly prohibited from discriminating on the basis of "gender
19 identity." Cal. Stat. 2007, ch. 569 (defining "gender" to include "gender identity");
20 Cal. Educ. Code § 220 (prohibition on discrimination). The only definition of gender
21 identity, however, is a circular one that defines it as "a person's identity based on the
22 individual's stated gender identity … without regard to any contrary statement by … a
23 family member." Cal. Health & Saf. Code § 1439.50(b). And California's Civil Rights
24 Department has defined gender identity discrimination to include misgendering and
25 segregating facilities based on biological sex. Cal. Code Regs. tit. 2, § 11034(e), (h).[6]

26
27 [6] Although there is no analogous "Privacy Clause" in the federal constitution, the
   Supreme Court has recognized certain autonomy privacy rights related to procreation,
28 *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972), and certain informational privacy rights.
   *Roe v. Critchfield*, 137 F.4th 912, 931-32 (9th Cir. 2025). However, there is no federal

## B. The Role of the State in California's Education System

In California, "[i]t is 'well settled that the California Constitution makes public education uniquely a fundamental concern of the state' and that 'the degree of supervision ... retained by the State over the common school system is high indeed.'" *Ass'n of Mex.-Am. Educators v. California*, 231 F.3d 572, 581 (9th Cir. 2000) (en banc) (quoting *Butt v. California*, 4 Cal.4th 668, 685, 689 (1992)). Because the public education system is a matter of statewide concern, the California Department of Education ("CDE") has "general supervision" over school districts. Barrera Dep., 199:6-200:7, 211:12-212:13.

It is tasked with providing training to local school officials, Cal. Educ. Code § 33316(d), with issuing regulations to implement various provisions of the Education Code, *see id.* at §§ 33031, 33316(b), and with apportioning and distributing state funds to local school districts, *see id.* at §§ 33316(a), (c), 41330-41344.6, which can make up 2/3 or more of a school district's budget. Barrera Dep., 40:2-13. The CDE may not disperse these funds if the local school district is violating *any aspect* of California law. Cal. Educ. Code § 250; Cal. Gov. Code § 11135; Ibarra Dep., 45:20-53:19. In addition, if the CDE investigates and determines a school district is out of compliance, it can order the school district to comply. Cal. Code Regs. tit. 5, § 4670(a)(3); Barrera Dep., 40:14-41:13, 108:11-110:15; Ibarra Dep., 53:21-57:3.

## C. History of California's Adoption of Parental Exclusion Policies

In 2013, the California Legislature passed a new statute providing that "[a] pupil shall be permitted to participate in sex-segregated school programs … and use facilities consistent with his or her gender identity, irrespective of the gender listed on the pupil's records." Cal. Stat. 2013, ch. 85 (AB 1266) (amending Cal. Educ. Code § 221.5(f)). As a result of this change, the California School Boards Association

---

Equal Protection right for gender incongruent minors to engage in a gender transition, *see United States v. Skrmetti*, 145 S. Ct. 1816 (2025), nor a federal informational privacy right for minors against their parents. *See Wyatt v. Fletcher*, 718 F.3d 496, 505 (5th Cir. 2013); *Nguon v. Wolf*, 517 F. Supp. 2d 1177, 1196 (C.D. Cal. 2007).

("CSBA") and the CDE jointly pushed out new guidance and new model policies, Barrera Dep., 20:13-23:1, 59:5-63:20; Exs.65-67, which EUSD adopted in August 2014. *See* Ibarra Dep., 22:15-26:6, Ex.49; Schmidt Dep., 41:8-32:1; Albert Dep., 35:12-36:11. The CSBA's 2014 policy brief—published alongside its model policies—explained that although students have privacy rights with respect to their gender identity, "certain requests (e.g., a name and pronoun change) cannot be kept private." Ex. C-67. Thus, in 2014, the CSBA's guidance was a bit ambiguous. It could be read as advising California school districts that a student has privacy rights, but that unless he is willing to share his transgender status publicly, then he would not be able to transition at school.

In January 2016, the CDE published online a "Legal Advisory regarding application of California's antidiscrimination statutes to transgender youth in schools," and accompanying "Frequently Asked Questions" page. Barrera Dep., 41:15-42:9, Exs.1-2. The purpose of the Legal Advisory was to provide school districts with what the CDE believed to be "minimum requirements" for compliance with the law, *id.* at 42:10-43:3, and linked to the CSBA models and policy brief. *Id.* at 43:7-20. At the time, the Legal Advisory was likely circulated to all school districts, or at least they would have been notified of its existence. *Id.* at 44:25-45:8.

However, the FAQ Page itself went further than CSBA's 2014 model policies. Unlike the CSBA—which identified the obvious fact that one cannot publicly transition privately—the CDE stated that (1) "school districts should accept and respect a student's assertion of their gender identity where the student expresses that identity at school," (2) "schools must consult with a transgender student to determine who can or will be informed of the student's transgender status, if anyone, including the student's family"; (3) "[w]ith rare exceptions, schools are required to respect the limitations that a student places on the disclosure of their transgender status, including not sharing that information with the student's parents"; and (4) "[a] transgender student's right to privacy does not restrict a student's right to openly discuss and express their gender identity or to decide when or with whom to share private

1  information." Ex. C-2.

2  In August 2020, the CSBA pushed out new model policies, which EUSD
3  adopted. Ibarra Dep., 19:15-22:13, Ex.3; Schmidt Dep., 17:19-25:6; Smith Dep., 91:10-
4  21; White Dep., 26:14-28:9; Barlow Dep., 92:8-95:24. Although these largely tracked
5  the 2014 policies, the CSBA's new policy brief now tracked the FAQ Page. Ex. C-71.
6  Like the CSBA, many other entities soon also fell in line. Attorney General Bonta
7  created a "State of Pride" page on the California Department of Justice website to
8  explain the actions he is taking for the LGBTQ community. That page stated: "You
9  have the right to disclose—or not disclose—your gender identity on your own terms,
10  regardless of your age. Your school, whether public or private, doesn't have the right
11  to 'out' you as LGBTQ+ to anyone without your permission, including your parents."
12  Faer Dep., 126:21-134:2, Ex.12.

13  In February 2022, EUSD conducted a staff-wide training explaining these
14  policies. Schmidt Dep., 47:14-48:12, Ex.4. Information about those policies was never
15  forwarded to families. *See* Smith Dep., 38:12-42:7, 98:3-99:19, Ex.62.[7] Similarly, for
16  the Doe Family in Los Angeles County, their school district adopted the new 2020
17  model policies as well as a separate document explaining children's privacy rights.
18  Apodaca Dep., 13:23-14:16, 22:11-20, 36:9-37:3, 64:22-67:24, 84:12-87:1, 100:12-
19  101:18, Exs.42-43. For the Poe Family in Fresno County, their initial school district
20  adopted a "Gender Acknowledgment Plan" that quoted the privacy provisions of the
21  CDE's FAQ page. Hammack Dep., 28:5-15, 34:9-13, 41:4-43:14, 48:5-52:5, 59:9-
22  60:22, Ex.2. In 2023, they tried to backtrack and require parental consent, but had a
23  complaint filed against them by a counselors' union and were forced to reinstate
24  Parental Exclusion Policies. Hammack Dep., 17:13-19:8, 26:12-20, 54:16-22, 62:3-
25  71:17, 75:11-81:5, Exs.3, 8. When the Poe Family moved Child Poe out of that school
26  district and into an online charter school, they found the policies following them. *See*

27  ───────────────
   [7] Although Mr. Smith testified that he would expect AR 5145.3 to be included in the
28  annual acknowledgement that parents are given to review when enrolling their
   children, it is not. *Cf.* Apodaca Dep., 90:18-92:5, 104:2-11.

Poe Decls., ¶¶13-23. In adopting their Parental Exclusion Policies, all school districts believed they were required by the CDE. Ibarra Dep., 19:15-21:8, 39:5-16, 64:7-72:6; Apodaca Dep., 52:11-53:13, 57:12-58:1, 71:8-21, 82:9-83:2, 112:18-113:1; Hammack Dep., 59:9-60:22, 89:4-100:9, 115:18-116:9, 131:25-135:14.

**B. History of California's Enforcement of Parental Exclusion Policies**

On July 20, 2023, the Chino Valley Unified School District ("CVUSD") considered whether to adopt a Parental Notification Policy requiring school officials to notify a child's parents anytime a child asks to be identified or treated as a gender 'other than the student's biological sex or gender listed on the student's birth certificate or any other official records." Ex. I-75.

Shortly thereafter, AG Bonta sued CVUSD, alleging that its Parental Notification Policy violated both equal protection principles (both constitutional and statutory), and the Privacy Clause of the California Constitution. He also immediately applied for a temporary restraining order. Ex. I-76, Ex. I-77. Similarly, on September 6, 2023, the Rocklin Unified School District ("RUSD") adopted a Parental Notification Policy. The next day, a teacher filed an administrative complaint with the CDE. After conducting an investigation, the CDE issued a Final Investigation Report in which it ordered RUSD to rescind its policy as a violation of student privacy rights. When RUSD refused to comply, the CDE filed suit. Barrera Dep., 106:2-110:15, Ex.7.

In July 2024, California passed a new statute creating Education Code sections which prohibit schools from: (1) enacting policies requiring notification of parents when a student requests to transition at school; and (2) ordering any specific employee to inform a parent when a student requests to transition at school. As stated in the statute, this "does not constitute a change in, but is declaratory of, existing law." *See* Cal. Stat. 2024, ch. 95 (creating Cal. Educ. Code §§ 220.1, 220.3, 220.5). At this time, the CDE took the FAQ page off its website. Barrera Dep., 81:15-25. But the CDE did not inform school districts that the directives set forth on the FAQ page were no longer required, *see* Ibarra Dep., 70:9-71:16, 77:21-80:1, 144:9-146:23, which school districts

1  would expect, Schmidt Dep., 79:23-80:9, such that without such guidance, they would

2  assume that they directives on the FAQ page were still required by law. Apodaca Dep.,

3  24:4-25:6, 58:15-20. And both the CDE and Attorney General continue to assert that

4  those directives did accurately summarize what the law currently requires. As stated by

5  the CDE: "A student retains a reasonable expectation of privacy in their gender

6  identity with respect to nondisclosure to their parents at home, even if the student is

7  open about their gender identity at school." Barrera Dep., 105:12-21, *see also id.*, 28:15-

8  31:9, 67:24-68:2, 76:8-13, 86:25-87:8, 100:15-101:17, 104:7-105:21, 106:11-107:8, 110:22-

9  118:16, 126:11-13, 145:8-149:6; Faer Dep., 18:21-26:14, 30:14-32:9, 53:10-55:4, 65:6-80:5,

10  91:22-94:4, 103:8-105:20, 122:11-132:25, 180:17-181:23, 190:9-191:10, 197:2-199:3.

## LEGAL STANDARD

12  Summary judgment should be granted "if the movant show(s) that there is no

13  genuine dispute as to any material fact and that the movant is entitled to judgment as a

14  matter of law." Fed. R. Civ. P. 56(a). Partial summary judgment is appropriate where no

15  genuine issue of material fact exists regarding a part of a party's claim. Parties can

16  move for partial summary judgment on any part of their claims. *See id.* The moving

17  party bears the initial burden of demonstrating the absence of a genuine issue of

18  material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Then the burden shifts

19  to the opposing party to controvert that showing "with specific facts showing that there

20  is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

21  574, 586-87 (1986). "When filing a Motion for Summary Judgment and/or

22  Adjudication, the parties need not file a separate statement of material facts absent

23  prior leave of the court." ECF 108, Scheduling Order, at 5:9-10.

24  Plaintiffs seeking a preliminary injunction must establish (1) that they are likely

25  to succeed on the merits, (2) that they are likely to suffer irreparable harm without

26  injunctive relief, (3) that the balance of harms tips in their favor, and (4) that a

27  preliminary injunction is in the public interest. *Fellowship of Christian Athletes v. San

28  Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 683-84 (9th Cir. 2023) ("*FCA*"). The

same standard applies for a permanent injunction, "with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987). Because of the analytical overlap between the two, "[b]oth motions can be made simultaneously, but in the alternative." *Chappell & Co. v. Frankel*, 367 F.2d 197, 203 & n.13 (2d Cir. 1966).

