1   ROB BONTA
    Attorney General of California
2   DARRELL W. SPENCE
    Supervising Deputy Attorney General
3   JENNIFER A. BUNSHOFT (SBN 197306)
    KEVIN L. QUADE (SBN 285197)
4   ANNE BUSACCA-RYAN (SBN 318295)
    SHATTI A. HOQUE (SBN 350250)
5   Deputy Attorneys General
      455 Golden Gate Avenue, Suite 11000
6     San Francisco, CA 94102-7004
      Telephone: (415) 510-3377
7     Fax: (415) 703-5480
      E-mail: Jennifer.Bunshoft@doj.ca.gov
8   *Attorneys for State Defendants*

9

                IN THE UNITED STATES DISTRICT COURT

10

            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11

12

13

| | |
|---|---|
| 14  **ELIZABETH MIRABELLI, an individual, and LORI ANN WEST, an individual,** | 3:23-cv-00768-BEN-VET |
| 15 | **STATE DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON PROSPECTIVE RELIEF CLAIMS** |
| 16                                    Plaintiffs, | |
| 17       v. | |
| 18  **MARK OLSON, in his official capacity as President of the EUSD Board of Education, et al.,** | Date:        September 29, 2025 |
| 19 | Time:        10:30 a.m. |
| 20 | Dept:        5A |
| | Judge:       The Honorable Roger T. Benitez |
| 21                                    Defendants. | Trial Date: |
| | Action Filed:     April 27, 2023 |

22

23

24

25

26

27

28

**Page**

Introduction..................................................................................................1

Background..................................................................................................1

    I.    Plaintiffs' Complaint...................................................................1

    II.   Role and Responsibilities of the State Defendants ................2

Legal Standards .........................................................................................3

Argument ....................................................................................................4

    I.    Plaintiffs' Claims Are Not Justiciable .....................................4

        A.   Plaintiffs' Claims Against State Education Defendants Are Moot.................................................................................4

        B.   Plaintiffs Lack Standing to Sue State Defendants................4

            1.   Background law on standing .................................4

            2.   Teacher Plaintiffs lack standing ...........................5

            3.   Parent Plaintiffs lack standing.............................7

        C.   The Attorney General Is Immune from Suit Under the Eleventh Amendment ..........................................................8

    II.   Plaintiffs' Constitutional Claims Fail on Their Merits ...........9

        A.   Plaintiffs' Facial Challenges Fail ........................................10

        B.   Plaintiffs Have Not Established Violations of Their Rights to Free Exercise of Religion.........................................11

            1.   Parent Plaintiffs' free exercise claim fails ....................11

                a.   *Mahmoud v. Taylor*.............................................11

                b.   *Mahmoud* does not afford Parent Plaintiffs the right to dictate a school's interactions with their child ....................13

                c.   *Mahmoud* does not afford Parent Plaintiffs the right to affirmative school disclosure of their children's gender identity .....................15

            2.   Teacher Plaintiffs' free exercise claim fails................17

                a.   California's privacy protections for students do not contain discretionary exemptions ............18

                b.   California's privacy protections for students do not permit comparable secular activity..........21

                c.   Policies that protect student privacy survive review under both strict scrutiny and rational basis..................................25

        C.   Parent Plaintiffs Have Not Established a Violation of Their Substantive Due Process Rights ...................................26

i

Page

1.     Parental substantive due process rights are limited, especially in a school setting ........................................... 26

2.     Plaintiffs do not assert a fundamental right ................... 29

       a.     There is no fundamental right to control whether school officials respect a transgender student's decision to socially transition at school ................................................ 30

       b.     Permitting students to socially transition in the school context does not constitute medical treatment requiring parental notice and consent ........................................................ 31

       c.     Plaintiffs fail to show that student-privacy policies infringe on any fundamental right .......... 37

3.     Policies that protect student privacy satisfy any standard of scrutiny ......................................................... 39

D.    Teacher Plaintiffs' Have Not Established a Violation of Their Right to Free Speech ...................................................... 39

    1.     Teacher Plaintiffs' speech is not constitutionally protected ............................................................................ 40

       a.     Disclosure of an individual student's gender identity in private is not a matter of public concern ............................................................... 40

       b.     Teachers speak as public employees, not private citizens, when they communicate with parents about a student's gender identity ..... 41

    2.     Any restriction on speech is outweighed by the school's substantial interests ....................................... 43

E.    Plaintiffs' Request for Declaratory Relief Regarding FERPA Lacks Merit ...................................................... 45

III.    Plaintiffs Have Not Shown That They Are Entitled to a Preliminary or Permanent Injunction ................................................. 46

IV.    Plaintiffs Seek an Unenforceable and Unworkable Injunction, and Declaratory Relief That Is Outside the Scope oF Their Claims .................................................................................. 49

Conclusion ................................................................................................. 50

ii

# TABLE OF AUTHORITIES

**Page**

CASES

*All. for the Wild Rockies v. Cottrell*
   632 F.3d 1127 (9th Cir. 2011)..................................................................47

*Allen v. Cnty. of Lake*
   2014 WL 4380297 (N.D. Cal. Sept. 4, 2014).......................................47

*Am. Acad. of Pediatrics v. Lungren*
   16 Cal. 4th 307 (1997)...........................................................................26

*Am. Legion v. Am. Humanist Ass'n*
   588 U.S. 29 (2019) ................................................................................17

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986) ................................................................................3

*Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health*
   503 F.3d 256 (3d Cir. 2007) .......................................................16, 38, 39

*Arnold v. Bd. of Educ. of Escambia Cnty.*
   880 F.2d 305 (11th Cir. 1989).............................................................38, 39

*Association des Eleveaurs de Canards et d'Oies du Quebec v. Harris*
   729 F.3d 937 (9th Cir. 2013) ...................................................................9

*Bacon v. Woodward*
   104 F.4th 744 (9th Cir. 2024)................................................................22

*Betschart v. Oregon*
   103 F.4th 607 (9th Cir. 2024)................................................................47

*Bulthuis v. Rexall Corp.*
   789 F.2d 1315 (9th Cir. 1985)..................................................................3

*C.N. v. Ridgewood Bd. of Educ.*
   430 F.3d 159 (3d Cir. 2005)...................................................................37

*Cal. Parents for the Equalization of Educ. Materials v. Torlakson*
   973 F.3d 1010 (9th Cir. 2020)...........................................................28, 30

*Cal. Trucking Ass'n v. Bonta*
996 F.3d 644 (9th Cir. 2021) ............................................................. 5, 7

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) ............................................................................ 3

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*
508 U.S. 520 (1993) .......................................................................... 17

*City of Huntington Beach v. Newsom*
__ F. Supp. 3d. __, 2025 WL 1720210 (C.D. Cal. June 16, 2025) .. 31, 32, 34, 44

*Clapper v. Amnesty Int'l USA*
568 U.S. 398 (2013) ........................................................................ 5, 6

*Comes v. Edmonds Sch. Dist. No. 15*
816 F.3d 1255 (9th Cir. 2016) ........................................................ 42, 43

*Cruzan et rel. Cruzen v. Dir. Mo. Dep't of Health*
497 U.S. 261 (1990) .......................................................................... 27

*Damiano v. Grants Pass Sch. Dist. No. 7*
140 F.4th 1117 (9th Cir. 2025) .......................................................... 41

*DeShaney v. Winnebago Cty. DSS*
489 U.S. 189 (1989) .......................................................................... 39

*Desrochers v. City of San Bernardino*
572 F.3d 703 (9th Cir. 2009) ............................................................. 41

*Dodge v. Evergreen Sch. Dist. #114*
56 F.4th 767 (9th Cir. 2022) .......................................................... 40, 42

*Doe by & through Doe v. Boyertown Area Sch. Dist.*
897 F.3d 518 (3rd Cir. 1980) ...................................................... 25, 44, 49

*Doe v. Franklin Square Union Free Sch. Dist.*
100 F.4th 86 (2d Cir. 2024) .............................................................. 33

*Doe v. Irwin*
615 F.2d 1162 (6th Cir. 1980) ........................................................... 39

*Doe v. San Diego Unified Sch. Dist.*
19 F.4th 1173 (9th Cir. 2021).................................................................23, 24

*Drakes Bay Oyster Co. v. Jewell*
747 F.3d 1073 (9th Cir. 2014)..................................................................47

*Edmo v. Corizon*
935 F.3d 757 (9th Cir. 2019)....................................................................34

*Edwards v. Aguillard*
482 U.S. 578 (1987) ..................................................................................15

*Emp't Div., Dep't of Hum. Res. of Or. v. Smith*
494 U.S. 872 (1990) ...............................................................17, 19, 20, 24

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of
Educ.*
82 F.4th 664 (9th Cir. 2023).....................................................................20

*Fields v. Palmdale Sch. Dist.*
427 F.3d 1197 (9th Cir. 2005)..........................................................28, 30, 39

*Foote v. Ludlow School Committee*
128 F.4th 336 (1st Cir. 2025) .............................................................*passim*

*Foothills Christian Ministries v. Johnson*
__ F.4th __, 2025 WL 2351204 (9th Cir. Aug. 14, 2025) ..................19, 20, 21

*Fulton v. City of Phila., Pa.*
593 U.S. 522 (2021) ...........................................................................*passim*

*Garcetti v. Ceballos*
547 U.S. 410 (2006) ..................................................................................43

*Gonzaga Univ. v. Doe*
536 U.S. 273 (2002) ..................................................................................45

*Grayned v. City of Rockford*
408 U.S. 104 (1972) ..................................................................................12

v

# TABLE OF AUTHORITIES
### (continued)

*Great N. Res., Inc. v. Coba*
  2020 WL 6820793 (D. Or. Nov. 20, 2020) .......................................................... 47

*Grimm v. Gloucester Cnty. Sch. Bd.*
  972 F.3d 586 (4th Cir. 2020) ........................................................................ 33, 34

*Gruenke v. Seip*
  225 F.3d 290 (3d Cir. 2000) .................................................................................. 38

*In re Est. of Ferdinand Marcos Hum. Rts. Litig.*
  94 F.3d 539 (9th Cir. 1996) ................................................................................... 49

*In re M.T.*
  106 Cal. App. 5th 322 (2024) ............................................................................... 19

*Int'l Partners for Ethical Care Inc v. Ferguson*
  __ F.4th __, 2025 WL 2089421 (9th Cir. July 25, 2025) ................................. 6, 8

*J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*
  650 F.3d 915 (3d Cir. 2011) ............................................................................ 37, 39

*Johnson v. Astrue*
  597 F.3d 409 (1st Cir. 2009) ................................................................................. 33

*Johnson v. Poway Unified Sch. Dist.*
  658 F.3d 954 (9th Cir. 2011) ............................................................... 39, 40, 41, 42

*Kennedy v. Bremerton Sch. Dist.*
  597 U.S. 507 (2022) .......................................................................... 21, 42, 43

*LA All. for Hum. Rts. v. Cnty. of Los Angeles*
  14 F.4th 947 (9th Cir. 2021) ................................................................................. 49

*Lane v. Franks*
  573 U.S. 228 (2014) ........................................................................................ 40, 41

*Littlejohn v. Sch. Bd. of Leon Cnty., Fla.*
  132 F.4th 1232 (11th Cir. 2025) ........................................................................... 38

*Lopez v. Candaele*
  630 F.3d 775 (9th Cir. 2010) ........................................................................ 5, 7, 8

vi

*Lujan v. Defenders of Wildlife*
  504 U.S. 555 (1992) .................................................................. 5

*Mahmoud v. Taylor*
  145 S. Ct. 2332 (2025) ........................................................*passim*

*Manchester v. Ludlow*
  780 F. Supp. 3d 302 (D. Mass. 2025)..................................41, 44

*Mann v. Cnty. of San Diego*
  907 F.3d 1154 (9th Cir. 2018) ................................................. 32

*Mathews v. Becerra*
  8 Cal. 4th 756 (2019) ..........................................................*passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
  475 U.S. 574 (1986) ................................................................. 3

*Mirabelli v. Olson*
  691 F. Supp. 3d 1197 (S.D. Cal. 2023) (*Mirabelli I*) ............18, 42, 43

*Mirabelli v. Olson*
  761 F. Supp. 3d 1317 (S.D. Cal. 2025) (*Mirabelli II*)................5, 7

*Mueller v. Auker*
  700 F.3d 1180 (9th Cir. 2012) ................................................. 32

*Munge v. City of Glasgow Police Dep't*
  227 F.3d 1982 (9th Cir. 2000) ................................................... 3

*Murthy v. Missouri*
  603 U.S. 43 (2024) ................................................................... 8

*New York v. Ferber*
  58 U.S. 747 (1982) ................................................................. 25

*Ngoun v. Wolf*
  517 F. Supp. 2d 1177 (C.D. Cal. 2007)................................... 26

*Norwood v. Harrison*
  413 U.S. 455 (1973) ............................................................... 27

*Nunez v. Davis*
169 F.3d 1222 (9th Cir. 1999)...........................................................43

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*
810 F.3d 631 (9th Cir. 2015)...........................................................49

*Parents for Priv. v. Barr*
949 F.3d 1210 (9th Cir. 2020)......................................25, 28, 29, 30

*Parham v. J. R.*
442 U.S. 584 (1979) .........................................................................32

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty. Ill.*
391 U.S. 563 (1968) .........................................................................40

*Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*
122 F.4th 825 (9th Cir. 2024)............................................................4

*Poder in Action v. City of Phoenix*
481 F. Supp. 3d 962 (D. Ariz. 2020)...............................................47

*Poway Unified Sch. Dist. v. Sup. Ct.*
62 Cal. App. 4th 1496 (1998)...........................................................26

*Regino v. Staley*
133 F.4th 951 (9th Cir. 2025)...................................................passim

*Regino v. Staley*
2023 WL 4464845 (E.D. Cal. July 11, 2023) ..................................44

*Reno v. Flores*
507 U.S. 292 (1993) .........................................................................26

*Ricard v. Geary Cnty. Unified Sch. Dist. 475*
2022 WL 1471372 (D. Kan. May 9, 2022) ......................................31

*Riley's Am/ Heritage Farms v. Elsasser*
32 F.4th 707 (9th Cir. 2022)............................................................40

*Runyon v. McCrary*
427 U.S. 160 (1976) ..........................................................27

*Sable Commuc'ns of Cal., Inc. v. FCC*
492 U.S. 115 (1989) ..........................................................44

