ROB BONTA
Attorney General of California
DARRELL W. SPENCE
Supervising Deputy Attorney General
JENNIFER A. BUNSHOFT (SBN 197306)
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3377
 Fax:  (415) 703-5480
 E-mail:  Jennifer.Bunshoft@doj.ca.gov
*Attorneys for State Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ELIZABETH MIRABELLI, an individual, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**MARK OLSON, in his official capacity as President of the EUSD Board of Education, et al.,**<br><br>Defendants. | 3:23-cv-00768-BEN-VET<br><br>**DECLARATION OF DR. CHRISTINE ERIN LAM BRADY, PH.D., IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON PROSPECTIVE RELIEF CLAIMS**<br><br>Date:      September 29, 2025<br>Time:     10:30 a.m.<br>Dept:     5A<br>Judge:    The Honorable Roger T. Benitez<br>Trial Date:    Not assigned<br>Action Filed:   April 27, 2023 |

I, Christine Erin Lam Brady, declare:

1.    I am over the age of 18 years, a resident of the State of California, and a U.S. citizen.  I know the following facts based on my own personal knowledge, and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

2.    I am a licensed psychologist in the State of California.  I received my Bachelor of Science and Master of Arts in Psychology from James Madison University, Harrisonburg, VA, and my Ph.D. in Clinical Psychology from Ohio University, Athens, OH in 2014.  I completed a year-long Pre-Doctoral Internship at the University of Washington/Seattle Children's Hospital as well as a year-long Post-Doctoral Fellowship at the University of Louisville/Norton Children's Hospital.

3.    In the 10 years I have been working with individuals with gender dysphoria, I have treated over 1,000 youth and families.

4.    I am currently a full-time psychologist at the Pediatric and Adolescent Gender Clinic at Stanford Medicine Children's Health.  I am also a Clinical Assistant Professor in the Department of Pediatric Endocrinology and Diabetes, and the Department of Psychiatry and Behavioral Sciences (by courtesy) at Stanford University School of Medicine.

5.    I have been retained by State Defendants to provide expert opinions in this matter, as set forth in my declaration and reports discussed below.

6.    I prepared an expert declaration in opposition to Plaintiffs' motion for a class-wide preliminary injunction in this matter, which was filed on October 21, 2024 (ECF 163-3).  A true and correct copy of that declaration is attached hereto as Exhibit 1.

7.    I subsequently prepared an expert report, dated May 1, 2025.  A true and correct copy of my expert report is attached hereto as Exhibit 2.

8.    I also prepared a supplemental expert report, dated May 15, 2025, which responds to the reports prepared by Plaintiffs' experts Dr. Erica Anderson and Dr. Nathan Szajnberg on May 1, 2025.  A true and correct copy of my supplemental expert report is attached hereto as Exhibit 3.

9.    All of my statements in the attached declarations and expert reports represent my own opinions, based on my own personal knowledge and review of

DECLARATION OF DR. CHRISTINE ERIN LAM BRADY IN OPPOSITION TO
PLAINTIFF' MOTION FOR SUMMARY JUDGMENT (3:23-CV-00768-BEN-VET)

scientific literature, as applied to the facts of this case. I could and would testify to them in court if called upon to do so.

10. In their motion for summary judgment, Plaintiffs rely upon a declaration I submitted in *People of State of California v. Chino Valley Unified Sch. Dist.*, San Bernardino County Superior Court Case No. CIVSB2317301, a case in which I was retained as an expert. Specifically, Plaintiffs quote a statement in the initial declaration I submitted on August 24, 2023, in support of the People's ex parte application for a temporary restraining order in that matter: "by itself, social transition is psychologically beneficial and is a medically recognized treatment for gender dysphoria." See ECF No. 247-1 at 49 (citing Ex. B-20, pp. 5).

11. Plaintiffs ignore that weeks later, on October 8, 2023, I submitted a supplemental declaration in *People v. Chino Valley Unified Sch. Dist.*, in support of the People's reply brief regarding preliminary injunction, which clarifies that my statement in the initial declaration had been misinterpreted. Specifically, in paragraph 12 of the Supplemental Declaration of Dr. Christine Brady, Ph.D., dated October 8, 2023, I explain:

> In that statement, I referred to the medically recognized *benefits* of transgender and gender non-conforming youth being able to socially transition (*see*, *e.g.*, Brady Decl. ¶¶ 37-41). For example, while aerobic exercise is not a "medical intervention," medical professionals might recognize research documenting its physical and psychological benefits for certain health conditions. Likewise, social transition, though not requiring or constituting medical intervention, does provide numerous important and well-documented psychological and physical benefits to transgender or gender non-conforming youth, as detained in my initial declaration. (Brady Decl., ¶¶ 37-41.)

Thus, I reiterated that "Dr. Anderson's suggestion that medical professional consultation is always required before social transition—or that prevailing professional norms require such consultations—is incorrect." (*See* Suppl. Decl., ¶ 13.) A true and correct copy of my Supplemental Declaration filed in *People v Chino Valley United Sch. Dist.* is attached hereto as Exhibit 4.

12.   Plaintiffs also cite my statement in the initial declaration in *People v. Chino Valley Unified Sch. Dist.* that "treatment" for gender dysphora can include social transition.  ECF 247-1 (citing Plfs. Ex. B-20 at 7.)  Mindful of how my statement was misinterpreted in the *People v. Chino Valley* matter, I was careful to explain in my declaration and reports in the current matter what I meant when I used the phrase "medically recognized benefits" and the term "treatment."  As I explained in my expert report in this matter:

> By itself, social transition is highly beneficial. Social transition also has medically-and-psychologically recognized benefits. When I or other professionals describe social transition as a "treatment" or as having "medically recognized benefits," we refer only to the proven benefits experienced by transgender individuals who can express their genuine selves. The consultation of a licensed medical, psychiatric, or psychological professional is not required for an individual to socially transition or to ask others, for example, to respect their pronouns.

*See* Ex. 2, § II.C.3; *see also* Ex. 1, ¶ 20c.  I further clarified my use of the terms "treatment" and "intervention" in my supplemental expert report in this matter. (*See* Ex. 3, ¶ 12).

13.   I was deposed by Plaintiffs on June 3, 2025.  At the deposition, I was asked about the above statements in my initial declaration in the *People v. Chino Valley* matter.  I explained that I had clarified the meaning of that prior statement in my reports in this matter to avoid further misinterpretation.  True and correct copies of pages 197 through 201 of the transcript from my June 3, 2025 deposition are attached hereto as Exhibit 5.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed in _Los Gatos, CA_____, California on September _7_, 2025.

By:_____
Christine Erin Lam Brady, Ph.D

SA2024300204

4

DECLARATION OF DR. CHRISTINE ERIN LAM BRADY IN OPPOSITION TO PLAINTIFF' MOTION FOR SUMMARY JUDGMENT (3:23-CV-00768-BEN-VET)

# TABLE OF CONTENTS

| Exh. No. | Description | Page Numbers |
|---|---|---|
| 1 | Declaration of Dr. Christine Brady, PH.D., in Opposition to Plaintiffs' Motion for a Class-Wide Preliminary Injunction (ECF 163-3) | 001 - 038 |
| 2 | Expert Report of Christine Lam Brady | 039 - 088 |
| 3 | Supplemental Expert Report of Christine Lam Brady, PH.D | 089 - 097 |
| 4 | Supplemental Declaration of Dr. Christine Brady, PH.D, in Support of the People of the State of California's Reply in Support of Order to Show Cause Re: Preliminary Injunction (*People v. Chino Valley United Sch. Dist.*; San Bernardino County Superior Court Case No. CIVSB2317301) | 098 - 116 |
| 5 | Excerpts of June 3, 2025 Deposition of Christine Erin Lam Brady, pages 197-201 | 117 - 131 |

EXHIBIT 1

LEN GARFINKEL, State Bar No. 114815
General Counsel
PAUL GANT, State Bar No. 159844
Assistant General Counsel
VIRGINIA CALE, State Bar No. 258557
Deputy General Counsel
CHRISTOPHER MANDARANO, State Bar No. 263625
Deputy General Counsel
California Department of Education
1430 N Street, Room 5319
Sacramento, California 95814
Telephone: 916-319-0860
Facsimile: 916-322-2549
Email: cmandarano@cde.ca.gov
Attorneys for Defendants Tony Thurmond in his official capacity as State
Superintendent of Public Instruction

*(Defendant Tony Thurmond, in his official capacity, is a Governmental Party Exempt from the Provisions of FRCP 7.1)*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH MIRABELLI, an individual, and LORI ANN WEST, an individual, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>MARK OLSON, in his official capacity as President of EUSD Board of Education, et al.,<br><br>    Defendants. | Case No. 3:23-cv-0768-BEN-VET<br><br>DECLARATION OF DR. CHRISTINE BRADY, PH.D., IN OPPOSITION TO PLAINTIFFS' MOTION FOR A CLASS-WIDE PRELIMINARY INJUNCTION<br><br>Hearing Date:    November 4, 2024<br>Time:    10:30 a.m.<br>Courtroom:    5A<br>Judge:    Hon. Roger T. Benitez |

## Declaration of Dr. Christine Brady, Ph.D.

I, Christine Brady, declare:

1. I am over the age of 18 years, a resident of the State of California, and a U.S. citizen. I know the following facts based on my own personal knowledge, and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

## Background and Experience

2. I am a licensed psychologist in the State of California.

3. I am the full-time psychologist at the Pediatric and Adolescent Gender Clinic at Stanford Medicine Children's Health. I am also a Clinical Assistant Professor in the Department of Pediatric Endocrinology and Diabetes, and the Department of Psychiatry and Behavioral Sciences (by courtesy) at Stanford University School of Medicine.

4. At Stanford, I provide direct therapeutic services to an average of 350 children and families per year. I also clinically supervise and train psychology graduate students and psychiatry fellows. I give lectures on gender-affirming care to psychology students, residents, and fellows and psychiatry fellows. I have conducted scholarly research on evidence-based practices and supports for transgender and gender nonconforming youth.

5. In this declaration, when I use the term transgender and gender nonconforming, I mean to include gender diverse, gender non-binary, and gender nonconforming individuals.

6. I received my Bachelor of Science and Master of Arts in Psychology from James Madison University, Harrisonburg, VA, and my Ph.D. in Clinical Psychology from Ohio University, Athens, OH in 2014. I completed a year-long Pre-Doctoral Internship at the University of Washington/Seattle Children's Hospital as well as a year-long Post-Doctoral Fellowship at the University of Louisville/Norton Children's Hospital.

Case No. 3:23-cv-0768-BEN-WVG          1          Decl. of Brady in Opp. to PI Motion

7. In 2015, I co-founded and was Co-Director of the Gender Clinic at Hennepin Healthcare in Minneapolis, MN. After a year in Minnesota, I became Co-Director of the Pediatric Gender Clinic at the University of Louisville and was there for three years before coming to Stanford, where I have been working for almost four years.

8. In the nine years I have been working with individuals with gender dysphoria, I have treated over 1,000 youth and families.

9. Currently, 100 percent of my clinical patients are transgender and gender nonconforming youth.

10. In my career, I have provided therapy to patients presenting issues including ADHD, depression, anxiety, trauma, and coping with medical illnesses such as cancer.

11. Thus, I have extensive experience and strong therapeutic skills in working with patients with gender dysphoria as well as other common diagnoses in adolescents and young adults.

12. Since 2017, I have been a member of the World Professional Association for Transgender Health ("WPATH"), a non-profit, interdisciplinary professional and educational organization promoting evidence based care, education, research, public policy and respect in transgender and gender nonconforming health.

13. Articles, book chapters, commentaries, and presentations of which I have authored or contributed in this subject include:

    a. Turban, Christine Brady and Johanna Olson-Kennedy, *Understanding And Supporting Patients With Dynamic Desires For Gender-Affirming Medical Interventions*, J. of the American Medical Assn. Network Open (2022) available at: doi:10.1001/jamanetworkopen.2022.24722.

    b. Brady, and Tandy Aye, T. *Supporting Gender Diverse Youth with Medical Conditions*, Workshop presented at the Gender Spectrum Professional Symposium (July 2021).

c. Brady and Michelle Ernst, *Gender identity: Disorders/differences of sex development/intersex and transgender concerns*, Clinician Handbook of Pediatric Psychological Consultation in Medical Settings (2020) p. 439.

d. Brady et al., (2012) *Evaluating School Impairment with Adolescents: A Psychometric Evaluation of the Classroom Performance Survey*, School Psychology Review, p. 429.

14. Further information about my professional background and experience is outlined in my curriculum vitae, a true and accurate copy of which is attached as **Exhibit 1** to this declaration.

15. In this declaration, I cite scientific research on both transgender and gender nonconforming individuals, and on broader research on LGBTQ+ individuals. Scientific research has historically focused on all sexual minorities, but has in recent years turned to transgender and gender nonconforming individuals specifically.

16. Based on my clinical and academic experience, there are many shared experiences between sexual minorities and transgender and gender nonconforming individuals, especially as it pertains to the issues discussed in this declaration and as it relates to Mirabelli v. Olson.

17. My opinions below are based on my professional experience, both as a scientific researcher and as a clinician, my review of scientific research and other surveys and studies pertaining to transgender and gender nonconforming youth and students, and my review of Mirabelli v. Olson.

18. Over the last two years, I have been retained and provided expert testimony in the following cases: *Poe v. Labrador*, No. 1:23-cv-00269-CWD; and *California v. Chino Valley*, No. CIVSB2317301.

19. In preparing this declaration, I have reviewed all of the court documents submitted thus far including the expert report of Dr. Erica Anderson:

///

Case No. 3:23-cv-0768-BEN-WVG        3        Decl. of Brady in Opp. to PI Motion

a. Brady Curriculum Vitae

b. Dkt. 153-6 Declaration of Dr. Erica E. Anderson, PhD, in Support of Plaintiffs' Motion for a Preliminary Injunction

c. Dkt. 153 Notice of Motion and Plaintiffs' Motion for a Class-Wide Preliminary Injunction

d. Dkt. 153.1 Memorandum of Points & Authorities in Support of Plaintiffs' Motion for a Class-Wide Preliminary Injunction

e. Dkt. 153.3 Appendix of Evidence, Volume I, in Support of Plaintiffs' Motion for a Class-Wide Preliminary Injunction

f. Dkt. 153.4 Appendix of Evidence, Volume II, in Support of Plaintiffs' Motion for a Class-Wide Preliminary Injunction

g. Dkt. 153.5 Appendix of Evidence, Volume III, in Support of Plaintiffs' Motion for a Class-Wide Preliminary Injunction

h. Dkt. 153.6 Appendix of Previously Submitted Declarations in Support of Plaintiffs' Motion for a Class-Wide Preliminary Injunction

i. [Proposed] ORDER GRANTING PLAINTIFFS' MOTION FOR A CLASS-WIDE PRELIMINARY INJUNCTION

j. RJN, Ex. 1 Assembly Bill 1955

**Summary of Opinions**

20. In this declaration, I cite relevant research and studies to support my opinions that:

a. Gender identity is not the same as sex assigned at birth based on externally observed genitalia. Unconsented disclosure creates social pressure for transgender and gender nonconforming youth to maintain their sex assigned at birth in the school environment.

b. Transgender and gender nonconforming identity is not pathological or a medical or mental illness. Not all transgender and gender nonconforming individuals have gender dysphoria. Unconsented

Case No. 3:23-cv-0768-BEN-WVG      4      Decl. of Brady in Opp. to PI Motion

disclosure may cause an increase in symptoms of mental distress in transgender and gender nonconforming youth by intensifying social pressure to maintain a transgender or gender nonconforming individual's assigned sex at birth. It could lead to development of gender dysphoria for those youths who do not have such a diagnosis.

c. Social transition is the individualized process in which a person changes their behavior and appearance, such as clothing, name, pronouns and hair style, to align with their gender identity. By itself, social transition is highly beneficial. Social transition also has medically- and psychologically-recognized benefits. When I or other professionals describe social transition as a "treatment" or as having "medically-recognized benefits," we refer only to the proven benefits experienced by transgender individuals who can express their genuine selves. The consultation of a licensed medical, psychiatric, or psychological professional is not required for an individual to socially transition or to ask others, for example, to respect their pronouns.

d. School staff informing a parent or guardian without youth consent and before understanding the readiness of that youth/family is reckless. This can cause significant psychological, emotional, and sometimes even physical harm to the youth.

e. Unconsented disclosure incentivizes youths to hide their identity, colloquially referred to as "being in the closet," which causes psychological and emotional harm with long-term consequences into adulthood; and this contributes to a harmful school climate, which negatively impacts LGBTQ+ youths mentally, socially and academically.

f. Research does not support Dr. Anderson's claims that social transition "causes" individuals to persist in their transgender identity. Dr.

Case No. 3:23-cv-0768-BEN-WVG          5          Decl. of Brady in Opp. to PI Motion

Anderson misinterprets data which show correlation—not causation—and the latest research indicates that social transition does not make "persistence" more likely.

g.  Current and leading professional standards of care—which discuss transgender youth health more holistically—recommend that youth should have the ability to initiate social transition in their own timeframe and in the manner they choose without formal mental health involvement. Unconsented disclosure provisions burden and disrupt this natural process, harming transgender youth in numerous ways.

<strong>Analysis</strong>

<strong>I.    Gender Identity Is Not Assigned Sex</strong>

21.    A person's sex is typically assigned at birth by a physician based on externally observed genitalia. A person's assigned sex, or designated sex, may or may not align with their gender identity. Transgender and gender nonconforming individuals have a gender that does not align with their assigned sex. Cisgender individuals have a gender that does align with their assigned sex.

22.    Gender identity is a person's core, innate, sense of self gender, such as male, female or non-binary. Every person, transgender, gender nonconforming, or cisgender, has a gender identity.

23.    Gender identity is not a choice. It is an essential part of one's identity and being. Moreover, gender identity is not something that can be voluntarily changed with great effort, like using a dominant hand to write with.

24.    Efforts to try to change a person's gender identity through therapy have been shown to be ineffective and harmful. For example, in a survey of transgender adults, those who reported receiving talk therapy aimed at changing their gender identity to match their sex assigned at birth (sometimes referred to as conversion therapy) indicated a lack of effectiveness of that treatment, higher psychological distress, and

increased risk of suicide attempts.[1] The survey found that conversion efforts in children under the age of 10 correlated with a four-fold increase in attempted suicides.

25. Psychological attempts to force a transgender or gender nonconforming person to be cisgender are considered unethical by the American Psychiatric Association.[2] Major U.S. professional medical organizations have published statements warning against the dangers of conversion therapy and recommend that it should not be used with transgender or gender nonconforming individuals (e.g., American Psychological Association, American Medical Association, and American Academy of Child and Adolescent Psychiatry).[3]

26. Unconsented disclosure and immediately informing caregivers of observed changes (negative consequences) privileges a student's birth name, which, based on my academic and clinical experience, is most often based on an individual's assigned sex at birth. For transgender and gender nonconforming students, this birth name likely does not align with an individual's gender identity.

27. As such, based on my academic and clinical experience, this creates social pressure at school and at home for all students to maintain the gender identity that aligns with their sex assigned at birth, even if it does not reflect their authentic gender identity. Transgender and gender nonconforming students who conceal their gender identity are colloquially known as being "in the closet."

---

[1] Turban et al., *Association Between Recalled Exposure To Gender Identity Conversion Efforts And Psychological Distress And Suicide Attempts Among Transgender Adults*, JAMA Psychiatry (2020) p. 68.

[2] Am. Psychiatric Assn., *What is Gender Dysphoria* (2023) <https://tinyurl.com/2emj8vb8> [as of July 11, 2024].

[3] Am. Psychological Assn., *APA Resolution on Gender Identity Change Efforts* (Feb. 2021) <https://tinyurl.com/y37xx78s> [as of July 11, 2024]; Am. Medical Academy, *Sexual Orientation And Gender Identity Change Efforts (So-Called "Conversion Therapy")* (2022) <https://tinyurl.com/yuw7rv2k> [as of July 11, 2024]; Am. Academy of Child and Adolescent Psychiatry, *Conversion Therapy Policy Statement* (Feb. 2018) <https://tinyurl.com/yc3x2knh> [as of July 11, 2024].

---

Case No. 3:23-cv-0768-BEN-WVG　　　7　　　Decl. of Brady in Opp. to PI Motion

008

28. As discussed below, unconsented disclosure that pressures transgender or gender nonconforming students to remain in the closet will increase these student's psychological distress and increase the likelihood of a mental health diagnosis.

29. Social pressures created by a lack of confidentiality may result in numerous psychological, emotional, physical, and social harms, which are particularly devastating for children, adolescents and young adults because of their ongoing brain development.

### A. Not All Transgender and Gender Nonconforming Individuals Have Gender Dysphoria

30. Transgender and gender nonconforming identity is not a mental illness.[4]

31. Gender dysphoria refers to clinically significant levels of psychological distress caused by an incongruence between one's assigned sex at birth and one's gender identity.

32. Some transgender and gender nonconforming individuals may experience gender dysphoria at some point in their lives. However, some transgender and gender nonconforming individuals may feel at ease with their bodies, and may not experience gender dysphoria.[5] The experience of every transgender or gender nonconforming individual is different.

33. A transgender or gender nonconforming individual is more likely to have certain symptoms of gender dysphoria such as significant distress or impairment in social functioning if they live in an unsupportive or unaccepting household and experience a hostile school environment.

---

[4] The World Prof. Assn. for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (Version 8, 2022) p. S6 <https://tinyurl.com/zcvth6rc> [as of July 12, 2024] (hereinafter "WPATH SOC8") ["The expression of gender . . . identities . . . that are not stereotypically associated with one's sex assigned at birth is a common and culturally diverse human phenomenon that should not be seen as inherently negative or pathological"].)

[5] *See ibid.* ("In addition, this version of the SOC recognizes and validates various expressions of gender that may not necessitate psychological, hormonal, or surgical treatments.").

Case No. 3:23-cv-0768-BEN-WVG      8      Decl. of Brady in Opp. to PI Motion

34.     Unaccepting, unsupportive, or hostile school or family environments can exacerbate mental health symptoms such as depression and anxiety.[6]

35.     Unconsented disclosure could also lead to development of gender dysphoria because it creates social pressure for the student to maintain their assigned sex at birth and deters social transition which can alleviate such symptoms.

## B. What Social Transition Entails

36.     Transgender and gender nonconforming individuals may choose social transitioning to align their gender expression with their gender identity. Social transition describes an individualized process in which a person changes various aspects of their gender expression (e.g., clothing, name, pronouns, hair style) to align with their gender identity. In other words, social transitioning allows others to see the transgender and gender nonconforming individual as they feel on the inside and live as their authentic selves.

37.     Social transition is non-medical. As Defendants' expert, Dr. Erica Anderson, agrees, "'[s]ocial transition' is primarily used to refer to name-and-pronoun changes" and "'[s]ocial transition' is used as a contrast to medical transition" because social transition *does not* involve "various medical interventions . . . such as puberty blockers, cross-sex hormone therapy, and various surgical interventions." (Anderson Decl., ¶ 9.)

## C. Social Transition Can Be Important for the Health of Transgender and Gender Nonconforming Students

38.     A positive social transition experience allows the transgender or gender nonconforming youth to feel safe, included and protected, improving mental health and reducing depression and anxiety.

39.     I have seen my patients who are youths become more confident, and outgoing after social transition because they are being treated as their affirmed gender. I have seen them sit up straighter and make friends.

---

[6] Pariseau et al., *The Relationship Between Family Acceptance-Rejection And Transgender Youth Psychosocial Functioning*, Clinical Practice in Pediatric Psychology (2019) p. 267.

40. For several patients, their mental distress was preventing them from participating in extracurricular activities like dance, martial arts, badminton and soccer. After social transitioning, these patients blossomed and thrived and joined or rejoined their sports and dance teams.

41. Research shows that transgender and gender nonconforming children who socially transition have mental health outcomes that mirror their cisgender peers.[7]

42. A recent study examined the impact of name and pronoun use on depression, suicidal ideation and suicide attempts among transgender and gender nonconforming youth.[8] Results showed that adding one context (e.g., school, work, friends) where affirmed gender was used consistently decreased suicidal behavior by 56%.[9]

43. Gender-affirming school environments, specifically, had the strongest association with reduced odds of reporting a suicide attempt within the past year of all the spaces studied.[10]

44. Because gender identities and how people choose to express themselves are diverse, social transition can manifest differently for different people. Moreover, the process of social transition can occur in stages wherein individuals may transition in one area of life but not others (e.g., only at home, only at school, only with friends, or any combination of these contexts).

