ROB BONTA
Attorney General of California
DARRELL W. SPENCE (SBN: 248011)
Supervising Deputy Attorney General
JENNIFER A. BUNSHOFT (SBN: 197306)
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3377
Fax: (415) 703-5480
E-mail: Jennifer.Bunshoft@doj.ca.gov
*Attorneys for State Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ELIZABETH MIRABELLI, an individual, and LORI ANN WEST, an individual,**<br><br>Plaintiffs,<br><br>v.<br><br>**MARK OLSON, in his official capacity as President of the EUSD Board of Education, et al.,**<br><br>Defendants. | 3:23-cv-00768-BEN-VET<br><br>**DECLARATION OF DARLENE TANDO, LCSW, IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON PROSPECTIVE RELIEF CLAIMS**<br><br>Date:        September 29, 2025<br>Time:        10:30 a.m.<br>Dept:        5A<br>Judge:       The Honorable Roger T. Benitez<br><br>Trial Date:    Not assigned<br>Action Filed:  April 27, 2023 |

I, Darlene Tando, declare:

1.     I am over the age of 18 years, a resident of the State of California, and a U.S. citizen. I know the following facts based on my own personal knowledge, and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

1

2. I am a Licensed Clinical Social Worker in the State of California. I am a full-time therapist and supervisor at my own private practice, Tando Therapy Team.

3. I received my Bachelor's degree from UC Santa Barbara in 1998 and earned my Master's degree in Social Work at San Diego State University in 2000. I have been licensed since 2003. After I graduated with my Master's degree, I worked at a residential treatment facility for children and then at the Naval Medical Center San Diego, treating dependents of military personnel.

4. I have owned and operated my private practice for the past 19 years. I have been working with transgender youth and adults for the past 18 years. Approximately 95% of the clientele I see in my practice are trans or gender nonconforming. I supervise other gender-affirming therapists who are a part of my practice. I specialize in doing work with trans and gender-nonconforming individuals and their families. Over the course of the past 18 years, I have seen hundreds of transgender individuals and their families. My work with all of these clients has informed my philosophies on working with transgender youth and adults, and my work with families. Additionally, my work with transgender adults continues to educate me about working with transgender youth, as the adults were once transgender kids, with or without affirmation.

5. I have been retained by State Defendants to provide expert opinions in this matter, as set forth in my declaration and report discussed below.

6. I prepared an expert declaration in opposition to Plaintiffs' motion for a class-wide preliminary injunction in this matter, which was filed on October 21, 2024 (ECF 165-1 Ex. 3). A true and correct copy of that declaration is attached hereto as Exhibit 1.

7. I subsequently prepared an expert report, dated May 1, 2025. A true and correct copy of my expert report is attached hereto as Exhibit 2.

2

8.     All of my statements in the attached declaration and expert report represent my own opinions, based on my own personal knowledge and review of scientific literature, as applied to the facts of this case. I could and would testify to them in court if called upon to do so.

9.     I was deposed by Plaintiffs on June 6, 2025.  True and correct copies of relevant excerpts of the transcript from my June 6, 2025 deposition are attached hereto as Exhibit 3.

10.   In their motion for summary judgment, Plaintiffs point to analogies and metaphors I used in my 2016 book, *The Conscious Parent's Guide to Gender Identity: A Mindful Approach to Embracing Your Child's Authentic Self*, including analogizing being transgender to a medical condition. I used the analogies to help parents understand their children's gender identity by conceptualizing being transgender as something concrete, similar to how a medical condition is concrete, in order for parents to be more attuned to the availability of various practical steps or interventions that may be beneficial for their child. Even when I referred to it as a medical condition in a post on my Gender Blog from 2012, I was also trying to make the point that being transgender is *not* a mental disorder. (*See* Ex. 3 at 195:6-14; 196:9-197:10.) Over the years, my language and conceptualization has evolved, and I would use different phrasing now than thirteen years ago.

11.     At my deposition, I was asked about the analogies in my book and blog, and provided the above explanations. I further clarified that "interventions" include non-medical interventions, such as drinking water when you are thirsty or eating when you are hungry, which "could be ways of intervening to increase our well-being and decrease our distress." This is similar to gender affirming care in the sense that "there can be interventions that are not medical, like using someone's name and pronouns." (Ex. 3 at 203:21-204:6).

12.   Plaintiffs argue that analogizing being transgender to having a medical condition means I believe that social transition is a medical treatment. That is not

DECLARATION OF DARLENE TANDO, LCSW, ISO STATE DEFENDANTS' OPP. TO
PLAINTIFFS' MOT. FOR SUMMARY JUDGMENT (3:23-CV-00768-BEN-VET)

correct. My attempts at analogies from many years ago have no bearing on my consistent belief—stated in my declaration, expert report, and deposition—that affirming a youth though social transition "does not involve medical interventions nor is it a medical treatment." (*See, e.g.,* Ex. 1 ¶ 34; Ex. 2 ¶¶ 16.d, 36, 37; Exhibit 3 at 204:2-6.)

13. In my book, blog and training materials, when I refer to "medical interventions" or "medical treatment" to address gender dysphoria, I mean interventions such as puberty blockers, gender-affirming hormones, and surgeries, which are *not* a part of a social transition.

14. I also have consistently opined that being transgender is not pathological or a mental disorder. (See Ex. 1 ¶ 15.d; Ex. 2 ¶ 16.c ("Transgender or gender nonconforming identities are not pathological or a mental illness"); Exhibit 3 at 195:13-20.)

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed in San Diego, California on September 8, 2025.

By: _Darlene Tando, LCSW_
    Darlene Tando, LCSW

SA2024300204

DECLARATION OF DARLENE TANDO, LCSW, ISO STATE DEFENDANTS' OPP. TO PLAINTIFFS' MOT. FOR SUMMARY JUDGMENT (3:23-CV-00768-BEN-VET)

## TABLE OF CONTENTS

| Exh. No. | Description | Page Numbers |
|---|---|---|
| 1 | Declaration of Darlene Tando, LCSW, in Support of Defendant Bonta's Opposition to Motion for Class-Wide Preliminary Injunction (ECF 165-1) | 001 - 030 |
| 2 | Expert Report of Darlene Tando, LCSW dated May 1, 2025 | 031 - 067 |
| 3 | Excerpts of June 6, 2025 Deposition of Darlene Tando, pages 195-197; 204-204 | 068 - 082 |

EXHIBIT 1

ROB BONTA
Attorney General of California
DARRELL W. SPENCE (SBN: 248011)
Supervising Deputy Attorney General
JENNIFER A. BUNSHOFT (SBN: 197306)
KEVIN L. QUADE (SBN: 285197)
EMMANUELLE S. SOICHET (SBN: 290754)
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone: (415) 510-4426
 Fax: (415) 703-5843
 E-mail: Emmanuelle.Soichet@doj.ca.gov
*Attorneys for Defendant Attorney General
Rob Bonta*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ELIZABETH MIRABELLI, an individual, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**MARK OLSON, in his official capacity as President of the EUSD Board of Education, et al.,**<br><br>Defendants. | 3:23-cv-00768-BEN-VET<br><br>**DECLARATION OF DARLENE TANDO, LCSW**<br><br>Judge: The Honorable Roger T. Benitez<br><br>Action Filed: 4/27/2023 |

I, Darlene Tando, declare:

1. I am over the age of 18 years, a resident of the State of California, and a U.S. citizen. I know the following facts based on my own personal knowledge, and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

22

DECLARATION OF DARLENE TANDO, LCSW (3:23-CV-00768-BEN-VET)
001

**Background and Experience**

2. I am a Licensed Clinical Social Worker in the State of California. I am a full-time therapist and supervisor at my own private practice, Tando Therapy Team.

3. I received my bachelor's degree from UC Santa Barbara in 1998 and earned my Master's in Social Work at San Diego State University in 2000. I have been licensed since 2003. After I graduated with my Master's, I worked at a residential treatment facility for children and then at the Naval Medical Center San Diego, treating dependents of military personnel.

4. I have owned and operated my private practice for the past 19 years. I have been working with transgender youth and adults for the past 18 years. Approximately 95% of the clientele I see in my practice are trans or gender nonconforming. I supervise other gender-affirming therapists who are a part of my practice. I specialize in doing work with trans and gender-nonconforming individuals and their families. Over the course of the past 18 years, I have seen hundreds of transgender individuals and their families. My work with all of these clients has informed my philosophies on working with transgender youth and adults, and my work with families. Additionally, my work with transgender adults continues to educate me about working with transgender youth, as the adults were once transgender kids, with or without affirmation.

5. I am a co-facilitator of "TransYouth Care," which provides a comprehensive 15-hour training designed for professionals interested in providing sensitive and competent mental health and medical care for gender-diverse children, transgender youth and young adults. Parents, guardians, and caregivers also attend these trainings to learn about the many facets of caring for a transgender youth, including the parent/guardian/caregiver's own process, supporting the youth with dysphoria, and best practices needed to inform and guide their care.

///

///

23

DECLARATION OF DARLENE TANDO, LCSW (3:23-CV-00768-BEN-VET)

002

6. I also provide trainings to hospitals, schools, and other organizations, and I teach a training on writing letters for gender-affirming surgeries for a local chain of clinics.

7. I am a proponent of the Informed Consent model[1] and believe the individual is the "expert" on their own gender identity. I authored the book "The Conscious Parent's Guide to Gender Identity: A Mindful Approach to Embracing Your Child's Authentic Self" in 2016. I have also contributed to the book "My Child Told Me They're Trans… What Do I Do?" as a Subject Matter Expert.

8. I have served on the board for a camp for transgender and gender nonconforming children called "Camp Laurel," now "Camp Mulberry."

9. I have appeared as a specialist in working with gender identity on the show The Doctors, Dr. Phil, Good Morning America, as well as the CNN Short Film "Raising Ryland." I have been interviewed on two different podcasts, Trans Parenting and Gender GP.

10. I am a member of the National Association of Social Workers and a former member of the World Professional Association for Transgender Health.

11. I have received the following awards: "Appreciation Award" from the San Diego transgender community at the Transgender Day of Empowerment in 2008, and was named the Stonewall Spirit Awards' "Friend of Pride" for San Diego Pride 2015. My gender blog won the NASW's 2013 Media Award for "Best Single Topic Blog."

12. Further information about my professional background and experience is outlined in my curriculum vitae, a true and accurate copy of which is attached as Exhibit 1 to this declaration.

---

[1] The informed consent model in is an approach that empowers individuals to make decisions about their own transition without needing extensive gatekeeping or psychological evaluations. This model emphasizes that patients are capable of understanding the risks and benefits of interventions and can provide informed consent based on their own experiences and needs.

24

13. My opinions below are based on my professional experience as a clinician, as well as my review of research, surveys and studies related to transgender and gender nonconforming youth and students. I routinely rely upon newer studies and research to inform my clinical practice as well as educate parents, other professionals, and clients. I continue to attend conferences that share and review the latest research information in the field.

14. The California Attorney General's Office asked me to provide this declaration to address the statements in the declaration of Dr. Erica E. Anderson, submitted by plaintiffs in this lawsuit.

<strong>Summary of Opinions</strong>

15. In this declaration, I rely upon my extensive professional experience as well as relevant research and studies to support my opinions that:

a. Designated sex and gender identity are not the same thing, and may align or not.

b. Youth are capable of understanding and asserting authentic gender identity.

c. Gender Dysphoria is a cluster of symptoms that one may experience when their authentic gender identity does not align with one's designated sex. It is extremely individualized and yet also a collective experience.

d. Transgender or gender nonconforming identities are not pathological or a mental illness.

e. Social transition/affirmation does not have to be a formal or professionally approved process; the individual should be empowered to make choices based on their own free will, and privacy shall be respected throughout the process.

f. A policy that allows or requires teachers to disclose the chosen pronouns of or the authentic gender identity of a student without their consent can

25

be extremely violating and can contribute to more dysphoria, family strife, and negative outcomes.

g.  The individual experiencing a different gender identity than what was assumed at birth should be able to make decisions about how to access disclosure, affirmation, and transition.

h.  The stakes can be high for a transgender youth whose teacher forcibly outs them to their parents and puts them at risk for rejection, discrimination, and unstable housing.

i.  Open communication between youth and their parents and affirmation of the youth's gender identity by the parents is ideal, although not always possible.

j.  Supportive educators significantly reduce school absenteeism and enhance feelings of safety for transgender youth.

k.  Dr. Erica Anderson's declaration relies on outdated Standards of Care that do not reflect current professional consensus, as well as problematic studies that have caused harm to the transgender community and have been largely criticized.

l.  Dr. Anderson purports that social transition "causes" individuals to persist in their transgender identity, although there is no research or data to confirm this. Additionally, while there may be correlation between social transition and remaining stable in one's gender identity, it is not a causal relationship.

**Gender Identity And Designated Sex**

16. Designated (anatomical) sex and gender identity are two separate things, although they usually align and are often conflated. Many assume one's gender identity will always align with one's anatomical sex, and this is simply not the case. One's "designated gender" or "designated sex" is the gender or sex that is assumed by looking at one's anatomy. Gender identity is a personal, core characteristic of a

26

person; a psychological sense of self. When one's designated sex and gender identity do not align, it is called being transgender. A transgender or gender nonconforming identity is not pathological, nor is it a mental illness.

17. In her declaration, Dr. Anderson implies that because of the recent "surge" of children and adolescents reporting a transgender identity, social and cultural factors may play a significant role.

18. However, transgender identities have existed for centuries across various cultures. Historical records show that individuals in ancient civilizations subscribed to the fluidity of gender expression, the acknowledgement of a third gender category, and the representation of diverse gender identities in religious and mythological figures.

19. Indigenous cultures in North America recognized Two-Spirit people, embodying both masculine and feminine traits. This long-standing presence reflects that transgender identities are not a modern phenomenon but rather part of the broader human experience. It is only now that understanding, visibility, and language to describe one's gender identity are increasing such that individuals may become consciously aware of their authentic gender identity at a younger age, instead of it being repressed or ignored indefinitely. Susan Stryker, *Transgender History* (2008).

### Understanding One's Gender Identity

20. Children can know and understand their gender by the ages of 3 to 5, sometimes earlier. Most children have a stable gender identity by the age of four years old. However, much like physical development, one's understanding of their gender identity can develop over time.

21. Cisgender children are assumed to know and understand their gender, because their gender aligns with their designated sex. However, a transgender child is just as capable of understanding their gender identity but is faced with doubt and

resistance from others, and others often assume they may be confused simply because their gender does not align with their designated sex.

22. Not only is this my experience as a clinician, but this is also supported by the American Academy of Pediatrics, which has stated that: "Research substantiates that children who are prepubertal and assert an identity of TGD (transgender/gender diverse) know their gender as clearly and as consistently as their developmentally equivalent peers who identify as cisgender and benefit from the same level of social acceptance." Jason Rafferty, et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*; 142 Pediatrics, e20182162 (2018); https://publications.aap.org/pediatrics/article/142/4/e20182162/37381/Ensuring-Comprehensive-Care-and-Support-for.

23. A November 2019 study published in *Proceedings of the National Academy of Sciences* revealed no significant differences in gender development between transgender and cisgender children, challenging the notion that transgender kids are too young to make decisions about a social transition. Selin Gülgöz, et al, *Similarity in Transgender and Cisgender Children's Gender Development*, 116 Proceedings of the National Academy of Sciences (2019) 24480-24485 (2019); https://doi.org/10.1073/pnas.1909367116.

