UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ELIZABETH MIRABELLI, and LORI ANN WEST, individually and on behalf of herself and all others similarly situated, et al.,

Plaintiffs,

v.

MARK OLSON, in his official capacity as President of the EUSD Board of Education, et al.,

Defendants.

Case No.:  3:23-cv-768-BEN-WVG

**ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF THE PLAINTIFFS ON CLAIMS 1, 2, 3, 6, 7, AND 8, DECLARING CONSTITUTIONAL RIGHTS, AND GRANTING A PERMANENT INJUNCTION**
**[Dkt. 247]**

Long before Horace Mann advocated in the 1840's for a system of common schools and compulsory education, parents have carried out their rights and responsibility to direct the general and medical care and religious upbringing of their child. "The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). It is a right and a responsibility that parents still hold. *Mahmoud v. Taylor,* 145 S. Ct. 2332, 2357 (2025) (applying *Yoder* as "embod[ying] a principle of general applicability"). The role of a

1

parent includes a duty to recognize symptoms of illness and to seek medical advice. *Parham v. J.R.*, 442 U.S. 584, 604 (1979).  These rights are protected by the First and Fourteenth Amendments to the Constitution.  *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.").  Fortunately, the natural bonds of affection normally lead parents to act in the best interests of their child.  *Parham*, 442 U.S. at 602.

With these longstanding principles in mind, this case presents the following four questions about a parent's rights to information as against a public school's policy of secrecy when it comes to a student's gender identification.  First, do parents have a right to gender information based on the Fourteenth Amendment's substantive due process clause?  Second, do parents have a right to gender information protected by the First Amendment's free exercise of religion clause?  Third, do religious public school teachers have a right to provide gender information to parents based on the First Amendment's free exercise clause?  Fourth, do public school teachers have a right to communicate accurate gender information to parents based on the First Amendment free speech clause?  In each case, this Court concludes that, as a matter of law, the answer is "yes."  Parents have a right to receive gender information and teachers have a right to provide to parents accurate information about a child's gender identity.[1]

_____

[1] This summary judgment decision addresses only the certified class of parents and teachers and their federal constitutional claims brought in the form of a class action against the California Superintendent of Public Instruction, the Members of the California State Board of Education, and the State Attorney General (the "State Defendants").

Historically, school teachers informed parents of physical injuries or questions about a student's health and well-being.  For example, where an eight-year old student is sexually assaulted at school, the school owes a duty to inform the parents.  *Phyllis P. v. Superior Court*, 183 Cal. App. 3d 1193, 1196 (1986) ("We hold that such a special relationship exists here between defendants and petitioner, and defendants had a duty to notify petitioner upon learning of the first series of sexual assaults upon [the student]."). But for something as significant as a student's expressed change of gender, California public school parents end up left in the dark.  When it comes to a student's change in gender identity, California state policymakers apparently do not trust parents to do the right thing for their child.  So, the state purposefully interferes with a parent's access to meaningful information about their child's gender identity choices.  The state does this by prohibiting public school teachers from informing parents.  The State Defendants explain that these policies are needed to prevent bullying and harassment.  Preventing student bullying and harassment in school is a laudable goal.  The problem is that the parent exclusion policies seem to presume that it is the parents that will be the harassers from whom students need to be protected.

Even if the State Defendants could demonstrate that excluding parents was good policy on some level, such a policy cannot be implemented at the expense of parents' constitutional rights.  The difficult and long lasting issues of gender nonconformity leave parents to suffer adverse consequences over a lifetime.  The State Defendants, on the other hand, have no personal investment in a student's health and the State Defendants will not be exposed to a lifetime of a student's mental health issues.  Instead, that will be the parents' grief to bear alone.

If parents were informed early on (as is their right) after a student says or dresses in a way that suggests a non-conforming gender identity, four of the five probable outcomes will be positive.  One, the parents might fully affirm their child's new gender identity.  According to the defense experts, this is the best possible outcome of having the

child's gender identity affirmed in both school and home life. "Depends on the reactions of the family. But in situations where they are supported and not rejected, they fare better, yes." Deposition Transcript of Dr. Christine Brady, Dkt. 243-7, at 209; Deposition Transcript of Dr. Erica Anderson, Ph.D, Dkt 247-10, at 25 ("And – and the scientific literature confirms that children grow up healthy and happy when they are supported by the adults and caregivers in their lives."); *Id*. at 123 ("This is a well-known view of people in the field, which is that children who are supported by their families do better than those who are not.").

Two, the parents might arrange health care from clinicians like Dr. Szajnberg, Dr. Brady, Dr. Anderson, or Darlene Tando, to help the child work through issues therapeutically. Once again, this is a good outcome according to the defense experts because the child can be authentic and supported in both school and home life.

Three, the parents might not take a position while waiting to see if the child's gender identity persists over time. Still, the child can be authentic at school and in home life and at least one third of young children eventually de-transition with time. Deposition Transcript of Dr. Christine Brady, Dkt. 243-7, at 84-86.

Four, although they love their child, the parents might disagree completely. "Parents – in my vast experience with . . . thousands of families over a long career, parents love their children. They want what's best for them. Do parents always agree with every decision of their children? No. Do they have good reasons? Almost always." Deposition Transcript of Dr. Erica Anderson, Ph.D, Dkt 247-10, at 52. Even the defense experts agree that parental disagreement is a valid reaction.

> Q. And so just to -- just because a
> parent is not immediately affirming that doesn't mean
> they don't love their child, correct?
> A. Yes.
> Q. And that does not mean they'll
> abuse their child, correct?
> A. I can't guarantee that.
> Q. It doesn't necessarily mean that.

23-cv-00768-BEN-WVG

1    You would agree, correct?
2    A. Correct.

3  Deposition Transcript of Darlene Tando, LMFT, Dkt. 243-3, at 245.

4    Overall, it is a grave mistake to deprive parents of information about their child's

5  gender at school, according to Dr. Anderson: "My objection is depriving parents of the

6  knowledge of what's going on with their child's gender at school, particularly if the child

7  chooses a different preferred name and pronouns and wants accommodations and that is

8  information that is shared throughout the school by  -- by teachers, staff, and students.

9  To deprive parents of that information is a grave mistake in my opinion."  Deposition

10  Transcript of Dr. Erica Anderson, Ph.D, Dkt 247-10, at 57.  Disagreement is not abuse,

11  and the court so finds.  In contrast, adolescent social transitioning without parents usually

12  results in serious problems for the adolescent.  Dr. Anderson testified,

13    Q.  Okay.  Say with an adolescent.  Are you aware of
14    circumstances where in any context and adolescent has socially
      transitioned without the help or knowledge of their parents?
15    A.  I am.  And some of those cases involve kids in
16    California.  And the cases only come to my attention because
      there is a rupture and serious problems with the child."

17

18  Deposition Transcript of Dr. Erica Anderson, Ph.D, Dkt 247-10, at 116.

19    Five.  For the isolated instances where a parent or caregiver commits physical

20  abuse on a child, there are mandatory reporting laws and a complete law enforcement and

21  judicial system in place.   Even there, "courts have recognized that a state has no interest

22  in protecting children from their parents unless it has some definite and articulable

23  evidence giving rise to a reasonable suspicion that a child has been abused or is in

24  imminent danger of abuse." *Brokaw v. Mercer County*, 235 F.3d 1000, 1019 (7th Cir.

25  2000).

26    Three Supreme Court Justices recently described this issue as "a particularly

27  contentious question," *i.e.*, "whether a school district violates parents' fundamental rights

28  when, without parental knowledge or consent, it encourages a student to transition to a

new gender or assists in that process." *Lee v Poudre*, (Oct 14, 2025) (Alito, Thomas, Gorsuch) (statement respecting denial of certiorari). These Justices describe the question as one of "great and growing national importance." *Id*.

The state bases its legal position on a derogation of the parents' federal constitutional right to care for and raise their children and an unwarranted aggrandizing of a student's state-created right to privacy. California's education policymakers may be experts on primary and secondary education but they would not receive top grades as students of Constitutional Law. They misapprehend the supremacy of federal constitutional rights. *Doe v. Dynamic Physical Therapy, LLC*, 607 U.S. ___, No. 25-180 (Dec. 8, 2025) (quoting U.S. Const., Art. IV, cl. 2) (per curiam). They misperceive federal constitutional rights belonging to parents as weak-kneed and frail and subservient to the student's right to privacy. Yet, under federal constitutional law, "parents [ ] retain a substantial, if not the dominant, role." *Parham*, 442 U.S. at 604. How did they arrive at this miscalculation?

The State Defendants mix up legal constructs. The Attorney General on behalf of the State of California says Plaintiffs' lawsuit is "properly understood as seeking a federal constitutional exemption from the California constitutional right to privacy, as applied to gender identity in the school context." State Defs' Oppo to Plaintiffs' MSJ, Dkt 256, at 9. But the Attorney General gets it upside down. Plaintiffs do not ask the State to magnanimously permit a sort of federal constitutional exemption. What Plaintiffs seek is to force the State to respect their enduring federal constitutional rights as citizens of the United States.

## I.    BACKGROUND

The Plaintiffs move for summary judgment against the state defendants. Earlier, Plaintiffs' claims for money damages against all defendants and all claims against the Escondido Union School District were severed and stayed. The Plaintiffs have been certified as a class under F.R.C.P Rule 23(b)(2) and (b)(1)(A). The Plaintiffs' class action seeks prospective relief against the State Defendants in the form of a permanent

injunction enjoining school gender policies they refer to as "Parental Exclusion Policies." These policies were developed at the State Department of Education under the apparent authority of the Superintendent of Public Instruction and the Board of Education. *See e.g.*, Model Policy AR 5145, Exh 12 Dkt 153-3 at 89-95. The policies have been adopted by local school districts throughout the state.[2] *See* Dkt 207-1, at 5-21 (listing 598 California school districts that have similar policies). The gender policies were described in more detail in this Court's earlier Order granting a preliminary injunction. *See* Order (dated September 14, 2023) Dkt 42.

These parental exclusion policies are designed to create a zone of secrecy around a school student who expresses gender incongruity. The policies restrain public school teachers and staff from informing parents about a child's unusual gender expression, unless the child consents. The policies apply to children as young as two and as old as seventeen. The policies do not permit teachers to use their own judgment in responding to an inquiring parent. Unless the child consents, the teacher who communicates about a child's gender incongruity faces adverse employment action. However, prohibiting accurate answers to a parent's question is, the plaintiff class asserts, a violation of several federal constitutional rights. In particular, the parents subclass asserts rights under the First and Fourteenth Amendments while the teacher subclass asserts rights under the free speech and the free exercise clauses of the First Amendment.

The State Defendants initially claimed that the whole question is a moot point. They originally said that by taking down the FAQ page on gender identity from their official website it should be obvious that their policies have changed. But the State

---

[2] *See e.g., Regino v. Staley*, 133 F.4th 951, n.1 (9th Cir. 2025) (describing Chico Unified School District's Regulation #5145.3 which is based on a sample regulation circulated by the California School Boards Association in accordance with directives issued by the California Department of Education, a regulation similar to the polices addressed here that restrict school teachers from informing parents about their child's gender identity changes).

