1  ROB BONTA
   Attorney General of California
2  DARRELL W. SPENCE
   Supervising Deputy Attorney General
3  KATHERINE BRUCK (SBN: 342536)
   Deputy Attorney General
4
     455 Golden Gate Avenue, Suite 11000
5    San Francisco, CA 94102
     Telephone:  (415) 229-0125
6    Fax:  (916) 732-7920
     E-mail:  Katherine.Bruck@doj.ca.gov
7  *Attorneys for State Defendants*
8
9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH MIRABELLI, an individual, and LORI ANN WEST, an individual, | Case No. 3:23-cv-00768-BEN-VET |
| | **DECLARATION OF JAMES P. SCHRATZ IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES** |
| Plaintiffs, | |
| v. | |
| MARK OLSON, in his official capacity as President of the EUSD Board of Education, et al., | Date:     March 9, 2026 |
| | Time:     10:30 a.m. |
| Defendants. | Dept:     5A |
| | Judge:    The Honorable Roger T. Benitez |
| | Action Filed:     April 27, 2023 |

– i –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

# TABLE OF CONTENTS

**EXECUTIVE SUMMARY** ......................................................... **1**

**DECLARATION OF JAMES P. SCHRATZ** .................................. **3**

**ADDITIONAL NOTES RE: AUDITS IN GENERAL** ..................... **5**

**SCOPE OF REVIEW** ............................................................... **8**

**AUDIT METHODOLOGY** ......................................................... **9**

**SCOPE OF AUDIT** ................................................................... **9**

**STANDARD OF REVIEW** ......................................................... **10**

**BILLING RECORDS** ............................................................... **12**

**FINDINGS AND OPINIONS** ................................................... **13**

   **I.**    **THE REQUESTED BILLING RATES
     ARE UNSUPPORTED AND UNJUSTIFIED** ............................. **13**

        **A. Not Usual and Customary Rates That Are
          Paid by Clients or Awarded by Courts** ........................... **14**
        **B. There are No Declarations from Other Attorneys** ................ **15**
        **C. The Other Information Provided Is Insufficient** ................. **15**
        **D. The Rate Evidence Required** .......................................... **17**
        **E. Small Law Firm Market Rates** ...................................... **17**
        **F. Reference Rates** ......................................................... **25**
        **G. Reasonable Local Rates** .............................................. **27**

   **II.**    **OVERSTAFFING THE CASE** ........................................ **29**

   **III.**   **DUPLICATIVE ATTENDANCE** ..................................... **31**

   **IV.**   **BILLING FOR EXCESSIVE
      INTRA-OFFICE CONFERENCING** ................................. **36**

   **V.**    **BILLING FOR CLERICAL AND
      ADMINISTRATIVE TASKS** ......................................... **39**

   **VI.**   **BILLING FOR MEDIA MATTERS** ................................ **40**

   **VII.**  **BILLING FOR AMICUS MATTERS** .............................. **41**

   **VIII.** **BILLING USING VAGUE TASK DESCRIPTIONS** ............. **41**

   **IX.**   **BILLING APPARENTLY EXCESSIVE TIME
      FOR DOCUMENTS** ................................................... **43**

– ii –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF STATE DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

X.      THE USE OF A 0.2-HOUR MINIMUM
        BILLING INCREMENT ........................................................ 44

XI.     BLOCK BILLING .................................................................. 46

XII.    THE REQUESTED 1.25 MULTIPLIER
        IS NOT JUSTIFIED .............................................................. 50

XIII.   QUANTIFICATION OF HOURS BILLED
        FOR TITLE VII-RELATED ISSUES ................................. 50

SUMMARY OF FINDINGS .......................................................... 51

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DECLARATION OF J. SCHRATZ IN SUPPORT OF STATE DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

# EXECUTIVE SUMMARY

Plaintiffs' attorneys move for an award of attorneys' fees, asking for a lodestar of $3,641,325.30, in addition to the application of a 1.25 multiplier, for total fees of $4,551,656.63.

My audit of the fee motion found several areas of concern.

First, only one attorney submitted a declaration in support of the fee motion despite the fact that they are seeking fees for 24 timekeepers. The auditor does not understand how that single individual can attest to the manner of recording and accuracy of the billing records of everyone other than himself.

Second, the requested hourly rates are not reasonable for the Southern District of California or San Diego market. Plaintiffs' attorneys have not demonstrated that the rates they are requesting have ever been paid by a client or awarded by a court. They have not provided supporting declarations from other attorneys or any other evidence as to the reasonableness of the requested rates.

Third, the case was overstaffed with at least 24 timekeepers: seven principals, five senior attorneys, six associates, five paralegals, and one law clerk. Thirteen of these timekeepers billed fewer than 50 hours to this case and had minimal involvement with it.

Fourth, Plaintiffs' attorneys frequently had two or three attorneys attending and billing for depositions. It might have been necessary to have two attorneys attend when they were defending their clients, but otherwise this staffing is excessive.

Fifth, there was an excessive amount of intra-office conferencing. Two timekeepers billed over 40 percent of their time in conferencing tasks. Some conferencing is necessary. Excessive conferencing simply inflates the fees.

Sixth, I found billing for clerical or administrative tasks. The billing records reflected times that the timekeepers billed for matters related to invoices, a court reporter, or the clerk of the court on routine issues among other tasks. Clerical and

– 1 –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

1  administrative work is overhead and should not be billed to a client let alone an

2  opposing party.

3       Seventh, Plaintiffs' attorneys billed for preparing press releases and giving

4  media interviews. This time should not be billed to this case.

5       Eighth, Plaintiffs' attorneys billed time for preparing amicus briefs in other

6  cases. This time should not be billed to this case.

7       Ninth, Plaintiffs' timekeepers at times billed using vague task descriptions

8  that did not sufficiently identify the nature of the task to allow the auditor or court

9  to analyze the reasonableness and necessity of those tasks. It should be noted that

10  this is unrelated to the issue of redactions.

11       Tenth, it appeared that excessive time was billed for the preparation of

12  certain documents. I have itemized and quantified the time billed for those

13  documents.

14       Eleventh, there were no 0.1-hour billing entries among the 4,003 billing

15  entries submitted. The minimum billing increment was 0.2-hour, which artificially

16  increased the time billed and fees requested.

17       Twelfth, I identified block billing among some of the timekeepers that again

18  prevented an accurate analysis of the reasonableness and necessity of the time

19  billed for the tasks contained in those entries.

20       Thirteenth, the requested 1.25 multiplier is not warranted.

21

22

23

24

25

26

27

28

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

# DECLARATION OF JAMES P. SCHRATZ

I, JAMES P. SCHRATZ, hereby declare:

1.     I am an attorney at law licensed to practice in the State of California and have been so licensed since 1976. I received my law degree from the University of San Francisco School of Law in June 1976, where I was the Editor-in-Chief of *The Law Review*. In September 1976, I joined the law firm of Heller, Ehrman, White & McAuliffe, where I worked as an associate in its litigation department. It must be emphasized that if the court has any questions about my declaration, I am more than willing to appear at the hearing to answer them. I never want to give the appearance that I am "hiding" from questioning by either opposing counsel or the court and merely relying on the declaration. The purpose of my declaration in all the cases I handle is to hopefully give the court whatever benefit there may be in my 48 years of experience. I have personally reviewed the case billings, deposition transcripts, and other case documents as detailed below. I believe it is imperative to review all available pleadings, depositions, and, where available, arbitration or trial transcripts in order to give a full, fair opinion on the reasonableness of the fees requested and that any opinions that are based on other than such a complete review lack a proper foundation.

2.     In March 1978, I left Heller, Ehrman, White & McAuliffe and joined a smaller firm until August 1980, when I joined Fireman's Fund Insurance Company in San Francisco, California, in its General Counsel's Office. My responsibilities included representing Fireman's Fund as attorney of record in various litigation matters throughout the country. In addition, I supervised outside counsel throughout the country on various types of cases, including many complex civil litigation cases and many employment cases.

3.     In 1984, I left the General Counsel's Office and transferred to the Claims Department where I established the Major Litigation Unit, which was responsible for managing complex litigation throughout the country, including the

– 3 –

$65 million bankruptcy of The Woodson Company. In this role, I was responsible for approximately 1,000 cases and a staff of ten people. I also became very familiar with the rates charged not only by Fireman's Fund "panel counsel," but also rates charged by solo practitioners and small, medium, and large law firms throughout the United States.

4.    In July 1990, I was promoted to Vice President Major Claims, where my duties were expanded to include responsibility for any case throughout the world that had potential exposure of $3 million or more, and responsibility for supervising approximately 100 adjusters. Again, I continued my involvement in supervising cases throughout the United States and stayed abreast of what solo practitioners and small, medium, and large law firms charged their respective clients.

5.    On January 1, 1994, I left Fireman's Fund to establish my own litigation management and consulting firm. I am the principal of Jim Schratz and Associates, a firm that conducts legal fee audits of various law firms throughout the country. Over the past thirty-one years, I have personally supervised or conducted approximately 4,000 legal fee audits throughout the country on behalf of both clients and law firms, including governmental agencies, insurance companies, corporations, and private individuals.

6.    Many of these audits have involved plaintiff's fee requests in fee-shifting cases. In that role, I have performed legal fee audits of various law firms on behalf of the California Department of Justice, the City and County of San Francisco, the City of Huntington Beach, the Sonoma County Sheriff's Office, the State of Wisconsin, United Airlines, and Avis Rent-A-Car, among others. The amount of the fee requests audited ranges from a low of a few hundred thousand dollars to approximately $60 million.

7.    A description of several of the cases in which I have provided expert opinions and/or testimony is attached as **Exhibit 1**.

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'**
**OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

8.    I know of no expert whose opinion is wholly accepted by courts 100 percent of the time. Like most other experts, not all courts have accepted my audit findings. Over the years we have attempted to track all cases that have rejected, in whole or in part, my opinions and it appears that out of approximately 4,000 audits only a few cases have done so.

9.    My analysis of those cases in which the courts have not accepted my audit findings or have criticized aspects of my methodology or credentials is attached as **Exhibit 2**.

10.    If the plaintiffs in this case or anybody else has other cases to add to this list we are more than willing to do so. It is my firm belief that all experts should be fully transparent and inform both the court and all parties involved of all cases which did not accept their opinions. More specifically, I believe all the declarants in a case should provide any and all information concerning any declarations they have filed in the past where the courts have rejected, in whole or in part, their statements. I believe we all owe that to the court and to the opposing party.

### ADDITIONAL NOTES RE: AUDITS IN GENERAL

11.    An audit does not always uncover overbilling. On numerous occasions, I have been retained by a client to audit a legal bill and have informed the client that there is little, if any, overbilling and that the client should pay most, if not all, of the invoice.

12.    For example, previously I have been retained by the California Department of Insurance to audit a number of law firms in connection with numerous matters, including the insolvency of Golden Eagle Insurance Company, which was located in San Diego, California (and was declared insolvent by the California Insurance Commissioner). On a number of these audits, I found that most, if not all, of the fees involved were reasonable and necessary, and recommended to the client that it pay most, if not all, of the fees audited.

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'**
**OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

13.     As a standard practice, I make an offer to all of my clients to review the bills free of charge and arrive at a preliminary opinion as to whether an audit would uncover any overbilling, so as to make an audit cost efficient. I estimate that in approximately 10 to 15 percent of the requests I receive, I suggest to the client that an audit is not cost justified.

14.     On numerous occasions, I have been retained by a law firm engaged in litigation with a client to conduct an audit, and if the audit discloses no overbilling, I testify as an expert witness on behalf of the law firm. The following is a partial list of the law firms that I have audited where the audit disclosed that most, if not all of the fees, were reasonable.

> Sidley & Austin
> Manatt, Phelps & Phillips
> Mower, Koeller, Nebeker, Carlson & Halluck
> Lanahan & Reilley
> Lurie & Zepeda
> Banning, Micklow, Bull & Lopez
> Robles & Castles
> Thelen Reid & Priest
> Stoel Rives
> Robinson & Cole
> LeBoeuf, Lamb, Greene & MacRae
> Husch & Eppenberger
> Parson, Behle & Latimer
> Christiensen Miller Fink Jacobs Glaser Weil & Shapiro, LLP
> Berding & Weil
> Meredith Weinstein & Numbers
> Spector Law Offices
> Epstein Becker and Green
> Pillsbury Winthrup
> Latham and Watkins

15.     The following is a sampling of cases where I have provided deposition and/or trial testimony in support of a law firm's fee request. It is important to emphasize that we use the same legal fee audit methodology whether we are retained by a law firm in support of its fee request or retained by an opposing party in opposition to the fee request. The purpose of the audit is to give an honest, unbiased opinion on the reasonableness of the legal fees.

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

- In *PNY Technologies, Inc. v. Miller, Kaplan, Arase & Co., LLP*, Case No. 3:15-cv-01728-MMC, in the United States District Court, Northern District of California, I testified in support of the national law firm Winston & Strawn's request for fees.

- In *Gen. Charles E. Yeager, Victoria Yeager, Charles E. Yeager Revocable Living Trust, and General Chuck Yeager Foundation v. Don A. Lesser, The Lesser Law Group, and Does 1 through 20, inclusive*, Case No. 34-2011-00109638, in the Superior Court of California, County of Sacramento, I testified in support of the law firm's request for fees.

- In *North Coast Engineering, Inc. v. State Farm General Insurance Company, et al.,* Case No. SCV 243762, in the Superior Court of California, County of Sonoma, I testified in support of a request for fees submitted by the Law Offices of Duncan James.

- In *Victaulic Company v. American Home Assurance Company, et al.,* Case No. RG12642929, in the Superior Court of California, County of Alameda, I testified in support of Pillsbury Winthrop's request for fees.

- In *Sonic Automotive, Inc., v. Chrysler Insurance Company, et al.,* Case No. 1:10CV717, in the United States District Court for the Southern District of Ohio – Western Division, we were retained to audit fees and expenses for over $10 million submitted by the law firms of Hinshaw & Culbertson LLP, Broad & Cassel, James McElroy & Diehl, P.A., and Williams & Connolly LLP. We performed a legal fee audit according to our standard audit methodology.

- In *EDUCAP, Inc. et al., v. Philadelphia Indemnity Insurance Company*, Civil Action No. 1:13-cv-72 LO/IDD, in the United States District Court for the Eastern District of Virginia – Alexandria Division, we were retained to audit $3.9 million in fees for the law firms of Williams & Connolly LLP, Simpson Thacher & Bartlett LLP, Skadden, Arps, Alte, Meagher & Flom LLP, and Jaffe Raitt Heuer & Weiss PC. We performed a legal fee audit according to our standard audit methodology.

16.    I have published approximately 35 articles, many of which involve the control of legal fees and abuses in the billing practices of attorneys. Over the past several years, I have given numerous presentations on legal auditing and controlling legal costs throughout the United States, Canada, and England. I have made a

– 7 –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'**
**OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

number of presentations to various Bar Associations, insurance industry groups, and other organizations, including the American Bar Association, on how to assist the court in analyzing fee requests. I wrote an article on employing legal fee auditors in fee-shifting cases, which was published in *Trial Diplomacy Journal.* I also wrote an article, "How to Win a Fee Petition," which was published in a number of publications including *The Rhode Island Bar Journal*, *The Practical Litigator*, *The Federal Lawyer* and Business Laws, Inc.'s *Law Department Management Adviser*. Among other points, this article listed various "red flags" or questionable billing practices that should be avoided in submitting a fee application.

17.    Attached hereto as **Exhibit 3** is a true and correct copy of my Curriculum Vitae, which lists my work history, my publications, and my general experience.

## SCOPE OF REVIEW

18.    On or around February 6, 2026, I was retained by the State of California through attorney Jennifer Bunshoft, Deputy Attorney General for the State of California, to review the Motion for Attorneys' Fees that was filed by Plaintiff's attorneys on or around February 2, 2026 and to provide an opinion as to the reasonableness and necessity of the requested fees. The motion was filed by LiMandri & Jonna LLP ("LJ") and the Thomas More Society ("TMS"). LJ and TMS represented plaintiffs in this matter.

19.    As part of this audit, I reviewed the following documents related to the fee motion:

- NOTICE OF MOTION AND PLAINTIFFS' MOTION FOR ATTORNEYS' FEES ("Notice")

- MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES ("MPA")

- DECLARATION OF PAUL M. JONNA, ESQ. IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES ("Jonna Declaration" or "Jonna Decl.")

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

1    • [Proposed] ORDER AWARDING ATTORNEYS' FEES

2    20.    Collectively, these documents are referred to as "Plaintiffs' Motion" or

3    "Fee Motion." In addition, I reviewed all available deposition transcripts as well as

4    multiple pleadings as set forth in **Exhibit 4** and conferred with defense counsel

5    regarding this case. In total, I read or reviewed at least 96 documents totaling 9,134

6    pages of case documents.

7    21.    I am not being compensated based upon my "success" at reducing the

8    requested fees.

9    **AUDIT METHODOLOGY**

10    22.    As part of the audit process the billing time records were input into a

11    computer database to allow for comprehensive searching and analysis. The

12    computerized database permitted creation of summary reports of billing by

13    categories of activities. To the best of my information and belief, these reports

14    accurately reflect the information contained in the submitted billing records. Having

15    the records in the computer database also allowed for accurate quantification of

16    various other issues including, but not limited to, those discussed in this

17    declaration. My staff and I analyzed each of the 4,003 billing entries for necessity

18    and reasonableness.

19    **SCOPE OF AUDIT**

20    23.    The starting point in any audit is to determine the lodestar, or the

21    amount being requested. Plaintiffs' Notice states that they are requesting a lodestar

22    of $3,641,325.30 with a 1.25 multiplier, for total fees of $4,551,656.63. (Notice,

23    p. 2:8-9; see also MPA, pp. 3:17-18; 21:28; Jonna Decl., ¶85.) Mr. Jonna's

24    declaration clarifies that the total billed is $4,045,917 but they have taken a

25    voluntary reduction of 10% to account for over-billing, or excessive, redundant, or

26    otherwise unnecessary time, resulting in a lodestar of $3,641,325.30. (Jonna Decl.,

27    ¶ 85.)

28

– 9 –
**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

24.    The auditor's independent calculation of the billing records submitted in the Fee Motion (Jonna Decl., Exhibit 2) identified a 0.20-hour discrepancy in the hours claimed for attorney Peter C. Breen. Plaintiffs' attorney state that he billed 11.4 hours whereas the detailed time records for him total 11.6 hours.

25.    This error on Plaintiffs' attorneys' part does not affect my analysis or opinions. The hours and fee number totals used throughout this report reflect the information provided in the detailed billing records, not the summary table, provided in the motion.

## STANDARD OF REVIEW

26.    Based on my experience as an attorney, client, and legal fee expert, it is my opinion that billing standards have changed over the past 30 years. In the past, many courts and clients were not sensitive to the numerous potential problems caused by block billing, vague entries, or excessive minimum billing increments. However, as academics such as William Ross, a law school professor at Samford University of Birmingham, Alabama and author of The Honest Hour, published in 1996, began to study both the prevalence of such billing practices and their potentially harmful effects, both courts and clients began to pay close attention. In response, the profession of legal fee auditing developed to aid clients and the courts in quantifying those potentially harmful effects. Courts began to look at these expert reports and then developed an increasing body of case law that the legal fee experts used as part of their methodology.

27.    As law firm fees began to be reduced because they were employing these questionable billing practices, law firms began establishing their own internal billing guidelines requiring timekeepers to refrain from such practices. I have personally put on presentations to such law firms. In addition, many law firms instituted Quality Control procedures to assure themselves that such questionable billing practices would not be permitted within the law firm. These Quality Control procedures developed because the law firms realized that certain questionable

– 10 –

1  billing practices such as block billing, vague entries, excessive minimum billing

2  increments, and excessive intra-firm conferencing were within the control of the

3  law firm and to the degree they could be controlled or eliminated the law firm

4  increased its chances of recovering its fees. Many of the more sophisticated law

5  firms even issued their own internal billing guidelines prohibiting such practices.

6      28.    In conducting a legal fee audit, I analyze the invoices and work

7  product generated in light of one of two standards. The first standard is contained in

8  any retainer agreement between the law firm and client, or in billing guidelines or

9  any other instructions provided by the client to the law firm. In addition to looking

10  at such agreement, guidelines, or instructions, I look to established case law for

11  what are acceptable billing practices as the second standard. To the extent there are

12  instructions from the client, State Bar opinions and case law may supplement or

13  even override the instructions. **The case law referenced in this report is not being**

14  **cited for its legal authority, but to establish that there is a foundation for the**

15  **opinions stated herein.** In that way the cases may be analogized to Generally

16  Accepted Accounting Principles, commonly-known as GAAP, which are a

17  collection of commonly-followed accounting rules and standards for financial

18  reporting. I am not aware of any billing guidelines that may be in place in this

19  matter.

20      29.    This case was taken on contingency. In a fee-shifting case such as this,

21  if a jury or court found that the defense prevailed, plaintiffs would not be entitled to

22  any attorneys' fees whatsoever. On the other hand, if a jury or court found that

23  plaintiffs prevailed on the merits of a fee-shifting claim, then they would be entitled

24  to seek to recover their reasonable and necessary attorneys' fees and costs related to

25  those fee-shifting claims from the defendant(s) against whom they prevailed.

26      30.    In the auditor's experience a significant issue related to attorneys' fees

27  in contingency fee matters is that there are no billing guidelines and the firm's

28  billing is not contemporaneously or regularly reviewed by the client. The lack of

– 11 –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'**
**OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

any external oversight can lead to lax internal oversight of billing practices, particularly where billing overages accrue to the benefit of the ones who are billing. This lack of this extra, external incentive to control fees is especially troublesome in light of the magnitude of the fees requested in this case.

31.     The auditor approaches all legal fee audits with the assumption that most attorneys do not intentionally inflate their bills. In this regard, the auditor also believes that attorneys should be given the benefit of the doubt where possible overbilling may have occurred. On the other hand, in those cases where it is difficult to determine the nature and extent of the possible overbilling due to the firms' questionable billing practices, such as block billing or vague entries, it is incumbent upon the law firms, as the moving party, to justify their fees.

### BILLING RECORDS

32.     The auditor views a law firm's billing records as a representation by the law firm that a particular task was performed on a particular day, by a particular timekeeper, and that the timekeeper spent the amount of time stated on the invoice. Billing format or billing practice irregularities that bring into question the credibility, integrity or reliability of a law firm's billing records are not only unacceptable, they are potentially grounds for a significant disallowance of fees.

33.     Attorney Jonna states that LJ uses "an electronic system for recording and managing time entries…." (Jonna Decl., ¶ 9 at p. 6:5-6.) He also states that all LJ time was recorded contemporaneously. (Jonna Decl., ¶ 9 at p. 6:10.)

34.     However, while he can attest to his own recordkeeping practice, he cannot know the timekeeping practice of the 23 other timekeepers with any degree of certainty. While he can state the general office rule for timekeeping, he does not have personal knowledge of each timekeeper's actual practice across all 4,003 billing entries.

35.     In *Muniz v. UPS* (9th Cir. 2013) 738 F.3d 214, 222, the court noted: "Declarations in support of attorney fee awards should be based upon personal

– 12 –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

knowledge. *Mardirossian & Assocs., Inc. v. Ersoff, 153 Cal. App. 4th 257, 62 Cal. Rptr. 3d 665, 674-75* (Cal. Ct. App. 2007)." In *Muniz*, the District Court had accepted the declaration of the supervising attorney as to the time billed by the paralegal in making its fee award. The 9th Circuit held that "[i]n the absence of a more complete explanation from the district court regarding paralegal hours, we cannot conclude that allowing hearsay as the sole justification for an award to Ms. Jaffe [the paralegal] was harmless." *Muniz, supra*, 738 F.3d at 223.

36.    Furthermore, Mr. Jonna has not laid a foundation to be able to state, under penalty of perjury, that [Thomas More] "Society attorney are regularly expected to track their time, and its attorneys' time is accurately reflected on the attached spreadsheet." (Jonna Decl., ¶ 10 at p. 6:13-15.) The same applies to his attestation as to the time of attorneys Grissom, Coughlin, and Professor Gómez-Arostegui. (Jonna Decl., ¶ 10 at p. 6:15-17.)

37.    The burden of proof is initially on the party seeking the fees to justify their fee request and to that extent, other than for attorney Jonna they have failed to show that the time records were made contemporaneously and that it shows work actually done.

**FINDINGS AND OPINIONS**

**I.    THE REQUESTED BILLING RATES ARE UNSUPPORTED AND UNJUSTIFIED.**

38.    I regularly have access to current law firm rates in conducting legal fee audits and auditing law firms' billing invoices. I also regularly review court opinions on attorneys' fee motions and requests and I am familiar with what law firms practicing in San Diego County Superior Court and the United States District Court for the Southern District of California are seeking as hourly rates and what courts are awarding. Based on my experience in having conducted approximately 4,000 legal fee audits, my experience as an attorney and expert in legal fees over the past 46 years, and my review of the above-mentioned material, I have personal

– 13 –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

knowledge of hourly billing rates for attorneys and staff in the San Diego County Superior Court and the United States District Court for the Southern District of California market areas. On that basis, it is my opinion that the billing rates being claimed in Plaintiffs' Motion are unreasonable for the reasons set forth below and that the requested rates should be adjusted. Furthermore, seeking these rates and then asking for a 1.25 multiplier on top of these rates is even more excessive.

### A.  Not Usual and Customary Rates That Are Paid by Clients or Awarded by Courts.

39.     Plaintiffs' attorneys begin the analysis of rates by stating that they "create[] hourly rates" by reviewing what courts have awarded (to other attorneys) and fee charts. (Jonna Decl., ¶ 54.) However, those should not be the initial metrics or data points analyzed. The starting point should be what clients have paid or courts have awarded to these attorneys, excluding outliers.

40.     Two cases cited by Plaintiffs' attorneys in which fees were received were *Burfitt v. Newsom* and *South Bay United Pentecostal Church v. Newsom*. (Jonna Decl., ¶¶ 69-70.) In those cases which involved California's imposition of restrictions on houses of worship during Covid-19 Plaintiffs' attorneys state they negotiated fee settlements with the State of California and County of Los Angeles in 2021 based on rates of $1,150 for Mr. LiMandri, $850 for Mr. Jonna, $600 for Mr. Trissell, and $500-475 for unnamed and unidentified junior associates. (Jonna Decl., ¶ 70.) However, they have not provided any documents confirming these rates.

41.     They also refer to an unidentified matter in which they claim they were awarded $1,260 per hour for Mr. LiMandri and $1,140 for Mr. Jonna. (Jonna Decl., ¶ 81.) However, they provide no information about the matter, the venue of the matter, their role in the matter, whether they represented plaintiffs or defendants, whether the fee request was opposed or stipulated, or any other information about that matter. They also did not provide an exhibit evidencing these rates. Our

– 14 –

1   research has not identified this matter. However, based upon this claimed 2023

2   award, Plaintiffs' attorneys arrived at current rates based upon a 20 percent increase

3   or randomly assigned rates. (Jonna Decl., ¶¶ 82-83.)

4       42.    The claimed rate increases are based on rate increases for the largest

5   law firms in the United States. (Jonna Decl., Exhibit 20, chart on p. 2.) The rate

6   increase for midsized firms is much more modest, coming in at just around six

7   percent. No data is provided for small law firms, but following the trends, the rate

8   increases would be expected to be no more than six percent.

9       **B.    There are No Declarations from Other Attorneys.**

10      43.    Plaintiffs' attorneys typically submit declarations from other counsel

11  in support of a fee request. In this case, they have not done so.

12      **C.    The Other Information Provided is Insufficient.**

13      44.    Plaintiffs' attorneys also refer to the Laffey Matrix (both the original

14  and revised iterations) as well as the Real Rate Report. (Jonna Decl., ¶¶ 55-60.)

15      45.    The Laffey Matrix is a compilation of attorney and paralegal rate data

16  that is designed to provide guidance in appropriate hourly rates for attorneys in the

17  Washington, D.C. area.

18      46.    While some district courts in the 9th Circuit have accepted the Laffey

19  Matrix when calculating attorneys' fees, some do not or they do so with

20  modification for economic differences between the California and Washington,

21  D.C. (See, e.g., *Kempf v. Barrett Business Services, Inc.* (N.D. Cal. Nov. 20, 2007)

22  2007 WL 4167016; *In re Portal Software, Inc. Securities Litigation* (N.D. Cal.

23  Nov. 26, 2007) 2007 WL 417120.)

24      47.    For example:

25      That the Laffey matrix has been accepted in the District of Columbia does
        not mean that it is a sound basis for determining rates elsewhere, let alone in
26      a legal market 3,000 miles away. It is questionable whether the matrix is a
        reliable measure of rates even in Alexandria, Virginia, just across the river
27      from the nation's capital.

28

– 15 –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

1    *Prison Legal News v. Schwarzenegger* (9th Cir. 2010) 608 F.3d 446, 454; see

2    also *Fitzgerald v. Law Office of Curtis O. Barnes* (E.D. Cal. Apr. 15, 2013) No.

3    1:12–CV–00071–LJO–GAS, 2013 WL 1627740, at *3, findings and

4    recommendation adopted, (E.D. Cal. May 6, 2013) 2013 WL 1896273 [concluding

5    that the Laffey Matrix is "irrelevant to determining reasonable hourly rates for"

6    counsel in the Eastern District of California].)

7        48.    The Laffey Matrix also fails to account for differences in hourly rates

8    depending on the area of practice or size of the firm. An intellectual property

9    attorney does not bill at the same rate as a personal injury attorney or employment

10   law attorney.

11       49.    A Central District Court has noted: "The Ninth Circuit has implicitly

12   disapproved using the Laffey Matrix to show the prevailing rate in communities

13   outside the District of Columbia area." (*Montes v. Duran* (C.D. Cal. Aug. 3, 2021)

14   No. 2:20–cv–00468–MCS–RAO, 2021 U.S. Dist. LEXIS 156657, at *7, citing

15   *Roberts v. City and Cty. Of Honolulu* (9th Cir. 2019) 938 F.3d 1020, 1024). A true

16   and correct copy of this opinion is attached hereto as **Exhibit 5** and incorporated

17   herein by this reference.

18       50.    Likewise, "[I]t is unsettled in the Ninth Circuit whether the *Laffey*

19   matrix is a relevant basis for assessing the reasonableness of attorney's fees outside

20   of the District of Columbia. (*Intl Bhd. of Teamsters, Local 396 v. NASA Servs.*

21   (C.D. Cal. Mar. 6, 2019) No. 2:18–cv–03681–SVW–E, 2019 U.S.Dist. LEXIS

22   123669, at *11, fn. 1, citing *Prison Legal News v. Schwarzenegger* (9th Cir. 2010)

23   608 F.3d 446, 454.) A true and correct copy of this opinion is attached hereto as

24   **Exhibit 6** and incorporated herein by this reference.

25       51.    Some California state courts do reference the Laffey Matrix in

26   considering fee motions, but I believe that for the foregoing reasons, the *Laffey*

27   *Matrix* is of limited, if any, value as a reference point for what San Diego County or

28   Southern District billing rates should be.

– 16 –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'**
**OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

52.    At the end of their five-paragraph argument related to the Laffey Matrix, Plaintiffs' attorneys basically conclude, "never mind," when they argue "the matrices need to be compared against actual rates in the forum." (Jonna Decl., ¶ 59 at p. 22:12.)

53.    Plaintiffs' attorneys also refer to the Real Rate Report. (Jonna Decl., ¶ 60.) I have at various times referred to the Real Rate Report and found it to be a useful data point in certain circumstances. However, as noted by Plaintiffs' Attorney, their data on San Diego rates is very broad and I believe to be of little use here.

**D.    The Rate Evidence Required.**

54.    The fee applicant must "produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community." (*Dang v. Cross* (9th Cir. 2005) 422 F.3d 800, 814.)

55.    In my opinion, Plaintiffs' attorneys have not submitted evidence that would support the reasonableness of the hourly rates sought.

**E.    Small Law Firm Market Rates.**

56.    I want to start by attempting to clearly state what I am ***not*** saying in my opinion in this section. By saying that small law firm billing rates are usually and generally lower than large law firm billing rates, I am not saying that attorneys at smaller law firms are de facto less experienced or capable than attorneys at larger law firms. I am not saying that attorneys at smaller law firms necessarily provide a lower quality level of service than attorneys at larger law firms. I am not saying that attorneys at smaller law firms always have a worse reputation than attorneys at larger law firms. I am not saying that attorneys at smaller law firms automatically deserve a lower hourly rate than attorneys at larger law firms do.

57.    What I ***am*** presenting is economic reality, grounded in multiple independent reviews (i.e., not just by me or other legal fee experts) of multi-billions of dollars in legal billing, recorded around the entire country, by attorneys

– 17 –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

practicing in a variety of areas, and unambiguously reported by media focusing on the practice of law that the larger the law firm, the more they can command in the way of billing rates.

58.    Despite what some have claimed, this is not a settled matter as the Ninth Circuit has yet to issue an opinion in a case dealing with this very issue. (*L.A. International Corp., et al. v. Prestige Brands Holdings, Inc., et al.*, Case No. 24-3776) If a lawyer at a small law firm provides evidence that clients pay the high rates they are requesting in a fee motion, that would be a valid factor in seeking to determine a reasonable billing rate. However, it is my opinion that many of the awards currently being made to smaller law firms are the consequence of an unconscious anchoring effect. If one court or arbitrator decides that a small law firm should be awarded rates that are 10, 20, or more percent higher in a case than in their previous fee award, the rates in that new fee award, rather than being recognized as outliers, become the floor for any future fee award. Future courts and tribunals may find it difficult to award rates lower than what is rightfully or wrongfully considered the newly-established floor for one reason or another.

59.    On November 4, 2025, Brightflag, a legal e-billing and matter management company, reported on 2025 law firm billing rate increases. A copy of this article is attached as **Exhibit 7**. They listed the three biggest factors in law firm billing rates. The factor they listed first was "Firm Size." (See Exhibit 7, p. 2.) They stated:

> The size of the firm you engage in indicates their market power and their ability to command higher rates. The top 50 firms in the US, for instance, charge double the rates of their peers lower down the Am Law ® 100 list. These high-grossing, large law firms attract some of the best lawyers in the world, but you're paying for both the expertise and the brand.

60.    On January 29, 2025, jdjournal.com reported on Wells Fargo's Legal Specialty Group's Year-End 2024 survey. A copy of this article is attached as **Exhibit 8**. In the section on Billing Rate Growth, the author said: "This trend [of the largest law firms increasing their billing rates more than mid and smaller law

– 18 –

firms] indicates that top-tier firms have greater pricing power, allowing them to command higher rates ….."

61.     Brightflag's <u>Hourly Rates in Am Law 100® Firms: Increases and Key Drivers</u> reported on this same fact upon review of the Am Law 100® firms. A copy of this report is attached as **Exhibit 9**.

62.     Page 7 of this report graphs out the differences in billing rates between the various size tiers of law firms. The difference in billing rates by firm size is readily apparent.



63.     The LexisNexis CounselLink 2024 Trends Report reported on insights based on data derived from over $59 billion in legal spending, billed by nearly 460,000 timekeepers, involved in more than 1.6 million matters. A copy of this article is attached as **Exhibit 10**. On page 20 of the report, they stated: "The size of a law firm is highly correlated to the rates billed by its lawyers."

64.     On April 23, 2024, law.com published an article titled: "Largest Firms Continue Growing Market Share, as Hourly Rates Break Records." The author

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

stated: "At 61%, the difference in 2023 between the median partner billing rates at firms with more than 750 lawyers and that of the next size tier has never been wider in the 11 years that CounselLink has publicly tracked such data."

65.    The June 2022 <u>Enterprise Legal Management Trends Report: Insight into 7 Key Metrics</u> was published by LexisNexis CounselLink®. Based on their analysis of $49 billion in legal spending, they found an undisputable partner hourly rate difference by law firm size:

> This shows that the median partner rate at the largest (750+ attorneys) law firms is $895 while the median partner rate at the smaller law firms (<50) is $300.

A copy of this report is attached as **Exhibit 11**.

66.    In 2020, abovethelaw.com posted an article titled: "The Bigger The Biglaw Firm, The Bigger The Billing Rate." A copy of the July 14, 2020 article is attached as **Exhibit 12**. The lead line to the article stated: "According to CounselLink's 2020 Enterprise Legal Management Trends Report, the more attorneys that are employed at a firm, the more money that firm in [sic] able to command in its average billing rates." The article went on to quote Kris Satkunas, director of strategic consulting at LexisNexis CounselLink and the report's author. Ms. Satkunas is quoted as saying: "I don't think people realize how strong the correlation is between the size of the firm and the rates."

67.    The significance of law firm size was confirmed as early as 2016 by the 2016 Real Rate Report:

> **Law Firm Size Has the Largest Impact on Hourly Rates**
>
> Of the more than 350 factors we tested, our analysis confirmed that law firm size was the largest driver of law firm rates. Regardless of the market location or type of work performed, larger firms consistently charged higher rates. These data suggest that larger law firms have been more successful not only in promoting an integrated "one-stop-shop" value proposition but also in obtaining a greater share of large matters. Location (especially in New York or Washington, DC), years of experience, and the designation as a partner also heavily impacted a lawyer's hourly rate.

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

A copy of the first several pages of the 2016 Real Rate Report is attached as **Exhibit 13** (see page 6, column 2). The 2024 Real Rate Report also affirms this on page 5: "Firm size -The rates can increase if the firm is large and has various timekeeper roles at the firm. For example, the cost to work with an associate or partner at a larger firm will be higher compared to a firm that has one to two associates and a paralegal.") (A copy of the first several pages of the 2024 Real Rate Report is attached as **Exhibit 14**.)

68.    I have here provided ten years' worth of data and reporting that supports my reporting of the facts and forms the basis of my opinion on this issue. While awaiting the Ninth Circuit's decision in the *Prestige Brands Holding* case, other courts have already ruled, either as a holding or in dicta, that law firm size can affect the billing rates awarded.

69.    In *Greene v. City of New York* (S.D.N.Y. October 25, 2013) 2013 U.S. Dist. LEXIS 154342, the court noted that the size of the law firm was a significant factor in determining reasonable rates. The *Greene* court noted: "[T]he fact is that the large firms listed on the [National Law Journal] survey have acquired a reputation that allows them to command high rates in the market. Many other firms, in particular smaller firms that may be providing equally capable services, simply do not command anywhere near such rates …." (*Greene v. City of New York* (S.D.N.Y. October 25, 2013) 2013 U.S. Dist. LEXIS 154342, *14, fn. 44.) A copy of the *Greene* case is attached as **Exhibit 15**.

70.    The Ninth Circuit provides that "rates should be established by reference to the fees that private attorneys of an ability and reputation comparable to that of prevailing counsel charge their paying clients for legal work of similar complexity." (*Davis v. City of San Francisco* (9th Cir. 1992) 976 F. 2d 1536, 1545.)

71.    In applying the Ninth Circuit standard for lodestar rates, the Central District of California recognized that the size of a firm can be taken into consideration when determining rates for lawyers of comparable ability and

– 21 –

reputation. (*Common Cause v. Jones* (C.D. Cal. 2002) 235 F. Supp.2d 1076, 1081-1082.) In *Jones*, when evaluating whether plaintiff's request for current rates was reasonable to establish the lodestar, the Court compared firms of similar size and reputation. (See also the Ruling on Submitted Matters: Motion to Tax Costs and Motion for Attorneys' Fees in *Streisand v. Adelman*, Los Angeles County Superior Court Case No. SC 077 257, filed May 10, 2004, p. 4.) A true and correct copy of this Ruling is attached hereto as **Exhibit 16** and incorporated herein by this reference.

72.    The "court should look to fees charged by attorneys COMPARABLY SITUATED to those representing the movant. Thus, if the movant is represented by a small or medium-size firm, the appropriate rates are those typically charged by such firms, whereas a movant may obtain higher compensable rates if represented by a large urban firm …." (*Algie v. RCA Global Communications* (S.D.N.Y. 1994) 891 F. Supp. 875, 895 (emphasis added), citing *Chambless v. Masters, Mates & Pilots Pension Plan* (2nd Cir. 1989) 885 F.2d 1053, 1058-59; *Jennette v. City of New York* (S.D.N.Y. 1992) 800 F. Supp. 1165, 1169; *Williams v. City of New York* (S.D.N.Y. 1990) 728 F. Supp. 1067, 1071; see also *Swisher v. U.S.* (D. Kan. 2003) 262 F. Supp.2d 1203, 1214.)

73.    I am aware of at least one other federal district court case (from the Second Circuit) that held that in awarding fees in a fee-shifting case, the hourly rates awarded must reflect the size of the law firm involved. This case, *Bick v. City of New York* (S.D.N.Y. April 21, 1998) (95 Civ. 8781), 1998 U.S. Dist. LEXIS 5543, 1998 WL 190283, is an unpublished opinion by the U.S. District Court for the Southern District of New York. Notwithstanding being an unpublished opinion, *Bick* has been cited in other decisions, both reported and unreported, in the Second Circuit since 1998, e.g., *Shannon v. Fireman's Fund Insurance Co.* (S.D.N.Y. June 7, 2001) 2001 U.S. Dist. LEXIS 7452 [age discrimination case; district court

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

focused on hourly rates for seasoned civil rights litigators at small to midsize law firms in New York].

74.    *Bick* follows the judicial reasoning in a reported decision by the Second Circuit Court of Appeals, *Chambless v. Masters, Mates & Pilots Pension Plan* (2d. Cir. 1989) 885 F.2d 1053, 1058-59, cert. denied (1990) 496 U.S. 905, 110 L.Ed. 2d 268 [110 S.Ct. 2587] (district court not required to assign the same hourly rate to every law firm in the same city, since several market rates may prevail in a large and diverse legal community such as New York City; lodestar rate can be calculated by specific reference to small-to-midsize firms).[1]

---

[1] Multiple other Courts have reached the same conclusion. "The Court sets Snitow's and Epstein's hourly rate at $275. This rate reflects both partners' years of litigation experience (at least 25 years apiece). See, e.g., Expeditors Int'l of Wash., Inc. v. Rubie's Costume Co., Inc., No. 03-CV-3333, 2007 U.S. Dist. LEXIS 7692, at *6 (E.D.N.Y. Feb. 2, 2007) (taking a partner's 25 years of commercial litigation experience into account in setting an hourly rate). This rate also reflects SKHM's small size (10 to 12 attorneys). (See Epstein Decl. at 2; see also Chambless, 885 F.2d at 1058-59 (affirming an award of attorneys' fees where the district court set the hourly rates by reference to small to medium-sized firms and suggesting that "smaller firms may be subject to their own prevailing market rate"); Vilkhu v. City of New York, 06-CV-2095, 2009 U.S. Dist. LEXIS 73696, at *9 (E.D.N.Y. June 25, 2009) ("The size of the firm may also be considered as a factor in determining the hourly rate, 'primarily due to varying overhead costs.'" (quoting Cioffi v. N.Y. Cmty. Bank, 465 F. Supp. 2d 202, 219 (E.D.N.Y. 2006)))).)" GuideOne Specialty Mutual Ins. v. Con. Adas Yereim, 1:04-cv-5300 (ENV) (JO), at *7-8 (E.D.N.Y. Sep. 29, 2009); "The size of the firm may affect a court's determination of a reasonable fee "since a smaller firm does not have the same overhead costs as a larger firm and, thus, should have a lower rate." Levy v. Powell, No. 00-CV-4499, 2005 WL 1719972, at *9 (E.D.N.Y. Jul. 22, 2005) (citing Murray ex rel. Murray v. Mills, 354 F. Supp. 2d 231, 241 (E.D.N.Y. 2005)); Green v. City of New York, No. 05-CV-429, 2009 WL 3088419, at *3 (E.D.N.Y. Feb. 13, 2009); Cioffi v. N.Y. Cmty. Bank, 465 F. Supp. 2d 202, 219 (E.D.N.Y. 2006) (finding that rates are lower for solo practitioners)." Wong v. Yoo, 04-CV-4569 (JBW) (ALC), at *3 (E.D.N.Y. Oct. 19, 2010); "the size and caliber of a firm may also be considered when determining a reasonable hourly rate, "primarily due to varying overhead costs." Cioffi v. New York Cmty. Bank, 465 F. Supp. 2d 202, 219 (E.D.N.Y. 2006) (citations omitted); (Continued…)

– 23 –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

75.    Large law firms spend a considerable amount of time and money marketing their services to establish "brand identification," so that potential clients will think of the law firm when they seek legal services. For example, Orrick, Herrington & Sutcliffe, a large firm in San Francisco, spends considerable resources to establish an identity as specialists in municipal bonds. In the auditor's experience, clients of larger firms are often drawn by this brand identification and specialization and price is not the major factor. By contrast, small law firms and solo practitioners do not devote large resources to marketing, and, therefore, their potential clients are much more price sensitive, and their overhead more limited.

76.    Both of Plaintiffs' law firms are small firms. In my opinion and experience, and based upon the analysis of billions of dollars of legal billing referenced above, small firms do not charge hourly rates in the same range as larger law firms, because a large law firm's client base consists mainly of large corporate clients who are more willing and more able to pay the higher rates of firms who specialize in large complex litigation matters and who charge for, among other items, higher overhead costs. It is important to emphasize that I am not giving an

---

Lukaszuk v. Sudeen, No. CV 02-5143, 2007 U.S. Dist. LEXIS 95919, at *35 (E.D.N.Y. Nov. 27, 2007) ("[C]ourts typically recognize that the size and caliber of a firm will influence the determination of appropriate billing rates.") (citing cases)." *Olsen v. County of Nassau*, CV 05-3623 (ETB), at *5 (E.D.N.Y. Jan. 26, 2010); "Although courts in this district have awarded attorneys fees based on rates as high as those requested by the Plaintiff, such rates are usually reserved for attorneys in larger law firms. Courts have recognized that the size of the firm representing a plaintiff seeking attorney's fees is a factor in determining a reasonable attorney's fee, largely because of overhead costs.; *Algie v. RCA Global Communication, Inc.*, 891 F. Supp. 875, 895 (S.D.N.Y. 1994) ("If the movant is represented by a small or medium-size firm, the appropriate rates are those typically charged by such firms, whereas a movant may obtain higher compensable rates if represented by a large urban firm, since such firms typically charge more per hour to cover a higher overhead."), aff'd, 60 F.3d 956 (2d Cir. 1995)." *Tlacoapa v. Carregal*, 386 F. Supp. 2d 362, 369-70 (S.D.N.Y. 2005).

– 24 –

1    opinion that an attorney's self-worth or quality of work depends on the size of the

2    law firm. Rather I am simply stating a basic fact of the market forces that small firm

3    rates are less than larger firms' rates, which should be taken into consideration

4    when determining reasonable rates.

5          77.    The Ninth Circuit provides that "rates should be established by

6    reference to the fees that private attorneys of an ability and reputation comparable

7    to that of prevailing counsel charge their paying clients for legal work of similar

8    complexity." (*Davis v. City of San Francisco* (9th Cir. 1992) 976 F. 2d 1536, 1545.)

9          **F.    Reference Rates.**

10          78.    My research has found several cases in which Plaintiffs' attorneys

11    have requested or been awarded various rates, all significantly lower than the rates

12    they are requesting here.

13          79.    In *Cox v. Renfree* (USDC SD Cal., Aug. 19, 2021), Case No. 3:21-cv-

14    01341-CAB-LL, Document 13-2, LiMandri and Jonna filed a motion for attorneys'

15    fees. In that 42 U.S.C. § 1988 case, they asked for the following hourly rates:

16          Charles LiMandri (38 years)        $914
            Paul Jonna (12 years)             $759
17          Mark Myers (18 years)             $759
            Jeffrey Trissell (8 years)        $600
18          Milan Brandon II (4 years)        $378

19    A true and correct copy of Mr. Jonna's declaration in that case is attached as

20    **Exhibit 17**. The motion for fees was denied. However, the declaration provides a

21    reference point.

22          80.    In 2022, in *Gadinis v. USAA* (San Diego County Superior Court, Case

23    No. 37-2018-0015334-CU-UM-CTL), I was retained to perform a *Brandt* analysis

24    of fees claimed by LiMandri & Jonna and another law firm. The following were the

25    rates *claimed* in that matter:

26          Charles LiMandri            $600-700
            Mark D. Myers              $550
27          Paul Jonna                 $450-600
            Milan Brandon II           $350-400
28          Jeffrey Trissell           $350

– 25 –
**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

Law Clerks                                $200

A true and correct copy of a document produced by the attorneys in that case setting

forth the above rates is attached as **Exhibit 18**.

81.    In *Harrison v. Roman Catholic Faithful, Inc., et al.* (Kern County

Superior Court Case No. BCV-19-102204), on March 3, 2023 the Court awarded

fees at the following hourly rates:

| | |
|---|---|
| Charles LiMandri | $573.50 |
| Paul Jonna | $425.00 |
| Jeffrey Trissell | $340.00 |
| Milan Brandon II | $297.50 |
| Clerks | $175.00 |
| Paralegals | $125.00 |

A true and correct copy of the disposition page of the minute order in that case is

attached as **Exhibit 19**.

82.    Plaintiffs' attorneys in this case cite to this Court's order in *Garnier v.*

*Poway Unified School District*. (Jonna Decl., Exhibit 7.) In that order, issued just

four months ago, the court noted that the moving attorneys in that case cited to

"numerous Southern District of California fee orders" as evidence of prevailing

market rates. (*Garnier*, *9.) The cases cited included:

*Dunsmore v. San Diego County Sheriff's Dept.* (Aug. 8, 2025)

| | |
|---|---|
| 17-year attorney | $975 |
| 19-year attorney | $900 |

*Bloom v. City of San Diego* (Oct. 15, 2024)

| | |
|---|---|
| 25-year attorney | $990-1,250 |
| 18-year attorney | $1,200 |
| Paralegals | $280-390 |

*Herring v. Maddow* (2021)

| | |
|---|---|
| 30+ year attorney | $1,050-1,150 |
| Senior Associate | $720 |
| Paralegals | $265-280 |

83.    After reviewing the information, the *Garnier* court awarded lead

counsel Mr. Briggs, who had 30 years of experience focusing on civil rights and

– 26 –

First Amendment litigation, $925 per hour because he "possesse[d] specialized expertise that justifies higher rates." (*Id.*) Paralegals were awarded fees at $175 per hour. (*Garnier*, *10.)

G.    **Reasonable Local Rates.**

84.    It is my opinion that Plaintiffs' attorneys have not *demonstrated* the rates being sought in this matter are reasonable and appropriate market rates for them for the practice area by small-sized law firms in this community.

85.    Based upon the one evidenced fee award to Plaintiff's attorneys, the reference rates I cite, and this Court's own analysis in *Garnier v. Poway Unified School District*, it is my opinion that the requested rates are unsupported and unreasonable.

86.    Starting with Mr. LiMandri who is the attorney with most years of experience in this case, in 2021 in *Cox v. Renfree*, a Civil Rights case, his stated hourly rate was $914. Allowing for a four percent per year increase, which is a reasonable annual rate increase for small law firms, his current rate would be:

| | |
|------|--------|
| 2021 | $914 |
| 2022 | $951 |
| 2023 | $989 |
| 2024 | $1,028 |
| 2025 | $1,069 |

87.    Starting with Mr. LiMandri's recommended rate, I have adjusted the other timekeepers' rates to be relatively proportionate.

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

88.    The recommended rates for 11 of the 24 timekeepers are as follows:

| Timekeeper | Title | Bar Admit | Years of Exp. | Requested Rate | Recommended Rate |
|---|---|---|---|---|---|
| Charles S. LiMandri | Principal | 1983 | 42 | $1,512 | $1,069 |
| Frank J. Coughlin | Principal | 1993 | 32 | $1,050 | $925 |
| Norman D. Grissom | Principal | 2005 | 20 | $1,050 | $800 |
| Paul M. Jonna | Principal | 2009 | 16 | $1,368 | $800 |
| Mark D. Myers | Senior Attorney | 2001 | 24 | $1,278 | $800 |
| Jeffrey M. Trissell | Associate | 2013 | 12 | $1,050 | $625 |
| Milan L. Brandon | Associate | 2016 | 9 | $840 | $550 |
| William T. Duke | Associate | 2024 | 1 | $450 | $300 |
| Matthew Zavaro | Law Clerk | | | $300 | $175 |
| Kathy Denworth | Paralegal | | | $240 | $175 |
| Robert Muldowny | Paralegal | | | $240 | $175 |

89.    I have recommended a rate of $800 for attorneys Grissom, Jonna, and Myers even though they have 20, 16, and 24 years of experience because Mr. Jonna was essentially lead counsel for Plaintiffs in this matter. Although he has four fewer

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

1  years of experience than Mr. Grissom does, the increased recommended rate is to

2  acknowledge his leading role in this case. I have recommended that Mr. Myers also

3  have an $800 rate because although he has more years of experience than either

4  Mr. Grissom or Mr. Jonna, he is only a Senior Attorney and not a principal in

5  addition to the fact that he billed less than 100 hours to this case.

6      90.    The reason I have not opined on recommended rates for the remaining

7  13 timekeepers is explained in the following section.

8      91.    I next address issues I identified in the billing records.

9  **II.    OVERSTAFFING THE CASE.**

10     92.    24 timekeepers billed to this case on Plaintiffs' behalf: seven

11 principals, five senior attorneys, six associates, five paralegals, and one law clerk.

12     93.    Overstaffing a case presents a strong potential for overbilling by virtue

13 of the fact that these temporary staff effectively rotate through a matter, requiring

14 orientation time and effort from both orientor and orientee that does not accrue to

15 the long-term benefit of the matter or perform discrete work that is duplicated or

16 redone by another timekeeper. See *In re Maruko, Inc.*, 160 B.R. 633, 640 (Bankr.

17 S.D. Cal. 1993); (With such billers, "it is difficult to appreciate how [their] limited

18 involvement … could have given [them] an appreciation sufficient to be helpful in

19 the matter.") Overstaffing also typically results in the supervising attorney not

20 being able to properly supervise the other timekeepers and their work. In *Hensley*

21 *v. Eckerhart* (1983) 103 S.Ct. 1933, the United States Supreme Court stated that in

22 staffing cases, counsel is required to exercise "billing judgment," which means

23 exercising judgment to adjust or write down fees and/or expenses incurred when the

24 fees would be excessive, duplicative, or unnecessary.

25     94.    Overstaffing can also happen when multiple attorneys, each of whom

26 could (and should) handle an aspect of the case by themselves, all work on a

27 particular task whether it be research or briefing.

28

– 29 –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'**
**OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

95.     Courts have routinely reduced fee requests based on overstaffing. For example, in *Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1326, the Court of Appeal left the trial court's assessment that the matter was overstaffed alone to the discretion of the trial court and affirmed the reduction in fees for the overstaffing as well as for the overall fee award.

96.     In *Yeskin v. Pacific Mercantile Bank*, Case No. G045361 (4th Dist., Div. 3 Oct. 5, 2012) (unpublished), the Court of Appeal affirmed the fee awards, which were based, in part, on the trial judge finding the requested fees to be excessive, based on overstaffing, and driven by over analysis of the litigation by Bank's counsel.

97.     In *Kronfeld v. Transworld Airlines, Inc.,* 129 F.R.D. 598, 602 (S.D.N.Y. 1990), a class action wherein fees were awarded, the court had to determine the lodestar and adjustment thereof for "overstaffing and other forms of duplicative or inefficient work … In addition, a court must analyze the tasks entrusted to various lawyers to ensure that they were performed by individuals with appropriate skills and experience. Partners should not perform duties that could as readily be performed by associates, and associates should not do paralegal work." (Citation omitted).  See also *Lochren v. County of Suffolk,* 344 Fed. Appx. 706, 709 (2nd Cir. 2009) (court did not err in applying 25% across-the-board reduction in fees to compensate for overstaffing and needless duplication).

98.     I identified 13 timekeepers who billed fewer than 50 hours in total to this case. These timekeepers accounted for 5.4 percent of the total lodestar hours and 4.0 percent of the total lodestar fees. I recommend that the time for these 13 timekeepers not be considered in making any fee award.

99.     My recommended adjustment based on the overstaffing is set forth in the section titled "SUMMARY" at the end of this declaration.

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

### III.   DUPLICATIVE ATTENDANCE.

100.   Duplicative attendance at depositions is rarely warranted as only one attorney should take the lead in questioning or defending the witness and the other timekeepers in attendance typically do little, if anything, of substantive benefit to the client or case. However, in this case, duplicative (or greater) attendance at depositions appeared to be the norm for Plaintiffs' Attorneys.

101.   I identified the following instances of multiple attendance at depositions:

| 1/7/25 | JMT | Participate in client Lori West's deposition. | 3.00 |
|--------|-----|------------------------------------------------|------|
| 1/7/25 | JMT | Participate in client Elizabeth Mirabelli's deposition. | 3.00 |
| 1/7/25 | PMJ | Defend the deposition of client Lori West. | 3.00 |
| 1/7/25 | PMJ | Defend the deposition of client Elizabeth Mirabelli. | 3.60 |
| 1/8/25 | JMT | Prepare for and participate in Jane Boe deposition. | 1.80 |
| 1/8/25 | JMT | Prepare for and participate in Jane Roe deposition. | 3.60 |
| 1/8/25 | PMJ | Attend/defend the deposition of Jane Boe. | 2.00 |
| 1/8/25 | PMJ | Attend deposition of Jane Roe; Discuss * with client; Interview with * regarding case. | 4.40 |
| 1/15/25 | JMT | Participate in Jane Poe's deposition. | 3.00 |
| 1/15/25 | PMJ | Prepare for and attend Jane Poe's deposition. | 3.20 |
| 1/15/25 | PMJ | Attend the deposition of Jane Poe; Prepare for "person most knowledgeable" deposition of Clovis Unified School District. | 3.20 |
| 1/17/25 | BMM | Participate in preparation and taking of the deposition of "person most knowledgeable" Marc Hammack for Clovis Unified School District. | 4.60 |
| 1/17/25 | JMT | Prepare for and participate in deposition of "person most knowledgeable" for Clovis Unified School District. | 4.60 |

– 31 –
**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

| | | | | |
|---|---|---|---|---|
| 1/17/25 | PMJ | Attend deposition of "person most knowledgeable" for Clovis Unified School District; Discuss same with client. | | 5.20 |
| 2/12/25 | JMT | Prepare for and participate in depositions of Katie Terrill and Kathleen Barlow; Draft outline for CDE "person most knowledgeable" deposition. | | 8.40 |
| 2/12/25 | PMJ | Take deposition of Katie Terrill. | | 3.00 |
| 2/12/25 | PMJ | Take deposition of Kathleen Barlow. | | 2.80 |
| 3/7/25 | JMT | Participate in deposition of the Attorney General "person most knowledgeable." | | 5.80 |
| 3/7/25 | PMJ | Take deposition of Attorney General's "person most knowledgeable." | | 5.80 |
| 3/27/25 | JMT | Prepare for and participate in CDE deposition. | | 4.00 |
| 3/27/25 | PMJ | Take deposition of CDE. | | 2.00 |
| 5/28/25 | JMM | Attend deposition of expert Dr. Szajnberg. | | 4.40 |
| 5/28/25 | JMT | Prepare for and participate in deposition of expert Dr. Szajnberg. | | 4.60 |
| 5/28/25 | PMJ | Defend deposition of expert Dr. Szajnberg. | | 7.00 |
| 5/30/25 | JMM | Attend deposition of expert Dr. Anderson. | | 4.80 |
| 5/30/25 | JMT | Prepare for and participate in deposition of expert Dr. Anderson. | | 5.00 |
| 5/30/25 | PMJ | Defend deposition of expert Dr. Anderson. | | 4.80 |
| 6/3/25 | JMM | Attend deposition of the defense expert Dr. Brady. | | 7.40 |
| 6/3/25 | JMT | Prepare for and participate in defense expert Dr. Christine Brady's deposition. | | 7.40 |
| 6/3/25 | PMJ | Take afternoon session of the deposition of defense expert Dr. Brady. | | 3.00 |
| 6/3/25 | PMJ | Take morning session of the deposition of defense expert Dr. Brady. | | 4.60 |
| 6/3/25 | WTD | Attend and assist Mr. Jonna and Mr. Trissell with Zoom deposition of defense expert Dr. Brady; Conference with Mr. Jonna and Mr. Trissell regarding same. | | 1.80 |
| 6/6/25 | BMM | Attend deposition of defense expert Darlene Tando. | | 1.80 |
| 6/6/25 | JMM | Attend deposition of defense expert Darlene Tando. | | 7.60 |

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

| 6/6/25 | PMJ | Take the morning session of the deposition of defense expert Darlene Tando; Debrief regarding same. | 3.40 |
|--------|-----|-------|------|
| 6/6/25 | PMJ | Take afternoon session of the deposition of defense expert Darlene Tando. | 4.40 |
| 6/6/25 | WTD | Attend and assist Mr. Jonna and Mr. Trissell in the deposition of defense expert Darlene Tando. | 1.40 |

102.    I noted some issues with the above billing records.

103.    Mr. Jonna appears to have double-billed the January 15, 2025 deposition of Jane Poe:

| 1/15/25 | PMJ | Prepare for and attend Jane Poe's deposition. | 3.20 |
|---------|-----|------|------|
| 1/15/25 | PMJ | Attend the deposition of Jane Poe; Prepare for "person most knowledgeable" deposition of Clovis Unified School District. | 3.20 |

104.    Mr. Trissell billed for attending Jane Poe's January 15, 2025 deposition, but he does not appear on the appearances page of the deposition transcript:

| 1/15/25 | JMT | Participate in Jane Poe's deposition. | 3.00 |
|---------|-----|------|------|

105.    The two February 12, 2025 depositions were billed by Mr. Jonna and Mr. Trissell:

| 2/12/25 | JMT | Prepare for and participate in depositions of Katie Terrill and Kathleen Barlow; Draft outline for CDE "person most knowledgeable" deposition. | 8.40 |
|---------|-----|------|------|
| 2/12/25 | PMJ | Take deposition of Katie Terrill. | 3.00 |
| 2/12/25 | PMJ | Take deposition of Kathleen Barlow. | 2.80 |

106.    However, Mr. Trissell does not appear on the appearances page of the deposition transcripts.

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

107.    Mr. Jonna and Mr. Trissell both billed for the CDE deposition on March 27, 2025:

| 3/27/25 | JMT | Prepare for and participate in CDE deposition. | 4.00 |
|---------|-----|-----|------|
| 3/27/25 | PMJ | Take deposition of CDE. | 2.00 |

108.    However, Mr. Trissell does not appear on the appearances page of the deposition transcript.

109.    Three timekeepers billed to attend the deposition of Dr. Szajnberg on May 28, 2025:

| 5/28/25 | JMM | Attend deposition of expert Dr. Szajnberg. | 4.40 |
|---------|-----|-----|------|
| 5/28/25 | JMT | Prepare for and participate in deposition of expert Dr. Szajnberg. | 4.60 |
| 5/28/25 | PMJ | Defend deposition of expert Dr. Szajnberg. | 7.00 |

110.    Ms. Mannix (JMM) does not appear on the appearances page of the deposition transcript and her time has already been adjusted due to overstaffing as she billed only 32.2 hours.

111.    Three timekeepers also billed to attend the deposition of Dr. Anderson on May 30, 2025:

| 5/30/25 | JMM | Attend deposition of expert Dr. Anderson. | 4.80 |
|---------|-----|-----|------|
| 5/30/25 | JMT | Prepare for and participate in deposition of expert Dr. Anderson. | 5.00 |
| 5/30/25 | PMJ | Defend deposition of expert Dr. Anderson. | 4.80 |

112.    Three timekeepers billed to attend at least part of the June 3, 2025 deposition of Dr. Brady:

| 6/3/25 | JMM | Attend deposition of the defense expert Dr. Brady. | 7.40 |
|--------|-----|-----|------|
| 6/3/25 | JMT | Prepare for and participate in defense expert Dr. Christine Brady's deposition. | 7.40 |

– 34 –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'**
**OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

| 6/3/25 | PMJ | Take afternoon session of the deposition of defense expert Dr. Brady. | 3.00 |
|--------|-----|------------------------------------------------|------|
| 6/3/25 | PMJ | Take morning session of the deposition of defense expert Dr. Brady. | 4.60 |
| 6/3/25 | WTD | Attend and assist Mr. Jonna and Mr. Trissell with Zoom deposition of defense expert Dr. Brady; Conference with Mr. Jonna and Mr. Trissell regarding same. | 1.80 |

113.   Mr. Duke (WTD) does not appear on the appearances page of the deposition transcript.

114.   Four timekeepers billed to attend the June 6, 2025 deposition of Dr. Tando:

| 6/6/25 | BMM | Attend deposition of defense expert Darlene Tando. | 1.80 |
|--------|-----|------------------------------------------------|------|
| 6/6/25 | JMM | Attend deposition of defense expert Darlene Tando. | 7.60 |
| 6/6/25 | PMJ | Take the morning session of the deposition of defense expert Darlene Tando; Debrief regarding same. | 3.40 |
| 6/6/25 | PMJ | Take afternoon session of the deposition of defense expert Darlene Tando. | 4.40 |
| 6/6/25 | WTD | Attend and assist Mr. Jonna and Mr. Trissell in the deposition of defense expert Darlene Tando. | 1.40 |

115.   Neither Mr. Duke nor Ms. Mannix appear on the appearances page of the deposition transcript.

116.   In an exercise of discretion, I have allowed two timekeepers to bill for attending and defending the depositions of the individual Plaintiffs. However, I believe that it is not reasonable to allow two or more timekeepers to bill for the other depositions.

117.   My recommended fee adjustment based on this duplication is set forth in the table contained in the section titled "SUMMARY" at the end of this declaration.

– 35 –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

**IV.    BILLING FOR EXCESSIVE INTRA-OFFICE CONFERENCING.**

118.    Although attorneys and staff within a firm need to coordinate work and discuss strategy, when done to excess, such intra-office conferencing becomes troubling. Especially where a law firm claims expertise and experience in a given area of law, the need for such conferencing should be minimal.

119.    Here, I identified the following amounts of intra-office conferencing among the non-excessive timekeepers:

| Timekeeper | Lodestar Hours (LS) | Intra-Office Conferencing Hours (IOC) | IOC as a % of LS | 4.00% of LS | Excess IOC Hrs |
|---|---|---|---|---|---|
| CSL | 97.20 | 43.40 | 44.7% | 3.89 | 39.51 |
| FJC | 53.20 | 3.75 | 7.0% | 2.13 | 1.62 |
| JMT | 1,836.80 | 99.20 | 5.4% | 73.47 | 25.73 |
| KD | 98.20 | 10.00 | 10.2% | 3.93 | 6.07 |
| MDM | 88.20 | 38.60 | 43.8% | 3.53 | 35.07 |
| MLB | 88.40 | - | 0.0% | 3.54 | - |
| MZ | 66.00 | - | 0.0% | 2.64 | - |
| NDG | 67.90 | 1.70 | 2.5% | 2.72 | - |
| PMJ | 1,003.80 | 25.40 | 2.5% | 40.15 | - |
| RM | 60.00 | 0.60 | 1.0% | 2.40 | - |
| WD | 140.80 | 28.40 | 20.2% | 5.63 | 22.77 |

120.    To quantify the extent of intra-office conferencing in Plaintiffs' attorneys' billing records, I conducted word searches for words pertaining to conferencing such as "meet with," "discuss," "co-counsel," "call," "correspond," or "team." I also searched in the task descriptions for the names or initials of the timekeepers who billed to this matter for entries that would indicate communications with those personnel. All intra-office conferencing entries I identified are included in the table attached as **Exhibit 20**.

– 36 –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

121.   Conferencing is not directly related to any particular work product and consists of exactly what it says – attorneys and staff discussing the case amongst themselves, giving or receiving assignments, and other such communications. In my experience, excessive conferencing is typically subject to disallowance by courts. Some strategic conferencing among attorneys does have value, but not when done to excess.

122.   In *Munoz v. California Business Bureau, Inc.* (E.D. Cal., July 14, 2017) Case No. 1:15-cv-1345-BAM, 2017 U.S. Dist. LEXIS 212842, the court examined the issue of intra-office conferencing in the context of evaluating a fee request. A true and correct copy of this opinion is attached as **Exhibit 21**. The court reasoned as follows:

> With regard to the time and labor required, the Court has reviewed the billing records submitted by Plaintiff's counsel and finds that, with two exceptions, the number of hours expended to be reasonable. First, a review of counsels' billing records reveals that counsel billed over 10 attorney hours for interoffice conversations between all three attorneys to discuss case status or strategy. While it is reasonable to spend some time coordinating legal resources, it is not reasonable to double or triple-bill a client for internal meetings, many of which appear to be for partner, Mr. Hyde, to provide instructions to his junior associates, Mr. Connolly and Ms. Dorman. *See Gauchat-Hargis v. Forest River, Inc.*, No. 2:11-cv-02737-KJM-EFB, 2013 U.S. Dist. LEXIS 128508, 2013 WL 4828594, (E.D. Ca l. Sep. 6, 2013) (finding it unreasonable for partners and associates to collectively "triple-bill" a client for attending internal meetings).

> For example, on June 16, 2016, Mr. Connolly and Ms. Dorman each billed .4 hours to "speak with Robert Hyde" about "opposing counsel's summary judgment letter." (Doc. 29-8, Exh. A at 4). Mr. Hyde billed a slightly longer .6 hours for that same meeting ostensibly in preparation to provide Mr. Connolly and Ms. Dorman further instruction at the meeting. Given the triple-billing here for these kinds of internal communications, the Court agrees with Defendant that such charges are excessive. *See Chalmers*, 796 F.2d at 1211 (The court may reduce those hours where a case is overstaffed and hours are duplicated and where the hours expended are deemed to be excessive). Thus, while the billing of 3.3 hours to conduct strategy meetings by Mr. Hyde was reasonable, the additional duplicative billing to attend those meetings was not. Accordingly, the Court will deduct the 3.3 hours each spent by Ms. Dorman and Mr. Connolly to attend meetings with co-counsel for a total reduction of 6.6 hours.

(*12-13.)

– 37 –

123. The court thus allowed the time for one timekeeper to be involved in a meeting, but disallowed the time billed by other timekeepers for that same meeting. The same analysis can apply in cases in which one timekeeper bills to draft and send an email or memo and another timekeeper bills to receive and review that communication.

124. In *Scott v. Jayco, Inc.* (E.D. Cal. Dec. 18, 2021) 1:19-cv-0315 JLT, at *7-8, the court said:

> As this Court previously observed, "many courts ... reduced fee awards for time spent in 'interoffice conferences' or other internal communications." *Gauchat-Hargis v. Forest River, Inc.*, 2013 WL 4828594 at *3 (E.D. Cal. Sept. 9, 2013) citing, *e.g., Mogck v. Unum Life Ins. Co. of Am.*, 289 F.Supp.2d 1181, 1194 (S.D. Cal. 2003); *see also United States v. One 2008 Toyota Rav 4 Sports Util. Vehicle*, 2012 WL 5272281 at *9 (C.D. Cal. Oct. 18, 2012) ("[w]hen attorneys hold a telephone or personal conference, good 'billing judgment' mandates that only one attorney should bill that conference to the client, not both attorneys" [citation omitted]); *Coles v. City of Oakland*, 2007 WL 39304, at *10 (N.D. Cal. Jan. 4, 2007) (observing that billing for communications between attorneys may be a sign of overstaffing, warranting a reduction in hours billed).

A true and correct copy of this order is attached as **Exhibit 22**.

125. In *Lemmons v. Ace Hardware Corp.* (N.D. Cal. Feb. 1, 2015) Case No. 12-cv-03936-JST, the court reduced fees due to excessive and vague conferencing.

> The Court knows that co-counsel sometimes need to strategize. But lawyers who are experts in the field of disability litigation, working at a small firm that exclusively handles that kind of work, should not need to bill 259 separate entries for strategizing. "The Ninth Circuit has approved of reductions in fees for unnecessary and duplicative intra-office conferences," and other courts in this District have "previously been critical of excessive conferencing by Rein Law." *Hernandez*, 2014 WL 1724356 at *10. Compounding these concerns is that some entries lack any specificity, such as "Meet w/ co-co re: pending issues" or "Strategize w/ staff re current case issues," which make such review more difficult and cause the Court some concern. ECF No. 130-8 at 3, 5.

> Because the Court finds that Defendants' criticisms of the excessive nature of Plaintiff's counsel's billing for internal meetings are valid, it will exercise its discretion to reduce the $39,048.00 that Defendants characterize as having been billed for time spent on internal meetings by 50%, awarding $19,524.00 for these entries.

(*4.) A true and correct copy of this opinion is attached as **Exhibit 23**.

– 38 –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

126.   Plaintiffs' attorneys state their credentials, experience, and expertise. However, given their credentials, experience, and expertise in this area of law, they have not explained the need for so much conferencing.

127.   Over the past 30+ years, I have audited major national and international law firms and in general I have found that the amount of intra-office conferencing in well-managed litigation averaged between two to four percent of the total fees so the conferencing here by some of the timekeepers is not within this reasonable amount.

128.   Based upon the above analysis, it is my opinion that the intra-office conferencing hours that are greater than 4.0 percent of the total hours for each timekeeper are excessive.

129.   My recommended fee adjustment based on this excessive intra-office conferencing is set forth in the table contained in the section titled "SUMMARY" at the end of this declaration.

## V.    BILLING FOR CLERICAL AND ADMINISTRATIVE TASKS.

130.   Clerical or firm administrative work is generally not recoverable because it is considered overhead. Instead, it should be taken into account when a law firm sets its attorneys' hourly rates.

131.   Clerical work is considered overhead, and as such, it is neither billable nor recoverable. "[C]lerical or ministerial costs are part of an attorney's overhead and are reflected in the charged hourly rate." (*Jeremiah B. v. Dep't of Educ.* (D.Haw. Jan 29, 2010) Civil No. 09-00262 DAE-LEK, 2010 WL 34654, at *5, citing *Sheffer v. Experian Info. Solutions, Inc.* (E.D. Pa. 2003) 290 F. Supp. 2d 538, 549.)

132.   As the Court in *Pelayo Playa, et al. v. Platinum Limousine Services, Inc., et al.* (D.Haw. 2016) 2016 WL 5402185 (Civil No. 15-00023, September 27, 2016) stated:

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

Clerical costs, on the other hand, are part of an attorney's overhead and are subsumed in the attorney's charged hourly rate. *Jeremiah B. v. Dep't of Educ.*, 2010 WL 346454, at *5 (D. Haw. Jan. 29, 2010) (citation omitted). *See also Frankl v. HGH Corp.*, 2012 WL 1755423, at *8 (D. Haw. Apr. 23, 2012), F&R adopted by 2012 WL 1753644 (D. Haw. May 14, 2012) ("[I]t is not customary to bill for purely clerical or secretarial work separately from attorney's services. As previously stated, in this district, such tasks are subsumed in an attorney's overhead costs.")

*Pelayo* at *7.

133.   Clerical work is also not recoverable simply because an attorney or paralegal actually does the work. "[F]ee requests for ministerial tasks performed by counsel such as 'file organization' should not be allowed as compensable time." (*In re Taylor* (Bankr. D. Colo. 1989) 100 B.R. 42, 44) And, "[t]ruly ministerial services such as xeroxing and filing documents with the Court should not be compensated at the same rate as those services which are legal. Even if an attorney or paralegal performs the ministerial services, it does not increase the value of that service." (*Id.*)

134.   An entry-by-entry search for clerical-related words was conducted to identify time entries that refer to clerical or administrative tasks. Many of the entries related to corresponding with a court reporter or the court clerk.

135.   A table setting forth all billing entries containing clerical or administrative tasks is attached as **Exhibit 24**. All such time should be disallowed.

136.   My recommended fee adjustment based on billing for clerical or administrative tasks is set forth in the table contained in the section titled "SUMMARY" at the end of this declaration.

## VI.   BILLING FOR MEDIA MATTERS.

137.   Plaintiffs' attorneys billed for time related to media-related tasks. Although media matters may be tangentially-related to the issues in this case, if they were billing to a paying client, such time should not be billed. I am not including time the attorneys billed to review media reports regarding the case, but am including time billed to prepare for or participate in media appearances.

– 40 –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

138.   A table setting forth all billing entries pertaining to media matters is attached as **Exhibit 25**. All such time should be disallowed.

139.   My recommended fee adjustment based on billing for this category is set forth in the table contained in the section titled "SUMMARY" at the end of this declaration.

## VII.   BILLING FOR AMICUS MATTERS.

140.   Plaintiffs' attorneys billed for time related to working on amicus briefs in other cases. If they were billing to a paying client, such time should not be billed.

141.   A table setting forth all billing entries pertaining to amicus matters is attached as **Exhibit 26**. All such time should be disallowed.

142.   My recommended fee adjustment based on billing for this category is set forth in the table contained in the section titled "SUMMARY" at the end of this declaration.

## VIII.  BILLING USING VAGUE TASK DESCRIPTIONS.

143.   The auditor identified a number of entries that are vague to the extent that they are lacking sufficient specificity about what was done to justify the time and fees billed. I am ***not*** here concerned with the billing entries containing redactions, which may be necessary or prudent based upon a potential or actual appeal of issues from this case. Based on a review of all the billing records in the case, the auditor found vague entries throughout the billing records. A table setting forth all billing entries using vague task descriptions is attached as **Exhibit 27**. Vague entries provide little or no information about the nature or significance of the work performed, thereby severely hampering a realistic assessment of its utility or the reasonableness of the associated fees.

144.   Vague entries omit crucial information about one or more essential elements of a time description, such as the specific activity undertaken, a particular document reviewed or drafted, identities of participants in a meeting or telephone conference, and the like. Vague time entries simply mention or hint at a particular

– 41 –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'**
**OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

1   task and leave it to the reader to fill in the gaps. Vague time entries are essentially

2   incomplete time entries. As such, they neither sufficiently document nor adequately

3   support a statement for fees for services, such as a petition for fees.

4       145.    Lack of detail is acknowledged in the January 29, 2003 State Bar of

5   California Arbitration Advisory, No. 2003-01, that states, in pertinent part, at page

6   7: ''Research issues', 'attention to file', 'discovery', 'prepare for trial', and similar

7   statements are not specific enough to let the reader know what was done." A true

8   and correct copy of this advisory is attached as **Exhibit 28**. In my opinion, both

9   case law and standard billing practice require more in the way of justification for

10  the vague billing entries in this case.

11      146.    The vagueness of deficient billing entries makes it impossible for the

12  Court to assess whether the time claimed was reasonably expended. *See Davis v.*

13  *Prison Health Servs.,* No. C 09-2629 SI, 2012 WL 4462520, at *11 (N.D. Cal. Sept.

14  25, 2012) (concluding that such billing entries as "conference calls with co-

15  counsel," "review e-mail from opposing counsel," "review e-mail chain," "draft e-

16  mail," and "legal research" were insufficiently detailed and reducing the fee award

17  on that ground); *McCarthy v. R.J. Reynolds Tobacco Co.,* No. CIV. 2:09-2495

18  WBS DAD, 2011 WL 4928623, at *4 (E.D. Cal. Oct. 17, 2011) (reducing a fee

19  award where most of counsel's entries referred generally to "legal research" and

20  "conversations with [co-counsel]" "without identifying the subject of the research

21  or conversations"); *Ambriz v. Arrow Fin. Servs., LLC*, No. CV 07-5423-JFW (SSx),

22  2008 WL 2095617, at *5 (C.D. Cal. May 15, 2008) (finding that billing entries for a

23  "telephone conference" were inadequate because the Court could not determine the

24  reasonableness of the time spent without being provided any information on the

25  "nature of the conference"); *Lowe v. Unum Life Ins. Co. of Am.*, No. CIV. S-05-

26  00368 WBS GGH, 2007 WL 4374020, at *4-5 (E.D. Cal. Dec. 14, 2007) (denying

27  attorney's fees for time spent on "monthly file review," "review" and "paperwork"

28  for lack of sufficiently detailed time records).

– 42 –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

147.   While it is difficult to arrive at a precise figure, based on the caselaw and State Bar Opinion, I recommend at least a twenty percent reduction of hours billed for the vaguely-billed tasks where the lack of specificity interferes with the auditor's (and the court's) ability to analyze the billing records. Another option would be to completely disallow all of this time as the timekeepers had the ability to record their tasks with complete information.

148.   My recommended fee adjustment based on billing using vague task descriptions is set forth in the table contained in the section titled "SUMMARY" at the end of this declaration.

## IX.   BILLING APPARENTLY EXCESSIVE TIME FOR DOCUMENTS.

149.   Based upon my review of the billing records, Plaintiffs' timekeepers billed at least the following number of hours for the specified document, motion, or issue:

| | |
|---|---|
| Complaint | 187.30 |
| Preliminary Injunction | 97.20 |
| First Amended Complaint | 22.80 |
| Second Amended Complaint | 27.60 |
| Class Certification | 46.00 |
| Motion for Summary Judgment | 106.40 |
| Renewed Motion for Summary Judgment | 145.80 |

150.   A table setting forth the time for billing entries related to these tasks is attached as **Exhibit 29**.

151.   While it is admittedly difficult to quantify how many hours were actually needed or necessary for each of these tasks, the hours do not appear to be reasonable. Therefore, I recommend a ten percent adjustment in each of these categories.

– 43 –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'**
**OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

152.    My recommended fee adjustment based on this apparently excessive time is set forth in the table contained in the section titled "SUMMARY" at the end of this declaration.

## X.    THE USE OF A 0.2-HOUR MINIMUM BILLING INCREMENT.

153.    Generally speaking, 0.1 hour is the standard minimum billing unit in current law practice. As the court in *Welch v. Metropolitan Life Insurance Company*, 480 F.3d 942 (9th Cir. 2007) stated, "The district court also imposed a 20 percent across-the-board reduction because the law firm billed in quarter-hour increments." The district court reasonably concluded that the law firm's practice of billing by the quarter-hour resulted in a request for "excessive hours." The court of appeal went on to note that the district court found the hours were inflated because counsel billed a minimum of 15 minutes for numerous phone calls and e-mails that likely took a fraction of the time. The court of appeal went on to add that its own review of the time sheet confirmed that it was replete with quarter-hour or half-hour charges for the drafting of letters, telephone calls and intra-office conferences.

154.    As noted above, Plaintiffs' timekeepers submitted 4,003 billing entries. Of note, there were ***no*** billing entries for 0.1 hour. There were 1,587 billing entries for 0.2-hours. This means that 40 percent of the entries (1,587/4,003 = 0.40) used this 0.2-hour minimum.

155.    The main concern with minimum billing units greater than 0.1-hour is that they tend to invite rounding up to the next multiple, even when the time actually spent on a given task falls well short of 12 minutes. Thus, a short telephone call, for example, or a quick email or correspondence review, easily falls into at least a 0.2-hour slot. For example, an attorney could bill 1.0 hour for reviewing or drafting five short emails, when those tasks probably only took 0.2 to 0.3 hours at the most. The same applies to the time needed for drafting or reviewing documents. Rounding up to the next highest tenth-of-an-hour billing unit can very rapidly grow and overstate fees. This risk is acknowledged in the January 29, 2003 California

– 44 –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

State Bar Mandatory Fee Arbitration Advisory, No. 03-01 (subsequently replaced

and superseded by California State Bar Mandatory Fee Arbitration Advisory, No.

2016-02 (March 25, 2016)), that states, in pertinent part:

> The standard minimum is 1/10th of an hour or 6 minutes. If a higher minimum is used, such as .25 or .5, **this probably increases the time by 15% to 25%**. Some courts have criticized the use of a .25 or ¼ hour minimum as being too high. [Emphasis added.]

156.    The subsequent Arbitration Advisory (No. 2016-02) also points out the

issues with minimum billing increments higher than 0.1 hour:

> On the other hand, some lawyers still bill in minimum increments of .25 hours or greater. Consequently, they may charge .25 hours for any compensable task, irrespective of how long the task actually takes. Assume that such a lawyer charges $300/hour. Assume further that on any given day, that lawyer completes at least four separate compensable tasks, each task taking less than 3 minutes each to complete. Billing in increments of .25 hours means that the client would be billed $300 for the four tasks [4 x .25 hours x $300/hour = $300]. However, in this example, the client is being charged $300 for less than 12 minutes of actual work, essentially requiring the client to pay an effective hourly rate greater than $1,500.

> Courts and fee arbitrators view high incremental charges with suspicion as they may constitute an unreasonable or unconscionable fee, particularly where application of high incremental charges results in overstating the fees owed by a client. *Your Bill: A Behind the Scene look at a Legal Audit*, Mekler Bulger Tilson Marick & Pearson Legal Audit Group, 1, 2 (March 2007) (high incremental charges artificially inflate fees).

157.    The 2016 Arbitration Advisory example means that the quarter-hour

billing can essentially constitute a 500 percent markup ($300 x 500% = $1,500) in

the hourly rate being charged the client or, as in this case, the opposing party.

158.    One California unpublished decision criticized quarter-hour billing.

(*Ekstrom v. Marquesa at Monarch Beach Homeowners Assn.*, Case No. G039289,

2008 Cal. App. Unpub. LEXIS 8298; 2008 WL 4768861 (Cal.App. 4th Dist., Div. 3

Nov. 3, 2008 unpublished) [The court found merit in the defense argument that

billing in minimum quarter hour increments resulted in overbilling by plaintiff's

prevailing attorneys, leading to proper reductions in the fee request].) A copy of this

opinion is attached as **Exhibit 30**. See also *In re Myers*, 280 Kan. 956 (Kan. Sup.

Ct. Feb. 3, 2006) [lawyer impermissibly rounded up his billable time to 1-hour

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

minimum time increments when he spent at least 45 minutes on any given task]. A copy of this opinion is attached as **Exhibit 31**.

159. Courts acknowledge that billing "by the quarter-hour, not by the tenth" is a "deficient" practice "because it does not reasonably reflect the number of hours actually worked." *Zucker v. Occidental Petroleum Corp.*, 968 F. Supp. 1396, 14034 (C.D. Cal. 1997) (attorney billing at $300 per hour who works six minutes on a matter would charge $30 if he bills by a tenth of an hour and $75 if he bills by quarter hour).

160. This analysis related to quarter-hour billing is also relevant when the minimum billing increment is 0.2 hour. Although 0.2 is not as large as 0.25, it still works to effectively overstate the fees. This is especially true with regard to emails. Most emails take under 6 minutes, or 0.1-hour, to draft or read. When 0.2 hours or more are billed for each email, that effectively doubles the rate or the fee.

161. Inasmuch as the California Arbitration advisory notes that quarter-hour billing increases the time by 15 percent to 25 percent, and the billers here frequently billed in 0.2-hour minimums, it is my opinion that a 15 percent reduction in the lodestar would be justified.

162. My recommended fee adjustment based on this billing practice is set forth in the table contained in the section titled "SUMMARY" at the end of this declaration.

## XI.   BLOCK BILLING.

163. "Block billing" is a time-keeping method by which each lawyer and paralegal enters the total time daily spent working on a case, rather than itemizing the time expended on specific tasks.

164. Within the fee shifting context some federal courts have disapproved of block billing and disallowed fees where this practice exists (see *Welch v. Metropolitan Life Insurance Co.,* No. 04-56768, D.C. No. CV-04-00084-PA (9th Cir. 2007). While disapproving the District Court's across-the-board reduction of

– 46 –

hours by 20 percent (because only about half the entries were blocked), the Ninth Circuit Court acknowledged the lower court's right to "impose a reduction for block billing," at p. 7.

165.   It is impossible to tell how long each of the individual tasks took in the above table because of the block-billing. Therefore, it is also impossible to determine whether the amount of time billed for each of the tasks was reasonable. It is for these reasons that block billing has been criticized by a number of courts: because it seriously hampers review of billing data to determine the reasonableness of fees for services performed. See *Brown v. Smythe*, 1993 WL 481543, at *6 (E.D. Pa. Nov. 18, 1993) (with block billing the Court has no way of determining how much time was spent on each task and, thus, the Court is unable to ascertain the reasonableness of the hours charged); see also *In re Leonard Jed Co.*, 103 B.R. 706, 713 (Bankr. D. Md. 1989) ("[Block billing] permits an applicant to claim compensation for rather minor tasks which, if reported individually, would not be compensable … [and] it prevents the Court from determining whether individual tasks were expeditiously performed within a reasonable period of time because it is impossible to separate into components the services which have been lumped together.").

166.   In accord, the Tenth Circuit has ruled: "[t]he use of billing practices that camouflage the work a lawyer does naturally and quite correctly raise suspicions about whether all the work claimed was actually accomplished or whether it was necessary…." *Robinson, et al. v. City of Redmond, et al.*, 160 F. 3d 1275 (10th Cir. 1998); see also *Leroy v. City of Houston*, 906 F. 2d 1068 (5th Cir. 1990) (plaintiff has burden to show amount of time expended was reasonable, and this showing could not be made without some breakdown as to the separate functions performed and number of hours devoted to each).

167.   In a December 2005 decision by the District Court in the Northern District of California, *North Pacifica LLC v. City of Pacifica, et al.*, Case No. C01-

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

4823 EMC, Magistrate Chen cited my audit report and confirmed my disapproval of block billing in that case. In so doing, Magistrate Chen referred to a California State Bar fee arbitration advisory that I cite in my report, "Detecting Attorney Bill Padding," January 29, 2003, No. 03-01 (attached as Exhibit 28). The advisory states, in pertinent part: "… [block billing] hides accountability and may increase time by 10 to 30 percent. The larger the 'block,' the more care should be exercised," at page 5. Magistrate Chen also disapproved of block billing in *Defenbaugh v. JBC & Associates, Inc.*, No. C-03-0651 JCS, 2004 WL 1874978, *9 (N.D. Cal., August 10, 2004), and *Navarro v. General Nutrition Corp.*, Northern District Case No. C-03-0603.

168.   State Bar of California Mandatory Fee Arbitration Advisory No. 03-01, "Detecting Attorney Bill Padding," January 29, 2003, at page 5, attached as Exhibit 28, likewise disapproves block billing, stating in pertinent part:

> If one amount of time is shown for working on more than one discreet task, this is called "block billing" or "lumping" time. This is almost never allowed by federal courts. The practice hides accountability and may increase time by 10% to 30%. The larger the "block," the more care should be exercised

169.   The California State Bar advisory was also used to reduce hours billed in block format in *Welch v. Metropolitan Life Inc. Co.*, 480 F.3d 942, 948 (9th Cir. 2007). While disapproving the District Court's across-the-board reduction of hours by 20 percent (because only about one-half of the entries were actually blocked), the Ninth Circuit acknowledged the lower court's right to "impose a reduction for block billing," at p. 7. The *Welch* court further states, in pertinent part, at p. 6:

> We do not quarrel with the district court's authority to reduce hours that are billed in block format. The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked. See *Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992). It was reasonable for the district court to conclude that Welch failed to carry her burden, because block billing makes it more difficult to determine how much time was spent on particular activities. See, e.g., *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 971 (D.C. Cir. 2004) (reducing requested hours because counsel's practice of block billing "lump[ed] together multiple tasks, making it impossible to evaluate their reasonableness"); see also *Hensley v. Eckerhart*, 461 U.S. [424,] at 437 (holding that applicant should "maintain billing time records in a manner that

– 48 –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

will enable a reviewing court to identify distinct claims"); *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1121 (9th Cir. 2000) (holding that a district court may reduce hours to offset "poorly documented" billing).

170.    Following the Welch decision, and in line with the State Bar of California Mandatory Fee Arbitration Advisory No. 03-01, the auditor recommends a modest ten percent disallowance of the block-billed fees due to entries being billed in block format. All block-billed entries are attached as **Exhibit 32**. That is well within the guidelines set forth in case law and the State Bar opinion cited above. *Bell v. Vista Unified School Dist.,* 82 Cal.App.4th 672, 689 (2001), the seminal case on the block billing subject, supports the proposition "the trial court *should* exercise its discretion in assigning a reasonable percentage to the entries, or simply cast them aside" if counsel "cannot further define his billing entries …." The Fourth District, Division One ruled in the unpublished decision of *AntiCancer, Inc. v. Novartis Corp.,* 2006 WL 147530 at *5-6 (4th Dist., Div. 1 Jan. 20, 2006) (unpublished) that, in the context of awarding fees to a successful SLAPP defendant, "[w]e decline to categorically condemn the use of block billing." However, the appellate court did give stern warning to practitioners adopting this billing practice that they may be unhappy with a resultant fee award: If block billing entries are used, counsel "places itself at risk of receiving a substantially reduced recovery or no recovery at all based on an unjustified or unsupported request." (*Id.* at *5.) The *AntiCancer* court did quote *Bell,* sustaining a trial court's 37% reduction due to block billing and apportionment issues (with the trial court indicating it gave the claimant the benefit of the doubt on most block billing entries, but still made some appropriate reductions).

171.    My recommended fee adjustment based on this billing practice is set forth in the table contained in the section titled "SUMMARY" at the end of this declaration.

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

1    **XII.    THE REQUESTED 1.25 MULTIPLIER IS NOT JUSTIFIED.**

2        172.    Plaintiffs' Attorneys state, but present little to no argument, that a 1.25

3    multiplier is warranted in this case. (Notice, p. 2:8; MPA, pp. 3:18, 20:23-21:28;

4    Jonna Decl., ¶ 86 at pp. 30:28-31:1.)

5        173.    Plaintiffs' attorneys admit that the lodestar is presumptively reasonable

6    and enhancements (multipliers) may be awarded in "rare" and "exceptional"

7    circumstances. (MPA, pp. 20:24-25:1.) They also admit that their requested rates

8    are near the high-end of appropriate rates in San Diego County.  (MPA, p. 21:21-

9    22.)

10        174.    They then refer to rates in other parts of the State, being paid by a

11    municipality to one of the largest law firms in the State if not the country, which is

12    neither the relevant venue or inquiry. (MPA. p. 21:21-25; see also Jonna Decl.,

13    ¶ 68.)

14        175.    Plaintiffs' Attorneys have not argued that a multiplier is warranted

15    based on any of the other factors typically used to justify application of an

16    enhancement.

17        176.    Plaintiffs' attorneys have not justified application of a multiplier.

18    **XIII.  QUANTIFICATION OF HOURS BILLED FOR**

19            **TITLE VII-RELATED ISSUES.**

20        177.    Defense counsel has identified certain billing entries that they state

21    relate to the Title VII claims and asked me to quantify the time and fees for those

22    entries. Those entries are attached as **Exhibit 33**. These entries total 379.40 hours

23    and $405,925.20 in fees at requested rates.

24

25

26

27

28

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'**
**OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

# SUMMARY OF FINDINGS

178.  The following tables summarize my findings by timekeeper:

| Charles S. LiMandri | |
|---|---:|
| Hours Requested | 97.20 |
| Excessive Intra-Office Conferencing | -39.51 |
| Amicus | -4.40 |
| Excessive Time on Documents | -0.36 |
| Vague Task Descriptions | -4.40 |
| Billing in 0.2-hour Minimum | -7.94 |
| Block Billing | -3.10 |
| Net Hours | 37.49 |
| Recommended Rate | $1,069 |
| **Net Fees** | **$40,076.81** |
| | |
| Frank J. Coughlin | |
| Hours Requested | 53.20 |
| Excessive Intra-Office Conferencing | -1.62 |
| Excessive Time on Documents | -0.15 |
| Vague Task Descriptions | -2.70 |
| Billing in 0.2-hour Minimum | -7.71 |
| Block Billing | -2.58 |
| Net Hours | 38.44 |
| Recommended Rate | $925 |
| **Net Fees** | **$35,557.00** |
| | |
| Jeffrey M. Trissell | |
| Hours Requested | 1836.80 |
| Clerical and Administrative | -6.40 |
| Duplicative Attendance | -42.80 |
| Excessive Intra-Office Conferencing | -25.73 |
| Media | -6.80 |
| Amicus | -46.00 |
| Excessive Time on Documents | -40.42 |
| Vague Task Descriptions | -0.48 |

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

| | |
|---|---|
| Billing in 0.2-hour Minimum | -250.23 |
| Net Hours | 1417.94 |
| Recommended Rate | $625 |
| **Net Fees** | **$886,212.50** |
| | |
| **Kathy Denworth** | |
| Hours Requested | 98.20 |
| Clerical and Administrative | -12.40 |
| Excessive Intra-Office Conferencing | -6.07 |
| Amicus | -3.20 |
| Excessive Time on Documents | -0.04 |
| Billing in 0.2-hour Minimum | -11.47 |
| Net Hours | 65.02 |
| Recommended Rate | $175 |
| **Net Fees** | **$11,378.50** |
| | |
| **Mark D. Myers** | |
| Hours Requested | 88.20 |
| Excessive Intra-Office Conferencing | -35.07 |
| Amicus | -2.60 |
| Excessive Time on Documents | -1.02 |
| Vague Task Descriptions | -0.04 |
| Billing in 0.2-hour Minimum | -7.42 |
| Block Billing | -2.65 |
| Net Hours | 39.40 |
| Recommended Rate | $800 |
| **Net Fees** | **$31,520.00** |
| | |
| **Milan L. Brandon** | |
| Hours Requested | 88.40 |
| Excessive Time on Documents | -8.76 |
| Billing in 0.2-hour Minimum | -11.95 |
| Block Billing | -6.09 |
| Net Hours | 61.60 |
| Recommended Rate | $550 |

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

| | |
|---|---|
| **Net Fees** | **$33,880.00** |
| | |
| **Matthew Zavaro** | |
| Hours Requested | 66.00 |
| Clerical and Administrative | -5.40 |
| Vague Task Descriptions | -11.08 |
| Billing in 0.2-hour Minimum | -7.43 |
| Net Hours | 42.09 |
| Recommended Rate | $175 |
| **Net Fees** | **$7,365.75** |
| | |
| **Norman D. Grissom** | |
| Hours Requested | 67.90 |
| Excessive Time on Documents | -0.70 |
| Billing in 0.2-hour Minimum | -10.08 |
| Net Hours | 57.12 |
| Recommended Rate | $800 |
| **Net Fees** | **$45,696.00** |
| | |
| **Paul M. Jonna** | |
| Hours Requested | 1003.80 |
| Clerical and Administrative | -2.80 |
| Duplicative Attendance | -3.20 |
| Media | -33.60 |
| Amicus | -10.80 |
| Excessive Time on Documents | -7.42 |
| Vague Task Descriptions | -0.36 |
| Billing in 0.2-hour Minimum | -141.84 |
| Net Hours | 803.78 |
| Recommended Rate | $800 |
| **Net Fees** | **$643,024.00** |
| | |
| **Robert Muldowney** | |
| Hours Requested | 60.00 |
| Amicus | -4.00 |

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

| | |
|---|---|
| Excessive Time on Documents | -1.30 |
| Billing in 0.2-hour Minimum | -8.21 |
| Net Hours | 46.49 |
| Recommended Rate | $175 |
| **Net Fees** | **$8,135.75** |
| | |
| **William T. Duke** | |
| Hours Requested | 140.80 |
| Excessive Intra-Office Conferencing | -22.77 |
| Amicus | -7.60 |
| Excessive Time on Documents | -3.14 |
| Billing in 0.2-hour Minimum | -16.09 |
| Block Billing | -3.74 |
| Net Hours | 87.46 |
| Recommended Rate | $300 |
| **Net Fees** | **$26,238.00** |

A chart setting forth the entries for the timekeepers removed for overstaffing is attached as **Exhibit 34**. Their hours totaled 206.85 (206.85/3,807.35 = 0.054, or 5.4 percent of total hours billed by all timekeepers) and $162,244.80 (162,244.80/4,045,916.00 = 0.040, or 4.0 percent of total fees billed by all timekeepers at requested rates.)

The above findings and adjustments would result in the following fee award:

| | |
|---|---|
| Charles S. LiMandri | $40,076.81 |
| Frank J. Coughlin | $35,557.00 |
| Jeffrey M. Trissell | $886,212.50 |
| Kathy Denworth | $11,378.50 |
| Mark D. Myers | $31,520.00 |
| Milan L. Brandon | $33,880.00 |
| Matthew Zavaro | $7,365.75 |
| Norman D. Grissom | $45,696.00 |
| Paul M. Jonna | $643,024.00 |
| Robert Muldowney | $8,135.75 |

– 54 –

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

| William T. Duke | $26,238.00 |
|---|---|
| | **$1,769,084.31** |

In my opinion, the total fees that should be awarded to Plaintiffs' Attorneys is $1,769,084.31 with no multiplier.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 23rd day of February 2026 at Sonoma, California.

_____
James P. Schratz

**DECLARATION OF J. SCHRATZ IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

EXHIBIT 1

1.      In March 1978, I left Heller, Ehrman, White & McAuliffe and joined a smaller firm until August 1980, when I joined Fireman's Fund Insurance Company in San Francisco, California, in its General Counsel's Office. My responsibilities included representing Fireman's Fund as attorney of record in various litigation matters throughout the country. In addition, I supervised outside counsel throughout the country on various types of cases, including many complex civil litigation cases and many employment cases.

2.      In 1984, I left the General Counsel's Office and transferred to the Claims Department where I established the Major Litigation Unit, which was responsible for managing complex litigation throughout the country, including the $65 million bankruptcy of The Woodson Company. In this role, I was responsible for approximately 1,000 cases and a staff of ten people. I also became very familiar with the rates charged not only by Fireman's Fund "panel counsel," but also rates charged by solo practitioners and small, medium, and large law firms throughout the United States.

3.      In July 1990, I was promoted to Vice President Major Claims, where my duties were expanded to include responsibility for any case throughout the world that had potential exposure of $3 million or more, and responsibility for supervising approximately 100 adjusters. Again, I continued my involvement in supervising cases throughout the United States and stayed abreast of what solo practitioners and small, medium, and large law firms charged their respective clients.

4.      On January 1, 1994, I left Fireman's Fund to establish my own litigation management and consulting firm. I am the principal of Jim Schratz and Associates, a firm that conducts legal fee audits of various law firms throughout the country. Over the past thirty-one years, I have personally supervised or conducted approximately 4,000 legal fee audits throughout the country on behalf of both clients and law firms, including governmental agencies, insurance companies, corporations, and private individuals. Approximately 500 to 1,000 audits have been in Southern California with most of them having been in Los Angeles and I have qualified as an expert witness in attorneys' fees in Los Angeles County Superior Court.

5.      Many of these audits have involved plaintiff's fee requests in fee-shifting cases. In that role, I have performed legal fee audits of various law firms on behalf of the California Department of Justice, the City and County of San Francisco, the City of Huntington Beach, the Sonoma County Sheriff's Office, the State of Wisconsin, United Airlines, and Avis Rent-A-Car, among others. The amount of the fee requests audited ranges from a low of a few hundred thousand dollars to approximately $60 million.

6.      In 1999, I was appointed by the District Court for the Northern Mariana Islands to audit approximately $22 million in legal fees in *In re the Estate of Larry Lee Hillblom*, one of the founders of DHL Express, whose estate was valued at approximately $1 billion. I was also retained by the United States Department of Justice to conduct an audit of a fee request in a nationwide class action lawsuit against the Immigration and Naturalization Service. I have served as an arbitrator for the Sonoma County Bar Association and the State Bar of California in their mandatory fee arbitration programs.

7.      In January 2010, I was retained by investor Carl Icahn to serve as special litigation counsel to review approximately $60 million in legal fees in *In re Tropicana Entertainment, LLC, et al*, Case No. 08-10856 (KJC) in the United States Bankruptcy Court for the District of Delaware.

8.      In February 2010, in *Department of Fair Employment and Housing v. United Dominion Realty* (Case Nos. 07CC12067, 02CC12069), the court accepted our audit findings stating:

> In awarding fees in these amounts, the court has fully accepted the declaration of James P. Schratz in opposition to the motion, including all of his recommended reductions. The court finds his qualifications to be impressive. Likewise, his reasoning as to why the fees sought are excessive is persuasive.

9.      In April 2010, I was again retained by Mr. Icahn to serve as special litigation counsel to review an additional $6 million in legal fees in *In re Adamar of New Jersey, Inc. and Manchester Mall, Inc.*, Case No. 09-20711 and 09-20716 in the United States Bankruptcy Court for the District of New Jersey.

10.      I have qualified as an expert witness in numerous state courts, including San Francisco County Superior Court, Alameda County Superior Court, Sacramento County Superior Court, Los Angeles County Superior Court, Orange County Superior Court, and Sonoma County Superior Court, District Court in Corpus Christi, Texas, and Seattle Washington, and in Federal District Court in California, Pennsylvania, Michigan, and Oklahoma.

11.      In the case of *Madrid v. Gomez*, No. C-90-3094, United States District Court for the Northern District of California, I was retained by the California Department of Justice to audit a fee request of $8.3 million in connection with a prisoners' civil rights case at Pelican Bay State Prison. The audit disclosed a number of billing concerns and the audit report was submitted to Judge King, the settlement judge. The case resulted in a negotiated settlement of $4.25 million, or a reduction of approximately 50 percent. A copy of an article from *The Recorder* dated September 26, 1995, describing the settlement is attached as **Exhibit 1-1**.

12.      In *Rios v. Rowland*, No. 330211, Superior Court of California, County of Sacramento, I was retained to audit a fee request of $1.5 million. The audit disallowed a significant amount of the fees requested. The court upheld the audit results and reduced the fee request to approximately $227,000.

13.      In *CVB Corporation v. John Cavallucci*, No. 156505, Superior Court of California, County of Marin, I was retained to audit a fee request of approximately $2 million pursuant to a contractual provision. The audit uncovered a number of billing abuses and the court disallowed approximately 50 percent of the fee request.

14.      In *Aguilar v. Avis Rent-A-Car System*, No. 948597, Superior Court of California, County of San Francisco, I was retained to audit a fee request of approximately $1.3 million. The audit disclosed a number of problem areas and disallowed a significant amount. The court followed the audit findings and reduced the request by approximately 50 percent, to $650,000.

15.      In *McCauley v. BFC Direct Mailing*, No. 5711562, Superior Court of California, County of Orange, the plaintiff alleged violations of campaign election laws and sought attorneys' fees of $1.1 million. The defendant, Howard Jarvis Tax Reform Movement, hired this office to conduct a legal fee audit, and we disallowed approximately 50 percent of the fees. The court followed the audit findings and awarded approximately $525,000 of the $1.1 million requested.

16.      In *Florida Asset Financing Corp. v. Borton, Petrini & Conron*, United States District Court, Central District of California, Southern Division (Santa Ana), Case No. 8:96 cv 01144 AHS-MLG, we were retained by a private client to audit a fee request of $600,000. Based on the audit report, the court awarded $80,000.

17.    I conducted an audit of plaintiff's motion for attorneys' fees in *Adam v. Norton,* Northern District of California, Case No. C-98-2094 CW, a case in which plaintiff sought total fees in the sum of $1,726,312.92. The Special Master appointed by Judge Claudia Wilken to adjudicate the fee petition cited my declaration and recommended a total award of only $434,581.95 in attorneys' fees, less than 25 percent of the amount originally sought. The Special Master stated, "I believe Mr. Schratz' expert testimony meets the standard. Schratz's testimony is relevant, in that Schratz has provided a useful breakdown of the time spent by plaintiff's attorneys, and reliable, in that Schratz has accurately summarized the time and expenses claimed by plaintiff's attorneys." It must be stated the Special Master did not follow all of the audit recommendations. However, the Special Master did recommend reducing the fee request by approximately 75 percent, from $1,726,312.92 to $434,581.95, a result that Judge Claudia Wilken adopted in toto in July 2005.

18.    In January 2004, in *Frieders v. City of Glendale*, No. BC263271, Los Angeles County Superior Court Judge David A. Workman adopted our findings with respect to an audit of plaintiff's fee request. As a result, plaintiff's request of $4.1 million in fees was reduced to $1.1 million. The court specifically referred to our audit and reduced the fee request by approximately 75 percent. A copy of that order is attached as **Exhibit 1-2**.

19.    In August 2005, in *Rose v. Lancaster School District,* No. BC 303843, Superior Court of California, County of Los Angeles, the court adopted the methodology, analysis, and recommendations contained in our audit, and reduced plaintiff's request for fees by 58 percent from $498,000 to $209,000.

20.    In *North Pacifica, LLC v. City of Pacifica*, United States District Court, Northern District of California, Case No. C-01-4823 EMC, plaintiff sought damages at trial of approximately $16 million. I was retained by the defendant to audit plaintiff's request for $2,046,759.16 in fees and costs. In awarding plaintiffs only $453,810.75 in fees, Magistrate Judge Edward M. Chen cited my audit with approval with respect to various billing issues. A copy of the order dated December 16, 2005 is attached as **Exhibit 1-3**, and states, in pertinent part:

> [B]ased on the information provided in the declaration, Mr. Schratz has demonstrated that he is qualified to opine about fee awards and that his methodology in evaluating the billing records of NP's attorneys in this case is reasonable and sufficiently reliable. For example, Mr. Schratz's approach to categorizing the nature of the work of the attorneys is reasonable and sufficiently reliable as is, overall, his approach to unblocking the block-billed time entries.

21.    In *Poland v. L.A. Boxing*, Orange County Superior Court, Case No. 30-2009 0121184, plaintiff filed a lawsuit alleging eight causes of action against the defendants. Based upon their expert's testimony at trial, plaintiff had suffered $4,959,023 to $6,423,566 in damages. The jury found in favor of the plaintiff on two causes of action and on the statutory failure to pay owed wages claim awarded $2,800. This was the only cause of action on which they were successful that contained a statutory attorneys' fee provision. Plaintiff's counsel submitted a motion for attorneys' fees. They submitted bills totaling $709,242.50 and initially sought a 1/6 allocation (because two causes of action had been dismissed just prior to trial), or $118,207.08 in fees. I was retained by the defendant to audit plaintiff's request. Based upon deficiencies in the billing records such as block billing, redactions, excessive time to create deposition summaries, and excessive internal conferencing, and allocation issues, I

recommended that plaintiff's counsel only be awarded fees in the range of $25,000 to $30,000. In a subsequent supplemental declaration, plaintiff increased the amount of attorneys' fees sought to approximately $350,000. In July 2011, the Court found that plaintiff should only be awarded $30,000 – which is the amount that I had recommended.

22.     In *Shiow Huey-Chang v. County of Santa Clara, et al.*, Santa Clara County Superior Court, Case No. 5:15-cv-02502-RMW, plaintiff filed a lawsuit alleging excessive force by police. Plaintiff prevailed at jury trial and was awarded $40,000.00, although certain parts of the verdict were overturned by a defense post-trial motion for judgment as a matter of law. Plaintiff was deemed the prevailing party for purposes of attorneys' fees, and defendants did not dispute that finding for purposes of the fee motion. Plaintiff sought $970,063.74 in attorneys' fees and costs. I was retained by the defendant to audit plaintiff's request. I recommended that the billing rates being requested be reduced and that fees related to excessive staffing and time billed for certain aspects of the case be adjusted. I recommended that the fee request should be reduced to $236,860.38 plus costs of $27,575.72 for a total of $264,436.10. The court's reasoning and deductions tracked many of those set forth in my declaration and it ruled that plaintiff's fee award, including costs, should be reduced to $350,000.00.

23.     In *Carroll v. State of California, et al.,* Sacramento County Superior Court Case No. 34-2012-00135527-CU-OE-GDS, plaintiff was dismissed from her employment as a Staff Attorney with the California Commission on Teacher Credentialing. She filed suit alleging the termination was a wrongful retaliation for whistleblowing. Plaintiff prevailed at trial and sought attorneys' fees of $1,542,397.75, plus a 2.0 multiplier for a total of $3,084,795.50. I recommended that the billing rates being requested be reduced and that fees related to transient billers, unsuccessful claims, clerical billing, and duplicative billing be adjusted. I recommended that the fee request should be reduced to $323,720.37. The court awarded $638,484 or approximately 21 percent of the fees requested after reducing the requested billing rates, reducing the time billed for certain tasks, and reducing the requested multiplier.

24.     In *Violante v. Jayco, Inc.,* Los Angeles Superior Court Case No. 21AVC00911, plaintiffs brought suit under the Song-Beverly Act seeking damages for breach of express and implied warranties arising out of their purchase of a 2017 Jayco motorhome. The parties settled the matter but left the issue of attorneys' fees for the court. Plaintiffs' attorney claimed $140,342.00 as their reasonable fees based upon 11 generalized categories of work without submitting any billing records, let alone detailed billing records. Plaintiffs' attorney also requested a 0.50 multiplier. It was my opinion that the Song-Beverly Act was unique in explicitly requiring any award of fees to be tied to "actual time expended" and that generalized categories of work did not meet that requirement. I also identified block billing and billing for an unsuccessful appeal that mostly mirrored arguments made at the trial court level. Based upon my analysis, I recommended that no more than $41,860 be awarded as fees with no multiplier. This is precisely what the court awarded.

25.     In *Ashley Howell v. Department of State Hospitals for the State of California,* Napa County Superior Court Case No. 20CV000794, plaintiff asserted five causes of action against defendant claiming, among other issues, discrimination and wrongful termination. Plaintiff prevailed on a single cause of action before the jury and was awarded $28,941 in damages. Plaintiff's attorneys sought fees of $1,745,450. I reviewed the fee request and found that Plaintiff's attorneys had not provided detailed billing records but only broad, general categories of work; were requesting rates that were not reasonable; the fees requested were inconsistent with the representations they made at the Mandatory Settlement Conference earlier

in the year; claimed an apparently excessive number of hours for trial preparation; and that their request for a multiplier was not supported. In ruling on the fee motion, although the court did not directly reference my report, it reduced the lead plaintiff's attorney's rate to the rate I had recommended. The court also noted the discrepant representations of plaintiff's attorney's fees and found that a multiplier was not warranted. I had recommended that plaintiff's attorneys should be awarded no more than $395,460 in fees. The court awarded $135,102.

26.     In *Johnson v. City of San Jose*, USDC ND Cal. Case No. 5:21-cv-01849-BLF, plaintiff took part in a protest in the City of San Jose following the death of George Floyd. At the protest, plaintiff was struck by a police projectile, leading to his filing of a lawsuit against the police officer who shot the projectile and against the City. The jury found for plaintiff against only the officer. Thereafter, plaintiff's attorneys moved for attorneys' fees of $3,041,032.50 plus a 1.50 multiplier. I reviewed the fee request and among other issues found that the requested rates were unsupported and unreasonable. I also found and criticized a partner-heavy staffing model where more than half of the hours billed and two-thirds of the fees claimed were billed by partners. I further found excessive intra-office conferencing, with one timekeeper billing over half of their hours on conferencing and vague billing, including for trial preparation. Based upon my analysis, I opined that plaintiff's attorneys should receive no more than $2.10M in fees at requested rates and anywhere from $1.17M to $1.22M in fees at adjusted rates. In its August 15, 2025 order, the court found that some of the requested rates were justified but reduced other rates. The court agreed with me that the billing was "astonishingly partner heavy." The court also found that plaintiff's attorneys overbilled for trial preparation, including using vague task descriptions, allowing partner-level attorneys to bill approximately 75 hours in preparation for each hour of trial presentation. Based upon the court's adjustments and reductions, the lodestar was reduced to $1,884,867.25 and the court analyzed and rejected the request for a multiplier.

EXHIBIT 2

1.      **Courts That Have "Rejected" My Methodology.** As an initial matter, although there may be an expert who proves to be the exception to the rule, I know of no expert whose opinion is wholly accepted by courts 100 percent of the time. I am aware of approximately twenty-four (24) cases (out of the approximately 3,600 audits I have performed around the country) in which the courts have criticized aspects of my methodology or credentials.

2.      The following is my analysis and/or discussion of those cases.

3.      *Zuegel v. Mountain View Police Department*, United States District Court, Northern District of California, San Jose Division, Case No. 17-cv-03249-BLF ("*Zuegel*"). *Zuegel* alleged Fourth Amendment violations were committed by the Mountain View Police Department. The jury found that certain violations were committed and awarded $3,000 in damages. Subsequently, Plaintiff's attorneys sought $864,486.90 in attorney's fees plus additional charges for preparing a reply brief to the motion for fees. Following my analysis, I concluded that Plaintiff's attorneys should be awarded no more than $77,627.65 in fees.

4.      Plaintiff's counsel, Violet Grayson, requested fees at a rate of $675 per hour. Evaluating the information submitted in support of the fee motion and other rate information as well as the case documents, I recommended that she be compensated at no more than $525 per hour.

5.      The *Zuegel* court rejected my recommended rate for Ms. Grayson. It cited *Curtin v. County of Orange*, which in turn cited *Lopez v. San Francisco Unified Sell.* [sic] *Dist.* for the proposition that "multiple courts" had held my methodology lacked legal and factual support. I note that despite the *Curtin* case's reference to "multiple courts," *Curtin* only cited to a single case: *Lopez*. Furthermore, while the *Lopez* court did reject parts of my opinion, the court did not cite to any other case or court that had rejected my opinions.

6.      The *Zuegel* court then cited to Judge Koh of the Northern District who rejected my opinion in *Kalani v. Starbucks* that solo practitioners should be paid less [than attorneys who work at large law firms] based on firm size alone because there was no Ninth Circuit authority for this holding.

7.      First, I have *never* stated that law firm size *alone* should dictate an appropriate hourly rate. However, I have stated that law firm size does affect what an appropriate hourly rate may be.

8.      In support of my opinion in *Zuegel* that smaller law firms typically do not charge rates that larger law firms can or do charge, I cited to seven cases out of the United States District Court for the Southern District of New York and one case out of the District Court for Kansas. I also referenced the 2016 Real Rate Report that confirmed law firm size has the largest impact on hourly rates. The Real Rate Report is an analysis of law firm rates based on invoice data published by Wolters Kluwer that has been cited with approval by courts nationwide, including in California. I also cited to a case out of the Central District of California (*Common Cause v. Jones* (C.D. Cal. 2002) 235 F.Supp.2d 1076, 1081-1082) as well as a Los Angeles Superior Court case (*Streisand v. Adelman*, Los Angeles Superior Court Case No. SC077 257 (ruling filed on May 10, 2004, at p. *4)) that both recognized that the size of a law firm could be taken into consideration when determining rates for lawyers.

9.      As the Ninth Circuit has stated (quoting Carl Sagan and possibly others), "the absence of evidence is not evidence of absence." (*Altera Corp. v. Comm'r* (9th Cir. 2019) 926 F.3d 1061, 1099; see also *International Ass'n of Machinists Workers, Local Lodge 964 v. BF Goodrich Aerospace Aerostructures Group* (9th Cir. 2004) 387 F.3d 1046, 1055; *AirWair International Ltd. v. Pull & Bear Espana SA* (N.D. Cal. July 12, 2021) 19-cv-07641-SI, at p. *1.) The lack of 9th Circuit authority for the proposition that firm size affects billing rates does not mean that firm size does not affect billing rates.

10.     As referred to later in this report, the 2016 Real Rate Report stated law firm size *does* have an impact on hourly rates. Furthermore, earlier this year, in June 2022, LexisNexis published the LexisNexis CounselLink® Enterprise Legal Management Trends Report ("LexisNexis Report"). The LexisNexis Report is based on data derived from over $49 billion in legal spending, more than 350,000 timekeepers, and more than 1.2 million matters. The key metrics were based on charges billed by outside counsel in 2021. The LexisNexis Report stated

that: "The size of a law firm is highly correlated to the rates billed by its lawyers." (LexisNexis Report, p. 14.) Based on their analysis of $49 billion in legal spending, they found that the median partner rate at the largest (750+ attorneys) law firms was $895 while the median partner rate at the smallest law firms (<50) was $300. (*Id.*) Thus, the largest law firms were billing rates almost 300 percent (298 percent to be accurate) higher than the smallest law firms.

11.    The lack of Ninth Circuit precedent does not establish that law firm size does not affect billing rates. The Real Rate Report and the LexisNexis Report establish that law firm size *does* affect billing rates.

12.    The *Zuegel* court independently calculated Plaintiff's attorney's lodestar based upon an updated billing table (*Zuegel*, p. 15:12-13). The updated billing table requested an award of $952,222.50. (*Id.*) This was inclusive of a 1.1 multiplier. The court determined that they were requesting $882,545.80. (*Zuegel*, p. 20:3-8.) After analysis of various factors, the court eventually awarded $449,166.19 in fees, or a 49 percent reduction from the calculated lodestar.

13.    Thus, although the *Zuegel* court made a broad, sweeping statement that "multiple courts had rejected my methodology" (quoting from *Curtin*), the only specific objection it had with my "methodology" related to law firm size affecting appropriate hourly rates, which I have addressed above.

14.    ***Curtin v. County of Orange***, United States District Court, Central District of California, Case No. SACV16-00591-SVW-PLA ("*Curtin*"), 2018 U.S. Dist. LEXIS 233110. *Curtin* alleged violations of the United States Constitution were committed by the Orange County Sheriff's Department. Plaintiff prevailed on certain claims and her attorneys sought $1,044,055.00 in attorney's fees. Following my analysis, I concluded that Plaintiff's attorneys should be awarded no more than $480,840.40 in fees.

15.    The *Curtin* court stated:

> Multiple courts, including the Ninth Circuit, have already held that his [i.e., my] methodology in calculating fees lacks legal and factual support. See e.g. *Lopez v. San Francisco Unified Sch. Dist.*, 385 F. Supp. 2d 981, 992-993 (N.D. Cal. 2005)

*Curtin*, *33.

16.     However, despite claiming that multiple courts had criticized my methodology, the only case cited by *Curtin* was *Lopez*, a Northern District of California case that is discussed below.

17.     The *Curtin* court stated that it had three concerns with my qualification as an expert under Federal Rule of Evidence 702. First, it stated that my opinions were not based on personal knowledge. Second, it stated that I was not qualified to opine on the reasonableness of attorney fees. Third, it stated that my opinions were not based on a reliable methodology but frequently relied on speculation. (*Curtin*, \*34.)

18.     Regarding the court's first concern, it stated:

> Regarding personal knowledge and a lack of foundation, Schratz does not have personal knowledge of the facts he asserts in his declaration. Schratz was not at the hearings where he disputes the number of plaintiffs' attorneys in attendance. Furthermore, Schratz makes broad sweeping generalizations about contingency fees as a whole, without providing [\*35] and specific or factual support to show the contingency fee in the case at hand was problematic. Schratz Decl. ¶ 58.

*Curtin*, \*34.

19.     My understanding of FRE 702 is that expert testimony needs to be "based on sufficient facts or data." "Personal knowledge" is not mentioned or referred to anywhere in the Rule. As I state in virtually all my declarations, as part of the audit in *Curtin* I reviewed *all* the pleadings, deposition transcripts, trial transcripts, motions, and discovery. Although I was not at the various events to count the number of plaintiff's attorneys present, the court records, transcripts, and plaintiff's attorneys' billing records themselves provided the "facts and data" upon which I based my opinions.

20.     With regard to the alleged "broad sweeping generalizations about contingency fees as a whole," I stated the following in the referenced paragraph (Schratz Decl. in *Curtin*, ¶ 58):

> This type of agreement [a fee-shifting contingency agreement] appears to reward liberal, if not actual excessive billing by the attorneys and other legal professionals: That is, the more they billed, the more fees they could claim under the fee petition, and the more the attorneys stand to recover.

21.     I am unsure where the court found "broad sweeping generalizations" in this paragraph. There are only two opinions in this paragraph.: Attorneys may choose to engage in liberal billing practices; if they bill more, they can recover more. The fact is that in every single case I have audited involving this type of fee agreement, as far as I have been made aware, the plaintiff has *never* seen, let alone reviewed at any time, the attorney's invoices. Regular client review of attorney invoices serves an important function in seeking to ensure that billing records accurately reflect the work done. Without that regular review, improper or inaccurate billing can happen and not be flagged. The second statement, that if attorneys bill more they stand to recover more, is simply a truism.

22.     I stated that attorneys *may* overbill, but two paragraphs later I also stated: "The auditor approaches all legal fee audits with the assumption that most attorneys do not intentionally inflate their bills." (Schratz Decl. in *Curtin*, ¶ 60.)

23.     Regarding the court's second concern, it stated that I was not qualified to provide opinions on the reasonableness of attorneys' fees because I had no experience with the issues in the case and the reference cases I cited for the recommended rates were not from the Central District of California.

24.     Returning to FRE 702, experience is one basis on which an expert may be qualified, but it is only one out of the five enumerated bases: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion …."

25.     While it is true that I have never been involved in a *Monell* case as a practicing attorney or supervising attorney, the *Curtin* court nowhere addressed my knowledge, skill, training, or education as a legal fee expert. The court also did not acknowledge my experience as a legal fee auditor.

26.     As for the recommended rates, my exhaustive search found only one case, which happened to be from the Eastern District of California, in which any of the Plaintiff's attorneys had been awarded fees by a Court. I used that case, adjusted for time and location, as the basis

for the recommended rates in *Curtin* as the Eastern District court had already determined Plaintiff's attorney's reasonable rate rather than using a rate awarded to another attorney.

27.     Regarding the court's final concern, it stated that my opinions were not based on a reliable methodology but frequently relied on speculation. The court did not cite to any specific methodology that it found to be unreliable so I do not know what the court was thinking when it made this statement. Furthermore, I have re-reviewed my declaration in *Curtin* and have not found a single instance where I *speculated* on an auditing issue. In certain instances, I made estimates or arrived at educated conclusions, but I do not, and did not, guess on any auditing issue.

28.     ***Kalani v. Starbucks Corp.***, United States District Court, Northern District of California, San Jose Division, Case No. 13-CV-00734-LHK ("*Kalani*"), 2016 U.S. Dist. LEXIS 12445. *Kalani* was an ADA access case. The court granted injunctive relief and a statutory damage award of $4,000. Plaintiff's attorneys sought $135,931 in fees.

29.     Unbeknownst to me, rather than file any actual opposition to the motion for fees, defense counsel simply "adopted" my declaration as the opposition and asked the court to accept my conclusions. As my declaration was not intended to be an opposition brief, it contained no legal arguments.

30.     ***Lopez v. San Francisco Unified Sch. Dist.*** (N.D. Cal. 2005) 385 F. Supp. 2d 981. *Lopez* was a class action. The *Lopez* opinion is basically a precursor to the *Curtin* opinion, making many of the same points related to FRE 702 as the later *Curtin* court made. I have the same response to those points here as I made in *Curtin.*

31.     ***Amphastar Pharms. Inc. v. Aventis Pharma SA*** (C.D. Cal. Nov. 13, 2020) Case No. No. 5:09-cv-00023-SHK, 2020 U.S. Dist. LEXIS 251236. The *Amphastar court* rejected my argument on conferencing and there were some errors in specifically identifying certain types of billing entries among the over 8,400 entries in that case.

32.     In my declaration in *Amphastar* while I identified conferencing entries and listed in an exhibit, I neglected to specify *how* I had identified them. I always endeavor to specify how

searches are performed but in that instance I did not. As far as errors are concerned, there were over 8,400 billing entries and over $16 million in fees so despite my best efforts to manually double-check all entries that were identified by computerized searches and analysis, some errors were not caught. Those errors were minimal and I still stand by my overall analysis.

33.     *Velez v. Roche* (N.D. Cal. Sep. 22, 2004) Case No. No. C-02-0337 EMC, 2004 U.S. Dist. LEXIS 29848. The *Velez* court rejected my argument on conferencing. The court made an independent determination that the number of hours of conferencing in the case was not unreasonable, despite my opinion to the contrary. However, the court rejected the plaintiff's wholesale opposition to my qualifications, stating, "The Court disagrees. Mr. Schratz's expert opinion on fee awards, including hourly rates, has sufficient foundation."

34.     *Wit v. United Behav. Health* (N.D. Cal. 2022) 578 F. Supp. 3d 1060, 1081. The *Wit* court rejected my recommended hourly rates for certain personnel, rejected my conferencing argument, and rejected my argument regarding duplicative work.

35.     As for the court's rejection of my opinion on hourly rates, the court's comment was specifically addressing the issue of appropriate rates for paralegals and litigation support personnel. I had noted that Plaintiff's attorneys had provided some, but insufficient, information in their moving papers as to the qualifications of the paralegals for whom they were seeking compensation. This opinion is what the court rejected. Plaintiff's attorney's initial declaration contained only three paragraphs identifying the paralegals and providing limited information regarding them. Following receipt of my declaration, plaintiff's attorneys found it necessary to submit 19 additional paragraphs of new information in a reply declaration discussing the qualifications of their paralegals. My criticism was directed at their original filing, which I found to be lacking. Obviously, plaintiff's attorneys agreed that their original submittal was lacking in this aspect as they supplemented it in a reply. If plaintiff's attorneys had provided more complete information in their initial moving papers, I would not have criticized the lack of information regarding paralegal qualifications.

36.     The court also noted that I had stated plaintiff's attorneys had not provided evidence that the rates sought were the rates billed to fee-paying clients when, in fact, they had. That was an error on my part in overlooking that phrase in the motion.

37.     The court also found my evidence of reasonable paralegal rates to be unpersuasive. I only presented one data point on the recommended paralegal rates although I could and should have presented more reference cases to support my recommendation.

38.     The court stated that it found my opinion on conferencing "unpersuasive." It did not object to or challenge my methodology in identifying conferencing, agreed with me that conferencing can become excessive, and even cited to three cases in which a court did reduce time for excessive conferencing where the amount of conferencing identified in those cases was similar to what I had found in Plaintiff's attorneys' billing records. However, the challenge was my alleged overcounting of the conferencing time. Plaintiff's attorneys, in their reply declaration, provided new information related to those billing entries that, if it had been presented initially, would have changed my analysis. With the reduced conferencing hours, the court did not find the amount of conferencing sufficient to warrant adjustment.

39.     The court also chose not to follow my recommendation on duplicative work. My primary issue with duplication was multiple attendance at depositions by personnel who did not ask any questions or make any substantive comments during the depositions according to the transcripts. In their reply declaration, Plaintiff's attorneys provided additional information regarding these depositions or deponents. Again, Plaintiff's attorneys had not provided that information when I prepared my opinion or my opinion on duplication might have changed.

40.     *Mahtesian v. Snow* (N.D. Cal. Dec. 14, 2004) Case Nos. 03-5372 13MMC, 04-1306 MMC, 2004 U.S.Dist. LEXIS 25656. The *Mahtesian* court rejected my recommended rates and rejected my argument that the declaration in support of the fee motion was deficient. Both issues related to the requested rate.

41.     My rate recommendation was based on the limited information Plaintiff had submitted in support of the fee motion. The court disagreed and found the information supplied to be sufficient.

42.     *Branham v. Snow* (S.D. Ind. June 19, 2006) Case No. 1:01-cv-0152-JDT-WTL, 2006 U.S.Dist. LEXIS 42405. The *Branham* court rejected my recommended hourly rate.

43.     In *Branham*, I referenced the fees that had recently been awarded in a similar Federal case out of Indiana to recommend a rate lower than what Plaintiff's attorney was requesting. The original fee motion was filed on January 17, 2006. I submitted my declaration based upon those moving papers. At a hearing held on May 2, 2006, the court ordered supplemental briefing of the motion. The court ultimately based its ruling on the motion, in part, on the supplemental information provided by the parties after May 2, 2006, well after my analysis had been performed. Certain information relevant to the issue of the reasonableness of the rate being requested was included in that supplemental briefing. If I had had access to that additional information in preparing my declaration, I might have arrived at a different opinion on the reasonableness of the requested rate.

44.     *Duran v. United States Bank Nat'l Ass'n*, Alameda County Superior Court Case No. 2001-035537, 2010 Cal. Super. LEXIS 1058. At issue was the trial court's order regarding fees following trial. The class action was appealed to the Court of Appeal although the court's ruling on attorney's fees was not part of the appeal. (*Duran v. U.S. Bank National Assn.* (2012) 203 Cal. App. 4th 212). The Court of Appeal called the court's "trial management plan … fatally flawed," decertified the class, and reversed an order awarding certain expert witness fees to the plaintiffs. It also remanded certain claims to be re-evaluated by the trial court.

45.     The Court of Appeal held that the judge's trial plan barred the defendant from introducing "manifestly relevant evidence," denied defendant's Due Process rights, and committed prejudicial errors. The Court of Appeal's opinion was subsequently depublished when the California Supreme Court accepted review of the Court of Appeal's decision but it was later

affirmed by the Supreme Court's opinion. (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1.)

46.    I do not know why or how the judge found me to be partisan and non-independent. Without further information as to the court's reasoning, I cannot respond. I can only state that I had no bias in the case, no conflicts in the case, and I approached and conducted the audit the same way that I do all audits, whether I am retained by a law firm in support of its fee request or retained by an opposing party in opposition to the fee request.

47.    ***Gober v. Ralph's Grocery Co.*** (Superior Court of California, County of San Diego 2007) Case No. N72142. I understand that the Court sustained plaintiff's objections to that portion of my declaration that stated there is a percentage allowable for attorney conferencing. The court also stated that I had included time entries that were not attorney conferencing under the category of "conferencing." Despite sustaining this discrete objection, the court agreed with my finding that there was excessive intra-office conferencing, but disagreed on the amount of such conferencing. Furthermore, "The Court adopts Mr. Schratz's recommendation of a 25% reduction in [Rosen Bien's fees for the preparation of the fee motion]." "The Court also adopts [Mr. Schratz's] recommendation that that Mr. Kay's fees for the instant motion be reduced by 25%."

48.    ***California DUI Lawyers Assn et al. v California Dept. of Motor Vehicles*** (Superior Court of California, Los Angeles County 2022) Case No. BC553552. The issue of attorney's fees was fully briefed, argued, and decided by the trial court in a written opinion. I was not involved in that initial round of briefing. The case went up on appeal and, on remand, I opined that the number of hours billed should be reduced as well as the hourly rates for some or all of the attorneys involved. A different Superior Court judge handled the motion for attorney's fees on remand and stated: "the court considered Schratz's opinion, he did not persuade the court to reduce Plaintiff's counsel's hours." The court chose not to accept my opinion on the number of hours billed, choosing to follow what the prior judge had already decided was the lodestar.

The court did not make any specific finding or comment on my rate recommendation, choosing rather to follow what the prior judge had awarded.

49.    ***Bickley v. CenturyLink, Inc.***, Case No. CV 15-1014-JGB (ASX), 2016 WL 9046911 (C.D. Cal. Nov. 29, 2016). The court stated that I had provided no evidence in support of my proposed rates, and no evidence to support the rates I provided for smaller firms. "Defendant does not, for example, identify similarly-sized employment law firms whose attorneys charge the rates he recommends."

50.    Despite extensive research, it is true that I was unable to locate any fee awards made to similarly-sized employment law firms in the Central District of California. My recommendations were based on other data but the court's issue was that I did not provide data for similarly-sized employment law firms.

51.    ***Duffy v. City of Desert Hot Springs***, No. EDCV06385VBFOPX, 2008 WL 11429368 (C.D. Cal. Mar. 25, 2008). The Court's only expressed issue with my declaration in this case, as I understand, was my opinion that there is a difference in billing rates between small firms and large firms, citing to other courts that had questioned or rejected such a distinction. That was in 2008. As seen elsewhere in my declaration in this case, this distinction in billing rates between small firms and large firms is now being more readily recognized by courts and is backed up by major rate surveys.

52.    ***Johnson v Sears*** (Superior Court of California, Sacramento County 2012) Case No. 34-2009-00054053-CU-WT-GDS.  The court stated that it found my declaration to be "of minimal assistance." It also stated: "The declarations do identify certain areas of inquiry typically utilized by fee auditors. Too often however, the declarations adopt questionable or incorrect factual assumptions in an effort to support the reduction or disallowance of various amounts claimed." However, the Court did not identify what it found questionable or incorrect in my declaration and I was not called upon to testify so I have no way to respond. The Court also found partisanship in my declaration, again without any further elaboration, so I cannot respond to this other than to state that whether I am retained to support fee motions or to oppose them, I

utilize the same methodology and criteria and have been retained by both. I can also state that in my ___ years of performing approximately 3,600 audits I have only been accused of being partisan twice.

53.     ***Bobol v. HP Pavilion Management*** (N.D. Cal. 2006) Case No. C-04-0082 (Order Granting Motion for Attorneys Fee, dated April 10, 2006). The court's issue with my declaration concerned recommended billing rates. The court stated that I did not factor the skill and reputation of the attorney or the nature of the work into my analysis. I do incorporate an attorney's skill into my opinion if it's a relevant factor based upon comments made by the court or by opposing counsel, however I'm not sure how to factor reputation into billing rates. Furthermore, simply because an attorney has a generally favorable reputation overall does not mean that that attorney performed at a level commensurate with that reputation in any particular case.

54.     ***Brown v. City of Pittsburgh*** (W.D. Pennsylvania 2010) 2010 WL 2207935 (May 27, 2010). The court referred to my opinion multiple times, claiming that it was rejecting my opinions because I lacked experience with civil rights trials. Nevertheless, the court ultimately made many reductions to the requested lodestar consistent with several of my opinions.

55.     ***Branham v. Snow*** (S.D. Ind. 2006) 2006 WL 1750443, Entry on Plaintiff's Motion for Reasonable Attorneys' Fees and Costs, dated June 19, 2006. The court found my testimony on attorney rates to be "somewhat arbitrary" and portions of my declaration to be "conclusory and argumentative." The court rejected my opinion on rates and block billing. As noted above, not all courts accept my opinions. In addition, since that time I have modified my declarations to address the issues noted by the court.

56.     ***Campbell v. National Passenger R.R. Corp.*** (N.D. Cal. 2010) 718 F.Supp.2d 1093. The court rejected my proposed cuts to the attorneys' time for not prevailing on every claim, and for the time they spent conferencing. Again, no expert's opinions are accepted by all courts every time.

57. **Miller v. Vicorp Restaurants, Inc.** (N.D. Cal. 2006) 2006 WL 212021. The court simply noted that it did not find my declaration to be helpful. I was not presented to testify in that case (other than through my declaration). Regardless of what the court wrote regarding my declaration, plaintiffs' attorneys sought fees of $907,676.03. The Court adjusted the hourly rates and hours billed and awarded fees of only $410,728.95.

58. **Millar v. San Francisco Bay Area Rapid Transit** (Superior Court of California, County of Alameda 2004) Case No. C830013-9, Order Awarding Plaintiff and His Counsel Reasonable Attorneys Fees, dated April 12, 2004. The Court found the foundations for my opinions defeated plaintiff's evidentiary objections, but found my opinions to be inadequately supported. As noted above, not all courts accept my opinions.

59. **Oberfelder v. City of Petaluma** (N.D. Cal. 2002) 2002 WL 472308. According to the Court, I used a "computer generator report" to erroneously object to "whole categories of work" without analyzing whether any particular item was "reasonably spent." The court misunderstood (or I insufficiently described) the computerized reports, but accepted my opinions on vagueness.

60. **Oberfelder v. City of Petaluma** (N.D. Cal. 2002) No. C-98-1470 MHP, 2002 WL 472308, aff'd sub nom. *Oberfelder v. Bertoli*, 67 F. App'x 408 (9th Cir. 2003)**.** The Court found the clerical tasks I identified and recommended adjusting were contained in block-billed entries and were essentially *de minimus*. The Court also found the long billing days in this case were reasonable. As noted above, not all courts accept my opinions.

61. **Velez v. Wynne**, 220 F. App'x 512 (9th Cir. 2007). The only issue the Court had with my declaration was my use of a 2-year old survey in support of the hourly rates I recommended. At the time, despite extensive research, that was the only reference rates I could find.

62. **Myles v. County of San Diego** (Case No. 3:15-cv-01985-JAH-BLM, Doc 484, Sep. 29, 2023). Although the Court acknowledged that my opinion referenced my experience with rates charged by San Diego law firms and a fee survey conducted by Judge Anelleo, the

Court stated that it was "not persuaded by [my] opinion [on reasonable rates] which is based on criteria the Court finds irrelevant, namely the size of the firm." However, one, my opinion was not solely based on the size of the law firm as the Court itself acknowledged. Two, a case involving the relevance of law firm size to rates is awaiting an opinion from the Ninth Circuit.

63.     The above are the only cases of which I am currently aware that have criticized or explicitly rejected my opinions, in whole or in part, on legal fees. If I am made aware of any other such cases by opposing counsel or a court I will add to this discussion in future declarations.

EXHIBIT 3



# JIM SCHRATZ
## *President*

- In *Department of Fair Employment and Housing v. United Dominion Realty* (Case Nos. 07CC12067, 02CC12069) the court accepted our audit findings stating, "In awarding fees in these amounts, the court has fully accepted the declaration of James P. Schratz in opposition to the motion, including all of his recommended reductions. The court finds his qualifications to be impressive. Likewise his reasoning as to why the fees sought are excessive is persuasive."

- Retained by investor Carl Icahn and other shareholders as special litigation counsel to review approximately $60 million in professional fees in *In re Tropicana Entertainment, LLC, et al*, Case No. 08-10856 (KJC) ("Tropicana") in the United States Bankruptcy Court for the District of Delaware.

- Retained by investor Carl Icahn and other shareholders to serve as special litigation counsel to review approximately $8 million in legal fees in In *re Adamar of New Jersey, Inc. and Manchester Mall, Inc.*, Case No. 09-20711 and 09-20716 in the United States Bankruptcy Court for the District of New Jersey.

- Appointed by District Court in Northern Mariana Islands to audit $22 million in legal fees in *The Estate of Larry Lee Hillblom*, one of the founders of DHL Express, whose estate was estimated to be worth $1 billion.

- Described by the <u>American Bar Association Journal</u> as a "major player in the field of legal fee audits."

- *In Victaulic Company v. American Home Assurance Company, et al.*, (Case No. RG12642929, Superior Court of the State of California for County of Alameda), I testified on behalf of an $8.3 million Brandt fee request by Victaulic's law firm Pillsbury Winthrop Shaw Pittman LLP, which is what the jury awarded.

- *In Lathrop & Gage v Kenney, (*Civil Action No. 07CC09697, In the Superior Court of California for the County of Orange), I testified at trial and assisted the law firm in recovering approximately $1 million in fees from the client.

- *In Gen. Charles E. Yeager, Victoria Yeager, Charles E. Yeager Revocable Living Trust, and General Chuck Yeager Foundation v. Don A. Lesser, The Lesser Law Group, and Does 1 through 20, inclusive,* Superior Court of California, County of Sacramento, Case No. 34-2011-00109638, I testified at trial and assisted the law firm in successfully seeking its fees from a former client.

- In *North Pacifica, LLC v. City of Pacifica*, United States District Court, Northern District of California, Case No. C-01-4823 EMC, I was retained by the defendant to audit plaintiff's request for $2,046,759.16 in fees and costs. In awarding plaintiffs only $453,810.75 in fees, Magistrate Judge Edward M. Chen cited my audit with approval with respect to various billing issues and noted:

  > [B]ased on the information provided in the declaration, Mr. Schratz has demonstrated that he is qualified to opine about fee awards and that his methodology in evaluating the billing records of NP's attorneys in this case is reasonable and sufficiently reliable. For example, Mr. Schratz's approach to categorizing the nature of the work of the attorneys is reasonable and sufficiently reliable as is, overall, his approach to unblocking the block-billed time entries.

- Qualified as expert witness on issues involving reasonableness of attorneys' fees and proper claims handling procedures in state and federal court.


**PRIOR WORK HISTORY:**


- Vice President, Major Claims, Fireman's Fund Insurance Company

- Director, Corporate Litigation, Fireman's Fund Insurance Company

- Assistant General Counsel, Fireman's Fund Insurance Company

- Associate, Rosenblum, Fenolio, Parish, Jack & Bacigalupi, San Francisco

- Associate, Heller, Ehrman, White, & McAuliffe, San Francisco


**EDUCATION:**

University of San Francisco Law School, J.D., 1976, Editor-in-Chief, Law Review

University of Illinois, M.A. Political Science, 1972

State University of New York at Buffalo, B.A., 1969

- Taught at various law schools and universities in the Bay Area and lectured throughout the United States and in Europe.

- References furnished upon request.

**PUBLICATIONS:**

April 1991, "Managing Insurer, Insured Conflicts of Interest by Use of Independent Counsel," American Bar Association, Section of Litigation, Committee on Insurance, Mid-Year Meeting

June 1992, "Do The Right Thing," <u>California Lawyer</u>

June 1992, "Resolving the Cumis Quandary: Guidelines for Reasonable Fees," <u>Insurance Litigation Reporter</u>

October 1992, "The Alliance Lives," <u>Underwriters Report</u>

October 1992, "The Need For Legal Audits," <u>Verdict</u>

February 1993, "Cumis Counsel's Obligation To Provide Information To The Insurance Company," American Bar Association, Insurance Coverage Litigation Committee, Mid-Winter Meeting

Spring 1993, "The Other Side of the Cumis Coin:  The Insurer's Ability To Select Associate Defense Counsel Under Civil Code, Section 2860 (f)" (with Jon R. Mower), Western <u>State Law Review</u>

July 1993, "Is Your Insurance Company Doing Enough To Fight Fraud?" <u>Risk Management</u>

July 1993, "Why We Lost The Battle Against Insurance Fraud," <u>Claims</u>

September 1993, "Customer Satisfaction - The Secret Weapon in Law Firm Marketing," <u>Washington State Bar News</u>

October 1993, "Tactical Defenses:  An Insurance Company's Guide to Working with Cumis Counsel" (with Jon R. Mower), <u>Claims</u>

October 1993, "Fighting Insurance Fraud Takes Persistence," <u>Missouri Agent</u>

Spring 1994, "Legal Auditing Makes Sense," <u>Legal Audit Review</u>

September 1994, "Empowering Adjusters For Creative Solutions," <u>Best's Review</u>

February 1995, "How To Avoid A Fee Dispute With Your Client," American Bar Association, Insurance Coverage Litigation Committee (with Susan R. Brown)

February 1995, "Billing Guidelines and Fee Disputes," American Bar Association, Insurance Coverage Litigation Committee

April 1995, "Bad Faith for Legal Work? Your Insurer May Be Liable for Mishandling Its Lawyers," <u>Claims Magazine</u>

April 1995, "Is Your Company's Insurance Firm Guilty of Litigation Mismanagement?" <u>The American Lawyer's Corporate Counsel Magazine</u>

May 1995, "Billing Guidelines and Fee Disputes:  A Case Law Review," <u>Trial Diplomacy Journal</u>, Volume 18, Number 3

July 1995, "How to Avoid Fee Disputes" (with Susan Brown), <u>The Practical Litigator</u>, Volume 6, Number 4

April 1996, "Take A Psychological Approach To Managing Legal Fees," <u>Claims</u>

May 1996, "Cross-Examining the Legal Auditor,"  <u>The Practical Litigator</u>, Volume 7, Number 3

August 1996, "Is your Insurance Company Liable for Bad Faith Litigation Management," <u>Business Laws, Inc</u>., Litigation Management

August 1996, "Is Your Company's Insurance Firm Guilty of Litigation Mismanagement," Business <u>Laws, Inc.'s Law Department Management Adviser</u>, Issue No. 149

Fall 1996, "Cross-Examining a Legal Auditor," <u>American Journal of Trial Advocacy</u>, Volume 20:1

November 1996, "Cross-Examining a Legal Auditor," Business Laws, Inc., <u>Law Department Management Adviser</u>, Issue No. 152

August 1997, "The Recovery of Legal Fees and the Use of A Legal Fee Auditor in Fee-Shifting Cases" (with Susan R. Brown), <u>Business Laws, Inc</u>., Law Department Management Adviser

September-October, 1997, "Recovering Legal Fees and using Legal Fee Auditors" (with Susan R. Brown), <u>Trial Diplomacy Journal</u>, Volume 20, Number 5

Winter 1997, "How to Avoid a Fee Dispute with Your Client," (with Susan R. Brown), American Bar Association <u>The Brief</u>, Vol. 26, No. 2

March, 1998, "How the Legal Auditor Can Help You in the Fee-Shifting Case" (with Susan R. Brown), <u>The Practical Litigator</u>, Volume 9, Number 2

March/April 1998, "Strategic Inflection Points in the Legal Profession," <u>American Journal of Trial Advocacy</u>

April 1998, "Controlling the Uncontrollable: When Insurers Must Pay Plaintiff's Legal Fees," <u>Commercial Claims</u>

July 1998, "Strategic Inflection Points in the Legal Profession,"  Business Laws, Inc., <u>Law Department Management Adviser</u>

Summer 1998, "I Told You to Fire Nicholas Farber -- A Psychological and Sociological Analysis of Why Attorneys Overbill," *Rutgers Law Review*, Vol 50; No. 4.

April 2001, "Winning an Attorney's Fee Petition," Rhode Island Bar Journal, Volume XLIX, Number 7

May 2001, "How To Win a Fee Petition," <u>The Practical Litigator</u>, Volume 12, Number 3

August 2001, "How To Win a Fee Petition," <u>The Federal Lawyer</u>, Volume 48, Number Seven

December 2001, "How To Win a Fee Petition:  What the Plaintiff Should Avoid, What the Defendant Should Look For," Business Laws, Inc., <u>Law Department Management Adviser</u>

April 2002, "How to Win a Fee Petition:  What the Plaintiff Should Avoid, What the Defendant Should Look For," Business Laws, Inc.,<u> Corporate Counsel's Guide to Litigation Management</u>

May 31, 2002, "Ballooning Costs – Avoiding Questionable Billing Practices Improves Chance of Recovering Fees," <u>Los Angeles Daily Journal, Dicta</u>

December 14, 2010,  "Winning a Fee Application in Hawaii," <u>Hawaii Bar Journal</u>

EXHIBIT 4

| | Pages |
|---|---|
| **DEPOS** | |
|     Anderson, Erica 5-30-2025 | 135 |
|     Barlow Kathleen   021225 | 103 |
|     Barrera Richard Vol I 021325 | 161 |
|     Barrera Richard Vol II 032725 | 62 |
|     Boe, Jane - Errata Sheet | 1 |
|     Boe, Jane 1-8-2025 | 60 |
|     Brady Errata and Signature | 4 |
|     Brady Phd Christine Erin   060325 | 320 |
|     Doe, Jane 1-27-2025 | 91 |
| Doe, John 1-27-2025 | 41 |
| Faer Laura | 204 |
| Frank Audrey   030425 | 104 |
| Hammack, Marc 1-17-2025 | 139 |
| Mirabelli Corrections Page Deposition 01-07-25 | 1 |
| MIrabelli, Elizabeth 1-7-2025 | 98 |
| Poe, Jane 1-15-2025 | 93 |
| Poe, John 1-15-22025 | 85 |
| Roe, Jane - Errata Page | 2 |
| Roe, Jane 1-8-2025 | 118 |
| Szajnberg, Nathan 5-28-2025 | 132 |
| Tando LMFT Darlene   060625 | 330 |
| Terrill Katie   021225 | 106 |
| West Lori Errata Sheet - 1-7-2025 | 1 |
| West, Lori 1-7-2025 | 100 |
| **HEARINGS** | |
| Hearing Transcripts\2024 0108 Transcript of Hearing - Motion for Judgment on the | 56 |
| Hearing Transcripts\2024 0429 Transcript of Motion Hearing ECF 111 | 46 |
| Hearing Transcripts\2024 0710 Transcript of Hearing - Motion to Amend Complaint | 53 |
| Hearing Transcripts\2024 1202 Transcript of Hearing | 92 |
| Hearing Transcripts\2025 0710 Transcript of Hearing Motion to Amend | 53 |
| Hearing Transcripts\2025 1117 Transcript of Hearing OSC | 182 |
| **PLEADINGS** | |
| Pleadings\1 - Complaint | 293 |
| Pleadings\133 - Second Amended Class Action Complaint | 391 |

| | |
|---|---|
| Pleadings\243 - MOTION to Exclude Defendants Experts Darlene Tando and Christi | 3 |
| Pleadings\243-1 - Attachments # (1) Memo of Points and Authorities | 32 |
| Pleadings\243-2 - Attachments # (2) Declaration of Paul M | 5 |
| Pleadings\243-3 - Attachments # (3) Exhibit A | 328 |
| Pleadings\243-4 - Attachments # (4) Exhibit A-1, A-2, A-4, A-5 | 185 |
| Pleadings\243-5 - Attachments # (5) Exhibit A-6 | 115 |
| Pleadings\243-6 - Attachments # (6) Exhibit A-8 - A-16 | 68 |
| Pleadings\243-7 - Attachments # (7) Exhibit B | 271 |
| Pleadings\243-8 - Attachments # (8) Exhibit B-1 - B-28)(Jonna, Paul) | 181 |
| Pleadings\247 - MOTION for Summary Judgment - Renewed Motion for (1) Summary J | 9 |
| Pleadings\247-1 - Attachments # (1) Memo of Points and Authorities | 70 |
| Pleadings\247-10 - Attachments # (10) Declaration of Dr Anderson | 222 |
| Pleadings\247-11 - Attachments # (11) Declaration of Dr Szajnberg | 194 |
| Pleadings\247-12 - Attachments # (12) Renewed Motion for Manual Filing | 2 |
| Pleadings\247-13 - Attachments # (13) Declaration of Paul Jonna | 9 |
| Pleadings\247-14 - Attachments # (14) Appendix of Authorities - Volume 1 | 176 |
| Pleadings\247-15 - Attachments # (15) Appendix of Authorities - Volume 2 | 50 |
| Pleadings\247-16 - Attachments # (16) Exhibits C & D | 307 |
| Pleadings\247-17 - Attachments # (17) Exhibit E | 310 |
| Pleadings\247-18 - Attachments # (18) Exhibits F & G | 293 |
| Pleadings\247-19 - Attachments # (19) Exhibits H & I | 294 |
| Pleadings\247-2 - Attachments # (2) Declaration of Elizabeth Mirabelli | 204 |
| Pleadings\247-20 - Attachments # (20) Exhibits J, K & L | 368 |
| Pleadings\247-21 - Attachments # (21) Exhibits M, N, & O)(Jonna, Paul) | 346 |

| | |
|---|---|
| Pleadings\247-3 - Attachments # (3) Declaration of Lori West | 54 |
| Pleadings\247-4 - Attachments # (4) Declaration of Jane Boe | 6 |
| Pleadings\247-5 - Attachments # (5) Declaration of Jane Roe | 8 |
| Pleadings\247-6 - Attachments # (6) Declaration of Jane Poe | 29 |
| Pleadings\247-7 - Attachments # (7) Declaration of John Poe | 10 |
| Pleadings\247-8 - Attachments # (8) Declaration of Jane Doe | 22 |
| Pleadings\247-9 - Attachments # (9) Declaration of John Doe | 13 |
| Pleadings\256 - Opposition re [247] MOTION for Summary Judgment - | 65 |
| Pleadings\256-1 - Attachments # (1) Declaration Declaration of Jennifer A Bun | 23 |
| Pleadings\256-10 - Attachments # (10) Objection to Declaration of Jane Poe | 5 |
| Pleadings\256-11 - Attachments # (11) Objection to Declaration of Jane Roe | 4 |
| Pleadings\256-12 - Attachments # (12) Objection to Declaration of John Doe | 7 |
| Pleadings\256-13 - Attachments # (13) Objection to Declaration of John Poe | 6 |
| Pleadings\256-14 - Attachments # (14) Objection to Declaration of Elizabeth Mi | 3 |
| Pleadings\256-15 - Attachments # (15) Objection to Declaration of Lori Ann Wes | 4 |
| Pleadings\256-2 - Attachments # (2) Declaration Declaration of Dr Chistine E | 142 |
| Pleadings\256-3 - Attachments # (3) Declaration Declaration of Darlene Tando, | 91 |
| Pleadings\256-4 - Attachments # (4) Declaration Declaration of Maria Al-Shamma | 13 |
| Pleadings\256-5 - Attachments # (5) Declaration Declaration of Richard Barrera | 32 |
| Pleadings\256-6 - Attachments # (6) Objection to Declaration of Jane Doe | 9 |
| Pleadings\256-7 - Attachments # (7) Objection to Declaration of Dr Erica E | 41 |

| | |
|---|---|
| Pleadings\256-8 - Attachments # (8) Objection to Declaration of Nathan M Szaj | 8 |
| Pleadings\256-9 - Attachments # (9) Objection to Declaration of Jane Boe | 4 |
| Pleadings\259 - RESPONSE in Opposition re [243] MOTION to Exclude Defendants E | 31 |
| Pleadings\259-1 - Attachments # (1) DECLARATION OF DR CHRISTINE ERIN LAM BRAD | 142 |
| Pleadings\259-2 - Attachments # (2) DECLARATION OF JENNIFER A BUNSHOFT IN SUP | 42 |
| Pleadings\259-3 - Attachments # (3) DECLARATION OF DARLENE TANDO, LCSW, IN SUP | 91 |
| Pleadings\265 - RESPONSE in Support re [243] MOTION to Exclude Defendants Expe | 6 |
| Pleadings\269 - RESPONSE in Support re [247] MOTION for Summary Judgment - Ren | 30 |
| Pleadings\269-1 - Attachments # (1) Objections to Declarations of Maria Al-Sha | 8 |
| Pleadings\269-2 - Attachments # (2) Suppl Declaration of Father John Poe | 6 |
| Pleadings\269-3 - Attachments # (3) Suppl | 53 |
| Pleadings\269-4 - Attachments # (4) Suppl Declaration of Elizabeth Mirabelli) | 19 |
| Pleadings\286 - ORDER granting [244] Class Certification Signed by Judge Roge | 13 |
| Pleadings\289 - ORDER denying [243] Plaintiffs motions to exclude the testimon | 7 |
| Pleadings\290 Order severing teacher claims against EUSD | 4 |
| Pleadings\307 - ORDER Granting Summary Judgment in Favor of the Plaintiffs on | 52 |
| Pleadings\308 - ORDER Granting Plaintiffs Motion for a Class-Wide Permanent In | 4 |
| Pleadings\80 - Amended Verified Complaint | 328 |
| | |
| | |
| **TOTAL PAGES** | **9134** |

EXHIBIT 5


Neutral
As of: February 7, 2022 9:27 PM Z

# *Montes v. Duran*

United States District Court for the Central District of California

August 3, 2021, Decided; August 3, 2021, Filed

Case No. 2:20-cv-00468-MCS-RAO

**Reporter**

2021 U.S. Dist. LEXIS 156657 *; 2021 WL 3623306

LEE MONTES, Plaintiff, v. OFFICER DURAN, #673, et al., Defendants.

**Subsequent History:** Motion for new trial denied by *Montes v. Duran, 2021 U.S. Dist. LEXIS 156600 (C.D. Cal., Aug. 3, 2021)*

Dismissed by, Judgment entered by *Montes v. Duran, 2021 U.S. Dist. LEXIS 156681 (C.D. Cal., Aug. 12, 2021)*

## Core Terms

rates, courts, cases, paralegal, assigning, attorney's fees, per hour, costs, lodestar figure, hourly rate, documents, quotation, expenses, marks, skill, determinations, prevailing, reputation, clerical, expended, Reply, litigation expenses, prevailing party, legal assistant, civil rights, market rate, circumstances, out-of-pocket, declarations, calendaring

**Counsel:** [*1] For Lee Montes, Plaintiff: Kevin Shawn Conlogue, LEAD ATTORNEY, Law Offices of Kevin Conlogue, Beverly Hills, CA USA.

For Officer Duran, No. 673, City of El Monte, Defendants: Brent J Lehman, LEAD ATTORNEY, Olivarez Madruga Lemieux O Neill LLP, Los Angeles, CA USA; Edward B Kang, Thomas M Madruga, Olivarez Madruga Lemieux O'Neill LLP, Los Angeles, CA USA.

For Officer Raneer, No. 664, Defendant: Brent J Lehman, LEAD ATTORNEY, Olivarez Madruga Lemieux O Neill LLP, Los Angeles, CA USA;

Thomas M Madruga, Olivarez Madruga Lemieux O'Neill LLP, Los Angeles, CA USA.

For Phyllis W Cheng, Mediator (ADR Panel): Phyllis Wei-Erh Cheng, LEAD ATTORNEY, Phyllis Cheng.

**Judges:** MARK C. SCARSI, UNITED STATES DISTRICT JUDGE.

**Opinion by:** MARK C. SCARSI

## Opinion

**ORDER RE: MOTION FOR ATTORNEY'S FEES AND COSTS (ECF NO. 78)**

Plaintiff Lee Montes moves for an order awarding him reasonable attorney's fees and costs. (Mot., ECF No. 78.) Defendants City of El Monte and Officer Clayton Duran filed an opposition brief, and Plaintiff filed a reply brief. (Opp'n, ECF No. 84; Reply, ECF No. 85.) The Court deems the motion appropriate for decision without oral argument. *Fed. R. Civ. P. 78(b)*; C.D. Cal. R. 7-15. The Court takes off calendar the hearing on the motion set for August 9, 2021.

## I. [*2] BACKGROUND

This case arises from an encounter between Plaintiff and Officer Duran, a police officer of the City of El Monte, on September 30, 2018. (Statement of the Case, ECF No. 46.) The Court

Case 3:23-cv-00768-BEN-VET    Document 334-1    Filed 02/23/26    PageID.18883
Page 93 of 592

Page 2 of 8
2021 U.S. Dist. LEXIS 156657, *2

conducted a two-day jury trial on June 11 and 15, 2021. (Minutes, ECF No. 59; Minutes, ECF No. 62.) A jury found Officer Duran liable under *42 U.S.C. § 1983* for using excessive force against Plaintiff in violation of the *Fourth Amendment to the United States Constitution*. The jury awarded Plaintiff $235,000 in compensatory damages and $1,000,000 in punitive damages. (Special Verdict, ECF No. 70.)

## II. LEGAL STANDARD

*Federal Rule of Civil Procedure 54(d)(2)* authorizes a party to make a claim for attorney's fees and related nontaxable expenses by motion. In an action under *42 U.S.C. § 1983*, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." *42 U.S.C. § 1988(b)*. A prevailing party is a party that "succeed[s] on any significant issue in litigation which achieves some of the benefit the part[y] sought in bringing suit." *Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)* (internal quotation marks omitted). Courts in the Ninth Circuit employ the familiar "lodestar method" to determine reasonable attorney's fees under *§ 1988(b)*. *Roberts v. City & County of Honolulu, 938 F.3d 1020, 1023 (9th Cir. 2019)*. The lodestar method proceeds in two steps. First, courts multiply the number of hours reasonably expended **[*3]** on the litigation by a reasonable hourly rate to arrive at the lodestar figure. Second, courts may adjust the figure upward or downward based on factors not subsumed in the lodestar figure. *Id. at 1023-24*.

## III. DISCUSSION

Defendants do not contest that Plaintiff is the prevailing party, that the Court should exercise its discretion to award attorney's fees, and that the Court should award out-of-pocket litigation expenses in the amount requested. Defendants challenge Plaintiff's requested rates, take issue with

several billed items, and oppose Plaintiff's request for a fee multiplier. (*See generally* Opp'n 5-15.)

### A. Reasonable Hourly Rates

In determining the reasonable hourly rate, courts consider "[t]he prevailing market rates in the relevant community," which is "the forum in which the district court sits." *Gonzalez v. City of Maywood, 729 F.3d 1196, 1205 (9th Cir. 2013)* (internal quotation marks omitted). Courts must consider the experience, skill, and reputation of attorneys and paralegals in determining the appropriate rate. *Id. at 1205-06*; *accord Hiken v. Dep't of Def., 836 F.3d 1037, 1044 (9th Cir. 2016)* (imploring courts to consider the "experience, reputation, and ability of the attorney; the outcome of the results of the proceedings; the customary fees; and the novelty or the difficulty of the question presented.") (internal **[*4]** quotation marks omitted)). The movant must submit evidence to support the requested hourly rates. *Roberts, 938 F.3d at 1024*; *Gonzalez, 729 F.3d at 1205*. Courts ordinarily look to attorney affidavits and rate determinations in other cases to ascertain the prevailing fees in the community. *Roberts, 938 F.3d at 1024*; *Camacho v. Bridgeport Fin., Inc., 523 F.3d 973, 980 (9th Cir. 2008)*. Judges also may apply their own knowledge of rates in the community. *See Ingram v. Oroudjian, 647 F.3d 925, 928 (9th Cir. 2011)*.

Plaintiff requests a rate of $700 per hour for Kevin S. Conlogue, lead trial counsel, and a rate of $200 per hour for Judy Y. Yip, Mr. Conlogue's legal assistant. Plaintiff submits attorney declarations, Wolters Kluwer's *2018 Real Rate Report*, and the 2021 Laffey Matrix in support of these rates. (Mot. 5-8.) Defendants respond that Plaintiff has not met his burden to establish that either requested rate is appropriate. However, Defendants do not provide any rebuttal evidence of the prevailing rates in the community, let alone any persuasive justification for the $350 rate they suggest for Mr. Conlogue and the $50 rate they suggest for Ms. Yip. (*See* Opp'n

6-11.) *See also Camacho, 523 F.3d at 980* (placing burden on the opposing party to submit rebuttal evidence to challenge the accuracy and reasonableness of the prevailing party's evidence). Nonetheless, the Court evaluates whether Plaintiff meets **[*5]** his initial burden to proffer evidence supporting the rates he requests and concludes that he does not.

1. Mr. Conlogue

Mr. Conlogue graduated from Loyola Law School in 2012 at the top of his class. Before opening his own practice to represent civil rights claimants, he gained litigation experience at the Law Offices of Preston Easley; Kabateck Brown Kellner, LLP; Zuckerman & Rowley; and Drake Law Firm. He has tried no fewer than 20 cases to verdict in state and federal court. (Conlogue Decl. ¶¶ 6-10, ECF No. 78-4.)

Mr. Conlogue bases the request for a $700 per hour rate on the difficulty and undesirability of the case; his extensive involvement in the day-to-day management of the case; the skill, experience, and ability he employed in preparing for and presenting the case at trial; and his agreement to take the case on a contingency basis. (*Id.* ¶¶ 3, 5, 19-22.) Plaintiff also submits declarations from two civil rights attorneys from the greater Los Angeles legal community, Thomas E. Beck and Gabriel H. Avina, both of whom opine that $700 per hour is within the range of reasonable market rates for civil rights attorneys of Mr. Conlogue's skill, experience, and reputation. (Beck Decl. **[*6]** ¶ 5, ECF No. 78-1; Avina Decl. ¶ 8, ECF No. 78-2.) The Court assigns limited weight to the attorneys' declarations. Courts often question the value of attorney declarations concerning rates, as "[a] high award in this case would support the declarants' own high hourly rate requests in the future." *Kochenderfer v. Reliance Standard Life Ins. Co., No. 06-CV-620 JLS (NLS), 2010 U.S. Dist. LEXIS 41330, at *10 (S.D. Cal. Apr. 21, 2010)*; *see also, e.g., Antuna v. County of Los Angeles, No. CV 14-5600-MWF (PLAx), 2016 U.S. Dist. LEXIS 189152, at *9 (C.D. Cal. Mar. 8, 2016)* ("The Court does not assign much weight to

Plaintiffs' [submitted] declarations given their self-serving nature.").

Wolters Kluwer's *2018 Real Rate Report* indicates that litigation partners in Los Angeles in the third quarter of 2018 charged hourly rates between $395 and $908, with a median rate of $650. Litigation associates charged between $355 and $670, with a median rate of $510. (Conlogue Decl. Ex. 6, ECF No. 78-10.) Many district courts use the *Real Rate Report* in evaluating attorney's fee applications. *E.g., Kries v. City of San Diego, No. 17-cv-1464-GPC-BGS, 2021 U.S. Dist. LEXIS 6826, at *22 (S.D. Cal. Jan. 13, 2021)* (collecting cases approving use of the *Real Rate Report*). However, the edition Plaintiff submits is three years old. The report has limited value given its age. *See Bell v. Clackamas County, 341 F.3d 858, 869 (9th Cir. 2003)* (finding district court abused its discretion in applying market rates in effect two years before the work performed). Further, the excerpts from the report Plaintiff presents provide a broad view **[*7]** of rates for litigation attorneys and are not specific to the civil rights bar or to solo practitioners like Mr. Conlogue. The Court gives limited credit to the report.

The Laffey Matrix indicates that attorneys with 8-10 years' experience in the District of Columbia area charge approximately $672 per hour. (Conlogue Decl. Ex. 5, ECF No. 78-9.) The Ninth Circuit has implicitly disapproved using the Laffey Matrix to show the prevailing rate in communities outside the District of Columbia area. *See Roberts, 938 F.3d at 1024*. Plaintiff suggests the Laffey Matrix rates may be "[a]djusted by locality pay differentials," (Mot. 7), but the Court declines to entertain his unexplained calculations for geographic differences in rates. The Laffey Matrix provides little to no information concerning the market rates in the Los Angeles area.

The Court considers rates approved for Mr. Conlogue in previous cases. *See United Steelworkers of Am. v. Phelps Dodge Corp., 896 F.2d 403, 407 (9th Cir. 1990)* ("[R]ate

determinations in other cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate."). Mr. Conlogue avers that a state superior court approved a rate of $500 per hour in a breach of contract case in 2017-2018. (Conlogue Decl. ¶ 11.) In [*8] its independent research, the Court discovered that federal district courts awarded Mr. Conlogue a rate of $550 per hour in 2019, *Singh v. Roadrunner Intermodal Servs., LLC, No. 1:15-cv-01497-DAD-BAM, 2019 U.S. Dist. LEXIS 11724, at *30 (E.D. Cal. Jan. 24, 2019)*, and a rate of $275 per hour in 2016, *Cervantes v. County of Los Angeles, No. CV 12-09889 DDP (MRWx), 2016 U.S. Dist. LEXIS 23378, at *7 (C.D. Cal. Feb. 24, 2016)*. These rate determinations are relatively old, and the Court considers them accordingly. *See Roberts, 938 F.3d at 1024-25* (reversing rate determination predicated solely on hourly rates awarded in prior cases).

Finally, the Court considers rates approved for attorneys in other civil rights cases in this district. Rates range from $375 to $700 for civil rights attorneys with similar experience. *E.g.*, *Craig v. County of Orange, No. SACV 17-00491-CJC (KESx), 2019 U.S. Dist. LEXIS 238485, at *8-9 (C.D. Cal. Sept. 5, 2019)* (assigning $625 rate to attorney with 12 years' experience); *Mkay Inc. v. City of Huntington Park, No. CV 17-01467 SJO (AFM), 2019 U.S. Dist. LEXIS 69150, at *10-12 (C.D. Cal. Mar. 7, 2019)* (assigning $525 rate for attorney with 13 years' experience, and $500 rate for attorney with 12 years' experience); *Hoffman v. County of Los Angeles, No. CV 15-3724 FMO (ASx), 2018 U.S. Dist. LEXIS 1162, at *22-23 (C.D. Cal. Jan. 3, 2018)* (assigning $700 rate to attorney with nine years' experience); *Antuna, 2016 U.S. Dist. LEXIS 189152, at *10* (collecting cases for the proposition that solo practitioners in civil rights cases with 10-28 years' experience merit reasonable rates of $425-500); *Contreras v. City of Los Angeles, No. 2:11-cv-1480-SVW-SH, 2013 U.S. Dist. LEXIS 49412, at *9-10 (C.D. Cal. Mar. 28, 2013)* (assigning $400 rate for attorney with 12 years' experience and $375 rate for attorney with

eight years' experience). The Court weighs these decisions considering their relative age.

Considering this evidence, Mr. Conlogue's skill in managing the litigation by himself [*9] on behalf of a client whose personal circumstances might have dissuaded other attorneys from representing him, the Court's own knowledge of rates in the community, and the totality of the circumstances, the Court determines that $575 is a reasonable rate for an attorney of Mr. Conlogue's skill, experience, and reputation in the greater Los Angeles legal community.

## 2. Ms. Yip

Plaintiff submits very little evidence supporting a $200 rate for Ms. Yip. Ms. Yip is a 2018 graduate of California State University, Long Beach, and she opines without explanation that her legal assistant services are worth $200 per hour. (Yip Decl. ¶¶ 2, 4, ECF No. 78-3.) Mr. Conlogue also opines that Ms. Yip's "paralegal work" should be compensated at a $200 rate, but he too does not explain the basis of his opinion. (Conlogue Decl. ¶ 19.) Further, Ms. Yip has not provided proof that she is a certified paralegal. Although the Laffey Matrix suggests a rate of $206 for paralegals and law clerks in the District of Columbia area, (Conlogue Decl. Ex. 5), the Court again questions the relevance of this rate to the greater Los Angeles legal community, *see Roberts, 938 F.3d at 1024*. Further, the Laffey Matrix does not indicate the appropriate [*10] rate for legal assistants without a paralegal certificate or postgraduate legal degree.

Given this dearth of evidence, the Court reviews rates awarded for paralegal and legal assistant work in civil rights cases in this district. The Court observes that approved rates range between $65 and $150. *E.g.*, *Mkay Inc., 2019 U.S. Dist. LEXIS 69150, at *8-9, 12* (assigning rates of $100 and $150 for non-attorney staff); *Spangler v. County of Ventura, No. 2:16-cv-09174-ODW-GJS, 2018 U.S. Dist. LEXIS 182675, at *11-13 (C.D. Cal. Oct. 24, 2018)* (assigning rate of $85 for paralegal work); *Hoffman, 2018 U.S. Dist. LEXIS 1162, at *25*

(assigning $150 rate for paralegal work); *Antuna, 2016 U.S. Dist. LEXIS 189152, at \*31* (assigning $65 rate for paralegal work); *Cervantes, 2016 U.S. Dist. LEXIS 23378, at \*7* (assigning $125 rate for paralegal work). Again, the Court weighs this information considering the relative age of these decisions.

Considering this evidence, the Court's own knowledge of rates in the community, and the totality of the circumstances, the Court determines that $90 is a reasonable rate for a legal assistant of Ms. Yip's skill, experience, and reputation in the greater Los Angeles legal community.

## B. Reasonable Hours Expended

Courts calculate the number of compensable hours "by considering whether, in light of the circumstances, the time could reasonably have been billed to a private client." *Moreno v. City of Sacramento, 534 F.3d 1106, 1111 (9th Cir. 2008)*. The movant bears the burden of establishing the number of hours it requests is reasonable. *Gonzalez, 729 F.3d at 1202*. Courts **[\*11]** should begin the analysis "with the billing records the prevailing party has submitted." *Id.* If the records include hours that could not reasonably be billed to a private client because they are inadequately documented or "excessive, redundant, or otherwise unnecessary," a court may exclude such hours from the sum or, if faced with a "massive fee application," may apply "across-the-board percentage cuts." *Id. at 1203* (internal quotation marks omitted); *accord Chalmers v. City of Los Angeles, 796 F.2d 1205, 1210 (9th Cir. 1986)* (authorizing deduction of inadequately documented hours).

Plaintiff provides contemporaneous time records indicating Mr. Conlogue expended 357.0 hours[1]

---

[1] This is a sum of the 316.2 hours Mr. Conlogue expended as of the date Plaintiff filed the motion and the 40.8 hours Mr. Conlogue expended after that date. *See Camacho, 523 F.3d at 981* ("[T]ime spent in establishing the entitlement to and amount of the fee is

and Ms. Yip expended 9.5 hours on this matter. (Conlogue Decl. Ex. 1, ECF No. 78-5; Yip Decl. Ex. 4, ECF No. 78-8; Conlogue Reply Decl. Ex. 8, ECF No. 85-2.) Defendants do not argue that any of the hours are inadequately documented, excessive, redundant, or otherwise unnecessary. Instead, they contend that Mr. Conlogue's time records contain numerous entries that should be deemed noncompensable clerical work, and that all of Ms. Yip's work was clerical and unrecoverable. (Opp'n 11-12.) "[P]urely clerical or secretarial tasks should not be billed at a paralegal [or lawyer's] rate, regardless **[\*12]** of who performs them . . . ." *Sierra Club v. U.S. Env't Prot. Agency, 625 F. Supp. 2d 863, 868 (C.D. Cal. 2007)* (alterations in original) (quoting *Missouri v. Jenkins, 491 U.S. 274, 288 n.10, 109 S. Ct. 2463, 105 L. Ed. 2d 229 (1989)*).[2]

The Court declines to extend Defendants' challenge to Mr. Conlogue's time records beyond the four entries they cite, which memorialize serving documents, calendaring dates, and updating files. (Opp'n 12.)[3] *See Indep. Towers of Wash. v. Washington, 350 F.3d 925, 929 (9th Cir. 2003)* (declining to manufacture arguments for a party). Plaintiff does not substantively dispute that Mr. Conlogue's service efforts are noncompensable at attorney rates. (*See* Reply 4 (arguing instead that Plaintiff "would have incurred costs regardless").) *See Robinson v. Padilla, No. 2:07-cv-1072-GEB-KJM, 2008 U.S. Dist. LEXIS 119330, at \*2 (E.D. Cal. Apr. 7, 2008)* (observing that serving documents is secretarial work). The Court deducts 3.0 hours attributed to the service line items. (*See* Conlogue Decl. Ex. 2, at 501, 503, ECF No. 78-6

---

compensable." (internal quotation marks omitted)).

[2] Plaintiff argues that different rules apply to *Section 1983* cases. (Reply 4 (citing *Tucker v. City of New York, 704 F. Supp. 2d 347, 356 (S.D.N.Y. 2010)*).) The out-of-circuit decision he cites does not stand for the proposition. *See Tucker, 704 F. Supp. 2d at 356* (characterizing party's attempt to recover for clerical work performed by attorneys "indefensible").

[3] Defendants identify a second instance of calendaring, (Opp'n 12), but the page they cite contains a second instance of service, (*see* Conlogue Decl. Ex. 2, at 503, ECF No. 78-6).

(claiming 2.4 hours for service of summons in January 2020 and 0.6 hours for service of a subpoena in August 2020).) The other two entries are compensable. The Court agrees with Defendants that calendaring dates, standing alone, is a clerical task. *See Mitchell v. Chavez, No. 1:13-cv-01324-DAD-EPG, 2018 U.S. Dist. LEXIS 109386, at *34-35 (E.D. Cal. June 29, 2018)* (collecting cases characterizing calendaring as a clerical task). Although the entry in question employs the verb "calendared," it also indicates Mr. Conlogue engaged in legal work by reviewing court orders and calculating dates **[*13]** based on procedural rules. (*See* Conlogue Decl. Ex. 2, at 502.) Further, Plaintiff's reply brief indicates that the entry for "[u]pdat[ing] file with docs received" memorializes Mr. Conlogue's analysis of documents to determine whether a lawsuit was viable, which is legal work. (Conlogue Decl. Ex. 2, at 500; *see* Reply 4.)

Defendants challenge all of Ms. Yip's entries. (Opp'n 12.) The Court's review uncovers only one purely secretarial line item, making copies of exhibits. (Yip Decl. Ex. 4, at 520.) *See Deocampo v. Potts, No. 2:06-1283 WBS CMK, 2014 U.S. Dist. LEXIS 24639, at *22 (E.D. Cal. Feb. 24, 2014)* (characterizing "copying, scanning, and faxing documents" as clerical work). The Court deducts 2.9 hours attributed to this task.

With these deductions, the Court determines that Mr. Conlogue reasonably expended 354.0 hours on compensable tasks, and Ms. Yip reasonably expended 6.6 hours.

## C. Lodestar Figure

Based on the rates and hours determined above, the lodestar figure is as follows:

⊞Go to table1

## D. Adjustment

The lodestar figure represents a presumptively reasonable attorney's fee. *Gonzalez, 729 F.3d at 1202*. However, the Court may adjust the lodestar based on several factors:

> (1) the time and labor required, (2) the novelty **[*14]** and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Id. at 1209 n.11* (quoting *Morales v. City of San Rafael, 96 F.3d 359, 363 n.8 (9th Cir. 1996)*).

Plaintiff asks for an enhancement of the lodestar due to counsel's superior performance at trial, and in order to induce competent counsel to accept similar cases. (Mot. 10.) Defendants respond that this is not an exceptional case in which a fee enhancement would be appropriate. (Opp'n 12-15.)

The Court agrees with Defendants. Plaintiff does not offer evidence demonstrating why this case warrants a rare, exceptional enhancement. *Perdue v. Kenny A., 559 U.S. 542, 552-53, 130 S. Ct. 1662, 176 L. Ed. 2d 494 (2010)* (noting enhancements are "rare and exceptional," and requiring movant to "produce specific evidence that supports the award" (internal quotation marks omitted)). Despite the **[*15]** favorable verdict, an enhancement is unwarranted here given Plaintiff's limited success: at trial, the Court dismissed and Plaintiff withdrew all but one of his theories of liability, including all claims against the City. (*Compare* Pl.'s Mem. of Contentions of Fact & Law 2, ECF No. 37 (presenting five claims), *with* Day Two Tr. 134, ECF No. 81 (withdrawing unreasonable seizure claim), *and id.* at 136-37 (granting *Rule 50* motion on malicious prosecution claim and *Monell*

ratification claim).) *See Mendez v. County of San Bernardino, 540 F.3d 1109, 1130 (9th Cir. 2008)* (obliging courts to consider the results obtained by and extent of success of the prevailing party in considering whether to deviate from the lodestar figure).

Defendants do not lobby for a fee reduction, and the Court finds the lodestar figure reasonable given Plaintiff's mixed success on his claims. The Court awards $204,144.00 in attorney's fees.

### E. Litigation Expenses

Plaintiff seeks to recover out-of-pocket litigation expenses under *42 U.S.C. § 1988(b)*. (Mot. 11.) Defendants do not respond to this request. (*See generally* Opp'n.)

Even if litigation expenses are not recoverable as taxable costs under *Federal Rule of Civil Procedure 54(d)(1)* and *28 U.S.C. § 1920*, "reasonable out-of-pocket expenses that would normally be charged to a fee paying client" may be recovered under **[*16]** *42 U.S.C. § 1988*. *Woods v. Carey, 722 F.3d 1177, 1179 n.1 (9th Cir. 2013)* (internal quotation marks omitted). Examples of such expenses include "photocopying, paralegal expenses, and travel and telephone costs." *Id.* (internal quotation marks omitted).

Plaintiff's table of costs lists expenses for filing, printing, traveling, parking, sending mail, conducting depositions, and ordering transcripts. (Conlogue Decl. Ex. 7, ECF No. 78-11.) On the basis of Defendants' non-opposition, the Court deems the expenses set forth in Plaintiff's table of costs reasonable and recoverable under *§ 1988(b)*. The Court awards Plaintiff $3,860.50 in out-of-pocket litigation expenses.[4]

### IV. CONCLUSION

The motion is granted in part and denied in part. The Court awards Plaintiff $204,144.00 in attorney's fees and $3,860.50 in reasonable out-of-pocket expenses pursuant to *42 U.S.C. § 1988(b)*. Within 14 days, Plaintiff shall file a proposed final judgment consistent with this Order.

**IT IS SO ORDERED**.

Dated: August 3, 2021

/s/ Mark C. Scarsi

MARK C. SCARSI

UNITED    STATES    DISTRICT    JUDGE

---

[4] The motion does not indicate whether Plaintiff will seek to recover taxable costs under *Rule 54(d)(1)*. Any application to tax costs must be submitted for determination by the Clerk in compliance with **Local Rule 54-2 et seq.** and must not seek recovery for expenses awarded in this Order.

EXHIBIT 6

# *Int'l Bhd. of Teamsters, Local 396 v. NASA Servs.*

United States District Court for the Central District of California

March 6, 2019, Decided; March 6, 2019, Filed

2:18-cv-03681-SVW-E

**Reporter**

2019 U.S. Dist . LEXIS  123669 *

International Brotherhood of Teamsters, Local 396 v. NASA Services, Inc.

**Prior History:** *Int'l Bhd. of Teamsters, Local 396 v. NASA Servs., 2019 U.S. Dist. LEXIS 40824 (C.D. Cal., Jan. 16, 2019)*

**Counsel:** **[*1]** For International Brotherhood of Teamsters, Local 396, Petitioner: F Benjamin Kowalczyk, Paul L More, LEAD ATTORNEYS, McCracken Stemerman and Holsberry LLP, San Francisco, CA USA.

For Nasa Services, Inc., Respondent: L Brent Garrett, LEAD ATTORNEY, Brian M Wheeler, Atkinson Andelson Loya Ruud and Romo, Cerritos, CA USA.

**Judges:** STEPHEN V. WILSON, UNITED STATES DISTRICT JUDGE.

**Opinion by:** STEPHEN V. WILSON

# Opinion

## CIVIL MINUTES - GENERAL

**Proceedings**: ORDER GRANTING PETITIONER'S MOTION FOR ATTORNEY'S FEES [29]

On January 16, 2019, the Court granted a motion to compel arbitration brought by Petitioner International Brotherhood of Teamsters, Local 396 ("Local 396" or the "Union") against NASA Services, Inc. ("NASA" or the "Employer")

pursuant to a mutually-executed labor peace agreement between the parties (the "LPA"). *See* Dkt. 28. In the Order, the Court stated that, "[b]ecause the Court grants Local 396's motion to compel arbitration, Local 396 is entitled to an award of attorney's fees and costs as provided by the LPA." *Id.* at 28. The Court advised the parties to address in their briefing the question of whether an award of attorney's fees is ripe notwithstanding the fact that arbitration over the parties' substantive dispute—whether **[*2]** the LPA remains in effect due to the potential failure of a condition precedent to the performance of the parties' obligations under the LPA—has yet to be completed. *Id.* at 28-29.

Consistent with the Court's order, on January 30, 2019, Local 396 filed a motion for attorney's fees. Dkt. 29. For the reasons stated below, Local 396's motion is GRANTED.

## I. Ripeness

NASA argues that Local 396's request for attorney's fees is not ripe under either federal law or California state law. NASA is incorrect on both accounts, because NASA's argument relies on the erroneous conclusion that Paragraph 14 of the LPA is a "prevailing party" fee-shifting provision.

Paragraph 14 of the LPA sets forth the framework for an award of attorney's fees as follows: "Any party who unsuccessfully resists arbitration or an arbitration award under this Agreement shall be liable for the other party's legal fees and expenses for enforcement." Dkt. 1 Ex. A., ¶ 14. This sentence does not require that a party be labeled as a "prevailing party" for purposes of attorney's fees.

2019 U.S. Dist . LEXIS  123669, *2

Instead, as the Court noted in its Order compelling arbitration, the LPA merely states that an award of fees and expenses is available against any party who "unsuccessfully [*3] *resists* arbitration," without regard to whether the ensuing arbitration concludes in that party's favor. *Id.* ¶ 14 (emphasis added); *see also* Dkt. 28 at 29 n. 6. Moreover, the LPA explicitly separates the concept of resisting "arbitration" from resisting "an arbitration award," implying that attorney's fees are ripe following a successful motion to compel arbitration as a separate point in time from the conclusion of the arbitration, at which point a party's resistance to the actual arbitration award may subject that party to a separate award of attorney's fees from one at the "motion to compel" stage.

From the standpoint of pure contractual interpretation, NASA was "unsuccessful" in its attempt to "resist" Local 396's motion to compel arbitration, by virtue of the fact that the Court granted Local 396's motion to compel arbitration. Nothing more is required to allow for Local 396 to recover its fees and expenses incurred in bringing this action. Because of the clear and unambiguous language of the LPA's fee-shifting provision, the cases NASA cites where courts determine the meaning of "prevailing party" under the LMRA or in other federal contexts are not relevant here. *See* [*4] *Sheet Metal Workers' Int'l Ass'n, Local Union No. 115 v. Alliance Mech. Corp., No. SACV 09-1163 RNB, 2011 U.S. Dist. LEXIS 129946, 2011 WL 7047040, at *2 (C.D. Cal. Nov. 7, 2011)* (interpreting a labor agreement providing for attorney's fees to a "party seeking to enforce the [arbitration] award [that] *prevails* in litigation") (emphasis added); *see also* Dkt. 33 at 9-10 (citing cases interpreting "prevailing party" in the context of the Equal Access to Justice Act, the Americans with Disabilities Act, the Individuals with Disabilities Education Act, the Resource Conservation and Recovery Act of 1976, and the Civil Rights Act of 1964).

NASA's cited state court authority is also not relevant to the LPA, which is governed by *§ 301* of the Labor Management Relations Act (the "LMRA"). The Ninth Circuit has held that "the broad preemptive force of the LMRA applies against *California Civil Code section 1717*." *Roy Allen Slurry Seal v. Laborers Int'l Local Union 1184, 241 F.3d 1142, 1146 (9th Cir. 2001)*. Therefore, NASA's authority relying on *Section 1717* does not apply, as the statutory provision at the heart of those cases is preempted here. Furthermore, even without LMRA preemption, California law does not dictate a contrary result. *Section 1717* states that if a contract provides for an award of attorney's fees and costs to one of the two parties to the contract, "the party who is determined [*5] to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." *Cal. Civ. Code § 1717(a)*. "The primary purpose of *section 1717* is to ensure mutuality of remedy for attorney fee claims under contractual attorney fee provisions." *Santisas v. Goodwin, 17 Cal. 4th 599, 610, 71 Cal. Rptr. 2d 830, 951 P.2d 399 (1998)*. The mutuality of the fee-shifting provision in Paragraph 14 of the LPA is not the issue advanced by NASA here; instead, NASA misreads *Section 1717* to impose a "prevailing party" requirement on the fee-shifting provision in the LPA, even though no such language is found in the agreement.

Instead, under California law, "a court should grant attorney's fees and costs if the contract specifically provides attorney's fees and costs for the party forced to file a petition to compel arbitration." *Patrone v. Plasma Procurement Servs., Inc.*, No. CV 09-03429 RGK (AGRx), 2009 WL 10700383, at *4 (C.D. Cal. July 9, 2009) (citing *Acosta v. Kerrigan, 150 Cal. App. 4th 1124, 1132, 58 Cal. Rptr. 3d 865 (2007))*. An award of attorney's fees against NASA for NASA's refusal to submit to arbitration, requiring Local 396 to file a motion to compel arbitration, and subsequently concluding the litigation in defeat, is what the LPA requires. And in any event, *Section 1717* has been revised to re-define the term "prevailing party" as "the party who recovered a greater [*6] relief in the action on

2019 U.S. Dist . LEXIS  123669, *6

the contract." *Cal. Civ. Code § 1717(b)(1)*. The former version of *Section 1717*, which was the operative version of the statute in NASA's cited cases such as *Lachkar v. Lachkar, 182 Cal. App. 3d 641, 227 Cal. Rptr. 501 (1986)*, defined "prevailing party" as "the party who is entitled to recover the costs of suit." *See Lachkar, 182 Cal. App. 3d at 648*; *see also Turner v. Schultz, 175 Cal. App. 4th 974, 984 n. 5, 96 Cal. Rptr. 3d 659 (2009)* (explaining the revisions to *Section 1717* as broadening the types of successful litigants that may be eligible for attorney's fees under the statute). Thus, even under the state court authority NASA cites relying on *Section 1717*, Local 396 would be considered a "prevailing party" because Local 396 was successful in its motion to compel arbitration, despite the fact that the Court ultimately reserved for the arbitrator the parties' substantive dispute about whether the LPA remains in effect.

NASA has not articulated a legitimate reason why it would be unripe for the Court to award attorney's fees to Local 396 under the LPA following NASA's unsuccessful attempt to resist arbitration in this action. Local 396's motion is plainly ripe per the explicit language of Paragraph 14 of the LPA, and the Court will proceed to address NASA's challenges to the reasonableness of Local 396's requested fees.

## II. Reasonableness of Requested Fees

In the Ninth Circuit, a calculation of **[*7]** an award of attorney's fees begins with the "lodestar" method, which multiplies the number of hours reasonably expended by the party to which fees are awarded by a reasonable hourly rate. *See Caudle v. Bristow Optical Co., Inc., 224 F.3d 1014, 1028 (9th Cir. 2000)* (citing *Hensley v. Eckerhart, 461 U.S. 424, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983))*. After calculating the lodestar, the court then considers whether an adjustment of the lodestar is appropriate based on the factors set forth in *Kerr v. Screen Extras Guild, Inc., 526 F.2d 67 (9th Cir. 1975)*, *abrogated on other grounds by City of Burlington*

*v. Dague, 505 U.S. 557, 112 S. Ct. 2638, 120 L. Ed. 2d 449 (1992)*. *Caudle, 224 F.3d at 1028*; *see also Maxwell v. Lucky Const. Co., Inc., 710 F.2d 1395, 1399 (9th Cir. 1983)* (applying the *Kerr* factors to a LMRA case). Nevertheless, the lodestar is presumed to be the reasonable fee and should not be adjusted except in a rare or exceptional case. *See Pennsylvania v. Del. Valley Citizens' Council for Clean Air, 478 U.S. 546, 565, 106 S. Ct. 3088, 92 L. Ed. 2d 439 (1986)*; *Fischel v. Equitable Life Assurance Soc'y of U.S., 307 F.3d 997, 1007 (9th Cir. 2002)* (citation omitted).

## A. Reasonable Hourly Rate

Counsel for Local 396 seeks a rate of $500 per hour as a reasonable hourly rate. A reasonable hourly rate is assessed in relation to the relevant community—the forum in which the district court sits, *i.e.*, the Central District of California— and considers the rate for similar work performed by an attorney with the requisite skill to perform the duties required of the litigation. *See Camacho v. Bridgeport Fin., Inc., 523 F.3d 973, 979 (9th Cir. 2008)*; *Moreno v. City of Sacramento, 534 F.3d 1106, 1111 (9th Cir. 2008)*. "Affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiffs' **[*8]** attorney, are satisfactory evidence of the prevailing market rate." *United Steelworkers of Am. v. Phelps Dodge Corp., 896 F.2d 403, 407 (9th Cir. 1990)* (citation omitted). The party seeking attorney's fees has the burden to prove that the rate charged to the client is in line with the prevailing market rate. *Carson v. Billings Police Dep't, 470 F.3d 889, 891 (9th Cir. 2006)* (citations omitted).

Local 396 has met this burden. The requested rate of $500 per hour for the work performed by Paul L. More, a partner with 16 years of experience in the field of labor law, is reasonable. Local 396 has attached declarations filed in other cases in California by Richard Pearl, a leading authority on

attorney's fees, confirming that Mr. More's requested fees are within—if not below—the range of rates charged by Los Angeles attorneys with similar experience. *See* Declaration of Paul L. More, Dkt. 29-2 ("More Decl."), ¶¶ 12-13; *see also id.* Exs. 2-4. Based on this evidence, Mr. More's charged rate of $500 per hour is within the prevailing rates of the Los Angeles community, and therefore Local 396's requested rate for purposes of the lodestar calculation is reasonable. *See also Chambers v. Whirlpool Corp., 214 F. Supp. 3d 877, 899 (C.D. Cal. 2016)* (citing other cases showing that, "[i]n Los Angeles, hourly rates between $485 and $750 are common").

NASA's objections to Mr. More's identified rate misunderstand Local **[\*9]** 396's burden of proof. Mr. More does not need to "demonstrate firsthand personal knowledge of the prevailing market rates" in Los Angeles. Dkt. 33 at 27. All Local 396 must do is submit competent evidence that allows the Court to conclude that Mr. More's rates are reflective of the prevailing market rate in the relevant community, which Local 396 has done via Mr. More's declaration and the exhibits thereto. NASA's evidentiary objections to Mr. More's declaration are unfounded, because the Court need not rely on Mr. More's legal conclusions in his declaration to determine that the evidence included with the declaration is sufficient to establish a prevailing market rate. Neither has NASA identified a basis to reject the declarations from Mr. Pearl on the ground that Mr. Pearl "is not familiar with the hourly rate Mr. More is seeking in this case." Dkt. 33 at 28. NASA has not shown why Local 396 was obligated to hire an expert witness to assess specifically whether the attorney who performed the specific work at issue in this case charges a reasonable rate, which would impermissibly require extensive litigation on the issue of attorney's fees. *See Hensley, 461 U.S. at 437* ("A request for attorney's fees should **[\*10]** not result in a second major litigation."). The focus is on the "prevailing market rate of the relevant community," *Carson, 470 F.3d at 891* (quotation marks and citation omitted), and Mr. Pearl's

declarations are sufficient to establish that Mr. More's rate of $500 per hour are within such a rate.

Tellingly, NASA failed to present any evidence to rebut the admissible evidence in Mr. More's declaration. The Ninth Circuit, in a case cited by NASA itself, noted that "[e]vidence establishing that the prevailing community rate is lower than the attorney's charged rate is a sufficient reason to cut the rate used in the lodestar calculation." *Carson, 470 F.3d at 892*. Where the party opposing a request for attorney's fees does not submit contrary evidence establishing a different prevailing market rate, a court may reasonably rely on the uncontroverted evidence submitted by the proponent. *See id.* (affirming a calculation of attorney's fees where "[o]ne side submitted evidence of the prevailing community rate, the other side didn't, and the judge went with the uncontradicted evidence he had"). Without any evidence from NASA to overcome Local 396's prima facie showing that Mr. More's requested rate is within the prevailing market rate, the **[\*11]** uncontradicted evidence submitted by Local 396 establishes that the requested hourly rate is reasonable.

Accordingly, Mr. More's requested hourly rate of $500 is reasonable as falling within the prevailing market rate for Los Angeles.[1]

## B. Reasonable Hours Expended

---

[1] Mr. More's hourly rate is reasonable without the need to refer to the so-called *Laffey* matrix, which was developed to assess the reasonableness of attorney's fees specifically in the District of Columbia with adjustments for inflation. *See Laffey v. Nw. Airlines, Inc., 572 F. Supp. 354, 371-75 (D.D.C. 1983)*, *rev'd in part on other grounds*, *746 F.2d 4, 241 U.S. App. D.C. 11 (D.C. Cir. 1984)*. As the parties both acknowledge, it is unsettled in the Ninth Circuit whether the *Laffey* matrix is a relevant basis for assessing the reasonableness of attorney's fees outside of the District of Columbia. *See Prison Legal News v. Schwarzenegger, 608 F.3d 446, 454 (9th Cir. 2010)*. Neither party has indicated whether an adjustment for inflation is even necessary in light of the fact that all relevant work performed on this case occurred within the last 12 months.

Reasonable attorney's fees are calculated in the Court's equitable discretion as "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley, 461 U.S. at 433*. The party seeking an award of attorney's fees bears the burden to "document[] appropriate hours expended and hourly rates." *Id. at 437*; *see also McCown v. City of Fontana, 565 F.3d 1097, 1102 (9th Cir. 2009)*. However, the party resisting attorney's fees "bears the burden of providing specific evidence to challenge the accuracy and reasonableness of the hours charged." *McGrath v. County of Nevada, 67 F.3d 248, 255 (9th Cir. 1995)* (citations omitted). District courts are then authorized in their discretion to "attempt to identify specific hours that should be eliminated," *Hensley, 461 U.S. at 436-37*, including hours that are "excessive, redundant, or otherwise unnecessary," *id. at 434*. The Ninth Circuit also discourages "block billing," the practice of lumping multiple tasks performed during the same day into a single entry on a billing sheet, which "makes it more difficult **[*12]** to determine how much time was spent on particular activities." *Welch v. Metro. Life Ins. Co., 480 F.3d 942, 948 (9th Cir. 2007)*; *see also id. at 945 n. 2* (quoting a case in the Tenth Circuit for the definition of "block billing").

Local 396 states that its counsel performed 86.3 hours of work up to, and including, the filing of the instant motion for attorney's fees. *See* More Decl. Ex. A. Mr. More also states in a supplemental declaration attached to Local 396's reply brief that Mr. More spent an additional 4.5 hours to prepare the reply brief and that F. Benjamin Kowalczyk, an associate with Mr. More's firm, spent 2.5 hours reviewing and responding to NASA's voluminous evidentiary objections lodged with NASA's opposition, Dkt. 33-2. *See* Dkt. 34-1 ¶ 1.[2] Thus, with the additional hours for filing the reply brief, the total hours sought by counsel for Local 396 is 93.3 hours. Nevertheless, Local 396 has agreed to a

reduction of 0.5 hours for its entry of a *Rule 26* conference with NASA's counsel on June 8, 2018. Dkt. 34 at 11; *see also* More Decl. Ex. A. Therefore, Local 396's final asserted figure for reasonable hours expended is 92.8.

Local 396's expended hours in this litigation are reasonable. Local 396 presented a sufficiently detailed billing sheet showing the hours **[*13]** worked by Local 396's counsel on this case. *See* More Decl. Ex. A. Although the proceedings in this case were slim, as the Court's lengthy Order compelling arbitration reveals, see Dkt. 28, the issues presented in the case were complex. The central legal issue conflated the question of whether arbitration under the LPA is appropriate with the preliminary determination of whether the LPA is binding and enforceable in the first place, and resolution of these questions required an analysis of both federal law and substantive state law on contract interpretation. Given the tricky nature of the legal questions posed by this case, Local 396 was justified in expending time researching and preparing its petition to compel arbitration and accompanying motion thereafter. NASA's argument that this case "did not raise any novel arguments or issues," Dkt. 33 at 14, is incorrect.

NASA also has not provided a sufficient reason to invalidate any particular entry on Local 396's billing sheet as unreasonably excessive. NASA vaguely argues that 9.5 hours billed to draft the petition to compel arbitration was excessive because of the relatively short length of Local 396's five-page petition. *See* Dkt. 1. **[*14]** But 9.5 hours is a reasonable amount of time to ensure that the first document filed by Local 396 to initiate litigation is prepared in a sufficient manner to withstand challenges from NASA. NASA has not identified an alternate number that is more reasonable than 9.5 hours and has not provided any type of evidence showing that Local 396's actual expended hours either on the petition in this case or other similar petitions in other cases were less than what was billed. Similarly, Local 396 reasonably expended 26 hours to draft and file the motion to

---

[2] Mr. Kowalczyk's billable rate is $300 per hour, Dkt. 34-1 ¶ 3, which is also a reasonable rate in line with the authority cited in Section II.A above.

compel arbitration in this case, see Dkt. 21, which was the sole dispositive motion to resolve the entirety of Local 396's petition. Mr. More's considerable experience notwithstanding, the issues to be resolved in Local 396's motion required a detailed review of legal precedent in a manner not typically conducted in a run-of-the-mill action to compel arbitration under a labor agreement. Counsel for Local 396 was justified in expending greater time to ensure clarity in Local 396's legal positions regarding the motion, because the entirety of the case depended upon it. For the same reasons, it was reasonable for Local 396 to spend 13 hours [**15**] drafting the equally important reply brief, Dkt. 26, and an additional 10 hours to prepare for and attend oral argument on August 27, 2018, see Dkt. 27, which was a lengthy and complicated discussion between the parties and the Court regarding the intertwined legal issues presented by Local 396's motion. Simply put, NASA has not met its burden to provide "specific evidence" to challenge the length of time billed by Local 396 as unreasonable. *McGrath, 67 F.3d at 255* (citations omitted).

Separately, NASA asserts that Mr. More was unreasonable by performing all of the substantive work in this case himself, rather than delegating less significant tasks to Mr. Kowalczyk, a more junior colleague appearing in the caption page of Local 396's filings in this case. NASA's argument is baseless. Counsel for Local 396 had every right to determine how to perform the necessary work on this case, and it was wholly reasonable for Mr. More to perform all of the substantive research and writing in connection with the motion to compel arbitration due to the complexity of issues and the significance of the case to the client. *See* Dkt. 34 at 8. NASA has not identified which tasks were "easily delegable to non-professionals or [**16**] less experienced associates" and should have been delegated to Mr. Kowalczyk or others. *See MacDougal v. Catalyst Nightclub, 58 F. Supp. 2d 1101, 1105 (N.D. Cal. 1999)* (quotation marks and citation omitted). In fact, the Court cannot locate any such delegable entries akin to those referenced

in MacDougal, such as "arrangements for filing, service, faxing and scheduling appointments." *Id. at 1106*. And as Local 396 correctly noted, involving more attorneys on a case may lead to greater inefficiencies and duplication of efforts, meaning that Local 396's ultimate bill from its counsel conceivably could have been *more* expensive had Mr. More utilized Mr. Kowalczyk in a greater capacity on this case. *See Rosenfeld v. U.S. Dep't of Justice, 904 F. Supp. 2d 988, 1005-06 (N.D. Cal. 2012)*. Mr. More's billing sheet reflects reasoned billing judgment and does not represent a "windfall" as NASA argues. *See* Dkt. 33 at 18.

Lastly, NASA incorrectly argues that Local 396 was guilty of block billing and deserves a 20% reduction in the hours billed. A review of Mr. More's billing sheet proves otherwise. The entries on Mr. More's billing sheet are generally listed as daily entries, with the exception of two separate entries for June 12, 2018. The other daily entries each pertain to an isolated assignment or related tasks pertaining to the same general assignment. The [**17**] level of detail provided by Mr. More's billing sheet is sufficient for the Court to conclude that the time spent on each task was reasonable. *See Hensley, 461 U.S. at 437 n. 12* (counsel seeking attorney's fees "is not required to record in great detail how each minute of his time was expended" but at the least should "identify the general subject matter of his time expenditures"); *Lytle v. Carl, 382 F.3d 978, 989 (9th Cir. 2004)* (finding "minimal" time descriptions sufficient to support a district court's award of attorney's fees). Other courts analyzing billing sheets with singular entries for "research, drafting and revising" pleadings and motion papers, similar to Mr. More's time entries in this case, concluded that such entries are sufficiently detailed and do not constitute impermissible block billing. *See, e.g., Maloney v. T3Media, Inc.*, No. CV 14-05048-AB (VBKx), 2015 WL 3879634, at *8 (C.D. Cal. May 27, 2015) (finding that entries including both "[r]esearch and drafting" in connection with a motion does not constitute block billing); *Potter v. Colvin, No. 14-cv-02562-JSC,   2015   U.S.   Dist.   LEXIS   158141,*

2019 U.S. Dist . LEXIS  123669, *17

*2015 WL 7429376, at *2 (N.D. Cal. Nov. 23, 2015)* (declining to reduce an attorney's fees award for block billing because single entries including review of the factual record, research, and drafting briefs are sufficient to allow the court "to evaluate the reasonableness of the hours billed"). **[\*18]** Mr. More's billing sheet provides the requisite detail to allow the Court to conclude that Mr. More's hours billed were reasonable.

In the end, the 92.8 hours expended by counsel for Local 396 to litigate this case is a reasonable figure, well in line with other cases litigating arbitration issues under the LMRA. *See, e.g., Sheet Metal Workers' Int'l Ass'n, 2011 U.S. Dist. LEXIS 129946, 2011 WL 7047040, at *7* (finding 162.35 hours expended on a case featuring cross-motions to confirm or vacate an arbitration award reasonable); *MV Transp., Inc. v. Amalgamated Transit Union, Local 1756, No. CV 10-2775 PSG (VBKx), 2011 U.S. Dist. LEXIS 16314, 2011 WL 488869, at *3 (C.D. Cal. Feb. 2, 2011)* (finding 77.2 hours expended on a case to confirm an arbitration award reasonable). Based on the above, the calculated lodestar for the work performed by Local 396's counsel on this case is 90.3 hours from Mr. More at $500 per hour, or $45,150, plus 2.5 hours from Mr. Kowalczyk at $300 per hour, or $750, arriving at a total of $45,900.

### C. Adjustments to Lodestar

To repeat from above, once a court calculates the lodestar amount of reasonable attorney's fees, the court then must apply the *Kerr* factors to determine whether an adjustment of the lodestar amount is appropriate. *Caudle, 224 F.3d at 1028*. The *Kerr* factors are:

(1) the time and labor required, (2) the novelty and difficulty of the questions involved, **[\*19]** (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time

limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Kerr, 526 F.2d at 70* (citation omitted).

Here, an assessment of the *Kerr* factors as a whole does not warrant an adjustment of the lodestar amount in either direction. As discussed above, the time and labor required in this case was relatively standard compared to other labor-related cases presenting similar arbitration issues. This case did present some highly complex legal issues, but nothing about those issues warrants a greater portion of attorney's fees than what is necessary to compensate Local 396's counsel for the effort actually expended in resolving those issues. Local 396's counsel demonstrated the requisite skill in this case, but the skill required was not substantially **[\*20]** higher than in a typical arbitration dispute. Factors 4-11 have minimal to no impact on the Court's analysis, as those factors are either irrelevant or immaterial. The last factor, awards in similar cases, counsels against an adjustment of the lodestar, since the cases described above all feature awards of attorney's fees in line with those requested by Local 396's counsel here. In sum, this case is not an exceptional one necessitating an adjustment to the lodestar amount of attorney's fees. *See Fischel, 307 F.3d at 1007* (noting the "strong presumption" that the lodestar method is reasonable and that "adjustments [to the lodestar] are the exception rather than the rule") (internal quotation marks and citation omitted).

### III. Conclusion

Based on the analysis above, Local 396's motion for attorney's fees is GRANTED. Local 396 is awarded $45,900 in reasonable attorney's fees for Local 396's successful action to compel arbitration

2019 U.S. Dist . LEXIS 123669, *20

with NASA, pursuant to the terms of the LPA.

IT IS SO ORDERED.

---

**End of Document**

EXHIBIT 7

Benchmark Your Salary with the Legal Operations Compensation Survey                    ✕

 brightflag                 Platform ⌄   Success Stories   Why Brightflag   Events   Resources ⌄        Book a Demo

Resources  ›  Vendor Billing

# 2025 Law Firm Billing Rate Increases: Why Rates Rose and How to Negotiate Lower Fees

  **Sinead Kenny, Director, Customer Insights at Brightflag**
Updated November 4, 2025

Tight budgets and rising costs were a defining characteristic of 2025, and legal billing was no exception. The data from our most recent rates report on the Am Law top 100 firms showed a jump in billing rates of 8.3% — the second-largest increase in the four years since we started tracking these statistics.

The bad news is that rates are likely to continue climbing.

The good news? In-house teams can still take control of rate increases if they know how to navigate this environment. That includes negotiating reasonable rate increases to control costs and ensure they can continue to deliver effective legal services to the broader company.

Here's what you need to know going into 2025.

## Why Law Firm Billing Rates Went Up

Among the most significant factors driving price increases were high rates among top firms and a tight attorney labor market.

### The Inflation Factor: How Rising Costs Impacted Legal Fees

Last year, high inflation and rising interest rates drove up the cost of doing business. To compensate, law firms, like many businesses, raised their rates.

It's worth noting, however, that legal firm rate increases were higher than inflation. This indicates firms raised rates beyond rising costs, influenced by additional factors.

### Why Demand for Top Talent Drives Legal Billing Up

Part of that cost comes from another spike in legal salaries in 2025, building on a trend of salaries shooting up dramatically in recent years. The trend has also hopped the pond, with UK law salaries increasing in tandem with the US. The growth in demand for legal work is also outpacing the entry of new attorneys into the labor market, and firms have fiercer competition than ever to attract and retain top talent.

### Role of In-House Teams

Firms can't increase their rates unilaterally. In-house teams get a right of refusal, or at least a right of negotiation, before rate increases come into effect. In-house teams may have felt that the increases requested were justified given the caliber of work from their firms or the rising costs firms had to shoulder. However, it's also possible that many teams didn't have the data and the processes in place to push back on significant rate increases.

Captured by FireShot Pro: 24 January 2026, 10:27:18
https://getfireshot.com



**Better understand and control timekeeper rates.**
Get Brightflag's report on the latest trends and drivers behind rate increases.

Download now

Hourly Rates in Am Law 100 Firms: Increases and Key Drivers

## The Three Biggest Factors in Law Firm Billing Rates

While a turbulent economy and shifting geopolitical landscape both play a role in rising legal firm rates, most of the cost difference between firms is baked into just three factors.

### Firm Size

The size of the firm you engage in indicates their market power and their ability to command higher rates. The top 50 firms in the US, for instance, charge double the rates of their peers lower down the Am Law® 100 list. These high-grossing, large law firms attract some of the best lawyers in the world, but you're paying for both the expertise and the brand.

### Practice Area

Another key factor in billing rates is the type of legal work being done. High-stakes and complex work, like Mergers and Acquisitions, command a premium, with our latest data showing that the top 25 Am Law firms charge partner rates of $1,680 per hour.

Meanwhile, more routine work, like intellectual property filings, comes with correspondingly lower pricing.

### Geography

Lastly, partner rates vary significantly by metro area, with law firm billing rates reflecting the cost of living of fee earners in the most expensive cities.

For example, our study shows that rates in New York are more than double those charged in Kansas City. Other high-cost cities include Chicago, Los Angeles, Washington D.C., and San Francisco.

## 5 Ways to Negotiate Lower Fees

Rate increases are a normal part of doing business. But that doesn't mean your in-house legal team has to accept increases at face value. Financially prudent in-house teams are increasingly adopting new strategies to manage their legal spend.

That includes evaluating existing partnerships and ensuring that top law firms are only engaged on matters where their expertise is really adding value — instead of hiring them as a matter of course because the relationship is long-standing. For some legal matters, there may also be scope for outsourcing to smaller firms or Alternative Legal Service Providers (ASLPs).

Wherever your legal spending is going, it's worth employing strategies that give you greater insight so you can negotiate the best possible rates. Here are our top tips for getting it right.

### Use an E-Billing System to Enforce Rates

You can't change what you can't see, and many in-house legal teams end up overpaying because of inconsistent invoice reviews or incorrectly charged rates.

To track rates effectively and start the conversation with outside counsel about better potential rates, we recommend using a dedicated e-billing system.

Having e-billing in place also gives your in-house team more control because you can require firms to submit rate requests for their fee-earners. Those can then be checked, approved and automatically monitored on future invoices so that any incorrect charges can be flagged.

## Leverage Data to Better Understand—and Push Back on—Rate Increase Requests

Another advantage of having e-billing in place is that it allows in-house teams to quickly benchmark rate increase requests against the rates they're currently paying. If the increase seems steeper than in previous years, having the data on hand is a valuable way to open up the conversation about why external counsel is requesting an increase and whether it's appropriate.

Remember: You don't have to accept rate increases without question. Having open, honest conversations with outside counsel if you have concerns is both appropriate and a necessary part of managing legal spending.

## Create an Outside Counsel Engagement Strategy

A structured approach to resourcing and engaging outside counsel is a key part of ensuring you're getting the best rates across the board.

Your legal team should assess outside counsel spending by vendor, matter type, and geographic location to determine where there might be opportunities to cut costs.

That, in turn, will allow you to make better choices about which firms to instruct work to and for which matters.

Matt Wheatley, VP of Client Strategy at Priori, puts it like this:

"'Right-sourcing,' a term that describes the process of categorizing legal work and shifting it to internal and external providers that offer the most value, has become a buzzword in the legal industry because the idea it represents is a powerful one. In-house teams that think strategically about where their legal dollars are spent can save money while increasing value even as rates rise."

Once again, a sound e-billing system adds value here by centralizing the information you need for decision-making and making it easy for everyone on the team to access.

## Use a Risk Matrix to Assess When It's Appropriate to Use Top Firms.

If your team already uses Am Law top 100 firms, they're likely to remain a core part of your legal outsourcing strategy. But as you refine your guidelines around outside counsel engagement, you'll likely find some matters that could either be handled internally or shifted to lower-cost providers

Deciding when to engage top firms versus when to instruct work to other providers can still be tricky, however, so it's worth running individual matters through a risk matrix.



For each matter your team is dealing with, assess the legal complexity and the risk associated with that matter. Matters that are both high-risk and high-complexity should continue to be instructed to top firms (think big mergers or high-stakes litigation).

For everything else, your team should make a call about whether it's worth handling the matter internally or whether the time saved by engaging a smaller firm or ALSP is more valuable.

Those decisions will naturally depend on the matter in question. For example, helping a colleague get their legal ducks in a row for a visa application is generally a low-complexity and low-risk task, which is easy to handle internally.

## Monitor Partner Time

Another important consideration in negotiating better rates is the amount of time being spent on your matters by partners at outside firms. They may be worth their weight in gold, but it's not doing your budget any favors if the bulk of work on your matter could actually be handled by someone with an associate's level of expertise.

For example, if a partner is spending 30% of their time on document review, consider negotiating for an associate to handle this task.

Advocating for a closer look at the staffing strategy often proves cost-effective for in-house teams.

Try to develop a staffing strategy collaboratively with outside counsel—and don't hesitate to underscore potential cost-optimization opportunities.

Then, use your e-billing system to monitor partner resourcing and ensure firms are sticking to the guidelines you've established.

## Take Control of Rates with Brightflag

The tips above are a strong starting point for effectively controlling law firm rates. But if you really want to get to grips with how to optimize your legal budget, you need a legal spend management system like Brightflag.

Brightflag helps you understand what you're currently charged for legal work and to set and enforce reasonable limits on rate increases.

Brightflag also makes it easy to negotiate optimal rates with your firms and to identify areas where work can be insourced, outsourced, or moved to lower-cost providers. All while ensuring your legal team delivers optimal outcomes to the business at large.

Want to take charge of your legal spend? Brightflag can provide the tools you need to track, analyze, and optimize your budget. Schedule a demo to see how.

Share: 



**Sinead Kenny**
Director, Customer Insights at Brightflag

Sinead is the Director of Customer Insights at Brightflag, and holds a Bachelor's Degree in Law and Accounting from the University of Limerick. She previously worked as a Solicitor with Matheson LLP, Ireland's largest law firm, and is widely regarded as a thought leader in the legal technology space.

## Related Articles for You







Blog
**UTBMS Codes Explained**

Blog
**6 Signs Your Legal E-Billing System Needs an Upgrade**

Download
**Sample Enterprise Legal Management RFP**

**Want new Brightflag blog posts delivered straight to your inbox?**

Sign up for our monthly newsletter.

Work email*

By submitting this form, you agree to our privacy policy.

Subscribe



Book a Demo

in X


Read our reviews on

**About**
Leadership
Contact Us
Careers
Press
System Status
Trust and Security
Environmental, Social, and Governance (ESG)
Privacy Policy
Terms of Use

**Solutions**
Legal E-Billing
Legal Spend Management
Enterprise Legal Management Software: A Guide for In-House Teams
Legal Bill Review
Legal Department Software
For Legal Operations
For General Counsel
For In-House Counsel
For Finance

**Popular Resources**
Sample Outside Counsel Guidelines
Legal Cost Control Checklist
Legal Ops Compensation Survey
Sample Enterprise Legal Management RFP
A Beginner's Guide to UTBMS Codes
10 Must-Follow Legal Blogs
Top 15 Legal Podcasts
Building Your Legal Operations Team
E-Billing Best Practices

EXHIBIT 8

# Wells Fargo's 2024 Law Firm Survey: A Year of Strong Growth and Profitability in the Legal Industry

🌐 jdjournal.com/2025/01/29/wells-fargos-2024-law-firm-survey-a-year-of-strong-growth-and-profitability-in-the-legal-industry

January 29, 2025

By [Maria Lenin Laus](#)

## Introduction

Wells Fargo's Legal Specialty Group recently released its **Year-End 2024 Survey**, revealing that the legal industry had a **stellar year**, driven primarily by robust revenue growth, higher billing rates, and increased demand for legal services. The survey, which included more than **130 law firms**, including **70 Am Law 100** firms and **45 Am Law Second Hundred** firms, highlights the ongoing evolution of law firm economics and the impact of transactional practices on industry performance.

### Key Findings at a Glance:

- **Revenue growth surged to 12.5%,** nearly doubling from 6.0% in 2023.
- **Billing rates increased 9.1%,** up from 8.3% the prior year.
- **Demand for legal services rose 3.5%,** showing a significant rebound from just 0.7% in 2023.
- **Productivity improved by 1.9%,** reaching 1,576 hours per lawyer.
- **Inventory grew 11.1%,** but the collection cycle improved for the first time in three years.
- **Expenses climbed 9.0%,** largely due to higher bonuses and prepayments.
- **Net income soared by 17.2%,** with **profits per equity partner (PEP) rising 16.9%.**

This in-depth report explores the key findings of the **Wells Fargo 2024 Legal Industry Survey**, along with **expert insights, future predictions, and the broader impact on the legal sector**.

## Law Firm Revenue Growth Reaches New Highs in 2024

One of the biggest takeaways from the survey is the **impressive 12.5% revenue growth** across all participating firms. This increase marks a significant acceleration from the **6.0% revenue growth** seen in 2023. The only year surpassing 2024's performance in recent history was **2021, with 14.0% revenue growth**—a year driven by post-pandemic legal activity.

**Segment-Wise Revenue Growth:**

- **Am Law 1-50 Firms:** 13.9%
- **Am Law Second Fifty:** 9.6%
- **Am Law Second Hundred:** 9.9%

Larger firms outperformed their smaller counterparts, a trend that correlates with their dominance in high-value transactional work.

## Billing Rate Growth: The Primary Driver of Revenue

One of the key **contributors to revenue growth was higher billing rates**. The survey found that **standard rates rose 9.1% year-over-year**, exceeding the **8.3% increase in 2023**.

- **Am Law 1-50 Firms:** 10% increase
- **Am Law Second Fifty:** 7% increase
- **Am Law Second Hundred:** 6% increase

This trend indicates that **top-tier firms have greater pricing power**, allowing them to command **higher rates for specialized legal services**, particularly in **corporate, M&A, and regulatory law**.

## Legal Industry Demand Surges by 3.5%

After **years of sluggish growth in legal demand**, the industry finally saw a notable rebound. **Lawyer billable hours rose by 3.5% in 2024**, a sharp contrast to the **mere 0.7% increase in 2023**.

- **Am Law 1-50 Firms:** 3.9% growth
- **Am Law Second Fifty:** 3.5% growth
- **Am Law Second Hundred:** 2.3% growth

The top firms once again led the way, benefiting from **higher-value transactional work** and **corporate deal activity**.

## Productivity & Lawyer Count: A Balancing Act

The **lawyer count across surveyed firms rose 1.7%**, yet **productivity increased by 1.9%**, reaching **1,576 billable hours per lawyer**.

Notably, Am Law 1-50 firms had the **smallest lawyer headcount growth (1.2%)** but still managed the highest **productivity gains**, reflecting **strong utilization of existing talent.**

## Inventory & Collections: Firms Are Getting Paid Faster

Law firms experienced an **11.1% increase in inventory** (work performed but not yet collected). However, there was **an improvement in collection cycles**, reducing the number of days it takes to receive payments.

This marks the **first improvement in collections in three years** and is attributed to:

- A **greater focus on transactional work** (which typically has shorter payment cycles).
- **More widespread adoption of electronic billing systems.**
- **Stronger negotiation of payment terms in client engagements.**

## Expense Growth & Associate Compensation Trends

Total **expenses grew 9.0% in 2024**, reflecting an **acceleration from 6.0% in 2023**. The fourth quarter saw particularly high costs due to:

- **Higher associate bonuses.**
- **Prepayment of expenses** for tax and operational planning purposes.

While costs were rising, law firms were able to **outpace expenses with revenue growth**, leading to significant profit gains.

## Profits Per Equity Partner (PEP) Surge 16.9%

The **most critical profitability metric—Profits Per Equity Partner (PEP)—rose 16.9%**, outpacing overall net income growth of 17.2%.

### PEP Growth by Firm Segment:

- **Am Law 1-50:** 18.9%
- **Am Law Second Fifty:** 12.4%
- **Am Law Second Hundred:** 12.3%

With firms keeping a **tight rein on equity partner growth (up just 0.3%)**, profitability gains were **spread among a stable group of partners**, rather than being diluted by new additions.

## Insights & Future Outlook

### What This Means for Law Firms:

1. **Higher Billing Rates Are Here to Stay**
   - Firms are successfully passing rate increases onto clients.
   - **Top-tier firms have the most pricing power.**
2. **Transactional Practices Will Continue to Lead Growth**
   - Corporate, M&A, and regulatory work remain strong.
   - Litigation remains steady but is **not the primary driver of growth**.
3. **Smaller Firms Must Focus on Efficiency**
   - Am Law Second Fifty and Second Hundred firms had slower revenue growth.
   - To remain competitive, they must **boost productivity and optimize operations**.

### Potential Challenges Ahead:

- **Rising expenses** (especially for associate compensation).
- **A potential slowdown in deal-making** if economic conditions shift.
- **Maintaining client relationships amid rising fees.**

### Impact on the Legal Industry

The 2024 survey results indicate a **strong and resilient legal industry**, with:

- **Top firms dominating transactional work.**
- **Profits reaching record highs.**
- **Increased efficiency in collections and billing practices.**

Going forward, **law firms must balance aggressive growth with strategic cost management** to sustain profitability.

### Conclusion

The **Wells Fargo 2024 Legal Industry Survey** paints a **bullish picture for the legal market**, with **double-digit revenue growth, rising billing rates, and record-breaking profitability**. However, **competition remains fierce**, and **smaller firms must adapt quickly** to maintain their market position.

As **2025 approaches, law firms must navigate economic uncertainties, evolving client demands, and rising operational costs**—all while sustaining the impressive growth momentum seen in 2024.

EXHIBIT 9

**2025 EDITION**

# Hourly Rates in Am Law 100® Firms:

## Increases and Key Drivers

brightflag

# Table of Contents

Introduction ....................................................................................................................... 3

Methodology ..................................................................................................................... 4

Rate Increases .................................................................................................................. 5

The Key Drivers of Rates ................................................................................................. 6

    Firm Ranking ................................................................................................................ 7

    Practice Area ................................................................................................................ 8

    Geography ..................................................................................................................... 9

    Resourcing Mix ........................................................................................................... 10

Emerging Trends: AI's Impact on Law Firm Rates ....................................................... 11

Recommendations .......................................................................................................... 13

Closing ............................................................................................................................ 14

About Brightflag ............................................................................................................. 15

About the Authors .......................................................................................................... 15

[1] The AM LAW 100 is a registered trademark of ALM Global Properties, LLC, which has no affiliation with Brightflag or this report.

# Introduction

**Outside counsel rate increases continue to be an anxiety-inducing year-end ritual. While these conversations are inevitable, having the data you need to best negotiate and strengthen relationships with your outside counsel is critical.**

Our analysis of 2025 rates shows that, while the pace of growth has slowed from last year's historic surge, firms continue to request and realize substantial year-over-year increases. This translates into continued upward pressure on outside counsel spend.

This year's report provides updated benchmarks on timekeeper rates across Am Law® 100 firms and examines the drivers that most influence those rates: firm ranking, practice area, geography, and resourcing. Armed with these insights, in-house teams can engage in more informed rate negotiations, design smarter resourcing strategies, and ensure their budgets deliver maximum value.

In addition, we've included a special section on how law firms are beginning to integrate artificial intelligence into their operations—and the potential implications for resourcing and pricing models in the years ahead.



*Michael Dineen*

**Michael Dineen**
**VP of Data Science,**
**Brightflag**



*Sarah Scales*

**Sarah Scales**
**Head of Product Marketing,**
**Brightflag**

# Methodology

This report analyzes billed rates from the Am Law® 100 — the 100 highest-revenue U.S. law firms, as ranked by ALM.[1] Brightflag's dataset reflects billions of dollars in annual outside counsel spend.

For the 2025 analysis, billed rates from January 1 through June 30, 2025 were included. For other years, full-year data were used. All figures are based on billed rates (the actual rates invoiced by firms), rather than rack rates or requested increases, providing an accurate reflection of what in-house teams are paying.

[1] ALM Global Properties, LLC is the owner of U.S. Trademark Registration No. 2313571 for the mark "THE Am Law® 100".



# Rate Increases

**The blended hourly rate among the Am Law® 100 rose by 8.3% in 2025, reaching $1,145 per hour.**

While this increase is lower than 2024's historic 10% jump, it remains nearly double the growth of 2023 (4.8%).



**Change in Blended Rates in Top 100 Firms**   ■ Blended Rate   — Year-over-year Change

These figures underscore a clear trend: even as inflation moderates, firms continue to push through rate increases at levels that outpace broader economic conditions.

# The Key Drivers of Rates

Annual rate increases place continued pressure on legal budgets, and it can feel as though in-house teams have little choice but to accept them. In reality, legal departments do have levers to pull — starting with decisions about which outside counsel firms to engage and how matters are resourced.

The data shows that firm ranking, practice area, geography, and resourcing all play a role in determining costs. By taking these drivers into account, in-house teams can benefit from the expertise and trust they've built with existing outside counsel where it matters, while also identifying opportunities to stretch their budgets further.

In the following sections, we explore each of these drivers and share insights to help legal departments make informed, cost-conscious decisions regarding which outside counsel firms to engage and how matters are resourced.



brightflag

# Firm Size

Firm ranking remains one of the strongest predictors of hourly rates. In 2025, partners at the top 25 firms charged an average of **$1,635 per hour**, nearly double the **$845 average at firms ranked 76–100**. Associates at top 25 firms billed **$1,065 per hour**, outpacing partner rates at the bottom half of the list.



This data highlights the premium commanded by top-ranked firms and the potential savings available by reallocating lower-risk or routine work to smaller firms, even within the Am Law® 100.

# Practice Area

**M&A and corporate work remain the highest-priced practice areas.** In 2025, M&A partners at top-25 firms billed **$1,843 per hour**, a **9.7% increase from 2024**, while corporate partners followed at **$1,692 per hour**, up **8.1% year-over-year**.

**Litigation rates also remain elevated**, averaging **$1,594** at top-25 firms and **$1,360** at firms ranked 26–50, while partners in lower tiers billed under **$1,000**.

While practice area sets the baseline for rates, in-house teams still have meaningful opportunities to influence cost — particularly in their choice of firm ranking, the staffing mix applied to matters, and, where appropriate, the use of ALSPs for repeatable work like document review.



Partner Rates by Practice Area 2025

# Geography

**Rates continue to vary significantly by location. New York remains the most expensive market, with partners billing $1,795 per hour. Chicago ($1,697) and Los Angeles ($1,318) followed closely.**

In contrast, partners in Kansas City ($790) billed at less than half the New York rate. Even within the Am Law® 100, geographic differences create meaningful opportunities for cost savings.

### Partner Rates by Metro Area 2025





# Resourcing Mix

**How firms allocate work across partners and more junior fee-earners plays a critical role in determining overall legal spend.**

In 2025, partners accounted for 30% of billable work at the top 25 law firms, compared to 50% at firms ranked 76–100. While the greater partner involvement at lower-ranked firms might raise cost concerns, their partner rates are nearly half those at top-tier firms on average, which keeps overall matter costs down.



The takeaway for in-house teams: heavy partner billing at top-tier firms has a much greater financial impact than similar allocations at lower-ranked firms, due to their higher hourly rates. Monitoring resourcing patterns remains critical to controlling overall spend.

# Emerging Trends: AI's Impact on Law Firm Rates

Firms across the Am Law® 100 are investing in artificial intelligence (AI) technologies, primarily to drive internal efficiencies and streamline routine legal workflows. While widespread operational use of these tools is still in early stages, we are approaching a tipping point: one where AI will materially impact how firms deliver legal services and, by extension, how they price them.

For in-house teams, the implications are significant. AI is poised to reshape the foundational unit of legal pricing: the billable hour.

 ## What's Changing?

AI is accelerating how legal work gets done. Tools that support research, drafting, and revision—traditionally the domain of junior associates—are already reducing the number of human hours required to complete legal tasks.

Over time, this will lead to:

- **Fewer hours billed per matter**, as more work is completed by AI.
- **Smaller teams staffed per matter**, particularly fewer junior associates.

On the surface, these trends may suggest cost savings for the legal department. But the reality may be more complex.

 ## How Law Firms Are Likely to Respond

To maintain revenue, firms will likely adjust their pricing to offset reduced billable hours. After all, the value of resolving a matter remains unchanged—or may even increase—when AI enables faster, higher-quality, and more consistent outcomes. To capture that value, firms are expected to raise hourly rates and other commercial models to maintain or improve on their current margins.



 ## Is the Hourly Rate Model at Risk?

Some have speculated that AI will hasten a broader shift away from hourly billing toward value-based pricing. While such a transformation is possible, it's unlikely to happen quickly. The billable hour remains deeply embedded in law firm economics, incentive structures, and client expectations.

That said, the economic pressure created by AI-enabled efficiency gains may create an opening for firms and clients to experiment more seriously with fixed-fee engagements and other alternative fee arrangements.

 ## What In-House Teams Should Watch For

There are three early indicators that AI is starting to affect how law firms are getting work done, even if it might not show up in the form of reduced pricing:

1. **Reductions in total billed hours per matter,** particularly for repeatable work.

2. **Shifts in resourcing patterns,** such as fewer junior timekeepers and more partner time billed.

3. **Rate increase requests** that significantly outpace increases seen today.

In-house teams should track these patterns in their own data and use them to inform rate negotiations. Ultimately, clients and firms should share the value created by deploying AI to resolve matters.

While it may not always feel like it, legal departments are in the driver's seat when it comes to negotiating rates. Now more than ever, it pays to negotiate confidently and explore new partnerships when needed.

Brightflag is closely monitoring how AI adoption is shaping rates and resourcing, and will be among the first to reflect these shifts in future benchmarking data.

# Recommendations

**Armed with the insights in this report, in-house teams can enter rate negotiations with a clearer understanding of what constitutes an acceptable increase — and greater confidence in pushing back when proposals exceed market norms.**

At the same time, effectively managing outside counsel rates is not a one-time exercise. To keep legal spend under control, teams need to take a structured, ongoing approach to monitoring and managing their law firm engagements.

Here are a few strategies that legal departments can apply to get — and stay — ahead of outside counsel costs:

**Enforce agreed rates systematically.**
Require firms to submit and adhere to approved timekeeper rates via an e-billing system.

**Push back on excessive increases.**
Use benchmarking data to challenge rate requests that exceed market norms.

**Right-source strategically.**
Reserve engagements with top firms for the highest-risk, most complex matters. Redirect routine or lower-risk work to regional firms, ALSPs, or flexible legal talent.

**Monitor resourcing closely.**
Track the proportion of partner time billed and ensure staffing is aligned with the complexity and risk of the task at hand.

**Keep an eye on AI adoption.**
While still in early stages, AI is beginning to change how firms approach staffing and task completion. Over time, these changes may impact billing models and cost expectations. For now, legal teams should begin asking firms how they're using AI and whether it's reducing manual work—especially for repeatable tasks like research or document review.



# Closing

The forces shaping outside counsel costs in 2025 are largely familiar: firm ranking, practice area, geography, and resourcing remain the strongest drivers of rates. But in-house teams are not without influence. With the right data and a clear understanding of how and where work is delivered, legal departments can make smarter sourcing decisions and maximize the value received from their outside counsel spend.

While artificial intelligence is not yet a dominant factor in rate setting, its growing presence in law firm workflows suggests new questions will arise in future negotiations. Staying informed and engaged on these trends now will ensure your team is prepared as technology begins to reshape how legal services are delivered—and priced.



# About Brightflag

Brightflag's enterprise legal management platform is the most effective solution for providing visibility into legal work and spend. The intuitive AI-powered platform makes in-house legal teams more productive by taking on time-consuming, manual, tasks related to invoicing, reporting, and matter management.

# About the Authors



### Michael Dineen
**VP of Data Science, Brightflag**

Michael leads data science at Brightflag and is passionate about AI and the future of legal operations. He is the architect of Brightflag's patented AI engine. Michael has a Masters in Machine Learning from DIT Dublin and an MLitt in Philosophy from the University of St Andrews in Scotland. Prior to Brightflag, Michael worked in consulting helping UK and Irish organizations leverage machine learning to enhance their operations and customer targeting.



### Sarah Scales
**Head of Product Marketing, Brightflag**

Sarah leads product marketing at Brightflag, including developing thought leadership and research for the benefit of the in-house legal community. Sarah has previously worked as a product manager at Brightflag and a market researcher for a variety of public projects. Sarah has a Bachelor of Law and Political Science from Trinity College Dublin and a Masters in Product Management from Technological University Dublin.

EXHIBIT 10



# DYNAMICS SHAPING THE FUTURE OF LEGAL

LexisNexis® CounselLink®

# 2024

TRENDS REPORT





CounselLink® *2024 Trends Report*

**INSIGHTS BASED ON DATA DERIVED FROM:**

**OVER**
$59 Billion
IN LEGAL SPENDING

**NEARLY**
460,000
TIMEKEEPERS

**MORE THAN**
1.6 Million
MATTERS



# TABLE OF CONTENTS

**4** Executive Highlights

**6** Introduction

**7** Market Insights: In-house Counsel Stay with Largest Tier of Law Firms

**11** The Seven Key Metrics

**12** #1A: Blended Hourly Rates for Matters by Practice Area

**13** #1B: Blended Hourly Rates for Matters by Subcategory

**17** #2: Law Firm Consolidation:
Number of Legal Vendors Used by Corporations

**18** #3A: Alternative Fee Arrangement Usage by Matter

**19** #3B: Alternative Fee Arrangement Usage by Billings

**20** #4: Partner Hourly Rate Differences by Law Firm Size

**22** #5A: Partner Hourly Rate Growth by City

**23** #5B: Partner Hourly Rate Growth by State

**24** #6A: Median Partner Hourly Rate by Practice Area

**25** #6B: Median Partner Rates by Subcategory of Work

**27** #6C: Partner Hourly Rate Growth by Practice Area

**28** #7A: International Partner Rates: Additions for 2023

**29** #7B: International Partner Rates: The Americas

**30** #7C: International Partner Rates: EMEA Region

**31** #7D: International Partner Rates: APAC Region

**32** About the Trends Report

**33** Expert Contributor

# Executive Highlights

## 2023 WAS A RECORD-SETTING YEAR FOR LAW FIRM HOURLY RATE INCREASES

Partner rates increased in 2023 at the highest levels since LexisNexis CounselLink first produced the *Trends Report* in 2013. The average partner rate increase in 2023 was 5.4% (relative to 4.6% in 2022 and 3.4% in 2021). It is noteworthy that this pattern applies to all law firm sizes and all but one small practice area. Refer to the chart (page 5) to visualize the trend since 2013.

## RATE INCREASES ARE HIGHLY CORRELATED WITH PRACTICE AREA RATES

Lawyers in practices charging the highest rates in 2023 are generally the same lawyers who raised their rates the most on a percentage basis. This rate increase contributes to a growing gap in rates billed by larger law firms in comparison to smaller firms, as well as a rate gap between practice areas perceived at different levels of value. In 2023, the median partner in the largest law firms billed at a rate that was 61% higher than the median partner in the next tier of firms. That same differential was only 49% in 2022.

## LARGE LAW INCREASED MARKET SHARE

Despite reports to the contrary, there is no indication that clients are moving legal work from Large Law to mid-sized firms. Large Law increased market share from 47.9% in 2022 to 48.2% in 2023. Within the five practice areas commanding the highest billing rates, Large Law increased its share of wallet from 59.0% to 60.3% in 2023.

## MANAGEMENT OF MIX MITIGATES INDIVIDUAL RATE INCREASES

A positive finding of the report is that, despite individual timekeeper rates increasing at record levels, the overall matter rates did not increase at the same level in most practice areas. This likely means that the management of mix (firms, levels and individual timekeepers) is helping corporate counsel mitigate individual attorney rate increases.

## ALTERNATIVE FEE ARRANGEMENTS STRONG IN TWO PRACTICE AREAS

Overall, there has not been significant movement toward adoption of alternatives to hourly billing. Alternative Fee Arrangements (AFAs) are used materially in two practice areas – Labor & Employment and Intellectual Property. Multiple individual companies within our sample are trending toward greater adoption of AFAs. To date, overall benchmark trends have not been affected.

# Hourly Rates
## Throughout *Trends Report* History

**2022 and 2023 had significantly higher rate increases than all prior years**



Average Partner Rate Increase*

* As reported each year since 2013 in the LexisNexis CounselLink *Trends Report*

# Introduction

The first edition of the annual CounselLink Enterprise Legal Management *Trends Report* was published in October 2013. That report established a set of six key metrics based on data available via the CounselLink Enterprise Legal Management platform and provided insights that corporate law departments and law firms could use to guide their decisions and subsequent actions.

Beginning with the 2021 edition, a seventh key metric was added to highlight hourly rates billed by law firm partners located in countries outside of the United States.

With the volume of data available for analysis growing with each passing year, the 2024 edition of the *Trends Report* represents the most up-to-date and detailed picture of how legal market dynamics are evolving over time.

This edition of the *2024 Trends Report* incorporates a new Market Insights section that highlights trends in client engagement of law firms of varying sizes.

Information about the methodologies used, definitions and expert contributors conducting the analysis are presented at the end of the report.



# Market Insights:
## In-house Counsel Stay with Largest Tier of Law Firms

### Large Law Continues Domination in Share of Wallet

For years, Key Metric #4 in the CounselLink *Trends Report* has demonstrated that the largest law firms charge significantly higher rates than firms in the next smaller tier. With full recognition of the many valid circumstances for corporate legal to engage large law firms, a cost-savings strategy could include opportunities with law firms outside of the largest tier.

In a January 22, 2024 *Corporate Counsel* article, the headline suggests that legal departments are beginning to employ this strategy, "Big Law Has 'False Sense of Security' as Clients Depart for Midsized Firms." The article cites reported revenue trends from 179 law firms in three different size categories.

**CounselLink benchmark data does not substantiate this headline.**

The CounselLink benchmark database includes billing from more than 25,000 law firms. Our data shows that "Big Law" continues to dominate with the largest share of wallet. This chart shows the percentage of legal spend over three years within four size categories of firms.



Share of Legal Spend by Law Firm Size by Year

*Source: LexisNexis® CounselLink® Benchmark Database, 2021 – 2023; CounselLink 2024 Trends Report*

Roughly 100 of the largest firms, with more than 750 lawyers, have shown growth in share of wallet over each of the last two years, from generating 45.5% of legal billing in 2021 to 48.2% in 2023.

## Peeling the Onion

We can see from the illustration (page 7) that the largest law firms increased their share overall, but does that trend hold up for various practice areas? Breaking down this data by matter category points to only one area where larger firms have lost share of wallet for more than two years running:

> **Finance, Loans & Investments:**
> 60.5%, 59.9% and 58.4% share of wallet, respectively, over three years: 2021 to 2023

Larger firms also lost a share of Insurance and Intellectual Property (non-litigation) work in 2023 relative to 2022, but not in 2022 relative to 2021.



**Large Law Share of Wallet by Matter Category**

CounselLink® 2024 *Trends Report*

Source: LexisNexis® CounselLink® Benchmark Database, 2024 Trends Report

Significantly, note the lines at the top of this chart where large law firms dominate. These are the same practices that command the highest billing rates: Mergers & Acquisitions; Finance Loans & Investments; Corporate; Commercial; and Regulatory & Compliance. These are also the practice areas large law firms want to dominate to increase revenue and profitability. However, they are not losing sleep over not dominating work in Intellectual Property, Environmental, Employment, or Insurance. Refer to Key Metric #6 in the *Trends Report* for data on partner billing rates by practice area.

## Leading Indicators

If some corporate counsels execute a strategy change, perhaps it will take time to see its effect in terms of overall law firm revenue. The output in the chart on page eight showing a range of several years, is the result of corporate counsel decisions about which firms to engage over the last several years. The metric is very much a lagging indicator that can't be materially affected by current decisions.

To assess which firms are being engaged using a leading indicator metric, a better method is to identify:

- New matters opened each year
- Which firms they are assigned to
- Amount of legal spend associated with those respective matters

This is a subset of the total legal spend tracked by CounselLink each year. As a point of reference, the annual spend associated with new matters is about 30% of that year's total spend. The other 70% comes from matters originating in prior years.

Looking at just this subset of data suggests that there *may* be a subtle shift occurring.



**Large Law Share of Wallet: New Matters by Year**

CounselLink® 2024 *Trends Report*

*Source: LexisNexis® CounselLink® Benchmark Database, 2024 Trends Report*

# Movement in Legal Spend

At a practice area level, little consistency exists regarding increases or decreases in large law firm legal spend. Large Law saw an increased share in some practice areas and a decreased share in others. In many cases, the following year reflected a reversal of that shift.

Consistency in moving new work from the largest firms is not evident. It is apparent in individual years, most notably in 2022 in Litigation, from a 55.3% share to a 44.8% share. Also in 2022, Mergers & Acquisitions saw movement from 75% share to 69.5% share. In 2023, Large Law rebounded to gain some share back, but not all of it.

Note that four large firm practice areas consistently show an *increasing* portion of share in both 2022 and 2023: Employment & Labor, Intellectual Property, Real Estate, and Regulatory & Compliance.

At the end of the day, when aggregating legal spend across all practice areas, this data informs us that Large Law had a 3.8% lower share of overall legal spend in 2023 vs 2021: from 52.4% to 48.7%, respectively. This indicates there may be a change in the size of firms some organizations choose to engage in support of their new legal needs.

This leading indicator is significant enough that CounselLink plans to track data on which law firms receive NEW work from corporate counsel to determine whether there is, indeed, a noteworthy trend. In future CounselLink *Trends Reports*, this information will be included as Key Metric #8.





# Update on Seven Key Metrics

Each annual update of the CounselLink *Trends Report* covers a standard set of key metrics related to hourly legal rates and the corporate procurement of legal services.



## 1A
### KEY METRIC

# Blended Hourly Rates for Matters by Practice Area

**BLENDED HOURLY RATES AND RATE VOLATILITY DIFFER BY TYPE OF WORK**

Based on 12 months of data ending December 31, 2023
Practice areas ordered by median blended matter rates

**Blended matter hourly rates metrics**
- 10th – 90th Percentile Range
- Median
- 25th – 75th Percentile Range

**Timekeeper rates metrics**
- Partner – Median
- Associate – Median
- Paralegal – Median

**Volatility Rate**

| Mergers & Acquisitions | Regulatory & Compliance | Finance, Loans & Investments | Commercial & Contracts | Real Estate | Intellectual Property | Corporate | Employment & Labor | Environmental | Litigation | Insurance |
|---|---|---|---|---|---|---|---|---|---|---|
| 4 | 5 | 5 | 5 | 3 | 3 | 10 | 4 | 4 | 2 | 2 |

Volatility is a calculated indicator of blended rate variability. Higher numbers suggest better possibilities for negotiating rates and/or changing the assigned timekeeper mix.

*See page 15 for guidance on interpreting all blended hourly rates charts.*



# Blended Hourly Rates for Matters by Subcategory

**1B KEY METRIC**

**BLENDED HOURLY RATES AND RATE VOLATILITY DIFFER BY SUBCATEGORY OF WORK**

Based on 12 months of data ending December 31, 2023
Practice areas ordered by median blended matter rates

**CORPORATE**

**EMPLOYMENT & LABOR**

**INSURANCE**

Volatility Rate

Antitrust: 6
Tax: 6
Bankruptcy: 3

Compensation & Benefits: 10
Immigration: 4
Discrimination: 4

Property Damage: 3
Bodily Injury: 2
Workers' Compensation: 1

**Blended matter hourly rates metrics**
- 10th – 90th Percentile Range
- ⋯⋯ Median
- 25th – 75th Percentile Range

**Timekeeper rates metrics**
- Partner – Median
- Associate – Median
- Paralegal – Median



# 1B
## KEY METRIC

## Blended Hourly Rates for Matters by Subcategory

**BLENDED HOURLY RATES AND RATE VOLATILITY DIFFER BY SUBCATEGORY OF WORK**

Based on 12 months of data ending December 31, 2023
Practice areas ordered by median blended matter rates

**INTELLECTUAL PROPERTY**

**LITIGATION**

Volatility Rate

Blended matter hourly rates metrics
- 10th – 90th Percentile Range
- Median
- 25th – 75th Percentile Range

Timekeeper rates metrics
- Partner – Median
- Associate – Median
- Paralegal – Median

**Interpreting the Charts:**

The charts on the previous pages capture matter level benchmarks. It's important to distinguish that Key Metric #1 is not benchmarking individual timekeeper rates, but rather the blended rates that result from the multiple timekeepers that work on a given matter. As a guide to interpreting the output, compare the two categories (page 12) Corporate and Employment & Labor. These two categories have very similar median blended average matter rates ($395 and $387, respectively). Note that Corporate matters have a median partner rate of $723, considerably higher than that of Employment & Labor ($536). This indicates that relative to Corporate work, Employment & Labor matters are staffed more significantly with non-partners whose hourly rates bring down the overall blended average matter rates.

The Volatility Index provided in this section is a calculated marker that shows the variability in blended matter rates. Using a 10-point scale, the Index highlights the broad spread between the 25th and 75th percentiles of hourly rates. High volatility scores indicate greater variance in prices paid based on the mix of timekeepers and individual hourly rates.

Although individual lawyer rates are the focus of considerable industry attention, it is equally, or arguably more important, to look at the bigger picture: the blended average rate of the different timekeepers that work on a matter. The chart shows that the median blended hourly rate is highest for Mergers & Acquisitions (M&A), which often involve the most expensive firms and require significant partner engagement.

**Practice Area Volatility Index**

Readers should keep in mind that the median is only one data point. It is important to consider the range of blended rates around the median. The Volatility Index metric assesses the spread between the 25th and the 75th percentiles. As an example, Corporate work has a Volatility Index of 10 while Insurance has a Volatility Index of two. This indicates that the mix of timekeepers and rates paid on Corporate matters varies significantly compared to those for Insurance matters. A high Volatility Index could also indicate that a category represents a wide range of matter types (which Corporate does). Refer to Key Metric #1B for a breakdown of Corporate work.

The 2023 data reveal that four matter categories have Volatility Indices lower than four. This means rates are consistent and less subject to negotiations between corporations and their firms in these matter categories:

- Insurance
- Intellectual Property
- Litigation
- Real Estate

**Changes in Median Blended Rates**

Five matter categories saw their median blended average matter rate increase by more than 5% relative to 2022. Categories with increases include Mergers & Acquisitions (6.9%); Litigation (5.8%); Intellectual Property (5.7%); Commercial and Contracts (5.6%); and Corporate (5.3%). These are the highest matter rate increases in the history of this report, as are the individual partner rate increases tracked in Key Metric #6.

For all practice areas except Litigation, it is worth noting that the median blended average matter rate change was materially less than the average partner rate change for these practices (refer to Key Metric #6). For example, the median Employment & Labor partner increased their rate by 6.6% in 2023 (Key Metric #6). However, the median blended average Employment & Labor matter rate increased only 0.5%, relative to the prior year. This means that the mix of timekeepers working on Employment & Labor matters in 2023 shifted toward less costly timekeepers in 2023.

Legal departments can compare their own data against these rates and ranges for help managing costs. If departments are paying at or near the top of the range for more volatile matter types, there may be opportunities to negotiate lower rates or request a different mix of timekeepers to reduce costs. Note, however, that when looking at trends, it is important to evaluate the entire range of rates rather than focusing solely on the median rate.

**Key Metric 1B: Blended Hourly Rates and Rate Volatility Differ by Legal Work Subcategories**

Key Metric #1 measures average billing rates for high-level categories of legal work. Beginning in 2021, the *Trends Report* expanded upon this to include benchmarks for more granular categories of work to continue to provide more meaningful data points for decision making in the legal industry.

Note that several of the subcategories have Volatility Indices that are lower than that of their parent categories. For example, refer to the Corporate practice area in Key Metric #1 that had a Volatility Index of 10.

The three subcategories of Corporate reflected in Key Metric #1B include Antitrust, Bankruptcy and Tax. These areas have volatility scores of 6, 3 and 6, respectively. As we narrow to more granular/similar types of legal work relative to the broader Corporate category, there is less variability between the 25th and 75th percentile blended average rates. For example, there is greater consistency in the staffing and/or negotiated rates for these types of work, particularly for Bankruptcy.



## 2
### KEY METRIC

## Law Firm Consolidation:
## Number of Legal Vendors Used by Corporations

**62% OF COMPANIES HAVE 10 FIRMS OR FEWER
ACCOUNTING FOR ~80% OF OUTSIDE COUNSEL FEES**

Based on 12 months of data ending December 31, 2023



This chart shows the degree of law firm consolidation among companies whose outside counsel legal billings are processed through CounselLink. The horizontal axis separates participating companies into nine segments representing different degrees of consolidation. For example, the bar on the far right shows that 34% of participating companies have 90% to 100% of their legal billings with 10 or fewer vendors; these are the most consolidated legal departments. The far left bar shows that just 1% of companies have 20% to 30% of their legal billings with 10 or fewer firms. Levels of consolidation have increased slightly relative to the prior year. Last year, we reported 61% of companies had 10 firms or fewer accounting for at least 80% of outside counsel fees.

**Industry type plays a significant role in consolidation:**

─────────── **HIGH DEGREES OF CONSOLIDATION** ───────────

| 83% | 80% | 80% | 75% | 71% |
|-----|-----|-----|-----|-----|
| Mining, Quarry and Oil | Admin & Support Services | Construction | Manufacturing | Retail Trade |

─────────── **LOW DEGREES OF CONSOLIDATION** ───────────

**46%**  Finance (including Insurance)

# 3A
## KEY METRIC

## Alternative Fee Arrangement Usage by Matter

**SOME FORM OF ALTERNATIVE FEE ARRANGEMENTS (AFAS) WERE USED IN 9.9% OF MATTERS**

Based on 12 months of data ending December 31, 2023



**PERCENTAGE OF MATTERS UTILIZING AFAs**

9.9% AVERAGE

The use of AFAs to govern legal services payments varies considerably by legal matter type. High volume, predictable work included in Intellectual Property and the Employment & Labor categories continues to have the highest volume of matters billed under AFAs. More than 25% of these matters are billed under AFAs.

### INTELLECTUAL PROPERTY  |  EMPLOYMENT & LABOR

### utilized AFAs for more than  25%  of matters

Trends indicate that adoption of AFAs within the two matter categories highlighted above is growing. In 2023, 26.9% of Employment & Labor matters were billed under an AFA compared to 24.7% in 2022. Intellectual Property matters were billed under AFAs at a rate of 30.3% in 2023 compared to 26.4% in 2022.

# 3B
## KEY METRIC

# Alternative Fee Arrangement Usage by Billings

**SOME FORM OF AFAs WERE USED IN 5.7% OF BILLINGS**

Based on 12 months of data ending December 31, 2023

## PERCENTAGE OF BILLINGS UTILIZING AFAs



5.7% AVERAGE

Practice Area

Many matters are billed partially under alternative fee arrangements but not entirely, which is why the percentage of billings is always lower than the percentage of matters under a fee arrangement.

While some years have reflected a slightly higher use of AFAs, the adoption of them overall has not fundamentally changed. Several individual companies within our benchmarking database have made intentional efforts to increase these types of billing arrangements, but their efforts have not moved the overall needle.

# 4 KEY METRIC

## Partner Hourly Rate Differences by Law Firm Size

**MEDIAN RATES ACROSS PRACTICE AREAS EXCLUDING INSURANCE**

Based on 12 months of data ending December 31, 2023



**MEDIAN PARTNER HOURLY RATES BY LAW FIRM SIZE**

The size of a law firm is highly correlated to the rates billed by its lawyers. This progression is especially notable for the largest category of firms: those with 750 or more lawyers. The median hourly billing rate for partners in firms with more than 750 lawyers ($991) is 61% higher than the median hourly billing rate billed by partners in the next smaller tier of firms ($615).

The 61% differential for the largest firms compared to the next tier of firms represents the largest gap recorded in the 11 years of tracking the metric in the *Trends Report*. The differential was 46% for 2022 rates relative to 2021.

**61%** **DIFFERENTIAL FOR LARGEST FIRMS** IN 2023

**COMPARED TO** **46%** IN 2022

**There are several relevant data points to this trend not discernable from Key Metric #4:**

1   For firms with 750+ lawyers, the median partner rate in 2023 was 8% higher than the median partner rate in 2022.

2   For those same firms, the partner rate at the 90th percentile in 2023 was 9% higher than the partner rate at the 90th percentile in 2022. This point is significant because it tells us that those partners who are already billing at the highest rates (very senior partners in practices such as M&A, Regulatory & Compliance, etc.) can raise their rates to even higher degrees than other partners. The market is bearing these rate increases. Notably, in 2023, some partners billed hourly rates at more than $2,300 per hour.

3   On average, partners in firms with 750+ lawyers increased their rates by 7.9%, very similar to the rate change of the median partner. This was the highest average increase of all the firm size categories.

4   The average rate increases for partners in all size categories increased more in 2023 than ever in the history of the *Trends Report*. The average rate increase for all partners was 5.4%, compared to 4.6% in 2022 and 3.4% in 2021.

5   While this report emphasizes partner rates as a primary benchmark, it should also be noted that associate rates in 2023 increased at an even higher rate than partner rates. The average partner rate increase in 2023 in the largest firms was 7.9%. In the largest firms, the average associate rate increase was 11.5%.

6   Associate and of counsel rates have been increasing on average at a higher rate than partner rates for the last several years. In 2023, there were associates (in high-value practices) who billed rates at more than $1,800 per hour.



# 5A
## KEY METRIC

## Partner Hourly Rate Growth by City

**SIX MAJOR METROPOLITAN AREAS SHOW MEDIAN PARTNER RATE GROWTH OF MORE THAN 6%**

Based on 12 months of data ending December 31, 2023



**PARTNER RATE GROWTH IN SIX METRO AREAS**

Across the United States, partner hourly rates grew 5.4%, on average, in 2023.

The highest growth in partner rates occurred in Boston; Washington, D.C.; New York; Atlanta; Chicago; and Seattle. Each of the six cities saw average attorney rates grow more than 6%, relative to 2022.

On the opposite side of the spectrum, one city, Detroit, had average hourly growth rate below 3%.

Two major metropolitan areas had a median partner rate above $1,000 per hour: Boston and New York. It's important to bear in mind that these are median rates, meaning half of the partners in these cities bill at rates higher than $1,000 per hour.

# 5B
## KEY METRIC

# Partner Hourly Rate Growth by State

**GROWTH IN MEDIAN PARTNER RATES BY STATE;
5.4% YEAR-OVER-YEAR AVERAGE INCREASE**

Based on 12 months data ending December 31, 2023



**8.3%**
$1,080 median
Massachusetts

**6.9%**
$860 median
Washington

**7.5%**
$1,209 median
New York

**7.6%**
$360 median
Hawaii

**YOY GROWTH RATE**

- > 6.0%
- 5.1% to 6.0%
- 4.1% to 5.0%
- 3.1% to 4.0%
- < 3.0%

LOW BILLING VOLUME

**5.4%** AVERAGE GROWTH IN PARTNER RATES ACROSS STATES

The average growth in partner rates across states is 5.4%, notably higher than prior year increases (4.5% in 2022).

# 6A
## KEY METRIC



## Median Partner Hourly Rate by Practice Area

**MEDIAN PARTNER RATES IN FIVE PRACTICE AREAS ABOVE $700 AN HOUR**

Based on 12 months of data ending December 31, 2023



Mergers & Acquisitions

# $1,130

Commercial & Contracts

# $788

Regulatory & Compliance

# $795

Finance, Loans & Investments

# $789

Corporate

# $723



$600
Intellectual Property

$550
Real Estate

$536
Employment & Labor

$415
Environmental

$362
Litigation

$235
Insurance

Aggregate statistics based on legal work performed in 2023 identify Mergers & Acquisitions as the practice area with the highest median partner rate of $1,130. This year, 2023, was the first year a practice's median billing rate exceeded $1,000. Additionally, the other practices with median partner rates over $700 per hour have high medians in large part because companies often use larger firms for these kinds of matters.

As noted in this report's Market Insights section on page seven, in 2023 the Large Law firms handled 69% of Mergers & Acquisitions work. Concerning the other high-rate practices of Regulatory & Compliance; Finance, Loans & Investments; Commercial & Contracts; and Corporate, Large Law had 59% of work from these practice areas combined.

Conversely, at the lower end of the hourly rate spectrum is insurance work. Insurance carriers demand and negotiate aggressively for low rates on their high-volume defense matters. Law firms with fewer than 50 lawyers handled 38% of insurance work in 2023.

# 6B

## KEY METRIC

## Median Partner Rates by Subcategory of Work

**WITHIN PRACTICE AREAS, SUBCATEGORY RATES VARY CONSIDERABLY**

Based on 12 months of data ending December 31, 2023



**6B**
KEY
METRIC

# Median Partner Rates by Subcategory of Work

**WITHIN PRACTICE AREAS, SUBCATEGORY RATES VARY CONSIDERABLY**

Based on 12 months of data ending December 31, 2023



New since the CounselLink *2021 Trends Report*, benchmarks are available for more granular categories of legal work. Litigation work, for example, encompasses a wide variety of practices that command very different rates. At the high end, Intellectual Property Litigation had a median partner hourly rate of $1,020 in 2023; whereas, Asbestos Litigation work was billed at a median partner hourly rate of $240.

# 6C

## KEY METRIC

## Partner Hourly Rate Growth by Practice Area

**FOUR PRACTICE AREAS LEAD PARTNER RATE GROWTH IN 2023**

Based on 12 months of data ending December 31, 2023



LARGEST AVERAGE RATE INCREASES IN 2023

RELATIVE TO 2022

Turning to partner rate growth by practice area, rates increased at higher levels in every practice area compared to rate increases in 2022, with the exception of Environmental. Leading the pack was Mergers & Acquisitions with an average rate change for partners of 8.4% in 2023. Note that all five of the types of work that command median hourly rates above $700 (see Key Metric #6A) are at or near the top of this list with increases above 7%.

There is a strong correlation between the hourly rates partners bill and the percentage increase of their rates in the next year. The gap between rates in "high-value" practices and rates billed in other practice areas continues to widen for this reason.

## 7A
### KEY METRIC

## International Markets
## Median Partner Hourly Rates

**CORPORATIONS FREQUENTLY HIRE INTERNATIONAL OUTSIDE COUNSEL FOR MULTIPLE TYPES OF WORK**

Based on 12 months data ending December 31, 2023

**EXPANDED FOR 2024**



**SIX PRACTICE AREAS :**

REGULATORY & COMPLIANCE      EMPLOYMENT
LITIGATION                   CORPORATE
INTELLECTUAL PROPERTY        COMMERCIAL & CONTRACTS

Corporations headquartered outside of the United States, as well as U.S. corporations with international interests, look to firms in many countries to handle their legal needs. More than 10% of invoice spending processed through CounselLink comes from law firms outside the U.S. Key Metric #7 provides benchmarks of partner hourly rates for countries where outside counsel is most often engaged for Regulatory & Compliance; Litigation; Intellectual Property; Employment & Labor; Corporate; and Commercial & Contracts work. CounselLink has benchmark data for more than 100 countries spanning multiple practice areas. Key Metric #7 provides data for those countries and practices with the most significant and consistent international billing.

In 2023, median hourly partner rates were among the highest in the United Kingdom and in South Korea in five of the six practice areas. In all matter categories, India, Mexico and Japan had partners billing at considerably lower rates.

# 7B
## KEY METRIC

## International Markets: The Americas
## Median Partner Hourly Rates

**CORPORATIONS FREQUENTLY HIRE INTERNATIONAL OUTSIDE COUNSEL FOR MULTIPLE TYPES OF WORK**

Based on 12 months data ending December 31, 2023

RATES IN $USD


**EXPANDED FOR 2024**



### CANADA

| | |
|---|---|
| $678 | Regulatory & Compliance |
| $540 | Litigation |
| $474 | Intellectual Property |
| $509 | Employment |
| $659 | Corporate |
| $676 | Commercial & Contracts |

### MEXICO

| | |
|---|---|
| $480 | Regulatory & Compliance |
| $435 | Litigation |
| $305 | Intellectual Property |
| $400 | Employment |
| $479 | Corporate |
| $370 | Commercial & Contracts |

### BRAZIL

| | |
|---|---|
| $550 | Regulatory & Compliance |
| $317 | Litigation |
| $375 | Intellectual Property |
| $351 | Employment |
| $401 | Corporate |
| $368 | Commercial & Contracts |



# 7C
## KEY METRIC

## International Markets: EMEA Region
## Median Partner Hourly Rates

**CORPORATIONS FREQUENTLY HIRE INTERNATIONAL OUTSIDE COUNSEL FOR MULTIPLE TYPES OF WORK**

Based on 12 months data ending December 31, 2023

RATES IN $USD



**EXPANDED FOR 2024**

### BELGIUM

| | |
|---|---|
| $657 | Regulatory & Compliance |
| $490 | Litigation |
| $525 | Intellectual Property |
| $470 | Employment |
| $497 | Corporate |
| $567 | Commercial & Contracts |

### IRELAND

| | |
|---|---|
| $549 | Regulatory & Compliance |
| $459 | Litigation |
| $477 | Intellectual Property |
| $670 | Employment |
| $693 | Corporate |
| $670 | Commercial & Contracts |

### FRANCE

| | |
|---|---|
| $554 | Regulatory & Compliance |
| $679 | Litigation |
| $454 | Intellectual Property |
| $434 | Employment |
| $517 | Corporate |
| $457 | Commercial & Contracts |

### ISRAEL

| | |
|---|---|
| $620 | Regulatory & Compliance |
| $464 | Litigation |
| $466 | Intellectual Property |
| $520 | Employment |
| $540 | Corporate |
| $520 | Commercial & Contracts |

### GERMANY

| | |
|---|---|
| $630 | Regulatory & Compliance |
| $633 | Litigation |
| $365 | Intellectual Property |
| $414 | Employment |
| $510 | Corporate |
| $438 | Commercial & Contracts |

### THE NETHERLANDS

| | |
|---|---|
| $590 | Regulatory & Compliance |
| $617 | Litigation |
| $429 | Intellectual Property |
| $568 | Employment |
| $640 | Corporate |
| $559 | Commercial & Contracts |



# 7D
## KEY METRIC

## International Markets: APAC Region
## Median Partner Hourly Rates

**CORPORATIONS FREQUENTLY HIRE INTERNATIONAL OUTSIDE COUNSEL FOR MULTIPLE TYPES OF WORK**

Based on 12 months data ending December 31, 2023

RATES IN $USD



**EXPANDED FOR 2024**

### AUSTRALIA

| | |
|---|---|
| $570 | Regulatory & Compliance |
| $539 | Litigation |
| $581 | Intellectual Property |
| $509 | Employment |
| $572 | Corporate |
| $556 | Commercial & Contracts |

### JAPAN

| | |
|---|---|
| $368 | Regulatory & Compliance |
| $316 | Litigation |
| $303 | Intellectual Property |
| $337 | Employment |
| $350 | Corporate |
| $263 | Commercial & Contracts |

### CHINA

| | |
|---|---|
| $686 | Regulatory & Compliance |
| $480 | Litigation |
| $300 | Intellectual Property |
| $660 | Employment |
| $484 | Corporate |
| $800 | Commercial & Contracts |

### REPUBLIC OF KOREA

| | |
|---|---|
| $859 | Regulatory & Compliance |
| $765 | Litigation |
| $500 | Intellectual Property |
| $666 | Employment |
| $765 | Corporate |
| $657 | Commercial & Contracts |

### INDIA

| | |
|---|---|
| $203 | Regulatory & Compliance |
| $350 | Litigation |
| $225 | Intellectual Property |
| $369 | Employment |
| $300 | Corporate |
| $350 | Commercial & Contracts |

### SINGAPORE

| | |
|---|---|
| $699 | Regulatory & Compliance |
| $695 | Litigation |
| $497 | Intellectual Property |
| $741 | Employment |
| $676 | Corporate |
| $664 | Commercial & Contracts |

# LexisNexis CounselLink
# *2024 Trends Report*

**TERMINOLOGY:**

**Matter Categorization**: CounselLink solution users define the types of work associated with various matters that were analyzed and categorized into legal practice areas. For this analysis, all types of litigation matters are classified as Litigation regardless of the nature of the dispute.

**Law Firm Size**: Based on the total number of lawyers in a firm, firms were grouped into these six categories:

> 750+
> 501-750
> 201-500
> 101-200
> 51-100
> 1-50



# Expert Contributor

Since the inception of the LexisNexis CounselLink *Enterprise Legal Management Trends Report in 2013*, Kris Satkunas has been the principal author. She has made notable contributions to this latest *Trends Report* in the analysis of CounselLink data and in preparing the surrounding narrative.

## Author



**KRISTINA SATKUNAS**
**DIRECTOR OF STRATEGIC CONSULTING**

As Director of Strategic Consulting at LexisNexis CounselLink, Kris brings more than 20 years of experience consulting in the legal industry to advise corporate legal department managers on improving operations with data-driven decisions. Kris is an expert in managing the business of law and in data mining, with specific expertise in matter pricing and staffing, practice area metrics, and scorecards.

Prior to joining CounselLink, Kris served as Director of the LexisNexis Redwood Think Tank, which she also established. For five years, Kris worked closely with thought leaders in large law firms conducting unbiased data-based research studies focused on finding solutions to legal industry management issues. Before that, she led the business of law consulting practice for large law firms. During that time she worked with key management at more than 100 large law firms to improve their financial models and analyses.

Kris has authored numerous articles and spoken at many legal industry conferences and events. She came to LexisNexis in 2000 after honing her finance skills as a Senior Vice President in Strategic Finance at SunTrust Bank. She holds a B.B.A. in Finance from The College of William and Mary.

Kris may be reached at kristina.satkunas@lexisnexis.com.





LexisNexis® CounselLink® is the leading cloud-based legal management solution designed to help corporate legal departments gain 100% visibility into all matters and invoices so they can control costs, maximize productivity and make better decisions. For nearly 30 years, LexisNexis has been providing innovative solutions to corporate legal departments based on insight from thought leaders, industry expertise and customer feedback.

Here's how CounselLink supports your legal department with enterprise legal management and contract lifecycle management solutions:

- **Financial Management** improves the predictability of legal spend with complete visibility and oversight of every penny spent by the department.

- **Work Management** helps you collect, organize, track, audit, and report on all the work done within the legal department to increase productivity and drive better outcomes for your business.

- **Vendor Management** strengthens your relationships with law firms while measuring their performance, so you can select the best mix for your needs.

- **Analytics** provides you with full visibility over workloads and legal data analytics to make informed, data-driven decisions.

- **Contract Lifecycle Management** streamlines development, execution and management of contracts throughout their lifecycle.

If you have questions or comments about the CounselLink *2024 Trends Report* or want to learn more about CounselLink software and services, visit CounselLink.com, or contact us via email: LNCounselLink@LexisNexis.com.

---

## Follow us online   



LexisNexis and the Knowledge Burst logo are
registered trademarks of Reed Elsevier Properties
Inc., used under license. CounselLink is a registered
trademark of LexisNexis, a division of RELX Inc. Other
products or services may be trademarks or registered
trademarks of their respective companies.
Copyright © 2024 LexisNexis. All rights reserved.

EXHIBIT 11



# Enterprise Legal Management Trends Report

## INSIGHT INTO

# 7 KEY METRICS

JUNE 2022





# Enterprise Legal Management Trends Report
## INSIGHTS ARE BASED ON DATA DERIVED FROM



OVER
$49 Billion
IN LEGAL SPENDING

MORE THAN
350,000
TIMEKEEPERS

MORE THAN
1.2 Million
MATTERS



# Executive Highlights

Insights are based on data derived from over $49 billion in legal spending, more than 350,000 timekeepers, and more than 1.2 million matters. The key metrics are based on 2021 charges billed by outside counsel.

### 2021 RECORD SETTING YEAR FOR MERGERS & ACQUISITIONS

LexisNexis® CounselLink® data aligns with reports of 2021 being a record setting year for global mergers and acquisitions. Mergers & Acquisitions (M&A) related legal fees processed through CounselLink in 2021 represented 7.4% of total legal billing, a significant increase from 4.3% in 2020. The data also reflects that greater demand for M&A legal expertise resulted in material price increases. The median partner rate billed for M&A work in 2021 was $878, a 6.1% increase over the prior year median.

### HOURLY RATE INCREASES SHOW NO SIGNS OF SLOWING

Consistent with what we observed in 2020, despite pandemic-related and other pressures for legal departments to reduce outside counsel spending, hourly rate increases paid to US firms showed no signs of slowing. On average, 2021 partner hourly rates increased by 3.4% relative to 2020. This compares to 3.5% growth in 2020 versus 2019.

### USE OF ALTERNATIVE FEE ARRANGEMENT CONTINUES TO INCREASE

In 2021, 14.8% of matters had at least a portion of their billing under an arrangement other than hourly billing. Non-hourly fees billed accounted 9.6% of all billings. Use of alternative fee arrangements (AFAs) has been slowly rising over the years, showing an increased appetite by corporate counsel for AFAs, and a willingness by law firms to provide them.

### THE "LARGEST 50" FIRMS ACCOUNT FOR LARGEST SHARE OF SPENDING

The "Largest 50" firms (those with more than 750 lawyers) continue to account for the largest share of U.S. legal spending. In 2021, 46% of outside counsel fees were paid to these firms, consistent with recent year results. Further, the largest firms are continuing to gain share of wallet for the highest rate work. The three practices commanding the highest partner rates are Mergers & Acquisitions; Finance, Loans & Investments; and Regulatory & Compliance. Combining these types of matters, the "Largest 50" firms had a 61% share of legal billings in 2021. Several sub-categories of other matter categories with high partner rates follow the same pattern. For example, those firms had a 77% share of IP Litigation and a 78% share of Corporate Antitrust work.

# Introduction

The first edition of the annual CounselLink Enterprise Legal Management Trends Report was published in October 2013. That report established a set of six key metrics based on data available via the CounselLink Enterprise Legal Management platform and provided insights that corporate law departments and law firms could use to guide their decisions and subsequent actions. Beginning with the 2021 edition, a seventh key metric has been added to highlight hourly rates billed by law firm partners located in countries outside of the United Sates.

With the volume of data available for analysis growing with each passing year, the 2022 edition of the Trends Report represents the most up-to-date and detailed picture of how legal market dynamics are evolving over time.

As always, information about the methodologies used, definitions, and expert contributors conducting the analysis are presented at the end of the report.




## TABLE OF CONTENTS

**5** The Seven Key Metrics

**6** #1A: Blended Hourly Rate for Matters by Practice Area

**7** #1B: Blended Hourly Rate for Matters – by Subcategory

**11** #2: Law Firm Consolidation:
      Number of Legal Vendors Used by Corporations

**12** #3A: Alternative Fee Arrangement (AFA) Usage by Matter

**13** #3B: Alternative Fee Arrangement (AFA) Usage by Billings

**14** #4: Partner Hourly Rate Differences by Law Firm Size

**15** #5A: Partner Hourly Rate Growth by City

**16** #5B: Partner Hourly Rate Growth by State

**17** #6A: Median Partner Hourly Rate by Practice Area

**18** #6B: Median Partner Rates by Subcategory of Work

**20** #6C: Partner Hourly Rate Growth by Practice Area

**21** #7A: International Partner Rates for Litigation and IP

**22** #7B: International Partner Rates for Employment and Corporate

**23** About the Trends Report

**24** Expert Contributor



# Update on seven key metrics

Each annual update of the CounselLink Enterprise Legal Management Trends Report covers a standard set of key metrics related to hourly legal rates and the corporate procurement of legal services.

# 1A

**KEY METRIC**

## Blended Hourly Rate for Matters by Practice Area

**BLENDED HOURLY RATES AND RATE VOLATILITY DIFFER BY TYPE OF WORK**

All analysis is based on data through December 31, 2021
Practice areas ordered by median blended matter rates



**Blended matter hourly rate metrics**
- 10th – 90th Percentile Range
- ···· Median
- 25th – 75th Percentile Range

**Timekeeper rate metrics**
- Partner – Median
- Associate – Median
- Paralegal – Median

**Volatility Rate**

| Mergers and Acquisitions | Regulatory and Compliance | Finance, Loans, and Investments | Environmental | Commercial and Contracts | Corporate | Intellectual Property | Real Estate | Employment and Labor | Insurance | Litigation |
|---|---|---|---|---|---|---|---|---|---|---|
| 5 | 7 | 7 | 3 | 6 | 10 | 5 | 4 | 5 | 3 | 5 |

Volatility is a calculated indicator of blended rate variability. Higher numbers suggest better possibilities for negotiating rates and/or changing the assigned timekeeper mix.

*See page 9 for guidance on interpreting all blended hourly rates charts.*

# 1B
## KEY METRIC

# Blended Hourly Rate for Matters – by Subcategory

**BLENDED HOURLY RATES AND RATE VOLATILITY DIFFER BY SUBCATEGORY OF WORK**

All analysis is based on data through December 31, 2021
Practice areas ordered by median blended matter rates





## 1B
### KEY METRIC

# Blended Hourly Rate for Matters – by Subcategory

**BLENDED HOURLY RATES AND RATE VOLATILITY DIFFER BY SUBCATEGORY OF WORK**

All analysis is based on data through December 31, 2021
Practice areas ordered by median blended matter rates

**INTELLECTUAL PROPERTY**

**LITIGATION**

Volatility Rate: 5, 5 | 10, 4, 3, 3, 5, 5, 3

**Blended matter hourly rate metrics**
- 10th – 90th Percentile Range
- ···· Median
- 25th – 75th Percentile Range

**Timekeeper rate metrics**
- Partner – Median
- Associate – Median
- Paralegal – Median

*Interpreting the Charts:*

*The charts on the previous pages capture matter level benchmarks. It's important to distinguish that Metric 1 is not benchmarking individual timekeeper rates, but rather the blended rates that result from the multiple timekeepers that work on a given matter. As a guide to interpreting the output, compare the two categories Corporate and Employment & Labor. These two categories have very similar median blended average matter rate ($376 and $366, respectively). But note that Corporate matters have a median partner rate of $636, considerably higher than that of Employment & Labor ($520). This indicates that relative to Corporate work, Employment & Labor matters are staffed more significantly with non-partners, whose hourly rates bring down the overall blended average matter rates.*

*The Volatility Index provided in this section is a calculated marker that shows the variability in blended matter rates. Using a 10-point scale, the Index highlights the broad spread between the 25th and 75th percentiles of hourly rates. High volatility scores indicate greater variance in prices paid based on the mix of timekeepers and individual hourly rates.*

Although individual lawyer rates are the focus of considerable industry attention, it is equally, or arguably more important, to look at the bigger picture: the blended average rate of the different timekeepers that work on a matter. The chart shows that the median blended hourly rate is highest for Mergers and Acquisitions, which often involve the most expensive firms and require significant partner engagement.

Comparing the Corporate category to Insurance as an example, the spread between the 25th and 75th percentiles of blended hourly rates for Corporate work is broader than the spread for Insurance. On a 10-point scale, Corporate has a Volatility Index of 10 while Insurance has an Index of three, which indicates that the mix of timekeepers and rates paid on Corporate matters vary significantly compared to the timekeeper mix and rates paid for Insurance matters. A high Volatility Index could also indicate that a category represents a wide range of matter types.

The 2020 data revealed that three matter categories have relatively low Volatility Indices (lower than 5), which means rates are consistent and less subject to negotiations between corporations and their firms:

- Insurance
- Real Estate
- Environmental

The two matter categories with the greatest change relative to the prior year are Mergers & Acquisitions and Commercial & Contracts. The median blended average matter rate for these categories increased 7% relative to 2020.

Legal departments can compare their own data against these rates and ranges for help managing costs. If departments are paying at or near the top of the range for more volatile matter types, there may be opportunities to negotiate lower rates or request a different mix of timekeepers to reduce costs. Note, however, that when looking at trends, it is important to evaluate the entire range of rates rather than focusing solely on the median rate.

**Key Metric 1B:** *Blended Hourly Rates and Rate Volatility Differ by Legal Work Subcategories*

Key Metric #1 measures average billing rates for high-level categories of legal work. Beginning in 2021, the Trends Report expanded upon this to include benchmarks for more granular categories of work to continue to provide more meaningful data points for decision-making in the legal industry.

Note that several of the sub-categories have Volatility Indices that are lower than that of their parent categories. For example, refer to the Corporate practice area in Key Metric #1 which had a Volatility Index of 10.

The three sub-categories of Corporate reflected in Key Metric #1B include Antitrust, Bankruptcy, and Tax. These areas have volatility scores of 6, 3, and 8 respectively. This can be interpreted to mean that as we narrow down to more granular/similar types of work, there is less variability between the 25th and 75th percentile blended average rates paid for these specific types of legal work relative to the broader category of Corporate. For example, there is greater consistency in the staffing and/or negotiated rates for these types of work, particularly for Antitrust and Bankruptcy.



1

# 2

## KEY METRIC

## Law Firm Consolidation:
## Number of Legal Vendors Used by Corporations

**HALF OF COMPANIES IN THE COUNSELLINK DATA POOL HAVE 10 FIRMS OR FEWER THAT ACCOUNT FOR AT LEAST 80% OF THEIR OUTSIDE COUNSEL FEES**

All analysis is based on data through December 31, 2021



*Interpreting the Chart:*

*This chart shows the degree of law firm consolidation among companies whose outside counsel legal billings are processed through CounselLink. The horizontal axis separates participating companies into nine segments representing different degrees of consolidation. For example, the bar on the far right shows that 35% of participating companies have 90 – 100% of their legal billings with 10 or fewer vendors; these are the most consolidated legal departments. The far left bar shows that just 1% of companies have 20 – 30% of their legal billings with 10 or fewer firms. In 2020,  we noted a subtle shift of law departments that had dropped from between 80-90% on the chart to the 70-80% bucket. That shift has reversed itself, and we see 59% of companies with high levels of law firm consolidation, consistent with consolidation levels noted in the last five years (excepting 2020).*

Industry type plays a significant role in consolidation.

**HIGH DEGREES OF CONSOLIDATION:**

88% Transportation and Warehousing

83% Information Companies

78% Retail Trade

74% Manufacturing

**LOW DEGREES OF CONSOLIDATION:**

40% Finance
       Insurance

36% Utilities



# 3A
## KEY METRIC

## Alternative Fee Arrangement (AFA) Usage by Matter

**SOME FORM OF AFAs WERE USED IN 14.8% OF MATTERS**

Based on 12 months of data ending December 31, 2021

### PERCENTAGE OF MATTERS UTILIZING AFAs



**14.8% AVERAGE**

Practice Area

The use of AFAs to govern legal service payments varies considerably by legal matter type. High volume, predictable work included in Intellectual Property, Insurance, and the Employment and Labor categories continue to have the highest volume of matters billed under AFAs.

### INTELLECTUAL PROPERTY | INSURANCE | EMPLOYMENT & LABOR
## utilized AFAs for at least 20% of matters

Other matter categories are gaining in use of alternative billing. Mergers and Acquisitions, Real Estate, and Regulatory and Compliance have nearly 10% of matters with non-hourly billing.

# 3B
## KEY METRIC

## Alternative Fee Arrangement (AFA) Usage by Billings

**SOME FORM OF AFAs WERE USED IN 9.6% OF BILLINGS**

Based on 12 months of data ending December 31, 2021



**PERCENTAGE OF BILLINGS UTILIZING AFAs**

9.6% AVERAGE

Practice Area

The use of Alternative Fee Arrangements has been gradually increasing as the industry slowly moves in the direction of not relying solely on hourly billing as the mechanism for payment of legal services. When CounselLink first started reporting on these key metric ten years ago, AFAs were used in approximately 12% of matters and 7% of fees and billings.

# Partner Hourly Rate Differences by Law Firm Size

**4 KEY METRIC**

**MEDIAN RATES ACROSS PRACTICE AREAS, EXCLUDING INSURANCE**

Based on 12 months of data ending December 31, 2021

## MEDIAN PARTNER HOURLY RATES BY LAW FIRM SIZE



Law Firm Size [Number of Lawyers]

The size of a law firm is highly correlated to the rates billed by its lawyers. This progression is especially notable for the largest category of firms, those with 750 or more lawyers. The median hourly billing rate for partners in firms with more than 750 lawyers ($895) is 54% higher than the median hourly billing rate billed by partners in the next smaller tier of firms ($575).

Relative to prior years, the 54% differential for the largest firms compared to the next tier of firms is the largest in all the years we have tracked this metric. The differential was 47% for 2020.

Additionally, relative to prior years, the gap between mid-sized firm rates has narrowed. The median partner rate for firms with 51-100 lawyers ($400) is nearly the same as that for firms with 101-200 lawyers ($405).

The average partner growth rate for the largest firms was 4.6% in 2021 relative to 2020—the largest increase of the various law firm bands.

**AVERAGE PARTNER GROWTH RATE**
FOR THE LARGEST FIRMS  **4.6%**  2021 RELATIVE TO 2020

# 5A
## KEY METRIC

## Partner Hourly Rate Growth by City

**FOUR MAJOR METROPOLITAN AREAS SHOW MEDIAN PARTNER RATE GROWTH OF MORE THAN 4.0%**

Based on 12 months of data ending December 31, 2021

**PARTNER RATE GROWTH IN THREE MAJOR CITIES**



MEDIAN PARTNER RATE
ABOVE $800/HOUR
BOSTON | NEW YORK | WASHINGTON, D.C. |

SAN FRANCISCO
YoY 4.0%

WASHINGTON D.C.
YoY 5.0%

NEW YORK
YoY 4.3%

**Interpreting the Chart:**

*Across the United States, partner hourly rates grew 3.4% on average in 2021.*

The biggest growth spurts in attorney rates for the last year occurred in Washington D.C., New York, and San Francisco. Each of these four cities saw average attorney rates grow more than 4.0% relative to 2020.

On the opposite side of the spectrum, two cities saw hourly growth rate below 2%: Boston and Houston.

# 5B
## KEY METRIC

## Partner Hourly Rate Growth by State

**GROWTH IN MEDIAN PARTNER RATES VARIES BY STATE, AVERAGING 3.4% YEAR-OVER-YEAR INCREASE**

Based on 12 months data ending December 31, 2021



**4.6%**
$349 median
Nebraska

**4.2%**
$475 median
Wisconsin

**4.5%**
$1,030 median
New York

**4.7%**
$532 median
Texas

**YOY GROWTH RATE**

\> 3.0%

2.1% to 3.0%

1.1% to 2.0%

< 1.0%

LOW BILLING VOLUME

**3.4%** AVERAGE GROWTH IN PARTNER RATES ACROSS STATES

*The average growth in partner rates across states is 3.4%, in line with prior year increases.*



# 6A
## KEY METRIC

## Median Partner Hourly Rate by Practice Area

**MEDIAN PARTNER RATES IN FIVE PRACTICE AREAS ABOVE $600 AN HOUR**
Based on 12 months of data ending December 31, 2021



### Mergers and Acquisitions
# $878

### Finance, Loans, and Investments
# $725

### Regulatory and Compliance
# $690

$668
Commercial and Contracts

$636
Corporate

$575
Intellectual Property

$520
Employment and Labor

$495
Environmental

$477
Real Estate

$350
Litigation

$234
Insurance

Aggregate statistics based on legal work performed in 2021 identify Mergers and Acquisition as the practice area with the highest median partner rate of $878. Additionally, the other practices with median partner rates over $600 per hour have such high medians in large part because companies often use larger firms for these kinds of matters. In 2021, the "Largest 50" firms handled 66% of Merger and Acquisition work, and 62% of Finance, Loans & Investment work. With regard to the other high rate practices of Regulatory and Compliance, Commercial and Contracts, and Corporate, the "Largest 50" firms had a 47%, 52%, and 53% share of the wallet.

Conversely, at the lower end of the hourly rate spectrum is insurance work. Insurance carriers demand and negotiate aggressively for low rates on their high-volume defense matters. Law firms with fewer than 100 lawyers handled 69% of insurance work in 2021.

# 6B
## KEY METRIC

## Median Partner Rates by Subcategory of Work

**WITHIN PRACTICE AREAS, SUBCATEGORY RATES VARY CONSIDERABLY**
Based on 12 months of data ending December 31, 2021



CORPORATE

EMPLOYMENT AND LABOR

INSURANCE

## 6B
### KEY METRIC

## Median Partner Rates by Subcategory of Work

**WITHIN PRACTICE AREAS, SUBCATEGORY RATES VARY CONSIDERABLY**
Based on 12 months of data ending December 31, 2021



New since the 2021 Trends Report, benchmarks are available for more granular categories of legal work. Litigation work, for example, encompasses a wide variety of practices that command very different rates. At the high end, Intellectual Property Litigation had a median partner hourly rate of $895 in 2020, whereas Asbestos Litigation work was billed at a median partner hourly rate of $235.

# Partner Hourly Rate Growth by Practice Area

**FOUR PRACTICE AREAS LEAD PARTNER RATE GROWTH IN 2021**

Based on 12 months of data ending December 31, 2021



| Practice Area | YOY Change |
|---|---|
| **Mergers and Acquisitions** | 6.1% |
| **Employment and Labor** | 3.7% |
| **Finance, Loans, and Investments** | 3.6% |
| **Corporate** | 3.5% |
| Intellectual Property | 3.2% |
| Regulatory and Compliance | 3.2% |
| Commercial and Contracts | 2.9% |
| Real Estate | 2.7% |
| Litigation - General | 2.4% |
| Environmental | 2.1% |
| Insurance | 1.5% |

**LARGEST AVERAGE RATE INCREASES IN 2021** RELATIVE TO 2020

■ YOY Change

Turning to partner rate growth by practice area, Mergers and Acquisitions was the area that far and away saw the largest increases in rates in 2021. The average rate change for Mergers and Acquisitions partners was 6.1%. Note that three of the types of work that command median hourly rates above $600 (see Metric 6A) are at or near the top of this list. They are: Mergers and Acquisitions, Finance, Loans, and Investments, and Corporate.

Partner rates for Insurance work increased notably less than rates in other practice areas.

# 7A
## KEY METRIC

## International Partner Rates for Litigation and Intellectual Property (non-Litigation)

**CORPORATIONS HIRED INTERNATIONAL OUTSIDE COUNSEL FOR BOTH LITIGATION AND IP WORK**

Based on 12 months data ending December 31, 2021

**EXPANDED FOR 2021**

### MEDIAN PARTNER HOURLY RATES IN 13 INTERNATIONAL MARKETS
RATES IN $USD



$521 / $472 CANADA
$736 / $550 UNITED KINGDOM
$687 / $671 NETHERLANDS
$547 / $421 GERMANY
$576 / $434 IRELAND
$634 / $368 FRANCE
$440 / $331 MEXICO
$517 / $349 SWITZERLAND
$288 / $400 BRAZIL
$400 / $224 INDIA
$480 / $333 CHINA
$780 / $655 REPUBLIC OF KOREA
$597 / $586 AUSTRALIA

**LITIGATION RATE   IP RATE**

Corporations headquartered outside of the United States as well as U.S. corporations with international interests look to firms in many countries to handle their legal needs. Key Metric 7 provides benchmarks of partner hourly rates for countries where outside counsel is most often engaged for Litigation, Intellectual Property, Employment and Labor, and Corporate work.

In 2021, median hourly partner rates were among the highest in the Republic of Korea across all four practice areas. *(See page 22 for Employment and Labor, and Corporate work.)*

UK partner rates are relatively high particularly in Litigation and Corporate work.

In all matter categories, India and Brazil had partners billing at considerably lower rates.

# 7B

## KEY METRIC

## International Partner Rates for Employment and Labor and Corporate

**CORPORATIONS HIRED INTERNATIONAL OUTSIDE COUNSEL FOR BOTH EMPLOYMENT & LABOR AND CORPORATE WORK**

Based on 12 months data ending December 31, 2021

**EXPANDED FOR 2021**

### MEDIAN PARTNER HOURLY RATES IN 13 INTERNATIONAL MARKETS
RATES IN $USD



$467
$634
CANADA

$625
$782
UNITED KINGDOM

$570
$606
NETHERLANDS

$425
$470
GERMANY

$586
$681
IRELAND

$520
$531
FRANCE

$450
$420
MEXICO

$599
$665
SWITZERLAND

$420
$350
INDIA

$700
$460
CHINA

$770
$780
REPUBLIC OF KOREA

$310
$302
BRAZIL

$580
$626
AUSTRALIA

EMPLOYMENT & LABOR   CORPORATE

# About the Enterprise Legal Management Trends Report



**TERMINOLOGY:**

**Matter Categorization**: CounselLink solution users define the types of work associated with various matters that were analyzed and categorized into legal practice areas. For this analysis, all types of litigation matters are classified as Litigation regardless of the nature of the dispute.

**Company Size**: Based on revenue cited in public sources, companies were grouped into these three size categories:

> ❯ $10 Billion Plus

> ❯ $1 – 10 Billion

> ❯ < $1 Billion



# Expert Contributor

Since the inception of the CounselLink Enterprise Legal Management Trends Report, Kris Satkunas has been the principal author. She has made notable contributions to this latest Enterprise Legal Management Trends Report in the analysis of CounselLink data and in preparing the surrounding narrative.

## Author

**KRIS SATKUNAS — DIRECTOR OF STRATEGIC CONSULTING**

As Director of Strategic Consulting at LexisNexis CounselLink, Kris brings over 20 years of experience consulting in the legal industry to advise corporate legal department managers on improving operations with data-driven decisions. Kris is an expert in managing the business of law and in data mining, with specific expertise in matter pricing and staffing, practice area metrics, and scorecards.

Prior to joining CounselLink, Kris served as Director of the LexisNexis® Redwood Think Tank, which she also established. For five years, Kris worked closely with thought leaders in large law firms conducting unbiased data-based research studies focused on finding solutions to legal industry management issues. Before that, she led the business of law consulting practice for large law firms. During that time she worked with key management at over a hundred law firms to improve the financial models and analyses developed for large law firms.

Kris has authored numerous articles and spoken at many legal industry conferences and events. She came to LexisNexis in 2000 after honing her finance skills as a Senior Vice President in Strategic Finance at SunTrust Bank. She holds a B.B.A. in Finance from The College of William and Mary.

Kris may be reached at kristina.satkunas@lexisnexis.com.

**Linked** in.



LexisNexis CounselLink is the leading cloud-based legal management solution designed to help corporate legal departments gain 100% visibility into all matters and invoices so they can control costs, maximize productivity, and make better decisions. For nearly 30 years, LexisNexis has been providing innovative solutions to corporate law departments based on insight from thought leaders, industry expertise, and customer feedback.

Here's how CounselLink supports your legal department:

- **Financial Management** improves the predictability of legal spend with complete visibility and oversight of every penny spent by the department.

- **Work Management** helps you collect, organize, track, audit, and report on all the work done within the legal department to increase productivity and drive better outcomes for your business.

- **Vendor Management** strengthens your relationships with law firms while measuring their performance, so you can select the best mix for your needs.

- **Analytics** provides you with full visibility over workloads and legal data analytics to make informed, data-driven decisions.

If you have questions or comments about the CounselLink Enterprise Legal Management Trends Report or want to learn more about CounselLink software and services, visit CounselLink.com, or contact us via email: LNCounselLink@LexisNexis.com.

For media inquiries, please contact: eric@plat4orm.com.

## Follow us online:

**Website:** www.CounselLink.com

**Twitter:** @LexisNexisLegal

**Facebook:** www.facebook.com/LexisNexisLegal

**LinkedIn:**  LexisNexis Legal: www.linkedin.com/company/lexisnexislegal



CounselLink.com/**Trends**

LexisNexis and the Knowledge Burst logo are registered
trademarks of Reed Elsevier Properties Inc., used
under license. CounselLink is a registered trademark of
LexisNexis, a division of RELX Inc. Other products or
services may be trademarks or registered trademarks
of their respective companies. Copyright © 2022
LexisNexis. All rights reserved.

EXHIBIT 12

Page 1
The Bigger The Biglaw Firm, The Bigger The Billing Rate - Above the Law
https://abovethelaw.com/2020/07/the-bigger-the-biglaw-firm-the-bigger-the-billing-rate/



BIGLAW

# The Bigger The Biglaw Firm, The Bigger The Billing Rate

Putting the big in Biglaw.

By Kathryn Rubino on July 14, 2020 4:44 pm    → Share

In Biglaw, as in capitalism generally, the rich just keep on getting richer.



According to CounselLink's 2020 Enterprise Legal Management Trends Report, the more attorneys that are employed at a firm, the more money that firm in able to command in its average billing rates. The biggest 50 law firms have an average partner billing rate of $575 per hour, which is 51 percent higher than the next band of firms. Those that are slightly smaller, with 501-750 attorneys, are averaging partner billing rates of $380 an hour. And it keeps on going down from there, with partner billing rates at firms with 201-500 lawyers 29 percent higher than those with only 101-200 lawyers.

As reported by Law.com, Kris Satkunas, director of strategic consulting at LexisNexis CounselLink, notes that these higher rates make the biggest Biglaw firms even more profitable, but there is an opportunity for the firms below:

> "[The largest firms] really have a hold on those markets," said Kris Satkunas, director of strategic consulting at LexisNexis CounselLink and the report's author. "It's almost a chicken-and-the-egg thing: the larger the firm, the higher its rate. But a higher rate drives up the firms' average income, meaning the firm can grow even larger."
>
> ....
>
> "I don't think people realize how strong the correlation is between the size of the firm and the rates," Satkunas said. "Firms slightly smaller than the "largest firms" category, ones with head counts of 501-750 lawyers, have an opportunity, she added, as clients look for high-quality legal work at a lower cost.

But the report also found that alternative fee arrangements are gaining traction — as Satkunas said, "I'm hopeful that we're finally moving away from talking about alternative fee arrangements and starting to embrace them." Last year, 12.1 percent of matters were under alternative fee arrangements and as the economic pressure of COVID-19 continues, that number is bound to continue to go up.

### Recommended

**Biglaw's Return-To-Office Push Is Showing Up In Law Firm Real Estate Deals**

**Biglaw Defamation Fight Escalates As Ex–Baker McKenzie Associate Fires Back With Her Own Lawsuit**

**How Young Lawyers Get Trial Experience (And Why It Still Matters)**

Captured by FireShot Pro: 24 January 2026, 10:34:58
https://getfireshot.com

*Kathryn Rubino is a Senior Editor at Above the Law, and host of The Jabot podcast. AtL tipsters are the best, so please connect with her. Feel free to email her with any tips, questions, or comments and follow her on Twitter (@Kathryn1).*



**Topics:** Biglaw, Billing Rates, CounselLink, Lexis/Nexis CounselLink

---

### More from Above the Law

   

**How Did The Beatles Get Involved With This? — See Also**

**Breaking The Ivy League's Legal Glass Ceiling**

**Pentagon CTO Offers Industry Free Use Of 400 Patents From Gov't Labs — For A Start**

**Stat(s) Of The Week: Law Schools' Revolving Door**

### From the Above the Law Network

  

**The Fifth-Year Dilemma: Do I Stay Or Do I Go (In-House)?**

Peerpoint

**Gen AI: Your Legal Research Assistant, Not Your Replacement**

Thomson Reuters

**A Law Firm Checklist For Successful Client Portals**

Thomson Reuters



**A Law Firm Checklist For Successful Transaction Management**

Thomson Reuters

### Recent Jobs

**Mid-Level Litigation Associate**
Location: New York
posted by Kinney Recruiting LLC

**Finance Counsel**
Location: New York
posted by Kinney Recruiting LLC

**Experienced Legal Secretary / Executive Assistant**
Location: Dallas
posted by Kinney Recruiting LLC

VIEW ALL >



The Bigger The Biglaw Firm, The Bigger The Billing Rate - Above the Law
https://abovethelaw.com/2020/07/the-bigger-the-biglaw-firm-the-bigger-the-billing-rate/

© 2026 Breaking Media, Inc. All rights reserved. Registration or use of this site constitutes acceptance of our Terms of Service and Privacy Policy.



EXHIBIT 13



*2016 Real Rate Report*®:
*Lawyer Rates, Trends,
and Analysis*









## Report Editors

Bradley Tingquist
**Quantitative Leader, CEB**

David Moran
**Sr. Director of Product Management, Legal
Analytics, Wolters Kluwer's ELM Solutions**

## Lead Data Analysts

Ashish Shakya
**Quantitative Consultant, CEB**

Steve Vumback
**Data Analyst, Wolters Kluwer's ELM Solutions**

Beth Seefelt
**Data Architect, Wolters Kluwer's ELM Solutions**

## Contributing Analysts and Authors

Aaron Kotok
**Practice Leader, CEB**

Bill Sowinski
**Director, Decision Support Services,
Wolters Kluwer's ELM Solutions**

Joel Surdykowski
**LegalVIEW Product Manager,
Wolters Kluwer's ELM Solutions**

Leslie Gillette
**Senior Product Marketing Manager,
Wolters Kluwer's ELM Solutions**

## Content Publishing Solutions

Kathryn Minock
**Graphic Designer, CEB**

Aasthaa Dhiman
Christie J.E. Parrish
Priyanka Sinha
**Contributing Designers, CEB**

A. Kate MacDougall
**Editor, CEB**

## Executive Sponsors

Christina Hertzler
**Practice Leader, CEB**

Glenn Paredes
**EVP and General Manager,
Wolters Kluwer's ELM Solutions**

© 2017 CEB and Wolters Kluwer's ELM Solutions. All rights reserved. This material may not be reproduced, displayed, modified, or distributed in any form without the express prior written permission of the copyright holders. To request permission, please contact:

ELM Solutions, a Wolters Kluwer business        Or        CEB
20 Church Street                                                      1919 North Lynn Street
Hartford, CT 06103                                                 Arlington, VA 22209
United States                                                            United States
ATTN: Marketing                                                     ATTN: Marketing
+1-860-549-8795                                                     +1-571-303-3000

**LEGAL CAVEAT**

CEB and Wolters Kluwer's ELM Solutions have worked to ensure the accuracy of the information in this report; however, CEB and Wolters Kluwer's ELM Solutions cannot guarantee the accuracy of the information or analyses in all cases. CEB and Wolters Kluwer's ELM Solutions are not engaged in rendering legal, accounting, or other professional services. This report should not be construed as professional advice on any particular set of facts or circumstances. Neither CEB nor Wolters Kluwer's ELM Solutions is responsible for any claims or losses that may arise from any errors or omissions in this report or from reliance upon any recommendation made in this report.

# Table of Contents

**A Letter to Our Readers** — **4**
**How to Use This Report** — **5**
**Executive Summary** — **6**
**A Note on Comparability of Data** — **8**
**Chapter 1: Rate Trends** — **11**
- Rebounding Growth — 12
- Operating in a Changing Legal Market — 13
- Partner and Associate Rate Increases Widen at Larger Firms — 14
- Associate Rate Increases Outpace Partners in Most US Cities — 15
- Identifying Value in Secondary Markets — 16
- Growing Separation in Associate Rates — 17

**Chapter 2: Drivers of Lawyer Rates** — **18**
- Unpacking the Drivers of Lawyer Rates — 19
- The Model for Lawyer Rates — 20
- The Model at Work — 21

**Chapter 3: Managing Billing Behaviors** — **22**
- Introducing Law Firm Billing Behaviors — 23
- Fractional Billing — 25
- Block Billing — 27
- Duplicate Billing — 31
- Low-Value Billing — 34
- Late Billing — 36
- Upbilling — 39
- Heavy Billing — 41

**Appendix A: Summary Data Tables** — **43**
- High-Level Data Cuts — 45
- Industry Analysis — 80
- Practice Area Analysis — 98
- In-Depth Analysis for Select US Cities — 164
- Summary Reference Cards for Select US Cities — 194
- International Analysis — 201
- Matter Staffing Analysis — 221

**Appendix B: Methodology Notes** — **225**
**Appendix C: Data Methodology** — **229**
- Invoice Information — 230
- Non-Invoice Information — 230
- A Note on US Cities — 231
- Data Methodology — 234

©2017 CEB. All rights reserved. GCR166424PR
wkelmsolutions.com
cebglobal.com

# A Letter to Our Readers

Welcome to the sixth edition of the *Real Rate Report®*, the industry's leading data-driven report for lawyer rates and matter costs.

We continue to see many changes in the way Legal departments work with their law firms. As the market for legal services evolves, we see greater reliance on internal analytics and the usage of data resources such as Wolters Kluwer's ELM Solutions LegalVIEW® data warehouse. Legal departments are doing more with our data than benchmarking the cost of their law firms and negotiating preferred rates. They are getting more granular, monitoring lawyer staffing and billing patterns to manage their matters actively. Law firms are also benefiting more, using our data not only to create accurate budgeting projections but also to monitor the level of service provided to their clients.

This year's report analyzes more than $19.6 billion in legal spending data from corporations' and law firms' e-billing and time management solutions as well as other industry sources. As in past *Real Rate Reports*, users get a unique look into matter costs because we use actual invoice data at a depth and granularity not available anywhere else. In addition, we have provided a first-time analysis of lawyer billing behaviors which highlight potentially inappropriate lawyer invoicing and demonstrate how these exceptions can add significant cost. Using this information, Legal departments and law firms can set joint expectations for reasonable billing practices and discuss potential invoicing issues early enough to prevent longer-term harm in their relationship.

As always, our hope is that this information and analysis will not only inform Legal departments about hourly rates and total costs but also empower them to make better and more confident decisions that create substantial cost savings and greater satisfaction with the law firms they use.

We strive to make the *Real Rate Report* a valuable and actionable reference tool for Legal departments and law firms. As with previous *Real Rate Reports*, we welcome your comments and suggestions on what information would make this publication more valuable to you. We thank you and look forward to continuing the conversation on how Legal departments and law firms can collaborate with better clarity and trust.


Warm regards,


**Christina Hertzler**          **Glenn Paredes**

Practice Leader               EVP and General Manager

                              Wolters Kluwer's ELM Solutions

©2017 CEB. All rights reserved. GCR166424PR

# How to Use This Report

The *Real Rate Report* examines law firm rates over time; identifies rates by location, experience, firm size, areas of expertise, industry, and timekeeper role (i.e., partner, associate, and paralegal); and enumerates variables that drive rates up or down. All the analyses included in the study are derived from the actual rates charged by law firm professionals as recorded on invoices submitted and approved for payment.

Examining real, approved rate information along with the ranges of those rates and their changes over time highlights the role these variables play in driving aggregate legal cost and income. The analyses can energize questions for both corporate clients and law firm principals. Clients might ask whether they are paying the right amount for different types of legal services, while law firm principals might ask whether they are charging the right amount for legal services and whether they could generate additional income if they modified their approach.

Affirmatively or intuitively, company purchasers of law firm services usually evaluate law firm rates based on five classic value propositions[1]:

1. **Quality—**Whether good, poor, or acceptable results are routinely achieved
2. **Cost—**The price, or rate, paid to achieve results
3. **Service—**The level of responsiveness and compliance with required processes
4. **Speed—**How quickly matters or tasks are resolved
5. **Innovation—**The application of novel solutions to issues or matters

These value propositions are more or less important across varying practice areas, and their relative values are clearly demonstrated in this study. Delivering fast and excellent results in complicated financial matters is appropriately valued by clients more highly (with resulting higher rates) than is delivering excellent results in routine workers' compensation or real estate matters. The information in this report can assist law firms in considering whether they are properly pricing their services and can further inform the profitability of alternative business models. The *Real Rate Report* can help companies align their past and future paid rates with the value propositions that return the greatest value by practice area.

## New to the *2016 Real Rate Report*

This edition of the *Real Rate Report* contains many new analyses that provide added insight on lawyer rates and ultimately matter costs.

### Lawyer Billing Behaviors

The most notable enhancement to this report is the detailed analysis of lawyer billing behaviors. Over the years, ELM Solutions developed metrics for corporate Legal departments to track billing behaviors of lawyers and paralegals. ELM Solutions collects these metrics in its Actionable Insight Billing Tendencies Reports, which are run against a corporate Legal department's invoice data. Those metrics are calculated for a corporate Legal department by identifying the timekeepers who generated unusual billing entries, either from a single law firm or across a panel of many firms. In the *2016 Real Rate Report*, these billing tendencies were aggregated across the total dataset to measure their likelihood and potential impact.

### More Robust Data Appendix with Real Rate Cards for Large US Markets

The *2016 Real Rate Report* builds on the demand for more granularity. In addition to displaying rate benchmarks for detailed practice areas, US and Canadian cities, and non-US geographic regions, a new appendix section provides pocket-sized summary tables for the 25 US cities with the most billing data available in LegalVIEW. Each of these Real Rate Cards provides summary statistics on rates, annual rate changes, and volume of work performed filtered by firm size and that city's most frequently billed practice areas.

---

[1] Dave Ulrich, Jack Zenger, and Norm Smallwood, *Results-Based Leadership*, Boston: Harvard Business Press, 1999.

©2017 CEB. All rights reserved. GCR166424PR

# Executive Summary

Over the past decade, the legal services market has undergone a series of substantial changes disrupting the traditional client–law firm model. The introduction of new Legal department technologies and alternative Legal service providers has created a more competitive environment for law firms and has provided cheaper alternatives for Legal departments. In addition, the Great Recession forced companies to adopt more aggressive cost control efforts that impacted all parts of the business, including corporate Legal department budgets. A CEB survey conducted in the midst of the recession revealed that more than half of corporate Legal departments cut their budgets in 2009. Not surprisingly, most Legal departments focused first on reducing the fees paid to their outside counsel to accomplish this, as outside counsel spending accounted for more than half of a typical Legal department's budget.

With this as the backdrop, Legal departments have spent an increasing amount of time sifting through data on legal fees to better clarify how they are spending their money and with whom. However, law firm selection and rate negotiation are only part of cost control.

In CEB's 2015 Outside Counsel Performance Assessment survey, 37% of Legal departments reported that the total amount they paid to law firms was more than they expected to pay for the work performed. In that same survey, 21% of departments reported that they required their law firms to format their invoices to defined standards for less than half of their matters and 24% educated their outside counsel on their preferences for less than half of their matters. These results suggest that ongoing law firm management through the life of a matter is frequently overlooked. Setting expectations clearly and increasing ongoing communications with law firms can improve the quality of legal work and in turn prevent costly invoicing and production mistakes. Legal departments are increasingly aware that closer law firm management is also necessary to manage costs and are spending more time strengthening the oversight of their outside counsel.

To aid in both of these efforts, we reviewed the data from Wolters Kluwer's ELM Solutions' LegalView warehouse, which holds more than $19.6 billion in actual law firm invoices. We found a number of interesting themes emerge.

### Lawyer Rates Are Increasing Again
After a notable slowdown in 2013 that suggested rate increases might be stabilizing, year-on-year rate increases again rose over consecutive years to 5.4% in 2015. The percentage growth in rates occurred for both partners and associates, with associates enjoying a higher rate increase relative to partners.

### First-Year Associates Rates Have Flattened
After a small increase in 2011, the average rate that a first-year associate billed in a given year has not changed. Meanwhile, average rates for associates at different levels of experience have seen more significant growth. In 2010, the average fifth-year associate billed a rate 8% higher than the average second-year. In 2015, that difference had increased to 21%.

### Law Firm Size Has the Largest Impact on Hourly Rates
Of the more than 350 factors we tested, our analysis confirmed that law firm size was the largest driver of law firm rates. Regardless of the market location or type of work performed, larger firms consistently charged higher rates. These data suggest that larger law firms have been more successful not only in promoting an integrated "one-stop-shop" value proposition but also in obtaining a greater share of large matters. Location (especially in New York or Washington, DC), years of experience, and the designation as a partner also heavily impacted a lawyer's hourly rate.

©2017 CEB. All rights reserved. GCR166424PR

**Oversight of Law Firm Billing Discipline Varies Widely**

Although inappropriate billing is the exception for an individual lawyer when compared with all of their otherwise valid invoice entries, some lawyers did invoice clients for questionable entries more frequently than others. Similarly, it is also true that some clients were more likely to pay for questionable invoice entries than other clients. For just the three most common billing practices—fractional billing, block billing, and duplicate billing—the difference in fees paid on each behavior in 2015 varied by approximately $0.2 million, $2.9 million, and $1 million, respectively, for top- and bottom-quartile Legal departments.

Factors not tested here certainly played a role in these clients' likelihood of receiving more or fewer questionable invoice entries in a year (e.g., a large number of general liability litigation matters where instances are more common). However, the large difference in spending between top- and bottom-quartile clients suggests that some in-house counsel are simply doing more with their law firms to manage these behaviors.

Overall, this report suggests that despite the disruptions in the legal market, it is still very healthy, particularly for the largest firms. We see a valuable opportunity for Legal departments to examine not only hourly rates but also how law firms work with them to manage invoicing and matters.

©2017 CEB. All rights reserved.  GCR166424PR

EXHIBIT 14



*ELM Solutions*

# 2024 Real Rate Report®

The industry's leading analysis of law firm rates, trends, and practices





**Report Editor**

**Jennifer McIver**
Director, Legal Operations and Industry Insights
Wolters Kluwer ELM Solutions

**Lead Data Analysts**

**Carol Au**
Business Systems Quantitative Analyst
Wolters Kluwer ELM Solutions

**Aaryak Shandilya**
Data Scientist
Wolters Kluwer ELM Solutions

**ELM Solutions Creative**

**David Andrews**
Senior Graphic Designer
Wolters Kluwer ELM Solutions

**Contributing Analysts and Authors**

**Jason Bender**
Legal Analytics Product Manager
Wolters Kluwer ELM Solutions

**Haemi Jung**
Strategic Business Intelligence Manager
Wolters Kluwer ELM Solutions

**Margie Sleboda**
Lead Technology Product Manager
Wolters Kluwer ELM Solutions

**Executive Sponsor**

**Brian Jorgenson**
Vice President, Product Management
Wolters Kluwer ELM Solutions

© 2004 – 2024 Wolters Kluwer ELM Solutions. All rights reserved. This material may not be reproduced, displayed, modified, or distributed in any form without the express prior written permission of the copyright holders. To request permission, please contact:

> ELM Solutions, a Wolters Kluwer business
> 2929 Allen Pkwy Ste 3300
> Houston, TX 77019 United States
> ATTN: Marketing
> ELMSolutionsSales@wolterskluwer.com

**LEGAL CAVEAT**

Wolters Kluwer ELM Solutions has worked to ensure the accuracy of the information in this report; however, Wolters Kluwer ELM Solutions cannot guarantee the accuracy of the information or analyses in all cases. Wolters Kluwer ELM Solutions is not engaged in rendering legal, accounting, or other professional services. This report should not be construed as professional advice on any particular set of facts or circumstances. Wolters Kluwer ELM Solutions is not responsible for any claims or losses that may arise from any errors or omissions in this report or from reliance upon any recommendation made in this report.

# Table of Contents - 2024 Real Rate Report

**A Letter to Our Readers • 4**

**Report Use Considerations • 5**

**Section I: High-Level Data Cuts • 8**
- Partners, Associates, and Paralegals
- Partners and Associates by City and Matter Type
- Partners and Associates by City
- Partners, Associates, and Paralegals by Practice Area and Matter Type
- Partners and Associates by Firm Size and Matter Type
- Partners by City and Years of Experience
- Associates by City and Years of Experience

**Section II: Industry Analysis • 65**
- Partners, Associates, and Paralegals by Industry Group
- Partners and Associates by Industry Group and Matter Type
- Basic Materials and Utilities
- Consumer Goods
- Consumer Services
- Financials (Excluding Insurance)
- Health Care
- Industrials
- Insurance
- Technology and Telecommunications

**Section III: Practice Area Analysis • 88**
- Bankruptcy and Collections
- Commercial
- Corporate: Mergers, Acquisitions, and Divestitures
- Corporate: Other
- Corporate: Regulatory and Compliance
- Employment and Labor
- Environmental
- Finance and Securities
- General Liability (Litigation Only)
- Insurance Defense (Litigation Only)
- Intellectual Property: Other
- Intellectual Property: Patents
- Intellectual Property: Trademarks
- Real Estate

**Section IV: In-Depth Analysis for Select US Cities • 175**
- Boston, MA
- Chicago, IL
- Los Angeles, CA
- New York, NY
- Philadelphia, PA
- San Francisco, CA
- Washington, DC

**Section V: International Analysis • 195**

**Section VI: Matter Staffing Analysis • 220**

**Appendix: Data Methodology • 225**

# A Letter to Our Readers

**Welcome to the latest edition of Wolters Kluwer ELM Solutions Real Rate Report®, the industry's leading data-driven benchmark report for lawyer and paralegal rates.**

Our Real Rate Report has been a relied upon data analytics resource to the legal industry since its inception in 2010 and continues to evolve, providing you with the most comprehensive rate benchmarking insights, trends, and practices. The Real Rate Report is powered by the Wolters Kluwer ELM Solutions LegalVIEW® data warehouse, which has grown to include $180B+ in anonymized legal data.

The depth and granularity of the data within the Real Rate Report empowers users to benchmark and negotiate effectively and make well-informed investment and resourcing decisions for the organization.

As with previous Real Rate Reports, our data is sourced from corporations' and law firms' e-billing and time management solutions. We have included lawyer and paralegal rate data filtered by specific practice and sub-practice areas, metropolitan areas, and types of matters. This level of detail gives legal departments and law firms the precision they need to identify areas of opportunity. We strive to make the Real Rate Report a valuable and actionable reference tool for legal departments and law firms.

As always, we welcome your comments and suggestions on what information would make this publication more valuable to you. We thank our data contributors for participating in this program. And we thank you for making Wolters Kluwer ELM Solutions your trusted partner for legal industry domain expertise, data, and analytics and look forward to continuing to provide market-leading, expert solutions that deliver the best business outcomes for collaboration among legal departments and law firms.

Sincerely,

**Brian Jorgenson**
Vice President, Product Management
Wolters Kluwer ELM Solutions

# Report Use Considerations

**2024 Real Rate Report**
- Examines law firm rates over time
- Identifies rates by location, experience, firm size, areas of expertise, industry, and timekeeper role (i.e., partner, associate, and paralegal)
- Itemizes variables that drive rates up or down

All the analyses included in the report derive from the actual rates charged by law firm professionals as recorded on invoices submitted and approved for payment.

Examining real, approved rate information, along with the ranges of those rates and their changes over time, highlights the role these variables play in driving aggregate legal cost and income. The analyses can energize questions for both corporate clients and law firm principals.

Legal departments might ask whether they are paying the right amount for different types of legal services, while law firm principals might ask whether they are charging the right amount for legal services and whether to modify their pricing approach.

**Some key factors[1] that drive rates[2]:**

**Attorney location -** Lawyers in urban and major metropolitan areas tend to charge more when compared with lawyers in rural areas or small towns.

**Litigation complexity -** The cost of representation will be higher if the case is particularly complex or time-consuming; for example, if there are a large number of documents to review, many witnesses to depose, and numerous procedural steps, the case is likely to cost more (regardless of other factors like the lawyer's level of experience).

**Years of experience and reputation -** A more experienced, higher-profile lawyer is often going to charge more, but absorbing this higher cost at the outset may make more sense than hiring a less expensive lawyer who will likely take time and billable hours to come up to speed on unfamiliar legal and procedural issues.

**Overhead -** The costs associated with the firm's support network (paralegals, clerks, and assistants), document preparation, consultants, research, and other expenses.

**Firm size –** The rates can increase if the firm is large and has various timekeeper roles at the firm. For example, the cost to work with an associate or partner at a larger firm will be higher compared to a firm that has one to two associates and a paralegal.

---

1 **David Goguen, J.D., University of San Francisco School of Law (2020) Guide to Legal Services Billing Retrieved from:**
   https://www.lawyers.com/legal-info/research/guide-to-legal-services-billing-rates.html
2 **Source:  2018 RRR.** Factor order validated in multiple analyses since 2010

EXHIBIT 15

 Positive
As of: July 29, 2018 5:27 AM Z

## *Greene v. City of New York*

United States District Court for the Southern District of New York

October 25, 2013, Decided; October 25, 2013, Filed

12 Civ. 6427 (SAS)

**Reporter**

2013 U.S. Dist. LEXIS 154342 *; 2013 WL 5797121

ANTHONY GREENE, Plaintiff, - against- THE CITY OF NEW YORK, DETECTIVE DAVID COWAN SH. # 1558, DETECTIVE CHRISTOPHER SCHILLING, SH. # 6516, DETECTIVE CARDINALE and POLICE OFFICER JOHN DOE 1-10, Defendants.

## Core Terms

attorneys', per hour, lodestar, costs, rates, cases, prevailing, reduction, Services, calculation, mediation, settlement, entries, spent, reasonable *hourly rate*, reasonable fee, across-the-board, rights, attorney's fees, district court, civil rights, *hourly rate*, paralegal, charges, limited success, presumptively, compensable, paying, marks, degree of success

**Counsel:** [*1] For Plaintiff: Michael Colihan, Esq., Brooklyn, NY.

For Defendants: Tobias E. Zimmerman, Assistant Corporation Counsel, New York, NY.

**Judges:** Shira A. Scheindlin, U.S.D.J.

**Opinion by:** Shira A. Scheindlin

## Opinion

## OPINION AND ORDER

## SHIRA A. SCHEINDLIN, U.S.D.J.:

On August 22, 2012, Anthony Greene filed suit pursuant to *42 U.S.C. § 1983* ("*section 1983*") against the City of New York and several detectives with the New York Police Department ("NYPD"). Plaintiff brought claims, *inter alia*, for false arrest and violation of his civil rights under the *Fourth Amendment*.[1] Approximately eight months later, in April 2013, the parties executed a Stipulation and Order of Dismissal, thereby settling this action for $7,501 plus reasonable ***attorneys' fees*** and costs. Plaintiff now moves pursuant to *42 U.S.C. § 1988* ("*section 1988*") seeking an award of $51,577.50 in ***attorneys' fees*** and $560.00 in costs. For the following reasons, plaintiff's motion is granted but not in the amount requested.

## I. BACKGROUND

On August 1, 2011, plaintiff was arrested by [*2] detectives of the Brooklyn North Narcotics unit of the NYPD.[2] Plaintiff was charged with possession of narcotics and remained in custody for approximately twenty-four hours.[3] The charges against him were eventually dismissed.[4] Plaintiff

---

[1] Plaintiff also brought claims for intentional infliction of mental and emotional distress, negligent infliction of mental and emotional distress, as well as a *Monell* claim against the City.

[2] *See* First Amended Complaint ("FAC") ¶ 10.

[3] *See id.* ¶ 12.

[4] *See id.* ¶ 16.

Case 3:23-cv-00768-BEN-VET    Document 334-1    Filed 02/23/26    PageID.19008
Page 218 of 592                                                           Page 2 of 9
Greene v. City of New York

filed this lawsuit on August 12, 2012, alleging, *inter alia*, violations of his *Fourth Amendment* rights. The case was docketed under the Court's Plan for Certain *§ 1983* Cases Against the City of New York ("*Section 1983* Plan").

On January 31, 2013, plaintiff's counsel made a settlement demand for $40,000.[5] A mediation session was held on February 21, 2013, during which defendants made a counteroffer of $5,000, inclusive of costs and fees.[6] Contrary to the requirements of the *Section 1983* Plan, plaintiff did not personally appear at the mediation.[7] Because of plaintiff's absence, the parties were unable to make any progress toward settlement during that mediation session.[8] Defendants made clear that they were amenable to another mediation session if plaintiff would personally attend.[9] Plaintiff's counsel refused further mediation unless and until the City recognized this case as "a 5 **[*3]** figure matter."[10] Defendants refused to make such a concession as a precondition to further mediation. Plaintiff's counsel therefore refused to return to mediation, accusing the City of bad faith.[11]

On March 22, 2013, the City served plaintiff with a *Rule 68 Offer of Judgment* in the amount of

───────────────────────

[5] *See* 1/31/13 E-mail from plaintiff's counsel, Michael Colihan, to defendants' counsel, Tobias Zimmerman, Ex. A to the Declaration of Tobias E. Zimmerman in Support of Defendants' Memorandum in Opposition to Plaintiff's Motion for Attorney's Fees ("Zimmerman Decl.").

[6] *See* Zimmerman Decl. ¶ 3.

[7] *See id.* ¶ 4.

[8] *See id.*

[9] *See id. See also* 3/4/13 E-mail from Zimmerman to Colihan, Ex. B to the Zimmerman Decl. ("I would be in favor of having a follow-up mediation before the initial conference to see if we can make progress towards settlement.").

[10] 3/6/13 E-mail from Colihan to Zimmerman, Ex. C to the Zimmerman Decl.

[11] *See* 3/6/13 E-mail from Colihan to Zimmerman, Ex. D to the Zimmerman Decl. ("I will have to pass on further mediation. I don't think the City is dealing in good faith, and frankly don't have time to waste in this fashion.").

$7,501.[12] Although the offer was accepted on March 27, 2013, plaintiff did **[*4]** not file the *Rule 68 Offer of Judgment* with the Court. Instead, plaintiff chose to negotiate a separate settlement agreement based on the terms of the *Rule 68 Offer of Judgment*.[13] The parties then negotiated a settlement agreement and submitted a stipulated Order of Dismissal, which I signed on April 9, 2013. Approximately one month later, plaintiff's counsel provided defendants with a Statement of Services detailing the work he performed in this case.[14] In the Statement of Services, plaintiff's counsel demanded $31,312.50 in legal fees (83.5 hours at $375 per hour) and $560 in costs.[15] Defendants offered $8,067.50 to settle the ***attorneys' fees*** issue which consisted of 46.1 hours of compensable work at $350 per hour, discounted by fifty percent for plaintiff's limited success, plus $560 in costs.[16] Plaintiff rejected defendants' offer and filed the instant motion for ***attorneys' fees***.

## II. LEGAL STANDARD

## A. Presumptively Reasonable Fee

A "prevailing party" in a civil rights action is entitled to an award of ***attorneys' fees*** and costs.[17]

───────────────────────

[12] *See* Ex. E to the Zimmerman Decl.

[13] *See* 3/27/13 E-mail from Colihan to Zimmerman, Ex. F to the Zimmerman Decl.

[14] *See* 5/10/13 E-mail from Colihan to Zimmerman, Ex. G to the Zimmerman Decl.

[15] *See* 9/16/13 Statement of Services, Ex. H to the Zimmerman Decl., at 20.

[16] *See* 6/28/13 Letter from Zimmerman to Colihan, **[*5]** Ex. I to the Zimmerman Decl., at 3-4.

[17] *See 42 U.S.C. § 1988(b)* (stating that "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs" in civil rights actions). *See also* Raishevich v. Foster, 247 F.3d 337, 344 (2d Cir. 2001) ("Although a district court typically has wide discretion in choosing whether to deny ***attorneys' fees***, . . . this discretion is narrowed by a presumption that successful civil rights litigants should ordinarily

Furthermore, a prevailing party is also entitled to reimbursement for time reasonably expended in preparing an attorneys' fee application.[18] A "prevailing party" is a party who achieves a "'material alteration of the legal relationship of the parties'"[19] "The district court retains discretion to determine . . . what constitutes a reasonable fee.'"[20]

In determining the amount of a fee award, courts must calculate the "lodestar" figure which represents the "presumptively reasonable fee."[21] The lodestar figure is calculated "by multiplying a reasonable **_hourly rate_** by the number of reasonably expended hours."[22] The Supreme Court has endorsed the "lodestar" approach as the superior method in calculating **_attorneys' fees_** for several reasons.[23]

First, a "reasonable" fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case. . . Second, the lodestar method yields a fee that is presumptively sufficient to achieve this objective. **[*7]** [Finally,] the lodestar figure includes most, if not all, of the relevant factors constituting a "reasonable" attorney's fee.[24]

"In determining what fee is reasonable, the court takes account of claimed hours that it views as 'excessive, redundant, or otherwise unnecessary.'"[25] "In so doing, 'the district court does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience **[*8]** generally as well as to the evidentiary submissions and arguments of the parties.'"[26] "In reducing the 'lodestar' amount, the court may exclude the excessive and unreasonable hours from its calculation by making an across-the-board reduction, or percentage cut, in the amount of hours."[27]

## B. Proportionality

There is no rule requiring proportionality between the amount of fees requested and the damages recovered. The Second Circuit has stated:

> While a court may, in exceptional

---

[18]*See Short v. Manhattan Apartments, Inc., No. 11 Civ. 5989, 2013 U.S. Dist. LEXIS 83347, 2013 WL 2477266, at * 8 (S.D.N.Y. June 10, 2013)* **[*6]** (citing *Weyant v. Okst, 198 F.3d 311, 316 (2d Cir. 1999)* ("[A] reasonable fee should be awarded for time reasonably spent in preparing and defending an application for § 1988 fees.")).

[19]*Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health and Human Res., 532 U.S. 598, 604, 121 S. Ct. 1835, 149 L. Ed. 2d 855 (2001)* (quoting *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 792-93, 109 S. Ct. 1486, 103 L. Ed. 2d 866 (1989)*).

[20]*See Millea v. Metro-North R.R. Co., 658 F.3d 154, 166 (2d Cir. 2011)* (quoting *LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 758 (2d Cir. 1998)*, ellipsis in original).

[21]*Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 551-52, 130 S. Ct. 1662, 176 L. Ed. 2d 494 (2010)* (stating that "the lodestar method produces an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case) (emphasis in original). *Accord Millea, 658 F.3d at 166* ("Both this Court and the Supreme Court have held that the lodestar — the product of a reasonable **_hourly rate_** and the reasonable number of hours required by the case — creates a 'presumptively reasonable fee.'").

[22]*Bergerson v. New York State Office of Mental Health, Central New York Psychiatric Center, 652 F.3d 277, 289 (2d Cir. 2011)*.

[23]*See Perdue, 559 U.S. at 551*.

[24]*Id. at 552* (quotation marks and citation omitted).

[25]*Bliven v. Hunt, 579 F.3d 204, 213 (2d Cir. 2009)* (quoting *Hensley v. Eckerhart, 461 U.S. 424, 434, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)*).

[26]*Id.* (quoting *DiFilippo v. Morizio, 759 F.2d 231, 236 (2d Cir. 1985)*).

[27]*T.S. Haulers, Inc. v. Cardinale, No. 09 CV 0451, 2011 U.S. Dist. LEXIS 9578, 2011 WL 344759, at *3 (E.D.N.Y. Jan. 31, 2011)* (citing *Green v. City of New York, 403 Fed. App'x 626, 630 (2d Cir. 2010)* (stating that district courts are authorized "to make across-the-board percentage cuts in hours 'as a practical means of trimming fat from a fee application'") (quoting *In re Agent Orange Prod. Liab. Litig., 818 F.2d 226, 237 (2d Cir. 1987)* (internal quotation marks and citation omitted))).

circumstances, adjust the lodestar, it may not disregard it entirely. Especially **[\*9]** for claims where the financial recovery is likely to be small, calculating **_attorneys' fees_** as a proportion of damages runs directly contrary to the purpose of fee-shifting statutes: assuring that civil rights claims of modest cash value can attract competent counsel. The whole purpose of fee-shifting statutes is to generate **_attorneys' fees_** that are _disproportionate_ to the plaintiff's recovery. Thus, the district court abused its discretion when it ignored the lodestar and calculated the **_attorneys' fees_** as a proportion of the damages awarded.[28]

"Reasoning that a rule calling for proportionality between the fee and the monetary amount involved in the litigation would effectively prevent plaintiffs from obtaining counsel in cases where deprivation of a constitutional right caused injury of low monetary value, [courts] have repeatedly rejected the notion that a fee may be reduced merely because the fee would be disproportionate to the financial interest at stake in the litigation."[29]

## C. Degree of Success

"[T]he most critical factor' in a district court's determination of what constitutes reasonable attorney's fees in a given case 'is the degree of success obtained' by the plaintiff."[30] "Hours spent on unsuccessful fee-shifting claims, like those spent on claims wholly ineligible for fee-shifting, must be excluded from the reasonable hours spent on the case when calculating the lodestar."[31] As recognized

by the Supreme Court, where

a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable **_hourly rate_** may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, the most critical factor is the degree of success obtained.[32]

The "degree of success" inquiry "is not limited to inquiring whether a plaintiff prevailed on individual claims."[33] "Both the quantity and quality of relief obtained, **[\*11]** as compared to what the plaintiff sought to achieve as evidenced in her complaint, are key factors in determining the degree of success achieved."[34] Accordingly, "a district judge's authority to reduce the fee awarded to a prevailing plaintiff below the lodestar by reason of the plaintiff's 'partial or limited success' is not restricted either to cases of multiple discrete theories or to cases in which the plaintiff won only a nominal or technical victory."[35]

## D. _Hourly Rate_

"To determine the reasonable **_hourly rate_** for each attorney, courts must look to current market rates 'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'"[36] "A review of precedent in the

---

[28] _Millea, 658 F.3d at 169_ (citation omitted, emphasis in original).

[29] _Kassim v. City of Schenectady, 415 F.3d 246, 252 (2d Cir. 2005)_ (citing cases). _Accord Torres v. Gristede's Operating Corp., 519 Fed. App'x 1, 5 (2d Cir. 2013)_ **[\*10]** (citing _Kassim, 415 F.3d at 252_).

[30] _Barfield v. New York City Health and Hosps. Corp., 537 F.3d 132, 152 (2d Cir. 2008)_ (quoting _Farrar v. Hobby, 506 U.S. 103, 114, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992))_.

[31] _Millea, 658 F.3d at 168_.

[32] _Hensley, 461 U.S. at 436_.

[33] _Barfield, 537 F.3d at 152_.

[34] _Id._ (quotation marks and citation omitted).

[35] _Kassim, 415 F.3d at 256_.

[36] _Heng Chan v. Sung Yue Tung Corp., No. 03 Civ. 6048, 2007 U.S._

Case 3:23-cv-00768-BEN-VET    Document 334-1    Filed 02/23/26    PageID.19011
Page 221 of 592                                                          Page 5 of 9
Greene v. City of New York

Southern District reveals that rates awarded to experienced civil rights attorneys over the past ten years have ranged from $250 to $600, and that rates for associates have ranged **[\*12]** from $200 to $350, with average awards increasing over time."[37] In determining the presumptively reasonable attorneys' fee award,

> the district court should, in determining what a reasonable, paying client would be willing to pay, consider factors including, but not limited to, the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether the attorney had an interest (independent of that of his client) in achieving the ends of the litigation or initiated the representation himself, whether the attorney was initially acting pro bono (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) the attorney expected from the representation.[38]

Accordingly, a reasonable ***hourly rate*** is "what a reasonable paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively."[39] "The reasonable ***hourly rate*** for such

calculation is determined by the rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished."[40] The reasonable rate is determined by "a case-specific inquiry into the prevailing market rates for counsel of similar experience and skill to the fee applicant's counsel," which may include taking "judicial notice of the rates awarded in prior cases."[41] The burden is on the movant to show "by satisfactory evidence — in addition to the attorney's own affidavits — that the requested hourly rates are the prevailing market **[\*14]** rates."[42]

## III. DISCUSSION

### A. Counsel's *Hourly Rate*

In determining reasonable hourly rates for civil rights attorneys, this Court has stated it is appropriate to determine whether the billing attorneys are "more like members of a large New York City law firm than they are like members of a nonprofit organization or a two to three-person obscure law firm."[43] Plaintiff's counsel, Michael Colihan, is a solo practitioner.[44] In his fee motion,

---

[37] *Dist. LEXIS 33883, 2007 WL 1373118, at \*2 (S.D.N.Y. May 8, 2007)* (quoting *Gierlinger v. Gleason, 160 F.3d 858, 882 (2d Cir. 1998)*).

[37] *Tatum v. City of New York, No. 06 Civ. 4290, 2010 U.S. Dist. LEXIS 7748, 2010 WL 334975, at \*5 (S.D.N.Y. Jan. 28, 2010)* **[\*13]** (quotation marks and citation omitted). *Accord Mugavero v. Arms Acres Inc., No. 03 Civ. 5724, 2010 U.S. Dist. LEXIS 11210, 2010 WL 451045, at \*5 (S.D.N.Y. Feb. 9, 2010)*.

[38] *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 484 F.3d 162, 164 (2d Cir. 2007), amended and superseded on denial of rehearing, 493 F.3d 110 (2d Cir. 2007), amended and superseded, 522 F.3d 182, 184, 192 (2d Cir. 2008)*.

[39] *Bergerson, 652 F.3d at 289-90. Accord Arbor Hill, 522 F.3d at 190* ("The reasonable ***hourly rate*** is the rate a paying client would be willing to pay . . . bear[ing] in mind that a reasonable, paying client

wishes to spend the minimum necessary to litigate the case effectively.").

[40] *Streck v. Board of Educ. of the East Greenbush Cent. Sch.. Dist., 408 Fed. App'x 411, 416 (2d Cir. 2010)*.

[41] *Farbotko v. Clinton Cnty, 433 F.3d 204, 209 (2d Cir. 2005)*.

[42] *Id.*

[43] *Wise v. Kelly, 620 F. Supp. 2d 435, 446 (S.D.N.Y. 2008)* (citing cases awarding rates between $350-$430 per hour for experienced civil rights litigators).

[44] The ***size of the law firm*** is a significant factor in determining the relevant market rates. *See, e.g., Reiter v. Metropolitan Transp. Auth. of State of New York, No. 01 Civ. 2762, 2007 U.S. Dist. LEXIS 71008, 2007 WL 2775144, at \*7 (S.D.N.Y. Sept. 25, 2007)* ("[T]he fact is that the large firms listed on the [National Law Journal] survey have acquired a reputation that allows them to command high rates in the market. Many other firms, in particular smaller firms that may be providing equally capable services, simply do not command anywhere near such rates . . . .").

Colihan requests $450 per hour, citing *Tatum v. City of New York* in support thereof.[45] Yet Colihan has conceded that he has accepted rates of $325-$350 per hour from the City for "a number of years."[46] Moreover, in the first Statement 46 of Services served on the City, Colihan chose an **_hourly rate_** of $375 per **[*15]** hour.[47]

"A reasonable starting point for determining the **_hourly_ [*16] _rate_** for purposes of a [presumptively reasonable fee] calculation is the attorney's customary rate."[48] Although Colihan has not provided this Court with the actual **_hourly rate_** he charges his clients, I find the rate of $375 per hour is on par with rates charged by seasoned civil rights solo practitioners with comparable experience. Accordingly, Colihan will be compensated for a reasonable number of hours at the rate of $375 per hour.

## B. Number of Hours

Colihan's time entries are presented in numbered paragraphs in the second Statement of Services, attached as Exhibit 1 to his undated Affirmation. The last page of the Statement of Services summarizes the total hours requested as follows: 102.4 attorney hours at $450 per hour, 3.3 paralegal hours at $125 per hour. Colihan also spent 11.3 hours on his reply memorandum of law, thus increasing his hours to 113.7 hours.[49]

A review of the Statement of Services reveals two basic categories of non-compensable time: (1) administrative work more properly performed by a paralegal, **[*17]** and (2) review of pleadings and documents in other cases. For example, the first category includes entries such as: "Visit to 5th floor clerk's office to order file on underlying criminal action at 120 Schermerhorn Street, Brooklyn, NY" and "Review ECF bounces." These entries describe work of an administrative nature that should have been done by a paralegal rather than an attorney charging $375 per hour. Accordingly, I am deducting 5.1 hours from Colihan's total hours (entries # 4, 5, 10, 12, 13, 14, 16, 19, 25, 26, 30, 68 and 69) but those hours will be compensated at the paralegal rate of $125 per hour.[50]

As for the second category, there are numerous entries relating to the review of pleadings and documents in unrelated cases which have settled. The first such entry reads: "Read docket sheet, **[*18]** orders & stipulation of settlement in Gray v. NYC, et al 08-cv-02210 (EDNY) where def Schilling is also a defendant settled for $25,000.00."[51] Colihan has litigated nearly two hundred civil rights cases within the Second Circuit, all of which but a "handful" were settled.[52] Given his experience, it is unclear why Colihan would need to review pleadings and documents in a handful of other cases, even those where Detective Christopher Schilling was named as a defendant. Resort to outside materials seems completely unnecessary given that this case settled at an early stage without any motion practice. In any event, it is highly unlikely that a reasonable client looking to minimize the costs of his own litigation would pay for time spent by his attorney reviewing unrelated

---

[45] In *Tatum*, the two charging attorneys were awarded the standard rates they charged their clients, $400 and $450 per hour. *See 2010 U.S. Dist. LEXIS 7748, 2010 WL 334975, at *5* ("Although the actual rate an attorney charges paying clients is persuasive evidence of reasonableness, compensable **_attorneys' fees_** must ultimately conform to market rates.").

[46] Affirmation of Michael Colihan ("Colihan Aff.") ¶ 22.

[47] *See* Statement of Services, Ex. H to the Zimmerman Decl., at 20.

[48] *Parrish v. Sollecito, 280 F. Supp. 2d 145, 169-70 (S.D.N.Y. 2003).*

[49] *See* 9/29/13 Second Declaration of Michael Colihan in Support of This Application for Attorney's Fees ¶ 2.

---

[50] In his Affirmation, Colihan asks that this time be billed at the rate of $150 per hour yet the "Paralegal rate" in the Statement is $125 per hour. *See* Affirmation of Michael Colihan ("Colihan Aff.") ¶ 28; Statement at 20. Because I find $150 per hour for administrative tasks to be excessive, paralegal work supported by detailed time entries will be compensated at the rate of $125 per hour.

[51] Statement entry # 28.

[52] Colihan Aff. ¶ 22 ("I have litigated over 115 civil rights matters in this Court and an additional 80 in the US District Court for the Eastern District of New York.").

case files. The time entries for this type of work total 24.3 hours, all of which I am excluding as non-compensable time. Thus, out of 113.7 total attorney hours charged, 84.3 attorney hours are included in the lodestar calculation. Only 5.1 paralegal hours are included as there is no supporting time entry for the 3.3 hours listed in the Statement. Accordingly, the lodestar amount, before any across-the-board reduction **[*19]** is made, totals $32,250 [(84.3 hours x $375 per hour) + (5.1 hours x $125 per hour)].

## C. Percentage Reduction for Limited Success, Duplication, and Excessiveness

"There is a strong presumption that the lodestar figure represents the 'reasonable' fee, even when that figure is disproportional to the amount of damages obtained by the successful plaintiff."[53] "Nevertheless, a court must still determine whether the plaintiff's level of success is so low as to warrant a reduction in the fee award[.]"[54] Furthermore, a court can make a percentage reduction for claimed hours it views as excessive and unnecessary. Here, a combined reduction of forty percent is warranted to account for plaintiff's limited success and to eliminate excessive and redundant time charges.

According to plaintiff, his success was in no way limited by his acceptance of the $7,501 settlement, even **[*20]** though his original demand was for $40,000. Plaintiff states that "[a] [settlement] of $7501.00 works out to over $312.00 per hour to be in jail, with no deduction for attorney's fees."[55] In offering this calculation, plaintiff has implicitly conceded that the $7,501 settlement was compensation for his claims of false arrest and

violation of *Fourth Amendment* rights. But plaintiff brought three other claims in his First Amended Complaint: intentional infliction of emotional distress, negligent infliction of emotional distress, and a *Monell* violation. While the emotional distress claims can be seen as interrelated to the false arrest claim, the *Monell* claim is a distinct and separate claim. "Although full fees may be awarded to a partially prevailing plaintiff when the underlying claims are intertwined, the court retains substantial discretion to take into account the specific procedural history and facts of each case."[56]

In addition to plaintiff's limited success, there is considerable duplication **[*21]** of time entries in Colihan's Statement of Services. For example, on March 12, 2013, Colihan charged 1.10 hours for the following work: "I prepared the first amended complaint to include the names of additional defendants with copies to my adversary ACC Zimmerman and the Clerk of the USDC SDNY I also reviewed and marked the file".[57] This exact entry appears verbatim on March 21, 2013.[58] In addition, entry number 84 appears verbatim as entry number 87 and entry number 85 is repeated verbatim in entry number 88.[59] This sort of double-billing is especially troublesome to the Court.

Finally, an across-the-board reduction is needed to trim the fat from plaintiff's fee request.[60] "Courts in

_____

[52] *Anderson v. City of New York, 132 F. Supp. 2d 239, 245 (S.D.N.Y. 2001)* (citing *Grant v. Martinez, 973 F.2d 96, 101-02 (2d Cir. 1992)).*

[54] *Id.*

[55] Plaintiff's's [sic] Reply Memorandum of Law in Support of His Motion for Attorney's Fees ("Reply Mem.") at 7.

[53] *Green v. Torres, 361 F.3d 96, 99 (2d Cir. 2004)* (citing *Hensley, 461 U.S. at 435-37*).

[57] Statement at 14.

[58] *See id.* at 18.

[59] *See id.* at 15.

[60] *See Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 173 (2d Cir. 1998)* (court should "deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application"); *New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1146 (2d Cir. 1983)* (because "it is unrealistic to expect a trial judge to evaluate and rule on every entry in an application" courts may apply across-the-board percentage reductions); *American Camping Ass'n v. Camp Shane, No. 06 Civ. 716, 2006 U.S. Dist. LEXIS 50379, 2006 WL 1982770, at *2-*4 (S.D.N.Y. June 16, 2006)* (approving significant across-the-board

Greene v. City of New York

this Circuit are permitted to reduce an excessive fee request by making an across-the-board percentage [reduction] for redundant or otherwise unnecessary hours."[61] The total number of compensable attorney hours (84.3 hours) is simply too high for the amount of work expended by counsel. In this case, there were no depositions or motions. Furthermore, there was only one mediation session and one initial conference before this Court. By comparison, the Assistant **[*22]** Corporation Counsel assigned to this case, who was the only attorney billing time, spent approximately thirty-five hours on this litigation.[62] Colihan spent an astonishing 37.5 hours on the instant fee application alone.[63] A percentage reduction is clearly needed to adjust for Colihan's heavy-handed time entries.

Therefore, in my discretion, I find that an across-the-board percentage reduction of forty percent is needed given the combination of plaintiff's limited success and Colihan's often repetitive and excessive time charges. Accordingly, plaintiff is hereby awarded $18,967.50 in ***attorneys' fees*** [(84.3 hours x $375 per hour x 60%) + (5.1 hours x $125 per hour)].

### D. Costs

An award of costs under *section 1988* "normally

include[s] those reasonable out-of-pocket expenses incurred by the attorney and which are normally charged fee-paying clients."[64] "The rationale for this rule is that attorney[s'] **[*24]** fees include expenses that are 'incidental and necessary' to the representation, provided they are 'reasonable.'"[65] Accordingly, "[i]dentifiable, out-of-pocket disbursements for items such as photocopying, travel, and telephone costs are generally taxable under *§ 1988* and are often distinguished from nonrecoverable routine office overhead, which must normally be absorbed within the attorney's ***hourly rate***."[66]

Here, plaintiff is seeking $560 in costs which consists of a $350 filing fee and a service fee of $210. These amounts appear reasonable and will be included in plaintiff's fee award.

### IV. CONCLUSION

For the foregoing reasons, plaintiff is hereby awarded ***attorneys' fees*** of $18,967.50 and costs of $560, for a total **[*25]** award of $19,527.50. The Clerk of the Court is directed to close plaintiff's motion for ***attorneys' fees*** and costs (Docket Entry # 17).

Dated: New York, New York

October 25, 2013

SO ORDERED:

/s/ Shira A. Scheindlin

Shira A. Scheindlin

---

reduction where matter was overstaffed); *General Electric Co. v. Compagnie Euralair, S.A., No. 96 Civ. 884, 1997 U.S. Dist. LEXIS 19969, 1997 WL 397627, at *6 (S.D.N.Y. July 3, 1997)* (reducing the fee request by fifty percent for, inter alia, excessive and duplicative hours billed).

[61] *Builders Bank v. Rockaway Equities, LLC, No. CV 2008-3575, 2011 U.S. Dist. LEXIS 107409, 2011 WL 4458851, at *9 (E.D.N.Y. Sept. 23, 2011)* **[*23]** .

[62] *See* Zimmerman Decl. ¶ 14. Plaintiff's characterization of this statement as a "conclusory statement," Reply Mem. at 7, is misplaced. Because ACC Zimmerman is an officer of the Court, statements he makes in a sworn declaration are presumed to be truthful.

[63] Colihan charged a total of 15.9 hours on legal research for this motion. This seems unreasonably high for an experienced civil rights attorney like Colihan who has filed numerous ***attorneys' fees*** motions in the past and is therefore familiar with the law in this area.

[64] *Reichman v. Bonsignore, Brignati & Mazzotta P.C., 818 F.2d 278, 283 (2d Cir. 1987)* (citation marks and citation omitted). *Accord Weyant, 198 F.3d at 316* (stating that "a reasonable fee should be awarded for time reasonably spent in preparing and defending an application for *§ 1988* fees") (citing cases).

[65] *Reichman, 818 F.2d at 283* (quoting *Northcross v. Board of Educ., 611 F.2d 624, 639 (6th Cir. 1979))*.

[66] *Kuzma v. I.R.S., 821 F.2d 930, 933-34 (2d Cir. 1987)* (citing cases).

Greene v. City of New York

U.S.D.J.

---

**End of Document**

EXHIBIT 16

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 05/10/04

DEPT. WEH

HONORABLE Allan J. Goodman    JUDGE    D. SALISBURY    DEPUTY CLERK

B. HALL, CSL.

HONORABLE    JUDGE PRO TEM    ELECTRONIC RECORDING MONITOR

Deputy Sheriff    NONE    Reporter

| 8:30 am | SC077257 | Plaintiff Counsel | | NO APPEARANCES |
| | BARBARA STREISAND | | | |
| | VS | Defendant Counsel | | |
| | KENNETH ADELMAN, ET. AL | | | |

**NATURE OF PROCEEDINGS:**

RULING ON SUBMITTED MATTERS;

No appearances.

The matters of plaintiff's Motion to Tax Costs and of
defendants' Motions for Attorneys' Fees having been
argued and submitted, the Court now rules as follows:

The motion is granted in part and denied in part and
costs are taxed accordingly and are fully set forth
in the Court's ruling filed and incorporated herein.

Clerk to give notice.

                    CLERK'S CERTIFICATE OF MAILING/
                      NOTICE OF ENTRY OF ORDER

I, the below named Executive Officer/Clerk of the
above-entitled court, do hereby certify that I am not
a party to the cause herein, and that this date I
served Notice of Entry of the above minute order of
5/10/04 upon each party or counsel named below by
depositing in the United States mail at the courthouse
in W. Los Angeles, California, one copy of the
original entered herein in a separate sealed envelope
for each, addressed as shown below with the postage
thereon fully prepaid.

Date: May 10, 2004

John A. Clarke, Executive Officer/Clerk

                    Page    1 of    2    DEPT. WEH

**MINUTES ENTERED**
05/10/04
**COUNTY CLERK**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 05/10/04                                                          **DEPT.** WEH

HONORABLE Allan J. Goodman            JUDGE | D. SALISBURY            DEPUTY CLERK
                                              B. HALL, CSL.

HONORABLE                           JUDGE PRO TEM            ELECTRONIC RECORDING MONITOR

                                Deputy Sheriff | NONE                     Reporter

---

8:30 am | SC077257                        Plaintiff
                                          Counsel      NO APPEARANCES
          BARBARA STREISAND
          VS                              Defendant
          KENNETH ADELMAN, ET. AL         Counsel

---

**NATURE OF PROCEEDINGS:**

By: _____
              D. Salisbury


Alschuler, Grossman, Stein & Kahan
1620 26th Street, 4th Floor, North Tower
Santa Monica, CA 90404-4060


Irell & Manella
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276


Reynolds Casas & Riley, LLP
One First Street, Suite 2
Los Altos, CA 94022-4109



                    Page    2 of    2    DEPT. WEH                **MINUTES ENTERED**
                                                                  05/10/04
                                                                  **COUNTY CLERK**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# ORIGINAL FILED

### MAY 1 0 2004

## LOS ANGELES
## SUPERIOR COURT

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF LOS ANGELES
## WEST DISTRICT

**BARBRA STREISAND,**

    Plaintiff,

vs.

**KENNETH ADELMAN**, et al,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. **SC 077 257**

**RULING ON SUBMITTED MATTERS: MOTION TO TAX COSTS AND MOTIONS FOR ATTORNEYS' FEES**

    The matters of plaintiff's Motion to Tax Costs and of defendants' Motions for Attorneys' Fees having been argued and submitted, the Court now rules as follows:

### MOTION TO TAX COSTS

This motion is granted in part and denied in part.

Costs are taxed as follows:

/ / /

1      1. Item 11 is taxed by $211.09 for the exhibit board [showing a portion of a front

2  page of the Los Angeles Times] that was not admitted; thus $1,027.35 is allowed. The

3  Court notes that photocopying was done at the rate of 10 cents per page and this cost

4  was incurred for copying exhibits as allowed by statute. See CCP 1033.5(b)(3).

5      2. Item 13 is taxed by $837.20. As counsel for defendant stated at the hearing,

6  it is a matter of professional courtesy to messenger copies of filings to opposing

7  counsel. The Court Rules suggest and encourage courtesy in general (see, e.g., Rule

8  7.12, Los Angeles Superior Court Rules) and there is much to commend defense

9  counsel for their exemplary courtesy in this case. Nor does the Court wish to

10  discourage such practices in the future. Nevertheless, the messenger fees in this case

11  exceed a reasonable amount, particularly when there were less costly options available,

12  and what is desirable is not always compensable: Conducting oneself in accordance

13  with a high professional standard is done for its intrinsic value.

14      Defendants seek reimbursement for 18 messenger trips to the courthouse or to

15  the office of counsel for the plaintiffs. The burden is on defendants to establish the

16  reasonable nature of a service or charge and the reasonableness of the amount

17  charged. While defendants established that the use of messengers to make such

18  deliveries in this case was reasonable, the frequency of trips and the amounts charged

19  for the various trips are not, as next indicated.

20      Exhibit B to the declaration of principal counsel for defendants Adelman and

21  Pictopia.com, submitted with the Motion for Award of Fees (filed March 4, 2004), sets

22  out the detail for line 13 of defendants' Memorandum of Costs. There are 4 entries for

23  deliveries to the Courthouse on July 14, 2003, totaling $303.10. This amount is taxed in

24  the sum of $253.10 [allowing $50.00 because one of the deliveries had to include

25  several large exhibits which could not otherwise be transported] - a single delivery that

26  date is reasonable; the other deliveries are not reasonable in the context of a motion to

27  tax. There are 3 entries for deliveries to the courthouse on July 15, 2004, totaling

28  $260.50. For the same reasons, this amount is taxed in the sum of $235.50 [allowing

1  $25.00 for a single trip that day].  Deliveries on other days to the courthouse are taxed

2  by the amount each exceeds $25.00.  Deliveries to the firm of counsel for plaintiff are

3  taxed by the amount each exceeds $30.  The differential is allowed as the distance from

4  defense counsel's office to the office of plaintiff's counsel is greater that the distance

5  from the former location to the courthouse.

6      Plaintiff did not raise any other issues with respect to line 13, as was her burden

7  to do.  The total amount taxed on line 13 is $837.20.

8      All other costs are allowed.

9

10          **ATTORNEYS' FEES REQUESTED BY**

11        **DEFENDANTS ADELMAN AND PICTOPIA.COM**

12

13      Moving parties submitted extensive and detailed documentation to explain the

14  numbers of hours devoted to each aspect of this matter and to inform the Court of the

15  levels of expertise of the various persons employed by defendants' firm who devoted

16  time to the case.  Moving parties also filed declarations addressed to the rates charged

17  in this legal community by persons of skill and experience levels similar to those of the

18  its lawyers and other staff who devoted time to this case.[1]  This Court is fully familiar

19  with the quality of the legal services rendered in this matter and with the amount of time

20  devoted to the hearing of this case, and inferentially to the time reasonably required to

21  prepare the memoranda and exhibits filed and to prepare for and participate in the

22  hearings in this case.  The Court is also familiar with the rates charged in this legal

23  community for legal services, derived from 33 years of legal and judicial experience.

24  Further, the Court is mindful of the difficulty in estimating the reasonable amount for

25  which counsel should be compensated and with appellate decisions on the subject,

26

27  _____

28  [1] Moving parties did not request a multiplier, thus waiving use of any multiplier
    other than 1.

SC077257-Fees-MO.wpd                                    3

1 including but not limited to the caution suggested by one appellate court in determining

2 the propriety of fees based in part on the length of the documents filed:

3     "The length of a document is no gauge of the time needed to prepare it. The

4 pithy pleadings that are most effective usually require more time to prepare than the

5 endlessly discursive and digressive documents judges often receive. Moreover, given

6 the complexities of this case, the precise language of the concise complaint warranted

7 the exceptional attention counsel devoted to its preparation. Judicial use of the length

8 of a pleading or brief as a measure of the time necessary to prepare it would reward

9 verbosity and penalize thoughtful and precise draftsmanship. Given the ponderous

10 plethora of prolix pleadings that inundate our courts, no trial judge in his or her right

11 mind would adopt such an approach." *Children's Hosp. and Medical Center v. Bonta*

12 (2002) 97 Cal.App.4th 740, 783 -784.

13     The evidence of prevailing or reasonable hourly rates submitted by the parties is

14 supplemented by the Court's experience in such matters as indicated. The Court has

15 placed lesser weight on the declaration of plaintiff's CPA-expert because the rates he

16 suggests as reasonable are based on *all* firms of 76 or more lawyers. The court is

17 aware that that category is too broad to provide data entitled to great weight in

18 connection with the determination of the proper rates with respect to firms

19 approximating the size of the firm representing moving parties Adelman and

20 Pictopia.com. This is not to say that the determination is properly made only if one

21 limits the comparison of rates to that which is the reasonable prevailing rate for firms of

22 identical size. Rather, one of the premises of this determination is that firms of over 200

23 lawyers, as is the firm representing the defendants, are in a different rate category than

24 firms with fewer lawyers.

25     Further, no adverse inference should be drawn from the determinations made;

26 these determinations are not negative comment on the skill or devotion to this case by

27 any defense counsel.

28

SC077257-Fees-MO.wpd                                                          4

With all of the forgoing in mind, the court determines that the reasonable hourly rates for the lawyers and others billing time on behalf of defendants' counsel for whom compensation is requested in this motion are as set out in the table which follows. The Court also sets out its determination of the appropriate number of hours to be allocated to each person or category below.  This subject will be discussed below these tables.

I.  Moving Papers

### Legal research and analysis

| NAME | HOURLY RATE | HOURS EXPENDED | LODESTAR AMOUNT |
|---|---|---|---|
| Newman | $275 | 21.75 | 5,981.25 |
| Cooper | $225 | 5.5 | 1,237.50 |
| Summer Assocs. | $75 | 60.00 | 4,500.00 |
| Rsrch. Librarians | $135 | 6.25 | 843.75 |
| | Totals | 93.5 | $12,562.50 |

### Factual Research

| NAME | HOURLY RATE | HOURS EXPENDED | LODESTAR AMOUNT |
|---|---|---|---|
| Summer Assoc. | $75 | 4.25 | 318.75 |
| Sr. Legal Assistant | $190 | 13.25 | 2,517.50 |
| Litigation Clerk | $50 | 1.5 | 75.00 |
| Rsrch. Librarians | $135 | 5.75 | 776.25 |
| | Totals | 24.75 | $3,687.50 |

### Client communication, legal analysis, motion management

| NAME | HOURLY RATE | HOURS EXPENDED | LODESTAR AMOUNT |
|---|---|---|---|
| Seigle | $425 | 6 | 2,550 |
| Kendall | $575 | 17.5 | 10,062.50 |
| | Totals | 23.5 | $12,612.50 |

Drafting motion, declarations and accompanying papers

| NAME | HOURLY RATE | HOURS EXPENDED | LODESTAR AMOUNT |
|------|-------------|----------------|-----------------|
| Newman | 275 | 56 | 15,400 |
| Seigle | 425 | 33 | 14,025 |
| Kendall | 575 | 11 | 6,325 |
| | Totals | 100 | $35,750 |

II.  Reply papers

Research, analysis, client communications, motion management

| NAME | HOURLY RATE | HOURS EXPENDED | LODESTAR AMOUNT |
|------|-------------|----------------|-----------------|
| Rsrch. Librarians | 135 | 2.75 | 371.25 |
| Sr. Legal Assistant | 190 | .5 | 95 |
| Newman | 275 | 9.5 | 2,612.50 |
| Seigle | 425 | 6 | 2,550 |
| Kendall | 575 | 3.5 | 2,012.50 |
| | Totals | 22.25 | $7,641.25 |

Drafting reply, declarations and accompanying papers

| NAME | HOURLY RATE | HOURS EXPENDED | LODESTAR AMOUNT |
|------|-------------|----------------|-----------------|
| Seigle | 425 | 25 | 10,625 |
| Kendall | 575 | 2.25 | 1,293.75 |
| | Totals | 27.25 | $11,918.75 |

/ / /

/ / /

/ / /

SC077257-Fees-MO.wpd

6

III. Hearing Preparation

Preparing objections and responses, preparing for argument,
addressing issues arising during hearings, supplemental brief

| NAME | HOURLY RATE | HOURS EXPENDED | LODESTAR AMOUNT |
|---|---|---|---|
| Rsrch. Librarians | 135 | 4.25 | 573.75 |
| Sr. Legal Assistant | 190 | 6 | 1,140 |
| Newman | 275 | 15 | 4,125 |
| Seigle | 425 | 35 | 14,875 |
| Kendall | 575 | 21.1 | 12,132.50 |
| | Totals | 81.35 | $32,846.25 |

IV. Attending Hearing

| NAME | HOURLY RATE | HOURS EXPENDED | LODESTAR AMOUNT |
|---|---|---|---|
| Sr. Legal Assistant | 190 | 0 | 0 |
| Newman | 275 | 22.5 | 0 |
| Seigle | 425 | 22.5 | 9,562.50 |
| Kendall | 575 | 22.5 | 12,937.50 |
| | Totals | 45 | $22,500 |

The adjustments in hours are as follows:

1. The number of hours which summer associates devoted to legal research is reduced. The 60 hours allowed represents a reasonable number of hours for the work described.

2. The total number of hours devoted to drafting the motion, etc. is reduced to 100; it is allocated in the same proportion as the hours sought. One hundred hours is two full 50 hour weeks; that is a reasonable amount of time for the drafting of the motion and declarations accompanying the motion.

3. Time allocated to preparation for the hearings has been reduced for certain timekeepers to amounts which the Court determines to be reasonable based on the complexity of the issues, the number of persons performing research, the relative levels of skill and knowledge of the timekeepers and the amount of time reasonably necessary for that preparation.

4. Time for attendance at the hearings of this matter by Mr. Newman and a senior legal assistant is reduced to zero. While counsel clearly found it convenient to have persons available to respond to questions immediately during the breaks, there is nothing that prevented counsel from instructing those persons to be available at the firm by telephone for the same consultation during the break to which counsel referred at argument on this motion. That would have allowed them to work on other matters, but be on call for any telephonic contact with respect to this matter. Moreover, defendants were represented at the hearing by their two most experienced litigators working on this case. Had there been an emergency requiring immediate consultation with one of the persons whose billing is now reduced (e.g., a question the answer to which neither of the counsel present at a hearing knew), the other could have stepped outside of the courtroom and made the telephone call to the person available at the firm but otherwise occupied on other matters.

The Court awards a total of $139,518.75 for this motion for attorneys' fees.

Counsel also seek fees for securing the recovery of the fees discussed. This request is proper. The amount requested, $15,000, is reasonable under the circumstances. The motion itself was extensive and included considerable detail. A motion of this nature takes [and, in this case, took] considerable time to prepare, write and file. Argument on the motion took more than two hours, and due to technical problems, took up almost an entire morning. The amount sought is reasonable and shall be paid with the sum set out earlier in this paragraph.

Plaintiff shall pay the total of $154,518.75 for attorneys' fees and for the motion

1 | to collect those fees, and $1,048.29 for costs, to counsel for defendants by noon on

2 | May 28, 2004.

3

4 | **ATTORNEYS' FEES REQUESTED BY DEFENDANT LAYER42.NET**

5 |     The Court has reviewed the motion, opposition and reply following the argument

6 | on April 30. The Court concludes that the rates at which services are billed by moving

7 | party's counsel are reasonable; indeed, plaintiff's principal objection is that time has not

8 | been allocated properly, viz., time has been charged to the SLAPP motion that should

9 | have been charged to other functions, e.g., the demurrer. After review of the billing

10 | attached to the moving papers, the Court concludes that some adjustment is necessary

11 | to meet the 'reasonable number of hours' test of the cases.

12 |     Time for the following dates has been reduced to zero due to lack of relevance

13 | of that time to the SLAPP motion: 5/28, 5/29, 5/30 [slip 71237], 6/26 [this is described as

14 | relating to a property dispute with a neighbor], 9/24, 9/29, and 10/3.

15 |     Time for the following dates has been decreased, generally by half to represent

16 | a reasonable allocation to the SLAPP motion; the balance is properly allocated to other

17 | work performed for the client: 5/30 [slip 71277], 6/2, 6/3, 6/4, 6/5, 6/6, 6/9, and 6/19.

18 |     The reduction in the $21,294.00 claimed is $2,353.50; the Court determines that

19 | the amount of $18,940.50 is reasonable and constitutes the amount which plaintiff shall

20 | pay to counsel for this defendant by noon on May 28, 2004.

21 |     Layer42.net has also sought recovery of $2,600 for fees incurred in making and

22 | prosecuting this motion. The court finds that amount to be reasonable and it shall be

23 | paid to counsel for this moving party by the same date as the principal sum set out

24 | above is paid.

25

26 | DATED: MAY 10, 2004

                                        ALLAN J. GOODMAN

27 |                                         JUDGE OF THE SUPERIOR COURT

28

EXHIBIT 17

Charles S. LiMandri, SBN 110841
 cslimandri@limandri.com
Paul M. Jonna, SBN 265389
 pjonna@limandri.com
Mark D. Myers, SBN 235719
 mmyers@limandri.com
Jeffrey M. Trissell, SBN 292480
 jtrissell@limandri.com
Milan L. Brandon II, SBN 326953
 mbrandon@limandri.com
LiMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Tel: (858) 759-9930
Fax: (858) 759-9938

Thomas Brejcha, *pro hac vice forthcoming*
 tbrejcha@thomasmoresociety.org
Peter Breen, *pro hac vice forthcoming*
 pbreen@thomasmoresociety.org
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES COX, an individual, et al., | CASE NO.: 3:21-cv-01341-CAB-LL |
| Plaintiffs, | **IMAGED FILE** |
| v. | **DECLARATION OF PAUL JONNA, ESQ. IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES** |
| DR. ERICA RENFREE, in her official capacity as Principal of Serra High School at SDUSD, et al. | |
| Defendants. | Date:        September 22, 2021 |
| | Courtroom: 15A |
| | Judge:       Hon. Cathy Ann Bencivengo |
| | PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT |

I, Paul M. Jonna, declare:

1. I am an attorney at law duly licensed to practice before all courts in California, and am counsel for Plaintiffs in this action. As such, I have personal knowledge of the matters set forth below and could and would competently testify thereto if called upon to do so.

2. This declaration is submitted in support of Plaintiffs' motion for attorneys' fees and costs, under 28 U.S.C. § 1447(c).

3. As of August 17, 2021, Plaintiffs incurred approximately $55,228.00 in attorneys' fees and $132.52 in costs as a result of Defendants' improper removal of this case.

## Attorney Rates

4. Our firm handles a significant amount of constitutional litigation in which we initially proceed pro bono, without any hourly rate billed to our clients, and then seek our attorneys' fees under 42 U.S.C. § 1988 and Cal. Code Civ. Proc. § 1021.5. Because there is no actual hourly rate billed to clients, we create hourly rates for our fee motions. The rates at which we seek our fees varies depending on whether the action is in a state or federal forum, and what county or federal district the case is in. In each different case, we take a holistic approach to creating the hourly rates, reviewing what courts have recently awarded, various fee databases, and the *Laffey* Matrices.

5. For this motion, the attorney rates that Plaintiffs' counsel (with years of experience) are seeking are:

      a.      Charles LiMandri (38 years) $914;

      b.      Paul Jonna (12 years) $759;

      c.      Mark Myers (18 years) $759;

      d.      Jeffrey Trissell (8 years) $600; and

      e.      Milan Brandon II (4 years) $378.

/ / /

6. These rates are based primarily on the Adjusted *Laffey* Matrix, rates recently awarded to Plaintiffs' counsel by the Hon. Cynthia Bashant's recent fee award in *South Bay United Pentecostal Church v. Newsom*, 20cv865-BAS-AHG (filed May 8, 2020), and recent case law from this district. *See NuVasive, Inc. v. Alphatec Holdings, Inc.*, No. 3:18-CV-347-CAB-MDD, 2020 WL 6876300, at *2 (S.D. Cal. Mar. 20, 2020).

7. The Original *Laffey* Matrix was originally prepared using "a barrage of data" for litigation in Washington D.C. with the intent that it could be adjusted annually to take inflation into account. *Laffey v. Nw. Airlines, Inc.*, 572 F. Supp. 354, 371 (D.D.C. 1983). Subsequently, a case found that the Original *Laffey* Matrix was not keeping up with increasing attorney rates and developed an Adjusted *Laffey* Matrix. *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516, 1525 (D.C. Cir. 1988). Generally, California courts have looked to the Adjusted *Laffey* Matrix as more in line with California rates than the Original *Laffey* Matrix. *See, e.g., Kempf v. Barrett Bus. Servs., Inc.*, No. C-06-3161 SC, 2007 WL 4167016, at *5 (N.D. Cal. Nov. 20, 2007), *aff'd*, 336 F. App'x 658 (9th Cir. 2009).

8. For Mr. LiMandri, myself, and Mr. Brandon, the rates we seek are substantially lower than the hourly rates which formed the basis of Judge Bashant's recent fee award in the *South Bay* action, an average of $141 less. *See South Bay United Pentecostal Church v. Newsom*, 20cv865-BAS-AHG (filed May 8, 2020); *see* Doc. Nos. 127 (joint motion) and 129 (judgment, including fee award of $1.6 million). For Mr. Myers, he joined the firm very recently and was not involved in litigating *South Bay*. For Mr. Trissell, his rate would have increased by $72 per hour based on his years in practice, but we are only seeking the lower *South Bay* rate.

9. The following table is an accurate summary of the Adjusted *Laffey* Matrix adjusted for the period June 1, 2020 through May 31, 2021 as published by an independent group online. It is located at: http://www.laffeymatrix.com/see.html. The rates which the Adjusted *Laffey* Matrix would propose are the following:

| **Experience** | **Hourly Rate** |
| --- | --- |
| 20+ years | $914 |
| 11-19 years | $759 |
| 8-10 years | $672 |
| 4-7 years | $465 |
| 1-3 years | $378 |
| Paralegal/Law clerk | $206 |

10. In line with my personal knowledge of the San Diego legal field, and taking into account the Original *Laffey* Matrix, the Adjusted *Laffey* Matrix, and the rates awarded in the recent *South Bay* case, I have arrived at the rates we seek. These rates represent a conservative estimate of what is reasonable for this case. While higher rates have been awarded, and while I believe higher rates could be justified here, I believe these rates are both modest and reasonable for the tasks undertaken.

11. **Charles S. LiMandri, Esq. (CSL) ($914/hour)**—Mr. LiMandri obtained his law degree from Georgetown Law Center in 1983, and has practiced law in Southern California ever since. He is admitted to practice in California, New York, Washington D.C., and before the United States Supreme Court. He is a member of the Million Dollar Advocates Circle and holds the highest rating for legal skills and ethics in the Martindale-Hubbell national directory of attorneys. He is also listed in the Bar Register of Preeminent Lawyers. He is a member of both the American Board of Trial Advocates and the National Board of Trial Advocacy. He is also a member of the Board of Editors of the California Tort Reporter and the California Insurance Law and Regulation Reporter, both of which are published by West Group. He is a member of the Congress of Fellows of the Center for International Legal Studies based in Salzburg, Austria, and is the President and Chief Counsel of the Freedom of Conscience Defense Fund. He is the founding partner of LiMandri & Jonna LLP, a litigation firm which has been providing quality legal services for more than 30 years. His trial experience encompasses many areas of civil litigation.

12. **Paul M. Jonna, Esq. (PMJ) ($759/hour)**—Mr. Jonna obtained his law degree from the University of San Diego School of Law in 2009, and has been practicing law in San Diego ever since. In law school, he was the Comments Editor of the San Diego Law Review. He is admitted to practice before all courts in California, both state and federal, and is admitted to practice before the Ninth Circuit and the United States Supreme Court. He began working with the firm in 2013, and became a named partner with LiMandri & Jonna LLP in 2016. Prior to that he was an associate at the national law firm of Gordon & Rees, where he represented a broad range of clients, including major Fortune 500 companies, small and large businesses, and leading national and international insurers in complex commercial litigation and class actions in state and federal courts throughout California. Prior to joining Gordon & Rees, he was an associate at Bernstein Litowitz Berger & Grossmann, where he represented institutional investors in complex litigation and securities class actions, including *Public Employees Ret. Sys. of Mississippi vs. Merrill Lynch & Co.* ($315 million recovery); *In re Wells Fargo Mortgage Pass-Through Certificate Litigation* ($125 million); and *In re AXA Rosenberg Investor Litigation* ($65 million). He is also the Vice President of the Freedom of Conscience Defense Fund. He was included in the San Diego Business Journal's "Best of the Bar" for 2016 and 2017.

13. **Mark D. Myers, Esq. (MDM) ($759/hour)**—Mr. Myers graduated with distinction from Stanford Law School in 2001, where he was Senior Articles Editor for the Stanford Journal of International Law. He began serving as a term clerk for the Hon. William J. Holloway, Jr. of the U.S. Court of Appeals for the Tenth Circuit. After passing the Texas bar exam, he was licensed to practice law in November of 2001. After his clerkship, he worked as an associate at Vinson & Elkins LLP in Dallas. He was admitted to practice in California, moved to San Diego, and worked as a litigation associate at the downtown San Diego office of Sheppard Mullin. From 2006 through July 2021, he served as law clerk to the Hon. Larry A. Burns, of the U.S. District Court for the Southern District of California, where he worked

1  primarily on civil cases. He recently joined the firm, and has been active in helping
2  litigate this case since that time. Mr. Myers also has degrees from Cambridge
3  University (M.A.) and Yale University (M.A.R.)

4      14.   **Jeffrey M. Trissell, Esq. (JMT) ($600/hour)**—Mr. Trissell obtained
5  his law degree from the George Washington University Law School in 2013. When he
6  attended, it was ranked in the top 20 of law schools nationwide by U.S. News &
7  World Report. Prior to that, he graduated magna cum laude from Oklahoma State
8  University. He passed the California bar in 2013, and after a brief legal fellowship,
9  joined Messrs. LiMandri & Jonna to work on their constitutional law practice. He is
10 admitted to practice before all courts in California, both state and federal, and is
11 admitted to practice before the Ninth Circuit and the United States Supreme Court.
12 Mr. Trissell handles all of the firm's appellate work. He has handled many appeals
13 and writs in both California and federal court. In California, he has handled appeals in
14 the Second, Fourth, Fifth, and Sixth Appellate Districts. Many of his appeals have
15 also resulted in published opinions, including in California's Fourth, Fifth, and Sixth
16 Appellate Districts, the Ninth Circuit, and the U.S. Supreme Court. Mr. Trissell was
17 named a Rising Star by Super Lawyers San Diego in 2020 and 2021, is the recipient of
18 the 2020 St. Thomas More Award by the St. Thomas More Society of San Diego.

19     15.   **Milan L. Brandon II (MLB) ($378/hour)**—Mr. Brandon obtained his
20 law degree from the University of Southern California, Gould School of Law in May
21 2016. Prior to that, as the valedictorian of his class, he obtained his B.A. in Economics
22 from the University of San Diego in 2014. Although Mr. Brandon passed the
23 California bar in February 2017, due to bureaucratic issues with the State Bar, he did
24 not receive his license until October 2019. Following his passage of the bar, and
25 before licensure, Mr. Brandon worked with a University of San Diego law professor
26 as a research assistant and co-writer for journal articles on medical malpractice
27 reform, alternative dispute resolution, and issues of academic freedom. He also
28 served as a law clerk to various attorneys in private practice. He joined our firm in

1    December 2018. Since 2017, Mr. Brandon has also served as director of the J.J.

2    O'Neill Foundation, a private foundation that awards scholarships in order to expand

3    access to a quality Catholic education for worthy students.

4          16.     In calculating our hours, we have avoided seeking fees for "block billed"

5    tasks—*i.e.*, blocks of time dedicated to both tasks for which recovery is appropriate

6    and other tasks in the same case. To the extent single time entries in the chart list

7    multiple tasks, all tasks resulted from the improper removal. This resulted in

8    substantial numbers of hours being omitted from our request. In other words, we are

9    requesting fees only for the hours we can confirm that we spent on matters resulting

10   from the improper removal. The total number of hours we actually worked on these

11   matters is significantly greater than what we are requesting. Specifically, from the date

12   of removal through August 17, Plaintiffs' counsel worked a total of 218.4 hours on this

13   case. At the billing rates above, this amounts to $152,301.20.

14         17.     Attached as **Exhibit 1** is a chart listing all of the contemporaneously

15   recorded time entries for attorneys and clerks employed by the firm who worked on

16   the tasks for which fees are sought.

17         18.     Attached as **Exhibit 2** is a chart accurately listing expenses the firm

18   incurred in carrying out the tasks listed in Exhibit 1.

19         I declare under penalty of perjury under the laws of the United States and the

20   State of California that the foregoing is true and correct. Executed this 19th day of

21   August, 2021, at Rancho Santa Fe, California.

22

23   
24                                           _____
                                              Paul M. Jonna
25

26

27

28

DECLARATION OF PAUL M. JONNA, ESQ. IN SUPPORT OF
PLAINTIFFS' MOTION FOR ATTORNEYS' FEES



EXHIBIT 1

*Charles B. Cox, et al. v. Dr. Erica Remfree, et al.*

USDC Case No.: 3:21-cv-01341-CAB-LL

# EXHIBIT 1

| **Date** | **Aty** | | **Hours** | **Hrly Rate** | **Billed** |
|---|---|---|---|---|---|
| 07/27/21 | CSL | Multiple e-mail correspondence regarding removal of case from State court; Review press release regarding board meeting; Exchange e-mail correspondence regarding strategy for amended complaint and temporary restraining order. | 1.20 | $914.00 | $1,096.80 |
| 07/29/21 | CSL | Review and analysis of ex parte application regarding temporary restraining order. | 1.20 | $914.00 | $1,096.80 |
| 08/03/21 | CSL | Conference with Mr. Trissell regarding issues for hearing on temporary restraining order; Conference with Mr. Myers regarding same. | 0.80 | $914.00 | $731.20 |
| 08/04/21 | CSL | Conference with Mr. Jonna and Mr. Trissell regarding preparation for oral argument for temporary restraining order hearing; Review and analysis of temporary restraining order papers; Telephone conference with Mr. Jonna regarding | 2.20 | $914.00 | $2,010.80 |
| 08/04/21 | CSL | Telephone conference with Mr. Trissell regarding issues for oral argument on temporary restraining order. | 0.60 | $914.00 | $548.40 |
| 08/05/21 | CSL | Travel to and from and attend temporary restraining order hearing; Legal research on attorneys' fees for prevailing on remand. | 3.40 | $914.00 | $3,107.60 |
| 08/05/21 | CSL | Review and revise correspondence to Attorney Sullivan regarding attorneys' fees for renewal of case to State court. | 0.40 | $914.00 | $365.60 |
| | | | **9.80** | **TOTAL** | **$8,957.20** |
| 07/27/21 | JMT | Review and revise temporary restraining order papers. | 0.80 | $600.00 | $480.00 |
| 08/03/21 | JMT | Prepare for temporary restraining order; Research and review relevant cases. | 1.00 | $600.00 | $600.00 |
| 08/04/21 | JMT | Conference with Mr. Jonna and Mr. LiMandri to prepare for hearing. | 0.40 | $600.00 | $240.00 |
| 08/04/21 | JMT | Assist Mr. Jonna in preparing for temporary restraining hearing. | 4.00 | $600.00 | $2,400.00 |
| 08/05/21 | JMT | Travel to and from and attend temporary restraining order hearing; Debrief with team before and after on next legal | 3.00 | $600.00 | $1,800.00 |
| 08/05/21 | JMT | Research on remand procedure and getting case started in Superior Court again. | 0.30 | $600.00 | $180.00 |
| 08/06/21 | JMT | Revise ex parte application for a temporary restraining order for re-filing in Superior Court; Incorporate materials from federal TRO reply papers, hearing outline, and new | 3.00 | $600.00 | $1,800.00 |
| 08/13/21 | JMT | Research hourly rates awarded by Judge Bencivengo. | 0.40 | $600.00 | $240.00 |
| 08/17/21 | JMT | Help craft rates for motion for fees. | 0.40 | $600.00 | $240.00 |
| | | | **13.30** | **TOTAL** | **$7,980.00** |

| Date | Atv | | Hours | Hrly Rate | Billed |
|------|-----|--|-------|-----------|--------|
| 07/27/21 | MB | Revise ex parte application regarding temporary restraining order in federal court; Review and revise cites and perform legal research on federal standard for temporary restraining order; Meeting with Mr. Jonna and Mr. Trissell regarding same. Finalize same. | 6.60 | $378.00 | $2,494.80 |
| 07/28/21 | MB | Draft request for oral argument and proposed order; Multiple e-mail correspondence with Mr. Jonna and Mr. LiMandri regarding same; Revise same. | 2.80 | $378.00 | $1,058.40 |
| 07/29/21 | MB | Begin drafting anticipated legal arguments rebutting anticipated positions in opposition to ex parte application. | 5.80 | $378.00 | $2,192.40 |
| | | | **15.20** | **TOTAL** | **$5,745.60** |
| 08/04/21 | MDM | Research Article III standing in preparation for temporary restraining order hearing in response to Judge Bencivengo's minute order; Draft memorandum preparing Mr. Jonna to address this issue. | 4.50 | $759.00 | $3,415.50 |
| 08/05/21 | MDM | Conference with Mr. Jonna regarding hearing before Judge Bencivengo and her remand decision; Research possibility of filing attorneys' fees motion. | 2.00 | $759.00 | $1,518.00 |
| 08/05/21 | MDM | Research regarding fee award under 1447(c); Draft attorneys' fees demand letter to Attorney Sullivan. | 0.60 | $759.00 | $455.40 |
| 08/06/21 | MDM | Review e-mail correspondence regarding temporary restraining order hearing, possible attorneys' fees motion, and procedure following remand; Review reporter's transcript of hearing and provide analysis to Mr. Jonna; Review e-mail correspondence from Attorney Sullivan responding to | 1.20 | $759.00 | $910.80 |
| 08/16/21 | MDM | Continue research; Revise attorneys' fees motion; Review time entries for inclusion in motion; E-mail correspondence to Mr. Jonna for review, confirmation of history, and billing | 5.60 | $759.00 | $4,250.40 |
| 08/17/21 | MDM | Review state court docket for procedural history; research reasonable fee rates; continue drafting fee motion. | 5.90 | $759.00 | $4,478.10 |
| | | | **19.80** | **TOTAL** | **$15,028.20** |
| 07/26/21 | PMJ | Telephone call with Attorney Sullivan regarding removal and settlement and next steps. | 0.40 | $759.00 | $303.60 |
| 07/26/21 | PMJ | E-mail correspondence with clients regarding removal and reply regarding temporary restraining order. | 0.20 | $759.00 | $151.80 |
| 07/27/21 | PMJ | Review removal papers and judicial assignment. | 0.20 | $759.00 | $151.80 |
| 07/27/21 | PMJ | Discuss updated temporary restraining order papers. | 0.20 | $759.00 | $151.80 |
| 07/28/21 | PMJ | Watch videos of client statements to Board. | 0.20 | $759.00 | $151.80 |
| 08/03/21 | PMJ | Prepare for temporary restraining order hearing. | 0.80 | $759.00 | $607.20 |
| 08/03/21 | PMJ | Continue preparing for temporary restraining order hearing. | 0.40 | $759.00 | $303.60 |
| 08/04/21 | PMJ | Prepare for oral argument regarding temporary restraining order hearing. | 3.80 | $759.00 | $2,884.20 |

| Date | Aty | | Hours | Hrly Rate | Billed |
|---|---|---|---|---|---|
| 08/04/21 | PMJ | Continue preparing for temporary restraining order hearing. | 3.80 | $759.00 | $2,884.20 |
| 08/04/21 | PMJ | Continue preparing for temporary restraining order hearing. | 3.80 | $759.00 | $2,884.20 |
| 08/04/21 | PMJ | Continue preparing for temporary restraining order hearing. | 1.20 | $759.00 | $910.80 |
| 08/05/21 | PMJ | Continue preparing for temporary restraining order hearing. | 1.80 | $759.00 | $1,366.20 |
| 08/05/21 | PMJ | Travel to and from and attend hearing in Federal Court on motion for temporary restraining order; | 3.80 | $759.00 | $2,884.20 |
| 08/05/21 | PMJ | Assess possible motion for attorneys' fees regarding removal. | 0.20 | $759.00 | $151.80 |
| 08/05/21 | PMJ | Review and revise e-mail correspondence regarding motion for attorneys' fees; Assess total time and costs; Review letter from clients to SDUSD; Revise e-mail correspondence to opposing counsel regarding attorneys' fees. | 0.80 | $759.00 | $607.20 |
| 08/08/21 | PMJ | Review and respond to e-mail correspondence from Attorney Sullivan regarding removal, remand, and attorneys' fees. | 0.40 | $759.00 | $303.60 |
| 08/09/21 | PMJ | E-mail correspondence to Attorney Sullivan regarding motion for attorneys' fees. | 0.20 | $759.00 | $151.80 |
| 08/09/21 | PMJ | Review time entries for motion for attorneys' fees. | 0.20 | $759.00 | $151.80 |
| 08/09/21 | PMJ | Review and revise reply in support of temporary restraining order. | 0.20 | $759.00 | $151.80 |
| 08/17/21 | PMJ | Review and revise motion for attorneys' fees. | 0.20 | $759.00 | $151.80 |
| | | | **22.80** | | **$17,305.20** |

|  |  |  |  |
|---|---|---|---|
| CSL - Charles LiMandri | 9.8 x | $914.00 | $8,957.20 |
| PMJ - Paul Jonna | 22.8 x | $759.00 | $17,305.20 |
| MDM - Mark Myers | 19.8 x | $759.00 | $15,028.20 |
| JMT - Jeffrey Trissell | 13.3 x | $600.00 | $7,980.00 |
| MB - Milan Brandon | 15.2 x | $378.00 | $5,745.60 |

EXHIBIT 2

***Charles B. Cox, et al. v. Dr. Erica Remfree, et al.***

USDC Case No.: 3:21-cv-01341-CAB-LL

# EXHIBIT 2

| <u>Date</u> | | <u>Cost Incurred</u> | <u>Billed</u> |
|---|---|---|---|
| 08/05/21 | | LiMANDRI - MILEAGE TRAVEL TO AND FROM USDC COURT FOR TRO HEARING | $27.56 |
| 08/05/21 | | PARKING FEE - LiMANDRI - USDC COURT FOR TRO HEARING | $14.00 |
| 08/05/21 | | PARKING FEE - TRISSELL - USDC COURT FOR TRO HEARING | $15.00 |
| 08/05/21 | | TRISSELL - MILEAGE TRAVEL TO AND FROM USDC COURT FOR TRO HEARING | $27.56 |
| 08/06/21 | | MAURALEE RAMIREZ, INC. - REPORTER'S TRANSCRIPT HEARING 08/05/21 | $48.40 |

**TOTAL:**   **$132.52**

EXHIBIT 18

## ISABELLA GADINIS V. UNITED SERVICES AUTOMOBILE FEE REVIEW
### Re: LiMandri & Jonna LLP
### Index of Billing Personnel

| Timekeeper | Bar Admittance Date | Rate | Hours By Rate | Total Hours Billed |
|---|---|---|---|---|
| **Partner** | | | | |
| Jonna, Paul M. | 2009 CA | $450.00 | 57.00 | 58.60 |
| | | $600.00 | 1.60 | |
| LiMandri, Charles S. | 1983 CA | $600.00 | 707.20 | 873.40 |
| | | $700.00 | 166.20 | |
| **(2) $608.66 Partner Total  (53.82%)** | | | | **932.00** |
| **Associate** | | | | |
| Brandon, Milan | 2019 CA | $350.00 | 495.60 | 637.40 |
| | | $400.00 | 141.80 | |
| Myers, Mark D. | 2005 CA | $550.00 | 1.80 | 1.80 |
| Trissell, Jeffrey M. | 2013 CA | $350.00 | 4.00 | 4.00 |
| Wilson, B. Dean | 2015 CA | $350.00 | 13.60 | 13.60 |
| Yarbrough, Ted | 2014 TX | $350.00 | 20.20 | 20.20 |
| **(5) $361.00 Associate Total  (39.10%)** | | | | **677.00** |
| **Law Clerk/Other Billing Personnel** | | | | |
| Cavalieri, Francesco M. | NA | $100.00 | 0.50 | 18.40 |
| | | $175.00 | 17.90 | |
| LaCrosse, John | NA | $200.00 | 51.60 | 51.60 |
| Meza, Noel J. | NA | $200.00 | 2.00 | 2.00 |
| Peterson, Kate | NA | $200.00 | 50.60 | 50.60 |
| **(4) $195.94 Law Clerk/Other Billing Personnel Total  (7.08%)** | | | | **122.60** |
| **(11) $482.61 All Timekeepers Total** | | | | **1,731.60** |

Invoice dated 12/23/2021 has one no charge entry of 0.2 by timekeeper Paul Jonna.

Hours billed at no charge are not included in Total Hours Billed

EXHIBIT 19



1  Charles S. LiMandri, SBN 110841
    cslimandri@limandri.com
2  Paul M. Jonna, SBN 265389
    pjonna@limandri.com
3  Jeffrey M. Trissell, SBN 292480
    jtrissell@limandri.com
4
   LiMANDRI & JONNA LLP
5  P.O. Box 9120
6  Rancho Santa Fe, California 92067
   Telephone: (858) 759-9930
7  Facsimile:  (858) 759-9938
8
   Attorneys for Defendants
9  ROMAN CATHOLIC FAITHFUL, INC.
   and STEPHEN BRADY
10

FILED
KERN COUNTY SUPERIOR COURT
05/04/2023

BY Urena, Veronica
   DEPUTY

11

12           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13                          **COUNTY OF KERN**

14
   CRAIG HARRISON,                          CASE NO.:  BCV-19-102204
15
                  Plaintiff,                **IMAGED FILE**
16
   v.                                       **ORDER AWARDING DEFENDANTS'**
17                                          **ATTORNEYS' FEES PURSUANT TO**
   ROMAN CATHOLIC FAITHFUL, INC.,           **THE ANTI-SLAPP STATUTE**
18 STEPHEN BRADY and DOES 1-50 Inclusive,
                                            Dept.:      1
19                Defendants.               Judge:     Hon. J. Eric Bradshaw
20
                                            Action Filed:     August 6, 2019
21

22

23

24

25

26

27

28

## ORDER AWARDING ATTORNEYS' FEES

The motion of Defendants Roman Catholic Faithful, Inc. and Stephen Brady for an order awarding attorneys' fees against Plaintiff Craig Harrison, pursuant to Code of Civil Procedure section 425.16, subdivision (c), came on regularly for hearing on December 13, 2022, at 8:30 a.m., before this Court. Attorney Paul M. Jonna appeared for Defendants and attorney Craig Edmonston appeared for Plaintiff.

Based on the evidence presented, submissions of the parties, the complete file in this matter, the oral argument of the parties, and good cause appearing, and as stated in this Court's Ruling dated March 3, 2023, which is copied and incorporated below, it is hereby ORDERED and DECREED as follows:

Defendants' motion for attorney's fees is GRANTED in part, and defendants are awarded a total sum of $219,800.00.

The court awards defendants' fees pursuant to Code of Civil Procedure section 425.16(c) as to the time entries color coded in Green (fee matters related to the anti-SLAPP proceedings), Blue (factual investigation and witness interviews), and Purple (discovery propounded by Defendants as part of the anti-SLAPP strategy). The Court awards fees pursuant to Code of Civil Procedure section 1021.5 as to the time entries color coded in Orange (fee entries that are extraneous to the anti-SLAPP proceedings but compensable pursuant to the Private Attorney General Statute).

The court DENIES fees as to time entries color coded in Pink (research into federal SLAPP law and efforts to remove for a better SLAPP venue), which results in a reduction of 33.6 hours (LiMandri 1.0; Jonna 3.0; Trissell 19.8; Brandon 3.8; Clerks 6.0). The court DENIES fees related to media engagements, which results in a reduction of 14.4 hours (LiMandri 1.0; Jonna 12.6; Trissell 0.8).

The court has reduced the defense hourly rates, as set forth below, to reflect local market rates for defamation defense. Defendants have failed to adequately show that obtaining local counsel was impracticable. Accordingly, the court finds that the following rates are reasonable under the circumstances of this case: LiMandri--$573.50/hour; Jonna--$425/hour; Trissell--$340/hour; Wilson and Brandon--$297.50/hour.

1     Based on the foregoing, the lodestar calculation is $219,800.00, which is the product of the

2  reasonable hours spent, multiplied by the reasonable hourly rates:

3

4
|  | Hrs claimed | Reduction | Total allowed | Reasonable Rate | Total |
|---|---|---|---|---|---|
| LiMandri | 25.8 | -2.0 | 23.8 | $573.50/hr | $13,649.30 |
| Jonna | 192.6 | -15.6 | 177 | $425/hr | $75,225.00 |
| Trissell | 371.6 | -20.6 | 351 | $340/hr | $119,340 |
| Wilson | 16.4 | -0 | 16.4 | $297.50/hr | $4,879.00 |
| Brandon | 5.0 | -3.8 | 1.2 | $297.50/hr | $357.00 |
| Clerks | 37.0 | -6.0 | 31 | $175/hr | $5,425.00 |
| Paralegals | 7.4 | -0 | 7.4 | $125/hr | $925.00 |
|  |  |  |  | **Total:** | **$219,800.00** |

10     The court finds that a multiplier is not warranted.

11

12     IT IS HEREBY ORDERED that Plaintiff Craig Harrison shall pay a total sum of

13  $219,800.00 to Defendants Roman Catholic Faithful, Inc. and Stephen Brady.

14

15  Dated: _____May 4_____, 2023          Signed: 5/4/2023 01:30 PM

16                                      HON. J. ERIC BRADSHAW
                                        PRESIDING JUDGE OF THE SUPERIOR COURT

17

18

19

20

21

22

23

24

25

26

27

28

ORDER AWARDING DEFENDANTS' ATTORNEYS' FEES PURSUANT TO THE ANTI-SLAPP STATUTE

EXHIBIT 20

| Date | Biller | Description – 373 | Hours |
|------|--------|-------------------|-------|
| 9/20/22 | PMJ | Multiple telephone calls and e-mail correspondence with clients and team regarding Mirabelli case. | 0.20 |
| 10/10/22 | JMT | Discuss strategy of case with Mr. Jonna. | 0.60 |
| 10/12/22 | MDM | Confer with Mr. Trissell regarding * ; Research this issue. | 1.00 |
| 10/13/22 | MDM | Continue research on * and confer with Mr. Trissell regarding same; Review memorandum by Mr. Trissell on legal issues in connection with claims. | 0.80 |
| 10/19/22 | JMT | Discuss legal strategy and memorandum with Mr. Jonna; E-mail correspondence to * for their review. | 0.40 |
| 10/30/22 | PMJ | E-mail correspondence with team regarding next steps. | 0.20 |
| 11/18/22 | CSL | Multiple emails regarding School District's failure to accommodate religious liberty request; Telephone conference with Mr. Jonna regarding same. | 0.80 |
| 12/6/22 | PMJ | E-mail correspondence with clients and team regarding next steps. | 0.20 |
| 1/17/23 | PMJ | Discuss case strategy and next steps. | 0.20 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 1/23/23 | NDG | Correspondence with co-counsel regarding Mr. Shinoff's suggestion for an additional meeting. | 0.70 |
| 2/1/23 | PMJ | Review e-mail correspondence from Mr. Trissell regarding case status. | 0.20 |
| 2/1/23 | CSL | E-mail correspondence from client regarding * ; Conference with Mr. Trissell regarding potential preliminary injunction. | 0.40 |
| 2/6/23 | MDM | Confer with Mr. Trissell regarding * ; Preliminary research of * Forward results of initial research to Mr. Trissell. | 0.40 |
| 2/21/23 | JMT | Conference call with Attorney Grissom and Mr. Jonna regarding religious accommodation meeting and next steps. | 0.60 |
| 2/21/23 | CSL | Review and analysis of memorandum on parental rights; Conference with Mr. Jonna regarding same. | 0.60 |
| 2/22/23 | JMT | Discuss case developments with Mr. Jonna and Mr. Breen. | 0.20 |
| 3/6/23 | PMJ | Review e-mail correspondence from team regarding * | 0.20 |
| 3/27/23 | JMT | Respond to client's e-mail correspondence regarding status of case. | 0.20 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 3/28/23 | NDG | Correspondence with LiMandri & Jonna LLP regarding final causes of action and allegations. | 0.40 |
| 3/29/23 | JMT | Conference with Mr. Jonna and regarding legal strategy. | 0.60 |
| 4/10/23 | PMJ | Discuss case status and next steps. | 0.20 |
| 4/11/23 | JMT | Telephone call with Mr. Jonna regarding Dr. Anderson; Further research regarding same; Multiple conferences regarding same. | 1.40 |
| 4/11/23 | CSL | Conference with Mr. Jonna regarding case strategy. | 0.40 |
| 4/19/23 | JMT | Conference with Mr. Jonna to prepare for client meeting. | 0.40 |
| 4/20/23 | NDG | Correspondence with LiMandri & Jonna LLP regarding disclosure of School BOD letters and related matters. | 0.60 |
| 4/24/23 | JMT | Telephone call with Mr. Jonna regarding * ; Research same. | 0.40 |
| 4/27/23 | JMT | Review filed complaint; Conference with Mr. Jonna regarding same. | 0.20 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 4/27/23 | CSL | Review multiple articles on filing of case; Telephone conference with Mr. Jonna regarding assignment of case. | 0.80 |
| 4/28/23 | CSL | Review multiple articles regarding filing of case; Emails regarding same; Conference with Mr. Jonna regarding same. | 1.00 |
| 4/29/23 | CSL | E-mail correspondence with Mr. Jonna regarding * interview and review * article; Telephone conference with Mr. Jonna regarding case strategy. | 0.80 |
| 5/1/23 | PMJ | Discuss case analysis with Mr. LiMandri. | 0.20 |
| 5/1/23 | PMJ | Attend TMS executive meeting to discuss Mirabelli case. | 0.40 |
| 5/3/23 | KD | Draft waiver of summons and attachment for EUSD defendants; E-mail correspondence to Mr. Trissell for review. | 0.40 |
| 5/4/23 | JMT | Conference with Mr. Jonna; Telephone calls with Attorney Shinoff and client regarding paid administrative leave. | 0.40 |
| 5/4/23 | CSL | Multiple e-mail correspondence regarding administrative leave for client; Conference with Mr. Jonna regarding same. | 0.60 |
| 5/8/23 | CSL | View video regarding transgender agenda in schools; Emails regarding same; E-mail correspondence regarding potential parent as plaintiff; Conference with Mr. Trissell regarding same. | 1.20 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 5/9/23 | CSL | E-mail correspondence with * ; Telephone conference with* regarding local school district cases; Emails regarding same; Telephone conference with Mr. Jonna regarding above. | 1.00 |
| 5/15/23 | MDM | Confer with Mr. Trissell regarding requirements for motion to seal; Review draft motion for preliminary injunction and forward recommended changes to Mr. Trissell, Mr. Jonna, and team. | 1.60 |
| 5/19/23 | CSL | Review emails regarding client's administrative leave; Telephone conference with Mr. Jonna regarding same. | 0.60 |
| 5/23/23 | CSL | Conference with Mr. Myers regarding defendant's motion to dismiss; Telephone conference with Mr. Trissell and Mr. Jonna regarding same. | 0.60 |
| 5/24/23 | PMJ | Review EUSD's motion to dismiss and discuss same with team. | 0.20 |
| 6/9/23 | JMT | Conference with Mr. Jonna regarding opposition to motion to dismiss; Edits to same; E-mail correspondence to client with opposition for review. | 1.40 |
| 6/10/23 | MDM | Confer with Mr. Trissell regarding arguments; Draft text disputing defendant's definition of "lying" and forward to Mr. Trissell for possible use in reply brief. | 1.60 |
| 6/12/23 | MDM | Review and suggest revisions to opposition to motion to dismiss and forward to Mr. Trissell; Telephone call with Mr. Trissell regarding edits; Review and evaluate brief in opposition to motion for preliminary injunction. | 1.40 |
| 6/13/23 | MDM | Review and evaluate docket activity and pleadings; Confer with Mr. Trissell regarding same. | 0.60 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 6/16/23 | MDM | Continue reviewing reply briefs; Confer with Mr. Trissell and Mr. Jonna regarding additional arguments and evidence to include; Send suggested revisions to Mr. Trissell; Review newly-edited draft before filing and send comments to Mr. Trissell. | 3.40 |
| 6/19/23 | JMT | Conference with Mr. Myers regarding qualified immunity research. | 0.40 |
| 6/19/23 | MDM | Review e-mail correspondence from client and notices of docket filings; Confer with Mr. Trissell regarding qualified immunity and proposed order. | 0.40 |
| 6/19/23 | JMT | Multiple conferences with Mr. Jonna to prepare for preliminary injunction hearing. | 0.80 |
| 6/20/23 | JMT | Obtain a copy of CSBA Model AR 5145.3; E-mail correspondence to Mr. Jonna with explanation of same. | 0.40 |
| 6/20/23 | JMT | Conferences with Mr. Jonna to prepare for preliminary injunction hearing. | 1.20 |
| 6/20/23 | MDM | Confer with Mr. Jonna regarding Article III standing in preparation for oral argument on preliminary injunction motion. | 0.20 |
| 6/21/23 | JMT | Multiple conferences with Mr. Jonna to prepare for preliminary injunction hearing; Review notice reseting hearing from court; E-mail correspondence to clients regarding same. | 0.60 |
| 6/21/23 | CSL | Conference with Mr. Jonna regarding continuance of hearing; E-mail correspondence regarding same. | 0.40 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 6/22/23 | MDM | Confer with Mr. Jonna regarding Eleventh Amendment and sovereign immunity in preparation for oral argument. | 0.20 |
| 6/23/23 | MDM | Confer with Mr. Jonna regarding likely focus of upcoming hearing. | 0.20 |
| 6/26/23 | JMT | Conference with Mr. Jonna regarding CDE's request to delay hearings on all matters to August 7, 2023. | 0.20 |
| 6/28/23 | JMT | Conferences with Mr. Jonna to prepare for preliminary injunction hearing. | 0.20 |
| 6/29/23 | CSL | Telephone conference with Mr. Jonna regarding clients' interviews; Emails regarding same. | 0.40 |
| 7/7/23 | MDM | Review and analysis of case law and analysis forwarded by Mr. Trissell; Discuss same with Mr. Trissell and Mr. Jonna; Forward analysis to Mr. Trissell and Mr. Jonna; Discuss potential supplemental authority with Mr. Trissell and Mr. Jonna. | 1.20 |
| 7/10/23 | CSL | View Podcast on gender ideology on public schools; Emails regarding same; Conference with Mr. Jonna and Mr. Trissell regarding same. | 1.40 |
| 7/11/23 | JMT | Multiple conferences with Mr. Jonna to prepare for preliminary injunction hearing; Review long e-mail correspondence from Mr. Youngkin regarding various cases. | 0.60 |
| 7/11/23 | CSL | Conference with Mr. Trissell and Mr. Jonna regarding strategy for  *  ; Review Podcast regarding same. | 1.20 |

| Date | Biller | Description – 373 | Hours |
|------|--------|-------------------|-------|
| 7/13/23 | JMT | Review notice from court continuing preliminary injunction hearing; Conference with Mr. Jonna and Mr. Myers regarding same. | 0.40 |
| 7/13/23 | MDM | Receive and review order consolidating and continuing argument on pending motions; Confer with Mr. Jonna and Mr. Trissell regarding rescheduling of hearing on motions and evaluation of this action. | 0.40 |
| 7/13/23 | CSL | Review notice from Court continuing hearing on motion for preliminary injunction; Conference with Mr. Jonna and Mr. Myers regarding same. | 0.40 |
| 7/25/23 | PMJ | Review client e-mail correspondence regarding * ; Discuss same with Mr. Trissell. | 0.20 |
| 8/3/23 | CSL | Conference with Mr. Jonna regarding client's * . | 0.40 |
| 8/7/23 | PMJ | Discuss preliminary injunction hearing with Mr. Trissell. | 0.20 |
| 8/16/23 | MDM | Assist Mr. Jonna with preparation for upcoming preliminary injunction hearing. | 0.20 |
| 8/16/23 | JMT | Conference with Mr. Jonna to prepare for preliminary injunction and motion to dismiss hearing. | 2.40 |
| 8/17/23 | JMT | Work with Mr. Jonna to prepare for preliminary injunction hearing; Further edits to hearing outline. | 2.80 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 8/21/23 | JMT | Prepare with Mr. Jonna for preliminary injunction hearing. | 3.20 |
| 8/21/23 | CSL | Conference with Mr. Jonna regarding new Fourth Circuit Court of Appeals case and moot court; Emails regarding same. | 0.60 |
| 8/22/23 | JMT | Review new Eleventh Circuit case, Ecknes-Tucker v. Governor of Alabama, and draft notice of supplemental authority; Conference with Mr. Jonna regarding same. | 2.20 |
| 8/22/23 | JMT | Conference with Mr. Jonna to continue to prepare for preliminary injunction hearing. | 0.40 |
| 8/25/23 | JMT | Meeting with Mr. Jonna regarding preliminary injunction hearing. | 0.40 |
| 8/29/23 | KD | Review e-mail correspondence from Mr. Trissell regarding notice of related case; Prepare documents for exhibits to same; Finalize same; File with court. | 0.60 |
| 8/29/23 | MDM | Confer with Mr. Jonna regarding oral argument; Review notice of related case. | 0.20 |
| 8/29/23 | JMT | Conference with Mr. Jonna to prepare for preliminary injunction hearing. | 2.80 |
| 8/29/23 | MDM | Confer with Mr. Jonna and Mr. Trissell regarding procedure for tomorrow's hearing; Call to chambers to confirm expected schedule; Assist Mr. Jonna in preparing for tomorrow's hearing. | 0.40 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 8/29/23 | CSL | Discuss issues for hearing with Mr. LiMandri. | 0.40 |
| 8/30/23 | MDM | Confer with Mr. Jonna regarding courtroom logistics. | 0.20 |
| 8/30/23 | CSL | Telephone conference with Mr. Jonna regarding hearing on motion for preliminary injunction; Emails and text messages regarding same. | 1.40 |
| 8/31/23 | PMJ | Hearing recap and discuss next steps with Mr. Myers. | 0.20 |
| 9/1/23 | PMJ | Hearing recap with Peter Breen. | 0.20 |
| 9/14/23 | CSL | Review order on preliminary injunction; Conference with Mr. Jonna regarding same; Review press release; E-mail correspondence regarding same. | 1.20 |
| 9/15/23 | KD | Prepare attorneys' fees and costs chart; E-mail correspondence to Mr. Trissell with same. | 0.40 |
| 9/19/23 | MDM | Review e-mail correspondence sent to our clients from School District and discuss same with Mr. Trissell. | 0.40 |
| 9/19/23 | JMT | Assist Mr. Jonna with preparing for TMS webinar. | 0.20 |

| Date | Biller | Description – 373 | Hours |
|------|--------|-------------------|-------|
| 9/20/23 | JMT | Review letter from the CDE regarding successive Rule 12(b)(6) motion; Telephone call with Mr. Jonna regarding research into same; E-mail correspondence to team regarding same. | 1.00 |
| 9/21/23 | JMT | Conference with Mr. Jonna and Mr. Myers regarding CDE's second motion to dismiss. | 0.40 |
| 9/21/23 | MDM | Confer with Mr. Jonna and Mr. Trissell regarding amendment of complaint and state defendants' proposed new motion to dismiss; Prepare for meet-and-confer telephone conference. | 0.60 |
| 9/21/23 | KD | Review e-mail correspondence from co-counsel with invoices and excel spreadsheet of same; E-mail correspondence to Mr. Trissell with same. | 0.20 |
| 9/22/23 | MDM | Confer with Mr. Jonna and Mr. Trissell regarding telephone conference with opposing counsel, possibility of amendment, and appropriate response should state defendants seek reconsideration of the court's order. | 0.60 |
| 9/26/23 | JMT | Review and respond to e-mail correspondence from Mr. Jonna regarding telephone call from * . . | 0.40 |
| 9/26/23 | JMT | Conference with Mr. Jonna regarding decision to not amend complaint; Emails to opposing counsel. | 1.00 |
| 9/27/23 | PMJ | Telephone calls with TMS regarding response to Attorney General Bonta press release. | 0.40 |
| 9/27/23 | PMJ | E-mail correspondence with team regarding Attorney General Bonta's press release and our public response. | 0.20 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 9/29/23 | PMJ | E-mail correspondence with TMS regarding Daily Journal Open Letter Request. | 0.20 |
| 10/2/23 | JMT | Review voluminous emails exchanged regarding Lori West returning to work; Conference with Mr. Jonna regarding same; E-mail correspondence to Attorney Coughlin and Lori West introducing each other. | 0.60 |
| 10/2/23 | PMJ | Telephone calls and e-mail correspondence with Andrew Mirabelli regarding * and next steps; Discuss Lori West employment and investigation status with Attorney Coughlin, Mr. LiMandri, and Mr. Trissell; E-mail correspondence with EUSD regarding same. | 1.60 |
| 10/2/23 | CSL | E-mail correspondence regarding administrative complaint against client and investigation; Telephone conference with Mr. Jonna regarding same. | 0.60 |
| 10/3/23 | JMT | Telephone call with Mr. Jonna regarding Elizabeth Mirabelli's employment status; E-mail correspondence to Attorney Coughlin regarding same. | 0.40 |
| 10/3/23 | PMJ | Assess next steps with Mr. Trissell. | 0.20 |
| 10/3/23 | CSL | E-mail correspondence regarding clients' return to work; Conference with Mr. Trissell regarding same. | 0.40 |
| 10/4/23 | JMT | Conference with Mr. Jonna regarding case strategy; Review e-mail correspondence from Attorney Coughlin with his thoughts; Draft responsive e-mail correspondence. | 0.40 |
| 10/4/23 | PMJ | Telephone call with Attorney Coughlin and Mr. Trissell regarding amending complaint and next steps. | 0.40 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 10/4/23 | JMT | Conference with Mr. Jonna and Attorney Coughlin regarding next steps in litigation and amending complaint. | 0.40 |
| 10/4/23 | JMT | Telephone conference with Attorney Coughlin to provide legal background of claims for him. | 0.40 |
| 10/4/23 | PMJ | E-mail correspondence with team regarding litigation and next steps. | 0.20 |
| 10/4/23 | FJC | Review matter, telephone conference with Paul Jonna. | 1.00 |
| 10/6/23 | FJC | Telephone confernce regarding spreadsheet. | 0.40 |
| 10/11/23 | MDM | Receive and review various e-mail correspondence from Mr. Jonna and opposing counsel regarding joint motion to extend time to answer; Review court update regarding extension. | 0.40 |
| 10/16/23 | JMT | Conference with Mr. Jonna regarding next steps in litigation and seeking contempt sanctions. | 0.20 |
| 10/20/23 | JMT | Conference with Mr. Jonna regarding next steps with contempt application and first amended complaint. | 0.20 |
| 10/23/23 | JMT | Meeting with Mr. Jonna regarding strategy in case; Telephone conference with clients regarding * . | 0.40 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 10/23/23 | JMT | Telephone call with Attorney Coughlin regarding adding Title VII claims to case; E-mail correspondence regarding * . | 0.40 |
| 11/2/23 | JMT | Conference with Mr. Jonna regarding update on Elizabeth Mirabelli's Title VII meeting with EUSD. | 0.20 |
| 11/3/23 | PMJ | E-mail correspondence with team regarding order to show cause re: contempt and next steps; Review client e-mail correspondence regarding  * . | 0.20 |
| 11/3/23 | JMT | Conference with Mr. Jonna regarding settlement e-mail correspondence to be sent to opposing counsel. | 0.20 |
| 11/7/23 | JMT | Conference with Mr. Jonna regarding next steps in litigation. | 0.20 |
| 11/9/23 | CSL | Review e-mail correspondence regarding client's return to work. | 0.20 |
| 11/14/23 | JMT | Conference with Mr. Jonna regarding responding to motion for judgment on the pleadings. | 0.20 |
| 11/30/23 | JMT | Conference with Mr. Jonna regarding next steps in case, contempt, and early neutral evaluation conference. | 0.20 |
| 12/4/23 | KD | Review e-mail correspondence from Mr. Trissell regarding sending Rincon Middle School protest videos and photographs; E-mail correspondence to clients * . | 0.40 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 12/5/23 | KD | Telephone call with Mr. Trissell regarding declaration of Elizabeth Mirabelli; E-mail correspondence to Ms. Mirabelli with same. | 0.20 |
| 12/7/23 | MDM | Receive and review e-mail correspondence from Mr. Trissell regarding time for opposing counsel to respond to ex parte motion for order to show cause regarding contempt; Review ex parte motion and local rules; Draft analysis and forward to Mr. Trissell and Mr. Jonna. | 0.60 |
| 12/11/23 | CSL | Review articles on motion for sanctions; e-mail correspondence regarding media interviews; Telephone conference with Mr. Jonna regarding same. | 1.00 |
| 12/14/23 | PMJ | Review notice of case transfer and discuss implications with Mr. Myers. | 0.20 |
| 12/14/23 | MDM | Confer with Mr. Jonna regarding reassignment of case to new Magistrate judge and effect on scheduling going forward; Draft analysis and forward same to Mr. Jonna and Mr. Trissell. | 0.40 |
| 12/19/23 | JMT | Conference with Mr. Jonna regarding edits to opposition to motion for judgment on the pleadings; Revise same. | 1.80 |
| 12/20/23 | MDM | Confer with Mr. Trissell regarding request for fees for unauthorized motion for reconsideration; Review pleadings. | 0.80 |
| 12/20/23 | JMT | Conference with Mr. Myers regarding edits to opposition to motion for judgment on the pleadings; Further edits to same. | 1.60 |
| 12/22/23 | CSL | E-mail correspondence regarding new claim against EUSD; Telephone conference with Mr. Jonna regarding same. | 0.40 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 12/28/23 | JMT | Receive and download opposition to order to show cause regarding contempt; Begin drafting reply in support of same; Conference with Mr. Jonna regarding points to make on reply. | 4.60 |
| 1/2/24 | PMJ | E-mail correspondence with team regarding workers' compensation issues. | 0.20 |
| 1/2/24 | MDM | Review e-mail correspondence from Attorney Trissell regarding discovery requests. | 0.20 |
| 1/3/24 | PMJ | Review notice from court regarding motion for judgment on the pleadings hearing; Discuss same with team. | 0.20 |
| 1/3/24 | JMT | Receive order regarding setting hearing on motion for judgment on the pleadings; E-mail correspondence regarding briefing and cases for binder. | 0.80 |
| 1/5/24 | MDM | Confer with Mr. Jonna and Mr. Trissell regarding the significance of Judge Benitez's order rescheduling hearing and denying leave for defendants to appear remotely; Telephone call to chambers to clarify hearing calendar; Evaluate issues to prepare in advance of two upcoming motion hearings. | 0.80 |
| 1/6/24 | JMT | Telephone conference with Mr. Jonna regarding strategy on upcoming hearings on motion for judgment on the pleadings and contempt. | 0.40 |
| 1/8/24 | JMT | Prepare for hearing on motion for judgment on the pleadings with Mr. Jonna; Edit outline. | 1.40 |
| 1/8/24 | CSL | Telephone conference with Mr. Jonna regarding motion for contempt hearing. | 0.20 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 1/9/24 | PMJ | Review minute order regarding adding Attorney General and State to case; Discuss with team. | 0.20 |
| 1/9/24 | JMT | Telephone conference with Mr. Jonna to prepare for contempt hearing. | 0.20 |
| 1/10/24 | CSL | E-mail correspondence regarding result of contempt hearing; Telephone conference with Mr. Jonna regarding same. | 0.60 |
| 1/16/24 | JMT | Conference with Mr. Jonna regarding next steps in case. | 0.20 |
| 1/16/24 | PMJ | Assess next steps in case with Mr. Trissell; E-mail correspondence with EUSD regarding next steps. | 0.40 |
| 1/17/24 | JMT | Legal research regarding adding employment claims to case; E-mail correspondence to Mr. Jonna and Attorney Coughlin regarding same. | 0.60 |
| 1/17/24 | FJC | Telephone call with Paul Jonna; emails to/from Paul Jonna; review prior emails. | 1.25 |
| 1/19/24 | MDM | Confer with Mr. Jonna regarding employment information to forward to Attorney Coughlin with comments. | 0.40 |
| 1/23/24 | JMT | Review emails regarding CDE refusal to stipulate to amended complaint; Conference with Mr. Jonna and Mr. Myers regarding same. | 0.60 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 1/25/24 | PMJ | Follow-up with Mr. Trissell regarding next steps with first amended complaint. | 0.20 |
| 1/25/24 | FJC | Follow up with LiMandri & Jonna LLP, with Lori West; review prior emails; status to client, to LiMandri & Jonna LLP. | 1.10 |
| 1/27/24 | MDM | Receive and review e-mail correspondence from Mr. Jonna to Attorney Coughlin regarding Elizabeth MIrabelli's claims. | 0.20 |
| 1/28/24 | PMJ | E-mail correspondence with TMS regarding Elizabeth Mirabelli and Lori West photographs; Revise press statement regarding filing of first amended complaint. | 0.20 |
| 2/1/24 | PMJ | Review and analyze e-mail correspondence from Attorney General's office regarding service and proposed motion to dismiss; Discuss response with Mr. Trissell. | 0.40 |
| 2/1/24 | JMT | Review e-mail correspondence from Attorney Coughlin regarding Elizabeth's Title VII claims, and respond. | 0.20 |
| 2/1/24 | KD | Review e-mail and telephone call with Mr. Trissell regarding letter to Deputy Attorney General Emmanuelle Soichet regarding response to telephone call on January 31, 2024; Finalize same and e-mail correspondence to Deputy Attorney General Soichet with same. | 0.40 |
| 2/1/24 | KD | Research Internet regarding service location on Governor Gavin Newsom and Attorney General; Exchange e-mail correspondence with attorney service regarding same; Discuss above with Mr. Trissell. | 0.40 |
| 2/2/24 | PMJ | Review letter to State defendants regarding motion to dismiss; Discuss same with Mr. Trissell. | 0.20 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 2/8/24 | MDM | Review draft notice of new authority; Confer with Mr. Jonna and Mr. Trissell regarding recommended changes. | 0.40 |
| 2/13/24 | MDM | Confer with Mr. Trissell regarding failure of defendant to answer. | 0.20 |
| 2/15/24 | MDM | Confer with Mr. Jonna and Mr. Trissell regarding advisability of opposing or consenting to joint motion to continue the early neutral evaluation conference to accommodate new defendants. | 0.20 |
| 2/22/24 | MDM | Confer with Mr. Jonna and Ms. Oakley regarding service of initial disclosures; Confer with Mr. Jonna regarding conflicts with rescheduled early neutral evaluation conference; Research dates for serving written discovery on newly added parties and confer with Mr. Jonna regarding same; Assist Mr. Jonna in preparing communications to opposing counsel giving our position on FRCP 26(f) | 0.80 |
| 2/26/24 | CSL | Review article on favorable ruling from State court in Riverside; Conference with Mr. Jonna regarding same. | 0.40 |
| 2/28/24 | JMT | Conference with Mr. Jonna regarding Newsom and Bonta's motions to dismiss. | 0.20 |
| 3/18/24 | JMT | Work with Mr. Muldowney on the table of authorities for the opposition to Newsom's and Bonta's motion to dismiss. | 1.00 |
| 3/18/24 | RM | Discuss revisions to table of authorities in support of opposition to Newsom's and Bonta's motion to dismiss with Mr. Trissell; Revise same. | 0.60 |
| 3/20/24 | JMT | Conference with Mr. Jonna regarding joint discovery plan and Rule 26(f) conference. | 0.60 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 4/4/24 | CSL | Conference with Mr. Jonna regarding change in plaintiffs. | 0.40 |
| 4/4/24 | KD | Review e-mail correspondence from Mr. Trissell regarding updating attorney hours for early neutral evaluation conference statement; Update same. | 0.40 |
| 4/5/24 | CSL | Review video on school indoctrination; E-mail correspondence regarding same; Conference with Mr. Jonna and Mr. Trissell regarding same. | 1.00 |
| 4/10/24 | PMJ | Interview potential plaintiff Jane Poe; Discuss same with Mr. Trissell. | 0.40 |
| 4/10/24 | CSL | Conference with Mr. Jonna regarding new plaintiffs and claims. | 0.40 |
| 4/15/24 | CSL | Conference with Mr. Jonna regarding discovery and motion for summary judgment; E-mail correspondence regarding same. | 0.40 |
| 4/23/24 | PMJ | Assess settlement and next steps with Mr. Trissell. | 0.20 |
| 4/24/24 | JMT | Telephone call to Mr. Jonna regarding potential new plaintiff Jane Doe. | 0.20 |
| 4/26/24 | MDM | Confer with Mr. Jonna and Mr. LiMandri regarding upcoming oral argument and presentation of exhibits; Assist Mr. Jonna in preparing for oral argument. | 1.00 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 4/26/24 | JMT | Meeting with Mr. Jonna regarding preparation for oral argument. | 0.40 |
| 4/26/24 | JMT | Assist Mr. Jonna in preparing for motions to dismiss hearing. | 2.80 |
| 4/26/24 | CSL | Conference with Mr. Jonna, Mr. Trissell, and Mr. Myers regarding strategy for presentation of oral argument on motions to dismiss; Review exhibit regarding same. | 0.80 |
| 4/29/24 | CSL | Telephone conference with Mr. Jonna regarding hearing on motions to dismiss defendants Newsom and Bonta. | 0.60 |
| 4/30/24 | MDM | Confer with Mr. Trissell regarding research needed on bringing claims as a class action; Review and analysis of Supreme Court precedent on breadth of injunctions; Review and assess settlement terms sent to opposing counsel. | 0.80 |
| 4/30/24 | PMJ | E-mail correspondence with team regarding next steps. | 0.20 |
| 5/1/24 | JMT | Telephone call with Mr. Jonna regarding next steps. | 0.20 |
| 5/6/24 | JMT | Conference with Mr. Jonna regarding adding school districts to case. | 0.40 |
| 5/7/24 | JMT | Telephone call with Mr. Jonna regarding * . | 0.20 |

| Date | Biller | Description – 373 | Hours |
|------|--------|-------------------|-------|
| 5/9/24 | PMJ | Observe Regino v. Staley oral argument; Discuss same with Mr. Trissell. | 1.20 |
| 5/9/24 | MDM | Discuss Regino oral argument with Mr. Jonna and view argument. | 1.00 |
| 5/10/24 | PMJ | Assess class action complaint and next steps with Mr. Trissell. | 0.20 |
| 5/15/24 | PMJ | Discuss motion to dismiss hearing with Peter Breen. | 0.20 |
| 5/16/24 | CSL | Conference with Mr. Jonna regarding new potential School District plaintiff. | 0.20 |
| 5/17/24 | MDM | Confer with Mr. Trissell and Mr. Jonna regarding class certification and definition of classes in proposed amended complaint; Review authority forwarded by Mr. Trissell on class definitions. | 0.40 |
| 5/22/24 | PMJ | Telephone call with *  regarding California bill regarding parental notification; Discuss same with Peter Breen. | 0.40 |
| 5/23/24 | JMT | Conference with Mr. Jonna regarding next steps in light of legislation. | 0.20 |
| 5/29/24 | PMJ | Review e-mail correspondence from Mr. Trissell regarding second amended complaint, motion for class certification, and next steps. | 0.20 |

| Date | Biller | Description – 373 | Hours |
|------|--------|-------------------|-------|
| 5/30/24 | PMJ | Assess motion for class certification and next steps with Mr. Trissell. | 0.40 |
| 5/30/24 | JMT | Conference with Mr. Jonna regarding motion for leave to amend complaint and class certification. | 0.60 |
| 5/31/24 | MDM | Confer with Mr. Jonna regarding research needed on capacity of a state agency to sue a state officer in federal court; Research regarding same and send preliminary findings to Mr. Jonna and Mr. Trissell with written authority; Additional research and analysis; Forward analysis to Mr. Jonna, Mr. Trissell, and Peter Breen. | 2.60 |
| 6/2/24 | MDM | Review various e-mail correspondence from Peter Breen and Mr. Jonna regarding possibility of adding Lakeside School District as plaintiff; Research Younger and Colorado River Abstention Doctrines and forward analysis to same. | 0.80 |
| 6/3/24 | JMT | Conference with Mr. Jonna and Peter Breen regarding next steps in case. | 0.40 |
| 6/3/24 | PMJ | Telephone call with TMS regarding media and next steps. | 0.20 |
| 6/4/24 | JMT | Telephone calls with Mr. Jonna regarding second amended complaint; Incorporate his edits to same. | 0.40 |
| 6/5/24 | PMJ | Assess applicability of ascertainability requirement in Ninth Circuit; E-mail correspondence with team regarding same. | 0.20 |
| 6/5/24 | PMJ | Assess various class action issues with Mr. Trissell. | 0.20 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 6/5/24 | MDM | Various e-mail correspondence with Michael McHale, Mr. Jonna, and Mr. Trissell regarding class certification and ascertainability; Additional research of this issue; Confer with Mr. Trissell regarding analysis. | 1.00 |
| 6/5/24 | CSL | E-mail correspondence from Mr. Jonna regarding meeting with Lakeside School District; Telephone conference with Mr. Jonna regarding same. | 0.40 |
| 6/6/24 | PMJ | Telephone call with Peter Breen to discuss additional fee agreements, status, and next steps. | 0.20 |
| 6/6/24 | JMT | Telephone call with Peter Breen regarding new class action retainer agreements. | 0.20 |
| 6/7/24 | KD | Review and finalize motion for leave to amend complaint and proceed pseudonymously, declarations of Paul Jonna, Jane Roe, Jane Boe, John Poe, Jane Poe, John Doe, Jane Doe, and proposed order; Discussion with Mr. Trissell regarding face-page cover for exhibits to Jonna declaration; Prepare same and update exhibits. | 1.20 |
| 6/7/24 | MDM | Confer with Mr. Jonna regarding Judge Benitez's decision to set a status conference; Review and assess various e-mail correspondence regarding supplemental discovery requests and motion to amend complaint. | 0.60 |
| 6/11/24 | PMJ | Review minute order regarding advancing hearing date on motion for leave to amend complaint; Discuss same with Mr. Trissell. | 0.20 |
| 6/14/24 | MDM | Review Supreme court decision in FDA v. Alliance for Hippocratic Medicine regarding standing for possible use in case; Discuss same with Mr. Trissell. | 1.00 |
| 6/14/24 | CSL | E-mail correspondence regarding pending California Legislation on parental gender transition notification in schools; Telephone conference with Mr. Trissell regarding same. | 0.60 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 6/17/24 | CSL | Conference with Mr. Jonna regarding strategy. | 0.40 |
| 6/19/24 | JMT | Conference with Mr. Jonna regarding edits to discovery responses. | 0.40 |
| 6/28/24 | MDM | Continue researching standing of school district to seek declaratory relief against state; Confer with Mr. Jonna and Mr. Trissell regarding possibility of dividing arguments among reply briefs; Confer with same regarding effect of continuation of hearing on briefing deadlines; Forward proposed revisions to reply brief to Mr. Trissell for incorporation into final reply briefs. | 4.40 |
| 7/1/24 | JMT | Conference with Mr. Jonna regarding preparing for hearing on motion for leave to file amended complaint. | 0.40 |
| 7/2/24 | MDM | Confer with Mr. Jonna and Mr. Trissell regarding strategy going forward. | 0.40 |
| 7/7/24 | JMT | Conference with Mr. Jonna regarding hearing on motion to amend complaint. | 0.20 |
| 7/8/24 | MDM | Confer with Mr. Jonna regarding possible course of action involving seeking summary judgment and entry of judgment as to some claims and staying litigation of the remainder pending any appeal. | 0.40 |
| 7/9/24 | JMT | Assist Mr. Jonna in preparing for motion to amend complaint hearing. | 0.20 |
| 7/9/24 | JMT | Assist Mr. Jonna in preparing for motion to amend complaint hearing. | 2.00 |

| Date | Biller | Description – 373 | Hours |
|------|--------|-------------------|-------|
| 7/9/24 | MDM | Confer with Mr. Jonna and Mr. Trissell to prepare for status conference and hearing on motion for leave to amend; Additional research of issues raised by Mr. Jonna, and forward analysis to same. | 2.60 |
| 7/15/24 | CSL | Telephone conference with Mr. Jonna regarding new statute prohibiting School Districts from informing parents of a child's gender transition at school; Review emails regarding same. | 0.40 |
| 7/17/24 | PMJ | Assess strategy and next steps with team. | 0.60 |
| 7/23/24 | JMT | Conference with Mr. Muldowney regarding preparing attorney declarations and appendix tables. | 0.20 |
| 7/26/24 | JMT | Conference with Mr. Muldowney regarding preparing attorney declarations for motion for class certification. | 0.20 |
| 7/30/24 | JMT | Conference call with attorneys in various parental notification cases. | 1.40 |
| 7/31/24 | JMT | Telephone call with Mr. Muldowney regarding creating attorney declaration and appendix of exhibits for motion for summary judgment. | 0.20 |
| 8/5/24 | PMJ | Assess discovery and next steps with team. | 0.20 |
| 8/8/24 | JMT | Conference with Mr. Jonna and other TMS attorneys regarding ruling on motion for leave to file a second amended complaint. | 1.00 |

| Date | Biller | Description – 373 | Hours |
|------|--------|-------------------|-------|
| 8/10/24 | PMJ | Assess next steps regarding motion for summary judgment and class certification; Multiple telephone calls with team regarding same. | 1.40 |
| 8/12/24 | MDM | Confer with Mr. Jonna and Mr. Trissell regarding amendment of complaint and FERPA claim. | 0.20 |
| 8/12/24 | JMT | Meeting with Mr. Jonna regarding case strategy and next steps. | 0.60 |
| 8/13/24 | JMT | Telephone calls with clients regarding motion for summary judgment; Meeting with Mr. Jonna regarding same. | 0.40 |
| 8/15/24 | PMJ | Analyze motion for summary judgment and next steps in case with Mr. Trissell. | 0.20 |
| 8/17/24 | PMJ | E-mail correspondence with * and Mr. Trissell regarding preliminary injunction hearings. | 0.20 |
| 8/26/24 | PMJ | Review order granting Bonta's ex parte application and discuss next steps regarding reconsideration motion with team. | 0.60 |
| 8/26/24 | JMT | Conferences with Mr. Jonna, Mr. Myers, and Peter Breen regarding how to respond to order granting ex parte motion to continue hearings. | 0.80 |
| 8/29/24 | PMJ | Review minute order denying motion for reconsideration; Assess next steps with team. | 0.20 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 8/29/24 | JMT | Telephone call with Peter Breen regarding next steps. | 0.40 |
| 9/4/24 | PMJ | Telephone call with * to provide update on status of case; Discuss motion for preliminary injunction with Mr. Trissell and assess strategy regarding same. | 0.20 |
| 9/5/24 | JMT | Telephone call with Mr. Jonna regarding edits to motion for preliminary injunction. | 0.40 |
| 10/15/24 | PMJ | Assess request from CDE to adjust scheduling order; Review e-mail correspondence regarding same; Discuss same with Mr. Trissell. | 0.20 |
| 10/22/24 | CSL | Research regarding statistics on suicide rates of transgenders; Conference with Mr. Trissell regarding same. | 0.80 |
| 11/19/24 | KD | Prepare unredacted discovery responses for service on opposing counsel; Discussion with Mr. Trissell regarding same; E-mail correspondence to opposing counsel with same. | 0.40 |
| 11/24/24 | JMT | Numerous text messages with Mr. Jonna to prepare for preliminary injunction hearing. | 0.40 |
| 11/26/24 | JMT | Multiple text message conferences and calls with Mr. Jonna to prepare for motion for preliminary injunction hearing and update him on what is needed for Rule 26(f) conference with opposing counsel. | 0.80 |
| 11/27/24 | JMT | Multiple text messages with Mr. Jonna to prepare for motion to dismiss hearing. | 0.40 |

| Date | Biller | Description – 373 | Hours |
|------|--------|-------------------|-------|
| 11/29/24 | JMT | Text messages with Mr. Jonna to prepare for hearings. | 0.40 |
| 11/30/24 | JMT | Multiple text messages with Mr. Jonna to prepare for motion to dismiss and motion for preliminary injunction hearings. | 0.40 |
| 12/1/24 | JMT | Meeting with Mr. Jonna to prepare for preliminary injunction hearing; Edits to outline. | 4.20 |
| 12/2/24 | CSL | Telephone conference with Mr. Jonna regarding oral argument on motion to dismiss; Emails regarding same; Conference with Mr. Jonna regarding motion for preliminary injunction. | 1.00 |
| 12/4/24 | JMT | Conference with Mr. Duke regarding distinguishing cases where a school district adopted a policy versus a state adopting a policy, and potential of moving your child to a different school. | 0.20 |
| 12/10/24 | JMT | Conference with Mr. Jonna regarding strategy following denial of motions to dismiss. | 0.40 |
| 12/19/24 | JMT | Conference with Mr. Jonna regarding discovery, strategy, and next steps. | 0.60 |
| 12/19/24 | JMT | Conference with Mr. Muldowney regarding preparation of discovery response shells. | 0.20 |
| 12/23/24 | JMT | Emails to Mr. Jonna regarding how to respond to emails from Jane Doe regarding * . | 0.40 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 12/30/24 | JMT | Conference with Mr. Jonna regarding various discovery issues and depositions. | 1.00 |
| 1/14/25 | JMT | Meeting with Mr. Jonna to discuss next steps in case. | 0.80 |
| 1/14/25 | PMJ | Telephone call with Peter Breen regarding classwide preliminary injunction motion and next steps; E-mail correspondence to clients regarding deposition links. | 0.20 |
| 1/14/25 | CSL | E-mail correspondence regarding latest motion to dismiss; Telephone conference with Mr. Trissell regarding same; Emails regarding depositions. | 0.60 |
| 1/15/25 | CSL | E-mail correspondence regarding ratification by state agency through failure to repudiate; Legal research regarding same; Conference with Mr. Trissell regarding above. | 0.80 |
| 1/21/25 | PMJ | Telephone call with Mr. Trissell to discuss preliminary injunction hearing and next steps. | 0.20 |
| 1/22/25 | CSL | Conference with Mr. Jonna regarding request for judicial notice of President Trump's executive order; Emails regarding same. | 0.60 |
| 1/30/25 | JMT | Telephone call with Mr. Jonna regarding moving Rankins-Ibarra deposition; Telephone call to Lauren Combronero regarding same. | 0.20 |
| 1/30/25 | JMT | Conference with Mr. Jonna regarding edits to interrogatory responses to Attorney General Bonta. | 0.20 |

| Date | Biller | Description – 373 | Hours |
|------|--------|-------------------|-------|
| 1/30/25 | CSL | Conference with Mr. Jonna regarding depositions; E-mail correspondence regarding same. | 0.40 |
| 2/10/25 | JMT | Prepare with Mr. Jonna for Trent Smith and Tracy Schmidt depositions. | 0.60 |
| 2/13/25 | PMJ | Telephone calls with team regarding deposition scheduling. | 0.20 |
| 2/13/25 | CSL | Conference with Mr. Jonna regarding deposition of CDE's "person most knowledgeable." | 0.40 |
| 2/14/25 | KD | Review e-mail correspondence from Mr. Trissell regarding deadline to designate portions of deposition transcripts confidential per the protective order for Jane & John POE, Jane BOE and Jane ROE; Review emails to confirm receipt date of transcripts. | 0.40 |
| 2/14/25 | CSL | Conference with Mr. Jonna regarding ex parte hearing regarding Child Poe's psychiatric needs. | 0.40 |
| 2/18/25 | PMJ | Assess case status and next steps with team regarding division of labor for document review. | 0.20 |
| 2/21/25 | JMT | Conference with Mr. Jonna regarding edits to letter to Attorney Cale regarding CDE "person most knowledgeable" deposition. | 0.80 |
| 2/21/25 | JMT | Prepare with Mr. Jonna for hearing on CDE defendants' motion to dismiss. | 0.40 |

| Date | Biller | Description – 373 | Hours |
|------|--------|-------------------|-------|
| 2/21/25 | JMT | Conference with Mr. Jonna to prepare for hearing on CDE defendants' motion to dismiss. | 1.00 |
| 2/23/25 | JMT | Conference with Mr. Jonna regarding hearing on CDE defendants' motion to dismiss. | 0.20 |
| 2/24/25 | KD | Draft amended notice of deposition for Escondido Union School District and deposition subpoena and topics for California Department of Education; E-mail correspondence to Mr. Trissell and Mr. Jonna for review. | 0.40 |
| 2/24/25 | PMJ | Assess status of discovery and next steps with team. | 0.20 |
| 2/26/25 | JMT | Conference with Mr. Jonna regarding Attorney General's latest threatened motion to compel; Telephone call with Attorney Wessell regarding same; Telephone call with client regarding * . | 0.60 |
| 2/26/25 | JMT | Conference with Mr. Jonna and multiple telephone calls with clients and potential experts regarding * ; Multiple emails regarding same. | 1.80 |
| 2/26/25 | CSL | E-mail correspondence and telephone calls regarding retention of psychiatric expert; Conference with Mr. Jonna regarding same. | 1.00 |
| 2/28/25 | KD | Review e-mail correspondence from Mr. Trissell regarding the petition for writ of mandate in the CDE v. Cajon Valley Union School District case; Obtain same from San Diego Superior Court website. | 0.20 |
| 3/3/25 | JMT | Prepare with Mr. Jonna for deposition of "person most knowledgeable" for Pasadena Unified School District. | 1.00 |

| Date | Biller | Description – 373 | Hours |
|------|--------|-------------------|-------|
| 3/4/25 | JMT | Prepare with Mr. Jonna for depositions of "person most knowledgeable" for Escondido Union School District. | 0.60 |
| 3/20/25 | KD | Discussion with Mr. Trissell regarding adding expert curriculum vitae to the first expert designation; Finalize same and serve on opposing counsel with same. | 0.20 |
| 3/25/25 | PMJ | Assess strategy on expert discovery with team. | 0.20 |
| 3/25/25 | JMT | Meeting with Mr. Jonna regarding outline for continued deposition of CDE. | 0.60 |
| 3/25/25 | WTD | Conference with Mr. Trissell regarding opposing expert Darlene Tando; Review Attorney General's expert disclosure; Begin review of Ms. Tando's blog. | 2.20 |
| 4/2/25 | PMJ | Prepare for and participate in * zoom meeting; Discuss case status with  *and Mr. Trissell. | 1.00 |
| 4/11/25 | PMJ | Review CDE motion to dismiss order and discuss next steps with team. | 0.40 |
| 4/11/25 | PMJ | Review and analyze court's order denying CDE motion to dismiss and discuss same with team; Prepare statement in press release with TMS. | 0.40 |
| 4/29/25 | PMJ | Assess expert discovery and next steps with team. | 0.20 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 5/7/25 | JMT | Telephone call with Mr. Jonna regarding next steps in case and preparation for case status conference. | 0.60 |
| 5/9/25 | CSL | Telephone conference with Mr. Jonna regarding status conference; E-mail correspondence regarding same. | 0.40 |
| 5/21/25 | KD | Review e-mail correspondence and telephone call with Mr. Trissell regarding obtaining expert deposition transcript in another case; Telephone call to Nelson Reporting regarding same. | 0.20 |
| 5/23/25 | JMT | Meeting with Mr. Jonna regarding deposition of defense expert Dr. Brady. | 1.00 |
| 5/27/25 | CSL | Legal research regarding expert witness depositions; Conference with Mr. Jonna regarding same. | 0.60 |
| 5/28/25 | CSL | E-mail correspondence on Roe v. Critchfield appellate decision; Conference with Mr. Jonna regarding same. | 0.40 |
| 5/30/25 | CSL | Telephone conference with Mr. Jonna regarding scope of testimony of expert. | 0.20 |
| 6/3/25 | PMJ | E-mail correspondence with team regarding the deposition of defense expert Dr. Brady. | 0.20 |
| 6/3/25 | CSL | Telephone conference with Mr. Jonna regarding deposition of defense expert; E-mail correspondence regarding same. | 0.60 |

| Date | Biller | Description – 373 | Hours |
|------|--------|-------------------|-------|
| 6/4/25 | KD | Review e-mail correspondence and telephone call with Mr. Trissell regarding experts Drs. Szajnberg and Anderson's deposition invoices; E-mail correspondence to Dr. Anderson requesting W-9. | 0.40 |
| 6/6/25 | CSL | Conference with Mr. Jonna regarding depositions of defense experts; Research regarding harms of chest binding. | 0.60 |
| 6/27/25 | CSL | Review and analysis of U.S. Supreme court case on parental rights in education of children; Telephone conference with Mr. Trissell and Mr. Jonna regarding same. | 1.60 |
| 6/30/25 | CSL | Conference with Mr. Jonna regarding effect of class action injunction; Conference with Mr. Trissell regarding same. | 0.40 |
| 7/2/25 | JMT | Conference with Mr. Duke regarding drafting updated declarations for all clients. | 0.40 |
| 7/7/25 | WTD | Conference with Mr. Trissell regarding status of Does and Poes declarations; Begin review of Jane and John Poe deposition transcripts identifying additional information to include in motion for summary judgment declarations. | 1.40 |
| 7/9/25 | PMJ | Assess renewed motion for summary judgment and Daubert motion to exclude testimony of defendants' experts Darlene Tando and Christine Brady with Mr. Trissell. | 0.20 |
| 7/9/25 | WTD | Telephone conference with Mr. Trissell regarding updating plaintiffs Jane Roe and Jane Boe declarations; Begin reviewing deposition transcripts regarding same. | 1.80 |
| 7/14/25 | PMJ | Team meeting to prepare for and * mediation regarding renewed summary judgment motion hearing. | 0.80 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 7/16/25 | WTD | Compile and organize all exhibits to declaration of Paul Jonna into volumes; Conference with Mr. Trissell and Mr. Muldowney regarding same. | 3.80 |
| 7/17/25 | KD | Discussion with Mr. Jonna and Mr. Trissell regarding proposed order excluding testimony of defendants' experts Darlene Tando and Christine Brady; Finalize same and forward to Judge Benitez and opposing counsel. | 0.20 |
| 7/17/25 | KD | Review e-mail correspondence from Mr. Jonna regarding motion(s) filed; Discussion with Ms. Oakley regarding same and proposed order for motion to exclude. | 0.20 |
| 7/17/25 | PMJ | Review voicemail message from Attorney Spence regarding extension of briefing schedule and discuss same with team. | 0.20 |
| 7/17/25 | CSL | Review letter to opposing counsel regarding settlement; Conference with Mr. Jonna regarding same; E-mail correspondence regarding briefing schedule. | 0.40 |
| 7/18/25 | PMJ | E-mail correspondence with opposing counsel and team regarding renewed motion for summary judgment hearing date. | 0.20 |
| 7/18/25 | PMJ | Review substack article on Dr. Anderson; Discuss same with team. | 0.40 |
| 7/22/25 | KD | Discussion with Mr. Jonna regarding payment to Dr. Szajnberg via Zelle. | 0.20 |
| 8/13/25 | CSL | Conference with Mr. Jonna regarding upcoming hearing and potential trial. | 0.20 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 9/10/25 | KD | Review order from court regarding creating an index for all motions filed; Discussion with Mr. Trissell regarding same; Beigin preparing indexes for renewed motion for summary judgment, renewed class certification, motion to exclude testimony on defendants experts, and ex parte application to seal. | 0.40 |
| 9/12/25 | KD | Continue working on indexes for court regarding renewed motion for summary judgment and renewed class certification; E-mail correspondence to Mr. Trissell with same for review; e-mail correspondence to copy service to include with courtesy copies. | 0.40 |
| 9/15/25 | KD | Review emails from Peter Breen regarding pro hac vice application to the Southern District for this case; Telephone call to Mr. Breen regarding Pacer account. | 0.20 |
| 9/18/25 | PMJ | Review court's order regarding mandatory settlement conference, Daubert motion, and vacating of dates; E-mail correspondence with team. | 0.20 |
| 9/22/25 | JMT | Conference with Mr. Jonna regarding potential settlement of case; Telephone call with Attorney Spence regarding same. | 0.40 |
| 9/22/25 | KD | Discussion with Mr. Trissell regarding notice of second manual filing of flash drive and preparing same for opposing counsel and the court. | 0.20 |
| 9/30/25 | PMJ | Telephone call to chambers regarding motion for summary judgment hearing and class cert hearing dates; Discuss same with Mr. Trissell. | 0.20 |
| 10/6/25 | KD | Review e-mail correspondence from Mr. Trissell regarding updated attorneys' fees for settlement conference; Prepare chart of attorneys' fees and forward to Mr. Trissell. | 0.40 |
| 10/16/25 | CSL | Review and analysis of order granting class certification; Emails regarding same; Conference with Mr. Jonna and Mr. Trissell regarding above. | 1.00 |

| Date | Biller | Description – 373 | Hours |
|------|--------|-------------------|-------|
| 10/24/25 | JMT | Review order severing case; Conference with Mr. Jonna regarding same. | 0.20 |
| 10/24/25 | PMJ | Review and analyze ruling severing claims and discuss same with team. | 0.20 |
| 10/27/25 | WTD | Conference with Mr. Jonna regarding need for notes on California Department of Education enforcement actions and summaries of named and pseudonym plaintiffs' declarations; Prepare enforcement action notes for motion to summary judgment hearing; Conference with Mr. Jonna regarding same. | 1.80 |
| 10/28/25 | JMT | Conference with Mr. Jonna to prepare for motion for summary judgment hearing. | 0.60 |
| 10/29/25 | JMT | Conference with Mr. Jonna to continue to prepare for motion for summary judgment hearing. | 0.20 |
| 11/3/25 | JMT | Assist Mr. Jonna in preparing for motion for summary judgment hearing. | 0.80 |
| 11/7/25 | KD | Review and finalize ex parte application for an order to show cause re: sanctions; Prepare exhibits to declaration of Paul Jonna; E-mail correspondence to team with same; Discussion with Mr. Duke regarding proposed order. | 0.40 |
| 11/7/25 | CSL | Conference with Mr. Jonna regarding order re: sanctions; Review order; Review press release regarding same. | 0.60 |
| 11/7/25 | WTD | Review ex parte application, declaration, and notice of manual filing in preparation for drafting proposed order; Draft proposed order for order to show cause regarding sanctions; Conference with Mr. Jonna regarding same; Review and revise based on Mr. Jonna's edits. | 1.60 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 11/7/25 | WTD | Telephone conference with Mr. Trissell regarding proposed order for order to show cause regarding sanctions and subsequent briefing schedule. | 0.20 |
| 11/7/25 | WTD | Conference with Mr. Jonna regarding status of proposed order. | 0.20 |
| 11/8/25 | WTD | Telephone conference with Mr. Jonna regarding need to review PRISM training documents and draft supplemental brief for sanctions; Review documents and PRISM training video in preparation for same. | 2.60 |
| 11/10/25 | WTD | Revise brief for order to show cause re: sanctions; E-mail correspondence to Mr. Jonna and Mr. Trissell regarding same; Telephone conference with Mr. Jonna and Mr. Trissell regarding same. | 1.80 |
| 11/10/25 | WTD | Telephone conference with Mr. Trissell regarding need for declarations for Mr. Burt and Ms. Shaw; Review and revise same following feedback from each declarant. | 1.40 |
| 11/10/25 | WTD | Conference with Mr. Jonna regarding need for one-page summaries for all plaintiffs' declarations before the hearing on motion for summary judgment; Review declarations for each plaintiff; Create summaries for each declaration. | 3.20 |
| 11/11/25 | PMJ | Multiple e-mail correspondence with team regarding sanctions filing. | 0.40 |
| 11/12/25 | PMJ | Hearing preparation with team for motion for summary judgment hearing. | 0.20 |
| 11/12/25 | JMT | Assist Mr. Jonna in preparing for oral argument. | 2.40 |

| Date | Biller | Description – 373 | Hours |
|------|--------|-------------------|-------|
| 11/12/25 | CSL | Review multiple emails and articles on upcoming hearing on motion for summary judgment and order to show cause regarding sanctions; Conference with Mr. Jonna regarding same. | 1.00 |
| 11/12/25 | WTD | Review e-mail correspondence from *  regarding  *  ; Conference with Mr. Jonna regarding same; Research into connections with California Department of Education. | 1.40 |
| 11/13/25 | JMT | Assist Mr. Jonna with preparing for motion for summary judgment hearing. | 0.40 |
| 11/13/25 | CSL | Conference with Mr. Jonna regarding hearing on motion for summary judgment; emails regarding same. | 0.60 |
| 11/14/25 | JMT | Assist Mr. Jonna with preparing for motion for summary judgment hearing; Edits to hearing outline. | 3.80 |
| 11/15/25 | JMT | Prepare for motion for summary judgment hearing with Mr. Jonna; Edits to hearing outline. | 8.00 |
| 11/15/25 | CSL | Conference with Mr. Jonna regarding defendants' opposition to motion for sanctions; Review emails regarding same. | 0.60 |
| 11/16/25 | CSL | Conference with Mr. Jonna regarding supplemental brief on order to show cause re: sanctions; emails regarding same. | 0.40 |
| 11/16/25 | CSL | Telephone conference with Mr. Jonna regarding hearing on motion for summary judgment; E-mail correspondence regarding sanctions hearing. | 0.40 |

| Date | Biller | Description – 373 | Hours |
|------|--------|-------------------|-------|
| 11/18/25 | KD | Prepare transcript request for hearings on order to show cause re: sanction and motion for summary judgment; E-mail correspondence to Mr. Trissell for review. | 0.20 |
| 11/18/25 | KD | Discussion with Mr. Jonna regarding availability for conference call with * ; e-mail correspondence to * regarding same. | 0.20 |
| 11/19/25 | PMJ | Follow-up with Mr. Trissell regarding notice of new authority renew HHS report. | 0.20 |
| 11/19/25 | CSL | E-mail correspondence regarding new HHS report; Telephone conference with Mr. Jonna regarding same. | 0.60 |
| 11/20/25 | WTD | Review e-mail correspondence from Attorney Shinoff regarding public records requests for plaintiffs Lori West and Elizabeth Mirabelli; Conference with Mr. Jonna regarding research into same; Conduct quick research into whether Ms. West and Ms. Mirabelli can object to same; Conference with Mr. Jonna regarding same. | 0.60 |
| 12/3/25 | PMJ | Follow-up with team regarding PRISM training and supplemental Jonna declaration in support of ex parte application for an order to show cause re: sanctions | 0.20 |
| 12/22/25 | PMJ | Analyze motion for summary judgment ruling and next steps with team; Media interviews regarding same. | 1.40 |
| 12/22/25 | CSL | Review order on preliminary injunction; Emails regarding same; Telephone conference with Mr. Jonna regarding above. | 0.80 |
| 12/22/25 | WTD | Review order for motion for summary judgment and permanent injunction; Conference with Mr. Jonna and Mr. Trissell regarding same. | 1.60 |

| Date | Biller | Description – 373 | Hours |
|---|---|---|---|
| 12/23/25 | PMJ | Multiple telephone calls with team regarding appeal and next steps. | 0.40 |
| 12/30/25 | WTD | Draft joint motion for extension of deadlines to file bill of costs and motion for attorneys' fees; Review local rules regarding same; Conference with Mr. Trissell regarding same; Review and revise same. | 2.20 |
| 12/31/25 | WTD | Review final versions of joint motion for extension of deadlines to file bill of costs and motion for attorneys' fees and proposed order; Emails with Mr. Trissell and Ms. Oakley regarding same. | 0.60 |
| 1/30/26 | KD | Discussion with Mr. Trissell regarding telephone call with clerk regarding sending e-mail correspondence to schedule hearing date for bill of costs; Review revised draft e-mail correspondence to clerk regarding same; Forward to clerk. | 0.20 |

EXHIBIT 21



Neutral
As of: January 26, 2018 1:30 AM Z

## *Munoz v. Cal. Bus. Bureau, Inc.*

United States District Court for the Eastern District of California

July 14, 2017, Decided; July 14, 2017, Filed

Case No. 1:15-cv-1345-BAM

**Reporter**

2017 U.S. Dist. LEXIS 109855 *; 2017 WL 3009210

GEORGE MUNOZ, Plaintiff, v. CALIFORNIA BUSINESS BUREAU, Inc., Defendant.

**Prior History:** *Munoz v. Cal. Bus. Bureau, Inc., 2016 U.S. Dist. LEXIS 151495 (E.D. Cal., Nov. 1, 2016)*

## Core Terms

expended, hourly rate, costs, attorneys, attorney's fees, billing, statutory damages, cases, duplicative, awarding, consumer, attend, per hour, depositions, prevailing, time spent, declarations, Practices, litigating, maximum, records, rates, summary judgment, Collection, violations, reminders, meetings, parties, reply

**Counsel:** [*1] For George R. Munoz, Plaintiff: Jessica Rene' King Dorman, Robert Lyman Hyde, LEAD ATTORNEYS, Crosby Scott Connolly, Hyde & Swigart, San Diego, CA.

For California Business Bureau, Inc., Defendant: Franklin J Love, LEAD ATTORNEY, Franklin J. Love, Covina, CA.

**Judges:** Barbara A. McAuliffe, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** Barbara A. McAuliffe

## Opinion

### ORDER REGARDING PLAINTIFF'S MOTION FOR AN AWARD OF ATTORNEY

### FEES AND COSTS

(Doc. 29)

### I. INTRODUCTION

Plaintiff George Munoz ("Plaintiff") brings the instant action against Defendant California Business Bureau, Inc. ("Defendant") alleging claims under the *Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq.*, and *California's Rosenthal Fair Debt Collection Practices Act ("RFDCPA"), Cal. Civ. Code § 1788 et seq.* On November 11, 2016, the Court granted summary judgment in favor of Plaintiff on his FDCPA and RFDCPA claims, but instructed the parties to address the issue of damages and attorney's fees in a separate motion. (Docs. 25, 27).[1] The parties are presently before the Court on Plaintiff's motion for statutory damages, attorney's fees, and costs. (Doc. 29). Defendant opposes the motion. (Doc. 31). The Court deemed the matter suitable for decision without oral argument pursuant to *Local Rule 230(g)*, and took the matter [*2] under submission. (Doc. 35). Having considered the moving, opposition, reply papers, and the entire file, the Court hereby GRANTS IN PART AND DENIES IN PART Plaintiff's motion for the reasons stated below.[2]

---

[1] Pursuant to *28 U.S.C. § 636(c)(1)*, the parties consented to have a United States Magistrate Judge conduct all further proceedings in this case, including trial and entry of final judgment. (Docs. 4, 8).

[2] The Court assumes the parties' familiarity with the factual background of this case, which has been set forth in greater detail in

Case 3:23-cv-00768-BEN-VET    Document 334-1    Filed 02/23/26    PageID.19093
Page 303 of 592

Page 2 of 8
2017 U.S. Dist. LEXIS 109855, *2

## II. DISCUSSION

In the instant motion Plaintiff seeks an award of $81,773.40, consisting of: (1) maximum statutory damages under the FDCPA and RFDCPA in the amount of $2,000; (2) attorney's fees in the amount of $77,853.50;[3] and (3) costs in the amount of $1,919.90. In response, Defendant contends that Plaintiff is not entitled to an award of statutory damages under the FDCPA and/or the RFDCPA because there has been no showing that Defendant had a knowing intent to violate the statutes. In addition, Defendant challenges the reasonableness of Plaintiff's attorney's fees request.

### A. Statutory Damages

If a debt collector fails to comply with any provision of the FDCPA, a plaintiff may recover statutory damages not to exceed $1,000. *15 U.S.C. § 1692k(a)(2)(A)*. In determining the amount of liability, the court must consider, among other relevant factors, "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional." **[*3]** *15 U.S.C. § 1692k(b)(1)*. Under the RFDCPA, any debt collector who willfully and knowingly violates the RFDCPA with respect to any debtor is also liable to the debtor for a penalty in such amount as the court may allow, which shall be no less than one hundred dollars ($100) nor greater than one thousand dollars ($1,000). *Cal. Civ. Code §§ 1788.30(a)* and *(b)*.

In granting summary judgment for the Plaintiff, the Court found that Defendant violated the FDCPA and RFDCPA when, following a settlement agreement between the parties in a related state court action, Defendant sent Plaintiff two separate

payment reminders stating the remaining balance owed by Plaintiff on his debt obligation. (Doc. 25). The Court found that Defendant's payment reminders violated the Acts in two ways. First, Defendant erred by contacting Plaintiff despite knowledge that he was represented by an attorney; a violation of section *15 U.S.C. § 1692c(a)(2)* and its state law counterpart. Second, in viewing Defendant's payment reminders under "the least sophisticated consumer standard," the letters misrepresented Plaintiff's debt obligation by stating an amount owed in excess of negotiated settlement amount; a violation of *15 U.S.C. § 1692e*.

These violations of the FDCPA and RFDCPA warrant an award of statutory damages, **[*4]** although not in the amounts Plaintiff seeks. While Defendant contacted Plaintiff twice, in writing, regarding the settled debt, this contact was not sufficiently frequent or egregious to suggest that Defendant's letters were intended to intimidate or harass Plaintiff. Rather, the Court found that Defendant's misconduct was largely based on its mistaken belief that Plaintiff was no longer represented by counsel once the settlement agreement was signed. As for Defendant's monthly balance reminders, the representation that Plaintiff owed more than the agreed upon settlement amount was willfully and knowingly misleading, however, Plaintiff received only two of these payment reminders over a two-month period. This conduct is therefore less serious than other harassing and threatening conduct that violates the FDCPA and RFDCPA. See *Esget v. TCM Fin. Servs. LLC, 2014 U.S. Dist. LEXIS 8583, 2014 WL 258837, at *5, 7 (E.D. Cal. Jan. 23, 2014)* (awarding maximum statutory damages where defendant "repeatedly" contacted plaintiff's place of work in an attempt to collect an alleged debt, including contacting plaintiff's supervisor and disclosing the alleged debt, and made false threats, including a threat to file a lawsuit and garnish plaintiff's wages); *Mulvihill v. St. Amant & Assocs., 2014 U.S. Dist. LEXIS 57422, 2014 WL 1665229, at *2 (E.D. Cal. Apr. 24, 2014)* (finding nearly 20 calls, even after plaintiff **[*5]** instructed defendant to stop calling

---

the Court's summary judgment Order. (Doc. 25).

[3] This sum includes Plaintiff's initial fee request of $70,919.00 for 187.2 hours of time expended plus an additional sum of $6,934.50 for 20.1 hours expended since the filing of the underlying fee motion. (Docs. 29-1 at 27; 33 at 7).

Case 3:23-cv-00768-BEN-VET    Document 334-1    Filed 02/23/26    PageID.19094
Page 304 of 592

Page 3 of 8
2017 U.S. Dist. LEXIS 109855, *5

him, warranted maximum statutory penalty).

Given the nature and extent of Defendant's noncompliance with the FDCPA and RFDCPA, Plaintiff has failed to show that a maximum statutory damage award is warranted for these two violations. However, because Defendant sent two letters that ran afoul of the Acts, the Court finds that an award of $250 per letter be awarded under the FDCPA and the RFDCPA. *See Davis v. Hollins L., 25 F. Supp. 3d 1292 (E.D. Cal. 2014)* (awarding $250 for a one-time violation under the FDCPA); *Mejia v. Marauder Corp., 2007 U.S. Dist. LEXIS 21313, 2007 WL 806486, at *11 (N.D. Cal. 2007)* (concluding that $250 in statutory damages was appropriate where there was only a single collection letter and the violations of the FDCPA were not frequent or persistent). Accordingly, the Court awards Plaintiff $500 in damages under the FDCPA and $500 under the RFDCPA for a total of $1,000 in statutory damages.

## B. Attorney's Fees

The Fair Debt Collection Practices Act allows a plaintiff to recover "the costs of the action, together with a reasonable attorney's fee as determined by the court." *15 U.S.C. § 1692k(a)(3)*; *Camacho v. Bridgeport Fin., Inc., 523 F.3d 973, 978 (9th Cir. 2008)*. A similar award is also available under the RFDCPA. *Klein v. Law Offices of D. Scott Carruthers, 2015 U.S. Dist. LEXIS 75269, 2015 WL 3626946, at *2 (N.D. Cal. June 10, 2015)* (citing *Cal. Civil Code § 1788.30(c)*).

The Court calculates an attorney's fees award using the "lodestar" method. *Camacho, 523 F.3d at 978*. Under the lodestar method, "a district court must start by determining **[*6]** how many hours were reasonably expended on the litigation, and then multiply those hours by the prevailing local rate for an attorney of the skill required to perform the litigation." *Moreno v. City of Sacramento, 534 F.3d 1106, 1111 (9th Cir. 2008)*. The fee applicant bears the burden of documenting the appropriate hours

expended in the litigation. *Klein, 2015 U.S. Dist. LEXIS 75269, 2015 WL 3626946 at *2* (citing *Hensley v. Eckerhart, 461 U.S. 424, 433-34, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)*. The Court may reduce the award "[w]here the documentation of hours is inadequate," and may "exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." *Hensley, 461 U.S. at 433*. The Court has "'a great deal of discretion in determining the reasonableness of the fee.'" *Camacho, 523 F.3d at 978* (quoting *Gates v. Deukmejian, 987 F.2d 1392, 1398 (9th Cir. 1992))*.

### 1. Plaintiff's Position

Plaintiff contends that he is the prevailing party in this litigation and therefore entitled to an award of reasonable attorney's fees. As mentioned, Plaintiff requests $77,853.50 in attorney's fees comprised of 207.3 hours of attorney time at hourly rates ranging from $295 per hour to $545 per hour for three attorneys: Crosby Connolly, Jessica Dorman, and Robert Hyde. (Docs. 29-11, 33-3).

To support these rates, Plaintiff's counsel directs the Court to several cases where they have been awarded hourly rates between $295 and $375 per hour based on expertise and experience.[4] Specifically, Mr. Connolly **[*7]** states that he has been engaged with consumer protection litigation for four years. *See* Declaration of Crosby S. Connolly ("Connolly Decl."), (Doc. 29-2). He also recently attended the National Association of Consumer Advocates conference which is an event that provides extensive training on consumer rights litigation, including the Fair Debt Collection Practices Act. Connolly Decl. at ¶ 23. Practicing for

---

[4] Mr. Connolly has been approved by the Eastern District of California at an hourly rate of $295. *See Lyon v. Bergstrom Law, Ltd., Case No. 1:16-cv-00401-DAD-SKO, 2016 U.S. Dist. LEXIS 152148, 2016 WL 6522746 (E.D. Cal. Nov. 2, 2016)*. Jessica Dorman has recently been approved by the Los Angeles County Superior Court in an FDCPA class action at an hourly rate of $375 in *Scheuerman v. Vitamin Shoppe*, Case No. BC592773. (Doc. 33-2, Ex. D). Mr. Hyde does not direct the Court to any cases where he was awarded an hourly rate of $545 per hour.

2017 U.S. Dist. LEXIS 109855, *7

four years, Ms. Dorman states that her extensive experience practicing FDCPA law justifies her requested $345 rate. *See* Declaration of Jessica R. K. Dorman ("Dorman Decl."), (Doc. 29-4). Finally, Mr. Hyde, a founding partner of the prevailing law firm Hyde & Swigart, was admitted to practice in 2003 and he has practiced consumer law for over thirteen years. *See* Declaration of Robert L. Hyde ("Hyde Decl."), (Doc. 29-3). Plaintiff's counsel also introduces the declarations of consumer protection attorneys Stephen Recordon and Clinton Rooney, as well as the 2013-2014 United States Consumer Law Attorney Fee Survey Report, by Ronald L. Burdge to support their respective rates. (Doc. 29-9, Exh. B).

In support of the hours expended, **[*8]** Plaintiff attaches itemized billing records which contain descriptions of the activities performed by Plaintiff's counsel and the time expended. (Docs. 29-9). The billing records reflect that Mr. Connolly expended 82.1 hours, Ms. Dorman expended 52.9 hours, and Mr. Hyde expended 52.2 hours during the course of this litigation. *Id.* Additionally, Ms. Dorman seeks supplemental fees for an additional 20.1 hours spent since the filing of the underlying fee motion. (Doc. 33-3 at 8).

Plaintiff asserts that both the number of hours expended and the respective hourly rates are reasonable based on counsels' qualifications and experience. Plaintiff further contends that he is entitled to an award of costs in the amount of $1,919.90 for out of pocket expenses occurred in bringing this action.

## 2. Defendant's Position

Defendant raises one primary objection to Plaintiff's billing records. Defendant contends that the hours and fees claimed by Plaintiff's counsel are unreasonable because the decision to staff three attorneys on this "comparatively simple area of law" resulted in excessive conferencing and duplicative efforts. (Doc. 31 at 6). As an example of overstaffing, Defendant argues that "Jessica **[*9]**

Dorman and Crosby Connolly attended the depositions, but yet Crosby Connolly did nothing but watch." (Doc. 31 at 6). Defendant also asserts that time spent by the three attorneys consulting with each other resulted in duplicative work. As a result, Defendant argues that the Court should discount all the hours expended by Ms. Dorman and Mr. Hyde and only award compensation based on the 82.1 hours expended by lead attorney Mr. Connolly.

In reference to Plaintiff's counsels' proposed hourly rates, Defendant argues that the Court should not credit the declarations submitted by outside attorneys Stephen Recordon and Clinton Rooney as lacking merit to support Plaintiff's counsels' hourly rates.

As a final matter, Defendant does not appear to challenge the amount requested in costs.

## 3. Reasonable Hourly Rate

Having considered the moving papers, arguments and relevant lodestar factors, the Court finds that the requested amount of attorneys' fees should be reduced. The primary basis for such a reduction is the Court's determination that counsels' requested hourly rates are unreasonable because the evidence submitted by Plaintiff does not justify an hourly rate between $295-$545.

A reasonable hourly **[*10]** rate is not defined by reference to the rates actually charged by the prevailing party." *Chalmers v. City of Los Angeles, 796 F.2d 1205, 1210 (9th Cir. 1986)*. Rather, reasonable fees must be calculated based on the prevailing market rates charged by "attorneys in the relevant community engaged in 'equally complex Federal litigation.'" *Van Skike v. Dir., Off. of Workers' Comp. Programs, 557 F.3d 1041, 1046 (9th Cir. 2009)*.

Here, Plaintiff cites one case in the Eastern District approving Mr. Connolly's $295 hourly rate—a case awarding Mr. Connolly $1,475.00 in discovery

sanctions (5.0 hours) for prevailing on a discovery motion. *Lyon v. Bergstrom Law, Ltd., No. 1:16cv0401DAD-SKO, 2016 U.S. Dist. LEXIS 152148, 2016 WL 6522746, at *1 (E.D. Cal. Nov. 2, 2016)*. None of the other cases cited by Plaintiff granting a fee request in excess of $295 per hour are from the Eastern District. In other words, each case counsel has previously been granted a rate in excess of $295 reflects the prevailing rates of other communities, not the Eastern District.

The Court similarly is not persuaded by Plaintiff's reference to the United States Consumer Law Attorney Fee Survey Report, nor the declarations of Stephen Recordon or Clinton Rooney. These exhibits do not demonstrate that Mr. Recordon, Mr. Rooney, Plaintiff's counsel, or any other FDCPA practitioner in the Eastern District has been awarded an hourly rate over $295.

To the contrary, **[*11]** the Court's review of some of the most recent attorney fee awards in FDCPA cases indicate that the most common hourly rate awarded to Plaintiff's counsel in FDCPA cases is $250 with a maximum of $300-$315 for the most experienced attorneys. *See, e.g., Miranda v. Law Office of D. Scott Carruthers, No. 1:10-CV-01487-BAM, 2012 U.S. Dist. LEXIS 2866, 2012 WL 78236, at *7 (E.D. Cal. Jan. 10, 2012)* ("The Court's review of some of the most recent attorney fee awards in FDCPA cases indicate[s] that the most common hourly rate awarded to plaintiff's counsel in FDCPA cases is $250."); *Alonso v. Blackstone Fin. Group. LLC, 2014 U.S. Dist. LEXIS 24677 (E.D. Cal. Feb. 25, 2014)* (average rate awarded in FDCPA cases is $250 per hour but awarding $300 per hour to attorney with 35 years of experience); *Valero v. Bryant, LaFayette and Associates, LLC, 2011 U.S. Dist. LEXIS 40578, 2011 WL 1438436 (E.D. Cal. 2011)* ($250); *Brablec v. Paul Coleman & Associates, P.C., 2010 U.S. Dist. LEXIS 4500, 2010 WL 235062 (E.D. Cal., 2010)* ($250); *Hartung v. J.D. Byrider, Inc., 2009 U.S. Dist. LEXIS 54415, 2009 WL 1876690 (E.D. Cal., 2009)* ($250).

According to counsels' declarations, Mr. Connolly and Ms. Dorman have approximately four years of experience, and Mr. Hyde thirteen years of experience all devoted primarily to consumer protection litigation. Counsels' proposed rates are therefore well outside the prevailing market rates for attorneys with comparable experience in Fresno. As addressed above, courts in the Eastern District repeatedly have found $250 per hour to be a reasonable rate for attorneys with less than fifteen years of experience bringing actions under the FDCPA. Further, while **[*12]** the Court accepts that Plaintiff's attorneys have specialized experience in consumer protection litigation, this case did not involve complicated legal or factual issues. Indeed, the present case was relatively simple and not an exceptional case meriting a higher fee. While the Court has identified cases in which FDCPA practitioners were awarded $300-$315 hourly rates, *see e.g., Costa v. National Action Financial Services, 2008 U.S. Dist. LEXIS 35539, 2008 WL 1925235 (E.D. Cal., 2008)* ($315); *Johnson v. JP Morgan Chase Bank, N.A., 2010 U.S. Dist. LEXIS 133096, 2010 WL 4977648 (E.D. Cal., 2010)* ($300), those awards are outliers reserved for those FDCPA practitioners with the highest degree of skill, experience and reputation.

Thus, in light of counsels' comparatively shorter experience and the minimal complexity of this case, there is nothing to justify awarding or exceeding the maximum hourly rate found to be reasonable in non-class action FDCPA cases in this district. Considering these factors, rate determinations for similarly skilled and experienced counsel in other cases in this forum, and this Court's own knowledge of the local value of legal services comparable to those rendered here, a reasonable hourly rate for Mr. Connolly, Ms. Dorman, and Mr. Hyde is $250 per hour, respectively.

### 4. Hours Reasonably Expended

With regard to the time and labor required, the Court has reviewed the billing **[*13]** records

2017 U.S. Dist. LEXIS 109855, *13

submitted by Plaintiff's counsel and finds that, with two exceptions, the number of hours expended to be reasonable. First, a review of counsels' billing records reveals that counsel billed over 10 attorney hours for interoffice conversations between all three attorneys to discuss case status or strategy. While it is reasonable to spend some time coordinating legal resources, it is not reasonable to double or triple-bill a client for internal meetings, many of which appear to be for partner, Mr. Hyde, to provide instructions to his junior associates, Mr. Connolly and Ms. Dorman. *See Gauchat-Hargis v. Forest River, Inc., No. 2:11-cv-02737-KJM-EFB, 2013 U.S. Dist. LEXIS 128508, 2013 WL 4828594, (E.D. Cal. Sep. 6, 2013)* (finding it unreasonable for partners and associates to collectively "triple-bill" a client for attending internal meetings).

For example, on June 16, 2016, Mr. Connolly and Ms. Dorman each billed .4 hours to "speak with Robert Hyde" about "opposing counsel's summary judgment letter." (Doc. 29-8, Exh. A at 4). Mr. Hyde billed a slightly longer .6 hours for that same meeting ostensibly in preparation to provide Mr. Connolly and Ms. Dorman further instruction at the meeting. Given the triple-billing here for these kinds of internal communications, the Court [*14] agrees with Defendant that such charges are excessive. *See Chalmers, 796 F.2d at 1211* (The court may reduce those hours where a case is overstaffed and hours are duplicated and where the hours expended are deemed to be excessive). Thus, while the billing of 3.3 hours to conduct strategy meetings by Mr. Hyde was reasonable, the additional duplicative billing to attend those meetings was not. Accordingly, the Court will deduct the 3.3 hours each spent by Ms. Dorman and Mr. Connolly to attend meetings with co-counsel for a total reduction of 6.6 hours.

Second, the Court has reviewed Plaintiff's request for fees-on-fees[5] and finds the requested award excessive. Along with the work performed on the merits of this case, Plaintiff billed approximately

32.8 hours for preparing and drafting the underlying fee motion and reply (24 hours to draft the motion and 8.8 hours for the reply). (Doc. 29-8 at Ex. A at 9-10; Doc. 33-3, Ex. E at 3). Plaintiff is entitled to recover attorney's fees for time reasonably expended on a motion for attorney fees and costs, however, an inflated request for a "fees-on-fees" award may be reduced to an amount deemed reasonable by the awarding court. *See Brown v. Sullivan, 916 F.2d 492, 497 (9th Cir.1990); Jadwin v. County of Kern, 767 F.Supp.2d 1069, 1140 (E.D. Cal. 2011)* (denying attorney's motion for "fees-on-fees" [*15] due to lack of a reasonable basis for such an award).

Defendant does not contend that any specific time entry relating to attorney's fees is excessive however; an independent review of the billing records reveals that the time spent pursuing fees is disproportionate to the time spent litigating the merits of this case. For comparison, whereas Ms. Dorman dedicated 32.8 hours in pursuit of fees in this matter, counsel expended approximately 36.4 hours drafting the summary judgment motion and reply. (Doc. 29-8 at Ex. A at 9-10; Doc. 33-3, Ex. E at 3). While Courts in the Ninth Circuit reject the notion that an automatic reduction in fees is warranted where the time spent on litigating fees begins to approach the time spent litigating the case's merit, the Court must still determine the reasonable number of hours expended in light of the issues and tasks involved. *See Golden Gate Audobon Soc'y, Inc. v. United States Army Corps of Eng'rs, 732 F. Supp. 1014, 1021-22 (N.D. Cal. 1989)*.

Here, while the time expended on litigating the summary judgment and fees was similar, the fee motion is far less complex. Indeed, the issues raised in the fee motion are not novel or difficult—a fact further demonstrated by Defendant's meager six-page opposition to the fee motion. (Doc. 31). Further, the fee motion and supporting [*16] documents contained a high degree of duplication and a large amount of boilerplate. Thus, because the motion was not particularly complicated, it does

---

[5] Fees for time spent litigating the fees motions.

not warrant essentially the same amount of effort expended on the motion for summary judgment. As a result, the Court finds the fees sought on the fee motion to be excessive. Accordingly, the Court reduces the time spent by Ms. Dorman preparing and drafting the fee motion and reply by 10 hours.

Finally, although Defendant challenges the duplicative attendance of Ms. Dorman and Mr. Connolly at the deposition, having two attorneys present at a deposition is not necessarily duplicative, especially if the deponent is a key witness. *PSM Holding Corp. v. Nat'l Farm Fin. Corp., 743 F. Supp. 2d 1136, 1157 (C.D. Cal. 2010)* ("[D]ivision of responsibility may make it necessary for more than one attorney to attend activities such as depositions and hearings."). Although the Ninth Circuit has instructed courts to "examine with skepticism claims that several lawyers were needed to perform a task," it has also emphasized that staffing multiple lawyers on a single task is not by itself evidence of excessive billing. *Democratic Party of Wash. State v. Reed, 388 F.3d 1281, 1286 (9th Cir. 2004)*; *see also Moreno, 534 F.3d at 1113* (emphasizing that "[f]indings of duplicative work should not just become a shortcut for reducing a fee award without identifying **[\*17]** just why the requested fee was excessive").

Here, the record reflects that on March 15, 2016, Mr. Connolly and Ms. Dorman billed 8.1 hours each to "travel and attend" the depositions of two of Defendant's employees. (Doc. 29-8, Exh. A at 4). The Court is familiar with the issues in the case and finds that in light of the significance of the testimony of Defendant's employees, it was reasonable for both Ms. Dorman and Mr. Connolly to attend these depositions. *PSM Holding Corp., 743 F. Supp. 2d at 1157*. Further, it is not duplicative to have a second attorney serve as a sounding board or be present to assure that valuable testimony is obtained during the limited time allotted in a deposition. *See Moreno, 534 F.3d at 1112* ("By and large, the court should defer to the winning lawyer's professional judgment as to how

much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker"). The Court, therefore, does not reduce Plaintiff's requested fee based on duplicative attendance at the depositions.

Having considered all the relevant factors, the Court finds that of the requested 207.3 hours, 190.7 hours of attorney time was reasonably expended in litigating this case. This reflects a deduction of 3.3 hours of Mr. **[\*18]** Connolly's requested 82.1 hours for duplicative interoffice conferences and a 13.3 hour deduction of Ms. Dorman's 73 hours for 3.3 hours of similar interoffice conferences and 10 hours of excessive work on the fee application. Given these deductions, the Court will award counsel a total fee award of $47,675.00.

## C. Costs

Plaintiff seeks $1,919.90 in costs and has submitted a statement of itemized costs in support of his request. (Doc. 29-8). Plaintiff seeks reimbursement for filing fees, travel costs, service fees, and court reporter fees. (Doc. 29-8). Defendant has not challenged any item of costs. Having reviewed Plaintiff's statement of costs, the Court finds that the costs Plaintiff seeks to recover were reasonably incurred and recoverable. *See Garcia v. Resurgent Capital Services, L.P., 2012 U.S. Dist. LEXIS 123889, 2012 WL 3778852, at \*12 (N.D. Cal. 2012)* ("in FDCPA cases, 'expenses that are generally charged to paying clients may be awarded, even though they are not normally taxable as costs.'"). Accordingly, Plaintiff's motion for costs in the amount of $1,919.90 is GRANTED.

## III. CONCLUSION

Based on the foregoing, Plaintiff's motion for an award of statutory damages, attorney's fees, and costs is GRANTED IN PART AND DENIED IN PART. Plaintiff is awarded a total amount of $50,594.90, comprised **[\*19]** of $500 in statutory damages under the FDCPA; $500 in statutory

2017 U.S. Dist. LEXIS 109855, *19

damages under the RFDCPA; $47,675.00 in reasonable attorneys' fees; and $1,919.90 in costs.

The Clerk shall enter judgment and close the case file.

IT IS SO ORDERED.

Dated: **July 14, 2017**

/**s**/ Barbara A. McAuliffe

UNITED STATES MAGISTRATE JUDGE

---

**End of Document**

EXHIBIT 22

1

2

3

4

5

6

7

8                                 **UNITED STATES DISTRICT COURT**

9                                 **EASTERN DISTRICT OF CALIFORNIA**

10

11   KEVIN H. SCOTT and JACQUIE L. SCOTT,   )   Case No.: 1:19-cv-0315  JLT
                                             )
12                Plaintiffs,                )   ORDER GRANTING IN PART PLAINTIFF'S
                                             )   MOTION FOR ATTORNEY FEES AND COSTS
13         v.                                )
                                             )   (Doc. 70)
14   JAYCO INC.,                             )
                                             )
15                Defendant.                 )
                                             )
16   _____ )

17         The Scotts are California residents who purchased a new RV in Iowa. After a short time, they

18   discovered the RV suffered from various defects and required repairs.  Plaintiffs sought to hold Jayco,

19   Inc. liable for damages and injunctive relief under California's Unfair Competition Act and Consumer

20   Legal Remedies Act, and under federal law with the Magnuson-Moss Warranty Act.  The parties have

21   settled the underlying claims and agreed Jayco shall pay attorney fees and costs in an amount to be

22   determined by the Court.  (*See* Doc. 70-3.)

23         Plaintiffs now seek an award of attorney fees in the amount of $170,385.75 and costs in the

24   amount of $1,509.13.  (Doc. 71 at 15.)  Jayco opposes the motion, asserting the fees requested are

25   excessive.  (Doc. 72.)  The Court found the matter suitable for decision without oral argument, and the

26   motion was taken under submission pursuant to Local Rule 230(g). For the reasons set forth below,

27   Plaintiffs' motion is **GRANTED** in part, with fees in the modified amount of **$67,634.35** and costs in

28   the modified amount of **$400.00**.

                                              1

## I.    Background

In December 2016, "Plaintiffs purchased a new 2017 Jayco Seneca RV" online through RV One Superstores.  (Doc. 1 at 4; *see also* Doc. 11-4 at 1-2.)  On December 30, 2016, Mr. Scott travelled to Des Moines, Iowa and signed the purchase contract for the RV.  (*See* Doc 11-4 at 2, ¶ 3.)  Plaintiffs assert that after purchasing the RV, they discovered it suffered from numerous defects and repeatedly sought repairs.  (Doc. 1 at 5-13.)  Plaintiffs assert the they suffered "ongoing and recurring problems with fit and finish, and a myriad of mechanical issues."  (*Id.* at 12, ¶ 23.)  According to Plaintiffs, Jayco "had multiple repair attempts on the RV, through its Dealer, and … refused and or failed to remedy, fix or remediate the serious issues."  (*Id.*, ¶ 24.)

On June 22, 2018, Plaintiff initiated this action by filing a complaint asserting the following causes of action: (1) breach of an express warranty in violation of the Song-Beverly Consumer Warranty Act;  (2) breach of an implied warranty in violation of the Song-Beverly Consumer Warranty Act; (3) unlawful, unfair, and fraudulent business practices in violation of Cal. Bus. & Prof. Code § 17200; (4) violation of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; and (5) violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301.  (*See generally* Doc. 1.)  However, the parties stipulated that Plaintiffs' claims under the Song-Beverly Act be dismissed with prejudice on September 10, 2021.  (Doc. 10.)

On July 15, 2021, the parties informed the Court that they had reached a settlement in the action.  (Doc. 64.)  They agreed on the substantive settlement terms, including that Plaintiffs would file a motion for fees and costs, which they have now done (Docs. 70, 71.)

## II.    Legal Standards

In general, "[t]he starting point for determining a reasonable fee is the 'lodestar' figure, which is the number of hours reasonably expended multiplied by a reasonable hourly rate."  *Gates v. Deukmejian*, 987 F.2d 1390 (9th Cir. 1992); *see also Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008); *Laffitte v. Robert Half Int'l Inc*., 1 Cal. 5th 480, 489 (2016) (a lodestar involves "multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate").

When the parties are unable to "settle the amount of a fee," "the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly

rates." *Hensley v. Eckerhart*, 461 U.S. at 424, 437 (1983). Thus, the burden of proof is on fee applicants. *Id.*; *see also Welch v. Metropolitan Life Ins. Co*., 480 F.3d 942, 945-46 (9th Cir. 2007). Any party opposing the fee request must make specific objections to the hours expended. *Gates v. Deukmejian*, 987 F.2d 1392, 1397-98 (9th Cir. 1993); *see also Premier Med. Mgmt. Sys. v. Cal. Ins. Guarantee Assoc.*, 163 Cal. App. 4th at 550, 564 (2008) ("[g]eneral arguments that fees claimed are excessive, duplicative, or unrelated do not suffice"). Thus, the burden shifts to opposing party to demonstrate the hours spent are duplicative or excessive. *See id.; see also Gorman v. Tassajara Dev. Corp.*, 178 Cal. App. 4th 44, 101 (2009) ("[t]he party opposing the fee award can be expected to identify the particular charges it considers objectionable").

Courts are given discretion when calculating a fee award. *Hensley,* 416 U.S. at 437. However, the Supreme Court explained "it remains important ... for the district court to provide a concise but clear explanation of its reasons for the fee award." *Id*. Thus, the Court should provide sufficient information on how it arrived at the total of compensable hours for which fees were awarded to allow for meaningful appellate review. *Cunningham v. County of Los Angeles*, 879 F.2d 481, 485 (9th Cir. 1988) ("Courts need not attempt to portray the discretionary analyses that leads to their numerical conclusions as elaborate mathematical equations, but they must provide sufficient insight into their exercises of discretion to enable [the appellate court] to discharge our reviewing function").

### III.    Discussion and Analysis

Pursuant to the terms of the settlement agreement, "Jayco agrees to pay Plaintiff's (sic) attorney's fees and costs in an amount to be determined by the Court, by way of noticed motion, to have been reasonably incurred by Plaintiffs in the commencement and prosecution of this action." (Doc. 70-3 at 6, ¶ 1(b), emphasis omitted.) Thus, there is no dispute that Plaintiffs are entitled to fees in the action. Rather, Jayco challenges the number of hours "reasonably incurred" and the hourly rates sought by counsel and the administrative professionals. (*See generally* Doc. 72.)

Plaintiffs seek an award of "$106,090.55 in fees, plus an additional $7,5000 for bringing this Motion, reviewing Jayco's Opposition to Plaintiffs' Motion, drafting Plaintiffs' Reply, preparing and attending any relating hearing, preparing any needed filings to satisfy the order, for time to wrap up the settlement and ultimately collect any amount awarded by this Court." (Doc. 71 at 6.) Plaintiffs request

3

multiplier to enhance the lodestar in the amount of 1.5, for the total amount of $170,385.75. (*Id.* at 6, 15.) Finally, Plaintiffs seek costs and expenses in the amount of $1,509.13. (*Id.*)

## A.    Hours expended

A fee applicant must provide records documenting the tasks completed and the amount of time spent. *Hensley,* 461 U.S. at 424 (1983); *see also Ketchum v. Moses,* 24 Cal.4th 1122, 1132 (2001) (party must provide records sufficient for the court to "carefully review … [the] hours expended" to determine whether the time reported was reasonable). "Where the documentation of hours in inadequate, the district court may reduce hours accordingly." *Hensley,* 461 U.S. at 433; *see also Ketchum*, 24 Cal.4th at 1131-32.

Plaintiffs seek fees for 270.3 hours of work in the action, plus anticipated time for future work on this motion.[1]  (Doc. 70-1 at 12-13; Doc. 71 at 7-8, 15.)  This time includes work by attorneys Jon Jacobs, Terry Baker, Chad David, Rene Dupart, Jon Feeley, Elana Midda, and Nicolas, Dillavou; as well as paralegals Lisa Tyler, Gabriela Torres, Kimberly Riley, Kayla Goettman, Cindy Lewandowski, and Shaina Cateldge.  (*Id*.)  Jayco contends the time reported reflects overstaffing of the work with "transient timekeepers."  (Doc. 72 at 3, 7-9.)  In addition, Jayco objects the hours reported includes "numerous clerical entries, which should be considered as overhead" and "impossibly vague billing entries" that should be excluded from the fee award.  (*Id.* at 3-4, 9-12.)  Finally, Jayco argues the time sheets reflect overbilling with tasks that should not take six minutes to complete.  (*Id.* at 12.)

### 1.    Exhibits in opposition

Jayco enlisted James Schratz to "provide an audit and opinion regarding the reasonableness of the attorneys' fees requested" by Plaintiffs.  (*See* Doc. 72-1 at 1, ¶ 1.)  According to Mr. Schratz, he "reviewed Plaintiffs' Fee Motion and accompanying declarations and exhibits in support thereof, including billing records covering the time period from February 9, 2018 through August 27, 2021," as well as "various pleading and written discovery provided by Jayco, Inc.'s counsel."  (*Id.* at 14, ¶ 46.) Based upon his review, Jayco compiled billing entries that were challenged for overstaffing with

---

[1] Although the table in the motion indicates a total of 230.7 hours, this appears to be a clerical error.  (*See* Doc. 71 at 8.)  Rather, Mr. Jacobs reports: "The Law Offices of Jon Jacobs has spent 230.7 hours on this matter."  (*See* Doc. 70-5 at 4.)  In addition, Mr. Baker billed 39.6 hours prior to joining as co-counsel with the firm of Mr. Jacobs.  (*See id.*; Doc. 70-4 at 7-8.)  These hours are reflected in the billing records and the table in the motion, and when combined total 270.3 hours.

4

1   "transient timekeepers" in "Exhibit 8," clerical tasks in "Exhibit 11," and vague billing entries in

2   "Exhibit 12."

3         Significantly, whether fees should be awarded—and the reasonableness of the fees requested—

4   are matters of law for the Court to decide.  *See Hensley,* 416 U.S. at 437.  Thus, the Court declines to

5   simply adopt the opinions of Mr. Schratz related to the reasonableness of the fees requested by

6   Plaintiffs' counsel.  The Court has reviewed each exhibit, as discussed below, and used the exhibits to

7   identify the more than 400 billing entries challenged by Jayco in support of the assertion that the hours

8   billed by Plaintiffs' counsel should be reduced for overstaffing, clerical tasks, and vagueness.[2]

9         2.   Overstaffing

10        Jayco observes that while Plaintiffs' counsel "professes expertise in consumer warrant law,"

11  the firm "collectively staffed this matter with 13 different timekeepers consisting of 7 attorneys and 6

12  paralegals."  (Doc. 72 at 7.)  Jayco contends "at least 9 of the 13 timekeepers are transient or excessive

13  timekeepers that each billed less than 20 hours for the entire case," for which Plaintiffs requested fees

14  in the amount of $15,569.50.  (*Id.*)  In addition, Jayco observes that six individuals "billed less than 3

15  hours, with 3 of those timekeepers billing less than a half hour total." (*Id.*)  Jayco compiled the

16  challenged billing entries for these individuals in "Exhibit 8."  (*See id.* at 8; Doc. 72-3 at 125-129.)

17        According to Jayco, "in staffing cases, counsel is required to exercise 'billing judgment',

18  which means exercising judgment to adjust or write down fees and/or expenses incurred when the fees

19  would be excessive, duplicative, or unnecessary."  (Doc. 72 at 8, citing *Hensley v. Eckerhart*, 103

20  S.Ct. 1933 (1983).)  Jayco notes the Supreme Court explained:

21        Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel
22        for the prevailing party should make a good faith effort to exclude from a fee request
       hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in
       private practice ethically is obligated to exclude such hours from his fee submission.
23        "In the private sector, 'billing judgment' is an important component in fee setting. It is
       no less important here."
24

25  (*Id.* at 8-9, quoting *Hensley, 103* S.Ct. at 1939-40.)  Based upon the limited tasks performed, Jayco

26

27         [2] Due to the significant number of entries challenged, the Court declines to list each and every billing entry
28  challenged by Jayco in its exhibits.  However, the Court categorized the billing entries below, to identify which categories
    of tasks were not compensable—particularly with clerical tasks— and which of the challenged entries are not stricken from
    the fee award.

1    contends the time of attorneys Jon Jacobs, Elena Midda, Rene Dupart, Jon Feely, and Nicolas Dillavou

2    should be deducted from the fee award.  (*Id.* at 7-8.)  For the same reason, Jayco contends the Court

3    should deduct the time of the following administrative professionals: Gabriela Torres, Kimberly Riley,

4    Cindy Lewandowski, and Shaina Cateldge.  (*Id.*)

5        Plaintiffs contend the number of timekeepers on the action "would only be relevant had the

6    billing been duplicative with multiple timekeepers performing the same task."  (Doc. 73 at 2.)

7    According to Plaintiffs, "[t]he Law Offices of Jon Jacobs was retained by Plaintiffs in March of 2018,

8    and multiple attorneys and paralegals left the law firm over the course of this case."  (*Id.*)  Plaintiffs

9    explain: "During the pendency of the lawsuit, timekeeper Rene Dupart, Jon Feely, Shaina Catley,

10   Kimberly Riley, Gabriela Torres, and Elana Midda all left the law firm."  (*Id.* at 5.)  Plaintiffs argue

11   that a review of the billing records indicates "it is clear that the case was primarily handled by attorneys

12   Rene Dupart and Terry Baker, then Chad David and Terry Baker upon Mr. Dupart's departure from the

13   law firm."  (*Id.* at 3.)  Further, Plaintiffs assert: "There was not one billing entry related to any attorney

14   catching up on the facts of the case or performing duplicative tasks."  (*Id.* at 2-3.)

15       Importantly, the Ninth Circuit has "recognized that 'the participation of more than one attorney

16   does not necessarily constitute an unnecessary duplication of effort.'"  *McGrath v. County of Nevada*,

17   67 F.3d 248, 256 (1995) (quoting *Kim v. Fujikawa*, 871 F.2d 1427, 1435 n.9 (9th Cir. 1989)).  The

18   Ninth Circuit recently determined a district court erred in striking all hours billed by several attorneys

19   on the grounds that "the case was overstaffed."  *Fernandez v. Torres*, 2021 U.S. App. LEXIS 30145 at

20   *1-2, 2021 WL 4690940, at *1 (9th Cir. Oct. 7, 2021).  In *Fernandez*, five attorneys billed for work on

21   an action, and the district court "ignored the time billed by three of Fernandez's five attorneys."  *Id.*

22   The Ninth Circuit concluded "[t]he district court abused its discretion," because the identified attorneys

23   "performed at least <u>some</u> necessary work, such as drafting a joint Rule 26 report and a settlement

24   agreement."  *Id.* (emphasis in original).  The Ninth Circuit explained: "To the extent that overstaffing

25   resulted in inefficiencies, the district court should reduce the fee award in proportion to those

26   inefficiencies, rather than through a 'shortcut'" in striking all actions. *Id.*, citing *Moreno v. City of*

27   *Sacramento,* 534 F.3d 1106, 1113 (9th Cir. 2008).

28       As in *Fernandez*, the number of attorneys on the action suggests that the firm overstaffed the

1    matter.  However, the Court declines to strike time billed on these grounds.  *See Fernandez*,  2021 U.S.

2    App. LEXIS 30145 at *1-2, 2021 WL 4690940, at *1.  Rather, the Court will review the challenged

3    billing records in "Exhibit 8" to determine whether "overstaffing resulted in inefficiencies," and

4    whether unnecessary time or duplicative tasks were included in the billing records.

5                              *a.      Time reported by Jon Jacobs*

6              Notably, contrary to Plaintiffs' assertion, challenged entries from Jon Jacobs indicate an effort

7    to "catch[] up on the facts of the case."  Mr. Jacobs was the first to review the action on March 2, 2018,

8    when he conducted an "intake review."  (Doc. 70-5 at 43.)  He then billed for further review and

9    assigning the case on March 9, 2018.  (*Id.*)  Presumably, review had to occur for his law firm to

10   determine whether to take the action and identify the attorney(s) who would work on the action.  Thus,

11   the Court declines to strike these hours.  However, the billing records do not include any other entries

12   from Mr. Jacobs for more than three years.  (*See id.* at 9-43.)

13            On July 14, 2021, Mr. Jacobs billed 0.4 hours for reviewing the file to determine the authorized

14   amount and determine where the sales contract was signed.  (Doc. 70-5 at 9.)  If Mr. Jacobs worked on

15   the action consistently, it would not be necessary to review the file to determine where the contract was

16   signed.  (*See* Doc. 11-4 at 2; Doc. 19 at 1-2.)  Further, Chad David drafted a confidential settlement

17   conference statement a week before—which was provided to the Court on July 9, 2021—and the

18   parties were already actively engaged in settlement discussions when Mr. Jacobs reviewed the file.

19   (*See id.* at 9-10.)  Thus, Mr. Jacobs' file review on July 14, 2021 was unnecessary to the action, and 0.4

20   hour will be deducted from his time.

21            Finally, Mr. Jacobs billed 0.2 hour for his review of the file in advance of preparing the fees

22   motion and a memo on August 16, 2021.  (Doc. 70-5 at 7.)  Importantly, the record indicates that Mr.

23   Jacobs was involved with the preparation of the motion for fees now pending before the Court, as he

24   executed a declaration in support of the motion.  (*Id.* at 1-5.)  Therefore, the Court is unable to find this

25   review related to the motion for fees was unnecessary, and declines to deduct this challenged time.

26                              *b.      Time billed by Jon Feely*

27            Jayco objects to the 0.2 hour billed by Jon Feely in this action. (Doc. 72 at 7.)  Mr. Feely billed

28   the 0.20 hour for "Choice of Law" on May 14, 2019.  (Doc. 70-5 at 32.)  Curiously, this entry is the

                                                  7

1   *only* one for Mr. Feeley, and the only work entered for the entirety of the month of May 2019.  (*See id.*

2   at 31-32.)  Further, Terry Baker began to research the "choice of law" issue—or "controlling law," as

3   counsel used the terms interchangeably in the billing records—in February 2019.  (Doc. 70-4 at 7; *see*

4   *also* Doc. 70-5 at 21-24.)  Mr. Baker continued to research the issue, prepared the motion to establish

5   controlling law, reviewed the opposition, prepared the reply brief, attended the hearing, and

6   communicated with the client regarding the Court's ruling.  (Doc. 70-5 at 21-24.)  In total, Mr. Baker

7   billed approximately 36 hours related to that motion, through March 2020.  (*See id.*; Doc. 70-4 at 7.)

8   Because there is no indication in the billing records that Mr. Feely offered any assistance to Mr. Baker

9   with the preparation of the motion—particularly where Mr. Baker did not bill for any work on the

10  issue between February 2019 and January 2020—it appears work by Mr. Feely was duplicative of the

11  efforts of Mr. Baker.  Therefore, the 0.2 hour will be deducted from the fee award.

12                          *c.      Time billed by Nicolas Dillavou*

13          On June 22, 2021, Mr. Dillavou billed 0.3 hour for a "[p]hone call with [Chad David] re status

14  of case, settlement, and next steps."  (Doc. 70-5 at 14.)  Jayco asserts this time should not be awarded,

15  noting it was the only work completed by Mr. Dillavou on the action.  (Doc. 72 at 7; *see also* Doc. 72-

16  3 at 128.)

17          Notably, Mr. David also billed 0.3 hour for a call with Mr. Dillavou "re legal strategy" on June

18  22, 2021.  (Doc. 70-5 at 14.)  In general, two attorneys cannot bill for communicating with each other,

19  as such time is duplicative and unnecessary.  *In re Mullins*, 84 F.3d 459, 467, 318 U.S. App. D.C. 19

20  (D.C. Cir. 1996); *Robinson v. Plourde*, 717 F. Supp. 2d 1092, 1099 (D. Haw. 2010).  As this Court

21  previously observed, "many courts ... reduced fee awards for time spent in 'interoffice conferences' or

22  other internal communications." *Gauchat-Hargis v. Forest River, Inc.*, 2013 WL 4828594 at *3 (E.D.

23  Cal. Sept. 9, 2013) citing, *e.g., Mogck v. Unum Life Ins. Co. of Am.*, 289 F.Supp.2d 1181, 1194 (S.D.

24  Cal. 2003); *see also United States v. One 2008 Toyota Rav 4 Sports Util. Vehicle,* 2012 WL 5272281 at

25  *9 (C.D. Cal. Oct. 18, 2012) ("[w]hen attorneys hold a telephone or personal conference, good 'billing

26  judgment' mandates that only one attorney should bill that conference to the client, not both attorneys"

27  [citation omitted]); *Coles v. City of Oakland*, 2007 WL 39304, at *10 (N.D. Cal. Jan. 4, 2007)

28  (observing that billing for communications between attorneys may be a sign of overstaffing, warranting

8

a reduction in hours billed). Because Mr. David has billed for the same conference, the Court finds the billing by Mr. Dillavou was duplicative and unnecessary. Therefore, the 0.3 hour will be deducted from the Court's lodestar calculation.

### d.    Time billed by Elena Midda

On March 13, 2018, Ms. Midda billed 2.0 hours for her review of the initial file documents and preparation of a notice and demand. (Doc. 70-5 at 43.) On March 21, 2018, she billed for her review of Jayco's response. (*Id.*) Jayco object to the entries from Ms. Midda, asserting she is a "transient timekeeper" and the 2.2 hours she billed for these tasks should not be included in the fee award. (Doc. 72 at 7-8; Doc. 72-3 at 126.)

Notably, the billing records indicate that while the action was originally assigned by the firm to Ms. Midda for work, the assignment changed to Rene Dupart in May 2018. (*Id.* at 43.) Plaintiffs also report Ms. Midda left the firm during the pendency of this action, although it is unclear when her departure occurred. (*See* Doc. 73 at 5.) Jayco does not assert the work performed by Ms. Midda prior to the reassignment or her departure was not relevant or unnecessary to the matter. (*See* Doc. 72 at 7-9.) Further, there is no indication her work was duplicative of other attorneys. Accordingly, the Court declines to deduct the challenged time for Ms. Midda from the lodestar.

### e.    Time billed by Rene Dupart

Jayco contends Plaintiffs should not receive any fees for the time billed by Mr. Dupart. (Doc. 72 at 7-9.) Again, however, Jayco does not address the substance of the work performed by the attorney. (*Id.*) Mr. Dupart billed 19.7 hours for tasks that included: communicating with Plaintiffs and opposing counsel; drafting the complaint (Doc. 1) drafting the Joint Scheduling Report filed on September 13, 2018 (Doc. 8); attending the conference via telephone on September 20, 2018; and drafting the opposition to the motion to change venue filed October 18, 2018 (Doc. 16). (*See* Doc. 70-5 at 35-43; *see also* Doc. 72-3 at 128.) It is indisputable that such tasks were necessary and relevant to the litigation. Because no other attorney billed for drafting the identified pleadings, it does not appear there was duplicative billing to warrant a deduction. Consequently, the Court declines Jayco's request to strike the 19.7 hours billed by Mr. Dupart from the fee award.

///

f.  *Challenged time billed by paralegals*

On the grounds that several paralegals were also "transient timekeepers," Jayco objects to the 12.8 hours billed by Gabriela Torres, the 5.4 hours billed by Kimberly Riley, the 0.2 hour billed by Cindy Lewandowski, and the 2.4 hours billed by Shaina Cateldge.  (Doc. 72 at 7-9.)  Review of the records for each of the individuals does not reveal duplicative tasks.  Therefore, the Court declines to deduct this time based upon Jayco's objection to "the high number" of individuals who worked on the action and limited number of tasks completed.  *See Fernandez*, 2021 U.S. App. LEXIS 30145 at *1-2, 2021 WL 4690940, at *1.  Review of the records for each of the individuals does not reveal any duplicative efforts among the paralegals. To the extent Jayco also argues to the time billed by Gabriela Torres and Kimberley Riley should not be awarded because the tasks performed were clerical in nature (Doc. 72 at 8), such objections are addressed below.

3.  Clerical tasks

The Supreme Court determined that "purely clerical or secretarial tasks should not be billed at a paralegal or [lawyer's] rate, regardless of who performs them."  *Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989).  As a result, courts have approved of elimination of clerical tasks from fee awards.  *See, e.g., Nadarajah v. Holder*, 569 F.3d 906, 921 (9th Cir. 2009); *see also Marquez v. Harper Sch. Dist.*, 546 F. App'x 659, 660 (9th Cir. 2013) ("[t]he district court was within its discretion" when it declined to award fees for clerical tasks); *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 985 (4th Cir. 1997) (approving the deduction of hours spent on secretarial tasks from the lodestar calculation). Such tasks may include: "creating indexes for a binder; filing emails, memoranda, and other correspondence; updating the case calendar with new dates; copying, scanning, and faxing documents; and filing or serving documents."  *Moore v. Chase, Inc.*, 2016 (E.D. Cal. July 7, 2016), citing *Prison Legal News v. Schwarzenegger*, 561 F.Supp.2d 1095, 1102 (N.D. Cal. 2008).

Jayco argues counsel billed more than 60 hours in "clerical tasks such as uploading and saving documents, calendaring, intra-office coordinating and scheduling, and e-filing documents," and prepared "Exhibit 11" as table of 256 challenged billing entries.[3]  (Doc. 72 at 10; Doc. 72-3 at 153-67.)

---

[3] Again, the Court relies on the exhibit only to determine the challenged entries, which were then identified in Plaintiffs' original billing records.

10

In addition, Jayco asserts paralegals it previously identified as "transient timekeepers" performed clerical tasks.  (*Id.* at 8-9.)  Specifically, Jayco contends that "Gabriel[a] Torres billed a total of 12.8 hours consisting of 14 entries for clerical work with the most hours billed in round numbers (2 entries for 2 hours and 1 entry for 6 hours) totaling 10 hours for reviewing the file and preparing discovery shells."  (*Id.*)  Jayco also asserts, "Kimberly Riley billed a total of 5.4 hours consisting of 22 entries for clerical work such as calendaring, uploading documents, and client communication."  (*Id.*)

In reply, Plaintiffs argue "many of the indicated billing entries offered by Defendant as Exhibit 11 of their Opposition do not fall under clerical tasks."  (Doc. 73 at 5.)  According to Plaintiffs, "A review of the billing entries show that many of the tasks complained of are fully recoverable."  (*Id.*)  However, Plaintiffs do not offer the Court any assistance by identifying which billed tasks they believe to be "fully recoverable," or which tasks Plaintiffs indirectly concede are not recoverable.  (*See id.*)

### a.     Updating and reviewing the firm's file

Previously, this Court determined that organizing and updating files appeared to be clerical work.  *L.H. v. Schwarzenegger*, 645 F. Supp. 2d 888, 899 (E.D. Cal. 2009).  Thus, the Court declined to award fees where the applicant "tendered no evidence that these are tasks that required the skill of a paralegal."  *Id.*  Approximately 30 billing entries challenged by Jayco as clerical involve updates and reviews of the firm's file by Kimberly Riley, Gabriela Torres, Lisa Tyler, and Kayla Goettman.  (*See, e.g.,* Doc. 72-3 at 127-28, 157-59, 161-63, 165-66.)

For example, Ms. Tyler billed 0.2 hours to indicate in the system that the "attorney assignment [changed]" from Rene Dupart to Elana Midda on May 25, 2018; and billed an additional 0.2 hour to indicate the attorney assignment changed back to Mr. Dupart on May 31, 2018.  (Doc. 70-5 at 43.)  Ms. Tyler billed 2.8 hours for updates to the firm's file that included, but were not limited to: meeting dates; tasks for the deadline sheet; and information concerning the parties, assigned judges, and contact information of opposing counsel "for easy access."  (*See id.* at 8, 31.)  Likewise, Ms. Goettman billed 0.8 hour for updates with party information, "case details," and "case numbers" for the Eastern District of California and Northern District of Indiana.  (*See, e.g. id.* at 33, 36, 41-42.)  Ms. Goettman also billed 0.8 hour for reviewing the file to confirm the "case is in [the] Eastern District," document filing, and the prior demand for a jury trial.  (*Id.* at 20-21.)  Similarly, Ms. Riley billed 0.9 hour for file

11

review in an effort to locate a letter, which she was unable to find.  (Doc. 70-5 at 25.)  Ms. Riley also billed 0.4 hour to upload documents to the file such as an email from Plaintiffs and a "conformed copy of stipulation."  (*Id.* at 25-26.)  Ms. Torres billed 1.3 hours for file updates that were requested when Mr. David and Ms. Tyler were away from the office, reviewing the file, and organizing documents. (*Id.* at 22-23, 27-28, 31.)

Plaintiffs do not argue these file updates or reviews "required the skill of a paralegal," or present any evidence that would support such a conclusion.  Based upon the Court's review of the challenged records, 7.8 hours will be deducted from the lodestar, which includes 3.6 hours for Lisa Tyler, 1.6 hours for Kayla Goettman, 1.3 hours for Kimberly Riley, and 1.3 hours for Gabriela Torres.

> *b.    Document retrieval and saving*

Courts have declined to award fees for "retrieving electronic court documents or copying" due to the clerical nature of the tasks.  *Jones v. Metropolitan Life Ins. Co.*, 845 F. Supp. 2d 1016, 1027 (N.D. Cal. 2012); *Schmidt v. City of Modesto*, 2018 WL 6593362, at *9 (E.D. Cal. Dec. 18, 2018) (indicating clerical work included downloading, saving, and printing documents); *T.B. v. San Diego Unified Sch. Dist.*, 2017 U.S. Dist. LEXIS 218434, at *97 (S.D. Cal. Oct 2, 2017) ("scanning and saving" documents is clerical work).  Thus, to the extent the billing records include such tasks, fees for such tasks should not be awarded.

As Jayco argues, the billing records from Plaintiffs' counsel include many entries related to document retrieval from the docket, printing copies, and saving numerous documents to the firm's file. For example, Kayla Goettman billed 0.2 hour to "[d]ownload/retrieve Docket No. 2 [the Summons]; upload to case file" and another 0.2 hour to "[d]ownload/retrieve Docket No. 3 [the New Case Documents]; upload to case file" on June 22, 2018.  (Doc. 70-6 at 42; Doc. 72-3 at 154.)  On June 28, 2018, Ms. Gotteman billed 0.2 hour to scan a copy of the complaint with supporting documents and "upload to the case file."  (*Id.* at 41.)  On July 17, 2018, she billed 0.2 hour to "Retrieve Docket No. 4; upload to the case file."  (*Id.* at 43.)  Similarly, in October 2018, Lisa Tyler billed 0.4 hour to upload and save Documents 14 and 15.  (*Id.* at 37.)  Ms. Tyler also billed 0.3 hour to print documents for Rene Dupart and "put [them] on his chair" with a "pad, pen and business cards" prior to a hearing. (*Id.* at 35.)  Ms. Riley also billed for 0.4 saving documents to the firm's file, such a copy of the signed

mediation agreement. (*Id.* at 27.)

Though these are only a handful of examples, throughout the duration of the action, paralegals billed for document retrieval from the Court's docket and save copies, with more than 30 billing entries for document retrieval and uploading to the firm's file. (*See generally* Doc. 70-5 at 5-43; *see also* Doc. 72-3 at 154-167.) However, tasks such as saving, scanning, and printing documents should be included in the firm's overhead, and fees will not be awarded. *Jones*, 845 F. Supp. 2d at 1027. Accordingly, based upon the Court's review of the billing records, 8.4 hours will be deducted from the requested fee award, which includes 4.4 hours for Lisa Tyler, 3.6 hours for Kayla Goettman, and 0.4 hour for Kimberly Riley.

<em>c.    Document finalizing and filing</em>

"Finalizing" a document generally refers to the preparation of documents for filing and service after an attorney has drafted the document. Courts throughout the Ninth Circuit determined the "finalizing" of a document is a clerical task for which fees should not be awarded. *See, e.g.*, *Moores v. Berryhill*, 2017 WL 4386050, at *3 (E.D. Cal. Oct. 3, 2017) (declining to award fees for finalizing a complaint as clerical work); *United States v. Haw. Student Suites*, 2021 WL 3134925, at *10 (D. Haw. May 28, 2021) ("Finalizing a document" is a "clerical task[]" for which time is not compensable); *Velu v. Aristotle Air Conditioning & Heating, LLC*, 2021 WL 4122297, at *2 (D. Az. Sept. 9, 2021); (declining to include time billed for finalizing and filing a document in the court's calculation of fees).

Further, the Ninth Circuit indicated "filing, transcript, and document organization time was clerical in nature and should have been subsumed in firm overhead." *See Nadarajah*, 569 F.3d at 921. *see also Garcia v. Colvin*, 2013 WL 5347494, at *7 (E.D. Cal. Sept. 23, 2013) (observing the "document emailing and e-filing constitutes clerical or secretarial work and should not be awarded as these activities should be considered overhead costs," and explaining "filing documents is a clerical task, regardless of whether counsel has delegated the authority to his paralegal to access his CM/ECF account"); *United States v. One 2008 Toyota Rav 4 Sports Utility Vehicle*, 2012 WL 5272281, at *12 (C.D. Cal. Oct. 18, 2012) (declining to award fees for time spent e-filing documents with the court).

As indicated by Jayco in "Exhibit 11," the billing records include many entries for finalizing documents and e-filing with the Court. For example, Kayla Gottman billed 0.8 hour for e-filing the

Summons, and finalizing and e-filing the Joint Scheduling Report.  (Doc. 70-5 at 39-40; Doc. 72-3 at 154-55.)  Lisa Tyler billed 0.9 hour to related to finalizing the complaint and coversheet, e-filing, and upload the documents to the firm's case file.  (Doc. 70-5 at 42; Doc. 72-3 at 154.)  Additionally, Ms. Tyler billed for finalizing and e-filing other documents including, but not limited to, a stipulation to dismiss, the motion regarding controlling law, and a notice of appearance.  (*See, e.g.* Doc. 70-5 at 15, 38.)  For example, she billed 1.1 to talk to Mr. Baker about what needed to be done to finalize the documents for the motion controlling law and then "made [the documents] pretty for filing."  (*Id.* at 24.)  Therefore, based upon the Court's review of the challenged billing records and the entries for "finalizing" and e-filing documents, 3.2 hours will be deducted from the lodestar calculation, which includes 0.8 hour for Kayla Goettman and 2.4 hours for Lisa Tyler.

### d.    Document revision by paralegals

In several billing entries challenged by Jayco, Lisa Tyler billed for reviewing and revising documents previously drafted by attorneys prior to saving the document to the firm's system or e-filing with the Court.  For example, after attorney Rene Dupart spent 4.0 hours drafting the complaint in the action, Ms. Tyler billed 0.5 hour for the following: "[r]eview revise complaint, and uploaded and saved to Merus."  (Doc. 70-5 at 43; *see also* Doc. 72-3 at 154.)  After Mr. Dupart spent 1.0 hour drafting a stipulation to dismiss on September 24, 2018, Ms. Tyler billed 0.2 hour to "[r]eview revise stip to dismiss" and upload the document to the system. (*Id.* at 38; *see also* Doc. 72-3 at 156.) Again, in October 2018, Mr. Dupart spent 10 hours drafting the opposition to the motion to change venue after which Ms. Tyler billed 0.8 hour for the following: "Review revise oppo. Review court's website for judge's info. Prepared GOS label for delivery of judge's copy. Uploaded and saved docs to merus. Uploaded and saved conformed copy."  (*Id.* at 37; Doc. 72-3 at 157.)  Similarly, after Mr. Baker worked more than 15.00 hours on a reply to the motion to establish controlling law and supporting documents, Ms. Tyler billed 1.3 hours to: "Review revise finalize Reply to oppo, TB decl and RJN. Uploaded/saved docs to file. Updated calendar. Efiled with the court. Uploaded and saved conformed copies to file."  (*See* Doc. 70-5 at 22-23; Doc 72-3 at 161.)

To the extent Ms. Tyler reviewed and revised documents, her work was duplicative of the efforts performed by attorneys on the complaint, stipulation, opposition to the motion, and reply to the

motion.  In addition, courts have determined proofreading is clerical when the review of work completed by counsel.  Further, it is indisputable that the tasks identified in the billing entries— including uploading documents, preparation of mailing labels, calendaring, and e-filing— are clerical tasks that should not be included in the lodestar calculation, as they do not require the skill of a paralegal.  *See, e.g., Nadarajah*, 569 F.3d at 921; *Smith v. A Check Am.*, 2017 U.S. Dist. LEXIS 143717, at *26 (C.D. Cal. July 18, 2017) (identifying "proofreading, making copies, uploading data to a server, formatting documents, and managing databases" as clerical tasks); *Garcia*, 2013 WL 5347494, at *7.  Therefore, 2.8 hours will be deducted from the requested fee award for Ms. Tyler.

e.    *Calendaring*

Repeatedly, this Court and others in the Ninth Circuit indicated calendaring deadlines is a clerical task that should not being included in a fee award.  *See, e.g., Hill v. Comm'r of Soc. Sec.*, 428 F. Supp. 3d 253, 265 (E.D. Cal. 2019) (observing clerical staff could "easily" complete "calendaring of court dates" and reducing the fee award); *Campbell v. AMTRAK*, 718 F.Supp.2d 1093, 1105 (N.D. Cal. 2010) (deducting calendaring as clerical work from the awarded fees); *Doran v. Vicorp Rests., Inc.*, 407 F.Supp.2d 1120, 1125 (C.D. Cal. 2005) (noting "calendaring court dates" is clerical and reducing the fee award); *T.B.*, 2017 U.S. Dist. LEXIS 218434, at *97 ("calendaring [an] event is clerical").

As Jayco indicated in its exhibit of challenged billing, Kayla Goettman and Lisa Tyler billed for calendaring deadlines and their review of documents for calendaring.  (*See generally* Doc. 72-3 at 154-56, 158-64, 166-67.)  For example, after the Court issued the new case documents on June 22, 2018 (Doc. 3), Ms. Goettman billed 0.3 hour to review and add the scheduling conference and joint scheduling report deadlines to the firm's calendar.  (Doc. 70-5 at 42.)  The following week, Ms. Tyler billed 0.2 hour for calendaring the deadline for Jayco's answer.  (*Id.* at 41.)  On August 22, 2018, Ms. Goettsman billed 0.3 hour to again "Review Docket No. 3; update calendar."  (*Id.*)  The following month, she billed 0.4 hour to update the firm's calendar with the initial disclosure due date and the scheduling conference date.  (*Id.* at 39.)  On April 3, 2019, Ms. Gottesman billed 0.4 hour for calendaring discovery deadlines—before the Court issued its scheduling order—and proposed dates in the firm's calendar.  (*Id.* at 32.)  Once the order was issued on April 9, 2019 (Doc. 45), Ms. Gottesman billed another 1.0 hour for calendaring the deadlines ordered by the Court.  (*Id.*)  In November 2019,

Kimberly Riley billed for calendaring the deposition dates, and Ms. Gottesman billed for updating the calendar with amended dates.  (*Id.* at 26.)

In total, there are more than 35 challenged entries related to calendaring or updating dates—such a discovery deadlines, the date of the vehicle inspection, deposition dates, or other unidentified events—and the paralegals billed a minimum of 0.2 hour for the task each time.  (*See, e.g.,* Doc. 70-5 at 16-17, 22-23, 27-28, 32-33, 37-39, 42-42.)  Because the tasks are clearly clerical, the time will be deducted from the lodestar calculation.  *See Hill*, 428 F.Supp.3d at 265; *Campbell*, 718 F.Supp.2d at 1105.  Based upon the Court's review of the billing entries related to calendaring, 9.2 hours will be deducted from the lodestar calculation, which includes 5.1 hours for Kayla Goettman, 3.9 hours for Lisa Tyler, and 0.2 Hour for Kimberly Riley.

### f.    Clerical internal communications

Billing entries challenged by Jayco include communications within the firm, whether to another paralegal or to counsel.  (*See generally* Doc. 72-3 at 154-167.)  Courts decline to award fees for staff emailing documents.  *See Schmidt v. City of Modesto*, 2018 WL 6593362, at *9 (E.D. Cal. Dec. 18, 2018) (declining to award fees for emailing documents, noting emailing was a clerical task rather than a paralegal task); *LaToya A. v. S.F. Unified Sch. Dist*., 2016 WL 344558, at *9 (N.D. Cal. Jan. 28, 2016) (forwarding documents to attorneys is "purely clerical work").  In addition, courts have disapproved of two individuals billing for communicating with each other, as such time is duplicative and unnecessary. *In re Mullins*, 84 F.3d 459, 467 (D.C. Cir. 1996); *Robinson v. Plourde*, 717 F. Supp. 2d 1092, 1099 (D. Haw. 2010).  Consequently, "many courts have ... reduced fee awards for time spent in 'interoffice conferences' or other internal communications." *Gauchat-Hargis v. Forest River, Inc*., 2013 WL 4828594 at *3 (E.D. Cal. Sept. 9, 2013), citing *Mogck v. Unum Life Ins. Co. of Am*., 289 F.Supp.2d 1181, 1194 (S.D. Cal. 2003) (reducing the fee award where the attorneys "billed an inordinate amount of time for interoffice conferences").

In "Exhibit 8" and "Exhibit 11," Jayco objects to more than 80 entries—each billed for a minimum of 0.2 hour—related to emails, chats, and telephone conferences between the paralegals and counsel.  (*See generally* Doc. 72-3 at 154-67.)  Again, though the Court declines to identify each of the internal communications given the significant number, challenged entries related to forwarding emails

16

1   or documents to others working on the action.  (*See, e.g., id.* at 154, 155, 157, 158, 165, 167.)  For

2   example, Ms. Tyler billed for forwarding emails on April 11, 2020; September 22, 2020; November 3,

3   2020; and July 9, 2021. (*See, e.g.,* Doc. 70-5 at 10, 18, 21.)  Shaina Cateldge billed 0.2 for forwarding

4   documents to others, including Ms. Tyler.  (*Id.* at 32.)  In addition, Ms. Goettman and Ms. Tyler billed

5   for emailing documents and attachments including, but not limited to: the executed summons, a draft of

6   the initial disclosures, the joint discovery plan, the court's conference notice, an invoice from JAMS,

7   court orders, and settlement breakdown.  (*See, e.g.,* Doc. 70-5 at 7, 19, 27, 32, 33, 41.)  Likewise, Terry

8   Baker billed 0.2 hour for receiving a transcript and forwarding the document to Ms. Goettman.  (Doc.

9   70-4 at 7.)  Given the clerical nature of these tasks, the requested fee award will be reduced for the

10  forwarding of emails and documents.  *See Schmidt*, 2018 WL 6593362, at *9.

11          The paralegals also repeatedly billed for communications with others working on the case,

12  including telephonic conversations, electronic chats, texting, and emailing.  (*See generally* Doc. 70-5 at

13  7-43.)  For example, Ms. Tyler and Ms. Goettman each billed 0.2 hour on April 15, 2019, for emailing

14  one another regarding completing calendaring in the firm's system.  (Doc. 70-5 at 32.)  Ms. Tyler

15  regularly billed for emailing counsel reminders of upcoming deadlines and actions needed.  (*See, e.g.,*

16  *id.* at 7, 9-11, 13, 16, 32, 43.)  Ms. Tyler also billed for communications with counsel "regarding who

17  the case is assigned to;" a hearing location; and document and task status, such as changing the attorney

18  assignment in the firm's system, filing the summons, and "calendaring the settlement conference."

19  (*See, e.g., id.* at 7, 14, 34-36, 41.)  Further, Ms. Cateldge billed 0.2 hour for each of the electronic chats

20  in which she simply notified Ms. Tyler and Mr. Dupart of Plaintiffs' phone calls.  (*Id.* at 35-36, 39.)

21  Similarly, Ms. Goettman billed for chat and text messages that included date confirmation.  (*See, e.g.,*

22  Doc. 70-5 at 17-18.)  In addition, Ms. Goettman billed 1.0 hour for communications with co-counsel,

23  such as emails with Terry Baker related to the motion to reset the scheduling conference, his pro hac

24  vice application, and forwarding documents on December 5, 2018.[4]  (*Id.* at 32.)

25          Due to the clerical nature of internal communications among those working on the action—as

26  well as the significant number of entries related to the interoffice communication by the paralegals—

27

28          [4] Notably, Mr. Baker also billed for the email exchange on December 5, 2018.  (Doc. 70-4 at 6.)  Thus, this time
    for Ms. Goettman is also duplicative in nature. *See In re Mullins*, 84 F.3d at 467; *Robinson*, 717 F. Supp. 2d at 1099.

17

the requested fee award should be reduced.  *See In re Mullins*, 84 F.3d at 467; *Gauchat-Hargis*, 2013 WL 4828594 at *3; *Mogck v. Unum Life Ins. Co. of Am*., 289 F.Supp.2d at 1194.  Accordingly, based upon the Court's review of the challenged billing records, 19.5 hours will be deducted from the lodestar calculation, which includes: 0.2 hour for Terry Baker, 11.7 hours for Lisa Tyler, 6.4 hours for Kayla Goettman, 0.6 hour for Shaina Cateldge, 0.2 hour for Kimberly Riley, and 0.4 hour for Gabriela Torres.

### g.    *Docket review*

Entries to which Jayco objects include docket reviews by Lisa Tyler and Kayla Goettman. (Doc. 72-3 at 157, 162.)  Specifically, on October 31, 2018, Ms. Tyler billed 0.2 hour for reviewing the "court website to see if any tentative issued" prior to the hearing on the motion for change of venue, and noted she "didn't see anything."  (Doc. 70-5 at 36.)  Ms. Goettman also billed 0.2 hour to review the docket to determine whether any hearings were continued on April 13, 2020. (*Id.* at 21.)  Reviewing the docket is a clerical task, for which this Court has declined to award fees. *See, e.g., Moore v. Chase, Inc.*, 2016 U.S. Dist. LEXIS 88293, at *12 (E.D. Cal. July 7, 2016).  Therefore, 0.4 hour will be deducted from the lodestar, including 0.2 hour for Lisa Tyler and 0.2 hour for Kayla Goettman.

### h.    *Scheduling*

Jayco identifies and challenges 16 billing entries related to scheduling depositions, and the vehicle inspection.  (*See* Doc. 72-3 at 160-161; Doc. 72-3 at 126.)  In September 2019, Ms. Tyler billed 0.2 hour for contacting Plaintiffs regarding scheduling a vehicle inspection, while Ms. Torres billed 0.3 hour for contacting opposing counsel to confirm the vehicle inspection date.  (*Id.* at 128, 160; Doc. 70-5 at 28.)  In addition, Ms. Tyler billed at total of 2.4 hours between December 2019 and March 2020 for emails to Plaintiffs and opposing counsel related to scheduling Plaintiffs' deposition dates.  (*Id.* at 160-161; *see also* Doc. 70-5 at 22-25.)  Kimberly Riley also billed 0.4 hours related to confirming the deposition dates.  (Doc. 72-3 at 126; Doc. 70-5 at 26.)

Courts in the Ninth Circuit have repeatedly indicated that communication related to scheduling, even with a client, is a non-compensable clerical task.  *See, e.g., Soler v. County of San Diego*, 2021 WL 2515236, at *10 (S.D. Cal. June 18, 2021) (identifying "time spent scheduling depositions… [as] clerical tasks non-compensable at any billing rate"); *Brown v. Cascade Mgmt., Inc.*, 2018 WL 4207097, at *5, 14 (D. Or. Sept. 4, 2018) (emails with the client regarding "deposition scheduling" were deduced

from the fee award); *Schrum v. Burlington N. Santa Fe. Ry. Co.*, 2008 WL 2278137, at \*12 (D. Az. May 29, 2018) (identifying "scheduling depositions" as "tasks which the court deems clerical or secretarial, and hence not compensable as part of the attorneys' fee award").  Likewise, the Court finds communications regarding scheduling a vehicle inspection are clerical in nature.  Thus, given the clerical nature of the challenged entries related to scheduling, the lodestar will be reduced by 2.6 hours for Lisa Tyler, 0.4 hour for Kimberly Riley, and 0.3 hour for Gabriela Torres.

> ### i.    Communications with clients

"A lawyer has an ethical responsibility to communicate with a client."  *Clendon v. Astrue*, 570. F.Supp. 2d 1164, 1667 (D. Az. 2008).  Nevertheless, as one district court observed, "some client communications may be considered clerical or ministerial, such as merely informing the client that a document has been filed or what a hearing date is, [while] others that are more substantive are part of an attorney's duties, and therefore billable."  *See James v. City & County of Honolulu*, 2014 WL 6908313, at \*10 (D.Haw. Dec. 8, 2014) (internal quotation marks omitted).

Billing entries challenged by Jayco include non-clerical communications with Plaintiffs, related to questions or case issues.  By way of example, on October 4, 2018, Ms. Tyler noted she received a voicemail from Plaintiffs "regarding whether or not he should move forward with fixing the damage to his unit, while at the dealership," and billed 0.6 hour for several communications related to the phone call.  (Doc. 70-5 at 37.)  The Court declines to deduct the challenged time for these ongoing communications with Plaintiffs.  Similarly, the Court declines to find communications with Plaintiffs regarding discovery requests and verifications and addressing the settlement agreement were purely clerical in nature.

On the other hand, eight challenged entries indisputably include clerical communications.  (*See* Doc. 72-3 at 127, 154, 151, 146-45.)  Ms. Riley billed 0.4 hour related to forwarding a document for signature and the needed signature from Plaintiff.  (Doc. 70-5 at 27.)  In addition,  emailing Plaintiff simply to "confirm[] receipt of documents" was a clerical task, and the 0.2 hour billed by Ms. Tyler will be deducted.  (Doc. 70-5 at 42.)  Similarly, Ms. Tyler billed 0.2 hour to email Plaintiffs a declaration for signature and 0.2 hour "confirming receipt" once Plaintiffs responded on January 24, 2020.  (*Id.* at 23.)  Ms. Tyler also billed 0.6 hour for communications with Plaintiffs regarding the

settlement conference date and appearances.  (*Id.* at 11-13)  Given the clerical nature of the tasks

related to scheduling, sending documents, and confirming receipt, the time billed should be omitted

from the lodestar. *See, e.g. Schmidt*, 2018 WL 6593362, at *9 (emailing documents is a clerical task);

*Soler*, 2021 WL 2515236, at *10 (identifying scheduling as clerical work).  Thus, based upon the

Court's review of the challenged billing records related to client communications, the lodestar

calculation will be reduced by 0.4 hour for Kimberly Riley and 1.2 hours for Lisa Tyler.

> *j.*    *Communications with opposing counsel*

Jayco challenges two entries in "Exhibit 8" and two  billing entries in "Exhibit 11" that

indicate emailed communication with opposing counsel, objecting the time should not be awarded as

"clerical" in nature.  (*See* Doc. 72 at 9-10; Doc. 72-3 at 128.)

Specifically, Kimberly Riley billed 0.4 hour for two emails attaching document production to

opposing counsel on October 13, 2019. (Doc. 70-5 at 27.)  Chad David billed 0.2 hour to send the

settlement agreement to Defendant's counsel on August 6, 2021.  (Doc. 72-3 at 166.)  Because

Plaintiffs and counsel had previously executed the agreement[5], it appears Mr. David was only required

to forward the document to opposing counsel.  As discussed above, mailing and forwarding documents

is deemed clerical work that is included in a firm's overhead costs.  *See Schmidt*, 2018 WL 6593362 at

*9; *see also Chavez v. Stomp*, 2014 WL 12796784, at *5 (N.M.D.C. Feb. 27, 2014) (delivering

documents to opposing counsel is a clerical task for which billing at an attorney's rate "is not

consistent with the obligation to exercise billing judgment").  In addition, Mr. David billed 0.2 hour

for communications related to "payment instructions" for opposing counsel.  (*Id.*)  However, emailing

payment instructions was clerical, work as it did not require any legal work or analysis of the

information.  Accordingly, 0.4 hour is deducted from the lodestar for Kimberley Riley and 0.4 hour is

deducted for Chad David.

> *k.*    *Communications with the Court and JAMS*

This Court and others declined to award fees for communicating with the Court—such emailing

or calling courtroom deputy—due to the clerical nature of the task.  *See, e.g., Miller v. Schmidt*, 2017

---

[5] Plaintiffs executed the settlement agreement on August 3, 2021; and Mr. David executed the agreement on August 5, 2021.  (Doc. 70-3 at 11.)

WL 633892, at *7 (E.D. Cal. Feb. 15, 2017) (agreeing with the party opposing the fee request that "communicating with the Court staff and court reports is purely clerical work" and excluding the time billed for communications with the courtroom deputies from a fee award); *Robinson v. Plourde,* 717 F. Supp. 2d 1092, 1099-1100 (D. Haw. 2010) ("communication with court staff, scheduling, and corresponding regarding deadlines, are clerical and not compensable [tasks]"); *Comcast of Illinois X v. Kwak,* 2010 WL 3781768, at *6 (D. Nev. Sept. 20, 2010) (declining to award fees for "ministerial tasks such as contacting court staff for scheduling reasons or noting due dates").

Ms. Tyler billed 0.2 hour on several occasions for contacting the court, both by email or phone call.  For example, on September 14, 2018, Ms. Tyler billed 0.2 hour for her "[e]mail to court regarding appearing telephonically" and another 0.2 hour for her "response to [the] clerk confirming Plaintiff can appear telephonically."  (Doc. 70-5 at 39.)  On November 21, 2018, Ms. Tyler billed 0.2 hour for emailing the court clerk regarding the status of an order, and 0.2 hour for leaving a voicemail regarding the status with a request for a return call.  (*Id.* at 34.)  She billed another 0.3 hour for contacting the court with status requests on November 26, 2018.  (*Id.*)  Ms. Tyler billed 0.2 hour for review of "court emails" on April 5, 2019.  (*Id.* at 32.)  Further, between June 30 and July 9, 2021, Ms. Tyler billed 1.9 for contacts regarding the conference, availability, inquiring whether only Kevin Scott could appear during the conference, confirming the date, and Zoom information.  (*Id.* at 10-13.)  Given the clerical nature of these communications, 3.2 hours shall be deducted from the lodestar for Ms. Tyler.  *See Miller*, 2017 WL 633892, at *7; *Robinson,* 717 F. Supp. 2d at 1099-1100.

In addition, Cindy Lewandowski billed 0.2 hour for forwarding an email from the Court that informed the parties there would be no jury trials in April 2021, and asking Mr. Baker to respond as soon as possible for calendaring purposes.  (Doc. 70-5 at 17.)  Given the communications concerned scheduling, 0.2 hour will be deducted from the fee award for Ms. Lewandowski.

Likewise, given the quasi-judicial nature of JAMS, and communications between Plaintiffs' counsel and the mediation organization—and actions related thereto—appear clerical.  Ms. Goettman billed 0.2 for her review of the "mediation confirmation from JAMS and confirm[ing] details on [the] calendar."  (Doc. 72-3 at 160; Doc. 70-5 at 26.)  She also billed 0.2 hour to "[r]eview the JAMS deposit request form" and "update [the] costs in the case file."  (*Id.* at 160; Doc. 70-5 at 25.)  Ms. Riley billed

0.2 hour for her receipt of an email from JAMS and saving it to the firm's system. (*Id.* at 126; Doc. 70-5 at 27.)  There is nothing suggesting review of the mediation confirmation, confirming the date, or noting the cost in the firm's file requires the work of a paralegal.  Thus, the 0.4 hour billed by Ms. Goettman and the 0.2 hour billed by Ms. Riley related to communications from JAMS will also be omitted from the fee award.

### l.    *Document preparation and mailing*

On July 9, 2018, Ms. Goettman billed 0.3 hour to "[f]ill out Summons & attach proof of return receipt from the certified mailing; upload to the case files." (Doc. 72-3 at 154; Doc. 70-5 at 42.)  It is unclear what Ms. Goettman filled out, as the Summons was issued by the Court on June 22, 2018. (Doc. 2.)  Regardless, the Ninth Circuit identified "preparing and serving summons" as "purely clerical tasks." *Neil v. Comm'r of Soc. Sec.,* 495 F. App'x 845, 847 (9th Cir. 2012).  In addition, tasks related to mailing and drafting a certificate of service are clerical. *Acosta v. Martinez*, 2020 WL 1026890 at *10 (E.D. Cal. Mar. 2, 2020) ("drafting certificates of service… and sending documents" are clerical tasks).  Therefore, this time billed by Ms. Goetteman will be deducted.

Ms. Tyler billed 0.2 hour to complete a form declining consent to magistrate judge jurisdiction and e-file it on August 22, 2018. (Doc. 70-5 at 40; Doc. 72-3 at 155.)  The Court's consent form is a single-page, check-the-box document could not take more than moments to complete.  Previously, this Court noted that "completing and filing a consent to proceed before a magistrate judge form" is work that may be "completed by experienced support staff," but allowed minimal billed time, considering the documents should be review by a counsel. *Kirk*, 244 F.Supp.3d at 1084.  On the other hand, e-filing the form, as discussed above, is clerical work. *Nadarajah*, 569 F.3d at 921.  Thus, the Court will deduct 0.1 for Ms. Tyler for the e-filing. *See Calderon v. Astrue,* 2010 WL 4295583 at *5 (E.D. Cal. Oct. 22, 2010) (permitting only 0.1 hour for completion of the form regarding magistrate judge jurisdiction).  Likewise, the Court will deduct the challenged 0.2 hour billed by Ms. Tyler to draft the certificate of service for Plaintiff's initial disclosures and 0.2 hour for generating a mailing label due to the clerical nature of the work.  (Doc. 72-3 at 155, 157, Doc. 70-5 at 33, 39.)

Conversely, the preparation of representation agreements and declarations is not *purely* clerical work, as it is appropriate for paralegals and counsel to prepare such agreements.  The Court declines to

deduct the challenged billed time related to preparation of these documents.  Based upon the Court's review of the challenged entries related to document preparation, 0.8 hour will be deducted from the lodestar calculation, which includes 0.3 hour for Kayla Goettman and 0.5 hour for Lisa Tyler.

### m.    Discovery

Jayco objects to the time billed by Gabriela Torres related to discovery and preparation of "discovery shells," including an entry for 6.0 hours, asserting it was clerical work.  (Doc. 72 at 8.)  However, the Court declines to assume the identified tasks were purely clerical in nature.  Indeed, the challenged billing entries indicates the work completed by Ms. Torres included preparing "rough responses" to the written discovery requests from Jayco, including responses interrogatories and requests for production of documents.  (*See* Doc. 70-5 at 30.)  Because this work is not purely clerical, the lodestar will not be reduced.  *See, e.g., Chloe SAS v. Sawabeh Information Servs. Co.*, 2015 WL 12763541, at *26 (C.D. Cal. June 22, 2015) (hours billed by professional staff for collecting and reviewing discovery was not clerical, and were "substantive case-related tasks"); *Triplett v. N.C. Dept' of Pub. Safety,* 2017 WL 3840422, at *11 (W.D.N.C. Aug. 31, 2017) (declining to reduce a fee award for billing entries challenged to which the defendant objected as clerical because"[t]he drafting and editing of discovery requests and answers… is far from a clerical task and is a task appropriate delegated to a paralegal").

### n.    Tasks related to admission

Jayco objects to the time billed by Ms. Tyler for her "[r]eview [of] Indiana Northern district for admission requirements," which she then printed for Mr. Dupart.  (Doc. 72-3 at 157.)  In addition, Jayco objects to the time billed by Mr. Baker for contacting Ohio attorney services regarding a certificate of good standing as clerical.  (*Id.* at 158.)  Previously, the Ninth Circuit indicated tasks related to "attorney admission" are clerical in nature.  *See Nadarajah*, 569 F.3d at 921 (reducing the requested fee award for the time award billed by a paralegal related to counsel's admission).  Based upon the clerical nature of the tasks concerning Mr. Dupart's admission to the Northern Indiana District Court, the 0.2 hour billed by Lisa Tyler and 0.2 hour billed by Terry Baker will be deducted from the lodestar calculation.

///

o. *Mixed entries with block-billed tasks*

As explained by one district court, "[b]lock billing, which bundles tasks in a block of time, makes it extremely difficult for a court to evaluate the reasonableness of the number of hours expended." *Aranda v. Astrue*, 2011 U.S. Dist. LEXIS 63667, at *13 (D. Ore. June 8, 2011); *see also Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007) ("block billing makes it more difficult to determine how much time was spent on particular activities"). In addition, a court may reduce a fee award when "documentation of hours is inadequate." *Hensley*, 461 U.S. at 433. Accordingly, the Ninth Circuit has explained that, where time is billed in "blocks," the Court may "simply reduce[] the fee to a reasonable amount." *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1121 (9th Cir. 2000); *see also Welch*, 480 F.3d at 948 ("We do not quarrel with the district court's authority to reduce hours that are billed in block format.").

Although the Court addressed several block-billed entries above that included only clerical tasks, there were also many challenged entries that involved legal research. As identified below, Ms. Goettman and Ms. Tyler billed for performing legal research—including reviewing local rules and the Federal Rules—which is not clerical work. *See Nechitaylo v. Wedum Family Ltd. P'ship*, 2015 WL 8479627, at *2 (E.D. Cal. Dec. 10, 2015) (finding "tasks involving legal research" were not clerical); *Chloe SAS*, 2015 WL 12763541, at *26 (fees billed by staff who assisted counsel "performing legal research" were recoverable). Thus, to the extent the billed records below involve legal research, such time is compensable.

| DATE | BILLER | TASK | TIME |
|------|--------|------|------|
| 6/28/18 | KG | Review FRCP 4 re service of the Summons and Complaint; the rule states that we can follow state rules regarding service. Print Docket No. 1-4 and give all to SJ in addition to Jayco's registered agent information for certified mailing to D today | 0.6 |
| 9/27/18 | LT | Review local rule re motion deadlines and saved to Merus. Calendared motion and deadlines. Uploaded and saved motion docs to file. Print hard copy for RD, and noted d/l to file oppo on docs. Also printed rules for him, and summary of calendar of events with upcoming deadlines, etc. Put on his chair for review. | 0.7 |
| 4/1/21 | LT | Review TB's email regarding dates for matter. Check file, and saw trial date and pre-trial needed to be calendared, with related deadlines. Email response to TB and updated him dates needed to be added. Review file for docs, and emails from the court, to figure out dates to be calendared, and for related deadlines to be saved…. | 1.5 |

| | | | Review order #45. Review local rules. Updated notes, calendar and d/l sheet, and saved notes to file. | |
|---|---|---|---|---|
| 6/4/21 | LT | | Review local forms for appearance/withdrawal for eastern, and there weren't any. Found Central, but that won't work. Kept trying to find forms. Found general for appearance and drafted for CD review. Went ahead and revised a withdrawal on pleading, that way if CD wants to mess with language, he can. Uploaded/saved docs to file, and updated chat. | 0.6 |
| 6/21/21 | LT | | Link court email and saved Doc#61 to file. Review order signed by court. Review local rule re settlement conference. Review doc #45. Review dept. rules. Updated notes, calendar, and d/l sheet. | 0.6 |

Where, as here, the billing records present time in blocks, the Court may "simply reduce[] the fee to a reasonable amount." *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1121 (9th Cir. 2000); *see also Welch*, 480 F.3d at 948 ("We do not quarrel with the district court's authority to reduce hours that are billed in block format"). Because the firm billed in a minimum of 0.2 hour increments—as discussed further below—the Court will deduct 0.2 hour from each of the above entries to reflect the inclusion of clerical tasks, such as printing, uploading. and saving documents; file reviews and updates; calendaring deadlines; and internal communications about clerical matters. This results in a reduction of the lodestar by 0.2 hour for Ms. Goettman and 0.8 hour for Ms. Tyler.

### 4. Vague entries and overbilling

Jayco asserts that it "identified a number of entries in … counsel's records that are vague and lack sufficient specificity about what was done to justify the time and fees billed." (Doc. 72 at 11.) As discussed above, counsel has a burden to document the hours expended, and do so in "in a manner that will enable a reviewing court to identify distinct claims." *Hensley*, 461 U.S. at 437. The Court may reduce hours to offset the "poorly documented" billing. *Fischer v. SJN-P.D. Inc.*, 214 F.3d 1115, 1121 (9th Cir. 2000); *see also Mendez v. County of San Bernardino*, 540 F.3d 1109 (9th Cir. 2008) (finding district courts have broad discretion to reduce the number of hours included in the fee award where the billing records are vague, insufficiently descriptive, or inflated).

This Court and others in the Ninth Circuit have reduced fee awards where the billing entries were too vague to conduct "a meaningful review" or determine whether the time expended was reasonable. *See, e.g., McCarthy v. R.J. Reynolds Tobacco Co.,* 2011 WL 4928623, at *4 (E.D. Cal. Oct. 17, 2011) (reducing time for a fee award where "most of the entries refer only generally to 'legal

research' and 'conversations with [co-counsel]' without identifying the subject of the research or conversations"); *Nolan v. City of Los Angeles,* 2014 WL 12564127, at *7 (C.D. Cal. Feb. 10, 2014) (criticizing "entries that merely indicate that an email was sent or that a phone call was made without describing in any way the reason for or topic of the particular correspondence" and reducing the lodestar); *Davis v. Prison Health Serv.*, 2012 WL 4462520, at *11 (N.D. Cal. Sept. 25, 2012) (concluding billing entries were "too vague to enable the Court to assess the reasonableness of the time claimed" when there were "scores of time entries such as 'review e-mail from opposing counsel,' 'review e-mail chain,' and 'draft e-mail' without any further detail provided").

Jayco contends the billing records the billing records of Plaintiffs' counsel also are vague, warranting a reduction in fees.  (Doc. 72 at 10-12.)  Specifically, Jayco asserts:

> Plaintiff counsel's billing contains numerous entries that say "E-mail client", "E-mail opc", or "E-mail exchange with...", without providing any details as to the substance of the communication. There are also entries that are devoid of any information as to what tasks were specifically performed such as a description on 8/21/19 that is simply "Scott v. Jayco" for .5 hours. The vagueness of these and other similarly deficient billing entries makes it impossible for the Court to assess whether the time claimed by Plaintiffs' counsel was reasonably expended.

(*Id.* at 12.)  Jayco compiled 99 billing entries it asserts should be stricken as vague in "Exhibit 12," totaling 27.9 hours.  (*See id.*; *see also* Doc. 169-71.)  In addition, Jayco contends "there are numerous examples of billing entries that typical would be billed at .1 even though 6 minutes is more than what it would take to complete a task," such as calling Plaintiffs and leaving voice messages and calendaring deadlines.  (*Id.* at 12.)  Thus, Jayco "requests a 75% reduction due to the considerable vague nature of the excessive billing entries in Exhibit 12 where the lack of specificity severely interferes."  (*Id.*)

In response, Plaintiffs argue that "many of the entries are sufficiently specific" in Exhibit 12. (Doc. 73 at 6.)  For example, Plaintiffs observe: "Billing entries such as "Email D" or "Email OPC" are well known to mean email Defendant and email Opposing Counsel."  (*Id.*)  Plaintiffs contend: "All correspondence with opposing counsel is recoverable billing. Further specificity of the entries is not necessary when Defense counsel has records of the emails received that correspond to the billing entries."  (*Id.*)  Plaintiffs also assert "any further specificity on the billing entries more than 'email opc' or 'spoke with client' would lead to issues concerning attorney-client privilege and the attorney

work product doctrine." (*Id.*)  Finally, Plaintiffs observe that "defense counsel makes no arguments that any of the alleged vague billing entries did not in fact occur as they also have records of the communications that were billed for." (*Id.*)  Therefore, Plaintiffs "request[] that no billing entries be disallowed due to being vague." (*Id.*)

Significantly, Jayco's presentation of the challenged billing entries in Exhibit 12—pulling the entries out of the chronological order from the original billing records and reorganizing them into alphabetical order of the identified tasks—gives the appearance that the billing records are more vague than, in fact, they are.  Review of the challenged entries in the context of the original billing records provides clarity as to many of the topics of communications with Plaintiffs and opposing counsel.  For example, Jayco challenges three entries that state "Email D" on September 13, 2018 as vague.  (Doc. 72-3 at 169.)  However, the billing records clearly indicate Plaintiffs' counsel and Defendant's counsel were engaged in ongoing communications that day related to preparation of and revisions to the Joint Scheduling Report (*See* Doc. 70-5 at 39-40.)  Similarly, Jayco challenges 12 entries related to communications between July 13 and July 15, 2021, including calls, voice messages, and emails to Plaintiffs and opposing counsel. (Doc. 72-3 at 169-71.)  Other entries with these in the billing records show the challenged entries were a portion of ongoing communications regarding settlement, prior to the parties notifying the Court that the action settled on July 15, 2021.  (*See* Doc. 70-5 at 9-10; *see also* Doc. 64 [indicating the parties informed the Court on July 15 that a settlement was reached, and vacating the settlement conference for July 16].)  A simple review of the original billing records also easily reveals the topics of ongoing communications challenged in Exhibit 12 including, but not limited to: emails with opposing counsel regarding the motion to transfer venue, discussion regarding the parties' stipulation to transfer the action back to the Eastern District, preparation prior to a settlement conference, and email exchanges with Plaintiffs concerning availability.  (*E.g., compare* Doc. 72-3 at 169-171 *with* Doc. 70-4 at 7, Doc. 70-5 at 9, 13-14, 19-20.)  Consequently, the Court declines to find the billing records are poorly documented or too vague to evaluate.

On the other hand, the Court notes that counsel and the professional staff billed a minimum of 0.2 hour for each task. This is comparable to the quarter-hour billing repeatedly criticized by the courts, because it inflates the time billed on the matter. *See e.g., Welch v. Metro Life Ins. Co.,* 480 F.3d

942, 949 (9th Cir. 2007) (affirming a reduction after finding the billing practice inflated the time recorded); *Robinson v. Plourde,* 717 F. Supp. 2d 1092, 1100-01 (D. Haw. 2010) (applying a 20% reduction for billing with a minimum of 0.25 hour); *Prudential Ins. Co. v. Am. v. Remington,* 2014 WL 294989 at *4 (E.D. Cal. Jan. 24, 2014) (also applying a 20% reduction where counsel billed a minimum of 15 minutes and in 15-minute increments).

In *Welch,* the district court "imposed a 20 percent across-the-board reduction on [the] requested hours" because the law firm "billed in quarter-hour increments." *Welch*, 480 F.3d at 948. The court concluded the "practice of billing by the quarter-hour resulted in a request for excessive hours . . . because counsel billed a minimum of 15 minutes for numerous phone calls and e-mails that likely took a fraction of the time." *Id.* The Ninth Circuit also reviewed the time sheets and noted: "Our own review of the time sheet confirms that it is replete with quarter-hour or half-hour charges for the drafting of letters, telephone calls and intraoffice conferences." *Id.* Therefore, the Court affirmed the reduction for quarter-hour billing. *Id.*

The thorough review of counsel's billing records strongly suggests the 0.2 hour minimum resulted in overbilling. Counsel and professional staff billed 12 minutes on numerous occasions for voices messages, reviewing minute orders, more than 50 emails[6]. (*See e.g.,* Doc. 70-5 at 6; Doc. 70-5 at 8-9, 13-15, 20, 22.) Notably, Plaintiffs do not disavow a practice of billing a 0.2 hour minimum or otherwise address Jayco's arguments concerning how the practice results in overbilling in the reply. In *Remington*, this Court observe that "15-minute billing for reading the three-sentence Minute Order, which should have been read in 30 seconds or less time, obviously inflated the time spent performing that task, and causes concern that other unverifiable tasks likely took a fraction of the time billed to complete." *Remington*, 2014 WL 294989 at *4. Similarly, billing 12 minutes for noting a minute order to the file (*see, e.g.* Doc. 70-5 at 36) suggests the reported time was inflated significantly by the 0.2 hour billing minimum on other tasks such as reviewing emails, leaving a telephone message, and telephone conferences with Plaintiffs and co-counsel. *See id; Welch*, 480 F.3d at 948-49. Therefore, the remaining time reported by counsel is reduced by 15% for purposes of the lodestar calculation.

---

[6] This excludes intraoffice emails addressed above.

### 5.    Unsupported and "anticipated" time

Plaintiffs contend, "It is well established that Plaintiffs are entitled to fees for bringing in this motion to enforce their right to attorney fees." (Doc. 71 at 14, citing *Serrano v. Unruh*, 32 Cal.3d 621, 637-639 (1982); *State v. Mayer*, 174 Cal.App.3d 1061, 1075 (1986).)  Therefore, Plaintiffs seek "an additional $7,500 for bringing [the] Motion, reviewing Jayco's Opposition to Plaintiffs' Motion, drafting Plaintiffs' Reply, preparing and attending any related hearing, preparing any needed filings to satisfy the order, for time to wrap up the settlement and ultimately collect any amount awarded by this Court." (*Id.* at 6.)

Importantly, Plaintiffs failed to provide any evidence with the Reply related to the time actually spent preparing the motion, reviewing the opposition, and drafting the brief.  In addition, the motion was taken under submission without oral arguments.  (Doc. 74.)  The Court declines to speculate as to the actual time spent by counsel in preparation of the instant motion and the reply, as it is the fee applicant's burden to present evidence to support the fee request.  *See Hensley*, 461 U.S. at 424; *Welch*, 480 F.3d at 945-46.  Accordingly, the Court declines to bolster the lodestar with the monetary amount requested.

### B.    Hourly rates

The Supreme Court determined attorney fees are to be calculated with "the prevailing market rates in the relevant community."  *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984); *see also PLCM Group, Inc. v. Drexler*, 22 Cal.4th 1084, 1096 (2000) ("[t]he reasonable hourly rate is that prevailing in the community for similar work").  The fee applicant has the burden to establish the rates are reasonable within the community, and meets this burden by "produc[ing] satisfactory evidence—in addition to counsel's own declarations—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 896 n.11.  For example, the Court may refer to "[a]ffidavits of the plaintiffs' attorney and other attorneys regarding fees in the community" and rates paid in other cases. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990).

In general, the "relevant community" for purposes of determining the prevailing market rate is the "forum in which the district court sits."  *Camacho v. Bridgeport Fin., Inc.,* 523 F.3d 973, 979 (9th

1    Cir. 2008).  Thus, when a case is filed in this Court, the Eastern District of California "is the

2    appropriate forum to establish the lodestar hourly rate."  *See Jadwin v. County of Kern*, 767 F.Supp.2d

3    1069, 1129 (E.D. Cal. 2011); *see also Gordillo v. Ford Motor Co.*, 2014 WL 2801243 (E.D. Cal. June

4    19, 2014).  The court may apply "rates from outside the forum… 'if local counsel was unavailable,

5    either because they are unwilling or unable to perform because they lack the degree of experience,

6    expertise, or specialization required to handle properly the case.'"  *Barjon v. Dalton*, 132 F.3d 496 (9th

7    Cir. 1997) (quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992)).

8                    1.    Rates for counsel

9            Although the Law Offices of Jon Jacobs is currently located in Temecula, California—which is

10    within the Central District of California—the law office was headquartered near Sacramento when the

11    complaint was filed.  (*See* Doc. 1 at 1; Doc. 73 at 4.)  Thus, the Court finds, for purposes of this motion,

12    that counsel were "local" to the Eastern District, such that the Court need not determine whether rates

13    outside the form are applicable.  Rather, the Court must evaluate whether the hourly rates requested are

14    reasonable for the Eastern District of California.[7]

15            The attorneys on this action seek hourly rates ranging from $350 to $650.  (Doc. 71 at 7-8.)

16    Specifically, Mr. Jacobs seeks the hourly rate of $495 for the 2.2 hours of work he completed in 2018

17    and the rate of $550 for his 0.6 hour of work in 2021.  (*See* Doc. 71 at 8; Doc. 70-4 at 7, 9, 43.)  Mr.

18    Baker reports his "hourly rate started at $525, and increased to $650 per hour…[i]n March of 2020."

19    (Doc. 70-4 at 3, Baker Decl. ¶ 12.)  In addition, Plaintiffs seek $495 per hour for work completed by

20    Rene Dupart, who was admitted to the California State Bar in 2013, and Elana Midda, who was

21    admitted to the bar in December 2004.[8]  (Doc. 70-5 at 4, Jacobs Decl. ¶ 19.)  In addition, they seek

22    $175 per hour for work completed by Chad David while he was a law clerk, and $350 per hour for

23    work completed after his admission to the Bar in November 2019.  (Doc. 70-3 at 2, David Decl. ¶¶ 7-

24

25    _____

26    [7] With the Eastern District, the Sacramento Division and Fresno Division award comparable rates. *See Fitzgerald v. Law Office of Curtis O. Barnes*, 2013 WL 1627740, n.5 (E.D. Cal. Apr. 15, 2013) (observing that "[c]ases from this Court's Sacramento Division largely mirror the rate determinations from the Fresno Division").

27    [8] Plaintiff did not provide any information regarding when Elana Midda began practicing law. However, the Court "may take judicial notice of the State Bar of California's website regarding attorneys' dates of admission to the Bar." *Davis*

28    *v. Hollins Law*, 25 F.Supp.3d 1292, 1298 n. 5 (2014). Thus, the Court takes judicial notice of the admission date of Elana Midda as December 2004, as represented on the website of the State Bar of California. *See id.*; Fed. R. Evid. 201(b).

8; Doc. 71 at 7-8.)

Jayco objects to the hourly rates sought by Plaintiffs' counsel "are unreasonable compared to what small litigation firms bill and should be adjusted accordingly." (Doc. 72 at 4.) According to Jayco, "there is no indication in any of the moving papers that the rates being sought here by Plaintiffs' counsel are their usual and customary rates and that their clients routinely pay these rates or that any court has awarded them these rates." (*Id.*, emphasis omitted.) Jayco observes: "Mr. Jacob's Declaration and Mr. Baker's Declaration both lack any sort of information to identify which cases, if any, they have been awarded the requested hourly rates or the outcome of court rulings on prior fee motions." (*Id.* at 5.) Further, Jayco notes that in *Flores v. FCA US LLC*, "this Court granted in part an attorneys' fees motion and reduced a fee request," finding reasonable hourly rates for "in the Eastern District of California's Fresno Division … generally rang[e] from $250 to $400 for attorneys." (*Id.* at 5-6, citing *Flores*, 2019 U.S. Dist. LEXIS 203497 (E.D. Cal. Nov. 19, 2019).)

In reply, Plaintiffs' contend "the *Flores* case is readily distinguishable to the case at hand both factually and in regards to the basis of the attorney fees sought." (Doc. 73 at 4.) Plaintiffs observe: "Flores involved a Dodge RAM passenger vehicle that was purchased in California and contained a known defect," and "[f]rom all records available, it appears *Flores* was a 'simple' lemon law case." (*Id.*, citing *Flores*, 2019 U.S. Dist. LEXIS 203597, at *4.) In addition, Plaintiffs contend, "[i]n August of 2020, the Eastern District of California found that Mr. Jacobs' and Mr. Baker's hourly rate for lodestar purposes to be $505 per hour." (*Id.* at 3, citing *Seebach v. BMW of N. Am., LLC*, 2020 U.S. Dist. LEXIS 152330 at *9, 2020 WL 4923664 at *3 (E.D. Cal. Aug. 21, 2020).) Plaintiffs assert, "In *Seebach*, the Court also confirmed the rates of attorney Ryan Gomez of $300 and $350 per hour who has the same level of experience as attorney Chad David at the time." (*Id.* at 3-4.)

Previously, the Court observed: "A recent comprehensive analysis of attorney's fees in this district found the following hourly rates to be reasonable: $450 for partners with at least 20 years of experience; $400 for partners with between 10 and 20 years of experience; and $250 for associates with between four and 10 years of experience." *Price Simms Holdings v. Candle3*, 2021 WL 1884995, at *2 (E.D. Cal. May 11, 2021), citing *Firstsource Sols. USA, LLC v. Tulare Reg'l Med. Ctr.*, 2019 WL 2725336, at *8 (E.D. Cal. June 28, 2019); *but see Acosta v. Perez*, 2021 WL 3910543, at *12 (E.D. Cal.

31

Sept. 1, 2021) ("District Judge Anthony W. Ishii … surveyed prevailing rates in this district and found that reasonable hourly rates … are between $175 and $380, depending on the attorney's experience and expertise, with $300 being the upper range for attorneys with 10 years or less experience"). However, as Plaintiffs assert, this Court recently awarded higher hourly rates to counsel in *Seebach*.

In *Seebach*, the plaintiffs were also represented by Jon Jacobs and Terry Baker in a lemon law action filed originally in December 2017. *See id.*, 2020 WL 4923664 at *2-3. The parties reached a settlement, but "could not agree on a reasonable attorneys' fee amount" and filed a motion for fees. *Id.* at *1. Counsel requested hourly "rates ranging from $350 to $650 per hour for work performed on the case," including $650 per hour for Mr. Baker and $550 per hour for Mr. Jacobs, $400 for an attorney "with roughly one year of experience," and $300 to $350 per hour for an attorney "with roughly 4 years of experience." *Id.* at *3. The Court noted opined the "requested rates [were] not reasonable for lodestar purposes." *Id.* Given the experience of Mr. Jacobs and Mr. Baker—which each had "roughly 20 years of experience"—the Court reduced their hourly rate to $505, noting it was taking into account state court judgments cited by Mr. Baker in which he was awarded $475 to $505 per hour in similar actions. *Id.* In addition, the Court reduced the hourly rate of Mr. Walker to $200 to reflect that he had "one year and two months of experience litigating." *Id.*

Based upon the Court's prior surveys of hourly rates awarded in this district, Plaintiffs fail to demonstrate the reasonableness of the rates requested by counsel, and the hourly rates must be adjusted to rates that are reasonable in this forum to calculate the lodestar. *See Seebach,* 2020 WL 4923664, at *3. John Jacobs seeks the rate of $495 per hour for his work completed in 2018, and $550 for his work completed in 2021. (*See* Doc. 71 at 8.) As previously noted, Mr. Jacobs has practiced law for more than 20 years. This Court found the reasonable rate for attorneys in the Eastern Division was "$450 for partners with at least 20 years of experience." *See Price Simms Holdings*, 2021 WL 1884995 at *2, citing *Firstsource Sols. USA, LLC*, 2019 WL 2725336 at *8 (E.D. Cal. June 28, 2019); *see also Eagle Sys. & Servs. v. Int'l Assoc. of Machinists,* 2017 WL 1213373 at *3 (E.D. Cal. Mar. 31, 2017) (finding the rate of $450 was acceptable in this district "for partners with 20 to 35 years of experience"). Therefore, the hourly rate for work completed by Mr. Jacobs in 2018 will be reduced to the rate of $450. In addition, his hourly rate for work completed in 2021 will be reduced to $505, to

align with the hourly rate previously approved as reasonable for Mr. Jacobs by this Court. *See Seebach*, 2020 WL 4923664, at *3. Likewise, the hourly rates requested by Mr. Baker will be reduced to $505 to mirror the fees awarded in *Seebach* and the state court judgments previously reviewed by the Court. *See id.*

The requested hourly rate of $495 for Elana Midda and Rene Dupart must also be reduced to be reasonable for this forum. The rate for Ms. Midda, who was admitted to practice in 2004 and had approximately 14 years of experience when she worked on the action, will be reduced to $350 per hour. *See In re Taco Bell Wage & Hour Actions,* 222 F. Supp. 3d 813, 839 (E.D. Cal. 2016) (noting courts in the Eastern District have awarded attorneys "with less than fifteen years of experience … $250.00 to $350.00 per hour"); *see also Estrada v. iYogi, Inc.,* 2016 WL 310279, at *6 (E.D. Cal. Jan. 26, 2016) (approving $400 requested rate for attorneys with as much as 19 years of experience). Similarly, the hourly rate will be reduced to $250 for Mr. Dupart, who had been admitted to the bar for approximately five years when he worked on the action in 2018. *See Perkins v. City of Modesto*, 2020 WL 4547325, at *2 (E.D. Cal. Aug. 5, 2020) (finding "$250 per hour to be a reasonable rate" for an attorney who "had been licensed for fewer than seven years" when the fees were incurred); *Lowery v. Account Outsourcing Group, LLC*, 2018 WL 3769430 at *2 (E.D. Cal. Aug. 9, 2018) (finding the requested rate of $250 was appropriate for a lawyer who had been "a consumer protection attorney" for three years); *Mike Murphy's Enters., v. Fineline Indus,* 2018 WL 1871412, at *3 (E.D. Cal. Apr. 19, 2018) (case awarding the hourly rate of $250 for an attorney who had been practicing for seven years); *see also Seebach*, 2020 WL 4923664, at *3 (noting that for an attorney with 4 years of experience, $300 was "within the reasonable range for the Sacramento market," though it is unclear what year(s) these fees were incurred).

Finally, the hourly rates for Chad David, who was admitted to the bar in November 2019 exceed those awarded in this forum. When Mr. David began working on the action, he was a law clerk with the firm. Although the Court approved the requested rate of $175 in *Seebach*, the Court noted this rate was "for a *certified* law clerk." *Seebach*, 2020 WL 4923664 at *3 (emphasis added). Here, there is no evidence that Mr. David completed the process to become a certified law clerk with the California bar. Thus, the Court finds the hourly rate should be reduced to $125 for his work prior to admission to the

bar.  *Compare Lowery v. Account Outsourcing Group, LLC*, 2018 WL 3769430 at *2 (E.D. Cal. Aug. 9, 2018) (awarding the hourly rate of $125 to a law clerk) *with Seebach*, 2020 WL 4923664 at *3 (awarding the rate of $175 for a certified law clerk).  Further, as of the filing of the reply to this motion, Mr. David had been practicing law for only two years.  The requested hourly rate for Mr. David once he was admitted to the bar is reduced to $200, to be within the reasonable range for the Eastern District.  *See Seebach*, 2020  WL 4923664, at *3 (reducing the requested hourly rate of $400 to $200 for an attorney who had less than two years of practicing law).

### 2.    Paralegals

Plaintiffs seek an hourly rate of $150 for each of the paralegals on the action.  (Doc. 71 at 7-8.)  Mr. Baker reports that he has "charged $150 per hour for paralegal time for at least seven years" and "received that amount in nearly every settlement with every major vehicle, motor home, RV, and boat manufacturer."  (Doc. 70-5 at 3, Jacobs Decl. ¶ 12.)  In addition, Mr. Baker stated he "obtained that rate in a fee motion in Sacramento County."  (*Id.*, citing *Brown v. FCA US LLC*, Case No. 34-2016-00202429.)  Jayco objects to the rate and requests it be reduced to $115.  (Doc. 72 at 6.)

Notably, Plaintiffs' counsel report—without identifying any supporting evidence or documentation—"the contingency fee agreement signed by the Plaintiffs specifically provides for the billing of paralegal time at $150.00 an hour."  (Doc. 71 at 13.)  However, Mr. Scott reports that the "Letter of Engagement" he signed with the Law Offices of Jon Jacobs made it "clear" that Plaintiff "would not pay a penny out of [his] pocket for their legal services or costs."  (Doc. 71-1 at 1-2, ¶ 5.)  Thus, it is not clear whether Plaintiffs agreed they would pay $150 per hour for paralegals' work on the action, or if they simply acknowledged this was the hourly rate typically billed by the firm.  Regardless, any agreement between Plaintiffs and counsel is not dispositive of the issue of whether fees requested are reasonable.  Instead, the Court has an obligation to determine whether a proposed hourly rate is reasonable for the forum. *See Gates*, 987 F.2d 1390; *Moreno v*, 534 F.3d at 1111.

Paralegal rates within the Eastern District range between $75 to approximately $150.00, depending on experience.  *Schmidt v. City of Modesto,* 2018 WL 6593362, at *6 (E.D. Cal. Dec. 14, 2018) ("the reasonable rate of compensation for a paralegal would be between $75.00 to $150.00 per hour depending on experience"); *see also Phillips 66 Co. v. Cal. Pride*, 2017 WL 2875736, at *15

(E.D. Cal. July 6, 2017) (identifying the same range of hourly rates); *Trujillo v. Singh*, 2017 WL 1831941 at \*3 (E.D. Cal. May 8, 2017) (finding requested hourly rates of $95-115 were reasonable within the Eastern District). Although the requested rate is within the range approved by this district, Plaintiffs' counsel fails to provide any information regarding the levels of education or experience for the paralegals. The Court is unable to assume, as counsel would have it, that the hourly rate awarded in prior actions was to the same paralegals, or to individuals with the same level of experience. Without such information, Plaintiffs fail to show an hourly rate at the highest end of the spectrum is appropriate. *See, e.g,, Freshko Produce Servs. v. ILA Prods*, 2021 WL 4033176, at \*4 (E.D. Cal. Sept. 2, 2021) (approving $150 per hour as reasonable "for a paralegal with more than 30 years of experience" for purposes of calculating the lodestar).

When counsel has failed to provide information related to the experience of paralegals, the Court has reduced the requested fee award to the lower end of the hourly rate range. *See, e.g., Englert v. City of Merced*, 2020 WL 2215749, at \*13 (E.D. Cal. May 7, 2020) (rejecting the requested rate of $125 to $150 per hour for the paralegals and reducing them to $75 when the plaintiffs "provided no information on the experience of the paralegals"); *Freshko Produce Servs. v. Write on Mktg.*, 2019 WL 3798491 at \*3 (E.D. Cal. Aug. 13, 2019) (finding the proposed hourly rate of $150 was not reasonable because counsel "fail[ed] to identify the education and experience of [the] paralegal to justify the upper rate of $150," and adjusting the hourly rate to $100); *Mora v. Cal W. Ag Servs., Inc.*, 2019 WL 2084725, at \*9 (E.D. Cal. May 13, 2019) (applying adjusted rate for paralegals of $100 per hour where counsel failed to identify the experience of the paralegals). Because counsel has not provided any information regarding the education and experience of *any* of the paralegals who worked on this action, the hourly rate for each paralegal will be reduced to $100. *See Freshko Produce*, 2019 WL 3798491 at \*3; *Mora,* 2019 WL 2084725, at \*9.

Based upon the Court's prior surveys of the attorney fees awarded in the Eastern District and the Court's own knowledge, these hourly rates are reasonable for the tasks completed by counsel and the professional staff in this action. *See Roach,* 2017 WL 5070264 at \*9; *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011) (concluding "the district court did not abuse its discretion either by relying, in part, on its own knowledge and experience" to determine reasonable hourly rates).

## C.    Lodestar Calculation

The lodestar method calculates attorney fees by "by multiplying the number of hours reasonably expended by counsel on the particular matter times a reasonable hourly rate." *Florida* , 915 F.2d at 545 n. 3 (citing *Hensley*, 461 U.S. at 433); *see also Laffitte v. Robert Half Int'l*, 1 Cal. 5th 480, 489 (2016). With the time and rate adjustments set forth above, the lodestar in this action is **$67,634.35**:

| LEGAL PROFESSSIONAL | HOURS | RATE | LODESTAR |
|---|---|---|---|
| Jon Jacobs (2018) | 1.87 | $450 | $841.50 |
| Jon Jacobs (2021) | 0.17 | $505 | $85.85 |
| Terry Baker | 109.10 | $505 | $55,095.50 |
| Chad David (as a law clerk) | 0.34 | $125 | $42.50 |
| Chad David (after admission) | 21.34 | $200 | $4,268.00 |
| Rene Dupart | 16.75 | $250 | $4,187.50 |
| Jon Feely | 0 | N/A | N/A |
| Elana Midda | 1.87 | $350 | $654.50 |
| Nicolas Dillavou | 0 | N/A | N/A |
| Lisa Tyler | 7.65 | $100 | $765.00 |
| Gabriela Torres | 9.18 | $100 | $918.00 |
| Kimberly Riley | 1.81 | $100 | $181.00 |
| Kayla Goettman | 3.91 | $100 | $391.00 |
| Cindy Lewandowski | 0 | N/A | N/A |
| Shaina Cateldge | 2.04 | $100 | $204.00 |
| | | | |
| **TOTAL** | | | **$67,634.35** |

## D.    Application of a multiplier

Plaintiffs request that the lodestar figure be enhanced by a multiplier of 1.5.  (Doc. 71 at 9.) Once a court has calculated the lodestar, "it may increase or decrease that amount by applying a positive or negative 'multiplier' to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented." *Laffitte,* 1 Cal.5th at 504 (citation omitted); *see also Ketchum v. Moses*, 24 Cal.4th 1122, 1132 (2001) (indicating the court may adjust the fee award considering "the following factors: (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award").  The party seeking a lodestar enhancement bears a "heavy" burden to overcome the "strong presumption" that the lodestar is reasonable. *Stewart v. Gates*, 987 F.2d 1450, 1453 (9th Cir. 1993).

1    Plaintiffs contend, "This case calls for a multiplier to enhance the lodestar fee amount." (Doc.

2    71 at 9.) According to Plaintiffs, "Lemon Law litigation is a specialized field that involves complex

3    interplay between state and federal consumer statutes and the Uniform Commercial Code as interpreted

4    by state and federal courts." (*Id.*) In addition, Plaintiffs assert this case was "especially complex" with

5    novel issues raised "at multiple times during the lawsuit." (*Id.* at 10.) Plaintiffs observe:

6        [T]he facts of this case involve a motor home purchased in Iowa by residents of
         California with a warranty provision that litigation be prosecuted in Indiana. As
7        evidenced by this Court's ruling on Plaintiff's Motion for Order Establishing the
         Controlling Law, complex issues of law arose with little case precedent to guide
8        Plaintiffs' claims. Specifically, here, this case was transferred to the Northern
         District of Indiana and subsequently transferred back to this venue upon discovery
9        of Defendants utilizing improper evidence to support their transfer of venue.
         Attorney Terry Baker was required to be admitted *pro hac vice* to prosecute this
10       case in Indiana.

11   (*Id.*) As a result, Plaintiffs contend they "had to overcome procedural hurdles prior to litigating this

12   case on the merits." (*Id.*)

13       Further, Plaintiffs argue the skill counsel displayed also supports application of a multiplier.

14   (Doc. 71 at 10.) They contend counsel's "overall skill … is evidenced by the claim's survival through

15   litigation and the outcome achieved in Plaintiffs." (*Id.*) Plaintiffs report:

16           In over 20 years of practicing exclusively in the field of Lemon Law, Jon
         Jacobs has handled approximately 2,000 Lemon Law cases. Last year alone, the Law
17       Offices of Jon Jacobs handled over 300 Lemon Law cases. Jacobs Decl. ¶ 4.
             Similarly, Terry Baker has over 20 years of litigation and trial experience
18       working for multiple law firms specializing in consumer warranty protection. He
         alone has successfully taken over 25 cases to trial and has handled over 100 Lemon
19       Law cases during the pendency of this current action. Baker Decl.

20   (*Id.*) Plaintiffs assert "they spent more than 200 hours on this matter, with an additional 25 hours

21   anticipated to close out this case," and that "[u]ntil this case is fully resolved, Plaintiffs' counsel is

22   unable to allow another case to take its' (sic) place." (*Id.* at 11.)

23       Finally, Plaintiffs argue the contingency fee contract between Plaintiffs and counsel supports

24   the application of a fee multiplier. (Doc. 71 at 11-12.) Plaintiffs assert, "counsel prosecuted this case on a

25   contingency fee basis and advanced *all* of the costs of litigation." (*Id.* at 11, emphasis in original.)

26   According to Plaintiffs, the application of a fee multiplier also "encourage[s] competent counsel to

27   protect consumers on a contingency fee basis." (*Id.* at 12, emphasis omitted.) Plaintiffs assert,

28   "[w]ithout full compensation for successful cases, experienced and competent counsel will be deterred

1   from accepting consumer cases." (*Id.*)

2          Jayco opposes the request for a multiplier, asserting that "Plaintiff's counsel lists the factors that

3   support such a determination, but fails to demonstrate why such an entitlement is justified on the instant

4   facts." (Doc. 72 at 13.)  Jayco contends that while "Plaintiffs' counsel repeatedly refers to the excellent

5   result achieved …, Plaintiffs settled their claims for a diminished value payment of $42,500.00 – not a

6   repurchase or replacement of their motor home." (*Id.*)  According to Jayco, it "always argued that

7   Plaintiffs' damages must only be calculated as a 'diminished value' recovery," while Plaintiffs "refused

8   to acknowledge that Song-Beverly repurchase remedies were unavailable until the eve of trial." (*Id.*) In

9   addition, Jayco contends "Plaintiffs' Counsel were clearly not precluded from taking on any work as a

10  consequence of their work in this case," as a review of the hours billed reveals that "Counsel billed less

11  than 10 hours per month in this matter for 27 of the 40 months of the litigation between February 2018

12  and August 2021." (*Id.* at 14.)  Jayco observes that "[t]he most hours billed for any month was 21

13  hours in February 2020." (*Id.*)  Thus, Jayco contends "Counsel could have accepted other cases,

14  assuming such cases were available." (*Id.*)

15         Significantly, it does not appear counsel faced truly novel and complex issues of law in this

16  action, contrary to their assertions.  Indeed, the only substantive motions filed with the Court related to

17  a motion to change venue and motion to resolve the parties' dispute related to the controlling law. (*See*

18  Docs. 11, 49.)  Despite the representations of counsel, the level of skill and experience of Mr. Jacobs

19  and Mr. Baker were not particularly reflected in the prosecution of this action.  Counsel was not

20  required to face significant factual disputes or dispositive motions in this action, such as a motion to

21  dismiss, motion to strike, or motion for summary judgment.  Indeed, of the 230.7 hours originally billed

22  by the Law Offices of Jon Jacobs, approximately 40% of the hours were billed by paralegals and 10%

23  by an attorney who was licensed to practice during the pendency of this action.  (*See* Doc. 71 at 7-8.)

24  Thus, the Court finds the issues presented and skill required do not support the application of a

25  multiplier.  *See, e.g., Steel v. GMC*, 912 F. Supp. 724, 746 (N.J. Dist. 1995) ("the issues in lemon law

26  litigation are not complex and do not require a significant amount of legal analysis or novel pleading");

27  *Ketchum*, 24 Cal. 4th at 1138 (explaining that "[a] more difficult legal question typically requires more

28  attorney hours").

Furthermore, there is no evidence that the nature of the litigation precluded other employment by counsel.  To the contrary, Plaintiffs' counsel expended a total of fewer than 275 hours of work on this action over the course of three years.  Indeed, Plaintiffs' counsel admits that "[l]ast year alone, the Law Offices of Jon Jacobs handled over 300 Lemon Law cases" and Mr. Baker "handled over 100 [other] Lemon Law cases during the pendency of this current action."  (Doc. 71 at 10.)  Finally, the Court finds the contingent nature of the fee award is outweighed by the other factors, particularly in this action where the disputed facts and issues were minimal.  *See Amaral v. Cintas Corp. No. 2*, 163 Cal.App.4th 1157, 1217 (2008) (enhancement for contingent risk is appropriate where "[t]he claims and defenses . . . raised a significant number of complex legal issues of first impression, and class counsel took a substantial risk that it would not prevail on these issues and thus would not recover a full fee").  Accordingly, the Court finds the lodestar amount of **$67,634.35** is reasonable for the work completed and results achieved, and declines to award a multiplier.

### E.    Costs to be Awarded

Plaintiff requests costs and expenses in the amount of $1,509.13, as reflected in their "Bill of Costs."  (Doc. 71 at 6; Doc. 70-5 at 106-08.)  In general, an award of costs in federal district court is governed by Federal Rule of Civil Procedure 54(d) and not applicable state law.  *See Champion Produce, Inc. v. Ruby Robinson Co., Inc.*, 342 F.3d 1016, 1022 (9th Cir. 2003) (citing *In re Merrill Lynch Relocation Mgmt., Inc.*, 812 F.2d 1116, 1120 n. 2 (9th Cir. 1987)).  This is because "federal courts sitting in diversity apply state substantive law and federal procedural law." *Feldman v. Allstate Ins. Co*., 322 F.3d 660, 666 (9th Cir. 2003) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)).  Thus, federal procedural law governs a request for an award of costs.

Rule 54 of the Federal Rules of Civil Procedure provides that costs "should be allowed to the prevailing party."  Fed. R. Civ. P. 54(d)(1).  This "creates a presumption in favor of awarding costs to the prevailing party, but the district court may refuse to award costs within its discretion." *Champion Produce*, 342 F.3d at 1022. "[A] district court need not give affirmative reasons for awarding costs; instead, it need only find that the reasons for denying costs are not sufficiently persuasive to overcome the presumption in favor of an award." *Save Our Valley v. Sound Transit*, 335 F.3d 932, 945 (9th Cir. 2003).  For example, costs may be declined in light of "a losing party's limited financial resources" or

where there has been "misconduct by the prevailing party." *Champion Produce*, 342 F.3d at 1022.

The Supreme Court explained that 28 U.S.C. § 1920 "defines the term 'costs' as used in Rule 54(d)." *Crawford Fitting Co. v. J.T. Gibbons, Inc*., 482 U.S. 437, 441 (1987). Costs that may be taxed under 28 U.S.C. § 1920 include:

(1) Fees of the clerk and marshal;
(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
(3) Fees and disbursements for printing and witnesses;
(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
(5) Docket fees under section 1923 of this title;
(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

Section 1920 imposes "rigid controls on cost-shifting in federal courts," and "federal courts are bound by the limitations set out in." *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 444-45 (1987). Generally, the court may not award costs under Rule 54(d) not authorized by statute or court rule. *Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 301 (2006). Thus, "costs almost always amount to less than the successful litigant's total expenses in connection with a lawsuit." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 573 (2012) (citation omitted).

### 1.    Filing fee

Section 1920 specifically provides that a prevailing party may recover costs for fees to the court clerk. 28 U.S.C. § 1920(1). *See also Carr v. Tadin, Inc.*, 51 F.Supp.3d 970, 985 (S.D. Cal. 2014) ("the filing fee is recoverable as a fee of the clerk"). Therefore, Plaintiffs are entitled to recover the $400 filing fee.

### 2.    Mediation fees

Plaintiffs seeks $987.50 for "[m]ediation fees paid to JAMS." (Doc. 70-5 at 108.) However, "nothing in 28 U.S.C. § 1920 provides for the costs of a mediator*." Sea Coast Foods, Inc. v. Lu-Mar Lobster & Shrimp, Inc.* 260 F.3d 1054, 1061 (9th Cir. 2001); *see also Cook Children's Med. Ctr. v. New England PPO Plan of Gen. Consol. Mgmt., Inc.,* 491 F.3d 266, 277 (5th Cir. 2007) (mediation fees are not taxable costs because Section 1920 does not expressly permit their recovery). Plaintiffs are therefore not entitled to recover mediation fees pursuant to Section 1920.

3.    Certificate of good standing

Finally, Plaintiffs seek $121.63 for obtaining a certificate of good standing from the State Bar of California.  (Doc. 70-5 at 108.)  However, courts have determined costs related to a *pro hac vice* application are not recoverable under Section 1920.  *See Kalitta Air L.L.C. v. Central Texas Airborne System, Inc.,* 741 F.3d 955 (9th Cir. 2013) (finding Section 1920 does not provide for recovery of costs expended on *pro hac vice* applications); *see also Eagle Ins. Co. v. Johnson*, 982 F. Supp. 1456, 1459 (M.D. Ala. 1997), *aff'd*, 162 F.3d 98 (11th Cir. 1998) (finding no statute authorizes compensation for certificate of good standing or *pro hac vice* filing fees).

## IV.    Conclusion and Order

Based upon the foregoing, the Court **ORDERS**:

1.    Plaintiff's motion for fees is **GRANTED** in the modified amount of $**67,634.35**; and

2.    Plaintiff's motion for costs is **GRANTED** in the amount of $**400.00**.

IT IS SO ORDERED.

Dated:    **December 18, 2021**            _____ **/s/ Jennifer L. Thurston**
                                    CHIEF UNITED STATES MAGISTRATE JUDGE

EXHIBIT 23

Lemmons v. Ace Hardware Corp., Case No. 12-cv-03936-JST (N.D. Cal. Feb. 1, 2015)

Case No. 12-cv-03936-JST

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

# Lemmons v. Ace Hardware Corp.

## Case No. 12-cv-03936-JST (N.D. Cal. Feb. 1, 2015)

Decided February 1st, 2015

JON S. TIGAR United States District Judge

## ORDER GRANTING IN PART MOTION FOR ATTORNEY FEES

Re: Dkt. No. 122

Before the Court is Plaintiff's motion for attorney fees, litigation expenses, and costs totaling $272,912 in this action for discrimination on the basis of disability relating to the Berkeley Ace Hardware store located in Berkeley, CA.

# I. BACKGROUND

## A. Factual Background

Plaintiff Portia Lemmons brought this action against Defendants Ace Hardware Corporation ("Ace"), Berkeley Hardware, Inc., and EQR-Acheson Commons Limited Partnership ("EQR") for claims arising out of Defendants' purported denial of access to disabled persons at the Berkeley Ace Hardware store in Berkeley, California ("the store"). Complaint, ECF No. 1. Lemmons has lived with cerebral palsy since birth and claimed that she had encountered numerous barriers that prevented her from fully accessing the store during the course of visits over the last several years. ECF No. 107 at 2-4.

Ace and Berkeley Hardware have a franchising agreement that permits Berkeley Hardware to operate the store while using the "Ace" name. Id. at 1. EQR owns the building in which the *2 store is located and leases it to Berkeley Hardware. Id. Defendants insist that EQR plans to tear down the building that houses the store in the near future and that the store plans to relocate to a new space. ECF No. 130 at 7. As of the date of this order, the store remains in operation in the EQR building. ECF No. 122 at 4.

### B. Procedural History

The Defendants entered into a court-enforceable settlement agreement with Lemmons. The parties did not reach any agreement as to damages or attorney's fees. Id.

The parties subsequently brought cross-motions for summary judgment. ECF No. 64, 80. The Court granted summary judgment in favor of Plaintiff that the Defendants Berkeley Hardware and EQR-Acheson Commons Limited Partnership ("EQR") were liable for $52,000 in damages under the Unruh Act for the "difficulties, discomfort, or embarrassment" she suffered during her visits to the store. ECF No. 107 at 21-22. Lemmons had agreed to limit her recovery to the statutory minimum of $4,000 per visit to the store. Id. at 22. The Court found Lemmons could not recover for her California Disabled Persons Act claim because she had already recovered under the Unruh Act and plaintiffs are not permitted to recover under both statutes. Id. at 25-26.

The Court granted summary judgment in favor of Defendant Ace Hardware, concluding that Ace could not be held liable as an "operator" under the ADA because



Lemmons v. Ace Hardware Corp., Case No. 12-cv-03936-JST (N.D. Cal. Feb. 1, 2015)

Ace, as a franchisor, lacked "specific control" over the store. Id. at 11-12.

**C. Jurisdiction**

The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367.

# II. LEGAL STANDARD

Recognizing the "need for private lawsuits to enforce disabled access," California disability laws and the Americans with Disabilities Act both provide for fee shifting to successful plaintiffs. Blackwell v. Foley, 724 F. Supp. 2d 1068 at 1075 (N.D. Cal 2010). "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any *3 action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." Cal. Civ. Proc. Code § 1021.5. California Civil Code § 55 also provides that the prevailing party in an action for injunctive relief under California's disability laws "shall be entitled to recover reasonable attorney's fees."

"California courts, like their federal counterparts, utilize the lodestar (or 'touchstone') approach to determine a proper fee award to a prevailing plaintiff in a civil rights law suit." Muniz v. United Parcel Serv., Inc., 738 F.3d 214, 222 (9th Cir. 2013). Under the lodestar, "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). Courts "should ex-

clude from this initial fee calculation hours that were not reasonably expended." Id. at 434 (internal quotation and citation omitted). "Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." Id. If "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." Id. at 436.

# III. ANALYSIS

**A. Hourly Rate**

Plaintiff's request that the "reasonable hourly rate[s]" used by the Court for calculating the lodestar in this case should be as follows: "Paul L. Rein, $645; Celia McGuinness, $550; Catherine 'Cat' Caballo, $475; senior paralegal Aaron Clefton, $190; paralegal Emily O'Donohoe, *4 $155, and paralegal Holly Jaramillo, $135." ECF No. 122 at 12. In support of their proposed hourly rates, Plaintiff's counsel point to their "education, experience, and expertise in disability rights law," declarations provided by other attorneys practicing in the field, and other decisions in this District awarding similar hourly rates for attorneys practicing in the Rein Law Office. Although Defendants take issue with the reasonableness of the hours expended by Plaintiff's counsel on the litigation, they do not appear to contest the proposed hourly rates. Nonetheless, the Court will satisfy itself that Plaintiff's proposed hourly rate is reasonable before moving on to evaluate the reasonableness of the hours expended.

When determining a reasonable hourly rate for a lawyer's service, "the lodestar looks to the prevailing market rates in the relevant community." Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 551 (2010) (internal quotations and citations omitted). "The burden is on the fee applicant to produce satisfactory evi-



Lemmons v. Ace Hardware Corp., Case No. 12-cv-03936-JST (N.D. Cal. Feb. 1, 2015)

dence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum v. Stenson, 465 U.S. 886, 896 n.11 (1984).

Rein has forty-five years of litigation experience, including forty years of disability representation, during which time he worked on many cases that achieved substantial victories for disabled plaintiffs. Cabalo has thirteen years of practice as a litigator who has practiced with the Rein firm in the field of disability law for the last five years. McGuinness has twenty-four years of litigation experience and has practiced with the Rein firm for the past six years. Plaintiff's counsel has provided charts documenting orders by courts in this District, which have calculated fees for other attorneys and paralegals with similar amounts of litigation experience using hourly rates similar to or greater than those requested here. ECF No. 122 at 18-20. This evidence is not disputed.

Furthermore, Plaintiff's counsel has shown that other judges in this District have approved *5 payments to these same lawyers using hourly rates either identical to or similar to the rates currently sought. Earlier this year, Judge Seeborg noted that, in the prior fifteen months, Rein's $645 per hour rate had been approved by "four different judges in this district . . . in light of Rein's skill, reputation, and extensive experience." Rodriguez v. Barrita, Inc., No. 09-04057-RS, 2014 WL 2967925 at *2 (N.D. Cal July 1, 2014) (citing Hernandez v. Grullense, No. 12-cv-03257-WHO, 2014 WL 1724356 at *5 (N.D. Cal. April 30, 2014), Moralez v. Whole Foods Mkt., Inc., No. 12-01072-CRB, 2013 WL 3967639 at *4 (N.D. Cal. July 31, 2013); Cruz v. Starbucks Corp., No. 10-01868-JCS, 2013 WL 2447862 at *5 (N.D. Cal. June 5, 2013); Delson v. CYCT Mgmt. Grp., Inc., No. 11-03781-MEJ, 2013 WL 1819265 at *5 (N.D. Cal. Apr. 30, 2013)).

Judge Seeborg also approved compensating Cabalo at an hourly rate of $425 per hour in that litigation. Rodriguez, 2014 WL 2967925 at *2. Although Cabalo requests $475 per hour in the current motion, the Court concludes that an increase is appropriate. Cabalo acted as lead attorney in this matter. The charts provided by Plaintiff's counsel indicate that, in the last several years, other judges in this District have approved hourly rates within this range for plaintiffs' attorneys with a similar amount of litigation experience. ECF No. 122 at 19. Finally, as already noted, Cabalo's hourly rate is unopposed by Defendant.

Judge Breyer has previously approved a rate of $495 per hour for McGuinness, who now seeks an hourly rate of $550. Moralez, 2013 WL 3967639 at *3. The Court finds the $550 hourly rate now sought by McGuinness is reasonable, in light of the rates approved by other judges in this District over the last several years for plaintiffs' attorneys with similar amounts of litigation experience. ECF No. 122 at 19-20. McGuiness's requested rate is also unopposed.

Lastly, the Court finds the hourly rates requested for the work done by the firm's paralegals are reasonable. Judge Breyer has previously approved compensating Clefton at a rate of $175 an hour, noting that two other judges in the District had compensated Clefton at that rate. In early 2013, Judge James reasoned that the $175 rate was an appropriate adjustment from the *6 $165 hourly rate courts had approved for Clefton in 2010 and 2011. Delson, 2013 WL 1819265 at *5 (N.D. Cal. Apr. 30, 2013). The Court finds that the $190 rate is appropriate for Clefton, given his extensive experience, the rates approved for other paralegals by courts in this District, and the fact that his requested hourly rate is unopposed. ECF No. 122 at 20. The Court similarly concludes that the hourly rate requested for the work of the firm's other two paralegals is appropriate given the prevailing rates in the community. Id.



Lemmons v. Ace Hardware Corp., Case No. 12-cv-03936-JST (N.D. Cal. Feb. 1, 2015)

The Court finds that Plaintiff's counsel has established that the lodestar should be calculated using the hourly rates they have requested.

**B. Hours Reasonably Expended**

Defendants principally contest the reasonableness of the number of hours billed by Plaintiff's counsel. Defendants contend that Plaintiff's counsel: 1) billed excessively for internal meetings and conferences; 2) billed excessively on particular motions; 3) billed for an ultimately unsuccessful claim against Ace Hardware; and 4) billed for services performed on behalf of deceased plaintiff Bertha Johnson. Defendants ask that the Court cut Plaintiff's requested fees by half "across the board" in light of the "excessive and redundant billing." ECF No. 130 at 11.

**1) Entries for Meetings**

Defendants argue that Plaintiff's counsel billed an unreasonable number of internal meetings, comprising in Defendants' calculation a total of $39,048.00 in fees over 259 separate entries. Defendants have compiled the hours billed for such meetings into a single spreadsheet, submitted as Exhibit H to their opposition. ECF No. 130-8. Additionally, Defendants note that many of these meetings were of short duration, such as .1 hour or .2 hour increments--six or twelve minutes. The practice of billing for many short meetings has been criticized by other judges in this District as having the effect of potentially inflating a fees award. See, e.g. Hernandez, 2014 WL 1724356, at *8-9; Cruz v. Int'l Collection Corp., No. 08-00991-JF (RS), 2010 WL 2509988, at *4 (N.D. Cal. June 17, 2010).

*7 Although the Court has approved the substantial hourly rates requested by Plaintiff's counsel, it has done so based on the attorneys' experience and expertise in disability litigation. This same expertise undercuts the reasonableness of some of their hours. "One of the trade-offs of being an expert in a specific filed of law is the expectation that tasks will be completed with greater efficiency because the knowledge base and resources have already been well-established." Delson v. CYCT Mgmt. Grp., Inc., No. C 11-03781 MEJ, 2013 WL 1819265, at *8 (N.D. Cal. Apr. 30, 2013). The Court knows that co-counsel sometimes need to strategize. But lawyers who are experts in the field of disability litigation, working at a small firm that exclusively handles that kind of work, should not need to bill 259 separate entries for strategizing. "The Ninth Circuit has approved of reductions in fees for unnecessary and duplicative intra-office conferences," and other courts in this District have "previously been critical of excessive conferencing by Rein Law." Hernandez, 2014 WL 1724356 at *10. Compounding these concerns is that some entries lack any specificity, such as "Meet w/ co-co re: pending issues" or "Strategize w/ staff re current case issues," which make such review more difficult and cause the Court some concern. ECF No. 130-8 at 3, 5.

Because the Court finds that Defendants' criticisms of the excessive nature of Plaintiff's counsel's billing for internal meetings are valid, it will exercise its discretion to reduce the $39,048.00 that Defendants characterize as having been billed for time spent on internal meetings by 50%, awarding $19,524.00 for these entries.

**2) Summary Judgment Motions**

Defendants contend that Plaintiff's counsel billed an excessive number of hours on motions practice, including the summary judgment proceedings, administrative motions, and the current motion for fees. Defendants first object to the 102.8 hours they have classified as having been billed for the summary judgment proceedings, ECF No. 130-7, claiming that many of the arguments made is Plaintiff's opposition to Defendants' cross-motion overlap with arguments *8 made in Plaintiff's affirmative motion. The Court agrees the time billed for these motions was substantial. But Defendants' themselves created some of these costs by filing affirmative motions for summary judgments on



Lemmons v. Ace Hardware Corp., Case No. 12-cv-03936-JST (N.D. Cal. Feb. 1, 2015)

claims where summary judgment was ultimately granted against them.

The Court also notes that Plaintiff's well-drafted and ultimately-successful summary judgment motion resulted in a lower total amount of fees by bringing the litigation to an end without the need for a trial. Any concerns the Court might have regarding the amount of time Plaintiff's counsel have billed for that motion are counterbalanced by this fact. In the same vein, the Court notes that Plaintiff also compromised on certain issues of injunctive relief and agreed to limit her damages claim, decisions that also prevented the need for a trial and lowered the amount of fees. The Court finds these hours were reasonably expended.

### 3) Fee Motions

Defendants object to the number of hours Plaintiff's counsel spent preparing the present attorney's fees motion. Defendants note that the motion is "nearly identical" to a motion the Rein firm submitted in Gerardo Hernandez v. Taqueria El Grullense, 12-cv-3257-WHO. Defendants include the fees motion from that case as Exhibit L. ECF No. 130-12. Defendants also call the Court's attention to the fee decision issued in Hernandez, wherein Judge Orrick observed that "Judges in this District have, on several occasions, criticized the fees sought by Rein Law for work on re-purposed fees motions," and deducted $6,276 of the $16,474 requested relating to this briefing. 2014 WL 1724356, at *13 (collecting cases). The Court has compared the motion filed in Hernandez and the opening brief filed herein and finds many sections regarding the statutes and public policies at issue do overlap substantially. The opening brief does not appear to have required substantial time to draft in light of Rein Law's ability to use a template motion. The Court will therefore award just 2 of the 10.4 hours Caballo has sought to bill on the opening motion for attorney's fees. The Court will therefore reduce the lodestar figure by $3,990 for time spent on preparing the initial fees motion.

*9 **4) Administrative Motions**

Defendants' also point to $6,018.50 requested for time Plaintiff's counsel spent preparing a motion to seek a continuance of defendants' motion for summary judgment from the Court and related declarations. ECF No. 130-10. That number is indeed substantial, but the motion was important to Plaintiff's litigation strategy. Moreover, Defendants opposed the motion and the Court ultimately granted it. ECF No. 72.

When the motions for summary judgment were submitted to the Court several months later, after which time the Plaintiff had been able to conduct further discovery, the Court ruled largely in Plaintiff's favor. ECF No. 107. Defendants' criticism that this motion should have been routine for the Rein Law attorneys, and therefore should have taken less time, is not well taken. Defendants increased Plaintiff's counsel's costs by refusing to stipulate to a continuance, see ECF Nos. 68, 69, and should not be heard now to complain about those costs. The Court finds that time spent by lawyers and paralegals on this motion was reasonably expended.

On the other hand, the Court notes that Paul Rein billed 4 hours strategizing and preparing an opposition to Defendant Berkeley Hardware's motion to amend their answer to include a statute of limitations defense. ECF No. 45. The Court ultimately granted Defendant's motion to amend over this objection, as discovery had not yet begun and the trial date was almost a year in the future. ECF No. 58. The Court will deduct the four hours Rein seeks to bill for preparing this motion from its fees award, finding that this time was not reasonably expended. An administrative motion of this kind need not have been drafted by a lawyer of Rein's experience, charging Rein's substantial hourly rate. "With four decades of experience in this area, Rein is an authority on ADA litigation. But in light of that specialized knowledge and his commensurately high billing rate, Rein should reasonably limit his involvement to matters requiring his level



Lemmons v. Ace Hardware Corp., Case No. 12-cv-03936-JST (N.D. Cal. Feb. 1, 2015)

of skill." Hernandez, 2014 WL 1724356 at *8. Furthermore, a lawyer of Rein's experience and expertise should have recognized that it would be difficult at best to defeat a motion to amend an answer *10 when discovery had not yet even started and trial was almost a year away, and simply stipulated to permit the amendment. The Court will therefore reduce the lodestar figure by $2,580 for time spent on this opposition.

### 5) Ace Hardware

Defendants argue that time Plaintiffs spent pursuing claims against Ace Hardware should be deducted from Plaintiff's fees, because the Court ultimately granted summary judgment in favor of Ace Hardware, concluding that, as a franchisor, Ace lacked operational control over the store. Defendants claim that law was clear at the outset of the litigation that "a franchisor or licensor that does not control the day to day operations of the franchisee or licensee is not liable under the ADA." ECF 130 at 13 (citing Neff v. Am. Dairy Queen Corp., 58 F.3d 1063, 1066 (5th Cir. 1995) and Lentini v. California Ctr. for the Arts, Escondido, 370 F.3d 837, 849 (9th Cir. 2004)). In light of this backdrop, Defendants contend that this claim thus should not have been brought against Ace, because Defendants' counsel told Plaintiff's counsel at the outset of the litigation that Ace had no right or obligation to operate the store.

"California law requires a trial court to adjust a lodestar award to account for time spent exclusively on an unsuccessful claim." Muniz v. United Parcel Serv., Inc., 738 F.3d 214, 224 (9th Cir. 2013). "[T]he court must find that the time deducted did not aid in proving the successful claims." Id., 738 F.3d at 224. The Court agrees with Defendants that time spent by Plaintiff's counsel on claims against Ace Hardware exclusively should not be included in the fees award. The Court ruled in favor of Ace on the issue of damages at summary judgment, as the Court concluded that Lentini and Neff dictated that Ace was not liable

as it lacked day to day operational control over the store. Although Plaintiff claims that the injunctive settlement reached with EQR states that Plaintiff is the prevailing party as to all Defendants, nothing agreed to in the settlement required Ace to take any action. See ECF No. 57. Therefore, the Court concludes that Plaintiff's claims against Ace were unsuccessful and time spent exclusively on those claim should be *11 deducted from the fees award.

Defendants have identified $13,713.50 in entries that they contend reflect time spent exclusively on claims against Ace Hardware. ECF No. 130-6. The Court does not agree with Defendants' characterization of all of the entries. For instance, Defendants have included time entries by McGuinness and Cabalo on April 3, 4, 7, and 8 relating to drafting a discovery letter brief that pertained to Plaintiff's claims against all three Defendants, located at ECF No. 74. The Court will not deduct these hours, as they include time spent on successful claims. Additionally, Defendants characterize entries made by Cabalo on May 12, 14, 16, and 19 as pertaining to the claims against Ace. These entries relate to a further discovery letter brief, located at ECF No. 79, and the discovery issues discussed in that brief did not involve Ace Hardware at all, but only involved Plaintiff's claims against Berkeley Hardware and EQR - on which Plaintiff prevailed. The Court will likewise not deduct these hours from the lodestar figure.

Defendants additionally ask the Court to consider that some of the time billed on summary judgment briefing was spent on drafting sections pertaining to the claims against Ace and to reduce the summary judgment fees accordingly. Plaintiff's affirmative motion did not pertain specifically to its claim against Ace and was successful, so therefore does not represent time spent exclusively on pursuing the unsuccessful claims. During summary judgment, Plaintiff opposed the portion of Defendants' motion that sought summary judgment in favor of Ace. Ace prevailed. It appears that Plaintiff's counsel billed 18.8 on its opposition to Defendants' motion. In light of this, the Court will subtract 4 hours



Lemmons v. Ace Hardware Corp., Case No. 12-cv-03936-JST (N.D. Cal. Feb. 1, 2015)

of Cabalo's time spent drafting the opposition, to re-flect the amount of time spent on opposing summary judgment as to the claims against Ace.

The Court will therefore deduct from the award of fees $10,378.50 of the $13,713.50 that Defendants have characterized as time Plaintiff's counsel spent pursuing claims against Ace Hardware. ECF 130-6. The Court will also deduct an additional $1,900 for time spent opposing the portions of Defendants' mo-tion for summary judgment relating to Ace.

*12 **7) Bertha Johnson**

Defendants also argue the Court should further reduce the fees award due to the time Plaintiff's counsel spent performing work on behalf of co-Plaintiff Bertha Johnson, who passed away during the course of the litigation. This does not provide a basis for further reducing the fees awarded to Plaintiff's counsel. The Rein declaration specifically addresses this issue, stat-ing that "[a]ll work done on this case prior to Ms. Johnson's death was done on behalf of both plaintiffs, and no work was done, or time kept separately, for decedent Johnson." ECF No. 123 at 1 n.1. The Court credits this, as Johnson's claims were identical to Lem-mons' and involved the same store location.

**8) Conclusion**

Defendants have identified some billing items which give the Court pause, particularly a large number of internal strategic meetings and an excessive amount of time spent on some items in motions practice. Nonetheless, the Court does not agree with all of De-fendants' criticisms of the billing and does not find that Defendants' proposed 50% across the board slash-ing of the requested fees is justified. Plaintiff's counsel have thoroughly documented how they spent their time and have secured a victory for the Plaintiff and other disabled individuals seeking to access the store.

The Court will reduce the amount of hours Plaintiff's counsel spent billing internal strategic meetings by

50% in light of the excessive number of such meetings. The Court will also subtract from the hours requested 8.4 hours billed by Caballo in preparing the attorney's fees motion, 4 hours spent by Rein in preparing an opposition to Defendant Berkeley Hardware's motion for leave to amend its answer, and $10,378.50 in time spent pursuing claims against Ace Hardware. The Court therefore awards Plaintiff's counsel $218,237.5 of the $256,610 they have requested.

*13 **C. Degree of Success**

In addition to their claims regarding excessive billing, Defendants also ask the Court to reduce the fees due to Plaintiff's "limited success in light of the scope of the litigation." ECF No. 130 at 9-11, 17. In considering whether to reduce a fees award due to the limited suc-cess of a litigation, a district court "must deduct from the lodestar hours spent exclusively on unrelated un-successful claims; and second, the court must evaluate the remaining hours to determine if they were reason-ably necessary to achieve the result obtained." <u>Muniz</u>, <u>738 F.3d at 224</u>. The Court does not agree with De-fendants' characterizations of the outcome of the liti-gation.

As a result of the injunctive settlement reached in this case, the store has become substantially more accessi-ble to the disabled population. Specifically, the store created van-accessible parking and signage, provided bells for disabled customers to ring for assistance at a services counter, and removed barriers that had pre-viously prevented wheelchairs from turning around aisles and obstructed elevator doors. ECF No. 131 at 2. The store also agreed to provide on its main floor a catalogue of items found on other floors that disabled customers could consult before attempting to access those floors. <u>Id.</u> Additionally, the settlement secured a number of changes to employee training at the store regarding assisting disabled customers. <u>Id.</u>

The Court also granted Plaintiff summary judgment for liability and damages against EQR and Berkeley Hardware, over the Defendants' cross-motions for



Lemmons v. Ace Hardware Corp., Case No. 12-cv-03936-JST (N.D. Cal. Feb. 1, 2015)

summary judgment. ECF No. 107. The Court awarded Plaintiff $52,000 in damages. Id. The Court denied Defendants' motion for reconsideration. ECF No. 114. Given the number of defenses raised by Defendants' and Defendants' own summary judgment motion, Plaintiff's victory at summary judgment was hard-fought and the damages achieved for Plaintiff provided a substantial compensation for the "difficulties, discomfort, or embarrassment" she experienced upon visiting the store.

Defendants insinuate throughout their briefing that the fact that EQR intends to tear down the building in the near future somehow renders this litigation inappropriate or undermines the *14 value of the results achieved by Plaintiff. Defendants also claim that the litigation was potentially unnecessary, as Plaintiff never requested alterations to the premises before filing her complaint and may have been able to obtain them without bringing suit. The Court is not persuaded by these arguments (which are somewhat in tension with each other). Plaintiff was not required to request changes prior to bringing suit. Defendants' continued insistence that the allegedly-impending closure of the store somehow absolves them from making the premises accessible to disabled individuals indicates that Plaintiff would have been unlikely to persuade them to make the alterations without this litigation. Indeed, the parties did not reach an injunctive settlement agreement until almost a year after the complaint was filed and Plaintiff compromised on several of her initial requests.

"The reason for the fee-shifting provisions of both the ADA and California law is to motivate plaintiffs' attorneys to advocate for full and equal access for the disabled to public accommodations." Blackwell, 724 F. Supp. 2d at 1076. The store remains open in the EQR building to this day and Plaintiff's lawsuit achieved an injunctive settlement which has ensured a greater degree of access for disabled people to the public accommodation. This is the exact outcome the laws govern-

ing disabled individual's ability to access to public accommodations are intended to encourage.

**D. Plaintiff's Costs**

Plaintiff requests an award of costs in the amount of $16,302. The costs are well-documented and the request is unopposed. The Court will grant the request in full.

## *15 IV. CONCLUSION

For the foregoing reasons, the Court will grant Plaintiff's request for attorney's fees in part, and award $218,237.50. The Court also grants the Plaintiff's award of costs in the amount of $16,302. The total amount awarded by this order is $234,539.50.

**IT IS SO ORDERED**. Dated: February 1, 2015

/s/_____


JON S. TIGAR


United States District Judge



EXHIBIT 24

| Date | Biller | Description – 64 | Hours |
|------|--------|------------------|-------|
| 9/19/22 | JMT | Draft fee agreement. | 1.40 |
| 9/19/22 | PMJ | Review and revise Mirabelli fee agreement. | 0.20 |
| 9/26/22 | JMT | Draft fee agreement with Lori West. | 0.20 |
| 11/4/22 | KD | Schedule Zoom meeting with clients and Norman Grissom regarding * ; E-mail correspondence regarding same. | 0.40 |
| 2/9/23 | KD | Draft civil cover sheet; Prepare list of attorneys for plaintiffs and a list of defendants to attach to same. | 0.60 |
| 2/9/23 | KD | Draft summons; Prepare list of defendants to attach to same. | 0.40 |
| 4/19/23 | KD | E-mail correspondence to Dr. Anderson with executed retainer agreement. | 0.20 |
| 4/24/23 | KD | Revise summons, civil cover sheet, and attachment of list of defendants to same. | 0.40 |
| 5/3/23 | JMT | Send waiver of service of summons to the EUSD defendants. | 0.20 |
| 5/9/23 | PMJ | Telephone call with clerk regarding motion for preliminary injunction hearing. | 0.20 |
| 5/10/23 | JMT | Calendar deadlines for preliminary injunction briefing. | 0.20 |

| Date | Biller | Description – 64 | Hours |
|---|---|---|---|
| 5/30/23 | JMT | Draft project list for interns. | 0.40 |
| 7/13/23 | MZ | Organize key cases binders; Review and summarize cases and forward to Mr. Jonna. | 0.60 |
| 7/27/23 | MZ | Continue to organize key cases binder; Shepardize cases. | 3.80 |
| 7/28/23 | MZ | Continue to organize key cases binders. | 1.00 |
| 8/31/23 | KD | Telephone call and e-mail correspondence to court reporter regarding expediting transcript of motion preliminary injunction/motion to dismiss hearing. | 0.20 |
| 1/9/24 | KD | E-mail correspondence to court reporter to order a copy of the hearing transcript for motion for judgment on pleadings. | 0.20 |
| 1/24/24 | PMJ | Telephone call to Clerk to discuss allegations in first amended complaint. | 0.20 |
| 1/25/24 | PMJ | Telephone call with court Clerk regarding ex parte application regarding first amended complaint. | 0.20 |
| 4/12/24 | JMT | Draft fee agreements for new clients Jane Roe and Jane Boe. | 1.40 |
| 4/16/24 | PMJ | Calendar case management conference dates. | 0.20 |
| 4/16/24 | JMT | Draft fee agreement for Jane Poe. | 0.40 |

| Date | Biller | Description – 64 | Hours |
|---|---|---|---|
| 4/18/24 | JMT | Revisions to fee agreement for Jane Poe. | 0.60 |
| 4/24/24 | KD | Exchange e-mail correspondence to attorney service with subpoenas for personal service on Genders & Sexualities Alliance Network, National Center for Lesbian Rights, Inc., California School Boards Association, Inc., and Equality California, Inc. | 0.20 |
| 4/29/24 | KD | Exchange e-mail correspondence to court reporter Adrian Baule to request an expedited transcript of defendants' motion to dismiss hearing; Complete request form. | 0.40 |
| 4/30/24 | JMT | Prepare fee agreement for potential new plaintiff John Doe and Jane Doe. | 0.40 |
| 6/4/24 | JMT | Prepare fee agreement for Lakeside School District, including class action representative duties. | 0.60 |
| 6/17/24 | KD | E-mail correspondence to copy service with instructions for delivery of courtesy copy to Judge Benitez with reply to EUSD defendants in support of motion for leave to amend complaint and supporting papers. | 0.20 |
| 7/1/24 | KD | E-mail correspondence to copy service with instructions for delivery of courtesy copy to Judge Benitez with reply to CDE defendants and Attorney General in support of motion for leave to amend complaint and supporting papers. | 0.20 |
| 9/24/24 | PMJ | E-mail correspondence with department clerk regarding hearing date and time for preliminary injunction motion. | 0.20 |
| 9/25/24 | KD | Exchange e-mail correspondence with Judge Benitez' clerk Bob, regarding proposed order in Word format; Telephone call with Bob regarding same and help him open order in Word. | 0.20 |
| 12/3/24 | JMT | E-mail correspondence to court reporter to order transcript from motion to dismiss hearing. | 0.20 |
| 12/3/24 | PMJ | Review e-mail correspondence with clerk regarding expedited transcript. | 0.20 |

| Date | Biller | Description – 64 | Hours |
|------|--------|------------------|-------|
| 1/14/25 | PMJ | Assess classwide preliminary injunction motion and next steps; Telephone call to court Clerk to discuss same. | 0.60 |
| 1/17/25 | PMJ | Telephone conference with court Clerk regarding preliminary injunction hearing. | 0.20 |
| 2/10/25 | KD | Exchange emails with court reporter regarding depositions of Trent Smith and Tracy Schmidt; E-mail correspondence to opposing counsel with deposition link for same. | 0.20 |
| 2/11/25 | KD | Exchange emails with court reporter regarding depositions of John Albert and Steve White; E-mail correspondence to opposing counsel and clients with deposition link for same. | 0.20 |
| 2/14/25 | KD | E-mail correspondence to court reporter requesting expedited transcript of CDE designee Richard Barrera. | 0.20 |
| 2/25/25 | KD | Review and respond to e-mail correspondence from court reporter Juliet Eichenlaub regarding delay in processing transcript and her request for case names cited at the hearing. | 0.20 |
| 2/26/25 | KD | Review and respond to e-mail correspondence from court reporter Adrian Baule regarding ordering the hearing transcript of the defendants' motion to dismiss. | 0.20 |
| 2/28/25 | KD | Review and respond to e-mail correspondence from court reporter Adrian Baule with a copy of check for payment of transcript. | 0.20 |
| 3/5/25 | KD | Follow-up telephone call to court reporting office regarding request for rush rough draft of the deposition transcript for Dr. Rankins-Ibarra; E-mail correspondence to court reporter Taylor with exhibits for the deposition of Audrey Frank and Dr. Rankins-Ibarra. | 0.40 |
| 3/5/25 | KD | Follow-up telephone call to Jilio-Ryan Court Reporters regarding Mr. Jonna's request for rush deposition transcript of Ana Maria Apodaca, "person most knowledgeable" for Pasadena Unified School District. | 0.20 |
| 3/6/25 | KD | Exchange emails with court reporter regarding deposition of Laura Faer, "person most knowledgeable" for the California Department of Justice; E-mail correspondence to opposing counsel with deposition link for same. | 0.20 |

| Date | Biller | Description – 64 | Hours |
|---|---|---|---|
| 3/10/25 | KD | E-mail correspondence to all counsel with call-in information for conference call with Mr. Jonna and Mr. Trissell. | 0.20 |
| 6/3/25 | KD | E-mail correspondence to court reporter with a copy of form proof of service. | 0.20 |
| 6/4/25 | JMT | Review invoices from experts for their depositions. | 0.20 |
| 6/4/25 | KD | Review multiple emails regarding the start time for the deposition of defense expert Darlene Tando; E-mail correspondence to court reporter with new start time. | 0.20 |
| 7/17/25 | KD | Review and respond to e-mail correspondence from court reporter Adrian Baule with hearing transcript request for the May 9, 2025 status conference; Prepare form. | 0.20 |
| 9/15/25 | KD | Apply to Pacer for Peter Breen for pro hac vice application to the Southern District for this case. | 0.40 |
| 9/15/25 | KD | Revise and finalize pro hac vice application for Peter Breen to the Southern District for this case; File with court. | 0.40 |
| 9/23/25 | PMJ | Telephone call to clerk regarding motion hearing date. | 0.20 |
| 11/7/25 | KD | E-mail correspondence to copy service to deliver courtesy copies to Judge Benitez with ex parte application for an order to show cause re: sanctions, declaration of Paul Jonna, proposed order, and notice of manual filing, and thumb drive of videos. | 0.20 |
| 11/10/25 | KD | E-mail correspondence to copy service to deliver courtesy copies to Judge Benitez with supplemental brief in support of ex parte application for an order to show cause re: sanctions, declaration of Paul Jonna, declaration of Sonja Shaw, declaration of Greg Burt, and supplemental notice of manual filing, | 0.20 |
| 11/18/25 | KD | E-mail correspondence to court reporter Juliette regarding request for rush transcript of hearing on order to show cause re: sanction and motion for summary judgment. | 0.20 |

| Date | Biller | Description – 64 | Hours |
|---|---|---|---|
| 11/18/25 | KD | Telephone call to court reporter Juliette regarding request for hearing transcript; Exchange emails regarding same and she no longer works for the court; Telephone call and e-mail correspondence to supervisor Noey Martinez requesting name of court reporter for hearing. | 0.20 |
| 11/18/25 | KD | Review e-mail correspondence from court reporter Stephanie-Whitehead regarding request for rush transcript of hearing on order to show cause re: sanction and motion for summary judgment; E-mail correspondence to attorney service to have a check delivered for prepayment of the transcript. | 0.20 |
| 11/20/25 | KD | Review and respond to e-mail correspondence from court reporter Stephanie-Whitehead regarding correct case law cited names of people cited at hearing; Research same and provide information. | 0.40 |
| 11/20/25 | JMT | E-mail correspondence to court reporter regarding names in transcript. | 0.20 |
| 11/24/25 | KD | Review e-mail correspondence from court reporter Stephanie Whitehead with final hearing transcript of the order to show cause regarding sanctions; E-mail correspondence to all clients * . | 0.20 |
| 1/30/26 | KD | Gather invoices for court reporters in support of bill of costs; Review and redact information of same; Forward to Mr. Trissell for review. | 3.40 |
| 1/30/26 | PMJ | Call clerk regarding motion for attorneys' fees hearing | 0.20 |
| 1/30/26 | PMJ | Call with clerk regarding motion for attorneys fees hearing; calendar same. | 0.20 |
| 1/30/26 | KD | Telephone call to clerk to schedule hearing date for bill of costs; Draft e-mail correspondence to clerk regarding same. | 0.20 |

EXHIBIT 25

| Date | Biller | Description – 82 | Hours |
|---|---|---|---|
| 4/24/23 | PMJ | Review and revise press release. | 0.20 |
| 4/25/23 | JMT | Review and edit press release. | 0.60 |
| 4/25/23 | PMJ | Review and revise press release. | 0.40 |
| 4/27/23 | PMJ | Telephone call with Andrew Mirabelli and Tom Ciesielka regarding media interviews and next steps. | 0.40 |
| 4/28/23 | PMJ | Coordinate multiple media interviews. | 0.40 |
| 4/28/23 | PMJ | Telephone calls with client and Tom Ciesielka regarding media interviews. | 0.20 |
| 4/28/23 | JMT | Participate in client's media preparation. | 0.80 |
| 4/28/23 | PMJ | Coordinate media issues. | 0.20 |
| 5/1/23 | JMT | Respond to Tom Cisielka's e-mail correspondence seeking hi-res photographs for Fox News. | 0.40 |
| 5/3/23 | PMJ | Review and revise e-mail press release. | 0.20 |
| 5/12/23 | PMJ | Review and revise TMS press release regarding motion for preliminary injunction. | 0.20 |

| Date | Biller | Description – 82 | Hours |
|---|---|---|---|
| 5/12/23 | PMJ | Telephone calls with Tom Ciesielka and Lori West regarding press release. | 0.20 |
| 5/16/23 | PMJ | Telephone calls with Steve Grosklaus and Tom Ciesielka regarding press and media issues. | 0.40 |
| 5/16/23 | PMJ | Telephone call with Tom Ciesielka regarding press issues. | 0.20 |
| 5/17/23 | JMT | Review media on case. | 0.40 |
| 8/15/23 | PMJ | Assess media inquiry. | 0.20 |
| 9/14/23 | JMT | Edit press release on preliminary injunction win. | 0.20 |
| 9/14/23 | PMJ | Review and revise draft press release. | 0.20 |
| 9/14/23 | PMJ | Press interviews; E-mail correspondence and text messages regarding same. | 0.80 |
| 9/14/23 | PMJ | Prepare social media posts regarding victory; Review media. | 0.80 |
| 9/15/23 | PMJ | Coordinate multiple media interviews. | 0.80 |
| 9/16/23 | PMJ | Travel to and from and attend second * interview; Multiple e-mail correspondence regarding media. | 1.80 |

| Date | Biller | Description – 82 | Hours |
|------|--------|------------------|-------|
| 9/17/23 | PMJ | Draft media statements regarding federal court win. | 0.40 |
| 9/18/23 | PMJ | Multiple e-mail correspondence and telephone calls regarding media. | 0.20 |
| 9/18/23 | PMJ | * media interview. | 0.20 |
| 9/18/23 | PMJ | Draft comment for Daily Signal. | 0.40 |
| 9/20/23 | JMT | Review media on case. | 0.20 |
| 9/20/23 | PMJ | E-mail correspondence with counsel regarding deadline to respond to complaint; E-mail correspondence and telephone calls regarding multiple media inquiries. | 0.20 |
| 9/20/23 | PMJ | Participate in * radio interview regarding case. | 0.40 |
| 9/27/23 | PMJ | Draft statement in response to Attorney General Bonta press release. | 1.20 |
| 9/27/23 | PMJ | Edit draft press release and letter responding to Attorney General Bonta. | 0.20 |
| 12/4/23 | JMT | Edits to press release on contempt application. | 0.60 |
| 12/4/23 | PMJ | Review draft press release regarding contempt application. | 0.20 |

| Date | Biller | Description – 82 | Hours |
|---|---|---|---|
| 12/5/23 | PMJ | Review final draft of contempt press release. | 0.20 |
| 12/13/23 | PMJ | Telephone call with Epoch Times reporter. | 0.20 |
| 12/14/23 | PMJ | Interview with * news. | 0.40 |
| 1/9/24 | PMJ | Review draft Mirabelli media advisory copy. | 0.20 |
| 1/10/24 | PMJ | Telephone call with media team regarding next steps. | 0.20 |
| 1/11/24 | PMJ | Multiple telephone calls and e-mail correspondence with Tom Ciesielka to review and revise press release. | 0.40 |
| 1/12/24 | JMT | Conference with Tom Ciesielka regarding radio interview; Participate in interview. | 0.40 |
| 1/18/24 | JMT | Review new press release from Attorney General; Edits to first amended complaint. | 2.80 |
| 1/18/24 | PMJ | Media interview with * ; Review and revise first amended complaint. | 0.80 |
| 1/22/24 | PMJ | Participate in interview with * radio show regarding case status. | 0.40 |
| 2/5/24 | PMJ | Respond to media inquiry regarding amended complaint. | 0.20 |

| Date | Biller | Description – 82 | Hours |
|---|---|---|---|
| 2/14/24 | PMJ | Participate in webinar with * regarding impact of ruling. | 0.60 |
| 2/17/24 | PMJ | Review Daily Signal reporting and help with quotes. | 0.20 |
| 5/2/24 | PMJ | Respond to reporters regarding latest Court order granting motion to dismiss. | 0.20 |
| 5/3/24 | PMJ | Review and revise case press release. | 0.20 |
| 5/3/24 | JMT | Review and edit press release on Governor Newsom and Attorney General Bonta's dismissal from case. | 0.20 |
| 5/6/24 | PMJ | Review and revise press release from *   . | 0.20 |
| 5/8/24 | PMJ | Social media posts regarding TMS press release. | 0.20 |
| 5/8/24 | PMJ | Provide update to * during webinar; * interview regarding case. | 1.20 |
| 5/8/24 | PMJ | Telephone call with reporter regarding status. | 0.20 |
| 6/7/24 | PMJ | Review and revise press release; Review final edits to motion papers and second amended complaint. | 0.60 |
| 6/7/24 | PMJ | Final edits to press release. | 0.20 |

| Date | Biller | Description – 82 | Hours |
|---|---|---|---|
| 6/10/24 | PMJ | Review and revise press release. | 0.40 |
| 6/19/24 | PMJ | Participate in * webinar. | 0.60 |
| 7/10/24 | PMJ | Respond to media inquiry regarding litigation. | 0.20 |
| 7/15/24 | PMJ | Draft press release regarding AB 1955. | 0.40 |
| 8/14/24 | PMJ | Participate in webinar with * regarding legal update. | 0.60 |
| 12/4/24 | PMJ | Prepare for and participate in * webinar. | 0.60 |
| 1/8/25 | PMJ | Review draft press release regarding motion to dismiss ruling. | 0.20 |
| 4/11/25 | PMJ | Review and revise press release regarding CDE motion to dismiss. | 0.20 |
| 6/25/25 | PMJ | Review and revise draft editorial on the case. | 0.20 |
| 6/26/25 | PMJ | Review edits to draft oped. | 0.20 |
| 6/28/25 | PMJ | Review and revise oped article on the case. | 1.00 |

| Date | Biller | Description – 82 | Hours |
|------|--------|------------------|-------|
| 7/2/25 | PMJ | Participate in * webinar. | 0.40 |
| 7/10/25 | PMJ | Attend * webinar regarding Mahmoud decision. | 0.60 |
| 7/16/25 | PMJ | Review and revise press release regarding renewed motion for summary judgment. | 0.60 |
| 10/16/25 | PMJ | Review order granting motion for class certification; Review and revise press statements; Multiple e-mail correspondence to clients * | 2.00 |
| 11/5/25 | PMJ | Participate in status conference regarding settlement; Participate in webinar with * regarding claims; Assess impact of PRISM training. | 1.40 |
| 11/7/25 | PMJ | Work on Mirabelli video for TMS. | 0.80 |
| 11/7/25 | PMJ | Prepare videos for TMS regarding Mirabelli case. | 2.00 |
| 11/7/25 | PMJ | Review and revise TMS press release regarding order setting a sanctions hearing. | 0.80 |
| 11/12/25 | PMJ | Edit press release with media advisory about upcoming hearing. | 0.20 |
| 11/18/25 | PMJ | Review and revise press release. | 0.20 |
| 12/2/25 | JMT | Edits to draft press release regarding ultimate victory. | 0.20 |

| Date | Biller | Description – 82 | Hours |
|------|--------|------------------|-------|
| 12/2/25 | PMJ | Review draft press release. | 0.20 |
| 12/23/25 | PMJ | Multiple media statements. | 0.80 |
| 12/24/25 | PMJ | Follow-up regarding media statements. | 0.60 |
| 12/30/25 | PMJ | Draft answers to * regarding media inquiry. | 0.40 |
| 12/31/25 | PMJ | Review and respond to media request from * . | 0.20 |

EXHIBIT 26

| Date | Biller | Description – 107 | Hours |
|---|---|---|---|
| 8/28/23 | JMT | Review complaint in Bonta v. Chino Valley Unified School District and draft notice of related cases. | 1.00 |
| 9/1/23 | JMT | Review emails from * regarding California v. Chino, and respond,* . | 0.20 |
| 9/1/23 | PMJ | Assess Amicus brief in California v. Chino Valley Unified School District. | 0.40 |
| 9/1/23 | PMJ | Telephone call with * office regarding Chino case. | 0.20 |
| 9/1/23 | MDM | Review and respond to Mr. Trissell e-mail correspondence regarding temporary restraining order hearing in China Valley School District case; Confer with Mr. Jonna and Mr. Trissell  regarding * ; Conference call to counsel for Chino. | 0.60 |
| 9/1/23 | JMT | Draft potential Amicus curiae brief to file in California v. Chino Valley Unified School District; Emails with counsel in same regarding connecting with expert witnesses. | 4.80 |
| 9/1/23 | PMJ | Review and analyze draft Amicus brief. | 0.20 |
| 9/1/23 | CSL | Conference with Mr. Trissell regarding filing Amicus brief in Chino Unified case; E-mail correspondence regarding same. | 0.60 |
| 9/2/23 | CSL | Review and revise Amicus brief in California v. Chino case; E-mail correspondence regarding same. | 0.60 |
| 9/3/23 | JMT | Edit ex parte application for leave to file Amicus Curiae brief. | 1.40 |
| 9/3/23 | CSL | E-mail correspondence with Mr. Trissell regarding Amicus brief. | 0.40 |

| Date | Biller | Description – 107 | Hours |
|---|---|---|---|
| 9/4/23 | PMJ | Review and revise Amicus brief in Chino action. | 0.40 |
| 9/4/23 | MDM | Confer via e-mail correspondence with Mr. Jonna regarding advisability of filing Amicus brief in California v. Chino Valley Unified School District; Review proposed brief and send analysis to Mr. Jonna. | 0.80 |
| 9/5/23 | PMJ | Assess next steps with Chino litigation and Amicus brief. | 0.60 |
| 9/5/23 | PMJ | Review and revise ex parte application to file Amicus brief. | 0.20 |
| 9/5/23 | JMT | Telephone calls with Mr. Jonna and Ms. Denworth regarding Amici Curiae brief; Edits to same; Provide ex parte notice to parties in Bonta v. Chino; Finalize same. | 3.00 |
| 9/5/23 | PMJ | Assess filing and next steps with Chino case. | 0.60 |
| 9/5/23 | MDM | Various e-mail correspondence with team regarding filing of Amicus brief in San Bernardino Superior Court. | 0.20 |
| 9/5/23 | KD | Review e-mail correspondence from Mr. Trissell regarding filing of amicus brief in Chino case; Telephone call to department Clerk regarding ex parte application hearing date. | 0.20 |
| 9/5/23 | KD | Prepare proof of service for ex parte application for leave to file Amici Curiae brief in opposition to California's application for a temporary restraining order, declaration of Paul Jonna, and proposed order in the People of the State of California v. Chino Valley Unified School District case; Review and finalize same; | 0.80 |
| 9/5/23 | JMT | Review temporary restraining order briefing by Chino Valley Unified School District and Center for American Liberty in Bonta v. Chino. | 0.80 |
| 9/5/23 | PMJ | Review Chino brief. | 0.20 |

| Date | Biller | Description – 107 | Hours |
|---|---|---|---|
| 9/5/23 | JMT | Research regarding scheduling remote appearance for Mr. Jonna in the Bonta v. Chino Valley Unified case. | 0.20 |
| 9/5/23 | JMT | Conference with Mr. Jonna regarding Elizabeth Mirabelli's concerns regarding * ; Forward Amicus Curiae brief to clients. | 0.20 |
| 9/5/23 | PMJ | Review Bonta's brief in the California v. Chino case. | 0.20 |
| 9/5/23 | JMT | Review opposition to application for leave to file Amicus brief in Californiav. Chino. | 0.40 |
| 9/5/23 | PMJ | Telephone call with * regarding Chino case. | 0.20 |
| 9/5/23 | CSL | E-mail correspondence regarding ex parte notice requesting leave to file Amicus brief; Telephone conference with Mr. Jonna regarding same. | 0.60 |
| 9/6/23 | JMT | Review news article on hearing in Bonta v. Chino Valley Unified School District. | 0.20 |
| 9/6/23 | PMJ | Review press release regarding ruling in Chino case. | 0.20 |
| 9/6/23 | JMT | Review California's reply brief in Bonta v. Chino; Telephone call with * regarding hearing. | 0.40 |
| 9/6/23 | PMJ | Telephone call with * regarding Chino hearing. | 0.20 |
| 9/6/23 | CSL | Review e-mail correspondence regarding result of temporary restraining order hearing in California v. Chino. | 0.40 |

| Date | Biller | Description – 107 | Hours |
|---|---|---|---|
| 9/7/23 | PMJ | Review minute order in Bonta v. Chino Valley Unified School District case. | 0.20 |
| 9/7/23 | MDM | Review and evaluate third notice of supplemental authority in support of motion for preliminary injunction regarding temporary restraining order issued in Chino case; Confer with Mr. Jonna and Mr. Trissell regarding same. | 0.40 |
| 9/8/23 | PMJ | Review final order in Chino case. | 0.20 |
| 9/8/23 | PMJ | E-mail correspondence to court reporter for Chino case seeking copy of temporary restraining order transcript. | 0.20 |
| 9/8/23 | PMJ | Review transcript from temporary restraining order hearing in Chino case. | 0.20 |
| 9/11/23 | JMT | Review transcript of temporary restraining order hearing in Bonta v. Chino Valley Unified School District. | 1.80 |
| 9/11/23 | PMJ | Review temporary restraining order transcript in Bonta v. Chino Valley Unified School District. | 0.40 |
| 9/11/23 | PMJ | Review and revise notice of new authority regarding Chino case. | 0.20 |
| 9/22/23 | JMT | Telephone call with Emily Rae of Liberty Justice Center, representing Chino Valley Unified School District; E-mail correspondence regarding same. | 0.40 |
| 9/22/23 | PMJ | Telephone call with Attorney Rae of Liberty Justice Center for Chino regarding preliminary injunction motion. | 0.20 |
| 9/27/23 | JMT | Conference with Mr. Jonna regarding updating and re-filing Amicus brief in the Chino case. | 0.20 |

| Date | Biller | Description – 107 | Hours |
|---|---|---|---|
| 9/27/23 | MDM | Confer with Mr. Trissell regarding possible Amicus brief in Chino case; Review and evaluate letter by Mr. Jonna regarding Attorney General's guidance to school districts and news coverage of same. | 0.60 |
| 9/28/23 | JMT | Review docket of Chino Valley case to see whether Amicus brief could be re-filed. | 0.20 |
| 9/28/23 | JMT | Update Amicus brief in Chino Valley Unified for re-filing. | 3.80 |
| 9/29/23 | PMJ | Review and revise Amicus brief in the case of People v. Chino Valley Unified. | 0.20 |
| 9/29/23 | JMT | Edits to Amicus brief in Chino Valley case. | 2.60 |
| 9/29/23 | PMJ | Review and revise Chino Valley Unified Amicus brief ex parte application. | 0.40 |
| 10/2/23 | JMT | Finalize Amicus brief in People v. Chino Valley Unified. | 0.20 |
| 10/3/23 | JMT | Review preliminary injunction opposition papers in Chino Valley Unified case. | 0.20 |
| 10/4/23 | PMJ | Review Chino Valley opposition to preliminary injunction in Bonta v. Chino Valley. | 0.20 |
| 10/4/23 | JMT | Review ACLU Amicus brief filed in People v. Chino Valley Unified; E-mail correspondence to counsel for Chino regarding same. | 0.40 |
| 10/5/23 | PMJ | Prepare for and attend ex parte hearing regarding application for leave to submit Amicus brief in Chino case. | 1.60 |

| Date | Biller | Description – 107 | Hours |
|---|---|---|---|
| 10/5/23 | JMT | Prepare for and participate in ex parte hearing regarding application for leave to file amicus curiae brief in People v. Chino Valley Unified case. | 1.40 |
| 10/5/23 | PMJ | Telephone call with Emily Rae regarding Chino ex parte hearing. | 0.20 |
| 10/5/23 | JMT | Draft reply Amicus brief in Chino Valley Unified case. | 1.80 |
| 10/5/23 | PMJ | Review and revise Amicus reply brief in Chino case. | 0.20 |
| 10/6/23 | CSL | Review reply to opposition to Amicus brief in Bonta v. Chino Valley. | 0.40 |
| 10/19/23 | JMT | Listen to preliminary injunction hearing in California v. Chino case. | 2.20 |
| 10/19/23 | JMT | Listen to afternoon preliminary injunction argument in California v. Chino case. | 1.20 |
| 10/20/23 | PMJ | Review recap of Chino preliminary injunction hearing; Discuss same with Mr. Trissell. | 0.40 |
| 1/5/24 | KD | Review e-mail correspondence from Mr. Trissell to obtain filing in Chino case; Review court docket for ex parte application to file Amicus Curiae in support of plaintiff's motion preliminary injunction; E-mail correspondence to Mr. Trissell with same. | 0.40 |
| 1/16/24 | JMT | Receive and review preliminary injunction order in People v. Chino. | 0.20 |
| 2/28/24 | JMT | Review ruling on preliminary injunction motion in M. v. Komrosky; Discuss with Ms. Denworth regarding obtaining final ruling. | 0.40 |

| Date | Biller | Description – 107 | Hours |
|---|---|---|---|
| 2/29/24 | KD | Review e-mail correspondence from Mr. Trissell regarding obtaining documents in the M. v. Komrosky case; Research court docket for notice of ruling on preliminary injunction and minute order regarding motion for preliminary injunction; E-mail correspondence to Mr. Trissell with same. | 0.40 |
| 5/7/24 | PMJ | Review e-mail correspondence from * regarding Chico Unified School District. | 0.20 |
| 5/28/24 | KD | Review e-mail correspondence from Mr. Trissell regarding obtaining documents in the M. v. Komrosky case; Research court docket for notice of ruling on demurrer and motion to strike, minute orders regarding same, and first amended complaint; E-mail correspondence to Mr. Trissell with same. | 0.40 |
| 6/5/24 | JMT | Review rules for filing Amicus briefs for Parents Protecting our Children v. Eau Claire. | 0.20 |
| 6/5/24 | KD | E-mail correspondence to Cockle Legal Briefs to put them on notice for filing and printing of Amicus brief in Parents Protecting Our Children v. Eau Claire Area School District | 0.20 |
| 6/18/24 | JMT | Draft amicus brief in Parents Protecting Our Children case. | 1.00 |
| 6/19/24 | JMT | Draft Amicus brief in Parents Protecting Our Children case. | 4.60 |
| 6/20/24 | JMT | Edit Amicus brief. | 0.60 |
| 6/20/24 | PMJ | Review and revise Amicus brief in Parents Protecting Our Children v Eau Claire Area School District. | 0.80 |
| 6/27/24 | JMT | Edits to Amicus brief; Send notice to counsel per S.C. Rule 37.2; E-mail correspondence to clients regarding * | 0.40 |
| 7/1/24 | JMT | Incorporate Elizabeth Mirabelli's edits into amicus brief. | 0.40 |

| Date | Biller | Description – 107 | Hours |
|---|---|---|---|
| 7/1/24 | KD | E-mail correspondence to Cockle Legal Brief with draft Amicus brief in the Parents Protecting Children v. Eau Claire Sch. Dist. appeal; Upload same to portal. | 0.20 |
| 7/2/24 | JMT | E-mail correspondence to Cockle regarding preparation of amicus brief, edits to same, and service list. | 0.40 |
| 7/2/24 | JMT | Review amicus brief proof from Cockle. | 0.40 |
| 7/2/24 | RM | Review amicus brief for Parents Protecting our Children v. Eau Claire Area School District. | 1.00 |
| 7/5/24 | JMT | Review second proof of amicus brief; Edit and return to Cockle. | 0.60 |
| 7/8/24 | JMT | Review proof of amicus brief; Finalize same for filing. | 0.20 |
| 7/8/24 | JMT | Serve amicus brief on opposing counsel. | 0.20 |
| 7/8/24 | KD | Review e-mail correspondence from Cockle with final versions of amicus brief, certification, and proof of service; File notice of appearance and amicus brief with US Supreme court. | 0.60 |
| 7/19/24 | PMJ | Check court docket in Chino case. | 0.20 |
| 8/12/24 | JMT | Review new complaint in Chino v. Newsom. | 0.40 |
| 8/28/24 | PMJ | Assess arguments with * regarding amicus brief in Mae M. v. Komrosky (Temecula School District case). | 0.40 |

| Date | Biller | Description – 107 | Hours |
|---|---|---|---|
| 9/5/24 | WTD | Discussion with Mr. Trissell regarding amicus brief in Mae M. v. Komrosky case. | 0.20 |
| 9/13/24 | WTD | Review opening and response appellate briefs in Mae M. v. Komrosky in preparation of drafting amicus brief. | 2.80 |
| 9/13/24 | WTD | Begin drafting amicus brief for Mae M. v. Komrosky. | 1.60 |
| 9/25/24 | JMT | Edit amicus brief to be filed in Mae M. v. Komrosky. | 4.00 |
| 9/27/24 | WTD | Review and revise amicus brief for Mae M. v. Komrosky case. | 2.40 |
| 9/28/24 | JMT | Final edits to Komrosky amicus brief. | 0.60 |
| 9/30/24 | WTD | Research rules of court related to electronic service of amicus brief by amici to trial court. | 0.60 |
| 9/30/24 | JMT | Review Mr. Duke's edits to amicus brief in Mae M. v. Komrosky; Incorporate client's edits to same. | 0.60 |
| 10/1/24 | JMT | Finalize amicus brief for filing in Mae M. v. Komrosky. | 0.40 |
| 10/1/24 | RM | Prepare table of authorities for amicus brief for Mae M. v. Komrosky. | 3.00 |
| 11/8/24 | JMT | Review response to amicus briefs filed by Temecula Valley School District in Mae M. v. Komrosky. | 0.20 |

| Date | Biller | Description – 107 | Hours |
|------|--------|-------------------|-------|
| 2/24/25 | PMJ | Review Chino Valley summary judgement ruling; Review amended deposition notices. | 0.20 |
| 2/24/25 | JMT | Research summary judgment order in Chino Valley case. | 1.00 |
| 2/24/25 | PMJ | Telephone call with * regarding status of Chino case. | 0.20 |
| 2/24/25 | CSL | Conference with Mr. Jonna regarding hearing on motion to dismiss; Telephone conference with Mr. Jonna regarding applicability of ruling in Chino Valley case. | 0.60 |
| 3/20/25 | PMJ | Assess potential amicus support in case. | 0.20 |
| 4/3/25 | JMT | Research into Judge Benitez's practice regarding allowing amicus briefs. | 0.20 |
| 4/23/25 | PMJ | Review motion to dismiss ruling in Chino v. Newsom. | 0.20 |
| 11/21/25 | CSL | Telephone conference with attorneys for DOJ regarding facts, legal issues, and amicus brief. | 0.80 |

EXHIBIT 27

| Date | Biller | Description – 76 | Hours |
|------|--------|------------------|-------|
| 9/18/22 | CSL | Exchange e-mail correspondence regarding facts and legal issues. | 0.40 |
| 9/22/22 | CSL | Review e-mail correspondence regarding * . | 0.20 |
| 11/17/22 | PMJ | Multiple e-mail correspondence regarding next steps. | 0.20 |
| 12/13/22 | CSL | E-mail correspondence regarding status of * School District policies. | 0.40 |
| 12/21/22 | CSL | Review e-mail correspondence regarding matter status; Telephone conference with Mr. Jonna regarding strategy. | 0.40 |
| 3/24/23 | CSL | Review e-mail correspondence regarding * . | 0.40 |
| 4/13/23 | JMT | Multiple emails regarding retaining experts. | 0.40 |
| 4/13/23 | PMJ | Review e-mail correspondence regarding * . | 0.20 |
| 5/1/23 | CSL | Multiple emails regarding media and negative push back from students; Emails regarding administrative leave. | 0.60 |
| 5/4/23 | CSL | Review articles and radio interviews on case; E-mail correspondence regarding request for administrative leave; Review emails regarding fundraising. | 0.80 |
| 5/5/23 | CSL | E-mail correspondence regarding video sent to client from band leader; View video. | 0.60 |

| Date | Biller | Description – 76 | Hours |
|---|---|---|---|
| 5/10/23 | CSL | E-mail correspondence regarding motion for preliminary injunction. | 0.40 |
| 5/16/23 | CSL | Review e-mail correspondence on filing of motion for preliminary injunction. | 0.20 |
| 6/12/23 | CSL | Multiple emails regarding opposition to motion to dismiss and opposition to motion for preliminary injunction. | 0.40 |
| 6/16/23 | CSL | E-mail correspondence regarding complaint and pending motions. | 0.40 |
| 6/16/23 | MZ | Continue to review and summarize key cases. | 6.60 |
| 6/19/23 | MZ | Continue to review and summarize key cases. | 5.20 |
| 6/20/23 | MZ | Continue to review and summarize key cases. | 6.60 |
| 6/21/23 | MZ | Continue to review and summarize key cases. | 6.80 |
| 6/22/23 | MZ | Continue to review and summarize key cases. | 0.60 |
| 6/23/23 | MZ | Continue to review and summarize key cases. | 2.80 |
| 6/26/23 | MZ | Continue to review and summarize key cases. | 6.40 |

| Date | Biller | Description – 76 | Hours |
|------|--------|------------------|-------|
| 6/27/23 | MZ | Continue to review and summarize key cases. | 6.20 |
| 6/28/23 | MZ | Continue to review and summarize key cases. | 6.60 |
| 6/29/23 | MZ | Continue to review and summarize key cases. | 3.40 |
| 6/30/23 | MZ | Continue to review and summarize key cases. | 4.20 |
| 7/30/23 | CSL | E-mail correspondence regarding * education system and the transgender agenda. | 0.40 |
| 8/7/23 | CSL | E-mail correspondence regarding Podcast addressing LGTBQ agenda in schools; Review articles regarding same. | 0.60 |
| 9/8/23 | CSL | Review and analysis of excerpts of transcript of temporary restraining order hearing; Emails regarding same. | 0.60 |
| 9/20/23 | CSL | Review articles on case; E-mail correspondence regarding media interviews; Telephone conference with * ; Conference with Mr. Jonna regarding same. | 0.80 |
| 9/25/23 | CSL | E-mail correspondence on * . | 0.40 |
| 9/26/23 | CSL | Review press release from Attorney General Bonta; Review Attorney Bonta's guideline letter on preliminary injunction order; Emails regarding same. | 0.60 |
| 9/27/23 | PMJ | Review and revise press release regarding Attorney General Bonta statement; Telephone calls and e-mail correspondence regarding same; Telephone conference with CDE regarding stipulation to extend time to answer complaint. | 1.00 |

| Date | Biller | Description – 76 | Hours |
|------|--------|-----------------|-------|
| 10/4/23 | FJC | Review emails, consider and analyze; respond; further email from Jeff Trissell. | 1.50 |
| 10/5/23 | FJC | Talk to Lori West; review documents; research; review various emails from Paul Jonna to Dan Shinoff; edit proposed letter. | 3.90 |
| 10/7/23 | FJC | First review of files sent by Mirabell on 10/6/23. | 0.30 |
| 10/9/23 | CSL | View Podcast of parents protesting transgernder indoctrination; E-mail correspondence regarding same. | 0.40 |
| 10/13/23 | CSL | Review e-mail correspondence regarding retaliation against clients; Review protest flyer regarding same. | 0.40 |
| 10/14/23 | CSL | E-mail correspondence regarding harassment and retaliation against clients; Review materials regarding same. | 0.60 |
| 10/16/23 | CSL | E-mail correspondence regarding harassment of clients and contempt. | 0.20 |
| 10/20/23 | CSL | Conference with * regarding protest against clients; Review e-mail correspondence and photographs regarding same. | 0.40 |
| 10/23/23 | CSL | Review e-mail correspondence regarding meeting with opposing counsel. | 0.20 |
| 10/24/23 | FJC | Case work; emails from last 2 days (.2); put all intake documents together and review for purposes of drafting EEOC claim. | 0.70 |
| 10/25/23 | CSL | E-mail correspondence regarding meeting with opposing counsel. | 0.20 |

| Date | Biller | Description – 76 | Hours |
|---|---|---|---|
| 10/25/23 | FJC | Review documents, review research, organize notes, interviews, emails, re-review emails, drafting claim for EEOC; email to LiMandri & Jonna LLP re: potential video. | 4.00 |
| 10/25/23 | FJC | Begin document review in the morning. | 0.70 |
| 10/30/23 | FJC | Review and send document. | 2.40 |
| 12/11/23 | CSL | Review Heritage article on Rights of Parents in Education of Children; E-mail correspondence regarding same. | 0.60 |
| 12/27/23 | JMT | Review numerous emails regarding continuing the Rule 26(f) conference, and respond regarding why this cannot be done. | 0.40 |
| 1/12/24 | CSL | Review articles on latest court hearing; Emails regarding same. | 0.60 |
| 1/18/24 | CSL | Review notices from Attorney General regarding transgender school policies; E-mail correspondence regarding same. | 0.40 |
| 2/8/24 | CSL | Review text messages regarding media coverage. | 0.40 |
| 3/1/24 | CSL | Further e-mail correspondence regarding investigation of claims made against client. | 0.40 |
| 3/1/24 | CSL | E-mail correspondence regarding investigation of claims made against client Lori West. | 0.40 |
| 3/19/24 | JMT | Review numerous emails regarding employment situation. | 0.40 |

| Date | Biller | Description – 76 | Hours |
|---|---|---|---|
| 4/4/24 | JMT | Review numerous emails regarding employment compensation, confiscation of funds, differential pay, and filing a grievance. | 0.40 |
| 5/7/24 | CSL | Review articles on press release from Attorney General Bonta's office regarding policy enforcement; Emails regarding same. | 0.40 |
| 5/13/24 | CSL | Review e-mail correspondence regarding class action complaint. | 0.40 |
| 6/15/24 | PMJ | Review draft reply in support of motion for leave to amend complaint; E-mail correspondence regarding same. | 0.40 |
| 6/17/24 | MDM | Receive and review e-mail correspondence regarding new case filings. | 0.20 |
| 8/19/24 | JMT | Telephone call with regarding next steps in our cases. | 0.40 |
| 8/29/24 | JMT | Review various emails regarding Elizabeth's employment status. | 0.40 |
| 10/28/24 | CSL | Multiple emails regarding recent court filings. | 0.20 |
| 12/3/24 | CSL | Review article regarding Court hearing on motion to dismiss; Emails regarding same. | 0.40 |
| 2/26/25 | CSL | E-mail correspondence regarding new adverse First Circuit decision, Foote v. Ludlow School Committee; Review portions of decision. | 0.60 |
| 3/29/25 | CSL | Review article on federal government review of state transgender policies in schools; Emails regarding same. | 0.60 |

| Date | Biller | Description – 76 | Hours |
|---|---|---|---|
| 5/1/25 | CSL | E-mail correspondence regarding statistics on social transitioning. | 0.40 |
| 5/30/25 | CSL | E-mail correspondence and research on social transitions. | 0.60 |
| 5/31/25 | CSL | E-mail correspondence on anticipated U.S. Supreme court case on parental rights; Review article regarding same. | 0.40 |
| 5/31/25 | CSL | Review research on harms of social transitioning; E-mail correspondence regarding same. | 0.60 |
| 5/31/25 | CSL | E-mail correspondence regarding questions for defense expert witnesses at depositions. | 0.80 |
| 6/1/25 | CSL | E-mail correspondence regarding additional questions for defense expert witnesses at depositions. | 0.40 |
| 7/12/25 | CSL | E-mail correspondence regarding evidence in support of renewed motion for summary judgment. | 0.40 |
| 7/16/25 | CSL | Review e-mail correspondence regarding multiple court filings. | 0.40 |
| 11/6/25 | CSL | E-mail correspondence regarding social transitions; Review and analysis of HHS Umbrella Systematic Review regarding same. | 1.20 |
| 11/18/25 | CSL | Review multiple emails regarding hearing on motion for summary judgment; emails regarding same. | 0.40 |

EXHIBIT 28

Printed from The State Bar of California website (www.calbar.ca.gov) on Wednesday, September 2, 2009

Location:

## 03-01

## ARBITRATION ADVISORY
## 03-01

DETECTING ATTORNEY BILL PADDING
January 29, 2003

> Points of view or opinions expressed in this document are those of the Committee on Mandatory Fee Arbitration. They have not been adopted or endorsed by the State Bar's Board of Governors and do not constitute the official position or policy of the State Bar of California.

QUESTION PRESENTED:

When an attorney's invoice overstates the amount of time required for work performed, it is called bill "padding." If a lawyer charges for services on an hourly basis how can an arbitrator evaluate the invoices for possible bill padding? This advisory explores the question of how an arbitrator may identify bill padding and determine a reasonable fee in such circumstances.

INTRODUCTION

Most bills are a collection of a great many estimates of time spent for work performed in the privacy of a lawyer's office. Accordingly, it is usually true that one cannot challenge most of these estimates with mathematical precision. Overall, arbitrators should look at three things:

    A. Evaluate the team/staffing used on the matter,

    B. Evaluate the work performed against the time billed, and

    C. Look for certain patterns in the form of the work descriptions.

DISCUSSION

Rules and observations about determining reasonable attorney's fees in general are addressed in Arbitration Advisories 95-02 (June 9, 1995) and 98-03 (June 23, 1998). This advisory focuses on a subset of that topic: when too much time is recorded for the individual units of work performed, generally known as bill "padding". In order to understand the likely areas to look for such problems, it is useful to consider the historical background of attorney's professional fees [See American Bar Association Commission on Billable Hours Report (August, 2002) referred to hereinafter as "ABA Report" (See http://www.abanet.org/].

Historically, lawyers routinely billed clients in flat sums or fixed amounts - often at the conclusion of the matter. This required some estimating and discretion on the part of counsel. A bill often read something like this: "Fee for services rendered, $ 750.00."

Clients sometimes paid their bills six months or a year after receipt of the invoice, which reflected services performed long before it was sent.

In Gisbrecht v. Barnhart [Gisbrecht v. Barnhart, 535 U.S. 789 (2002)] the Supreme Court wrote:

> ". . . . An American Bar Association (ABA) report, published in 1958, observed that attorneys' earnings had failed to keep pace with the rate of inflation; the report urged attorneys to record the hours spent on each case in order to ensure that fees ultimately charged afforded reasonable compensation for counsels' efforts. See Special Committee on Economics of Law Practice, The 1958 Lawyer and His 1938 Dollar 9-10 (reprint 1959).

> Hourly records initially provided only an internal accounting check. See Honest Hour 19. The fees actually charged might be determined under any number of methods: the annual retainer, the fee-for-service method, the "eyeball" method under which the attorney estimated an annual fee for regular clients, or the contingent-fee method, recognized by this Court in Stanton v. Embrey, 93 U. S. 548, 556 (1877), and formally approved by the ABA in 1908. See Honest Hour [W. Ross, The Honest Hour: The Ethics of Time-Based Billing by Attorneys (1996),13-19]. As it became standard accounting practice to record hours spent on a client's matter, attorneys increasingly realized that billing by hours devoted to a case was administratively convenient; moreover, as an objective measure of a lawyer's labor, hourly billing was readily impartable to the client. Id., at 18. By the early 1970's, the practice of hourly billing had become widespread. See id., at 19, 21."

Over the decades, federal and state courts have developed various approaches in evaluating requests for fees calculated on the basis of units of time at hourly rates. This process is called the "lodestar" method. The number of hours reasonably devoted to each case is multiplied by an amount determined to be a reasonable hourly rate. The time involved in many lodestar matters is often hundreds, perhaps thousands of hours of time, and evaluating such a request can be a vexing, complicated process even for courts experienced in such matters. Once the lodestar amount is determined it is presumed thereafter to be the reasonable fee, although the amount can sometimes be adjusted upwards or downwards for 12 reasons or factors [See Kerr v. Screen Extras Guild, Inc. 526 F.2d 67, 70 (9th Cir. 1975)]. This advisory is not concerned with these adjustments but with evaluating the lodestar for fees for services which have been rendered by a law firm to its client on an hourly basis and with a specific focus on whether or not there has been "padding" or "heavy pencil" time estimates in the bill.

In the now-standard chronological legal bill, almost all time is (or can be, if requested) shown by day and by timekeeper. If a lawyer or other timekeeper does several things in one day on a particular matter then he or she must decide how to describe this work and how much time to enter for the work. This can be done for the batch of things done as a total or for each element within the batch. The use of only one total time is called "block billing" or "lumping" and it is not a favored practice. Many sophisticated users of legal services and many courts specifically prohibit block billing, and in evaluating the appropriateness of charges for legal services it may be appropriate - even essential in some cases - to write off time and fees to account for this practice.

An arbitrator's review of legal bills should include an inquiry into the method and timing used to prepare the bills in order to form an opinion as to the accuracy of the data shown by the bills. Some attorneys, particularly solo practitioners and very small firms, still use word processing programs to generate bills but most mid-size and larger firms use billing programs for this function. Many time and billing software programs in use today have a timer feature that allows one to input "start" and "stop" commands for one or more matters. The program then automatically calculates the elapsed time for each procedure in the same manner as a stopwatch. This feature is cumbersome and very rarely used by timekeepers, due in part to the nature of the way timekeepers devote their time to various matters during a typical day. Telephone calls, voice-mails, e-mails, faxes, couriers, mail, colleagues, sudden inspiration, etc., interrupt and require instant attention to another matter. Sometimes two or more things are happening at the same time, and there is no way to have a timekeeper keep track of these events and the time involved for each event will have to be estimated and written or entered manually for each task.

Many lawyers no longer write out what they do by hand on paper time sheets but input their work descriptions directly into computers. These can usually be identified because they are often longer and more detailed. For example, if an entry in an invoice reads: "meeting with client to discuss the elements of the separate statement of facts and the source of evidence for each element (1.8); research new opinion on the presumptions and burden of proof under Festo and progeny (2.5)" [Example 1], this is likely (but not necessarily) something actually entered into the program by the lawyer. On the other hand, the briefer description for the same work of: "meeting with client re MSJ; research burden of proof (4.3)" [Example 2] is probably something written in longhand and then transcribed into the billing program. Some lawyers still do not use billing programs but generate their bills by word processing programs or even on hand-written slips of carbon paper designed for this use. It is not the format of the bill but the information provided which is important. Full and complete hand-written descriptions are fine, but these are now very rare.

While it is almost universally acknowledged that contemporaneous records are the best practice, many times the press of business is such that a day or two (or more) goes by without the timekeeper entering any times. Sometimes a month may pass without any entries. Rarely years go by without any entries! At some point a bill needs to be generated and the timekeeper is faced with the need to reconstruct what happened a day or two or a month ago (or a year ago) with great precision. The time will be turned in or reconstructed and the invoices may appear to be very precise, with exact times noted for each activity, but this surface appearance of accuracy is deceptive and the time recorded is subject to re-evaluation by the arbitrator. When reading the bill it is very important to remember that in the vast majority of cases each time entry in a lawyer's bill is merely an estimate of how much time was required for the work performed that is being described in a summary fashion.

Since the entry for time spent is done by the individual timekeeper with no one watching, and because the ascribing of time is sometimes a very subjective thing which must be done with some care, it is up to the timekeeper to exercise judgment in making these estimates. Once the time is entered it is not final, however. It is customary for larger law firms to have a draft of the bill circulated to the partner in charge of billing on the matter. These are often called "pre-bills" which are edited for errors and the time is written up or down in an exercise of what is called "billing judgment" by the billing partner (who may or may not be the lawyer actually working on the file) who originated the case for the firm. Pre-bills have the raw data and often have cumulative totals as well. After the pre-bill is revised it becomes the invoice. The client may or may not ever know about this process. The final bill may or may not have some entries that read "no charge". Following this process, the final bill is sent out to the client, with or without an explanatory letter. Many times the pre-bills are not carefully reviewed by the billing partner for a number of reasons, including the fact that most billing partners are very busy and do not have or want to allocate the time to check each bill carefully, the entries may be for timekeepers who are not readily available, and the billing partner may have a huge stack of pre-bills to go through and only a short time to do so since the firm wants to "get the bills out".

It is just about impossible to be certain that any one single time entry is wrong or faked or padded. "The 'perfect crime' [is the] padding of bills…" [W. Ross, the Honest Hour: The Ethics of Time Based Billing by Attorneys 2 (1996)]. If, in Example 1 above, the client is certain that the meeting required only 30 minutes (with no travel time), then perhaps one could question the entry of 1.8 hours. But how can one prove that the time for, say, a specific letter was really 12 minutes rather than 30? If the time is block-billed and one does not even know how much time is being claimed for the letter, then what? Look at the totality of the data and consider the following three methods.

THE THREE APPROACHES TO IDENTIFYING PADDING

Assuming that one is presented with a group of invoices that seem to be (or are claimed to be) too high, and assuming that one suspects that some irregularity might be present, how can one evaluate these invoices for padding? There are three ways: (1) examine the staffing; (2) quantify and evaluate the reasonableness of the time spent on specific tasks or for major specific items; and (3) look at the format of the bills.

A. Examine Staffing. Invoices should indicate the names of the timekeepers.

It is customary to show the hours and fees billed by timekeepers by invoice and sometimes also cumulatively for the life of the matter. Examine these invoices and make a list of timekeepers and their hours per invoice. Do many come and go from invoice to invoice? If there are many timekeepers on a matter then one should focus on the ones who are more likely to have been using what is called a "heavy pencil" in recording their time. Who in the firm is the most likely to pad the bill?

The least experienced lawyers are called "associates". They are employees of the firm and are paid a salary and sometimes a bonus for billing high hours in a year. Many firms pay bonuses if associates bill about 2,000 to 2,420 hours in a year. Try to ascertain the plan in effect for the particular case and be aware that some firms will allow an associate to elect a particular plan. Base salary is tied to a certain minimum, and an associate may get a bonus for meeting specified "billables". New associates are often not efficient but they need to record as many hours as they can to meet their targets. The matters they work on are usually ones where they have no direct relationship with the client. New associates are most likely to be under great pressure to bill very high hours. If they have not developed the discipline to record their times daily, some time may go by before the associate enters the work description and time. Some will give in to the temptation to guess and to exaggerate in order to meet the demands on them, anticipating that it will be at least a month and maybe longer before anyone questions the time. Be observant for elastic phrases to describe what they did in a way which is easy to justify or at least hard to disprove. Phrases such as "review documents produced by counsel, 8.0 hours", "discovery, 6.0 hours", "prepare for trial 9.0 hours", etc., should trigger suspicion. Scrutinize newer associates' times first. The fewer the years of practice, the higher the probability of padding. The ABA Commission on Billable Hours Report recognizes that hourly billing penalizes efficient and productive lawyers and "may allow, indeed may encourage, profligate work habits" [ABA Commission on Billable Hours Report (August, 2002), at pages 6 - 8].

It is also generally accepted that the more timekeepers on a case, the higher the bill will be. Pay particular attention to time recorded by newer associates who record time on the matter only briefly, such as one or two months.

B. Measure some or all of the work produced by the law firm against the hours claimed. Evaluate this for a range of reasonableness.

What were the major items of work performed? How many hours were recorded for this work? How many timekeepers were involved? What did they do? Did they duplicate each other's work? Was some of this "training" time for new lawyers? Was the client given an estimate or a budget? An "estimate" is not binding. A budget is supposed to be accurate and binding but subject to revision if circumstances change and the client is promptly informed.

Major tasks. One may need to quantify the time first. It may be possible to calculate how much time was billed for certain major tasks and then to look at the work product to see if the time falls into a range that appears reasonable. This can be hard to do without some experience in the particular legal area involved.

While the times-by-task can be hard to assemble, sometimes the bills themselves will have guides to that information within them if the firm employs what are called the "Uniform Task-Based Management System" (or Codes) published by the American Bar Association. Task-based billing codes are in fairly wide use but are not standard and there is some debate over their usefulness. For example, one may know that certain hours were recorded for "L240 - Motions For Judgment" but not how many hours were shown for a specific Motion for Summary Adjudication.

The ABA Task Codes assign litigation time within 5 groups: case assessment, pre-trial, discovery, trial and appeal. There are also 11 optional Activities Codes (such as "A106 - Communication (with client)" which may be used within each of these 5 groups in the Litigation Code Set.

In Example 1 above, for example, the time billed for meeting with the client to prepare the statement of facts would show the codes "L240" / "A106" in or right after the descriptions of the activities and the totals for these things would (or could) appear on the bill. Once the ABA key is in hand, this will help to break down the time and fees into broad tasks, which may be useful information. Once it is known that a motion for summary judgment required many hours of several timekeepers' time, one can then come to a conclusion or ask for an explanation of whether or not the time spent on this particular task is reasonable.

Documents. There often is a good deal of time shown for "reviewing documents" ("L320 - Document Production") in many litigation matters. First, ascertain how many document pages were produced or reviewed. This is sometimes stated in terms of "boxes" which is a standard file storage box normally holding anywhere from 2,000 to 3,500 pages of documents, depending on how tightly they are packed. Some courts and commentators mention 2,500 as the average number of pages per box. Ask how many timekeepers reviewed the documents and how long did it took. A general rule of thumb commonly used by experts in billing analysis is that it will take a lawyer about 8 hours to review a box of relevant documents. It might also require a paralegal's help at about 4 hours per box. This can vary widely depending on the type of documents and their importance and repetitiveness.

C. Examine the format of the invoices for patterns that suggest padding.

### 1. Formula billing

Every single piece of paper gets a time entry as it wends its way past the timekeeper to its destination. It does not take more than a few seconds to read most routine correspondence. If the timekeeper reads a group of documents in a minute or two and then records a minimum time for each document, this may ultimately increase the time by several hours. Look for multiple timekeepers reading the same documents.

### 2. High minimum increments

The standard minimum is 1/10th of an hour or 6 minutes. If a higher minimum is used, such as .25 or .5, this probably increases the time by 15% to 25%. Some courts have criticized the use of a .25 or 1/4 hour minimum as being too high.

### 3. Time estimates

If the bills show hours in even numbers such as 8.0, 9.0, or 10.0, these are probably estimates rather than actual time spent and should be investigated.

### 4. Block billing

If one amount of time is shown for working on more than one discrete task, this is called "block billing" or "lumping" time. This is almost never allowed by federal courts. The practice hides accountability and may increase time by 10% to 30%. The larger the "block", the more care should be exercised.

### 5. Standardized work descriptions

If one sees the exact same phrases used again and again in the bills, it is likely that some routine has set in and this allows some "down time" to find it way into the bills. An entry such as "review documents produced by opposition, 7.5 hours" is typical.

### 6. Lack of detail

"Research issues", "attention to file", "discovery", "prepare for trial", and similar statements are not specific enough to let the reader know what was done.

### 7. Wrong times

Sometimes a client knows that certain things took less time than was billed such as the meeting in Example 1, above. Perhaps other meetings were for known times or can be checked. Deposition transcripts usually have start and end times and can be checked against billing invoices.

### 8. Timeliness of invoices

Was the invoice prepared at or near the time when the services were provided? As noted above, if too much time has elapsed between the event and generating the invoice, the times shown might be estimates or best guesses of the time involved. On the other hand, it is possible that the timekeeper recorded his or her time contemporaneously but did not generate the invoice for some reason. The responsible attorney should be questioned about this.

### 9. Experts and outside investigators

Outside vendors such as experts or investigators should submit invoices that set out what they did with adequate detail. Representations or proof that these charges have actually been paid should also be produced.

### 10. Computer Assisted Legal Research ("CALR")

Firms such as Lexis-Nexis and Westlaw may offer "pro-forma" invoices which are not the actual charges to the firm. The actual net amounts paid by the firm should be determined.

### 11. Overhead items

Some charges such as telephone, facsimile, internet fees, extranet costs, office supplies, library charges, seminars, continuing legal education charges, and perhaps even basic CALR are really part of the cost of doing business and should be reflected in the professionals' hourly rates. These should not be passed on to the client unless the client has clearly agreed otherwise.

CONCLUSION

The vast majority of lawyers are honest and their bills are reliable statements of what was done. However, the economic pressure on lawyers and firms is enormous, continuous, and irrefutable. Some few timekeepers will pad the bill by inserting extra hours from time to time, and the cumulative effect of this practice can be very significant. Arbitrators should examine each case appropriately by: (1) examining the staffing, (2) quantifying and evaluating the time spent on major items of work, and (3) evaluating the form or pattern of the invoices for padding.

©2009 The State Bar of California

EXHIBIT 29

| Date | Biller | Description – 294 | Hours |
|---|---|---|---|
| 1/20/23 | JMT | Begin drafting motion for a preliminary injunction. | 2.40 |
| 1/20/23 | MLB | Review case file; Discuss facts with Mr. Jonna; Review multiple e-mail correspondence and documents received from Mr. Jonna; Review client-provided documents; Begin drafting outline for statement of facts. | 7.20 |
| 1/23/23 | JMT | Continue drafting preliminary injunction papers. | 3.80 |
| 1/23/23 | MLB | Begin drafting complaint and initial draft statement of facts based on review of case file. | 9.20 |
| 1/24/23 | JMT | Continue drafting preliminary injunction papers. | 2.20 |
| 1/24/23 | MLB | Continue working on complaint; Review TIPM reports and add facts to statement of facts; Legal research on * . | 10.80 |
| 1/25/23 | JMT | Continue working on preliminary injunction papers. | 3.20 |
| 1/25/23 | MLB | Continue working on complaint; Review client timeline of events; Review emails from EUSD counselors regarding students with pronoun requests. | 9.60 |
| 1/26/23 | JMT | Continue drafting preliminary injunction papers. | 2.40 |
| 1/26/23 | MLB | Continue working on complaint; Review Rights of Gender Diverse Students Powerpoint presentation; Review video and transcript; Integrate facts as necessary. | 9.80 |
| 1/27/23 | JMT | Continue working on preliminary injunction papers. | 2.00 |

| Date | Biller | Description – 294 | Hours |
|---|---|---|---|
| 1/27/23 | MLB | Continue working on complaint; Legal research on * . | 9.20 |
| 1/30/23 | MLB | Compile draft exhibits to complaint; Revise complaint based on conversation with Mr. Trissell; Legal research on * . | 7.80 |
| 1/31/23 | JMT | Continue working on motion for preliminary injunction. | 4.60 |
| 2/1/23 | JMT | Work on preliminary injunction papers. | 6.40 |
| 2/2/23 | JMT | Continue working on preliminary injunction papers. | 5.40 |
| 2/2/23 | JMT | Review draft complaint. | 0.60 |
| 2/3/23 | PMJ | Assess complaint and exhibits. | 0.20 |
| 2/3/23 | JMT | Conferences with Mr. Jonna and Mr. Brandon regarding strategy for complaint and preliminary injunction papers; Review various complaints for Mr. Brandon to review. | 1.20 |
| 2/3/23 | MLB | Begin revisions to draft complaint based on comments from Mr. Trissell; Review * . | 8.20 |
| 2/6/23 | PMJ | Assess parties to name in complaint. | 0.20 |
| 2/6/23 | JMT | Perform research for complaint. | 5.40 |

| Date | Biller | Description – 294 | Hours |
|---|---|---|---|
| 2/6/23 | MLB | Continue revisions to draft complaint; Incorporate new * ; expansions and revisions to statement of facts. | 8.80 |
| 2/7/23 | JMT | Further research on necessary joinder of California Department of Education under FRCP 19. | 0.80 |
| 2/7/23 | JMT | Edits to complaint. | 3.00 |
| 2/7/23 | JMT | Continue working on complaint. | 1.80 |
| 2/7/23 | MLB | Complete revisions to draft complaint; Prepare exhibits for same; Exchange e-mail correspondence with Mr. Trissell regarding same. | 6.40 |
| 2/8/23 | JMT | Continue editing complaint. | 6.20 |
| 2/8/23 | NDG | Review emails from clients regarding case facts to include in the draft civil complaint. | 0.30 |
| 2/9/23 | JMT | Additional revisions to the complaint. | 5.20 |
| 2/14/23 | JMT | Continue working on complaint. | 2.40 |
| 2/23/23 | JMT | Review Joan Mannix's edits to preliminary injunction papers. | 1.40 |
| 3/22/23 | JMT | Update complaint in light of EUSD's latest letter responding to our specific questions. | 6.20 |

| Date | Biller | Description – 294 | Hours |
|---|---|---|---|
| 3/23/23 | JMT | Continue revising complaint. | 4.00 |
| 3/24/23 | JMT | Continue revising complaint. | 3.00 |
| 3/24/23 | JMT | Update preliminary injunction papers. | 0.60 |
| 3/27/23 | JMT | Revise preliminary injunction memorandum. | 3.40 |
| 3/27/23 | CSL | E-mail correspondence regarding filing of complaint. | 0.40 |
| 3/28/23 | PMJ | Review and revise draft complaint. | 1.00 |
| 3/28/23 | PMJ | Discuss edits to complaint with Mr. Trissell. | 0.20 |
| 3/28/23 | JMT | Conference with Mr. Jonna regarding complaint; E-mail correspondence to Attorney Grissom regarding same and potential of * . | 0.20 |
| 3/28/23 | PMJ | Review and revise complaint. | 1.40 |
| 3/28/23 | JMT | Conference with Mr. Jonna regarding revised complaint. | 0.40 |
| 3/28/23 | NDG | Review final draft of Complaint and Motion for Preliminary Injunction. | 2.00 |

| Date | Biller | Description – 294 | Hours |
|---|---|---|---|
| 3/29/23 | PMJ | Review and revise memorandum or points and authorities regarding preliminary injunction. | 0.80 |
| 3/29/23 | JMT | Update complaint with Mr. Jonna's proposed edits. | 2.20 |
| 3/29/23 | PMJ | Review and revise preliminary injunction motion. | 0.40 |
| 3/29/23 | PMJ | Telephone call with regarding preliminary injunction motion. | 0.60 |
| 3/29/23 | JMT | Additional revisions to complaint. | 2.20 |
| 3/30/23 | PMJ | Review and revise complaint; Review recent legal authority. | 0.40 |
| 3/30/23 | PMJ | Assess complaint and motion for preliminary injunction. | 0.20 |
| 3/30/23 | JMT | Revise complaint; Review expert declarations and amicus briefs from similar cases; Review briefing in similar cases in California; Review Board policies. | 7.40 |
| 3/30/23 | JMT | Additional research regarding parental rights for complaint. | 1.00 |
| 3/31/23 | JMT | Further research on parental rights; Update complaint. | 0.80 |
| 3/31/23 | JMT | Update complaint further. | 0.40 |

| Date | Biller | Description – 294 | Hours |
|---|---|---|---|
| 4/10/23 | JMT | Review and update complaint. | 2.60 |
| 4/11/23 | JMT | Additional revisions to the complaint. | 2.00 |
| 4/11/23 | PMJ | Assess further edits to complaint and next steps. | 0.40 |
| 4/11/23 | PMJ | Interview experts and assess edits to complaint. | 1.00 |
| 4/11/23 | PMJ | Telephone call with client to discuss complaint and next steps. | 0.40 |
| 4/11/23 | NDG | Review Federal Complaint drafted by Jeff Trissell and suggested edits by clients; review most recent national cases on this subject. | 3.70 |
| 4/12/23 | PMJ | Assess framing of arguments and legal theories in complaint. | 0.20 |
| 4/12/23 | JMT | Update complaint to * . | 7.20 |
| 4/12/23 | PMJ | Review updated complaint. | 0.20 |
| 4/12/23 | CSL | E-mail correspondence regarding revisions to complaint. | 0.40 |
| 4/13/23 | JMT | Revise complaint per Mr. Jonna and client's comments. | 0.80 |

| Date | Biller | Description – 294 | Hours |
|---|---|---|---|
| 4/13/23 | JMT | Work on preliminary injunction motion; Gather key cases for binder; Further research on 14th amendment parental rights. | 4.00 |
| 4/14/23 | JMT | Additional updates to preliminary injunction papers. | 4.00 |
| 4/18/23 | JMT | Edits to preliminary injunction motion. | 2.00 |
| 4/18/23 | PMJ | Review and revise preliminary injunction papers. | 0.40 |
| 4/18/23 | NDG | Review Plaintiff's Motion for Preliminary Injunction. | 1.00 |
| 4/19/23 | JMT | Respond to emails from client with questions regarding next steps; Minor edits to preliminary injunction papers. | 0.80 |
| 4/19/23 | JMT | Incorporate client's edits into complaint. | 0.80 |
| 4/19/23 | PMJ | Client meeting regarding preliminary injunction and complaint. | 1.00 |
| 4/19/23 | JMT | Meeting with clients; Revise complaint. | 2.00 |
| 4/20/23 | JMT | Update complaint; Telephone call with Dr. Anderson. | 4.80 |
| 4/20/23 | PMJ | Assess expert report, complaint, and preliminary injunction motion. | 0.20 |

| Date | Biller | Description – 294 | Hours |
|------|--------|-------------------|-------|
| 4/20/23 | CSL | Telephone call with Mr. Trissell regarding status of complaint; Review e-mail correspondence regarding same. | 0.40 |
| 4/21/23 | JMT | Review and finalize complaint. | 2.00 |
| 4/21/23 | JMT | Telephone calls with Mr. Jonna, * , and Attorney Grissom regarding "confidential" designation on various of the religious accommodation process documents; Add footnote to complaint. | 0.60 |
| 4/21/23 | PMJ | Assess final edits to complaint and privilege issues. | 0.60 |
| 4/21/23 | PMJ | Review and revise complaint. | 0.40 |
| 4/21/23 | PMJ | Review and revise complaint. | 0.40 |
| 4/21/23 | JMT | Revise preliminary injunction papers. | 0.60 |
| 4/21/23 | PMJ | Review and revise complaint. | 1.00 |
| 4/21/23 | CSL | Review and revise complaint; Conference with Mr. Jonna regarding same. | 2.40 |
| 4/22/23 | PMJ | Review final edits to complaint. | 0.20 |
| 4/24/23 | JMT | Receive verification for complaint from client; Send revised expert declaration to Dr. Anderson; Revise complaint per client West's comments. | 0.80 |

| Date | Biller | Description – 294 | Hours |
|------|--------|-------------------|-------|
| 4/24/23 | PMJ | Review complaint and prepare outline of key points. | 2.20 |
| 4/25/23 | PMJ | Review complaint. | 0.20 |
| 4/26/23 | PMJ | Review complaint and create outline of key points. | 0.40 |
| 4/26/23 | JMT | Finalize complaint for filing. | 1.00 |
| 4/26/23 | PMJ | Review complaint and assess legal theories. | 1.00 |
| 4/26/23 | PMJ | Review legal theories in complaint. | 0.20 |
| 4/26/23 | PMJ | Review complaint and revise press release. | 0.80 |
| 4/26/23 | JMT | Multiple telephone calls with Mr. Jonna regarding issues for complaint; Further edits to same. | 2.40 |
| 4/26/23 | PMJ | Assess final edits to complaint. | 0.20 |
| 4/26/23 | PMJ | Review exhibits to complaint. | 0.80 |
| 4/27/23 | KD | Review e-mail correspondence from Mr. Trissell regarding revised summons, civil cover sheet, and complaint; Prepare documents for filing; File with Court; Telephone call to USDC to confirm receipt of filed docs. | 0.40 |

| Date | Biller | Description – 294 | Hours |
|---|---|---|---|
| 4/27/23 | JMT | Update preliminary injunction motion with citations to filed complaint. | 1.00 |
| 4/28/23 | JMT | Lengthy telephone call with expert Dr. Anderson regarding expert declaration. | 2.00 |
| 5/4/23 | JMT | Update declaration of Dr. Anderson. | 1.00 |
| 5/9/23 | JMT | Work on preliminary injunction declarations for clients. | 5.60 |
| 5/10/23 | JMT | Update Mirabelli preliminary injunction declaration with her edits. | 0.20 |
| 5/10/23 | JMT | Update Anderson declaration per Mr. Jonna's edits; Forward to Mr. Jonna and Dr. Anderson for review. | 1.80 |
| 5/11/23 | JMT | Continue working on motion for preliminary injunction papers. | 6.20 |
| 5/12/23 | MLB | Revisions to the West declaration for preliminary injunction; Email correspondence with Mr. Jonna and Mr. Trissell regarding same. | 0.60 |
| 5/15/23 | PMJ | Review and revise preliminary injunction motion. | 0.20 |
| 5/15/23 | JMT | Finalize motion for a preliminary injunction and declaration of Lori West; Incoroporate edits to memorandum from Mr. Jonna, Mr. Weisenburger, and Mr. Myers; Finalize notice and order * . | 8.00 |
| 5/15/23 | PMJ | Review and revise preliminary injunction motion. | 1.00 |

| Date | Biller | Description – 294 | Hours |
|---|---|---|---|
| 5/15/23 | PMJ | Review and revise preliminary injunction papers. | 0.40 |
| 5/16/23 | PMJ | Review final court filings regarding motion for preliminary injunction. | 0.20 |
| 9/21/23 | JMT | Begin drafting first amended complaint. | 0.20 |
| 9/21/23 | JMT | Begin drafting first amended complaint. | 0.80 |
| 9/22/23 | JMT | Continue working on first amended complaint. | 5.20 |
| 9/25/23 | JMT | Continue working on first amended complaint. | 4.20 |
| 10/2/23 | JMT | Edit first amended complaint with citations to LW v. Skrmetti, and Parents Defending Education. | 0.20 |
| 10/2/23 | FJC | Telephone conference with Paul Jonna; email from Jeff Trissell; begin review of complaint. | 1.50 |
| 11/14/23 | PMJ | Assess amended complaint and next steps. | 0.20 |
| 1/11/24 | JMT | Begin drafting first amended complaint. | 2.60 |
| 1/12/24 | JMT | Continue working on first amended complaint. | 4.20 |

| Date | Biller | Description – 294 | Hours |
|---|---|---|---|
| 1/18/24 | PMJ | Review edits to first amended complaint. | 0.20 |
| 1/18/24 | PMJ | Assess edits to complaint with Attorney Coughlin. | 0.20 |
| 1/22/24 | JMT | Telephone call with client regarding * ; Prepare redline version of first amended complaint and send to opposing counsel. | 0.60 |
| 1/23/24 | PMJ | Assess next steps regarding first amended complaint. | 0.20 |
| 1/24/24 | JMT | Telephone call to Clerk regarding how to proceed regarding first amended complaint. | 0.20 |
| 1/24/24 | JMT | Draft ex parte application for clarification regarding first amended complaint. | 1.40 |
| 1/25/24 | JMT | Telephone call to court Clerk regarding next steps on first amended complaint. | 0.40 |
| 1/25/24 | JMT | Draft ex parte application for clarification of order to amend complaint. | 0.80 |
| 1/29/24 | JMT | Finalize first amended complaint. | 0.60 |
| 1/29/24 | JMT | Receive first amended complaint. | 0.20 |
| 2/1/24 | PMJ | Review and revise edits to first amended complaint. | 0.40 |

| Date | Biller | Description – 294 | Hours |
|---|---|---|---|
| 4/18/24 | JMT | Draft second amended complaint. | 3.00 |
| 4/19/24 | JMT | Continue working on second amended complaint. | 3.00 |
| 4/23/24 | JMT | Continue working on second amended complaint. | 1.40 |
| 4/24/24 | JMT | Edits to second amended complaint. | 0.60 |
| 5/8/24 | JMT | Research for proposed amended complaint. | 4.20 |
| 5/8/24 | MDM | Begin researching feasibility of bringing injunctive class action against government defendants. | 0.80 |
| 5/9/24 | JMT | Begin drafting second amended complaint. | 3.40 |
| 5/10/24 | JMT | Continue working on second amended complaint. | 4.80 |
| 5/10/24 | PMJ | Review and revise second amended complaint. | 1.00 |
| 5/10/24 | PMJ | Legal research and analysis regarding amended complaint. | 0.60 |
| 5/10/24 | MDM | Continue research on class action; Review authority forwarded by Mr. Trissell regarding injunctive class actions; Review proposed second amended complaint. | 0.40 |

| Date | Biller | Description – 294 | Hours |
|------|--------|-------------------|-------|
| 5/13/24 | MDM | Continue researching availability of class action and requirements for it. | 0.80 |
| 5/13/24 | JMT | Draft motion for class certification. | 2.20 |
| 5/14/24 | PMJ | Telephone call with clients regarding second amended complaint. | 0.40 |
| 5/14/24 | MDM | Continue research and analysis of possibility of injunctive or declaratory class action. | 1.60 |
| 5/14/24 | JMT | Draft motion for class certification. | 3.40 |
| 5/15/24 | JMT | Continue working on motion for class certification. | 2.40 |
| 5/15/24 | MDM | Update research memorandum on class action; Additional analysis for same; Forward preliminary memorandum to Mr. Trissell and Mr. Jonna. | 0.80 |
| 5/16/24 | JMT | Continue working on motion for class certification. | 2.00 |
| 5/16/24 | MDM | Review, analyze, and comment on draft motion to certify class. | 2.40 |
| 5/16/24 | JMT | Continue working on motion for leave to amend complaint and motion for class certification. | 2.20 |
| 5/27/24 | JMT | Edits to second amended complaint. | 1.00 |

| Date | Biller | Description – 294 | Hours |
|---|---|---|---|
| 5/28/24 | JMT | Edit motion for class certification. | 3.40 |
| 5/30/24 | PMJ | Review and revise motion for leave to amend complaint and proceed pseudonymously and supporting declarations. | 0.60 |
| 5/30/24 | JMT | Edits to complaint and motion for leave to proceed pseudonymously. | 2.60 |
| 5/31/24 | PMJ | Assess amended complaint and next steps. | 0.20 |
| 6/3/24 | JMT | Edits to second amended complaint. | 2.80 |
| 6/4/24 | JMT | Additional revisions to second amended complaint. | 3.00 |
| 6/4/24 | PMJ | Review and revise second amended complaint and new allegations. | 1.20 |
| 6/4/24 | JMT | Further edits to complaint. | 0.60 |
| 6/4/24 | PMJ | E-mail correspondence to Lakeside School District regarding draft second amended complaint. | 0.20 |
| 6/5/24 | JMT | Edit second amended complaint; Review the Poe Family's edits to their declarations. | 1.40 |
| 6/5/24 | JMT | Incorporate Chris Galiardo's edits into complaint and motion for leave to amend complaint. | 0.80 |

| Date | Biller | Description – 294 | Hours |
|---|---|---|---|
| 6/6/24 | JMT | Incorporate client's edits into complaint and declarations; Finalize motion for leave to amend complaint. | 1.80 |
| 6/6/24 | PMJ | Review final edits to proposed second amended complaint. | 0.40 |
| 6/6/24 | JMT | Prepare class action addendum to retainer agreement and forward to all clients for review. | 0.80 |
| 6/19/24 | JMT | Draft motion for summary judgment. | 1.40 |
| 6/20/24 | JMT | Continue drafting motion for summary judgment. | 1.40 |
| 6/21/24 | JMT | Continue working on motion for summary judgment. | 5.80 |
| 6/22/24 | JMT | Continue working on motion for summary judgment. | 4.00 |
| 6/24/24 | JMT | Continue working on motion for summary judgment. | 4.60 |
| 6/26/24 | JMT | Edits to motion for summary judgment. | 0.80 |
| 6/27/24 | JMT | Continue working on motion for summary judgment. | 2.20 |
| 6/28/24 | JMT | Continue working on motion for summary judgment. | 6.20 |

| Date | Biller | Description – 294 | Hours |
|------|--------|-------------------|-------|
| 6/28/24 | JMT | Draft motion for summary judgment; Research FERPA. | 1.00 |
| 6/30/24 | JMT | Research and draft motion for summary judgment. | 1.00 |
| 7/1/24 | JMT | Draft motion for summary judgment. | 3.40 |
| 7/2/24 | JMT | Continue working on motion for summary judgment. | 3.80 |
| 7/2/24 | JMT | Continue working on motion for summary judgment. | 3.80 |
| 7/5/24 | JMT | Continue working on motion for summary judgment. | 1.80 |
| 7/10/24 | JMT | Revisions to motion for summary judgment. | 2.00 |
| 7/11/24 | JMT | Continue working on motion for summary judgment. | 4.40 |
| 7/12/24 | JMT | Update motion for summary judgment upon reviewing Blackstone and Kent legal commentaries. | 1.20 |
| 7/15/24 | JMT | Continue working on motion for summary judgment. | 1.40 |
| 7/15/24 | JMT | Work on motion for class certification. | 1.40 |

| Date | Biller | Description – 294 | Hours |
|------|--------|-------------------|-------|
| 7/16/24 | JMT | Updates to motion for summary judgment. | 1.40 |
| 7/16/24 | JMT | Continue working on motion for class certification. | 2.40 |
| 7/17/24 | JMT | Continue working on motion for class certification. | 2.60 |
| 7/25/24 | RM | Begin drafting attorney declaration and appendix of exhibits in support of motion for summary judgment and motion for class certification. | 0.20 |
| 7/26/24 | RM | Reviewed exhibits and added authentication paragraphs to the class certification attorney declaration. | 0.60 |
| 7/30/24 | JMT | Edit to declaration of Paul Jonna in support of motion for class certification. | 1.00 |
| 7/31/24 | JMT | Review new case on qualified immunity and add to motion for summary judgment. | 0.20 |
| 7/31/24 | RM | Review exhibits and edit declarations in support of motion for summary judgment. | 1.20 |
| 8/2/24 | JMT | Edit declaration of Paul Jonna in support of motion for summary judgment. | 0.40 |
| 8/7/24 | JMT | Review new case Texas v. Cardona; Edit memorandum of points and authorities in support of motion for summary judgment to include new case. | 0.40 |
| 8/9/24 | JMT | Edits to second amended complaint, motion for class certification, and motion for summary judgment. | 4.40 |

| Date | Biller | Description – 294 | Hours |
|------|--------|-------------------|-------|
| 8/12/24 | JMT | Revisions to motion for summary judgment. | 4.00 |
| 8/12/24 | RM | Reviewed exhibits and draft declaration of Paul Jonna in support of motion for summary judgment. | 2.00 |
| 8/13/24 | JMT | Finalize second amended complaint. | 0.80 |
| 8/13/24 | JMT | Additional edits to summary judgment motion. | 1.20 |
| 8/13/24 | PMJ | Review and revise motion for class certification. | 0.40 |
| 8/13/24 | PMJ | Review and revise motion for summary judgment. | 0.80 |
| 8/13/24 | RM | Complete declaration of Paul Jonna in support of motion for summary judgment. | 0.60 |
| 8/13/24 | RM | Begin preparing table of authorities in support of motion for class certification. | 1.80 |
| 8/14/24 | JMT | Finalize motion for summary judgment and motion for class certification. | 5.60 |
| 8/14/24 | PMJ | Review and revise motion for class certification. | 0.40 |
| 8/14/24 | RM | Prepare table of authorities for motion for summary judgment. | 3.20 |

| Date | Biller | Description – 294 | Hours |
|------|--------|-------------------|-------|
| 8/15/24 | PMJ | Review and revise motion for summary judgment briefs. | 1.60 |
| 8/15/24 | PMJ | Review and revise motion for summary judgment. | 1.00 |
| 8/15/24 | PMJ | Assess edits to motion for summary judgment. | 0.40 |
| 8/15/24 | PMJ | Make additional edits to motion for summary judgment papers. | 0.40 |
| 8/15/24 | JMT | Edits to motion for summary judgment, prepare supporting declarations for same. | 7.20 |
| 8/15/24 | RM | Update table of authorities for memorandum of points and authorities in support of motion for summary judgment. | 0.60 |
| 8/15/24 | RM | Prepare appendix vols. 1 and 2, appendix of authorities, and appendix of declarations in support of motion for summary judgment. | 1.00 |
| 8/15/24 | MDM | Review motion for summary judgment or a preliminary injunction, identify corrections and changes. | 3.40 |
| 8/16/24 | PMJ | Review and revise motion for summary judgment. | 0.60 |
| 8/16/24 | JMT | Draft ex parte application for leave to file oversized memoranda; Finalize motion for summary judgment, motion for class certification, and protective order. | 5.40 |
| 8/16/24 | RM | Revise table of authorities for memorandum of points and authorities in support of motion for summary judgment. | 1.80 |

| Date | Biller | Description – 294 | Hours |
|---|---|---|---|
| 9/3/24 | JMT | Begin drafting motion for a preliminary injunction. | 5.40 |
| 9/4/24 | JMT | Continue working on motion for preliminary injunction. | 4.80 |
| 9/13/24 | JMT | Edits to motion for a class-wide preliminary injunction. | 3.40 |
| 9/18/24 | JMT | Edits to motion for class-wide preliminary injunction. | 1.40 |
| 9/24/24 | JMT | Finalize motion for class-wide preliminary injunction. | 0.80 |
| 3/19/25 | JMT | Further research on gender identity for summary judgment motion. | 1.80 |
| 3/19/25 | JMT | Begin drafting renewed motion for summary judgment. | 1.80 |
| 6/30/25 | WTD | Review deposition transcripts of Poe and Doe families in preparation for drafting declarations; Review and revise Jane and John Poe declarations according to new information identified in their individual deposition transcripts; Begin revision of Jane and John Doe declarations. | 3.20 |
| 6/30/25 | JMT | Being drafting motion for summary judgment. | 3.40 |
| 6/30/25 | WTD | Draft Jane and John Doe declarations for motion for summary judgment. | 1.40 |
| 7/1/25 | JMT | Continue working on renewed motion for summary judgment. | 3.00 |

| Date | Biller | Description – 294 | Hours |
|---|---|---|---|
| 7/2/25 | WTD | Conference with Mr. Trissell regarding edits to clients' declarations; E-mail correspondence with Mr. Trissell regarding same. | 0.40 |
| 7/7/25 | WTD | Continue review of John and Jane Doe deposition transcripts; Revise declarations with additional information. | 2.20 |
| 7/8/25 | WTD | Complete review of Jane and John Poe deposition transcripts; Revise declarations to include additional information; E-mail correspondence with Mr. Trissell regarding same. | 2.40 |
| 7/9/25 | JMT | Continue drafting renewed motion for summary judgment. | 5.00 |
| 7/10/25 | JMT | Continue working on renewed motion for summary judgment. | 6.20 |
| 7/10/25 | WTD | Continue review of Jane Boe and Jane Roe deposition transcripts; Revise declarations for same. | 2.80 |
| 7/10/25 | WTD | Review and revise Jane Boe and Jane Roe declarations to include section detailing the burden the school policies have placed on each; Review deposition transcripts for information regarding same. | 1.40 |
| 7/11/25 | JMT | Continue working on renewed motion for summary judgment. | 1.40 |
| 7/11/25 | JMT | Work on reviewing discovery and preparing exhibits for renewed motion for summary judgment; Begin comprehensive review of all deposition transcripts of defense witnesses. | 8.00 |
| 7/11/25 | WTD | Begin review of deposition transcript of Elizabeth Mirabelli to identify additional information for draft declaration in support of renewed motion for summary judgment. | 1.80 |
| 7/11/25 | WTD | Draft declaration of Elizabeth Mirabelli in support of renewed motion for summary judgment. | 1.60 |

| Date | Biller | Description – 294 | Hours |
|------|--------|-------------------|-------|
| 7/11/25 | WTD | Draft declaration of Lori Ann West in support of renewed motion for summary judgment. | 1.80 |
| 7/11/25 | WTD | Begin review of deposition transcript of Lori Ann West to identify additional information for draft declaration in support of renewed motion for summary judgment. | 2.00 |
| 7/12/25 | PMJ | Review and revise client declarations in support of renewed motion for summary judgment. | 0.60 |
| 7/12/25 | JMT | Continue working on renewed motion for summary judgment; Incorporate into brief historical information from memorandum prepared by Professor Tomas Arestegui and continue review of depositions. | 9.80 |
| 7/13/25 | JMT | Continue working on renewed motion for summary judgment; Continue reviewing depositions and incorporating into brief. | 6.80 |
| 7/14/25 | JMT | Continue working on renewed motion for summary judgment; Continue reviewing deposition transcripts. | 5.80 |
| 7/14/25 | PMJ | Review updated declaration of Jane Roe in support of renewed motion for summary judgment. | 0.20 |
| 7/14/25 | JMT | Further edits to client declarations in support of renewed motion for summary judgment. | 1.80 |
| 7/14/25 | WTD | Review and revise draft declarations for Ms. West and Ms. Mirabelli; Review deposition transcripts regarding same; E-mail correspondence with Mr. Trissell regarding same. | 1.40 |
| 7/14/25 | WTD | Review Mr. Trissell's revisions to plaintiffs' declarations in support of renewed motion for summary judgment; Incorporate similar changes into other declarations. | 1.20 |
| 7/15/25 | PMJ | Review and revise renewed motion for summary judgment. | 0.40 |

| Date | Biller | Description – 294 | Hours |
|------|--------|-------------------|-------|
| 7/15/25 | PMJ | Review and revise renewed motion for summary judgment. | 0.60 |
| 7/15/25 | JMT | Draft renewed motion for class certification. | 1.40 |
| 7/15/25 | JMT | Edits to declarations of Elizabeth Mirabelli and Lori West in support of renewed motion for summary judgment; Continue working on renewed motion for class certification. | 4.60 |
| 7/15/25 | PMJ | Review and revise renewed motion for summary judgment. | 1.00 |
| 7/15/25 | WTD | Review and incorporate Mr. Trissell's edits to declarations of Elizabeth Mirabelli and Lori West; E-mail correspondence with Mr. Trissell regarding same. | 0.80 |
| 7/15/25 | WTD | Review Mr. Trissell's e-mail correspondence from July 11, 2025 and begin review of draft renewed motion for summary judgment. | 1.20 |
| 7/16/25 | PMJ | Review and revise Elizabeth Mirabelli declaration in support of renewed motion for summary judgment. | 0.60 |
| 7/16/25 | PMJ | Review and revise Lori West declaration in support of renewed motion for summary judgment. | 0.60 |
| 7/16/25 | JMT | Continue working on renewed motion for class certification, renewed motion for summary judgment, Daubert motion; Finalize and ensure all are filed. | 11.40 |
| 7/16/25 | PMJ | Review and revise motion for class certification. | 1.40 |
| 7/16/25 | PMJ | Review and revise Paul Jonna declaration in support of renewed motion for summary judgment. | 0.20 |

| Date | Biller | Description – 294 | Hours |
|---|---|---|---|
| 7/16/25 | PMJ | Review final edits to class certification motion. | 0.20 |
| 7/16/25 | PMJ | Review and revise renewed motion for summary judgment papers. | 0.60 |
| 7/16/25 | PMJ | Review and revise renewed motion for summary judgment. | 1.00 |
| 7/16/25 | WTD | Review and revise record citations in various motion; Conference with Mr. Trissell regarding same. | 3.60 |
| 7/16/25 | WTD | Review and revise record citations in renewed motion for summary judgment. | 0.60 |
| 7/16/25 | WTD | Draft and revise Paul Jonna declaration in support of renewed motion for summary judgment; Conference with Mr. Trissell and Mr. Muldowney regarding same. | 1.60 |
| 7/17/25 | JMT | Review and edit press release for renewed motion for summary judgment filings. | 0.20 |
| 7/21/25 | PMJ | Prepare outline for renewed motion for summary judgment hearing. | 0.20 |
| 7/21/25 | PMJ | Continue working on outline for renewed motion for summary judgment hearing. | 0.40 |
| 10/22/25 | PMJ | Prepare for motion for summary judgment hearing. | 0.40 |
| 10/22/25 | PMJ | Prepare for motion for summary judgment hearing | 0.40 |

| Date | Biller | Description – 294 | Hours |
|---|---|---|---|
| 10/24/25 | PMJ | Prepare for motion for summary judgment hearing. | 1.00 |
| 10/25/25 | PMJ | Prepare for motion for summary judgment hearing. | 1.00 |
| 10/27/25 | PMJ | Continue preparing for motion for summary judgment hearing. | 0.60 |
| 10/28/25 | PMJ | Continue preparing for motion for summary judgment hearing. | 1.00 |
| 10/29/25 | PMJ | Review evidence to prepare for motion for summary judgment hearing. | 0.60 |
| 10/29/25 | PMJ | Continue preparing for motion for summary judgment hearing. | 2.60 |
| 10/30/25 | PMJ | Continue preparing for motion for summary judgment hearing. | 3.00 |
| 10/31/25 | PMJ | Continue preparing for motion for summary judgment hearing. | 1.40 |
| 11/1/25 | PMJ | Prepare for motion for summary judgment hearing. | 0.60 |
| 11/3/25 | PMJ | Continue preparing for motion for summary judgment hearing. | 2.60 |
| 11/4/25 | PMJ | Continue to prepare for motion for summary judgment hearing. | 1.20 |

| Date | Biller | Description – 294 | Hours |
|---|---|---|---|
| 11/4/25 | PMJ | Draft outline for motion for summary judgment hearing. | 0.40 |
| 11/5/25 | PMJ | Continue preparing for motion for summary judgment hearing. | 0.80 |
| 11/8/25 | PMJ | Prepare for motion for summary judgment hearing and analyze PRISM materials. | 1.60 |
| 11/12/25 | PMJ | Continue preparation for motion for summary judgment hearing. | 1.00 |
| 11/13/25 | PMJ | Continue to prepare for motion for summary judgment hearing. | 3.20 |
| 11/14/25 | PMJ | Continue to prepare for motion for summary judgment hearing. | 4.80 |
| 11/15/25 | PMJ | Continue to prepare for motion for summary judgment hearing. | 7.00 |
| 11/17/25 | PMJ | Continue to prepare for motion for summary judgment hearing. | 1.80 |

EXHIBIT 30

● Warning
As of: December 23, 2019 1:36 AM Z

## *Ekstrom v. Marquesa at Monarch Beach Homeowners Ass'n*

Court of Appeal of California, Fourth Appellate District, Division Three

November 3, 2008, Filed

G039280

**Reporter**
2008 Cal. App. Unpub. LEXIS 8298 *; 2008 WL 4768861

ROBERT EKSTROM et al., Plaintiffs and Appellants, v. MARQUESA AT MONARCH BEACH HOMEOWNERS ASSOCIATION, Defendant and Appellant.

**Notice:** NOT TO BE PUBLISHED IN OFFICIAL REPORTS. CALIFORNIA RULES OF COURT, RULE 8.1115(a), PROHIBITS COURTS AND PARTIES FROM CITING OR RELYING ON OPINIONS NOT CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED, EXCEPT AS SPECIFIED BY RULE 8.1115(b). THIS OPINION HAS NOT BEEN CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED FOR THE PURPOSES OF RULE 8.1115.

**Prior History:** [*1] Appeal from a postjudgment order of the Superior Court of Orange County. Super. Ct. No. 04CC12264. Charles Margines, Judge.

**Disposition:** Affirmed in part, reversed in part, and remanded with directions.

## Core Terms

costs, attorney's fees, Plaintiffs', billing, percent, trial court, subdivision, total hours, hourly rate, per hour, nonstatutory, calculating, reasonable attorney's fees, litigation costs, prevailing party, award of attorney's fees, declaration, increments, practices, minute

**Counsel:** Enterprise Counsel Group, David A. Robinson, Benjamin P. Pugh; Jeffrey Lewis for Plaintiffs and Appellants.

Kulik, Gottesman, Mouton & Siegel LLP, Thomas M. Ware II, Sharon Barber; Borton Petrini & Conron, LLP, Matthew J. Trostler for Defendant and Appellant.

**Judges:** O'LEARY, J.; RYLAARSDAM, ACTING P. J., ARONSON, J. concurred.

**Opinion by:** O'LEARY

## Opinion

2008 Cal. App. Unpub. LEXIS 8298, *1

In a companion case filed concurrently with this opinion (*Ekstrom et al. v. Marquesa at Monarch Beach Homeowners Association* [Nov. 3, 2008, G038537] (*Ekstrom I*)), we affirm the judgment against Marquesa at Monarch Beach Homeowners Association (the Association), in favor of the Plaintiffs, [1] who are individual homeowners within the Marquesa at Monarch Beach development, compelling the Association to enforce a recorded declaration of conditions, covenants, and restrictions (CC&Rs) as concerns neighborhood palm trees that obstruct the Plaintiffs' ocean views. The judgment awarded the Plaintiffs their costs and attorney fees in accordance with the CC&Rs and *Civil Code section 1354, subdivision (c)*. [*2] The Plaintiffs subsequently requested attorney fees of over $ 686,816.44. The trial court awarded them $ 522,216.

The Association appeals from the order awarding the Plaintiffs their attorney fees. It concedes the Plaintiffs are entitled to attorney fees, but contends the amount actually awarded does not comport with the trial court's stated intention to reduce the Plaintiffs' total claimed hours by 40 percent. We agree with the Association and reverse the attorney fees award and remand the matter to the trial court with directions to recalculate [*3] the attorney fees award.

The Plaintiffs also appeal from the postjudgment order contending: (1) the trial court abused its discretion in reducing its attorney fees because the court relied on factors, such as overstaffing and overbilling, that are not supported by the evidence; and (2) the court erred by denying its request for over $ 40,000 in litigation costs that are otherwise

---

not permitted under *Code of Civil Procedure section 1033.5*. We find no merit to either of the Plaintiffs' contentions.

FACTS AND PROCEDURE

The facts and the parties' underlying dispute are thoroughly discussed in the companion case, *Ekstrom I*, and we need not reiterate them here. Following entry of judgment, the Plaintiffs submitted a memorandum of costs seeking $ 37,297.83 in litigation costs allowed under *Code of Civil Procedure section 1033.5*, of which the court awarded the Plaintiffs $ 36,192.61. The Plaintiffs filed a separate motion for attorney fees and nonstatutory costs totaling $ 731,446.03. The nonstatutory costs totaled $ 44,629.59. The Plaintiffs sought attorney fees of $ 673,130.19 up through March 2007. They sought an additional $ 13,686.25 in attorney fees for preparing the motion and responding [*4] to the Association's motion to tax costs. The total attorney fees requested were $ 686,816.44.

The Plaintiffs submitted their counsel's detailed billing statements in support of the motion. They excised from the invoices hours attributable to pursuing this action against individual members of the Association's Board, who were dismissed on summary judgment, and the Association's property management company, which settled out. The invoiced attorney hours on the underlying matter from October 2004 through February 2007, totaled 3,326.80, from which the Plaintiffs deleted 455.5 hours, for a requested total of 2,871.3 hours. In their brief, the Plaintiffs agree the total hours they claimed through February 2007 were 2,871. The Plaintiffs' attorneys declared that since February 2007, they had or intended to spend an additional 54.75 hours in preparing the motion for attorney fees and nonstatutory costs, replying to opposition, and responding to the Association's motion to tax costs.

In his declaration, the Plaintiffs' counsel Benjamin Pugh explained this case was primarily staffed by himself (a partner in his law firm), another partner,

---

[1] The plaintiffs and respondents are Robert and Margaret Ekstrom, James and Shendel Haimes, Michael and Betty Sue Hopkins, Robert and Leona Kampling, Stephen and Cheryl Kron, Jim O'Neil, G. John and Joanne Scheffel, and Nicholas Shubin. For convenience, they will hereafter be referred to collectively as the Plaintiffs, unless the context indicates otherwise. In their respondents' brief, the Plaintiffs inform us that while this appeal was pending, Robert Kempling passed away. His estate was not substituted in. Additionally, Jim O'Neil and Michael and Betty Sue Hopkins no longer reside in Marquesa, although they have not been dismissed from this action.

and a senior associate, and their hourly rates ranged [*5] from $ 210 to $ 450 per hour. Additionally, 10 other attorneys in his office (whose hourly rates ranged from $ 135 to $ 450 per hour) and three paralegals (with hourly rates ranging from $ 85 to $ 100 per hour) also worked on the case at various times. The Plaintiffs submitted a declaration from attorney Thomas R. Malcom, as an attorney fees expert witness, opining the total of the fees and costs billed by the Plaintiffs' attorneys was "extremely reasonable."

In its opposition to the attorney fees and nonstatutory costs motion, the Association submitted a declaration from attorney Daniel A. Nordberg offering his own opinion as an attorney fees expert witness. He explained various billing practices detailed in the Plaintiffs' counsels' invoices that he believed rendered the total hours billed unreasonable. Those practices included billing in quarter-hour increments (minimum increments of 15 minutes), when the standard for this type of case is one-tenth (i.e., six minute increments); rounding up time entries for each individual task to the next 15 minute increment; unreasonable congregational billing for meetings and telephone calls (all attorneys at a meeting bill for their time thereby [*6] unreasonably compounding the time), excessive billing for e-mails (every attorney working on the case is copied on every e-mail and each bills a minimum of 15 minutes to review each e-mail); and overbilling. Nordberg opined the Plaintiffs' reasonable attorney fees should not exceed $ 200,000.

The trial court awarded the Plaintiffs $ 522,216 in attorney fees and denied their request for nonstatutory litigation costs. With regards to attorney fees, the court's order stated its reasoning as follows: "In reducing the amount of fees claimed, the court is persuaded by [the Plaintiffs'] counsel's excessive billing. Counsel's firm employed a virtual army--[13] attorneys and three paralegals--to work on this case, at rates which varied from $ 85 . . . to $ 450 . . . per hour. No explanation was provided for the need to employ so

many people and why the hourly rates were reasonable. Plaintiffs' argument, that essentially their counsel is worth twice as much per hour as counsel for the director defendants, is without any support. That argument also ignores the fact that 'cheaper' counsel prevailed against them in the lawsuit. The court finds merit in defendant's argument that billing in minimum [*7] .25 hour increments results in overbilling. The industry standard is .10 hours. One example of overbilling is the amount sought for this motion, a staggering $ 13,686.25 in fees, reflecting work performed by two attorneys who bill $ 295 . . . and $ 210 per hour, respectively. Why does a partner need to spend some 20 hours working on a fees and costs motion when an associate is also billing a similar number of hours on the same motion? The court cannot come up with a reasonable explanation. Thus, the court reduces the hours claimed by 40 [percent] to 2,596.08, to which the court adds 15 hours for preparation of the motion and reply thereto, for a total of 2,611.08 hours. Moreover, using plaintiffs' own benchmark of $ 150 . . . , the amount charged by counsel for the director defendants (who prevailed in the lawsuit), and accepting that counsel for the director defendants reduced their customary hourly rates, the court finds that a reasonable hourly rate for work by plaintiff's counsel is $ 200 . . . ."

DISCUSSION

*1. Attorney Fees*

The Association concedes that as the prevailing party in the underlying litigation, the Plaintiffs are entitled to an award of their attorney fees. It argues, [*8] however, the amount awarded is not supported by substantial evidence in the record in view of the trial court's statements in the order as to how the figure was reached. We find merit to the claim.

As prevailing party in this litigation, the Plaintiffs were entitled to an award of their reasonable attorney fees. (*Civ. Code, §§ 1717, subd. (a)*, *1354, subd. (c)*.) The amount to be awarded as reasonable

attorney fees is left to the sound discretion of the trial court. (*City of Oakland v. Oakland Raiders (1988) 203 Cal.App.3d 78, 85*.) The trial judge is in the best position to evaluate the services rendered, and the court's decision will not be disturbed on appeal unless it is clearly wrong. (*Ibid.*) "'The trial court makes its determination after consideration of a number of factors, including the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case.'" (*PLCM Group, Inc. v. Drexler (2000) 22 Cal.4th 1084, 1096*.) The hours claimed for fee-related services must be reasonable and an excessive claim may constitute special circumstances justifying reduction **[*9]** or denial of the fee award. (*Serrano v. Unruh (1982) 32 Cal.3d 621, 635*; *Meister v. Regents of University of California (1998) 67 Cal.App.4th 437, 455*.)

The court awarded the Plaintiffs $ 522,216 in attorney fees. In its order, the trial court explained because the hours claimed were, in the court's view, grossly excessive, it reduced the hours claimed by the Plaintiffs' counsel by 40 percent to come up with a total number of allowable hours of 2,596.08, to which the court added another 15 hours for preparation of the motion, for a total of 2,611.08 hours. The court then multiplied that by a reasonable hourly rate of $ 200 per hour (2,611.08 x $ 200 = $ 522,216).

The problem with the award, as the Association points out, is that the bills submitted by the Plaintiffs counsel show total billed hours of 3,326.80, from which the Plaintiffs excised 455.5 hours as being related to the individual defendants, for a total of 2,871.3 hours being claimed by the Plaintiffs. If that number were then reduced by 40 percent, the total hours allowed should have only been 1,722.6 (2,871 x .60 = 1,722.6), not 2,596.08, and the resulting attorney fees award should have been $ 347,520 (1,722.6 + 15 = 1,737.6; **[*10]** 1,737.6 x $ 200 = $ 347,520) not $ 522,216. For the court to have arrived at the number of hours it awarded, it would have had to start with claimed

hours of 4,326.08 (2,596.08/.6 = 4,326.8; 4,326.8 x .60 = 2,596.08)--an amount that is not supported by the bills submitted.

We agree with the Association, no matter how one does the math, the numbers set forth in the trial court's minute order do not add up. The court stated its intention in fashioning the final award was to reduce the total hours the Plaintiffs had claimed by 40 percent. But the total number of hours it awarded (2,596.08) was over 90 percent of the total hours the Plaintiffs claimed to have billed (2,871.3). (And if one begins with the Plaintiffs' unexcised hours of 3,326.80, the total awarded was for over 78 percent of that number.) The final dollar amount the court awarded ($ 522,216) was over 75 percent of the total dollar amount the Plaintiffs sought ($ 686,816.44).

Faced with the obvious uncertainties in the trial court's calculations, the Plaintiffs feebly respond, "[t]he trial court did not *necessarily* make a math error[.]" (Italics added.) While acknowledging that as demonstrated by the Association, to get to the **[*11]** number of hours it awarded, the court had to begin with a number of hours that was "well in excess of the amount of hours the Plaintiffs' claimed[,]" the Plaintiffs' nonetheless argue the court might have used a different method of calculating the number that would get closer to the amount the court awarded. They suggest that to calculate the number the court started with (which it then reduced by 40 percent), one could also multiply the hours it awarded (2,596.08) by 1.4, which would suggest the court started with 3,634.5 hours. But a 40 percent reduction of 3,634.5 is 2,180.7--still several hundred hours less than the court awarded. And, the Plaintiffs acknowledge that starting number (3,634.5) is also unsupported by the bills they submitted claiming a total of only 2,871 hours.

The Plaintiffs also offer another possible calculation. They suggest the court might have taken the number of hours they sought 2,871 and then taken the hours they expressly did not claim

2008 Cal. App. Unpub. LEXIS 8298, *11

(i.e., the 455 hours solely attributable to the individual defendants), reduced the already excised hours by another 40 percent (455 x .6 = 273), and subtracted that amount (273) from the claim. The Plaintiffs are correct **[\*12]** that 2,871 minus 273 equals 2,598, which is almost exactly what the court awarded--2,596. While those numbers do conveniently align, it defies common sense the trial court in calculating an award it clearly intended to equal 60 percent of the total hours claimed would calculate that number by simply resubtracting a percentage of the hours that expressly were not claimed.

Finally, the Plaintiffs cite us to two familiar rules. First, "In examining [an] order on appeal, we review the trial court's actual ruling, not its reasons. A judgment or order correct in theory will be affirmed, even where the trial court's given reasoning is erroneous. [Citation.]" (*Punsly v. Ho (2003) 105 Cal.App.4th 102, 113*.) And second, "Where, as here, a trial court has discretionary power to decide an [attorney fee award], its decision will be reversed only if there has been a prejudicial abuse of discretion. "'To be entitled to relief on appeal . . . it must clearly appear that the injury resulting from such a wrong is sufficiently grave to amount to a manifest miscarriage of justice . . . .'" [Citation.]" (*Baggett v. Gates (1982) 32 Cal.3d 128, 142-143*.)

Accordingly, the Plaintiffs argue it is of no importance **[\*13]** the court's order indicates an obvious miscalculation in arriving at the amount of the fees. The amount the court awarded, $ 522,216, was less than what the Plaintiffs originally sought, $ 686,816.44. And the amount they originally sought was supported by the bills they submitted and the declaration from Malcom stating those fees were reasonable. The Association has not demonstrated the actual amount awarded in the end was excessive or shocks the conscience. (*Acree v. General Motors Acceptance Corp. (2001) 92 Cal.App.4th 385, 404*.) Thus, because the court had evidence that would have supported awarding higher fees, the order was within its discretion, and

the Association has not been prejudiced by any mathematical errors in calculating the final number.

We cannot agree with the Plaintiffs' argument. The trial court's order left no doubt it found the total hours the Plaintiffs' counsel billed to be excessive due to overstaffing the case and unjustified billing practices that inflated the hours. It specifically stated the total hours claimed should be reduced by 40 percent. The Plaintiff concedes they claimed 2,871 hours, yet the order awarded them 2,596 hours--over 90 percent of what **[\*14]** was claimed. There is sufficient uncertainty in the resulting award to persuade us the matter should be remanded for recalculation of attorney fees. (See *Ketchum v. Moses (2001) 24 Cal.4th 1122, 1141*.)

In their cross-appeal, the Plaintiffs argue the court abused its discretion by reducing the attorney fees at all based on the factors the court relied upon-- overstaffing and unjustified billing practices. They argue the number of attorneys and the lawfirm's billing practices were entirely appropriate. Accordingly, they assert that if the matter is remanded for recalculation of the attorney fees award due to the errors the Association has pointed out, we direct the trial court that it may not consider any of the factors set forth in its order to reduce the award. The Plaintiffs cite to no legal authority in support of their contention. The argument is waived for failure to provide any authority to support it. (*Kim v. Sumitomo Bank (1993) 17 Cal.App.4th 974, 979*.) As we have already noted, the trial court is in the best position to determine what constitutes a reasonable attorney fee. (*City of Oakland v. Oakland Raiders, supra, 203 Cal.App.3d at p. 85*.) The Plaintiffs have not demonstrated **[\*15]** the court abused its discretion by reducing the hours they claimed for the reasons stated in its order.

## 2. Nonstatutory Costs

Also in their cross-appeal, the Plaintiffs contend the trial court erred by denying their request for $ 44,629.59 in litigation costs that were not included in their memorandum of costs because the costs are not permitted by *Code of Civil Procedure section*

2008 Cal. App. Unpub. LEXIS 8298, *15

*1033.5*. We find no error.

The Plaintiffs' motion sought costs including photocopying expenses, messenger fees, attorney travel expenses, computerized research fees, and fees paid to expert witnesses. While conceding the costs are not allowed by *Code of Civil Procedure section 1033.5, subdivision (b)*, the Plaintiffs contend they were nonetheless entitled to them by statute and contract.

We address the Plaintiffs' statutory argument first. *Code of Civil Procedure section 1033.5, subdivision (b)*, does not permit the costs the Plaintiffs sought "except when expressly authorized by law[.]" *Civil Code section 1354, subdivision (c)*, provides that in an action to enforce CC&Rs, the prevailing party is entitled to recover "reasonable attorney's fees and costs." The Plaintiffs contend *Civil Code section 1354, subdivision (c)*'s [*16] authorization of "costs" must be interpreted as permitting an award of all costs that are otherwise not allowed by *Code of Civil Procedure section 1033.5, subdivision (b)*. *Code of Civil Procedure section 1032, subdivision (b)*, already provides for an award of costs to the prevailing party, and *Code of Civil Procedure section 1033.5*, describes those costs. The Plaintiffs assert "costs" as used in *Civil Code section 1354, subdivision (c)*, must mean something more than the costs already permitted under *Code of Civil Procedure section 1032*, or the former statute is meaningless.

The same argument was rejected by our Supreme Court in *Davis v. KGO-T.V., Inc. (1998) 17 Cal.4th 436* (*Davis*). *Davis* considered Government Code section 12965, subdivision (b), which at the time provided that in a Fair Employment and Housing Act action, "'the court, in its discretion, may award to the prevailing party reasonable attorney fees and costs . . . .'" (*Id. at p. 439*.) The prevailing plaintiff argued "costs" necessarily included fees for expert witnesses not ordered by the court, even though such fees were not allowed by *Code of Civil Procedure section 1033.5, subdivision (b)*. The Supreme Court disagreed concluding, [*17] "*Code*

*of Civil Procedure section 1033.5* was intended to give a more precise meaning to the term 'costs' in existing fee-shifting statutes--including Government Code section 12965, subdivision (b)-- by defining which items of costs are allowable and which are not." (*Id. at pp. 443-444*.) Unless the fee-shifting statute specifically authorized expert witness fees, the broader authorization to award costs did not include such fees. The Plaintiffs spend considerable time in their reply brief explaining why they believe *Davis* was poorly reasoned. But their arguments are unpersuasive, and in any event, we are bound by Supreme Court precedent. (*Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455*.)

We turn next to the Plaintiffs' contract argument. They contend they are entitled to all litigation costs under section 13.7 of the CC&Rs, which provides that in litigation arising out of the CC&Rs "the prevailing party shall be entitled to receive costs of suit and such sum for attorney's fees as the Court deems reasonable." While the CC&Rs allow costs, such "contractual costs provisions are presumed to adopt the statutory definition absent evidence to the contrary. [Citation.]" (*Hsu v. Semiconductor Systems, Inc. (2005) 126 Cal.App.4th 1330, 1341-1342* [*18] (*Hsu*); *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co. (1996) 47 Cal.App.4th 464, 491-492*.) Accordingly, nonstatutory costs may only be recovered as special contract damages, after pleading and proof at trial, which did not occur here. (*Hsu, supra, 126 Cal.App.4th at p. 1342*; see also *Carwash of America-PO v. Windswept Ventures No. I (2002) 97 Cal.App.4th 540, 543-544*; *First Nationwide Bank v. Mountain Cascade, Inc. (2000) 77 Cal.App.4th 871, 878*; *Robert L. Cloud & Associates, Inc. v. Mikesell (1999) 69 Cal.App.4th 1141, 1154*; *Ripley v. Pappadopoulos (1994) 23 Cal.App.4th 1616, 1625-1626*; contra *Bussey v. Affleck (1990) 225 Cal.App.3d 1162, 1165-1167*.) Accordingly, the Plaintiffs are not entitled to recover litigation costs that are not allowed under *Code of Civil Procedure section 1033.5*.

2008 Cal. App. Unpub. LEXIS 8298, *18

DISPOSITION

The award of attorney fees is reversed and the
matter remanded for recalculation of attorney fees.
In all other respects, the postjudgment order is
affirmed.

O'LEARY, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

ARONSON, J.

**End of Document**

EXHIBIT 31

 Cited
As of: December 23, 2019 5:17 AM Z

## *In re Myers*

Supreme Court of Kansas

February 3, 2006, Opinion Filed

No. 95,132

**Reporter**
280 Kan. 956 *; 127 P.3d 325 **; 2006 Kan. LEXIS 14 ***

In the Matter of LARRY L. MYERS, Respondent.

**Prior History: [***1]** Original proceeding in discipline.

**Disposition:** Published censure.

## Core Terms

hearing panel, recommendation, discipline, factors, billed, spent, censure, increments, one-hour, billing practices, nursing home, aggravating, misconduct

## Case Summary

### Procedural Posture

Petitioner Kansas Disciplinary Administrator's Office brought a proceeding in discipline against respondent lawyer for violations of *Kan. R. Prof. Conduct 1.1*, *1.5* when he was was found to have violated his duty to his client to provide competent representation and to charge a reasonable fee. A published censure was recommended.

### Overview

The disciplinary administrator's office hearing panel found that the lawyer violated his duty to his client to provide competent representation in violation of *Kan. R. Prof. Conduct 1.1* when he created trust documents for his clients that failed to accomplish the goals of the estate plan and when he encouraged his clients' daughter to file an appeal of the social and rehabilitation services agency action denying his clients' application for Medicaid benefits. The panel also found that the lawyer violated *Kan. R. Prof. Conduct 1.5* by charging his clients' estate a fee for performing work that was not required and that it was unreasonable to bill in one-hour increments when one-hour of work was not performed. Contrary to the panel's finding, the supreme court found that the lawyer was remorseful of his handling of his clients' estate matters. However, the supreme court concluded that the findings of the panel were supported by clear and convincing evidence and adopted the findings, conclusions, and recommendation of the panel.

### Outcome

The lawyer was censured and the order was published.

280 Kan. 956, *956; 127 P.3d 325, **325; 2006 Kan. LEXIS 14, ***1

## LexisNexis® Headnotes

Legal Ethics > Client Relations > Duties to Client > Effective Representation

### *HN1*[⬇] **Duties to Client, Effective Representation**

Lawyers must provide competent representation to their clients. *Kan. R. Prof. Conduct 1.1*. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

Legal Ethics > Client Relations > Billing & Collection

### *HN2*[⬇] **Client Relations, Billing & Collection**

The fee that an attorney charges for legal services must be reasonable. *Kan. R. Prof. Conduct 1.5*. It is unreasonable to charge a client a fee for performing a legal service that is unnecessary.

Legal Ethics > Sanctions > General Overview

### *HN3*[⬇] **Legal Ethics, Sanctions**

Pursuant to ABA Stand. Imposing Law. Sanctions 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

Legal Ethics > Sanctions > Reprimands

### *HN4*[⬇] **Sanctions, Reprimands**

Reprimand is generally appropriate when a lawyer: (a) demonstrates failure to understand relevant legal doctrines or procedures and causes injury or potential injury to a client; or (b) is negligent in determining whether he or she is competent to handle a legal matter and causes injury or potential injury to a client. ABA Stand. Imposing Law. Sanctions 4.53. Reprimand is generally appropriate when a lawyer negligently fails to provide a client with accurate or complete information, and causes injury or potential injury to the client. ABA Stand. Imposing Law. Sanctions 4.63.

**Counsel:** Alexander M. Walczak, deputy disciplinary administrator, argued the cause and Stanton A. Hazlett, disciplinary administrator, was with him on the formal complaint for the petitioner.

G. Craig Robinson argued the cause for the respondent, and Larry L. Myers, respondent, argued the cause Pro se.

**Judges:** DAVIS, J., not participating. MARQUARDT, J., assigned. [1]

## Opinion

[*956] [**326]   ORIGINAL PROCEEDING IN DISCIPLINE

*Per Curiam*: This is an original uncontested proceeding in discipline filed by the Disciplinary Administrator's office against Larry L. Myers, of Garden City, an attorney admitted to the practice of

---

[1] REPORTER'S NOTE: Judge Marquardt, of the Kansas Court of Appeals, was appointed to hear case No. 95,132 vice Justice Davis pursuant to the authority vested in the Supreme Court by K.S.A. 20-3002(c).

law in Kansas in 1978. The formal complaint against respondent alleges violations of *KRPC 1.1* (2005 Kan. Ct. R. Annot. 356) (competence) and *KRPC 1.5* (2005 Kan. Ct. R. Annot. 397) (fees).

A hearing before the panel of the Kansas Board for Discipline **[***2]** of Attorneys was held on July 28, 2005, in Topeka, Kansas. Respondent appeared in person and through counsel, G. Craig Robinson. The panel made the following findings of fact:

"1. Larry L. Myers (hereinafter 'the Respondent') is an attorney at law, Kansas Attorney Registration No. 09793. His last registration address with the Clerk of the Appellate Courts of Kansas is Garden City, Kansas. The Respondent was admitted to the practice of law in the state of Kansas on April 10, 1978.

"2. In February, 1996, Robert and Betty Brown retained the Respondent for estate planning purposes. Mr. and Mrs. Brown wanted to provide for the surviving spouse, avoid paying estate taxes, and preserve their assets in the event that nursing home care was required. Mrs. Brown was nine years older than Mr. Brown. The parties assumed that Mr. Brown would survive Mrs. Brown and that Mrs. Brown would require nursing home care.

"3. In July, 1996, Mr. and Mrs. Brown's estate was worth approximately $ 465,000 and included IRA accounts, mutual funds, checking and saving accounts, and real property.

"4. In 1996, the Respondent informed Mr. and Mrs. Brown that the best way to protect their assets **[***3]** and ensure that their children inherited their estate was to provide gifts **[*957]** to their children. Mr. and Mrs. Brown did not want to provide gifts to their children. Mr. and Mrs. Brown wished to retain their property for their benefit during their lifetimes. The Respondent then recommended to Mr. and Mrs. Brown that they split their assets and place them in revocable trusts that would become irrevocable upon the death or incapacity of the respective grantor. Placement of assets into the revocable trusts would not, however,

preserve the assets in the event nursing home care was required because Congress revised the Medicaid laws that deal with trusts in 1993 to include such trust assets in determining Medicaid eligibility.

"5. Mr. and Mrs. Brown agreed and the Respondent prepared trust documents for Mr. Brown and for Mrs. Brown.

"6. Mrs. Brown's health deteriorated and she was placed in a nursing facility.

"7. Mr. Brown became ill with cancer. On October 27, 1999, Mr. Brown died. Following Mr. Brown's death, Patricia Willis, one of Mr. and Mrs. Brown's children, met with the Respondent regarding her **[**327]** father['s] estate. As a result of the meeting, the Respondent sent Ms. **[***4]** Willis a letter

"8. In the letter, the Respondent stated that the steps necessary to administer Mr. Brown's estate included: 'Prepare and file a Kansas Estate Tax Return, which is due nine (9) months after death. Any Kansas Estate taxe [*sic*] owed will be payable at that time.' While it was necessary for the Respondent to determine the total value of Mr. Brown's estate to determine whether estate tax would be owing, it was not necessary to prepare and file a Kansas estate tax return because Mr. Brown's estate fell below the threshold amount.

"9. For the work that the Respondent performed following Mr. Brown's death, including preparing the inventory and the Kansas estate tax return, the Respondent charged Mr. Brown's estate $ 4,250, for a total of 43.5 hours. The Respondent billed in whole hour increments, save one entry.

"10. During the hearing on this matter, a member of the Hearing Panel questioned the Respondent regarding his billing practices as follows:

'Q. [By Mr. Sear] In reviewing these bills, all of the time entries are in full one hour increments except for an entry on March 1, 2000, for three and one-half hours. Was it your practice to bill in **[***5]**

full one hour increments in this time frame?

'A. [By the Respondent] Yes.

'Q. So regardless of the amount of time that you spent on a matter, if you spent less than an hour on it, you still billed for an hour?

'A. Well, if we spent three-fourths of an hour, I would bill for an hour, yes.

'Q. What if you spent one-quarter of an hour?

'A. I would not bill for an hour.

'Q. What was the smallest time spent in this time frame that you would bill for a full hour?

'A. I'd say three-fourths of an hour.

'Q. Is that your current practice?

'A. Yes.'

 [*958]  "11. Following Mr. Brown's death and after Mrs. Brown's trust was depleted, Ms. Willis applied for Medicaid assistance for her mother. However, the Kansas Department of Social and Rehabilitation Services denied the application, concluding that assets of Mr. Brown's trust could be used to pay for Mrs. Brown's nursing home care.

"12. The trust document, prepared by the Respondent for Mr. Brown, did not accomplish what it was intended to accomplish. The trust document did not shield Mr. Brown's assets from the expense of Mrs. Brown's nursing home care.

"13. After SRS denied the Medicaid application,  [***6]  on September 19, 2001, Ms. Willis contacted the Respondent for advice. Despite the well established law regarding Medicaid eligibility, evidenced by the 1993 Medicaid amendment and the decision of the Kansas Supreme Court in *Williams v. Kansas Dept. of SRS, 258 Kan. 161, 899 P.2d 452 (1995)*), the Respondent recommended that Ms. Willis appeal the agency's decision. The Respondent retained Jim Lawing, an attorney practicing in Wichita to assist him with the

appeal. However, on appeal, the agency's decision was affirmed. The Respondent billed Ms. Willis $ 3,600 for his work on the appeal.

"14. On April 26, 2002, Ms. Willis wrote to the Disciplinary Administrator complaining of the Respondent's representation of Mr. and Mrs. Brown, and Mr. Brown's estate. Then, on May 15, 2003, Ms. Willis supplemented her complaint.

"15. Mrs. Brown died in 2003, after approximately $ 30,000 of Mr. Brown's trust assets were used to pay for Mrs. Brown's care.

"16. Ms. Willis retained Robert E. Johnson, II, to review the Respondent's representation of Mr. and Mrs. Brown and their estate. Mr. Johnson wrote to the Respondent and suggested that the Respondent settle Ms. Willis'  [***7]  claims by paying Mr. Brown's estate $ 53,934.37. Thereafter, Mr. Johnson and the Respondent negotiated a settlement. To settle Ms. Willis' claim, the Respondent paid $ 10,000  [**328]  and wrote off the attorney fee bill of $ 3,600 that remained unpaid."

Based on those Findings of Fact, the panel concluded as follows:

"CONCLUSIONS OF LAW

"1. Based upon the findings of fact and the Respondent's stipulations, the Hearing Panel concludes as a matter of law that the Respondent violated *KRPC 1.1* and *KRPC 1.5*, as detailed below.

"2. *HN1*[↑] Lawyers must provide competent representation to their clients. *KRPC 1.1*. 'Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.' The Respondent failed to competently represent Mr. and Mrs. Brown when he created trust documents that failed to accomplish the goals of the estate plan and when he encouraged Ms. Willis to file an appeal of the SRS agency action denying Mrs. Brown's application for Medicaid benefits. Accordingly, the

Hearing Panel concludes that the Respondent violated *KRPC 1.1* [***8] .

[*959] "3. *HN2*[⬆] The fee that an attorney charges for legal services must be reasonable. *KRPC 1.5.* It is unreasonable to charge a client a fee for performing a legal service that is unnecessary. In this case, the Respondent charged Mr. Brown's estate a fee for performing work that was not required. As such, the Hearing Panel concludes that the Respondent violated *KRPC 1.5* in this regard.

"4. Additionally, it is unreasonable to bill in one-hour increments when one-hour of work is not performed. In *In re Scimeca, 265 Kan. 742, 760, 962 P.2d 1080 (1998)*, the Kansas Supreme Court stated:

'We agree with the Deputy Disciplinary Administrator that billing for quarter hours is not a violation if that time is spent on a client's business. The violation is not spending the time billed to the client on the client's business. Here, respondent clearly billed for time not spent in representing the client. He concedes that his billing practices were improper, and although he claims it was done in ignorance, it is nevertheless a violation of the MRPC.'

The Respondent testified at the hearing held in this matter that he billed Ms. Willis in one-hour [***9] increments even when one-hour of work was not completed. The Respondent also testified that he continues to use this billing practice to date. In this case, it is impossible to know exactly how much time the Respondent spent working in behalf of Mr. and Mrs. Brown and Mr. Brown's estate, given the Respondent's billing practices. However, as a matter of law, the Hearing Panel concludes that billing in one-hour increments when one-hour is not spent working on a matter is an improper billing practice and is in violation of *KRPC 1.5.*"

RECOMMENDED DISCIPLINE

The panel applied the ABA Standards as follows:

"In making the recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). *HN3*[⬆] Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"*Duty Violated.* The Respondent violated his duty to his client to provide competent representation and to charge a reasonable [***10] fee.

"*Mental State.* The Respondent knowingly violated his duties.

"*Injury.* As a result of the Respondent's misconduct, the Respondent caused actual harm to his clients.

"*Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

"Dishonest or Selfish Motive. In his letter to Ms. Willis, the Respondent blatantly misstated the law by stating that [**329] filing a Kansas estate tax return was mandatory. [*960] The Hearing Panel concludes that the intentional misstatement of the law was a dishonest act and motivated by selfishness.

"Vulnerability of Victim. Mr. Brown, Mrs. Brown, and their heirs were vulnerable to the Respondent's misconduct. Mr. and Mrs. Brown went to the Respondent to plan their estates. They relied on his experience and expertise in planning for their future. However, the documents the Respondent prepared failed to accomplish their goals. . . . .

"Substantial Experience in the Practice of Law. The [***11] Kansas Supreme Court admitted the

Respondent to practice law in 1978. At the time the Respondent engaged in misconduct, the Respondent had been practicing law for a period of approximately 20 years. Accordingly, the Hearing Panel concludes that the Respondent had substantial experience in the practice of law at the time he engaged in the misconduct.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstance present:

"Absence of a Prior Disciplinary Record. The Respondent has not previously been disciplined.

"In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standards:

*HN4*[↑] 'Reprimand is generally appropriate when a lawyer:

(a) demonstrates failure to understand relevant legal doctrines or procedures and causes injury or potential injury to a client; or

(b) is negligent in determining whether he or she is competent to handle a legal matter and causes injury or potential injury to a client. Standard 4.53.

'Reprimand **[***12]** is generally appropriate when a lawyer negligently fails to provide a client with accurate or complete information, and causes injury or potential injury to the client. Standard 4.63.

"The Deputy Disciplinary Administrator recommended that the Respondent be censured by the Kansas Supreme Court and that the censure be published in the Kansas Reports. The Respondent recommended that the Respondent be censured by the Kansas Supreme Court. The Respondent, however, urged that the censure not be published in the Kansas Reports.

"Based upon the findings of fact, conclusions of

law, and the Standards listed above, the Hearing Panel unanimously recommends that the Respondent be censured by the Kansas Supreme Court. The Hearing Panel further recommends that because of the persuasive aggravating factors, the censure be published in the Kansas Reports."

The respondent has filed no exceptions herein. Contrary to the hearing panel's finding, we believe, based on respondent's comments before this court, that the respondent is remorseful of his **[*961]** handling of the Browns' estate matters. However, we conclude that the findings of the hearing panel are supported by clear and convincing evidence **[***13]** and adopt the findings, conclusions, and recommendation of the hearing panel, although a minority of the court would impose a private censure.

IT IS THEREFORE ORDERED that the respondent, Larry L. Myers, be and he is hereby censured in accordance with *Supreme Court Rule 203(a)(3)* (2005 Kan. Ct. R. Annot. 247) for the violations found herein.

IT IS FURTHER ORDERED that this order be published in the official Kansas Reports and that the costs of this action be assessed to respondent.

DAVIS, J., not participating.

**[**330]** MARQUARDT, J., assigned. [1]

---

**End of Document**

---

[1] **REPORTER'S NOTE:** Judge Marquardt, of the Kansas Court of Appeals, was appointed to hear case No. 95,132 vice Justice Davis pursuant to the authority vested in the Supreme Court by *K.S.A. 20-3002(c)*.

EXHIBIT 32

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 9/7/22 | JMT | Initial telephonic client meeting; Telephone call with Tom Brejcha regarding same. | 1.40 |
| 9/7/22 | PMJ | Telephone call with Elizabeth Mirabelli to assess potential religious discrimination case against Escondido Union School District; Discuss case with     . | 1.20 |
| 10/4/22 | JMT | Respond to client emails; Additional research regarding legal claims. | 1.20 |
| 10/5/22 | JMT | Review response to public records request; Forward same to client; E-mail correspondence to client seeking further information regarding * | 0.20 |
| 10/12/22 | MDM | Confer with Mr. Trissell regarding * ; Research this issue. | 1.00 |
| 10/13/22 | MDM | Continue research on * and confer with Mr. Trissell regarding same; Review memorandum by Mr. Trissell on legal issues in connection with claims. | 0.80 |
| 10/19/22 | JMT | Discuss legal strategy and memorandum with Mr. Jonna; E-mail correspondence to * for their review. | 0.40 |
| 10/21/22 | PMJ | Review documents produced by EUSD and legal memorandum regarding strategy; E-mail correspondence to clients *   . | 0.40 |
| 10/24/22 | PMJ | Telephone call with client to discuss next steps regarding * ; Telephone call with Norman Grissom regarding same. | 0.40 |
| 10/31/22 | NDG | Review documents sent by client in preparation for accommodation meeting: California Education Codes and various School Policies and promotional materials; correspondence with all regarding same. | 0.70 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 11/4/22 | KD | Schedule Zoom meeting with clients and Norman Grissom regarding * ; E-mail correspondence regarding same. | 0.40 |
| 11/14/22 | NDG | Prepare for meeting with Escondido school officials and clients regarding interactive process for requests for religious exemptions; review case file and correspondence with clients and counsel. | 1.40 |
| 11/16/22 | NDG | Correspondence with clients and counsel; review Mirabelli's summary of meeting. | 0.30 |
| 11/18/22 | CSL | Multiple emails regarding School District's failure to accommodate religious liberty request; Telephone conference with Mr. Jonna regarding same. | 0.80 |
| 12/21/22 | CSL | Review e-mail correspondence regarding matter status; Telephone conference with Mr. Jonna regarding strategy. | 0.40 |
| 12/21/22 | NDG | Correspondence with School Board attorney Mr. Shinoff regarding lack of response to clients and status of Dupree's memo/recommendations; cc to all counsel. | 0.40 |
| 1/17/23 | PMJ | Review and revise follow up e-mail correspondence regarding accommodation request; Review *. | 0.60 |
| 1/19/23 | NDG | Review Dr. Dupree's report; legal research regarding same. | 0.80 |
| 1/20/23 | MLB | Review case file; Discuss facts with Mr. Jonna; Review multiple e-mail correspondence and documents received from Mr. Jonna; Review client-provided documents; Begin drafting outline for statement of facts. | 7.20 |
| 1/23/23 | MLB | Zoom meeting with Mr. Jonna, Mr. Trissell, and clients regarding * ; E-mail correspondence regarding same. | 0.80 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 1/24/23 | MLB | Continue working on complaint; Review TIPM reports and add facts to statement of facts; Legal research on * . | 10.80 |
| 1/25/23 | MLB | Continue working on complaint; Review client timeline of events; Review emails from EUSD counselors regarding students with pronoun requests. | 9.60 |
| 1/26/23 | MLB | Continue working on complaint; Review Rights of Gender Diverse Students Powerpoint presentation; Review video and transcript; Integrate facts as necessary. | 9.80 |
| 1/27/23 | MLB | Continue working on complaint; Legal research on * . | 9.20 |
| 1/30/23 | MLB | Compile draft exhibits to complaint; Revise complaint based on conversation with Mr. Trissell; Legal research on   *   . | 7.80 |
| 2/1/23 | CSL | E-mail correspondence from client regarding * ; Conference with Mr. Trissell regarding potential preliminary injunction. | 0.40 |
| 2/3/23 | JMT | Conferences with Mr. Jonna and Mr. Brandon regarding strategy for complaint and preliminary injunction papers; Review various complaints for Mr. Brandon to review. | 1.20 |
| 2/3/23 | MLB | Begin revisions to draft complaint based on comments from Mr. Trissell; Review * . | 8.20 |
| 2/6/23 | MDM | Confer with Mr. Trissell regarding * ; Preliminary research of  * Forward results of initial research to Mr. Trissell. | 0.40 |
| 2/6/23 | MLB | Continue revisions to draft complaint; Incorporate new * ; expansions and revisions to statement of facts. | 8.80 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 2/7/23 | MLB | Complete revisions to draft complaint; Prepare exhibits for same; Exchange e-mail correspondence with Mr. Trissell regarding same. | 6.40 |
| 2/9/23 | KD | Draft civil cover sheet; Prepare list of attorneys for plaintiffs and a list of defendants to attach to same. | 0.60 |
| 2/9/23 | KD | Draft summons; Prepare list of defendants to attach to same. | 0.40 |
| 2/15/23 | JMT | Review letter responding to PRR request; Forward same to client. | 0.20 |
| 2/15/23 | NDG | Conference call with clients and counsel concerning * ; review emails and client letter regarding * . | 1.80 |
| 2/21/23 | PMJ | Assess next steps with EUSD; Telephone call with * regarding same. | 0.60 |
| 2/21/23 | CSL | Review and analysis of memorandum on parental rights; Conference with Mr. Jonna regarding same. | 0.60 |
| 2/22/23 | JMT | Review Mr. Jonna's edits to draft letter to EUSD; Review client emails and respond to same. | 0.40 |
| 3/14/23 | NDG | Review Mr. Shinoff's response to clients questions about how to apply exemption; correspondence with all regarding same. | 1.30 |
| 3/15/23 | JMT | Review letter from EUSD regarding Title VII accommodation; E-mail correspondence to clients regarding * . | 0.20 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 3/20/23 | NDG | Review * from client; respond accordingly. | 0.40 |
| 3/28/23 | JMT | Conference with Mr. Jonna regarding complaint; E-mail correspondence to Attorney Grissom regarding same and potential of * . | 0.20 |
| 3/28/23 | PMJ | Assess* ; Telephone call with Attorney Grissom to discuss same. | 0.20 |
| 3/30/23 | PMJ | Review and revise complaint; Review recent legal authority. | 0.40 |
| 3/30/23 | JMT | Revise complaint; Review expert declarations and amicus briefs from similar cases; Review briefing in similar cases in California; Review Board policies. | 7.40 |
| 3/31/23 | JMT | Further research on parental rights; Update complaint. | 0.80 |
| 4/11/23 | JMT | Telephone call with Mr. Jonna regarding Dr. Anderson; Further research regarding same; Multiple conferences regarding same. | 1.40 |
| 4/11/23 | REW | Strategy discussions with Mr. Jonna and Mr. Trissell regarding retaining expert Erica Anderson; Joint telephone call with Dr. Anderson regarding same. | 0.40 |
| 4/11/23 | NDG | Review Federal Complaint drafted by Jeff Trissell and suggested edits by clients; review most recent national cases on this subject. | 3.70 |
| 4/13/23 | JMT | Work on preliminary injunction motion; Gather key cases for binder; Further research on 14th amendment parental rights. | 4.00 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 4/19/23 | JMT | Respond to emails from client with questions regarding next steps; Minor edits to preliminary injunction papers. | 0.80 |
| 4/19/23 | JMT | Meeting with clients; Revise complaint. | 2.00 |
| 4/20/23 | JMT | Update complaint; Telephone call with Dr. Anderson. | 4.80 |
| 4/20/23 | CSL | Telephone call with Mr. Trissell regarding status of complaint; Review e-mail correspondence regarding same. | 0.40 |
| 4/21/23 | JMT | Telephone calls with Mr. Jonna, * , and Attorney Grissom regarding "confidential" designation on various of the religious accommodation process documents; Add footnote to complaint. | 0.60 |
| 4/21/23 | CSL | Review and revise complaint; Conference with Mr. Jonna regarding same. | 2.40 |
| 4/24/23 | JMT | Receive verification for complaint from client; Send revised expert declaration to Dr. Anderson; Revise complaint per client West's comments. | 0.80 |
| 4/24/23 | JMT | Telephone call with Mr. Jonna regarding * ; Research same. | 0.40 |
| 4/26/23 | JMT | Multiple telephone calls with Mr. Jonna regarding issues for complaint; Further edits to same. | 2.40 |
| 4/27/23 | KD | Review e-mail correspondence from Mr. Trissell regarding revised summons, civil cover sheet, and complaint; Prepare documents for filing; File with Court; Telephone call to USDC to confirm receipt of filed docs. | 0.40 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 4/27/23 | JMT | Review filed complaint; Conference with Mr. Jonna regarding same. | 0.20 |
| 4/27/23 | PMJ | Review key cases; Prepare for and participate in *  interview. | 1.40 |
| 4/27/23 | JMT | Send emails to counsel for various defendants seeking acceptance of service of the complaint; E-mail correspondence to Dr. Anderson with complaint. | 0.60 |
| 4/27/23 | CSL | Review multiple articles on filing of case; Telephone conference with Mr. Jonna regarding assignment of case. | 0.80 |
| 4/28/23 | PMJ | Review data on transgender youth and new church documents concerning same; Correspond with client regarding case. | 0.40 |
| 4/28/23 | MDM | Review press inquiries regarding case and replies by Mr. LiMandri and Mr. Jonna; Review e-mail correspondence from opposing counsel waiving service. | 0.40 |
| 4/28/23 | CSL | Review multiple articles regarding filing of case; Emails regarding same; Conference with Mr. Jonna regarding same. | 1.00 |
| 4/28/23 | KD | Review e-mail correspondence from opposing counsel with signed waiver of summons; File with court. | 0.20 |
| 4/29/23 | CSL | E-mail correspondence with Mr. Jonna regarding * interview and review * article; Telephone conference with Mr. Jonna regarding case strategy. | 0.80 |
| 5/1/23 | KD | Review waiver of summons for defendants Tony Thurmond, Linda Darling-Hammond, Cynthia Glover Woods, Francisco Escobedo, Brenda Lewis, James J. McQuillen, Sharon Olken, Gabriela Orozco-Gonzalez, Kim Pattillo Brownson, Haydee Rodriguez, Alison Yoshimoto-Towery, and Naomi Porter; File with court. | 0.40 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 5/1/23 | PMJ | Review media regarding lawsuit; E-mail correspondence to EUSD regarding paid administrative leave for client. | 0.40 |
| 5/1/23 | CSL | Multiple emails regarding media and negative push back from students; Emails regarding administrative leave. | 0.60 |
| 5/1/23 | NDG | Ongoing correspondence (email and telephone calls) with entire legal team and clients regarding harassment and hostile work environment as a result of TV coverage of lawsuit; individual acts of harassment; suggested remedies and paths to report the transgressions. | 2.10 |
| 5/2/23 | PMJ | Prepare for and participate in * interview; Meet with client regarding * . | 1.00 |
| 5/2/23 | CSL | Review articles on case; Review request for administrative leave for client; Conference with client regarding * . | 1.20 |
| 5/2/23 | NDG | Ongoing correspondence (email and telephone calls) with entire legal team and clients regarding how to address the untenable situation at the school; legal research regarding same. | 1.80 |
| 5/3/23 | KD | Draft waiver of summons and attachment for EUSD defendants; E-mail correspondence to Mr. Trissell for review. | 0.40 |
| 5/4/23 | JMT | Conference with Mr. Jonna; Telephone calls with Attorney Shinoff and client regarding paid administrative leave. | 0.40 |
| 5/4/23 | CSL | Review articles and radio interviews on case; E-mail correspondence regarding request for administrative leave; Review emails regarding fundraising. | 0.80 |
| 5/4/23 | CSL | Multiple e-mail correspondence regarding administrative leave for client; Conference with Mr. Jonna regarding same. | 0.60 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 5/5/23 | CSL | E-mail correspondence regarding video sent to client from band leader; View video. | 0.60 |
| 5/7/23 | KD | Review e-mail correspondence from opposing counsel with signed waiver of summons; File with court. | 0.20 |
| 5/8/23 | REW | Review inquiry from *  regarding transgender issues at school; Discuss same with Mr. Jonna and Mr. Trissell. | 0.40 |
| 5/8/23 | CSL | View video regarding transgender agenda in schools; Emails regarding same; E-mail correspondence regarding potential parent as plaintiff; Conference with Mr. Trissell regarding same. | 1.20 |
| 5/9/23 | CSL | E-mail correspondence with *  ; Telephone conference with*  regarding local school district cases; Emails regarding same; Telephone conference with Mr. Jonna regarding above. | 1.00 |
| 5/10/23 | JMT | Edit client declarations per Mr. Jonna's comments; Send to clients for review. | 0.60 |
| 5/10/23 | JMT | Update Anderson declaration per Mr. Jonna's edits; Forward to Mr. Jonna and Dr. Anderson for review. | 1.80 |
| 5/12/23 | MLB | Revisions to the West declaration for preliminary injunction; Email correspondence with Mr. Jonna and Mr. Trissell regarding same. | 0.60 |
| 5/15/23 | PMJ | Review letter from EUSD regarding administrative leave; E-mail correspondence with client regarding same. | 0.20 |
| 5/15/23 | JMT | Finalize motion for a preliminary injunction and declaration of Lori West; Incorporate edits to memorandum from Mr. Jonna, Mr. Weisenburger, and Mr. Myers; Finalize notice and order * . | 8.00 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 5/15/23 | MDM | Confer with Mr. Trissell regarding requirements for motion to seal; Review draft motion for preliminary injunction and forward recommended changes to Mr. Trissell, Mr. Jonna, and team. | 1.60 |
| 5/16/23 | MDM | Review motion to seal; Research of issues for this motion; Forward recommended revisions to Mr. Trissell. | 1.00 |
| 5/16/23 | JMT | Review e-mail correspondence from interested third-party  * ; Forward same. | 0.20 |
| 5/18/23 | NDG | Draft response to Administrative Leave letter from Mr. Albert; review related communications from clients and counsel. | 1.80 |
| 5/19/23 | PMJ | Telephone call with Attorney Shinoff; E-mail correspondence with clients regarding next steps. | 0.40 |
| 5/19/23 | CSL | Review emails regarding client's administrative leave; Telephone conference with Mr. Jonna regarding same. | 0.60 |
| 5/23/23 | CSL | Conference with Mr. Myers regarding defendant's motion to dismiss; Telephone conference with Mr. Trissell and Mr. Jonna regarding same. | 0.60 |
| 5/24/23 | NDG | Review letter and text from the School District to Mrs. West regarding paid admin leave pending investigation; correspondence with client and LiMandri & Jonna LLP regarding same. | 0.40 |
| 5/26/23 | JMT | Telephone call with Lori West to finalize supplemental declaration; E-mail correspondence with Ms. Denworth regarding same. | 0.40 |
| 5/26/23 | KD | Review and finalize supplemental declaration of Lori West in support of motion preliminary injunction; File with Court; E-mail correspondence to opposing with same. | 0.40 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 5/31/23 | NDG | Review client's summary of events leading up to involuntary leave and investigation; correspondence with clients and LiMandri & Jonna LLP regarding same. | 0.50 |
| 6/9/23 | JMT | Conference with Mr. Jonna regarding opposition to motion to dismiss; Edits to same; E-mail correspondence to client with opposition for review. | 1.40 |
| 6/10/23 | MDM | Confer with Mr. Trissell regarding arguments; Draft text disputing defendant's definition of "lying" and forward to Mr. Trissell for possible use in reply brief. | 1.60 |
| 6/12/23 | JMT | Review CDE's opposition to motion for preliminary injunction; Draft reply in support of same. | 2.80 |
| 6/12/23 | MDM | Review and suggest revisions to opposition to motion to dismiss and forward to Mr. Trissell; Telephone call with Mr. Trissell regarding edits; Review and evaluate brief in opposition to motion for preliminary injunction. | 1.40 |
| 6/12/23 | JMT | Telephone call with Mr. Myers regarding edits to opposition to motion to dismiss; Finalize same. | 1.00 |
| 6/12/23 | KD | Review and finalize opposition to motion to dismiss; File with court. | 0.60 |
| 6/13/23 | MDM | Review and evaluate docket activity and pleadings; Confer with Mr. Trissell regarding same. | 0.60 |
| 6/15/23 | PMJ | Review and revise reply declarations regarding motion for preliminary injunction; Prepare for preliminary injunction hearing. | 0.80 |
| 6/15/23 | JMT | Draft rebuttal declarations and reply brief; Research into new case Foote v. Ludlow School Committee. | 7.60 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 6/16/23 | MDM | Continue reviewing reply briefs; Confer with Mr. Trissell and Mr. Jonna regarding additional arguments and evidence to include; Send suggested revisions to Mr. Trissell; Review newly-edited draft before filing and send comments to Mr. Trissell. | 3.40 |
| 6/16/23 | PMJ | Review and revise reply declaration of Elizabeth Mirabelli; Continue to prepare for Preliminary injunction hearing. | 0.40 |
| 6/16/23 | KD | Review and finalize reply to EUSD and reply to CDE and rebuttal declarations of Elizabeth Mirabelli and Lori West in support of motion for preliminary injunction; file with court; e-mail correspondence to opposing cousnel with same. | 0.40 |
| 6/19/23 | KD | Review and finalize second motion to seal documents; File with court. | 0.40 |
| 6/19/23 | MDM | Review e-mail correspondence from client and notices of docket filings; Confer with Mr. Trissell regarding qualified immunity and proposed order. | 0.40 |
| 6/19/23 | MZ | Research regarding qualified immunity; E-mail correspondence to Mr. Trissell regarding same. | 1.00 |
| 6/20/23 | JMT | Obtain a copy of CSBA Model AR 5145.3; E-mail correspondence to Mr. Jonna with explanation of same. | 0.40 |
| 6/21/23 | JMT | Multiple conferences with Mr. Jonna to prepare for preliminary injunction hearing; Review notice reseting hearing from court; E-mail correspondence to clients regarding same. | 0.60 |
| 6/21/23 | CSL | Conference with Mr. Jonna regarding continuance of hearing; E-mail correspondence regarding same. | 0.40 |
| 6/23/23 | JMT | Review parental rights cases; Review and revise case list "cheat sheet" summary prepared by law clerk. | 2.80 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 6/27/23 | MDM | Review and evaluate state defendants' motion to dismiss; Research issue of Article III standing and traceability. | 1.00 |
| 6/28/23 | PMJ | Prepare for preliminary injunction hearing; Review cases; Prepare for meeting with EUSD. | 1.20 |
| 6/29/23 | PMJ | Travel to and from and attend EUSD interviews of Lori West and Elizabeth Mirabelli; Discuss same with clients. | 4.00 |
| 6/29/23 | JMT | Review new Supreme Court opinions in Counterman v. Colorado, Students for Fair Admissions v. Harvard, and Groff v. DeJoy; Draft notice of new authority. | 2.60 |
| 6/29/23 | CSL | Telephone conference with Mr. Jonna regarding clients' interviews; Emails regarding same. | 0.40 |
| 6/30/23 | JMT | Continue drating notice of supplemental authority; Revise per Mr. Jonna's comments. | 3.60 |
| 6/30/23 | KD | Review and finalize notice of supplemental authority in support of motion for a preliminary injunction and in opposition to EUSD's motion to dismiss; file with court; e-mail correspondence to opposing counsel with same. | 0.40 |
| 7/7/23 | MDM | Review and analysis of case law and analysis forwarded by Mr. Trissell; Discuss same with Mr. Trissell and Mr. Jonna; Forward analysis to Mr. Trissell and Mr. Jonna; Discuss potential supplemental authority with Mr. Trissell and Mr. Jonna. | 1.20 |
| 7/10/23 | MDM | Review and analysis of L.W. v. Skrmetti case for possible use in this case; Forward evaluation to Mr. Jonna, Mr. LiMandri, Mr. Trissell, and Mr. Weisenburger. | 0.60 |
| 7/10/23 | CSL | View Podcast on gender ideology on public schools; Emails regarding same; Conference with Mr. Jonna and Mr. Trissell regarding same. | 1.40 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 7/11/23 | MDM | Review *  brief regarding parental rights and analysis of same forwarded by Mr. Youngkin for possible use in this case; Research and analysis of parental rights issues; Forward analysis to Mr. Trissell, Mr. Youngkin, Mr. Jonna, Mr. LiMandri, and Mr. Weisenburger. | 1.60 |
| 7/11/23 | JMT | Multiple conferences with Mr. Jonna to prepare for preliminary injunction hearing; Review long e-mail correspondence from Mr. Youngkin regarding various cases. | 0.60 |
| 7/11/23 | CSL | Conference with Mr. Trissell and Mr. Jonna regarding strategy for  *  ; Review Podcast regarding same. | 1.20 |
| 7/11/23 | MZ | Research regarding Supremacy of Rights under the U.S. Constitution v. State Constitution; Draft e-mail summary to Mr. Trissell and Mr. Youngkin regarding same. | 0.60 |
| 7/12/23 | MZ | Continue research regarding Supremacy of Rights under the U.S. Constitution v. State Constitution; Continue summarizing same and forward to Mr. Trissell and Mr. Youngkin regarding same. | 0.80 |
| 7/13/23 | JMT | Review notice from court continuing preliminary injunction hearing; Conference with Mr. Jonna and Mr. Myers regarding same. | 0.40 |
| 7/13/23 | MDM | Receive and review order consolidating and continuing argument on pending motions; Confer with Mr. Jonna and Mr. Trissell regarding rescheduling of hearing on motions and evaluation of this action. | 0.40 |
| 7/13/23 | CSL | Review notice from Court continuing hearing on motion for preliminary injunction; Conference with Mr. Jonna and Mr. Myers regarding same. | 0.40 |
| 7/13/23 | MZ | Organize key cases binders; Review and summarize cases and forward to Mr. Jonna. | 0.60 |
| 7/15/23 | MDM | Review and analysis of emails from client's husband and from client regarding  *  ; Forward analysis to Mr. Jonna, Mr. Trissell, and Mr. Brandon. | 0.20 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 7/22/23 | JMT | Review numerous text messages from clients with * ; Amend opposition to CDE motion to dismiss. | 1.40 |
| 7/25/23 | PMJ | Review client e-mail correspondence regarding * ; Discuss same with Mr. Trissell. | 0.20 |
| 7/27/23 | MZ | Continue to organize key cases binder; Shepardize cases. | 3.80 |
| 7/31/23 | PMJ | Follow-up e-mail correspondence to opposing counsel regarding status of clients' administrative leave; E-mail correspondence to clients regarding same. | 0.20 |
| 8/7/23 | CSL | E-mail correspondence regarding Podcast addressing LGTBQ agenda in schools; Review articles regarding same. | 0.60 |
| 8/14/23 | PMJ | Participate in interactive process with EUSD regarding Mirabelli workplace incident; Telephone calls with client regarding same. | 1.80 |
| 8/16/23 | JMT | Review CDE reply in support of motion to dismiss; Research and draft response to objection and draft plaintiffs' objection to new reply argument. | 3.20 |
| 8/17/23 | PMJ | Review and revise objection and response to CDE reply brief; Review new legal authority relevant to motion to dismiss. | 0.40 |
| 8/17/23 | JMT | Work with Mr. Jonna to prepare for preliminary injunction hearing; Further edits to hearing outline. | 2.80 |
| 8/17/23 | KD | Review and finalize response to CDE's objections, objections to CDE reply in support of plaintiffs' opposition to CDE motion to dismiss; File with court; E-mail correspondence to opposing counsel with same. | 0.40 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 8/21/23 | CSL | Conference with Mr. Jonna regarding new Fourth Circuit Court of Appeals case and moot court; Emails regarding same. | 0.60 |
| 8/22/23 | PMJ | Continue preparing for preliminary injunction hearing; Participate in moot court. | 3.60 |
| 8/22/23 | JMT | Review new Eleventh Circuit case, Ecknes-Tucker v. Governor of Alabama, and draft notice of supplemental authority; Conference with Mr. Jonna regarding same. | 2.20 |
| 8/22/23 | KD | Review and finalize second notice of supplemental authority in support of motion for preliminary injunction; File with court; E-mail correspondence to opposing counsel with same. | 0.40 |
| 8/22/23 | CSL | Participate in moot court with Mr. Jonna and Mr. Trissell; E-mail correspondence regarding same. | 1.00 |
| 8/29/23 | KD | Review e-mail correspondence from Mr. Trissell regarding notice of related case; Prepare documents for exhibits to same; Finalize same; File with court. | 0.60 |
| 8/29/23 | MDM | Confer with Mr. Jonna regarding oral argument; Review notice of related case. | 0.20 |
| 8/29/23 | MDM | Confer with Mr. Jonna and Mr. Trissell regarding procedure for tomorrow's hearing; Call to chambers to confirm expected schedule; Assist Mr. Jonna in preparing for tomorrow's hearing. | 0.40 |
| 8/30/23 | CSL | Telephone conference with Mr. Jonna regarding hearing on motion for preliminary injunction; Emails and text messages regarding same. | 1.40 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 8/31/23 | JMT | Review e-mail correspondence from clerk requesting courtesy copy of complaint; E-mail to Ms. Denworth regarding same. | 0.20 |
| 9/1/23 | MDM | Review and respond to Mr. Trissell e-mail correspondence regarding temporary restraining order hearing in China Valley School District case; Confer with Mr. Jonna and Mr. Trissell regarding * ; Conference call to counsel for Chino. | 0.60 |
| 9/1/23 | JMT | Draft potential Amicus curiae brief to file in California v. Chino Valley Unified School District; Emails with counsel in same regarding connecting with expert witnesses. | 4.80 |
| 9/1/23 | CSL | Conference with Mr. Trissell regarding filing Amicus brief in Chino Unified case; E-mail correspondence regarding same. | 0.60 |
| 9/2/23 | CSL | Review and revise Amicus brief in California v. Chino case; E-mail correspondence regarding same. | 0.60 |
| 9/4/23 | MDM | Confer via e-mail correspondence with Mr. Jonna regarding advisability of filing Amicus brief in California v. Chino Valley Unified School District; Review proposed brief and send analysis to Mr. Jonna. | 0.80 |
| 9/5/23 | JMT | Telephone calls with Mr. Jonna and Ms. Denworth regarding Amici Curiae brief; Edits to same; Provide ex parte notice to parties in Bonta v. Chino; Finalize same. | 3.00 |
| 9/5/23 | KD | Review e-mail correspondence from Mr. Trissell regarding filing of amicus brief in Chino case; Telephone call to department Clerk regarding ex parte application hearing date. | 0.20 |
| 9/5/23 | KD | Prepare proof of service for ex parte application for leave to file Amici Curiae brief in opposition to California's application for a temporary restraining order, declaration of Paul Jonna, and proposed order in the People of the State of California v. Chino Valley Unified School District case; Review and finalize same; | 0.80 |
| 9/5/23 | KD | Review e-mail correspondence from Attorney Dixon from the Center for American Liberty with intervenors' ex parte application to intervene, opposition to ex parte application for temporary restraining order, and answer to complaint; Review same for filing with court; E-mail correspondence to attorney service with same for rush | 0.60 |
| 9/5/23 | JMT | Conference with Mr. Jonna regarding Elizabeth Mirabelli's concerns regarding * ; Forward Amicus Curiae brief to clients. | 0.20 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 9/5/23 | CSL | E-mail correspondence regarding ex parte notice requesting leave to file Amicus brief; Telephone conference with Mr. Jonna regarding same. | 0.60 |
| 9/6/23 | JMT | Review California's reply brief in Bonta v. Chino; Telephone call with * regarding hearing. | 0.40 |
| 9/7/23 | MDM | Review and evaluate third notice of supplemental authority in support of motion for preliminary injunction regarding temporary restraining order issued in Chino case; Confer with Mr. Jonna and Mr. Trissell regarding same. | 0.40 |
| 9/8/23 | CSL | Review and analysis of excerpts of transcript of temporary restraining order hearing; Emails regarding same. | 0.60 |
| 9/11/23 | MDM | Review and evaluate quotations from preliminary injunction hearing transcript and response by Mr. Weisenburger; Review emails from client, and court notice of filing. | 0.40 |
| 9/11/23 | KD | Review and finalize third notice of supplemental authority in support of motion for preliminary injunction; File with court; E-mail correspondence to opposing counsel with same. | 0.40 |
| 9/13/23 | JMT | Review new FCA v. SJUSD Ninth Circuit en banc opinion; Draft fourth notice of new authority. | 3.00 |
| 9/13/23 | PMJ | Review Fellowship of Christian Athletes v. San Jose Unified School District case; Review draft fourth notice of supplemental authority. | 0.20 |
| 9/13/23 | KD | Review and finalize fourth notice of supplemental authority in support of motion for preliminary injunction; File with court; E-mail correspondence to opposing counsel with same. | 0.40 |
| 9/14/23 | MDM | Review Ninth Circuit's en banc opinion in FCA v. San Jose USD and e-mail correspondence forwarded by Mr. Trissell with analysis; Evaluate for possible use in cases. | 0.60 |
| 9/14/23 | PMJ | Review and analyze ruling granting preliminary injunction; Discuss same with clients. | 1.00 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 9/14/23 | PMJ | Press interviews; E-mail correspondence and text messages regarding same. | 0.80 |
| 9/14/23 | PMJ | Prepare social media posts regarding victory; Review media. | 0.80 |
| 9/14/23 | CSL | Review order on preliminary injunction; Conference with Mr. Jonna regarding same; Review press release; E-mail correspondence regarding same. | 1.20 |
| 9/15/23 | PMJ | Travel to and from and attend * interview; Telephone calls and e-mail correspondence regarding multiple other interviews. | 2.40 |
| 9/15/23 | MDM | Review analysis forwarded by Mr. Trissell regarding amendment and extension of time to answer; Send additional analysis in response, including * . | 0.80 |
| 9/15/23 | MDM | Travel to and from and attend lunch meeting with clients and discuss case; View news broadcast with client regarding the case and the Judge's order. | 2.20 |
| 9/15/23 | KD | Prepare attorneys' fees and costs chart; E-mail correspondence to Mr. Trissell with same. | 0.40 |
| 9/15/23 | CSL | View media coverage on case; Conference with client regarding *  . | 0.60 |
| 9/16/23 | PMJ | Travel to and from and attend second * interview; Multiple e-mail correspondence regarding media. | 1.80 |
| 9/18/23 | KD | Review and finalize correspondence regarding next steps in the litigation; E-mail correspondence to opposing counsel with same. | 0.60 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 9/18/23 | KD | Review and finalize correspondence to opposing counsel regarding employment status of clients; E-mail correspondence to opposing counsel with same. | 0.40 |
| 9/20/23 | PMJ | E-mail correspondence with counsel regarding deadline to respond to complaint; E-mail correspondence and telephone calls regarding multiple media inquiries. | 0.20 |
| 9/20/23 | JMT | Review letter from the CDE regarding successive Rule 12(b)(6) motion; Telephone call with Mr. Jonna regarding research into same; E-mail correspondence to team regarding same. | 1.00 |
| 9/20/23 | CSL | Review articles on case; E-mail correspondence regarding media interviews; Telephone conference with * ; Conference with Mr. Jonna regarding same. | 0.80 |
| 9/21/23 | PMJ | Assess next steps regarding amended complaint and motions to dismiss; E-mail correspondence with opposing counsel regarding same. | 0.40 |
| 9/21/23 | MDM | Confer with Mr. Jonna and Mr. Trissell regarding amendment of complaint and state defendants' proposed new motion to dismiss; Prepare for meet-and-confer telephone conference. | 0.60 |
| 9/21/23 | KD | Review e-mail correspondence from co-counsel with invoices and excel spreadsheet of same; E-mail correspondence to Mr. Trissell with same. | 0.20 |
| 9/22/23 | PMJ | E-mail correspondence with counsel for EUSD regarding meet and confer conference call; E-mail correspondence with clients regarding next steps. | 0.20 |
| 9/22/23 | JMT | Telephone call with Emily Rae of Liberty Justice Center, representing Chino Valley Unified School District; E-mail correspondence regarding same. | 0.40 |
| 9/22/23 | JMT | Meet and confer with the CDE attorneys regarding their proposed successive motion to dismiss; Draft e-mail correspondence in response documenting what was said. | 1.20 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 9/26/23 | JMT | Conference with Mr. Jonna regarding decision to not amend complaint; Emails to opposing counsel. | 1.00 |
| 9/26/23 | PMJ | Assess amending complaint and next steps; Telephone calls with Attorney Shinoff and clients. | 0.40 |
| 9/26/23 | CSL | Review press release from Attorney General Bonta; Review Attorney Bonta's guideline letter on preliminary injunction order; Emails regarding same. | 0.60 |
| 9/27/23 | JMT | Edit Open Letter to Attorney General Bonta regarding his "guidance" to school districts; Legal research for same. | 3.00 |
| 9/27/23 | PMJ | Review and revise press release regarding Attorney General Bonta statement; Telephone calls and e-mail correspondence regarding same; Telephone conference with CDE regarding stipulation to extend time to answer complaint. | 1.00 |
| 9/27/23 | KD | Review and finalize joint ex parte application for extension of time for defendants to respond to complaint and order; File with Court; E-mail correspondence to Judge Benitez with proposed order; E-mail correspondence to opposing counsel with same. | 0.40 |
| 9/27/23 | MDM | Confer with Mr. Trissell regarding possible Amicus brief in Chino case; Review and evaluate letter by Mr. Jonna regarding Attorney General's guidance to school districts and news coverage of same. | 0.60 |
| 9/27/23 | CSL | Review and revise press release responding to Attorney General Bonta; E-mail correspondence regarding same. | 0.60 |
| 9/28/23 | PMJ | Review e-mail correspondence from Attorney Shinoff regarding clients; Discuss *. | 0.40 |
| 10/2/23 | JMT | Review voluminous emails exchanged regarding Lori West returning to work; Conference with Mr. Jonna regarding same; E-mail correspondence to Attorney Coughlin and Lori West introducing each other. | 0.60 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 10/2/23 | PMJ | Telephone calls and e-mail correspondence with Andrew Mirabelli regarding * and next steps; Discuss Lori West employment and investigation status with Attorney Coughlin, Mr. LiMandri, and Mr. Trissell; E-mail correspondence with EUSD regarding same. | 1.60 |
| 10/2/23 | CSL | E-mail correspondence regarding administrative complaint against client and investigation; Telephone conference with Mr. Jonna regarding same. | 0.60 |
| 10/2/23 | KD | Review and finalize ex parte application for leave to file Amici curiae brief in opposition to OSC re: preliminary injunction and supporting documents; E-mail correspondence to attorney service with instructions for filing in San Bernardino court; E-mail correspondence to opposing counsel with same. | 0.60 |
| 10/2/23 | FJC | Telephone conference with Paul Jonna; email from Jeff Trissell; begin review of complaint. | 1.50 |
| 10/3/23 | JMT | Telephone call with Mr. Jonna regarding Elizabeth Mirabelli's employment status; E-mail correspondence to Attorney Coughlin regarding same. | 0.40 |
| 10/3/23 | CSL | E-mail correspondence regarding clients' return to work; Conference with Mr. Trissell regarding same. | 0.40 |
| 10/4/23 | JMT | Conference with Mr. Jonna regarding case strategy; Review e-mail correspondence from Attorney Coughlin with his thoughts; Draft responsive e-mail correspondence. | 0.40 |
| 10/4/23 | JMT | Review ACLU Amicus brief filed in People v. Chino Valley Unified; E-mail correspondence to counsel for Chino regarding same. | 0.40 |
| 10/4/23 | PMJ | E-mail correspondence regarding Elizabeth's work status; Telephone call with Politico regarding case. | 0.20 |
| 10/4/23 | FJC | Review emails, consider and analyze; respond; further email from Jeff Trissell. | 1.50 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 10/5/23 | FJC | Talk to Lori West; review documents; research; review various emails from Paul Jonna to Dan Shinoff; edit proposed letter. | 3.90 |
| 10/5/23 | FJC | Research of procedural issues for filing claims of employees, GTCA, FEHA, etc.; Review parts of the EUSD MOU; Review Westlaw re: Board of Ed. At EUSD; Review policies and regulations of EUSD Board of Education, including AR-4030. | 2.00 |
| 10/6/23 | JMT | Review client's lengthy emails regarding * ; Review e-mail correspondence from Mr. Jonna regarding same; Review Attorney Coughlin's emails regarding employment claims. | 0.20 |
| 10/6/23 | KD | Review and finalize reply Amici curiae brief in opposition to California's order to show cause regarding preliminary injunction; E-mail correspondence to attorney service with same for rush filing. | 0.40 |
| 10/6/23 | FJC | Review client emails (.2); email to Paul Jonna re: confirming with opposing counsel re: internal grievance (.2); telephone conference with Paul Jonna (.2). | 0.60 |
| 10/7/23 | FJC | Review emails from Andrew Mirabelli; review documents and timeline; create restated timeline. | 4.40 |
| 10/8/23 | PMJ | E-mail correspondence with opposing counsel regarding meeting with Lori West on administrative complaint; Review new court decision regarding transgender issues. | 0.20 |
| 10/9/23 | CSL | View Podcast of parents protesting transgernder indoctrination; E-mail correspondence regarding same. | 0.40 |
| 10/9/23 | FJC | Email from Andrew Mirabelli; response. | 0.40 |
| 10/11/23 | KD | Review and finalize second joint ex parte application for extension of time for defendants to respond to complaint and order; File with Court; E-mail correspondence to Judge Benitez with proposed order; E-mail correspondence to opposing counsel with same. | 0.40 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 10/11/23 | MDM | Receive and review various e-mail correspondence from Mr. Jonna and opposing counsel regarding joint motion to extend time to answer; Review court update regarding extension. | 0.40 |
| 10/13/23 | PMJ | Review flyer at EUSD protesting lawsuit; E-mail correspondence to EUSD notifying them of same. | 0.40 |
| 10/13/23 | JMT | Review emails from Attorney Coughlin and Andrew Mirabelli regarding * ; Conference with Mr. Jonna regarding same. | 0.60 |
| 10/13/23 | CSL | Review e-mail correspondence regarding retaliation against clients; Review protest flyer regarding same. | 0.40 |
| 10/14/23 | CSL | E-mail correspondence regarding harassment and retaliation against clients; Review materials regarding same. | 0.60 |
| 10/18/23 | PMJ | Review e-mail correspondence from Attorney Shinoff regarding administrative investigation and next steps; Forward same to team. | 0.20 |
| 10/20/23 | PMJ | Review recap of Chino preliminary injunction hearing; Discuss same with Mr. Trissell. | 0.40 |
| 10/20/23 | CSL | Conference with * regarding protest against clients; Review e-mail correspondence and photographs regarding same. | 0.40 |
| 10/23/23 | JMT | Meeting with Mr. Jonna regarding strategy in case; Telephone conference with clients regarding * . | 0.40 |
| 10/23/23 | JMT | Telephone call with Attorney Coughlin regarding adding Title VII claims to case; E-mail correspondence regarding * . | 0.40 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 10/24/23 | FJC | Case work; emails from last 2 days (.2); put all intake documents together and review for purposes of drafting EEOC claim. | 0.70 |
| 10/25/23 | FJC | Review documents, review research, organize notes, interviews, emails, re-review emails, drafting claim for EEOC; email to LiMandri & Jonna LLP re: potential video. | 4.00 |
| 10/25/23 | FJC | Analysis re: potential issues with employment claims, risk of anti-SLAPP, etc.; Review case documents. | 0.60 |
| 10/26/23 | FJC | Continued brief review of relevant case documents; substantive review and revisions to draft EEOC complaint. | 1.30 |
| 10/27/23 | FJC | Research adverse action issue; draft and revise claim; emails and calls with clients. | 3.00 |
| 10/27/23 | FJC | Review and revise EEOC complaint; research re: EEOC/CRD complaint and right to sue letter; draft memo re: procedure. | 1.30 |
| 10/31/23 | FJC | Review client email; review CRD form; telephone conference with client; send her * . | 1.10 |
| 10/31/23 | FJC | Review client accomodation draft; review and begin to compose notes for client for review in advance of accommodation meeting. | 0.50 |
| 11/2/23 | PMJ | Telephone call with Attorney Shinoff regarding Lori West's return to work date; Participate in interactive process meeting with Attorney Shinoff, Attorney Coughlin, and Elizabeth Mirabelli. | 1.80 |
| 11/2/23 | FJC | Analysis re: possible accommodations and brainstorm what to request to protect client; substantive review and comments to memo to client. | 0.50 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 11/3/23 | PMJ | E-mail correspondence with team regarding order to show cause re: contempt and next steps; Review client e-mail correspondence regarding  * . | 0.20 |
| 11/13/23 | JMT | Review CDE motion for judgment on the pleadings; Emails to team regarding same. | 0.40 |
| 11/15/23 | JMT | Review early neutral evaluation conference and case management conference order issued by Magistrate Judge Crawford; E-mail correspondence to clients * . | 0.60 |
| 12/4/23 | KD | Review e-mail correspondence from Mr. Trissell regarding sending Rincon Middle School protest videos and photographs; E-mail correspondence to clients * . | 0.40 |
| 12/5/23 | JMT | Additional edits to Mirabelli declaration in support of contempt; Finalize all papers. | 0.60 |
| 12/5/23 | KD | Telephone call with Mr. Trissell regarding declaration of Elizabeth Mirabelli; E-mail correspondence to Ms. Mirabelli with same. | 0.20 |
| 12/6/23 | KD | Review and finalize ex parte application for an order to show cause re: civil contempt of court and/or clarification of the preliminary injunction order, Declaration of Paul Jonna, Elizabeth Mirabelli, Lori West, and proposed order; File with Court; E-mail correspondence to opposing counsel with same; E-mail | 0.60 |
| 12/7/23 | MDM | Receive and review e-mail correspondence from Mr. Trissell regarding time for opposing counsel to respond to ex parte motion for order to show cause regarding contempt; Review ex parte motion and local rules; Draft analysis and forward to Mr. Trissell and Mr. Jonna. | 0.60 |
| 12/11/23 | CSL | Review articles on motion for sanctions; e-mail correspondence regarding media interviews; Telephone conference with Mr. Jonna regarding same. | 1.00 |
| 12/11/23 | CSL | Review Heritage article on Rights of Parents in Education of Children; E-mail correspondence regarding same. | 0.60 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 12/12/23 | MDM | Review and assess order setting hearing on order to show cause; Forward initial assessment to Mr. Jonna and Mr. Trissell. | 0.40 |
| 12/14/23 | MDM | Confer with Mr. Jonna regarding reassignment of case to new Magistrate judge and effect on scheduling going forward; Draft analysis and forward same to Mr. Jonna and Mr. Trissell. | 0.40 |
| 12/15/23 | JMT | Review new Vlaming decision from Virginia Surpeme Court; Update opposition to CDE motion for judgment on the pleadings to cite same. | 1.60 |
| 12/19/23 | JMT | Conference with Mr. Jonna regarding edits to opposition to motion for judgment on the pleadings; Revise same. | 1.80 |
| 12/20/23 | MDM | Confer with Mr. Trissell regarding request for fees for unauthorized motion for reconsideration; Review pleadings. | 0.80 |
| 12/20/23 | JMT | Conference with Mr. Myers regarding edits to opposition to motion for judgment on the pleadings; Further edits to same. | 1.60 |
| 12/22/23 | KD | Review and finalize opposition to defendants' motion for judgment on the pleadings and declaration of Paul Jonna; File with Court; E-mail correspondence to opposing counsel with same. | 0.40 |
| 12/22/23 | CSL | E-mail correspondence regarding new claim against EUSD; Telephone conference with Mr. Jonna regarding same. | 0.40 |
| 12/28/23 | JMT | Receive and download opposition to order to show cause regarding contempt; Begin drafting reply in support of same; Conference with Mr. Jonna regarding points to make on reply. | 4.60 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 1/2/24 | MDM | Review and suggest revisions to draft reply brief regarding contempt; Review supporting documents for possible changes; Forward assessment and recommended revisions to Mr. Trissell. | 1.60 |
| 1/2/24 | JMT | Review and incorporate Mr. Jonna's edits into reply in support of motion for contempt; Edit same; Draft declarations of Paul Jonna and Elizabeth Mirabelli. | 1.40 |
| 1/3/24 | JMT | Edits to reply in support of motion for contempt; Draft Frank Coughlin declaration. | 2.00 |
| 1/3/24 | KD | Review and finalize reply in support of motion for contempt, declarations of Paul Jonna, Elizabeth Mirabelli, and  Frank Coughlin; file with court; E-mail correspondence to opposing counsel with same. | 0.60 |
| 1/3/24 | PMJ | Review notice from court regarding motion for judgment on the pleadings hearing; Discuss same with team. | 0.20 |
| 1/3/24 | JMT | Receive order regarding setting hearing on motion for judgment on the pleadings; E-mail correspondence regarding briefing and cases for binder. | 0.80 |
| 1/3/24 | JMT | Review various emails from clients regarding * ; Send draft joint discovery plan to Mr. Jonna. | 0.40 |
| 1/3/24 | FJC | Review declaration; talk to Paul Jonna; review papers and draft declaration; emails to/from LiMandri & Jonna LLP. | 1.50 |
| 1/4/24 | PMJ | Telephone call with client * ; Review e-mail correspondence from Lori West regarding *. | 0.40 |
| 1/4/24 | MDM | Review court notice regarding contempt hearing; Review and assess *  sent by clients; Research possible additional damages or claims on behalf of Lori West and forward analysis to Mr. Trissell and Mr. Jonna. | 0.60 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 1/5/24 | JMT | Review e-mail correspondence from client regarding * ; Respond with information regarding * . | 0.20 |
| 1/5/24 | KD | Review e-mail correspondence from Mr. Trissell to obtain filing in Chino case; Review court docket for ex parte application to file Amicus Curiae in support of plaintiff's motion preliminary injunction; E-mail correspondence to Mr. Trissell with same. | 0.40 |
| 1/5/24 | MDM | Confer with Mr. Jonna and Mr. Trissell regarding the significance of Judge Benitez's order rescheduling hearing and denying leave for defendants to appear remotely; Telephone call to chambers to clarify hearing calendar; Evaluate issues to prepare in advance of two upcoming motion hearings. | 0.80 |
| 1/8/24 | JMT | Prepare for hearing on motion for judgment on the pleadings with Mr. Jonna; Edit outline. | 1.40 |
| 1/9/24 | PMJ | Review minute order regarding adding Attorney General and State to case; Discuss with team. | 0.20 |
| 1/9/24 | PMJ | Prepare for contempt hearing and draft media statement; Telephone call with client. | 0.60 |
| 1/10/24 | JMT | Prepare for, travel to and from, and participate in contempt hearing; Post-hearing debrief meeting with client. | 5.00 |
| 1/10/24 | CSL | E-mail correspondence regarding result of contempt hearing; Telephone conference with Mr. Jonna regarding same. | 0.60 |
| 1/12/24 | JMT | Conference with Tom Ciesielka regarding radio interview; Participate in interview. | 0.40 |
| 1/12/24 | CSL | Review articles on latest court hearing; Emails regarding same. | 0.60 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 1/16/24 | PMJ | Assess next steps in case with Mr. Trissell; E-mail correspondence with EUSD regarding next steps. | 0.40 |
| 1/17/24 | JMT | Legal research regarding adding employment claims to case; E-mail correspondence to Mr. Jonna and Attorney Coughlin regarding same. | 0.60 |
| 1/17/24 | PMJ | Telephone call with Lori West regarding * ; Telephone call Attorney Shinoff regarding same. | 0.20 |
| 1/17/24 | FJC | Telephone call with Paul Jonna; emails to/from Paul Jonna; review prior emails. | 1.25 |
| 1/18/24 | JMT | Review new press release from Attorney General; Edits to first amended complaint. | 2.80 |
| 1/18/24 | PMJ | Media interview with * ; Review and revise first amended complaint. | 0.80 |
| 1/18/24 | MDM | Identify information regarding pay and benefits to forward to Attorney Coughlin; E-mail correspondence to Lori West in advance of forwarding this information. | 0.40 |
| 1/18/24 | CSL | Review notices from Attorney General regarding transgender school policies; E-mail correspondence regarding same. | 0.40 |
| 1/22/24 | JMT | Telephone call with client regarding * ; Prepare redline version of first amended complaint and send to opposing counsel. | 0.60 |
| 1/22/24 | JMT | Finalize initial disclosures; Telephone call to Ms. Oakley regarding service of same on opposing counsel. | 0.60 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 1/22/24 | RO | Telephone call and e-mail correspondence with Mr. Trissell regarding initial disclosures; Finalize and serve initial disclosures. | 0.20 |
| 1/23/24 | MDM | Review e-mail correspondence from Attorney Mandarano declining to consent to amendment of complaint; Confer with Mr. Jonna and Mr. Trissell regarding procedure for seeking leave to amend; Telephone conference with Attorney Mandarano regarding same; Review e-mail correspondence from Mr. Jonna | 0.60 |
| 1/23/24 | JMT | Review emails regarding CDE refusal to stipulate to amended complaint; Conference with Mr. Jonna and Mr. Myers regarding same. | 0.60 |
| 1/25/24 | MDM | Review and suggest to Mr. Trissell revisions to ex parte application for clarification of order to amend complaint; Confer with Mr. Trissell regarding nature of proposed amendments; E-mail correspondence to Mr. Jonna and Mr. Trissell regarding next steps. | 0.40 |
| 1/25/24 | FJC | Follow up with LiMandri & Jonna LLP, with Lori West; review prior emails; status to client, to LiMandri & Jonna LLP. | 1.10 |
| 1/26/24 | JMT | Review order on clarification; Prepare first amended complaint. | 1.40 |
| 1/28/24 | PMJ | E-mail correspondence with TMS regarding Elizabeth Mirabelli and Lori West photographs; Revise press statement regarding filing of first amended complaint. | 0.20 |
| 1/29/24 | KD | Draft amended summons, civil cover sheet, and update attachment list of defendants; Prepare documents for filing; File with Court. | 0.60 |
| 1/29/24 | MDM | Research issue of resolving scheduling conflict between this early neutral evaluation and oral argument in separate case; Review draft letter regarding schedule and recommend revisions. | 0.40 |
| 2/1/24 | PMJ | Research new Deputy Attorney General assigned to case; Review e-mail correspondence from Attorney General regarding telephone call on extension of time to respond to first amended complaint. | 0.20 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 2/1/24 | PMJ | Review and analyze e-mail correspondence from Attorney General's office regarding service and proposed motion to dismiss; Discuss response with Mr. Trissell. | 0.40 |
| 2/1/24 | JMT | Finalize response to Deputy Attorney General Soichet and send out; Telephone call with Ms. Denworth regarding serving Attorney General and Governor Newsom. | 0.40 |
| 2/1/24 | KD | Review e-mail and telephone call with Mr. Trissell regarding letter to Deputy Attorney General Emmanuelle Soichet regarding response to telephone call on January 31, 2024; Finalize same and e-mail correspondence to Deputy Attorney General Soichet with same. | 0.40 |
| 2/1/24 | KD | Research Internet regarding service location on Governor Gavin Newsom and Attorney General; Exchange e-mail correspondence with attorney service regarding same; Discuss above with Mr. Trissell. | 0.40 |
| 2/2/24 | PMJ | Review letter to State defendants regarding motion to dismiss; Discuss same with Mr. Trissell. | 0.20 |
| 2/2/24 | KD | Prepare issued amended summons for Governor Newsom and Attorney General Rob Bonta; Prepare documents for service on same; E-mail correspondence to attorney with instructions for service. | 0.80 |
| 2/7/24 | PMJ | Radio interview with * regarding status of case and next steps; Review letter from CDE to Rocklin. | 0.40 |
| 2/8/24 | JMT | Review letter to Rocklin Unified School District; Research quotes from preliminary injunction hearing contradicting it. | 0.40 |
| 2/8/24 | MDM | Review draft notice of new authority; Confer with Mr. Jonna and Mr. Trissell regarding recommended changes. | 0.40 |
| 2/8/24 | KD | Review and finalize supplemental request for judicial notice in opposition to State defendants' motion for judgment on pleadings; File with Court; E-mail correspondence to opposing counsel with same. | 0.40 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 2/8/24 | KD | Review and finalize written discovery: Elizabeth Mirabelli's interrogatories to State defendants, defendants Trent Smith, Steve White, John Albert, Tracy Schmidt, and EUSD official-capacity defendants; Elizabeth Mirabelli's requests for admission to all defendants; Lori West's requests for admission to State defendants and EUSD | 0.80 |
| 2/9/24 | KD | Review and finalize written discovery: Lori West's request for admissions to State defendants and EUSD defendants, Elizabeth Mirabelli's interrogatories to State defendants, Trent Smith, Steve White, John Albert, EUSD defendants, Tracy Schmidt, and request for admissions to all defendants, and joint plaintiffs' request | 0.80 |
| 2/14/24 | PMJ | Review and respond to client e-mail correspondence regarding next steps with Elizabeth Mirabelli; E-mail correspondence with Department of Justice regarding motions to dismiss. | 0.40 |
| 2/14/24 | PMJ | Client meeting regarding* ; Review and respond to e-mail correspondence from Attorney General regarding meeting and conferring on Rule 12(b)1 motion. | 1.00 |
| 2/15/24 | JMT | Edit joint motion regarding continuing the early neutral evaluation conference; Conference with Mr. Jonna regarding same and further edits. | 1.00 |
| 2/16/24 | JMT | Review notices of appearance of Deputy Attorneys General; Review motion to continue the early neutral evaluation conference. | 0.20 |
| 2/18/24 | MDM | Review and evaluate edited early neutral evaluation conference statement forwarded by Mr. Jonna; Identifyand recommend additional changes. | 0.40 |
| 2/22/24 | RO | Telephone calls with Mr. Jonna and Mr. Myers regarding: service of initial disclosures to opposing counsel for defendants Newsom and Bonta and early neutral evaluation conference; Prepare initial disclosures and forward to opposing counsel; Review e-mail correspondence between Mr. Jonna and Attorney Quade. | 0.40 |
| 2/22/24 | MDM | Confer with Mr. Jonna and Ms. Oakley regarding service of initial disclosures; Confer with Mr. Jonna regarding conflicts with rescheduled early neutral evaluation conference; Research dates for serving written discovery on newly added parties and confer with Mr. Jonna regarding same; Assist Mr. Jonna in preparing communications to opposing counsel giving our position on FRCP 26(f) | 0.80 |
| 2/26/24 | CSL | Review article on favorable ruling from State court in Riverside; Conference with Mr. Jonna regarding same. | 0.40 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 2/28/24 | JMT | Review ruling on preliminary injunction motion in M. v. Komrosky; Discuss with Ms. Denworth regarding obtaining final ruling. | 0.40 |
| 2/29/24 | KD | Review e-mail correspondence from Mr. Trissell regarding obtaining documents in the M. v. Komrosky case; Research court docket for notice of ruling on preliminary injunction and minute order regarding motion for preliminary injunction; E-mail correspondence to Mr. Trissell with same. | 0.40 |
| 3/1/24 | PMJ | Review and respond to e-mail correspondence from Attorney General's office regarding meet and confer date; Review and respond to client e-mail correspondence regarding investigation of Lori West. | 0.20 |
| 3/14/24 | PMJ | Participate in Lori West EEOC interview; Discuss same with Frank Coughlin. | 0.20 |
| 3/18/24 | RM | Discuss revisions to table of authorities in support of opposition to Newsom's and Bonta's motion to dismiss with Mr. Trissell; Revise same. | 0.60 |
| 3/19/24 | PMJ | Follow-up e-mail correspondence with client regarding * ; Forward draft e-mail correspondence to workers' compensation lawyer. | 0.20 |
| 3/20/24 | PMJ | Assess workers' compensation issues from Craig Fuller; E-mail correspondence with Frank Coughlin regarding EEOC letter. | 0.40 |
| 3/22/24 | JMT | Receive * from client; Send charge of discrimination on behalf of Lori West to EEOC. | 0.20 |
| 3/25/24 | KD | Review and finalize meet and confer letter to Attorney Cale regarding CDE discovery responses; E-mail correspondence to opposing counsel with same. | 0.40 |
| 4/1/24 | KD | Review and finalize opposition to defendants' ex parte application for protective order staying discovery; Revise exhibits to Jonna declaration; File with court; E-mail correspondence to attorney service to deliver courtesy copy to court; E-mail correspondence to opposing counsel with same. | 0.60 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 4/4/24 | PMJ | Review and respond to e-mail correspondence from client with draft grievance; Review Lori West right to sue letter. | 0.20 |
| 4/4/24 | KD | Review e-mail correspondence from Mr. Trissell regarding updating attorney hours for early neutral evaluation conference statement; Update same. | 0.40 |
| 4/5/24 | KD | Review and finalize joint discovery plan; File with Court. | 0.40 |
| 4/5/24 | CSL | Review video on school indoctrination; E-mail correspondence regarding same; Conference with Mr. Jonna and Mr. Trissell regarding same. | 1.00 |
| 4/10/24 | PMJ | Interview potential plaintiff Jane Poe; Discuss same with Mr. Trissell. | 0.40 |
| 4/15/24 | CSL | Conference with Mr. Jonna regarding discovery and motion for summary judgment; E-mail correspondence regarding same. | 0.40 |
| 4/16/24 | KD | Review and finalize letter to EUSD regarding meet and confer on discovery; E-mail correspondence to opposing counsel with same. | 0.40 |
| 4/16/24 | KD | Review and finalize letter to Deputy General Counsel Virginia Cale, of CDE regarding discovery meet and confer; E-mail correspondence to opposing counsel with same. | 0.40 |
| 4/22/24 | KD | Review and finalize letter to Deputy General Counsel Virginia Cale, of CDE regarding discovery meet and confer; E-mail correspondence to opposing counsel with same. | 0.40 |
| 4/23/24 | PMJ | Review materials for motion to dismiss hearing; Update outline. | 0.40 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 4/24/24 | PMJ | Review e-mail correspondence to client regarding * ; Review e-mail correspondence to CDE regarding same. | 0.20 |
| 4/24/24 | PMJ | Telephone conference with * regarding Jane Poie's claims and next steps; Telephone call with potential new plaintiff Jane Doe. | 0.80 |
| 4/26/24 | MDM | Confer with Mr. Jonna and Mr. LiMandri regarding upcoming oral argument and presentation of exhibits; Assist Mr. Jonna in preparing for oral argument. | 1.00 |
| 4/26/24 | PMJ | Review briefing in Regino v. Staley case; Telephone call to Clerk regarding motion hearing. | 0.20 |
| 4/26/24 | CSL | Conference with Mr. Jonna, Mr. Trissell, and Mr. Myers regarding strategy for presentation of oral argument on motions to dismiss; Review exhibit regarding same. | 0.80 |
| 4/27/24 | MDM | Research on issue of governor's immunity and necessary party status per discussion with Mr. Jonna; Forward analysis to same and to Mr. Trissell. | 1.60 |
| 4/29/24 | KD | Exchange e-mail correspondence to court reporter Adrian Baule to request an expedited transcript of defendants' motion to dismiss hearing; Complete request form. | 0.40 |
| 4/30/24 | PMJ | Review EUSD's meet and confer letter response regarding discovery disputes; Review Courthouse News update on case. | 0.40 |
| 4/30/24 | MDM | Confer with Mr. Trissell regarding research needed on bringing claims as a class action; Review and analysis of Supreme Court precedent on breadth of injunctions; Review and assess settlement terms sent to opposing counsel. | 0.80 |
| 5/1/24 | KD | Review, revise, and finalize meet and confer letter to Attorney Shinoff; E-mail correspondence to opposing counsel with same. | 0.40 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 5/3/24 | PMJ | Interview with *   ; E-mail correspondence with client regarding differential pay discrepancy. | 0.40 |
| 5/7/24 | CSL | Review articles on press release from Attorney General Bonta's office regarding policy enforcement; Emails regarding same. | 0.40 |
| 5/8/24 | PMJ | Provide update to * during webinar; * interview regarding case. | 1.20 |
| 5/9/24 | PMJ | Observe Regino v. Staley oral argument; Discuss same with Mr. Trissell. | 1.20 |
| 5/10/24 | MDM | Continue research on class action; Review authority forwarded by Mr. Trissell regarding injunctive class actions; Review proposed second amended complaint. | 0.40 |
| 5/13/24 | KD | Review and finalize joint ex parte application for extension of time for plaintiffs to move to compel discovery responses and proposed order; File with Court; Email proposed order to Judge Torres; E-mail correspondence to opposing counsel with same. | 0.40 |
| 5/15/24 | MDM | Update research memorandum on class action; Additional analysis for same; Forward preliminary memorandum to Mr. Trissell and Mr. Jonna. | 0.80 |
| 5/17/24 | MDM | Confer with Mr. Trissell and Mr. Jonna regarding class certification and definition of classes in proposed amended complaint; Review authority forwarded by Mr. Trissell on class definitions. | 0.40 |
| 5/22/24 | PMJ | Telephone call with *  regarding California bill regarding parental notification; Discuss same with Peter Breen. | 0.40 |
| 5/23/24 | PMJ | Assess next steps regarding proposed legislation; Telephone call with Elizabeth Mirabelli regarding same. | 0.60 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 5/28/24 | KD | Review e-mail correspondence from Mr. Trissell regarding obtaining documents in the M. v. Komrosky case; Research court docket for notice of ruling on demurrer and motion to strike, minute orders regarding same, and first amended complaint; E-mail correspondence to Mr. Trissell with same. | 0.40 |
| 5/28/24 | JAY | Review CSBA's objections to third-party subpoena; E-mail correspondence to Mr. Trissell regarding ESI strategy and production protocol. | 1.60 |
| 5/29/24 | JAY | Review other ESI protocols used in other cases; Review updates in third-party e-discovery case law; Select protocol for Mr. Trissell to send to counsel for CSBA in advance of meet and confer on same, based on initial expectation of 10K+ pages of responsive, non-privileged/lightly redacted | 2.20 |
| 5/30/24 | MDM | Review and assess article commenting on scientific status of transition therapies; Forward to Mr. LiMandri, Mr. Jonna, and Mr. Trissell. | 0.60 |
| 5/30/24 | JAY | Prepare for and participate in conference call with Mr. Trissell and counsel for CSBA regarding custodians, search terms, limitations, format for production, metadata fields to be included with production, etc.; Determine that responsive document universe is currently 100K+, with pages far exceeding that number; | 0.80 |
| 5/31/24 | MDM | Confer with Mr. Jonna regarding research needed on capacity of a state agency to sue a state officer in federal court; Research regarding same and send preliminary findings to Mr. Jonna and Mr. Trissell with written authority; Additional research and analysis; Forward analysis to Mr. Jonna, Mr. Trissell, and Peter Breen. | 2.60 |
| 5/31/24 | JAY | Research CSBA, member associations, and relations to CDE; Prepare for and participate in telephone conference with Mr. Trissell regarding additional case background, litigation strategy, and ESI strategy, following reflection on positions taken by CSBA. | 0.80 |
| 6/1/24 | PCB | Emails about importance of including FERPA allegations in the Complaint; and other issues. | 0.40 |
| 6/2/24 | MDM | Review various e-mail correspondence from Peter Breen and Mr. Jonna regarding possibility of adding Lakeside School District as plaintiff; Research Younger and Colorado River Abstention Doctrines and forward analysis to same. | 0.80 |
| 6/4/24 | JMT | Telephone calls with Mr. Jonna regarding second amended complaint; Incorporate his edits to same. | 0.40 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 6/4/24 | PMJ | Review draft Lakeside School District fee agreement; Review client e-mail correspondence regarding * ; Telephone call with Lakeside School District regarding retention. | 0.40 |
| 6/5/24 | PMJ | Assess applicability of ascertainability requirement in Ninth Circuit; E-mail correspondence with team regarding same. | 0.20 |
| 6/5/24 | JMT | Edit second amended complaint; Review the Poe Family's edits to their declarations. | 1.40 |
| 6/5/24 | MDM | Various e-mail correspondence with Michael McHale, Mr. Jonna, and Mr. Trissell regarding class certification and ascertainability; Additional research of this issue; Confer with Mr. Trissell regarding analysis. | 1.00 |
| 6/5/24 | CSL | E-mail correspondence from Mr. Jonna regarding meeting with Lakeside School District; Telephone conference with Mr. Jonna regarding same. | 0.40 |
| 6/6/24 | JMT | Incorporate client's edits into complaint and declarations; Finalize motion for leave to amend complaint. | 1.80 |
| 6/6/24 | PCB | Review addendums to fee agreements; review LSUSD fee agreement. | 0.40 |
| 6/7/24 | PMJ | Review and revise press release; Review final edits to motion papers and second amended complaint. | 0.60 |
| 6/7/24 | JMT | Review objections to various third-party subpoenas; Draft response letters to same; Finalize motion for leave to amend complaint. | 1.20 |
| 6/7/24 | KD | Review and finalize motion for leave to amend complaint and proceed pseudonymously, declarations of Paul Jonna, Jane Roe, Jane Boe, John Poe, Jane Poe, John Doe, Jane Doe, and proposed order; Discussion with Mr. Trissell regarding face -page cover for exhibits to Jonna declaration; Prepare same and update exhibits. | 1.20 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 6/7/24 | KD | Final review of motion for leave to amend complaint and proceed pseudonymously, declarations of Paul Jonna, Jane Roe, Jane Boe, John Poe, Jane Poe, John Doe, Jane Doe, and proposed order; File with court; E-mail correspondence to Judge Benetiz with Word version of proposed order; Prepare documents in DropBox and | 0.60 |
| 6/7/24 | MDM | Confer with Mr. Jonna regarding Judge Benitez's decision to set a status conference; Review and assess various e-mail correspondence regarding supplemental discovery requests and motion to amend complaint. | 0.60 |
| 6/11/24 | PMJ | Review minute order regarding advancing hearing date on motion for leave to amend complaint; Discuss same with Mr. Trissell. | 0.20 |
| 6/14/24 | MDM | Review Supreme court decision in FDA v. Alliance for Hippocratic Medicine regarding standing for possible use in case; Discuss same with Mr. Trissell. | 1.00 |
| 6/14/24 | CSL | E-mail correspondence regarding pending California Legislation on parental gender transition notification in schools; Telephone conference with Mr. Trissell regarding same. | 0.60 |
| 6/15/24 | PMJ | Review draft reply in support of motion for leave to amend complaint; E-mail correspondence regarding same. | 0.40 |
| 6/17/24 | PMJ | Review and revise motion for leave to amend complaint reply brief; Telephone call with clients * . | 0.60 |
| 6/17/24 | KD | Review and finalize reply to EUSD defendants in support of motion for leave to amend complaint and declaration of Lori West; File with Court; E-mail correspondence to opposing counsel with same. | 0.40 |
| 6/20/24 | PMJ | Telephone call with * to discuss proposed class action and next steps regarding same; Telephone call with * regarding same. | 0.60 |
| 6/24/24 | JMT | Review CDE and Attorney General's oppositions to motion for leave to amend complaint; Research for reply. | 1.20 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 6/25/24 | JMT | Edit discovery responses per client's comments; Email to client with same. | 1.00 |
| 6/25/24 | MDM | Additional research of ability of school district to sue California state government; Forward analysis to Mr. Trissell. | 1.60 |
| 6/27/24 | JMT | Edits to Amicus brief; Send notice to counsel per S.C. Rule 37.2; E-mail correspondence to clients regarding * | 0.40 |
| 6/27/24 | KD | Review and finalize Mirabelli and West responses to Thurmond and Darling-Hammond special interrogatories, request for production of docs, and request for admissions; Prepare responses and documents in DropBox link for service; E-mail correspondence to opposing counsel with same. | 0.40 |
| 6/28/24 | MDM | Continue researching standing of school district to seek declaratory relief against state; Confer with Mr. Jonna and Mr. Trissell regarding possibility of dividing arguments among reply briefs; Confer with same regarding effect of continuation of hearing on briefing deadlines; Forward proposed revisions to reply brief to Mr. Trissell for incorporation into final reply briefs. | 4.40 |
| 6/28/24 | JMT | Draft motion for summary judgment; Research FERPA. | 1.00 |
| 6/29/24 | MDM | Review draft reply briefs forwarded by Mr. Trissell; Review cited authority and recommend additional revisions. | 0.60 |
| 7/1/24 | MDM | Final review of reply in support of motion for leave to amend complaint; Forward suggested revisions to Mr. Trissell; Check key case citations. | 1.00 |
| 7/1/24 | KD | E-mail correspondence to Cockle Legal Brief with draft Amicus brief in the Parents Protecting Children v. Eau Claire Sch. Dist. appeal; Upload same to portal. | 0.20 |
| 7/1/24 | KD | Review and finalize reply to CDE defendants and Attorney General in support of plaintiffs' motion for leave to amend the complaint and proceed pseudonymously; File with Court; E-mail correspondence to opposing counsel with same. | 0.40 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 7/5/24 | JMT | Review second proof of amicus brief; Edit and return to Cockle. | 0.60 |
| 7/8/24 | JMT | Review proof of amicus brief; Finalize same for filing. | 0.20 |
| 7/8/24 | KD | Review e-mail correspondence from Cockle with final versions of amicus brief, certification, and proof of service; File notice of appearance and amicus brief with US Supreme court. | 0.60 |
| 7/9/24 | RO | Review declarations of John Poe and John Doe; E-mail correspondence to Mr. Jonna regarding same. | 0.40 |
| 7/9/24 | MDM | Confer with Mr. Jonna and Mr. Trissell to prepare for status conference and hearing on motion for leave to amend; Additional research of issues raised by Mr. Jonna, and forward analysis to same. | 2.60 |
| 7/10/24 | PMJ | Prepare for motion for leave to amend hearing; Refine outline and review key cases. | 2.00 |
| 7/10/24 | PMJ | Travel to and from and attend hearing on motion for leave to amend complaint; Lunch meeting with clients regarding same. | 4.80 |
| 7/10/24 | JMT | Prepare for, travel to and from, and participate in hearing on motion for leave to amend complaint; * . | 4.60 |
| 7/15/24 | KD | Review and finalize notice of new authority in support of motion for leave to amend complaint and proceed pseudonymously; E-mail correspondence to opposing counsel with same. | 0.40 |
| 7/15/24 | CSL | Telephone conference with Mr. Jonna regarding new statute prohibiting School Districts from informing parents of a child's gender transition at school; Review emails regarding same. | 0.40 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 7/25/24 | JMT | Review new Title IX case, Arkansas v. Department of Education; Review Mary Catherine's edits to motion for summary judgment. | 1.40 |
| 7/30/24 | JMT | Review documents from Elizabeth Mirabelli and answers to discovery questions; Edit letter to opposing counsel. | 1.20 |
| 8/6/24 | JMT | E-mail correspondence to opposing counsel regarding extending discovery deadline and setting deposition dates; E-mail correspondence to client regarding same. | 0.40 |
| 8/7/24 | JMT | Review new case Texas v. Cardona; Edit memorandum of points and authorities in support of motion for summary judgment to include new case. | 0.40 |
| 8/8/24 | JMT | Review order on motion for leave to amend complaint; Edits to second amended complaint; E-mail correspondence to * regarding same; Emails to clients regarding * ; Additional edits to motion for summary judgment. | 1.60 |
| 8/10/24 | PMJ | Assess next steps regarding motion for summary judgment and class certification; Multiple telephone calls with team regarding same. | 1.40 |
| 8/13/24 | JMT | Telephone calls with clients regarding motion for summary judgment; Meeting with Mr. Jonna regarding same. | 0.40 |
| 8/13/24 | PMJ | Review Ninth Circuit Court of Appeals Circuit letter briefs regarding AB 1955; Telephone call with Jane Doe regarding case status. | 0.60 |
| 8/13/24 | KD | Review and finalize second amended class action complaint; Draft second amended civil cover sheet; Update attachment to civil cover sheet and summons with attorneys, plaintiffs, and defendants; File with court; E-mail correspondence to opposing counsel with same. | 0.60 |
| 8/16/24 | JMT | Draft ex parte application for leave to file oversized memoranda; Finalize motion for summary judgment, motion for class certification, and protective order. | 5.40 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 8/16/24 | KD | Review and finalize motion for class certification; File with court; E-mail correspondence to opposing counsel with same. | 0.40 |
| 8/16/24 | KD | Review and finalize ex parte application for leave to file oversized memoranda; File with court; E-mail correspondence to opposing counsel with same. | 0.40 |
| 8/16/24 | KD | Review and finalize motion for summary judgment, memorandum of points and authorities, appendix of evidence, vol.1 and 2, appendix of authorities, appendix of declarations, declaration of Paul Jonna, declaration of Elizabeth Mirabelli, declaration of Lori West, proposed judgment and permanent injunction, and | 0.80 |
| 8/19/24 | PMJ | Telephone call with Attorney Shinoff regarding differential pay issue; Assess next steps regarding Attorney General's motion to dismiss. | 0.60 |
| 8/22/24 | PMJ | E-mail correspondence with client regarding * ; Review ex parte application. | 0.40 |
| 8/23/24 | KD | Review and finalize letter to Attorney Shinoff regarding employment status of Elizabeth Mirabelli; E-mail correspondence to Attorney Shinoff with same. | 0.40 |
| 8/27/24 | PMJ | Review Attorney General Bonta's ex parte application; Telephone call to chambers regarding response to order; Review and revise motion to reconsider. | 0.40 |
| 8/27/24 | KD | Review and finalize ex parte application to reconsider/clarify order on defendant Bonta's application to stay plaintiffs' motions for summary judgment and class certification, declaration of Paul Jonna, declarations of Jane Poe and Jane Doe, and proposed order; File with court; E-mail correspondence to Judge Benitez with | 0.40 |
| 8/29/24 | PMJ | Review minute order denying motion for reconsideration; Assess next steps with team. | 0.20 |
| 9/4/24 | PMJ | Telephone call with * to provide update on status of case; Discuss motion for preliminary injunction with Mr. Trissell and assess strategy regarding same. | 0.20 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 9/19/24 | KD | Review and finalize notice of withdrawal for Mark Myers and Milan Brandon; File with court; E-mail correspondence to opposing counsel with same. | 0.20 |
| 9/24/24 | KD | Review and finalize motion for class-wide preliminary injunction and proposed order; File with Court; Email proposed order to Judge Benitez in support of same; e-mail correspondence to opposing counsel with same. | 0.40 |
| 9/25/24 | KD | Exchange e-mail correspondence with Judge Benitez' clerk Bob, regarding proposed order in Word format; Telephone call with Bob regarding same and help him open order in Word. | 0.20 |
| 9/25/24 | CSL | Conference with * regarding support of class action; Discuss case with * member. | 0.60 |
| 9/27/24 | RO | Discussions with Mr. Jonna and Mr. Trissell regarding ex parte opposition; Finalize same and file with court. | 0.40 |
| 9/30/24 | JMT | Review Mr. Duke's edits to amicus brief in Mae M. v. Komrosky; Incorporate client's edits to same. | 0.60 |
| 10/4/24 | JMT | Review CDE's edits to protective order; Draft comprehensive meet and confer letter in response to same; Continue working on written discovery responses. | 5.80 |
| 10/7/24 | JMT | Telephone call with client Jane Poe regarding * ; Finalize same and forward same for her review. | 2.20 |
| 10/8/24 | PMJ | E-mail correspondence with Elizabeth Mirabelli regarding * ; Discuss same with Attorney Shinoff. | 0.40 |
| 10/9/24 | PMJ | Review updated scheduling order; E-mail correspondence with Attorney Shinoff regarding Elizabeth Mirabelli's accommodation. | 0.20 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 10/15/24 | PMJ | Assess request from CDE to adjust scheduling order; Review e-mail correspondence regarding same; Discuss same with Mr. Trissell. | 0.20 |
| 10/21/24 | KD | Review and finalize opposition to defendants' motions to dismiss second amended complaint; File with Court; e-mail correspondence to opposing counsel with same. | 0.40 |
| 10/22/24 | JMT | Review filings in opposition to motion for a preliminary injunction; Telephone call with expert Dr. Anderson regarding doing rebutal declaration; Emails regarding same; E-mail correspondence to counsel in related cases to inquire regarding experts. | 1.60 |
| 10/22/24 | CSL | Research regarding statistics on suicide rates of transgenders; Conference with Mr. Trissell regarding same. | 0.80 |
| 10/23/24 | JMT | Review oppositions to motion for a preliminary injunction; Begin drafting reply memorandum. | 4.80 |
| 10/25/24 | RO | Telephone call from Mr. Trissell regarding DocuSign; Review e-mail correspondence from Mr. Trissell to Dr. Anderson regarding declaration; Send declaration to Dr. Anderson with same. | 0.20 |
| 10/28/24 | WTD | Review and revise reply in support of motion for class-wide preliminary injunction; Review and revise appendix of exhibits in support of same. | 1.20 |
| 10/28/24 | KD | Review and finalize reply in support of motion for class-wide preliminary injunction, rebuttal declaration of Dr. Erica Anderson, response to evidentiary objections, and corrected appendix of evidence, Vol. 2; File with Court; E-mail correspondence to opposing counsel with same. | 0.40 |
| 10/28/24 | KD | Review and finalize ex parte application for leave to file oversized memoranda and proposed order; File with Court; E-mail correspondence to opposing counsel with same. | 0.40 |
| 10/29/24 | JMT | Review Attorney General's edits to draft protective order; Conference with Mr. Jonna regarding same and proposed depositions; E-mail correspondence to opposing counsel regarding same. | 1.00 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 10/29/24 | PMJ | Review edits to scheduling order and protective order; Assess depositions and next steps. | 0.60 |
| 10/30/24 | KD | Review and finalize declaration of Paul Jonna in support of joint stipulation to modify first amended scheduling order; File with Court; E-mail correspondence to opposing counsel with same. | 0.40 |
| 11/14/24 | KD | Review and finalize stipulated protective order; File with court; E-mail correspondence to opposing counsel with same; E-mail correspondence to Judge Torres with Word version of stipulated protective order. | 0.40 |
| 11/19/24 | KD | Prepare unredacted discovery responses for service on opposing counsel; Discussion with Mr. Trissell regarding same; E-mail correspondence to opposing counsel with same. | 0.40 |
| 11/21/24 | KD | Review and prepare confidential authorization to release student records for child Doe and child Poe; E-mail correspondence to opposing counsel with same. | 0.40 |
| 11/22/24 | WTD | E-mail correspondence with Mr. Jonna regarding non-party "person most knowledgeable" depositions; Research and conference with Mr. Jonna regarding same. | 0.40 |
| 11/25/24 | RO | Telephone calls with Mr. Jonna regarding research task; Internet research regarding school boards with parental secrecy policies. | 1.00 |
| 11/26/24 | PMJ | Telephone call with Jane Poe regarding * ; E- mail correspondence to counsel regarding same. | 0.40 |
| 11/26/24 | RO | Review e-mail correspondence from * with regarding Telephone calls with Mr. Jonna and *  regarding same; Internet research regarding number of schools on the Defending Education article list and list of school districts in California, their use of eboardsolutions; Brief comparison between DefendingEducation article and list of | 1.60 |
| 11/26/24 | PMJ | Prepare for preliminary injunction hearing; Review second amended complaint. | 2.20 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 11/27/24 | RO | Discussion with Mr. Jonna regarding school districts that have the policy; Research regarding same; Telephone calls and e-mail correspondence to Mr. Muldowney regarding same. | 3.80 |
| 12/1/24 | PMJ | Prepare for preliminary injunction hearing; Revise outline. | 2.40 |
| 12/1/24 | JMT | Meeting with Mr. Jonna to prepare for preliminary injunction hearing; Edits to outline. | 4.20 |
| 12/2/24 | PMJ | Review outline for preliminary injunction hearing; Prepare for same. | 1.20 |
| 12/2/24 | JMT | Travel to and from and attend hearing on motions to dismiss; Lunch meeting to discuss hearing before afternoon session. | 6.20 |
| 12/2/24 | PMJ | Review draft notice of new authority for Matsumoto case; Review case. | 0.20 |
| 12/2/24 | CSL | Telephone conference with Mr. Jonna regarding oral argument on motion to dismiss; Emails regarding same; Conference with Mr. Jonna regarding motion for preliminary injunction. | 1.00 |
| 12/3/24 | JMT | Research regarding issues raised by Court at hearing;  i.e., role of school counselors and psychologists, when gender incongruence is medicalized or not, role of Doe v. Horne and Hecox cases from Ninth Circuit Court of Appeals. | 0.40 |
| 12/3/24 | CSL | Review article regarding Court hearing on motion to dismiss; Emails regarding same. | 0.40 |
| 12/3/24 | KD | Review and finalize notice of supplemental authority in support of plaintiff's opposition to motions to dismiss; File with court; E-mail correspondence to opposing counsel with same. | 0.40 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 12/5/24 | JMT | Review DSM-5 definition of gender dysphoria; Review Ninth Circuit Court of Appeal cases regarding what it means for "gender identity" to be a protected characteristic under the Equal Protection Clause; Review transcript of motion hearing in which Judge Benitez discusses same. | 2.40 |
| 12/6/24 | PMJ | Review correspondence from Attorney Shinoff regarding client Mirabelli medical benefits; Discuss *with client. | 0.40 |
| 12/16/24 | PMJ | E-mail correspondence to * regarding hearing transcript; Telephone call regarding same. | 0.40 |
| 12/20/24 | JMT | Telephone conference with John Poe and Jane Poe regarding *  ; Finalize letter to CDE regarding same. | 1.40 |
| 12/23/24 | JMT | E-mail correspondence to clients regarding * ; Continue working on written discovery propounded to Attorney General. | 0.80 |
| 12/26/24 | RO | Telephone calls and e-mail correspondence to Mr. Trissell regarding requesting medical records; Prepare authorizations and cover letters for * Internet research regarding authorizations. | 1.20 |
| 12/30/24 | JMT | Prepare for discovery meet and confer call; Particpate in same with CDE. | 1.00 |
| 12/30/24 | RO | Review and respond to e-mail correspondence from Mr. Trissell regarding Child Poe's medical records; Review Mr. Trissell e-mail correspondence to Mr. and Mrs. Poe regarding same. | 0.20 |
| 12/31/24 | RO | Discussions with Mr. Jonna regarding Child Poe's medical records; Prepare and fax letters to * and * ; E-mail correspondence to Mr. Jonna and Mr. Trissell regarding same. | 0.60 |
| 1/6/25 | JMT | Finalize supplemental discovery responses; E-mail correspondence to opposing counsel with same. | 0.60 |
| 1/6/25 | RO | Discussion with Mr. Mai regarding faxes sent on December 31, 2024 to * ; Refax medical records request to * regarding Child Poe. | 0.20 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 1/6/25 | KD | Finalize teacher Jane Boe and Jane Roe supplemental discovery responses to defendant Darling-Hammonds interrogatories; Prepare same in DropBox; E-mail correspondence to opposing counsel with same. | 0.40 |
| 1/8/25 | PMJ | Attend deposition of Jane Roe; Discuss * with client; Interview with * regarding case. | 4.40 |
| 1/9/25 | JMT | Review draft written discovery responses; Identify deponents and e-mail correspondence list to clients. | 3.00 |
| 1/9/25 | RO | Telephone call with Mr. Jonna regarding Child Poe's medical records; Telephone call to * and * regarding same. | 0.40 |
| 1/10/25 | JMT | Review new Title IX case from Tennessee; Review new Parents Defending Education poll. | 0.20 |
| 1/10/25 | RO | Telephone call to * regarding Child Poe's medical records; Discussions with Ms. Denworth, Mr. Mai, and Mr. Trissell regarding same. | 0.20 |
| 1/10/25 | RO | Prepare notices of depositions of Luis Rankins-Ibarra, Trent Smith, Tracy Schmidt, John Albert, Steve White, Katie Terrill, Kathleen Barlow, EUSD, CDE/SBE, and Attorney General; Prepare subpoenas for Kathleen Barlow and Katie Terrill; E-mail correspondence and telephone call with Mr. Trissell regarding same. | 2.00 |
| 1/10/25 | KD | Finalize interrogatories and requests for production of documents, sets 2 propounded on CDE; E-mail correspondence to opposing counsel with same. | 0.40 |
| 1/10/25 | RO | Review e-mail correspondence from Mr. Trissell regarding subpoenas from the DOJ; Discussions with Ms. Denworth regarding same; Prepare letter to DOJ requesting copies of documents received via the subpoenas; E-mail correspondence to opposing counsel regarding same. | 0.60 |
| 1/13/25 | RO | Review Child Poe's medical and billing records from * ; E-mail correspondence to Mr. Trissell regarding same; Telephone call to * regarding Child Poe's medical records; Telephone call to Mr. Trissell regarding same. | 0.40 |
| 1/13/25 | JAY | Summarize and review medical records; Draft explanatory e-mail correspondence regarding same to Mr. Trissell and Mr. Jonna. | 1.80 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 1/14/25 | PMJ | Assess classwide preliminary injunction motion and next steps; Telephone call to court Clerk to discuss same. | 0.60 |
| 1/14/25 | PMJ | Telephone call with Peter Breen regarding classwide preliminary injunction motion and next steps; E-mail correspondence to clients regarding deposition links. | 0.20 |
| 1/14/25 | CSL | E-mail correspondence regarding latest motion to dismiss; Telephone conference with Mr. Trissell regarding same; Emails regarding depositions. | 0.60 |
| 1/15/25 | RO | E-mail correspondence to opposing counsel regarding corrected DOE000001-000150; Telephone calls to * regarding Child Poe's medical records; E-mail correspondence to Mr. Jonna and Mr. Trissell regarding same. | 0.80 |
| 1/15/25 | RO | Prepare notices of deposition for all defendants; E-mail correspondence to Mr. Trissell regarding same. | 0.40 |
| 1/15/25 | PMJ | Attend the deposition of Jane Poe; Prepare for "person most knowledgeable" deposition of Clovis Unified School District. | 3.20 |
| 1/15/25 | JMT | Prepare topics for examination for depositions of entity defendants; Finalize and serve all notices of deposition. | 1.00 |
| 1/15/25 | CSL | E-mail correspondence regarding ratification by state agency through failure to repudiate; Legal research regarding same; Conference with Mr. Trissell regarding above. | 0.80 |
| 1/16/25 | RO | Review and respond to e-mail correspondence from * regarding Child Poe's medical records; E-mail correspondence to Mr. Jonna and Mr. Trissell regarding same; E-mail correspondence to opposing counsel regarding production of * medical records. | 0.40 |
| 1/17/25 | PMJ | Review records from * for Child Poe; Prepare for deposition. | 0.40 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 1/17/25 | PMJ | Attend deposition of "person most knowledgeable" for Clovis Unified School District; Discuss same with client. | 5.20 |
| 1/22/25 | CSL | Conference with Mr. Jonna regarding request for judicial notice of President Trump's executive order; Emails regarding same. | 0.60 |
| 1/23/25 | RO | Review and respond to e-mail correspondence from Mr. Jonna regarding President Trump's executive order "Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government;" Review various documents rescinded in same; E-mail correspondence to Mr. Jonna regarding same. | 0.60 |
| 1/23/25 | WTD | Review written discovery propounded on Lori West by EUSD regarding Title VII claims; Draft response to same. | 3.20 |
| 1/30/25 | JMT | Telephone call with Mr. Jonna regarding moving Rankins-Ibarra deposition; Telephone call to Lauren Combronero regarding same. | 0.20 |
| 1/30/25 | CSL | Conference with Mr. Jonna regarding depositions; E-mail correspondence regarding same. | 0.40 |
| 1/31/25 | PMJ | Review memorandum from titled "California Laws Force Public School Districts to Violate FERPA and Title IX; Mandatory Withholding of Federal Funds;" Review and respond to client | 0.40 |
| 1/31/25 | KD | Review and finalize joint ex parte application for extension of time to complete deposition of Escondido Union School District; File with court; E-mail correspondence to Judge Torres with proposed order; E-mail correspondence to opposing counsel with same. | 0.40 |
| 1/31/25 | CSL | E-mail correspondence regarding deposition scheduling; Review articles on changes in school curriculum. | 0.60 |
| 2/3/25 | PMJ | Review and respond to client *; Review letter regarding Title 11 from US DOJ. | 0.20 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 2/3/25 | PMJ | Review final edits to responses to Attorney General Bonta's interrogatories, set 2; Review order on motion to continue discovery deadline. | 0.20 |
| 2/5/25 | KD | Review and finalize plaintiffs' responses to Attorney General Bonta's interrogatories; E-mail correspondence to opposing counsel with same. | 0.20 |
| 2/10/25 | KD | Exchange emails with court reporter regarding depositions of Trent Smith and Tracy Schmidt; E-mail correspondence to opposing counsel with deposition link for same. | 0.20 |
| 2/10/25 | KD | Review and finalize opposition to CDE motion to dismiss and declaration of Paul Jonna; File with court; E-mail correspondence to opposing counsel with same. | 0.40 |
| 2/10/25 | PMJ | Prepare for EUSD depositions; Review order on motion to continue discovery dates. | 0.40 |
| 2/11/25 | KD | Exchange emails with court reporter regarding depositions of John Albert and Steve White; E-mail correspondence to opposing counsel and clients with deposition link for same. | 0.20 |
| 2/12/25 | PMJ | E-mail correspondence with clients regarding * ; Review CDE discovery responses. | 0.20 |
| 2/12/25 | JMT | Prepare for and participate in depositions of Katie Terrill and Kathleen Barlow; Draft outline for CDE "person most knowledgeable" deposition. | 8.40 |
| 2/14/25 | JMT | Participate in discovery meet and confer conference call with opposing counsel; Telephone call to Chambers to raise discovery dispute. | 1.20 |
| 2/14/25 | KD | Review and finalize Lori West's responses to EUSD interrogatories and requests for production of documents; E-mail correspondence to all counsel with same. | 0.40 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 2/14/25 | KD | Review e-mail correspondence from Mr. Trissell regarding deadline to designate portions of deposition transcripts confidential per the protective order for Jane & John POE, Jane BOE and Jane ROE; Review emails to confirm receipt date of transcripts. | 0.40 |
| 2/18/25 | KD | Finalize highly confidential / attorneys eyes only portions of deposition transcripts of Jane Roe and Jane Boe; E-mail correspondence to opposing counsel with same. | 0.20 |
| 2/21/25 | PMJ | Review edits to Jane Roe deposition; Revise letter to Attorney Spence regarding Child Poe therapy records; Revise letter to Attorney Cale regarding CDE "person most knowledgeable" deposition. | 0.60 |
| 2/21/25 | KD | Review and finalize meet and confer letter to Attorney Cale; Prepare attachments for same; E-mail correspondence to all counsel with same. | 0.40 |
| 2/21/25 | KD | Review and finalize ex parte application for leave to supplement opposition to CDE defendants' motion to dismiss; File with Court; E-mail correspondence to opposing counsel with same; E-mail correspondence to Judge Benitez with proposed order. | 0.40 |
| 2/24/25 | KD | Draft amended notice of deposition for Escondido Union School District and deposition subpoena and topics for California Department of Education; E-mail correspondence to Mr. Trissell and Mr. Jonna for review. | 0.40 |
| 2/24/25 | PMJ | Review Chino Valley summary judgement ruling; Review amended deposition notices. | 0.20 |
| 2/24/25 | KD | Finalize amended notice of deposition for Escondido Union School District and deposition subpoena and topics for California Department of Education; E-mail correspondence to opposing counsel with same. | 0.40 |
| 2/24/25 | KD | Finalize letter to Attorney Spence regarding discovery meet and confer; E-mail correspondence to all opposing counsel with same. | 0.20 |
| 2/24/25 | CSL | Conference with Mr. Jonna regarding hearing on motion to dismiss; Telephone conference with Mr. Jonna regarding applicability of ruling in Chino Valley case. | 0.60 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 2/25/25 | BMM | Review and analyze Yosemite Valley Charter School document production; Draft memorandum regarding document production to Mr. Jonna and Mr. Trissell, collect documents referenced in memorandum; E-mail correspondence regarding same; Analysis of AB 1955 as it relates to District level Parental Exclusion | 5.40 |
| 2/26/25 | JMT | Conference with Mr. Jonna regarding Attorney General's latest threatened motion to compel; Telephone call with Attorney Wessell regarding same; Telephone call with client regarding * . | 0.60 |
| 2/26/25 | JMT | Conference with Mr. Jonna and multiple telephone calls with clients and potential experts regarding * ; Multiple emails regarding same. | 1.80 |
| 2/26/25 | PMJ | Telephone conference with potential experts Drs. Szjanberg * ; Telephone call with clients Poe and Doe to discuss legal strategy. | 0.80 |
| 2/26/25 | RO | Discussions with Mr. Jonna and Mr. LiMandri regarding publications stating that social transition is medical treatment; Internet research regarding * regarding same; Review *  expert affidavit from * case; E-mail correspondence to Mr. Jonna and Mr. Trissell regarding same. | 0.40 |
| 2/26/25 | PMJ | Interview potential experts; Telephone conference with Dr. Szjanberg regarding status and next steps. | 0.60 |
| 2/26/25 | RO | Review and respond to e-mail correspondence from Mr. Trissell and Mr. Jonna regarding Child Poe's therapy records; Telephone calls to* and therapists *  , and * ; Prepare medical records requests from and therapists *  and ; E-mail correspondences with Jane Poe regarding*  . | 1.60 |
| 2/26/25 | PMJ | Review Yosemite documents; Interview with * as a potential expert witness. | 0.40 |
| 2/26/25 | BMM | Review and analysis of Yosemite Valley production related to internal communication regarding AB 1955; Draft memorandum to Mr. Jonna and Mr. Trissell regarding same. | 1.20 |
| 2/26/25 | JMT | Work on designating Poe deposition transcripts as confidential; Numerous telephone calls and conferences regarding potential experts and retain Dr. Szanjberg. | 2.80 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 2/26/25 | CSL | E-mail correspondence and telephone calls regarding retention of psychiatric expert; Conference with Mr. Jonna regarding same. | 1.00 |
| 2/26/25 | CSL | E-mail correspondence regarding new adverse First Circuit decision, Foote v. Ludlow School Committee; Review portions of decision. | 0.60 |
| 2/27/25 | KD | Finalize highly confidential / attorneys eyes only portions of deposition transcripts of Jane and John Poe; E-mail correspondence to opposing counsel with same. | 0.20 |
| 2/27/25 | BMM | Review and analyze document production from Pasadena Unified School District; Draft memorandum and forward to Mr. Jonna and Mr. Trissell regarding same. | 0.80 |
| 2/28/25 | RO | Review and respond to e-mail correspondences from Jane Poe regarding * and * ; Briefly review records from  * . | 0.20 |
| 2/28/25 | KD | Review e-mail correspondence from Mr. Trissell regarding the petition for writ of mandate in the CDE v. Cajon Valley Union School District case; Obtain same from San Diego Superior Court website. | 0.20 |
| 3/2/25 | PMJ | Review e-mail correspondence from CDE regarding "person most knowledgeable" deposition; Review document production. | 0.40 |
| 3/3/25 | BMM | Draft deposition outline for Mr. Jonna for California Department of Justice; Review documents in preparation for gathering exhibits to use at deposition. | 1.80 |
| 3/4/25 | KD | Finalize response to Attorney General Bonta's notice of supplemental authority; File with court and forward same to opposing counsel. | 0.40 |
| 3/5/25 | KD | E-mail correspondence to court reporting office requesting a rough draft of the deposition transcript for Dr. Luis Rankins-Ibarra; Discussion with Mr. Jonna regarding same. | 0.20 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 3/5/25 | KD | Follow-up telephone call to court reporting office regarding request for rush rough draft of the deposition transcript for Dr. Rankins-Ibarra; E-mail correspondence to court reporter Taylor with exhibits for the deposition of Audrey Frank and Dr. Rankins-Ibarra. | 0.40 |
| 3/5/25 | RO | Review and respond to e-mail correspondence from Mr. Trissell regarding letter to therapists * and * ; Prepare and send letters; E-mail correspondence to Jane Poe regarding * . | 0.80 |
| 3/6/25 | KD | Exchange emails with court reporter regarding deposition of Laura Faer, "person most knowledgeable" for the California Department of Justice; E-mail correspondence to opposing counsel with deposition link for same. | 0.20 |
| 3/6/25 | PMJ | Prepare for "person most knowledgeable" deposition for California Department of Justice; Review exhibits and outline for same. | 2.80 |
| 3/6/25 | KD | Review and finalize supplemental opposition to the CDE defendants' motion to dismiss action as moot and declaration of Paul Jonna; File with court and serve on opposing counsel. | 0.40 |
| 3/6/25 | PMJ | Review and revise CDE motion to dismiss supplemental opposition brief; Prepare for Attorney General "person most knowledgeable" deposition. | 1.40 |
| 3/6/25 | RM | Draft table of authorities for opposition to motion to dismiss as moot; Edit Mr. Jonna's supporting declaration. | 3.00 |
| 3/6/25 | BMM | Prepare exhibits for deposition of Attorney General's "person most knowledgeable;" Revise deposition outline for same. | 6.00 |
| 3/7/25 | RM | Review rough draft deposition transcript of Jane Poe; Prepare errata sheet on her behalf. | 1.80 |
| 3/10/25 | KD | Finalize highly confidential / attorneys eyes only portions of deposition transcripts of Jane and John Doe; E-mail correspondence to opposing counsel with same. | 0.20 |
| 3/11/25 | RO | E-mail correspondences with Mr. Trissell regarding obtaining Child Poe's medical records from therapists * ; E-mail correspondence to *  regarding medical records; Telephone calls and e-mail correspondences to * and * regarding same. | 0.40 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 3/13/25 | JMT | Perform research for and prepare expert disclosures; Review information on Dr. Anderson and Dr. Szajnberg. | 1.60 |
| 3/14/25 | JMT | Finalize subpoena for continued deposition of CDE; Draft joint ex parte application for leave to take deposition. | 0.40 |
| 3/14/25 | KD | Finalize highly confidential / attorneys eyes only document production Bates Nos. POE000372 - POE000420, and redacted Child Poe subpoenaed DRQ documents received from the Attorney General, Bates Nos. DRQ-1 - DRQ-76; E-mail correspondence to opposing counsel with same. | 0.20 |
| 3/14/25 | JMT | Review issues regarding collecting medical records of Child Poe; Send follow-up emails to treating therapists. | 0.40 |
| 3/14/25 | KD | Review and finalize ex parte application for an extension of time to complete deposition of California Department of Education; File with Court; E-mail correspondence to Judge Torres with proposed order; E-mail correspondence to opposing counsel with ex parte application and proposed order. | 0.40 |
| 3/17/25 | KD | Review and finalize ex parte application for leave to file reply to California Department of Education's supplemental briefing; File with Court; E-mail correspondence to Judge Benitez with proposed order; E-mail correspondence to opposing counsel with ex parte application and proposed | 0.40 |
| 3/20/25 | KD | Review and finalize notice of supplemental authority in support of opposition to CDE's motion to dismiss as moot; File with court; E-mail correspondence to opposing counsel with same. | 0.40 |
| 3/20/25 | KD | Discussion with Mr. Trissell regarding adding expert curriculum vitae to the first expert designation; Finalize same and serve on opposing counsel with same. | 0.20 |
| 3/21/25 | JMT | Proposed edits to declaration of Dr. Nathan Szajnberg; Research regarding opposing experts Darlene Tando and Christine Brady. | 6.40 |
| 3/21/25 | PMJ | Review draft ex parte application for an order compelling production of Child POE therapy records; Review expert disclosures. | 0.20 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 3/25/25 | PMJ | Assess expert discovery; Telephone call with counsel for * . | 0.20 |
| 3/25/25 | WTD | Conference with Mr. Trissell regarding opposing expert Darlene Tando; Review Attorney General's expert disclosure; Begin review of Ms. Tando's blog. | 2.20 |
| 3/27/25 | KD | Review and finalize ex parte application for leave to submit supplemental request for judicial notice in opposition to motion to dismiss; File with Court; E-mail correspondence to Judge Benitez with proposed order; E-mail correspondence to opposing counsel with same. | 0.40 |
| 3/27/25 | KD | Finalize joint ex parte application for an order compelling production of Child Poe therapy records; File with Court; E-mail correspondence to Judge Torres with proposed order; E-mail correspondence to opposing counsel with same. | 0.40 |
| 3/27/25 | KD | Prepare amended proof of service for ex parte application for leave to submit supplemental request for judicial notice in opposition to motion to dismiss to include Attorney Stephanie Shin and  * ; File with Court; E-mail correspondence to opposing counsel with same. | 0.40 |
| 3/29/25 | CSL | Review article on federal government review of state transgender policies in schools; Emails regarding same. | 0.60 |
| 4/2/25 | PMJ | Prepare for and participate in * zoom meeting; Discuss case status with  *and Mr. Trissell. | 1.00 |
| 4/10/25 | JMT | Review order denying CDE's motion to dismiss; Review emails regarding same. | 0.40 |
| 4/11/25 | PMJ | Review and analyze court's order denying CDE motion to dismiss and discuss same with team; Prepare statement in press release with TMS. | 0.40 |
| 5/1/25 | JMT | Multiple telephone calls with expert Dr. Szajnberg; Additional edits to Dr. Szajnberg and Dr. Anderson's reports. | 10.00 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 5/1/25 | RO | Telephone call with Mr. Trissell regarding sending report via DocuSign to expert Dr. Anderson; Send report to Dr. Anderson via DocuSign; E-mail correspondences with Mr. Trissell regarding today's HHS publication. | 0.20 |
| 5/1/25 | KD | Review and finalize expert reports of experts Dr. Szajnberg and Dr. Anderson; E-mail correspondence to opposing counsel with same. | 0.40 |
| 5/6/25 | JMT | Review next case deadlines; Research on expert discovery. | 0.60 |
| 5/9/25 | JMT | Travel to and from and attend status conference in case; Review Darlene Tando's book while waiting before hearing. | 2.40 |
| 5/9/25 | RO | Discussion with Mr. Jonna and Mr. Trissell regarding WPATH hiding evidence, and attorney sanctions; Forward relevant e-mail correspondences to Mr. Jonna and Mr. Trissell. | 0.20 |
| 5/9/25 | CSL | Telephone conference with Mr. Jonna regarding status conference; E-mail correspondence regarding same. | 0.40 |
| 5/15/25 | JMT | Finalize experts Dr. Anderson and Dr. Szajnberg rebuttal reports; Telephone call with Dr. Anderson regarding report. | 4.20 |
| 5/15/25 | KD | Review and finalize rebuttal expert reports of Drs. Szajnberg and Anderson reports; Prepare same and upload to DropBox; E-mail correspondence to opposing counsel with same. | 0.40 |
| 5/16/25 | PMJ | Review and analyze expert Dr. Laidlaw's declaration in Boe case regarding WPATH and SOC8; Review HHS report dated May 1, 2025 regarding same. | 0.60 |
| 5/20/25 | JMT | Telephone conference with Dr. Szajnberg to prepare for deposition; Follow-up e-mail correspondence with materials to review. | 1.20 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 5/21/25 | KD | Review e-mail correspondence and telephone call with Mr. Trissell regarding obtaining expert deposition transcript in another case; Telephone call to Nelson Reporting regarding same. | 0.20 |
| 5/23/25 | RO | Discussions with Mr. Jonna regarding defense expert "gender case manager;" E-mail correspondences to Mr. Jonna and Mr. Trissell regarding same. | 0.20 |
| 5/23/25 | JMT | Respond to opposing counsel with subpoenas for experts; Send opposing party's subpoenas to our experts with instructions. | 0.80 |
| 5/27/25 | JMT | Prepare for depositions; E-mail correspondence to expert Dr. Szajnberg with deposition link; E-mail correspondence to clients with same; Prepare material from record for expert Dr. Anderson. | 0.40 |
| 5/27/25 | PMJ | Prepare for defense expert Dr. Brady deposition; Review key documents to prepare for expert Dr. Szajnberg's deposition. | 1.20 |
| 5/27/25 | CSL | Legal research regarding expert witness depositions; Conference with Mr. Jonna regarding same. | 0.60 |
| 5/28/25 | CSL | E-mail correspondence on Roe v. Critchfield appellate decision; Conference with Mr. Jonna regarding same. | 0.40 |
| 5/31/25 | CSL | E-mail correspondence on anticipated U.S. Supreme court case on parental rights; Review article regarding same. | 0.40 |
| 5/31/25 | CSL | Review research on harms of social transitioning; E-mail correspondence regarding same. | 0.60 |
| 6/3/25 | WTD | Attend and assist Mr. Jonna and Mr. Trissell with Zoom deposition of defense expert Dr. Brady; Conference with Mr. Jonna and Mr. Trissell regarding same. | 1.80 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 6/3/25 | CSL | Telephone conference with Mr. Jonna regarding deposition of defense expert; E-mail correspondence regarding same. | 0.60 |
| 6/4/25 | KD | Review e-mail correspondence and telephone call with Mr. Trissell regarding experts Drs. Szajnberg and Anderson's deposition invoices; E-mail correspondence to Dr. Anderson requesting W-9. | 0.40 |
| 6/4/25 | KD | Review multiple emails regarding the start time for the deposition of defense expert Darlene Tando; E-mail correspondence to court reporter with new start time. | 0.20 |
| 6/6/25 | PMJ | Take the morning session of the deposition of defense expert Darlene Tando; Debrief regarding same. | 3.40 |
| 6/6/25 | CSL | Conference with Mr. Jonna regarding depositions of defense experts; Research regarding harms of chest binding. | 0.60 |
| 6/6/25 | WTD | Review Olson-Kennedy research paper on Mental and Emotional Health of Youth; Prepare notes on same for Darlene Tando's deposition. | 0.60 |
| 6/11/25 | KD | Review and respond to e-mail correspondence from opposing counsel's office requesting review and signature of STD204 forms for experts Drs. Szajnberg and Anderson; Review forms; E-mail correspondence to Drs. Szajnberg and Anderson with same. | 0.40 |
| 6/11/25 | KD | Review e-mail correspondence from opposing counsel's office requesting payment of fees for defense expert Dr. Brady; Forward same to TMS accountant James O'Connor with same. | 0.20 |
| 6/11/25 | KD | Review e-mails from experts Drs. Szajnberg and Anderson with signed STD204 forms; Forward same to opposing counsel's office with same. | 0.20 |
| 6/11/25 | JMT | Receive and review deposition transcript of expert Dr. Anderson; Forward same to Dr. Anderson with instructions regarding corrections. | 0.20 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 6/12/25 | KD | Review e-mail correspondence from opposing counsel's office requesting a formal invoice for expert Dr. Szajnberg; Prepare formal invoice and forward to Dr. Szajnberg for review. | 0.40 |
| 6/12/25 | KD | Review e-mail correspondence from opposing counsel's office requesting payment of fees for defense expert Darlene Tando and follow-up on payment for Dr. Brady; Forward same to James O'Connor with same. | 0.20 |
| 6/13/25 | KD | Review e-mail correspondence from expert Dr. Szajnberg regarding formal invoice; E-mail correspondence to opposing counsel's office with same for payment. | 0.20 |
| 6/16/25 | KD | Review e-mail correspondence from opposing counsel rejecting experts Drs. Anderson and Szajnberg's deposition invoices because they did not have the name of their companies; E-mail correspondence to Dr. Anderson with revised invoice and to Dr. Szajnberg requesting the name of his company. | 0.40 |
| 6/17/25 | KD | Review file for deposition transcripts, signature page, and errata sheets; Update deposition chart regarding same. | 0.40 |
| 6/25/25 | KD | Review e-mail correspondence from opposing counsel regarding rejection of experts Drs. Anderson and Szajnberg's deposition invoices because it was not address to the DOJ; Revise invoices; E-mail correspondence to Dr. Anderson and Dr. Szajnberg with revised invoices and approval to send to opposing counsel; E- | 0.40 |
| 6/27/25 | CSL | Review and analysis of U.S. Supreme court case on parental rights in education of children; Telephone conference with Mr. Trissell and Mr. Jonna regarding same. | 1.60 |
| 6/30/25 | WTD | Review deposition transcripts of Poe and Doe families in preparation for drafting declarations; Review and revise Jane and John Poe declarations according to new information identified in their individual deposition transcripts; Begin revision of Jane and John Doe declarations. | 3.20 |
| 6/30/25 | CSL | Conference with Mr. Jonna regarding effect of class action injunction; Conference with Mr. Trissell regarding same. | 0.40 |
| 7/2/25 | WTD | Conference with Mr. Trissell regarding edits to clients' declarations; E-mail correspondence with Mr. Trissell regarding same. | 0.40 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 7/7/25 | WTD | Review e-mail correspondence from Mr. Jonna regarding PRISM training materials; Prepare summary of same. | 0.60 |
| 7/7/25 | WTD | Continue review of John and Jane Doe deposition transcripts; Revise declarations with additional information. | 2.20 |
| 7/7/25 | WTD | Conference with Mr. Trissell regarding status of Does and Poes declarations; Begin review of Jane and John Poe deposition transcripts identifying additional information to include in motion for summary judgment declarations. | 1.40 |
| 7/8/25 | WTD | Complete review of Jane and John Poe deposition transcripts; Revise declarations to include additional information; E-mail correspondence with Mr. Trissell regarding same. | 2.40 |
| 7/9/25 | WTD | Telephone conference with Mr. Trissell regarding updating plaintiffs Jane Roe and Jane Boe declarations; Begin reviewing deposition transcripts regarding same. | 1.80 |
| 7/9/25 | MFH | Daubert Motion: Analyze and revise; emails. | 4.80 |
| 7/10/25 | WTD | Continue review of Jane Boe and Jane Roe deposition transcripts; Revise declarations for same. | 2.80 |
| 7/10/25 | WTD | Review and revise Jane Boe and Jane Roe declarations to include section detailing the burden the school policies have placed on each; Review deposition transcripts for information regarding same. | 1.40 |
| 7/11/25 | JMT | Work on reviewing discovery and preparing exhibits for renewed motion for summary judgment; Begin comprehensive review of all deposition transcripts of defense witnesses. | 8.00 |
| 7/11/25 | MFH | Daubert Motion: Analyze and revise; emails with Jeff Trissell. | 2.70 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 7/12/25 | JMT | Continue working on renewed motion for summary judgment; Incorporate into brief historical information from memorandum prepared by Professor Tomas Arestegui and continue review of depositions. | 9.80 |
| 7/13/25 | JMT | Continue working on renewed motion for summary judgment; Continue reviewing depositions and incorporating into brief. | 6.80 |
| 7/14/25 | JMT | Continue working on renewed motion for summary judgment; Continue reviewing deposition transcripts. | 5.80 |
| 7/14/25 | WTD | Review and revise draft declarations for Ms. West and Ms. Mirabelli; Review deposition transcripts regarding same; E-mail correspondence with Mr. Trissell regarding same. | 1.40 |
| 7/14/25 | WTD | Review Mr. Trissell's revisions to plaintiffs' declarations in support of renewed motion for summary judgment; Incorporate similar changes into other declarations. | 1.20 |
| 7/14/25 | MFH | Daubert Motion: Review expert opinions; continuing revision of brief. | 5.30 |
| 7/15/25 | JMT | Edits to declarations of Elizabeth Mirabelli and Lori West in support of renewed motion for summary judgment; Continue working on renewed motion for class certification. | 4.60 |
| 7/15/25 | KD | Telephone call with Attorney Bunshoft regarding confirmation of approval of experts Drs. Anderson and Szajnberg's deposition invoices and request to revise the payee data record form for Dr. Anderson; E-mail correspondence to Dr. Anderson regarding same. | 0.40 |
| 7/15/25 | WTD | Review and incorporate Mr. Trissell's edits to declarations of Elizabeth Mirabelli and Lori West; E-mail correspondence with Mr. Trissell regarding same. | 0.80 |
| 7/16/25 | RO | Prepare table of authorities for motion to exclude defendants' experts Christine Brady and DarleneTando; Telephone calls with Mr. Trissell regarding same. | 1.20 |
| 7/16/25 | JMT | Continue working on renewed motion for class certification, renewed motion for summary judgment, Daubert motion; Finalize and ensure all are filed. | 11.40 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 7/16/25 | RO | Telephone calls with Ms. Denworth and Mr. Duke regarding filing Daubert motion to exclude testimony of defendants' experts Darlene Tando and Christine Brady; Review final versions of same; File and serve same. | 0.60 |
| 7/16/25 | KD | Prepare Daubert motion to exclude testimony of defendants' experts Darlene Tando and Christine Brady; Prepare emails to Judge Benitez with proposed orders; Prepare emails to opposing counsel with all motions; Prepare DropBox link for same. | 0.80 |
| 7/16/25 | KD | Review and finalize renewed motion for class certification, notice, memorandum of points and authorities, declaration of Paul Jonna, and proposed order; File with court; E-mail correspondence to Judge Benitez with proposed order; E-mail correspondence to opposing counsel with same. | 0.80 |
| 7/16/25 | KD | Review and finalize renewed motion for summary judgment and supporting documents; Correct Exhibits F&G; File with court; E-mail correspondence to Judge Benitez with proposed order; Email to opposing counsel with same. | 1.40 |
| 7/16/25 | KD | Review and finalize ex parte application to seal manually filed videos in support of renewed motion for summary judgment, redacted exhibits, and proposed order; File with court; E-mail correspondence to Judge Benitez with proposed order; Email to opposing counsel with same. | 0.60 |
| 7/16/25 | KD | Begin preparing Daubert motion to exclude testimony of defendants' experts Darlene Tando and Christine Brady for filing with court; Discussion with Ms. Oakley regarding same. | 0.40 |
| 7/16/25 | WTD | Review and revise record citations in various motion; Conference with Mr. Trissell regarding same. | 3.60 |
| 7/16/25 | WTD | Draft and revise Paul Jonna declaration in support of renewed motion for summary judgment; Conference with Mr. Trissell and Mr. Muldowney regarding same. | 1.60 |
| 7/16/25 | WTD | Compile and organize all exhibits to declaration of Paul Jonna into volumes; Conference with Mr. Trissell and Mr. Muldowney regarding same. | 3.80 |
| 7/16/25 | RM | Prepare declaration of Paul Jonna regarding authentication of exhibits; Prepare exhibits for same. | 1.60 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 7/17/25 | KD | Review and respond to e-mail correspondence from Joe Barnas requesting conformed copies of file documents; Prepare same. | 0.40 |
| 7/17/25 | PMJ | Assess case deadlines and lack of motion for summary judgment from state; Outline letter to State regarding settlement and next steps. | 0.20 |
| 7/17/25 | KD | Discussion with Mr. Jonna and Mr. Trissell regarding proposed order excluding testimony of defendants' experts Darlene Tando and Christine Brady; Finalize same and forward to Judge Benitez and opposing counsel. | 0.20 |
| 7/17/25 | KD | Review e-mail correspondence from Mr. Jonna regarding motion(s) filed; Discussion with Ms. Oakley regarding same and proposed order for motion to exclude. | 0.20 |
| 7/17/25 | KD | Review and respond to e-mail correspondence from court reporter Adrian Baule with hearing transcript request for the May 9, 2025 status conference; Prepare form. | 0.20 |
| 7/17/25 | CSL | Review letter to opposing counsel regarding settlement; Conference with Mr. Jonna regarding same; E-mail correspondence regarding briefing schedule. | 0.40 |
| 7/17/25 | WTD | Listen to voicemail message from Attorney Spence regarding possible extension; Review e-mail correspondence with Attorney Spence regarding same. | 0.40 |
| 7/18/25 | PMJ | Review substack article on Dr. Anderson; Discuss same with team. | 0.40 |
| 7/19/25 | KD | Review multiple emails between Dr. Anderson and Mr. Jonna regarding payment of deposition invoice and opposing counsel's request for revision to the payee data record form; Discussion with Mr. Jonna regarding same. | 0.40 |
| 7/22/25 | KD | Revise Dr. Anderson's payee data record form; E-mail correspondence to Mr. Jonna for review and draft e-mail correspondence to Attorney Bunshoft regarding same and canceling Dr. Szajnberg's payment. | 0.20 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 7/24/25 | KD | Review and respond to e-mail correspondence from Attorney Bunshoft confirming Dr. Anderson's deposition payment was being sent via Federal Express today; E-mail correspondence to Dr. Anderson regarding same. | 0.20 |
| 9/6/25 | JMT | Edits to opposition to EUSD's motion for summary judgment; Draft declarations of Elizabeth Mirabelli and Lori West. | 2.60 |
| 9/8/25 | JMT | Finalize opposition to EUSD motion for summary judgment; Draft declarations and evidentiary objections. | 5.40 |
| 9/8/25 | KD | Review and finalize opposition to EUSD's motion for summary judgment and supporting papers; File with court; E-mail correspondence to opposing counsel with same; E-mail correspondence to copy service to have courtesy copy delivered to Judge Benitez. | 0.40 |
| 9/9/25 | JMT | Review Daubert motion and opposition; Begin outlining reply. | 1.20 |
| 9/9/25 | JMT | Review motion for class certification and opposition to same; Begin outlining reply. | 1.00 |
| 9/9/25 | JMT | Review objections to evidence and evidence submitted by defendants regarding summary judgment; Begin drafting our objections | 2.00 |
| 9/10/25 | KD | Review order from court regarding creating an index for all motions filed; Discussion with Mr. Trissell regarding same; Begin preparing indexes for renewed motion for summary judgment, renewed class certification, motion to exclude testimony on defendants experts, and ex parte application to seal. | 0.40 |
| 9/12/25 | JMT | Draft reply in support of motion for class certification; Draft reply in support of Daubert motion. | 6.20 |
| 9/12/25 | KD | Continue working on indexes for court regarding renewed motion for summary judgment and renewed class certification; E-mail correspondence to Mr. Trissell with same for review; e-mail correspondence to copy service to include with courtesy copies. | 0.40 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 9/15/25 | KD | Review emails from Peter Breen regarding pro hac vice application to the Southern District for this case; Telephone call to Mr. Breen regarding Pacer account. | 0.20 |
| 9/15/25 | KD | Revise and finalize pro hac vice application for Peter Breen to the Southern District for this case; File with court. | 0.40 |
| 9/15/25 | CSL | Review new complaint on transgender issues in schools; Telephone conference with * regarding second new case against schools. | 1.20 |
| 9/15/25 | PCB | Mulitple emails about pro hac vice application; corrections to same. | 0.60 |
| 9/16/25 | KD | Revise and finalize opposition to EUSD's ex parte application for leave to file late opposition to motion for summary judgment; File with court; e-mail correspondence to opposing counsel with same. | 0.40 |
| 9/18/25 | PMJ | Review court's order regarding mandatory settlement conference, Daubert motion, and vacating of dates; E-mail correspondence with team. | 0.20 |
| 9/22/25 | JMT | Conference with Mr. Jonna regarding potential settlement of case; Telephone call with Attorney Spence regarding same. | 0.40 |
| 9/22/25 | KD | Review and finalize reply to EUSD defendants' opposition to renewed motion for summary judgment and notice of second manual filing of flash drive in support of renewed motion for summary judgment; File with court; E-mail correspondence to opposing counsel with same; E-mail correspondence to copy service to deliver | 0.40 |
| 9/25/25 | PMJ | Review ECF notice regarding motion for summary judgment hearing; E-mail correspondence to clients regarding same. | 0.20 |
| 9/27/25 | PMJ | Review court's order regarding settlement conference; Draft e-mail correspondence to court regarding same. | 0.40 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 9/30/25 | PMJ | Telephone call to chambers regarding motion for summary judgment hearing and class cert hearing dates; Discuss same with Mr. Trissell. | 0.20 |
| 10/6/25 | KD | Review e-mail correspondence from Mr. Trissell regarding updated attorneys' fees for settlement conference; Prepare chart of attorneys' fees and forward to Mr. Trissell. | 0.40 |
| 10/16/25 | PMJ | Review order granting motion for class certification; Review and revise press statements; Multiple e-mail correspondence to clients * | 2.00 |
| 10/16/25 | CSL | Review and analysis of order granting class certification; Emails regarding same; Conference with Mr. Jonna and Mr. Trissell regarding above. | 1.00 |
| 10/17/25 | PMJ | Prepare for mandatory settlement conference with EUSD; Discuss same with client. | 0.60 |
| 10/24/25 | JMT | Review order severing case; Conference with Mr. Jonna regarding same. | 0.20 |
| 10/27/25 | WTD | Conference with Mr. Jonna regarding need for notes on California Department of Education enforcement actions and summaries of named and pseudonym plaintiffs' declarations; Prepare enforcement action notes for motion to summary judgment hearing; Conference with Mr. Jonna regarding same. | 1.80 |
| 11/4/25 | PMJ | Continue to prepare for motion for summary judgment hearing; Research California law on emancipation. | 0.60 |
| 11/5/25 | JMT | Begin drafting ex parte application for leave to submit a sur reply and for sanctions; Review oral argument in City of Huntington Beach v. Newsom. | 2.00 |
| 11/5/25 | PMJ | Participate in status conference regarding settlement; Participate in webinar with * regarding claims; Assess impact of PRISM training. | 1.40 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 11/6/25 | CSL | E-mail correspondence regarding social transitions; Review and analysis of HHS Umbrella Systematic Review regarding same. | 1.20 |
| 11/7/25 | KD | Review and finalize ex parte application for an order to show cause re: sanctions; Prepare exhibits to declaration of Paul Jonna; E-mail correspondence to team with same; Discussion with Mr. Duke regarding proposed order. | 0.40 |
| 11/7/25 | KD | Review and revise proposed order in support of ex parte application for an order to show cause re: sanctions; Discussion with Mr. Duke regarding proposed order. | 0.20 |
| 11/7/25 | KD | Finalize ex parte application for an order to show cause re: sanctions, declaration of Paul Jonna, proposed order, and notice of manual filing; File with court; E-mail correspondence to Judge Benitez with proposed order; E-mail correspondence to opposing counsel with same. | 0.40 |
| 11/7/25 | CSL | Conference with Mr. Jonna regarding order re: sanctions; Review order; Review press release regarding same. | 0.60 |
| 11/7/25 | WTD | Review ex parte application, declaration, and notice of manual filing in preparation for drafting proposed order; Draft proposed order for order to show cause regarding sanctions; Conference with Mr. Jonna regarding same; Review and revise based on Mr. Jonna's edits. | 1.60 |
| 11/7/25 | WTD | Review and revise draft proposed order to include briefing schedule; Review and revise to remove same. | 0.20 |
| 11/8/25 | WTD | Telephone conference with Mr. Jonna regarding need to review PRISM training documents and draft supplemental brief for sanctions; Review documents and PRISM training video in preparation for same. | 2.60 |
| 11/10/25 | PMJ | Review and analyze 14th Amendment substantive due process cases; Edit Sonja Shaw and Greg Burt declarations. | 0.40 |
| 11/10/25 | PMJ | Review cases to prepare for motion for summary judgment hearing; Review and revise declarations of Greg Burt and Sonja Shaw regarding sanctions briefing. | 0.80 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 11/10/25 | KD | Finalize supplemental brief in support of ex parte application for an order to show cause re: sanctions, supplemental declaration of Paul Jonna, declaration of Sonja Shaw, declaration of Greg Burt, and supplemental notice of manual filing; File with court; E-mail correspondence to opposing counsel with same. | 0.40 |
| 11/10/25 | WTD | Revise brief for order to show cause re: sanctions; E-mail correspondence to Mr. Jonna and Mr. Trissell regarding same; Telephone conference with Mr. Jonna and Mr. Trissell regarding same. | 1.80 |
| 11/10/25 | WTD | Telephone conference with Mr. Trissell regarding need for declarations for Mr. Burt and Ms. Shaw; Review and revise same following feedback from each declarant. | 1.40 |
| 11/10/25 | WTD | Conference with Mr. Jonna regarding need for one-page summaries for all plaintiffs' declarations before the hearing on motion for summary judgment; Review declarations for each plaintiff; Create summaries for each declaration. | 3.20 |
| 11/12/25 | KD | Review and finalize notice of new authorities in support of renewed motion for summary judgment; File with Court; E-mail correspondence to opposing counsel with same; E-mail correspondence to copy service to deliver courtesy copy to Judge Benitez. | 0.40 |
| 11/12/25 | CSL | Review multiple emails and articles on upcoming hearing on motion for summary judgment and order to show cause regarding sanctions; Conference with Mr. Jonna regarding same. | 1.00 |
| 11/12/25 | WTD | Review e-mail correspondence from * regarding * ; Conference with Mr. Jonna regarding same; Research into connections with California Department of Education. | 1.40 |
| 11/13/25 | PMJ | Review e-mail correspondence from * member regarding PRISM; Review cases to prepare for motion for summary judgment hearing. | 1.60 |
| 11/13/25 | CSL | Conference with Mr. Jonna regarding hearing on motion for summary judgment; emails regarding same. | 0.60 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 11/14/25 | JMT | Assist Mr. Jonna with preparing for motion for summary judgment hearing; Edits to hearing outline. | 3.80 |
| 11/14/25 | KD | Review and finalize reply in support of order to show cause re: sanctions and declaration of Paul Jonna; File with court; E-mail correspondence to opposing counsel; E-mail correspondence to attorney to deliver courtesy copy to judge. | 0.40 |
| 11/15/25 | JMT | Prepare for motion for summary judgment hearing with Mr. Jonna; Edits to hearing outline. | 8.00 |
| 11/15/25 | CSL | Conference with Mr. Jonna regarding defendants' opposition to motion for sanctions; Review emails regarding same. | 0.60 |
| 11/16/25 | CSL | Conference with Mr. Jonna regarding supplemental brief on order to show cause re: sanctions; emails regarding same. | 0.40 |
| 11/16/25 | JMT | Prepare for motion for summary judgment hearing; Edits to hearing outline. | 4.00 |
| 11/16/25 | CSL | Telephone conference with Mr. Jonna regarding hearing on motion for summary judgment; E-mail correspondence regarding sanctions hearing. | 0.40 |
| 11/17/25 | CSL | Travel to and from and attend order to show cause re: sanction and motion for summary judgment hearings; Consult with Mr. Jonna and clients regarding strategy for oral argument. | 3.80 |
| 11/18/25 | KD | Prepare transcript request for hearings on order to show cause re: sanction and motion for summary judgment; E-mail correspondence to Mr. Trissell for review. | 0.20 |

| Date | Biller | Description – 767 | Hours |
|---|---|---|---|
| 11/18/25 | KD | Telephone call to court reporter Juliette regarding request for hearing transcript; Exchange emails regarding same and she no longer works for the court; Telephone call and e-mail correspondence to supervisor Noey Martinez requesting name of court reporter for hearing. | 0.20 |
| 11/18/25 | KD | Discussion with Mr. Jonna regarding availability for conference call with * ; e-mail correspondence to * regarding same. | 0.20 |
| 11/18/25 | KD | Review e-mail correspondence from court reporter Stephanie-Whitehead regarding request for rush transcript of hearing on order to show cause re: sanction and motion for summary judgment; E-mail correspondence to attorney service to have a check delivered for prepayment of the transcript. | 0.20 |
| 11/18/25 | CSL | Review multiple emails regarding hearing on motion for summary judgment; emails regarding same. | 0.40 |
| 11/19/25 | RO | Discussion and e-mail correspondence with Mr. Jonna regarding review of PRISM training; Review same. | 1.80 |
| 11/19/25 | CSL | E-mail correspondence regarding new HHS report; Telephone conference with Mr. Jonna regarding same. | 0.60 |
| 11/20/25 | KD | Review and respond to e-mail correspondence from court reporter Stephanie-Whitehead regarding correct case law cited names of people cited at hearing; Research same and provide information. | 0.40 |
| 11/20/25 | KD | Review and respond to e-mail correspondence from * regarding conference call; Send Teams invite for same. | 0.20 |
| 11/20/25 | RO | Continue review of PRISM training and preparation of Mr. Jonna declaration; Discussions and e-mail correspondence with Mr. Jonna and Mr. Trissell regarding same. | 4.60 |
| 11/20/25 | KD | Review and upate supplemental request for judicial notice in support of renewed motion for summary judgment; file with court; E-mail correspondence to opposing counsel; E-mail correspondence to copy service to delivery courtesy copy to judge. | 0.40 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 11/20/25 | WTD | Review e-mail correspondence from Attorney Shinoff regarding public records requests for plaintiffs Lori West and Elizabeth Mirabelli; Conference with Mr. Jonna regarding research into same; Conduct quick research into whether Ms. West and Ms. Mirabelli can object to same; Conference with Mr. Jonna regarding same. | 0.60 |
| 11/21/25 | RO | Continue review of PRISM training and preparation of Mr. Jonna declaration; E-mail correspondences with Mr. Jonna regarding same; Discussions with Ms. Denworth regarding same. | 6.80 |
| 11/21/25 | PMJ | Telephone call with DOJ regarding statement of interest; E-mail correspondence to DOJ with materials regarding same. | 1.20 |
| 11/24/25 | RO | Review further PRISM materials from Mr. Trissell; E-mail correspondence to Mr. Trissell regarding same. | 1.40 |
| 11/24/25 | KD | Review e-mail correspondence from court reporter Stephanie Whitehead with final hearing transcript of the order to show cause regarding sanctions; E-mail correspondence to all clients * . | 0.20 |
| 11/25/25 | RO | Review e-mail correspondences between Mr. Jonna and third-party * regarding Judge Benitez's motion for summary judgment decision; E-mail correspondence and telephone calls with * regarding PRISM documents she sent us; E-mail correspondence with Mr. Jonna regarding same. | 1.40 |
| 12/3/25 | RO | E-mail correspondences, text message, and telephone call to Mr. Trissell regarding supplemental Jonna declaration in support of ex parte application for an order to show cause re: sanctions; Review same. | 0.40 |
| 12/4/25 | KD | Review and finalize supplemental declaration of Paul M. Jonna, Esq., supplemental Jonna declaration in support of ex parte application for an order to show cause re: sanctions. File with court; E-mail correspondence to opposing counsel with same. | 0.40 |
| 12/22/25 | PMJ | Analyze motion for summary judgment ruling and next steps with team; Media interviews regarding same. | 1.40 |
| 12/22/25 | CSL | Review order on preliminary injunction; Emails regarding same; Telephone conference with Mr. Jonna regarding above. | 0.80 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 12/22/25 | WTD | Review order for motion for summary judgment and permanent injunction; Conference with Mr. Jonna and Mr. Trissell regarding same. | 1.60 |
| 12/24/25 | CSL | Review articles on preliminary injunction; Emails regarding same. | 0.60 |
| 12/26/25 | PMJ | * interview regarding case win; Travel to and from studio; Prepare for interview. | 1.80 |
| 12/30/25 | WTD | Draft joint motion for extension of deadlines to file bill of costs and motion for attorneys' fees; Review local rules regarding same; Conference with Mr. Trissell regarding same; Review and revise same. | 2.20 |
| 12/31/25 | RO | E-mail correspondences and text messages with Mr. Jonna, Mr. Trissell, and Mr. Duke regarding joint motion for extension of deadlines to file bill of costs and motion for attorneys' fees and proposed order; Finalize same, file and serve same; E-mail correspondence and telephone call to clerk regarding same. | 0.80 |
| 12/31/25 | WTD | Review final versions of joint motion for extension of deadlines to file bill of costs and motion for attorneys' fees and proposed order; Emails with Mr. Trissell and Ms. Oakley regarding same. | 0.60 |
| 1/21/26 | RM | E-mail correspondences with paralegal Knapp regarding fee motion; Telephone call with Mr. Trissell regarding same; Review excel spreadsheet regarding attorney fees and mark potential redactions. | 3.00 |
| 1/22/26 | RO | Continue review excel spreadsheet regarding attorney fees and mark potential redactions; E-mail correspondence to Mr. Trissell regarding same. | 1.20 |
| 1/24/26 | KD | Begin working on bill of costs; Prepare documents and separate charts for same; Draft Bill of costs. | 5.80 |
| 1/27/26 | JMT | Work on motion for fees; review timeslips. | 3.80 |

| Date | Biller | Description – 767 | Hours |
|------|--------|-------------------|-------|
| 1/30/26 | KD | Gather invoices for court reporters in support of bill of costs; Review and redact information of same; Forward to Mr. Trissell for review. | 3.40 |
| 1/30/26 | PMJ | Call with clerk regarding motion for attorneys fees hearing; calendar same. | 0.20 |
| 1/30/26 | KD | Telephone call to clerk to schedule hearing date for bill of costs; Draft e-mail correspondence to clerk regarding same. | 0.20 |
| 1/30/26 | KD | Discussion with Mr. Trissell regarding telephone call with clerk regarding sending e-mail correspondence to schedule hearing date for bill of costs; Review revised draft e-mail correspondence to clerk regarding same; Forward to clerk. | 0.20 |
| 1/30/26 | KD | Begin working on gather invoices for non-taxable costs; Draft chart regarding same. | 1.00 |

EXHIBIT 33

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 9/18/22 | CSL | Exchange e-mail correspondence regarding facts and legal issues. | 0.40 |
| 9/19/22 | JMT | Draft fee agreement. | 1.40 |
| 9/19/22 | PMJ | Review and revise Mirabelli fee agreement. | 0.20 |
| 9/20/22 | PMJ | Multiple telephone calls and e-mail correspondence with clients and team regarding Mirabelli case. | 0.20 |
| 9/20/22 | PMJ | Multiple e-mail correspondence regarding Mirabelli clients and next steps. | 0.20 |
| 9/20/22 | PMJ | Review video of policy at EUSD. | 0.20 |
| 9/20/22 | PMJ | Telephone call with clients regarding case and next steps. | 0.20 |
| 9/20/22 | JMT | Review file and draft e-mail correspondence to Tom Brejcha summarizing evidence. | 1.00 |
| 9/21/22 | PMJ | Telephone call with Attorney Grissom to discuss religious accommodation request. | 0.20 |
| 9/22/22 | PMJ | E-mail correspondence with client regarding * . | 0.20 |

| Date | Biller | Description – 472 | Hours |
|------|--------|-------------------|-------|
| 9/22/22 | PMJ | Multiple e-mail correspondence with client regarding next steps. | 0.20 |
| 9/22/22 | JMT | Draft public records request to Escondido Union School Dsitrict. | 1.00 |
| 9/22/22 | PMJ | Review and analyze draft public records request. | 0.20 |
| 9/22/22 | CSL | Review e-mail correspondence regarding * . | 0.20 |
| 9/23/22 | PMJ | E-mail correspondence with new potential plaintiff, Lori Ann West. | 0.20 |
| 9/26/22 | JMT | Telephone call with potential client Lori West. | 0.40 |
| 9/26/22 | PMJ | Telephone call with Lori West regarding * | 0.40 |
| 9/26/22 | JMT | Draft fee agreement with Lori West. | 0.20 |
| 9/27/22 | PMJ | E-mail correspondence with client regarding * . | 0.20 |
| 9/27/22 | PMJ | Review client e-mail correspondence regarding * . | 0.20 |
| 9/27/22 | REW | Telephone call with Mr. Trissell regarding strategy for *. | 0.40 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 9/27/22 | JMT | Begin drafting religious accommodation request for both Elizabeth Mirabelli and Lor West. | 2.80 |
| 9/27/22 | PMJ | Revew and revise religious accommodation request letter. | 0.40 |
| 9/28/22 | REW | Review draft religious accommodation request for teachers seeking excuse from gender pronoun policy. | 0.20 |
| 9/28/22 | JMT | Edit religious accommodation request. | 0.80 |
| 9/29/22 | PMJ | Review e-mail correspondence to * regarding *. | 0.20 |
| 9/29/22 | REW | Prepare comments and analysis of strategy for * . | 0.60 |
| 9/29/22 | PMJ | Telephone calls with client regarding *. | 0.20 |
| 9/29/22 | PMJ | Access edits to religious accommodation request. | 0.20 |
| 9/30/22 | PMJ | Review and respond to e-mail from client regarding * | 0.20 |
| 9/30/22 | PMJ | Telephone call with client to discuss * | 0.20 |
| 9/30/22 | JMT | Edit request for religious accommodation and send to clients. | 0.40 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 9/30/22 | PMJ | Telephone with client regarding * | 0.20 |
| 10/1/22 | PMJ | Telephone call with client to discuss * | 0.40 |
| 10/4/22 | JMT | Respond to client emails; Additional research regarding legal claims. | 1.20 |
| 10/5/22 | JMT | Draft legal memorandum with research regarding legal claims. | 3.00 |
| 10/5/22 | JMT | Review response to public records request; Forward same to client; E-mail correspondence to client seeking further information regarding * | 0.20 |
| 10/6/22 | JMT | Participate in conference call with counsel handling similar * case | 1.00 |
| 10/10/22 | PMJ | Review client's request for religious accommodation. | 0.20 |
| 10/10/22 | PMJ | E-mail correspondence with client regarding * . | 0.20 |
| 10/10/22 | JMT | Review draft religious accommodation request. | 0.20 |
| 10/10/22 | PMJ | Assess legal theories and discuss next steps. | 0.40 |

| Date | Biller | Description – 472 | Hours |
|------|--------|-------------------|-------|
| 10/10/22 | JMT | Discuss strategy of case with Mr. Jonna. | 0.60 |
| 10/10/22 | JMT | Draft legal research memorandum regarding legal claims. | 2.80 |
| 10/11/22 | PMJ | E-mail correspondence with client regarding *. | 0.20 |
| 10/11/22 | JMT | Review  *   opinion on *. | 0.60 |
| 10/11/22 | PMJ | Review and analyze * and client e-mail correspondence regarding same. | 0.20 |
| 10/11/22 | JMT | Research on legal claims for memorandum. | 1.20 |
| 10/12/22 | PMJ | Review final edits to client Mirabelli's accommodation request. | 0.20 |
| 10/12/22 | JMT | Research on legal claims for comprehensive memorandum. | 3.00 |
| 10/12/22 | MDM | Confer with Mr. Trissell regarding * ; Research this issue. | 1.00 |
| 10/12/22 | JMT | Legal research and draft memorandum regarding legal claims. | 5.60 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 10/13/22 | JMT | Legal research and work on memorandum regarding legal claims and case strategy. | 3.40 |
| 10/13/22 | PMJ | Review and respond to client e-mail correspondence regarding *. | 0.20 |
| 10/13/22 | MDM | Continue research on * and confer with Mr. Trissell regarding same; Review memorandum by Mr. Trissell on legal issues in connection with claims. | 0.80 |
| 10/18/22 | PMJ | Review legal memorandum regarding claims. | 0.20 |
| 10/19/22 | PMJ | Review and respond to client e-mail correspondence regarding next steps. | 0.20 |
| 10/19/22 | JMT | Discuss legal strategy and memorandum with Mr. Jonna; E-mail correspondence to * for their review. | 0.40 |
| 10/19/22 | JMT | Review PRR documents produced by EUSD. | 2.20 |
| 10/19/22 | MDM | Begin reviewing and evaluating research memorandum forwarded by Mr. Trissell. | 1.00 |
| 10/21/22 | PMJ | Telephone call with Andrew Mirabelli regarding status updates and next steps in litigation. | 0.20 |
| 10/21/22 | JMT | Telephone call with Andrew Mirabelli regarding * | 0.60 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 10/21/22 | PMJ | Review documents produced by EUSD and legal memorandum regarding strategy; E-mail correspondence to clients *  . | 0.40 |
| 10/21/22 | MDM | Begin reviewing public records request documents. | 0.40 |
| 10/24/22 | PMJ | Telephone call with client to discuss next steps regarding * ; Telephone call with Norman Grissom regarding same. | 0.40 |
| 10/24/22 | JMT | Telephone call with client and Norman Grissom regarding next steps. | 0.40 |
| 10/25/22 | PMJ | Review response from EUSD to Lori West regarding accommodation request. | 0.20 |
| 10/25/22 | PMJ | Review client's follow-up request to EUSD regarding religious accommodation request. | 0.20 |
| 10/25/22 | NDG | Telephone call with client's husband and Paul Jonna regarding * . | 0.40 |
| 10/26/22 | MDM | Review and evaluate * analysis of Mr. Trissell's memorandum and compare with original memorandum. | 0.60 |
| 10/26/22 | JMT | Receive and respond to lengthy e-mail correspondence from  *  commenting on legal research memorandum. | 0.20 |
| 10/27/22 | PMJ | Multiple e-mail correspondence with client regarding * . | 0.40 |
| 10/27/22 | PMJ | Review e-mail correspondence from client regarding * . | 0.20 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 10/27/22 | PMJ | Review and respond to client e-mail correspondence regarding *. | 0.20 |
| 10/27/22 | NDG | Multiple Correspondence with client and all counsel regarding * . | 1.00 |
| 10/28/22 | PMJ | Follow-up e-mail correspondence with client regarding next steps. | 0.20 |
| 10/28/22 | PMJ | E-mail correspondence with client regarding * . | 0.20 |
| 10/28/22 | PMJ | E-mail correspondence with client regarding * and next steps. | 0.20 |
| 10/28/22 | PMJ | Conference call with client and co-counsel regarding * . | 0.40 |
| 10/28/22 | NDG | Telephone call with Lori West and Mr. Jonna regarding pending accommodation meeting with employer. | 0.30 |
| 10/28/22 | JMT | Telephone call with client Lori West about * . | 0.40 |
| 10/30/22 | PMJ | E-mail correspondence with team regarding next steps. | 0.20 |
| 10/31/22 | NDG | Review documents sent by client in preparation for accommodation meeting: California Education Codes and various School Policies and promotional materials; correspondence with all regarding same. | 0.70 |

| Date | Biller | Description – 472 | Hours |
|------|--------|-------------------|-------|
| 11/1/22 | PMJ | E-mail correspondence with clients regarding *. | 0.20 |
| 11/2/22 | PMJ | Telephone call with Norman Grissom to discuss accommodation meeting. | 0.20 |
| 11/2/22 | PMJ | Review e-mail correspondence from Norman Grissom to clients regarding *   . | 0.20 |
| 11/2/22 | PMJ | Multiple e-mail correspondence with clients regarding *. | 0.20 |
| 11/2/22 | NDG | Review and respond to emails from clients and counsel regarding upcoming accommodation meeting with school officials and scope of issues to be addressed. | 0.80 |
| 11/3/22 | PMJ | Telephone call with Andrew Mirabelli to discuss * and next steps. | 0.20 |
| 11/4/22 | KD | Schedule Zoom meeting with clients and Norman Grissom regarding *  ; E-mail correspondence regarding same. | 0.40 |
| 11/10/22 | JMT | Zoom meeting with client * . | 1.60 |
| 11/10/22 | PMJ | Conference call with clients and Attorney Grissom to * . | 1.60 |
| 11/10/22 | NDG | Telephone conference with potential plaintiffs and LiMandri & Jonna LLP regarding *. | 1.50 |
| 11/14/22 | NDG | Prepare for meeting with Escondido school officials and clients regarding interactive process for requests for religious exemptions; review case file and correspondence with clients and counsel. | 1.40 |

| Date | Biller | Description – 472 | Hours |
|------|--------|-------------------|-------|
| 11/15/22 | NDG | Attend two (2) religious exemption accommodation meetings with clients and school officials (including travel). | 6.00 |
| 11/16/22 | PMJ | Review detailed summary of * from client. | 0.20 |
| 11/16/22 | CSL | Exchange e-mail correspondence with client regarding * | 0.40 |
| 11/16/22 | NDG | Correspondence with client and all counsel regarding * | 0.50 |
| 11/16/22 | NDG | Correspondence with clients and counsel; review Mirabelli's summary of meeting. | 0.30 |
| 11/17/22 | PMJ | E-mail correspondence with clients regarding and next steps. | 0.20 |
| 11/17/22 | PMJ | Multiple e-mail correspondence regarding next steps. | 0.20 |
| 11/17/22 | PMJ | Review update of * from Lori. | 0.20 |
| 11/17/22 | NDG | Correspondence with clients and all counsel regarding * . | 0.50 |
| 11/18/22 | PMJ | Review and respond to client e-mail correspondence regarding next steps. | 0.20 |
| 11/18/22 | PMJ | Review documents given to clients from EUSD. | 0.20 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 11/18/22 | PMJ | Review and respond to client e-mail correspondence regarding lawsuit and next steps. | 0.20 |
| 11/18/22 | CSL | Multiple emails regarding School District's failure to accommodate religious liberty request; Telephone conference with Mr. Jonna regarding same. | 0.80 |
| 11/18/22 | NDG | Read, review and respond to emails from clients and co counsel regarding * . | 0.50 |
| 11/21/22 | PMJ | Review summary of accommodation meeting from Norman Grissom. | 0.20 |
| 11/21/22 | NDG | Draft summary of EUSD interactive meetings. | 0.60 |
| 11/29/22 | PMJ | Review e-mail correspondence to School District regarding follow-up and next steps. | 0.20 |
| 11/29/22 | NDG | Review emails from clients, send e-mail to Mr. Shinoff regarding Dr. Dupree's summary of proceedings. | 0.40 |
| 12/6/22 | PMJ | E-mail correspondence with clients and team regarding next steps. | 0.20 |
| 12/6/22 | PMJ | Review and respond to client e-mail correspondence regarding update on next steps. | 0.20 |
| 12/6/22 | NDG | Review and respond to emails from clients and counsel regarding School Board's lack of response and/or Dr. Dupree's mediator's recommendations/decision. | 0.30 |

| Date | Biller | Description – 472 | Hours |
|------|--------|-------------------|-------|
| 12/12/22 | PMJ | Review e-mail correspondence with *  from clients. | 0.20 |
| 12/13/22 | PMJ | E-mail correspondence with clients regarding * . | 0.20 |
| 12/13/22 | JMT | Review and respond to emails from clients regarding *. | 0.20 |
| 12/13/22 | CSL | E-mail correspondence regarding status of * School District policies. | 0.40 |
| 12/14/22 | JMT | Amend research memorandum on case. | 5.00 |
| 12/21/22 | PMJ | Review and respond to client e-mail correspondence regarding next steps and * . | 0.20 |
| 12/21/22 | JMT | Conference call with clients regarding next steps. | 0.80 |
| 12/21/22 | PMJ | Telephone call with clients to discuss litigation and next steps. | 0.80 |
| 12/21/22 | CSL | Review e-mail correspondence regarding matter status; Telephone conference with Mr. Jonna regarding strategy. | 0.40 |
| 12/21/22 | NDG | Review and respond to emails from clients and counsel. | 0.40 |
| 12/21/22 | NDG | Correspondence with School Board attorney Mr. Shinoff regarding lack of response to clients and status of Dupree's memo/recommendations; cc to all counsel. | 0.40 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 12/22/22 | PMJ | Review follow-up e-mail correspondence to School District. | 0.20 |
| 12/22/22 | NDG | Telephone conference with clients and counsel regarding School Board's failure to issue a ruling. | 0.70 |
| 12/27/22 | NDG | Follow-up email to Daniel Shinoff regarding lack of response to clients request for accommodation and status of Dr. Dupree's memo/recommendations. | 0.30 |
| 1/9/23 | NDG | Correspondence with clients and co-counsel regarding * . | 0.30 |
| 1/10/23 | PMJ | Review and respond to status update on case from Attorney Grissom. | 0.20 |
| 1/14/23 | PMJ | Zoom call with client regarding * and next steps. | 1.20 |
| 1/14/23 | JMT | Zoom call with client regarding * and next steps. | 1.20 |
| 1/15/23 | NDG | Review San Dieguito School district policy on Non Discrimination / Harassment and Los Angeles School District School memorandum on Gender Identity and Students sent by clients. | 0.40 |
| 1/17/23 | PMJ | Review and revise follow up e-mail correspondence regarding accommodation request; Review *. | 0.60 |
| 1/17/23 | PMJ | Discuss case strategy and next steps. | 0.20 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 1/17/23 | NDG | Review and respond to emails from clients and co-counsel regarding response to new directive from the school board. | 0.40 |
| 1/18/23 | PMJ | Review e-mail correspondence from client regarding *. | 0.20 |
| 1/19/23 | NDG | Review Dr. Dupree's report; legal research regarding same. | 0.80 |
| 1/19/23 | NDG | Telephone call with Mr. Mirabelli regarding unemployment insurance and case status. | 0.50 |
| 1/20/23 | JMT | Begin drafting motion for a preliminary injunction. | 2.40 |
| 1/20/23 | MLB | Review case file; Discuss facts with Mr. Jonna; Review multiple e-mail correspondence and documents received from Mr. Jonna; Review client-provided documents; Begin drafting outline for statement of facts. | 7.20 |
| 1/22/23 | PMJ | Review and analyze summary from EUSD regarding religious accommodation request. | 0.20 |
| 1/23/23 | PMJ | Assess next steps. | 0.20 |
| 1/23/23 | JMT | Continue drafting preliminary injunction papers. | 3.80 |
| 1/23/23 | JMT | Telephone conference with clients regarding next steps. | 1.20 |
| 1/23/23 | PMJ | Telephone call with clients to discuss * and next steps regarding same. | 1.20 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 1/23/23 | MLB | Zoom meeting with Mr. Jonna, Mr. Trissell, and clients regarding * ; E-mail correspondence regarding same. | 0.80 |
| 1/23/23 | MLB | Begin drafting complaint and initial draft statement of facts based on review of case file. | 9.20 |
| 1/23/23 | NDG | Correspondence with co-counsel regarding Mr. Shinoff's suggestion for an additional meeting. | 0.70 |
| 1/23/23 | NDG | Telephone call with clients and co-counsel regarding case status, interactive meeting process, and new meeting with Board attorney. | 1.10 |
| 1/24/23 | JMT | Continue drafting preliminary injunction papers. | 2.20 |
| 1/24/23 | MLB | Continue working on complaint; Review TIPM reports and add facts to statement of facts; Legal research on * . | 10.80 |
| 1/24/23 | NDG | Correspondence with Mr. Shinoff regarding additional meeting with clients and counsel. | 0.40 |
| 1/25/23 | JMT | Continue working on preliminary injunction papers. | 3.20 |
| 1/25/23 | MLB | Continue working on complaint; Review client timeline of events; Review emails from EUSD counselors regarding students with pronoun requests. | 9.60 |
| 1/26/23 | JMT | Continue drafting preliminary injunction papers. | 2.40 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 1/26/23 | PMJ | Review IPM summary regarding Lori West. | 0.20 |
| 1/26/23 | MLB | Continue working on complaint; Review Rights of Gender Diverse Students Powerpoint presentation; Review video and transcript; Integrate facts as necessary. | 9.80 |
| 1/26/23 | NDG | Review Lori West's IPM Summary report from Dr. Dupree. | 0.40 |
| 1/27/23 | JMT | Continue working on preliminary injunction papers. | 2.00 |
| 1/27/23 | PMJ | Telephone call with client to discuss status and next steps. | 0.20 |
| 1/27/23 | MLB | Continue working on complaint; Legal research on * . | 9.20 |
| 1/30/23 | PMJ | Assess update with EUSD. | 0.20 |
| 1/30/23 | MLB | Compile draft exhibits to complaint; Revise complaint based on conversation with Mr. Trissell; Legal research on   *   . | 7.80 |
| 1/30/23 | NDG | Correspondence with clients and counsel regarding new meeting, date and time for continuation of interactive process and who will be attending. | 0.50 |
| 1/31/23 | JMT | Continue working on motion for preliminary injunction. | 4.60 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 2/1/23 | PMJ | Review e-mail correspondence from Mr. Trissell regarding case status. | 0.20 |
| 2/1/23 | JMT | Work on preliminary injunction papers. | 6.40 |
| 2/1/23 | CSL | E-mail correspondence from client regarding * ; Conference with Mr. Trissell regarding potential preliminary injunction. | 0.40 |
| 2/1/23 | NDG | Review emails and documents from * regarding documentary evidence for case. | 0.60 |
| 2/2/23 | JMT | Continue working on preliminary injunction papers. | 5.40 |
| 2/2/23 | PMJ | Review and revise follow-up e-mail correspondence regarding public records act request. | 0.20 |
| 2/2/23 | JMT | Review draft complaint. | 0.60 |
| 2/2/23 | NDG | Review California Public Records Act Request to School Board and related emails. | 0.60 |
| 2/3/23 | PMJ | Assess complaint and exhibits. | 0.20 |
| 2/3/23 | JMT | Conferences with Mr. Jonna and Mr. Brandon regarding strategy for complaint and preliminary injunction papers; Review various complaints for Mr. Brandon to review. | 1.20 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 2/3/23 | MLB | Begin revisions to draft complaint based on comments from Mr. Trissell; Review * . | 8.20 |
| 2/4/23 | PMJ | Review congressional testimony on gender ideology in schools. | 0.20 |
| 2/4/23 | NDG | Review emails from clients regarding teacher "RP", case facts, and evidence. | 0.40 |
| 2/6/23 | PMJ | Assess next steps. | 0.20 |
| 2/6/23 | MDM | Confer with Mr. Trissell regarding * ; Preliminary research of  * Forward results of initial research to Mr. Trissell. | 0.40 |
| 2/8/23 | NDG | Review emails from clients regarding case facts to include in the draft civil complaint. | 0.30 |
| 2/15/23 | NDG | Conference call with clients and counsel concerning * ; review emails and client letter regarding *  . | 1.80 |
| 2/16/23 | NDG | Appear at two (2) Escondido School Board meetings for Mrs. West and Mrs. Mirabelli to receive and discuss religious accommodations granted to clients by school administration (including travel). | 4.40 |
| 2/21/23 | JMT | Draft response letter to Attorney Shinoff. | 2.80 |
| 2/21/23 | PMJ | Review draft response letter to Attorney Shinoff. | 0.40 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 2/21/23 | NDG | Correspondence with clients and counsel regarding EUSD's meeting and granted accommodation. | 0.40 |
| 2/22/23 | PMJ | Review and revise response letter to Attorney Shinoff. | 0.20 |
| 2/22/23 | NDG | Conference call with clients and counsel regarding EUSD's granted accommodation, litigation and path forward. | 0.70 |
| 2/27/23 | NDG | Review all drafts of Shinoff letter and comments from clients. | 0.80 |
| 2/28/23 | NDG | Revise draft of Shinoff Mirabelli letter. | 0.80 |
| 3/1/23 | JMT | Review and revise draft letter from Attorney Grissom to EUSD with questions. | 0.20 |
| 3/1/23 | NDG | Review and revise letter to School Board incorporating all suggested edits. | 0.80 |
| 3/2/23 | NDG | Correspondence with client and counsel regarding communications to School Board and application of PTO hours for missed time after interactive meeting. | 0.40 |
| 3/6/23 | NDG | Review legal arguments and cases regarding violation of Title VII drafted by LiMandri & Jonna LLP. | 1.80 |
| 3/9/23 | NDG | Correspondence with client and counsel regarding * . | 1.20 |
| 3/14/23 | NDG | Correspondence with clients and counsel regarding legal arguments and case developments. | 0.60 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 3/14/23 | NDG | Review Mr. Shinoff's response to clients questions about how to apply exemption; correspondence with all regarding same. | 1.30 |
| 3/20/23 | NDG | Review * from client; respond accordingly. | 0.40 |
| 3/21/23 | JMT | Telephone call with Andrew Mirabelli with status update. | 0.40 |
| 3/21/23 | PMJ | Telephone call with Andrew Mirabelli regarding case status and next steps. | 0.40 |
| 3/28/23 | NDG | Review final draft of Complaint and Motion for Preliminary Injunction. | 2.00 |
| 3/28/23 | NDG | Correspondence with LiMandri & Jonna LLP regarding final causes of action and allegations. | 0.40 |
| 3/30/23 | NDG | Correspondence with clients and counsel regarding final draft of pleadings. | 0.40 |
| 4/11/23 | NDG | Review Federal Complaint drafted by Jeff Trissell and suggested edits by clients; review most recent national cases on this subject. | 3.70 |
| 4/18/23 | NDG | Review Plaintiff's Motion for Preliminary Injunction. | 1.00 |
| 4/20/23 | NDG | Correspondence with LiMandri & Jonna LLP regarding disclosure of School BOD letters and related matters. | 0.60 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 4/27/23 | NDG | Review Request for Waiver of Summons | 0.40 |
| 5/1/23 | NDG | Review LiMandri & Jonna LLP's email communication to Mr. Shinoff. | 0.30 |
| 5/1/23 | NDG | Ongoing correspondence (email and telephone calls) with entire legal team and clients regarding harassment and hostile work environment as a result of TV coverage of lawsuit; individual acts of harassment; suggested remedies and paths to report the transgressions. | 2.10 |
| 5/2/23 | NDG | Ongoing correspondence (email and telephone calls) with entire legal team and clients regarding how to address the untenable situation at the school; legal research regarding same. | 1.80 |
| 5/4/23 | JMT | Conference with Mr. Jonna; Telephone calls with Attorney Shinoff and client regarding paid administrative leave. | 0.40 |
| 5/5/23 | NDG | Review correspondence from clients and LiMandri & Jonna LLP regarding leave of absence and communications with Mr. Shinoff | 0.50 |
| 5/15/23 | NDG | Review and respond to client and LiMandri & Jonna LLP regarding Paid Admin Leave letter from the School Board. | 0.50 |
| 5/17/23 | NDG | Telephone conference with clients and Paul Jonna regarding * . | 0.30 |
| 5/18/23 | PMJ | Review draft letter to EUSD regarding administrative leave. | 0.20 |
| 5/18/23 | PMJ | Review correspondence from EUSD regarding Lori West. | 0.20 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 5/18/23 | JMT | Review draft letter to opposing counsel regarding Mirabelli's job restrictions. | 0.20 |
| 5/18/23 | JMT | Review emails putting Lori West on administrative leave. | 0.20 |
| 5/18/23 | NDG | Draft response to Administrative Leave letter from Mr. Albert; review related communications from clients and counsel. | 1.80 |
| 5/18/23 | NDG | Correspondence with clients and LiMandri & Jonna LLP regarding Lori West and her evolving discipline for alleged complaints from students. | 0.40 |
| 5/19/23 | PMJ | Telephone call with Attorney Shinoff; E-mail correspondence with clients regarding next steps. | 0.40 |
| 5/19/23 | PMJ | Telephone calls and e-mail correspondence with clients regarding next steps. | 0.20 |
| 5/19/23 | CSL | Review emails regarding client's administrative leave; Telephone conference with Mr. Jonna regarding same. | 0.60 |
| 5/22/23 | JMT | Edit letters to Attorney Shinoff regarding client's administrative leave status. | 0.80 |
| 5/22/23 | NDG | Draft response letter to Mr. Shinoff from Mrs. West regarding forced administrative leave. Review correspondence from client and counsel regarding same. | 1.30 |
| 5/22/23 | NDG | Correspondence with clients and LiMandri & Jonna LLP regarding summer school opportunity for Lori West and administrative status of both clients. | 0.70 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 5/24/23 | NDG | Review letter and text from the School District to Mrs. West regarding paid admin leave pending investigation; correspondence with client and LiMandri & Jonna LLP regarding same. | 0.40 |
| 5/25/23 | JMT | Send letters seeking clarification regarding administrative leave to opposing counsel. | 0.20 |
| 5/26/23 | NDG | Review Daniel Shinoff's letter to both clients regarding administrative leave and terms thereof. | 0.40 |
| 5/31/23 | NDG | Review client's summary of events leading up to involuntary leave and investigation; correspondence with clients and LiMandri & Jonna LLP regarding same. | 0.50 |
| 6/21/23 | NDG | Correspondence with client and LiMandri & Jonna LLP regarding interview with the School Board regarding pending allegations against Lori West. | 0.40 |
| 6/26/23 | PMJ | E-mail correspondence with opposing counsel regarding scheduling interview of clients. | 0.40 |
| 6/26/23 | PMJ | E-mail correspondence regarding client interviews and next steps. | 0.20 |
| 6/28/23 | JMT | Meeting with clients to prepare for administrative investigation interviews. | 0.60 |
| 6/28/23 | NDG | Conference call with clients and LiMandri & Jonna LLP regarding client interviews scheduled for 6/29/2023. | 0.50 |
| 6/29/23 | CSL | Telephone conference with Mr. Jonna regarding clients' interviews; Emails regarding same. | 0.40 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 7/7/23 | JMT | Listen to Elizabeth Mirabelli employment investigation interview with Attorney Jesse Basel. | 1.20 |
| 7/10/23 | JMT | Listen to Lori West employment investigation interview by Attorney Jesse Basel of Artiano Shinoff. | 1.00 |
| 7/13/23 | PMJ | Telephone calls with Attorney Shinoff and Lori West to discuss status of administrative leave. | 0.40 |
| 7/15/23 | PMJ | Review and respond to client e-mail correspondence regarding work status and paid leave. | 0.20 |
| 7/15/23 | MDM | Review and analysis of emails from client's husband and from client regarding  * ; Forward analysis to Mr. Jonna, Mr. Trissell, and Mr. Brandon. | 0.20 |
| 7/24/23 | MDM | Review emails from Andrew Mirabelli and decision forwarded by same. | 0.60 |
| 7/25/23 | NDG | Review Plaintiffs' Memorandum of Points & Authorities in Opposition to CDE Defendants' Motion to Dismiss and Supporting Declaration of Jeffrey M. Trissell, Esq. in support of Plaintiffs' Opposition to CDE Defendants' Motion to Dismiss. | 1.60 |
| 8/17/23 | NDG | Review Plaintiffs' (1) Response to CDE Defendants' Objections, and (2) Objections to CDE Defendants' Reply, in support of Plaintiffs' Opposition to CDE Defendants' Motion to Dismiss. | 0.40 |
| 8/22/23 | NDG | Review Plaintiffs' Second Notice of Supplemental Authority in Support of Plaintiffs' Motion for a Preliminary Injunction, and in Opposition to the Motions to Dismiss. | 0.30 |
| 8/29/23 | NDG | Review Plaintiffs' Notice of Related Case in Support of Plaintiffs' Motion for a Preliminary Injunction, and in Opposition to the Defendants' Motions to Dismiss. | 0.80 |
| 9/11/23 | NDG | Review Plaintiffs' Third Notice of Supplemental Authority in Support of Plaintiffs' Motion for a Preliminary Injunction, and in Opposition to the Motions to Dismiss. | 1.00 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 9/13/23 | NDG | Review Plaintiffs' Fourth Notice of Supplemental Authority in Support of Plaintiffs' Motion for a Preliminary Injunction, and in Opposition to the Motions to Dismiss. | 0.30 |
| 9/15/23 | NDG | Review Judge Benitez's decision on the motion to dismiss and preliminary injunction. | 1.00 |
| 9/18/23 | PMJ | Finalize letters to Attorney Shinoff regarding next steps. | 0.40 |
| 9/21/23 | JMT | Respond to Andrew Mirabelli's e-mail correspondence regarding * . . | 0.40 |
| 9/26/23 | PMJ | Assess amending complaint and next steps; Telephone calls with Attorney Shinoff and clients. | 0.40 |
| 9/28/23 | PMJ | Review e-mail correspondence from Attorney Shinoff regarding clients; Discuss *. | 0.40 |
| 10/2/23 | FJC | Telephone conference with Paul Jonna; email from Jeff Trissell; begin review of complaint. | 1.50 |
| 10/3/23 | JMT | Telephone call with Mr. Jonna regarding Elizabeth Mirabelli's employment status; E-mail correspondence to Attorney Coughlin regarding same. | 0.40 |
| 10/3/23 | PMJ | Assess next steps with Mr. Trissell. | 0.20 |
| 10/3/23 | CSL | E-mail correspondence regarding clients' return to work; Conference with Mr. Trissell regarding same. | 0.40 |

| Date | Biller | Description – 472 | Hours |
|------|--------|-------------------|-------|
| 10/3/23 | FJC | Review file and email from client. | 3.50 |
| 10/4/23 | PMJ | Assess next steps regarding Lori and Elizabeth employment status. | 0.20 |
| 10/4/23 | JMT | Conference with Mr. Jonna regarding case strategy; Review e-mail correspondence from Attorney Coughlin with his thoughts; Draft responsive e-mail correspondence. | 0.40 |
| 10/4/23 | PMJ | E-mail correspondence regarding Elizabeth's work status; Telephone call with Politico regarding case. | 0.20 |
| 10/4/23 | PMJ | Telephone call with Attorney Coughlin and Mr. Trissell regarding amending complaint and next steps. | 0.40 |
| 10/4/23 | JMT | Conference with Mr. Jonna and Attorney Coughlin regarding next steps in litigation and amending complaint. | 0.40 |
| 10/4/23 | JMT | Telephone conference with Attorney Coughlin to provide legal background of claims for him. | 0.40 |
| 10/4/23 | JMT | Conference call with Attorney Coughlin and Andrew Mirabelli to introduce them to each other. | 0.40 |
| 10/4/23 | FJC | Review emails, consider and analyze; respond; further email from Jeff Trissell. | 1.50 |
| 10/4/23 | FJC | Review matter, telephone conference with Paul Jonna. | 1.00 |

| Date | Biller | Description – 472 | Hours |
|------|--------|-------------------|-------|
| 10/5/23 | PMJ | Draft e-mail correspondence to EUSD regarding Lori and Elizabeth return date and next steps. | 0.60 |
| 10/5/23 | PMJ | Edit e-mail correspondence to opposing counsel regarding work status and next steps. | 0.20 |
| 10/5/23 | FJC | Talk to Lori West; review documents; research; review various emails from Paul Jonna to Dan Shinoff; edit proposed letter. | 3.90 |
| 10/5/23 | FJC | Research of procedural issues for filing claims of employees, GTCA, FEHA, etc.; Review parts of the EUSD MOU; Review Westlaw re: Board of Ed. At EUSD; Review policies and regulations of EUSD Board of Education, including AR-4030. | 2.00 |
| 10/5/23 | FJC | Review and research issue re: potential additional claims and amendment vs. supplemental complaint and drafted brief memo. | 1.00 |
| 10/6/23 | JMT | Review client's lengthy emails regarding * ; Review e-mail correspondence from Mr. Jonna regarding same; Review Attorney Coughlin's emails regarding employment claims. | 0.20 |
| 10/6/23 | PMJ | E-mail correspondence and telephone calls with Attorney Shinoff and Attorney Coughlin regarding employment issues. | 0.20 |
| 10/6/23 | PMJ | E-mail correspondence to Attorney Shinoff regarding next steps in the litigation and regarding interactive process meetings. | 0.20 |
| 10/6/23 | FJC | Review client emails (.2); email to Paul Jonna re: confirming with opposing counsel re: internal grievance (.2); telephone conference with Paul Jonna (.2). | 0.60 |
| 10/6/23 | FJC | Telephone confernce regarding spreadsheet. | 0.40 |

| Date | Biller | Description – 472 | Hours |
|------|--------|-------------------|-------|
| 10/7/23 | FJC | First review of files sent by Mirabell on 10/6/23. | 0.30 |
| 10/7/23 | FJC | Review emails from Andrew Mirabelli; review documents and timeline; create restated timeline. | 4.40 |
| 10/8/23 | PMJ | E-mail correspondence with opposing counsel regarding meeting with Lori West on administrative complaint; Review new court decision regarding transgender issues. | 0.20 |
| 10/9/23 | PMJ | E-mail correspondence regarding Lori West meeting details. | 0.20 |
| 10/9/23 | FJC | Email from Andrew Mirabelli; response. | 0.40 |
| 10/11/23 | PMJ | Prepare for and participate in interview with Lori West by EUSD. | 1.20 |
| 10/11/23 | JMT | Listen to audio recording of Lori Ann West investigative interview conducted by Attorneys Shinoff and Basel. | 0.60 |
| 10/12/23 | PMJ | Draft e-mail correspondence to EUSD regarding West and Mirabelli investigations and next steps. | 0.40 |
| 10/12/23 | PMJ | Revise e-mail correspondence to EUSD regarding next steps with administrative investigations. | 0.20 |
| 10/12/23 | PMJ | E-mail correspondence to opposing counsel regarding next steps with Lori West administrative investigation. | 0.20 |
| 10/12/23 | PMJ | Telephone call with Attorney Coughlin and Elizabeth to discuss * . | 1.00 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 10/12/23 | FJC | Telephone call with client, reivew emails, research and write email to client. | 2.75 |
| 10/13/23 | PMJ | Assess next steps with Elizabeth and team regarding * . | 0.20 |
| 10/13/23 | PMJ | Review flyer at EUSD protesting lawsuit; E-mail correspondence to EUSD notifying them of same. | 0.40 |
| 10/13/23 | PMJ | Draft e-mail correspondence to EUSD regarding employment investigations of Lori and Elizabeth and next steps. | 0.80 |
| 10/13/23 | JMT | Review emails from Attorney Coughlin and Andrew Mirabelli regarding * ; Conference with Mr. Jonna regarding same. | 0.60 |
| 10/13/23 | CSL | Review e-mail correspondence regarding retaliation against clients; Review protest flyer regarding same. | 0.40 |
| 10/13/23 | FJC | Review email, begin to review documents for purposes of requested response. | 4.40 |
| 10/14/23 | CSL | E-mail correspondence regarding harassment and retaliation against clients; Review materials regarding same. | 0.60 |
| 10/15/23 | PMJ | Multiple client e-mail correspondence regarding next steps with employment. | 0.40 |
| 10/16/23 | PMJ | Review and respond to client e-mail correspondence regarding * . | 0.20 |
| 10/16/23 | JMT | Review emails from Andrew Mirabelli regarding * . | 0.20 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 10/16/23 | PMJ | Telephone call with * | 0.20 |
| 10/16/23 | PMJ | Assess next steps regarding protest planned against clients. | 0.20 |
| 10/16/23 | JMT | Conference with Mr. Jonna regarding next steps in litigation and seeking contempt sanctions. | 0.20 |
| 10/16/23 | CSL | E-mail correspondence regarding harassment of clients and contempt. | 0.20 |
| 10/17/23 | PMJ | E-mail correspondence with clients regarding * . | 0.20 |
| 10/17/23 | PMJ | Review e-mail correspondence regarding * . | 0.20 |
| 10/18/23 | PMJ | Review and respond to e-mail correspondence with client regarding *. | 0.20 |
| 10/18/23 | JMT | Respond to Andrew Mirabelli's e-mail correspondence regarding * . | 0.20 |
| 10/18/23 | PMJ | Review e-mail correspondence regarding *. | 0.20 |
| 10/18/23 | PMJ | Review e-mail correspondence from Attorney Shinoff regarding administrative investigation and next steps; Forward same to team. | 0.20 |

| Date | Biller | Description – 472 | Hours |
|------|--------|-------------------|-------|
| 10/19/23 | JMT | Draft ex parte application for an order to show cause regarding civil contempt of court. | 2.20 |
| 10/20/23 | JMT | Review various text messages and photographs/videos of protest at Rincon Middle School. | 0.20 |
| 10/20/23 | JMT | Continue working on ex parte application for an order to show cause regarding civil contempt of court. | 4.20 |
| 10/20/23 | PMJ | Receive report on what occurred at protest. | 0.20 |
| 10/20/23 | PMJ | Assess next steps regarding contempt sanctions and amended complaint. | 0.20 |
| 10/20/23 | JMT | Conference with Mr. Jonna regarding next steps with contempt application and first amended complaint. | 0.20 |
| 10/20/23 | PMJ | Telephone call with client to discuss * . | 0.20 |
| 10/20/23 | PMJ | Review draft application for an order to show cause regarding contempt. | 0.20 |
| 10/20/23 | CSL | Conference with * regarding protest against clients; Review e-mail correspondence and photographs regarding same. | 0.40 |
| 10/21/23 | PMJ | Review and revise ex parte application for an order to show cause regarding civil contempt. | 0.40 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 10/21/23 | PCB | Review and comment on draft ex parte application for an OSC re: civil contempt. | 0.40 |
| 10/21/23 | CSL | Review ex parte papers regarding applying for contempt sanctions. | 0.40 |
| 10/22/23 | PMJ | Review article regarding EUSD pulling books from libraries. | 0.20 |
| 10/23/23 | PMJ | Assess response and edits to ex parte application to order to show cause regarding civil contempt. | 0.20 |
| 10/23/23 | PMJ | Telephone calls with Attorney Shinoff and clients to discuss employment investigations and next steps. | 0.40 |
| 10/23/23 | JMT | Meeting with Mr. Jonna regarding strategy in case; Telephone conference with clients regarding * . | 0.40 |
| 10/23/23 | PMJ | E-mail correspondence with Attorney Shinoff regarding employment status and next steps. | 0.20 |
| 10/23/23 | JMT | Telephone call with Attorney Coughlin regarding adding Title VII claims to case; E-mail correspondence regarding * . | 0.40 |
| 10/23/23 | PMJ | Telephone call with client regarding * . | 0.20 |
| 10/23/23 | CSL | Review e-mail correspondence regarding meeting with opposing counsel. | 0.20 |

| Date | Biller | Description – 472 | Hours |
|------|--------|-------------------|-------|
| 10/24/23 | PMJ | E-mail correspondence with Attorney Shinoff regarding whether Lori West can come to campus for open enrollment. | 0.20 |
| 10/24/23 | PMJ | E-mail correspondence to EUSD regarding deadline to complete investigation into Lori West. | 0.20 |
| 10/24/23 | FJC | Case work; emails from last 2 days (.2); put all intake documents together and review for purposes of drafting EEOC claim. | 0.70 |
| 10/25/23 | PMJ | Review and respond to e-mail correspondence from Attorney Shinoff regarding EUSD investigation into Lori West. | 0.20 |
| 10/25/23 | CSL | E-mail correspondence regarding meeting with opposing counsel. | 0.20 |
| 10/25/23 | FJC | Review documents, review research, organize notes, interviews, emails, re-review emails, drafting claim for EEOC; email to LiMandri & Jonna LLP re: potential video. | 4.00 |
| 10/25/23 | FJC | Begin document review in the morning. | 0.70 |
| 10/25/23 | FJC | Analysis re: potential issues with employment claims, risk of anti-SLAPP, etc.; Review case documents. | 0.60 |
| 10/26/23 | PMJ | E-mail correspondence with client regarding * . | 0.20 |
| 10/26/23 | FJC | Review administrative claim filing with EEOC and CRD, and potential issues that might arise. | 1.40 |
| 10/26/23 | FJC | Continued brief review of relevant case documents; substantive review and revisions to draft EEOC complaint. | 1.30 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 10/27/23 | FJC | Research adverse action issue; draft and revise claim; emails and calls with clients. | 3.00 |
| 10/27/23 | FJC | Review and revise EEOC complaint; research re: EEOC/CRD complaint and right to sue letter; draft memo re: procedure. | 1.30 |
| 10/27/23 | FJC | Revisions to EEOC complaint. | 0.50 |
| 10/27/23 | FJC | Research re: interviews before right to sue letter is issued. | 0.80 |
| 10/30/23 | PMJ | Review approving statements regarding Lori West made by students. | 0.20 |
| 10/30/23 | PMJ | Assess next steps regarding civil contempt filing. | 0.20 |
| 10/30/23 | JMT | Review and edit draft administrative complaints to file with EEOC. | 0.40 |
| 10/30/23 | JMT | Telephone call with Elizabeth Mirabelli, Andrew Mirabelli, Attorney Couhglin, and Mr. Jonna regarding * . | 0.80 |
| 10/30/23 | PMJ | Telephone call with clients regarding * . | 1.00 |
| 10/30/23 | PMJ | E-mail correspondence with opposing counsel regarding interactive process meeting. | 0.20 |
| 10/30/23 | FJC | Review and send document. | 2.40 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 10/31/23 | PMJ | Follow-up telephone call and e-mail correspondence with Attorney Shinoff regarding Lori West investigation and next steps. | 0.40 |
| 10/31/23 | FJC | Review client email; review CRD form; telephone conference with client; send her * . | 1.10 |
| 10/31/23 | FJC | Review client accomodation draft; review and begin to compose notes for client for review in advance of accommodation meeting. | 0.50 |
| 11/1/23 | PMJ | Telephone call with client and Andrew Mirabelli regarding *. | 0.20 |
| 11/2/23 | PMJ | Prepare for Elizabeth Mirabelli's Title VII meeting with EUSD. | 0.20 |
| 11/2/23 | JMT | Conference with Mr. Jonna regarding update on Elizabeth Mirabelli's Title VII meeting with EUSD. | 0.20 |
| 11/2/23 | PMJ | Telephone call with Attorney Shinoff regarding Lori West's return to work date; Participate in interactive process meeting with Attorney Shinoff, Attorney Coughlin, and Elizabeth Mirabelli. | 1.80 |
| 11/2/23 | FJC | Draft and send memo to client and group re: * . Participate in call with EUSD attorney. | 2.50 |
| 11/2/23 | FJC | Analysis re: possible accommodations and brainstorm what to request to protect client; substantive review and comments to memo to client. | 0.50 |
| 11/3/23 | PMJ | Review and respond to client e-mail correspondence regarding *. | 0.20 |

| Date | Biller | Description – 472 | Hours |
|------|--------|-------------------|-------|
| 11/3/23 | PMJ | E-mail correspondence with team regarding order to show cause re: contempt and next steps; Review client e-mail correspondence regarding  * . | 0.20 |
| 11/3/23 | JMT | Conference with Mr. Jonna regarding settlement e-mail correspondence to be sent to opposing counsel. | 0.20 |
| 11/3/23 | PMJ | E-mail correspondence to EUSD regarding settlement and next steps. | 0.20 |
| 11/3/23 | JMT | Draft letter to EEOC informing them of our representation of Lori West and requesting a right to sue letter. | 0.40 |
| 11/6/23 | JMT | Review video of Lori West interacting with students during lunch break. | 0.40 |
| 11/7/23 | PMJ | Review client e-mail correspondence regarding working document to move forward with EUSD accommodation process and return to work. | 0.20 |
| 11/7/23 | JMT | Conference with Mr. Jonna regarding next steps in litigation. | 0.20 |
| 11/8/23 | PMJ | Draft e-mail correspondence to Attorney Shinoff regarding next steps with Elizabeth Mirabelli's return to work. | 0.20 |
| 11/8/23 | PMJ | Review draft e-mail correspondence to Attorney Shinoff regarding next steps. | 0.40 |
| 11/8/23 | PMJ | Evaluate next steps. | 0.20 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 11/8/23 | PMJ | Telephone call with Elizabeth Mirabelli regarding * . | 0.40 |
| 11/9/23 | PMJ | Draft e-mail correspondence to EUSD regarding Elizabeth Mirabelli's return and accommodation regarding same. | 0.20 |
| 11/9/23 | PMJ | E-mail correspondence with client regarding *. | 0.20 |
| 11/9/23 | CSL | Review e-mail correspondence regarding client's return to work. | 0.20 |
| 11/13/23 | PMJ | E-mail correspondence with counsel for EUSD regarding answer to complaint and next steps. | 0.20 |
| 11/13/23 | JMT | Receive EUSD answer to complaint and CDE answer to complaint. | 0.20 |
| 11/15/23 | PMJ | Review and respond to e-mail correspondence from Attorney Shinoff regarding next steps. | 0.20 |
| 11/16/23 | PMJ | E-mail correspondence with co-counsel regarding Title VII claims and next steps. | 0.20 |
| 11/16/23 | PMJ | Review and respond to correspondence from Attorney Shinoff regarding early neutral evaluation conference date. | 0.20 |
| 11/16/23 | PMJ | Follow-up e-mail correspondence with Attorney Shinoff regarding next steps. | 0.20 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 11/16/23 | FJC | Email to Paul Jonna, email response from Paul Jonna to me re: FAC, Answer, EEOC timing and potential for supplemental pleading. | 0.20 |
| 11/17/23 | PMJ | E-mail correspondence with counsel for EUSD regarding next steps with clients. | 0.20 |
| 11/17/23 | PMJ | Assess next steps regarding order to show cause. | 0.20 |
| 11/30/23 | PMJ | Review correspondence from Attorney Shinoff regarding early neutral evaluation conference. | 0.20 |
| 12/7/23 | PMJ | Review and respond to e-mail correspondence from Attorney Shinoff regarding Elizabeth Mirabelli's workers' compensation information. | 0.20 |
| 12/7/23 | JMT | Draft response to Attorney Shinoff regarding scheduling Rule 26(f) conference. | 0.20 |
| 12/18/23 | PMJ | Telephone call with Andrew Mirabelli regarding * . | 0.20 |
| 1/3/24 | FJC | Review declaration; talk to Paul Jonna; review papers and draft declaration; emails to/from LiMandri & Jonna LLP. | 1.50 |
| 1/8/24 | PMJ | Review e-mail correspondence from Andrew Mirabelli regarding *. | 0.20 |
| 1/11/24 | MDM | Review e-mail correspondence from Andrew Mirabelli regarding * . | 0.20 |
| 1/17/24 | MDM | Review e-mail correspondence from Andrew Mirabelli and Lori West regarding* . | 0.20 |

| Date | Biller | Description – 472 | Hours |
|------|--------|-------------------|-------|
| 1/17/24 | PMJ | Telephone call with Lori West regarding * ; Telephone call Attorney Shinoff regarding same. | 0.20 |
| 1/17/24 | FJC | Telephone call with Paul Jonna; emails to/from Paul Jonna; review prior emails. | 1.25 |
| 1/23/24 | FJC | Telephone call with Lori West re: administrative charges and updates. | 0.20 |
| 1/25/24 | FJC | Follow up with LiMandri & Jonna LLP, with Lori West; review prior emails; status to client, to LiMandri & Jonna LLP. | 1.10 |
| 2/1/24 | JMT | Review e-mail correspondence from Attorney Coughlin regarding Elizabeth's Title VII claims, and respond. | 0.20 |
| 2/29/24 | PMJ | Review and respond to Attorney Shinoff regarding workers' compensation claim. | 0.20 |
| 3/4/24 | PMJ | Telephone calls with Frank Coughlin and Lori West regarding Title VII claims and next steps. | 0.20 |
| 3/14/24 | PMJ | Prepare for EEOC interview with Lori West and Frank Coughlin. | 0.40 |
| 3/14/24 | PMJ | Prepare for EEOC interview. | 0.20 |
| 3/14/24 | PMJ | Participate in Lori West EEOC interview; Discuss same with Frank Coughlin. | 0.20 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 3/19/24 | PMJ | Draft letter to Attorney Shinoff regarding Elizabeth Mirabelli's work status. | 0.40 |
| 3/20/24 | JMT | Telephone calls with Mr. Jonna, Frank Couglin, and Lori West regarding next steps and Title VII. | 1.00 |
| 3/20/24 | PMJ | Telephone call with Andrew Mirabelli regarding * | 0.20 |
| 3/21/24 | CSL | Receive report regarding Title VII claim. | 0.20 |
| 4/2/24 | PMJ | Telephone call with Andrew Mirabelli regarding * . | 0.20 |
| 4/2/24 | PMJ | Review and respond to e-mail correspondence from Attorney Coughlin regarding MOU and grievance procedures. | 0.20 |
| 4/2/24 | PMJ | Review e-mail correspondence from Attorney Coughlin regarding next steps with grievance procedure. | 0.20 |
| 4/3/24 | PMJ | Review e-mail correspondence from Attorney Coughlin regarding grievance process and next steps. | 0.20 |
| 4/3/24 | PMJ | E-mail correspondence to opposing counsel regarding grievance process and next steps. | 0.20 |
| 4/4/24 | PMJ | Review and respond to e-mail correspondence from client with draft grievance; Review Lori West right to sue letter. | 0.20 |
| 4/4/24 | PMJ | Review e-mail correspondence from Attorney Coughlin regarding edits to grievance form. | 0.20 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 4/5/24 | PMJ | Review e-mail correspondence from Attorney Shinoff regarding Elizabeth Mirabelli and confiscation of her pay. | 0.20 |
| 4/8/24 | PMJ | Assess next steps regarding letter to Audrey Frank regarding grievance procedure. | 0.20 |
| 4/10/24 | PMJ | Review letter from Attorney Shinoff regarding Elizabeth Mirabelli's pay issues. | 0.20 |
| 4/10/24 | PMJ | Review and respond to Attorney Shinoff's e-mail correspondence regarding Elizabeth Mirabelli's pay. | 0.20 |
| 4/10/24 | PMJ | E-mail correspondence with Attorney Shinoff regarding Elizabeth Mirabelli's letter regarding pay confiscation. | 0.20 |
| 4/10/24 | PMJ | Review and respond to Attorney Shinoff's letter regarding Elizabeth Mirabelli's status. | 0.20 |
| 4/17/24 | JMT | Review new Title VII case Muldrow v. City of St. Louis. | 0.40 |
| 4/22/24 | PMJ | Review e-mail correspondence from Attorney Shinoff regarding dismissal of defendants John Abert and Tracy Shmidt. | 0.20 |
| 4/26/24 | PMJ | Review and respond to Attorney Shinoff's e-mail correspondence regarding Elizabeth Mirabellli's grievance. | 0.20 |
| 4/30/24 | PMJ | Telephone call with Attorney Shinoff and clients to discuss settlement and next steps. | 1.00 |
| 4/30/24 | JMT | Telephone calls with Attorney Shinoff regarding next steps and settlement, and with client regarding same. | 0.80 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 4/30/24 | JMT | Review numerous text messages and draft settlement e-mail correspondence between Mr. Jonna and Attorney Shinoff. | 0.20 |
| 4/30/24 | JMT | Prepare fee agreement for potential new plaintiff John Doe and Jane Doe. | 0.40 |
| 5/1/24 | KD | Review, revise, and finalize meet and confer letter to Attorney Shinoff; E-mail correspondence to opposing counsel with same. | 0.40 |
| 5/2/24 | PMJ | Review e-mail correspondence from Attorney Shinoff regarding grievance. | 0.20 |
| 5/3/24 | PMJ | E-mail correspondence with Attorney Shinoff regarding resolution of grievance. | 0.20 |
| 5/3/24 | PMJ | Interview with *  ; E-mail correspondence with client regarding differential pay discrepancy. | 0.40 |
| 6/1/24 | PMJ | Telephone call with Andrew Hayes regarding * . | 0.40 |
| 6/5/24 | PMJ | Telephone conference with Andrew Hayes regarding * . | 0.20 |
| 6/6/24 | PMJ | Follow-up e-mail correspondence with Attorney Shinoff regarding Mirabelli settlement terms for grievance. | 0.20 |
| 6/16/24 | PMJ | Assess edits to settlement agreement regarding grievance. | 0.20 |
| 6/17/24 | JMT | Edit Elizabeth Mirabelli's settlement agreement regarding internal grievance. | 0.40 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 6/17/24 | PMJ | Review edits to settlement agreement regarding grievance and pay dispute. | 0.20 |
| 6/18/24 | PMJ | E-mail correspondence regarding Elizabeth Mirabelli's grievance settlement agreement. | 0.20 |
| 6/21/24 | PMJ | Review edits to draft settlement of Mirabelli grievance. | 0.20 |
| 6/26/24 | PMJ | E-mail correspondence with client regarding grievance settlement. | 0.20 |
| 8/19/24 | JMT | Telephone call with clients and Attorney Shinoff regarding *. | 0.60 |
| 8/21/24 | PMJ | Review letter from Attorney Shinoff regarding next steps. | 0.20 |
| 8/22/24 | JMT | Draft letter regarding employment status of Elizabeth Mirabelli to Attorney Shinoff. | 3.40 |
| 8/23/24 | JMT | Finalize and send out letter to Attorney Shinoff regarding Elizabeth's leave status. | 0.20 |
| 10/8/24 | PMJ | E-mail correspondence with Elizabeth Mirabelli regarding * ; Discuss same with Attorney Shinoff. | 0.40 |
| 10/9/24 | PMJ | Review Attorney Shinoff's response regarding Elizabeth Mirabelli's accommodation. | 0.20 |
| 10/9/24 | PMJ | E-mail correspondence with Attorney Shinoff regarding administrative leave for Elizabeth Mirabelli. | 0.20 |

| Date | Biller | Description – 472 | Hours |
|------|--------|-------------------|-------|
| 10/9/24 | PMJ | Review updated scheduling order; E-mail correspondence with Attorney Shinoff regarding Elizabeth Mirabelli's accommodation. | 0.20 |
| 10/10/24 | PMJ | Review e-mail correspondence from Attorney Shinoff regarding next steps with accommodation for Elizabeth Mirabelli. | 0.20 |
| 10/17/24 | PMJ | Telephone call with Andrew Mirabelli regarding * . | 0.20 |
| 10/18/24 | JMT | Multiple telephone calls with Andrew Mirabelli regarding *  . | 0.40 |
| 10/18/24 | PMJ | Telephone calls with Andrew Mirabelli regarding * . | 0.40 |
| 10/21/24 | PMJ | Telephone conference with Andrew Mirabelli * . | 0.20 |
| 10/22/24 | PMJ | E-mail correspondence with Attorney Coughlin regarding Andrew Mirabelli. | 0.20 |
| 10/23/24 | PMJ | Review correspondence from Attorney Shinoff to Elizabeth Mirabelli regarding employment accommodation. | 0.20 |
| 11/1/24 | PMJ | E-mail correspondence with Andrew Mirabelli regarding * . | 0.20 |
| 12/3/24 | PMJ | E-mail correspondence with Attorney Shinoff regarding Elizabeth Mirabelli health insurance benefits. | 0.20 |
| 12/6/24 | PMJ | Review correspondence from Attorney Shinoff regarding client Mirabelli medical benefits; Discuss *with client. | 0.40 |

| Date | Biller | Description – 472 | Hours |
|---|---|---|---|
| 1/3/25 | PMJ | Telephone conference with Andrew Mirabelli regarding * . | 0.20 |
| 3/25/25 | PMJ | Telephone call with Andrew Hayes regarding * . | 0.20 |
| 5/20/25 | PMJ | E-mail correspondence with Andrew Mirabelli regarding * . | 0.20 |
| 5/20/25 | JMT | Lengthy e-mail correspondence with Andrew Mirabelli regarding  * . | 0.40 |
| 5/21/25 | JMT | Respond to Andrew Mirabelli's e-mail correspondence regarding  * . | 0.20 |
| 5/22/25 | JMT | Telephone call with Andrew Mirabelli regarding * . | 0.20 |
| 6/4/25 | JMT | Respond to e-mail correspondence from Andrew Mirabelli regarding  * . | 0.20 |
| 6/18/25 | PMJ | Review e-mail correspondence from Andrew Mirabelli regarding * . | 0.20 |
| 6/18/25 | PMJ | Prepare for mandatory settlement conference with Andrew and Elizabeth Mirabelli. | 0.20 |
| 7/7/25 | PMJ | Telephone conference with Andrew Mirabelli regarding * . | 0.20 |
| 8/18/25 | JMT | E-mail correspondence to Andrew and Elizabeth Mirabelli regarding * . | 0.20 |

| Date | Biller | Description – 472 | Hours |
|------|--------|-------------------|-------|
| 11/20/25 | WTD | Review e-mail correspondence from Attorney Shinoff regarding public records requests for plaintiffs Lori West and Elizabeth Mirabelli; Conference with Mr. Jonna regarding research into same; Conduct quick research into whether Ms. West and Ms. Mirabelli can object to same; Conference with Mr. Jonna regarding same. | 0.60 |
| 11/24/25 | PMJ | Review and respond to e-mail correspondence from Attorney Shinoff regarding * reporter document request. | 0.20 |

EXHIBIT 34

| Date | Biller | Description – 176 | Hours |
|---|---|---|---|
| 1/21/26 | AK | Proposing redactions on attorneys timeslips | 1.00 |
| 1/21/26 | AK | Proposing redactions on attorneys timeslips | 0.25 |
| 1/21/26 | AK | Proposing redactions on attorneys timeslips | 1.00 |
| 1/22/26 | AK | Proposing redactions on attorneys timeslips | 1.00 |
| 1/22/26 | AK | Various emails re: redactions on attorneys timeslips | 0.20 |
|  | **AK Total** |  | 3.45 |
| 1/15/25 | BMM | Review and analyze second amended complaint. | 1.20 |
| 1/17/25 | BMM | Participate in preparation and taking of the deposition of "person most knowledgeable" Marc Hammack for Clovis Unified School District. | 4.60 |
| 2/20/25 | BMM | Review and analyze 4,000+ page document production from Attorney General's office, consisting of filed briefs and e-mail correspondence between Attorney General and opposing counsel in the Chino Valley case and related matters. | 3.80 |
| 2/21/25 | BMM | Continue to review and analyze Attorney General document production. | 1.80 |
| 2/21/25 | BMM | Review and analyze Yosemite Valley document production, including internal e-mail correspondence regarding parental notification requests from the parents of Child Poe. | 3.80 |
| 2/24/25 | BMM | Conference with Mr. Jonna and Mr. Trissell regarding case status, preparation for upcoming depositions, and document review. | 0.40 |
| 2/24/25 | BMM | Review thousands of pages of documents from Yosemite Valley subpoena production. | 4.80 |
| 2/25/25 | BMM | Review and analyze Yosemite Valley Charter School document production; Draft memorandum regarding document production to Mr. Jonna and Mr. Trissell, collect documents referenced in memorandum; E-mail correspondence regarding same; Analysis of AB 1955 as it relates to District level Parental Exclusion Policies. | 5.40 |
| 2/26/25 | BMM | Review and analysis of Yosemite Valley production related to internal communication regarding AB 1955; Draft memorandum to Mr. Jonna and Mr. Trissell regarding same. | 1.20 |
| 2/26/25 | BMM | Review and analysis of Attorney General's document production and responses to document requests, to determine whether all responsive documents were provided. | 0.60 |
| 2/27/25 | BMM | Review and analyze document production from Pasadena Unified School District; Draft memorandum and forward to Mr. Jonna and Mr. Trissell regarding same. | 0.80 |
| 2/27/25 | BMM | Upload documents regarding * . | 0.20 |

| 2/28/25 | BMM | Draft deposition outline for Attorney General related to actions in Chino Valley case. | 1.40 |
|---|---|---|---|
| 3/3/25 | BMM | Review and analyze document production from * . | 1.20 |
| 3/3/25 | BMM | Draft deposition outline for Mr. Jonna for California Department of Justice; Review documents in preparation for gathering exhibits to use at deposition. | 1.80 |
| 3/5/25 | BMM | Continue to draft and assemble exhibits for deposition of California Department of Justice's "person most knowledgeable." | 1.80 |
| 3/6/25 | BMM | Prepare exhibits for deposition of Attorney General's "person most knowledgeable;" Revise deposition outline for same. | 6.00 |
| 3/6/25 | BMM | Draft memorandum to Mr. Jonna regarding  * records. | 0.40 |
| 3/7/25 | BMM | Legal research regarding rule allowing questions of 30(b)(6) witnesses outside scope of designation. | 0.40 |
| 3/19/25 | BMM | Review and analyze U.S. Department of Justice's intervention in * case * . | 0.20 |
| 4/4/25 | BMM | Review and analyze appellate court decision in Regino v. Staley. | 0.40 |
| 4/14/25 | BMM | Conference with Mr. Jonna and Mr. Trissell regarding case status. | 0.20 |
| 4/15/25 | BMM | Review and analyze Regino v. Staley decision. | 0.40 |
| 5/9/25 | BMM | Review and analyze portions of Attorney General's motion for stay of summary judgement and forward same to Mr. Trissell for use at status conference. | 0.20 |
| 5/30/25 | BMM | Review and analyze videos produced by defense expert Darlene Tando. | 0.20 |
| 6/6/25 | BMM | Attend deposition of defense expert Darlene Tando. | 1.80 |
|  | **BMM Total** |  | 45.00 |
| 6/5/24 | CJG | Review and edit proposed second amended complaint. | 1.00 |
| 7/1/24 | CJG | Review and edit section regarding standing of LSUSD to sue the State of California. | 4.00 |
| 10/20/24 | CJG | Review and edit opposition to motions to dismiss. | 1.00 |
| 2/9/25 | CJG | Review and edit draft opposition to CDE's motion to dismiss action as moot. | 1.00 |
| 12/22/25 | CJG | Review ruling granting summary judgment. | 1.60 |
|  | **CJG Total** |  | 8.60 |
| 6/2/23 | JAY | Confer with Mr. Trissell and Mr. Myers regarding case strategy, facts, merits of claims and * | 0.60 |
| 7/10/23 | JAY | Research and draft email memorandum regarding federal and state amicus briefing by allied organizations on scope of fundamental right of parental upbringing and application of strict scrutiny as applied to any infringement of same. | 2.40 |

| | | | |
|---|---|---|---|
| 7/12/23 | JAY | Discuss with Mr. Zavarro his research into * Review memorandum regarding same and reply. | 0.60 |
| 9/11/23 | JAY | Review key excerpts from transcript of oral argument on hearing of state's motion to dismiss and plaintiffs' motion for preliminary injunction. | 0.80 |
| 9/14/23 | JAY | Review 36 page memorandum in support of order granting preliminary injunction and denying motions to dismiss by state and district. | 1.20 |
| 9/14/23 | JAY | Review decision in Fellowship of Christian Athletes v. San Jose Unified School District to reverse the district court's denial of FCA's motion for a preliminary injunction. | 1.20 |
| 5/28/24 | JAY | Review CSBA's objections to third-party subpoena; E-mail correspondence to Mr. Trissell regarding ESI strategy and production protocol. | 1.60 |
| 5/29/24 | JAY | Review other ESI protocols used in other cases; Review updates in third-party e-discovery case law; Select protocol for Mr. Trissell to send to counsel for CSBA in advance of meet and confer on same, based on initial expectation of 10K+ pages of responsive, non-privileged/lightly redacted documentation from nonprofit third-party. | 2.20 |
| 5/30/24 | JAY | Prepare for and participate in conference call with Mr. Trissell and counsel for CSBA regarding custodians, search terms, limitations, format for production, metadata fields to be included with production, etc.; Determine that responsive document universe is currently 100K+, with pages far exceeding that number; Provide right sized protocol to replace prior recommendation. | 0.80 |
| 5/31/24 | JAY | Research CSBA, member associations, and relations to CDE; Prepare for and participate in telephone conference with Mr. Trissell regarding additional case background, litigation strategy, and ESI strategy, following reflection on positions taken by CSBA. | 0.80 |
| 6/10/24 | JAY | Review correspondence from CSBA, protective order for CSBA subpoena, and ESI protocol. | 1.20 |
| 6/10/24 | JAY | E-mail correspondence on metadata fields to Mr. Trissell. | 1.00 |
| 1/13/25 | JAY | Summarize and review medical records; Draft explanatory e-mail correspondence regarding same to Mr. Trissell and Mr. Jonna. | 1.80 |
| | **JAY Total** | | 16.20 |
| 2/23/23 | JMM | Review and edit draft motion for a preliminary injunction. | 2.00 |
| 2/24/23 | JMM | Review and edit draft complaint. | 2.00 |

| Date | Initials | Description | Hours |
|---|---|---|---|
| 4/12/23 | JMM | Assess framing of arguments and legal theories in complaint. | 0.20 |
| 4/13/23 | JMM | Respond to email about messaging for case and phrase "Parental Exclusion Policy." | 0.20 |
| 9/14/23 | JMM | Review 36 page memorandum in support of order granting preliminary injunction and denying motions to dismiss by state and district. | 1.20 |
| 7/17/24 | JMM | Review and edit draft motion for summary judgment. | 2.00 |
| 5/28/25 | JMM | Attend deposition of expert Dr. Szajnberg. | 4.40 |
| 5/30/25 | JMM | Attend deposition of expert Dr. Anderson. | 4.80 |
| 6/3/25 | JMM | Attend deposition of the defense expert Dr. Brady. | 7.40 |
| 6/6/25 | JMM | Attend deposition of defense expert Darlene Tando. | 7.60 |
| 10/16/25 | JMM | Review order granting class certification. | 0.40 |
| | **JMM Total** | | 32.20 |
| 5/11/23 | KH | Prepare and send declaration of Dr. Erica Anderson document through DocuSign for signature. | 0.20 |
| | **KH Total** | | 0.20 |
| 7/11/24 | MCM | Emails about reviewing and editing motion for summary judgment. | 0.20 |
| 7/24/24 | MCM | Review and edit motion for summary judgment and motion for class certification. | 3.60 |
| | **MCM Total** | | 3.80 |
| 7/9/25 | MFH | Daubert Motion: Analyze and revise; emails. | 4.80 |
| 7/10/25 | MFH | Daubert Motion: Analyze and revise. | 4.10 |
| 7/11/25 | MFH | Daubert Motion: Analyze and revise; emails with Jeff Trissell. | 2.70 |
| 7/12/25 | MFH | Daubert Motion: Analyze and revise. | 1.30 |
| 7/14/25 | MFH | Daubert Motion: Review expert opinions; continuing revision of brief. | 5.30 |
| 7/15/25 | MFH | Daubert Motion: Review expert opinions. | 1.80 |
| | **MFH Total** | | 20.00 |
| 4/12/23 | MGM | Assess framing of arguments and legal theories in complaint. | 0.20 |
| 9/14/23 | MGM | Review 36 page memorandum in support of order granting preliminary injunction and denying motions to dismiss by state and district. | 1.20 |
| 6/5/24 | MGM | Review and provide commentary on class allegations in proposed amended complaint. | 1.00 |
| 6/18/24 | MGM | Respond to email about class action cases that Thomas More Society has participated in. | 0.20 |
| 12/22/25 | MGM | Review ruling granting summary judgment. | 1.60 |
| | **MGM Total** | | 4.20 |
| 2/22/23 | PCB | Conference call regarding case developments. | 0.20 |

| | | | |
|---|---|---|---|
| 9/1/23 | PCB | Hearing recap. | 0.20 |
| 9/14/23 | PCB | Review 36 page memorandum in support of order granting preliminary injunction and denying motions to dismiss by state and district. | 1.20 |
| 10/21/23 | PCB | Review and comment on draft ex parte application for an OSC re: civil contempt. | 0.40 |
| 1/9/24 | PCB | Respond to email about adding Attorney General Bonta as a defendant. | 0.20 |
| 4/12/24 | PCB | Multiple emails regarding draft fee agreements for new clients. | 0.40 |
| 4/18/24 | PCB | Further review of draft fee agreements for new clients. | 0.40 |
| 5/15/24 | PCB | Hearing recap. | 0.20 |
| 5/22/24 | PCB | Call regarding new AB 1955. | 0.20 |
| 5/28/24 | PCB | Email to team regarding filing amicus brief in Parents Protecting Our Children v. Eau Claire School District. | 0.20 |
| 5/31/24 | PCB | Review research memorandum regarding ability of an arm of the state to sue the state in federal court. | 0.40 |
| 6/1/24 | PCB | Emails about importance of including FERPA allegations in the Complaint; and other issues. | 0.40 |
| 6/3/24 | PCB | Conference call with Paul Jonna and Jeff Trissell about next steps. | 0.20 |
| 6/6/24 | PCB | Telephone call regarding new class action retainer agreements. | 0.20 |
| 6/6/24 | PCB | Review addendums to fee agreements; review LSUSD fee agreement. | 0.40 |
| 6/10/24 | PCB | Emails regarding issues of whether sovereign immunity applies to school districts. | 0.20 |
| 6/19/24 | PCB | Respond to email about class action cases that Thomas More Society has participated in. | 0.20 |
| 7/12/24 | PCB | Emails about filing amicus brief in Parents Protecting Our Children v. Eau Claire Area School District. | 0.20 |
| 7/16/24 | PCB | Call with Paul Jonna regarding AB 1955 challenge. | 0.20 |
| 8/16/24 | PCB | Emails regarding motion for summary judgment and motion for class certification. | 0.20 |
| 8/26/24 | PCB | Conference call regarding how to respond to order granting ex parte motion to continue hearings. | 0.60 |
| 8/29/24 | PCB | Telephone call with Jeff Trissell regarding next steps. | 0.40 |
| 8/29/24 | PCB | Multiple emails and calls about re-filing motion for summary judgment as a motion for a class-wide preliminary injunction. | 0.60 |
| 1/14/25 | PCB | Telephone call regarding preliminary injunction motion. | 0.20 |
| 4/30/25 | PCB | Telephone call with Attorney Sell at DOJ regarding filing a statement of interest. | 0.60 |

| Date | Initials | Description | Hours |
|------|----------|-------------|-------|
| 7/3/25 | PCB | Email about new case Montana v. Planned Parenthood. | 0.20 |
| 9/15/25 | PCB | Mulitple emails about pro hac vice application; corrections to same. | 0.60 |
| 10/16/25 | PCB | Review order granting class certification. | 0.40 |
| 11/18/25 | PCB | Review and revise press release. | 0.20 |
| 12/22/25 | PCB | Review ruling granting summary judgment. | 1.60 |
| | **PCB Total** | | 11.60 |
| 9/27/22 | REW | Telephone call with Mr. Trissell regarding strategy for *. | 0.40 |
| 9/28/22 | REW | Review draft religious accommodation request for teachers seeking excuse from gender pronoun policy. | 0.20 |
| 9/29/22 | REW | Prepare comments and analysis of strategy for * . | 0.60 |
| 2/8/23 | REW | Analyze issues regarding * and send e-mail correspondence to Mr. Trissell regarding same. | 0.40 |
| 4/11/23 | REW | Strategy discussions with Mr. Jonna and Mr. Trissell regarding retaining expert Erica Anderson; Joint telephone call with Dr. Anderson regarding same. | 0.40 |
| 4/11/23 | REW | Analyze strategy regarding * . | 0.20 |
| 5/8/23 | REW | Review inquiry from *  regarding transgender issues at school; Discuss same with Mr. Jonna and Mr. Trissell. | 0.40 |
| 5/9/23 | REW | Respond to e-mail correspondence from *  regarding parental rights case involving transgender daughter. | 0.20 |
| 5/15/23 | REW | Review and analyze draft memorandum of points and authorities in support of preliminary injunction. | 2.40 |
| 5/16/23 | REW | Analyze case strategy. | 0.40 |
| 8/30/23 | REW | Telephone call with Mr. Jonna regarding results of preliminary injunction hearing. | 0.20 |
| 9/11/23 | REW | Review excerpts of transcript from preliminary injunction hearing. | 0.60 |
| 9/13/23 | REW | Review recent free exercise and free speech case Fellowship of Christian Athletes v. San Jose Unified School District issued by the Ninth Circuit Court of Appeals. | 0.40 |
| 9/14/23 | REW | Review order granting preliminary injunction and denying motion to dismiss. | 0.20 |
| 7/18/24 | REW | Review declarations of fathers of proposed plaintiff's for class action allegations. | 0.40 |
| 12/3/24 | REW | Discussion with Mr. Jonna regarding case experts. | 0.40 |
| 5/19/25 | REW | Telephone call with Mr. Trissell regarding deposition preparation of Drs. Szajnberg and Anderson. | 0.20 |
| 5/19/25 | REW | E-mail correspondence to Mr. Trissell with sample deposition outlines. | 0.20 |

| Date | Initials | Description | Hours |
|---|---|---|---|
| 5/23/25 | REW | Telephone calls with Mr. Jonna regarding deposition strategy for defense expert. | 0.20 |
| 5/23/25 | REW | Prepare collection of deposition materials from transgender med-mal cases in support of deposition of expert. | 1.00 |
| | **REW Total** | | 9.40 |
| 1/22/24 | RO | Telephone call and e-mail correspondence with Mr. Trissell regarding initial disclosures; Finalize and serve initial disclosures. | 0.20 |
| 2/22/24 | RO | Telephone calls with Mr. Jonna and Mr. Myers regarding: service of initial disclosures to opposing counsel for defendants Newsom and Bonta and early neutral evaluation conference; Prepare initial disclosures and forward to opposing counsel; Review e-mail correspondence between Mr. Jonna and Attorney Quade. | 0.40 |
| 7/9/24 | RO | Review declarations of John Poe and John Doe; E-mail correspondence to Mr. Jonna regarding same. | 0.40 |
| 9/27/24 | RO | Discussions with Mr. Jonna and Mr. Trissell regarding ex parte opposition; Finalize same and file with court. | 0.40 |
| 10/25/24 | RO | Telephone call from Mr. Trissell regarding DocuSign; Review e-mail correspondence from Mr. Trissell to Dr. Anderson regarding declaration; Send declaration to Dr. Anderson with same. | 0.20 |
| 11/25/24 | RO | Telephone calls with Mr. Jonna regarding research task; Internet research regarding school boards with parental secrecy policies. | 1.00 |
| 11/26/24 | RO | Review e-mail correspondence from * with regarding Telephone calls with Mr. Jonna and * regarding same; Internet research regarding number of schools on the Defending Education article list and list of school districts in California, their use of eboardsolutions; Brief comparison between DefendingEducation article and list of school boards from the California Department of Education; E-mail correspondence to Mr. Jonna regarding same; Review e-mail correspondence from * . | 1.60 |
| 11/27/24 | RO | Discussion with Mr. Jonna regarding school districts that have the policy; Research regarding same; Telephone calls and e-mail correspondence to Mr. Muldowney regarding same. | 3.80 |
| 12/9/24 | RO | Review and respond to e-mail correspondence from Mr. Jonna regarding article titled* " Internet research regarding * . | 0.20 |
| 12/23/24 | RO | Calendar plaintiffs' written discovery propounded to Attorney General. | 0.40 |
| 12/26/24 | RO | Telephone calls and e-mail correspondence to Mr. Trissell regarding requesting medical records; Prepare authorizations and cover letters for * Internet research regarding authorizations. | 1.20 |

| 12/30/24 | RO | Review and respond to e-mail correspondence from Mr. Trissell regarding Child Poe's medical records; Review Mr. Trissell e-mail correspondence to Mr. and Mrs. Poe regarding same. | 0.20 |
| 12/31/24 | RO | Discussions with Mr. Jonna regarding Child Poe's medical records; Prepare and fax letters to * and * ; E-mail correspondence to Mr. Jonna and Mr. Trissell regarding same. | 0.60 |
| 1/6/25 | RO | Discussion with Mr. Mai regarding faxes sent on December 31, 2024 to * ; Refax medical records request to * regarding Child Poe. | 0.20 |
| 1/9/25 | RO | Telephone call with Mr. Jonna regarding Child Poe's medical records; Telephone call to * and * regarding same. | 0.40 |
| 1/10/25 | RO | Telephone call to * regarding Child Poe's medical records; Discussions with Ms. Denworth, Mr. Mai, and Mr. Trissell regarding same. | 0.20 |
| 1/10/25 | RO | Prepare notices of depositions of Luis Rankins-Ibarra, Trent Smith, Tracy Schmidt, John Albert, Steve White, Katie Terrill, Kathleen Barlow, EUSD, CDE/SBE, and Attorney General; Prepare subpoenas for Kathleen Barlow and Katie Terrill; E-mail correspondence and telephone call with Mr. Trissell regarding same. | 2.00 |
| 1/10/25 | RO | Review e-mail correspondence from Mr. Trissell regarding subpoenas from the DOJ; Discussions with Ms. Denworth regarding same; Prepare letter to DOJ requesting copies of documents received via the subpoenas; E-mail correspondence to opposing counsel regarding same. | 0.60 |
| 1/13/25 | RO | Review Child Poe's medical and billing records from * ; E-mail correspondence to Mr. Trissell regarding same; Telephone call to * regarding Child Poe's medical records; Telephone call to Mr. Trissell regarding same. | 0.40 |
| 1/15/25 | RO | E-mail correspondence to opposing counsel regarding corrected DOE000001-000150; Telephone calls to * regarding Child Poe's medical records; E-mail correspondence to Mr. Jonna and Mr. Trissell regarding same. | 0.80 |
| 1/15/25 | RO | Prepare notices of deposition for all defendants; E-mail correspondence to Mr. Trissell regarding same. | 0.40 |
| 1/16/25 | RO | Review and respond to e-mail correspondence from * regarding Child Poe's medical records; E-mail correspondence to Mr. Jonna and Mr. Trissell regarding same; E-mail correspondence to opposing counsel regarding production of * medical records. | 0.40 |
| 1/17/25 | RO | Review facsimile from * regarding * medical records. | 0.20 |

| | | | |
|---|---|---|---|
| 1/23/25 | RO | Review and respond to e-mail correspondence from Mr. Jonna regarding President Trump's executive order "Defending Women From Gender Ideology Extremism And Restoring Biological Truth To The Federal Government;" Review various documents rescinded in same; E-mail correspondence to Mr. Jonna regarding same. | 0.60 |
| 2/26/25 | RO | Discussions with Mr. Jonna and Mr. LiMandri regarding publications stating that social transition is medical treatment; Internet research regarding * regarding same; Review * expert affidavit from * case; E-mail correspondence to Mr. Jonna and Mr. Trissell regarding same. | 0.40 |
| 2/26/25 | RO | Review and respond to e-mail correspondence from Mr. Trissell and Mr. Jonna regarding Child Poe's therapy records; Telephone calls to* and therapists * , and * ; Prepare medical records requests from and therapists * and ; E-mail correspondences with Jane Poe regarding* . | 1.60 |
| 2/27/25 | RO | Follow up e-mail correspondence and telephone calls to * and therapists * and * regarding Child Poe's therapy records. | 0.40 |
| 2/28/25 | RO | Review and respond to e-mail correspondences from Jane Poe regarding * and * ; Briefly review records from * . | 0.20 |
| 3/5/25 | RO | Review and respond to e-mail correspondence from Mr. Trissell regarding letter to therapists * and * ; Prepare and send letters; E-mail correspondence to Jane Poe regarding * . | 0.80 |
| 3/6/25 | RO | Review and forward Jane Poe's e-mail correspondence to Mr. Trissell regarding * . | 0.20 |
| 3/11/25 | RO | E-mail correspondences with Mr. Trissell regarding obtaining Child Poe's medical records from therapists * ; E-mail correspondence to * regarding medical records; Telephone calls and e-mail correspondences to * and * regarding same. | 0.40 |
| 5/1/25 | RO | Telephone call with Mr. Trissell regarding sending report via DocuSign to expert Dr. Anderson; Send report to Dr. Anderson via DocuSign; E-mail correspondences with Mr. Trissell regarding today's HHS publication. | 0.20 |
| 5/9/25 | RO | Discussion with Mr. Jonna and Mr. Trissell regarding WPATH hiding evidence, and attorney sanctions; Forward relevant e-mail correspondences to Mr. Jonna and Mr. Trissell. | 0.20 |
| 5/23/25 | RO | Discussions with Mr. Jonna regarding defense expert "gender case manager;" E-mail correspondences to Mr. Jonna and Mr. Trissell regarding same. | 0.20 |

| Date | Initials | Description | Hours |
|---|---|---|---|
| 7/16/25 | RO | Prepare table of authorities for motion to exclude defendants' experts Christine Brady and DarleneTando; Telephone calls with Mr. Trissell regarding same. | 1.20 |
| 7/16/25 | RO | Telephone calls with Ms. Denworth and Mr. Duke regarding filing Daubert motion to exclude testimony of defendants' experts Darlene Tando and Christine Brady; Review final versions of same; File and serve same. | 0.60 |
| 11/19/25 | RO | Discussion and e-mail correspondence with Mr. Jonna regarding review of PRISM training; Review same. | 1.80 |
| 11/20/25 | RO | Continue review of PRISM training and preparation of Mr. Jonna declaration; Discussions and e-mail correspondence with Mr. Jonna and Mr. Trissell regarding same. | 4.60 |
| 11/21/25 | RO | Continue review of PRISM training and preparation of Mr. Jonna declaration; E-mail correspondences with Mr. Jonna regarding same; Discussions with Ms. Denworth regarding same. | 6.80 |
| 11/24/25 | RO | Review further PRISM materials from Mr. Trissell; E-mail correspondence to Mr. Trissell regarding same. | 1.40 |
| 11/25/25 | RO | Review e-mail correspondences between Mr. Jonna and third-party * regarding Judge Benitez's motion for summary judgment decision; E-mail correspondence and telephone calls with * regarding PRISM documents she sent us; E-mail correspondence with Mr. Jonna regarding same. | 1.40 |
| 12/3/25 | RO | E-mail correspondences with Mr. Trissell regarding supplemental declaration of Paul Jonna regarding PRISM training in support of ex parte application for an order to show cause re: sanctions | 0.20 |
| 12/3/25 | RO | E-mail correspondences, text message, and telephone call to Mr. Trissell regarding supplemental Jonna declaration in support of ex parte application for an order to show cause re: sanctions; Review same. | 0.40 |
| 12/16/25 | RO | Review videos sent to us by third-party * . | 0.20 |
| 12/31/25 | RO | E-mail correspondences and text messages with Mr. Jonna, Mr. Trissell, and Mr. Duke regarding joint motion for extension of deadlines to file bill of costs and motion for attorneys' fees and proposed order; Finalize same, file and serve same; E-mail correspondence and telephone call to clerk regarding same. | 0.80 |
| 1/22/26 | RO | Continue review excel spreadsheet regarding attorney fees and mark potential redactions; E-mail correspondence to Mr. Trissell regarding same. | 1.20 |
| 1/28/26 | RO | Review and respond to e-mail correspondence from Mr. Trissell regarding attorneys' fee motion. | 0.20 |

| | RO Total | | 42.20 |
|---|---|---|---|
| 3/27/25 | TGA | Searched online databases of 19th, 18th, and 17th century printed books (mostly treatises) and newspapers for material on parental and children's rights, particularly pertaining to schooling and health care. Aslo searched my own collection of legal treatises. Reviewed the sources I found. | 2.00 |
| 3/28/25 | TGA | Searched online databases for published cases relating to parental rights and children's rights, as above, during the period before about 1830. Also searched books that transcribed early legal manuscripts (including case reports and treatises) for relevant material. Reviewed the sources I found. Started outlining my findings. | 2.00 |
| 3/31/25 | TGA | Searched for and reviewed secondary sources (some that I previously ordered from other libraries and others available in local libraries) relating to 18th-century parental and children's rights, as above. Continued outlining my findings. | 2.00 |
| 4/1/25 | TGA | Continued reviewing historical sources and outlining my findings. | 2.00 |
| 4/3/25 | TGA | Finished memorandum and outline of my findings. | 2.00 |
| | **TGA Total** | | 10.00 |
| | **Grand Total** | | **206.85** |

| Rate | Fees |
|---|---|
| $ 240.00 | $ 240.00 |
| $ 240.00 | $ 60.00 |
| $ 240.00 | $ 240.00 |
| $ 240.00 | $ 240.00 |
| $ 240.00 | $ 48.00 |
| | $ 828.00 |
| $ 610.00 | $ 732.00 |
| $ 610.00 | $ 2,806.00 |
| $ 610.00 | $ 2,318.00 |
| $ 610.00 | $ 1,098.00 |
| $ 610.00 | $ 2,318.00 |
| $ 610.00 | $ 244.00 |
| $ 610.00 | $ 2,928.00 |
| $ 610.00 | $ 3,294.00 |
| $ 610.00 | $ 732.00 |
| $ 610.00 | $ 366.00 |
| $ 610.00 | $ 488.00 |
| $ 610.00 | $ 122.00 |

| | |
|---|---|
| $ 610.00 | $ 854.00 |
| $ 610.00 | $ 732.00 |
| $ 610.00 | $ 1,098.00 |
| $ 610.00 | $ 1,098.00 |
| $ 610.00 | $ 3,660.00 |
| $ 610.00 | $ 244.00 |
| $ 610.00 | $ 244.00 |
| $ 610.00 | $ 122.00 |
| $ 610.00 | $ 244.00 |
| $ 610.00 | $ 122.00 |
| $ 610.00 | $ 244.00 |
| $ 610.00 | $ 122.00 |
| $ 610.00 | $ 122.00 |
| $ 610.00 | $ 1,098.00 |
| | $ 27,450.00 |
| $ 840.00 | $ 840.00 |
| $ 840.00 | $ 3,360.00 |
| $ 840.00 | $ 840.00 |
| $ 840.00 | $ 840.00 |
| $ 840.00 | $ 1,344.00 |
| | $ 7,224.00 |
| $ 840.00 | $ 504.00 |
| $ 840.00 | $ 2,016.00 |

| | |
|---|---|
| $ 840.00 | $ 504.00 |
| $ 840.00 | $ 672.00 |
| $ 840.00 | $ 1,008.00 |
| $ 840.00 | $ 1,008.00 |
| $ 840.00 | $ 1,344.00 |
| $ 840.00 | $ 1,848.00 |
| $ 840.00 | $ 672.00 |
| $ 840.00 | $ 672.00 |
| $ 840.00 | $ 1,008.00 |
| $ 840.00 | $ 840.00 |
| $ 840.00 | $ 1,512.00 |
| | $ 13,608.00 |
| $ 1,368.00 | $ 2,736.00 |
| $ 1,368.00 | $ 2,736.00 |

| | |
|---|---|
| $ 1,368.00 | $ 273.60 |
| $ 1,368.00 | $ 273.60 |
| $ 1,368.00 | $ 1,641.60 |
| $ 1,368.00 | $ 2,736.00 |
| $ 1,368.00 | $ 6,019.20 |
| $ 1,368.00 | $ 6,566.40 |
| $ 1,368.00 | $ 10,123.00 |
| $ 1,368.00 | $ 10,397.00 |
| $ 1,368.00 | $ 547.20 |
| | $ 44,049.60 |
| $ 240.00 | $ 48.00 |
| | $ 48.00 |
| $ 1,278.00 | $ 255.60 |
| $ 1,278.00 | $ 4,600.80 |
| | $ 4,856.40 |
| $ 1,278.00 | $ - |
| $ 1,278.00 | $ - |
| $ 1,278.00 | $ 3,450.60 |
| $ 1,278.00 | $ - |
| $ 1,278.00 | $ 6,773.40 |
| $ 1,278.00 | $ - |
| | $ 10,224.00 |
| $ 1,050.00 | $ 210.00 |
| $ 1,050.00 | $ 1,260.00 |
| $ 1,050.00 | $ 1,050.00 |
| $ 1,050.00 | $ 210.00 |
| $ 1,050.00 | $ 1,680.00 |
| | $ 4,410.00 |
| $ 1,368.00 | $ 273.60 |

| $ 1,368.00 | $ 273.60 |
|---|---|
| $ 1,368.00 | $ 1,641.60 |
| $ 1,368.00 | $ 547.20 |
| $ 1,368.00 | $ 273.60 |
| $ 1,368.00 | $ 547.20 |
| $ 1,368.00 | $ 547.20 |
| $ 1,368.00 | $ 273.60 |
| $ 1,368.00 | $ 273.60 |
| $ 1,368.00 | $ 273.60 |
| $ 1,368.00 | $ 547.20 |
| $ 1,368.00 | $ 547.20 |
| $ 1,368.00 | $ 273.60 |
| $ 1,368.00 | $ 273.60 |
| $ 1,368.00 | $ 547.20 |
| $ 1,368.00 | $ 273.60 |
| $ 1,368.00 | $ 273.60 |
| $ 1,368.00 | $ 273.60 |
| $ 1,368.00 | $ 273.60 |
| $ 1,368.00 | $ 273.60 |
| $ 1,368.00 | $ 820.80 |
| $ 1,368.00 | $ 547.20 |
| $ 1,368.00 | $ 820.80 |
| $ 1,368.00 | $ 273.60 |
| $ 1,368.00 | $ 820.80 |

| | |
|---|---|
| $ 1,368.00 | $ 273.60 |
| $ 1,368.00 | $ 820.80 |
| $ 1,368.00 | $ 547.20 |
| $ 1,368.00 | $ 273.60 |
| $ 1,368.00 | $ 2,188.80 |
| | $ 15,868.80 |
| $ 1,050.00 | $ 420.00 |
| $ 1,050.00 | $ 210.00 |
| $ 1,050.00 | $ 630.00 |
| $ 1,050.00 | $ 420.00 |
| $ 1,050.00 | $ 420.00 |
| $ 1,050.00 | $ 210.00 |
| $ 1,050.00 | $ 420.00 |
| $ 1,050.00 | $ 210.00 |
| $ 1,050.00 | $ 2,520.00 |
| $ 1,050.00 | $ 420.00 |
| $ 1,050.00 | $ 210.00 |
| $ 1,050.00 | $ 630.00 |
| $ 1,050.00 | $ 420.00 |
| $ 1,050.00 | $ 210.00 |
| $ 1,050.00 | $ 420.00 |
| $ 1,050.00 | $ 420.00 |
| $ 1,050.00 | $ 210.00 |
| $ 1,050.00 | $ 210.00 |

| | |
|---|---|
| $ 1,050.00 | $ 210.00 |
| $ 1,050.00 | $ 1,050.00 |
| | $ 9,870.00 |
| $ 240.00 | $ 48.00 |
| $ 240.00 | $ 96.00 |
| $ 240.00 | $ 96.00 |
| $ 240.00 | $ 96.00 |
| $ 240.00 | $ 48.00 |
| $ 240.00 | $ 240.00 |
| $ 240.00 | $ 384.00 |
| $ 240.00 | $ 912.00 |
| $ 240.00 | $ 48.00 |
| $ 240.00 | $ 96.00 |
| $ 240.00 | $ 288.00 |

| | |
|---|---|
| $  240.00 | $      48.00 |
| $  240.00 | $    144.00 |
| $  240.00 | $      48.00 |
| $  240.00 | $      96.00 |
| $  240.00 | $      48.00 |
| $  240.00 | $    480.00 |
| $  240.00 | $    144.00 |
| $  240.00 | $      96.00 |
| $  240.00 | $    192.00 |
| $  240.00 | $      96.00 |
| $  240.00 | $      96.00 |
| $  240.00 | $      48.00 |

| | |
|---|---|
| $ 240.00 | $ 144.00 |
| $ 240.00 | $ 96.00 |
| $ 240.00 | $ 384.00 |
| $ 240.00 | $ 96.00 |
| $ 240.00 | $ 48.00 |
| $ 240.00 | $ 192.00 |
| $ 240.00 | $ 48.00 |
| $ 240.00 | $ 96.00 |
| $ 240.00 | $ 48.00 |
| $ 240.00 | $ 48.00 |
| $ 240.00 | $ 48.00 |

| | |
|---|---|
| $ 240.00 | $ 288.00 |
| $ 240.00 | $ 144.00 |
| $ 240.00 | $ 432.00 |
| $ 240.00 | $ 1,104.00 |
| $ 240.00 | $ 1,632.00 |
| $ 240.00 | $ 336.00 |
| $ 240.00 | $ 336.00 |
| $ 240.00 | $ 48.00 |
| $ 240.00 | $ 96.00 |
| $ 240.00 | $ 48.00 |
| $ 240.00 | $ 192.00 |
| $ 240.00 | $ 288.00 |
| $ 240.00 | $ 48.00 |

|              | $ 10,128.00  |
|--------------|--------------|
| $ 1,368.00   | $  2,736.00  |
| $ 1,368.00   | $  2,736.00  |
| $ 1,368.00   | $  2,736.00  |
| $ 1,368.00   | $  2,736.00  |
| $ 1,368.00   | $  2,736.00  |
|              | $ 13,680.00  |
|              | **$162,244.80** |