Rob Bonta
Attorney General of California
Darrell W. Spence
Supervising Deputy Attorney General
State Bar No. 248011
  1300 I Street, Suite 125
  Sacramento, CA 95814
  Telephone: (916) 210-6089
  Fax: (916) 324-5567
  E-mail: Darrell.Spence@doj.ca.gov
*Attorneys for State Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ELIZABETH MIRABELLI, an individual, and LORI ANN WEST, an individual,**<br><br>Plaintiffs,<br><br>v.<br><br>**MARK OLSON, in his official capacity as President of the EUSD Board of Education, et al.,**<br><br>Defendants. | 3:23-cv-00768-BEN-VET<br><br>**STATE DEFENDANTS' RESPONSE TO THE COURT'S QUESTIONS DURING THE 3/2/2026 HEARING**<br><br>Courtroom: 5A<br>Judge: The Honorable Roger T. Benitez<br><br>Action Filed: 4/27/2023 |

During the March 2, 2026, hearing in this case, the Court asked State Defendants (Defendants Attorney General Rob Bonta, State Superintendent Tony Thurmond and the members of the State Board of Education) to answer two questions.

First, the Court asked whether any of the State Defendants have "put up" anything "that addresses the issue before this court, i.e., whether or not parents should be allowed to have information about their child who has expressed a gender incongruity." (Tr. of Proceedings at 6, *Mirabelli v. Olsen*, No. 23-cv-00768-BEN

1

1 (S.D. Cal. Mar. 2, 2026).  It appears that this question was asked in relation to State
2 Defendants' argument in opposition to Plaintiffs' motion for attorney's fees (*see*
3 Dkt No. 333) that Plaintiffs were not a prevailing party under 42 U.S.C. section
4 1988.  Tr. at 5.

   The California Department of Education (CDE) has taken several actions
during the pendency of this case that touch on the issues before this Court.  For
example, CDE issued guidance on AB 1955 in January of 2025.[1]  CDE also made
changes to its PRISM training that were posted on November 19, 2025.  *See* Dkt
No. 306.  CDE made supplemental changes and posted them on December 19,
2025.  *See id*. at ¶ 8.  CDE also made changes to the PRISM Facilitation Guide, and
the Facilitation Guide was re-posted on January 29, 2026.  *See id*. at ¶ 7.  These
changes to the PRISM training were made to be consistent with the Superintendent
and the State Board of Education's withdrawal of their argument in opposition to
Plaintiffs' then-pending summary judgment motion that claims against the State
Education Defendants were moot following the CDE's rescission of Frequently
Asked Questions (FAQ) guidance pertaining to disclosure of students' private
information pertain to gender identity.  *See* Dkt No. 298.

   In any event, on March 2, 2026, shortly after the hearing before this Court
concluded, State Defendants withdrew the argument that Plaintiffs are not the
prevailing party made in opposition to Plaintiffs' Motion for Attorneys' Fees (*see*
Dkt No. 333) in light of the Supreme Court's order issued that same day in
*Mirabelli v. Bonta*, No. 25A810, 607 U.S. ___ (2026), which vacated the Ninth
Circuit's stay of the permanent injunction with respect to the parent plaintiffs.  *See*
Dkt No. 337.

   The second question the Court asked is where certain quoted language used by
the Ninth Circuit in its order staying the Court's permanent injunction came from.
Tr. at 7-8.  The Court stated:

---

[1] *See* https://www.cde.ca.gov/ci/pl/ab-1955-sum-of-prov.asp

> Specifically, I'm going to refer you to page 8. Page 8 right under paragraph B there the following – there's a following quotation. It says – in essence it's talking about the fact that the State's policies are not categorical. It says, "For example, guidance from the California Attorney General expressly states that schools can," quote, "allow disclosure where there is a compelling need to do so to protect the student's well-being." But there's something missing. That's – that's an incomplete sentence. [] That tells me that there is something that came before "allow disclosure."
>
> Frankly, since there's no citation to it, it doesn't tell me where that comes from. I'm interested in knowing what is that? What is it that – what is the language that is missing, and where is that coming from?

Tr. at 7-8.