# ARGUMENT

The Second Amended Complaint contains class claims on behalf of teachers and parents, substantively concerning Substantive Due Process, Free Exercise of Religion, Free Speech, the Family Educational Rights and Privacy Act, and Title VII. Below, in Section I, Plaintiffs request summary judgment on their 42 U.S.C. § 1983 prospective relief-only class claims against the official-capacity defendants.

Next, in Section II, Plaintiffs request partial summary judgment regarding liability with respect to the damages claims, including Plaintiff West's Title VII claim for failure to accommodate, and Plaintiffs Mirabelli's and West's 42 U.S.C. § 1983 damages claims against various EUSD personnel. Lastly, in Section III, Plaintiffs request severance of the claims for prospective relief from Section I, issuance of an appealable Rule 54(b) Separate Judgment with a permanent injunction, and a stay of the Section II damages claims. Alternatively, Plaintiffs request a preliminary injunction.

## I. The Court Should Grant Plaintiffs Summary Judgment on their Claims for Prospective Relief

Plaintiffs' class claims for prospective relief concern Free Exercise of Religion, Substantive Due Process, Free Speech, and FERPA. Below, Plaintiffs first provide an overview of relevant legal principles before addressing each claim in the above order.

### A. Background Legal Principles: The Constitution Protects Against Government Interference with Certain Inalienable Rights

#### 1. Background on the Right to Freedom of Thought

"The Free Speech Clause of the First Amendment … protect[s] the 'freedom to think as you will and to speak as you think.'" *303 Creative LLC v. Elenis*, 600 U.S. 570,

584 (2023) (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660-61 (2000)). Freedom of speech is both an end and a means. "An end because the freedom to think and speak is among our inalienable human rights. A means because the freedom of thought and speech is indispensable to the discovery and spread of political truth." *Id.* at 584-85 (cleaned up). Thus, "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011); *see also* Letter from George Washington to Officers of the Army (Mar. 15, 1783); Benjamin Franklin, *On Freedom of Speech and the Press*, Pa. Gazette (Nov. 17, 1737).

In light of this strong protection for freedom of thought, the government cannot "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). "Indeed, affirmative sponsorship of particular ethical, religious, or political beliefs is something we expect the State not to attempt in a society constitutionally committed to the ideal of individual liberty and freedom of choice." *Bellotti v. Baird*, 443 U.S. 622, 638 (1979) (plurality). The government's role is primarily teaching "future generations [to] understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 190 (2021).

### 2.  Background on the Right to Have a Family

Under the Fourteenth Amendment, "[n]o State shall … deprive any person of life, *liberty*, or property, without due process of law." U.S. Const. amend. XIV, §1 (emphasis added). As the Ninth Circuit recognized even before the Supreme Court, some rights are simply "given by the Almighty for beneficent purposes." *Farrington v. Tokushige*, 11 F.2d 710, 713 (9th Cir. 1926). Indeed, "the liberty interest in family privacy" is "older than the Bill of Rights" and "has its source … not in state law, but in intrinsic human rights." *Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 845 (1977) (cleaned up), which is "one of the basic civil rights of man." *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942).

Under this protection of liberty, every American has the right "to marry, establish a home and bring up children." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). Because this constellation of rights complement each other, "[t]he [Supreme] Court has recognized these connections by describing the varied rights as a unified whole: '[T]he right to 'marry, establish a home and bring up children' is a central part of the liberty protected by the Due Process Clause.'" *Obergefell v. Hodges*, 576 U.S. 644, 668 (2015) (quoting *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978)) (original alterations). And although "[t]he relationship between parent and child is one of "[t]he three great relations in private life," 1 William Blackstone, *Commentaries on the Laws of England* 422 (1765), "[t]he relation of parent and child is the gravest of all." John Alleyne, *The Legal Degrees of Marriage Stated and Considered* 8 (London, 1774).[8]

Strong protection of these rights is important because "evil or reckless hands" may wish to restrict them for the purpose of "caus[ing] … types which are inimical to the dominant group to wither and disappear." *Skinner*, 316 U.S. at 541. The "fundamental theory of liberty" thus "excludes any general power of the state to standardize its children," *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925), or to standardize "family patterns," *Moore v. E. Cleveland*, 431 U.S. 494, 506 (1977) (plurality), or to standardize family "communication" dynamics. *Hodgson v. Minnesota*, 497 U.S. 417, 452 (1990) (plurality). Under this right, parents have the "natural and inherent right to the nurture, control, and tutorship of their offspring, that they may be brought up according to the parents' conception of what is right and just, decent, and respectable, and manly and noble in life." *Soc'y of Sisters v. Pierce*, 296 F. 928, 936-38 (D. Or. 1924), *aff'd*, 268 U.S. 510 (1925).

The Supreme Court has not definitively decided what standard of review applies

---

[8] In its most recent major discussion of these rights, the Court reaffirmed them, stating that "our conclusion … does not undermine them in any way" since they did not concern "the critical moral question posed by" "what the law at issue in this case regards as the life of an 'unborn human being.'" *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 256-57 (2022).

to the right to raise children. *See, e.g.*, *Doe v. Heck*, 327 F.3d 492, 519 (7th Cir. 2003). But it has stated more generally that "[w]hen a fundamental right is at stake, the Government can act only by narrowly tailored means that serve a compelling state interest," i.e., "strict scrutiny," *Dep't of State v. Muñoz*, 602 U.S. 899, 910 (2024); *Carey v. Population Servs., Int'l*, 431 U.S. 678, 686 (1977), and has called "the interest of parents in the care, custody, and control of their children" as "the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality); *see id.* at 80 (Thomas, J., concurring). Indeed, "injuries in domestic relations are some of the greatest which man can possibly suffer," for "what reparation can be made to him whose … child is taken from him?" Robert Chambers, *A Course of Lectures on the English Law* 18-19 (1767-1773, Thomas M. Curley ed., 1986).

### 3.  Background on the Right to Raise Your Children

A necessary corollary of the right to *have* a family is that parents have "the right of control" over their children. *Meyer*, 262 U.S. at 400. "[C]onstitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society." *Ginsberg v. New York*, 390 U.S. 629, 639 (1968). "Not only do parents have a constitutional right to exercise lawful control over the activities of their minor children, the law requires parents to do so," *Brekke v. Wills*, 125 Cal. App. 4th 1400, 1410 (2005), and the "primary role of the parents in the upbringing of their children is now established *beyond debate* as an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) (emphasis added) (citing *Meyer*, 262 U.S. 390).

The tradition of parental authority extends back to the founding, and before. *See Tremain's Case*, 1 Str. 168 (Ch. 1719); *Hall v. Hall*, 3 Atk. 721 (Ch. 1749). As explained by John Locke,[9] "Children, I confess, are not born in this full state of equality, though

---

[9] The Supreme Court has often recognized that Locke's writings inspired America's founding principles. This applies especially in the context of parental rights: "In general, the most popular books in the Colonies on the eve of the American Revolution were not political discourses but ones concerned with child rearing." *Brown v. Ent.*

they are born to it. Their parents have a sort of rule and jurisdiction over them when they come into the world, and for some time after." John Locke, *Concerning Civil Government, Second Essay*, § 55 (1689); *see also* 1 Blackstone, *supra*, at 450-51.[10] This right of "parental control over children" flows from concomitant responsibilities: "those who nurture [the child] and direct his destiny have the right, *coupled with the high duty*, to recognize and prepare him for additional obligations." *Bellotti*, 443 U.S. at 637 (plurality) (quoting *Pierce*, 268 U.S. at 535; emphasis added)).

"The duty to prepare the child for 'additional obligations,' referred to by the Court, must be read to include the inculcation of moral standards, religious beliefs, and elements of good citizenship." *Yoder*, 406 U.S. at 233. Control of "the child reside[s] first in the parents, whose *primary function and freedom* include preparation for obligations the state can *neither supply*," in light of the First Amendment, "nor hinder." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) (emphasis added).

Procedurally, "there is a presumption that fit parents act in the best interests of their children," *Troxel*, 530 U.S. at 68 (plurality), because "historically [the law] has recognized that natural bonds of affection lead parents to act in the best interests of their children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979) (citing 1 Blackstone, *supra*, at 447; 2 James Kent, Commentaries on American Law 190 (1826)); *accord Roach v. Garvan*, 1 Ves. 157, 158 (Ch. 1748) (Lord Hardwicke, L.C.) (the court will "never" "remove a parent from being a guardian" "without some misbehaviour in the parent"). Indeed, "[a] parent may curtail a child's exercise of constitutional rights because a parent's own constitutionally protected 'liberty' includes the right to 'bring up children' and to 'direct the upbringing and education of children.'" *In re Antonio C.*, 83 Cal. App. 4th 1029, 1034 (2000) (quoting *In re Roger S.*, 19 Cal. 3d 921, 928 (1977)).

The Supreme Court, however, has explained that parental control is not a limit

---

*Merchs. Ass'n*, 564 U.S. 786, 825 (2011) (Thomas, J., dissenting);

[10] Additional examples of founding era treatises discussing these rights are attached as Exhibits K through Y of the Appendix of Authorities.

on the child's liberty—*but a fulfillment of it*: "

> [T]he tradition of parental authority is not inconsistent with our tradition of individual liberty [for a child]; rather, the former is one of the basic presuppositions of the latter. Legal restrictions on minors, especially those supportive of the parental role, may be important to the child's chances for the full growth and maturity that make eventual participation in a free society meaningful and rewarding.

*Bellotti*, 443 U.S. at 638-39 (plurality); *accord* Elizabeth Bristol, *The Laws Respecting Women* 326 (London, 1777). Indeed, "[c]hildren often misrepresent past and future Facts; their Memories are fallacious; their Discourse incoherent; their Affections and Actions disproportionate to the Value of the Things desired and pursued; and the connecting Consciousness is in them as yet imperfect." David Hartley, *Observations on Man, his Frame, his Duty, and his Expectations* 391 (London, 1749).

The only exception ever identified by the High Court is the exercise of the right to an abortion, because of its "peculiar nature" and "unique character" that "effectively expires in a matter of weeks from the onset of pregnancy." *Bellotti*, 443 U.S. at 642, 644 n.23, 650 (plurality).[11]

### 4. Background on the Right to Educate Your Children

Preparing one's children for adulthood includes the right and duty to "direct the education of children." *Pierce*, 268 U.S. at 534. "Comprehensive and all-pervading as the police power is, there are certain rights and certain relations beyond its scope. One of these is the right of a parent to educate his own child in his own way." *Farrington*, 11 F.2d at 714. At the time of the ratification of the Fourteenth Amendment, "[t]he

---

[11] In *Am. Acad. of Pediatrics v. Lungren*, 16 Cal. 4th 307, 335-36 & nn.19-20 (1997) (plurality), the California Supreme Court similarly adopted the U.S. Supreme Court's approach of recognizing this general rule before accepting a carve out for the right to obtain an abortion as unique because it is "*a decision that cannot be postponed until adulthood.*" *Id.* at 337 (original emphasis) (citing *Bellotti*, 443 U.S. at 642 (plurality)); *but see Dobbs*, 597 U.S. at 278-79 (explaining that this was an "unrestrained" expansion of the law); *Montana v. Planned Parenthood of Mont.*, No. 24-745, 2025 WL 1829166 (U.S. July 3, 2025) (Statement of Alito, J., respecting denial of certiorari) (inviting better vehicle for overruling this precedent).

concept of total parental control over children's lives extended into the schools." *Brown*, 564 U.S. at 830 (Thomas, J., dissenting). "The history clearly shows a founding generation that believed parents to have complete authority over their minor children and expected parents to direct the development of those children…. Teachers and schools came under scrutiny, and children's reading material was carefully supervised." *Id.* at 834-35 (Thomas, J., dissenting).