*San Diego v. Roe*
543 U.S. 77 (2004) .......................................................39, 40

*Shanks v. Blue Cross & Blue Shield of Wis.*
979 F.2d 1232 (7th Cir. 1992).........................................32

*Short v. New Jersey Dep't of Educ.*
2025 WL 984730 (D. N.J. Mar. 28, 2025) .........................39

*Snoeck v. Brussa*
153 F.3d 984 (9th Cir. 1998)..............................................9

*Stormans, Inc. v. Wiesman*
794 F.3d 1064 (9th Cir. 2015)......................................17, 21

*Tandon v. Newsom*
593 U.S. 61 (2021) ...............................................17, 22, 24

*Tarasoff v. Regents of Univ. of California*
17 Cal. 3d 425 (1976).......................................................20

*Taylor v. Vt. Dep't of Educ.*
313 F.3d 768 (2d Cir. 2002) .............................................45

*Tennessee v. Cardona*
2024 WL 3019146 (E.D., Ky. June 17, 2024) ...................31

*Thomas v. Newton Intern. Enterprises*
42 F.3d 1266 (9th Cir. 1994)..............................................3

*Tingley v. Ferguson*
47 F.4th 1055 (9th Cir. 2022)......................................32, 49

*Troxel v. Granville*
530 U.S. 57 (2000) ...........................................................29

# **TABLE OF AUTHORITIES**
### **(continued)**

3

4

*United States v. Salerno*
    481 U.S. 739 (1987) ............................................................. 10, 11

5

6

*United States v. Skrmetti*
    145 S. Ct. 1816 (2025) ................................................................. 34

7

8

*Vitsaxaki v. Skaneateles Central Sch. Dist.*
    2025 WL 874838 (N.D.N.Y Mar. 20, 2025).............................. 32

9

10

*Wallis v. Spencer*
    202 F.3d 1126 (9th Cir. 2000)................................................... 32

11

*Washington Env't Council v. Bellon*
    732 F.3d 1131 (9th Cir. 2013)..................................................... 5

12

13

*Washington v. Glucksberg*
    521 U.S. 702 (1997) ................................................................... 37

14

15

*We the Patriots USA, Inc. v. Hochul*
    17 F.4th 266 (2d Cir. 2021)....................................................... 23

16

17

*Whitaker v. Garcetti*
    486 F.3d 572 (9th Cir. 2007) ....................................................... 6

18

19

*Willey v. Sweetwater Cnty. Sch. Dist. #1 Bd. of Trust.*
    2023 WL 9597101 (D. Wyo., Dec. 18, 2023).......................... 42, 43

20

21

*Willey v. Sweetwater Cnty. Sch. Dist. #1 Bd. of Trust.*
    680 F. Supp. 3d 1250 (D. Wyo. 2023) ...................................... 41

22

*Williams v. Superior Ct.*
    3 Cal. 5th 531 (2017).................................................................. 19

23

24

*Winter v. Nat. Res. Def. Couns., Inc.*
    555 U.S. 7 (2008) ....................................................................... 46

25

26

*Wisconsin v. Yoder*
    406 U.S. 205 (1972) ............................................................*passim*

27

28

*Ex parte Young*
    209 U.S. 123 (1908) ................................................................. 7, 9

**STATUTES**

United States Code, Title 12
    § 1232g(a)(1)(A)...........................................................................45
    § 1232g(a)(4)(A)...........................................................................45

California Education Code
    § 33030 .........................................................................................2
    § 33031 .........................................................................................2
    § 33032 .........................................................................................2
    § 33111 .........................................................................................2
    § 33303 .........................................................................................2
    § 49063 .......................................................................................45
    § 49069.7 ....................................................................................45
    § 49070 ..................................................................................45, 46
    § 51101(a) ...................................................................................10
    § 51101(a)(1) ..............................................................................24
    § 51101(a)(3) ..............................................................................24

California Family Code
    § 6902 .........................................................................................32

Family Educational Rights and Privacy Act ....................................45, 46

**CONSTITUTIONAL PROVISIONS**

California Constitution
    Article I, § 1.........................................................................19, 26
    Article V, § 13.............................................................................3
    Article IX, § 2.............................................................................2
    Article IX, § 7.............................................................................2

United States Constitution
    First Amendment .................................................................*passim*
    Fourteenth Amendment ...................................................10, 30, 50

# TABLE OF AUTHORITIES
## (continued)

**COURT RULES**

Federal Rules of Civil Procedure
  § 54(b)...................................................................................................46
  § 56(a).....................................................................................................3

State Defendants' Opposition to Plaintiffs' Motion for Summary Judgment
(3:23-cv-00768-BEN-VET)

# INTRODUCTION

Plaintiffs, four teachers and two sets of parents, bring a motion for summary judgment against the California Superintendent of Public Instruction (SPI), the State Board of Education (SBE), and the California Attorney General (AG) (collectively, State Defendants). They argue that student privacy policies—local school district policies which regulate when staff can inform parents that a student has expressed a non-conforming gender identity, such as when students consent or when necessary to protect students' wellbeing—violate teachers' rights to free speech and free exercise of religion, and violate parents' right to free exercise, and their substantive due process right to raise their children how they see fit. Plaintiffs further contend that State Defendants force districts to implement these policies.

But this motion must fail because there are several triable issues of material fact as to this Court's jurisdiction and the merits of Plaintiffs' claims. Given a recent legislative enactment, the California Department of Education (CDE) has withdrawn nonbinding guidance that formed Plaintiffs' only alleged basis for suit against the SBE and SPI, mooting the claims against those Defendants. As to the Teacher Plaintiffs, State Defendants' disavowal of enforcement against their school district eliminates their claims against them. Even if they could prove likely future injuries, all Plaintiffs fail to prove these injuries are traceable to State Defendants.

Aside from the serious jurisdictional defects, Plaintiffs have also failed to show they are entitled to judgment on their constitutional claims, whether as facial challenges or as applied to them. For these reasons, and others discussed below, the Court should deny Plaintiffs' summary judgment motion in its entirety and decline to issue the requested injunctive and declaratory relief.

# BACKGROUND

## I. PLAINTIFFS' COMPLAINT

On August 8, 2024, Plaintiffs filed a Second Amended Complaint asserting constitutional claims against the Escondido Union School District (EUSD)

1

Defendants and State Defendants. ECF 133 (SAC) ¶¶ 51-65. As to the State Defendants, the SAC asserts free speech and free exercise of religion claims based on a basket of alleged state-level policy and conduct Plaintiffs collectively labeled "the State's Parental Exclusion Policies (PEPs)." *See* SAC ¶ 325.[1] Specifically, four current or former teachers at EUSD (Teacher Plaintiffs) claim that alleged restrictions on their ability to disclose the private gender identity information of their students violate their right to speak on matters of public concern and their right to exercise their religious beliefs. *Id.,* ¶¶ 346-60, 361-80, 381-400. The SAC also names two sets of Parent Plaintiffs who claim that they have a gender incongruent middle-school child. *Id.,* ¶ 24. Parent Plaintiffs assert free exercise of religion and substantive due process parental rights challenges against the State Defendants, claiming that PEPs unlawfully prevent them from obtaining information about their child's gender identity. *Id.,* ¶¶ 437-61, 462-84, 485-95.

## II. ROLE AND RESPONSIBILITIES OF THE STATE DEFENDANTS

Under the state constitution, the AG, SPI, and SBE members are all part of distinct entities with different roles and responsibilities in the operation of California government.  The SPI is the elected officer in charge of the California Department of Education (CDE), and is charged with executing the state-wide education rules and regulations adopted by the Board. Cal. Const. art. IX, § 2; Cal. Educ. Code §§ 33303, 33111. The SBE, an eleven-member body appointed by the Governor, is charged with determining state-wide education policy by adopting rules and regulations that govern K-12 public schools. Cal. Const. art. IX, § 7; Cal. Educ. Code §§ 33030, 33031, 33032. The AG is the State's chief law officer and is

---

[1] As evidence of the alleged PEPs, with respect to the AG, Plaintiffs point to his Legal Alert and "State of Pride" webpage, and the State's lawsuit challenging Chino Valley Unified School District's forced disclosure policy. SAC ¶¶ 318-19, 322-23; ECF 247-1 at 27, 28.  Regarding CDE/SBE, Plaintiffs point to CDE's previous FAQ and guidance, and civil action against Rocklin Unified School District. SAC, ¶¶ 308-15, 320-21; ECF 247-1 at 26-28.

charged with the duty to "see that the laws of the State are uniformly and adequately enforced." Cal. Const. art. V, § 13.[2]

Plaintiffs' claims against State Defendants challenge the State's so-called PEPs. But there is no such uniform State-level "policy;" school districts in California are responsible for and have flexibility in crafting and adopting their own policies, many different species of which can comply with State and federal law.

## LEGAL STANDARDS

The Court shall only grant summary judgment if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The evidence must be viewed in a light most favorable to the non-moving party, with all inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Only when the record taken as a whole, could not lead a rational trier of fact to find for the non-moving party, is summary judgment warranted. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see Munge v. City of Glasgow Police Dep't*, 227 F.3d 1982, 1087 (9th Cir. 2000) (summary judgment improper where conflicting evidentiary inferences).

"Expert opinion evidence is itself sufficient to create a genuine issue of disputed fact sufficient to defeat a summary judgment motion." *Thomas v. Newton Intern. Enterprises*, 42 F.3d 1266, 1270 (9th Cir. 1994); *see also Bulthuis v. Rexall Corp.*, 789 F.2d 1315, 318-19 (9th Cir. 1985) (summary judgment improperly granted because, after drawing all inferences in favor of the opposing party based on her experts' affidavits and "refraining from ruling on credibility," a trier of fact could reasonably find in the opposing party's favor).

---

[2] No state law authorizes the Attorney General to direct the actions of the SBE or CDE, or to dictate education policy at the state or local level.

**ARGUMENT**

I.  **PLAINTIFFS' CLAIMS ARE NOT JUSTICIABLE**

    A.  **Plaintiffs' Claims Against State Education Defendants Are Moot**

Plaintiffs' claims against the SPI and SBE (State Education Defendants) continue to be moot. "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 840-41 (9th Cir. 2024) (cleaned up). That is the case here, as CDE has withdrawn the prior challenged nonbinding FAQ guidance, replaced it with new guidance about the requirements of AB 1955, and notified every school district in California of that change. *See* Barrera Decl., Exs. 3, 4. CDE's replacement guidance mirrors California law as declared by AB 1955. *Id.*, ¶¶ 11-12, Ex. 3.

The Court previously held that Plaintiffs' claims against the State Education Defendants were not moot under the exception for voluntary cessation. ECF 236 at 2-6. But here, CDE's withdrawal and replacement of its earlier guidance was due to the passage of AB 1955, making it akin to a durable statutory change. By fully withdrawing the old guidance, as opposed to simply adding to it, CDE unequivocally communicated to districts that the rescinded guidance Plaintiffs focus on is no longer in effect. Because CDE has withdrawn and conclusively replaced Plaintiffs' only basis for suit against the State Education Defendants, *see* ECF 247-1 at 28-29 (emphasizing the purported lingering effect of withdrawn guidance), the claims against these Defendants are moot.

    B.  **Plaintiffs Lack Standing to Sue State Defendants**

        1.  **Background law on standing**

To establish standing, a plaintiff must demonstrate: (1) a concrete and particularized injury in fact; (2) a causal connection between the injury and

4

defendant's conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). As to injury, where prospective injunctive relief is sought, an alleged threatened injury must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Additionally, in First Amendment pre-enforcement cases such as this one,[3] a plaintiff must establish a "realistic danger" from a "credible threat" of enforcement. *See Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010).

The Ninth Circuit has listed three factors for assessing claims of future threatened prosecution: (1) whether the plaintiff has articulated a concrete plan to violate the law; (2) whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings; and (3) the history and circumstances of past prosecution or enforcement. *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 652 (9th Cir. 2021); *Lopez*, 630 F.3d at 786-87. As to traceability and redressability, a plaintiff must make related showings that their alleged injury is "fairly traceable" to the defendant's alleged misconduct, and not attenuated or the result of a third party's conduct, while also demonstrating a "substantial likelihood that the injury will be redressed by a favorable judicial decision." *Washington Env't Council v. Bellon*, 732 F.3d 1131, 1141142, 1146 (9th Cir. 2013).

## 2. Teacher Plaintiffs lack standing

This Court previously recognized that the AG's disavowal of enforcement against EUSD suffices to eliminate any threat of injury to Teacher Plaintiffs employed by EUSD. *See* ECF 114 at 6–8. However, in its subsequent order declining to dismiss the SAC, the Court explained that the addition of Parent Plaintiffs whose children attend different school districts changed this calculus. *See Mirabelli II*, 761 F. Supp. 3d at 1329. But the inclusion of new Plaintiffs, who assert separate and distinct constitutional injuries, has no bearing on whether the

---

[3] *See Mirabelli v. Olson*, 761 F. Supp. 3d 1317, 1329 (S.D. Cal. 2025) (*Mirabelli II*).

Teacher Plaintiffs have presented sufficient evidence to establish their own standing. *See Whitaker v. Garcetti*, 486 F.3d 572, 580 (9th Cir. 2007) (plaintiffs must each establish standing where legal claims and factual circumstances are not identical). The AG's continued disavowal of enforcement against EUSD deprives Plaintiffs Roe and Boe of standing to sue the Attorney General. ECF 114 at 6-8.[4]

The remaining Teacher Plaintiffs likewise lack standing. Plaintiff Mirabelli has retired from EUSD and is not currently teaching at any district, but hopes to "unretire" and resume teaching at some public school "[w]hen [her] health improves." Mirabelli Decl. ¶ 67. This evidence is far too speculative to establish the type of "certainly impending" injury necessary for standing. *Clapper*, 568 U.S. at 409. Indeed, by her own declaration, in order to return to teaching in some capacity, Plaintiff Mirabelli would have to feel healthy enough to "unretire" or apply for substitute teaching roles, actually be hired back into a public school teaching position given her potential physical limitations, and have the health necessary to commute to her new school, either by driving (which she claims she cannot currently do) or taking public transportation. Mirabelli Decl. ¶¶ 66–67. This chain of speculative possibilities is too attenuative and unlikely to confer standing. *Int'l Partners for Ethical Care Inc v. Ferguson*, __ F.4th __, 2025 WL 2089421, at *8 (9th Cir. July 25, 2025) (a chain of "'ifs' and 'shoulds,' without any detail or explanation as to when or why these circumstances might occur" is insufficient).