45. A survey of LGBT adults showed that most started questioning their identity around age 12 but did not come out to family until the average age of 20.[11]

---

[7] Durwood et al., *Mental Health and Self-Worth in Socially Transitioned Transgender Youth*, J. of the Am. Academy of Child & Adolescent Psychiatry (Feb. 2017) p. 116 <https://tinyurl.com/hd7scrv7> [as of July 12, 2024].

[8] Russell et al., *Chosen Name Use Is Linked To Reduced Depressive Symptoms, Suicidal Ideation, And Suicidal Behavior Among Transgender Youth*, J. of Adolescent Health (Oct. 2018) p. 503.

[9] *Ibid.*

[10] The Trevor Project Research Brief: LGBTQ & Gender-Affirming Spaces, The Trevor Project (Dec. 2020) <https://tinyurl.com/2c2p7zkf> [as of July 11, 2024].

[11] Pew Research Center, *A Survey of LGBT Americans* (June 13, 2013) <https://tinyurl.com/yc43ytuu> [as of July 12, 2024].

---

Case No. 3:23-cv-0768-BEN-WVG      10      Decl. of Brady in Opp. to PI Motion

46. In my experience as a clinician, a majority of youth come out first to peers, then teachers, then parents.

47. Adolescence is a time of great change physically, neurologically and socially. It is a time when individuals are learning to become autonomous and independent from their caregivers. As a result of this development, adolescents often gravitate towards same age peers for the support that they had previously received from the adults in their lives. This often results in adolescents confiding in their friends because they have more relatable experience.

48. Nonetheless, youths do want to share important life developments with adults. However, because parents and other primary caregivers are the most important adults in a youth's life, there is often heightened anxiety due to the desire for acceptance. In a 2017 Human Rights Campaign survey of LGBTQ+ youth in California, 36% reported coming out to parents as "extremely stressful" and only 21% were out to all caregivers.[12]

49. The 2015 U.S. Transgender Survey found that only 53% of transgender people disclosed their gender identity to all of their immediate family members, whereas 22% of transgender people have not revealed their gender identity to a single member of their immediate family.[13]

50. Coming out to a teacher is a lower risk action and is a practice run of the very important conversations youths may be planning with their parents.

51. I have treated many patients for whom school is a more accepting environment than their home.

52. I have patients who feel that their school is their safe haven because the school conscientiously uses the patient's authentic name and pronouns. In contrast, the

---

[12] The Human Rights Campaign Foundation, *LGBTQ Teen Survey* (2017) p. 6 <https://tinyurl.com/38pz59uc> [as of July 12, 2024].
[13] James et al., *The Report of the 2015 U.S. Transgender Survey*, Nat. Center For Transgender Equality (Dec. 2016) p. 51 <https://tinyurl.com/yn3hpcey>.

patients' parents are often misgendering them. School is a place where the hurt and anxiety they experience at home cannot touch them. My patients' experiences reflect national data.

53. The Trevor Project's 2022 LGBTQ+ survey indicated that 55 percent of LGBTQ+ youth identified their school as affirming, compared with only 37 percent of LGBTQ+ youth who felt that their home was affirming.[14]

54. Under these circumstances, the youth's experience at school gives them the hope that they can one day live a life where they can be their authentic selves. This allows them to focus on their academic work.

55. Unconsented disclosure discourages this healthy, incremental way of social transitioning and its benefits. Instead, it incentivizes students to either go back into the closet, or discloses a student's gender identity before the student and the family is ready. This disregards the potential harm that disclosure may put students in if families are unsupportive.

## II. The Severe Harms of Premature Disclosure

56. There are serious risks associated with disclosing someone's transgender or gender nonconforming identity without consent.

57. It is a potentially traumatic experience for a transgender or gender nonconforming youth to be outed to unsupportive parents. Even for youth who do have supportive parents, "outing" them without their consent undermines the agency and autonomy that adolescents are so desperately seeking to build at this point in their development.

58. Disclosing a youth's identity without understanding how caregivers will respond to their identity places them at risk for devastating consequences.

---

[14] The Trevor Project, *2022 National Survey of LGBTQ on Youth Mental Health* (2022) p. 20 <https://tinyurl.com/4y6psfjs> [as of July 12, 2024].

59.     Children and youths are dependent on their caregivers for shelter, food, and basic necessities, and therefore do not have the ability remove themselves from psychologically and physically abuse environments.

60.     In the 2015 U.S. Transgender Survey, 10 percent of respondents said that an immediate family member had been violent toward them because they are transgender, and 15 percent ran away from home or were kicked out of their home because they were transgender.[15]

61.     The Williams Institute LGBTQ+ Homeless Youth Provider Survey found that a disproportionate amount of homeless youth belonged to the LGBTQ+ community and 67% of homeless youth cited the reason for running away or being forced out was because of their sexual orientation or gender identity.[16]

62.     As a psychologist, my practice is to keep my youth patients' gender identity confidential until they are ready to disclose it and I have ensured that they are well supported if they are met with rejection. I often work closely with youth to anticipate how caregivers will respond and at time facilitate that conversation along with the youth to ensure the youth's safety.  Educators and school staff are welcome to perform this function as well and the current safeguards of confidentiality do not prohibit this.

63.     I have worked with youth who have been accidentally outed by family members, teachers, health care professionals or other adults in their lives. In most cases, youth express hurt, upset, distrust, and general regret that they were not able to come out on their own terms.

---

[15] James et al., *supra*, at p. 65.
[16] Choi et al., Serving Our Youth 2015: The Needs and Experiences of Lesbian, Gay, Bisexual, Transgender, and Questioning Youth Experiencing Homelessness, Williams Institute (June 2015) p. 5 <https://tinyurl.com/mrfjastv> [as of July 12, 2024]; see also Nat. Gay & Lesbian Task Force, Lesbian, Gay, Bisexual, and Transgender Youth: An Epidemic of Homelessness (2007) pp. 2, 4 <https://tinyurl.com/67k28675> [as of July 12, 2024] ("Family conflict is the primary cause of homelessness for all youth, LGBT or straight. Specifically, familial conflict over a youth's sexual orientation or gender identity is a significant factor that leads to homelessness or the need for out-of-home care.").

Case No. 3:23-cv-0768-BEN-WVG            13        Decl. of Brady in Opp. to PI Motion

64. Youths who are outed prematurely will not have had time to adequately prepare what they want to say to their parents and family members. This contributes to miscommunication and misunderstandings within families that is difficult to reverse, with far reaching consequences. For example, lesbian, gay and bisexual young adults who experience parental rejection are more than eight times more likely to attempt suicide and six times more likely to report major depressive symptoms.[17]

65. WPATH has likewise found that transgender youth rejected by parents or subjected to nonaffirming environments have "increased anxiety, depression, suicidal ideation, suicide attempts, and health care avoidance."[18]

66. The current case claims to prioritize parental rights, in my clinical experience, it is actually taking away a potentially healing experience for supportive parents and their children: the experience of a child sharing one of the most important parts of their identity with their parents.

### A. Forcing a Transgender or Gender Nonconforming Youth to Hide Can Also Cause Significant Harm

67. Knowing that educators may disclose information to caregivers without consent, students will feel pressure to hide their gender identity, which is psychologically harmful. A transgender or gender nonconforming youth who is fearful of disclosure to parents may be forced to go "into the closet," and internalize the identity that the school and parents want them to be. It will not make them cisgender.

68. A study of adults living in California showed that coming out in high school was associated with positive psychosocial adjustment in young adulthood, even after accounting for school victimization.[19]

---

[17] Ryan et al., *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults*, Pediatrics (Jan. 2009) p. 346 <https://tinyurl.com/2a7n4sch> [as of July 12, 2024].
[18] WPATH SOC8, *supra*, at p. S53 ("disaffirming behaviors" intended "to change gender identity/expression have been associated with negative psychological functioning that endures into adulthood").
[19] Russell et al., *Being Out at School: The Implications for School Victimization and Young Adult Adjustment*, *Am. J. of Orthopsychiatry* (Nov. 2014) p. 635.

---

69. Based on my clinical experience, unconsented disclosure is also likely to create feelings of distrust for transgender and gender nonconforming youth who have made social transition steps. I have treated youths whose parents have not agreed to the youth's social transition, essentially forcing the youth to stay in the closet. My patients struggled with anger, rejection and psychological pain under these circumstances.

70. Some of these patients present with depression and anxiety to the extent that impairment begins to show in academic settings. If there is significant stress, academic work is not a high priority.

71. These patients have told me, "what's the point? If I'm so depressed that I can't see a future, then there's no point in doing academic work because why worry about going to college when I don't know if I'm going to make it to tomorrow?"

72. I have patients who have also experienced significant trauma and hopelessness due partly to social and familial rejection and the inability to live as their authentic selves.

73. A meta-analysis of 193 studies on the psychological impacts of concealing an individual's gender identity and sexual orientation concluded that youth may be more harmed from being forced to be "closeted" than adults. [20]

74. The mental health burden is greater and more harmful to youth than adults because youth might have fewer coping mechanisms.[21] Youth cannot control their own environments and cannot seek mental health help without parental support. [22] This burden may drive chronic and anxious expectations of rejection and shame, which have their greatest mental health impact during the developmentally sensitive periods of adolescence. [23]

---

[20] Pachankis et al., *Sexual Orientation Concealment and Mental Health: A Conceptual and Meta-analytic Review*, Psychological Bulletin (Oct. 2020) p. 831.
[21] *Ibid.*
[22] *Ibid.*
[23] *Ibid.*

Case No. 3:23-cv-0768-BEN-WVG          15          Decl. of Brady in Opp. to PI Motion

75. Unconsented disclosure increases the risk of negative mental health impacts on transgender and gender nonconforming youth by encouraging youth to stay in the closet at school and at home, with lasting negative academic, mental and social consequences as the youth ages into adulthood.

### B. An Unsupportive School Climate Causes Mental, Social and Academic Harm

76. When schools are not supportive environments for transgender and gender nonconforming youth, very serious harms can result.

77. Based on my scientific research and clinical experience, I believe that Unconsented disclosure creates an unsupportive and unsafe environment for transgender and gender nonconforming students. This intensifies the existing social rejection and discrimination experienced generally by transgender and gender nonconforming students across the state. These unsupportive environments result in mental, social, and academic harm to transgender and gender nonconforming students.

78. Data from California shows experiences of physical and psychological harm generally experienced by transgender and gender nonconforming students. One report examined 2017-2019 data concerning students across 2,749 California schools—in grades seven, nine, and 11—and it found that transgender students in California reported negative mental health outcomes and school experiences "at higher rates" than any other "sexual orientation subgroup[]."[24]

79. California public school data from 2015-2016 show that more than 40 percent of transgender students reported being bullied because of their gender identity, while only 7.3 percent of non-transgender students reported gender-based bullying or bullying on the basis of perceived gender identity.[25]

---

[24] Hanson et al., *Understanding the Experiences of LGBTQ Students in California*, The California Endowment (Oct. 2019), pp. 9, 52 <https://tinyurl.com/v452ty7s> [as of July 12, 2024].
[25] De Pedro et al., Exploring Physical, Nonphysical, and Discrimination-Based Victimization among Transgender Youth in California Public Schools, International Journal of Bullying Prevention (2019) p. 222.

Case No. 3:23-cv-0768-BEN-WVG          16          Decl. of Brady in Opp. to PI Motion

80. California data from 2015-2016 show that more than half (55.6 percent) of transgender students in California reported physical victimization (such as being threatened with a weapon, threatened with harm, shoved, or in a physical fight), and more than two-thirds (69.2 percent) reported nonphysical victimization, for example, being called a demeaning name or being the recipient of demeaning sexual jokes or gestures.[26]

81. Transgender students also are at risk of suicide and other mental health harms due to the discrimination they receive because of their gender identity.[27] 86 percent of transgender youth reported suicidal thoughts, and 56 percent of transgender youth reported a previous suicide attempt.[28]

82. In my clinical experience, I have also worked with many youths who avoid school and social situations because being mis-gendered is too painful. Based on my clinical experience, it is the social rejection and discrimination experienced by transgender and gender nonconforming students that harms them, and not any inherent aspect of their gender identity.

83. Because Unconsented disclosure encourages a transgender or gender nonconforming youth to hide themselves because they are not yet ready to come out to their parents, unconsented disclosure innately communicates to the students, that the school district does not accept them, and that their school is not a safe environment for them.

84. This makes transgender and gender nonconforming youths more vulnerable to the negative psychological effects of bullying.

[26] *Id.*
[27] James et al., *supra* at 132; Herman et al., *Suicide Thoughts and Attempts Among Transgender Adults,* Williams Institute (Sept. 2013) p. 2 <https://tinyurl.com/msyy4wbw> [as of July 12, 2024].
[28] Austin et al., *Suicidality Among Transgender Youth: Elucidating the Role of Interpersonal Risk Factors*, 37 J. of Interpersonal Violence (Mar. 2022) p. 5 <https://tinyurl.com/ydx5cvzb> [as of July 15, 2024].

Case No. 3:23-cv-0768-BEN-WVG          17          Decl. of Brady in Opp. to PI Motion

85. My patients have told me that social transition gives them confidence to withstand bullying. Without social transitioning, my patients struggle with self-doubt: "what if the bullies are right?" they may ask.

86. Social transition fosters resilience, or the ability to bounce back from negative impacts. After my patients who are youths have socially transitioned and are able to express their authentic selves, they are more able to challenge negative social perceptions of themselves. "I know who I am, and the bullies are wrong about me," they might say.

87. The U.S. Centers for Disease Control explained in a 2023 report that:

88. "[s]chool connectedness, which is the feeling among adolescents that people at their school care about them, their well-being, and success, has long-lasting protective effects for adolescents. Youth who feel connected at school are less likely to experience risks related to substance use, mental health, violence, and sexual behavior."[29]

89. A survey of 5,830 LGBT youth published in the Journal of School Violence concluded in 2012 that a negative school climate contributed to lower academic outcomes and lower self-esteem for LGBT students.[30] Conversely, academic outcomes improved where schools implemented supports including gay-straight alliances or clubs, supportive educators, inclusive curriculums, and a comprehensive anti-bullying/harassment policy.[31]

**III. Dr. Erica E. Anderson's Declaration and the Opinions Within are Inconsistent with Current and Prevailing Standards of Care**

90. Dr. Anderson's declaration submitted in support of Defendants' Motion for Summary Judgment, or, in the Alternative, for Summary Adjudication—and the opinions

---

[29] Centers for Disease Control, *Youth Risk Behavior Survey: Data Summary & Trends Report 2011-2021* (2023) p. 72 <https://tinyurl.com/4cd8ka96> [as of July 12, 2024].
[30] Kosciw, et. al, *The Effect of Negative School Climate on Academic Outcomes for LGBT Youth and the Role of In-School Supports*, Journal of School Violence (2013) p. 45.
[31] *Id.* at pp. 51-52.

Case No. 3:23-cv-0768-BEN-WVG          18          Decl. of Brady in Opp. to PI Motion

contained within —are inconsistent with the current and prevailing standards of professional care concerning transgender youth.

91. In her declaration, Dr. Anderson acknowledges that the World Professional Association of Transgender Health's (WPATH) Standards of Care are "one of the more widely known and cited set of guidelines for transgender care." (Anderson Decl., ¶ 11.) As the WPATH's current Standards of Care state, "One of the main functions of WPATH is to promote the highest standards of health care for individuals through the Standards of Care (SOC) for the health of [transgender and gender diverse] people."[32]

92. While most of the WPATH's Standards of Care provide recommendations governing medical interventions—such as surgical operations—the Standards of Care also discuss transgender health more holistically and include some discussion of non-medical approaches to gender identity such as social transition.[33] It is important not to improperly conflate the Standards of Care's discussion of medical interventions with their discussion of non-medical issues like social transition.

93. As Dr. Anderson notes, WPATH has published its Eighth Edition Standards of Care (SOC8), providing its current recommendations. (Anderson Decl., ¶ 11.) Dr. Anderson claims that WPATH's Eighth Edition Standards of Care are "not universally agreed upon." (Anderson Decl., ¶ 11.) While there may always be individuals who do not adhere to current professional standards, the Standards of Care contain the professional community's general consensus on the latest state of research and experience in the field. The Eighth Edition of the Standards of Care "is based on the best available science and expert professional consensus."[34]

94. Despite her awareness that the WPATH's SOC8 reflects the current Standards of Care, Dr. Anderson "rel[ies] more heavily in [her] report" on "SOC7," or

---

[32] WPATH SOC8, *supra*, at p. S53.
[33] See generally *ibid*.
[34] *Id.* at p. S5.

Case No. 3:23-cv-0768-BEN-WVG      19      Decl. of Brady in Opp. to PI Motion

the Seventh Edition of the WPATH Standards of Care. (Anderson Decl., ¶ 11.) SOC7 was published over a decade ago in 2012 and neglects the past twelve years of scientific inquiry that has taken place.[35]

95.    Given how much knowledge and research in this field have grown in recent years, in my professional experience and opinion, it is inappropriate to rely on the SOC7's outdated recommendations, which no longer reflect the current research consensus and standards in the field.|

96.    Indeed, Dr. Anderson notes that "[i]n late 2021 . . . I resigned from my offices within USPATH and WPATH because I disagreed in important respects with some of the directions the organization was going." (Anderson Decl., ¶ 11.) This suggests that Dr. Anderson's views may not reflect the current professional consensus regarding transgender care.

97.    While professional organizations other than WPATH have published guidelines related to transgender care, such as the Endocrine Society, those other guidelines focus exclusively on medical interventions—for example, the levels at which to dose medications or hormone treatments.[36] Such guidelines are inappropriate to rely upon when discussing non-medical approaches such as social transition, as I describe below.

### A. Under Prevailing Professional Standards, Students Should Have the Ability to Initiate Social Transition Without Formal Mental Health Involvement

98.    Dr. Anderson's assertion that "[n]o medical or mental health organization" has endorsed permitting social transition without formal mental health involvement

---

[35] The World Prof. Assn. for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (Version 7, 2012) <https://tinyurl.com/ynnhubb4> [as of July 12, 2024] (hereinafter "WPATH SOC7").

[36] See generally, e.g., Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline* (2017) J. of Clinical Endocrinology & Metabolism 3869.

---

Case No. 3:23-cv-0768-BEN-WVG          20          Decl. of Brady in Opp. to PI Motion

(Anderson Decl., ¶ 57) is incorrect and contradicted by the very materials Dr. Anderson cites.

99. To begin, Dr. Anderson presents a non-sequitur—professional "medical associations" would not make specific endorsements about social transition, in school or elsewhere, because such social transition is non-medical, and it would be generally inappropriate for medical associations to issue medical guidelines governing non-medical behaviors.

100. Further, WPATH's Standards of Care, which discuss transgender health more holistically, contradict Dr. Anderson's claim. Dr. Anderson herself quotes the WPATH's SOC8's statement that "social transition should originate from the child and reflect the child's wishes in the process of making the decision to initiate a social transition process," and any "efforts at blocking reversible social expression or transition [like] choosing not to use the youth's identified name and pronouns" are "disaffirming behaviors" that are always inappropriate and equivalent to conversion therapy. (Anderson Decl., ¶ 59.) This language expressly states that a youth's wishes to "initiate a social transition process" should be respected, and that any "disaffirming behaviors" otherwise could prove harmful to the youth.[37]

101. Instead, Dr. Anderson misleadingly cites a different section of the outdated WPATH SOC7 referring to gender-affirming *medical interventions* (e.g., pubertal suppression or gender-affirming hormones) to support her arguments that adults should never "facilitate a social transition upon a child or adolescent's request without a careful evaluation by an appropriately trained mental health professional." (Anderson Decl., ¶ 57.)[38] Thus, the WPATH Standards of Care she quotes have no bearing on non-medical

---

[37] WPATH SOC8, p. S76. Additionally, in my clinical experience, it is rare for prepubertal youth to socially transition without parental knowledge. Most of these cases involve teenage adolescents.
[38] The section of SOC8 she cites, for instance, states that that "a comprehensive biopsychosocial assessment of adolescents who present with gender-identity concerns" is needed because "the decision to start gender-affirming *medical interventions* may not be in the long-term best interest of the young person at that time." (Anderson Decl., ¶ 62, emphasis added.)

Case No. 3:23-cv-0768-BEN-WVG        21        Decl. of Brady in Opp. to PI Motion

social transitions. (See also Anderson Decl., ¶ 45 ["SOC8's focus is on medical interventions"].)[39]

102.   Rather, when it comes to social transitions, WPATH SOC8 expressly states that it is the individual's decision to socially transition and that such decisions should be respected, rather than restricted.[40]

103.   Dr. Anderson also relies upon the Cass Review published in April 2024. (Anderson Decl., ¶¶ 34) But the WPATH and USPATH have observed that the Cass Review "do[es] not contain any new research that would contradict the recommendations made in professional consensus guidelines of . . . WPATH,"[41] and leading experts and professional organizations in transgender care have widely criticized the Cass Review and its opinions.[42]

104.   In a formal response to the Cass Review published by WPATH and USPATH on May 17, 2024, both organizations outlined "deep[] concern[s] about the facts regarding the Cass Review's process and content."[43] WPATH and USPATH state

---

[39] Dr. Anderson elsewhere quotes statements from SOC7—not only do these statements fail to rely on the current standards of care, they pull statements addressing gender dysphoria (see, e.g., Anderson Decl., ¶ 27 ["WPATH's SOC7, for example, recommends a 'thorough assessment' of 'gender dysphoria and mental health,'" emphasis added], ¶ 28 ["WPATH SOC7 notes that mental health professionals 'should strive to maintain a therapeutic relationship with gender nonconforming children/adolescents and their families through any subsequent social changes . . . . which 'ensures that decisions about gender expression *and the treatment of gender dysphoria* are thoughtfully and recurrently considered,'" emphasis added].) As I have discussed, gender dysphoria is a specific condition, it is not the same as being transgender or gender nonconforming, and many transgender and gender nonconforming youth do not experience gender dysphoria. (*Ante*, ¶ 33; see also WPATH SOC8, p. S6 ["The expression of gender . . . identities . . . that are not stereotypically associated with one's sex assigned at birth is a common and culturally diverse human phenomenon that should not be seen as inherently negative or pathological"].) Dr. Anderson's reliance on those recommendations to categorically apply to all transgender or gender nonconforming youth is inappropriate.
[40] WPATH SOC8, p. S76.
[41] WPATH & USPATH, *WPATH and USPATH Comment on the Cass Review* (May 17, 2024), <https://tinyurl.com/k9tz4nwh> [as of July 11, 2024].
[42] See, e.g., *ibid.*; Horton, *The Cass Review: Cis-Supremacy in the UK's Approach to Healthcare for Trans Children* (2024) Int. J. of Transgender Health; McNamara et al., *An Evidence-Based Critique of "The Cass Review" on Gender-affirming Care for Adolescent Gender Dysphoria* (2024) <https://tinyurl.com/56pc423d> [as of July 11, 2024]; Noone et al., *Critically Appraising the Cass Report: Methodological Flaws and Unsupported Claims* (2024) OSF Preprints.
[43] WPATH & USPATH, *WPATH and USPATH Comment on the Cass Review* (May 17, 2024) p. 1 <https://tinyurl.com/k9tz4nwh> [as of July 11, 2024].

---

Case No. 3:23-cv-0768-BEN-WVG          22          Decl. of Brady in Opp. to PI Motion

that "the Cass Review process . . . intentionally and explicitly excluded any oversight from patients and their families and trans healthcare experts, and its content is not supported by a robust methodology. The Cass Review relies on selective and inconsistent use of evidence, and its recommendations often do not follow from the data presented in the systematic reviews."[44]

105.   Yale University likewise published a report criticizing the Cass Review, stating that it "obscures key findings, misrepresents its own data, and is rife with misapplications of the scientific method."[45] The Yale report—authored by a team of experts that collectively holds "86 years of experience working with 4,800 transgender youth" and "has published 278 peer-reviewed studies, 168 of which are related to gender-affirming care"—concludes that the Cass Review's "errors conflict with well-established norms of clinical research and evidence-based healthcare," which "raise serious concern about the scientific integrity of critical elements of the report's process and recommendations."[46]

106.   In my clinical experience, it is normal for many transgender youth to socially transition without prior consultation with a mental health professional.

107.   Dr. Anderson's assertion that mental health consultation is always required before social transition runs contrary to both clinical experience and current standards of care (SOC8), and would improperly medicalize a developmentally appropriate, non-medical step that gender-diverse youth need to be able to access in understanding their identity.