24. Based on my professional training and clinical practice, I have learned and observed the following information. There are different trajectories that can occur for a transgender youth depending on many different factors. These factors include but are not limited to: the age of conscious awareness of authentic gender identity, temperament of child, temperament of parent, religion of family, culture of family, geographical location, political affiliation, and exposure to diversity. If a child recognizes and asserts their authentic gender identity from a young age, parents are witness to the evolution and unfolding of this gender. When this happens, it can often be an easier way for parents to digest having a child of a

28

different gender than they originally thought, and in my clinical experience these parents are often poised to be the earliest affirmers and biggest advocates.

25. However, many youth do not consciously realize their authentic gender identity until later, when parents are less aware this may be coming, and when the youth has a greater emotional understanding of the potential complications related to coming out. Having a different gender identity than their designated sex may have been more of a whisper of discomfort that had been suppressed for years.

26. The trajectory of a youth who does not come into conscious awareness of their "actual" gender identity until they are a teenager can have a different journey and often times, varying outcomes. Young children are often not fettered by how their life or identity impacts those around them; they are naturally focused on themselves, thereby resulting in a more pure and unfiltered expression of identity. Pre-adolescents and adolescents are preoccupied by what others think of them; trying to fit in, gain independence, and often feel misunderstood by parents (both related to gender and otherwise). Adolescence is a time of identity formation and figuring out who one is in general; adding gender identity to this can create quite a bit of anxiety and angst in regards to anticipated reactions from loved ones, as I have witnessed with many of my adolescent clients. In a developmentally appropriate fashion, many adolescents withdraw into themselves in order to think and figure things while trying to avoid pressure or resistance from adults in their lives.

27. It can be common for a transgender youth to come into conscious awareness of having a different gender identity than that which they were designated around the time of puberty. This is often due to hormones being rampant at that age which can feel even more distressing than usual if they do not align with one's gender identity. Similarly, the secondary sex characteristics being created by puberty can feel extremely distressing, especially if they are causing the youth to be misgendered, misunderstood, and miscategorized.

29

DECLARATION OF DARLENE TANDO, LCSW (3:23-CV-00768-BEN-VET)

28.   Additionally, "[s]ome of these adolescents may have withheld their feelings of gender nonconformity out of a fear of rejection, confusion, conflating gender identity and sexual orientation, or a lack of awareness of the option to identify as [transgender or gender-nonconforming]."  American Psychological Association, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 American Psychologist 843 (2015); https://www.apa.org/practice/guidelines/transgender.pdf.

29.   The process by which transgender adolescents come to understand their authentic gender identity can be wrought with many different emotions, sometimes conflicting: fear, excitement, self-doubt, relief, guilt, hope, shame, and anxiety. These are all things presented in the clinical space during my work with transgender adolescents. This process typically involves online research, trying to find answers, and trying to understand one's self. Adolescents tend to do this all on their own, at first. While ideally youth would have trusted adults to talk to about this, this is not always the case, just as it is not usually the case with any adolescent's journey to self-understanding. My colleagues and co-facilitators of TransYouth Care, Dr. Johanna Olson-Kennedy and Dr. Aydin Olson-Kennedy, call this period of time the "coming in" process. The "coming in" process is typically fairly lengthy and peppered with much mental "back and forth" as the adolescent wrangles with what it means for them to be transgender. Some people (especially those who do not work closely with transgender youth) assume adolescents are impulsively deciding they have a different gender than their designated gender; in my experience this is rarely ever the case.

30.   Once they complete the "coming in" process, many adolescents feel the need to be affirmed in their newly understood identity.

**Gender Dysphoria**

31.   Gender dysphoria has historically been a diagnosis in the Diagnostic and Statistical Manual of Mental Disorders (DSM). I and many others doing gender-

affirming work believe gender dysphoria should not be in the DSM any longer, much like homosexuality was removed from the DSM in the 1970s. Gender dysphoria is also a diagnosis in the International Classification of Diseases (ICD). Having this diagnosis can justify reimbursable medical interventions for the treatment of gender dysphoria, but is largely insurance-driven. It is important to note that not all aspects of gender dysphoria require medical or mental health intervention, and not all people who experience gender dysphoria need mental health or medical intervention.

32. In my experience in both my work with my clients and my collaboration with other gender-affirming practitioners, gender dysphoria is less helpful as a diagnosis and more helpful as an understanding that it is a unique set of symptoms that many transgender individuals, of all ages, experience. It can be in regards to a body that does not seem to reflect one's authentic identity, and the body can also cause the misgendering of an individual. Dysphoria caused by social interactions is experienced when an individual is misgendered, misunderstood, is categorized in ways that do not feel right, or is not perceived to be their authentic gender. Dysphoria can range from uncomfortable to dangerous, depending on many different factors.

33. The World Health Organization (WHO) removed gender dysphoria from its list of mental illnesses in 2019. In a Q&A interview, Dr. Lale Say, a reproductive health expert at the World Health Organization, said: "It was taken out from mental health disorders because we had a better understanding that this was not actually a mental health condition, and leaving it there was causing stigma." WHO, *WHO: Revision of ICD-11 (gender incongruence/transgender) – questions and answers (Q&A)*, https://www.youtube.com/watch?v=kyCgz0z05Ik.

**Social Transition/Affirmation**

34. Affirming a young child in their asserted gender identity through "social transition" does not involve medical interventions nor is it a medical treatment. It

31

usually involves changing pronouns to reflect the child's authentic gender identity, possibly a name change, and possibly changes in the child's gender expression (way of dress, haircut, etc.) to be "read" appropriately by others in society. It is crucial to affirm the youth with using the pronouns that best reflect their gender identity in settings where the youth has deemed it safe to do so.

35. This is confirmed by the American Academy of Pediatrics Policy, which defines social affirmation as "a reversible intervention in which children and adolescents express partially or completely in their asserted gender identity by adapting hairstyle, clothing, pronouns, name, etc." Rafferty (2018), *supra* ¶ 22 (Stating "Children who identify as transgender and are socially affirmed/supported in their asserted gender show no increase in depression and only minimal (clinically insignificant) increases in anxiety compared with age-matched averages.")

36. WPATH'S Standards of Care (Version 8) states that "newer research indicates the social transition process may serve a protective function for some prepubescent children and serve to foster positive mental health and well-being." Eli Colemen et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 International Journal of Transgender Health S76 (WPATH SOC 8); https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644. The Standards of Care also states that social transition can significantly benefit many transgender and gender-diverse (TGD) individuals, although not all may choose to or be able to undergo it. Some TGD people seek gender-affirming interventions at different stages of their transition, or even without social transition.

37. Gender identity is deeply personal, private information that is often disclosed in phases, depending on deemed safety in various settings. While an individual is coming to terms with their gender identity, this is a private process that calls for the individual to be in charge of when and how to share the information. Honoring the knowledge of a person's true identity by using their

32

requested pronouns, is a protective factor—that is, it is beneficial to the individual—even if they have not shared this yet with all others in their life. It allows them to control aspects of the journey when they may feel out of control of others. Ensuring affirmation, safety, control, and privacy are all ways to protect the youth against the harms caused by familial/societal rejection or discrimination. I have seen firsthand the positive benefit of these factors for the youth I have treated over the years.

38. Dr. Anderson also referenced teachers "facilitating social transition." This gives the impression that the teachers are driving the decisions. A youth asking to be referred to at school by their chosen name and pronouns that reflect their authentic gender, is only a partial aspect of social transition and not a complete social transition (in all settings). It is done at the student's request. Doing so (without the threat of forced disclosure) is honoring a youth's identity, dignity, and right to feel safe at school. Social transition, and the order of settings in which this is achieved, is individualized and should be driven by the youth themselves. Based on my experience and research, a youth does not need to consult with a medical or mental health practitioner in order to socially transition.

39. Research has directly linked social transition to improved mental health for transgender youth. A study published in the *Child Development Perspectives* noting "emerging research suggests that using [a transgender youth]'s chosen name and pronouns was associated with large reductions in compromised mental health outcomes." Russell B. Toomey, *Advancing Research on Minority Stress and Resilience in Trans Children and Adolescents in the 21st Century*, 15 Child Development Perspectives 96-102 (2021); https://srcd.onlinelibrary.wiley.com/doi/10.1111/cdep.12405.

40. Respecting a youth's pronouns to reflect and honor their authentic gender identity can be an important step in the youth's journey to self-understanding, identity, and self-acceptance. "Trying on" a different name and pronouns is a

33

unique and valuable way to see if being referred to in that way feels more authentic. This may make the youth more confident and more equipped to then come out to their parents.

41. There is nothing permanent or irreversible about youth using a different name and pronouns at school. In my experience, parents are always involved and must give consent if the youth later decides to pursue hormonal or medical gender affirming care.

42. Not only is social transitioning beneficial, transgender children who are affirmed show comparable mental health status as their cisgender peers and significantly improved mental health than other transgender youth who were not living in their authentic gender. Kristina Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics (2016); https://publications.aap.org/pediatrics/article-abstract/137/3/e20153223/81409/ Mental-Health-of-Transgender-Children-Who-Are; *Erratum in*: 142 Pediatrics (2018):e20181436.

43. A helpful way of looking at social transition is thinking about it as "social affirmation." Rather than changing from one gender to another, youth who take the steps for social transition are being affirmed in their authentic gender. During the past 18 years, when I have witnessed a youth change their name and/or pronouns, there has been a happiness and a lightness to the individual that often was not there before. Many times, when their parents are involved, it is the parents who have to emotionally transition from one idea of their child's gender to another, while the child enjoys affirmation in their authentic gender.

44. "When one seeks to better align their gender expression with their underlying identity, this process of reflection, acceptance, and, for some, intervention is known as 'gender affirmation.' It was formerly referred to as 'transitioning,' but many view the process as an affirmation and acceptance of who

34

they have always been rather than a transition from one gender identity to another." Rafferty (2018), *supra* ¶ 22.

45. WPATH'S Standards of Care (Version 8) confirms that a social transition can be partial: "Gender social transition refers to a process by which a child is acknowledged by others and has the opportunity to live publicly, either in all situations or in certain situations, in the gender identity they affirm and has no singular set of parameters or actions." WPATH SOC 8 at S75.

46. Even a partial transition can be protective and beneficial in nature; there is no evidence to substantiate Dr. Anderson's claim that it is confusing or detrimental to be referred to by one set of pronouns in one setting and a different set in another. Being affirmed and honored for one's authentic gender in one setting is more beneficial than not being affirmed at all. I have seen much evidence of this in my practice; youth experience hope, relief, and gender euphoria when they are acknowledged for who they really are in even one setting, before it extends to others.

47. Further, research shows that transgender children's gender development remains consistent regardless of whether they recently transitioned or have been living as their identified gender for several years, with only minor differences in clothing preferences. This supports findings that there is no significant difference in gender development between age-matched transgender children tested before and after socially transitioning. Gülgöz (2019), *supra* ¶ 23.

**Harm of Forced Outing**

48. Transgender and gender nonconforming adolescents face social complications, including family rejection, that are often more intense than those experienced by adults, who tend to be more independent. As a result, coming out for transgender and gender non-conforming adolescents in home and school settings may necessitate more careful planning due to these challenges. Laura Edwards-Leeper, et al., *Affirmative Practice with Transgender and Gender*

35

*Nonconforming Youth: Expanding the Model*, 3 Psychology of Sexual Orientation and Gender Diversity 165–172 (2016); http://dx.doi.org/10.1037/sgd0000167.

49. When a youth comes out at school and asks to be referred to by a different pronoun or name, from my clinician's perspective there is nothing that needs to be urgently reported to parents for purposes of the imminent health and wellness of the child. Of course, if a school knows a child is actively suicidal, they are obligated to tell the parents. Even then, the youth's gender identity may not need to be disclosed.

50. Research indicates that outing trans youth without their consent can have serious negative consequences. Here are a few key studies and their findings:

    a. Outing can lead to family rejection, which is a strong predictor of negative mental health outcomes. Youth who experience family rejection are more likely to face homelessness, substance abuse, and suicidal behavior. Caitlin Ryan et al., *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults*, 123 Pediatrics 346-352 (2009); https://publications.aap.org/pediatrics/article-abstract/123/1/346/71912/Family-Rejection-as-a-Predictor-of-Negative-Health;

    b. A University of Connecticut study explored the psychological effects of outing LGBTQ+ youth who prefer not to have their orientation disclosed. The findings revealed that about one-third of those outed without consent experienced significant symptoms of depression and reported lower family support compared to their non-outed peers. Additionally, 65 to 69 percent of youth indicated that being outed was highly stressful. Peter S. McCauley, *Stress of Being Outed to Parents, LGBTQ Family Support, and Depressive Symptoms Among Sexual and Gender Diverse Youth*, Journal of Research on Adolescence (2024); https://doi.org/10.1111/jora.12912.

36

51.   In my line of work, dictated by confidentiality, there are many situations where I know information that parents would likely *like* to know, but the youth does not want them to know. This is the nature of adolescence, and having another adult they can share things with, process life with, and explore their identity with is invaluable. I have seen many scenarios where the youth needs to be relatively far along in the "coming in" process regarding their own gender identity first before they are ready to come out to parents.  Youth also tend to assess "clues" or indications from the parents about potential for acceptance, and typically wait to come out until they feel their parents will be affirming.

52.   When I have been in the situation where I have to use different name and pronouns with the parent than the youth, I do not consider it deception. I look at it as protecting the youth's private information until they are ready to share it with their parents. I have found that having a safe place to explore, process, and experiment with a new name and pronouns increases confidence, stabilizes mental health, and allows the youth to discern what feels most "right" to them. This seems to be a way to facilitate readiness for coming out to parents, not a way of preventing it. In my anecdotal experience of 18 years, if a youth has asked me to use a different name and pronoun with their parents than with them, this has been very temporary.

**Risks of Unaffirming Parents**

53.   The stakes can be high for a transgender youth whose teacher forcibly outs them to their parents. In my work, I have witnessed many children and adolescents flourish under the support and affirmation by their parents. I have also seen the distress and devastation it can cause when parents or other loved ones do not respect or affirm their gender identity. I have seen that contending with this while trying to come to terms with being transgender can feel like a very heavy burden.

54.   In addition to my clinical experience, there are numerous studies that outline the detriment unaffirming parents can cause. For instance:

37

a. A study published in the journal *Pediatrics* found that transgender youth who faced discrimination or were not supported by their families were significantly more likely to experience mental health challenges. Stephen T. Russell & Jessica N. Fish, *Mental Health in Lesbian, Gay, Bisexual, and Transgender (LGBT) Youth*, 12 Annual Rev. Clinical Psychology 465-87 (2016); https://www.annualreviews.org/content/journals/10.1146/annurev-clinpsy-021815-093153.

b. A study in *Psychology of Sexual Orientation and Gender Diversity* found that, "[…]The impact of a TGNC adolescent's transition on family relationships could result in the adolescent having to choose between remaining in an unsupportive environment and becoming homeless. Due to the complexities described in this section, we believe that approaching TGNC adolescents in a supportive, yet thoughtful and cautious way is both affirmative and ethical." Laura Edwards-Leeper, et al., *Affirmative practice with transgender and gender nonconforming youth: Expanding the model*, 3 Psychology of Sexual Orientation and Gender Diversity 165–172 (2016); http://dx.doi.org/10.1037/sgd0000167.

c. A study in *JAMA Pediatrics* found that, "While parental support for transgender youth strengthens healthy development, unsupportive parents contribute to suicidality and homelessness." Mollie T. McQuillan, et al., (2024), *Transgender Adolescent School Climate, Mental Health, and Adult Social Support*, 178 JAMA Pediatrics 1082-1084 (2024); https://doi.org/10.1001/jamapediatrics.2024.3079.