Defendants have declined to enter into a consent judgment binding themselves and their successors in office. And recently, when faced with the presence of fresh statements of the parental exclusion policies in a newly state published cultural competency training program called PRISM, the State Defendants have formally withdrawn their claim that the case is moot. *See* Plaintiffs' Ex Parte Motion for Sanctions, Dkt 292; Notice of Withdrawal of Mootness Argument Pertaining to Plaintiffs' Motion for Summary Judgment, Dkt 298. And so, the actual chilling effect of the parental exclusion policies on Plaintiffs' constitutional rights remains.

To avoid confusion, it is noted that this case is not about the recently enacted California Assembly Bill 1955. AB 1955 prohibits forced disclosure by teachers. It does not, by its terms, prohibit a teacher's voluntary disclosure. *City of Huntington Beach v. Newsom*, Appeal No. 25-3826, 2025 US App. LEXIS 29953 *11 (9th Cir. Sept. 12, 2025) (mem. disp.) ("[n]othing in the language of these provisions [of AB 1955] forbids a school employee from deciding to disclose such information to a parent . . . . Nor does anything in these provisions [of AB 1955] forbid a school district from adopting a policy that employees *may* elect to make such disclosures.") (emphasis in original). This is precisely the injunctive relief the Plaintiffs class seeks in this case. The class seeks an injunction which would permit teachers to disclose (of their own volition) gender identity information to parents.

Does the passage of AB 1955 effectively mean the Plaintiffs have won? Do teachers now have a green light to inform parents once again, as they have done since the days of Horace Mann? No. The State Defendants, on one hand, say that AB 1955 does not prevent voluntary disclosure while, on the other hand, the State Defendants say that voluntary disclosure is prohibited by the privacy clause of the state constitution and other state anti-discrimination laws. Moreover, the text of AB 1955 says that it did not change existing law. *See e.g.,* Cal. Educ. Code §220.3 (b) ("Subdivision (a) does not constitute a change in, but is declaratory of, existing law."); Cal. Educ. Code § 220.5 (b) (same). Does "existing law" include existing regulatory policies? The plaintiffs make the point

that it is almost like the State Defendants are trying to confuse the question.[3]  To dispel any uncertainty, this Court asked that question of the Deputy Attorney General representing the State Defendants.  To his credit, he agreed that notwithstanding AB 1955, other state laws could still be used to prohibit disclosure of gender identification information to parents.

> Court:  And let me ask you whether or not you agree that there are other laws that could prohibit or restrain a teacher or a school district from disclosing to the parents that their child has manifested a gender incongruity besides 1955?
>
> Mr. Quade: Yes, I think there are.

Hearing Transcript (Nov. 24, 2025), Dkt. 303, at 75.  Nowhere in the body of AB 1955 can be found a positive statement that teachers *may voluntarily inform* a student's parents.  So, this case continues to present a live dispute about a parent's right *to receive information* about their child and whether a teacher may voluntarily *offer information* about their student's gender expression with a parent.

---

[3] *See* Hearing Transcript (Nov. 24, 2025), Dkt. 303, at 78:
> Counsel for Plaintiffs:  And, honestly, it's intentionally confusing.  They posted a Web page with model policies that say you can't disclose it.  Every school district adopted them without asking questions.  They're still on the books.  Then we filed this case, and they played games, and then they changed the page with the new language from AB 1955, and no one knows what it means.
> On the one hand, they say teachers can voluntarily disclose -- whatever that means.  And how do you – how do you reconcile that with what the Attorney General says on his Web page? Here's what's really happening.  What's really happening is the FAQ page accomplished its objective.   Every school has these policies on the books.

The dispute must be resolved against the legal backdrop of the federal constitutional right to direct the medical care and religious upbringing of a child, including the right to make important medical care decisions. While there are no genuine issues of material fact, the factual context is the case where a child's unusual gender expression may be a sign of psychological distress that *may need treatment* and the constitutional right of parents to know.

## II. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The class action plaintiffs seek summary judgment and declaratory and injunctive relief from the State Defendants.[4] The class claims numbered 1,2,3,6,7, and 8 are addressed in reverse order, from strongest to weakest, beginning with the class claims of parents and ending with the class claims of teachers.

## III. APPLICABLE LAW

Federal Rule of Civil Procedure 56 sets forth the well-known standard for summary judgment as explained by a trio of Supreme Court cases: *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The standards are not disputed here. Under these standards, summary judgment may be entered where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. The State Defendants do not contend that genuine issues of material fact are present that require trial. When asked at the hearing about what genuine issues of material fact were present in this case, the Deputy Attorney General could not point to a fact issue, instead explaining "fundamentally … in our view, plaintiffs' constitutional claims are not cognizable; they're not viable. . . . So recognizing that this is a motion for

---

[4] Claims for money damages and for violations of Title VII have been severed and stayed.

summary judgment, I think that our view of it is that as a matter of law, these claims are not correct."  Hearing Transcript at 125-26.[5]

As mentioned above, the State Defendants defend their parental exclusion policies by relying on state-created privacy rights.  The State Defendants see one source of those state-created rights as flowing from the California Constitution.  Article 1, Section 1 of the California Constitution provides, "All people are by nature free and independent and have inalienable rights.  Among these are . . . privacy."  Another source of student privacy rights mentioned by the State Defendants is found in state anti-discrimination laws.  The primary statue is California Education Code §220.  Section 220 prohibits discrimination by educational institutions in the following terms: "[n]o person shall be subjected to discrimination on the basis of . . . gender, gender identity, gender expression . . . or any other characteristic that is contained in the definition of hate crimes set forth in Section 422.55 of the Penal Code."[6]

_____

[5] The only potential issue of fact the State Defendants identify in their briefing (at page 37) is whether or not "respecting a student's social transition is medical treatment."  The State Defendants contend that social transitioning is not medical treatment.  This is not a material fact essential to deciding the constitutional claims.  But if it were a material fact, there is no genuine issue.  The Ninth Circuit has already decided that social transitioning is indeed a type of medical treatment for gender dysphoria.  *See Doe v. Horne*, 115 F.4th 1083, n.13 (9th Cir. 2024) ("The goal of medical treatment for gender dysphoria is to alleviate a transgender patient's distress by allowing them to live consistently with their gender identity.  This treatment, 'commonly referred to as 'transition,'' includes 'one or more of the following components: (i) social transition, including adopting a new name, pronouns, appearance, and clothing, and correcting identity documents . . . .'").

[6] California Penal Code §422.55 provides: "For purposes of this title, and for purposes of all other state law unless an explicit provision of law or the context clearly requires a different meaning, the following shall apply: (a) "Hate crime" means a criminal act committed, in whole or in part, because of one or more of the following actual or perceived characteristics of the victim: (1) Disability. (2) Gender. (3) Nationality. (4) Race or ethnicity. (5) Religion. (6) Sexual orientation. (7) Association with a person or group with one or more of these actual or perceived characteristics. (b) "Hate crime" includes, but is not limited to, a violation of Section 422.6."  In turn, Penal Code §422.6

23-cv-00768-BEN-WVG

However, where state-created rights run headlong into federal constitutional rights, federal rights are supreme. "The Supremacy Clause supplies a rule of decision when federal and state laws conflict. . . . So, for example, when a regulated party cannot comply with both federal and state directives, the Supremacy Clause tells us the state law must yield." *Martin v. United States*, 605 U.S 395, 409 (2025) (citation omitted).

## IV. ANALYSIS

### A. Parents' 14th Amendment Substantive Due Process Rights (Claim 7)

Parents of public school children assert that the state's parental exclusion policies violate their substantive due process rights as parents. Substantive due process rights are rooted in the Fourteenth Amendment Due Process Clause which "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). For a substantive due process claim, a court's analysis begins by carefully formulating the asserted right and adopting a narrow definition of the interest at stake. *Regino v. Staley*, 133 F.4th 951, 964-65 (9th Cir. 2025). Next, a court considers whether the right is deeply rooted in this nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if it was sacrificed. *Id.* at 965.

The right of parents to make decisions about their children -- including decisions on education, medical care and religious training – is long-recognized and deeply rooted in American history. "The Supreme Court has long recognized 'the fundamental right of parents to make decisions concerning the care, custody, and control of their children.'"

---

provides: "(a) A person, whether or not acting under color of law, shall not, by force or threat of force, willfully injure, intimidate, interfere with, oppress, or threaten any other person in the free exercise or enjoyment of a right or privilege secured by the Constitution or laws of this state or by the Constitution or laws of the United States in whole or in part because of one or more of the actual or perceived characteristics of the victim listed in subdivision (a) of Section 422.55."

*Regino,* 133 F.4th at 965 (quoting *Troxel,* 530 U.S. at 66).  "More than 75 years ago, in *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923), we held that the 'liberty' protected by the Due Process Clause includes the right of parents to 'establish a home and bring up children' and 'to control the education of their own.'"  *Troxel,* 530 U.S at 66.  "The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."  *Troxel,* 530 U.S. at 65.

The parental right is broad and encompasses both a right to direct a child's education and a duty to provide for a child's health care.  The Supreme Court has specifically recognized that within the broader parental right to raise children lies a narrower right to decide when a child needs health care.  In *Parham v. J.R.,* 442 U.S. 584, 602 (1979), the Supreme Court said,

> Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children.  Our cases have consistently followed that course; our constitutional system long ago rejected any notion that a child is "the mere creature of the State" and, on the contrary, asserted that  parents generally "have the right, coupled with the high duty, to recognize and prepare their children for additional obligations."  Surely, this includes a "high duty" to recognize symptoms of illness and to seek and follow medical advice.  The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions.  More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.

(citing *Pierce v. Society of Sisters*, 268 U.S. 510, 535 (1925); *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); and *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923)).  And "[s]imply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state."

*Parham*, 442 U.S. at 603. "Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments." *Id.*

So strong is the parental right to make health care decisions for a child that even the dissenting Justices in *Parham* took time to describe the necessity of a shield (from state interference) for the parent-child relationship:

> The rule in favor of deference to parental authority is designed to shield parental control of child rearing from state interference. The rule cannot be invoked in defense of unfettered state control of child rearing or to immunize from review the decisions of state social workers. The social worker-child relationship is not deserving of the special protection and deference accorded to the parent-child relationship, and state officials acting in loco parentis cannot be equated with parents.