The quoted language the Court is referring to appears to have come from the Attorney General's January 11, 2024, Legal Alert concerning Forced Disclosure Policies re: Transgender and Gender Nonconforming Students, in the last paragraph of page 2. A copy of the Legal Alert is attached hereto.

Dated: March 3, 2026                    Respectfully submitted,

                                                                     ROB BONTA
                                                                     Attorney General of California

                                                                     *S/ Darrell W. Spence*

                                                                   DARRELL W. SPENCE
                                                                   Supervising Deputy Attorney General
                                                                   *Attorneys for State Defendants*

SA2024300204
Response to Court's Questions_.docx

| California Department of Justice Office of the Attorney General | | *Legal Alert* |
|---|---|---|
| Subject:<br><br>**Forced Disclosure Policies re:<br>Transgender and Gender Nonconforming Students** | No.<br><br>OAG-2024-02<br><br>Date:<br><br>01/11/2024 | Contact for information:<br><br>LegalAlerts@doj.ca.gov |

**TO: All County and District Superintendents, Charter School Administrators, County Office, School Board, and Charter School Boards, and other interested parties**

**The Office of the California Attorney General issues this legal alert to remind all school boards that forced gender identity disclosure policies—which target transgender and gender nonconforming students by mandating that school personnel disclose a student's gender identity or gender nonconformity to a parent or guardian without the student's express consent—violate state law.1**

For purposes of this alert, "forced disclosure policies" refers to policies that require schools to inform parents and guardians, with minimal exceptions, whenever a student requests to use a name or pronoun different from that on their birth certificate or official records, even when the student does not consent. Such policies also require notification if a student requests to use facilities or participate in school programs that do not align with their sex or gender on official records, and tracking and recording of requests made by transgender and gender nonconforming youth. Some districts' policies require such disclosures even when revealing the student's gender identity or gender nonconformity to their parents could put them at risk of physical, emotional, or psychological harm. In this alert, the term "transgender and gender nonconforming" includes gender diverse, gender non-binary, and gender nonconforming students.

**1) Forced disclosure policies violate California's Equal Protection Clause by expressly discriminating based on gender identity.** Education is a fundamental right under California's equal protection clause. (*Serrano v. Priest* (1971) 5 Cal.3d 584, 608–09, 616–17; Cal. Const. Art. 1, § 7.) The invidious and prejudicial treatment to which transgender people have historically been subject is beyond dispute. (*Whitaker By Whitaker* (7th Cir. 2017) 858 F.3d 1034, 1051 ["There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity"]; *Grimm v. Gloucester Cty. Sch. Bd.* (4th Cir. 2020) 972 F.3d 586, 611 [same].) Such discrimination in the school context denies or limits these students equal access to education and causes psychological, emotional, and other harm.

Because gender identity is an aspect of gender, transgender or gender nonconforming individuals constitute a protected class under California's equal protection clause. As a result, any policy that singles out transgender and gender nonconforming students for disfavorable treatment vis-à-vis cisgender students is invalid unless it survives strict scrutiny. (See *Catholic Charities of Sacramento, Inc. v. Super. Ct.* (2004) 32 Cal.4th 527, 564; *Taking Offense v. State* (2021) 66 Cal.App.5th 696, 722-723, review on other grounds granted Nov. 10, 2021, S270535; see also *O'Connell v. Super. Ct.* (2006) 141 Cal.App.4th 1452, 1465 [fundamental right of equal

---

1 Please refer to the attached legal memoranda and reply brief for the Attorney General's full legal analysis. On October 19, 2023, the San Bernardino Superior Court granted a preliminary injunction against the Chino Valley Unified School District Board of Education's ("Board") mandatory gender identity disclosure policy, finding that the State is likely to prevail on the merits because the provisions violate California's Equal Protection Clause and discriminate against transgender and gender nonconforming students on the basis of sex. Because the Court found the Board's policy provisions violate equal protection, the Court did not reach the State's privacy and statutory arguments, which are also addressed below.

1

access to public education, warranting strict scrutiny of legislative and executive action that is alleged to infringe on that right]; Civ. Code, § 51, subd. (e)(5); Gov. Code, § 12926, subd. (r)(2); Ed. Code, § 210.7 [all defining "[s]ex" to include a person's "gender identity and gender expression"].) In addition, policies which by their operative language specifically target transgender and gender nonconforming students, on their face, discriminate on the basis of sex. (See *Sail'er Inn, Inc. v. Kirby* (1971) 5 Cal.3d 1, 17; *Woods v. Horton* (2008) 167 Cal.App.4th 658, 674.)