Thus, numerous nineteenth and early twentieth century courts held that parents had a right, whether based on the Constitution or the common-law, to direct the education of their children, including by opting their children out of classes. *See, e.g.*, *Vollmar v. Stanley*, 81 Colo. 276 (1927) (objection by Catholics to reading the King James Bible); *Hardwick v. Fruitridge Sch. Dist.*, 54 Cal. App. 696 (1921) (religious objection to dance class),[12] As succinctly explained by the Colorado Supreme Court one hundred years ago, *Vollmar*, 81 Colo. at 282, and then echoed nearly identically by the Supreme Court this year: "Public education is a public benefit, and the government cannot 'condition' its 'availability' on parents' willingness to accept a burden on their religious exercise." *Mahmoud*, 2025 WL 1773627, at *20, *22.

Indeed, over fifty years ago, the Supreme Court stated that it "has been the unmistakable holding of this Court for almost 50 years" that "students [do not] shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 506 (1969). And in recent years, the Court has reiterated this. *See, e.g.*, *Mahmoud*, 2025 WL 1773627, at *13 ("the right to free exercise, like other First Amendment rights, is not 'shed ... at the schoolhouse gate.'"); *Mahanoy*, 594 U.S. at 187 ("students do not 'shed their constitutional rights to freedom of speech or expression,' even 'at the school house gate'").

---

[12] *See also, e.g.*, *Kelley v. Ferguson*, 95 Neb. 63 (1914) (objection to cooking class as unnecessary); *Garvin County v. Thompson*, 24 Okla. 1 (1909) (objection to singing lessons); *Rulison v. Post*, 79 Ill. 567 (1875) (objection to book-keeping class); *Morrow v. Wood*, 35 Wis. 59 (1874) (objection to geography course); *Guernsey v. Pitkin*, 32 Vt. 224 (1859) (objection to writing compositions).

Traditionally, parents "delegate[] to school officials their own control of [their child]" under the doctrine of *in loco parentis*. *Mahanoy*, 594 U.S. at 192. But a pure application of in loco parentis would give schools the same level of authority as parents—but this is not "consonant with compulsory education laws." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995). Thus, in the modern context of "compulsory" education, parents must *only* be "treated as having relinquished the measure of authority that the schools must be able to exercise in order to carry out their state-mandated educational mission." *Tatel v. Mt. Lebanon Sch. Dist.*, 675 F. Supp. 3d 551, 561 n.7 (W.D. Pa. 2023) ("*Tatel II*") (quoting *Mahanoy*, 594 U.S. at 198-200 (Alito, J., concurring)). The teacher "has such a portion of the power of the parent committed to his charge, *viz.* that … as may be necessary to answer the purposes for which he is employed." Henry W. Disney, *The Law Relating to Schoolmasters* 67-68 (London, 1893) (quoting 1 Blackstone, *supra*, at 453).

Despite this guidance from the Supreme Court, a Circuit split emerged regarding the strength of the parental rights "beyond the threshold of the school door." *Tatel v. Mt. Lebanon Sch. Dist.*, 637 F. Supp. 3d 295, 316-18 (W.D. Pa. 2022) ("*Tatel I*") (discussing split). Nevertheless, even the narrow approach taken by the Ninth Circuit recognizes that the parental right *does* "extend beyond the threshold of the school door." *Fields v. Palmdale Sch. Dist.*, 447 F.3d 1187, 1190 (9th Cir. 2006) ("*Fields II*") (deleting contrary language from *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197 (9th Cir. 2005) ("*Fields I*")). Although the Ninth Circuit has rejected attempts to modify curriculum school-wide, it has affirmed that "[m]aking intimate decisions and controlling the state's dissemination of information regarding intimate matters are two entirely different subjects," and schools may "not interfere with the right of the parents to make intimate decisions." *Fields II*, 447 F.3d at 1191. By "intimate decisions," the Ninth Circuit was referring to autonomy privacy rights, such as "whether to bear children, who has control over children, and other decisions related to procreative autonomy," as well as the "right of sexual intimacy." *Fields I*, 427 F.3d at 1208.

### 5.  Background on the Right to Direct Healthcare of Children

The Fourteenth Amendment protects the right to refuse "unwanted medical treatment," *Cruzan v. Mo. Dep't of Health*, 497 U.S. 261, 278 (1990), and the right "to bodily integrity." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *accord Rochin v. California*, 342 U.S. 165 (1952). With respect to the medical care of children, the constitution "permit[s] the parents to retain a substantial, if not the dominant, role in the decision." *Parham*, 442 U.S. at 604. This right includes both "the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000). Indeed, because of youthful impetuosity, "children rely on parents or other surrogates to provide informed permission for medical procedures that are essential for their care." *Mann v. Cnty. of San Diego*, 907 F.3d 1154, 1162 (9th Cir. 2018) (quotations omitted). Further, "[a] parent's due process right to notice and consent is not dependent on the particular procedures involved …, or the environment …, or whether the procedure is invasive, or whether the child … protests." *Id.* at 1162.

As a general rule, because of the "presumption that parents act in the best interests of their child," any minimal "risk of error inherent in the parental decision" about a child's medical treatment is ameliorated by the involvement of doctors. *Parham*, 442 U.S. at 606, 610. Thus, alongside parents, "[w]hat is best for a child is an individual medical decision that must be left to the judgment of physicians in each case." *Id.* at 608. "The fact that a child may balk at hospitalization or complain about a parental [medical decision] … does not diminish the parents' authority to decide what is best for the child." *Id.* at 605.

Of course, "the family itself is not beyond regulation in the public interest," and "neither rights of religion nor rights of parenthood are beyond limitation." *Prince*, 321 U.S. at 166; *see L. W. v. Skrmetti*, 83 F.4th 460, 475 (6th Cir. 2023), *aff'd*, 145 S. Ct. 1816 (2025) ("This country does not have a custom of permitting parents to obtain banned medical treatments for their children"). But, "absent a finding of neglect or

1  abuse, … the traditional presumption that the parents act in the best interests of their
2  child should apply." *Parham*, 442 U.S. at 604.

3      This is particularly important because "the burden of litigating … can itself be so
4  disruptive of the parent-child relationship that the constitutional right of a … parent to
5  make certain basic determinations for the child's welfare becomes implicated," *Troxel*,
6  530 U.S. at 75 (plurality) (quotations omitted), and even "[i]n cases of alleged child
7  abuse, governmental failure to abide by constitutional constraints may have deleterious
8  long-term consequences for the child and, indeed, for the entire family." *Wallis*, 202
9  F.3d at 1130. A regulation interfering with parental decisionmaking "must fall *unless*
10 *shown* to be necessary for or conducive to the child's protection against some clear and
11 present danger." *Prince*, 321 U.S. at 167 (emphasis added).

12     **6.  Background on the Privacy Rights of Minors Against their Parents**

13     "Constitutional rights do not mature and come into being magically only when
14 one attains the state-defined age of majority." *Bellotti*, 443 U.S. at 634 & n.12
15 (plurality). But, when minors are involved, "constitutional principles [are] applied with
16 sensitivity and flexibility" such that the breadth of a minor's rights depend on the
17 specific right at issue. *Id.* at 634-38 & n.14. Further, "[t]raditionally at common law, and
18 still today, unemancipated minors lack some of the most fundamental rights of self-
19 determination—including even the right of liberty in its narrow sense, i.e., the right to
20 come and go at will. They are subject, even as to their physical freedom, to the control
21 of their parents or guardians." *Vernonia*, 515 U.S. at 654.

22     Thus, the law "provides, in general, that children can exercise the rights they do
23 have only through and with parental consent." *Hodgson*, 497 U.S. at 482 (Kennedy, J.,
24 concurring). Under that general rule, minors must "wait until the age of majority
25 before being permitted to exercise legal rights independently." *Bellotti*, 443 U.S. at 650
26 (plurality). For example, "[a] minor not permitted to marry before the age of majority
27 is required simply to postpone her decision." *Id.* at 642.[13] As one court aptly put it:

28 ─────────────
[13] *See also The Citizen's Law Companion* 111 (London, 1794); John Trusler, *A Concise*

MEMO. OF POINTS & AUTHORITIES ISO PLAINTIFFS' RENEWED
MOTION FOR SUMMARY JUDGMENT OR A PRELIMINARY INJUNCTION

"We categorically reject the absurd suggestion that [the boyfriend's] freedom of association trumps a parent's right to direct and control the activities of a minor child, including with whom the child may associate." *Brekke*, 125 Cal. App. 4th at 1410.

Even when core federal rights are involved, the Court has explained that requiring parental consent before a minor exercises her rights is constitutionally permissible so long as there is a "judicial bypass" mechanism. *Hodgson*, 497 U.S. at 479 (Scalia, J., concurring in part); *see Planned Parenthood of S. Ariz. v. Lawall*, 307 F.3d 783, 787 (9th Cir. 2002) (discussing contours of permissible judicial bypass). But "parental *notice* does not violate the constitutional rights of an immature, dependent minor," because parents are best suited "to supply essential medical and other information to a physician." *H.L. v. Matheson*, 450 U.S. 398, 409, 411 & n.17 (1981) (cleaned up; emphasis added). Indeed, "[a]lthough the Court has held that parents may not exercise an absolute, and possibly arbitrary, veto over that decision, it has never challenged … that [a medical] decision should be made after notification to and consultation with a parent." *Hodgson*, 497 U.S. at 445 (cleaned up).

## B. Under the Free Exercise Clause, Both Religious Parents and Teachers Have the Right to Opt Out of Parental Exclusion Policies

"At its heart, the Free Exercise Clause of the First Amendment protects 'the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of' religious acts." *Mahmoud v. Taylor*, 606 U.S. ___, 2025 WL 1773627, at *13 (U.S. June 27, 2025) (quoting *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022)). Here, California's Parental Exclusion Policies trigger and fail strict scrutiny for the reasons explained below.

### 1. Parental Exclusion Policies Burden Religion

To begin, "[w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of

---

*View of the Common and Statute Law of England* 87-88 (London, 1781); Bristol, *supra*, at 24; Chambers, *supra*, at 23.

1  conduct mandated by religious belief, thereby putting substantial pressure on an

2  adherent to modify his behavior and to violate his beliefs, a burden upon religion

3  exists." *Thomas v. Review Bd. of Ind.*, 450 U.S. 707, 717-18 (1981). Thus, when the

4  government conditions attendance at, or employment by, a public school on the

5  parent's abandonment of their religious beliefs, there is a constitutionally relevant

6  burden. *Mahmoud*, 2025 WL 1773627, at *13-15; *Kennedy*, 597 U.S. at 525. Here,

7  because all Plaintiffs object to Parental Exclusion Policies, a constitutionally relevant

8  burden exists. Mirabelli Decl., ¶¶5-13; West Decl., ¶¶7-10; Boe Decl., ¶7; Roe Decl.,

9  ¶7; Poe Decls., ¶¶4, 18; Doe Decls., ¶¶3, 31.

### 2. The Burden on Parent's Religion Triggers Strict Scrutiny

11  Drawing on both *Meyer* and *Pierce*, fifty years ago, the Supreme Court held that a

12  rule impinging on parents' rights to control "the *religious* upbringing and education of

13  their minor children" triggers strict scrutiny under the Free Exercise Clause. *Wisconsin*

14  *v. Yoder*, 406 U.S. 205, 231 (1972) (emphasis added). Later, the Supreme Court

15  reaffirmed this, describing "rights of parents to direct the religious upbringing of their

16  children" as continuing to receive strict scrutiny protection. *Emp't Div. v. Smith*, 494

17  U.S. 872, 881-82 & n.1 (1990). And most recently the Court has instructed that when

18  the government "substantially interfer[es] with the religious development of the

19  parents' children," then "we need not ask whether the law at issue is neutral or

20  generally applicable before proceeding to strict scrutiny." *Mahmoud*, 2025 WL 1773627,

21  at *22 (cleaned up). In *Mahmoud*, the Court found substantial interference through the

22  school reading story books that taught "that it is hurtful, perhaps even hateful, to hold

23  the view that gender is inextricably bound with biological sex." *Id.* at *16. Here, the

24  schools' facilitation of a secret gender transition is far worse. Thus, because Parental

25  Exclusion Policies burden the right of parents to direct the religious upbringing of their

26  children, they trigger strict scrutiny for parents.