That leaves Plaintiff West, who no longer works for EUSD, but has been serving as a guest/substitute teacher in other districts and plans to begin permanently substituting at Sweetwater School District. West Decl. ¶¶ 47-48, 53. On this record, however, the mere fact that Plaintiff West will be in a classroom for

---

[4] Given the preliminary injunction barring EUSD from enforcing its policy that prohibited staff from disclosing a student's gender identity without consent, the State Education Defendants likewise disavow any enforcement against EUSD for taking actions consistent with the Court's injunction issued on September 14, 2023. This disavowal deprives the EUSD Teacher Plaintiffs of standing to sue these Defendants as well.

6

the 2025-26 school year does not demonstrate that she is imminently likely to have her asserted constitutional rights violated. Plaintiffs have not proven anything about Sweetwater School District's policy with respect to teacher disclosure of transgender identity. *See Cal. Trucking Ass'n*, 996 F.3d at 652 (pre-enforcement standing turns on whether there is evidence of plans that would trigger the feared enforcement based on the defendant's prior history of enforcement). Because the AG and CDE have only ever initiated enforcement action against districts with mandatory-disclosure policies, *see* ECF 247-1 at 28, the lack of evidence about Sweetwater's intentions renders Plaintiff West's fears of future State intervention (which could potentially cause the district to violate her rights) unsupported.

And this matters. Although the Court previously downplayed the distinction between schools with mandatory-disclosure policies and schools with different or no policy as "draw[ing] too fine a line" in determining the likelihood of potential enforcement, *Mirabelli II*, 761 F. Supp. 3d at 1329, the *specific circumstances in which a defendant has exercised enforcement authority (or not)* in the context of a pre-enforcement challenges makes all the difference, *Lopez*, 630 F.3d at 786-87 ("A history of past enforcement against parties *similarly situated* . . . cuts in favor of a conclusion that a threat is specific and credible." (emphasis added)).

### 3. Parent Plaintiffs lack standing

Parent Plaintiffs likewise continue to lack standing. The Court, in previously denying State Defendants' motions to dismiss the SAC, held that Parent Plaintiffs' prior experiences where schools did not disclose their children's gender identity (along with purported adverse consequences that followed) "sufficiently describe facts that the Poes and Does have suffered an actual injury that is concrete and particularized, fairly traceable to [CDE's] FAQs on gender identity, and that is redressable by a favorable ruling." *Mirabelli II*, 761 F. Supp. 3d at 1326.

But Plaintiffs' suit against the State Defendants is limited to prospective declaratory and/or injunctive relief. *See Ex parte Young*, 209 U.S. 123, 155-56

(1908). Contrary to the Court's analysis, what previously happened to Parent Plaintiffs, while potentially relevant to their ability to show future injury, *does not itself establish an injury that confers standing against State Defendants*. The critical inquiry, rather, is whether Parent Plaintiffs have established a "substantial risk of future injury" by proffering evidence that "allegedly wrongful behavior would *likely* occur or continue." *Murthy v. Missouri*, 603 U.S. 43, 68 (2024) (cleaned up).

Here, the record does not show a likelihood of *future* injury traceable to State Defendants.[5] Parent Plaintiffs' prior experiences with non-disclosure centered entirely around their schools' purported applications of CDE's prior FAQ guidance. But all public schools have now been informed that this guidance has been withdrawn and replaced with guidance that conveys instead the requirements of AB 1955. This explicit withdrawal and replacement of those earlier FAQs unequivocally conveys to districts that the rescinded guidelines are no longer in effect. *See Murthy*, 603 U.S. at 71-72 (feared future injury not traceable when defendant ceased issuing directives to plaintiff). Nor does the Attorney General and CDE's prior enforcement litigation against districts with mandatory-disclosure policies establish a likelihood of similar intervention in the Poe and Doe Plaintiffs' districts that could link the State Defendants to any future non-disclosure harms. *See Int'l Partners for Ethical Care Inc*, 2025 WL 2089421, at *8. Again, the fact that the Attorney General and CDE have only sought enforcement against districts with forced-disclosure policies (and no other districts) provides critical context for assessing the credibility of Parent Plaintiffs' fear that such enforcement will occur and force their districts into violating their rights. *Lopez*, 630 F.3d at 786–87.

## C. The Attorney General Is Immune from Suit Under the Eleventh Amendment

This Court previously declined to dismiss the AG on Eleventh Amendment grounds as to the FAC, concluding that his litigation efforts in the context of

---

[5] Even after conducting discovery, Plaintiffs have failed to submit *any evidence* that purportedly links SBE members to their alleged injuries.

districts with mandatory-disclosure policies were "sufficient to overcome . . . immunity arguments." ECF 114 at 6 (citing *Association des Eleveaurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943-44 (9th Cir. 2013)). But here, unlike *Eleveaurs*, Plaintiffs have not shown that the AG has any plausible connection to their asserted injuries, let alone the type of "direct authority" required under *Ex parte Young*. Again, Plaintiffs' theory of constitutional harm is wholly derivative, requiring that the AG exercise some generalized enforcement power in a manner that causes a third-party school district to do something that violates Plaintiffs' rights. Plaintiffs have not shown a likelihood that the AG will do anything that directly violates their constitutional rights, or take an action that causes a local district to violate their rights. *See Snoeck v. Brussa*, 153 F.3d 984, 986 (9th Cir. 1998) (a "generalized duty to enforce state law" is insufficient).

## II. PLAINTIFFS' CONSTITUTIONAL CLAIMS FAIL ON THEIR MERITS

Plaintiffs allege that State Defendants enforce so-called "PEPs." Such policies, they contend, prohibit school staff from disclosing a student's gender identity to parents without the student's consent, and even require school participation in a student's social transition. *See* SAC ¶¶ 2-3; ECF 247-1 at 26-29. Although Plaintiffs claim to challenge only the "PEPs" allegedly enforced by State Defendants, *see* SAC, Prayer for Relief, their constitutional claims are centered on the California constitutional right to privacy, *see* SAC ¶¶ 3, 22, 316, 318, 326; ECF 247-1 at 28-29. In substance then, Plaintiffs argue that application of the Privacy Clause of the California Constitution and related statutory protections for student privacy (collectively, "California's privacy protections") is the reason that public school employees are allegedly prohibited from disclosing a student's gender identity. *See, e.g.*, SAC ¶¶ 316, 318, 326. Plaintiffs' constitutional challenges are thus properly understood as seeking a federal constitutional exemption from the California constitutional right to privacy, as applied to gender identity in the school context. As explained above, Plaintiffs have not adequately established that

9

1  California law is as prohibitive as they claim, or that State Defendants enforce such
2  prohibitions, at least at an individual school employee level. Nevertheless, even if
3  Plaintiffs were correct that California law prohibits the disclosures they seek, their
4  constitutional claims fail on their merits.

### A. Plaintiffs' Facial Challenges Fail

6      Plaintiffs bring facial challenges under the First and Fourteenth Amendments,
7  in addition to as-applied challenges. *See* SAC, Prayer for Relief. A facial challenge
8  is "the most difficult challenge to mount successfully, since the challenger must
9  establish that no set of circumstances exists under which the Act would be valid."
10  *United States v. Salerno*, 481 U.S. 739, 745 (1987). But California's protections for
11  student privacy permit disclosure of gender-identity information to parents in some
12  circumstances without student consent, most notably where there is a compelling
13  need for nonconsensual disclosure to protect the student's well-being, or where
14  state or federal law requires parental notification in a particular context. *See*, e.g.,
15  ECF 247-17, ex. E-15 at 2. Thus, even if Plaintiffs' underlying legal theories were
16  valid (they are not), because the policies permit disclosure in some circumstances,
17  there would be no constitutional violation in those circumstances.

18      Moreover, student-privacy policies do not prohibit parents from exercising
19  their existing rights to visit classrooms, which afford them the ability to observe
20  their child's gender expression at school. Cal. Educ. Code § 51101(a). And parents
21  may initiate conversations about gender identity and expression with their children
22  in the time and manner of their own choosing. *Cf. Foote v. Ludlow School*
23  *Committee*, 128 F.4th 336, 355 (1st Cir. 2025) (challenged district protocol only
24  operates in school setting, meaning that "[o]utside school, parents can obtain
25  information about their children's relationship to gender in many ways, including
26  communicating with their children and making meaningful observations of the
27  universe of circumstances that influence their children's preferences, such as in
28  clothing, extracurricular activities, movies, television, music, internet activity, and

10

more"). Because student-privacy policies do not prohibit a parent from learning—through school notification or other means—their child's gender identity or expression in the learning environment, in *every* set of circumstances, Plaintiffs cannot show that "no set of circumstances" exists under which California's privacy protections would be valid. *See Salerno*, 481 U.S. at 745.

### B. Plaintiffs Have Not Established Violations of Their Rights to Free Exercise of Religion

#### 1. Parent Plaintiffs' free exercise claim fails

Plaintiffs first contend that California's protections for student privacy burden Parent Plaintiffs' religious exercise, and that such burdening in the school context automatically triggers strict scrutiny review. ECF 247-1 at 40-41 (citing *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025)). Under exacting scrutiny, Plaintiffs argue that California cannot justify the burdens that state privacy protections impose on parents' ability to direct the religious upbringing of their children. *Id.* at 44-46. As explained below, Plaintiffs' exclusive reliance on *Mahmoud* is faulty.

##### a. *Mahmoud v. Taylor*

In *Mahmoud*, the Supreme Court considered and clarified the rights of parents under the Free Exercise Clause in the context of school curriculum that conflicts with parents' religious beliefs. *Mahmoud*, 145 S. Ct. at 2342. In that case, a school district adopted a policy that required teachers to use "LGBTQ+-inclusive" storybooks that presented "certain values and beliefs" as "unmistakably normative" during elementary school instruction. *Id.* at 2343-45, 2353. Teachers were also required to respond to student questions in a manner that confirmed the books' moral messages. *Id.* at 2355-56. When parents objected to the subject-matter of this instruction based on their religious beliefs and sought to opt out their children, the district refused to provide accommodation. *Id.* at 2345-47.

The Supreme Court first held that these circumstances demonstrated a burden on the parents' right to free exercise of religion. *Mahmoud*, 145 S. Ct. at 2363.

11

Religious exercise, the Court explained, had long been recognized as encompassing the right of a parent to direct the religious upbringing for their child. *Id.* at 2351. The Court relied heavily on *Wisconsin v. Yoder*, 406 U.S. 205 (1972), which held that Amish parents had a free exercise right to opt their children out of compulsory secondary school attendance because such schooling conflicted with the Amish community's religious beliefs. *Id.* at 2352-53 (citing *Yoder*, 406 U.S. at 211-12, 218). Under *Yoder*, school policies burden parents' right to religious exercise where they "'substantially interfere with the religious development of the parents' children . . . [a]nd . . . pose 'a very real threat of undermining' the religious beliefs and practices that the parents wish to instill in their children." *Id.* at 2361 (quoting *Yoder*, 406 U.S. at 218). Applying this principle, the Court held that instruction with the books in question carried this "very real threat" because the books positively reinforced and normalized views on same-sex marriage and gender identity that conflicted with and tended to undermine the religious views the parents sought to instill in their children. *Id.* at 2353-60.

Having found a burden on the parents' religious exercise rights, the Court proceeded to subject the district's policy to strict scrutiny. *Mahmoud*, 145 S. Ct. at 2361. Though strict scrutiny is typically reserved for laws challenged under the Free Exercise Clause that are not religiously neutral or generally applicable, *id* at 2360, the *Mahmoud* Court explained that "when a law imposed a burden of the same character as that in *Yoder*, strict scrutiny is appropriate regardless of whether the law is neutral or generally applicable," *id.* at 2361 (citing *Yoder*, 406 U.S. at 220-21 (applying "close judicial scrutiny")). In reviewing the district's policy, the Court recognized that "as a general matter, schools have a 'compelling interest in having an undisrupted school session conducive to the students' learning.'" *Id.* at 2362 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 119 (1972)). However, the district's assertion that its refusal to provide out-opt accommodations was necessary to serve this compelling interest was fatally undermined by the district's

12

allowance for opt-outs of other types of instruction and school activities. *Id.* As such, the Court held that the parents were constitutionally entitled to have their children excused from instruction using books that conflicted with the parents' religious beliefs. *Id.* at 2363-64.

### b. *Mahmoud* does not afford Parent Plaintiffs the right to dictate a school's interactions with their child

Parent Plaintiffs rest the entirety of their free exercise of religion claim on the rationale in *Mahmoud*. *See* ECF 247-1 at 41. Indeed, they argue that the burdening of religious exercise in this case is "far worse" because the challenged California privacy protections allegedly permit "schools' facilitation" of their children's "secret gender transition." *Id.* Thus, Plaintiffs believe, under *Mahmoud*, that they are entitled not only to affirmative school notification when their children express a transgender identity, but also to demand that schools reject the gender identity expressed by their children in the learning environment. *See* ECF 247 at 4 (requesting a permanent injunction that bars State Defendants from allowing school staff to use "a student's preferred names or pronouns without parental consent").

But, as explained as to jurisdiction, Plaintiffs have not pled or proved that any aspect of California law (or State Defendants' enforcement of it) affirmatively requires schools to "facilitat[e]" a student's gender transition. Even so, Plaintiffs' breathtakingly expansive understanding of parents' religious exercise rights has no basis in *Mahmoud* or any other corner of American jurisprudence. To the contrary, the rights recognized in *Mahmoud* are explicitly limited; the government burdens a parent's right to religious exercise "when it requires them to *submit their children to instruction* that poses 'a very real threat of undermining' the religious beliefs and practices that the parents wish to instill." *Mahmoud*, 145 S. Ct. at 2342 (emphasis added) (quoting *Yoder*, 406 U.S. at 218); *see id.* at 2353 (claim depends on "the specific nature of the educational requirement or curricular feature at issue"), 2357 (rule applies to "questions of public school curriculum"). *Mahmoud* and *Yoder*

13

1   establish that parents have a right to opt their children out of mandatory instruction

2   or educational requirements (even attendance altogether) where such requirements

3   substantially interfere with the religious upbringing that the parents desire for their

4   child. *Mahmoud*, 145 S. Ct. at 2361; *Yoder*, 406 U.S. at 218.[6]

5          What Parent Plaintiffs seek in this lawsuit is far greater. They claim

6   constitutional entitlement to direct how a school responds to their children's request

7   that their gender identity be respected in the learning environment. Comparing the

8   effect of the LGBTQ+-inclusive books and instruction in *Mahmoud*, Plaintiffs

9   claim that a school's use of a student's requested name or pronouns substantially

10  interferes with a parent's religious development of their child. ECF 247-1 at 41. But

11  even if this is true, it does not follow that parents are afforded control of school

12  administrative policies as they relate to their child. No court has recognized that

13  such burdening of a parent's right permits them to override a school's policy for

14  how staff interacts with the students.