[44] *Id.* at p. 2. For instance, WPATH and USPATH state that the Cass Review's "failure to include those with personal or professional experience 'had concerned many within the field," as "the Cass Review 'deliberately does not contain subject matter[] experts or people with lived experience of gender services' and Dr. Cass herself was explicitly selected as a senior clinician 'with no prior involvement . . . in this area.'" *Ibid.*

[45] McNamara et al., *An Evidence-Based Critique of "The Cass Review" on Gender-affirming Care for Adolescent Gender Dysphoria* (2024), https://tinyurl.com/56pc423d.

[46] *Id.* at pp. 2-3.

### B. Under Prevailing Professional Standards, Students Can Appropriately Initiate Social Transition at School without Necessarily Doing So at Home

108. Similarly, Dr. Anderson's statements that social transitions in only specific contexts such as school amount to "facilitating a double life for some children, in which they present as transgender in some contexts but cisgender in other contexts [which] is not in their best interest" (Anderson Decl., ¶ 78) is not supported by professional standards.

109. Indeed, the WPATH SOC8 states that "social transition may best occur in all *or in specific contexts/settings only* (e.g., school, home)."[47]

110. Dr. Anderson's only response to this language in the SOC8 is to disagree with it by claiming that "social transition may not in fact be easily 'reversible'" and that parents must be involved "to help their children avoid making bad decisions." (Anderson Decl., ¶¶ 60). As explained below in paragraphs, Dr. Anderson's views misinterpret the data and are otherwise unsubstantiated by research.

111. It is also a mischaracterization of transgender or gender nonconforming students' experiences to suggest that school officials are somehow "facilitating" these individuals leading a "double life" (Anderson Decl., ¶ 78) by respecting a student's decision, for example, to request use of a different pronoun or name reflecting their gender identity or gender expression.

112. First, it is incorrect to characterize schools officials' decisions to refrain from "dead-naming" transgender or gender nonconforming students or referring to them by their former pronouns as "facilitating" their transitions. Indeed, school officials are simply ensuring that these students are not injured by what Dr. Anderson agrees are harmful, "disaffirming" actions. (Anderson Decl., ¶ 59.)

---

[47] WPATH SOC8, p. S76 (emphasis added).

Case No. 3:23-cv-0768-BEN-WVG    24    Decl. of Brady in Opp. to PI Motion

113. Second, coming out in an incremental fashion is a well-documented phenomenon not only for transgender youth, for but LGBTQ+ individuals more generally. Coming out is not a discrete event that happens once and is over; rather, decisions to come out to particular individuals, and/or in particular contexts, are part of a process that LGBTQ+ individuals engage in across a whole lifetime. For that reason, it is especially important that transgender or gender nonconforming youth have the ability to healthily and safely decide when, where, and to whom to come out on their own terms and when they are ready.

### C. Unconsented Disclosure, Rather than Addressing "Coexisting Mental Health" Conditions, Could Worsen Them

114. One reason Dr. Anderson suggests that mental health professionals (and therefore parents, who she claims are always needed to consent to youths' treatment (Anderson Decl., ¶ 61) must always be involved before social transition is because Dr. Anderson claims that mental health interventions are needed to address other mental health conditions that transgender or gender nonconforming youth might be experiencing.

115. But at the outset, there are many alternative systems that can identify the mental health conditions experienced by youth without exposing them to potential harm from forced disclosure. Pediatricians, for example, screen the youth they treat for depression and anxiety as part of their standard practice. Additionally, clinical psychologists and physicians can, and often do, treat mental health issues experienced by transgender or gender nonconforming (and many other) youth—such as depression— without outing the transgender youth against their will, which, as I have described, causes significant mental health harm. Moreover, in the state of California, youth can engage in mental health care without parental consent beginning at age 12.

116. Further, in drawing attention to the mental health risks that transgender and gender nonconforming youth might face, Dr. Anderson indicates precisely why unconsented disclosure is detrimental.

///

Case No. 3:23-cv-0768-BEN-WVG          25          Decl. of Brady in Opp. to PI Motion

117. As I have noted previously, research shows that transgender students who can socially transition in an affirming and supportive environment have mental health outcomes that mirror their cisgender peers.[48] Another study notes that for such students who were not exposed to harassment in K-12 schools based on their gender identity, the ability to pursue early transition was linked to better mental health outcomes.[49]

118. And as I have also discussed previously, studies show that lesbian, gay, and bisexual youth who experience parental rejection are eight times more likely to attempt suicide and six times more likely to report major depressive symptoms.[50]

119. These studies highlight a key point: social transitions are linked to better mental health outcomes, but mainly if done in a safe and supportive environment. Sadly, some youths' parents do not provide a safe and supportive environment at home.

120. If school staff share a young person's social transition and gender identity with parents prior to the youth being ready, and prior to ensuring that the home environment would be safe and supportive, they place the youth at risk for devastating consequences.

121. Dr. Anderson's own citations illustrate this point. She cites WPATH's SOC8 as noting "studies showing that transgender youth have higher rates of depression, emotional and behavioral problems, suicide attempts and ideation, self-harm," and other issues. (Anderson Decl., ¶ 27.) But Dr. Anderson leaves out critical language from that same paragraph in SOC8: gender nonconforming youth "are at increased risk of mental

---

[48] Durwood et al., *Mental Health and Self-Worth in Socially Transitioned Transgender Youth* (2017) 56 J. Am. Acad. Of Child & Adolescent Psychiatry 116.

[49] Turban et al., *Timing of Social Transition for Transgender and Gender Diverse Youth, K-12 Harassment, and Adult Mental Health Outcomes* (2021) 69 J. of Adolescent Health 991, 991-998. See also Murchison et al., *School Restroom and Locker Room Restrictions and Sexual Assault Risk Among Transgender Youth* (2019) 143 Pediatrics 1, 2 (study of 3,673 transgender adolescents found adolescents at schools that did not allow them to use the bathroom that aligned with their gender identity had increased risk of sexual assault victimization).

[50] Ryan et al., *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults*, Pediatrics (Jan. 2009) p. 346 <https://tinyurl.com/mr38htdh/> [as of July 12, 2024].

health challenges, *often related to family/caregiver rejection*" and "*non-affirming community environments*."[51]

122.   Thus, Dr. Anderson's citation establishes precisely why unconsented disclosure is harmful, as it exposes youth to hostile and rejecting households and deny students an affirming school environment, causing these very harms.

## IV.   Research Does Not Support Dr. Anderson's Claims that Social Transition "Causes" Individuals to Persist in their Transgender Identity|

123.   The other main reason that Dr. Anderson offers for why parents must always be informed of a youth's transgender identity is because, in Dr. Anderson's view: (1) the majority of children and youth do not persist in their expressions of gender nonconforming identity (2) social transition causes youth to persist in gender nonconforming identity and (3) transitioned individuals may face certain challenges.[52] Thus, in Dr. Anderson's view, parental involvement should be required in all cases to guide young people's decisions in expressing their gender identity—even to the point where Dr. Anderson asserts that parents should have the power "to say 'no' to a social transition." (Anderson Decl., ¶ 60.) These claims are incorrect, misleading, and harmful, and the prevailing research does not support these conclusions.

### A. Dr. Anderson Has Misinterpreted the Data Regarding "Persistence" of Gender Nonconformity from Childhood into Adolescence|

---

[51] WPATH SOC8, p. S62 (emphasis added).

[52] One "challenge," described above, is the greater mental health risks that Dr. Anderson claims transgender individuals experience; as explained above, however, that phenomenon is not inherent to being gender nonconforming, but rather, often *exacerbated* by unconsented disclosure. Another potential "challenge" referenced by Dr. Anderson is the rare instance where individuals seek to "detransition" after undergoing medical interventions like surgery or medication. However, social transition is non-medical and involves no such interventions. In the rare case that a youth's gender identity does not match their social transition, it must be up to the youth to make that decision. In the rare clinical cases I have had involving such a situation, the decision to change a social transition is simple and reversible: the youth simply goes back to using the prior name and pronouns the youth had used before.

124. Dr. Anderson asserts that "for the vast majority of children, gender incongruence does not persist." (Anderson Decl., ¶ 20.) This is incorrect.[53] The research she references examined prepubertal children who were referred to gender clinics, but most of the young people in those studies did not appear to be transgender or gender nonconforming to begin with.

125. These past studies used an outdated diagnostic label of "gender identity disorder in children,"[54] which did not require the child to identify as a gender different from their sex assigned at birth.[55] This diagnosis label is flawed because its expansive definition likely included many cisgender "tomboys" or cisgender boys with "feminine interests" (e.g., playing with dolls and female peers) who never identified as transgender and, thus, unsurprisingly did not identify as transgender when followed up with later in life.[56] As Dr. Kristina Olson of Princeton University noted in a 2016 publication in The Journal of The American Academy of Child & Adolescent Psychiatry, more than 90% of children diagnosed with "gender identity disorder" in these studies, when directly asked their gender identity, reported their sex assigned at birth.[57]

126. In contrast, a recent publication in the Journal of Pediatrics followed 317 transgender children (i.e., those who had a gender identity different from their sex assigned at birth) over a period of five years and found that at the end of the follow-up period, 97.5% were still using pronouns indicating a transgender identity.[58]

---

[53] See, e.g., McNamara et al., *supra*, at pp. 21-23.

[54] See, e.g., Steensma et al., *Desisting and Persisting Gender Dysphoria after Childhood A Qualitative Follow-Up Study* (2011) 16 Clinical Child Psychology and Psychiatry 499 (following "Twenty-five adolescents . . . diagnosed with a Gender Identity Disorder"); Drummond et al., *A Follow-Up Study of Girls with Gender Identity Disorder* (2008) 44 *Developmental Psychology 34,* 34-45; Zucker et al., *Gender Identity Disorder and Psychosexual Problems in Children and Adolescents* (1995).

[55] See Am. Psychiatric Assn. (APA) Diagnostic and Statistical Manual of Mental Disorders (2000 4th ed.) (hereinafter "DSM-IV-TR").

[56] McNamara et al., *supra*, at pp. 21-22.

[57] Olson, *Prepubescent Transgender Children: What We Do and Do Not Know* (2016). 3 J. of the Am. Acad. of Child & Adolescent Psychiatry 155, 155-156.

[58] Olson et al., *Gender Identity 5 Years After Social Transition* (2022) 150 Pediatrics 1.

---

Case No. 3:23-cv-0768-BEN-WVG      28      Decl. of Brady in Opp. to PI Motion

**B. The Latest Research Indicates that Social Transition Does Not Make "Persistence" More Likely**

127. Dr. Anderson also claims that social transition at school or in the community may increase the likelihood of "persistence" of a transgender identity and thus would explain the results of the studies on "persistence" discussed above. But recent research shows that this is not the case.

128. In a study published in 2019 in the journal Psychological Science, Rae et al. examined the question of whether a social transition intensifies transgender identification.[59] They examined a cohort of gender-nonconforming children over two years, during which time 36 of these children socially transitioned.[60] They measured degree of gender nonconformity before and after social transition and found that social transition did not increase gender nonconformity.[61] Their study made it clear that the association between social transition and "persistence" that some studies have noted is because those who undergo a pre-pubertal social transition have stronger discordance between their sex assigned at birth and their gender identity to begin with, prior to the social transition.[62]

129. In other words, a social transition does not make a child identify more strongly as transgender and thus likely to persist with that gender identity. Rather, youth with strong transgender identification are more likely to pursue a social transition to begin with. This is consistent with the findings of Steensma et al. 2013, that Dr.

---

[59] Rae et al., *Predicting Early-Childhood Gender Transitions* (2019) 30 Psychological Science 669, 669-681.
[60] *Ibid.*
[61] *Ibid.*
[62] *Ibid.*

Case No. 3:23-cv-0768-BEN-WVG    29    Decl. of Brady in Opp. to PI Motion

Anderson cites (Anderson Decl., ¶ 32), which also observed that individuals who socially transitioned had more intense gender nonconformity.[63]

130. Thus, Dr. Anderson's claim that "[s]ocial transition sets children down a path that often leads to medical interventions" (Anderson Decl., ¶¶ 53-55), which is premised on the presumption that a social transition will make a child identify more strongly as transgender and increase the likelihood of "persistence," is false. Youth who socially transition already have very strong cross-gender identification to begin with, which is why they pursue a social transition in the first place, and social transition does not impact their transgender identity or likelihood of persistence, as discussed in Rae et al.'s study published in Psychological Sciences.[64]

131. Dr. Anderson has also deceptively lifted text from the introduction of the Rae et al. study which reads, "we know little about . . . whether transitions impact children's views of their own gender." (Anderson Decl., ¶ 37.)[65] But the purpose of that introduction section in the academic research paper is to set up gaps that existed in the literature prior to the data being presented, along with the research question to be answered.[66]

132. The paper subsequently answers the question Dr. Anderson quoted with new data.[67] It is misleading, not to say disingenuous, to quote the paper's introduction

---

[63] Steensma et al., *supra*. Dr. Anderson also cites text from the 2017 Endocrine Society Guidelines (Anderson Decl., ¶ 33), which, in addition to being published by an organization focused on a medical intervention (i.e., hormone treatments), could easily be misconstrued. Any correlation between social transition and cross-gender identity continuing into adolescence, as explained above, is because youth who socially transition already have very strong cross-gender identification to begin with, which is why they pursue a social transition in the first place, and social transition does not impact their transgender identity or likelihood of persistence, as later studies like those by Rae et al. have shown.

[65] Quoting Rae et al., *supra*, at p. 670.
[66] See *ibid.*
[67] *Id.* at pp. 678-679 ("[A]n assigned male who will later transition to live as a girl is roughly as feminine before transition as a transgender girl is after a transition . . . . this effect was remarkably robust across different analytic and data-processing decisions. . . . Consistent with the first explanation, our results showed that the children who transitioned showed more extreme cross-sex identification and preferences before transitioning.").

---

without subsequently discussing its actual research findings, which explicitly refute Dr. Anderson's assertion.[68]

133.   Thus, contrary to Dr. Anderson's suggestions, transgender identity or gender nonconformity is not "caused by" social transitions; rather, social transitions result from transgender or gender nonconforming youth seeking to more fully express who they are.[69]

### C. Dr. Anderson Has Misinterpreted the Data Discussing Cultural and Societal Factors in Relation to Transgender Identity or Gender Nonconformity

134.   For similar reasons, Dr. Anderson's suggestion that increased number of young people are expressing gender diversity due to "susceptibility to social influence" (Anderson Decl., ¶ 19) misinterprets the data.

135.   As I explained in this declaration, gender identity is not a choice; it is a core aspect of a person's being.

136.   Significant research indicates that transgender identity results not from social pressures but from a strong, innate biological basis. Studies have conducted neuroimaging on transgender adolescents, and found that transgender adolescents have patterns of brain activation more similar to those of other people who share their gender identity than people who share the same sex assigned at birth.[70] Other researchers have examined the identical twins and fraternal twins of transgender parents. These researchers found that identical twins of transgender parents, who have the same DNA, are far more likely to be transgender than fraternal twins, who have different DNA, and, thus, concluded that gender identity has a strong genetic component.[71] Meanwhile, sophisticated gene sequencing studies have suggested that genes involved in estrogen

---

[68] *Ibid.*

[69] McNamara et al., *supra*, at p. 19.

[70] Burke et al., *Hypothalamic Response to the Chemo-Signal Androstadienone in Gender Dysphoric Children and Adolescents* (2014) 5 Frontiers in Endocrinology 60.

[71] See, e.g., Coolidge et al., *The Heritability of Gender Identity Disorder in a Child and Adolescent Twin Sample* (2002) 32 Behavior Genetics 251, 251-257.

processing play a role in the development of gender identity among transgender people.[72] While the precise biological causes of gender identity have not been conclusively identified, these studies together indicate a strong innate biological basis for transgender identity.

137. My clinical experience confirms this research. Over the hundreds of adolescents I have treated, my patients do not ask me, "should I socially transition"—almost all have already decided that they wish to or have already done so. It is normal for many of them to have been on this journey for a while already because it is their decision.

138. Meanwhile, we are not seeing the same increases in number of adults as we have adolescents because transgender middle-aged adults have endured decades of stigma for their transgender identities that make them far less likely to come out as transgender, even despite some recent changes in current social attitudes. These decades of exposure to and survival in unaccepting environments, according to the "gender minority stress" model, leads to expectations of future rejection and internalized transphobia (i.e., internalization of society's stigma directed toward transgender people). This can cause self-hate for being transgender, as well as a desire to conceal one's identity.[73] These factors make it less likely for middle-aged transgender adults to come out, despite the more recent increases in societal acceptance for transgender people in the United States.

139. Meanwhile, many transgender youth are, for the first time, growing up in environments where transgender identity is not as stigmatized, making it relatively easier

[72] Theisen et al., *The Use of Whole Exome Sequencing in a Cohort of Transgender Individuals to Identify Rare Genetic Variants* (2019) 9 Scientific Reports 1, 1-11.
[73] Hendricks et al., *A Conceptual Framework for Clinical Work with Transgender and Gender Nonconforming Clients: An Adaptation of the Minority Stress Model* (2012) 43 Professional Psychology: Research and Practice 460.

Case No. 3:23-cv-0768-BEN-WVG      32      Decl. of Brady in Opp. to PI Motion

for them to come out when compared to transgender adults who are burdened by decades of living in a social milieu where being transgender was not recognized or accepted.

140.   Among the hundreds of transgender and gender nonconforming youth whom I have treated, none have indicated that they expressed a transgender or gender nonconforming identity because of social media or peer influences. Indeed, as Dr. Anderson acknowledges, a social transition can come with challenges, particularly due to the discrimination that a transgender or gender nonconforming individual might face;[74] these potential challenges provide all the more reason why transgender or gender nonconforming youth are not expressing such identities merely because of social media or peer influences.

## V.   Dr. Anderson's Suggestion that Parents Should Always Be Consulted So that They Can Sometimes "Say 'No'" to a Youth's Gender Identity is Harmful to Youth|

141.   As I explained in this declaration, the best outcome for transgender and gender nonconforming youth is for them to socially transition on their own terms, at their own pace, into supportive, loving environments. This type of social transition aligns with the natural process of a person growing up and learning how to navigate the different environments around them.

142.   Dr. Anderson's suggestion, then, that parental involvement should be required so that parents can sometimes "say 'no' to a social transition" (Anderson Decl., ¶60) is harmful to youth. As I have noted previously, research has shown that lesbian, gay, and bisexual youth who experience parental rejection are eight times more likely to attempt suicide and six times more likely to report major depressive symptoms.

143.   Studies specific to gender identity have reached similar conclusions. As WPATH's leading and current Standards of Care (SOC8) state, "efforts at blocking reversible social expression or transition may include choosing not to use the youth's

---

[74] See WPATH SOC8, *supra*, p. S6.

Case No. 3:23-cv-0768-BEN-WVG          33          Decl. of Brady in Opp. to PI Motion

identified name and pronouns or restricting self-expression in clothing and hairstyles."[75] These and other "disaffirming behaviors" have "been linked to increased anxiety, depression, suicidal ideation, suicide attempts, and health care avoidance."[76] Such efforts "to change gender identity/expression have been associated with negative psychological functioning that endures into adulthood."[77]

144. Thus, WPATH's SOC8 "recommend[s] against such [disaffirming] efforts," as "efforts undertaken a priori to change a person's identity are clinically and ethically unsound."[78] The best possible outcome for transgender and gender nonconforming youth is for them to socially transition on their own terms, at their own pace, into supportive, loving environments. This type of social transition aligns with the natural process of a child growing up and learning how to navigate the different environments around them.

## Conclusions

145. The process of coming out is often protracted, as youth try to understand how various people in their lives will respond to their identity. It is critical that youth be allowed to control that process, as it is their personal information to share in their own time.

146. Unconsented disclosure disrupts this process and harms transgender and gender nonconforming youth in numerous ways.

147. It creates social pressures to reject a transgender or gender nonconforming youth's gender identity, thereby intensifying psychological distress and increasing the risk of depression and anxiety in transgender and gender nonconforming youth.

148. It disincentives social transitioning, which is not only an essential process of self-actualization for a transgender or gender nonconforming individual, but also

[75] WPATH, SOC8, p. S53.
[76] *Ibid.*
[77] *Ibid.*
[78] *Ibid.*

Case No. 3:23-cv-0768-BEN-WVG          34          Decl. of Brady in Opp. to PI Motion

carries a number of medically-recognized benefits for those who may experience gender incongruence.

149. Unconsented disclosure increases the possibility of a forced disclosure of a student's transgender or gender nonconforming identity to potentially unaccepting family members, which not only causes psychological distress to the student, but also increases the risk of trauma, physical abuse, homelessness and long term negative mental health outcomes.

150. Unconsented disclosure pressures transgender and gender nonconforming youth to remain or return to hiding their gender identity, resulting in additional psychological distress, manifesting in depression, anxiety, and feelings of hopelessness.

151. Finally, unconsented disclosure creates an environment that is actively hostile to transgender and gender nonconforming students, which research has shown to result not only in mental and social harm, but also academic harm.

152. All these harms have serious long-term consequences. A foundation of negative experiences in childhood, adolescence and young adulthood contributes to lower quality of life and increased mental health issues as an adult.

153. In my expert opinion, unconsented disclosure forced disclosure directly contradict the recommendations in WPATH's leading and current Standards of Care for transgender health.

154. Dr. Anderson's assertions that "parental consent" is required before a student should socially transition is expressly contradicted by WPATH's current Standards of Care.[79]

155. Dr. Anderson's heavy reliance on an older and outdated version of WPATH's Standards of Care, rather than the most current edition, is inappropriate and

---

[79] WPATH SOC8, p. S76.

Case No. 3:23-cv-0768-BEN-WVG          35          Decl. of Brady in Opp. to PI Motion

invalidates many of her conclusions, as they do not reflect the current research or professional standards of care governing the health of transgender youth.

156. Dr. Anderson's reliance on the Cass Review is also inappropriate and invalidates a number of her conclusions, as the expert consensus in the field of transgender care is that the Cass Review explicitly excluded trans healthcare experts from its process, and the Review obscures key findings, misrepresents its own data, and is rife with misapplications of the scientific method.

157. Social transition is not a medical intervention, as Dr. Anderson herself acknowledges. Because social transition is not a medical intervention, consultation with a medical or mental health professional is not required before youth may socially transition.

158. Because social transition is not a medical intervention, Dr. Anderson's citations to the 2017 recommendations from the Endocrine Society, SOC7, or portions of the SOC8 which provide recommendations related to *medical* interventions (such as medications or surgery) is inappropriate.

159. By suggesting that medical recommendations specific to *gender dysphoria* are appropriate for transgender youth categorically, Dr. Anderson's analysis improperly pathologizes transgender and gender nonconforming identity. Being transgender is not a mental illness, and being transgender is not the same as having gender dysphoria. When they are given the opportunity to freely express themselves without being singled out for discriminatory treatment, countless transgender and gender nonconforming youth live psychologically healthy lives, with mental health outcomes paralleling their cisgender peers.

160. Research demonstrates that social transition does not cause the persistence of transgender or gender nonconforming identity. Dr. Anderson relies solely on studies showing *correlation*, not *causation*, and it is clear why social transition correlates with transgender identity: youth who are transgender to begin with choose to socially transition so that they can express their core identity.

161. A youth's transgender identity is not influenced by "social pressure." Transgender students do not "choose" their gender identity, let alone "choose" gender identity based on social media or peer pressure. Rather, research indicates that there is a strong, innate, biological basis to gender identity.

162. Dr. Anderson misleadingly claims that no professional medical organizations recommend social transition without professional consultation; professional medical organizations do not make recommendations one way or another regarding social transition because these organizations recognize that it would be inappropriate to issue medical recommendations for a non-medical action like social transition.

163. Current and leading professional standards of care—which discuss transgender youth health more holistically—recommend that youth should have the ability to initiate social transition in their own timeframe and in the manner they choose without formal mental health involvement. Unconsented disclosure burdens and disrupts this natural process, harming transgender youth in numerous ways.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on October 18, 2024, in Santa Clara, California.