**Working with Parents**

55. The majority of my work is helping parents to understand and hopefully affirm their child's authentic gender identity. Most professionals who specialize in working with gender diverse and transgender youth have agreed the best practice is to believe and affirm youth when they tell us who they are. If a child expresses they

38

have a gender identity that does not align with their sex designated at birth, believing them and affirming them can save them a lot of distress and dysphoria down the line. Parents are now encouraged to believe, listen to, and follow their child's assertions of gender identity. It is always my goal to open up communication between youth and their parents. Eventual parental understanding of and affirmation of their child's gender identity is crucial. This is why I authored a book to help parents do exactly that.

56. In a Systematic Review by Socioecological Level, "parental support was protectively associated with fewer depressive symptoms, perceived burden of being transgender, and improved life satisfaction." Michelle M. Johns, et al., *Protective Factors Among Transgender and Gender Variant Youth: A Systematic Review by Socioecological Level*, 39 Journal of Primary Prevention 263-301 (2018); https://link.springer.com/article/10.1007/s10935-018-0508-9.

57. While there is value and importance of sharing a youth's authentic gender identity with their parents, the timing of this needs to be up to the youth about how and when their parents are told about this intensely personal journey.

58. There can be a myriad of reasons why adolescents may not choose to come out to their parents first. They may not deem it safe or smart to come out to their parents due to witnessing comments, understanding their parents' beliefs on trans identities, or other implications that they will run into opposition to their authentic identity. Unfortunately, there have been many cases where transgender youth have been rejected, punished, or otherwise scorned for revealing their authentic identities.

59. Some youth worry about upsetting their parents, and don't feel they can tolerate navigating their parents' responses and emotions while they are still coming to terms with their own understanding and feelings about their identity.

60. In my experience, a youth's request to keep their chosen name/pronoun private is not to bypass parents in the gender journey. In fact, doing so would be

39

relatively impossible. However, when and how a youth comes out to their parents should be decided upon by the youth. The youth may have already come out at home and was possibly met with resistance and/or rejection, therefore making school the only place they can be referred to authentically. If this were to be revealed to the parents, the youth may face more rejection/resistance at home, along with punitive actions for being out at school. This can be hugely detrimental to the youth's mental health.

61. It is important to note that in my experience, many transgender youth do opt to come out at home first. The ideal situation is that home is the safest place to reveal one's authentic gender, and the parents are the first people to help the youth navigate exploring their gender and using new pronouns. However, not all home environments and relationships between parents and teenagers are ideal. For this reason, it's imperative to protect the school environment as a safety net *before* a youth is ready to come out at home, not necessarily *instead of*.

## Importance of Supportive Teachers/Reasons Why Youth May Come Out at School First

62. Within friend groups and school are often the first places where adolescents reveal their authentic gender identities. Social affirmation from friends can be very protective in nature and is often where transgender teens first hear their "correct" pronouns. When these things happen, and the adolescent feels affirmed, understood, and seen, they can experience a sense of elation, or "gender euphoria." The next step is often times disclosing to teachers, resulting in the ability to be referred to by their appropriate pronoun and name in a wider context.

63. Teachers are often poised to be safe, affirming adults because they can honor the youth's pronouns and newly asserted identity without the attachment to the youth's gender most parents naturally have. Parents also have more of an emotional attachment to the youth's name, so having a teacher help them explore being referred to by something else may feel like a natural first step to some youth.

40

64. There are likely many different scenarios in which a teacher would not disclose to a parent everything a student had shared with the teacher, especially if they knew it would cause more strife at home or place undue stress on the youth. The same applies when handling information about a student's gender identity. Switching name and pronouns depending on who you are talking to can be tricky, but manageable. Even if a teacher feels a personal inclination to disclose this information, this is not necessarily best for the youth's mental health.

65. Research shows providing a safe space has a tangible benefit for transgender youth's mental health outcomes:

a. Transgender and questioning students face higher rates of violence, mental health issues, suicidal thoughts, and unstable housing compared to cisgender peers, along with lower school connectedness. This disparity is concerning, but implementing inclusive policies and practices in schools can enhance safety and support, benefiting the mental health of all students. Nicolas A. Suarez et al., *Disparities in School Connectedness, Unstable Housing, Experiences of Violence, Mental Health, and Suicidal Thoughts and Behaviors Among Transgender and Cisgender High School Students — Youth Risk Behavior Survey, United States, 2023*, 73 MMWR Suppl. 50–58 (2024); DOI: http://dx.doi.org/10.15585/mmwr.su7304a6.

b. Supportive educators significantly reduce school absenteeism and enhance feelings of safety for transgender youth. Reports indicate that advocacy from school staff, including teachers, helps prevent dropout rates, even in the face of victimization. Additionally, faculty awareness and support of transgender issues positively impact the academic experiences of these students. Teachers and school staff) are sometimes the only sources of support available. Johns (2018), *supra* ¶ 56.

c. More than half (54%) of transgender and nonbinary young people found their school to be gender-affirming, and those who did reported lower rates

41

of attempting suicide. Trevor Project, *2024 U.S. National Survey on the Mental Health of LGBTQ+ Young People*; https://www.thetrevorproject.org/survey-2024/.

d. "To effectively provide a safe learning environment for all students, it is imperative that the voices and experiences of trans youth are heard by education professionals and reflected in their policies and practices." Lydia A. Sausa, *Translating Research into Practice: Trans Youth Recommendations for Improving School Systems*, 3 Journal of Gay & Lesbian Issues in Education 15-28 (2005); https://www.tandfonline.com/doi/abs/10.1300/J367v03n01_04.

e. LGBTQ+ students with many supportive school staff (11 or more) experience significantly better outcomes than those with few (0 to 5). They feel safer regarding their sexual orientation and gender expression, miss less school due to discomfort, and report a greater sense of belonging. Additionally, they perform better academically, are more likely to plan for post-secondary education, and show improved psychological wellbeing, including higher self-esteem and lower depression and suicide considerations. GLSEN, *2021 National School Climate Survey*; https://www.glsen.org/research/2021-national-school-climate-survey.

f. A recent study found that "among students who felt depressed and anxious, transgender students were 74% less likely than their cisgender peers to seek help from parents than from adults at school. Laurel White, *Transgender students more likely than cisgender peers to seek support from school staff, UW–Madison and NYU study finds*, https://news.wisc.edu/transgender-students-more-likely-than-cisgender-peers-to-seek-support-from-school-staff-uw-madison-and-nyu-study-finds/; see McQuillan (2024), *supra* ¶ 54(c).

DECLARATION OF DARLENE TANDO, LCSW (3:23-CV-00768-BEN-VET)

g. LGBTQ youth who had access to spaces that affirmed their sexual orientation and gender identity reported lower rates of attempting suicide. Trevor Project, *National Survey on LGBTQ Youth Mental Health 2021*; https://www.thetrevorproject.org/survey-2021/.

h. "For transgender youth who choose a name different from the one given at birth, use of their chosen name in multiple contexts affirms their gender identity and reduces mental health risks known to be high in this group." Stephen T. Russell, et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, 63 Journal of Adolescent Health 503-505 (2018); https://www.jahonline.org/article/S1054-139X(18)30085-5/abstract.

**Dr. Anderson Relies on Outdated Standards of Care and Discredited Studies**

*A. Outdated SOC references*

66. The Plaintiffs' expert, Dr. Erica Anderson, submitted a declaration that relies on the World Professional Association for Transgender Health (WPATH ) Standards Of Care.[2] Since their inception in 1979, WPATH's Standards of Care have been revised eight times. Not only have the recommendations evolved in regards to how practitioners are to navigate treating transgender clients, but the overall tone and approach has evolved and changed over time. In my opinion, the SOC have evolved from a pathologizing, patronizing, gatekeeping[3] set of standards to standards that embrace, celebrate, and honor the free will of the transgender individual.

---

[2] The WPATH Standards of Care are a set of guidelines that provide clinical recommendations for healthcare professionals treating transgender and gender diverse individuals, outlining best practices for assessing gender dysphoria, providing hormone therapy, and performing gender-affirming surgeries, with the ultimate goal of helping patients achieve lasting comfort with their gender identity through safe and effective interventions. *See* WPATH SOC 8.

[3] Gatekeeping in transgender care refers to the practices and policies that control access to gender-affirming medical treatments and services. This often involves requiring individuals to meet specific criteria or undergo evaluations before they can receive care, such as hormone therapy or surgery.

43

DECLARATION OF DARLENE TANDO, LCSW (3:23-CV-00768-BEN-VET)

67. Dr. Anderson primarily cites the SOC Version 7 which is an earlier and less evolved version than the current SOC 8, which is reflective of a consensus of a multidisciplinary team of providers doing the work today.

68. Dr. Anderson states in her declaration "When children or adolescents begin to experience gender incongruence, they should receive a careful evaluation and assessment by a professional mental health provider before transitioning, for a variety of reasons." This implies that if a child starts questioning their gender, they need immediate assessment or treatment. This is a largely pathological view of transgender identities, implying that this is something that needs to be evaluated to see if it is "real" or that the child needs to access immediate treatment. In WPATH'S Standards of Care (Version 8), it is recognized that not all gender diverse children wish to explore their gender. Cisgender children are not expected to undertake this exploration, and therefore attempts to force this with a gender diverse child, if not indicated or welcomed, can be experienced as pathologizing, intrusive and/or cisnormative.

69. The book *Histories of the Transgender Child* drives home the concept of embracing transgender identities rather than pathologizing them. The author proposes "an ethical relation that calls upon adults to stop questioning the being of trans children and affirm instead that there are trans children, that trans childhood is a happy and desired form - not a new form of life and experience but one richly, beautifully historical and multiple." Jules Gill-Peterson, Histories of The Transgender Child (2018).

70. While I think therapy can be hugely beneficial for someone undergoing transition or exploring their gender identity, it is not a prerequisite. Most youth who come to see me already know who they are; they need help with getting others to see them that way. In fact, if a youth has already started going by a name and pronouns that feel authentic to them, and had a positive mental health impact from this, this can contribute to the eventual assessment process. It can also help

44

confirm/reinforce future choices regarding gender affirming interventions. Finding out how it felt to be referred to with the chosen name and pronouns can give a lot of very important information to the youth and their parents.

### B. Desistance Myth

71. The studies Dr. Anderson references about how many children persist in a different gender have been long refuted and are known to be inherently flawed. These studies imply the vast majority of youth who are gender nonconforming or socially transition do not persist in a different gender identity, and this has largely become known as the "Desistance Myth." Dr. Anderson states that "numerous studies prior to the widespread adoption of social transition reported that gender incongruence did not persist through adolescence for the majority of children who experience it."

72. Dr. Anderson perpetuates this problematic narrative by stating that not only do most children not persist, but that many retransition and live to regret it. She posits, "The potential for a difficult detransition process in the future and regret over a prior transition are important considerations that a mental-health provider should help a child or adolescent and their parents understand before they decide to undertake a social transition."

73. Desistance studies are often cited to justify delaying a young person's social transition, based on the assumption that this may prevent future distress from needing to transition again. However, this perspective acknowledges that such distress is merely conceivable and not guaranteed. Evidence suggesting that a second transition would be traumatic is limited. The concern lies in the assumption that a possible future change in a child's gender identity justifies suppressing or redirecting their current expression of identity. Julie Temple-Newhook, et al., *A Critical Commentary on Follow-up Studies and "Desistance" Theories About Transgender and Gender-nonconforming Children*, 19 International Journal of

45

024

Transgenderism 212-224 (2018);

https://www.tandfonline.com/doi/full/10.1080/15532739.2018.1456390.

74.    New studies have emerged that show a very low rate of re-transition, which is also reflected in my own clinical experience.  Most children who socially transition remain stable in their gender identity and continue on to more gender-affirming interventions.  This is not because social transition caused them to blindly continue in pursuit of hormonal/medical transition, but rather because transition had been right for them.

75.    A new study from Perth, Australia, published in *JAMA Pediatrics* has found that only 1% of transgender youth receiving gender-affirming care at a clinic reidentified with their sex assigned at birth. Blake S. Cavve, *Reidentification With Birth-Registered Sex in a Western Australian Pediatric Gender Clinic Cohort*, 178 JAMA Pediatrics 446–453 (2024);

https://doi.org/10.1001/jamapediatrics.2024.0077.

### C.    Referencing outdated or debunked work

76.    Dr. Anderson's declaration references the work of Dr. Kenneth Zucker, Dr. James Cantor, and TD Steensma. All three of these individuals are controversial when it comes to gender-affirming care. They have been known to be harmful to the transgender community by focusing on detransitioning, pathologizing gender diversity, and focusing on gatekeeping/caution over affirming care.

77.    Dr. Anderson also references the Cass Review, which has been deemed harmful and inaccurate by many folks engaging in gender-affirming care, including myself.

78.    The Cass Review was commissioned to address the UK National Health Service's failures in providing timely, competent care for transgender youth, which includes long wait times for treatment. However, the Review's recommendations take an ideological stance that contradicts its own findings, which emphasize the need for individualized, age-appropriate medical care for gender dysphoria, aligned

46

025

with international standards. Further, the Review has been criticized for obscuring key findings, misrepresenting data, and misapplying scientific methods. For instance, it focuses on the potential harms of gender-affirming interventions for non-transgender individuals while neglecting the significant distress faced by transgender youth who do not receive timely care. In addition, the Review is said to misuse data, rely on speculation, and misunderstand clinical evidence, raising serious concerns about its scientific integrity and the validity of its conclusions. Meredithe McNamara, et al., *An evidence-based critique of "The Cass Review" on gender-affirming care for adolescent gender dysphoria* (July 1, 2024); Retrieved from https://law.yale.edu/sites/default/files/documents/integrity-project_cass-response.pdf.

79. The Cass Review is criticized as relying on the assumption that it is "best" to be cisgender within a healthcare system that lacks accountability for transgender issues. Four key concerns are identified: the Review's handling of prejudice, its cisnormative bias, the pathologization of transgender identities, and double standards in using evidence to inform policy. To improve transgender healthcare, policymakers and practitioners need to address these issues, focusing on transgender positivity and celebrating the lives of transgender children. There must be a stronger commitment to upholding the healthcare rights of trans youth, and to prioritizing equity and social justice for marginalized populations. Cal Horton, *The Cass Review: Cis-Supremacy in the UK's Approach to Healthcare for Trans Children*, International Journal of Transgender Health 1-25 (March 14, 2024); https://www.tandfonline.com/doi/full/10.1080/26895269.2024.2328249.

80. The British Medical Association (BMA) is critical of the Cass Review as well. The BMA Council recently voted to publicly critique the Review due to concerns raised by doctors and academics about its potential negative impact on transgender healthcare. Criticisms focus on the Review's unsubstantiated recommendations, unclear study protocols, ambiguous eligibility criteria, and the

47

exclusion of trans-affirming evidence. Phil Banfield, *BMA to undertake evidence-led evaluation of the Cass Review*; https://www.bma.org.uk/news-and-opinion/bma-to-undertake-evidence-led-evaluation-of-the-cass-review.