*Parham*, 442 U.S. at 637-38 (Brennan, J, Marshall, J, Stevens, J, concurring in part and dissenting in part) (citations omitted). At the same time, the constitutional rights of parents are not unlimited or unbounded. *Regino,* 133 F. 4th at 961. The Supreme Court has upheld a state prohibition on children selling a Jehovah's Witnesses Watchtower magazines on public sidewalks over a parent's First and Fourteenth Amendment rights, noting "neither rights of religion nor rights of parenthood are beyond limitation." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *cf. Jehovah's Witnesses of Wash. v. King Cty. Hosp.*, 278 F. Supp. 488, 498 (W.D. Wash. 1967), *aff'd,* 390 U.S. 598 (1968) (per curiam) (upholding state's authority to order necessary blood transfusions to minor children, contrary to the expressed beliefs and directions of their parents); *see also Pickup v. Brown*, 740 F.3d 1208, 1236 (9th Cir. 2014) ("the fundamental rights of parents do not include the right to choose a specific type of provider for a specific medical or mental health treatment that the state has reasonably deemed harmful.").

The State Defendants do not disagree in principle. How could they? The State Defendants disagreement is not about the recognition of parental constitutional rights. The State Defendants disagree over where to draw lines. In this case, the parent plaintiffs

14

seek a modest drawing of the lines.  The parent plaintiffs want accurate information about their children from school staff.  They reasonably contend that accurate information is necessary to carry out the right and duty to direct their children in religion, in medical care, and in life.

The State Defendants draw the lines differently.  The State Defendants argue that their policies do not amount to government coercive (*e.g.,* coercing a minor into having an abortion) or restraining conduct, so they do not offend the Constitution, citing *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 353 (1st Cir. 2025).  But unlike in this case[7], in *Foote* there was "no allegation suggest[ing] that, when the Parents tried to speak with school officials about the Student, the officials misrepresented the name the Student had chosen for in-school use."  *Id*.  And while the court was sympathetic ("we are sympathetic to the Parents' interest in having as much information as possible about their child's well-being and behavior in school revealed to them"), it drew the lines differently and concluded that "this canon *does not require governments to assist* parents in exercising their fundamental right to direct the upbringing of their children."  *Id.* at 355 (emphasis added); *see also Anspach v. City of Phila.*, 503 F.3d 256, 266 (3d Cir. 2007) (where teen obtained emergency contraceptive pills from a government clinic, the clinic was not constitutionally required to assist by notifying parents).

Closer to home, the Ninth Circuit has recognized that there is an absence of precedential rulings on this subject within this circuit.  But it would be error to not decide these issues in the first instance simply because of a lack of precedent.  *Regino*, 133 F.4th at 961-62 ("Because existing precedent did not expressly address Regino's articulation of her asserted fundamental rights, the district court held that the rights she asserted were not fundamental.  This was error.  We have never held that a plaintiff asserting a substantive due process claim must show that existing precedent clearly establishes the

---

[7] *See e.g.,* Decl of John Poe, Dkt 247-7 at ¶¶26-28; Decl of John Doe, Dkt 247-9 at ¶5.

23-cv-00768-BEN-WVG

asserted fundamental right, and we see no reason to import this standard now.").  The parent plaintiff class in this case do not ask schools for "assistance" in caring for their child.  Instead, they ask schools to not erect barriers and to simply permit accurate communications about the well-being of their children.  They want an end, to use the words of the Supreme Court, of "substantial interference" from the state public school system.  *Mahmoud*, 145 S. Ct. at 2350-51.

The parents' main concern about whether their child might be expressing gender incongruity is because of the relationship to a medical condition known as *gender dysphoria*.  Left untreated, gender dysphoria is a serious condition which can develop into anxiety, depression, and even suicidal ideation.  The Ninth Circuit recently described the condition flawlessly in *Pritchard v. Blue Cross Blue Shield of Ill.,* No. 23-4331, 2025 U.S. App. LEXIS 29943, at *7-8 (9th Cir. Nov. 17, 2025):

> Someone's gender identity is their "inner sense of belonging to a particular sex, like male or female."  Most people are cisgender, and their "actual sex" matches the sex they "are assigned . . . based solely on the appearance of their external genitalia."  For transgender people, however, their gender identity and sex do not match.  As the American Psychiatric Association has recognized, this "gender incongruence, in and of itself, does not constitute a mental disorder."  However, a transgender person can suffer from gender dysphoria if the "marked incongruence between their experienced/expressed gender and assigned gender" causes "clinically significant distress or impairment in social, occupational, or other important areas of functioning."  Without treatment, gender dysphoria can lead to anxiety, depression, suicide, and other mental health problems.
>
> Healthcare providers can treat gender dysphoria using counseling, hormone therapy, surgery, and other forms of gender-affirming care.  Providers adapt the treatments used to the medical needs of each patient; not all patients need each treatment.

Dr. Nathan M. Szajnberg, M.D., is a double-board certified psychiatrist with forty years of experience. Szajnberg testified that gender dysphoria is a specific medical diagnosis. Deposition Transcript of Szajnberg, Dkt 247-11 at 18. Dr. Szajnberg explains that "gender identity issues can percolate through, and the child does fine, or it can transform into gender identity disorder. And if it does, we now know from the literature they are -- it's replete with other serious psychiatric diagnoses, like major depression, autism, and so on." Transcript of Szajnberg, Dkt 247-11 at 100.

Consider these three case examples. In *Regino*, the child was eleven years old and in fifth grade. She began to feel depressed and anxious likely due to her mother's breast cancer and her grandfather's passing. The school counselor "addressed issues of gender identity and sexuality" with the child. 133 F.4th at 957. Within a few months the child began to express she felt like a boy and wanted a new name and pronouns. *Id.* The counselor relayed the name/pronoun decision to her teacher and eventually other school personnel. *Id.* at 958. Late in the school year, the child told her grandmother who, in turn, told the child's mother. *Id.* Regino let her child know that she supported her and would assist in her transition, if that is what she wanted. Importantly, the mother also arranged for counseling to discuss the depression and anxiety. *Id.* Over the spring and summer, the child's feelings about being a boy subsided. *Id.* According to *Regino*, the child identified as a girl again and remained in counseling for depression and anxiety. *Id.*

Had the mother continued to be uninformed about her student's gender non-conformity at school, the child would not have known of or benefitted from her mother's support. Her mother was able to arrange for counseling, which of course, an eleven year-old could not do on her own. Through counseling, her underlying issues of depression and anxiety are being treated and her child's mistaken feelings about her gender are not complicating the treatment. In effect, Regino did what parents normally do: she supported her child in an emotionally difficult time and arranged expert help for their child. In this case, social transitioning may have mistakenly masked a more serious mental health challenge.

The State Defendants' expert, Dr. Brady, tells the second story of another child: an autistic boy who liked the color pink and mistakenly concluded that he must be a girl. The patient had autism spectrum disorder and because of his cognitive rigidity, he thought that if he liked pink, he must be a girl. Deposition Transcript of Brady, Dkt 243-7, 112-114. Dr. Brady describes it this way. "So in that particular case, the patient presented to me because of the questions that they were asking themselves. And so our time together was spent on exploring why they felt that way and how they came to conclude that they were female identified. And during that time, I did affirm the patient and use appropriate name and pronouns that she had chosen at that time. But we explored that some more, and she came to understand that colors are not necessarily gendered and was more expansive in her ability to -- I'm sorry. At the end of therapy, he was using he again but in his ability to kind of understand gender more fully." *Id.* The boy, after a time of supportive counseling came to understand his innate male gender. Dr. Brady noted, "at least at the time we terminated therapy, he had come to a place where he was identifying as male but identified he had feminine qualities. *Id.*

Because of counseling with Dr. Brady, the boy-who-liked-pink is living a healthier, more self-aware and integrated life. The counseling with Dr. Brady would not have taken place without the boy's parents being informed about his gender questioning. Because the parents were informed, they did what parents usually do and sought expert advice. The boy could not have arranged for counselling with Dr. Brady by himself. Had the parents been unaware of their boy's new gender expression, the boy may have continued through his years mistakenly thinking he must be a girl and suffered from all of the dysphoria that may have followed.

The third case study is a cautionary tale. While attending a California public school in 7th grade their daughter, child Poe, began exhibiting at school a significant change of identifying as a boy. The child's teachers were prohibited by school district policies from informing child Poe's parents and the Poes remained oblivious. Meanwhile, the school accepted and perpetuated child Poe's new gender expression.

The Plaintiffs' experts and the State's experts agree that when a child expresses a new gender it is a significant event.  It may be a sign or signal that a serious unhealthy condition of gender dysphoria may be occurring or is in the offing.  It also may be that that the child is fine.  Like a child experiencing headaches, an incongruous expression of gender may signal a serious medical condition needing interventional care and treatment or it may be something that needs no treatment.  In either case, our nation's laws normally respect the parents' rights and role of deciding whether further investigation should be pursued.

Had they known of their child's new gender expression at school, the Poe parents (like most parents) would probably have sought an opinion from an expert like Dr. Brady. They may have pursued therapeutic counseling with Dr. Anderson.  They may have asked a neuropsychologist to rule out other conditions or comorbidities like generalized anxiety, depression, autism, or bipolar disorder, etc.  The point is that had they known, the Poe parents would have had an opportunity to exercise their parental judgment in deciding what do, as is their constitutional right under *Parham*.  And their child would have received what the Plaintiffs and all experts agree is the best for a child: at least the parents' involvement, and perhaps like Regino, even the parents' support.  But the Poe child did not get that support.  She did not tell her parents.  Her teachers did not tell her parents.  The school administration did not tell her parents. Instead, in accordance with state policies, the school required secrecy from its teachers and employees while promoting her new name.

As it turned out, child Poe's change in gender expression was a tremendously significant sign.  The Poe parents did not learn of their child's deteriorated mental health until after she attempted suicide.  Adding insult to constitutional injury, California public schools still refuse to use the child's given female name in spite of the Poe parents' instructions.  *See* Supp. Decl of John Poe, Dkt 269-2, at 2 & Exh. 1.  Dr. Szajnberg, after reviewing child Poe's medical records, summarizes what went wrong.

The school knew that this girl had issues around -- had gender issues. Let's not use the diagnosis yet. But gender issues and [the school] facilitated her transition from what they understand was their responsibility or their duty to transitioning to a different gender without informing the parents. That's the major issue as I see here … and the school started their social transitioning in August of 2022 without involving the parents. So this has been sort of a chronic repetition of keeping secret from the parents something this child was struggling with. And this child shows -- this is a good example of a child who expresses issues about gender identity uncertainty or confusion or coming to terms with it that then evolves into more serious gender dysphoria and even life-threatening gender dysphoria with all the associated diagnoses.

Deposition Transcript of Szajnberg, Dkt 247-11, at 106-107. Dr. Szajnberg continues:

Here is how I see this, as a physician, now. The school knew in August '22 this girl was struggling with her gender. They did not inform the parents. For months the parents knew nothing about this. And you can see from the record, this girl got sicker and sicker, until she's hospitalized. Had they informed the parents, hypothetically, the parents could have started working with the girl, with the school, with their therapist so there would be no September hospitalization, there would be no series of multiple psychotropic drugs, there would not be a girl who is hallucinating. We could have prevented all of this. We wouldn't be sitting here today.