To survive strict scrutiny, a school district must establish that a forced disclosure policy (1) serves a *compelling* governmental interest, and that the distinctions drawn by the policy are (2) *necessary* to further its purpose and (3) *narrowly tailored* to do so. (*In re Marriage Cases* (2008) 43 Cal.4th 757, 832; *Connerly v. State Pers. Bd.* (2001) 92 Cal.App.4th 16, 33, 43.) Forced disclosure policies fail all three prongs of the strict scrutiny test.

As to the first prong, districts advancing such policies have pointed to "outdated social stereotypes" that being transgender or gender nonconforming is a "mental illness," "perversion," or "mental health" issue that requires parental intervention as the governmental interest justifying such a policy. (*Sail'er Inn, Inc.*, supra, 5 Cal.3d at p. 18.)  An intent to classify all individuals who are transgender or gender nonconforming as mentally ill or otherwise "disordered" for purposes of forced disclosure cannot be a compelling government interest. (See *id*. at p. 22.)

To the contrary, local school districts (which are agents of the State for purposes of operation of our public school system) have a duty of care to protect, and a compelling interest in protecting, all students, including transgender and gender nonconforming students, from emotional, psychological, and physical harm, including from a parent. (See, e.g., *Cleveland v. Taft Union High School Dist.* (2022) 76 Cal.App.5th 776, 799; see also *In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [the "welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect"]; *In re Roger S.* (1977) 19 Cal.3d 921, 928 [parental right can be limited "'if it appears that parental decisions will jeopardize the health or safety of the child'"] [citations omitted]; *Brennon B. v. Super. Ct.* (2022) 13 Cal.5th 662, 681 ["[T]he management and controls of the public schools [is] a matter of state care and supervision, and local districts are the State's agents for local operation of the common school system"] [citations omitted].) Districts adopting forced disclosure policies ignore this countervailing compelling interest and risk breaching the duty of care they owe their students. Such an unlawful breach cannot form the basis for a compelling government interest.

Forced disclosure policies also fail the second and third prongs of strict scrutiny because they are not narrowly tailored or necessary to any non-discriminatory interest the policy might purport to advance. Generally, a policy is narrowly tailored if there is no alternative means of adequately serving the compelling interest that would impose a lesser burden on the constitutional interest. (*People v. Son* (2020) 49 Cal.App.5th 565, 590.) Only the "most exact connection between justification and classification" will suffice. (*Woods*, supra, 167 Cal.App.4th at p. 675.) And the classification must be "necessary rather than convenient." (*Ibid.*) The availability of gender-neutral alternatives—"or the failure of the legislative body to consider such alternatives"—will be "fatal to the classification." (*Ibid.*)

To the extent forced disclosure policies are intended to promote parental involvement by informing parents of concerns about a student's well-being, there are other gender-neutral options, such as a policy informing parents when any student—cisgender or transgender—is exhibiting symptoms of depression or other significant mental health issues. And numerous feasible and effective alternatives to forced disclosure policies exist. For example, schools can adopt policies to allow disclosure with a student's consent; allow disclosure where a student does not consent where there is a compelling need to do so to protect the student's wellbeing; allow staff to encourage students to inform their parents; and provide counseling and other support tools to help students initiate these conversations in the time and manner of the family's choosing. All such policies better protect families, parents, and students without placing students at risk: "It is the interest of youth itself, and of the whole community, that children be both safeguarded from abuses and given opportunities for growth into free and independent well-developed . . . citizens." (*Prince v. Massachusetts* (1944) 321 U.S. 158, 165.) These alternatives are fatal to the policies.