### 3. The Exemptions Trigger Strict Scrutiny for Teachers

28  With respect to teachers, the Free Exercise analysis requires finding that

1  Parental Exclusion Policies are not neutrally and generally applicable, which this
2  Court has already done. *Mirabelli*, 691 F. Supp. 3d at, 1217.

3  ### a. The individualized exemptions trigger strict scrutiny

4  First, the judicially created test for finding a violation of the Privacy Clause of
5  the California Constitution, which is the basis for all Parental Exclusion Policies, itself
6  has a mechanism for "individualized exemptions," which can even be shown through
7  de facto (not de jure) exemptions. *FCA*, 82 F.4th at 686. Under the Privacy analysis, the
8  penultimate consideration is always whether there is a "sufficient countervailing
9  interest" warranting the alleged privacy violation. *Hill v. NCAA*, 7 Cal. 4th 1, 40
10 (1994). This triggers strict scrutiny. *See, e.g.*, *Fulton v. City of Philadelphia*, 593 U.S. 522,
11 533 (2021) ("good cause"); *Sherbert v. Verner*, 374 U.S. 398, 401 (1963); ("good
12 cause"); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 537
13 (1993) ("unnecessary"); *Blackhawk v. Pennsylvania*, 381 F.3d 202, 210 (3d Cir. 2004)
14 (Alito, J.) ("consistent with sound" policies). Here, as the Court has already noted, the
15 Privacy analysis at the core of Parental Exclusion Policies "is the very definition of a
16 discretionary exemption," thereby triggering strict scrutiny. *Mirabelli*, 691 F. Supp. 3d
17 at 1217.

18 ### b. The comparable exceptions trigger strict scrutiny

19 The existence of secular exemptions from government-created burdens,
20 without offering a religious exemption, also triggers strict scrutiny. *Lukumi*, 508 U.S.
21 at 542-43; *Fulton*, 593 U.S. at 534. Stated differently, government actions are not
22 generally applicable "whenever they treat *any* comparable secular activity more
23 favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021).
24 "[W]hether two activities are comparable … must be judged against the asserted
25 government interest that justifies the regulation at issue." *Waln v. Dysart Sch. Dist.*, 54
26 F.4th 1152, 1159 (9th Cir. 2022). Thus, for example, if the government's interest is
27 "health and safety," then it can grant solely medical exemptions to vaccine mandates,
28 and not religious exemptions. But if that were its asserted interest, it could not grant

1  exemptions for its own administrative needs while denying religious exemptions. *Bacon*

2  *v. Woodward*, 104 F.4th 744, 752 (9th Cir. 2024).

3      Here, California's Parental Exclusion Policies are not generally applicable due to

4  their comparable, categorical exemptions. As stated above, the policies flow from the

5  Privacy Clause of the California Constitution, which builds in an exemption for

6  "countervailing interests." interests. *Hill v. NCAA*, 7 Cal. 4th 1, 34 (1994). In its

7  specific recitation of the requirements of the Privacy Clause, the CDE characterized

8  this as "a specific and compelling 'need to know,'" Ex. C-2; *see* Ex. F-2, while the

9  CSBA characterized the exemption in its model (adopted by all school districts) as

10 applying only "when the district has compelling evidence that disclosure is necessary

11 to preserve the student's physical or mental well-being." Ex. C-70; Ex. G-42; Ex. H-3.

12 While the CDE more accurately describes California law, under both, exempting

13 parents with religious objections from these policies is comparable to the existing

14 exemptions—parents always have a compelling "need to know" and informing them

15 will "preserve the student's physical or mental well-being." *Parham*, 442 U.S. at 602

16 (presumption that giving information to parents will be good for child); Cal. Educ.

17 Code § 51100 (same codified into statute).

18     Further, there are numerous other exemptions that exist in the California

19 Education Code itself. For example, "[a] pupil may not be compelled to affirm or

20 disavow any particular personally or privately held world view, religious doctrine, or

21 political opinion," Cal. Educ. Code § 49091.12(a), and the "use [of] gender-identity-

22 based pronouns" necessarily communicates that "[p]eople can have a gender identity

23 inconsistent with their sex at birth." *See Meriwether v. Hartop*, 992 F.3d 492, 507-08

24 (6th Cir. 2021). "At the very least, willful refusal to refer to transgender persons by

25 their preferred pronouns conveys general disagreement with the concept that a

26 person's gender identity may be different from the sex the person was assigned at

27 birth." *Taking Offense v. State*, 66 Cal. App. 5th 696, 712 (2021). Thus, no student

28 could be forced to manifest adherence to ideological views on gender identity, including

by being forced to use preferred pronouns (or not) with whomever the student is speaking—including another student's parents—while teachers are prohibited. *See* Hammack Dep., 122:11-123:19.

In addition, under California law, parents have the right to "observe the classroom or classrooms in which their child is enrolled" and the right to "provid[e] assistance in the classroom with the approval, and under the direct supervision, of the teacher." Cal. Educ. Code § 51101(a)(1), (3). And under both FERPA (discussed below) and California law, parents have the right "[t]o have access to the school records of their child." Cal. Educ. Code § 51101(a)(10). If a parent requested to sit in at class, or to review their child's gender-related records, then attempts to deceive him about his child's gender presentation at school would become moot.[14] Finally, from a de facto perspective, EUSD has never required all staff to learn about Parental Exclusion Policies, and they cannot comply with them if they do not know about them. *See* Terrill Dep., 77:9-78:3. These comparable exemptions trigger strict scrutiny.

### 4. Parental Exclusion Policies Cannot Satisfy Strict Scrutiny

To satisfy "strict scrutiny," the "government must demonstrate that its policy advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Mahmoud*, 2025 WL 1773627, at *22 (cleaned up). Once the plaintiff has made his case, "it is the government that must show its policy is the least restrictive means of furthering [a] compelling governmental interest." *Ramirez v. Collier*, 595 U.S. 411, 432 (2022). Strict scrutiny is "the most demanding test known to constitutional law," *Boerne v. Flores*, 521 U.S. 507, 534 (1997), and "as a practical matter," "is fatal in fact absent truly extraordinary circumstances." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. ___, 2025 WL 1773625, at *12 (U.S. June 27, 2025). "The whole point of strict

---

[14] Although the California Constitution controls over the Education Code, the Privacy Clause analysis involves reviewing statutory law to see whether there was a serious invasion of privacy. Thus, where an educator, "in making the disclosure[,] … was carrying out his statutory duty under the Education Code," there is no privacy violation. *Nguon v. Wolf*, 517 F. Supp. 2d 1177, 1191 (C.D. Cal. 2007).

1  scrutiny is to test the government's assertions, and our precedents make plain that it

2  has always been a demanding and rarely satisfied standard." *S. Bay United Pentecostal*

3  *Church*, 141 S. Ct. 716, 718 (2021) (Statement of Gorsuch, J.).[15] Strict scrutiny requires

4  the government to show that "it lacks other means of achieving its desired goal."

5  *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014) "[S]o long as the

6  government can achieve its interests in a manner that does not burden religion, it must

7  do so." *Fulton*, 593 U.S. at 541.

8       Here, the primary point of Parental Exclusion Policies is to comply with the

9  Privacy Clause of the California Constitution. California's mandatory reporting regime

10  should be more than adequate to protect students from actual abuse, but not adequate

11  for California's purpose of protecting children's so-called privacy. *See* Cal. Welf. & Inst.

12  Code § 15630; White Dep., 93:20-94:19. The defense experts Tando and Brady are

13  adamant in their view that children *should* have the right to initiate a social transition at

14  school—and force all staff to allow them access to opposite-sex facilities and to use

15  opposite-sex pronouns. Tando Dep., 324:5-18; Brady Dep., 222:15-223:17. But they do

16  not think that saying "no" to a social transition rises to the level of abuse or neglect—

17  they just believe that its discriminatory. Tando Dep., 314:13-316:23; Brady Dep.,

18  224:8-226:6, 228:18-230:3.

19       Indeed, in response to this Court's preliminary injunction, EUSD reverted to

20  the 2014 understanding of the "privacy" rights of transgender students. Under this

21  policy, if school personnel merely suspect or learn that a child is gender questioning,

22  they will not report this to anybody. But if the child states that she is transgender—

---

[15] The reasoning in Justice Gorsuch's statement was joined by four other Justices, making it a binding opinion. *See Tandon v. Newsom*, 593 U.S. 61, 63 (2021) (citing Justice Gorsuch's statement and Justice Barrett's concurrence as together binding authority); *accord Brach v. Newsom*, 6 F.4th 904, 933 n.26 (9th Cir. 2021), *vacated as moot on reh'g en banc*, 38 F.4th 6 (9th Cir. 2022); *Doe v. San Diego Unified Sch. Dist.*, 22 F.4th 1099, 1102 (9th Cir. 2022) (Bumatay, J., dissenting from denial of rehearing en banc); *United States v. Olsen*, 21 F.4th 1036, 1066 n.1 (9th Cir. 2021) (Collins, J., dissenting from denial of rehearing en banc); *Roman Cath. Archbishop of Wash. v. Bowser*, 531 F. Supp. 3d 22, 42 n.15 (D.D.C. 2021).

1  triggering an obligation for all staff to use new pronouns and allow her access to

2  opposite-sex facilities—EUSD will only honor that request with parental consent. *See*

3  Ibarra Dep., 28:4-34:22, 62:4-17, 76:18-77:11, 82:20-85:4, 157:2-12, Ex.50; Smith

4  Dep., 16:12-18:5; Barlow Dep., 92:8-9. The defendants' response was that this

5  approach is illegal. Ibarra Dep., 35:3-39:16, 74:13-76:5, 80:5-82:18, 133:16-23, 144:9-

6  146:23; Faer Dep., 101:24-105:9, 109:15-113:14, 115:19-119:13, 144:4-157:11.

7          But, as this Court recognized last year, state policies—whether based on privacy

8  rights[16] or antidiscrimination rights—are preempted by the Fourteenth Amendment

9  right of parents. *Mirabelli*, 691 F. Supp. 3d at 1212-13. This is self-evidently true since,

10  at times, "it can be appropriate for parents to say 'no' to a social transition (whether at

11  school or elsewhere) to, among other things, allow time for assessment and exploration

12  with the help of a mental health professional before making such a significant change,"

13  Anderson Rep., ¶121, and because of the presumption that parents will act in the best

14  interests of their child can only be overcome through a judicial finding, *Wallis*, 202

15  F.3d at 1141, which itself cannot be based on a "presumption" of unfitness in certain

16  classes of cases, but must always be based on an "individualized determination."

17  *Stanley v. Illinois*, 405 U.S. 645, 656-57 (1972). Thus, "[t]he reasons proffered by the

18  defendants for the policy pass neither the strict scrutiny nor the rational basis tests."

19  *Mirabelli*, 691 F. Supp. 3d at 1217. In light of the above, the Court should grant

20  summary judgment on the Plaintiffs' Free Exercise claims.[17]

21

22  [16] Although irrelevant due to the Supremacy Clause, the alleged "privacy" right does
not apply on its face. While an individual may have privacy interests in his sexual
23  orientation when it is *not* publicly known, *Sipple v. Chron. Publ'g Co.*, 154 Cal. App. 3d
1040, 1047 (1984); *Leibert v. Transworld Sys., Inc.*, 32 Cal. App. 4th 1693, 1701-02
24  (1995), or knowledge is limited to "five friends," *Nguon v. Wolf*, 517 F. Supp. 2d 1177,
1191 (C.D. Cal. 2007), there can be no objectively reasonable expectation of privacy
25  regarding matters that are known by the entire school community. *See Vo v. Garden
Grove*, 115 Cal. App. 4th 425, 448 (2004); *Sipple*, 154 Cal. App. 3d at 1047-48. Thus,
26  the privacy interest does not apply on its face to the context of minors requesting that
all school personnel use a preferred name and preferred pronouns for them.
27

28  [17] There is no concomitant federal right against which parental rights must be balanced.