15         This is a critical distinction. In *Mahmoud* and *Yoder*, the relief afforded

16  parents where a challenged policy conflicted with the religious values the parents

17  wished to instill was to have the parents' child opted out of the offensive

18  educational requirement. *See Mahmoud*, 145 S. Ct. at 2364; *Yoder*, 406 U.S. at 234-

19  35 & n.22. The denial of opt-outs in *Mahmoud* failed strict scrutiny precisely

20  because the district failed to adequately demonstrate that the requested opt-outs

21  would undermine the learning environment. *See Mahmoud*, 145 S. Ct. at 2362

22  (noting district's other opt-outs for different instruction and school activities).

23         Here, by contrast, to the extent Parent Plaintiffs characterize their insistence

24  that schools refrain from respecting their children's gender identities as an opt-out,

---

25

26  [6] Indeed, the Supreme Court's emphasis on "the potentially coercive nature
    of classroom instruction," *Mahmoud*, 145 S. Ct. at 2355, logically distinguishes
27  *Mahmoud* from the present case. Unlike the mandatory instruction at issue there,
    the alleged effects of California law challenged here are not imposed on students by
28  the government, but rather, arise only when the *student* elects to express their
    gender identity at school.

14

it is not an opt-out in the mold on *Mahmoud* and *Yoder*. Rather than simply removing their children from an aspect of the educational experience that conflicts with their religious beliefs, Parent Plaintiffs seek to alter the educational experience. They claim constitutional entitlement to direct how their schools interact with a student; to insist that school employees put parents' religious viewpoint into practice when engaging with their child. This stretches the narrow opt-out right recognized in *Mahmoud* beyond its breaking point.

And critical to the strict scrutiny analysis, unlike the opt-out in *Mahmoud*, the effect of Parent Plaintiffs' claimed right to control the learning environment is not limited to their children. If a teacher is forced (because of a parent's religious insistence) to refer to a student by a name or pronouns different from that student's gender identity, that necessarily shapes the school culture for *all students*. A refusal by staff to acknowledge the gender identity of students reinforces for every student on campus that transgender students are wrong and should not be respected. As such, restriction on parents' ability to dictate staff behavior in this manner is the only way to serve the government's "compelling interest" in fostering a conducive learning environment because, as *Mahmoud* recognized, students "'emulate[e] . . . teachers as role models" and are "'susceptib[le] to peer pressure.'" *Mahmoud*, 145 S. Ct. at 2355 (quoting *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987)).

c. ***Mahmoud* does not afford Parent Plaintiffs the right to affirmative school disclosure of their children's gender identity**

Moreover, even if Parent Plaintiffs' claim for relief were limited to mandatory school disclosure of their children's gender identity (something far more circumscribed than what they actually seek, *see* ECF 247 at 4), they remain unable to show a viable claim under the Free Exercise Clause. In *Mahmoud*, after concluding that the parents were entitled to opt-outs for instruction that conflicted with their religion, the Supreme Court held that the school district was required "to notify them in advance whenever one of the books in question or any other similar

15

book is to be used in any way and to allow them to have their children excused from that instruction." *Mahmoud*, 145 S. Ct. at 2364. It was "not realistic to expect parents to rely on after-the-fact reports by their young children to determine whether the parents' free exercise rights have been burdened." *Id.* at 2358.

No similar notification is constitutionally required here. As just detailed, a parent does not possess a religious exercise right to dictate that a school reject their child's gender identity. Parent Plaintiffs' exertion of control, insisting that schools be prohibited from using names and pronouns consistent with their children's gender identities—in response to their child's request—is categorically different from type of individual student opt-outs approved in *Mahmoud* and *Yoder*. Because Plaintiffs lack an underlying constitutional basis for altering any school policy respecting the gender identities of students, there is no constitutional need for notification when their child comes within the scope of such policy.

Of course, Parent Plaintiffs may find notification that their child is expressing a transgender identity at school helpful in the general exercise of their right to direct a religious upbringing for that child. But the mere fact that affirmative school disclosure could assist a parent in exercising their constitutional rights does not establish a constitutional obligation for a school to provide such assistance or that the school's nondisclosure is a tangible burden on those rights. *See Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health*, 503 F.3d 256, 274 (3d Cir. 2007) (rejecting free exercise claim because "the Constitution does not impose an affirmative obligation" to facilitate parents' religious exercise rights with respect to their children); *cf.* Foote, 128 F.4th at 354-55 (rejecting substantive due process challenge to school's withholding of gender identity information because "it is not enough for the Parents to allege that the nondisclosure Protocol makes their parenting more challenging"); *id.* at 355 (parents' due process rights did not "require governments to assist parents in exercising their fundamental right to direct the upbringing of their children").

16

Accordingly, although Parent Plaintiffs may disagree on religious grounds when (and if) a California school uses a name and pronouns consistent with their child's expressed gender identity, their religious exercise rights do not confer on them a sweeping power to impose their religious beliefs on the school's interactions with their child. Nor does the First Amendment entitle them to affirmative school disclosure of their child's gender identity in contravention of state privacy laws, even if such information would be helpful in the exercise of their religious beliefs.

## 2. Teacher Plaintiffs' free exercise claim fails

Teacher Plaintiffs' claim, by contrast, is subject to the traditional analysis for purported burdens on the free exercise of religion. Under the Free Exercise Clause, governmental restrictions that incidentally burden religious activity are not discriminatory—and as such are subject to rational basis review—if they are neutral and of general applicability. *Emp't Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 878-82 (1990); *see also Fulton v. City of Phila., Pa.*, 593 U.S. 522, 533 (2021) (declining to overturn *Smith*). A law is not "neutral" if it targets religious belief or has a purpose of suppressing religious practices. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533-34 (1993). A law is not generally applicable if it creates a mechanism for individual, discretionary exemptions, *Fulton*, 593 U.S. at 534-35, or "treat[s] any comparable secular activity more favorably than religious exercise," *Tandon v. Newsom*, 593 U.S. 61, 62 (2021); *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1079 (9th Cir. 2015) ("A law is not generally applicable if its prohibitions substantially underinclude non-religiously motivated conduct that might endanger the same governmental interest that the law is designed to protect").[7]

[7] As explained, Teacher Plaintiffs have not established an injury for standing purposes to their right to religious exercise that is attributable to California law. Because they point to no currently operative State policy or conduct of State Defendants that restricts individual teachers' purported right to disclose student gender identities without consent, they have not shown the threshold burden on religious exercise needed for a via Free Exercise Clause challenge. *See Am. Legion* (continued…)

17

**a.    California's privacy protections for students do not contain discretionary exemptions**

Here, even if Teacher Plaintiffs could show a cognizable burden on their right to free exercise of religion, such burdening would be constitutionally permissible. They argue that California's constitutional privacy protections effectively prohibit teachers from disclosing a student's gender identity to parents without the student's consent, which purportedly violates Teacher Plaintiffs' ability to freely exercise their religious beliefs. *See* ECF 247-1 at 25-29. As support for their understanding of California law, Plaintiffs point to alleged examples of State Defendants interpreting and applying these privacy protections, flagging both CDE's now-withdrawn FAQ guidance that, "with rare exception," schools must respect the privacy of their students, FAC ¶¶ 313-14 (Ex. 26-B), and the AG's January 2024 Legal Alert, which advised that mandatory-disclosure policies violated state law, but explained that schools could lawfully adopt policies permitting "disclosure where a student does not consent where there is a compelling need to do so to protect the student's wellbeing," FAC ¶¶ 322-23 (Ex. 39).

In its earlier preliminary injunction, this Court enjoined a student-privacy policy adopted by EUSD that functioned in similar fashion. *Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1217 (S.D. Cal. 2023) (*Mirabelli I*). EUSD's now-withdrawn policy limited staff disclosure of a student's gender identity, except where there was a "legitimate need" for disclosure. The Court determined that EUSD's now-withdrawn policy was not generally applicable because it viewed consideration of "legitimate need" as an impermissibly discretionary exemption. *Id.* (citing *Fulton*, 593 U.S. at 533). Plaintiffs now explode this reasoning and argue that application of the state constitutional right to privacy—which generally bars disclosure of private information related to fundamental personal autonomy, except where there exists a compelling need for disclosure that outweighs the individual's privacy interest, *see*

v. Am. Humanist Ass'n, 588 U.S. 29, 82 (2019) (Gorsuch, J., concurring) (mere religious indignation does not tangibly burden the ability to practice religious faith).

*Mathews v. Becerra*, 8 Cal. 4th 756, 769 (2019)—necessarily implicates an individualized discretionary exemption that triggers strict scrutiny. ECF 247-1 at 42 (citing *Mirabelli I*, 691 F. Supp. 3d at 1217). State Defendants disagree.

The Supreme Court in *Fulton* articulated a clear basis for the rule that discretionary exemptions vitiate general applicability. "A law is not generally applicable if it *invites the government to consider the particular reasons for a person's conduct* by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (emphasis added) (citing *Smith*, 494 U.S. at 884). As the Ninth Circuit recently explained, the basis for subjecting laws with discretionary exemptions to strict scrutiny is founded on the risk that "'unfettered discretion . . . could lead to religious discrimination.'" *Foothills Christian Ministries v. Johnson*, __ F.4th __, 2025 WL 2351204, at *5 (9th Cir. Aug. 14, 2025) (quoting *Stormans*, 794 F.3d at 1081-82). The availability of such discretion allows "the government to decide which reasons for not complying with the policy are worthy of solicitude," creating an inherent risk that the government will disfavor noncompliance that is based on religious exercise. *Fulton*, 593 U.S. at 537; *see Smith*, 494 U.S. at 884 (outlining cases invalidating "good cause" conditions on unemployment benefits that created discretionary "system[s] of individual exemptions").

None of these concerns are at play here. The California Constitution expressly recognizes a right to privacy, and this right encompasses intimate personal information like gender identity. Cal. Const., art. I, § 1; *see In re M.T.*, 106 Cal. App. 5th 322, 338-41 (2024). Under California law, invasion of privacy interests going to fundamental personal autonomy can be justified if there is a "compelling interest" or "compelling need" that overcomes the person's privacy interests. *Williams v. Superior Ct.*, 3 Cal. 5th 531, 556 (2017). A common example of this constitutional framework at play concerns the psychotherapist-patient privilege. Although this privilege has been deemed as an aspect of the patient's state constitutional right to privacy, *see Mathews*, 8 Cal. 5th at 770, where a therapist

19

determines, based on their interactions with a patient, that the patient poses a serious danger to others, the therapist must take steps (including potential disclosure) to address the danger, notwithstanding the patient's privacy rights, *see id.* at 772; *Tarasoff v. Regents of Univ. of California*, 17 Cal. 3d 425, 431 (1976).

Homing in on this constitutional analysis, Plaintiffs insist that application of these principles in the school context amounts to a discretionary exemption to state privacy law that triggers strict scrutiny under *Fulton* and *Smith*. ECF 247-1 at 42. But California's well-established parameters for its constitutional right to privacy are a poor fit for the discretionary-exemptions framework. Indeed, the determination of a compelling safety need for disclosure that overrides a Californian's fundamental right to privacy is *not discretionary at all*, but rather, made pursuant to an objective legal test that is applied consistently across similarly situated individuals. Where, for instance, the California Supreme Court holds that disclosure in particular circumstances is legally permissible, a California court has no discretion to say that a different individual in the same circumstances should receive a different outcome. Application of California privacy law in this manner is neither discretionary nor individualized. *See, e.g.*, *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 687-88 (9th Cir. 2023) (en banc) ("*Fulton* counsels that the mere existence of a *discretionary* mechanism to grant exemptions can be sufficient to render a policy not generally applicable") (emphasis added); *see also id.* at 687 ("the District's policies are not generally applicable because the District retains *discretion* to grant *individualized* exemptions for its own programs and student programs alike.") (emphasis added).

Moreover, even if disclosures pursuant to a compelling need involve some government decision-making, this does not vitiate the general applicability of this aspect of California law. *See Foothills Christian Ministries*, 2025 WL 2351204, at *5 (the presence of "some minimal discretion" is not dispositive). The state privacy analysis looks nothing like the type of unfettered governmental discretion that risks

20

undercover religious discrimination. *Id.*; *Stormans*, 794 F.3d at 1081-82. To the contrary, in the school setting, whether a disclosure of private student information is prohibited or permissible turns exclusively on the objective *circumstances of the student*, not subjective judgments concerning the motivations of the disclosing teacher. The student holds the privacy right and, thus, any nonconsensual disclosure based on a "compelling need" depends solely on objective facts pertinent to the student's situation that show a danger that overrides the student's privacy interests. *The teacher's personal reasons for disclosing (religious or secular) are entirely irrelevant.* The only thing that matters is whether the student's circumstances show a compelling safety need for disclosure.

As such, even though disclosure of a student's gender identity information is not unlawful under California's privacy protections in all circumstances, the California Constitution does not "invite[] the government to consider the particular reasons for" a teacher's nonconsensual disclosure. *Fulton*, 593 U.S. at 533. Whether a "compelling need" for disclosure exists does not require "the government to decide which reasons from not complying with [a student's right to privacy] are worthy of solicitude." *Id.* at 537. There is no discretionary picking and choosing of appropriate justifications. Thus, California's student privacy protections do not contain discretionary exemptions and do not require strict scrutiny to flesh out hidden religious discrimination.

### b. California's privacy protections for students do not permit comparable secular activity

Plaintiffs' argument that California's privacy protections contain comparable exemptions for secular activities fares no better. *See* ECF 247-1 at 42-43 (citing *Tandon*, 593 U.S. at 62). "A government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022) (quoting *Fulton*, 593 U.S. at 534).