/s/ Christine Brady

CHRISTINE BRADY, Ph. D

Case No. 3:23-cv-0768-BEN-WVG          37          Decl. of Brady in Opp. to PI Motion

EXHIBIT 2

LEN GARFINKEL, State Bar No. 114815
General Counsel
PAUL GANT, State Bar No. 159844
Assistant General Counsel
VIRGINIA CALE, State Bar No. 258557
Deputy General Counsel
CHRISTOPHER MANDARANO, State Bar No. 263625
Deputy General Counsel
California Department of Education
1430 N Street, Room 5319
Sacramento, California 95814
Telephone: 916-319-0860
Facsimile:  916-322-2549
Email: cmandarano@cde.ca.gov
Attorneys for Defendants Tony Thurmond in his official capacity as State
Superintendent of Public Instruction and State Board of Education Members in
their official capacities

*(Defendants Tony Thurmond in his official capacity and State Board of Education
Members in their official capacity are Governmental Parties Exempt from the
Provisions of FRCP 7.1)*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA


| | |
|---|---|
| ELIZABETH MIRABELLI, an individual, and LORI ANN WEST, an individual, | Case No. 3:23-cv-0768-BEN-VET |
| Plaintiffs, | EXPERT REPORT OF CHRISTINE LAM BRADY |
| v. | |
| MARK OLSON, Superintendent of Child Poe's school district, et al., | |
| Defendants. | |

**Expert Report of Christine Lam Brady, PhD.**
**Mirabelli, et al. v. Olsen, et al.**
**United States District Court, Southern District**
**Judge: Roger T. Benetiz**
**May 1, 2025**

## TABLE OF CONTENTS

Table of Contents ................................................................................................ 1

I.    Summary of Background and Experience ...................................................... 3

II.   Publications: ................................................................................................. 4

III.  Statement of Opinions Including Bases and Reasons Therefore ................... 6

      A.   Exhibits Setting Forth Facts and Data Considered in Forming Opinions ...................... 6

      B.   Publications Summarizing and/or Supporting Opinions ................................................ 7

      C.   Summary of Opinions ................................................................................. 12

      D.   Complete Statement of Opinions ............................................................... 13

           1.   Gender Identity Is Not Assigned Sex .................................................. 13

           2.   Not All Transgender and Gender Nonconforming Individuals Have Gender
                Dysphoria ............................................................................................ 15

           3.   The Severe Harms of Premature Disclosure ....................................... 21

           4.   Forcing a Transgender or Gender Nonconforming Youth to Hide Can Also Cause
                Significant Harm .................................................................................. 23

           5.   An Unsupportive School Climate Causes Mental, Social and Academic Harm ....... 24

           6.   Dr. Erica E. Anderson's Declaration and the Opinions Within are Inconsistent with
                Current and Prevailing Standards of Care ........................................... 27

           7.   Under Prevailing Professional Standards, Students Should Have the Ability to
                Initiate Social Transition Without Formal Mental Health Involvement ......... 29

           8.   Under Prevailing Professional Standards, Students Can Appropriately Initiate Social
                Transition at School without Necessarily Doing So at Home ...................... 32

           9.   Unconsented Disclosure, Rather than Addressing "Coexisting Mental Health"
                Conditions, Could Worsen Them ......................................................... 33

040

10.     Research Does Not Support Dr. Anderson's Claims that Social Transition "Causes" Individuals to Persist in their Transgender Identity ......................................... 35

11.     Dr. Anderson Has Misinterpreted the Data Regarding "Persistence" of Gender Nonconformity from Childhood into Adolescence| ......................................................... 36

12.     The Latest Research Indicates that Social Transition Does Not Make "Persistence" More Likely ..................................................................................................... 37

13.     Dr. Anderson Has Misinterpreted the Data Discussing Cultural and Societal Factors in Relation to Transgender Identity or Gender Nonconformity ........................... 39

14.     Dr. Anderson's Suggestion that Parents Should Always Be Consulted So that They Can Sometimes "Say 'No'" to a Youth's Gender Identity is Harmful to Youth| .............. 41

    E.     CONCLUSIONS............................................................................................... 42

IV.     All Cases in Which I Have Testified in the Previous Four Years ..................................... 46

V.     Curriculum Vitae................................................................................................................ 46

VI.     Statement of Compensation to Be Paid .......................................................................... 46

041

I.    **SUMMARY OF BACKGROUND AND EXPERIENCE**

a.    I received my Bachelor of Science and Master of Arts in Psychology from James Madison University, Harrisonburg, VA, and my Ph.D. in Clinical Psychology from Ohio University, Athens, OH in 2014. I completed a year-long Pre-Doctoral Internship at the University of Washington/Seattle Children's Hospital as well as a year-long Post-Doctoral Fellowship at the University of Louisville/Norton Children's Hospital.

b.    In 2015, I co-founded and was Co-Director of the Gender Clinic at Hennepin Healthcare in Minneapolis, MN. After a year in Minnesota, I became Co-Director of the Pediatric Gender Clinic at the University of Louisville and was there for three years before coming to Stanford, where I have been working for almost five years.

c.    In the ten years I have been working with individuals with gender dysphoria, I have treated over 1,000 youth and families.

d.    Currently, 100 percent of my clinical patients are transgender and gender nonconforming youth.

e.    In my career, I have provided therapy to patients presenting issues including ADHD, depression, anxiety, trauma, and coping with medical illnesses such as cancer. Thus, I have extensive experience and strong therapeutic skills in working with patients with gender dysphoria as well as other common diagnoses in adolescents and young adults.

f.    Since 2017, I have been a member of the World Professional Association for Transgender Health ("WPATH"), a non-profit, interdisciplinary professional and

educational organization promoting evidence-based care, education, research, public policy and respect in transgender and gender nonconforming health.

g.  I am a licensed psychologist in the State of California.

h.  I am a full-time psychologist at the Pediatric and Adolescent Gender Clinic at Stanford Medicine Children's Health. I am also a Clinical Assistant Professor in the Department of Pediatric Endocrinology and Diabetes, and the Department of Psychiatry and Behavioral Sciences (by courtesy) at Stanford University School of Medicine.

i.  At Stanford, I provide direct therapeutic services to an average of 350 children and families per year. I also clinically supervise and train psychology graduate students and psychiatry fellows. I give lectures on gender-affirming care to psychology students, residents, and fellows and psychiatry fellows. I have conducted scholarly research on evidence-based practices and supports for transgender and gender nonconforming youth.

II.  **PUBLICATIONS:**

a.  Carter, B., Kronenberger, W., Cruce, S., Mizell, D., Threlkeld, B., Brady, C. E.*, & Jones, L. (2015).  Factors associated with dropout versus completion of a manualized treatment for pediatric chronic pain.  Clinical Practice in Pediatric Psychology, 3, 327-339.

b.  Zoromski, A. K., Owens, J. S., Evans, S. W., Brady, C. E*. (2015). Identifying ADHD symptoms that best predict disorder-related impairment in early, middle, and late childhood. Journal of Abnormal Child Psychology, 43, 1243-1255.

c.  Evans, S.W., Brady, C.E.*, Harrison, J.R., Bunford, N., State, T., Kern, L., & Andrews, C. (2013). Measuring ADHD Symptoms and Impairment Based on

High School Teachers' Ratings. Journal of Clinical Child and Adolescent Psychology, 42, 197-207.

d.    Evans, S.W., Koch, R., Brady, C.E.*, Meszaros, P., & Sadler, J.M. (2013). Community and school mental health professionals' knowledge and use of evidence based substance use prevention programs.  Administration and Policy in Mental Health and Mental Health Service Research, 40, 319-330.

e.    Brady, C.E., Evans, S.W., Berlin, K.S., Bunford, N., & Kern, L. (2012). Evaluating School Impairment with Adolescents: A Psychometric Evaluation of the Classroom Performance Survey. School Psychology Review. 41, 429-446.

f.    Evans, S. W., Schultz, B., White, C. L., Brady, C. E.*, Sibley, M. H., & Van Eck, K. (2009). A school-based organization intervention for young adolescents with ADHD: Patterns of responding. School Mental Health, 1, 78-88.

g.    Turban, J., Brady, C. E., & Olson-Kennedy, J. (2022). Understanding and supporting patients with dynamic desires for gender-affirming medical interventions.  Journal of the American Medical Association Network Open. doi:10.1001/jamanetworkopen.2022.24722.

h.    Carter, B., Tsang, K., & Brady, C. E. (2020).  Models of Consultation-Liaison. In B. Carter and K. Kullgren (Eds.), Clinician Handbook of Pediatric Psychological Consultation in Medical Settings, 11-24.

i.    Brady, C. E. & Ernst, M. M. (2020).  Gender identity: Disorders/differences of sex development/intersex and transgender concerns.  In B. Carter and K. Kullgren (Eds.), Clinician Handbook of Pediatric Psychological Consultation in Medical Settings, 439-450.

j.     Carter, B., Kronenberger, W., Scott, E., Kullgren, K., Piazza-Waggoner, C., & Brady, C. E. (2017).  Inpatient pediatric consultation-liaison.  In M. Roberts and R. Steele (Eds.), Handbook of pediatric psychology (5th Ed.), 105-118.

k.     Evans, S.W., Sadler, J.M., & Brady, C.E.  (2009). Treating Children and Adolescents with ADHD in the Schools.  In A. Roberts (Ed.), Social Workers Desk Reference 2nd Edition. New York, NY: Oxford University Press.

l.     Carter, B., Kronenberger, W., Scott, E., & Brady, C. E. (2020). Children's Health and Illness Recovery Program: Clinician's Handbook.  Oxford, England: Oxford University Press, Programs that Work Series.

## III.   STATEMENT OF OPINIONS INCLUDING BASES AND REASONS THEREFORE

### A.   Exhibits Setting Forth Facts and Data Considered in Forming Opinions

1. Dkt. 153-6 Declaration of Dr. Erica E. Anderson, PhD, in Support of Plaintiffs' Motion for a Preliminary Injunction

2. Dkt. 153 Notice of Motion and Plaintiffs' Motion for a Class-Wide Preliminary Injunction

3. Dkt. 153.1 Memorandum of Points & Authorities in Support of Plaintiffs' Motion for a Class-Wide Preliminary Injunction

4. Dkt. 153.3 Appendix of Evidence, Volume I, in Support of Plaintiffs' Motion for a Class-Wide Preliminary Injunction

5. Dkt. 153.4 Appendix of Evidence, Volume II, in Support of Plaintiffs' Motion for a Class-Wide Preliminary Injunction

6. Dkt. 153.5 Appendix of Evidence, Volume III, in Support of Plaintiffs' Motion for a Class-Wide Preliminary Injunction

7.    Dkt. 153.6 Appendix of Previously Submitted Declarations in Support of Plaintiffs'

Motion for a Class-Wide Preliminary Injunction

8.    [Proposed] ORDER GRANTING PLAINTIFFS' MOTION FOR A CLASS-WIDE

PRELIMINARY INJUNCTION

9.    RJN, Ex. 1 Assembly Bill 1955

10.    Files pertaining to Poe: POE 000372-POE 000420, POE 000368-POE 000371,

DRQ 001-076, Poe 0018-0213, Poe 0471-0487, Poe 0488-0509, and the

Depositions of Jane and John Poe.

11.    Files pertaining to Doe: DOE 000001 – DOE 000150, and Depositions of Jane and

John Doe.

**B.    Publications Summarizing and/or Supporting Opinions**

1.    Turban et al., Association Between Recalled Exposure To Gender Identity

Conversion Efforts And Psychological Distress And Suicide Attempts Among

Transgender Adults, JAMA Psychiatry (2020) p. 68.

2.    Am. Psychiatric Assn., What is Gender Dysphoria (2023)

https://tinyurl.com/2emj8vb8.

3.    Am. Psychological Assn., APA Resolution on Gender Identity Change Efforts

(Feb. 2021) https://tinyurl.com/y37xx78s;

4.    Am. Medical Academy, Sexual Orientation And Gender Identity Change Efforts

(So-Called "Conversion Therapy") (2022) https://tinyurl.com/yuw7rv2k.

5.    Am. Academy of Child and Adolescent Psychiatry, Conversion Therapy Policy

Statement (Feb. 2018) https://tinyurl.com/yc3x2knh.

046

6.    The World Prof. Assn. for Transgender Health, Standards of Care for the *Health of Transsexual, Transgender, and Gender Nonconforming People* (Version 8, 2022) p. S6 <https://tinyurl.com/zcvth6rc (hereinafter "WPATH SOC8").

7.    Pariseau et al., The Relationship Between Family Acceptance-Rejection And Transgender Youth Psychosocial Functioning, Clinical Practice in Pediatric Psychology (2019) p. 267.

8.    Durwood et al., Mental Health and Self-Worth in Socially Transitioned Transgender Youth, J. of the Am. Academy of Child & Adolescent Psychiatry (Feb. 2017) p. 116 https://tinyurl.com/hd7scrv7.

9.    Russell et al., Chosen Name Use Is Linked To Reduced Depressive Symptoms, Suicidal Ideation, And Suicidal Behavior Among Transgender Youth, J. of Adolescent Health (Oct. 2018) p. 503.

10.    The Trevor Project Research Brief: LGBTQ & Gender-Affirming Spaces,

11.    The Trevor Project (Dec. 2020) https://tinyurl.com/2c2p7zkf.

12.    Pew Research Center, A Survey of LGBT Americans (June 13, 2013) https://tinyurl.com/yc43ytuu.

13.    The Human Rights Campaign Foundation, LGBTQ Teen Survey (2017) p. 6 https://tinyurl.com/38pz59uc.

14.    James et al., The Report of the 2015 U.S. Transgender Survey, Nat. Center For Transgender Equality (Dec. 2016) p. 5 https://tinyurl.com/yn3hpcey.

15.    The Trevor Project, 2022 National Survey of LGBTQ on Youth Mental Health (2022) p. 20 https://tinyurl.com/4y6psfjs.

16.    Choi et al., Serving Our Youth 2015: The Needs and Experiences of Lesbian, Gay,

Bisexual, Transgender, and Questioning Youth Experiencing Homelessness,

Williams Institute (June 2015) p. 5 https://tinyurl.com/mrfjastv

17.    Ryan et al., Family Rejection as a Predictor of Negative Health Outcomes in

White and Latino Lesbian, Gay, and Bisexual Young Adults, Pediatrics (Jan.

2009) p. 346 https://tinyurl.com/2a7n4sch.

18.    Russell et al., Being Out at School: The Implications for School Victimization and

Young Adult Adjustment, Am. J. of Orthopsychiatry (Nov. 2014) p. 635.

19.    Pachankis et al., Sexual Orientation Concealment and Mental Health: A

Conceptual and Meta-analytic Review, Psychological Bulletin (Oct. 2020) p. 831.

20.    Hanson et al., Understanding the Experiences of LGBTQ Students in California,

The California Endowment (Oct. 2019), pp. 9, 52 https://tinyurl.com/v452ty7s.

21.    De Pedro et al., Exploring Physical, Nonphysical, and Discrimination-Based

Victimization among Transgender Youth in California Public Schools,

International Journal of Bullying Prevention (2019) p. 222.

22.    James et al., supra at 132; Herman et al., Suicide Thoughts and Attempts Among

Transgender Adults, Williams Institute (Sept. 2013) p. 2

https://tinyurl.com/msyy4wbw.

23.    Austin et al., Suicidality Among Transgender Youth: Elucidating the Role of

Interpersonal Risk Factors, 37 J. of Interpersonal Violence (Mar. 2022) p. 5

https://tinyurl.com/ydx5cvzb.

24.    Centers for Disease Control, Youth Risk Behavior Survey: Data Summary &

Trends Report 2011-2021 (2023) p. 72 https://tinyurl.com/4cd8ka96.

25.    Kosciw, et. al, The Effect of Negative School Climate on Academic Outcomes for LGBT Youth and the Role of In-School Supports, Journal of School Violence (2013) p. 45.

26.    The World Prof. Assn. for Transgender Health, Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (Version 7, 2012) https://tinyurl.com/ynnhubb4.

27.    Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline* (2017) J. of Clinical Endocrinology & Metabolism 3869.

28.    WPATH & USPATH, WPATH and USPATH Comment on the Cass Review (May 17, 2024), https://tinyurl.com/k9tz4nwh.

29.    Horton, The Cass Review: Cis-Supremacy in the UK's Approach to Healthcare for Trans Children (2024) Int. J. of Transgender Health; McNamara et al., An Evidence-Based Critique of "The Cass Review" on Gender-affirming Care for Adolescent Gender Dysphoria (2024) https://tinyurl.com/56pc423d.

30.    Noone et al., Critically Appraising the Cass Report: Methodological Flaws and Unsupported Claims (2024) OSF Preprints.

31.    McNamara et al., An Evidence-Based Critique of "The Cass Review" on Gender-affirming Care for Adolescent Gender Dysphoria (2024), https://tinyurl.com/56pc423d.

32.    Durwood et al., Mental Health and Self-Worth in Socially Transitioned Transgender Youth (2017) 56 J. Am. Acad. Of Child & Adolescent Psychiatry 116.

049

33.　Turban et al., Timing of Social Transition for Transgender and Gender Diverse Youth, K-12 Harassment, and Adult Mental Health Outcomes (2021) 69 J. of Adolescent Health 991, 991-998.

34.　Ryan et al., Family Rejection as a Predictor of Negative Health Outcomes in White and

35.　Latino Lesbian, Gay, and Bisexual Young Adults, Pediatrics (Jan. 2009) p. 346 https://tinyurl.com/mr38htdh/.

36.　Steensma et al., Desisting and Persisting Gender Dysphoria after Childhood A Qualitative Follow-Up Study (2011) 16 Clinical Child Psychology and Psychiatry 499.

37.　Drummond et al., A Follow-Up Study of Girls with Gender Identity Disorder (2008) 44 Developmental Psychology 34, 34-45.

38.　Olson, Prepubescent Transgender Children: What We Do and Do Not Know (2016). 3 J. of the Am. Acad. of Child & Adolescent Psychiatry 155, 155-156.

39.　Olson et al., Gender Identity 5 Years After Social Transition (2022) 150 Pediatrics 1.

40.　Rae et al., Predicting Early-Childhood Gender Transitions (2019) 30 Psychological Science 669, 669-681.

41.　Coolidge et al., The Heritability of Gender Identity Disorder in a Child and Adolescent Twin Sample (2002) 32 Behavior Genetics 251, 251-257.

42.　Hendricks et al., A Conceptual Framework for Clinical Work with Transgender and Gender Nonconforming Clients: An Adaptation of the Minority Stress Model (2012) 43 Professional Psychology: Research and Practice 460.

C.    **Summary of Opinions**

1.    Gender identity is not the same as sex assigned at birth based on externally observed genitalia. Unconsented disclosure creates social pressure for transgender and gender nonconforming youth to maintain their sex assigned at birth in the school environment.

2.    Transgender and gender nonconforming identity is not pathological or a medical or mental illness. Not all transgender and gender nonconforming individuals have gender dysphoria. Unconsented disclosure may cause an increase in symptoms of mental distress in transgender and gender nonconforming youth by intensifying social pressure to maintain a transgender or gender nonconforming individual's assigned sex at birth. It could lead to development of gender dysphoria for those youths who do not have such a diagnosis.

3.    Social transition is the individualized process in which a person changes their behavior and appearance, such as clothing, name, pronouns and hair style, to align with their gender identity. By itself, social transition is highly beneficial. Social transition also has medically- and psychologically recognized benefits. When I or other professionals describe social transition as a "treatment" or as having "medically recognized benefits," we refer only to the proven benefits experienced by transgender individuals who can express their genuine selves. The consultation of a licensed medical, psychiatric, or psychological professional is not required for an individual to socially transition or to ask others, for example, to respect their pronouns.

4.    School staff informing a parent or guardian without youth consent and before understanding the readiness of that youth/family is reckless. This can cause

Page | 12

051

significant psychological, emotional, and sometimes even physical harm to the youth.

5.     Unconsented disclosure incentivizes youths to hide their identity, colloquially referred to as "being in the closet," which causes psychological and emotional harm with long-term consequences into adulthood; and this contributes to a harmful school climate, which negatively impacts LGBTQ+ youths mentally, socially and academically.

6.     Research does not support Dr. Anderson's claims that social transition "causes" individuals to persist in their transgender identity. Dr. Anderson misinterprets data which show correlation—not causation—and the latest research indicates that social transition does not make "persistence" more likely.

7.     Current and leading professional standards of care—which discuss transgender youth health more holistically—recommend that youth should have the ability to initiate social transition in their own timeframe and in the manner they choose without formal mental health involvement. Unconsented disclosure provisions burden and disrupt this natural process, harming transgender youth in numerous ways.

**D.     Complete Statement of Opinions**

**1.     Gender Identity Is Not Assigned Sex**

a.     A person's sex is typically assigned at birth by a physician based on externally observed genitalia. A person's assigned sex, or designated sex, may or may not align with their gender identity. Transgender and gender nonconforming individuals have a gender that does not align with their assigned sex. Cisgender individuals have a gender that does align with their assigned sex.

Page | 13

b.     Gender identity is a person's core, innate, sense of self gender, such as male, female or non-binary. Every person, transgender, gender nonconforming, or cisgender, has a gender identity.

c.     Gender identity is not a choice. It is an essential part of one's identity and being. Moreover, gender identity is not something that can be voluntarily changed with great effort, like using a dominant hand to write with.

d.     Efforts to try to change a person's gender identity through therapy have been shown to be ineffective and harmful. For example, in a survey of transgender adults, those who reported receiving talk therapy aimed at changing their gender identity to match their sex assigned at birth (sometimes referred to as conversion therapy) indicated a lack of effectiveness of that treatment, higher psychological distress, and increased risk of suicide attempts.  The survey found that conversion efforts in children under the age of 10 correlated with a four-fold increase in attempted suicides.

e.     Psychological attempts to force a transgender or gender nonconforming person to be cisgender are considered unethical by the American Psychiatric Association.   Major U.S. professional medical organizations have published statements warning against the dangers of conversion therapy and recommend that it should not be used with transgender or gender nonconforming individuals (e.g., American Psychological Association, American Medical Association, and American Academy of Child and Adolescent Psychiatry).

f.     Unconsented disclosure and immediately informing caregivers of observed changes (negative consequences) privileges a student's birth name, which, based

on my academic and clinical experience, is most often based on an individual's assigned sex at birth. For transgender and gender nonconforming students, this birth name likely does not align with an individual's gender identity.

g.    As such, based on my academic and clinical experience, this creates social pressure at school and at home for all students to maintain the gender identity that aligns with their sex assigned at birth, even if it does not reflect their authentic gender identity. Transgender and gender nonconforming students who conceal their gender identity are colloquially known as being "in the closet."

h.    As discussed below, unconsented disclosure that pressures transgender or gender nonconforming students to remain in the closet will increase these student's psychological distress and increase the likelihood of a mental health diagnosis.

i.    Social pressures created by a lack of confidentiality may result in numerous psychological, emotional, physical, and social harms, which are particularly devastating for children, adolescents and young adults because of their ongoing brain development.

**2.    Not All Transgender and Gender Nonconforming Individuals Have Gender Dysphoria**

a.    Transgender and gender nonconforming identity is not a mental illness. Gender dysphoria refers to clinically significant levels of psychological distress caused by an incongruence between one's assigned sex at birth and one's gender identity.  Some gender diverse individuals will experience this high level of distress while others may not.