### D. Correlation vs. Causation

81.  In her declaration, Dr. Erica Anderson states that "Social transition sets children down a path that often leads to medical interventions" and makes an argument that social transition can be causal when it comes to hormonal/medical/surgical or any other future gender affirming transitions. This is misleading. There is a correlation between social transition and later medical transition because these are both ways a transgender youth pursue alignment with their authentic gender identity. I have seen this many times in my own practice; when a youth is socially affirmed and it continues to feel right, they go on to pursue further and age-appropriate gender affirming interventions throughout development. Their journey of self-expression or to authentic identity can be altered based on affirmation, stigma, obstacles, or oppression, but it does not change their gender identity.

82.  Many people conceptualize social transition (or any type of gender-affirming transition) as a "big decision" that needs to be carefully analyzed and avoided if possible. Those of us who have been doing this work with transgender children for years have witnessed over and over again that their gender identity is a reflection of who they are, and any transition that follows is a natural step, or intervention, to allow them to live authentically.

83.  When Dr. Anderson states that social transition can lead to further transitions in the future, it is as if she is likening this to a bad or reckless decision that leads to an even worse outcome. (Social transition leading to later medical/hormonal affirmation is a natural progression of the pursuit of authenticity, not akin to excessive tanning leading to skin cancer.) It might make more sense to

DECLARATION OF DARLENE TANDO, LCSW (3:23-CV-00768-BEN-VET)

027

compare this to "kids that graduate from middle school are more likely to graduate from high school," as one naturally comes before the other.

84. Another analogy is a baby learning how to crawl before they walk; crawling "causes" walking in that it is a natural steppingstone to walking. Social transition is often a steppingstone to medical transition, as it allows the individual to live and be seen as their authentic gender identity, which helps them understand if it is the right thing for them before seeking further intervention.

85. Dr. Anderson also states "Social transition erects psychosocial barriers to potential desistence." The goal of working with transgender youth should not be desistence, it should be authenticity.

### E. Impact of Retransition

86. There are no studies to support Dr. Anderson's claims that socially transitioning and then re-transitioning would be detrimental to a child's mental health.

87. There have been so few incidents of transgender children "re-transitioning" after social transition that there is not a lot of research on the topic. However, in studies that do address it, findings indicate that there is little regret associated with the initial transition and/or the re-transition. In my extensive clinical experience as well as speaking with cohorts doing similar work, it is rare for a youth to socially transition and then re-transition. Additionally, when changes are made as a reflection of evolving gender identity, transgender individuals tend to experience this more as a "course correction" rather than a "re-transition."

88. There are significant doubts about the accuracy of reported persistence rates for transgender youth. Youths' gender identity trajectories are varied, and re-transitioning does not inherently signify a harmful or regrettable outcome. Instead of attempting to predict future gender identities, clinicians should focus on providing immediate support by respecting youths' expressed gender identities, supporting those who wish to socially transition, and facilitating access to medical

49

DECLARATION OF DARLENE TANDO, LCSW (3:23-CV-00768-BEN-VET)

028

transition for adolescents. Florence Ashley, *The Clinical Irrelevance of "Desistance" Research for Transgender and Gender Creative Youth*, 8 Psychology of Sexual Orientation and Gender Diversity 213–220 (2021); https://doi.org/10.1037/sgd0000504.

89. A recent qualitative study explored the experiences of youth who made binary social transitions before age 12 and later socially transitioned again, not necessarily back to their designated gender. Out of 317 participants, 23 had "re-transitioned" at least once, with 8 identifying as cisgender, 11 as nonbinary, and 4 as binary after initially identifying as nonbinary. Participants reported various reasons for re-transitioning, such as evolving identities or discovering a better-fitting identity. Social responses to re-transitioning were generally neutral or positive, and none expressed regret over their initial transitions. Kristina R. Olson, et al., *Gender Identity 5 Years After Social Transition*. 150 Pediatrics (2022), e2021056082; https://doi.org/10.1542/peds.2021-056082.

90. The findings challenge common concerns about re-transitioning, indicating that gender-diverse youth can navigate this process in supportive environments without facing rejection or distress. Some scholars argue that re-transitioning is a normal part of gender development, reflecting fluidity in gender identity rather than a definitive endpoint. Clinicians are encouraged to remain open to the possibility of re-transitioning and to discuss it proactively with families.

91. One study highlighted a case where a youth transitioned to male, paused puberty blockers, and re-transitioned to female without experiencing psychological distress. Parents expressed satisfaction with their children's transition journey, emphasizing the importance of following the child's lead. Overall, the study suggests that retransitions can be part of a broader gender exploration and do not necessarily lead to regret or social rejection when support is available. Lily Durwood, *Retransitioning: The Experiences of Youth Who Socially Transition*

DECLARATION OF DARLENE TANDO, LCSW (3:23-CV-00768-BEN-VET)
029

*Genders More Than Once*, 23 International Journal of Transgender Health 409-427 (2022); https://doi.org/10.1080/26895269.2022.2085224.

## Conclusion

92. This declaration illustrates the serious implications of outing transgender youth and the importance of supportive, confidential environments in schools.

93. Outing transgender youth to their parents without consent can have significant negative mental health consequences. If school districts permit or require forced outings, it will gravely undermine the safety of transgender youth.

94. A teacher outing a transgender youth to their parents without their consent can be devastating to the privacy of the student and undermines school as a safe place. If transgender youth do not know who is safe to disclose to and who is not, it eliminates this much-needed safety net. On the other hand, reinforcing the importance of teachers honoring students' privacy and students makes school a safe and protective environment, as it should be.

95. While an important element of a youth's social transition will be to communicate the youth's authentic gender identity to their parents, this needs to be on the terms of the youth, on their own timeline, and with the support of their schools.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed in San Diego, California on October 21, 2024.

By: _Darlene Tando, LCSW_
Darlene Tando, LCSW

SA2024300204
38485691

DECLARATION OF DARLENE TANDO, LCSW (3:23-CV-00768-BEN-VET)

EXHIBIT 2

ROB BONTA
Attorney General of California
DARRELL W. SPENCE
Supervising Deputy Attorney General
JENNIFER A. BUNSHOFT (SBN: 197306)
DARIN WESSEL (SBN: 176220)
KEVIN L. QUADE (SBN: 285197)
SHATTI A. HOQUE (SBN: 350250)
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3377
 Fax:  (415) 703-5480
 E-mail:  Jennifer.Bunshoft@doj.ca.gov
*Attorneys for Defendant*
*Attorney General Rob Bonta*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ELIZABETH MIRABELLI, an individual, and LORI ANN WEST, an individual,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**MARK OLSON, in his official capacity as President of the EUSD Board of Education, et al. ,**<br><br>Defendants. | 3:23-cv-00768-BEN-VET<br><br>**EXPERT REPORT OF DARLENE TANDO, LCSW** |

1

031

**EXPERT REPORT OF DARLENE TANDO, LCSW**

***MIRABELLI, ET AL. V. OLSON, ET AL.***

**TABLE OF CONTENTS**

Summary of Background and Experience …………………………………………....3

Summary of Opinions ……………………………………………………...........6

Opinions and the Bases and Support Therefor …………………………..............7

    A. Gender Identity and Designated Sex Are Not the Same Thing, and May
       Align or Not…………………………………………………………7

    B. Youth are Capable of Understanding and Asserting Authentic Gender
       Identity …………………………………………………………... 8

    C. Transgender or Gender Nonconforming Identities Are Not a Mental Illness;
       Not All Gender Nonconforming and Transgender People have Gender
       Dysphoria, Which Is a Cluster of Symptoms …………………................ 12

    D. Social Transition/Affirmation is Not a Medical Treatment, and Does not
       Need to Be a Formal or Professionally Approved Process ……………….13

    E. Forced Outing Policies at Schools Are Harmful ……………………….16

    F. Risks of Unaffirming Parents ……………………………………….18

    G. Working with Parents to Facilitate Open Communication Between
       Youth and their Parents, on the Youth's Terms and Timeline, and
       Affirmation of the Youth's Gender Identity by the Parents …………………..20

    H. Importance of Supportive Teachers/Reasons Why Youth May Come
       Out at School First …………………………………………………….21

    I. Dr. Anderson Relies on Outdated Standards of Care and Discredited
       Studies, and Makes Unsupported Claims ………………………………..24

        (1) Outdated SOC references ……………………………………24

        (2) Desistance myth ……………………………………………..26

        (3) Referencing outdated or debunked work …………………………27

        (4) Correlation vs. causation ……………………………………..28

        (5) Impact of re-transition ………………………………………..30

Conclusions ………………………………………………………………..31

Cases in Which I Have Testified in the Previous Four Years ……………………..32

Statement of Compensation …………………………………………………..32

032

**Summary of Background and Experience**

1.      I am a Licensed Clinical Social Worker in the State of California. I am a full-time therapist and supervisor at my own private practice, Tando Therapy Team.

2.      I received my bachelor's degree from UC Santa Barbara in 1998 and earned my Master's in Social Work at San Diego State University in 2000. I have been licensed since 2003. After I graduated with my Master's, I worked at a residential treatment facility for children and then at the Naval Medical Center San Diego, treating dependents of military personnel.

3.      I have owned and operated my private practice for the past 19 years.  I have been working with transgender youth and adults for the past 18 years. Approximately 95% of the clientele I see in my practice are trans or gender nonconforming. I supervise other gender-affirming therapists who are a part of my practice. I specialize in doing work with trans and gender-nonconforming individuals and their families. Over the course of the past 18 years, I have seen hundreds of transgender individuals and their families. My work with all of these clients has informed my philosophies on working with transgender youth and adults, and my work with families. Additionally, my work with transgender adults continues to educate me about working with transgender youth, as the adults were once transgender kids, with or without affirmation.

4.      I am a co-facilitator of "TransYouth Care," which provides a comprehensive 15-hour training designed for professionals interested in providing sensitive and competent mental health and medical care for gender-diverse children, transgender youth and young adults. Parents, guardians, and caregivers also attend these trainings to learn about the many facets of caring for a transgender youth, including the parent/guardian/caregiver's own process, supporting the youth with dysphoria, and best practices needed to inform and guide their care.

5.      I also provide trainings to hospitals, schools, and other organizations.

6.      I am a proponent of the Informed Consent model and I believe the individual is the "expert" on their own gender identity.  I authored the book "The Conscious Parent's Guide to

3

033

Gender Identity: A Mindful Approach to Embracing Your Child's Authentic Self" in 2016. I have also contributed to the book "My Child Told Me They're Trans… What Do I Do?" as a Subject Matter Expert.

7.  I have served on the board for a camp for transgender and gender nonconforming children called "Camp Laurel," now "Camp Mulberry."

8.  I have appeared as a specialist in working with gender identity on the show The Doctors, Dr. Phil, Good Morning America, as well as the CNN Short Film "Raising Ryland." I have been interviewed on two different podcasts, Trans Parenting and Gender GP.

9.  I am a member of the National Association of Social Workers and a former member of the World Professional Association for Transgender Health.

10.  I have received the following awards: "Appreciation Award" from the San Diego transgender community at the Transgender Day of Empowerment in 2008, and was named the Stonewall Spirit Awards' "Friend of Pride" for San Diego Pride 2015. My gender blog won the NASW's 2013 Media Award for "Best Single Topic Blog."

11.  My relevant publications and articles include the following:

a.  Tando. D. *The Conscious Parent's Guide to Gender Identity: A Mindful Approach to Embracing Your Child's Authentic Self,* Adams Media (2016); https://a.co/d/5iqvHVM.

b.  Tando, D. (2021). *How to Leave Gender Assumptions Behind—and Love Your Unique Child.* Motherly; https://www.mother.ly/parenting/blank-slate-parenting-how-to-leave-behind-gender-assumptionsand-why-your-child-will-benefit/.

c.  Contributor to the following book: *My Child Told Me They're Trans...What Do I Do?* (February 2023). https://a.co/d/dzHqUQQ.

4

034

d.      Contributor to a chapter in the second edition of the following book, which has not yet been released:  Colt Keo-Meier (Editor), Diane Ehrensaft (Editor). *The Gender Affirmative Model: An Interdisciplinary Approach to Supporting Transgender and Gender Expansive Children (Perspectives on Sexual Orientation and Gender Diversity Series.*).

e.      I also have a blog accessible from the following link: https://darlenetandogenderblog.com/.

12.     Further information about my professional background and experience is outlined in my curriculum vitae, a true and accurate copy of which is attached as Exhibit A to this report.

13.     My opinions in this report are based on my professional experience as a clinician, as well as my review of research, surveys and studies related to transgender and gender nonconforming youth and students. I routinely rely upon newer studies and research to inform my clinical practice as well as educate parents, other professionals, and clients. I continue to attend conferences that share and review the latest research information in the field.

14.     The California Attorney General's Office has retained me to provide this report and present evidence concerning the subject matters of gender identity and designated sex, understanding one's gender identity, gender dysphoria, social transitioning and affirmation, the harms of forced outing and the risks of unaffirming parents, and working with parents regarding their children's gender identity, as well as to address the statements in the Declaration of Dr. Erica E. Anderson, submitted by plaintiffs in this lawsuit.

15.     I reviewed and considered the following pleadings in preparing my report:  the Declaration of Dr. Erica E. Anderson, PhD., in Support of Plaintiffs' Motion for Preliminary Injunction in this matter, and the Declaration of Dr. Christine Brady, Ph.D., submitted in *People v. Chino Valley.,* San Bernardino County Superior Court Case No. CIVSB2317301.

5

035

**Summary of Opinions**

16.    In this declaration, I rely upon my extensive professional experience as well as relevant research and studies to support my opinions that:

a.    Designated sex and gender identity are not the same thing, and may align or not.

b.    Youth are capable of understanding and asserting authentic gender identity.

c.    Transgender or gender nonconforming identities are not pathological or a mental illness. Gender Dysphoria is a cluster of symptoms that one may experience when their authentic gender identity does not align with one's designated sex. It is extremely individualized and yet also a collective experience. Not all gender nonconforming and transgender people have gender dysphoria.

d.    Social transition usually involves changing pronouns to reflect the child's authentic gender identity, possibly a name change, and possibly changes in the child's gender expression to be "read" appropriately by others in society. Affirming a young child in their asserted gender identity through "social transition" does not involve medical interventions nor is it a medical treatment. It is crucial to affirm the youth with using the pronouns that best reflect their gender identity in settings where the youth has deemed it safe to do so.

e.    A forced outing policy that requires teachers to disclose the chosen pronouns of or the authentic gender identity of a student without their consent can be extremely violating and can contribute to more dysphoria, family strife, and negative outcomes.

f.    The stakes can be high for a transgender youth whose teacher forcibly outs them to their parents and puts them at risk for rejection by unaffirming parents,

6

036

discrimination, and unstable housing. The individual experiencing a different gender identity than what was assumed at birth should be able to make decisions about how to access disclosure, affirmation, and transition.

g       While an important element of a youth's social transition will be to communicate the youth's authentic gender identity to their parents, this needs to be on the terms of the youth, on their own timeline, and with the support of their schools. Open communication between youth and their parents and affirmation of the youth's gender identity by the parents is ideal, although not always possible.

h.       It is important to have supportive educators who honor students' privacy and identity, which makes school a more productive environment, significantly reduces school absenteeism, and enhances feelings of safety for transgender youth.

i.       Dr. Erica Anderson's declaration relies on outdated Standards of Care that do not reflect current professional consensus, as well as problematic studies that have caused harm to the transgender community and have been largely criticized.

j.       Dr. Anderson purports that social transition "causes" individuals to persist in their transgender identity, although there is no research or data to confirm this. Additionally, while there may be correlation between social transition and remaining stable in one's gender identity, it is not a causal relationship.