*Id.* at 122-23.

The policy of acknowledging and perpetuating a child's gender incongruent name and pronouns is known as social transitioning. According to the State Defendants' parent exclusion policies, when a student says he or she wants to be known by a new name or pronoun, the school does not sit idly by. In an earlier Order, this Court described how the State Defendants' policies require teachers and staff to immediately use a student's newly announced name and pronouns and record the new monikers in school records.

The State Defendants do not dispute that the policies require formal recognition and perpetuation of a student's change in gender identity. Instead, they argue that it is

23-cv-00768-BEN-WVG

not social transitioning, or if it is social transitioning, then it is not medical care.  Rather, the State Defendants explain that their policies are akin to a polite social courtesy.  For example, the State Defendants offer that,

> [r]especting a transgender person's request to be called by a name and pronouns consistent with their gender identity is far afield from anything that courts have recognized as medical treatment.  Doing so involves no medical procedure, examination, or hospitalization; need not be performed by medical personnel; and is not regulated as part of the practice of medicine.

State Defendants' Oppo., Dkt 256, at 32.  Though the claim is in tension with *Doe v. Horne*'s footnote 13[8], it is repeated throughout the briefing.[9]

Nevertheless, the secrecy aspect of the policy not only does not assist parents, it deprives parents of the opportunity to evaluate a significant medical sign and decide whether to pursue psychological counseling, psychiatric care, gender-affirming care, family acceptance, or something else.  When these signs of a potentially serious conditions appear, it is the parents' right and duty to investigate, evaluate, and decide on

---

[8] *Doe*, 115 F.4th at 1107 & n.13.

[9] *See e.g.,* State Defendants' Oppo., Dkt 256, at 31: "Parent Plaintiffs argue that student-privacy policies interfere with their due process right to direct medical treatment of their children.  Their argument is based on an implausible assertion that when school staff honor students' names and pronouns, or other aspects of a student's social transition, they are providing medical (or psychological) treatment. But parental rights to make medical decisions are irrelevant here because when school staff honor students' requests to socially transition in schools they are not providing medical treatment."; *Id.* at 33, "Unsurprisingly, no court has held that simply using a transgender student's requested name and pronouns constitutes medical treatment."; *Id.* at 35, "When school staff refer to students by their requested names and pronouns, they are not administering medical treatment."; and *Id.* at 37, "Plaintiffs have failed to plausibly allege (much less prove) that a teacher respecting a student's name and pronouns is medical treatment giving rise to a substantive due process claim."

23-cv-00768-BEN-WVG

whether to pursue help from medical or mental health professionals.  The State Defendants' policies trammel on the parent plaintiffs' substantive due process rights.  Dr. Szajnberg describes the significance of a child's expression of gender incongruence like this,

> Q. You would agree that gender incongruence in the absence of an impairment in functioning or a maladaptive behavior would not be considered gender dysphoria?
>
> THE WITNESS:  It depends. There's not a simple yes or no for me. If you think of development, healthy development or illness development as a trajectory over time, it could be that gender something, over here at this time period may be stable and continue on without any maladaptive disruption, or it could be that gender something or other is an early sign of a medical illness, like gender dysphoria.
> I think this example from Child Poe is an example. When she had her AVM malformation, in what I read, she -- it actually bled into her brain, she would have had a headache.  Now, headaches are not infrequent in kids in school, but most schools, I think -- like my kid's school.  If my kid has a headache, they would call me; they expect me to take care of it.
> If a school had decided, well, we don't want to call the parent over this headache, this girl could have died from her AV malformation.  So most headaches don't go on to AV malformation.  Those are really rare, in fact.  But it shouldn't be up to the school alone to decide whether an early perturbation in development is going to evolve into something serious or is a normal perturbation of development.

Deposition Transcript of Szajnberg, Dkt 247-11, at 71-72.

The constitutional question is really not whether expressing gender incongruence is pathological or healthy, or, whether social transitioning is or is not a medical procedure.

23-cv-00768-BEN-WVG

That debate is a red herring.  The constitutional question is about *when* gender incongruence is *observed*, whether parents have a right to be informed and make the decision about whether further professional investigation or therapy is needed.  Put another way, the question is whether being involved in potentially serious medical or psychological decision-making for their school student is a parent's constitutional right.

It is.  "Simply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state . . . .  Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment.  Parents can and must make those judgments."  *Parham*, 442 U.S. at 603.  Medically, it is also the preferred course of action.  Dr. Szajnberg opines,

> Q.  And how would that have occurred when Child Poe is indicating that mom [has] -- rejected her for even a sexual orientation change?
>
> A.  Look, this is my bread and butter as a psychiatrist.  If I tell a parent, "I think your child has major depression," they don't celebrate and say, "Thank you very much.  I'm so glad."  They usually have a reaction of, "Oh, no."  They try to deny it.  They don't want to accept it.  That's normal. So if I said, a diagnosis of general anxiety disorder, they're not happy with the diagnosis.  Just like any parent wouldn't be happy to be told, Listen, we think your kid has Hodgkin's lymphoma, which is curable.  They're not going to be happy about it, but you need to involve the parent in the illness treatment. Why make gender dysphoria a separate kind of treatment than any other medical treatment where we would want the parents involved?  And if the parents are having trouble with it, that's our job as physicians or as therapists to help them through it. We don't tell them, your kid has Hodgkin's lymphoma, we're not going to tell you, we're just going

23-cv-00768-BEN-WVG

to treat your kid without your knowing about it and
tough luck.  We would never do that in medicine.

Q.  Did you ever have occasion to treat youth who
had been rendered homeless because they had disclosed
that they identified by a different gender to their
parents?

A.  That's my San Francisco job you're describing.
Too many of them.  And right around Eighth and Market,
that's where they lived, so to speak.  So too many.

Q.  So that's a very real risk of disclosing
gender identity to parents, that the child would be
rendered homeless?

A.  If you don't work with the parents.  If you
don't work with the parents, that's a risk.  The school
needs to work with the parents to prevent adverse
outcome of any psychiatric diagnosis.
If they say to a parent, your kid is very,
very depressed and bring them to a doctor, and the
doctor says, no, it's really major depression, then the
parents and the doctor, and maybe the school,
collaborate to accept the diagnosis and then treat the
child well.

Deposition Transcript of Szajnberg, Dkt 247-11, at 108-110.  The defense experts do not

meaningfully disagree.  Dr. Christine Brady, Ph.D, is a psychologist who has treated

1,000 gender incongruent youth.  One hundred percent of her current patients are

transgender and gender nonconforming youth.  Deposition Transcript of Brady, Dkt 243-

7, at 43.  As an expert for the State Defendants, Dr. Brady opines that "everybody has a

gender identity or has a gender.  And so, you know, that can sometimes be different from

your sex; that can be aligned with your sex.  Gender is just, you know, how you identify

or don't identify with your sex."  *Id*. at 56.

Sometimes, a child mistakes his gender and a conversation with a therapist will

help the child realize his mistake.  Dr. Brady estimates that twenty percent of patients that

think they want to socially transition later decide not to.  *Id*. at 115.  And of her own patients, approximately ten percent are on the autistic spectrum.  *Id*. at 127.

To engage in social transitioning, Dr. Brady opines that a person need not see a mental health professional.  *Id*. at 167.  On the other hand, she says that "kids need support and help if they're experiencing these mental health disparities."  *Id*. at 167.  When she sees a youth at her gender clinic, she requires a parent's or other caregiver's involvement.  Dr. Brady states, "In the context of gender clinic, in order to get to gender clinic, you have to be out to at least one caregiver."  *Id*. at 171; 216 (same).

When a child as young as five years old decides to socially transition at school without their parents' knowledge and without the benefit of a psychological evaluation, Dr. Brady opines that the benefits still outweigh the risks.  *Id*. at 177.  But her opinion in this respect carries no weight because she concedes there are no studies to support her opinion.  Dr. Brady testifies,

> "But overall, I believe the benefits outweigh any potential risk that might be present.  But the literature would indicate that there is no risk.
> Q.  What literature is that?
> A.  The lack of evidence that indicates that there is a risk.  There are no studies that show any data regarding risk."
> ***
> "The percent of kids that identify as transgender is quite small, and so running studies with that specific scenario in mind would be very hard to conduct.  *I'll note those studies do not exist in either direction regarding negative outcomes or benefits*."

*Id*. at 177-78 (emphasis added).

Darlene Tando is another defense expert.  Tando is a licensed clinical social worker with approximately 100 current clients, most of which are transgender.  Approximately 30% or more of her patients are on the autistic spectrum.  Deposition Transcript of Tando, Dkt. 243-3, at 275-76.  Like patients of Dr. Brady, in order to be seen in Tando's practice, a child's parent must first consent.  *Id*. at 56.  Tando says that

the words "gender" and "gender identity" are synonymous and that they mean a sense of oneself: "I consider the word gender to be synonymous with gender identity and I use them interchangeably.  I believe it is the internal sense of self, psychological sense of self, identifying as male, female, all genders, both genders, no gender." *Id.* at 69.  She believes a child as young as three years old can "understand and assert their gender identity." *Id.* at 143-44.  While gender is not a medical condition, according to Tando, she concedes that "I think that a misalignment or an incongruence with one's designated sex and authentic gender identity could be considered a medical condition." *Id.* at 189; 194-95.

Similar to other experts, Tando acknowledges that gender dysphoria can have effects ranging from unpleasant to life-threatening.  *Id.* at 109.  A trans-identifying person who does not have gender dysphoria is at a greater risk of developing dysphoria if they do not receive proper support and affirmation, according to Tando.  *Id.* at 260-61.  And Tando observes that where a child is being referred to as a chosen gender in one environment, but not in a different setting, can be "harmful" in that it can "increase dysphoria, [and] increase mental health risks." *Id.* at 142-43.

In her testimony, Tando agrees that it is important for parents to know (*id.* at 118), in part because parents ultimately have the power to influence whether or not a child fully socially transitions.  *Id.* at 121.  In apparent contrast to state policymakers, Tando agrees that if parents believe that their child would be harmed with social transitioning, the parents should be notified.  *Id.* at 138.  Not surprisingly, Tando notes that a parent's role in understanding their child's behavior is important, and her book says that parents are the best historians of behaviors which is extremely beneficial to the course of treatment, adding: "it is an essential role in the journey." *Id.* at 175.

Tando testified, "I believe it's optimal for parents to understand and affirm the child's gender identity." *Id.* at 239.  And she agrees that parents will do everything they can to help their children, even if they are initially shocked.  *Id.* at 246.  Parents may be shocked at first, but Tando agrees that because parents want what is best for their child,

23-cv-00768-BEN-WVG

they will likely support and affirm the child.  *Id.* at 247-49.  In fact, Tando says that it is normal for parents to not respond positively to their child telling them that they are transgender and that the reaction does not mean that the parent is a bigot, hateful, or abusive.  *Id.* at 254-55.