Second, policies that do not create any exception for children who may face emotional, physical, or psychological abuse at home as a result of the school's disclosure to parents or family cannot satisfy the narrow tailoring prong. (See James et al., The Report of the 2015 U.S. Transgender Survey, Nat. Center For Transgender Equality (Dec. 2016) p. 65; Austin et al., *Suicidality Among Transgender Youth: Elucidating the Role of Interpersonal Risk Factors* (Mar. 2022) 37 J. of Interpersonal Violence 2696, 2698-2699.) Policies without such exceptions have already inflicted and continue to inflict irreparable physical, mental, and emotional harm upon transgender and gender nonconforming students, as demonstrated by research findings. For example, one in ten transgender individuals have experienced violence at the hands of an immediate family member (James et al., *supra*, The Report of the 2015 U.S. Transgender Survey at p. 65); 15 percent ran away or were kicked out of their home because they were transgender (*ibid.*); fewer than 40 percent of LGBTQ+ youth identified their home as supportive of their identity (The Trevor Project, *2022 National Survey of LGBTQ on Youth Mental Health* (2022) p. 20); and coming out to adverse parents has been shown to increase the risks of major depressive symptoms, suicide, homelessness, and drug use (see Ryan et al., *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults* (Jan. 2009) 123 Pediatrics 346; Choi, et al., *Serving Out Youth 2015: The Needs and Experiences of Lesbian, Gay, Bisexual, Transgender, and Questioning Youth Experiencing Homelessness, Williams Institute* (June 2015) p. 5).

In addition, such policies harm transgender and gender nonconforming students by forcing them to choose between hiding their identity in school or being compelled to share it with a parent or guardian whom they believe may emotionally, psychologically, or physically harm them. When forced with this decision, many students feel compelled to stay in the closet. (James et al., *supra,* The Report of the 2015 U.S. Transgender Survey at p. 51.) When young people are forced to hide their identity from peers or others, the psychological health effects can be serious. (Pachankis et al., *Sexual Orientation Concealment and Mental Health: A Conceptual and Meta-Analytic Review* (Oct. 2020) 146 Psychological Bulletin 831.) Rather than facilitating conversations between students and parents, these policies instead cause students to further hide who they are, denying students the care and support they need, including the support that would give students the tools they need to have these conversations with family. Such policies thus lack the exact connection required under strict scrutiny to prove that forced outing policies are necessary to promote parental involvement.

**2) Forced disclosure policies violate California statutory prohibitions on discrimination based on gender, gender expression, and gender identity.** Forced disclosure policies also run afoul of Education Code section 220's and Government Code section 11135, subdivisions (a)'s and (c)'s express commands not to discriminate on the basis of gender identity and gender expression. A law that categorically "presum[es]" the need for forced disclosures for one group but not another "reflect[s] . . . unexamined role stereotypes," plainly betraying a "statute . . . discriminatory on its face." (*Arp v. Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 395, 406–407.) Forced outing policies target one group, and "that group alone" for discriminatory treatment, which violates state antidiscrimination law. (*Isbister v. Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72, 89 [Unruh Act]; see also *Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 35 [Unruh Act violation because "[sex]-based . . . differential treatment is precisely the type of practice prohibited"]; *Bangerter v. Orem City Corp.* (10th Cir. 1995) 46 F.3d 1491, 1500 [where policy "facially single[s] out" group and "appl[ies] different rules to them," it directly reveals "discriminatory intent and purpose"].) Specifically singling out transgender and gender nonconforming students shows that "the decisionmaker . . . selected . . . a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." (*Personnel Adm'r of Mass. v. Feeney* (1979) 442 U.S. 256, 279 [cleaned up].)

**3) Forced disclosure policies violate students' California constitutional right to privacy with respect to how and when to disclose their gender identity.** "[M]inors, as well as adults, possess a constitutional right of privacy under the California Constitution." (*Poway Unified Sch. Dist. v. Super. Ct. (Copley Press)* (1998) 62 Cal.App.4th 1496, 1505; Cal. Const. Art. 1, § 1.) Courts have repeatedly affirmed that an individual has a constitutionally protected privacy interest in their sexual orientation or gender identity. (See, e.g., *Pettus v. Cole* (1996) 49 Cal.App.4th 402, 444–445 [describing "sexual orientation and conduct" as legally protected privacy interest]; *Powell v. Schriver* (2d Cir. 1999) 175 F.3d 107, 111–112 [transgender identity is an excruciatingly "private and intimate" detail about oneself protected by the right to privacy].) Moreover, forced disclosure