## C. Under the Fourteenth Amendment Right to Direct the Upbringing of Children, Parental Exclusion Policies Are Unconstitutional

As stated above, most recently, the Supreme Court has reiterated that schools may not interfere with parents' "*religious* upbringing of children." *Mahmoud*, 2025 WL 1773627, at *14 (emphasis added). At the same time, while the *Meyer/Pierce* right can be envisioned as a proto-Free Exercise right, *see Mahmoud*, 2025 WL 1773627, at *28-29 (Thomas, J., concurring), it has not been limited to the religious context. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 65 (2000). And the Supreme Court has very recently reiterated that constitutional rights are not "shed ... at the schoolhouse gate." *Mahmoud*, 2025 WL 1773627, at *13.

In addressing substantive due process rights, the Supreme Court has identified two legal standards: "One is the 'fundamental rights' standard" and "[t]he other is the 'shocks the conscience' standard." *Regino v. Staley*, 133 F.4th 951, 960 n.5 (9th Cir. 2025). These tests apply "depending on whether it is legislation or a specific act of a governmental officer that is at issue," i.e., legislative or executive action. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *see Mann*, 907 F.3d at 1164. Thus, Parental Exclusion Policies themselves would be reviewed under the "fundamental rights" standard, and the application of those policies in individual cases would be reviewed under the "shocks the conscience" standard. *Regino*, 133 F.4th at 960 n.5. Since Plaintiffs are only challenging the policies themselves, the "fundamental rights" standard applies. *See id*. In analyzing this claim, two questions must be answered: (1) does it provide parents with any rights at all relating to the social transition of their child; and (2) what rights exist in the school context.

---

Regulating on the basis of gender transition is not sex discrimination under the federal constitution. *United States v. Skrmetti*, 145 S. Ct. 1816, 1828-32 (2025); *contra Hecox v. Little*, 104 F.4th 1061 (9th Cir. 2024), *cert. granted*, No. 24-38, 2025 WL 1829165 (U.S. July 3, 2025). But even if it were, such regulations would be subject to intermediate scrutiny, where the right to "bodily privacy" satisfies such scrutiny, even when doing so would "out" a transgender child. *Roe v. Critchfield*, 137 F.4th 912, 920, 923-26, 931-32 (9th Cir. 2025). Protecting parental rights would undoubtedly also satisfy strict scrutiny.

**1. Directing a Child's Social Transition is Within the Parental Right**

As stated above, "[t]raditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination" and "are subject, even as to their physical freedom, to the control of their parents or guardians." *Vernonia*, 515 U.S. at 654. Thus, parents have the right to determine what their children learn, *Pierce*, 268 U.S. at 534, with whom they associate, *Brekke*, 125 Cal. App. 4th at 1410, what healthcare decisions they make, *Mann*, 907 F.3d at 1162, and what name they are called by. *Sydney v. Pingree*, 564 F. Supp. 412, 413 (S.D. Fla. 1982).

Here, a social transition encompasses behaving—in all regards—as a member of the opposite sex. That includes adopting a new name and pronouns, adopting a new opposite-sex presentation (hair, clothes, makeup), and beginning to use sex-segregated facilities and participating in sex-segregated activities as a member of the opposite sex. Anderson Rep., ¶¶17, 97-104, 132. As this Court previously noted, the decision over a social transition would seem to fall within the right to direct the "upbringing" of one's children, *Mirabelli*, 691 F. Supp. 3d at 1210, as the above precedent collectively shows that "parents retain a constitutionally protected right to guide their own children on matters of identity, including the decision to adopt or reject various gender norms and behaviors," *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 556 (E.D. Ky. 2024), and "to have a say in what a minor child is called and by what pronouns they are referred." *Ricard v. Geary Cnty. Unified Sch. Dist. 475*, No. 5:22-cv-4015, 2022 WL 1471372, at *8 (D. Kan. May 9, 2022). And because a child's social transition is one over which parents have a fundamental right, schools may "not interfere with the right of the parents to make [that] intimate decision[]." *Fields II*, 447 F.3d at 1191.

**2. The Medical Treatment of a Child's Social Transition is Within the Parental Right**

The Ninth Circuit has equally confirmed that Substantive Due Process includes both "the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state," *Wallis*,

202 F.3d at 1141, which does not change based on "the environment" where the treatment occurs. *Mann*, 907 F.3d at 1162. Here, in addition to being an important intimate decision relating to identity, parents have a right to direct a child's social transition because it is psychological treatment. *See* Anderson Rep., ¶¶10, 66-104, 132; Szajnberg Rep., ¶¶36-53; *Edmo v. Corizon, Inc.*, 935 F.3d 757, 770 (9th Cir. 2019) ("changes in gender expression and role" is an "evidence-based treatment option[] for individuals with gender dysphoria.").

Here, Plaintiffs' expert Dr. Nathan Szajnberg undertook a comprehensive review of Child Poe's therapy records to explain why and how a school's secret social transition of a child should be considered unethical psychological treatment, Szajnberg Rep., ¶¶48-82, and to explain the logical errors in the reasoning of the defense experts. Szajnberg Rep., ¶¶11-47. As stated in Plaintiffs' concurrently filed motion to exclude, the Court should reject the defense experts wholesale and treat Dr. Szajnberg's testimony as unrebutted. But even they agree with him.

As stated by Darlene Tando, "while being transgender is not a pathological condition, like a disease, it will be important for you [the parent] to look at your child's being transgender as something concrete, *like a medical condition*." Tando Dep., 184:20-185:16, 188:6-190:10. Othertimes she directly says "I do believe being transgender *is a medical condition*," *id*. at 194:2-195:23, and analogizes being transgender to needing supplemental oxygen, *id*. at 191:19-193:25, or antibiotics, a cast for a broken arm, or cough syrup. *Id*. at 201:4-204:6; *see also* Ex. A-12. Christine Brady similarly testified that "*[b]y itself*, social transition is psychologically beneficial and is a *medically recognized treatment* for gender dysphoria," and that "[t]he treatment for gender dysphoria … includes social affirmation of the individual's preferred pronouns and names." Ex. B-20, pp.5, 7 (emphasis added); *see* Brady Dep., 197:15-202:22.

To be sure, both Tando and Brady think that schools *should* facilitate a child's social transition without parental involvement. But based on their testimony, that decision belongs to parents—not them. *See T.F. v. Kettle Moraine Sch. Dist.*, No. 21-cv-

1650, \*9-10 (Wis. Cir. Ct., Waukesha Cnty., Oct. 3, 2023) ("This is undisputedly a medical and healthcare issue").[18]

As stated above, infringements on Substantive Due Process rights trigger strict scrutiny, § I.A.2, *supra*, and cannot satisfy it. § I.B.4, *supra*. Thus, the Court should grant summary judgment on the Plaintiffs' Substantive Due Process claims.

### D. Under Teacher's First Amendment Right to Freedom of Speech, Parental Exclusion Policies Are Unconstitutional

In balancing government-employer interests and citizen-employee interests under the First Amendment, the Supreme Court has explained that employees cannot be forced to engage in speech (1) about an issue of legitimate public concern, (2) that is unnecessary for their actual job duties (i.e., public v. private speech), (3) unless doing so is sufficiently necessary for the effective operation of the government as to outweigh First Amendment rights (i.e., *Pickering* balancing). *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 776-83 (9th Cir. 2022).

Here, this Court has already held that California cannot force teachers to speak in a manner that violates parent's rights—whether under Substantive Due Process, Free Exercise of Religion, or FERPA. *See Mirabelli*, 691 F. Supp. 3d at 1215 ("The teachers could also make out a freedom of speech claim if the policy compels them to violate the law"). But even applying the above, traditional test, several courts have held that "the Constitution does not require government officials to use 'preferred gender pronouns' 'in part because the speaker has a First Amendment right' to even 'the misuse of a pronoun.'" *Arkansas v. U.S. Dep't of Educ.*, 742 F. Supp. 3d 919, 945 (E.D. Mo. 2024) (teachers and professors); *Vlaming v. W. Point Sch. Bd.*, 302 Va. 504, 563-74 (2023) (public school teachers); *Geraghty v. Jackson Loc. Sch. Dist. Bd. of Educ.*, No. 5:22-cv-2237, 2024 WL 3758499, at \*11 (N.D. Ohio Aug. 12, 2024) (public school

---

[18] As stated in Plaintiffs' concurrently filed *Daubert* motion, the Court should exclude Tando and Brady. Notably, however, on the only issues relevant to this motion, they agree with Plaintiffs' experts.

1  teachers); *Meriwether*, 992 F.3d at 508-12 (college professors), *Taking Offense*, 66 Cal.

2  App. 5th at 706-21 (long-term care workers). The result should be no different here

3  where Parental Exclusion Policies require the use of preferred pronouns without

4  parental consent and the use of different pronouns in different contexts.

5              **1.    Gender Identity is a Matter of Public Concern**

6         "[T]he boundaries of what constitutes speech on matters of public concern are

7  not well defined." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). The analysis requires an

8  examination of "the content, form, and context of a given statement," but is a matter of

9  "law, not fact." *Connick v. Myers*, 461 U.S. 138, 147-48 & n.7 (1983). However,

10 "[s]peech deals with matters of public concern when it can be fairly considered as

11 relating to any matter of political, social, or other concern to the community." *Snyder*,

12 562 U.S. at 453 (cleaned up). "[C]ontroversial subjects such as climate change, the

13 Confederacy, sexual orientation and gender identity, evolution, and minority religions"

14 are matters of public concern. *Janus v. AFSCME, Council 31*, 585 U.S. 878, 913-14

15 (2018) (footnotes omitted).

16        Further, the standard is the same as that "used to determine whether a common-

17 law action for invasion of privacy is present." *San Diego v. Roe*, 543 U.S. 77, 83 (2004)

18 (per curiam). In this analysis, "content is king," *Johnson v. Poway Unified Sch. Dist.*, 658

19 F.3d 954, 965 (9th Cir. 2011), and the government may not "declare by ipse dixit that

20 controversial ideas are now uncontroversial." *Vlaming*, 302 Va. 504, 569. Thus, when

21 the "content" "plainly relates to broad issues of interest to society at large," the

22 "context" "cannot by itself transform" the speech into "a matter of private rather than

23 public concern." *Snyder*, 562 U.S. at 454; *accord San Diego*, 543 U.S. at 84 ("certain

24 private remarks" necessarily "touch on matters of public concern"). "Most speech

25 falling outside that purely private realm will warrant *at least some* First Amendment

26 protection and thus will qualify as speech on a matter of public concern," *Hernandez v.*

27 *Phoenix*, 43 F.4th 966, 977 (9th Cir. 2022) (emphasis added), because "the fundamental

28 purposes of the first amendment is to permit the public to decide for itself which issues

1  and viewpoints merit its concern." *Ulrich v. San Francisco*, 308 F.3d 968, 978 (9th Cir.

2  2002) (cleaned up).

3      Here, the specific speech at issue is speech to and from school districts (via

4  teachers) to parents regarding their child's gender identity. The general topic to which

5  this speech "relates" is "gender identity"—a matter of public concern. *See, e.g.*, *Riley's*

6  *Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 723 (9th Cir. 2022); *Josephson v. Ganzel*,

7  115 F.4th 771, 784 (6th Cir. 2024). Looking at the specific content of the speech (i.e.,

8  "your daughter" v. "your son" "is struggling to complete her English assignments on

9  time"), is too granular. The focus must be on whether, in practical reality, the

10  requirement is "an instrument for fostering public adherence to an ideological point of

11  view [the individual] finds unacceptable, and to compel him to speak in ways that align

12  with the government's views in a manner that defies his conscience about a matter of

13  major significance." *Vlaming*, 302 Va. at 568 (cleaned up). The Court cannot "ignore[]

14  what anyone …can readily see"—"the messages that the [government] plainly

15  intend[s] to convey." *Mahmoud*, 2025 WL 1773627, at *18.