21

Plaintiffs first return to "compelling need" disclosures under the state constitutional right to privacy, arguing that state law's allowance for disclosure in such circumstances—where a student's compelling health or safety needs override their privacy interests—is a secular exemption comparable to religiously motivated disclosure. ECF 247-1 at 43. But "whether two activities are comparable . . . must be judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62; *accord Bacon v. Woodward*, 104 F.4th 744, 751 (9th Cir. 2024). Plaintiffs' proposed disclosure categories are not comparable.

As explained, under the California Constitution, there is a right to privacy with respect to information fundamental to personal autonomy that cannot be violated absent a compelling need for disclosure that overcomes the individual's vital privacy interest. *Mathews*, 8 Cal. 5th at 769. In other words, circumstances demonstrating such a compelling need for disclosure change the calculus, flipping the pertinent governmental interests. Thus, while the State's interests associated with the constitutional right to privacy ordinarily weigh conclusively against disclosure, a compelling need for disclosure—for instance, where a student's circumstances demonstrate a danger to the student's safety or wellbeing—presents superseding public interests that outweigh the ordinary governmental interests in an individual maintaining their privacy. *See Mathews*, 8 Cal. 5th at 770-72.

By contrast, where an individual's privacy right is violated by a person purportedly exercising their religious beliefs, there is no comparable shift in the government's interests. California maintains a strong interest in safeguarding the individual's privacy precisely because there is no compelling safety rationale for overriding that constitutional right. And disclosure that violates the privacy right, even if based on the sincere religious exercise of the disclosing person, directly undercuts the State's interest in the privacy of individuals in a way that disclosure for a compelling need, by definition, does not. Only in that latter circumstance, there is no longer a dispositive governmental intertest in maintaining privacy.

Plaintiffs' comparison also fails for a second reason. In *Doe v. San Diego Unified Sch. Dist.*, the Ninth Circuit held that a school district's mandatory COVID-19 vaccination policy was generally applicable, even though the policy contained a medical exemption for students with specific contraindications. 19 F.4th 1173, 1177-78 (9th Cir. 2021). The Court specifically rejected a claim that the medical exemption constituted more favorable treatment for comparable secular activity, emphasizing that the number of students utilizing the medical exemption was likely "very small," while "the number of students likely to seek a religious exemption is large." *Id.* at 1178. Viewed through the lens of harms to the government's asserted interests, this substantial disparity rendered the policy's medical exemption not "comparable" to the desired religious exemption. *Id.* (citing *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 285-88 (2d Cir. 2021)).

The same reasoning applies here. Common sense dictates, thankfully, that the instances in which a student's circumstances will reflect a compelling health or safety need for nonconsensual disclosure will be rare. Though instances of bullying, depression, and even suicidal ideation in California's transgender student population have been documented, there is nothing before the Court demonstrating that a compelling need for disclosure that overrides a transgender student's fundamental autonomy right to privacy is or will be a common occurrence.

But that is not the case with Plaintiffs' expansive request for a religious exemption to state privacy rights. Indeed, as they argue in their motion for class certification, there are well over 300,000 public school teachers in California, and undoubtedly tens of thousands more school staff. ECF 244-1 at 24-25; *see id* at 14 (seeking certification of subclasses for all public school "employees"). Moreover, Plaintiffs allege in their SAC that 63% of Californians are Christian, including 28% who identify as Catholic, and that traditional Christian views dictate strong support for nonconsensual parental disclosure of a student's gender identity. SAC ¶¶ 333-34. These statistics paint a clear picture. A religious-exercise exemption that allows

23

California school staff to disclose a student's gender identity without their consent will be utilized by thousands and thousands of employees, unquestionably undermining the State's legitimate interests in a way that a handful of disclosures based on compelling need do not. *Doe*, 19 F.4th at 1178.

Plaintiffs next point to supposed comparable secular activities that undermine the State's interests in student privacy, such as the right of students to not be "compelled to affirm or disavow any particular personally or privately held world view, religious doctrine, or political opinion," arguing students have the freedom to disregard state privacy protections, while teachers do not. ECF 247-1 at 43 (citing Cal. Educ. Code § 49091.12(a)). These activities are not "comparable." The State has vastly different (and obvious) interests in regulating the professional conduct of school employees in the learning environment, as compared to the conduct of individual students, when it comes to the privacy of students. Plaintiffs also cite sections of the Education Code that permit parents to observe and assist in their child's classroom (Cal. Educ. Code § 51101(a)(1) & (3)), as well as parents' statutory right to access their child's school records (Cal. Educ. Code § 51101(a)(1)), arguing that these provisions result in privacy-undermining disclosure. ECF 247-1 at 44. But again, the different government interests at work in these statutes disprove Plaintiffs' arguments. Unlike a religious-exercise exemption from California privacy law, to the extent nonconsensual disclosure occurs in any of these incidents, it is purely incidental to facilitation of the separate governmental interests that undergird each of these statutes. Accordingly, to the extent the Teacher Plaintiffs have shown that California's privacy protections for students prohibit nonconsensual parental disclosure, and thereby burden their religious exercise, application of these state constitutional rights in California schools is neutral and generally applicable under *Smith*, *Fulton*, and *Tandon*.

### c. Policies that protect student privacy survive review under both strict scrutiny and rational basis

Because California's protections for student privacy with respect to gender identity are religion-neutral and generally applied to public school employees, the purported limits on disclosure are subject only to deferential rational basis review. Nevertheless, even under strict scrutiny, California's constitutional right to privacy (and other statutory protections for students) pass constitutional muster. The State has a legitimate, and even compelling, interest in protecting transgender and gender-nonconforming students from bullying and harassment, and in fostering a safe and supportive school environment where students can learn without fear of being outed to their parents before they are ready. *See, e.g.*, *New York v. Ferber*, 58 U.S. 747, 756 (1982) (state interest in "safeguarding the physical and psychological well-being of a minor" is compelling); *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 528 (3rd Cir. 1980) (policy served compelling state interest in not discriminating against transgender students); *see also Parents for Priv. v. Barr*, 949 F.3d 1210, 1238 (9th Cir. 2020) ("[T]he Student Safety Plan is rationally related to the legitimate purpose of protecting student safety and well-being, and eliminating discrimination on the basis of sex and transgender status"). This includes an interest in protecting these students from the harms, such as a heightened risk of suicide, that can result when school staff "forcibly out" students without their consent and before they are ready. Al-Shamma MSJ Decl. ¶¶ 25, 31-34 (detailing emotional and education harms faced by transgender or gender-nonconforming youth rejected by family, including harassment, homelessness, and self-harm); ¶¶ 37-41 (detailing risk of students not reporting harassment, bullying, or thoughts of self-harm at school because of fear of being outed to parents); Tando MSJ Decl., Ex. 2 ¶¶ 50-56; Brady MSJ Decl, Ex. 1, ¶¶ 56-89.

There is also a compelling governmental interest in protecting students' privacy as to their bodily autonomy, even with respect to their parents. *See, e.g.*,

Cal. Const. Art. 1, § 1; *Poway Unified Sch. Dist. v. Sup. Ct.*, 62 Cal. App. 4th 1496, 1505 (1998) ("[M]inors, as well as adults, possess a right of privacy under the California Constitution"); *Ngoun v. Wolf*, 517 F. Supp. 2d 1177, 1191 (C.D. Cal. 2007) (student had "[c]onstitutionally protected privacy right with respect to disclosure of her sexual orientation" by school administrators to her parents); *Am. Acad. of Pediatrics v. Lungren*, 16 Cal. 4th 307, 332-37 (1997) (pregnant minor has state constitutional privacy interest in deciding whether to terminate pregnancy).

Even if strict scrutiny applies to the Teacher Plaintiffs' claim (and it does not), a policy of guarding against forced outing absent consent, legal obligation, or regard for student well-being would meet that standard as well. *Reno v. Flores,* 507 U.S. 292, 301-02 (1993) (government infringement on "fundamental" right must be narrowly tailored to serve a compelling state interest). Such a policy would be narrowly tailored in furtherance of the State's compelling interest in protecting students because it would prevent the disclosure of information that may lead to psychological, emotional, and even physical harm, while allowing disclosure with a student's consent and, absent consent, where there is either a compelling need for disclosure to protect a student's well-being, or where it would otherwise be required by law. Plaintiffs' various free exercise of religion claims thus fail on their merits.

**C.  Parent Plaintiffs Have Not Established a Violation of Their Substantive Due Process Rights**

Parent Plaintiffs assert that they have a fundamental substantive due process right to prevent school staff from accepting their child's chosen gender identity at school absent parental consent. ECF No. 247-1 at 29-31. Yet there is no such fundamental right, nor do Parent Plaintiffs have a fundamental due process right to be notified of their child's gender identity at school, without the child's consent.

**1.  Parental substantive due process rights are limited, especially in a school setting**

"[C]aution is warranted" in the area of substantive due process because "'guideposts for responsible decisionmaking . . . are scarce and open-ended.'"

26

*Regino v. Staley*, 133 F.4th 951, 960 (9th Cir. 2025) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). "Substantive due process protects individuals from state action that interferes with fundamental rights." *Id.* at 959-60. "To assess whether there has been a violation of a fundamental right, [courts] begin with a careful description of the asserted fundamental liberty interests." *Id.* at 960 (cleaned up). Arriving at that "careful description" requires a court to "examine [the plaintiff's] articulation of the particular fundamental right she asserts," "consult . . . 'the scope of the challenged regulation,'" "eschew sweeping generalizations, and instead 'adopt a narrow definition of the interest at stake.'" *Regino*, 133 F.4th at 964 (citing, *e.g.*, *Cruzan et rel. Cruzen v. Dir. Mo. Dep't of Health*, 497 U.S. 261, 277-79 (1990) (examining the "right to refuse lifesaving hydration and nutrition" rather than the more generic "right to die").

"With that careful description in mind, [a court] must then decide whether the asserted interest" qualifies as "fundamental." *Regino*, 133 F.4th at 960. To do so, a court asks whether the asserted interest is "'objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it was] sacrificed." *Id.* Supreme Court precedent requires courts to be "'reluctant to expand the concept of substantive due process'" and to "'exercise the utmost care' before 'breaking new ground' in the area of unenumerated fundamental rights." *Id.* at 962.

The Ninth Circuit recently "identif[ied] some of the important decisional guideposts" with respect to whether an asserted parental interest qualifies as a fundamental right. *Regino*, 133 F.4th at 965. It noted that "the right to 'make decisions concerning the care, custody, and control' of children 'is not without limitations,'" and is especially "cabined" in school settings. *Id.* at 966 (internal citation omitted).[8] "As a general matter, parents have the right to choose the

---

[8] Indeed, the Supreme Court has repeatedly held that parental due process rights have "limited scope" in the educational context. *See Norwood v. Harrison*, 413 U.S. 455, 461 (1973); *Runyon v. McCrary*, 427 U.S. 160, 177 (1976).

educational forum" for their child, "but not what takes place inside the school." *Id.* (quotation omitted). "Parents lack a constitutional right to direct the curriculum that is taught to their children, and also lack constitutionally protected rights to direct school administration more generally." *Id.* (quotation omitted). "Schools cannot be expected to accommodate the personal, moral or religious concerns of every parent." *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1206 (9th Cir. 2005). "Such an obligation would not only contravene the educational mission of the public schools, but also would be impossible to satisfy." *Id.*

In keeping with those substantive due process guideposts, the Ninth Circuit has repeatedly rejected parents' substantive due process challenges to various school policies because they have no substantive due process right to control the administration, policies, curriculum, or operations of their children's schools. In *Fields*, for example, the Court affirmed the dismissal of a parent's substantive due process challenge to a school's survey of elementary-school students about their sexual experiences. *Id.* at 1200-02, 1207-08. And in *Parents for Privacy*, the Court rejected a parental substantive due process challenge to a school policy allowing transgender students to use facilities consistent with their gender identity, because while parents are entitled to inform their child about sex and gender identity, they have no substantive due process right to override school policy. 949 F.3d at 1232-33; *see also Cal. Parents for the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1020 (9th Cir. 2020) (rejecting parents' substantive due process challenge to school curriculum on Hinduism); *Fields*, 427 F.3d at 1204-05 (collecting cases rejecting other parental substantive due process challenges to school programs and policies concerning sex education, condom distribution, attendance, speech therapy services, and community service).

Here, Parent Plaintiffs have not followed the Ninth Circuit's instructions for analyzing due process claims, instead delving into the background of various broadly stated historical parental rights. *See, e.g.*, ECF 247-1 at 31-35. For

28

example, they describe the longstanding "liberty" interest in family privacy, including the right to "marry, establish a home and bring up children," the importance of the relationship between parent and child, and the interest of parents in the "care, custody, and control of their children." ECF 247-1 at 31-33 (citing broad propositions in inapposite cases regarding parental rights, such as *Troxel v. Granville*, 530 U.S. 57, 65 (2000)),[9] and various commentaries on 18th century English laws recognizing the importance of relationships between parents and children). Even then, Plaintiffs acknowledge that "the Ninth Circuit has taken a narrow approach" regarding the due process rights of parents in schools. *Id.* at 37.

### 2. Plaintiffs do not assert a fundamental right

Plaintiffs claim that student-privacy policies unconstitutionally burden their substantive due process rights. First, they argue they have a fundamental privacy right to control whether their child socially transitions based on their contention that it is an "intimate decision." Second, they argue that they have a fundamental right to control whether their child socially transitions at school based on their contention that social transition is a medical treatment.[10] Those asserted interests do not implicate any cognizable fundamental rights.

---

[9] Plaintiffs' reliance on *Troxel* here is misplaced because that case "concerned a state government's interference with a mother's decision about the amount of visitation" rights, and "did not address the extent of parents' rights to direct the policies of the public schools that their children attend." *Parents for Priv.*, 949 F.3d at 1230.

[10] These asserted rights represent a reframing of the parental rights alleged in this matter. The SAC broadly alleges that student-privacy policies violate Parent Plaintiffs' "right to direct the upbringing of their children." *See, e.g.*, SAC, ¶¶ 471, 475, 476, 482. Now, in the instant motion, they instead assert a fundamental parental right to direct their child's social transition and to prevent schools from permitting a child to socially transition at school without parental consent. ECF 247-1 at 29, 48-49. "These shifts in position are problematic because they undermine the critical requirement that [courts] begin the substantive due process analysis with a 'careful description' of the asserted fundamental right." *Regino*, 133 F.4th at 963.