Page | 15

054

b.  Some transgender and gender nonconforming individuals may experience gender dysphoria at some point in their lives. However, some transgender and gender nonconforming individuals may feel at ease with their bodies and may not experience gender dysphoria.  The experience of every transgender or gender nonconforming individual is different.

c.  A transgender or gender nonconforming individual is more likely to have certain symptoms of gender dysphoria such as significant distress or impairment in social functioning if they live in an unsupportive or unaccepting household and experience a hostile school environment.

d.  Unaccepting, unsupportive, or hostile school or family environments can exacerbate mental health symptoms such as depression and anxiety.

e.  Unconsented disclosure could also lead to development of gender dysphoria because it creates social pressure for the student to maintain their assigned sex at birth and deters social transition which can alleviate such symptoms.

f.  What Social Transition Entails

g.  Transgender and gender nonconforming individuals may choose social transitioning to align their gender expression with their gender identity. Social transition describes an individualized process in which a person changes various aspects of their gender expression (e.g., clothing, name, pronouns, hair style) to align with their gender identity. In other words, social transitioning allows others to see the transgender and gender nonconforming individual as they feel on the inside and live as their authentic selves.

h.  Social transition is non-medical. As Defendants' expert, Dr. Erica Anderson, agrees, "'[s]ocial transition' is primarily used to refer to name-and-pronoun changes" and "'[s]ocial transition' is used as a contrast to medical transition" because social transition does not involve "various medical interventions . . . such as puberty blockers, cross-sex hormone therapy, and various surgical interventions." (Anderson Decl., ¶ 9.)

i.  Social Transition Can Be Important for the Health of Transgender and Gender Nonconforming Student

j.  A positive social transition experience allows the transgender or gender nonconforming youth to feel safe, included and protected, improving mental health and reducing depression and anxiety.

k.  I have seen my patients who are youths become more confident, and outgoing after social transition because they are being treated as their affirmed gender. I have seen them sit up straighter and make friends.

l.  For several patients, their mental distress was preventing them from participating in extracurricular activities like dance, martial arts, badminton and soccer. After social transitioning, these patients blossomed and thrived and joined or rejoined their sports and dance teams.

m.  Research shows that transgender and gender nonconforming children who socially transition have mental health outcomes that mirror their cisgender peers.

n.  A recent study examined the impact of name and pronoun use on depression, suicidal ideation and suicide attempts among transgender and gender

Page | 17

nonconforming youth.  Results showed that adding one context (e.g., school, work, friends) where affirmed gender was used consistently decreased suicidal behavior by 56%.

o.  Gender-affirming school environments, specifically, had the strongest association with reduced odds of reporting a suicide attempt within the past year of all the spaces studied.

p.  Because gender identities and how people choose to express themselves are diverse, social transition can manifest differently for different people. Moreover, the process of social transition can occur in stages wherein individuals may transition in one area of life but not others (e.g., only at home, only at school, only with friends, or any combination of these contexts).

q.  A survey of LGBT adults showed that most started questioning their identity around age 12 but did not come out to family until the average age of 20.  Thus, the typically trajectory for this community is for there to be a delay between understanding one's identity and sharing with family members.

r.  In my experience as a clinician, there are two types of presentations.  Those who identify as transgender before puberty (or prepubertal) almost always share with parents first and in fact parents often see signs and suspect diversity prior to their child's disclosure.  The other category is those who identify around the time of puberty or later (adolescents).  Adolescents tend to share with peers first as would be developmentally expected with this age group.

s.  Adolescence is a time of great change physically, neurologically and socially. It is a time when individuals are learning to become autonomous and independent

Page | 18

from their caregivers. As a result of this development, adolescents often gravitate towards same aged peers for the support that they had previously received from adults in their lives. This often results in adolescents confiding in their friends because they have more relatable experience.

t.   Nonetheless, youths do want to share important life developments with adults. However, because parents and other primary caregivers are the most important adults in a youth's life, there is often heightened anxiety due to the desire for acceptance. In a 2017 Human Rights Campaign survey of LGBTQ+ youth in California, 36% reported coming out to parents as "extremely stressful" and only 21% were out to all caregivers. Clinically, even in the most supportive families, youth report feeling very scared and nervous to tell their parents.

u.   The 2015 U.S. Transgender Survey found that only 53% of transgender people disclosed their gender identity to all of their immediate family members, whereas 22% of transgender people have not revealed their gender identity to a single member of their immediate family. Again highlighting a majority of gender diverse people will come out to their families.

v.   Coming out to a teacher is a lower risk action and is a practice run of the very important conversations youths may be planning with their parents.

w.   I have treated many patients for whom school is a more accepting environment than their home.

x.   I have patients who feel that their school is their safe haven because the school conscientiously uses the patient's authentic name and pronouns. In contrast, the patients' parents are often misgendering them. School is a place where the hurt

Page | 19

and anxiety they experience at home cannot touch them. My patients' experiences reflect national data.

y.    The Trevor Project's 2022 LGBTQ+ survey indicated that 55 percent of LGBTQ+ youth identified their school as affirming, compared with only 37 percent of LGBTQ+ youth who felt that their home was affirming.

z.    Under these circumstances, the youth's experience at school gives them the hope that they can one day live a life where they can be their authentic selves. This allows them to focus on their academic work.

aa.    Unconsented disclosure discourages this healthy, incremental way of social transitioning and its benefits. Instead, it incentivizes students to either go back into the closet, or discloses a student's gender identity before the student and the family is ready. This disregards the potential harm that disclosure may put students in if families are unsupportive.

**3.    The Severe Harms of Premature Disclosure**

a.    There are serious risks associated with disclosing someone's transgender or gender nonconforming identity without consent.

b.    It is a potentially traumatic experience for a transgender or gender nonconforming youth to be outed to unsupportive parents. Even for youth who do have supportive parents, "outing" them without their consent undermines the agency and autonomy that adolescents are so desperately seeking to build at this point in their development.

c.    Disclosing a youth's identity without understanding how caregivers will respond to their identity places them at risk for devastating consequences.

d.    Children and youths are dependent on their caregivers for shelter, food, and basic necessities, and therefore do not have the ability to remove themselves from psychologically and physically abuse environments.

e.    In the 2015 U.S. Transgender Survey, 10 percent of respondents said that an immediate family member had been violent toward them because they are transgender, and 15 percent ran away from home or were kicked out of their home because they were transgender.

f.    The Williams Institute LGBTQ+ Homeless Youth Provider Survey found that a disproportionate amount of homeless youth belonged to the LGBTQ+ community and 67% of homeless youth cited the reason for running away or being forced out was because of their sexual orientation or gender identity.

g.    As a psychologist, my practice is to keep my youth patients' gender identity confidential until they are ready to disclose and I have ensured that they are well supported if they are met with rejection. I often work closely with youth to

Page | 21

060

anticipate how caregivers will respond and at times facilitate that conversation along with the youth to ensure the youth's safety. Educators and school staff are welcome to perform this function as well and the current safeguards of confidentiality do not prohibit this.

h.    I have worked with youth who have been accidentally outed by family members, teachers, health care professionals or other adults in their lives. In most cases, youth express hurt, upset, distrust, and general regret that they were not able to come out on their own terms.

i.    Youth who are outed prematurely will not have had time to adequately prepare what they want to say to their parents and family members. This contributes to miscommunication and misunderstandings within families that is difficult to reverse, with far reaching consequences. For example, lesbian, gay and bisexual young adults who experience parental rejection are more than eight times more likely to attempt suicide and six times more likely to report major depressive symptoms.

j.    WPATH has likewise found that transgender youth rejected by parents or subjected to nonaffirming environments have "increased anxiety, depression, suicidal ideation, suicide attempts, and health care avoidance."

k.    The current case claims to prioritize parental rights, in my clinical experience, it is taking away a potentially healing experience for supportive parents and their children: the experience of a child sharing one of the most important parts of their identity with their parents.

Page | 22

4. **Forcing a Transgender or Gender Nonconforming Youth to Hide Can Also Cause Significant Harm**

a. Knowing that educators may disclose information to caregivers without consent, students will feel pressure to hide their gender identity, which is psychologically harmful. A transgender or gender nonconforming youth who is fearful of disclosure to parents may be forced to go "into the closet," and internalize the identity that the school and parents want them to be. It will not make them cisgender.

b. A study of adults living in California showed that coming out in high school was associated with positive psychosocial adjustment in young adulthood, even after accounting for school victimization.

c. Based on my clinical experience, unconsented disclosure is also likely to create feelings of distrust for transgender and gender nonconforming youth who have made social transition steps. I have treated youths whose parents have not agreed to the youth's social transition, essentially forcing the youth to stay in the closet. My patients struggled with anger, rejection and psychological pain under these circumstances.

d. Some of these patients present with depression and anxiety to the extent that impairment begins to show in academic settings. If there is significant stress, academic work is not a high priority.

e. These patients have told me, "what's the point? If I'm so depressed that I can't see a future, then there's no point in doing academic work because why worry about going to college when I don't know if I'm going to make it to tomorrow?"

f. I have patients who have also experienced significant trauma and hopelessness due partly to social and familial rejection and the inability to live as their authentic selves.

g. A meta-analysis of 193 studies on the psychological impacts of concealing an individual's gender identity and sexual orientation concluded that youth may be more harmed from being forced to be "closeted" than adults.

h. The mental health burden is greater and more harmful to youth than adults because youth might have fewer coping mechanisms. Youth cannot control their own environments and cannot seek mental health help without parental support. This burden may drive chronic and anxious expectations of rejection and shame, which have their greatest mental health impact during the developmentally sensitive periods of adolescence.

i. Unconsented disclosure increases the risk of negative mental health impacts on transgender and gender nonconforming youth by encouraging youth to stay in the closet at school and at home, with lasting negative academic, mental and social consequences as the youth ages into adulthood.

5. **An Unsupportive School Climate Causes Mental, Social and Academic Harm**

a. When schools are not supportive environments for transgender and gender nonconforming youth, very serious harms can result.

b. Based on my scientific research and clinical experience, I believe that unconsented disclosure creates an unsupportive and unsafe environment for transgender and gender nonconforming students. This intensifies the existing social rejection and discrimination experienced generally by transgender and

Page | 24

gender nonconforming students across the state. These unsupportive environments result in mental, social, and academic harm to transgender and gender nonconforming students.

c.  Data from California shows experiences of physical and psychological harm generally experienced by transgender and gender nonconforming students. One report examined 2017-2019 data concerning students across 2,749 California schools—in grades seven, nine, and 11—and it found that transgender students in California reported negative mental health outcomes and school experiences "at higher rates" than any other "sexual orientation subgroup[]."

d.  California public school data from 2015-2016 show that more than 40 percent of transgender students reported being bullied because of their gender identity, while only 7.3 percent of non-transgender students reported gender-based bullying or bullying on the basis of perceived gender identity.

e.  California data from 2015-2016 show that more than half (55.6 percent) of transgender students in California reported physical victimization (such as being threatened with a weapon, threatened with harm, shoved, or in a physical fight), and more than two-thirds (69.2 percent) reported nonphysical victimization, for example, being called a demeaning name or being the recipient of demeaning sexual jokes or gestures.

f.  Transgender students also are at risk of suicide and other mental health harms due to the discrimination they receive because of their gender identity.  86 percent of transgender youth reported suicidal thoughts, and 56 percent of transgender youth reported a previous suicide attempt.

064

g.  In my clinical experience, I have also worked with many youths who avoid school and social situations because being mis-gendered is too painful. Based on my clinical experience, it is the social rejection and discrimination experienced by transgender and gender nonconforming students that harms them, and not any inherent aspect of their gender identity.

h.  Because unconsented disclosure encourages a transgender or gender nonconforming youth to hide themselves because they are not yet ready to come out to their parents, unconsented disclosure innately communicates to the students, that the school district does not accept them, and that their school is not a safe environment for them.

i.  This makes transgender and gender nonconforming youths more vulnerable to the negative psychological effects of bullying.

j.  My patients have told me that social transition gives them confidence to withstand bullying. Without social transitioning, my patients struggle with self-doubt: "what if the bullies are right?" they may ask.

k.  Social transition fosters resilience, or the ability to bounce back from negative impacts. After my patients who are youths have socially transitioned and are able to express their authentic selves, they are more able to challenge negative social perceptions of themselves. "I know who I am, and the bullies are wrong about me," they might say.

l.  The U.S. Centers for Disease Control explained in a 2023 report that: "[s]chool connectedness, which is the feeling among adolescents that people at their school care about them, their well-being, and success, has long-lasting

protective effects for adolescents. Youth who feel connected at school are less likely to experience risks related to substance use, mental health, violence, and sexual behavior."

m.  A survey of 5,830 LGBT youth published in the Journal of School Violence concluded in 2012 that a negative school climate contributed to lower academic outcomes and lower self-esteem for LGBT students.  Conversely, academic outcomes improved where schools implemented supports including gay-straight alliances or clubs, supportive educators, inclusive curriculums, and a comprehensive anti-bullying/harassment policy.

6. **Dr. Erica E. Anderson's Declaration and the Opinions Within are Inconsistent with Current and Prevailing Standards of Care**

a.  Dr. Anderson's declaration submitted in support of Defendants' Motion for Summary Judgment, or, in the Alternative, for Summary Adjudication—and the opinions contained within —are inconsistent with the current and prevailing standards of professional care concerning transgender youth.

b.  In her declaration, Dr. Anderson acknowledges that the World Professional Association of Transgender Health's (WPATH) Standards of Care are "one of the more widely known and cited set of guidelines for transgender care." (Anderson Decl., ¶ 11.) As the WPATH's current Standards of Care state, "One of the main functions of WPATH is to promote the highest standards of health care for individuals through the Standards of Care (SOC) for the health of [transgender and gender diverse] people."

c.  Though most of the WPATH's Standards of Care provide recommendations governing medical interventions—such as surgical operations—the Standards of

Page | 27

066

Care also discuss transgender health more holistically and include some discussion of non-medical approaches to gender identity such as social transition. It is important not to improperly conflate the Standards of Care's discussion of medical interventions with their discussion of non-medical issues like social transition.

d.    As Dr. Anderson notes, WPATH has published its Eighth Edition Standards of Care (SOC8), providing its current recommendations. (Anderson Decl., ¶ 11.) Dr. Anderson claims that WPATH's Eighth Edition Standards of Care are "not universally agreed upon." (Anderson Decl., ¶ 11.) While there may always be individuals who do not adhere to current professional standards, the Standards of Care contain the professional community's general consensus on the latest state of research and experience in the field. The Eighth Edition of the Standards of Care "is based on the best available science and expert professional consensus."

e.    Despite her awareness that the WPATH's SOC8 reflects the current Standards of Care, Dr. Anderson "rel[ies] more heavily in [her] report" on "SOC7," or the Seventh Edition of the WPATH Standards of Care. (Anderson Decl., ¶ 11.) SOC7 was published over a decade ago in 2012 and neglects the past twelve years of scientific inquiry that has taken place.

f.    Given how much knowledge and research in this field have grown in recent years, in my professional experience and opinion, it is inappropriate to rely on the SOC7's outdated recommendations, which no longer reflect the current research consensus and standards in the field.

Page | 28

067

g.   Indeed, Dr. Anderson notes that "[i]n late 2021 . . . I resigned from my offices within USPATH and WPATH because I disagreed in important respects with some of the directions the organization was going." (Anderson Decl., ¶ 11.) This suggests that Dr. Anderson's views may not reflect the current professional consensus regarding transgender care.

h.   While professional organizations other than WPATH have published guidelines related to transgender care, such as the Endocrine Society, those other guidelines focus exclusively on medical interventions—for example, the levels at which to dose medications or hormone treatments.  Such guidelines are inappropriate to rely upon when discussing non-medical approaches such as social transition, as I describe below.

7.   **Under Prevailing Professional Standards, Students Should Have the Ability to Initiate Social Transition Without Formal Mental Health Involvement**

a.   Dr. Anderson's assertion that "[n]o medical or mental health organization" has endorsed permitting social transition without formal mental health involvement (Anderson Decl., ¶ 57) is incorrect and contradicted by the very materials Dr. Anderson cites.

b.   To begin, Dr. Anderson presents a non-sequitur—professional "medical associations" would not make specific endorsements about social transition, in school or elsewhere, because such social transition is non-medical, and it would be generally inappropriate for medical associations to issue medical guidelines governing non-medical behaviors.

c.   Further, WPATH's Standards of Care, which discuss transgender health more holistically, contradict Dr. Anderson's claim. Dr. Anderson herself quotes the

Page | 29

068

WPATH's SOC8's statement that "social transition should originate from the child and reflect the child's wishes in the process of making the decision to initiate a social transition process," and any "efforts at blocking reversible social expression or transition [like] choosing not to use the youth's identified name and pronouns" are "disaffirming behaviors" that are always inappropriate and equivalent to conversion therapy. (Anderson Decl., ¶ 59.) This language expressly states that a youth's wishes to "initiate a social transition process" should be respected, and that any "disaffirming behaviors" otherwise could prove harmful to the youth.

d.    Instead, Dr. Anderson misleadingly cites a different section of the outdated WPATH SOC7 referring to gender-affirming medical interventions (e.g., pubertal suppression or gender-affirming hormones) to support her arguments that adults should never "facilitate a social transition upon a child or adolescent's request without a careful evaluation by an appropriately trained mental health professional." (Anderson Decl., ¶ 57.)  Thus, the WPATH Standards of Care she quotes have no bearing on non-medical social transitions. (See also Anderson Decl., ¶ 45 ["SOC8's focus is on medical interventions"].)

e.    Rather, when it comes to social transitions, WPATH SOC8 expressly states that it is the individual's decision to socially transition and that such decisions should be respected, rather than restricted.

f.    Dr. Anderson also relies upon the Cass Review published in April 2024. (Anderson Decl., ¶¶ 34) But the WPATH and USPATH have observed that the Cass Review "do[es] not contain any new research that would contradict the

Page | 30

069

recommendations made in professional consensus guidelines of . . . WPATH," and leading experts and professional organizations in transgender care have widely criticized the Cass Review and its opinions.

g.   In a formal response to the Cass Review published by WPATH and USPATH on May 17, 2024, both organizations outlined "deep[] concern[s] about the facts regarding the Cass Review's process and content."  WPATH and USPATH state that "the Cass Review process . . . intentionally and explicitly excluded any oversight from patients and their families and trans healthcare experts, and its content is not supported by a robust methodology. The Cass Review relies on selective and inconsistent use of evidence, and its recommendations often do not follow from the data presented in the systematic reviews."

h.   Yale University likewise published a report criticizing the Cass Review, stating that it "obscures key findings, misrepresents its own data, and is rife with misapplications of the scientific method."  The Yale report—authored by a team of experts that collectively holds "86 years of experience working with 4,800 transgender youth" and "has published 278 peer-reviewed studies, 168 of which are related to gender-affirming care"—concludes that the Cass Review's "errors conflict with well-established norms of clinical research and evidence-based healthcare," which "raise serious concern about the scientific integrity of critical elements of the report's process and recommendations."

i.   In my clinical experience, it is normal for many transgender youth to socially transition without prior consultation with a mental health professional.

Page | 31

070

j.     Dr. Anderson's assertion that mental health consultation is always required

before social transition runs contrary to both clinical experience and current

standards of care (SOC8), and would improperly medicalize a developmentally

appropriate, non-medical step that gender-diverse youth need to be able to

access in understanding their identity.

**8.     Under Prevailing Professional Standards, Students Can Appropriately
Initiate Social Transition at School without Necessarily Doing So at Home**

a.     Similarly, Dr. Anderson's statements that social transitions in only specific

contexts such as school amount to "facilitating a double life for some children,

in which they present as transgender in some contexts but cisgender in other

contexts [which] is not in their best interest" (Anderson Decl., ¶ 78) is not

supported by professional standards.

b.     Indeed, the WPATH SOC8 states that "social transition may best occur in all or

in specific contexts/settings only (e.g., school, home)."

c.     Dr. Anderson's only response to this language in the SOC8 is to disagree with it

by claiming that "social transition may not in fact be easily 'reversible'" and

that parents must be involved "to help their children avoid making bad

decisions." (Anderson Decl., ¶¶ 60). As explained below in paragraphs, Dr.

Anderson's views misinterpret the data and are otherwise unsubstantiated by

research.

d.     It is also a mischaracterization of transgender or gender nonconforming

students' experiences to suggest that school officials are somehow "facilitating"

these individuals leading a "double life" (Anderson Decl., ¶ 78) by respecting a

Page | 32

student's decision, for example, to request use of a different pronoun or name reflecting their gender identity or gender expression.

e.    First, it is incorrect to characterize schools officials' decisions to refrain from "dead-naming" transgender or gender nonconforming students or referring to them by their former pronouns as "facilitating" their transitions. Indeed, school officials are simply ensuring that these students are not injured by what Dr. Anderson agrees are harmful, "disaffirming" actions. (Anderson Decl., ¶ 59.)

f.    Second, coming out in an incremental fashion is a well-documented phenomenon not only for transgender youth, for but LGBTQ+ individuals more generally. Coming out is not a discrete event that happens once and is over; rather, decisions to come out to particular individuals, and/or in particular contexts, are part of a process that LGBTQ+ individuals engage in across a whole lifetime. For that reason, it is especially important that transgender or gender nonconforming youth have the ability to healthily and safely decide when, where, and to whom to come out on their own terms and when they are ready.

9.    **Unconsented Disclosure, Rather than Addressing "Coexisting Mental Health" Conditions, Could Worsen Them**

a.    One reason Dr. Anderson suggests that mental health professionals (and therefore parents, who she claims are always needed to consent to youths' treatment (Anderson Decl., ¶ 61) must always be involved before social transition is because Dr. Anderson claims that mental health interventions are needed to address other mental health conditions that transgender or gender nonconforming youth might be experiencing.

b.    But at the outset, there are many alternative systems that can identify the mental health conditions experienced by youth without exposing them to potential harm from forced disclosure. Pediatricians, for example, screen the youth they treat for depression and anxiety as part of their standard practice. Additionally, clinical psychologists and physicians can, and often do, treat mental health issues experienced by transgender or gender nonconforming (and many other) youth—such as depression—without outing the transgender youth against their will, which, as I have described, causes significant mental health harm. Moreover, in the state of California, youth can engage in mental health care without parental consent beginning at age 12.

c.    Further, in drawing attention to the mental health risks that transgender and gender nonconforming youth might face, Dr. Anderson indicates precisely why unconsented disclosure is detrimental.

d.    As I have noted previously, research shows that transgender students who can socially transition in an affirming and supportive environment have mental health outcomes that mirror their cisgender peers.  Another study notes that for such students who were not exposed to harassment in K-12 schools based on their gender identity, the ability to pursue early transition was linked to better mental health outcomes.

e.    And as I have also discussed previously, studies show that lesbian, gay, and bisexual youth who experience parental rejection are eight times more likely to attempt suicide and six times more likely to report major depressive symptoms.

f.  These studies highlight a key point: social transitions are linked to better mental health outcomes, but mainly if done in a safe and supportive environment. Sadly, some youths' parents do not provide a safe and supportive environment at home.

g.  If school staff share a young person's social transition and gender identity with parents prior to the youth being ready, and prior to ensuring that the home environment would be safe and supportive, they place the youth at risk for devastating consequences.

h.  Dr. Anderson's own citations illustrate this point. She cites WPATH's SOC8 as noting "studies showing that transgender youth have higher rates of depression, emotional and behavioral problems, suicide attempts and ideation, self-harm," and other issues. (Anderson Decl., ¶ 27.) But Dr. Anderson leaves out critical language from that same paragraph in SOC8: gender nonconforming youth "are at increased risk of mental health challenges, often related to family/caregiver rejection" and "non-affirming community environments."

i.  Thus, Dr. Anderson's citation establishes precisely why unconsented disclosure is harmful, as it exposes youth to hostile and rejecting households and deny students an affirming school environment, causing these very harms.

10.  **Research Does Not Support Dr. Anderson's Claims that Social Transition "Causes" Individuals to Persist in their Transgender Identity**

1.  The other main reason that Dr. Anderson offers for why parents must always be informed of a youth's transgender identity is because, in Dr. Anderson's view: (1) the majority of children and youth do not persist in their expressions of gender nonconforming identity (2) social transition causes youth to persist in

Page | 35

gender nonconforming identity and (3) transitioned individuals may face certain challenges.  Thus, in Dr. Anderson's view, parental involvement should be required in all cases to guide young people's decisions in expressing their gender identity—even to the point where Dr. Anderson asserts that parents should have the power "to say 'no' to a social transition." (Anderson Decl., ¶ 60.) These claims are incorrect, misleading, and harmful, and the prevailing research does not support these conclusions.

11. **Dr. Anderson Has Misinterpreted the Data Regarding "Persistence" of Gender Nonconformity from Childhood into Adolescence|**

a.     Dr. Anderson asserts that "for the vast majority of children, gender incongruence does not persist." (Anderson Decl., ¶ 20.) This is incorrect.  The research she references examined prepubertal children who were referred to gender clinics, but most of the young people in those studies did not appear to be transgender or gender nonconforming to begin with.

b.     These past studies used an outdated diagnostic label of "gender identity disorder in children," which did not require the child to identify as a gender different from their sex assigned at birth.  This diagnosis label is flawed because its expansive definition likely included many cisgender "tomboys" or cisgender boys with "feminine interests" (e.g., playing with dolls and female peers) who never identified as transgender and, thus, unsurprisingly did not identify as transgender when followed up with later in life.  As Dr. Kristina Olson of Princeton University noted in a 2016 publication in The Journal of The American Academy of Child & Adolescent Psychiatry, more than 90% of

Page | 36

children diagnosed with "gender identity disorder" in these studies, when directly asked their gender identity, reported their sex assigned at birth.

c.     In contrast, a recent publication in the Journal of Pediatrics followed 317 transgender children (i.e., those who had a gender identity different from their sex assigned at birth) over a period of five years and found that at the end of the follow-up period, 97.5% were still using pronouns indicating a transgender identity.