**Opinions and the Bases and Support Therefor**

    **A.       Gender Identity and Designated Sex Are Not the Same Thing, and May Align or Not.**

17.       Designated (anatomical) sex and gender identity are two separate things, although they usually align and are often conflated. Many assume one's gender identity will always align with one's anatomical sex, and this is simply not the case. One's "designated gender" or "designated sex" is the gender or sex that is assumed by looking at one's anatomy. Gender

7

037

identity is a personal, core characteristic of a person; a psychological sense of self. When one's designated sex and gender identity do not align, it is called being transgender. A transgender or gender nonconforming identity is not pathological, nor is it a mental illness.

18.     In her declaration, Dr. Anderson implies that because of the recent "surge" of children and adolescents reporting a transgender identity, social and cultural factors may play a significant role.

19.     However, transgender identities have existed for centuries across various cultures. Historical records show that individuals in ancient civilizations subscribed to the fluidity of gender expression, the acknowledgement of a third gender category, and the representation of diverse gender identities in religious and mythological figures.

20.     Indigenous cultures in North America recognized Two-Spirit people, embodying both masculine and feminine traits. This long-standing presence reflects that transgender identities are not a modern phenomenon but rather part of the broader human experience. It is only now that understanding, visibility, and language to describe one's gender identity are increasing such that individuals may become consciously aware of their authentic gender identity at a younger age, instead of it being repressed or ignored indefinitely.  Susan Stryker, *Transgender History* (2008).

**B.     Youth are Capable of Understanding and Asserting Authentic Gender Identity.**

21.     Children can know and understand their gender by the ages of 3 to 5, sometimes earlier. Most children have a stable gender identity by the age of four years old. However, much like physical development, one's understanding of their gender identity can develop over time.

22.     Cisgender children are assumed to know and understand their gender, because their gender aligns with their designated sex. However, a transgender child is just as capable of understanding their gender identity but is faced with doubt and resistance from others, and others

8

often assume they may be confused simply because their gender does not align with their designated sex.

23.    Not only is this my experience as a clinician, but this is also supported by the American Academy of Pediatrics, which has stated that: "Research substantiates that children who are prepubertal and assert an identity of TGD (transgender/gender diverse) know their gender as clearly and as consistently as their developmentally equivalent peers who identify as cisgender and benefit from the same level of social acceptance." Jason Rafferty, et al., *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*; 142 Pediatrics, e20182162 (2018); https://publications.aap.org/pediatrics/article/142/4/e20182162/37381/Ensuring-Comprehensive-Care-and-Support-for.

24.    A November 2019 study published in *Proceedings of the National Academy of Sciences* revealed no significant differences in gender development between transgender and cisgender children, challenging the notion that transgender kids are too young to make decisions about social or medical transition. Selin Gülgöz, et al, *Similarity in Transgender and Cisgender Children's Gender Development*, 116 Proceedings of the National Academy of Sciences (2019) 24480-24485 (2019); https://doi.org/10.1073/pnas.1909367116.

25.    Based on my professional training and clinical practice, I have learned and observed the following information. There are different trajectories that can occur for a transgender youth depending on many different factors. These factors include but are not limited to: the age of conscious awareness of authentic gender identity; temperament of child; temperament of parent; religion of family; culture of family; geographical location; political affiliation; and exposure to diversity. If a child recognizes and asserts their authentic gender identity from a young age, parents are witness to the evolution and unfolding of this gender. When this happens, it can often be an easier way for parents to digest having a child of a

039

different gender than they originally thought, and in my clinical experience these parents are often poised to be the earliest affirmers and biggest advocates.

26.    However, many youth do not consciously realize their authentic gender identity until later, when parents are less aware this may be coming, and when the youth has a greater emotional understanding of the potential complications related to coming out. Having a different gender identity than their designated sex may have been more of a whisper of discomfort that had been suppressed for years.

27.    The trajectory of a youth who does not come into conscious awareness of their "actual" gender identity until they are a teenager can have a different journey and often times, varying outcomes. Young children are often not fettered by how their life or identity impacts those around them; they are naturally focused on themselves, thereby resulting in a more pure and unfiltered expression of identity. Pre-adolescents and adolescents are preoccupied by what others think of them; trying to fit in, gain independence, and often feel misunderstood by parents (both related to gender and otherwise). Adolescence is a time of identity formation and figuring out who one is in general; adding gender identity to this can create quite a bit of anxiety and angst with regard to anticipated reactions from loved ones, as I have witnessed with many of my adolescent clients. In a developmentally appropriate fashion, many adolescents withdraw into themselves in order to think and figure things while trying to avoid pressure or resistance from adults in their lives.

28.    It can be common for a transgender youth to come into conscious awareness of having a different gender identity than that which they were designated around the time of puberty. This is often due to hormones being rampant at that age which can feel even more distressing than usual if they do not align with one's gender identity. Similarly, the secondary sex characteristics being created by puberty can feel extremely distressing, especially if they are causing the youth to be misgendered, misunderstood, and miscategorized.

040

29.     Additionally, "[s]ome of these adolescents may have withheld their feelings of gender nonconformity out of a fear of rejection, confusion, conflating gender identity and sexual orientation, or a lack of awareness of the option to identify as [transgender or gender-nonconforming]." American Psychological Association, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 American Psychologist 843 (2015); https://www.apa.org/practice/guidelines/transgender.pdf.

30.     The process by which transgender adolescents come to understand their authentic gender identity can be wrought with many different emotions, sometimes conflicting: fear, excitement, self-doubt, relief, guilt, hope, shame, and anxiety. These are all things presented in the clinical space during my work with transgender adolescents. This process typically involves online research, trying to find answers, and trying to understand one's self. Adolescents tend to do this all on their own, at first. While ideally, youth would have trusted adults to talk to about this, this is not always the case, just as it is not usually the case with any adolescent's journey to self-understanding. My colleagues and co-facilitators of TransYouth Care, Dr. Johanna Olson-Kennedy and Dr. Aydin Olson-Kennedy, call this period of time the "coming in" process. The "coming in" process is typically fairly lengthy and peppered with much mental "back and forth" as the adolescent wrangles with what it means for them to be transgender. Some people (especially those who do not work closely with transgender youth) assume adolescents are impulsively deciding they have a different gender than their designated gender; in my experience this is rarely ever the case.

31.     Once they complete the "coming in" process, many adolescents feel the need to be affirmed in their newly understood identity.

11

**C.    Transgender or Gender Nonconforming Identities Are Not a Mental Illness; Not All Gender Nonconforming and Transgender People have Gender Dysphoria, Which Is a Cluster of Symptoms.**

32.    Transgender or gender nonconforming identities are not pathological or a mental illness.  Moreover, not all people who have gender nonconforming identities or are transgender experience gender dysphoria.

33.    Gender dysphoria has historically been a diagnosis in the Diagnostic and Statistical Manual of Mental Disorders (DSM). I and many others doing gender-affirming work believe gender dysphoria should not be in the DSM any longer, much like homosexuality was removed from the DSM in the 1970s. Gender dysphoria is also a diagnosis in the International Classification of Diseases (ICD). Having this diagnosis can justify reimbursable medical interventions for the treatment of gender dysphoria, but is largely insurance driven. It is important to note that not all aspects of gender dysphoria require medical or mental health intervention, and not all people who experience gender dysphoria need mental health or medical intervention.

34.    In my experience in both my work with my clients and my collaboration with other gender-affirming practitioners, gender dysphoria is less helpful as a diagnosis and more helpful as an understanding that it is a unique set of symptoms that many transgender individuals, of all ages, experience. It can be with regard to a body that does not seem to reflect one's authentic identity, and the body can also cause the misgendering of an individual. Dysphoria caused by social interactions is experienced when an individual is misgendered, misunderstood, is categorized in ways that do not feel right, or is not perceived to be their authentic gender. Dysphoria can range from uncomfortable to dangerous, depending on many different factors.

35.    The World Health Organization (WHO) removed gender dysphoria from its list of mental illnesses in 2019.  In a Q&A interview, Dr. Lale Say, a reproductive health expert at the World Health Organization, said: "It was taken out from mental health disorders because we had

12

a better understanding that this was not actually a mental health condition, and leaving it there was causing stigma." WHO, WHO: Revision of ICD-11 (gender incongruence/transgender) – questions and answers (Q&A), https://www.youtube.com/watch?v=kyCgz0z05Ik.

**D.      Social Transition/Affirmation is Not a Medical Treatment, and Does not Need to Be a Formal or Professionally Approved Process.**

36.      Affirming a young child in their asserted gender identity through "social transition" does not involve medical interventions nor is it a medical treatment. It usually involves changing pronouns to reflect the child's authentic gender identity, possibly a name change, and possibly changes in the child's gender expression (way of dress, haircut, etc.) to be "read" appropriately by others in society. It is crucial to affirm the youth with using the pronouns that best reflect their gender identity in settings where the youth has deemed it safe to do so.

37.      This is confirmed by the American Academy of Pediatrics Policy, which defines social affirmation as "a reversible intervention in which children and adolescents express partially or completely in their asserted gender identity by adapting hairstyle, clothing, pronouns, name, etc." Rafferty (2018), *supra* ¶ 23 (stating "Children who identify as transgender and are socially affirmed/supported in their asserted gender show no increase in depression and only minimal (clinically insignificant) increases in anxiety compared with age-matched averages.")

38.      WPATH'S Standards of Care (Version 8) states that "newer research indicates the social transition process may serve a protective function for some prepubescent children and serve to foster positive mental health and well-being." Eli Colemen et al., *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, 23 International Journal of Transgender Health S76 (WPATH SOC 8); https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644. The Standards of Care also states that social transition can significantly benefit many transgender and gender-diverse (TGD) individuals, although not all

13

may choose to or be able to undergo it. Some TGD people seek gender-affirming interventions at different stages of their transition, or even without social transition.

39.     Gender identity is deeply personal, private information that is often disclosed in phases, depending on deemed safety in various settings. While an individual is coming to terms with their gender identity, this is a private process that calls for the individual to be in charge of when and how to share the information. Honoring the knowledge of a person's true identity by using their requested pronouns, is a protective factor—that is, it is beneficial to the individual— even if they have not shared this yet with all others in their life. It allows them to control aspects of the journey when they may feel out of control of others. Ensuring affirmation, safety, control, and privacy are all ways to protect the youth against the harms caused by familial/societal rejection or discrimination. I have seen firsthand the positive benefit of these factors for the youth I have treated over the years.

40.     Dr. Anderson also referenced teachers "facilitating social transition." This gives the impression that the teachers are driving the decisions. A youth asking to be referred to at school by their chosen name and pronouns that reflect their authentic gender, is only a partial aspect of social transition and not a complete social transition (in all settings). It is done at the student's request. Doing so (without the threat of forced disclosure) is honoring a youth's identity, dignity, and right to feel safe at school. Social transition, and the order of settings in which this is achieved, is individualized and should be driven by the youth themselves. Based on my experience and research, a youth does not need to consult with a medical or mental health practitioner in order to socially transition.

41.     Research has directly linked social transition to improved mental health for transgender youth. A study published in the Child Development Perspectives noting "emerging research suggests that using [a transgender youth]'s chosen name and pronouns was associated with large reductions in compromised mental health outcomes." Russell B. Toomey, *Advancing Research on Minority Stress and Resilience in Trans Children and Adolescents in the 21st*

14

044

*Century*, 15 Child Development Perspectives 96-102 (2021);

https://srcd.onlinelibrary.wiley.com/doi/10.1111/cdep.12405.

42.     Respecting a youth's pronouns to reflect and honor their authentic gender identity can be an important step in the youth's journey to self-understanding, identity, and self-acceptance. "Trying on" a different name and pronouns is a unique and valuable way to see if being referred to in that way feels more authentic. This may make the youth more confident and more equipped to then come out to their parents.

43.     There is nothing permanent or irreversible about youth using a different name and pronouns at school. In my experience, parents are always involved and must give consent if the youth later decides to pursue hormonal or medical gender affirming care.

44.     Not only is social transitioning beneficial, transgender children who are affirmed show comparable mental health status as their cisgender peers and significantly improved mental health than other transgender youth who were not living in their authentic gender. Kristina Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics (2016);; https://publications.aap.org/pediatrics/article-abstract/137/3/e20153223/81409/Mental-Health-of-Transgender-Children-Who-Are; Erratum in: 142 Pediatrics (2018):e20181436.

45.     A helpful way of looking at social transition is thinking about it as "social affirmation." Rather than changing from one gender to another, youth who take the steps for social transition are being affirmed in their authentic gender. During the past 18 years, when I have witnessed a youth change their name and/or pronouns, there has been a happiness and a lightness to the individual that often was not there before. Many times, when their parents are involved, it is the parents who have to emotionally transition from one idea of their child's gender to another, while the child enjoys affirmation in their authentic gender.

045

46.     "When one seeks to better align their gender expression with their underlying identity, this process of reflection, acceptance, and, for some, intervention is known as 'gender affirmation.' It was formerly referred to as 'transitioning,' but many view the process as an affirmation and acceptance of who they have always been rather than a transition from one gender identity to another." Rafferty (2018), *supra* ¶ 23.

47.     WPATH'S Standards of Care (Version 8) confirms that a social transition can be partial: "Gender social transition refers to a process by which a child is acknowledged by others and has the opportunity to live publicly, either in all situations or in certain situations, in the gender identity they affirm and has no singular set of parameters or actions." WPATH SOC 8 at S75.

48.     Even a partial transition can be protective and beneficial in nature; there is no evidence to substantiate Dr. Anderson's claim that it is confusing or detrimental to be referred to by one set of pronouns in one setting and a different set in another. Being affirmed and honored for one's authentic gender in one setting is more beneficial than not being affirmed at all. I have seen much evidence of this in my practice; youth experience hope, relief, and gender euphoria when they are acknowledged for who they really are in even one setting, before it extends to others.

49.     Further, research shows that transgender children's gender development remains consistent regardless of whether they recently transitioned or have been living as their identified gender for several years, with only minor differences in clothing preferences. This supports findings that there is no significant difference in gender development between age-matched transgender children tested before and after socially transitioning. Gülgöz (2019), *supra* ¶ 24.

E.     **Forced Outing Policies at Schools Are Harmful**

50.     Transgender and gender nonconforming adolescents face social complications, including family rejection, that are often more intense than those experienced by adults, who

16

046

tend to be more independent. As a result, coming out for transgender and gender non-conforming adolescents in home and school settings may necessitate more careful planning due to these challenges. Laura Edwards-Leeper, et al., *Affirmative Practice with Transgender and Gender Nonconforming Youth: Expanding the Model*, 3 Psychology of Sexual Orientation and Gender Diversity 165–172 (2016); http://dx.doi.org/10.1037/sgd0000167.

51.    When a youth comes out at school and asks to be referred to by a different pronoun or name, from my clinician's perspective there is nothing that needs to be urgently reported to parents for purposes of the imminent health and wellness of the child. Of course, if a school knows a child is actively suicidal, they are obligated to tell the parents about the suicide risk.

52.    Research indicates that outing trans youth without their consent can have serious negative consequences. Here are a few key studies and their findings:

a.    Outing can lead to family rejection, which is a strong predictor of negative mental health outcomes. Youth who experience family rejection are more likely to face homelessness, substance abuse, and suicidal behavior. Caitlin Ryan et al., *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults*, 123 Pediatrics 346-352 (2009); https://publications.aap.org/pediatrics/article-abstract/123/1/346/71912/Family-Rejection-as-a-Predictor-of-Negative-Health.

b.    A University of Connecticut study explored the psychological effects of outing LGBTQ+ youth who prefer not to have their orientation disclosed. The findings revealed that about one-third of those outed without consent experienced significant symptoms of depression and reported lower family support compared to their non-outed peers. Additionally, 65 to 69 percent of youth indicated that being outed was highly stressful. Peter S. McCauley, *Stress of Being Outed to Parents*, *LGBTQ Family Support,*

17

*and Depressive Symptoms Among Sexual and Gender Diverse Youth*, Journal of Research on Adolescence (2024); https://doi.org/10.1111/jora.12912.