Tando concluded her deposition testimony by disagreeing with other experts and opining that even where parents object or have instructed a school *not* to affirm their child's preferred identity, "I think that it would still be beneficial to the child to be referred to appropriately in one context."  *Id.* at 324.

In contrast, Dr. Erica Anderson, Ph.D, a former member of the board of directors of WPATH, says that, "it's hard to imagine any circumstances under which it is a good idea to socially transition a child without support of parents."  Deposition of Anderson, Dkt 247-10 at 117.  Dr. Anderson is a clinical psychologist who sees patients who are gender questioning or transgender for evaluation and possible treatment.  *Id.* at 18-19. Gender identity persistence is one of recurring issues in her work: "is this child likely going to persist in this transgender identity or a different gender identity.  And that's a -- that's a sticky wicket, trying to figure that out."  *Id.* at 52.

Parental support for children is important for a child's health, according to Dr. Anderson.  "Children deserve the support of adults, especially parents . . . . And that's what I've understood as a psychologist.  And -- and the scientific literature confirm that children grow up healthy and happy when they are supported by the adults and the caregivers in their lives."  *Id.* at 25.  Dr. Anderson holds the opinion that schools should bring to a parent's attention issues of their child's gender dysphoria.  Dr. Anderson testifies,

> Children -- children have things that go on at
> school that parents are notified about all the time.
> There are probably thousands and thousands of such
> notifications going on throughout California schools
> today.  If a child falls on the playground and scrapes
> their knee and gets some kind of first aid, parents are
> notified.  If a child needs to take medication at school

23-cv-00768-BEN-WVG

for any reason, patients are notified. If a child is
failing in their academic performance, schools -- or
parents are notified.
I am not persuaded that this is a reason to
carve out -- that there's justification to carve out a
social transition, which is not a neutral act, it's a
psychotherapeutic intervention. And I'm not persuaded
that school -- people at school are qualified to -- to
determine does this child suffer from gender dysphoria
or not or are there other psychological factors at play.
That is really to be brought to the attention of -- of
parents and for parents to intervene, as the
guidelines -- the very guidelines that Dr. Brady and
Ms. Tando use, recommend, that social transition can be
done with the concurrence of the parents. Nowhere in
any guidelines have I come across advice to school
people that they should go ahead and socially transition
kids without notifying parents.

*Id.* at 90-91. Lastly, Dr. Anderson said that she has had discussions with Dr. Cass (author of the most comprehensive review of scientific literature on transgenderism and social transitioning) and said, "[w]e agreed that, you know, as put in the report, social transition is not [a] neutral act and *it should be done selectively and carefully*." *Id.* at 102 (emphasis added).

The State Defendants' own experts say it is good if a child's gender expression is affirmed (which is facilitated in school). However, the parental exclusion policies presume that a child will not receive affirmation or support at home if parents are informed over the child's objection. Consequently, the state privacy policies assume that a ½ loaf of bread is better than no loaf at all. In other words, it is better to give at least some school affirmation for a non-conforming gender student even though school secrecy means the child is deprived of the opportunity to receive parent affirmation. The counterargument to that is that if parents are not informed at all, there will be gender incongruent children that *would have been affirmed* by their parents, had the parents been informed, but who will instead be forced to struggle without their parents' involvement

and affirmation. That group of schoolchildren will be deprived of the whole loaf of affirmation.

Along the same lines, that group of schoolchildren will be deprived of their parents' wisdom and opportunity to act in the child's best interest such as exploring counseling with a mental health expert, family discussions, or simply patient observation over time, etc. These schoolchildren will not have the benefit of their parent's involvement, at all. In other words, while these state privacy policies may be intended to protect a gender incongruent student may have the actual effect of depriving that student of what they need most and what is clinically the best: affirmation and support from their own parents.

As for whether gender incongruence is an unhealthy medical condition in need of treatment, or, whether social transitioning at school is medical treatment, does not matter. Under the Fourteenth Amendment, parents have a substantive due process right to know of and explore whether their own child's gender incongruence is a medical or psychological condition and whether and what kind of treatment or approach is in their child's best interest. The State Defendants' experts say that a child's gender identity is innate. There is no evidence presented to back up that assertion. But even if there is a question, it is best answered by parents taking the child to a mental health provider to explore the question, instead of leaving a child to answer the question on his or her own.

This Court has previously described the longstanding and enduring rights of parents to direct the upbringing and medical care of their children.[10] That right has been acknowledged by the U.S. Supreme Court once again in *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025). There are no genuine issues of material fact. The plaintiff parents are not claiming that the Fourteenth Amendment gives them a right to prescribe school curriculum, or force the schools to administer medical care, or disclose student private

---

[10] *See* Order (Sept 14, 2023), Dkt 42 at 14-18.

29

personal information to unrelated adults.  This Court holds that a parental right to be
informed about the gender identity expressed within the schoolhouse gate of one's child
lives comfortably within the limits of the Fourteenth Amendment right.

There are no genuine issues of material fact.  By their policies of social
transitioning and secrecy from parents and by stifling teachers who would voluntarily talk
with parents about the incongruent gender expressions of their children at school, the
parent plaintiffs have proven that the State Defendants' policies significantly infringe on
the federal constitutional right of the parent class members as a matter of law and the
parent class members are entitled to a permanent injunction.

### B.  Parents' First Amendment Free Exercise Rights (Claims 6 & 8)

The subclass of parents (and guardians) of public school children also seek a
declaration that the State Defendants privacy policies violate their First Amendment
rights to the free exercise of religion and specifically to direct the religious upbringing of
their children (Claims 6 & 8).  Applying *Mahmoud v. Taylor*, 145 S. Ct. 2332 (2025), the
parents' free exercise claim prevails.

The First Amendment to the U.S. Constitution reminds government that "Congress
shall make no law respecting an establishment of religion, or prohibiting the free exercise
thereof; or abridging the freedom of speech, or of the press; or the right of the people
peaceably to assemble, and to petition the Government for a redress of grievances."  U.S.
Const. Amend. 1.

"We have long recognized the rights of parents to direct 'the religious upbringing'
of their children.  And we have held that those rights are violated by government policies
that 'substantially interfere with the religious development' of children.  Such
interference, we have observed, 'carries with it precisely the kind of objective danger to
the free exercise of religion that the First Amendment was designed to prevent."
*Mahmoud*, 145 S. Ct. at 2350-51.  Although State Defendants may see it as an
unwelcome administrative burden, the Supreme Court reminds us that public school
activities that take place inside the schoolhouse gate are not beyond the reach of a

parent's free exercise right. "And the right to free exercise, like other First Amendment rights, is not 'shed . . . at the schoolhouse gate.'" *Id.* at 2350 (quoting *Tinker v. Des Moines Independent Community School Dist.*, 393 U. S. 503, 506-507 (1969)).

The plaintiff parents here sincerely hold religious beliefs like the plaintiffs in *Mahmoud*. In *Mahmoud*, the parents "believe[d] they have a 'sacred obligation' or 'God-given responsibility' to raise their children in a way that is consistent with their religious beliefs and practices." *Id.* at 2351. The same is true of the parent plaintiffs in this case.[11] "As devout Catholics, my husband and I believe that there are only two genders—male and female—and that God made every person as either male or female. We accept the Church's teaching that nobody can be born in the wrong body, that nobody can change their sex, and that efforts to do so are both sinful and harmful." Decl of Jane Poe, Dkt 247-6, at ¶4; Decl. of John Poe, Dkt 247-7, at ¶4. "As the leaders of a devout Catholic family, my husband and I believe the Catholic Church's teaching that there are only two sexes, male and female, that each one of us was made as male or female by God for a reason, and that one's sex cannot be changed. We also believe that as parents we have a special duty to protect our children and raise them according to our faith tradition." Decl of Jane Doe, Dkt 247-8, at ¶3. "My daughter, Child Doe, attends a public high school

---

[11] "Parent Plaintiffs' religious faith teaches them that God immutably created each person as male or female, that these two distinct, complementary sexes reflect the image of God, and that the rejection of one's biological sex is a rejection of the image of God within that person. Thus, Parent Plaintiffs' religious faith precludes them from adhering to or espousing transgender theory, whether in the form of the traditional, clinical view of transgenderism or the more modern view of gender diversity." Amended Complaint at ¶442. "Parent Plaintiffs' religious faith also teaches them that the parent-child relationship was ordained by God and that parents have the ultimate right and responsibility to care for and guide their children. Thus, they have a religious duty to guide their children and to refrain from doing anything that would be harmful to them or would create an unreasonable risk of harm to them. This requires them to be actively involved in all significant decision-making by their children, including gender transition." Amended Complaint at ¶443.

within Pasadena Unified School District in the County of Los Angeles.  We are a devout Roman Catholic family . . . .  My daughter attends weekly mass with my wife and me." Decl. of John Doe, Dkt 247-9, at ¶2.

In *Mahmoud*, as in this case, the parents "believe that biological sex reflects divine creation, that sex and gender are inseparable, and that children should be encouraged to accept their sex and to live accordingly."  145 S. Ct. at 2354.  An assertion of a sincere religious belief is generally accepted in law.  And while religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection, in this case the Poes', the Does', and the class of parents' beliefs are logical, consistent, and historical.  *Thomas v. Review Bd.*, 450 U.S. 707, 714, (1981) ("[T]he resolution of [whether a belief is religious] is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.").  *Mahmoud* explains, "[a] government burdens the religious exercise of parents when it requires them to submit their children to instruction that poses 'a very real threat of undermining' the religious beliefs and practices that the parents wish to instill."  145 S. Ct. at 2342 (quoting *Wisconsin v. Yoder*, 406 U. S. 205, 218 (1972)).

Parents in *Mahmoud,* and here, face school policies that keep them in the dark about things their schools are doing in conflict with their sincerely-held religious beliefs and which undermine their parental efforts to teach and train their children in their religion.  In *Mahmoud*, the schools rebuffed parental requests to know when transgender books were used in class.  It was a modest request.  The parents did not ask to have the curriculum changed.  They did not ask their school for "assistance" in exercising their rights.  They just wanted notice and the opportunity to opt their children out of the offensive book readings.  As the Supreme Court described it, "[i]t must be emphasized that what the parents seek here is not the right to micromanage the public school curriculum, but rather to have their children opt out of a particular educational requirement that burdens their well-established right 'to direct the religious upbringing of

their children.'"  *Id*. at 2363.  Unfortunately, the school district refused to communicate this information to the parents.

### 1. The Poes' Story

The plaintiff parents in this case face a similar barrier of school silence.  The plaintiff parents here need information too -- about if and when their child announces a new name/pronoun and school staff begins using the change of their child's name/pronoun.  In effect, if not in deed, their California public school concealed from child Poe's parents information about the child Poe's gender expression.  Consider what the Poe family faced:

> [O]n August 29, 2023, my wife and I attended our daughter's middle school's "back-to-school" night.  During that event, we met with several of her teachers in the classroom of her "GATE" teacher.  None of the teachers mentioned to us that she was presenting as a different gender at school or had requested a preferred name and preferred pronouns.  Her "GATE" teacher informed us of our daughter's involvement in the PRISM club, but did not tell us anything about the club (we did not realize it was the gay club) or that our daughter was the President.  To us, the teachers all referred to our daughter by using her legal name and biological pronouns.