provisions intrude upon a core aspect of a student's privacy and autonomy—their ability to express their core values and identity. (*Am. Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 335-339 [policy requiring parental consent before minor could obtain an abortion violated minor's constitutional right to privacy because it burdened a "decision . . . so central to the preservation of her ability to define and adhere to her ultimate values regarding the meaning of human existence and life"]; see also *Hill v. Nat. Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 25 ["Privacy rights also have psychological foundations emanating from personal needs to establish and maintain identity and self-esteem by controlling self-disclosure"].) Where, as here, there is "an obvious invasion of an interest fundamental to personal autonomy"—such as the most basic expression of gender identity—there must be a compelling government interest "to overcome the vital privacy interest," and there must not be less restrictive alternatives. (*Hill, supra*, 7 Cal.4th at pp. 34, 40.) As discussed *supra* in subsection 1), there is no compelling government interest that overrides the privacy invasion, and there are a number of less restrictive alternatives to address any parental interest.

Additionally, a student's disclosure of their gender identity to persons of their choosing at school does not negate their reasonable expectation of privacy in their gender identity generally. (See *Mathews v. Becerra* (2019) 8 Cal.5th 756, 769 [requiring reasonable expectation of privacy "in the circumstances"].) As the California Supreme Court explained, individuals in our society play "multiple, often conflicting" social roles, and people may still "fear exposure . . . to those closest to them . . . . The claim is not so much one of total secrecy as it is of the right to *define* one's circle of intimacy." (*Hill, supra*, 7 Cal.4th at p. 25.) "It does not follow that disclosure in one context necessarily relinquishes the privacy right in all contexts"; rather, the privacy analysis requires a "reasonable expectation of privacy in *the circumstances*," and the specific context matters—disclosure of a student's transgender identity at school is different than the disclosures to parents required by forced disclosure policies. (*Nguon v. Wolf* (C.D. Cal. 2007) 517 F.Supp.2d 1177, 1191, 1195-1196 [student had reasonable expectation of privacy in sexual orientation with respect to parents, even if she was publicly homosexual at school]; see *Hill, supra*, 7 Cal.4th at p. 25.)

Indeed, districts' insistence on forced disclosure policies inherently acknowledges that students may not share at home what that they otherwise share at school. And unfortunately, research supports their reasons to do so. (See The World Prof. Assn. for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (Version 8, 2022) p. S62 ["Evidence indicates [transgender] adolescents are at increased risk of mental health challenges, often related to family/caregiver rejection"]; Ryan et al., *supra*, *Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults*, 123 Pediatrics at p. 346 [study showing, e.g., lesbian, gay, and bisexual youth who experience parental rejection are eight times more likely to attempt suicide and six times more likely to report major depressive symptoms]; James et al., *supra*, The Report of the 2015 U.S. Transgender Survey at p. 65 [one in ten transgender youth have experienced violence at the hands of an immediate family member because they are transgender].) Due to those risks and others cited above, many transgender and gender nonconforming students are not "out" to their immediate families. (See The Trevor Project, *supra*, at p. 20.) Forced disclosure provisions unlawfully intrude upon transgender and gender nonconforming students' ability to express their core values and identities. These privacy and autonomy interests are protected by the California constitution, and the State and local school districts have a compelling interest in not only protecting student privacy under the circumstances here but also ensuring that transgender and gender nonconforming students are protected from the reasonable risk of physical, emotional, and psychological harm that forced disclosure causes.

In sum, by singling out transgender and gender nonconforming students for different, adverse treatment that puts them at risk of harm, forced disclosure policies violate their constitutional right to equal protection and privacy, as well as their statutory protection from discrimination under California law.

###

# CERTIFICATE OF SERVICE

Case Name:   <u>**Mirabelli et al. v. Olson, et al.**</u>     No.   <u>**3:23-cv-00768-BEN-VET**</u>

I hereby certify that on <u>March 3, 2026</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**STATE DEFENDANTS' RESPONSE TO THE COURT'S QUESTIONS DURING THE 3/2/2026 HEARING**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>March 3, 2026</u>, at Sacramento, California.

| Christopher R. Irby | *S/ Christopher R. Irby* |
|---|---|
| Declarant | Signature |

SA2024300204
39682804.docx