16      Because "gender identity" is perhaps the preeminent "controversial" issue of

17  the day, *see Janus*, 585 U.S. at 913-14, Plaintiffs' free speech rights "warrant *at least*

18  *some* First Amendment protection." *Hernandez*, 43 F.4th at 977. Indeed, the fact that

19  California has mandated Parental Exclusion Policies, which have resulted in litigation,

20  is itself strong evidence that they address matters of public concern.

21          **2.    *Parental Exclusion Policies Are Unnecessary for Education***

22      The second question is whether the speech is personal speech or government

23  speech. At base, the question is whether the speech was "required to perform [the

24  teacher's] job." *Dodge*, 56 F.4th at 778. This analysis has two parts. "First, a factual

25  determination must be made as to the scope and content of a plaintiff's job

26  responsibilities"; "Second, the ultimate constitutional significance of those facts must

27  be determined as a matter of law." *Johnson*, 658 F.3d at 966 (cleaned up). This is a

28  question of law. *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 697 (4th Cir. 2007); *Morgan v.*

1  *Swanson*, 659 F.3d 359, 375 n.52 (5th Cir. 2011) (en banc) (collecting cases).

2      As most relevant here, in *Johnson*, the Ninth Circuit held that a math teacher's

3  posting in his classroom of religious-patriotic banners was government speech.

4  *Johnson*, 658 F.3d at 966-70. If he had been "running errands for the school in a car

5  adorned with sectarian bumper stickers," that would have been private speech. *Id.* at

6  967. But the Court held that all of his speech "in the general presence of students, in a

7  capacity one might reasonably view as official"—regardless of whether it was

8  "curricular"—was government speech "because of the position of trust and authority

9  [teachers] hold and the impressionable young minds with which they interact." *Id.* at

10  967-68 & n.13. Later, however, the Supreme Court rejected this overbroad reasoning.

11  *Kennedy*, 597 U.S. at 527-31. There, a high school football coach was fired for praying in

12  the presence of students. *Id.* at 515-20. In looking at those prayers, the Court stated

13  that when praying, the coach "was not engaged in speech ordinarily within the scope of

14  his duties as a coach.... He was not instructing players, discussing strategy,

15  encouraging better on-field performance, or engaged in any other speech the District

16  paid him to produce as a coach." *Id.* at 530-31 (cleaned up).

17      The Court further rejected the Ninth Circuit's conclusion that it was dispositive

18  that the prayers occurred in front of students, and the coach "served as a role model

19  'clothed with the mantle of one who imparts knowledge and wisdom.'" *Id.* at 530.

20  This, the Court explained, would "commit[] the error of positing an 'excessively broad

21  job description' [that] treat[s] everything teachers … say in the workplace as

22  government speech." *Id.* at 530-31 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 424

23  (2006)) (cleaned up). Schools *cannot* require employees to "eschew any visible religious

24  expression," *Kennedy*, 597 U.S. at 540, because creating "[a] classroom environment

25  that is welcoming to all students … cannot be achieved through hostility toward the

26  religious beliefs of students and their parents." *Mahmoud*, 2025 WL 1773627, at *23.

27  Indeed, at Rincon, staff have the right to, and regularly do, share their personal views

28  on controversial topics—but generally only liberal views. *See* Ibarra Dep., 91:19-100:23,

105:17-106:9; Frank Dep., 16:12-24:15, 59:13-62:14, 90:12-25; White Dep., 35:13-23; Albert Dep., 27:9-22; Barlow Dep., 14:18-38:4, 73:23-75:5; Terrill Dep., 27:17-29:22, 34:15-35:3.

Thus—following *Kennedy*'s correction of the Ninth Circuit's departure from *Garcetti*'s admonition about "excessively broad job descriptions"—the question in the educational context *now* is whether the speech is "curricular-speech," *Vlaming*, 302 Va. at 573, i.e., "impart[ing] particular knowledge or skills to student[s]." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988). Further, "[preferred] pronouns carry a message," *Meriwether*, 992 F.3d at 507, communicating that "[p]eople can have a gender identity inconsistent with their sex at birth." *Tennessee v. Cardona*, 737 F. Supp. 3d at 543. So the question is not whether a teacher must use pronouns generally—i.e., to engage in standard speech—but whether her job duties include conveying the school's message on gender identity, *Geraghty*, 2024 WL 3758499, at *13, while recognizing that the school cannot impose a "blanket requirement" that all employees be de facto spokespersons for the government's message. *Janus*, 585 U.S. at 907.

The answer here is "no." Teachers in general are paid to teach *subjects*, not to be spokespersons "mouth[ing] a message on [the government's] behalf," *Janus*, 585 U.S. at 908, and the teachers here are no different. *See* Ibarra Dep. 131:21-132:3; Albert Dep., 34:13-35:6; Frank Dep., 24:19-25:8; White Dep., 44:8-45:10. As the Virginia Supreme Court put it, "[t]he core of the teacher's job is to speak in the classroom on the *subjects* she is expected to teach. Math teachers must teach math, science teachers must teach science, history teachers must teach history, and so on. But none of them can be compelled into the service of controversial religious, political, or ideological causes." *Vlaming*, 302 Va. at 568 (cleaned up).

### 3. There Is No Legitimate State Administrative or Efficiency Interest Requiring Parental Exclusion Policies

The final question is whether the government nevertheless has a "legitimate administrative interest" in its restriction on speech, necessary to prevent "disruption"

of its provision of service. *Dodge*, 56 F.4th at 781-82. The quintessential example is a teacher exercising his First Amendment right to participate in a pedophilia association. Although protected at the first two steps, the severity of the disruption to the school (through the parents protesting) gave the school a sufficiently legitimate administrative interest to fire him. *Melzer v. Bd. of Educ. of City Sch. Dist.*, 336 F.3d 185, 199 (2d Cir. 2003). Under this analysis "[t]he government's burden in proving disruption varies with the content of the speech. The more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made." *Dodge*, 56 F.4th at 782 (cleaned up). Because "[p]olitical speech is the quintessential example of protected speech, and it is inherently controversial," the government must show more than "the disruption that necessarily accompanies controversial speech." *Id.* at 782-83.

Here, as stated above, California's primary interest is compliance with the Privacy Clause of the California Constitution, and its secondary interest is protecting children from potential harm from their parents. But, as also stated above, minors have no privacy rights regarding their gender identity at school vis-à-vis their parents, and absent child-specific evidence, California must presume that parents will use more information to their child's benefit. *See* § I.B.4, *supra*. Absent a viable legal interest, the interest here has to be *practical* and *actual*: "actual, material and substantial disruption." *Dodge*, 56 F.4th at 782. Here, as stated above, EUSD actually reverted to a policy requiring parental consent and yet the education of children is proceeding apace with no complaints. *See* Ibarra Dep., 28:4-34:22, 62:4-17, 76:18-77:11, 82:20-85:4, 157:2-12. And even the purported disruption that led to EUSD placing Mrs. West on involuntary leave was based solely due "to the nature of the issue being controversial. White Dep., 99:3-12; *see also id.* at 70:10-75:6, 96:9-98:7. There has been no actual and meaningful disruption.

The Court should grant partial summary judgment on the teachers' Free Speech claim, both because they cannot be compelled to violate parents' rights, and because Parental Exclusion Policies violate their own rights.

### E. The Family Educational Rights and Privacy Act ("FERPA") Requires Parent Access to Gender Support Plans

As explained by the CDE in its 2016 FAQ Page, "[t]o prevent accidental disclosure of a student's transgender status, it is strongly recommended that schools keep records that reflect a transgender student's birth name and assigned sex (e.g., copy of the birth certificate) apart from the student's school records." Ex. C-2. Relying on this guidance—and in an effort to evade FERPA—school districts statewide have created "Gender Support Plan" forms that identify a child's legal name, preferred name, and whether their parents know. *See* Smith Dep., 34:13-35:5, Ex.6; Hammack Dep., 17:25-9:8, 84:2-25, Ex.8; Apodaca Dep., 38:19-39:10, 65:6-23, Ex.23. As explained below, this Court should issue declaratory relief clarifying that schools may not withhold records listing a gender transitioning students' preferred name and pronouns from parents.

*        *        *

In 1974, Congress enacted the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, 34 C.F.R. § 99, "to condition the receipt of federal funds on certain requirements relating to the access and disclosure of student educational records." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 278 (2002). Its sponsor, Senator James Buckley, "discovered that since students and their parents generally were not permitted to view their school records, students could be victimized by errors that were put into their transcripts and other records." Nicholas Trott Long, *Privacy in the World of Education: What Hath James Buckley Wrought?*, 46 R.I.B.J. 9 (Feb. 1998). Thus, FERPA "assure[s] parents of students ... access to their educational records" and "protect[s] such individuals' rights to privacy by limiting the transferability of their records without their consent." *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67-68 (1st Cir. 2002) (quoting 120 Cong. Rec. 39,862 (1974) (joint statement of Sens. Pell and Buckley explaining major amendments to FERPA) (original ellipses)).

The statute defines "education records" broadly as "records, files, documents,

and other materials which—(i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution." 20 U.S.C. § 1232g(a)(4)(A). But it does not include teachers', administrators', or other employees' *own* records, campus police records, and counseling records for individuals over the age of eighteen. *Id.* at subd. (a)(4)(B). As explained in the legislative history, this definition is intentionally broad:

> The proposed amendments define "education records" in order to make clear what documents and other material parents and students will have access to ... [The] intent to be that, except as provided in the definition, *parents and students should have access to everything in institutional records maintained for each student in the normal course of business and used by the institution in making decisions that affect the life of the student.*

*Belanger v. Nashua Sch. Dist.*, 856 F. Supp. 40, 49 (D.N.H. 1994) (quoting 120 Cong. Rec. 39,858-59 (1974) (original emphasis)); *see also id.* (further legislative history).

Thus, as "education records," courts have ordered schools to provide juvenile court records not created by the school, but kept in a child's file, *Nashua Sch. Dist.*, 856 F. Supp. at 50, records of a psychologist interviewing children to investigate claims of abuse, *Parents Against Abuse In Schools v. Williamsport Area Sch. Dist.*, 594 A.2d 796, 803 (Pa. Commw. Ct. 1991), a "disciplinary referral" form regarding bullying, *K.L. v. Evesham Bd. of Educ.*, 423 N.J. Super. 337, 363-64 (App. Div. 2011), records regarding an investigation into an athlete trading memorabilia for tattoos, *ESPN v. Ohio State Univ.*, 132 Ohio St. 3d 212, 218 (2012), a video recording showing a student altercation, *Cent. Dauphin Sch. Dist. v. Hawkins*, 253 A.3d 820, 830-31 (Pa. Commw. Ct. 2021), *aff'd*, 286 A.3d 726 (Pa. 2022), and recordings of a meeting discussing potential expulsion of a student, *Lewin v. Cooke*, 28 F. App'x 186, 193 (4th Cir. 2002). Even noncustodial parents retain the right to examine their child's education records. *Page v. Rotterdam-Mohonasen Cent. Sch. Dist.*, 441 N.Y.S.2d 323, 325 (1981); *cf. also Fay v. S. Colonie Cent. Sch. Dist.*, 802 F.2d 21, 33 (2d Cir. 1986).

Under FERPA, (1) parents have an absolute right to access their child's education records, 20 U.S.C. § 1232g(a)(1)(A); 34 C.F.R. §§ 99.10-99.12; (2) parents

have the right to an appeals process and formal hearing to correct inaccuracies in those records, 20 U.S.C. § 1232g(a)(2); 34 C.F.R. §§ 99.20-99.22; (3) parents have the right to opt their child out of directory services (which would include the child's name), 20 U.S.C. § 1232g(a)(5)(B); 34 C.F.R. § 99.37; and (4) parents have the right to be notified by the school district of these and other rights, 20 U.S.C. § 1232g(e); 34 C.F.R. § 99.7. When the California Education Code—or indeed any aspect of California law—conflicts with FERPA, it is preempted. *Rim of the World Unified Sch. Dist. v. Superior Ct.*, 104 Cal. App. 4th 1393, 1399 (2002).