**a.  There is no fundamental right to control whether school officials respect a transgender student's decision to socially transition at school**

Parent Plaintiffs' argument that parents have a fundamental right to control whether their children may socially transition at school because it is an "intimate decision," *see* ECF 247-1 at 29, lacks merit.[11] "Social transition" "describes an individualized process in which a person changes aspects of their gender expression (e.g. clothing, name, pronouns, hair style) to align with their gender identity." Brady MSJ Decl., Ex. 1, ¶ 36; *see also* ECF 247-10, Ex. 1, ¶ 17. As Plaintiffs' expert agrees, "'social transition' is used as a contrast to medical transition" because social transition *does not* involve "various medical interventions to bring one's physical appearance closer into alignment with one's asserted gender identity, such as puberty blockers, cross-sex hormone therapy, and various surgical interventions." ECF 247-10, Ex. 1, ¶ 17.

Plaintiffs argue that parents have a fundamental due process privacy right to control whether a child undergoes social transition, and therefore schools may not interfere with the right of the parents to make that "intimate decision." ECF 247-1 at 48; *see also id.* at 37 (referring to "autonomy privacy rights"). But they have failed to show that decisions by schools permitting students to use their requested name and pronouns or use a bathroom consistent with their gender identity, fall within the "intimate" privacy decisions protected by the Fourteenth Amendment, such as the right to decide whether or not to bear children and the right of sexual intimacy. *See Fields*, 427 F.3d at 1207-08; *see also Parents for Priv.*, 949 F.3d at 1224-25 (rejecting parents' arguments that due process privacy interest was

---

[11] Plaintiffs cite *Mahmoud* in support of their substantive due process argument. ECF 247-1 at 47. Yet the decision does not affect precedent regarding limitations on parental substantive due process challenges to school policies or otherwise inform the analysis of Plaintiffs' substantive due process claims. *Mahmoud* was a First Amendment free exercise case, and "the Court's analysis makes no mention of substantive due process rights or the Fourteenth Amendment Due Process Clause." *Mahmoud*, 145 S. Ct. at 2400 (Sotomayor, J., dissenting). Substantive due process and free exercise claims are subject to different constitutional standards. *See, e.g.*, *Cal. Parents*, 973 F.3d at 1019-20.

1  violated by district's policy permitting transgender students to use the restrooms

2  and locker rooms consistent with their gender identity, which parents alleged

3  subjected their children to intimate bodily exposure to a transgender student against

4  their wishes.)[12] Plaintiffs' attempt to avoid the well-established rule that parents do

5  not have a fundamental right to dictate school policies fails.

### b.  Permitting students to socially transition in the school context does not constitute medical treatment requiring parental notice and consent

8  To support their argument that parents have the right to control whether their

9  children may socially transition at school, Parent Plaintiffs argue that student-

10  privacy policies interfere with their due process right to direct medical treatment of

11  their children. *See, e.g.*, ECF 247-1 at 48-49.[13] Their argument is based on an

12  implausible assertion that when school staff honor students' names and pronouns,

13  or other aspects of a student's social transition, they are providing medical (or

14  psychological) treatment. *Id*. But parental rights to make medical decisions are

15  irrelevant here because when school staff honor students' requests to socially

16  transition in schools they are not providing medical treatment.

17  _____

[12] Although Plaintiffs assert a parental privacy claim, their cited cases do not address such claims. ECF 247-1 at 29. *Tennessee v. Cardona* was a challenge to a Title IX regulation defining "sex" to include gender identity, not a parental privacy-based challenge to school district or state policy regarding non-consensual disclosure of student's gender identity. 2024 WL 3019146, at *30-31 (E.D., Ky. June 17, 2024), *appeal docketed*, No. 24-5588, (6th Cir. June 26, 2024). Also, *Ricard v. Geary Cnty. Unified Sch. Dist. 475*, 2022 WL 1471372, at *8 (D. Kan. May 9, 2022), addressed only the teacher plaintiff's First Amendment Free Exercise challenge to the school district's policy, so any statement by the court regarding substantive due process rights of parents is dicta.

[13] Plaintiffs' argument that they have a fundamental right to control whether their child socially transitions at school assumes that they have a fundamental right to be *informed* by their school if their children request to use a name and pronouns consistent with their gender identity. But there has been no showing by Plaintiffs that any such right to information is "'objectively, deeply rooted in this Nation's history and tradition.'" *See Regino*, 133 F.4th at 960. Indeed, courts have repeatedly held that "mere nondisclosure of information" does not implicate a parental right. *Foote*, 128 F.4th at 354 ("the withholding of information about a student's expression of gender while at school" does not constitute "a constitutional deprivation") (collecting cases); *see also City of Huntington Beach v. Newsom*, _F. Supp. 3d. _, 2025 WL 1720210, at *14 (C.D. Cal. June 16, 2025) (rejecting asserted fundamental right imposing affirmative duty on schools to inform parents of their children's gender identity).

31

Courts have recognized a parental substantive due process right to "make important medical decisions for their children" in certain circumstances. *Regino*, 133 F.4th at 961-62. Medical treatment is what licensed healthcare professionals provide their patients, consistent with the regulated practice of medicine. *See, e.g.*, *Tingley v. Ferguson*, 47 F.4th 1055, 1082-83 (9th Cir. 2022); *Shanks v. Blue Cross & Blue Shield of Wis.*, 979 F.2d 1232, 1233 (7th Cir. 1992) ("Treatment, as commonly understood, occurs when a health care provider takes steps to remedy or improve a malady that caused the patient to seek his help.").[14] Accordingly, when courts have recognized a parental right to make decisions about a child's medical treatment, they have done so only in cases involving "intrusions upon the bodily integrity of the child or other conduct with clinical significance—whether through a medical procedure, examination, or hospitalization." *Foote*, 128 F.4th at 350; *see, e.g.*, *Parham v. J. R.*, 442 U.S. 584, 603 (1979) (in-patient hospitalization for mental illness); *Mann v. Cnty. of San Diego*, 907 F.3d 1154, 1158 (9th Cir. 2018) ("medical examination"); *Mueller v. Auker*, 700 F.3d 1180, 1186-89 (9th Cir. 2012) (administration of antibiotics and spinal tap); *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000) ("invasive vaginal and anal medical examinations").

Respecting a transgender person's request to be called by a name and pronouns consistent with their gender identity is far afield from anything that courts have recognized as medical treatment. Doing so involves no medical procedure, examination, or hospitalization; need not be performed by medical personnel; and is not regulated as part of the practice of medicine. *See, e.g, Foote*, 128 F.4th at 350; *City of Huntington Beach*, 2025 WL 1720210, at *10. Rather, it is "something people routinely do with one another," whether as a matter of basic courtesy or in keeping with anti-discrimination laws. *Foote*, 128 F.4th at 350; *see also Vitsaxaki v.*

---

[14] *See also, e.g.*, Cal. Fam. Code § 6902 ("'Medical care' means X-ray examination, anesthetic, medical or surgical diagnosis or treatment, and hospital care under the general or special supervision and upon the advice of or to be rendered by a physical and surgeon licensed under the Medical Practice Act.").

*Skaneateles Central Sch. Dist.*, 2025 WL 874838, *10 (N.D.N.Y Mar. 20, 2025) (labeling district's actions, including using requested name and pronouns, as mental health treatment "did not plausibly allege that the district diagnosed or treated [the student] or violated [the parent's] right to make healthcare decisions"). Unsurprisingly, no court has held that simply using a transgender student's requested name and pronouns constitutes medical treatment. To the contrary, courts have in many instances held that anti-discrimination laws require school officials to respect a transgender person's expressed identity, and have never once suggested that doing so requires the school officials to provide medical treatment. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020).

Accepting Plaintiffs' understanding of medical care would lead to absurd results. For example, exercise can alleviate the symptoms of certain health issues and is sometimes recommended by medical professionals. *See, e.g.*, *Johnson v. Astrue*, 597 F.3d 409, 411 (1st Cir. 2009). But it is not plausible to think that school officials who allow students to engage in physical activity during recess are providing medical treatment giving rise to a parental substantive due process claim. Courts "need not abandon [their] 'common sense and judicial experience' in [their] scrutiny of allegations pled." *Foote*, 128 F.4th at 350 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)); *see also, e.g.*, *Doe v. Franklin Square Union Free Sch. Dist.*, 100 F.4th 86, 96-97 (2d Cir. 2024) (rejecting argument that "the wearing of a mask qualifies as medical treatment" because, although "obviously intended as a health measure, it no more requires a medical treatment than laws requiring shoes in public places or helmets while riding a motorcycle").

Plaintiffs' assertion that mere use of a name or pronouns constitutes medical or psychological treatment seems to flow from their assumption that being transgender is a psychological disorder. But having a transgender identity or a gender nonconforming expression is not, in itself, a psychological disorder, as both State Defendants' and Plaintiffs' expert agrees. *See* Brady MSJ Decl., Ex. 1, ¶ 20(b)

("Transgender and gender nonconforming identity is not pathological or a medical or mental illness"); Tando MSJ Decl., Ex. 2, ¶ 16(c); ECF 247-10, Ex. 1, ¶ 170; Ex. 3 at 73:12-74:15, 125:3-126:3; *see also Grimm*, 972 F.3d at 594 ("Being transgender is also not a psychiatric condition, and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities"); *Edmo v. Corizon*, 935 F.3d 757, 769 (9th Cir. 2019) ("Not every transgender person has gender dysphoria.");[15] *United States v. Skrmetti*, 145 S. Ct. 1816, 1833 (2025) ("[T]here is a 'lack of identity' between transgender status and . . . medical diagnoses" of "gender dysphoria, gender identity disorder, and gender incongruence."). Moreover, social transition is not limited to individuals who suffer from gender dysphoria. *See* Brady MSJ Decl., Ex. 1, ¶¶ 20(b), 31, 36-37.

State Defendants' experts' opinions are in accord with the holdings in *Foote* and *City of Huntington Beach* that permitting students to request aspects of a social transition at school without the need for parental notification and consent do not run afoul of the parental right to control their children's medical care. *See Foote*, 128 F.4th at 349-50; *City of Huntington Beach*, 2025 WL 1720210, at *10-12. As State Defendants' experts, psychologist Dr. Christine Brady and Licensed Clinical Social Worker (LCSW) Darlene Tando, explain, referring to a gender nonconforming person by their chosen name and pronouns is not medical treatment. Brady MSJ Decl., Ex. 1, ¶¶ 20(c), 36-37, 157-59; Tando MSJ Decl., Ex. 2, ¶ 16(d), 36. It is not

---

[15] Plaintiffs contend that *Edmo* supports their argument that social transition is a "psychological treatment" because it recognized "changes in gender expression and role" as an "evidence-based treatment option[] for individuals with gender dysphoria"," ECF 247-1 at 49 (citing *Edmo*, 935 F.3d at 770). The court's identification of possible treatment options for gender dysphoria also included psychotherapy, hormone therapy, and surgery. *Edmo*, 935 F.3d at 770 (citing WPATH Standards of Care). Simply including something in a list of possible "treatments"—also including clearly medical treatments like hormone therapy and surgery—does not mean that everything on the list qualifies as a medical or psychological treatment. Moreover, while social transition is sometimes recommended by medical professionals to alleviate the symptoms of gender dysphoria, it does not plausibly follow that an individual who respects someone else's decision to socially transition by using their requested name and pronouns—an action routinely undertaken by laypeople in all facets of daily life—is administering medical treatment, and *Edmo* did not hold otherwise.

34

regulated as a form of medical care, nor does doing so require any diagnosis or licensure. When school staff refer to students by their requested names and pronouns, they are not administering medical treatment; rather, they are honoring the students' requests as a matter of common courtesy and respect. Brady MSJ Decl., Ex. 1, ¶¶ 20(c), 111-12, Ex. 3, ¶ 12. Indeed, Plaintiffs' experts agree that social transition is not a medical intervention, and that "[s]ocial transitioning is not 'medical'—in the sense that it does not involve pharmaceuticals or invasive medical procedures." *See* ECF 247-10, Ex. 1, ¶¶ 97-98; *see also* 247-11, Ex. 1, ¶ 53 (not describing social transitioning as a "medical" treatment). Instead, they contend that it is a "psychosocial" or "psychological" intervention that should not be permitted by schools without parental notice and consent. *See, e.g.*, ECF 247-10, Ex., 1, ¶¶ 10-13, 97; ECF 247-11, Ex. 1, ¶¶ 53, 82.

Plaintiffs allege that State Defendants' experts "agree" with Plaintiffs' expert Dr. Szajnberg that social transition is a "psychological treatment." ECF 247-1 at 49. That is a mischaracterization of their testimony. Plaintiffs point to an analogy LCSW Tando used in her 2016 book to help parents understand their children's gender identity by conceptualizing being transgender as something concrete, similar to how a medical condition is concrete, in order for parents to be more attuned to the availability of various practical steps or interventions that may be beneficial for their child. Tando MSJ Decl., ¶¶ 9-10, Ex. 3 at 203:21-204:6 (referring to "interventions" includes non-medical interventions, such as drinking water when you are thirsty or eating when you are hungry, that "could be ways of intervening to increase our well-being and decrease our distress," which is similar to gender affirming care in that sense that "there can be interventions that are not medical, like using someone's name and pronouns."). LCSW Tando has consistently opined that being transgender is not pathological or a mental disorder. *See, e.g.*, Tando MSJ Decl., ¶ 11; Ex. 1, ¶ 34; Ex. 2, ¶ 16.c; Ex. 3 at 195:13-20. And her attempt at analogies from many years ago has no bearing on her consistent testimony that

affirming a youth though social transition "does not involve medical interventions nor is it a medical treatment." *See*, *e.g.*, *id*., Ex. 2., ¶¶ 16.d, 36-40.

In addition, Plaintiffs cite Dr. Brady's statement in a prior matter that "by itself, social transition is psychologically beneficial and is a medically recognized treatment for gender dysphoria." ECF No. 247-1 at 49 (citing Dr. Brady's initial declaration in *People v. Chino Valley Unified Sch. Dist.*, San Bernardino County Superior Court Case No. CIVSB2317301; ECF 243-8, Ex. B-20 at 5). But Dr. Brady made it clear in her supplemental declaration *in that case*, that her statement had been misconstrued by the other party:

> In that statement, I referred to the medically recognized *benefits* of transgender and gender non-conforming youth being able to socially transition (*see*, *e.g.*, Brady Decl. ¶¶ 37-41). For example, while aerobic exercise is not a "medical intervention," medical professionals might recognize research documenting its physical and psychological benefits for certain health conditions. Likewise, social transition, though not requiring or constituting medical intervention, does provide numerous important and well-documented psychological and physical benefits to transgender or gender non-conforming youth, as detained in my initial declaration. (Brady Decl., ¶¶ 37-41.)