**12.    The Latest Research Indicates that Social Transition Does Not Make "Persistence" More Likely**

a.     Dr. Anderson also claims that social transition at school or in the community may increase the likelihood of "persistence" of a transgender identity and thus would explain the results of the studies on "persistence" discussed above. But recent research shows that this is not the case.

b.     In a study published in 2019 in the journal Psychological Science, Rae et al. examined the question of whether a social transition intensifies transgender identification.  They examined a cohort of gender-nonconforming children over two years, during which time 36 of these children socially transitioned.  They measured degree of gender nonconformity before and after social transition and found that social transition did not increase gender nonconformity.  Their study made it clear that the association between social transition and "persistence" that some studies have noted is because those who undergo a pre-pubertal social transition have stronger discordance between their sex assigned at birth and their gender identity to begin with, prior to the social transition.

Page | 37

c.   In other words, a social transition does not make a child identify more strongly as transgender and thus likely to persist with that gender identity. Rather, youth with strong transgender identification are more likely to pursue a social transition to begin with. This is consistent with the findings of Steensma et al. 2013, that Dr. Anderson cites (Anderson Decl., ¶ 32), which also observed that individuals who socially transitioned had more intense gender nonconformity.

d.   Thus, Dr. Anderson's claim that "[s]ocial transition sets children down a path that often leads to medical interventions" (Anderson Decl., ¶¶ 53-55), which is premised on the presumption that a social transition will make a child identify more strongly as transgender and increase the likelihood of "persistence," is false. Youth who socially transition already have very strong cross-gender identification to begin with, which is why they pursue a social transition in the first place, and social transition does not impact their transgender identity or likelihood of persistence, as discussed in Rae et al.'s study published in Psychological Sciences.

e.   Dr. Anderson has also deceptively lifted text from the introduction of the Rae et al. study which reads, "we know little about . . . whether transitions impact children's views of their own gender." (Anderson Decl., ¶ 37.)  But the purpose of that introduction section in the academic research paper is to set up gaps that existed in the literature prior to the data being presented, along with the research question to be answered.

f.   The paper subsequently answers the question Dr. Anderson quoted with new data.  It is misleading, not to say disingenuous, to quote the paper's introduction

without subsequently discussing its actual research findings, which explicitly refute Dr. Anderson's assertion.

g.    Thus, contrary to Dr. Anderson's suggestions, transgender identity or gender nonconformity is not "caused by" social transitions; rather, social transitions result from transgender or gender nonconforming youth seeking to more fully express who they are.

**13.   Dr. Anderson Has Misinterpreted the Data Discussing Cultural and Societal Factors in Relation to Transgender Identity or Gender Nonconformity**

a.    For similar reasons, Dr. Anderson's suggestion that increased number of young people are expressing gender diversity due to "susceptibility to social influence" (Anderson Decl., ¶ 19) misinterprets the data.

b.    As I explained in this declaration, gender identity is not a choice; it is a core aspect of a person's being.

c.    Significant research indicates that transgender identity results not from social pressures but from a strong, innate biological basis. Studies have conducted neuroimaging on transgender adolescents, and found that transgender adolescents have patterns of brain activation more similar to those of other people who share their gender identity than people who share the same sex assigned at birth. Other researchers have examined the identical twins and fraternal twins of transgender parents. These researchers found that identical twins of transgender parents, who have the same DNA, are far more likely to be transgender than fraternal twins, who have different DNA, and, thus, concluded that gender identity has a strong genetic component. Meanwhile, sophisticated gene sequencing studies have suggested that genes involved in estrogen

Page | 39

078

processing play a role in the development of gender identity among transgender people. While the precise biological causes of gender identity have not been conclusively identified, these studies together indicate a strong innate biological basis for transgender identity.

d.      My clinical experience confirms this research. Over the hundreds of adolescents I have treated, my patients do not ask me, "should I socially transition"—almost all have already decided that they wish to or have already done so. It is normal for many of them to have been on this journey for a while already because it is their decision.

e.      Meanwhile, we are not seeing the same increases in number of adults as we have adolescents because transgender middle-aged adults have endured decades of stigma for their transgender identities that make them far less likely to come out as transgender, even despite some recent changes in current social attitudes. These decades of exposure to and survival in unaccepting environments, according to the "gender minority stress" model, leads to expectations of future rejection and internalized transphobia (i.e., internalization of society's stigma directed toward transgender people). This can cause self-hate for being transgender, as well as a desire to conceal one's identity. These factors make it less likely for middle-aged transgender adults to come out, despite the more recent increases in societal acceptance for transgender people in the United States.

f.      Meanwhile, many transgender youth are, for the first time, growing up in environments where transgender identity is not as stigmatized, making it

relatively easier for them to come out when compared to transgender adults who are burdened by decades of living in a social milieu where being transgender was not recognized or accepted.

g.    Among the hundreds of transgender and gender nonconforming youth whom I have treated, none have indicated that they expressed a transgender or gender nonconforming identity because of social media or peer influences. Indeed, as Dr. Anderson acknowledges, a social transition can come with challenges, particularly due to the discrimination that a transgender or gender nonconforming individual might face; these potential challenges provide all the more reason why transgender or gender nonconforming youth are not expressing such identities merely because of social media or peer influences.

14.    **Dr. Anderson's Suggestion that Parents Should Always Be Consulted So that They Can Sometimes "Say 'No'" to a Youth's Gender Identity is Harmful to Youth|**

a.    As I explained in this declaration, the best outcome for transgender and gender nonconforming youth is for them to socially transition on their own terms, at their own pace, into supportive, loving environments. This type of social transition aligns with the natural process of a person growing up and learning how to navigate the different environments around them.

b.    Dr. Anderson's suggestion, then, that parental involvement should be required so that parents can sometimes "say 'no' to a social transition" (Anderson Decl., ¶60) is harmful to youth. As I have noted previously, research has shown that lesbian, gay, and bisexual youth who experience parental rejection are eight times more likely to attempt suicide and six times more likely to report major depressive symptoms.

Page | 41

080

c.      Studies specific to gender identity have reached similar conclusions. As WPATH's leading and current Standards of Care (SOC8) state, "efforts at blocking reversible social expression or transition may include choosing not to use the youth's identified name and pronouns or restricting self-expression in clothing and hairstyles." These and other "disaffirming behaviors" have "been linked to increased anxiety, depression, suicidal ideation, suicide attempts, and health care avoidance." Such efforts "to change gender identity/expression have been associated with negative psychological functioning that endures into adulthood."

d.      Thus, WPATH's SOC8 "recommend[s] against such [disaffirming] efforts," as "efforts undertaken a priori to change a person's identity are clinically and ethically unsound." The best possible outcome for transgender and gender nonconforming youth is for them to socially transition on their own terms, at their own pace, into supportive, loving environments. This type of social transition aligns with the natural process of a child growing up and learning how to navigate the different environments around them.

E.    CONCLUSIONS

1.      The process of coming out is often protracted, as youth try to understand how various people in their lives will respond to their identity. It is critical that youth be allowed to control that process, as it is their personal information to share in their own time.

2.      Unconsented disclosure disrupts this process and harms transgender and gender nonconforming youth in numerous ways.

3. It creates social pressures to reject a transgender or gender nonconforming youth's gender identity, thereby intensifying psychological distress and increasing the risk of depression and anxiety in transgender and gender nonconforming youth.

4. It disincentives social transitioning, which is not only an essential process of self-actualization for a transgender or gender nonconforming individual, but also carries a number of medically-recognized benefits for those who may experience gender incongruence.

5. Unconsented disclosure increases the possibility of a forced disclosure of a student's transgender or gender nonconforming identity to potentially unaccepting family members, which not only causes psychological distress to the student, but also increases the risk of trauma, physical abuse, homelessness and long term negative mental health outcomes.

6. Unconsented disclosure pressures transgender and gender nonconforming youth to remain or return to hiding their gender identity, resulting in additional psychological distress, manifesting in depression, anxiety, and feelings of hopelessness.

7. Finally, unconsented disclosure creates an environment that is actively hostile to transgender and gender nonconforming students, which research has shown to result not only in mental and social harm, but also academic harm.

8. All these harms have serious long-term consequences. A foundation of negative experiences in childhood, adolescence and young adulthood contributes to lower quality of life and increased mental health issues as an adult.

9. In my expert opinion, unconsented disclosure forced disclosure directly contradict the recommendations in WPATH's leading and current Standards of Care for transgender health.

10. Dr. Anderson's assertions that "parental consent" is required before a student should socially transition is expressly contradicted by WPATH's current Standards of Care.

11. Dr. Anderson's heavy reliance on an older and outdated version of WPATH's Standards of Care, rather than the most current edition, is inappropriate and invalidates many of her conclusions, as they do not reflect the current research or professional standards of care governing the health of transgender youth.

12. Dr. Anderson's reliance on the Cass Review is also inappropriate and invalidates a number of her conclusions, as the expert consensus in the field of transgender care is that the Cass Review explicitly excluded trans healthcare experts from its process, and the Review obscures key findings, misrepresents its own data, and is rife with misapplications of the scientific method.

13. Social transition is not a medical intervention, as Dr. Anderson herself acknowledges. Because social transition is not a medical intervention, consultation with a medical or mental health professional is not required before youth may socially transition.

14. Because social transition is not a medical intervention, Dr. Anderson's citations to the 2017 recommendations from the Endocrine Society, SOC7, or portions of the SOC8 which provide recommendations related to medical interventions (such as medications or surgery) is inappropriate.

Page | 44

15.    By suggesting that medical recommendations specific to gender dysphoria are appropriate for transgender youth categorically, Dr. Anderson's analysis improperly pathologizes transgender and gender nonconforming identity. Being transgender is not a mental illness, and being transgender is not the same as having gender dysphoria. When they are given the opportunity to freely express themselves without being singled out for discriminatory treatment, countless transgender and gender nonconforming youth live psychologically healthy lives, with mental health outcomes paralleling their cisgender peers.

16.    Research demonstrates that social transition does not cause the persistence of transgender or gender nonconforming identity. Dr. Anderson relies solely on studies showing correlation, not causation, and it is clear why social transition correlates with transgender identity: youth who are transgender to begin with choose to socially transition so that they can express their core identity.

17.    A youth's transgender identity is not influenced by "social pressure." Transgender students do not "choose" their gender identity, let alone "choose" gender identity based on social media or peer pressure. Rather, research indicates that there is a strong, innate, biological basis to gender identity.

18.    Dr. Anderson misleadingly claims that no professional medical organizations recommend social transition without professional consultation; professional medical organizations do not make recommendations one way or another regarding social transition because these organizations recognize that it would be inappropriate to issue medical recommendations for a non-medical action like social transition.

Page | 45

19.    Current and leading professional standards of care—which discuss transgender youth health more holistically—recommend that youth should have the ability to initiate social transition in their own timeframe and in the manner they choose without formal mental health involvement. Unconsented disclosure burdens and disrupts this natural process, harming transgender youth in numerous ways.

## IV.    ALL CASES IN WHICH I HAVE TESTIFIED IN THE PREVIOUS FOUR YEARS

a.    Poe v. Labrador, No. 1:23-cv-00269-CWD

b.    California v. Chino Valley, No. CIVSB2317301.

c.    A.B. v. Premera Blue Cross, No. 2:23-cv-00953-TSZ

## V.    CURRICULUM VITAE

Attached as Exhibit.

## VI.    STATEMENT OF COMPENSATION TO BE PAID

I am being compensated at an hourly rate of $125 per hour for preparation of expert declarations and reports, and time spent preparing for or giving deposition or trial testimony. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

Christine Lam Brady, PhD.

Date: 5/1/2025

Page | 46

085

LEN GARFINKEL, State Bar No. 114815
General Counsel
PAUL GANT, State Bar No. 159844
Assistant General Counsel
VIRGINIA CALE, State Bar No. 258557
Deputy General Counsel
CHRISTOPHER MANDARANO, State Bar No. 263625
Deputy General Counsel
California Department of Education
1430 N Street, Room 5319
Sacramento, California 95814
Telephone: 916-319-0860
Facsimile:  916-322-2549
Email: cmandarano@cde.ca.gov

Attorneys for Defendants Tony Thurmond in his official capacity as State Superintendent of Public Instruction and SBE Members

*(Defendants Tony Thurmond in his official capacity and State Board Members in their official capacity are Governmental Parties Exempt from the Provisions of FRCP 7.1)*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH MIRABELLI, an individual, and LORI ANN WEST, an individual, | Case No. 3:23-cv-0768 BEN-VET |
| Plaintiff, | PROOF OF SERVICE |
| v. | |
| MARK OLSON, et al., Superintendent of EUSD | |
| Defendants. | |

Case No. 3:23-cv-0768 BEN-VET                                        PROOF OF SERVICE

086

I, the undersigned, state that I am a citizen of the United States, over the age of 18 years, a resident of the State of California, and not a party to this action. My business address is 1430 N Street, Suite 5319, Sacramento, California 95814.

On May 1, 2025, I served the:

- EXPERT REPORT OF CHRISTINE LAM BRADY, PHD.

by electronic mail, addressed as follows:

| | |
|---|---|
| Charles S. LiMandri, Esq<br>cslimandri@limandri.com<br><br>Paul M. Jonna, Esq<br>pjonna@limandri.com<br><br>Jeffrey M. Trissell, Esq<br>jtrissell@limandri.com<br><br>Milan L. Brandon II., Esq<br>mbrandon@limandri.com<br><br>Kathy Denworth<br>kdenworth@limandri.com<br><br>LiMANDRI & JONNA LLP<br>**Attorneys for Plaintiffs** | Thomas Brejcha, pro hac vice*<br>tbrejcha@thomasmoresociety.org<br><br>Peter Breen, pro hac vice*<br>pbreen@thomasmorsociety.org<br><br><br><br><br><br><br><br><br><br>THOMAS MORE SOCIETY<br>**Attorneys for Plaintiffs** |
| Daniel R. Shinoff<br>dshinoff@as7law.com<br><br>Gil Abed<br>gabed@as7law.com<br><br>Jack M Sleeth, Jr<br>jsleeth@as7law.com<br><br>Maurice A. Bumbu<br>mbumbu@as7law.com<br><br>Lauren J. Cambronero<br>lcambronero@as7law.com<br><br>Nopealey Lay<br>nlay@as7law.com<br><br>Bianca Fregoso<br>bfregoso@as7law.com<br><br>ARTIANO SHINOFF<br>**Attorneys for EUSD Defendants** | Darrell W. Spence<br>Darrell.spence@doj.ca.gov<br><br>Kevin L. Quade<br>Kevin.quade@doj.ca.gov<br><br>Jennifer Bunshoft<br>Jennifer.Bunshoft@doj.ca.gov<br><br>Darin Wessel<br>Darin.Wessel@doj.ca.gov<br><br>Shatti Hoque<br>shatti.hoque@doj.ca.gov<br><br><br><br><br><br>DEPARTMENT OF JUSTICE<br>**Attorneys for Plaintiffs** |

Case No. 3:23-cv-0768 BEN-VET          1          PROOF OF SERVICE

I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of May, 2025 at Sacramento, California.

By:      Tereta McClory    Digitally signed by Tereta McClory
Date: 2025.05.01 16:50:52 -07'00'

TERETA MCCLORY

EXHIBIT 3

R‍OB B‍ONTA
Attorney General of California
D‍ARRELL W. S‍PENCE
Supervising Deputy Attorney General
J‍ENNIFER A. B‍UNSHOFT (SBN: 197306)
D‍ARIN W‍ESSEL (SBN: 176220)
K‍EVIN L. Q‍UADE (SBN: 285197)
S‍HATTI A. H‍OQUE (SBN: 350250)
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3377
  Fax:  (415) 703-5480
  E-mail:  Jennifer.Bunshoft@doj.ca.gov
*Attorneys for Defendants
Rob Bonta in his official capacity as Attorney
General, Tony Thurmond in his official
capacity as State Superintendent of Public
Instruction, and State Board of Education
Members in their official capacities*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ELIZABETH MIRABELLI, an individual, and LORI ANN WEST, an individual,**<br><br>Plaintiffs,<br><br>v.<br><br>**MARK OLSON, in his official capacity as President of the EUSD Board of Education, et al. ,**<br><br>Defendants. | 3:23-cv-00768-BEN-VET<br><br>**SUPPLEMENTAL EXPERT REPORT OF CHRISTINE LAM BRADY, PH.D** |

1

089

1.      I, Christine Lam Brady, PhD, have been retained by the State Defendants as an expert in connection with the above-captioned litigation, including responding to statements and opinions by Plaintiffs' experts.

2.      I previously prepared an Expert Report in this matter, dated May 1, 2025, which set forth my background and credentials, as well as my opinions in this matter, including the bases and reasons for my opinions.  State Defendants have asked me to review and respond to some of the assertions in the Expert Reports of Drs. Szajnberg and Anderson, dated May 1, 2025.

3.      In addition to the records I previously reviewed, identified in my May 1, 2025, Expert Report, prior to preparing this rebuttal report, I reviewed the Expert Reports of Nathan. Szajnberg, M.D., and of Erica E. Anderson, Ph.D., both dated May 1, 2025.  I also reviewed the complete set of records pertaining to Child Poe, identified as POE 0018-0213, POE 216-367, POE 000368-POE 000371, POE 000372-POE 000420, POE 0471-0487, POE 0488-0509, and DRQ 001-076.

4.      There are many assertions made in the reports of Drs. Szajnberg and Anderson that I do not believe are supported by evidence.  I do not attempt to address all of them here but, instead, respond to some of the central arguments made in those reports, especially in Dr. Szanjberg's Report.  I have already rebutted many of the opinions set forth in Dr. Anderson's Report, as they were also set forth in her previously-submitted declaration in support of Plaintiffs' preliminary injunction motion in this matter.  Rather than restating those opinions, I am incorporating by reference herein the critiques in my initial Expert Report regarding Dr. Anderson's conclusions.

## DR. SZAJNBERG'S QUESTIONING OF MY QUALIFICATIONS IS UNWARRANTED

5.      Dr. Szajnberg mischaracterized my graduate training as a psychologist, suggesting it was limited to four years of post-undergraduate training

2

090

with one year of fellowship. (Szajnberg Report ¶ 98). In fact, I obtained a master's degree (two years of training) in Psychological Sciences prior to attending my Ph.D. program (an additional four years of academic training). In addition, I completed pre-doctoral residency (one year) and post-doctoral fellowship (one year) culminating in eight years of training in Clinical Psychology prior to licensure (ten years of post-licensure practice). Thus, in the field of psychiatric disorders, Dr. Szajnberg and I have almost equal number of years in training. When I attended graduate school, DSM-IV (published in 1994) was taught as well as DSM 5, which was published in 2013, three years prior to obtaining my license. Both Drs. Szajnberg and Anderson graduated prior to the release of DSM-III (1980), which was the DSM to first include gender identity. Thus, I have not only had ample and adequate graduate school training, but my graduate training specifically consisted of content related to transgender youth as conceptualized in DSM-IV and DSM-5. Dr. Szajnberg does not provide details regarding the populations he treats clinically and whether or not he specializes in the treatment of Gender Dysphoria in youth.

## DR. SZAJNBERG'S INTERPRETATION OF CHILD POE'S TREATMENT RECORDS IGNORES OTHER STRESSORS CONTRIBUTING TO THEIR MENTAL HEALTH

6.     As Dr. Szajnberg outlines, Child Poe requested to socially transition in school during the 2022-2023 academic year and began therapy with a psychologist, Dr. Ariana Quinonez, in March of that school year. (Szajnberg Report ¶ 57-58). Therapy was initiated due to known and identified mood concerns (depression and anxiety). Child Poe shared their gender identity with Dr. Quinonez openly during the intake session. Child Poe was hospitalized following an overdose in September 2023. Throughout the records provided, Child Poe shared variables contributing to their hesitancy to share their gender identity with

3

091

parents including faith, gender roles enforced at home (e.g., family did not allow Child Poe to cut hair short), and pre-existing parent-child conflict.  Additionally, the records indicate Child Poe came out as bisexual in 4th/5th grade and their parents "rejected" their sexual orientation. (DRQ.1).  During the September 2023 hospitalization, Child Poe did want to come out to their parents and the staff facilitated a family session.  Treatment records show Child Poe was "still feeling depressed" after disclosure due to parents continuing to refer to Child Poe as their daughter. (POE.26).  Upon discharge, Child Poe reported improvements in mood, but the records show that they continued to struggle with suicidal ideation and lack of parental support after discharge.

7.       Later that same year (December 2023), Child Poe was seen in the emergency room for chest pain and disclosed suicidal ideation with a plan to overdose.  Child Poe reported stressors including parents opting to home school them, with Child Poe stating that their "parents think that they are wanting to dress as a boy because of influence of friends" and parents still "do not understand them." (POE.242).  Child Poe and their family worked with therapist Gidai Maaza until November 2024.  Their sessions appear to be focused on depression/anxiety management with a heavy focus on family dynamics to improve communication and shared understanding.

8.       Dr. Szajnberg states Child Poe's psychiatrist Dr. Brar noted improvements in their mood around February 2024 and started tapering off medications.  (Szajnberg Report. ¶ 68).  Dr. Szajnberg attributes this improvement solely to the involvement of Child Poe's parents.  (Szajnberg Report ¶ 72).  However, Child Poe reported mood difficulties beginning in 4th grade (DRQ.1), which precedes their gender identity exploration and social transition.  Child Poe's parents were involved and aware of their child's declining mental health and engaged them in therapy and medication management.  In other words, Child Poe's

4

parents did not first become involved in February 2024 when improvements were noted, but rather were involved in Child Poe's psychiatric care beginning in March 2023, and became aware of their gender identity in September 2023. Child Poe's improvement in mood also coincides with their return to in-person school which, as they expressed during their December 2023 hospitalization, was giving them hope for the future. (POE.242). Medication management also began in May 2023, and may have been optimized many months later also contributing to observed improvements.

9. Dr. Szajnberg believes, based on the records provided, that the likelihood that "social transition had a significant and lasting psychological effect on Child Poe is extremely high." (Szajnberg Report ¶ 73). Nowhere in the extensive treatment records does Child Poe report difficulties, discrimination, harassment, bullying or any other negative consequences experienced from their social transition prior to their September 2023 overdose. Child Poe was seen by multiple providers from varying disciplines none of whom expressed reservations or concerns to the parents regarding Child Poe's social transition. In fact, some (Gidai Maaza, for example) were working with the Poe family to help facilitate comfort with aspects of social transition, including hair style and clothing as negative comments and discouragement from their parents were exacerbating mood symptoms.

10. Dr. Szajnberg mischaracterizes the support provided to Child Poe by the school as "state-mandated social transition." (Szajnberg Report ¶ 73). Child Poe approached their teachers requesting the use of a different name and pronoun, which they opted to honor. Thus, Child Poe's social transition was individually initiated by Child Poe, and not initiated by the school or imposed by the state. Had information about Child Poe's request to use a different name and pronouns been disclosed to their parents prior to Child Poe's admission to the hospital in

5

093

September 2023, this may have had a significant negative impact on Child Poe's mental health and stability  As the records described, Child Poe had been previously rejected by their parents when disclosing their sexual orientation, and after disclosing their gender identity  Child Poe continued to feel rejected and unsupported by their parents who went as far as to remove Child Poe from school, isolating them from their friends.  As I outlined in my initial report (Brady Report. ¶ 44), rejection is known to have powerful negative impacts on LGBTQ youth and having disclosed this information to their parents prior to Child Poe feeling ready would have been detrimental.

## DRS. SZAJNBERG AND ANDERSON'S RELIANCE ON CASS REVIEW AND DISREGARD OF WPATH SOC8

11.     Both Drs. Szajnberg and Anderson heavily cite the Cass Review and criticize the World Professional Association of Transgender Health Standards of Care Version 8 (WPATH SOC8), and Dr. Anderson relies on the outdated SOC7, while disregarding robust research excluded from the Cass Review as well as the more recently published SOC8.  (See Anderson Report, ¶¶ 21-26, 39); Szajnberg Report, ¶¶ 84-91.)  As I explained in my report (Brady Report ¶¶ 73-75, 81, 83-85), both the Cass Review and SOC7 have major limitations which calls into question the ability to form scientific conclusions on the matter of social transition.