53.    In my line of work, dictated by confidentiality, there are many situations where I know information that parents would likely like to know, but the youth does not want them to know. This is the nature of adolescence, and having another adult they can share things with, process life with, and explore their identity with is invaluable. I have seen many scenarios where the youth needs to be relatively far along in the "coming in" process regarding their own gender identity first before they are ready to come out to parents.  Youth also tend to assess "clues" or indications from the parents about potential for acceptance, and typically wait to come out until they feel their parents will be affirming.

54.    When I have been in the situation where I have to use a name and pronouns when communicating with the parent that is different from the name and pronouns I use with the youth, I do not consider it deception. I look at it as protecting the youth's private information until they are ready to share it with their parents. I have found that having a safe place to explore, process, and experiment with a new name and pronouns increases confidence, stabilizes mental health, and allows the youth to discern what feels most "right" to them. This seems to be a way to facilitate readiness for coming out to parents, not a way of preventing it. In my anecdotal experience of 18 years, if a youth has asked me to use a different name and pronoun with their parents than with them, this has been very temporary.

### F.    Risks of Unaffirming Parents.

55.    The stakes can be high for a transgender youth whose teacher forcibly outs them to their parents. In my work, I have witnessed many children and adolescents flourish under the support and affirmation by their parents. I have also seen the distress and devastation it can cause when parents or other loved ones do not respect or affirm their gender identity. I have seen that contending with this while trying to come to terms with being transgender can feel like a very heavy burden.

18

048

56.    In addition to my clinical experience, there are numerous studies that outline the detriment unaffirming parents can cause. For instance:

a.    A study published in the journal Pediatrics found that transgender youth who faced discrimination or were not supported by their families were significantly more likely to experience mental health challenges.  Stephen T. Russell & Jessica N. Fish, *Mental Health in Lesbian, Gay, Bisexual, and Transgender (LGBT) Youth*, 12 Annual Rev. Clinical Psychology 465-87 (2016); https://www.annualreviews.org/content/journals/10.1146/annurev-clinpsy-021815-093153;

b.    A study in Psychology of Sexual Orientation and Gender Diversity found that, "[…]The impact of a TGNC adolescent's transition on family relationships could result in the adolescent having to choose between remaining in an unsupportive environment and becoming homeless. Due to the complexities described in this section, we believe that approaching TGNC adolescents in a supportive, yet thoughtful and cautious way is both affirmative and ethical." Laura Edwards-Leeper, et al., *Affirmative practice with transgender and gender nonconforming youth: Expanding the model*, 3 Psychology of Sexual Orientation and Gender Diversity 165–172 (2016); http://dx.doi.org/10.1037/sgd0000167.

c.    A study in JAMA Pediatrics found that, "While parental support for transgender youth strengthens healthy development, unsupportive parents contribute to suicidality and homelessness." Mollie T. McQuillan, et al., (2024), *Transgender Adolescent School Climate, Mental Health, and Adult Social Support*, 178 JAMA Pediatrics 1082-1084 (2024); https://doi.org/10.1001/jamapediatrics.2024.3079.

19

049

**G.    Working with Parents to Facilitate Open Communication Between Youth and their Parents, on the Youth's Terms and Timeline, and Affirmation of the Youth's Gender Identity by the Parents.**

57.    The majority of my work is helping parents to understand and hopefully affirm their child's authentic gender identity. Most professionals who specialize in working with gender diverse and transgender youth have agreed the best practice is to believe and affirm youth when they tell us who they are. If a child expresses they have a gender identity that does not align with their sex designated at birth, believing them and affirming them can save them a lot of distress and dysphoria down the line. Parents are now encouraged to believe, listen to, and follow their child's assertions of gender identity. It is always my goal to open up communication between youth and their parents. Eventual parental understanding of and affirmation of their child's gender identity is crucial. This is why I authored a book to help parents do exactly that.

58.    In a Systematic Review by Socioecological Level, "parental support was protectively associated with fewer depressive symptoms, perceived burden of being transgender, and improved life satisfaction." Michelle M. Johns, et al., *Protective Factors Among Transgender and Gender Variant Youth: A Systematic Review by Socioecological Level*, 39 Journal of Primary Prevention 263-301 (2018); https://link.springer.com/article/10.1007/s10935-018-0508-9.

59.    While there is value and importance of sharing a youth's authentic gender identity with their parents, the timing of this needs to be up to the youth about how and when their parents are told about this intensely personal journey.

60.    There can be a myriad of reasons why adolescents may not choose to come out to their parents first. They may not deem it safe or smart to come out to their parents due to witnessing comments, understanding their parents' beliefs on trans identities, or other implications that they will run into opposition to their authentic identity. Unfortunately, there have been many cases where transgender youth have been rejected, punished, or otherwise scorned for revealing their authentic identities.

20

050

61.     Some youth worry about upsetting their parents, and do not feel they can tolerate navigating their parents' responses and emotions while they are still coming to terms with their own understanding and feelings about their identity.

62.     In my experience, a youth's request to keep their chosen name/pronoun private is not to bypass parents in the gender journey. In fact, doing so would be relatively impossible. However, when and how a youth comes out to their parents should be decided upon by the youth. The youth may have already come out at home and was possibly met with resistance and/or rejection, therefore making school the only place they can be referred to authentically. If this were to be revealed to the parents, the youth may face more rejection/resistance at home, along with punitive actions for being out at school. This can be hugely detrimental to the youth's mental health.

63.     It is important to note that in my experience, many transgender youth do opt to come out at home first. The ideal situation is that home is the safest place to reveal one's authentic gender, and the parents are the first people to help the youth navigate exploring their gender and using new pronouns. However, not all home environments and relationships between parents and teenagers are ideal. For this reason, it's imperative to protect the school environment as a safety net before a youth is ready to come out at home, not necessarily instead of.

**H.     Importance of Supportive Teachers/Reasons Why Youth May Come Out at School First.**

64.     Within friend groups and school are often the first places where adolescents reveal their authentic gender identities. Social affirmation from friends can be very protective in nature and is often where transgender teens first hear their "correct" pronouns. When these things happen, and the adolescent feels affirmed, understood, and seen, they can experience a sense of elation, or "gender euphoria." The next step is often times disclosing to teachers, resulting in the ability to be referred to by their appropriate pronoun and name in a wider context.

21

051

65.     Teachers are often poised to be safe, affirming adults because they can honor the youth's pronouns and newly asserted identity without the attachment to the youth's gender most parents naturally have. Parents also have more of an emotional attachment to the youth's name, so having a teacher help them explore being referred to by something else may feel like a natural first step to some youth.

66.     There are likely many different scenarios in which a teacher would not disclose to a parent everything a student had shared with the teacher, especially if they knew it would cause more strife at home or place undue stress on the youth. The same applies when handling information about a student's gender identity. Switching name and pronouns depending on who you are talking to can be tricky, but manageable. Even if a teacher feels a personal inclination to disclose this information, this is not necessarily best for the youth's mental health.

67.     Research shows providing a safe space has a tangible benefit for transgender youth's mental health outcomes:

a.     Transgender and questioning students face higher rates of violence, mental health issues, suicidal thoughts, and unstable housing compared to cisgender peers, along with lower school connectedness. This disparity is concerning, but implementing inclusive policies and practices in schools can enhance safety and support, benefiting the mental health of all students.  Nicolas A. Suarez et al., *Disparities in School Connectedness, Unstable Housing, Experiences of Violence, Mental Health, and Suicidal Thoughts and Behaviors Among Transgender and Cisgender High School Students — Youth Risk Behavior Survey, United States, 2023*, 73 MMWR Suppl. 50–58 (2024); DOI: http://dx.doi.org/10.15585/mmwr.su7304a6.

b.     Supportive educators significantly reduce school absenteeism and enhance feelings of safety for transgender youth. Reports indicate that advocacy from school staff, including teachers, helps prevent dropout rates, even in the face of victimization. Additionally, faculty awareness and support of transgender issues positively impact the

22

052

academic experiences of these students. Teachers and school staff are sometimes the only sources of support available. Johns (2018), *supra* ¶ 58.

c.       More than half (54%) of transgender and nonbinary young people found their school to be gender-affirming, and those who did reported lower rates of attempting suicide.  Trevor Project, *2024 U.S. National Survey on the Mental Health of LGBTQ+ Young People*; https://www.thetrevorproject.org/survey-2024/.

d.       "To effectively provide a safe learning environment for all students, it is imperative that the voices and experiences of trans youth are heard by education professionals and reflected in their policies and practices." Lydia A. Sausa, *Translating Research into Practice: Trans Youth Recommendations for Improving School Systems*, 3 Journal of Gay & Lesbian Issues in Education 15-28 (2005); https://www.tandfonline.com/doi/abs/10.1300/J367v03n01_04.

e.       LGBTQ+ students with many supportive school staff (11 or more) experience significantly better outcomes than those with few (0 to 5). They feel safer regarding their sexual orientation and gender expression, miss less school due to discomfort, and report a greater sense of belonging. Additionally, they perform better academically, are more likely to plan for post-secondary education, and show improved psychological wellbeing, including higher self-esteem and lower depression and suicide considerations. GLSEN, *2021 National School Climate Survey*; https://www.glsen.org/research/2021-national-school-climate-survey.

f.       A recent study found that "among students who felt depressed and anxious, transgender students were 74% less likely than their cisgender peers to seek help from parents than from adults at school. Laurel White, *Transgender students more likely than cisgender peers to seek support from school staff, UW–Madison and NYU study finds*, https://news.wisc.edu/transgender-students-more-likely-than-cisgender-peers-to-

23

seek-support-from-school-staff-uw-madison-and-nyu-study-finds/; see McQuillan (2024), *supra* ¶ 56(c).

g.  LGBTQ youth who had access to spaces that affirmed their sexual orientation and gender identity reported lower rates of attempting suicide. Trevor Project, *National Survey on LGBTQ Youth Mental Health 2021*; https://www.thetrevorproject.org/survey-2021/.

h.  "For transgender youth who choose a name different from the one given at birth, use of their chosen name in multiple contexts affirms their gender identity and reduces mental health risks known to be high in this group."  Stephen T. Russell, et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, 63 Journal of Adolescent Health 503-505 (2018); https://www.jahonline.org/article/S1054-139X(18)30085-5/abstract.

## I.  Dr. Anderson Relies on Outdated Standards of Care and Discredited Studies, and Makes Unsupported Claims

### (1)  *Outdated SOC references*

68.  The Plaintiffs' expert, Dr. Erica Anderson, submitted a declaration that relies on the World Professional Association for Transgender Health (WPATH ) Standards Of Care. Since their inception in 1979, WPATH's Standards of Care have been revised eight times. Not only have the recommendations evolved with regard to how practitioners are to navigate treating transgender clients, but the overall tone and approach has evolved and changed over time. In my opinion, the SOC have evolved from a pathologizing, patronizing, gatekeeping  set of standards to standards that embrace, celebrate, and honor the free will of the transgender individual.

69.  Dr. Anderson primarily cites the SOC Version 7 which is an earlier and less evolved version than the current SOC 8, which is reflective of a consensus of a multidisciplinary team of providers doing the work today.

054

70.    Dr. Anderson states in her declaration "When children or adolescents begin to experience gender incongruence, they should receive a careful evaluation and assessment by a professional mental health provider before transitioning, for a variety of reasons." This implies that if a child starts questioning their gender, they need immediate assessment or treatment. This is a largely pathological view of transgender identities, implying that this is something that needs to be evaluated to see if it is "real" or that the child needs to access immediate treatment. In WPATH'S Standards of Care (Version 8), it is recognized that not all gender diverse children wish to explore their gender. Cisgender children are not expected to undertake this exploration, and therefore attempts to force this with a gender diverse child, if not indicated or welcomed, can be experienced as pathologizing, intrusive and/or cisnormative.

71.    The book Histories of the Transgender Child drives home the concept of embracing transgender identities rather than pathologizing them. The author proposes "an ethical relation that calls upon adults to stop questioning the being of trans children and affirm instead that there are trans children, that trans childhood is a happy and desired form - not a new form of life and experience but one richly, beautifully historical and multiple."  Jules Gill-Peterson, Histories of The Transgender Child (2018).

72.    While I think therapy can be hugely beneficial for someone undergoing transition or exploring their gender identity, it is not a prerequisite. Most youth who come to see me already know who they are; they need help with getting others to see them that way. In fact, if a youth has already started going by a name and pronouns that feel authentic to them, and had a positive mental health impact from this, this can contribute to the eventual assessment process. It can also help confirm/reinforce future choices regarding gender affirming interventions. Finding out how it felt to be referred to with the chosen name and pronouns can give a lot of very important information to the youth and their parents.

25

**(2)** *Desistance myth*

73.     The studies Dr. Anderson references about how many children persist in a different gender have been long refuted and are known to be inherently flawed. These studies imply the vast majority of youth who are gender nonconforming or socially transition do not persist in a different gender identity, and this has largely become known as the "Desistance Myth." Dr. Anderson states that "numerous studies prior to the widespread adoption of social transition reported that gender incongruence did not persist through adolescence for the majority of children who experience it."

74.     Dr. Anderson perpetuates this problematic narrative by stating that not only do most children not persist, but that many retransition and live to regret it. She posits, "The potential for a difficult detransition process in the future and regret over a prior transition are important considerations that a mental-health provider should help a child or adolescent and their parents understand before they decide to undertake a social transition."

75.     Desistance studies are often cited to justify delaying a young person's social transition, based on the assumption that this may prevent future distress from needing to transition again. However, this perspective acknowledges that such distress is merely conceivable and not guaranteed. Evidence suggesting that a second transition would be traumatic is limited. The concern lies in the assumption that a possible future change in a child's gender identity justifies suppressing or redirecting their current expression of identity. Julie Temple-Newhook, et al., *A Critical Commentary on Follow-up Studies and "Desistance" Theories About Transgender and Gender-nonconforming Children*, 19 International Journal of Transgenderism 212-224 (2018); https://www.tandfonline.com/doi/full/10.1080/15532739.2018.1456390.

76.     New studies have emerged that show a very low rate of re-transition, which is also reflected in my own clinical experience. Most children who socially transition remain stable in their gender identity. This is not because social transition caused them to blindly continue in pursuit of hormonal/medical transition, but rather because transition had been right for them.

056

77.     A new study from Perth, Australia, published in JAMA Pediatrics has found that only 1% of transgender youth receiving gender-affirming care at a clinic reidentified with their sex assigned at birth. Blake S. Cavve, *Reidentification With Birth-Registered Sex in a Western Australian Pediatric Gender Clinic Cohort*, 178 JAMA Pediatrics 446–453 (2024); https://doi.org/10.1001/jamapediatrics.2024.0077.

### (3)     *Referencing outdated or debunked work*

78.     Dr. Anderson's declaration references the work of Dr. Kenneth Zucker, Dr. James Cantor, and TD Steensma. All three of these individuals are controversial when it comes to gender-affirming care. They have been known to be harmful to the transgender community by focusing on detransitioning, pathologizing gender diversity, and focusing on gatekeeping/caution over affirming care.