Decl of John Poe, Dkt 247-7, at ¶7.  The administrators were not forthright with the Poes about whether the school perpetuated their child's new gender-diverse name.  "Upon learning the school socially transitioned our daughter without our knowledge and consent, my wife and I attended an in-person meeting with the school principal and school psychologist to ask if they were calling our daughter by a different name or using different pronouns.  They said, "no," and indicated their practice of using preferred names was limited to nicknames, such as "Johnny" for the name "John."  However, we learned that this was a lie."  Decl of John Poe, Dkt 247-7, at ¶11.  As months passed, the school continued to stonewall child Poe's parents.

> [I]n January 2024, we repeatedly reached out to our daughter's teachers at the charter school to ask about how she was doing.

One of our specific questions was whether our daughter was presenting as male at school. We did not get a response from her teachers. Instead, an administrator from Central Valley Charter Schools sent my wife a lengthy email. In that email, the administrator block-quoted large portions of the CDE's FAQ guidance, and summed up her conclusion with the following statement: "We cannot share the gender identity of the student with the parent even if that gender identity is expressed openly in class."

Decl of John Poe, Dkt 247-7, at ¶16. "Various emails over the next few months confirmed that Yosemite Valley was continuing to use our daughter's preferred male name and pronouns in violation of our instructions and in violation of our religious beliefs." Decl of John Poe, Dkt 247-7, at ¶23.

### 2. The Does' Story

The parents of child Doe have endured a similar experience. "Since the fifth grade, my daughter repeatedly transitioned to and desisted from a male transgender identity, which led me and my wife to request that her school communicate with us forthrightly about her. However, citing to the California Department of Education's FAQ guidance on gender identity, her school repeatedly and directly lied to us and refused to answer our questions." Decl of John Doe, Dkt 247-9, at ¶5.

To find out more about what was happening on campus, my wife immediately set up parent-teacher conferences with three of our daughter's six teachers. In each conference, my wife repeatedly and conspicuously referred to her as "my daughter" and by her given name. After discussing academics, my wife asked each teacher simply if there was anything about her that the teacher felt was important for us to know—whether socially, emotionally, or for any other reason at all. Although at least two of the teachers seemed distinctly uncomfortable— one by acting defensive and rude, and the other by appearing nervous—every teacher answered, "No."

However, it was clear to us that, at a minimum, some of the teachers were lying. This was clear because one of her teachers' seating charts showed the use of a male name and pronouns for our daughter. Additionally, it was evident from

our daughter's emails that she was not using her given name in class.

After these parent-teacher conferences, my wife and I met with the principal in February 2023. We told the principal that we knew that teachers were using a male name for our daughter and that each of them had lied to her about it. The principal denied any knowledge of the social transition and even denied that it was really happening. But, the principal stated if a child asked to be referred to using a new name and pronouns, and to keep this information from parents, "We are instructed to protect the rights of LGBTQ students. We have to do that, it's the law." My wife asked the principal to show her that "law." The principal then navigated on her laptop to the California Department of Education's FAQ page on AB 1266 and gender identity. My wife responded with, "That's not law, that's FAQs on a website," but the principal responded, "Yes it is, and we have to follow that."

Decl of John Poe, Dkt 247-7, at ¶¶26-28.

If a student changes his or her name due to the school's maintenance of a fluid gender identity construct, these parents would find the change odious to their own religious beliefs. Yet, the State Defendants' policies usually prevent teachers and staff from communicating to a parent this important information. Think of it. A baby is born. The parents give the child its legal name – perhaps even in reverence of a hero or heroine of their religion. The child goes to school. The child expresses a newfound desire to be regarded as a different gender with a different name. Unbeknownst to the parents, school teachers start calling on the child by the different name. School administrators keep the child's progress reports under the different name. The different-name reinforcement continues for months, and then semesters, and then years. Meanwhile, the child-with-a-new-name's parents are left in the dark. And if they happen to ask… the request is met with silence or vague references to a meeting with an administrator. Even if the parents somehow do find out and ask the school to discontinue referring to the child's unofficial

23-cv-00768-BEN-WVG

assumed name, the policies will not permit the school employees to accommodate the parental request.

Such state education policies substantially interfere with the First Amendment rights of parents to direct the religious upbringing of their children. As *Mahmoud* teaches, "government burdens the religious exercise of parents when it requires them to submit their children to instruction that poses 'a very real threat of undermining' the religious beliefs and practices that the parents wish to instill." 145 S. Ct. at 2342. After all, "[g]overnment schools, like all government institutions, may not place unconstitutional burdens on religious exercise." *Id.* at 2350.

Many plaintiff parents have no other choice than to enroll their children in public schools because the scholastic alternatives are costly. State truancy laws preclude opting out completely. Consequently, public schools must reasonably attempt to accommodate parents' free exercise rights. As *Mahmoud* observes, "[i]t is both insulting and legally unsound to tell parents that they must abstain from public education in order to raise their children in their religious faiths, when alternatives can be prohibitively expensive and they already contribute to financing the public schools." *Id.* at 2360.

A defense of administrative difficulty is not sufficient. Parents do not need to know what happens every school day. But, some sort of regular information may be constitutionally required. The State Defendants complain that parents are trying to micromanage the school day. That is not accurate. However, the State Defendants' policies do impact students every school day. Every day that a student is addressed by school staff using a gender incongruent name that insults the faith of the student's parents is another day of constitutional injury.

Schools may not insulate themselves from legal liability by weaving the free exercise offense into every-day school life. Like the school under review in *Mahmoud*, California's public school system,

> may not insulate itself from First Amendment liability by 'weaving' religiously offensive material throughout its

36

23-cv-00768-BEN-WVG

curriculum and thereby significantly increase the difficulty and complexity of remedying parents' constitutional injuries. Were it otherwise, the State could nullify parents' First Amendment rights simply by saturating public schools' core curricula with material that undermines 'family decisions in the area of religious training.' The 'Framers intended' for 'free exercise of religion to flourish.'

*Mahmoud,* 145 S. Ct. at 2381 (Thomas, J, concurring) (citations omitted). The *Mahmoud* majority reminds public school administrators that they "cannot escape its obligation to honor parents' free exercise rights by deliberately designing its curriculum to make parental opt outs more cumbersome." *Id.* at 2362-63. Moreover, government cannot be excused based on its desire to welcome and protect transgender students from those who believe gender is fixed. A public school, "cannot purport to rescue one group of students from stigma and isolation by stigmatizing and isolating another," based on *Mahmoud*. *Id.* at 2363. "A classroom environment that is welcoming to all students is something to be commended, but such an environment cannot be achieved through hostility toward the religious beliefs of students and their parents." *Id.* at 2363.

Previously, this Court applied standard free exercise analysis to similar gender-secrecy polices adopted by the Escondido Union School District and concluded that strict scrutiny applied and the policies failed strict scrutiny. The same analysis would yield the same outcome today concerning the parents free exercise claim against the State Defendants' policies. But that analysis may be bypassed when the burden is of the same character as was the burden in *Yoder*. Here, compared to the religious burden in *Mahmoud*, the California policies impose a similar, if not greater, burden on free exercise rights.

Consequently, *Mahmoud* leads the way by skipping the ordinary two-step inquiry and moving directly to the application of strict scrutiny. "Thus, when a law imposes a burden of the same character as that in *Yoder*, strict scrutiny is appropriate regardless of whether the law is neutral or generally applicable." *Id.* and n.14. To survive strict

scrutiny, a state must demonstrate that its policy *both* advances interests of the highest order and is narrowly tailored. *Id.* (citing *Fulton v. Philadelphia*, 593 U. S. 522, 541 (2021)).

The State Defendants argue that *Mahmoud* does not apply. They argue that a parent "does not possess a religious exercise right to dictate that a school reject their child's gender identity." State Defendants Oppo. at 16. They argue that Plaintiffs "lack an underlying constitutional basis for altering any school policy respecting the gender identities of students." *Id.* They argue that "there is no constitutional need for notification when their child comes within the scope of such policy." *Id.* Nevertheless, this Court disagrees.

### 3. *Not Interests of the Highest Order*

For the State Defendants' policies to survive strict scrutiny, they must first advance an interest of the highest order. The State Defendants identify a general interest in providing a "safe" learning environment, but the interest is too broadly stated. Overly broad formulations of compelling government interests are insufficient. *See Green v. Miss United States of Am., LLC*, 52 F.4th 773, 791-92 (9th Cir. 2022) (citation omitted) (identifying the issue as "not whether [the government] has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception to [plaintiff].")). They describe an interest in safeguarding a minor school student's individual's privacy. Their reasoning here, however, is something of a tautology when they say, "California maintains a strong interest in safeguarding the individual's privacy precisely because there is no compelling safety rationale for overriding that constitutional right." State Defendants Oppo. at 22.[12] More importantly,

---

[12]    The State Defendants also argue in vague terms that, "[c]ommon sense dictates, thankfully, that the instances in which a student's circumstances will reflect a compelling health or safety need for nonconsensual disclosure will be rare. Though instances of bullying, depression, and even suicidal ideation in California's transgender student population have been documented, there is nothing before the Court demonstrating that a

in articulating their interest the State Defendants completely ignore the fact that parents of students possess a free exercise right to direct a child's religious teaching.

The most articulate statement of the government's interest is found at page twenty-five of its brief: "The State has a legitimate, and even compelling, interest in protecting transgender and gender-nonconforming students from bullying and harassment, and in fostering a safe and supportive school environment where students can learn without fear of being outed to their parents before they are ready. This includes an interest in protecting these students from the harms, such as a heightened risk of suicide, that can result when school staff 'forcibly out' students without their consent and before they are ready." State Defendants Oppo., at 25 (citing Al-Shamma MSJ Decl. at ¶¶25, 31-34). The weakness of this articulation of the government interest is that the notion of a learning environment where students are insulated from their parents' discovery of a non-conforming gender identity is somehow better for a child, is yet to be proven.

Ironically, it is often other student peers and school staff that are not supportive, according to the State Defendants' expert Al-Shamma. Decl .of Al-Shamma, Dkt 256-4, at ¶25 ("Even in the best-case scenarios when a youth comes out to their family as transgender or nonbinary and their family is loving and accepting, the life of a transgender youth is often very difficult. The harassment and bullying they receive at school from peers and even at times from staff can be incredibly harmful.").