Although a parent or student cannot sue under 42 U.S.C. § 1983 for a violation of FERPA, *Gonzaga Univ.*, 536 U.S. at 284, both parents and school officials can seek declaratory relief regarding their rights and obligations. *See, e.g.*, *Owasso Indep. Sch. Dist. No. I-011 v. Falvo*, 534 U.S. 426, 431 (2002) ("the Court has subject-matter jurisdiction"); *Charlotte-Mecklenburg Bd. of Educ. v. Disability Rts. of N.C.*, 430 F. Supp. 3d 74, 78 (W.D.N.C. 2019) (declaratory relief action by school district); *Klein Indep. Sch. Dist. v. Mattox*, 830 F.2d 576 (5th Cir. 1987) (declaratory relief action by teacher); *Bauer v. Kincaid*, 759 F. Supp. 575, 591 (W.D. Mo. 1991) (declaratory relief action by student); *see also Oregon Cnty. R-IV Sch. Dist. v. LeMon*, 739 S.W.2d 553 (Mo. Ct. App. 1987) (declaratory relief action by school district).

Here, as stated above, FERPA is relevant to whether California's Parental Exclusion Policies are generally applicable under the Free Exercise Clause, and whether it violates teachers' Free Speech rights to be compelled to violate FERPA. Thus, this Court should clarify its contours through declaratory relief.

## II. The Court Should Grant Plaintiffs Partial Summary Judgment on Liability for the EUSD Damages Claims

Plaintiffs Mirabelli and West have asserted several legal theories under which damages are available. Both seek damages with respect to their 42 U.S.C. § 1983 claims, as applied to EUSD personnel. Plaintiff West further seeks damages against Defendant EUSD with respect to its failure to accommodate her religious objection,

and its retaliation against her for requesting an accommodation—both under Title VII. Below, Plaintiffs request that this Court enter partial summary judgment with respect to liability on Plaintiff West's failure to accommodate claim (not her retaliation claim), and with respect to EUSD's sovereign immunity and qualified immunity defenses to the 42 U.S.C. § 1983 claims.

### A. The Court Should Grant Partial Summary Judgment on Plaintiff West's Title VII Claim for Failure to Accommodate

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … religion[.]" 42 U.S.C. § 2000e-2(a)(1). To discriminate "because of … religion" includes discrimination because of "all aspects of religious observance and practice, as well as belief." *Id.* at § 2000e(j). Thus, an employer has a duty to "accommodate" an employee's religious practice, "which means … allowing the plaintiff to engage in her religious practice despite the employer's normal rules to the contrary." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772 n.2 (2015).

To establish a prima facie claim for religious discrimination through non-accommodation, a plaintiff must show that: (1) "he had a bona fide religious belief, the practice of which conflicted with an employment duty"; and (2) "the employer threatened him with or subjected him to discriminatory treatment … because of his [religious] inability to fulfill the job requirements." *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993). Once the plaintiff makes this prima facie case, the burden shifts to the employer to show that an accommodation would constitute an "undue hardship." *Groff v. DeJoy*, 600 U.S. 447, 472 (2023).[19]

Religious beliefs need only be sincerely held. They do not need to be

---

[19] *Heller* and other older Ninth Circuit cases "require that an employee 'inform[] his employer of the belief and conduct'." *Crawford v. Trader Joe's Co.*, No. 5:21-cv-1519, 2023 WL 3559331, *9 n.4 (C.D. Cal. May 4, 2023). But these cases were abrogated by *Abercrombie* on this point. *See id.*

understandable to others, recognized by any organization, or articulable in a way the employer accepts. *Thomas*, 450 U.S. at 714 (under Free Exercise Clause "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others").[20] Religious beliefs are broadly understood to include a person's "moral, ethical, or religious beliefs about what is right and wrong." *United States v. Ward*, 989 F.2d 1015, 1018 (9th Cir. 1992). As such, "a coincidence of religious and secular claims in no way extinguishes the weight appropriately accorded the religious one." *Callahan v. Woods*, 658 F.2d 679, 684 (9th Cir. 1981); *accord Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1010-11 (7th Cir. 2024). With respect to threatened or actual adverse action, "[t]o make out a Title VII discrimination claim, [an employee] must show some harm respecting an identifiable term or condition of employment. What [she] does not have to show, according to the relevant text, is that the harm incurred was 'significant.'" *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024); *see also Dahlia v. Rodriguez*, 735 F.3d 1060, 1078 (9th Cir. 2013) ("[P]lacement on administrative leave can constitute an adverse employment action.").

To establish the defense of "undue hardship," the employer must demonstrate that any of the accommodations proposed by the plaintiff would impose a burden that is "substantial in the overall context of an employer's business." *Groff*, 600 U.S. at 468. As for the factors that count toward a determination of undue hardship, the Supreme Court has clarified that "[w]hat matters more than a favored synonym for 'undue hardship' (which is the actual text) is that courts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, 'size and operating cost of [an] employer.'" *Id.* at 470-71 (citation omitted).

---

[20] *See Riley v. Bendix Corp.*, 464 F.2d 1113, 1116-17 (5th Cir. 1972) (Title VII's legislative history shows that it was "intended to protect the same rights in private employment as the Constitution protects"); *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481-88 (2d Cir. 1985) (courts use same standard for religious sincerity under Title VII as in free exercise cases).

The Supreme Court further clarified that co-worker hostility cannot factor at all into a finding of undue hardship. "[A] coworker's [or patron's] dislike of 'religious practice and expression in the workplace' or 'the mere fact [of] an accommodation' is not 'cognizable to factor into the undue hardship inquiry.'" *Id.* at 472. "An employer who fails to provide an accommodation has a defense only if the hardship is 'undue,' and a hardship that is attributable to ... animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice cannot be considered 'undue.'" *Id.* Indeed, "[i]f bias or hostility to a religious practice or a religious accommodation provided a defense to a reasonable accommodation claim, Title VII would be at war with itself. *Id.*

Here, Plaintiff West requested a religious accommodation from Defendant EUSD. Although the sincerity of her religious objection was undisputed, she was told no. West Decl., ¶¶16-23. The sole basis for the denial of a religious accommodation was EUSD's belief that granting one would violate the law. *See* Albert Dep., 19:8-20:20, 44:24-58:11, 75:16-77:4. But EUSD cannot possibly establish an undue hardship because the Parental Exclusion Policies are illegal. *See McGinnis v. U.S. Postal Serv.*, 512 F. Supp. 517, 523-24 (N.D. Cal. 1980) (granting injunction because government failed to meet its burden of demonstrating undue hardship). The Court should thus grant partial summary judgment on EUSD's liability for violating Title VII.

## B. The Court Should Grant Partial Summary Judgment on the Inapplicability of Sovereign Immunity as an Affirmative Defense for the EUSD Superintendent and EUSD Board of Education

A sovereign entity is immune from suit absent its consent. *Alden v. Maine*, 527 U.S. 706, 715 (1999). This immunity does not extend to municipalities, but it does extend to an "arm of the state" (whether sued in its own name, or via its officials) a determination which is a question of law. *Kohn v. State Bar of Cal.*, 87 F.4th 1021, 1026 (9th Cir. 2023) (en banc). Over thirty years ago, the Ninth Circuit held that California school districts are arms of the state because public schooling is a "central government

1   function in California." *Belanger v. Madera Unified Sch. Dist.*, 963 F.2d 248, 253 (9th
2   Cir. 1992). However, in 2023, the Ninth Circuit rejected its prior factors for
3   determining whether an entity is an "arm of the state" and instead adopted the D.C.
4   Circuit's three part test, which uses an "entity-based approach" instead of a
5   "function" approach. *Kohn*, 87 F.4th at 1030-31 (en banc).

6        The Ninth Circuit now requires the Court to analyze: "(1) the [s]tate's intent as
7   to the status of the entity, including the functions performed by the entity; (2) the
8   [s]tate's control over the entity; and (3) the entity's overall effects on the state
9   treasury." *Kohn*, 87 F.4th at 1030 (quoting *P.R. Ports Auth. v. Fed. Maritime Com'n*, 531
10  F.3d 868, 873 (D.C. Cir. 2008)). Under this new "entity-based approach," because
11  "public education in California [is] … locally funded and educational achievement [is]
12  … locally controlled"—even though they are performing the state "function" of
13  education—school districts should no longer be protected by sovereign immunity. *See*
14  *Health Freedom Def. Fund, Inc. v. Carvalho*, 104 F.4th 715, 727 (9th Cir. 2024) (Nelson,
15  J., concurring), *reh'g en banc granted*, 127 F.4th 750 (9th Cir. 2025).

16       Specifically, for the first factor, "intent," California has treated local school
17  districts as corporate entities that are separate and distinct from the state. The
18  California Constitution permits the California legislature to provide for the
19  incorporation of school districts and to classify them. Cal. Const. art. IX, § 14. The
20  California Education Code contemplates two bodies of agencies: state agencies and
21  local educational agencies. *Compare* Cal. Educ. Code §§ 33000-33605 (state
22  educational agencies), *with* Cal. Educ. Code §§ 35000-35950 (local educational
23  agencies). Every school district is controlled by a local "board of school trustees or a
24  board of education." *Id.*, § 35010(a). Members of these local boards are elected by the
25  "qualified voters of the school district." *Id.*, § 35012. Each board enjoys the powers to
26  administer their own school districts within the bounds set by state law. *Id.*, § 35010(b).

27       Thus, school districts enjoy the following powers: (1) promulgate and enforce
28  rules for their own government, *id.*, § 35010(b); (2) set the duties of all persons

1    employed by the district, *id.*, § 35020; (3) hire independent legal counsel, *id.*,

2    § 35041.5; (4) initiate and carry out any program or other activity or decision that does

3    not conflict with any state law, *id.*, §§ 35160, 35160.1; (5) sue and be sued in their own

4    names, *id.*, § 35162; (6) "hold and convey property for the use and benefit of the

5    school district," *id.*, § 35162; and (7) secure copyrights and collect revenues from

6    those copyrights for its own benefit. *Id.*, § 35170. School districts are considered local

7    public entities for disputes as to their liabilities, *id.*, § 35207, local school boards may

8    even accept gifts and donations to scholarship and loan funds without the approval of

9    "any state agency." *Id.*, § 35313.

10        For the second factor, "control," while the state of California retains overall

11    control over its public education system and local school districts are required to

12    comply with state public school policies, local school districts enjoy the power to

13    administer their own districts. Cal. Educ. Code § 35010(b). As outlined in the first

14    factor, school districts enjoy substantial powers and are free from state control in their

15    day-to-day operations.

16        The third factor requires the Court to look at the state of California's "overall

17    responsibility for funding the entity or paying the entity's debts or judgments, *not*

18    whether the state would be responsible to pay a judgment *in the particular case at issue*."

19    *Kohn*, 87 F.4th at 1036 (cleaned up; original emphasis). While California has

20    aggregated to itself the responsibility to fund school districts through a mixture of state

21    tax dollars and the proceeds of local property taxes, *Sato v. Orange Cnty. Dep't of Educ.*,

22    861 F.3d 923, 929-32 (9th Cir. 2017), nothing in California's statutory scheme makes

23    California responsible for paying local school district's debts or judgments. Instead,

24    school districts are required to obtain their own insurance. Cal. Educ. Code § 35208.