Brady MSJ Decl., ¶ 11, Ex. 4, ¶ 12. Plaintiffs also cite Dr. Brady's statement in her initial *People v. Chino Valley* declaration that "treatment" for gender dysphoria can include social transition. Plaintiffs' Ex. B-20 at 7. As Dr. Brady explained in her expert report:

> By itself, social transition is highly beneficial. Social transition also has medically-and-psychologically recognized benefits. When I or other professionals describe social transition as a "treatment" or as having "medically recognized benefits," we refer only to the proven benefits experienced by transgender individuals who can express their genuine selves. The consultation of a licensed medical, psychiatric, or psychological professional is not required for an individual to socially transition or to ask others, for example, to respect their pronouns.

Brady MSJ Decl., ¶ 12; Ex. 1, ¶ 20(c); *see also id.* Ex. 3, ¶ 12.

In the end, by shoehorning their attempt to direct school policies regarding social transition into the general parental right to consent to medical care, Plaintiffs focus on the wrong question. Whether social transition could be considered a psychological or medical treatment when a therapist diagnoses a transgender patient

36

with gender dysphoria is not dispositive of whether such conduct constitutes medical treatment in all contexts. Plaintiffs have failed to plausibly allege (much less prove) that a teacher respecting a student's name and pronouns is medical treatment giving rise to a substantive due process claim. Should this Court disagree, however, it certainly should not hold that Plaintiffs have proved as a matter of law that respecting a student's social transition is medical treatment. Instead, it should conclude that there is a genuine issue of disputed fact and deny summary judgment.

**c.    Plaintiffs fail to show that student-privacy policies infringe on any fundamental right**

Even assuming Plaintiffs do assert a fundamental right (and they do not), their substantive due process claims fail because they have not shown that student-privacy policies infringe on their asserted interests. *See Regino*, 133 F.4th at 961 ("identifying a general parental right is far different than concluding that it has been infringed"). Infringement of a fundamental right involves a "substantial obstacle" to its exercise, not merely an "incidental" effect that "makes it somewhat harder to exercise a fundamental liberty." *Glucksberg*, 521 U.S. at 767 n.8 (Souter, J., concurring). Infringement can occur where the state's action deprives parents of their "right to make decisions concerning their child," and not when the action merely "complicated the making and implementation of those decisions." *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 934 (3d Cir. 2011); *see also, e.g.*, *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005) (collecting cases). Thus, Plaintiffs must identify "'coercive' or 'restraining' conduct" by state actors with respect to parents or their children. *Foote*, 128 F.4th at 353 (collecting cases); *see, e.g.*, *J.S. ex rel. Snyder*, 650 F.3d at 933-934 ("A conflict with the parents' liberty interest will not be lightly found, and indeed, only occurs where there is some 'manipulative, coercive, or restraining conduct by the State.'").

Under the challenged policies, it is the student, not the district, and certainly not State Defendants, who makes the decision whether they want to socially

37

transition in one or more ways at school. Nor do student-privacy policies call for school officials to prevent or discourage students from speaking with their parents about their gender identity, or prevent parents from speaking with their children about same. And parents remain free to participate in their children's education in myriad ways—for example, by visiting their schools, volunteering in their classrooms, and requesting and receiving educational records. Indeed, student-privacy policies do not "force" parents or their children "to do anything at all." *Littlejohn v. Sch. Bd. of Leon Cnty., Fla.*, 132 F.4th 1232, 1245 (11th Cir. 2025) (rejecting due process challenge to school officials' non-disclosure). Student-privacy policies are thus fundamentally unlike state action "that other courts have found to "restrict parental rights." *Foote*, 128 F.4th at 353.[16]

Nor does substantive due process compel state actors to "*assist*" individuals "as parents or affirmatively *foster* the parent/child relationship." *Anspach*, 503 F.3d at 266. There is no "constitutional obligation on state actors to contact parents of a minor or to encourage minors to contact their parents." *Id.* at 262 (dismissing parent's substantive due process claim against health center that provided minor with emergency contraception absent parental notice); *see also Foote*, 128 F.4th at 354-55 ("[i]t is not enough for the Parents to allege that the nondisclosure Protocol makes their parenting more challenging"; parents "remain[ed] free to strive to mold their child according to the Parents' own belief, whether through direct conversations, private educational institutions, religious programming, homeschooling, or other influential tools.) Substantive due process does not "require governments to assist parents in exercising their fundamental right to direct

---

[16] *See, e.g., Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 305, 309, 312-13 (11th Cir. 1989) (school officials coerced student to have an abortion, paid for the procedure, and "[c]oerc[ed]" the student "to refrain from the discussing the matter with the parents"); *Gruenke v. Seip*, 225 F.3d 290, 296-97, 305-07 (3d Cir. 2000) (school swim coach forced student to discuss her possible pregnancy with him despite her express wishes otherwise; forced student to take a pregnancy test that he paid for; and disclosed student's pregnancy to the school community despite wishes of student and her parents to keep information private).

the upbringing of their children." *Foote*, 128 F.4th at 355.[17]  Accordingly, the Due Process Clause does not compel districts or State Defendants to adopt policies that would forbid social transition at school without parental notice and consent.

### 3. Policies that protect student privacy satisfy any standard of scrutiny

Because there is no fundamental parental right to unconsented notification and control regarding students' requests to socially transition at school, there need only be a "reasonable relation to a legitimate state interest" to justify a student-privacy policy. *Fields*, 427 F.3d at 1208. As set forth in sections II.B.1.b and II.B.2.c, *supra*, the State's interests here easily meet that standard.  Even if student-privacy policies were subject to strict scrutiny, they would satisfy that standard. *See id.*

### D. Teacher Plaintiffs' Have Not Established a Violation of Their Right to Free Speech

The Teacher Plaintiffs' claim that California's protections for student privacy violate their right to freedom of speech likewise fails on its merits. When a public employee claims the government violates this First Amendment right, courts balance "the employee's right to engage in speech and the government employer's right to protect its own legitimate interests in performing its mission." *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 961 (9th Cir. 2011) (quoting *San Diego v. Roe*, 543 U.S. 77, 82 (2004)). To establish a free speech violation, a public employee must first demonstrate their speech is constitutionally protected, and then

---

[17] Courts have reached the same conclusion across a variety of contexts.  *See, e.g., Arnold*, 880 F.2d at 314 (school officials not "constitutionally mandat[ed]" to "notify the parents of a minor who receives counseling regarding pregnancy"; no constitutional violation where "[t]he decision whether to seek parental guidance . . . rest[s] within the discretion of the minor"); *Anspach*, 503 F.3d at 262 (affirming dismissal of a parent's substantive due process claim against a health center that provided a minor with emergency contraception absent parental notice); *Doe v. Irwin*, 615 F.2d 1162, 1168-69 (6th Cir. 1980) (health clinic's "practice of not notifying [parents] of their children's voluntary decisions" did not infringe any parental right); *cf. DeShaney*, 489 U.S. 189, 195 (1989) (substantive due process "cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means")  The Third Circuit and district courts within it have also relied on *Anpsach* in school-related cases. *See, e.g., J.S. ex. Rel. Snyder*, 650 F.3d at 933-34; *Short v. New Jersey Dep't of Educ.*, 2025 WL 984730, at *17 (D. N.J. Mar. 28, 2025) (collecting cases).

39

show their speech was a substantial or motivating factor for an actual or threatened adverse employment action. *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 776-77 (9th Cir. 2022); *see Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty. Ill.*, 391 U.S. 563, 568 (1968). Courts then determine whether the government employer has a legitimate administrative need to prevent certain speech that outweighs the public employee's First Amendment right. *Id*.

### 1. Teacher Plaintiffs' speech is not constitutionally protected

Public school teachers have limited free speech rights under the First Amendment. A "governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." *Johnson*, 658 F.3d at 961 (quoting *City of San Diego*, 543 U.S. at 80). A public government employee's speech is only constitutionally protected when they speak on a matter of public concern and as a private citizen. *Dodge*, 56 F.4th at 777. Here, Teacher Plaintiffs' proposed speech—nonconsensual disclosure of an individual student's gender identity to their parents—is neither of public concern nor spoken in a private-citizen capacity.

#### a. Disclosure of an individual student's gender identity in private is not a matter of public concern

Speech is a matter of public concern when it is fairly considered to relate to any matter of political, social, or other concern to the community, or addresses a subject of legitimate news interest. *Lane v. Franks,* 573 U.S. 228, 241 (2014). While matters of public concern are defined broadly, courts look to the "'content, form, and context of a given statement, as revealed by the whole record.'" *Johnson*, 658 F.3d at 961 (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)).

Teacher Plaintiffs' proposed communication to parents about students' experiences at school does not implicate a matter of public concern. Though Plaintiffs contend that subject-matters like "gender identity" are "controversial," ECF 247-1 at 51-52 (citing *Riley's Am/ Heritage Farms v. Elsasser*, 32 F.4th 707,

40

723 (9th Cir. 2022)), this wholly ignores the all-important "content" and "context" of the speech at issue, *Johnson*, 658 F.3d at 961. The contemplated disclosure of gender identity information here relates solely to the private and personal information of individual students. Whether or not a student identifies as transgender or requests that their school address them with a different name or pronouns is not a matter of "concern to the community" or "subject of legitimate news interest." *Lane*, 573 U.S. at 241; *see Desrochers v. City of San Bernardino*, 572 F.3d 703, 709 (9th Cir. 2009) ("the essential question is whether the speech addressed matters of 'public' as opposed to 'personal' interest"). Indeed, this dispositive distinction has been easily discernable for courts. *See, e.g.*, *Manchester v. Ludlow*, 780 F. Supp. 3d 302, 310 (D. Mass. 2025) (teacher's out-of-school conversation with a parent was not of public concern when speaking about their student's gender identity and was of public concern when the teacher criticized broader school policies on transgender students); *cf. Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1138-42 (9th Cir. 2025) (a teacher's video and website opposing school policies/legislation on transgender students was of public concern).

Teacher Plaintiffs' disclosure of individual students' gender identity has nothing to do with voicing their political beliefs or publicly articulating their position on policies or legislation. Nor are they contributing to the public debate on transgender issues, speech that is afforded broad First Amendment protection. Instead, the "content, form, and context" of Teacher Plaintiffs' desired communication with the parents of their students "takes [their] speech out of the public arena and into a purely private sphere." *Willey v. Sweetwater Cnty. Sch. Dist. #1 Bd. of Trust.*, 680 F. Supp. 3d 1250, 1287 (D. Wyo. 2023).

> **b.** **Teachers speak as public employees, not private citizens, when they communicate with parents about a student's gender identity**

A public school teacher speaks as a private citizen "if [they] ha[ve] no official duty to make the questioned statements, or if the speech [i]s not the product of

1   performing the tasks [they are] paid to perform." *Dodge*, 56 F.4th at 778 (cleaned

2   up). The inquiry is a practical one, requiring assessment of scope and content of the

3   plaintiff's job responsibilities. *Johnson*, 658 F.3d at 966. Where the speech at issue

4   "'owes its existence'" to the plaintiff's government employment, the speech is that

5   of a public employee, not a citizen. *Id.* (citation omitted). Where a teacher speaks

6   as a public employee, "the school board that hires that speech . . . can surely

7   regulate the content of what is or is not expressed." *Id.* (cleaned up).

8       As this Court has preliminarily held (and Plaintiffs do not dispute), Teacher

9   Plaintiffs' job responsibilities include "the duty to communicate with a student's

10  parents from time to time about the student's school performance." *Mirabelli I*, 691

11  F. Supp. 3d at 1215. Indeed, the desired parental communications owe their

12  existence to Teacher Plaintiffs' positions as teachers; they speak to parents based on

13  their knowledge and experience as the student's teacher, not as private citizens.

14  Because the speech at issue is in Teacher Plaintiffs' capacity as public employees

15  the government may regulate the content of such communications, including

16  through policies that limit disclosure of a student's transgender identity. *See Comes*

17  *v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1264 (9th Cir. 2016) (teacher's

18  communication with parents was public speech because it was within the scope of

19  the teacher's job duties, even though she expressed disagreement with school

20  district policy); *Willey v. Sweetwater Cnty. Sch. Dist. #1 Bd. of Trust.*, 2023 WL

21  9597101, at *8-9 (D. Wyo., Dec. 18, 2023) ("communicating with parents about a

22  student's progress is part of a teacher's official duties.")

23      Teacher Plaintiffs attempt to duck this unassailable conclusion by arguing that

24  recent Supreme Court authority "correct[ed]" the Ninth Circuit's jurisprudence on

25  the line between private and government speech, leaving the question in the school

26  context limited to "whether the speech is 'curricular-speech,'" meaning that which

27  imparts knowledge or skills to students. ECF 247-1 at 53-54; *see Kennedy*, 597

28  U.S. at 527-31. *Kennedy* did no such thing. To the contrary, the Court determined

42

the post-game prayers of a high school football coach were private speech precisely because "he was not engaged in speech 'ordinarily within the scope' of his duties as a coach." *Kennedy*, 597 U.S. at 529 (quoting *Lane*, 573 U.S. at 240). Nothing in *Kennedy* supports Plaintiffs' abandonment of the "practical" considerations that have long guided the assessment of a public employee's job responsibilities. *See Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006). As this Court and others have recognized, communication with parents fits well within the Teacher Plaintiffs' official job responsibilities. *Mirabelli I*, 691 F. Supp. 3d at 1215; *see Coomes*, 816 F.3d at 1264; *Willey*, 2023 WL 9597101, at *8-9.[18]

### 2. Any restriction on speech is outweighed by the school's substantial interests

Even if the Teacher Plaintiffs could establish their proposed speech is constitutionally protected, a school district's legitimate (indeed, compelling) need to create a safe and supportive learning environment easily outweighs Teacher Plaintiffs' First Amendment free speech rights. An "employer's interest outweighs the employee's interest in speaking on a matter of public concern if the employee's speech . . . 'has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" *Nunez v. Davis*, 169 F.3d 1222, 1228 (9th Cir. 1999) (citation omitted).