## DR. SZAJNBERG'S DEFINITION OF "TREATMENT" AND "INTERVENTION" IS TOO BROAD

12.     Dr. Szajnberg argues that social transition is an "intervention" or "treatment" for individuals with Gender Dysphoria.  He states, "if an individual has been diagnosed with gender dysphoria, then a social transition is clearly an intervention undertaken as part of the treatment of that condition." (Szajnberg Report ¶ 38).  In this scenario, an individual would have to be working with a trained physician or mental health professional to have been evaluated and given

6

094

the diagnosis of Gender Dysphoria, and thus those professionals may already be working with youth and families to facilitate social transition. In the case of youth who do *not* have Gender Dysphoria and choose to socially transition, Dr. Szajnberg suggests that "intervention" or "treatment" is "whether it has an *effect.*" (Szajnberg Report. ¶ 47). Narrowing this broad statement down to psychological effect, there are many activities people engage in everyday life to improve mood or reduce distress without prescription or consultation. These include, for example, exercise, diet, deep breathing, mindfulness/meditation, and journaling. In fact, Dr. Szajnberg concedes this point stating "'treatment' and 'interventions' can be performed by non-healthcare professionals." (Szajnberg Report ¶ 43). Because the definitions provided by Dr. Szajnberg are too broad, I focused on differentiating "treatments" or "interventions" that require informed consent (such as medical interventions) requiring parental involvement in contrast to those that do not, such as social transition, changes in self-expression, hair-cuts, and clothing choices.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and if called as a witness would testify competently thereto. Executed in Los Gatos, California on May 15, 2025.

By: _____

Christine Lam Brady, Ph.D

## DECLARATION OF SERVICE BY E-MAIL

Case Name:    **Mirabelli et al. v. Olson, et al.**

Case No.:    **3:23-cv-00768-BEN-VET**

I declare:

I am employed in the Office of the Attorney General, and a member of the California State Bar. I am 18 years of age or older and not a party to this matter; I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence by electronic mail. In accordance with that practice, correspondence is served that same day in the ordinary course of business.

On **May 15, 2025,** I served the attached **SUPPLEMENTAL EXPERT REPORT OF CHRISTINE LAM BRADY, PH.D** by electronic mail addressed as follows:

### PLEASE SEE ATTACHED SERVICE LIST

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on **May 15, 2025,** at Los Angeles, California.

Jennifer Bunshoft

_____
Declarant

_____
Signature

67541112.docx

096

## DECLARATION OF SERVICE BY E-MAIL

Case Name:     **Mirabelli et al. v. Olson, et al.**

Case No.:     **3:23-cv-00768-BEN-VET**

LiMANDRI & JONNA LLP
*Attorneys for Plaintiff*

Paul Michael Jonna, Esq.
Charles S. LiMandri, Esq.
Jeffrey Trissell
Kathy Denworth
**E-mail Address**:  pjonna@limandri.com
**E-mail Address:**  cslimnadri@limandri.com
**E-mail Address:** jtrisell@limandri.com
**E-mail Address:** kdenworth@limandri.com

ARTIANO SHINOFF
*Attorneys for EUSD Defendants*

Daniel R. Shinoff
Gil Abed
Jack M. Sleeth, Jr.
Maurice A. Bumbu
Lauren J. Cambronero
Nopealey Lay
Bianca Fregoso
**E-mail Address:**  dshinoff@as7law.com
**E-mail address:**  gabed@as7law.com
**E-mail address:**  jsleeth@as7law.com
**E-mail Address:**  mbumbu@as7law.com
**E-mail Address:**  lcambronero@as7law.com
**E-mail Address:**  nlay@as7law.com
**E-mail Address:** bfregoso@as7law.com

097

EXHIBIT 4

ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
LAURA L. FAER (SBN 233846)
JAMES F. ZAHRADKA II (SBN 196822)
Supervising Deputy Attorneys General
EDWARD NUGENT (SBN 330479)
GARY D. ROWE (SBN 165453)
ALEXANDER SIMPSON (SBN 235533)
XIYUN YANG (SBN 315187)
DELBERT TRAN (SBN 323993)
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102
  Telephone: (415) 229-0110
  Email: Delbert.Tran@doj.ca.gov
*Attorneys for The People of the State of California*

*Exempt from filing fees pursuant to Government Code section 6103*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN BERNARDINO

| | |
|---|---|
| **THE PEOPLE OF THE STATE OF CALIFORNIA, EX REL. ROB BONTA, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,**<br><br>Plaintiff,<br><br>v.<br><br>**CHINO VALLEY UNIFIED SCHOOL DISTRICT,**<br><br>Defendant | Case No. CIVSB2317301<br><br>**SUPPLEMENTAL DECLARATION OF DR. CHRISTINE BRADY, PHD, IN SUPPORT OF THE PEOPLE OF THE STATE OF CALIFORNIA'S REPLY IN SUPPORT OF ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**<br><br>Date:        October 13, 2023<br>Time:        8:30 a.m.<br>Dept:        S-28<br>Judge:       Hon. Michael A. Sachs<br>Trial Date:<br>Action Filed: August 28, 2023 |

1

**SUPPLEMENTAL DECLARATION OF DR. CHRISTINE BRADY, PH.D**

I, Christine Brady, declare:

1. I am over the age of 18 years, a resident of the State of California, and a U.S. citizen. I know the following facts based on my own personal knowledge, and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

**Background and Experience**

2. I previously submitted a declaration dated August 24, 2023 in this case (Brady Decl.) in support of the People's Ex Parte Application for a Temporary Restraining Order and Order to Show Cause as to Why Preliminary Injunction Should Not Issue. That declaration, and my attached CV, detail my clinical and academic expertise in pediatric and adolescent gender psychology. (Brady Decl., ¶¶ 2-18 & Ex. A.)

3. Counsel for the People of the State of California asked me to provide this supplemental declaration to address the statements in the Declaration of Dr. Erica E. Anderson (Anderson Decl.), filed in support of the Chino Valley Unified School District (CVUSD or the District)'s Opposition to Plaintiff's Application for a Preliminary Injunction, as well as statements in Prospective Intervenors' filings. I have reviewed the District's Opposition to Plaintiff's Application for a Preliminary Injunction, Prospective Intervenors' Reply Memorandum in Support of Application for Leave to Intervene, Prospective Intervenors' [Proposed] Opposition to Preliminary Injunction, Dr. Anderson's declaration, and the professional guidelines and research cited in her declaration.

**Dr. Erica E. Anderson Inappropriately Relies on an Outdated Standard of Care**

4. In her declaration, Dr. Anderson acknowledges that the World Professional Association of Transgender Health's (WPATH) Standards of Care are "one of the more widely known and cited set of guidelines for transgender care." (Anderson Decl., ¶ 11.) While most of the WPATH's Standards of Care provide recommendations governing medical interventions—such as surgical operations—the Standards of Care also discuss transgender health more

2

holistically and include some discussion of non-medical approaches to gender identity such as social transition.[1] It is important not to improperly conflate the Standards of Care's discussion of medical interventions with their discussion of non-medical issues like social transition.

5. As Dr. Anderson notes, WPATH has published its eighth edition of the Standards of Care (SOC8), providing its current recommendations. Dr. Anderson also claims that WPATH's Standards of Care are "not universally agreed upon." (Anderson Decl., ¶ 11.) While there may always be individuals who do not adhere to current professional standards, the Standards of Care contain the professional community's general consensus on the latest state of research and experience in the field.

6. Despite her awareness that the WPATH's SOC8 reflects the current Standards of Care, Dr. Anderson "rel[ies] more heavily in [her] report" on "SOC7," or the Seventh Edition of the WPATH Standards of Care. (Anderson Decl., ¶ 11.) SOC7 was published over a decade ago in 2012.[2]

7. Given how much knowledge and research in this field have grown in recent years, in my professional experience and opinion, it is inappropriate to rely on the SOC7's outdated recommendations, which no longer reflect the current research consensus and standards in the field.

8. Indeed, Dr. Anderson notes that "[i]n late 2021 . . . I resigned from my offices within USPATH and WPATH because I disagreed in important respects with some of the directions the organization was going." (Anderson Decl., ¶ 11.) This suggests that Dr. Anderson's views may not reflect the current professional consensus regarding transgender care.

9. While professional organizations other than WPATH have published guidelines related to transgender care, such as the Endocrine Society, those other guidelines focus

---

[1] The World Prof. Assn. for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (Version 8, 2022), avail. at https://www.wpath.org/publications/soc (WPATH SOC8).

[2] The World Prof. Assn. for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (Version 7, 2012), avail. at https://www.wpath.org/publications/soc (WPATH SOC7).

(continued…)

3

exclusively on medical interventions—for example, the levels at which to dose medications or hormone treatments.[3] Such guidelines are inappropriate to rely upon when discussing non-medical approaches such as social transition, as I describe below.

**The Mere Act of Using a Transgender Youth's Affirmed Name and Pronouns Does Not Constitute Medical Treatment**

10.    As outlined in my initial declaration, "social transition" refers to an individualized process in which a person changes various aspects of their gender expression (e.g., clothing, name, pronouns, hair style) to align with their gender identity (Brady Decl., ¶ 35.)

11.    As further stated in my initial declaration, these changes in gender expression are, in and of themselves, not medical interventions. (Brady Decl., ¶ 36.) Dr. Anderson, too, agrees that "'[s]ocial transition' is primarily used to refer to name-and-pronoun changes" and "'social transition' is used as a contrast to medical transition" because social transition *does not* involve "various medical interventions . . . such as puberty blockers, cross-sex hormone therapy, and various surgical interventions." (Anderson Decl., ¶ 9.)

12.    Prospective Intervenors misinterpret paragraph 19.C. of my initial declaration, where I state that "social transition is psychologically beneficial and is a medically recognized treatment for gender dysphoria." (Brady Decl., ¶ 19.) In that statement, I referred to the medically recognized *benefits* of transgender and gender non-conforming youth being able to socially transition. (See, e.g., Brady Decl., ¶¶ 37-41.) For example, while aerobic exercise is not a "medical intervention," medical professionals might recognize research documenting its physical and psychological benefits for certain health conditions. Likewise, social transition, though not requiring or constituting medical intervention, does provide numerous important and well-documented psychological and physical benefits to transgender or gender non-conforming youth, as detailed in my initial declaration. (Brady Decl., ¶¶ 37-41.)

---

[3] See generally, e.g., Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline* (2017) J. of Clinical Endocrinology & Metabolism 3869.

4

13.     Thus, Dr. Anderson's suggestion that medical professional consultation is always required before social transition—or that prevailing professional norms require such consultations—is incorrect, as described below.

**Under Prevailing Professional Standards, Students Should Have the Ability to Initiate Social Transition Without Formal Mental Health Involvement**

14.     Dr. Anderson's assertion that "[n]o medical or mental health organization" has endorsed permitting social transition without formal mental health involvement (Anderson Decl., ¶ 57) is incorrect and contradicted by the very materials Dr. Anderson cites.

15.     To begin, Dr. Anderson presents a non-sequitur—professional "medical associations" would not make specific endorsements about social transition, in school or elsewhere, because such social transition is non-medical, and it would be generally inappropriate for medical associations to issue medical guidelines governing non-medical behaviors.

16.     Further, WPATH's Standards of Care, which discuss transgender health more holistically, contradict Dr. Anderson's claim. Dr. Anderson herself quotes the WPATH SOC8's statement that "social transition should originate from the child and reflect the child's wishes in the process of making the decision to initiate a social transition process," and any "efforts at blocking reversible social expression or transition [like] choosing not to use the youth's identified name and pronouns" are "disaffirming behaviors" that are always inappropriate and equivalent to conversion therapy. (Anderson Decl., ¶ 59.) This language expressly states that a youth's wishes to "initiate a social transition process" should be respected, and that any "disaffirming behaviors" otherwise could prove harmful to the youth.[4]

17.     Instead, Dr. Anderson misleadingly cites a different section of the outdated WPATH SOC7 referring to gender-affirming *medical interventions* (e.g., pubertal suppression or gender-affirming hormones) to support her arguments that adults should never "facilitate a social transition upon a child or adolescent's request without a careful evaluation by an appropriately trained mental health professional." (Anderson Decl., ¶ 57.) Thus, the WPATH Standards of Care

---

[4] WPATH SOC8, p. S76. Additionally, in my clinical experience, it is rare for prepubertal youth to socially transition without parental knowledge. Most of these cases involve teenage adolescents.

5

she quotes stating that "a comprehensive biopsychosocial assessment of adolescents who present with gender-identity concerns" is needed and that without such assessment "the decision to start gender-affirming *medical interventions* may not be in the long-term best interest of the young person at that time" (Anderson Decl., ¶ 58, emphasis added) have no bearing on non-medical social transitions. (See Anderson Decl., ¶ 45 ["SOC8's focus is on medical interventions"].)[5]

18.    Rather, when it comes to social transitions, WPATH SOC8 expressly states that it is the individual's decision to socially transition and that such decisions should be respected, rather than restricted.[6]

19.    Dr. Anderson also cites the American Psychological Association's Guidelines for Psychological Practice with Transgender and Gender Nonconforming People (APA Practice Guidelines); but she cites these guidelines incorrectly. (Anderson Decl., ¶ 57.) The APA Practice Guidelines "refer to psychological practice . . . rather than treatment. Practice guidelines are practitioner-focused and provide guidance for professionals regarding 'conduct and the issues to be considered'" when working with a particular client.[7] In contrast, "[t]reatment guidelines are client-focused and address intervention-specific recommendations for a clinical population or condition."[8] The APA Practice Guidelines thus provide guidance to psychologists who *are already* working with transgender or gender nonconforming youth, and make no "intervention-

---

[5] Dr. Anderson elsewhere quotes statements from SOC7—not only do these statements fail to rely on the current standards of care, they pull statements addressing gender dysphoria (see, e.g., Anderson Decl., ¶ 23 ["WPATH's SOC7, for example, recommends a 'thorough assessment' of '*gender dysphoria* and mental health,'" emphasis added], ¶ 24 ["WPATH SOC7 notes that mental health professionals 'should strive to maintain a therapeutic relationship with gender nonconforming children/adolescents and their families through any subsequent social changes . . . . which 'ensures that decisions about gender expression *and the treatment of gender dysphoria* are thoughtfully and recurrently considered,'" emphasis added].) As I have discussed, gender dysphoria is a specific condition, it is not the same as being transgender or gender nonconforming, and many transgender and gender nonconforming youth do not experience gender dysphoria. (Brady Decl., ¶¶ 29-31; see also WPATH SOC8, p. S6 ["The expression of gender . . . identities . . . that are not stereotypically associated with one's sex assigned at birth is a common and culturally diverse human phenomenon that should not be seen as inherently negative or pathological"].) Dr. Anderson's reliance on those recommendations to categorically apply to all transgender or gender nonconforming youth is inappropriate.
[6] WPATH SOC8, p. S76.
[7] Am. Psych. Assn., Guidelines for Psychological Practice with Transgender and Gender Nonconforming People (2015) p. 833. These Guidelines, which were issued eight years ago, are also due for an update to reflect current literature on the subject.
[8] *Ibid.*

(continued…)

Supplemental Declaration of Dr. Christine Brady

103

specific recommendations" for the treatment that all transgender or gender nonconforming youth should receive.[9] In other words, the portion of the APA Practice Guidelines quoted by Dr. Anderson does not say that all transgender or gender nonconforming youth should receive professional psychological evaluation before, e.g., using appropriate names and pronouns; instead, it simply suggests steps psychologists may take for transgender youth already in front of them.[10]

20.    In my clinical experience, it is normal for many transgender youth to socially transition without prior consultation with a mental health professional.

21.    Dr. Anderson's assertion that mental health consultation is always required before social transition runs contrary to both clinical experience and current standards of care (SOC8), and would improperly medicalize a developmentally appropriate, non-medical step that gender-diverse youth need to be able to access in understanding their identity.

**Under Prevailing Professional Standards, Students Can Appropriately Initiate Social Transition at School without Necessarily Doing So at Home**

22.    Similarly, Dr. Anderson's statements that social transitions in only specific contexts such as school amount to "facilitating a double life for some children, in which they present as transgender in some contexts but cisgender in other contexts [which] is not in their best interest" (Anderson Decl., ¶ 78) is not supported by professional standards.

23.    Indeed, the WPATH SOC8 states that "social transition may best occur in all *or in specific contexts/settings only* (e.g., school, home)."[11]

24.    Dr. Anderson's only response to this language in the SOC8 is to disagree with it by claiming that "social transition may not in fact be easily 'reversible'" and that parents must be involved "to help their children avoid making bad decisions." (Anderson Decl., ¶¶ 59-60.) As explained below in paragraphs 38-54, Dr. Anderson's views misinterpret the data and are otherwise unsubstantiated by research.

---

[9] *Ibid.*
[10] *Id.* at p. 843 (describing what psychologists are encouraged to do "*[w]hen* working with [transgender] adolescents" (emphasis added)).
[11] WPATH SOC8, p. S76 (emphasis added).

7

25.    It is also a mischaracterization of transgender or gender nonconforming students' experiences to suggest that school officials are somehow "facilitating" these individuals leading a "double life" (Anderson Decl., ¶ 78) by respecting a student's decision, for example, to request use of a different pronoun or name reflecting their gender identity or gender expression.

26.    First, it is incorrect to characterize schools officials' decisions to refrain from "dead-naming" transgender or gender nonconforming students or referring to them by their former pronouns as "facilitating" their transitions. Indeed, school officials are simply ensuring that these students are not injured by what Dr. Anderson agrees are harmful, "disaffirming" actions. (Anderson Decl., ¶ 59.)

27.    Second, coming out in an incremental fashion is a well-documented phenomenon not only for transgender youth, for but LGBTQ+ individuals more generally. (Brady Decl., ¶¶ 43-53.) Coming out is not a discrete event that happens once and is over; rather, decisions to come out to particular individuals, and/or in particular contexts, are part of a process that LGBTQ+ individuals engage in across a whole lifetime. For that reason, it is especially important that transgender or gender nonconforming youth have the ability to healthily and safely decide when, where, and to whom to come out on their own terms and when they are ready.

**Policy 5020.1's Forced Disclosure Provisions, Rather than Addressing "Coexisting Mental Health" Conditions, Could Worsen Them**

28.    One reason Dr. Anderson suggests that mental health professionals (and therefore parents, who she claims are always needed to consent to youths' treatment (Anderson Decl., ¶ 71)) must always be involved before social transition is because Dr. Anderson claims that mental health interventions are needed to address other mental health conditions that transgender or gender nonconforming youth might be experiencing. (Anderson Decl., ¶ 27.)

29.    But at the outset, there are many alternative systems that can identify the mental health conditions experienced by youth without exposing them to potential harm from forced disclosure. Pediatricians, for example, screen the youth they treat for depression and anxiety as part of their standard practice. Additionally, clinical psychologists and physicians can, and often do, treat mental health issues experienced by transgender or gender nonconforming (and many

8

other) youth—such as depression—without outing the transgender youth against their will, which, as I have described, causes significant mental health harm. (Brady Decl., ¶¶ 54-64.)

30.   Further, in drawing attention to the mental health risks that transgender and gender nonconforming youth might face, Dr. Anderson indicates precisely why Policy 5020.1's forced disclosure provisions are so detrimental to transgender and gender nonconforming youth.

31.   As I have noted previously (Brady Decl., ¶ 40), research shows that transgender students who can socially transition in an affirming and supportive environment have mental health outcomes that mirror their cisgender peers.[12] Another study notes that for such students who were not exposed to harassment in K-12 schools based on their gender identity, the ability to pursue early transition was linked to better mental health outcomes.[13]

32.   And as I have also discussed previously, studies show that lesbian, gay, and bisexual youth who experience parental rejection are eight times more likely to attempt suicide and six times more likely to report major depressive symptoms.[14] (See Brady Decl., ¶ 62.)

33.   These studies highlight a key point: social transitions are linked to better mental health outcomes, but mainly if done in a safe and supportive environment. Sadly, some youths' parents do not provide a safe and supportive environment at home.

34.   If school staff are forced to share a young person's social transition and gender identity with parents prior to the youth being ready, and prior to ensuring that the home environment would be safe and supportive, they place the youth at risk for devastating consequences.

---

[12] Durwood et al., *Mental Health and Self-Worth in Socially Transitioned Transgender Youth* (2017) 56 J. Am. Acad. Of Child & Adolescent Psychiatry 116.

[13] Turban et al., Timing of Social Transition for Transgender and Gender Diverse Youth, K-12 Harassment, and Adult Mental Health Outcomes (2021) 69 *J. of Adolescent Health* 991, 991-998. See also Murchison et al., *School Restroom and Locker Room Restrictions and Sexual Assault Risk Among Transgender Youth* (2019) 143 Pediatrics 1, 2 (study of 3,673 transgender adolescents found adolescents at schools that did not allow them to use the bathroom that aligned with their gender identity had increased risk of sexual assault victimization).

[14] Ryan et al., *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults*, Pediatrics (Jan. 2009) p. 346, avail. at: https://pubmed.ncbi.nlm.nih.gov/19117902/

(continued…)

9

35.    Dr. Anderson's own citations illustrate this point. She cites WPATH's SOC8 as noting "studies showing that transgender youth have higher rates of depression, emotional and behavioral problems, suicide attempts and ideation, self-harm," and other issues. (Anderson Decl., ¶ 27.) But Dr. Anderson leaves out critical language from that same paragraph in SOC8: gender nonconforming youth "are at increased risk of mental health challenges, *often related to family/caregiver rejection*" and "*non-affirming community environments*."[15]

36.    Thus, Dr. Anderson's citation establishes precisely why the forced disclosure provisions of the Policy are harmful, as they expose youth to hostile and rejecting households and deny students an affirming school environment, causing these very harms. (See Brady Decl., ¶¶ 54-86.)

**Research Does Not Support Dr. Anderson's Claims that Social Transition "Causes" Individuals to Persist in their Transgender Identity**

37.    The other main reason that Dr. Anderson offers for why parents must always be informed of a youth's transgender identity is because, in Dr. Anderson's view: (1) the majority of children and youth do not persist in their expressions of gender nonconforming identity (Anderson Decl., ¶¶ 20, 29); (2) social transition causes youth to persist in gender nonconforming identity (Anderson Decl., ¶¶ 30-38); and (3) transitioned individuals may face certain challenges (Anderson Decl., ¶¶ 44-52.)[16] Thus, in Dr. Anderson's view, parental involvement should be required in all cases to guide young people's decisions in expressing their gender identity—even to the point where Dr. Anderson asserts that parents should have the power "to say 'no' to a social

---

[15] WPATH SOC8, p. S62 (emphasis added).

[16] One "challenge," described above, is the greater mental health risks that Dr. Anderson claims transgender individuals experience; as explained above, however, that phenomenon is not inherent to being gender nonconforming, but rather, often *exacerbated* by policies like Policy 5020.1. (See *ante*, ¶¶ 30-36.)

Another potential "challenge" referenced by Dr. Anderson is the rare instance where individuals seek to "detransition" after undergoing medical interventions like surgery or medication. (Anderson Decl., ¶¶ 47-49.) However, social transition is non-medical and involves no such interventions. In the rare case that a youth's gender identity does not match their social transition, it must be up to the youth to make that decision. In the rare clinical cases I have had involving such a situation, the decision to change a social transition is simple and reversible: the youth simply goes back to using the prior name and pronouns the youth had used before.

10

transition." (Anderson Decl., ¶ 76.) These claims are incorrect, misleading, and harmful, and the prevailing research does not support these conclusions.

### A. Dr. Anderson Has Misinterpreted the Data Regarding "Persistence" of Gender Nonconformity from Childhood into Adolescence

38.    Dr. Anderson asserts that "for the vast majority of children, gender incongruence does not persist." (Anderson Decl., ¶ 20.) This is incorrect. The research she references examined prepubertal children who were referred to gender clinics, but most of the young people in those studies did not appear to be transgender or gender nonconforming to begin with.

39.    These past studies used an outdated diagnostic label of "gender identity disorder in children,"[17] which did not require the child to identify as a gender different from their sex assigned at birth.[18] This diagnosis label is flawed because its expansive definition likely included many cisgender "tomboys" or cisgender boys with "feminine interests" (e.g., playing with dolls and female peers) who never identified as transgender and, thus, unsurprisingly did not identify as transgender when followed up with later in life. As Dr. Kristina Olson of Princeton University noted in a 2016 publication in The Journal of The American Academy of Child & Adolescent Psychiatry, more than 90% of children diagnosed with "gender identity disorder" in these studies, when directly asked their gender identity, reported their sex assigned at birth.[19]

40.    In contrast, a recent publication in the Journal of Pediatrics followed 317 transgender children (i.e., those who had a gender identity different from their sex assigned at birth) over a period of five years and found that at the end of the follow-up period, 97.5% were still using pronouns indicating a transgender identity.[20]

---

[17] See, e.g., Steensma et al., *Desisting and Persisting Gender Dysphoria after Childhood A Qualitative Follow-Up Study* (2011) 16 Clinical Child Psychology and Psychiatry 499 (following "Twenty-five adolescents . . . diagnosed with a Gender Identity Disorder"); Drummond et al., *A Follow-Up Study of Girls with Gender Identity Disorder* (2008) 44 *Developmental Psychology 34,* 34-45; Zucker et al., *Gender Identity Disorder and Psychosexual Problems in Children and Adolescents* (1995).