79.     Dr. Anderson also references the Cass Review, which has been deemed harmful and inaccurate by many folks engaging in gender-affirming care, including myself.

79.     The Cass Review was commissioned to address the UK National Health Service's failures in providing timely, competent care for transgender youth, which includes long wait times for treatment. However, the Review's recommendations take an ideological stance that contradicts its own findings, which emphasize the need for individualized, age-appropriate medical care for gender dysphoria, aligned with international standards. Further, the Review has been criticized for obscuring key findings, misrepresenting data, and misapplying scientific methods. For instance, it focuses on the potential harms of gender-affirming interventions for non-transgender individuals while neglecting the significant distress faced by transgender youth who do not receive timely care. In addition, the Review is said to misuse data, rely on speculation, and misunderstand clinical evidence, raising serious concerns about its scientific integrity and the validity of its conclusions. Meredithe McNamara, et al., *An evidence-based critique of "The Cass Review" on gender-affirming care for adolescent gender dysphoria* (July

27

1, 2024); Retrieved from https://law.yale.edu/sites/default/files/documents/integrity-project_cass-response.pdf.

80.    The Cass Review is criticized as relying on the assumption that it is "best" to be cisgender within a healthcare system that lacks accountability for transgender issues. Four key concerns are identified: the Review's handling of prejudice, its cisnormative bias, the pathologization of transgender identities, and double standards in using evidence to inform policy. To improve transgender healthcare, policymakers and practitioners need to address these issues, focusing on transgender positivity and celebrating the lives of transgender children. There must be a stronger commitment to upholding the healthcare rights of trans youth, and to prioritizing equity and social justice for marginalized populations. Cal Horton, *The Cass Review: Cis-Supremacy in the UK's Approach to Healthcare for Trans Children,* International Journal of Transgender Health 1-25 (March 14, 2024);

https://www.tandfonline.com/doi/full/10.1080/26895269.2024.2328249.

81.    The British Medical Association (BMA) is critical of the Cass Review as well. The BMA Council recently voted to publicly critique the Review due to concerns raised by doctors and academics about its potential negative impact on transgender healthcare. Criticisms focus on the Review's unsubstantiated recommendations, unclear study protocols, ambiguous eligibility criteria, and the exclusion of trans-affirming evidence. Phil Banfield, *BMA to undertake evidence-led evaluation of the Cass Review*; https://www.bma.org.uk/news-and-opinion/bma-to-undertake-evidence-led-evaluation-of-the-cass-review.

### (4)    *Correlation vs. causation*

82.    In her declaration, Dr. Erica Anderson states that "Social transition sets children down a path that often leads to medical interventions" and makes an argument that social transition can be causal when it comes to hormonal/medical/surgical or any other future gender affirming transitions. This is misleading. There is a correlation between social transition and later medical transition because these are both ways a transgender youth pursue alignment with their

28

058

authentic gender identity. I have seen this many times in my own practice; when a youth is socially affirmed and it continues to feel right, they go on to pursue further and age-appropriate gender affirming interventions throughout development. Their journey of self-expression or to authentic identity can be altered based on affirmation, stigma, obstacles, or oppression, but it does not change their gender identity.

83.     Many people conceptualize social transition (or any type of gender-affirming transition) as a "big decision" that needs to be carefully analyzed and avoided if possible. Those of us who have been doing this work with transgender children for years have witnessed over and over again that their gender identity is a reflection of who they are, and any transition that follows is a natural step, or intervention, to allow them to live authentically.

84.     When Dr. Anderson states that social transition can lead to further transitions in the future, it is as if she is likening this to a bad or reckless decision that leads to an even worse outcome. (Social transition leading to later medical/hormonal affirmation is a natural progression of the pursuit of authenticity, not akin to excessive tanning leading to skin cancer.) It might make more sense to compare this to "kids that graduate from middle school are more likely to graduate from high school," as one naturally comes before the other.

85.     Another analogy is a baby learning how to crawl before they walk; crawling "causes" walking in that it is a natural steppingstone to walking. Social transition is often a steppingstone to medical transition, as it allows the individual to live and be seen as their authentic gender identity, which helps them understand if it is the right thing for them before seeking further intervention.

86.     Dr. Anderson also states "Social transition erects psychosocial barriers to potential desistence." The goal of working with transgender youth should not be desistence, it should be authenticity.

(5)     *Impact of re-transition*

29

059

87.     There are no studies to support Dr. Anderson's claims that socially transitioning and then re-transitioning would be detrimental to a child's mental health.

88.     There have been so few incidents of transgender children "re-transitioning" after social transition that there is not a lot of research on the topic. However, in studies that do address it, findings indicate that there is little regret associated with the initial transition and/or the re-transition. In my extensive clinical experience as well as speaking with cohorts doing similar work, it is rare for a youth to socially transition and then re-transition. Additionally, when changes are made as a reflection of evolving gender identity, transgender individuals tend to experience this more as a "course correction" rather than a "re-transition."

89.     There are significant doubts about the accuracy of reported persistence rates for transgender youth. Youths' gender identity trajectories are varied, and re-transitioning does not inherently signify a harmful or regrettable outcome. Instead of attempting to predict future gender identities, clinicians should focus on providing immediate support by respecting youths' expressed gender identities, supporting those who wish to socially transition, and facilitating access to medical transition for adolescents. Florence Ashley, The Clinical Irrelevance of "Desistance" Research for Transgender and Gender Creative Youth, 8 Psychology of Sexual Orientation and Gender Diversity 213–220 (2021); https://doi.org/10.1037/sgd0000504.

90.     A recent qualitative study explored the experiences of youth who made binary social transitions before age 12 and later socially transitioned again, not necessarily back to their designated gender. Out of 317 participants, 23 had "re-transitioned" at least once, with 8 identifying as cisgender, 11 as nonbinary, and 4 as binary after initially identifying as nonbinary. Participants reported various reasons for re-transitioning, such as evolving identities or discovering a better-fitting identity. Social responses to re-transitioning were generally neutral or positive, and none expressed regret over their initial transitions.  Kristina R. Olson, et al., *Gender Identity 5 Years After Social Transition*. 150 Pediatrics (2022), e2021056082; https://doi.org/10.1542/peds.2021-056082.

060

91.    The findings challenge common concerns about re-transitioning, indicating that gender-diverse youth can navigate this process in supportive environments without facing rejection or distress. Some scholars argue that re-transitioning is a normal part of gender development, reflecting fluidity in gender identity rather than a definitive endpoint. Clinicians are encouraged to remain open to the possibility of re-transitioning and to discuss it proactively with families.

92.    One study highlighted a case where a youth transitioned to male, paused puberty blockers, and re-transitioned to female without experiencing psychological distress. Parents expressed satisfaction with their children's transition journey, emphasizing the importance of following the child's lead. Overall, the study suggests that retransitions can be part of a broader gender exploration and do not necessarily lead to regret or social rejection when support is available. Lily Durwood, *Retransitioning: The Experiences of Youth Who Socially Transition Genders More Than Once*, 23 International Journal of Transgender Health 409-427 (2022); https://doi.org/10.1080/26895269.2022.2085224.

**Conclusions**

93.    This report illustrates the serious implications of outing transgender youth and the importance of supportive, confidential environments in schools.

94.    Outing transgender youth to their parents without consent can have significant negative mental health consequences. If school districts permit or require forced outings, it will gravely undermine the safety of transgender youth.

95.    A teacher outing a transgender youth to their parents without their consent can be devastating to the privacy of the student and undermines school as a safe place. If transgender youth do not know who is safe to disclose to and who is not, it eliminates this much-needed safety net. On the other hand, reinforcing the importance of teachers honoring students' privacy and students makes school a safe and protective environment, as it should be.

31

061

96.     While an important element of a youth's social transition will be to communicate the youth's authentic gender identity to their parents, this needs to be on the terms of the youth, on their own timeline, and with the support of their schools.

**Cases in Which I Have Testified in the Previous Four Years**

97.     I testified in Support of a Petition for Change of Name and Gender, in San Diego Superior Court in August 2021.

**Statement of Compensation**

98.     I am being compensated at an hourly rate of $200 per hour for preparation of expert declarations and reports, and time spent preparing for or giving deposition or trial testimony.  My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and if called as a witness would testify competently thereto.  Executed in San Jose, California on May 1, 2025.

By:  *Darlene Tando, LCSW*
_____
Darlene Tando, LCSW

32

062

# EXHIBIT A

063

Darlene A. Tando, LCSW

3245 University Ave STE 1 #357
San Diego, CA 92104
619-948-8926
tandotherapy@me.com
www.DarleneTando.com

Experience:

Licensed Clinical Social Worker
Private Practice
*San Diego, CA          November 2005 to Present*
- Provides individual, family, couples and group therapy to people of all ages
- Specializes in helping children with behavioral problems/social skills deficits
- Specializes in working with gender-diverse/nonbinary/transgender youth and adults
- Maintained a gender blog, www.DarleneTandoGenderBlog.com
- Attends and presents at various gender conferences around the United States
- Authored the book, "The Conscious Parent's Guide to Gender Identity: A Mindful Approach to Embracing Your Child's Authentic Self" (July, 2016)
- Provides clinical supervision to associates
- Provides a comprehensive training symposium titled "TransYouth Care" with two colleagues

Licensed Clinical Social Worker/Independent Contractor
Casa Palmera Treatment Center
*Del Mar, CA          August 2006 to December 2006*
- Provided psychotherapy to guests with chemical dependency and eating disorders
- Taught class to family members of guests on Family Systems Theory
- Provided intensive therapy with families as part of family week

Licensed Clinical Social Worker
Naval Medical Center San Diego, *Child/Adolescent Mental Health*
*San Diego, CA          April 2004 to August 2006*
- Performed diagnostic interviews/psychosocial assessments of incoming patients
- Made necessary referrals for medication evaluation, psychological testing, etc.
- Provided individual, family, and group therapy to children ages 2-18

Program Therapist
San Diego Center for Children, *Residential Treatment Level 12*
*San Diego, CA          June 2000 to April 2004*
- Served as primary therapist/case manager for caseload of 8-10 residential and day treatment clients (ages 6-13) from intake to discharge
- Coordinated and ensured implementation of comprehensive treatment plan

064

- Provided individual, family, and group therapy
- Facilitated weekly multidisciplinary treatment team meetings
- Created and facilitated weekly Specialty Groups, on topics including anger management, social skills, drug education, and developmental issues
- Trained Child Development Counselors who worked on therapeutic milieu
- Served as Field Instructor for MSW and BSW Interns

Clinical Internship
Home Start, Inc., *Child Abuse Treatment Program*
*San Diego, CA*                 *August 1999 to May 2000*
- Provided individual and family counseling to child victims of abuse and neglect, utilizing play therapy techniques such as sand tray and art therapy
- Provided crisis intervention to victims of crimes; assisted in filling out Victim/Witness applications

Clinical Internship
North Central Region County Mental Health, *Outpatient Services*
*San Diego, CA*                 *September 1998 to May 1999*
- Provided individual counseling to adult clients with depression, anxiety, schizophrenia, and other mental illnesses
- Co-facilitated weekly depression group; planned weekly activities

Education:          Masters Degree in Social Work, May 2000
San Diego State University
- GPA: 3.9 on a 4.0 scale

Bachelor of Arts in Psychology, June 1998
University of California, Santa Barbara
- GPA: 3.5 on a 4.0 scale; Dean's Honors

Achieved licensure:

- November 2003

Special Accomplishments:
- Received "Appreciation Award" from the transgender community at the Transgender Day of Empowerment in 2008
- Won NASW's 2013 Media Award for "Best Single Topic Blog"
- Was named "Friend of Pride" for the 2015 Stonewall Awards in San Diego
- Have appeared on "The Doctors", "Good Morning America", "Dr. Phil", San Diego local news programs, and the CNN Short Film "Raising Ryland"
- Received "Equality Leadership Award" from Equality California in June of 2019

## DECLARATION OF SERVICE BY E-MAIL

Case Name:     **Mirabelli et al. v. Olson, et al.**

Case No.:       **3:23-cv-00768-BEN-VET**

I declare:

I am employed in the Office of the Attorney General, and a member of the California State Bar. I am 18 years of age or older and not a party to this matter; I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence by electronic mail. In accordance with that practice, correspondence is served that same day in the ordinary course of business.

On **May 1, 2025,** I served the attached **EXPERT REPORT OF DARLENE TANDO, LCSW** by electronic mail addressed as follows:

### PLEASE SEE ATTACHED SERVICE LIST

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on **May 1, 2025,** at Los Angeles, California.

| | |
|---|---|
| Jennifer Bunshoft | *Jennifer Bunshoft* |
| Declarant | Signature |

67541112.docx

066

## DECLARATION OF SERVICE BY E-MAIL

Case Name:    **Mirabelli et al. v. Olson, et al.**

Case No.:      **3:23-cv-00768-BEN-VET**

| LiMANDRI & JONNA LLP<br>*Attorneys for Plaintiff*<br><br>Paul Michael Jonna, Esq.<br>Charles S. LiMandri, Esq.<br>Jeffrey Trissell<br>Kathy Denworth<br>**E-mail Address**: pjonna@limandri.com<br>**E-mail Address:** cslimnadri@limandri.com<br>**E-mail Address:** jtrisell@limandri.com<br>**E-mail Address:** kdenworth@limandri.com | THOMAS MORE SOCIETY<br>*Attorneys for Plaintiff*<br><br>Thomas Brejcha, pro hac vice*<br>Peter Breen, pro hac vice*<br>**E-mail Address:** tbrejcha@thomasmoresociety.org<br>**E-mail Address:** pbreen@thomasmoresociety.org |
| --- | --- |
| ARTIANO SHINOFF<br>*Attorneys for EUSD Defendants*<br><br>Daniel R. Shinoff<br>Gil Abed<br>Jack M. Sleeth, Jr.<br>Maurice A. Bumbu<br>Lauren J. Cambronero<br>Nopealey Lay<br>Bianca Fregoso<br>**E-mail Address:** dshinoff@as7law.com<br>**E-mail address:** gabed@as7law.com<br>**E-mail address:** jsleeth@as7law.com<br>**E-mail Address:** mbumbu@as7law.com<br>**E-mail Address:** lcambronero@as7law.com<br>**E-mail Address:** nlay@as7law.com<br>**E-mail Address:** bfregoso@as7law.com | CALIFORNIA DEPARTMENT OF EDUCATION<br>*Attorneys for CDE Defendants*<br><br>Len Garfinkel<br>Paul Gant<br>Virginia Cale<br>Christopher Mandarano<br>**E-mail Address:** lgarfinkel@cde.ca.gov<br>**E-mail Address:** pgant@cde.ca.gov<br>**E-mail Address:** vcale@cde.ca.gov<br>**E-mail Address:** cmandarano@cde.ca.gov |

067

EXHIBIT 3

### UNITED STATES DISTRICT COURT

#### for the

#### Southern District of California

|  |  |
|---|---|
| ELIZABETH MIRABELLI, an individual, and LORI ANN WEST, an individual, <br><br>Plaintiffs, <br>vs. <br><br>MARK OLSON, in his official capacity as President of the EUSD Board of Education, et al., <br><br>Defendant. | ) ) ) ) ) ) Case Action ) USDC No. 320- ) cv-00768BEN ) ) ) ) ) ) ) |

### VIDEO RECORDED VIDEOCONFERENCE DEPOSITION OF

### DARLENE TANDO, LMFT

### APPEARING REMOTELY VIA ZOOM WEBCAM

### FRIDAY, JUNE 6, 2025

Reported by:
LYDIA E. JOHNSON
CSR 5919
No. J12990470

THE SULLIVAN GROUP
OF COURT REPORTERS
AN ESQUIRE DEPOSITION SOLUTIONS COMPANY

068

UNITED STATES DISTRICT COURT

for the

Southern District of California

ELIZABETH MIRABELLI, an individual, )
and LORI ANN WEST, an individual,   )
                                    )
                      Plaintiffs,   )
              vs.                   ) Case Action
                                    ) USDC No. 320-
MARK OLSON, in his official         ) cv-00768BEN
capacity as President of the EUSD   )
Board of Education, et al.,         )
                                    )
                                    )
                      Defendant.    )
_____)

VIDEO RECORDED VIDEOCONFERENCE DEPOSITION OF

DARLENE TANDO, LMFT

APPEARING REMOTELY VIA ZOOM WEBCAM

FRIDAY, JUNE 6, 2025

Reported by:
LYDIA E. JOHNSON
CSR 5919
No. J12990470

UNITED STATES DISTRICT COURT

for the

Southern District of California

ELIZABETH MIRABELLI, an individual, )
and LORI ANN WEST, an individual,   )
                                    )
                        Plaintiffs, )
                                    )
            vs.                     ) Case Action
                                    ) USDC No. 320-
MARK OLSON, in his official         ) cv-00768BEN
capacity as President of the EUSD   )
Board of Education, et al.,         )
                                    )
                                    )
                        Defendant.  )
_____)

VIDEO RECORDED VIDEOCONFERENCE DEPOSITION

OF DARLENE TANDO, LMFT, taken on behalf of

Plaintiffs, all parties appearing remotely

via Zoom Webcam, commencing at 9:36 a.m.,

June 6, 2025, before Lydia Johnson, CSR 5919.