The State Defendants also identify what they describe as "a compelling governmental interest in protecting students' privacy as to their bodily autonomy, even with respect to their parents." State Defendants Oppo., at 25 (citations omitted). Yet, the State Defendants do not offer to explain how the stated government interest is furthered

_____

compelling need for disclosure that overrides a transgender student's fundamental autonomy right to privacy is or will be a common occurrence. But that is not the case with Plaintiffs' expansive request for a religious exemption to state privacy rights." State Defendants Oppo. at 23.

by their parental exclusion policies; the policies address gender identity rather than bodily autonomy.

Certainly, the State Defendants have a compelling interest in providing a safe learning environment. It is a legitimate purpose for schools to try to protect student safety and well-being, and even to try to eliminate discrimination on the basis of sex or transgender status. *Parents for Privacy v. Barr*, 949 F.3d 1210, 1238 (9th Cir. 2020). For example, in approving a prohibition on child pornography, the Supreme Court noted that, "[i]t is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'" *New York v. Ferber*, 458 U.S. 747, 756-57 (1982) ("The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance.").

Nevertheless, the State Defendants have not made the case that non-disclosure of a child's gender identity to the child's parents is a state interest of the highest order. Nor is there binding precedent. The medical experts agree that parental support is necessary for the best outcomes and constitutional principles rest on the premise that parents attempt to act in the best interests of their child.

### 4. *Not narrowly tailored*

Even assuming, for the sake of argument, that the State Defendants identified an interest of the highest order in the form of the parental exclusion policies, the policies remain constitutionally defective because they are not narrowly tailored. The State Defendants concede that parents "may find notification that their child is expressing a transgender identity at school helpful in the general exercise of their right to direct a religious upbringing for that child." *Id.* So, the State Defendants are aware that notification would be *helpful* to religious parents, but provide no room for those parents' to exercise those federal constitutional rights. Just like in the case in *Mahmoud*, the California state education parental exclusion policies provide no exceptions for religious parents.

23-cv-00768-BEN-WVG

### 5. *Tailoring Twice Declined*

At the hearing, the Court proposed two methods to more narrowly tailor the gender parental exclusion policies. The first method is currently in use at Escondido Union School District (as a result of this Court's preliminary injunction). There, if a child wants to use a different name or pronouns, the school says, "we understand," but explains that it will have to talk to the child's parents. If the child objects to informing his or her parents, then the school responds that it cannot respect the request. Hearing Transcript (Nov. 24, 2025), Dkt. 303 at 89-90. When asked if the state policies could offer that form of tailoring, the deputy attorney general representing the State Defendants declined to take a position.

The second method of tailoring this Court proposed is an annual school district questionnaire. The questionnaire would ask parents *if they want to be informed* in the event their child is observed to be experiencing gender incongruity or asking to go by a new name. If the parents said "yes," then the school would inform the parents during the year. If the parents said "no," then the school would not inform the parents during the year. The deputy attorney general suggested such a policy would violate privacy protections for students. Hearing Transcript (Nov. 24, 2025), Dkt. 303 at 92-93.

In other words, the State Defendants gender secrecy policies do not attempt in any way to tailor policies so as to respect the free exercise rights of parents. They do not provide for an opt-out from school recognition and propagation of gender incongruent names. They do not provide notice to parents who need or ask for notice. They do not even acknowledge a parent's constitutional right to direct their child's religious upbringing. *Mahmoud* rejected such a vision of the power of the state to strip away the critical right of parents to guide the religious development of their children, calling it "chilling." *Mahmoud*, 145 S. Ct. at 2358.

The State Defendants have articulated an overly broad state interest. The State Defendants have not demonstrated a narrowly tailored policy. A blanket prohibition on accurate communications, in all instances, with all parents, regarding all public school

23-cv-00768-BEN-WVG

students, does not fit the notion of narrow tailoring.  As such, the State Defendants' parental exclusion policies fail the narrow tailoring prong of the strict scrutiny test.

In the end, the plaintiff class of parents face an unlawful choice along the lines of "lose your faith and keep your child in public school, or keep your faith but lose public schooling." *Mahmoud*, 145 S. Ct. at 2359 (when the government chooses to provide public benefits, it may not condition the availability of those benefits upon a recipient's willingness to surrender his religion).  "Respect for religious expressions is indispensable to life in a free and diverse Republic."  *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 (2022).

The only meaningful justification the State Defendants offer for their insistence that the plaintiffs have no choice in the matter about their own children rests on a mistaken view that the State Defendants bear a duty to place a child's right to privacy above, and in derogation of, the rights of a child's parents.  The Supremacy Clause of the federal Constitution does not sanction that kind of rights misbalancing imposed by a state.  The plaintiffs have proven the merits of their free exercise claim, as a matter of law.  Because there are no genuine issues of material fact, they are entitled to judgment as a matter of law and a permanent injunction.

## C.  **Teachers' First Amendment Free Exercise Rights (Claims 2 & 3)**

The subclass of public school teachers seek a declaration that the state parental exclusion policies violate their own First Amendment rights to the free exercise of religion.  The teachers seek to enjoin the state policies which prevent them from communicating accurately with the parents of their gender-nonconforming students. (Claims 2 & 3).

At the outset of this case, two public school teachers who sincerely hold religious beliefs sought protection for their First Amendment Free Exercise rights.  At that time, the State Defendants' parent exclusion policies had been adopted by its local educational agency, the Escondido Union School District.  The teacher plaintiffs were severely burdened by the policies that required teachers to deceive parents concerning gender-

nonconforming students under their tutelage.  The local school district threatened adverse employment action.

Since then, two additional public school teachers have joined as plaintiffs (both proceeding under pseudonyms for fear of reprisals at their schools).  These teachers also sincerely hold religious beliefs that are severely burdened by being forced to stand mute or deceive the parents about gender non-conforming students in their classrooms.  For these teachers, as is likely the case state-wide, the local school communicated a "no-exceptions" stance due to n the mandatory nature of the State Defendants' policies.

### 1. *Jane Roe's Story*

One teacher, Jane Roe, says that she is a devout Christian.  She explains, "As a Christian, I believe that God made man and woman in his image, specifically male and female.  I believe that it is impossible to change our sex and that our sex was given to us by God for a reason.  I also believe that we are fearfully and wonderfully made, and God doesn't make mistakes."  Decl of Roe, Dkt 247-5, at ¶4-5.  Roe continues,  "Because of this I believe it would violate my religious beliefs to mislead a parent about his or her child's gender transition at school.  I understand that California requires me and all other school staff to accept a student's statement of their gender identity and immediately begin treating them as a member of the opposite-sex, regardless of whether their parents consent or even know.  And, if the child tells me that he does not want his parents to know about this, then I must keep it from them.  As a requirement for employment by the California school system, this is a severe burden on my religious beliefs."  Decl of Roe, Dkt 247-5, at ¶7.

This is not a hypothetical burden.  "I had two transgender students in my classes during the 2024-2025 school year," relates Roe.  "Additionally, there were two transgender students in my classes during the 2023-2024 school year, and a larger cohort of approximately six the year before 2022-2023 school year.  This has created a lot of stress for me because I would normally be very open and communicative with their parents, sending instant messages whenever I see anything off with their child."  *Id.* at

¶12.  Roe declares that it is "my understanding that no one has been granted a religious accommodation exempting them from these policies.  Instead, I have witnessed first-hand the retaliation and harassment against my colleague and friend, Elizabeth Mirabelli."  *Id.* at ¶19.  "Administrators made it clear to me," reports Roe, "that failing to adhere to the policy would result in termination."  *Id.*  Roe has witnessed negative repercussions suffered by others.  "I am proceeding anonymously in this case to avoid any personal retaliation at work.  I understand that Elizabeth Mirabelli and Lori Ann West were on administrative leave for much of 2023, and were both essentially run out of school."  *Id.* at ¶22.

## 2.  *Jane Boe's Story*

Plaintiff teacher Jane Boe describes a similar employment experience.  She describes herself as a devout Christian.  Decl of Boe, Dkt 247-4, at ¶3.  Boe states, "I believe that God made man and woman in his image, both male and female.  I believe that it is impossible to change our sex and that our sex was given to us by God for a reason.  I also believe that Scripture teaches that parents have a moral responsibility to guide their children and that children have a moral responsibility to obey their parents.  This is a sacred relationship that it is immoral for me to interfere with."  *Id.* at ¶4-5.  Boe explains, "I believe it would violate my religious beliefs to deceive parents about their child's gender transition at school."  *Id.* at ¶7.

When she sought to discuss the burden placed on her with a school administrator she was rebuked.  Boe recounts, "I approached the Assistant Principal to explain my issues with the policy—that I had sincerely held religious convictions that prevented me from complying.  In response, the Assistant Principal stated, 'If you're not able to follow this policy, you may have to find a different job.'  I was shocked and extremely distressed by his comment and perceived it as a threat."  *Id.* at ¶9.  According to Boe, little has changed since the entry of the preliminary injunction.  Boe says, "While I understand that the CDE has removed the legal advisory and FAQ page from their website, I also understand that the CDE continues to assert that they accurately described the law that

school districts must follow.  I also understand that EUSD has tried to change its policies to come into compliance with this Court's understanding of the law, but that the State has taken the position that EUSD's new policies are illegal.  So I still feel bound by the training and instruction I received from school leadership, and under threat to abide by these policies or 'find a different job.'"  *Id*. at ¶16.

California public schools may be gun-free zones, but they are not First Amendment-free zones.  "To hold differently would be to treat religious expression as second-class speech and eviscerate this Court's repeated promise that teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  *Kennedy v. Bremerton*, 597 U.S. 507, 531 (2024) (quoting *Tinker*, 393 U. S., at 506).

The four teacher Plaintiffs and class representatives sincerely hold religious beliefs that that are being severely burdened by the imposition of the parental exclusion policies. Their sincerity is undisputed.  Compelling teacher Plaintiffs to observe the State's parental exclusion policies or leave their employment in any of the California Department of Educations's local educational agencies and school districts works a substantial burden on the teacher plaintiffs' First Amendment rights to free exercise.  As the policies remain the same and the State Defendants intend to continue enforcement of the policies in their local schools, the same legal analysis used for the preliminary injunction of Escondido Union School District's local policy applies here -- which yields the same conclusion. The antithetical policies severely burden the free exercise rights of teachers with religious convictions, the policies are neither generally applicable[13] nor narrowly tailored.  The

_____

[13] Under the policies, informing parents about a student's gender incongruity (without the consent of the student) is deemed unlawful discrimination or harassment when administrators decide that the parent lacks a legitimate need for the information.  There are no standards written in the policies for determining when a parent has a "legitimate need" of the information, only that it requires a case-by-case decision by administrators. This means whether disciplinary action is taken against a teacher who informs a parent

policies burden a great deal more than is necessary for any compelling interest the State Defendants have.[14] "If you're not able to follow this policy, you may have to find a different job," is not an example of a narrowly tailored infringement on a core federal constitutional right.