25    Thus, the Court should determine that the EUSD Superintendent and EUSD Board of

26    Education are not protected by sovereign immunity.

27    ///

28    ///

1
2
3

**C. The Court Should Grant Partial Summary Judgment on the Inapplicability of Qualified Immunity as an Affirmative Defense for the EUSD Personal-Capacity Defendants**

4   When a government official is sued in his *personal* capacity, "[l]iability for
5   damages for every action which is found subsequently to have been violative of a
6   student's constitutional rights … would unfairly impose upon the school decisionmaker
7   the burden of mistakes made in good faith." *Wood v. Strickland*, 420 U.S. 308, 319
8   (1975). Thus, the Supreme Court has created the doctrine of "qualified immunity."
9   Under that doctrine, "government officials performing discretionary functions
10  generally are shielded from liability for civil damages insofar as their conduct does not
11  violate clearly established statutory or constitutional rights of which a reasonable
12  person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

13  Qualified immunity is an affirmative defense. *The Presbyterian Church (U.S.A.) v.*
14  *United States*, 870 F.2d 518, 527 (9th Cir. 1989). The essence of the defense turns on
15  whether the official had "fair notice" that his conduct was illegal. *Hope v. Pelzer*, 536
16  U.S. 730, 742 (2002); *Saucier v. Katz*, 533 U.S. 194, 206 (2001). To establish "fair
17  notice," the court may "look to the law of other circuits to determine if a principle is
18  clearly established." *Jones v. Williams*, 791 F.3d 1023, 1034 (9th Cir. 2015). The defense
19  can be overcome "in two ways: (1) by showing that there is clearly established law
20  putting [officials] on notice that their conduct is unlawful; or (2) by showing that the
21  [official's] conduct was a patently offensive violation of an existing right." *Beaver v.*
22  *Federal Way*, 301 F. App'x 704, 705 (9th Cir. 2008) (cleaned up); *see also Tatel II*, 675 F.
23  Supp. 3d at 575 (discussing "two ways").

24  To establish that the "right" was clearly established, "a plaintiff need not
25  produce 'a case directly on point.'" *Dodge*, 56 F.4th at 784 (quoting *Ashcroft v. al-Kidd*,
26  563 U.S. 731, 741 (2011)). Rather, "a general constitutional rule already identified in the
27  decisional law may apply with obvious clarity to the specific conduct in question, even
28  though the very action in question has not previously been held unlawful." *Id.* at 784

(cleaned up) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). But in the absence of "closely analogous preexisting case law," liability can only attach "if the claimed right is defined at an appropriately low 'level of generality.'" *Roe v. San Jose Unified Sch. Dist. Bd.*, No. 20-cv-2798, 2021 WL 292035, at *17 (N.D. Cal. Jan. 28, 2021) (quoting *Hope*, 536 U.S. at 741).

Thus, in reviewing whether the "right" was "clearly established," "[w]e are not to frame the issues presented at too high a level of generality," but "must define the rights implicated here at a level commensurate with the specific factual and legal context of the case." *Dodge*, 56 F.4th at 783-84. Framing the right as "the general right to be free from retaliation for one's speech," is too vague. *Id.* at 784. But an appropriate Free Speech framing would be to find that "it was patently unreasonable for [the government official] to believe that she could restrict [the plaintiff's] speech to quell what was, in reality, nothing more than the natural effect that disfavored political speech often has on those with different viewpoints." *Dodge*, 56 F.4th at 784.

A similar appropriate framing in the Free Speech context is that it is clearly established that "no legitimate pedagogical interest is served by forcing students to agree with a particular political viewpoint, or by punishing those who refuse," which instead "offend[s] the First Amendment." *Oliver v. Arnold*, 19 F.4th 843, 845-46 (5th Cir. 2021) (Ho, J., concurring in denial of reh'g en banc) (collecting cases). In the Free Exercise context, an appropriate framing is to find that "[i]t was clearly established by the Supreme Court that if a defendant has in place a system of individualized exemptions, it must extend that system to religious exemptions." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1300-01 (10th Cir. 2004); *accord Burke v. Walsh*, No. 3:23-cv-11798, 2024 WL 3548759, at *7 (D. Mass. June 5, 2024). Similarly, it was "clear from our decisions in *Yoder* and *Smith*," that "[w]hen the burden imposed is of the same character as that imposed in *Yoder*, we need not ask whether the law at issue is neutral or generally applicable before proceeding to strict scrutiny." *Mahmoud*, 2025 WL 1773627, at *22.

In the context of parental rights, an appropriate framing is to conclude that "[a] reasonable teacher in [defendant's] position would have known that where no notice or opt out rights are given, the alleged conduct [of instructing children on gender identity and telling them to not tell their parents] would violate the Parents' right to inculcate in their children their values about their own children's gender and identity." *Tatel II*, 675 F. Supp. 3d at 576-77. And in context of the state-created danger doctrine, "it was clearly established that state officials could be held liable where they affirmatively and with deliberate indifference placed an individual in danger she would not otherwise have faced." *Kennedy v. Ridgefield*, 439 F.3d 1055, 1066 (9th Cir. 2006).

Here, in addition to suing the EUSD Superintendent and Board, Plaintiffs named as defendants—in their individual capacities—EUSD Assistant Superintendent John Albert, EUSD Directors Trent Smith and Tracy Schmidt, and Rincon Principal Steve White, for their specific role in enforcing the Parental Exclusion Policies, which they enforced without question. *See* Albert Dep., 21:25-22:16, 40:10-17, 112:18-113:21; Smith Dep., 12:16-14:17, 20:25-22:16, 31:10-32:20, 43:16-49:7, 60:12-69:12, 95:13-20; Schmidt Dep., 52:24-55:6, 66:22-74:16, 95:1-13; White Dep., 26:14-28:9. While neither the Ninth Circuit nor any other Circuit has directly addressed the propriety of modern Parental Exclusion Policies, as this Court noted, they fail "the rational basis test[]" and are "foreign to federal constitutional and statutory law." *Mirabelli*, 691 F. Supp. 3d at 1212, 1217. Or, as stated by another court, "[i]t is difficult to envision why a school would even claim—much less how a school could establish—a generalized interest in withholding or concealing from the parents of minor children, information fundamental to a child's identity, personhood, and mental and emotional well-being such as their preferred name and pronouns." *Ricard*, 2022 WL 1471372, at *8.

"[T]he interest of parents in the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel*, 530 U.S. at 65 (plurality); *see id.* at 80 (Thomas, J., concurring). This interest has led to a litany of protections for parents. *See, e.g.*, Cal. Educ. Code § 51101. Thus, in

various contexts, courts have held that it is clearly established that the state cannot come between parents and their children. *See, e.g.*, *Words of Faith Fellowship, Inc. v. Rutherford Cnty. Dep't of Soc. Servs.*, 329 F. Supp. 2d 675, 690 (W.D.N.C. 2004) ("[I]nitiating sham investigations motivated by religious animus and enticing children to reject their parents' faith violates a clearly established right to exercise one's religion"). Here, it would be appropriate, in denying qualified immunity, for this Court to "conclude[] that Supreme Court … precedent put a reasonable defendant on notice that the conduct alleged in this case would—absent a compelling interest—plausibly infringe the Parents' Substantive and Procedural Due Process and Free Exercise rights…. The parental rights at issue are fundamental, long-recognized and clearly established." *Tatel II*, 675 F. Supp. 3d at 576.

## III. The Court Should Enter a Rule 54(b) Separate Judgment on the Prospective Relief Claims and stay the Rest of the Case, or Enter a Preliminary Injunction

### A. The Court Should Enter a Rule 54(b) Separate Judgment on the Prospective Relief Claims and stay the Rest of the Case

To perfect the record for appeal, Plaintiffs respectfully request that the Court enter judgment in their favor on their 42 U.S.C. § 1983 official-capacity claims, enter a permanent injunction, and then stay the remainder of the case (primarily concerning damages against EUSD) pending appeal. Federal Rule of Civil Procedure 54(b) allows a court to enter judgment as to "one or more, but fewer than all" claims if it expressly determines that there "is no just reason for delay." The rule is "designed to permit acceleration of appeals in multiple claim-cases" and "avoid the possible injustice of delaying judgment on a distinctly separate claim pending adjudication of the entire case." *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 409-10, 416 (2015). There is "no just reason for delay" here because Plaintiffs will obtain their principally desired remedy— injunctive relief—through success on this motion.

In addition, "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time

1  and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248,

2  254 (1936). "In determining whether a stay is appropriate, a federal court considers the

3  (1) 'possibility damage may result from the granting of a stay,' (2) 'hardship or inequity

4  which a party may suffer in being required to go forward,' and (3) 'orderly course of

5  justice measured in terms of the simplifying or complicating of issues, proof, and

6  questions of law which could be expected to result from a stay.'" *XPandOrtho, Inc. v.*

7  *Zimmer Biomet Holdings, Inc.*, No. 3:21-cv-105, 2021 WL 6064036, at *1 (S.D. Cal. Dec.

8  22, 2021) (quoting *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962)).

9  　　　Here, should Plaintiffs succeed on this motion, entering judgment on their 42

10  U.S.C. § 1983 official-capacity claims will "permit acceleration of appeals" on the main

11  constitutional issues. *Gelboim*, 574 U.S. at 409, 416. Those issues will drive any future

12  litigation against EUSD and are not nearly as fact-intensive as the damages claims,

13  thereby "simplifying … issues." *CMAX*, 300 F.3d at 268. There is no conceivable

14  hardship to the State-Level Defendants because the remaining claims do not apply to

15  them, and any hardship to the EUSD Defendants would be greatly outweighed by the

16  benefits of a stay.

17  ### B. The Court Should Enter a Class-Wide Injunction.

18  　　　Lastly, as stated above, the Court should enter either a permanent class-wide

19  injunction (if it enters a Rule 54(b) judgment), or a preliminary class-wide injunction.

20  In seeking either a preliminary or a permanent injunction, plaintiffs must establish:

21  (1) irreparable injury, (2) that legal remedies are inadequate, (3) that the balance of

22  hardships favors the plaintiff, and (4) that the public interest favors an injunction. *FCA*,

23  82 F.4th at 683-84; *Ariz. Dream Act Coal.*, 855 F.3d at 977. Here, like with the initial

24  preliminary injunction, all of these factors favor entry of a new injunction.

25  　　　To begin, "[i]t is axiomatic that '[t]he loss of First Amendment freedoms, for

26  even minimal periods of time, unquestionably constitutes irreparable injury.'" *FCA*, 82

27  F.4th at 694 (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19

28  (2020)); *see also Keene v. City & Cnty. of San Francisco*, No. 24-1574, 2025 WL 341831,

at *2 (9th Cir. Jan. 30, 2025) (quoting and following same in employment religious discrimination case). Further, "constitutional violations cannot be adequately remedied through damages." *Edmo*, 935 F.3d at 798.

"Where, as here, the party opposing injunctive relief is a government entity, the third and fourth factors—the balance of equities and the public interest—'merge.'" *FCA*, 82 F.4th at 695 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). On the defense side, "the state 'cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations.'" *Frankel v. Regents of Univ. of Cal.*, 744 F. Supp. 3d 1015, 1027 (C.D. Cal. 2024) (quoting *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983)). On Plaintiffs' side, "it is always in the public interest to prevent the violation of a party's constitutional rights." *FCA*, 82 F.4th at 695; *see also, e.g.*, *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018) ("Protecting religious liberty and conscience is obviously in the public interest."). In any event, in the absence of compelling evidence to the contrary, the Court must presume that an injunction will work to all children's benefit. *See Parham*, 442 U.S. at 602.

In sum, because Plaintiffs and the classes are suffering severe irreparable injury in the form of violations of their constitutional rights, and because it is always in the public interest to vindicate the Constitution, the injunction factors all favor Plaintiffs.[21]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant the above motion in full, granting: (1) summary judgment on all Plaintiffs' 42 U.S.C. § 1983 prospective relief only claims; (2) partial summary judgment as to liability on Plaintiffs Mirabelli's and West's 42 U.S.C. § 1983 damages claims and on Plaintiff West's Title VII failure to accommodate claim; (3) entry of a Rule 54(b) Separate Judgment and a class-wide permanent injunction as to the prospective relief only claims; and (4) in the alternative, a class-wide preliminary injunction as to those claims.

---

[21] If the Court enters a preliminary injunction instead of a permanent one, it should waive the bond requirement. *See Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011).

1

2          Respectfully submitted,

3          LiMANDRI & JONNA LLP

4   Dated: July 16, 2025          By:

5          Charles S. LiMandri
           Paul M. Jonna
6          Jeffrey M. Trissell
7          Attorneys for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Memo. of Points & Authorities ISO Plaintiffs' Renewed
Motion for Summary Judgment or a Preliminary Injunction