---

[18] Though Teacher Plaintiffs have premised their speech claim on alleged state-law restrictions on their ability to disclose a student's gender identity to parents without consent, *see* ECF 247-1 at 52, their motion makes a passing reference to being required to "use . . . preferred pronouns without parent consent," *see id.* at 51. First, there is no evidence that the Teacher Plaintiffs are required to use preferred pronouns. Second, to the extent Teacher Plaintiffs' claim is deemed to encompass an alleged speech burden associated with a purported requirement that California teachers respect the gender identity of their students in the learning environment, the legal analysis detailed above applies with equal or greater force. If a public school teacher is required to address and interact with students in a manner that respects their expressed gender identity, such interactions undoubtedly involve unprotected government speech made in the teacher's professional capacity, and do not touch on a public concern.

43

As the Supreme Court has recognized, governmental entities have a "compelling interest in protecting the physical and psychological well-being of minors." *Sable Commuc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). For public schools, this interest is "at its apex" when dealing with especially vulnerable children, "such as transgender minors." *Foote*, 128 F.4th at 357; *Doe ex rel Doe v. Boyertown Area Sch. Dist.*, at 528-29. The creation of a safe learning environment for transgender students includes protection against discrimination, including bullying and parental backlash. *City of Huntington Beach*, 2025 WL 1720210, at *1 (quoting *Regino v. Staley*, 2023 WL 4464845, at *4 (E.D. Cal. July 11, 2023)) ("school district had 'a legitimate state interest in creating a zone of protection for transgender students and those questioning their identity from adverse hostile reactions, including, but not limited to, domestic abuse and bullying'"); *Manchester*, 780 F. Supp. 3d at 310 (school policy had "'the legitimate objective of promoting a safe and inclusive environment for students'" that created "space for students to express their identity without worrying about parental backlash").

This compelling state interest to administer the learning environment in a manner that protects vulnerable students substantially outweighs Teacher Plaintiffs' miniscule speech interests in disclosing the private gender identity information of their students. Indeed, the desired nonconsensual disclosures would detrimentally impact Teacher Plaintiffs' ability to build strong teacher-student relationships and impede their ability to be effective educators. Teacher support of students positively impacts their academic performance, educational aspirations, and psychological well-being. *See* Tando Decl., ¶ 65(a)-(c), (e). Whereas when teachers are unwilling to abide by a student's privacy request, and disclose their gender identity without consent, the student is less likely to trust the teacher and excel in their classroom. *See* Al-Shamma MSJ Decl. ¶¶ 36, 39-40. The Teacher Plaintiffs' proposed nonconsensual parental disclosures would significantly impede their ability to perform their primary job responsibility—educating students—while more broadly

44

interfering with California schools' vital ability to create safe and supportive learning environments for all students.

### E.  Plaintiffs' Request for Declaratory Relief Regarding FERPA Lacks Merit

Plaintiffs ask this Court to issue declaratory relief regarding the Family Educational Rights and Privacy Act (FERPA) to "clarify[] that schools may not withhold records listing a gender transitioning students' preferred name and pronouns from parents." ECF 247-1 at 58. But they have submitted no evidence that any of the Parent Plaintiffs' rights under FERPA have been violated or that the State's policies conflict with FERPA.[19]

Under FERPA, parents must be afforded "the right to inspect and review" their child's education records and school districts must "establish appropriate procedures for the granting *of a request by parents*" to access these records. 20 U.S.C. § 1232g(a)(1)(A) (emphasis added).[20] Student-privacy policies do not implicate this right of access to education records *upon request*. It is not surprising that neither set of Parent Plaintiffs even allege that they requested their students' education records pursuant to FERPA and their schools refused them access. Nor have the Teacher Plaintiffs alleged that they were somehow prevented from complying with a request for education records pursuant to FERPA (even assuming that was within their job responsibilities, which they have not claimed). Nothing in FERPA mandates affirmatively notifying parents about the content of their children's education records, absent a formal parental request.[21] And it certainly

---

[19] Plaintiffs have not asserted a claim under FERPA. Nor could they because FERPA does not permit a private cause of action. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 276, 287, 290 (2002); *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 783 (2d Cir. 2002). Plaintiffs concede as much. ECF 247-1 at 58.

[20] FERPA defines "education records" as "records, files, documents, and other materials" containing information directly related to a student that "are maintained by an educational agency or institution or by a person acting for such agency or institution." 20 U.S.C. § 1232g(a)(4)(A).

[21] As part of California's implementation of FERPA, the California Education Code reinforces the right of parents to access their children's education records, and requires districts to adopt procedures for requesting such records. *See, e.g.*, Cal. Educ. Code, §§ 49063, 49069.7, 49070.

45

does not require affirmative disclosure of a student's verbal assertions about their gender identity.

Plaintiffs quote from CDE's prior FAQs to insinuate that CDE somehow instructed schools to evade producing records under FERPA. ECF 247-1 at 56. But the FAQs simply recommended that to protect transgender students from *accidental disclosure* of their transgender identity *at school*, records that reflect their birth name and assigned sex be kept separate from other records, including in locked file cabinets. Barrera Dec., Ex. 1. The FAQs do not suggest that "education records" reflecting a student's transgender identity are not subject to FERPA.

Plaintiffs further claim that school districts with student-privacy policies seek to evade FERPA's requirements through the use of Gender Support Plans. ECF 247-1 at 56. But Plaintiffs offer no evidence of districts' refusal to produce Gender Support Plans in response to parents' FERPA requests. Instead, the cited deposition testimony of school administrators only establishes that such districts have Gender Support Plans, and provides no support for the proposition that the districts do not disclose such documents to parents who make FERPA requests. *Id.*

## III. PLAINTIFFS HAVE NOT SHOWN THAT THEY ARE ENTITLED TO A PRELIMINARY OR PERMANENT INJUNCTION

Plaintiffs ask the Court to issue either a permanent class-wide injunction or, alternatively, a preliminary class-wide injunction in the event the Court denies their request for partial judgment under Rule 54(b). ECF 247-1 at 68. But Plaintiffs have failed to establish the entitlement to an injunction under the *Winter* factors. *See Winter v. Nat. Res. Def. Couns., Inc.*, 555 U.S. 7, 20 (2008).[22]

As discussed in Section II, *supra*, Plaintiffs have failed to meet the requirements to prevail on their constitutional claims. In addition, they have not established irreparable harm. The Ninth Circuit requires a showing that irreparable

[22] A party seeking a preliminary injunction must establish that: (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *Id.*

46

harm is likely, not just possible, for a plaintiff to obtain a preliminary injunction. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Here, Plaintiffs offer nothing more than a perfunctory assertion that the deprivation of First Amendment rights "unquestionably constitutes irreparable injury" and that "damages" cannot adequately remedy constitutional violations. ECF 247-1 at 68-69. But courts throughout the Ninth Circuit have repeatedly held that mere allegation of a constitutional violation does not constitute *per se* irreparable harm. *See Great N. Res., Inc. v. Coba*, 2020 WL 6820793 at *2-3 (D. Or. Nov. 20, 2020); *Poder in Action v. City of Phoenix*, 481 F. Supp. 3d 962, 979 & n.8 (D. Ariz. 2020); *Allen v. Cnty. of Lake*, 2014 WL 4380297 at *2 (N.D. Cal. Sept. 4, 2014). Thus, although a credible and supported claim of constitutional injury will ordinarily establish irreparable harm, *see Betschart v. Oregon*, 103 F.4th 607, 625 (9th Cir. 2024), in this case, as explained above, Plaintiffs cannot establish a viable claim that their constitutional rights will be violated absent an injunction.

Additionally, the balance of equities and public interest in this case cut against Plaintiffs' request for injunctive relief. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) ("Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge."). An injunction prohibiting "privacy policies" is likely to have substantial, multi-faceted harms on students. Forced outing eviscerates the trust relationship between students and staff, and when students no longer feel safe expressing their gender identity to school staff, they are less likely to report thoughts of self-harm or experiences with bullying and harassment. Al-Shamma Decl. ¶¶ 36, 39-40. Forced outing also incentivizes youth to "hide their identity . . . which causes psychological and emotional harm with long-term consequences into adulthood," and "contributes to a harmful school climate, which negatively impacts LGBTQ+ youths mentally, socially and academically." Brady MSJ Decl., Ex. 1, ¶ 20(e); *see also id.* ¶¶ 67-75.

And outside the school setting, forced disclosure policies—which is really what Plaintiffs are seeking on a statewide level—can have devastating impacts on a transgender student's mental health, physical security, and stability. The nonconsensual outing of an LGBTQ+ youth to their family creates a tangible risk of family rejection and alienation from family support. Al-Shamma Decl. ¶¶ 37-38; Brady MSJ Decl., Ex. 1, ¶¶ 56-66, 149 (for youths with unaccepting or unsupportive parents, forced outing policies place the transgender and gender nonconforming youth at risk for trauma, physical harm, homelessness and long-term mental health issues); Tando MSJ Decl., Ex. 2, ¶¶ 16(e )(f); 50-56. Family rejection is also a significant contributing factor to homelessness among LGBTQ youth, which in turn, increases the young person's vulnerability to victimization. Al-Shamma Decl. ¶¶ 30, 32-33. Perhaps most critically, an LGBTQ youth's level of family support (or lack thereof in the case of family rejection) directly correlates to the probability that the youth will experience suicidal ideation or actually attempt suicide. Al-Shamma Decl. ¶ 30; *see also* Tando MSJ Decl., Ex. 2 ¶ 52(a). Moreover, the harms associated with Plaintiffs' requested injunction are not limited to students. For parents who would support their child's gender-nonconforming identity (at a time when the child chooses to share that information), student-privacy protections avoid the insertion of school personnel into one of the most intimate familial topics a parent can discuss with their child. Al-Shamma Decl. ¶ 35; Brady MSJ Decl., Ex. 1., ¶ 66 (in my clinical experience, forced outing "is actually taking away a potentially healing experience for supportive parents and their children: the experience of a child sharing one of the most important parts of their identity with their parents.").

In addition, enjoining student-privacy protections is against the public interest because California has a legitimate and compelling interest in "protecting the physical and psychological well-being of . . . lesbian, gay, bisexual, and transgender youth," as well as "affirming the equal 'dignity and worth' of LGBT people." *See*

*Tingley*, 47 F.4th at 1078; *accord Boyertown Area Sch. Dist.*, 897 F.3d at 528-29; *Foote*, 128 F.4th at 357 (that interest "is at its apex" when a challenged law or policy "seeks to protect children who are particularly vulnerable, such as transgender minors"). In contrast, individual parents concerned about their child's gender identity have multiple options—including, raising the issue with their child, volunteering in their child's school, and requesting education records as provided by law—that are less restrictive than prohibiting student-privacy policies. *See Foote*, 128 F.4th at 355. The public interest associated with California's intent to protect vulnerable students weighs heavily against the requested relief.

## IV. PLAINTIFFS SEEK AN UNENFORCEABLE AND UNWORKABLE INJUNCTION, AND DECLARATORY RELIEF THAT IS OUTSIDE THE SCOPE OF THEIR CLAIMS

It is well-established that a court "should not issue an unenforceable injunction." *In re Est. of Ferdinand Marcos Hum. Rts. Litig.*, 94 F.3d 539, 545 (9th Cir. 1996). Plaintiffs' proposed judgment and class-wide permanent injunction is unenforceable, requiring State Defendants to police nearly 286,000 classroom-based teachers, plus other teachers and school staff, and over 5.8 million students and their parents in California, to ensure that staff never "enforce, implement, or recommend PEPs, including by using a student's preferred names and pronouns without parental consent, against any member of the Class." Bunshoft Decl., Ex. 1, § V.1; Barrera Decl, ¶ 14. The requested injunction also makes the implausible presumption that State Defendants can identify which parents and teachers meet the vague and fluid membership criteria in each subclass at any particular time. Bunshoft Decl., Ex, 1., § V.1

Second, an injunction, and related declaratory relief, is inappropriate—and constitutes an abuse of discretion—if the requested relief is "based on claims not pled in the complaint." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633, 636 (9th Cir. 2015); *see LA All. for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 957 (9th Cir. 2021) (district court abused its discretion when

49

it "granted relief based on claims that Plaintiffs did not allege"). This Lawsuit sought to enjoin application of student-privacy policies as to plaintiffs and putative class members, but the declaratory relief requested goes well beyond the scope of their claims and alleged injuries, and would impact non-class member teachers and parents who support student-privacy policies. *See* Bunshoft Decl., Ex. 1, § IV.

Moreover, the requested relief could be interpreted as requiring districts to adopt forced disclosure policies, which are prohibited under AB 1955. *See, e.g.*, *id.* § IV.1 ("[T]he government may not engage in the social gender transition of a minor child absent parental notification and consent. *See* U.S. Const. amend. XIV. Any contrary state law that conflicts with this is necessarily preempted."). But Plaintiffs' claims in the SAC only sought to enjoin student-privacy policies. Forced disclosure policies are not before the Court, and AB 1955 is not the subject of Plaintiffs' claims or their prayer for relief, and regulates policies categorically different than those that have allegedly injured Plaintiffs. *See id*.; *see also* SAC ¶¶ 324-25, 350-493, p. 121; Bunshoft Decl., Ex. 2 at 6:15; 7:20-28; 8:22-23; 9:16-21.

## CONCLUSION

For the reasons discussed above, Plaintiffs are not entitled to summary judgment on any of their claims against State Defendants, and are not entitled to a preliminary injunction in the alternative.

Dated:  September 8, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
DARRELL W. SPENCE
Supervising Deputy Attorney General
KEVIN L. QUADE
ANNE BUSACCA-RYAN
SHATTI A. HOQUE
Deputy Attorneys General

*Jennifer Bunshoft*

JENNIFER A. BUNSHOFT
Deputy Attorney General
*Attorneys for State Defendants*

# CERTIFICATE OF SERVICE

Case Name: **Mirabelli et al. v. Olson, et al.**       Case No. **3:23-cv-00768-BEN-VET**

I hereby certify that on <u>September 8, 2025,</u> I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## STATE DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON PROSPECTIVE RELIEF CLAIMS

I certify that **all** participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct, and that this declaration was executed on <u>September 8, 2025,</u> at Los Angeles, California.

<table>
<tr><td>Anthony Conklin</td><td><i>Anthony Conklin</i></td></tr>
<tr><td>Declarant</td><td>Signature</td></tr>
</table>

SA2024300204
67921457.docx