[18] See Am. Psychiatric Assn. (APA) Diagnostic and Statistical Manual of Mental Disorders (2000 4th ed.) (DSM-IV-TR).

[19] Olson, *Prepubescent Transgender Children: What We Do and Do Not Know* (2016). 3 J. of the Am. Acad. of Child & Adolescent Psychiatry 155, 155-156.

[20] Olson et al., *Gender Identity 5 Years After Social Transition* (2022) 150 Pediatrics 1.

11

**B.    The Latest Research Indicates that Social Transition Does Not Make "Persistence" More Likely**

41.    Dr. Anderson also claims that social transition at school or in the community may increase the likelihood of "persistence" of a transgender identity and thus would explain the results of the studies on "persistence" discussed above. (Anderson Decl., ¶¶ 30-38.) But recent research shows that this is not the case.

42.    In a study published in 2019 in the journal Psychological Science, Rae et al. examined the question of whether a social transition intensifies transgender identification.[21] They examined a cohort of gender-nonconforming children over two years, during which time 36 of these children socially transitioned.[22] They measured degree of gender nonconformity before and after social transition and found that social transition did not increase gender nonconformity.[23] Their study made it clear that the association between social transition and "persistence" that some studies have noted is because those who undergo a pre-pubertal social transition have stronger discordance between their sex assigned at birth and their gender identity to begin with, prior to the social transition.[24]

43.    In other words, a social transition does not make a child identify more strongly as transgender and thus likely to persist with that gender identity. Rather, youth with strong transgender identification are more likely to pursue a social transition to begin with. This is consistent with the findings of Steensma et al. 2013, that Dr. Anderson cites (Anderson Decl., ¶ 31), which also observed that individuals who socially transitioned had more intense gender nonconformity.[25]

---

[21] Rae et al., *Predicting Early-Childhood Gender Transitions* (2019) 30 Psychological Science 669, 669-681.
[22] *Ibid.*
[23] *Ibid.*
[24] *Ibid.*
[25] Steensma et al., *supra*. Dr. Anderson also cites text from the 2017 Endocrine Society Guidelines (Anderson Decl., ¶ 33), which, in addition to being published by an organization focused on a medical intervention (i.e., hormone treatments), could easily be misconstrued. Any correlation between social transition and cross-gender identity continuing into adolescence, as explained above, is because youth who socially transition already have very strong cross-gender
(continued…)

12

44. Thus, Dr. Anderson's claim that "[s]ocial transition sets children down a path that often leads to medical interventions" (Anderson Decl., ¶¶ 53-55), which is premised on the presumption that a social transition will make a child identify more strongly as transgender and increase the likelihood of "persistence," is false. Youth who socially transition already have very strong cross-gender identification to begin with, which is why they pursue a social transition in the first place, and social transition does not impact their transgender identity or likelihood of persistence, as discussed in Rae et al.'s study published in Psychological Sciences.[26]

45. Dr. Anderson has also deceptively lifted text from the introduction of the Rae et al. study which reads, "we know little about . . . whether transitions impact children's views of their own gender." (Anderson Decl., ¶ 37.)[27] But the purpose of that introduction section in the academic research paper is to set up gaps that existed in the literature prior to the data being presented, along with the research question to be answered.[28]

46. The paper subsequently answers the question Dr. Anderson quoted with new data.[29] It is misleading, not to say disingenuous, to quote the paper's introduction without subsequently discussing its actual research findings, which explicitly refute Dr. Anderson's assertion.[30]

47. Thus, contrary to Dr. Anderson's suggestions, transgender identity or gender nonconformity is not "caused by" social transitions; rather, social transitions result from transgender or gender nonconforming youth seeking to more fully express who they are.

---

identification to begin with, which is why they pursue a social transition in the first place, and social transition does not impact their transgender identity or likelihood of persistence, as later studies like those by Rae et al. have shown.

[27] Quoting Rae et al., *supra*, at p. 670.
[28] See *ibid.*
[29] *Id.* at pp. 678-679 ("[A]n assigned male who will later transition to live as a girl is roughly as feminine before transition as a transgender girl is after a transition . . . . this effect was remarkably robust across different analytic and data-processing decisions. . . . Consistent with the first explanation, our results showed that the children who transitioned showed more extreme cross-sex identification and preferences before transitioning.").
[30] *Ibid.*

**C.      Dr. Anderson Has Misinterpreted the Data Discussing Cultural and Societal Factors in Relation to Transgender Identity or Gender Nonconformity**

48.      For similar reasons, Dr. Anderson's suggestion that increased number of young people are expressing gender diversity due to "susceptibility to social influence" (Anderson Decl., ¶ 19) misinterprets the data.

49.      As I stated in my initial declaration, gender identity is not a choice; it is a core aspect of a person's being. (Brady Decl., ¶¶ 21-22.)

50.      Significant research indicates that transgender identity results not from social pressures but from a strong, innate biological basis. Studies have conducted neuroimaging on transgender adolescents, and found that transgender adolescents have patterns of brain activation more similar to those of other people who share their gender identity than people who share the same sex assigned at birth.[31] Other researchers have examined the identical twins and fraternal twins of transgender parents. These researchers found that identical twins of transgender parents, who have the same DNA, are far more likely to be transgender than fraternal twins, who have different DNA, and, thus, concluded that gender identity has a strong genetic component.[32] Meanwhile, sophisticated gene sequencing studies have suggested that genes involved in estrogen processing play a role in the development of gender identity among transgender people.[33] While the precise biological causes of gender identity have not been conclusively identified, these studies together indicate a strong innate biological basis for transgender identity.

51.      My clinical experience confirms this research. Over the hundreds of adolescents I have treated, my patients do not ask me, "should I socially transition"—almost all have already decided that they wish to or have already done so. It is normal for many of them to have been on this journey for a while already because it is their decision.

---

[31] Burke et al., *Hypothalamic Response to the Chemo-Signal Androstadienone in Gender Dysphoric Children and Adolescents* (2014) 5 Frontiers in Endocrinology 60.

[32] See, e.g., Coolidge et al., *The Heritability of Gender Identity Disorder in a Child and Adolescent Twin Sample* (2002) 32 Behavior Genetics 251, 251-257.

[33] Theisen et al., The Use of Whole Exome Sequencing in a Cohort of Transgender Individuals to Identify Rare Genetic Variants (2019) 9 Scientific Reports 1, 1-11.

14

52.    Meanwhile, we are not seeing the same increases in number of adults as we have adolescents (see Anderson Decl., ¶ 15) because transgender middle-aged adults have endured decades of stigma for their transgender identities that make them far less likely to come out as transgender, even despite some recent changes in current social attitudes. These decades of exposure to and survival in unaccepting environments, according to the "gender minority stress" model, leads to expectations of future rejection and internalized transphobia (i.e., internalization of society's stigma directed toward transgender people). This can cause self-hate for being transgender, as well as a desire to conceal one's identity.[34] These factors make it less likely for middle-aged transgender adults to come out, despite the more recent increases in societal acceptance for transgender people in the United States.

53.    Meanwhile, many transgender youth are, for the first time, growing up in environments where transgender identity is not as stigmatized, making it relatively easier for them to come out when compared to transgender adults who are burdened by decades of living in a social milieu where being transgender was not recognized or accepted.

54.    Among the hundreds of transgender and gender nonconforming youth whom I have treated, none have indicated that they expressed a transgender or gender nonconforming identity because of social media or peer influences. Indeed, as Dr. Anderson acknowledges, a social transition can come with challenges (Anderson Decl., ¶ 28), particularly due to the discrimination that a transgender or gender nonconforming individual might face; these potential challenges provide all the more reason why transgender or gender nonconforming youth are not expressing such identities merely because of social media or peer influences.

**D. Dr. Anderson's Suggestion that Parents Should Always Be Consulted So that They Can Sometimes "Say 'No'" to a Youth's Gender Identity is Harmful to Youth**

55.    As I explained in my initial declaration, the best outcome for transgender and gender nonconforming youth is for them to socially transition on their own terms, at their own pace, into

---

[34] Hendricks et al., *A Conceptual Framework for Clinical Work with Transgender and Gender Nonconforming Clients: An Adaptation of the Minority Stress Model* (2012) 43 Professional Psychology: Research and Practice 460.

15

supportive, loving environments. (Brady Decl., ¶¶ 35-53, 87.) This type of social transition aligns with the natural process of a person growing up and learning how to navigate the different environments around them.

56. Dr. Anderson's suggestion, then, that parental involvement should be required so that parents can sometimes "say 'no' to a social transition" (Anderson Decl., ¶¶ 60, 76) is harmful to youth. As I've noted previously, research has shown that lesbian, gay, and bisexual youth who experience parental rejection are eight times more likely to attempt suicide and six times more likely to report major depressive symptoms. (Brady Decl., ¶ 62.)

57. Studies specific to gender identity have reached similar conclusions. As WPATH's leading and current Standards of Care (SOC8) state, "efforts at blocking reversible social expression or transition may include choosing not to use the youth's identified name and pronouns or restricting self-expression in clothing and hairstyles."[35] These and other "disaffirming behaviors" have "been linked to increased anxiety, depression, suicidal ideation, suicide attempts, and health care avoidance."[36] Such efforts "to change gender identity/expression have been associated with negative psychological functioning that endures into adulthood."[37]

58. Thus, WPATH's SOC8 "recommend[s] against such [disaffirming] efforts," as "efforts undertaken a priori to change a person's identity are clinically and ethically unsound."[38]

**Conclusions**

59. In my expert opinion, Policy 5020.1's forced disclosure provisions directly contradicts the recommendations in WPATH's leading and current Standards of Care for transgender health. Similarly, Dr. Anderson's assertions that "parental consent" is required before a student should socially transition (Anderson Decl., ¶ 81) is expressly contradicted by WPATH's current Standards of Care.

60. Dr. Anderson's heavy reliance on an older and outdated version of WPATH's Standards of Care, rather than the most current edition, is inappropriate and invalidates many of

---

[35] WPATH, SOC8, p. S53.
[36] *Ibid.*
[37] *Ibid.*
[38] *Ibid.*

Supplemental Declaration of Dr. Christine Brady

her conclusions, as they do not reflect the current research or professional standards of care governing the health of transgender youth.

61.   Social transition is not a medical intervention, as Dr. Anderson herself acknowledges. Because social transition is not a medical intervention, consultation with a medical or mental health professional is not required before youth may socially transition.

62.   Because social transition is a *non-medical* intervention, Dr. Anderson's citations to the 2017 recommendations from the Endocrine Society, SOC7, or SOC8 which provide recommendations related to *medical* interventions (such as medications or surgery) is inappropriate.

63.   By suggesting that medical recommendations specific to *gender dysphoria* are appropriate for transgender youth categorically, Dr. Anderson's analysis improperly pathologizes transgender and gender nonconforming identity. Being transgender is not a mental illness, and being transgender is not the same as having gender dysphoria. When they are given the opportunity to freely express themselves without being singled out for discriminatory treatment, countless transgender and gender nonconforming youth live psychologically healthy lives, with mental health outcomes paralleling their cisgender peers'.

64.   Research demonstrates that social transition does not cause the persistence of transgender or gender nonconforming identity. Dr. Anderson relies solely on studies showing *correlation*, not *causation*, and it is clear why social transition correlates with transgender identity: youth who are transgender to begin with choose to socially transition so that they can express their core identity.

65.   A youth's transgender identity is not influenced by "social pressure." Transgender students do not "choose" their gender identity, let alone "choose" gender identity based on social media or peer pressure. Rather, research indicates that there is a strong, innate, biological basis to gender identity.

66.   Dr. Anderson misleadingly claims that no professional medical organizations recommend social transition without professional consultation; professional medical organizations do not make recommendations one way or another regarding social transition

17

because these organizations recognize that it would be inappropriate to issue medical recommendations for a non-medical action like social transition.

67.    Current and leading professional standards of care—which discuss transgender youth health more holistically—recommend that youth should have the ability to initiate social transition in their own timeframe and in the manner they choose without formal mental health involvement. Policy 5020.1's forced disclosure provisions burden and disrupt this natural process, harming transgender youth in numerous ways. (Brady Decl., ¶¶ 35-86.)

18

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on October _8____, 2023, in ____Santa Clara_____, California.

_____

Christine Brady, Ph.D

19

EXHIBIT 5

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ELIZABETH MIRABELLI, an individual, )
on behalf of herself and all others )
similarly situated; LORI ANN WEST,  )
an individual, on behalf of herself )
and all others similarly situated;  )
et al.,                             )
                                    )
            Plaintiffs,             )
                                    )
    vs.                             )     Case Number
                                    ) 3:20-cv-00768-BEN
MARK OLSON, in his official         )
capacity as President of the EUSD   )
Board of Education, et al.,         )
                                    )
            Defendants.             )
_____)

VIDEOTAPED DEPOSITION OF

CHRISTINE ERIN LAM BRADY, PH.D.

APPEARING REMOTELY VIA ZOOM WEBCAM

JUNE 3, 2025

Reported by:
WENDI J. VALLARINO
CSR 9337, RPR, CRR
Number 25-J12990361

**SG** THE SULLIVAN GROUP
OF COURT REPORTERS
AN ESQUIRE DEPOSITION SOLUTIONS COMPANY

117

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ELIZABETH MIRABELLI, an individual, )
on behalf of herself and all others )
similarly situated; LORI ANN WEST,  )
an individual, on behalf of herself )
and all others similarly situated;  )
et al.,                             )
                                     )
            Plaintiffs,              )
                                     )
    vs.                              )    Case Number
                                     )  3:20-cv-00768-BEN
MARK OLSON, in his official          )
capacity as President of the EUSD    )
Board of Education, et al.,          )
                                     )
            Defendants.              )
_____)

VIDEOTAPED DEPOSITION OF

CHRISTINE ERIN LAM BRADY, PH.D.

APPEARING REMOTELY VIA ZOOM WEBCAM

JUNE 3, 2025

Reported by:
WENDI J. VALLARINO
CSR 9337, RPR, CRR
Number 25-J12990361

THE SULLIVAN GROUP OF COURT REPORTERS

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


ELIZABETH MIRABELLI, an individual, )
on behalf of herself and all others )
similarly situated; LORI ANN WEST,  )
an individual, on behalf of herself )
and all others similarly situated;  )
et al.,                             )
                                    )
            Plaintiffs,             )
                                    )
   vs.                              )     Case Number
                                    ) 3:20-cv-00768-BEN
MARK OLSON, in his official         )
capacity as President of the EUSD   )
Board of Education, et al.,         )
                                    )
            Defendants.             )
_____)


VIDEOTAPED DEPOSITION OF CHRISTINE ERIN LAM

BRADY, PH.D., taken on behalf of Plaintiffs, with all

parties appearing remotely via Zoom Webcam, commencing

at 10:06 a.m., on Tuesday, June 3, 2025, before Wendi

J. Vallarino, CSR 9337, RPR, CRR.

APPEARANCES OF COUNSEL:


For the Plaintiffs:

        LiMANDRI & JONNA, LLP
        BY:   PAUL M. JONNA
              JEFFREY M. TRISSELL
        PO Box 9120
        Rancho Santa Fe, California 92067
        858-759-9930
        pjonna@limandri.com
        jtrissell@limandri.com

        THOMAS MORE SOCIETY
        BY:   JOAN MANNIX
        309 West Washington Street, Suite 1250
        Chicago, Illinois 60606
        312-782-1680
        jmannix@thomasmoresociety.org


For Defendants State Board of Education, California
Department of Education, and Attorney General Rob
Bonta:

        CALIFORNIA DEPARTMENT OF JUSTICE
        BY:   JENNIFER BUNSHOFT
              SHATTI HOQUE
        455 Golden Gate Avenue, Suite 11000
        San Francisco, California 94102
        415-510-3377
        jennifer.bunshoft@doj.ca.gov
        shatti.hoque@doj.ca.gov


For the Escondido Union School District:

        ARTIANO SHINOFF
        BY:   LAUREN CAMBRONERO
        3636 Fourth Avenue, Suite 200
        San Diego, California 92103
        619-232-3122
        lcambronero@as7law.com

APPEARANCES OF COUNSEL (Continued):


For the California Department of Education:

      CALIFORNIA DEPARTMENT OF EDUCATION
      BY:  PAUL GANT
      1430 N Street, Suite 5319
      Sacramento, California 95814
      916-319-0800
      pgant@cde.ca.gov


Also present:

      Alejandro Covarrubias, Videographer

      Anelise Trippe

      Emily Chamale

      Stella Reed

      Lori Ann West

agree, though, it would be a good idea to carefully review the HHS report; correct?

MS. BUNSHOFT:  Same objections.

THE WITNESS:  I will continue to read it if that's what you're asking me.

Q    BY MR. JONNA:  I'm asking if you agree it would be important for you to carefully read it given that it kind of touches on some of the stuff that you do?

MS. BUNSHOFT:  Same objections.  Asked and answered.

THE WITNESS:  I am not done reading it, and I do think it's important to read it.

Q    BY MR. JONNA:  Thank you.

I'm going to pull up Exhibit 19 -- actually, sorry.  Exhibit 20.

(Exhibit 20 was marked for identification.)

Q    BY MR. JONNA:  This is your declaration in the People versus Chino Valley Unified School District case.  It says here declaration of Dr. Christine Brady in support of the People of the State of California's ex parte application for temporary restraining order and order to show cause regarding preliminary injunction.

Do you see that?

A    Yes.

Q    Let's make sure that's your signature at the end.   That's your signature at the very bottom of page 19; correct?

A    Yes.

Q    This is a report that you authored on your own; correct?

A    Yes.

Q    And it's very similar to the report that you authored in this case; correct?

MS. BUNSHOFT:   Objection to the extent it misstates -- or misrepresents the documents.

THE WITNESS:   There are similar points in both reports.

Q    BY MR. JONNA:   And as you testified earlier, you were asked to provide opinions on similar issues in this case as you were in the Chino case; correct?

MS. BUNSHOFT:   Same objections.

THE WITNESS:   Yes.

Q    BY MR. JONNA:   Page 5, you state at section C "By itself, social transition is the psychologically" -- "is psychologically beneficial and is a medically recognized treatment for gender dysphoria.   Policy 5020.1 discourages this medically recognized treatment of gender dysphoria, thus harming

transgender and gender-nonconforming youths who have not yet socially transitioned."

Do you see that?

A    Yes.

Q    And that red highlighted portion that we just read, you took that out of your report in our case; isn't that true?

MS. BUNSHOFT:  Objection.  The documents speak for themselves.

THE WITNESS:  I believe I rephrased it.  And even in a rebuttal report in this case, I believe I clarified my meaning.

Q    BY MR. JONNA:  So you took this portion out of the report and you rephrased it for the report in the Mirabelli case; correct?

MS. BUNSHOFT:  Objection.  The documents speak for themselves.

THE WITNESS:  I'm not sure.  I feel like there is a very similar statement in my report for this case.

Q    BY MR. JONNA:  Well, would you agree that you largely copied and pasted a lot of your opinions from the Chino case into the Mirabelli case?

MS. BUNSHOFT:  Objection.  Argumentative.  The documents speak for themselves.

THE WITNESS:  I mean, as I stated, the cases are

fairly similar and so the points that I made in this case applied to this case as well.

Q    BY MR. JONNA:  So you did copy and paste large portions of your report from Chino into the Mirabelli case; correct?

MS. BUNSHOFT:  Same objections.

Q    BY MR. JONNA:  Because the cases are similar; correct?

MS. BUNSHOFT:  Same objections.

THE WITNESS:  I did use a lot of the same material and then edited it as I felt fit to do so.

Q    BY MR. JONNA:  And you still agree and it's still your opinion that social transition is psychologically beneficial and is a medically recognized treatment for gender dysphoria; correct?

A    So I went on to clarify in my current materials that what I mean by medically recognized and psychologically beneficial is that they have benefits to people that, you know, are noted in the -- by the medical field and by the psychological field.

Q    My question was it's still your position as you sit here today under oath, as it was when you provided this declaration under oath, that social transition is psychologically beneficial and is a medically recognized treatment for gender dysphoria;

correct?

MS. BUNSHOFT:  Objection.  Asked and answered.

THE WITNESS:  Yes.  The medical field recognizes that it is a beneficial treatment.  Yes.

Q    BY MR. JONNA:  Well, this is your declaration.  I'm not asking you about the medical field.

I'm asking if you, Dr. Brady, still maintain that social transition is psychologically beneficial and is a medically recognized treatment for gender dysphoria?

MS. BUNSHOFT:  Asked and answered.

THE WITNESS:  Yes.  I agree with that.

Q    BY MR. JONNA:  Okay.

On page 7, paragraph 30, it states "Gender dysphoria refers to the psychological distress caused by an incongruence between one's assigned sex at birth and one's gender identity.  The treatment for gender dysphoria includes an open-ended exploration of the individual's feelings and experiences of gender identity without any pre-defined, preferable gender identity.  Treatment also includes social affirmation of the individual's preferred pronouns and names."

Do you see that?

A    Yes.

Q    And then in the next paragraph at the end, it

CERTIFICATE OF REPORTER

---oOo---

I, Wendi J. Vallarino, a Certified Shorthand Reporter licensed by the State of California, being empowered to administer oaths and affirmations remotely pursuant to Section 2093(b) of the Code of Civil Procedure, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED:  June 16, 2025.

_____
Wendi J. Vallarino, CSR 9337, RPR, CRR

## DEPONENT'S DECLARATION UNDER PENALTY OF PERJURY

I, CHRISTINE ERIN LAM BRADY, PH.D., declare under penalty of perjury that I have read the foregoing transcript and I have made any corrections, additions, or deletions that I was desirous of making; that the foregoing is a true and correct transcript of my testimony contained herein.

Executed this __17__ day of __July__, 20_25_, at __Los Gatos__, __CA__.
                        (City)                (State)

_____
CHRISTINE ERIN LAM BRADY, PH.D.

DEPONENT'S CHANGES OR CORRECTIONS

Note: If you are adding to your testimony, print the exact words you want to add. If you are deleting from your testimony, print the exact words you want to delete. Specify with "Add" or "Delete" and sign this form.

DEPOSITION OF:        CHRISTINE ERIN LAM BRADY, PH.D.

CASE:                 MIRABELLI vs. OLSON

DATE OF DEPOSITION: JUNE 3, 2025

| PAGE | LINE | CHANGE/ADD/DELETE/REASON |
|------|------|--------------------------|
| 74 | 1 | Change ""may be" to ", maybe" / Transcription error |
| 127 | 6 | Change "very to "vary" / Transcription error |
| 220 | 11-12 | Change "3- to 400" to "300 to 400" / Clarification |
| 260 | 2 | Change "disclosure" to "disclose" / Transcription error |
| 158:24-159:1 | | Change "stability incongruent -- incongruence" to "stable incongruence" / transcription error |

| PAGE | LINE | CHANGE/ADD/DELETE/REASON |
|------|------|--------------------------|
|      |      |                          |
|      |      |                          |
|      |      |                          |
|      |      |                          |
|      |      |                          |
|      |      |                          |
|      |      |                          |
|      |      |                          |
|      |      |                          |
|      |      |                          |
|      |      |                          |
|      |      |                          |
|      |      |                          |
|      |      |                          |
|      |      |                          |
|      |      |                          |
|      |      |                          |
|      |      |                          |
|      |      |                          |
|      |      |                          |
|      |      |                          |
|      |      |                          |

Deponent's Signature _____    Date 7/17/25

THE SULLIVAN GROUP OF COURT REPORTERS

272

130

## CERTIFICATE OF REPORTER

---oOo---

I, Wendi J. Vallarino, a Certified Shorthand Reporter licensed by the State of California, being empowered to administer oaths and affirmations remotely pursuant to Section 2093(b) of the Code of Civil Procedure, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED:   June 16, 2025.

_Wendi J. Vallarino_

_____

Wendi J. Vallarino, CSR 9337, RPR, CRR

# CERTIFICATE OF SERVICE

Case Name:    **Mirabelli et al. v. Olson, et al.**          Case    **3:23-cv-00768-BEN-VET**
                                                              No.

I hereby certify that on <u>September 8, 2025</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## DECLARATION OF DR. CHRISTINE ERIN LAM BRADY, PH.D., IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON PROSPECTIVE RELIEF CLAIMS

I certify that **all** participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct, and that this declaration was executed on <u>September 8, 2025</u>, at Los Angeles, California.

| | |
|---|---|
| Anthony Conklin | *Anthony Conklin* |
| Declarant | Signature |

SA2024300204
67921457.docx