THE SULLIVAN GROUP OF COURT REPORTERS

070$^2$

                        A P P E A R A N C E S:


For Plaintiffs ELIZABETH MIRABELLI and
LORI ANN WEST:

LiMANDRI & JONNA, LLP
By:   Paul Michael Jonna, Esq.
        Jeffrey M. Trissell, Esq.
16236 San Dieguito Road
No. 3-15
Rancho Santa Fe, California   92067
(858) 759-9930
pjonna@limandri.com

THOMAS MORE SOCIETY
By:   Joan Mannix, Esq.
309 West Washington Street
Suite 1250
Chicago, Illinois   60606
(312) 782-1680
info@thomasmoresociety.org


For STATE OF CALIFORNIA:

OFFICE OF THE ATTORNEY GENERAL
By:   Darin Lee Wessel, Esq.
600 West Broadway
Suite 1800
San Diego, California 92101
(619) 738-9125
darin.wessel@doj.ca.gov


For Defendant ESCONDIDO UNION
SCHOOL DISTRICT

ARTIANO SHINOFF
By:   Lauren Janeille Cambronero, Esq.
3636 4th Avenue
Suite 200
San Diego, California   92103
(619) 232-3122
lcambronero@as7law.com


ALSO PRESENT:
Marcela Sandoval, Videographer

medical condition.

I do think it's helpful for individuals, particularly parents or other members of society, trying to understand that it can be very helpful.

But I would probably defer to the trans community on deciding whether or not, you know, this should be conceptualized as a medical condition. The thing that is very interesting about this is that the greatest relief for this can usually come from a medical intervention.

And so it's -- you know, it's really tricky. But I still do believe that it's not a mental disorder.

Q        So what edit would you make to this statement to make it more consistent with how you see things today?

A        I might say physical condition, or I might just stick with, you know, that I don't believe it's a mental disorder.

And for, you know, analogy purposes one can think of it more like a medical condition with medical treatment options.

Q        And was there a period -- a point in time that you recall where your thinking on this

195
072

shifted?

MR. WESSEL:  Objection.

Assumes facts not in evidence.

BY MR. JONNA:

Q        Other than when you were asked to give opinions in this case.

MR. WESSEL:  Objection.  Argumentative.

THE WITNESS:  No.

I mean, like I said, my language evolves and has evolved.  It's evolved since when I wrote the book.  It certainly has evolved since writing the blog.  I have not gone back and looked at it with a fine-tooth comb to update it.  I haven't had time.

But I'm always -- you know, it's also been sort of a paradigm shift with cisgender providers being here as voices and advocates of the community and there has been a shift over the past decade of cisgender providers to take a step back, take a back seat, have trans voices, trans providers be communicating things like that.

So that is partially why I stopped updating the blog, because I felt like I needed to center trans voices.

And so I think now in my -- my way

of saying it without being something so concrete or declarative about it being a medical condition.

Q    Did anybody ever give you any feedback on these statements and tell you they didn't agree with them?

A    No.

Q    Is there any reason why you haven't gone through the blog and updated it or edited it?

A    Just I'm so busy seeing clients and supervising and everything else.

Q    All right.

I'm going to look at Exhibit 1 again, which is your report, and we're going to go to Page 13 at this time.

And the next section says Social Transition/Affirmation is not a Medical Treatment and does not Need to be a Formal or Professionally Approved Process.

And then Paragraph 36 you wrote affirming a young child in their asserted gender identity through social transition does not involve medical interventions, nor is it a medical treatment.

As we established earlier I think you agreed you are not a doctor; is that correct?

A    Yes.

THE SULLIVAN GROUP OF COURT REPORTERS

197
074

there's a lot of different ways --

Q          Yeah.

A          -- to intervene.

Q          Yeah.

A          You know, and --

Q          I was going to ask you -- I was going to ask you about that slide.  So don't worry.

A          Okay.

Q          So what -- what do I mean by intervention.

           And it says we intervene naturally every day in response to our own needs and children's needs.

           Do you see that?

A          Yes.

Q          And you have a photo of water, food, it looks like tutoring, and then a child and then sleeping.

           Do you see that?

A          Yes.

Q          So are you analogizing gender affirming care to drinking water and sleeping?

A          Well, what I'm analogizing is we intervene and it doesn't mean it's a formal medical intervention -- that when we're thirsty we drink

water.  When we're hungry we eat.

Those could be ways of intervening to increase our well-being and decrease our distress, and that is very similar to gender affirming care, that there can be interventions that are not medical, like using someone's name and pronouns.

Q        Okay.

If you go down to the next page you wrote gender dysphoria is unique in that it often requires medical intervention to reduce mental distress.

Do you see is that?

A        Yes.

Q        And can you think of anything that's analogous to that that requires medical intervention to reduce mental distress?

MS. CAMBRONERO:  Objection.  Overbroad.

MR. WESSEL:  Join.

BY MR. JONNA:

Q        I'm actually going to withdraw the question.  Let's just go down.

Page 410, which is PDF Page 5, you wrote why.  Parents agonize over this.  Wouldn't allow child to make decisions over other big life topics.  So why wouldn't they for this.

I, LYDIA JOHNSON, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal case, before completion of the proceedings, review of the transcript was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: June 16, 2025

_____
LYDIA E. JOHNSON
CSR No. 5919

THE SULLIVAN GROUP OF COURT REPORTERS

DEPONENT'S CHANGES OR CORRECTIONS

Note:  If you are adding to your testimony, print the

exact words you want to add.  If you are deleting

from your testimony, print the exact words you want

to delete.  Specify with "add" or "delete" and sign

this form.

DEPOSITION OF:  Darlene Tando, LCSW

CASE:  Mirabelli, et al., vs. Olson, et al.

DATE OF DEPOSITION:  June 6, 2025

| PAGE | LINE | CHANGE/ADD/DELETE | REASON |
|---|---|---|---|
| 1 | 16 | Change "LMFT" to "LCSW" | Clarification |
| 2 | 16 | Change "LMFT" to "LCSW" | Clarification |
| 4 | 3 | Change "LMFT" to "LCSW" | Clarification |
| 5 | 18 | Change "Transformation" to "Transition | Transcription Error |
| 8 | 9 | Change "LMFT" to "LCSW" | Clarification |
| 10 | 1 | Change "LMFT" to "LCSW" | Clarification |
| 15 | 21 | Change second "declaration" to "declarations" | Clarification |
| 18 | 23 | Change "I guess the" to "The" | Clarification |
| 21 | 12 | Change "parents" to "parent" | Clarification |
| 22 | 2 | Change "inactive" to "the act of" | Transcription Error |
| 27 | 4 | Change "I would supervise at the time." to "I was being supervised at the time." | Transcription Error |
| 30 | 20 | Change "here" to "her" | Transcription Error |
| 32 | 9 | Change "transgender for me" to "transgender and nonconforming" | Transcription Error |
| 35 | 12 | Change "don't" to "might not" | Clarification |

THE SULLIVAN GROUP OF COURT REPORTERS

| PAGE | LINE | CHANGE/ADD/DELETE | REASON |
|---|---|---|---|
| 36 | 8 | Change "I'm" to "un" | Transcription Error |
| 43 | 12 | Delete "- - a therapist" | Clarification |
| 43 | 15 | Change "So" to "Also" | Transcription Error |
| 45 | 16 | Change "clinic" to "clinical" | Transcription Error |
| 46 | 12 | Change "term use" to "term I use" | Transcription Error |
| 51 | 17 | Change "CAM" to "CAMFT" | Clarification |
| 53 | 19 | Change "or" to "for" | Transcription Error |
| 56 | 10 | Change "Adolescents" to "Adolescence" | Transcription Error |
| 70 | 4 | Change "how" to "what" | Clarification |
| 77 | 6 | Change "have" to "had" | Transcription Error |
| 81 | 2 | Change "movies in- which" to "moving" | Clarification |
| 85 | 23 | Change "down to" to "down to if I" | Clarification |
| 92 | 6 | Change "His" to "Because" | Transcription Error |
| 96 | 21 | Change "awareness" to "identity" | Clarification |
| 99 | 17 | Change "physicality" to "typicality" | Transcription Error |
| 102 | 11 | Change "so" to "no" | Transcription Error |
| 103 | 25 | Delete "Not" | Clarification |
| 116 | 10 | Change "left" to "less" | Transcription Error |
| 123 | 11 | Change "of" to "in" | Clarification |
| 125 | 11 | Change "and as an" to "rather than" | Transcription Error |
| 130 | 9 | Change "keeping" to "picking" | Transcription Error |
| 132 | 11 | Change "binder mainly is to relieve dysphoria" to "binder, but main purpose is to relieve dysphoria" | Clarification |
| 133 | 16 | Change "partner" to "parent" | Transcription Error |
| 134 | 7 | Change "affirmed" to "affirming" | Transcription Error |
| 135 | 13 | Change "accurately if they order" to "accurately or if they need to order" | Clarification |
| 137 | 17 | Change "that it" to "that if it" | Transcription Error |
| 139 | 4 | Change "children" to "child's" | Clarification |
| 139 | 14 | Change "his" to "their" | Clarification |
| 141 | 1 | Change "he" to "then" | Transcription Error |
| 141 | 2 | Change "be called misgendered" to "be misgendered" | Clarification |
| 148 | 7 | Change "without" to "is by" | Transcription Error |
| 148 | 12 | Change "we conflate that" to "people conflate that" | Clarification |
| 148 | 18 | Delete "And so coming to understand" | Clarification |
| 148 | 19 | Change "coming" to "have come" | Clarification |
| 149 | 19 | Change "this" to "it" | Clarification |
| 151 | 22 | Change "sexes" to "concept" | Transcription Error |
| 156 | 9 | Change "uniform – uniforms" to "unicorn" | Transcription Error |
| 157 | 21 | Change "a hacking of" to "unpacking of" | Transcription Error |
| 165 | 13 | Change "reporting" to "recording" | Transcription Error |

079

| 165 | 16 | Change "Reporting" to "Recording" | Transcription Error |
|---|---|---|---|
| 165 | 20 | Change "reported" to "recorded" | Transcription Error |
| 165 | 22 | Change "reported" to "recorded" | Transcription Error |
| 166 | 3 | Change "reported" to "recorded" | Transcription Error |
| 167 | 20 | Change "female" to "feminine" | Clarification |
| 169 | 4 | Change "what" to "who" | Clarification |
| 179 | 20 | Change "cross-sex" to "gender affirming" | Clarification |
| 182 | 9 | Change "identify a" to "identify with a" | Clarification |
| 182 | 10 | Change "with that their" to "with their" | Transcription Error |
| 185 | 21 | Change "the way I work" to "in my work" | Clarification |
| 194 | 25 | Change "gender" to "gender dysphoria" | Clarification |
| 205 | 21 | Change "task man" to "a compassionate" | Transcription Error |
| 206 | 25 | Change "bid" to "big" | Transcription Error |
| 207 | 5 | Change "discussion" to "decision" | Transcription Error |
| 213 | 21 | Change "supported it" to support through it" | Transcription Error |
| 215 | 9 | Change "Intentional" to "Sufficiently" | Transcription Error |
| 217 | 22 | Change "of" to "for" | Clarification |
| 224 | 18 | Change "be" to "are" | Clarification |
| 231 | 19 | Change "social" to "socially" | Transcription Error |
| 235 | 23 | Change "for prior men" to "requirement" | Transcription Error |

080

| PAGE | LINE | CHANGE/ADD/DELETE | REASON |
|------|------|-------------------|--------|
| 243 | 16 | Change "identity form" to "nonconformity" | Clarification |
| 247 | 2 | Change "Fit parents -" to "the term fit parents is subjective." | Clarification |
| 252 | 18 | Change "I think they are tran" to "they think they are trans" | Clarification |
| 258 | 16 | Change "signalization" to "stigmatization" | Transcription Error |
| 260 | 13 | Change "it used" to "the youth" | Transcription Error |
| 264 | 13 | Change "decide to contact" to "decide to break contact" | Clarification |
| 265 | 7 | Change "without" to "about" | Clarification |
| 266 | 12 | Change "feature" to "future" | Transcription Error |
| 283 | 12 | Change "tactical" to "practical" | Transcription Error |
| 303 | 15 | Change "and as not" to "and not" | Clarification |
| 308 | 16 | Change "it either can" to "it can" | Clarification |
| 309 | 22 | Delete "and then" | Clarification |
| 317 | 12 | Change "be" to "been" | Transcription Error |

Deponent's Signature: ___Darlene Dando, LCSW_____

Date: ___July 18, 2025_____

THE SULLIVAN GROUP OF COURT REPORTERS

330

STATE OF CALIFORNIA          )
                            ) ss
COUNTY OF LOS ANGELES )

        I, DARLENE TANDO, LCSW, having appeared for my deposition on June 6, 2025, do this date declare under penalty of perjury that I have read the foregoing deposition, I have made any corrections, additions or deletions that I was desirous of making in order to render the within transcript true and correct.

        IN WITNESS WHEREOF, I have hereunto subscribed my name this ___17___ day of ____July_____ 2025.

_____
DARLENE TANDO, LCSW

# CERTIFICATE OF SERVICE

Case Name:   **Mirabelli et al. v. Olson, et al.**      Case No.   **3:23-cv-00768-BEN-VET**

I hereby certify that on <u>September 8, 2025</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DECLARATION OF DARLENE TANDO, LCSW, IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON PROSPECTIVE RELIEF CLAIMS**

I certify that **all** participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct, and that this declaration was executed on <u>September 8, 2025</u>, at Los Angeles, California.

Anthony Conklin
Declarant

*Anthony Conklin*
Signature

SA2024300204
67921457.docx