The State Defendants are aware that the free exercise burden on its teaching staff is widely felt. "These statistics paint a clear picture. A religious-exercise exemption that allows California school staff to disclose a student's gender identity without their consent

_____

depends on an undefined *ad hoc* determination. This is the very definition of a discretionary exemption. "A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). Under the *Fulton* framework, a law is not generally applicable "if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. Of Educ.*, 82 F.4th 664, 687 (9th Cir. 2023) (*en banc*) (quoting *Fulton*). The authority to find or not find that a parent has a good enough need to know about their child's gender incongruity is retained by the State Defendants local educational agency administrators. The retention of this authority to decide when a teacher may properly inform a parent creates a not-generally applicable policy. That, in turn, means it must satisfy strict constitutional scrutiny. "This authority 'to decide which reasons for not complying with the policy are worthy of solicitude' on an ad hoc basis renders the policy not 'generally applicable' and requires the application of strict scrutiny." *Id.* at 687 (citing *Fulton*).

[14] The State Defendants have no compelling interest in creating safe and inclusive campuses through deceiving parents about their children because "there is a presumption that fit parents act in the best interests of their children." *Troxel v. Granville*, 530 U.S. 57, 68 (2000). Moreover, the State Defendants have no compelling interest in enforcing their parental exclusion policies against teachers to comply with California or federal law because their policies are not required by California or federal law, or—if required by California law—must yield to federal constitutional law.

   "While inclusiveness is a worthy pursuit, it does not justify uncertain exemptions or exceptions from the broad non-discrimination policies, which undermine their neutrality and general applicability and burden Free Exercise." *Fellowship of Christian Athlete v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 687 (9th Cir. 2023).

will be utilized by thousands and thousands of employees." State Defendants Oppo, Dkt 247, at 23-24. Although aware of the burden on free exercise rights, the State Defendants offer no exemptions or other attempts at narrow tailoring. Instead, they say in essence narrow tailoring is too cumbersome.

However, this is a problem of the State Defendants' own making. It is not a defense justifying broad-based trenching on individual rights. When the State drops an elephant in the middle of its classrooms, it is not a defense to say that the elephants are too heavy to move. The school district defendant in *Mahmoud* made a similar argument that *if* it granted opt-outs from the LGBTQ+-inclusive storybooks, it would be too cumbersome and unworkable because the number of absent students would be unsustainably high. The *Mohmoud* court brushed the argument away because the school's concern was self-inflicted. 145 S. Ct. at 2362-63. Justice Thomas explains, "[t]he [school] Board may not insulate itself from First Amendment liability by 'weaving' religiously offensive material throughout its curriculum and thereby significantly increase the difficulty and complexity of remedying parent's constitutional injuries." Id. at 2381 (Thomas, J., concurring).

In the end, under the State Defendants parental exclusion policies and anti-discrimination laws, the subclass of religious teachers face an unlawful choice between sacrificing their faith and sacrificing their teaching position. *Cf. Keene v. City & Cnty. of San Francisco*, 2023 U.S. App. LEXIS 11807, *6 (9th Cir. May 15, 2023) (mem. disp.) ("lose your faith and keep your job, or keep your faith and lose your job."). The only meaningful justification the State Defendants offer for its policies' insistence -- that the plaintiffs not reveal to parents gender information about their own children -- rests on a mistaken view that the State's public schools hold a duty to place a child's right to privacy above and in derogation of the rights of parents. As mentioned previously, the Supremacy Clause of the U.S. Constitution requires the opposite. *Martin v. United States*, 605 U.S 395, 409 (2025) ("[W]hen a regulated party cannot comply with both

federal and state directives, the Supremacy Clause tells us the state law must yield.")
(citation omitted).

The teacher plaintiffs have proven the merits of their free exercise claim and are
entitled as a matter of law to a declaration and a permanent injunction.

### D. __Teachers' First Amendment Free Speech Rights (Claim 1)__

The subclass of public school teachers also seek a declaration that the state privacy
policies violate their First Amendment rights to free speech (Claim 1).  The State
Defendants contend that teachers are hired to deliver government-approved curricular
speech.  Communicating with parents about student school progress is part of that speech
for which they are hired.  The plaintiffs' argument that teachers may speak freely
whatever is on their own mind on matters of curricular speech is foreclosed by *Johnson v.
Poway Unified Sch. Dist.*, 658 F.3d 954 (9th Cir. 2011).  There, the Ninth Circuit
"recognize[d] that 'expression is a teacher's stock in trade, the commodity she sells to her
employer in exchange for a salary.'"  *Id*. at 967.  "Certainly, Johnson did not act as a
citizen when he went to school and taught class, took attendance, supervised students, or
regulated their comings-and-goings; he acted as a teacher—a government employee,"
according to *Johnson*.  *Id.*  *Johnson* concluded, "[a]ll the speech of which Johnson
complains belongs to the government, and the government has the right to 'speak for
itself.'  When it does, 'it is entitled to say what it wishes,' 'and to select the views that it
wants to express.'"  *Id.* at 975.

Here, like *Johnson,* the teacher plaintiffs are public school government teachers.
Teaching, taking attendance, supervising students, and regulating their comings-and-
goings are activities that are part of their employee duties.  Included among their duties as
teachers is the duty to communicate with a student's parents from time to time about the
student's school performance.  It is difficult to say that their classroom speech during the
school day as teachers is their own, rather than the school district's.  Consequently, at
least where the teachers' compelled speech takes place during the school day on

curricular matters, *Johnson* forecloses a generic freedom of speech claim. But while this is generally true, the drawing of lines in this case requires more nuance.

The defense position is that everything a teacher speaks while on the job is subject to that which the government decides should be spoken. Yet, teachers retain at least some speech of their own inside the schoolhouse gate. After all, "[i]t has long been established that *teachers* and students have First Amendment rights." *Eagle Point Educ. Ass'n/SOBC/OEA v. Jackson Cty. Sch. Dist. No. 9*, 880 F.3d 1097, 1105 (9th Cir. 2018) (emphasis added). Consequently, the State Defendants are correct that the current state of constitutional law holds that "if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message." *Janus v. AFSCME, Council 31*, 585 U.S. 878, 908 (2018) (citing *Garcetti*, 547 U. S., at 421-422, 425-426). At the same time, the Supreme Court has said, "however, it is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree." *Janus,* 585 U.S. at 908.

The case presented here lies somewhere between the two extremes. The teacher plaintiffs have a direct disagreement with the parental exclusion policy that they may not inform a student's parent about the student's expressions of gender incongruity, absent consent from the student. The problem is that when a parent asks directly, the teachers are compelled to avoid answering. Purposeful avoidance, or worse, purposeful deception by a teacher or staff member, directly undermines a parent's Fourteenth Amendment right to care for their child in every case and may undermine a religious parent's First Amendment right to direct their child's religious upbringing.

The teachers successfully make out a First Amendment freedom of speech claim when they are compelled to speak in violation of the law or to deliberately convey an illegal message. In this case, because the State Defendants' parental exclusion policies (like Escondido's AR 5145.3) demand that teachers communicate misrepresentations or deceptively avoidant responses to parental questions, which, in turn, violate the

23-cv-00768-BEN-WVG

constitutional rights of parents, this type of government speech may not be forced upon teachers who conscientiously disagree.

## V.  ARTICLE III STANDING

The State Defendants assert that neither the parents nor the teachers enjoy Article III standing.  This Court disagrees as it explained in its earlier Order.  *See* Order (dated January 7, 2025), Dkt 194.  In opposition to the motion for summary judgment, the State Defendants re-urge the same arguments.  However, the more recent arguments have been drained of any new vigor by virtue of the State Defendants withdrawing their mootness claims.  *See* Notice of Withdrawal of Mootness Argument Pertaining to Plaintiffs' Motion for Summary Judgment (Nov. 14, 2025), Dkt. 298.

## VI.  MOOTNESS

The State Defendants initially argued that the parental exclusion policies had been withdrawn and were (by implication) no longer in effect.  The State Defendants have now withdrawn this argument in view of the California Department of Education's newly distributed PRISM "cultural competency training" required of teachers and certificated staff in 7th through 12th grades mandated by California Education Code §218.3(c).  *Id; see also* Order (dated Apr. 10, 2025), Dkt. 236.

## VII.  PERMANENT INJUNCTION

"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006).  For elements (3) and (4), "[w]hen the government is a party, the balance of equities and public interest factors merge."  *Galvez v. Jaddou,* 52 F.4th 821, 831 (9th Cir. 2022) (citing *Nken v. Holder,* 556 U.S. 418, 435 (2009)).

All four factors are satisfied in this case. The parent plaintiffs have succeeded on the merits of their motion for summary judgment on their Substantive Due Process and Free Exercise Clause claims and therefore satisfy the four-factor test entitling them to permanent injunctive relief on this claim. This is also true for the teacher plaintiffs in regards to their First Amendment Free Exercise and Free Speech claims.

First, both the parents and teachers have established irreparable injury by showing the State Defendants are violating their rights. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Second, the only relief plaintiffs request that is available against the State Defendants and appropriate for these unconstitutional violations is injunctive relief. Third, the balance of hardships between the plaintiff class of parents and teachers versus the State Defendants warrants injunctive relief. The First and Fourteenth Amendment rights are core constitutional rights. The state's competing interests are less substantial and light in comparison and must yield. The fourth factor, the public interest, would not be disserved by a permanent injunction. As noted above, this element merges with the third when the government is a party. Together, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019); *Foothill Church v. Watanabe*, 654 F. Supp. 3d 1054, 1058-59 (E.D. Cal. 2023).

## VIII.  CONCLUSION

Parental involvement in essential to the healthy maturation of schoolchildren. California's public school system parental exclusion policies place a communication barrier between parents and teachers. Some parents who do not want such barriers may have the wherewithal to place their children in private schools or homeschool, or to move to a different public school district. Families in middle or lower socio-economic circumstances have no such options. For these parents, the new policy appears to undermine their own constitutional rights while it conflicts with knowledgeable medical opinion. The State Defendants are, in essence, asking this Court to limit, and restrict a

common-sense and legally sound description by the United States Supreme Court of parental rights.  That, this Court will not do.

Although, as stated previously, the State's desire to protect vulnerable children from harassment and discrimination is laudable, the parental exclusion policies create a trifecta of harm: they harm the child who needs parental guidance and possibly mental health intervention to determine if the incongruence is organic or whether it is the result of bullying, peer pressure, or a fleeting impulse.  They harm the parents by depriving them of the long-recognized Fourteenth Amendment right to care, guide, and make health care decisions for their children, and by substantially burdening many parents' First Amendment right to train their children in their sincerely held religious beliefs  And finally, they harm teachers who are compelled to violate the sincerely held beliefs and the parent's rights by forcing them to conceal information they feel is critical for the welfare of their students.

A permanent injunction against announcing, repeating, or enforcing the parental exclusion policies will issue in a separate Order.

Dated:  December 22, 2025

_____

ROGER T. BENITEZ
UNITED STATES DISTRICT JUDGE

23-cv-00768-BEN-WVG