Charles S. LiMandri, SBN 110841
  cslimandri@limandri.com
Paul M. Jonna, SBN 265389
  pjonna@limandri.com
Jeffrey M. Trissell, SBN 292480
  jtrissell@limandri.com
William T. Duke, SBN 361823
  wduke@limandri.com
LiMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Telephone: (858) 759-9930
Facsimile: (858) 759-9938

Peter Breen, *pro hac vice*
  pbreen@thomasmorsociety.org
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

ELIZABETH MIRABELLI, an individual, on behalf of herself and all others similarly situated; LORI ANN WEST, an individual, on behalf of herself and all others similarly situated; et al.,

Plaintiffs,

v.

MARK OLSON, in his official capacity as President of the EUSD Board of Education, et al.,

Defendants.

Case No.: 3:23-cv-0768-BEN-VET

**DECLARATION OF PAUL M. JONNA, ESQ IN SUPPORT OF PLAINTIFF'S OPPOSITION TO STATE DEFENDANTS' EX PARTE APPLICATION TO MODIFY THE PERMANENT INJUNCTION**

Judge:          Hon. Roger T. Benitez
Courtroom:    5A

Declaration of Paul M. Jonna, Esq. ISO Plaintiffs' Opposition to Defendants' Ex Parte Application to Modify the Permanent Injunction

I, Paul M. Jonna, Esq., declare and state as follows:

1.      I am an attorney at law duly licensed to practice in the State of California and in the Southern District of California. I am a Partner with LiMandri & Jonna LLP, and am counsel of record for Plaintiffs in this action. The matters discussed below are based on my own personal knowledge. I could and would testify to them if called upon to do so in court.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of the California Attorney General's "State of Pride Report 2025," showing a page inserted as of March 5, 2026, with the notice required by the Court's permanent injunction along with a prefatory statement. The report is available online here: https://oag.ca.gov/system/files/attachments/press-docs/Pride%20Report%202025_0.pdf.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of the California Attorney General's "Know Your Rights" webpage, showing the same notice required by the Court's permanent injunction along with the Attorney General's prefatory statement. The webpage is available here: https://oag.ca.gov/lgbtq/rights.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of the ACLU of Southern California's "Know Your Rights – Mirabelli v. Bonta FAQ" webpage, published on March 19, 2026, which provides guidance regarding how to interpret this Court's permanent injunction and the Supreme Court ruling. The webpage is available here: https://www.aclusocal.org/know-your-rights/know-your-rights-mirabelli-v-bonta-faq/.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of the Brief of Child & Parental Rights Campaign, Inc. and Our Duty USA as *Amici Curiae* in Support of Applicants filed in *Mirabelli v. Bonta*, No. 25A810 (U.S. Jan. 20, 2026).

6.      Attached hereto as **Exhibit 5** is a true and correct copy of the Supplemental Brief of the California Attorney General filed in *City of Huntington Beach v. Newsom*, No. 25-3826 (9th Cir. Mar. 13, 2026).

///

DECLARATION OF PAUL M. JONNA, ESQ. ISO PLAINTIFFS' OPPOSITION TO DEFENDANTS' EX PARTE APPLICATION TO MODIFY THE PERMANENT INJUNCTION

7. Attached hereto as **Exhibit 6** is a true and correct copy of the California School Boards Association's article titled, "Supreme Court Strengthens parental notification rights for gender transitions," published on March 6, 2026. That article is available online here: https://blog.csba.org/mirabelli-march26/.

8. Attached hereto as **Exhibit 7** is a true and correct copy of Plaintiffs' Supplemental Brief filed in *Mirabelli v. Bonta*, No. 25-8056 (9th Cir. Mar. 16, 2026).

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed on March 23, 2026, in Rancho Santa Fe, California.

_____
Paul M. Jonna, Esq.

DECLARATION OF PAUL M. JONNA, ESQ. ISO PLAINTIFFS' OPPOSITION TO DEFENDANTS' EX PARTE APPLICATION TO MODIFY THE PERMANENT INJUNCTION

**EXHIBIT 1**



**Statement of the Attorney General:**

In Mirabelli v. Olson, No. 3:23-cv-00768, a lawsuit brought by parents and teachers in the California public school system, the U.S. District Court for the Southern District of California issued an Order Granting Plaintiffs' Motion for Class-Wide Permanent Injunction. Among other things, the Order requires the Attorney General to include a statement drafted by the district court in any "state-created or approved instruction on the gender-related rights of student[s] and faculty." D.Ct. Dkt. 308 at 2. The Attorney General appealed the district court's decision, and the U.S. Court of Appeals for the Ninth Circuit stayed the Order pending appeal. On March 2, 2026, however, the U.S. Supreme Court vacated the stay entered by the Ninth Circuit with respect to the parent plaintiffs. See Mirabelli v. Bonta, 2026 WL 575049 (U.S. Mar. 2, 2026). As a result, the district court's Order is in effect with respect to the parent plaintiffs' claims and stayed with respect to the teacher plaintiffs' claims. In the Attorney General's view, the statement required by the district court in its Order does not fully reflect the reasoning of the Supreme Court's opinion. For example, the statement required by the district court does not mention the ability of public-school employees to "preclud[e] disclosure to parents who would engage in abuse." Id. at *3. The statement could also be interpreted to suggest that public-school employees have an affirmative duty to disclose information when the Supreme Court's order is limited to "parents who object to the challenged [disclosure] policies or seek religious exemptions." Id. Nonetheless, until the Attorney General is able to obtain further clarification or modification of the district court's Order, the Attorney General is adding the required statement to this publication as of March 5, 2026.

**Required Statement of the District Court:**

**"Parents and guardians have a federal constitutional right to be informed if their public school student child expresses gender incongruence. Teachers and school staff have a federal constitutional right to accurately inform the parent or guardian of their student when the student expresses gender incongruence. These federal constitutional rights are superior to any state or local laws, state or local regulations, or state or local policies to the contrary."**



STATE OF
# PRIDE
REPORT
## 2025

# Table of Contents

**A Message from Attorney General Rob Bonta** ............................................. 3

**State of Pride** .................................................................................. 4

    **A Timeline of Progress and Resistance: LGBTQ+ Rights in California** ..................... 5

**Challenges in California and Across the Nation** ........................................... 6

**DOJ's Work to Protect the LGBTQ+ Community** ...........................................7

    **Combating Hate and Violence** .......................................................... 7

    **Defending Access to Critical, Lifesaving Care** ......................................... 7

    **Ending Discriminatory and Dangerous 'Forced Outing' Policies** ........................ 8

    **Pushing Back Against Discrimination and Exclusion** .................................... 9

    **Championing Diversity and Inclusivity in Schools** ...................................... 9

**Know Your Rights** ............................................................................ 10

    **LGBTQ+ Discrimination Rights** ........................................................ 10

**Information about Hate Crimes** .......................................................... 13

    **What is the difference between a hate crime and a hate incident?** ..................... 13

    **How can I spot a hate crime?** ........................................................ 13

    **What should I do if I am the victim of a hate crime?** ................................. 14

    **I am the victim of a hate crime, and I am struggling to identify all of the services available to me. Who at the California DOJ should I talk to for help?** ................... 14

    **Members of my community have been targets of a major hate crime event. Does the California DOJ have resources to help my community?** .................................. 14

    **Where can I find the most up-to-date data on hate crimes in California?** ............ 14

**Hate Crimes: Know Your Rights** .......................................................... 15

# A Message from Attorney General Rob Bonta

Happy Pride Month, California!

From Crescent City to Blythe, Californians are coming together this month in celebration and in solidarity with our beautifully diverse LGBTQ+ community. Pride is more than a celebration; it's a reminder of the resistance that sparked this movement and the resilience that sustains it. The first Pride was a protest, and that spirit of joyful resistance remains crucial today, as LGBTQ+ individuals across the country face a troubling rise in discrimination, disinformation, and hate.

Here in the Golden State, we take pride in being a beacon of inclusivity, diversity, and belonging. But our work is far from over. Be it slurs, threats, harmful legislation, or violence — attacks on our LGBTQ+ are entirely unacceptable, and we will not stand for them. In the past year alone, hate crimes targeting LGBTQ+ Californians have risen across the board.

That's why in California we are actively fighting back by:

- Protecting LGBTQ+ students from forced outing policies in schools;

- Ensuring our classrooms and libraries provide inclusive and diverse books and curricula;

- Defending the right of transgender students to use bathrooms that align with their gender identity;

- Standing up for our transgender servicemembers against biased and discriminatory policies;

- Defending access to gender affirming care and anti-discrimination protections in healthcare settings; and

- Responding to hate crimes, ensuring that all Californians can live safely, authentically, and without fear.

As a proud ally, advocate, and the Attorney General, I'm committed to using every tool at my disposal to ensure LGBTQ+ individuals have access to all the rights and resources they deserve. But our fight for equality doesn't stop at California's border. We know that the struggle for LGBTQ+ rights is a national one, and we are committed to pushing back against discriminatory laws, wherever they arise. No matter who's in the White House or who controls Congress, we'll keep showing up with a message of unity, acceptance, and inclusion, ready to fight for the LGBTQ+ community. We will show anyone who attacks our rights, freedoms, and people that we are not backing down. Because no matter who you love, or how you identify, you deserve to be safe, protected, and respected.

This Pride Month let's celebrate how far we have come and recommit ourselves to the fight ahead. Because love wins. Unity wins. And together, we will keep showing up — for our neighbors, for our children, and for future generations.



## State of Pride

As we celebrate Pride Month, we honor the resilience, diversity, and strength of California's LGBTQ+ community. Our state leads the nation with over 2.8 million LGBTQ+ adults, representing 9.5% of our adult population, higher than the national average of 7.9%[1].

Throughout history, California has continued to pave the way empowering and advancing the rights of the LGBTQ+ community.



1    *California's LGBTQ+ Population*, Public Policy Institute of California. (June 2024), https://www.ppic.org/blog/californias-lgbt-population/.

# A Timeline of Progress and Resistance: LGBTQ+ Rights in California

**2014** — **Ban on "Gay Panic" Defense (AB 2501):** California became the first state in the U.S. to officially ban the use of "gay panic" and "transgender panic" defenses in murder trials, thereby preventing defendants from claiming they were provoked to violence due to a victim's sexual orientation or gender identity.[2]

**2015** — **Marriage Equality Legalized Nationwide:** In a landmark decision, *Obergefell v. Hodges,* the U.S. Supreme Court legalizes same-sex marriage. Californians celebrated this victory, building upon the state's earlier legalization of same-sex marriage in 2013.[3]

**2017** — **Gender Recognition Act (SB 179) Signed into Law:** California became the first state to allow residents to select a non-binary gender marker on state-issued IDs and birth certificates, affirming the rights of transgender and non-binary individuals.[4]

**2020** — **Transgender Respect, Agency, and Dignity Act (SB 132):** Governor Gavin Newsom signed Senate Bill 132 into law, ensuring that transgender, gender-nonconforming, and intersex individuals are provided with a safe, humane, and dignified environment while incarcerated.[5]

**2021** — **Affirming Transgender and Nonbinary Students' Names in College Act (AB 245):** Ensures that California's public colleges and universities allow transgender and nonbinary former students to have their name and gender accurately reflected on their academic records, such as transcripts and diplomas.[6]

**2022** — **Protecting Transgender Youth and Their Families (SB 107):** In response to a rise in anti-trans laws across the nation, Governor Gavin Newsom signed Senate Bill 107 protecting transgender youths and their families from bans against gender-affirming care.[7]

**2023** — **Establishment of the Transgender, Gender-Nonconforming, and Intersex (TGI) Wellness and Equity Fund:** The California Department of Public Health awarded nearly $2.4 million in grants to community organizations to provide gender-affirming healthcare services, demonstrating the state's investment in the wellbeing of TGI Californians.[8]

**2024** — **California Fights Back Against Forced Outing Policies (AB 1955):** California became the first state to prohibit and invalidate any adopted school board policy, rule, or administrative regulation that requires forced outings.[9]

**2025** — **Ongoing Advocacy and Legislation:** California continues to lead in advocating for LGBTQ+ rights through numerous legislative measures regarding issues such as healthcare, housing, inclusive education, and anti-discrimination protections.

2    Parker Marie Molloy, California Becomes First State to Ban Gay, Trans 'Panic' Defenses, Advocate (Sept. 2014), https://www.advocate.com/crime/2014/09/29/california-becomes-first-state-ban-gay-trans-panic-defenses

3    Ericka Cruz Guevarra, The Couple Who Helped Overturn California's Same-Sex Marriage Ban, KQED, https://www.kqed.org/news/11970658/ the-couple-who-helped-overturn-californias-same-sex-marriage-ban.

4    SB 179 – Gender Recognition Act of 2017, Equality California (Feb. 2018), https://www.eqca.org/sb179-leg/der Recognition Act of 2017 - Equality California.

5    Housing and Searching Incarcerated People Consistent with their Gender Identity, California Department of Corrections and Rehabilitation, https://www.cdcr.ca.gov/prea/sb-132-faqs/.

6    Newsom Signs Bill to ensure Trans, Nonbinary Students' Diplomas Reflect Identities, Equal California (Oct. 2021), https://www.eqca.org/release-ab245-signed/.

7    Newsom signs bill protecting transgender youths and families fleeing red-state policies, Los Angeles Times (Sept. 2022), https://www.latimes.com/california/story/2022-09-29/with-new-law-california-welcomes-out-of-state-transgender-youth

8    State Invests in Community Organizations to Better Support Gender-Affirming Health Care for Californians, California Department of Public Health (Oct. 2023), https://www.cdph.ca.gov/Programs/OPA/Pages/NR23-029.aspx

9    Protections for LGBTQ+ Students: AB 1955, California Department of Education, https://www.cde.ca.gov/ci/pl/ab-1955-sum-of-prov.asp

# Challenges in California and Across the Nation

Despite tremendous progress, LGBTQ+ individuals continue to face deeply rooted and emerging challenges across the nation, including here in California. While our state has long led the way in advancing LGBTQ+ rights, the fight for full equality, safety, and inclusion is far from over.

As California continues to advance inclusive laws, many other states are reversing course. In 2024 alone, more than 500 anti-LGBTQ+ bills were introduced across the country – targeting healthcare, education, and public spaces.[10] The coordinated weaponizing of public policy further marginalizes, disenfranchises, and endangers LGBTQ+ individuals.

Additionally, the Federal Bureau of Investigation's (FBI) most recent annual crime report showed a nearly 16% increase in reports of hate crimes nationally based on gender identity and a nearly 23% increase in reports of hate crimes based on sexual orientation.[11] Across the U.S., hate-fueled violence and intimidation against LGBTQ+ individuals are on the rise, driven in part by rising political polarization, misinformation, and deliberate targeting of LGBTQ+ individuals in schools, media, and public life.

As a result, California continues to remain vigilant and proactive, not only defending our own progress but serving as a model and advocate for equality in every corner of the country.



10   Mapping Attacks on LGBTQ Rights in U.S. State Legislatures in 2024, ACLU (Dec. 2024), https://www.aclu.org/legislative-attacks-on-lgbtq-rights-2024
11   Delphine Luneau, *FBI's Annual Crime Report — New FBI Data: Anti-LGBTQ+ Hate Crimes Continue to Spike, Even as Overall Crime Rates*, Human Rights Campaign (Sept. 2024), https://www.hrc.org/press-releases/new-fbi-data-anti-lgbtq-hate-crimes-continue-to-spike-even-as-overall-crime-rate-declines

# DOJ's Work to Protect the LGBTQ+ Community

## Combating Hate and Violence

In response to rising hate and violence targeting LGBTQ+ people and other vulnerable groups, the California Department of Justice (DOJ) works to ensure California's communities and local law enforcement have a clear view into this issue by:

- Urging the American Medical Association (AMA) to take stronger action to protect health care providers from potentially dangerous medical board certification requirements. Underscoring that requiring abortion and gender-affirming care providers to travel to states that restrict those forms of care in order to get board-certified puts them at legal and physical risk.

- Issuing a statement in response to President Trump's executive order that targets the LGBTQ+ community, reminding Californians of the resources and protections provided to them under state law.

- Releasing the annual Hate Crime in California Report, which in 2024 shows that crimes against the LGBTQ+ community have risen across the board. The 2024 statistics show the most notable increases in the following areas:

  o Anti-LGBTQ+ bias events increased by 13.9% from 151 in 2023 to 172 in 2024
  o Anti-transgender bias events increased by 12.3% from 65 in 2023 to 73 in 2024
  o Anti-gay (male) bias events increased by 8.7% from 231 in 2023 to 251 in 2024
  o Anti-lesbian bias events increased by from 17 in 2023 to 23 in 2024

- Providing valuable information, expertise, and training for federal, state, and local law enforcement on identifying, tackling, and preventing hate crimes, including through an updated law enforcement bulletin on California laws that prohibit hate crimes as well as guidance related to the investigation and prosecution of hate crimes. DOJ's Hate Crime Coordinator is an experienced criminal prosecutor and subject matter expert who leads the department's efforts in collaborating with internal and external partners and strengthening responses to hate crimes in California.

## Defending Access to Critical, Lifesaving Care

Research has consistently shown that gender-affirming care improves the health outcomes for individuals with gender dysphoria, a medical condition characterized by significant distress that occurs when an individual's gender identity differs from their sex assigned at birth. In individuals ages 13-20, receiving gender-affirming care was associated with 60% lower odds of moderate to severe depression and 73% lower odds of having suicidal thoughts over a 12-month period.[12] Despite this, many of the political attacks directed against LGBTQ+ people over the past year were focused on denying this life-saving treatment to some of the most vulnerable Americans — transgender people, particularly transgender youth.

---

12   Diana M. Tordoff et al., *Mental Health Outcomes in Transgender and Nonbinary youths Receiving Gender-Affirming Care,* JAMA Network Open(2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2789423#google_vignette

DOJ is defending this vital care and the rights of transgender youth by:

- [Submitting a comment letter](#) opposing a proposed rule by the U.S. Department of Health and Human Services (HHS) that would make over a dozen amendments to rules governing federal and state health insurance marketplaces including prohibiting coverage of gender-affirming care as an Essential Health Benefit (EHB) on federal exchange plans, leaving states responsible for paying any increase in premium as part of the premium subsidies if they require such coverage.

- [Backing a legal challenge](#) by Parents, Families and Friends of Lesbians and Gays (PFLAG), GLMA: Health Professionals Advancing LGBTQ+ Equality, and individual patients and their families against the Trump Administration's executive orders targeting transgender individuals by stating that gender identity was a "false" idea and by attempting to strip federal funding from institutions that provide life-saving gender affirming care for young people under the age of 19.

- [Reminding California hospitals](#) and federally funded healthcare providers of their ongoing obligation under California anti-discrimination law to provide gender affirming care amid confusion resulting from President Trump's Office of Management and Budget directive on freezing federal funding and his executive order on gender affirming care.

- [Supporting challenges](#) to state laws that limit transgender youths' access to critical and lifesaving care by leading nationwide coalitions against bans on gender-affirming care in states like Tennessee.

- [Protecting LGBTQ](#)+ youth from harmful practices such as conversion therapy, which is inconsistent with the standard of care for mental health practitioners for its ineffectiveness and increased risk of suicide and depression.

## Ending Discriminatory and Dangerous 'Forced Outing' Policies

In July 2024, California enacted Assembly Bill 1955 (Ward), becoming the first state to prohibit and invalidate any adopted school board policy, rule, or administrative regulation that requires forced outings.

DOJ worked to block these policies by:

- [Securing a victory](#) dismissing the City of Huntington Beach's challenge to AB 1955. In that case, the U.S. District Court for the Central District of California accepted Attorney General Bonta's arguments that AB 1955, which prohibits schools from adopting policies that "out" transgender students without their consent, does not violate the fundamental rights of parents under the Fourteenth Amendment. The court held that schools have no constitutional obligation to notify parents of a student's social transition (use of a name and pronouns consistent with the student's gender identity) because such activity does not constitute "medical treatment" and schools need not provide parents with any and all information that may be relevant to protected parental decision-making.

- [Securing a victory](#) in *People of the State of California v. Chino Valley Unified School District*, where the San Bernardino Superior Court issued an injunctive and declaratory relief against the Chino Valley Unified School District Board of Education's mandatory gender identity disclosure policy. The ruling permanently halted enforcement of the policy's provisions that required schools to inform parents, with minimal exceptions, whenever a student requests to use a name or pronoun — or access facilities or programs — that do not align with the sex on their birth certificate or official records, even when the school district knows that such disclosure will result in mental, psychological, or physical harm to the student.

## Pushing Back Against Discrimination and Exclusion

The weaponizing of public policy aimed at marginalizing and excluding LGBTQ+ individuals extends beyond healthcare and education and can severely impact people's participation in other areas of their lives.

DOJ stood up against these shameful and discriminatory attacks by:

- Filing a pre-enforcement lawsuit against the U.S. Department of Justice (U.S. DOJ) in response to its demand that California schools violate state law and the U.S. Constitution by excluding transgender female students from participation in sports consistent with gender identity. In the lawsuit, Attorney General Bonta asks the U.S. District Court for the Northern District of California to uphold California's law and prevent the Trump Administration from taking retaliatory action, such as withholding or conditioning federal funding, over the state's refusal to comply with U.S. DOJ's unlawful demands.

- Issuing letters to insurance companies reminding them of their legal obligations under Assembly Bill 571 (Petrie-Norris), which prevents insurers from refusing to issue or renew, or from altogether terminating, professional liability insurance for a licensed medical provider based solely on their provision of gender-affirming care services, if the services are performed in and lawful in California.

- Supporting a legal challenge to President Trump's executive order attempting to prohibit transgender servicemembers from serving in the military in any capacity.

- Pushing back on efforts to undermine civil rights protections for LGBTQ+ Americans in the workplace.

## Championing Diversity and Inclusivity in Schools

In September 2023, California passed Assembly Bill 1078 (Jackson), which prohibited school boards from banning instructional materials or library books that offer inclusive and diverse perspectives, including those representing the LGBTQ+ community[13].

DOJ worked to ensure classrooms in the state fulfilled this obligation by:

- Supporting Montgomery County Board of Education's decision to incorporate LGBTQ+ inclusive books into its curriculum.

- Issuing a statement in response to President Trump's executive order targeting transgender, nonbinary, intersex, and gender nonconforming students, reminding schools of their obligations under California law to provide inclusive curriculum that reflect the roles and contributions of our diverse population, including our LGBTQ+ community.

- Backing a legal challenge against Cobb County School District's attempt to enact and enforce two policies that prohibit school staff from discussing topics deemed "divisive," undermining their ability to teach diverse books and curricula.

---

13    Accurate and Inclusive Curriculum (AB 1078), California Department of Education, https://www.cde.ca.gov/ci/cr/cf/ab1078guidance.asp

# Know Your Rights

## LGBTQ+ Discrimination Rights

**You have the right to access and utilize public accommodations:** In California, it is illegal to discriminate against people using public accommodations on the basis of sexual orientation or gender identity.

**You have the right to use the restroom consistent with your gender identity:** You have the right to use the restroom consistent with your gender identity both in public settings, like schools, and at your workplace. As an employee in California, you have a right to safe and appropriate restroom facilities. Your employer cannot dictate which restroom you use. If your place of employment has single-stall restrooms, they must be labeled as "All Gender," "Unisex," "Gender Neutral," or something similar.

**You have the right to rent property without fear of discrimination:** The federal Fair Housing Act prohibits sex discrimination by most landlords and, as the Supreme Court held in 2020 (*Bostock v. Clayton County*), discrimination on the basis of sexual orientation and gender identity is sex discrimination. Thus, the Fair Housing Act prohibits discrimination on the basis of sexual orientation or gender identity. Housing discrimination against people with HIV/AIDS, or people perceived to have HIV/AIDS, is also illegal under the Fair Housing Act's protections against disability discrimination. California's Fair Employment and Housing Act provides similar protections.

Violations of both the federal Fair Housing Act and California's Fair Employment and Housing Act include:

- Refusal to sell, rent, or lease rooms, apartments, condos or houses to protected individuals.

- Refusal to negotiate for the sale, rental, or lease of housing.

- Representation that a housing accommodation is not available for inspection, sale, or rental when it is in fact available.

- Denial of a home loan or homeowner's insurance.

- Cancellation or termination of a sale or rental agreement.

- Policies, practices, terms, or conditions that result in unequal access to housing or housing-related services.

- Offering inferior terms, conditions, privileges, facilities, or services in connection with the housing accommodation.

- Sexual harassment involving unwanted sexual advances or requiring sexual favors for housing rights or privileges.

- Refusal to permit, at a disabled tenant's expense, reasonable modifications when necessary to accommodate a disability.

- Refusal to make reasonable accommodations in housing rules, policies, practices, or services where necessary to afford a disabled person equal opportunity to use and enjoy a dwelling.

- Retaliation against someone filing a complaint.

- Overly restrictive rules limiting the activities of daily life for families with children, including where children are allowed to play.

**You have the right to receive service, regardless of the provider's religion:** This includes wedding services, medical care, and child welfare services. California has banned religious exemption laws.

**You have the right to a discrimination-free workplace:** Both the California Fair Employment and Housing Act (FEHA) and Title VII of the federal Civil Rights Act (Title VII) make it illegal for an employer to fire, demote, fail to hire, fail to promote, harass, or otherwise discriminate against you (such as by paying a lower wage or denying benefits that other workers receive) because of your sexual orientation, gender identity, and/or gender expression.

While the majority of employees in California are covered under these laws, there are a few types of employees that are exempt from the laws:

- Certain employees of religious entities like churches and mosques.

- Employees of very small employers. California discrimination protections described here apply to entities with at least 5 employees (but the harassment provisions apply to every entity, even if you are the only employee); and federal discrimination protections apply to entities with at least 15 employees.

**You have the right to learn about and teach LGBTQ+ history:** California Education Code Section 51204.5 prescribes the inclusion of the contributions of various groups in the history of California and the United States. This section includes both men and women, Native Americans, African Americans, Mexican Americans, Asian Americans, Pacific Islanders, European Americans, lesbian, gay, bisexual, and transgender Americans, persons with disabilities, and members of other ethnic and cultural groups, to the economic, political, and social development of California and the United States of America, with particular emphasis on portraying the role of these groups in contemporary society.

**You have the right to discuss LGBTQ+ issues and topics in school under Section 48907 of the California Education Code:** In addition, under Section 48950, no public school, charter school, or non-religious private high school can discipline you for talking about being LGBTQ+ or for discussing LGBTQ+ issues.

**You have the right to disclose – or not disclose – your gender identity on your own terms, regardless of your age:** Your school, whether public or private, doesn't have the right to "out" you as LGBTQ+ to anyone without your permission, including your parents. Under the California and U.S. constitutions, you have a protected right to privacy, which includes the right to keep your sexual orientation, gender identity or that you are transgender private (what courts call a "reasonable expectation of privacy"). In other words, you have the right to control to what extent and to whom you disclose highly personal information about your sexual orientation or gender identity. This means that even if you are "out" about your sexual orientation or gender identity at school, if you're not "out" to your parents at home, and you can reasonably expect that they're not going to find out, then school staff can't tell your family that you are LGBTQ+ without your permission. Being open about your sexuality in school doesn't mean you automatically give up your right to privacy outside school.

However, under some limited circumstances, your school can tell your parents something about your sexual orientation or gender identity — but only if they have a very good reason for doing so. It really depends on the circumstances. But they can't do it just to punish you, harass you, discriminate against you, or retaliate against you for complaining about something. For example, if you complain to the principal about a teacher making or allowing anti-LGBTQ+ comments in class, they can't then call your parents (or threaten to call them) and discuss anything about your actual or perceived sexual orientation. If your principal or teachers are threatening to "out" you to your parents and you need advice, give us a call. You should also explain your desire and your right to keep this information private.

**You have the right to play on a sports team that aligns with your gender identity.**

**You have the right to services, activities, and programs in the California Juvenile Justice System.**

**You have the right to refuse and prosecute conversion therapy providers in California:** Conversion therapy for LGBTQ+ youth is illegal in California.

**You have the right to have your medically necessary gender affirming care covered by your private or public health insurance plan:** Under California law, employer-provided health plans and Medi-Cal cover medically necessary gender-affirming care just like they cover other medically necessary treatments.

**You have the right to have your same-sex spouse or registered domestic partner covered by your health insurance plan:** Under California law, same-sex spouses and registered domestic partners are entitled to the same healthcare coverage as different-sex spouses.

**You have the right to request that your California driver's license, birth certificate, and death certificate have a gender marker other than "M" or "F":** California allows residents to be identified by a gender marker other than "F" or "M" on their driver's license. It is also the first state to allow a nonbinary gender marker on birth certificates. You can also choose "bride," "groom," or "neither" on your marriage certificate.

**You have the right to serve on a jury:** California does not allow discrimination based on sexual orientation or gender.

**You have the right to donate blood and plasma.**

**You do NOT have the right to use a "panic defense" in murder cases (i.e. argue your way to a lesser charge of manslaughter by expressing your discomfort with, surprise at, or fear of a victim's sexual orientation or gender identity):** In September 2014, California became the first state in the U.S. to officially ban the use of "trans panic" and "gay panic" defenses in court.



# Information about Hate Crimes

## What is the difference between a hate crime and a hate incident?

A **hate crime** is a crime against a person, group, or property motivated by the victim's real or perceived protected social group. You may be the victim of a hate crime if you have been targeted because of your actual or perceived: (1) disability, (2) gender, (3) nationality, (4) race or ethnicity, (5) religion, (6) sexual orientation, and/or (7) association with a person or group with one or more of these actual or perceived characteristics. Hate crimes are serious crimes that may result in imprisonment or jail time.

A **hate incident** is an action or behavior motivated by hate but which, for one or more reasons, is not a crime. Examples of hate incidents include:

- Name-calling.
- Insults.
- Displaying hate material on one's own property.
- Posting hate material that does not result in property damage.
- Distribution of materials with hate messages in public places.

The U.S. Constitution allows hate speech as long as it does not interfere with the civil rights of others. While these acts are certainly hurtful, they do not rise to the level of criminal violations and thus may not be prosecuted. However, it is important to note that these incidents have a traumatic impact on the victims as well as on the community at large.

In California, under the Ralph Act, Civil Code § 51.7, your civil rights may be violated if you have been subjected to hate violence or the threat of violence – even where the incident does not rise to the level of a hate crime and may be otherwise constitutionally-protected from prosecution by the government – because of your actual or perceived: sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, immigration status, political affiliation, and/or position in a labor dispute. A civil violation may result in restraining orders, injunctive and/or equitable relief, damages, a civil penalty of $25,000, and/or attorney's fees.

## How can I spot a hate crime?

Signs that a crime was motivated by hate may include:

- The offender chose the victim or property because they belonged to a protected group, like a certain religion or gender.
- The offender made written or verbal comments showing a prejudice.
- The crime happened on a date that is important for the victim's or offender's protected group.
- There is organized hate activity in the area.

## What should I do if I am the victim of a hate crime?

- If you are in immediate danger, call 911, and if needed, get medical attention.

- Contact the local law enforcement agency right away and report the crime.

- Write down the exact words that were said and make notes about any other details and relevant facts.

- Save all evidence (e.g., graffiti, eggshells, writing on victim's vehicle). If safe, wait until law enforcement arrives and takes photos.

- Get the names and contact information for other victims and witnesses, and try to get their descriptions of the perpetrator(s).

- Contact community organizations in your area that respond to hate crimes.

## I am the victim of a hate crime, and I am struggling to identify all of the services available to me. Who at the California DOJ should I talk to for help?

If you have been a victim of a hate crime, please contact the California Victims' Services Unit (VSU) at the California DOJ. VSU offers support and information to victims and their families at every stage of the criminal process. The unit accomplishes this by advocating for victims, and by helping identify and close any gaps in services available to victims offered by all levels of government. The unit works in conjunction with victim service providers and frontline prosecutors all across the state.

## Members of my community have been targets of a major hate crime event. Does the California DOJ have resources to help my community?

Yes. To ensure that local law enforcement officials have the resources they need to respond to major hate crime events, the Attorney General's office has developed the Attorney General's Hate Crime Rapid Response Protocol. The protocol calls for the prioritization of resources to ensure that the California Department of Justice makes available resources to ensure that local authorities have access to skilled law enforcement special agents, lawyers who are experts on handling civil rights issues, victim services professionals, and others, in order to provide a comprehensive response to major incidents.

The Attorney General's Hate Crime Rapid Response Protocol acts as a supplemental resource to local, state, and federal enforcement agencies' investigation and prosecution of hate crimes. The Protocol ensures local agencies have the full resources of the Department of Justice at their disposal. Attorney General Bonta believes that through a strong cooperative and team effort, state, local, and federal law enforcement agencies will be in the best position to quickly and effectively respond to major hate crime incidents anywhere in California.

## Where can I find the most up-to-date data on hate crimes in California?

Every July 1st, the California Department of Justice releases an annual Hate Crimes in California Report to the California Legislature. The report outlines the previous year's hate crimes in California. You can find the report at oag.ca.gov/cjsc/pubs.

# Hate Crimes: Know Your Rights

Victims' rights are enumerated in article I, § 28, section (b) of the California Constitution, otherwise known as "Marsy's Law" and the "California Victims' Bill of Rights." Under this law, victims – including victims of hate crimes – have the following rights:

1. You have the right to be treated with fairness and respect for your privacy and dignity, and to be free from intimidation, harassment, and abuse, throughout the criminal or juvenile justice process.

2. You have the right to be reasonably protected from the defendant and persons acting on behalf of the defendant.

3. You have the right to have your safety and your family's safety considered in fixing the amount of bail and release conditions for the defendant.

4. You have the right to prevent the disclosure of confidential information or records to the defendant, the defendant's attorney, or any other person acting on behalf of the defendant, which could be used to locate or harass you or your family or which disclose confidential communications made in the course of medical or counseling treatment, or which are otherwise privileged or confidential by law.

5. You have the right to refuse an interview, deposition, or discovery request by the defendant, the defendant's attorney, or any other person acting on behalf of the defendant, and to set reasonable conditions on the conduct of any such interview to which the victim consents.

6. You have the right to reasonable notice of and to reasonably confer with the prosecuting agency, upon request, regarding, the arrest of the defendant if known by the prosecutor, the charges filed, the determination whether to extradite the defendant, and, upon request, to be notified of and informed before any pretrial disposition of the case.

7. You have the right to reasonable notice of all public proceedings, including delinquency proceedings, upon request, at which the defendant and the prosecutor are entitled to be present and of all parole or other post-conviction release proceedings, and to be present at all such proceedings.

8. You have the right to be heard, upon request, at any proceeding, including any delinquency proceeding, involving a post-arrest release decision, plea, sentencing, post-conviction release decision, or any proceeding in which a right of the victim is at issue.

9. You have the right to a speedy trial and a prompt and final conclusion of the case and any related post-judgment proceedings.

10. You have the right to provide information to a probation department official conducting a pre-sentence investigation concerning the impact of the offense on the victim and the victim's family and any sentencing recommendations before the sentencing of the defendant.

11. You have the right to receive, upon request, the pre-sentence report when available to the defendant, except for those portions made confidential by law.

12. You have the right to be informed, upon request, of the conviction, sentence, place and time

of incarceration, or other disposition of the defendant, the scheduled release date of the defendant, and the release of or the escape by the defendant from custody.

13. You have the right to restitution.

- All persons who suffer losses as a result of criminal activity have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer.

- Restitution shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss.

- All monetary payments, monies, and property collected from any person who has been ordered to make restitution shall be first applied to pay the amounts ordered as restitution to the victim.

14. You have the right to the prompt return of property when no longer needed as evidence.

15. You have the right to be informed of all parole procedures, to participate in the parole process, to provide information to the parole authority to be considered before the parole of the offender, and to be notified, upon request, of the parole or other release of the offender.

16. You have the right to have the safety of you, your family, and the general public considered before any parole or other post-judgment release decision is made.

17. You have the right to be informed of the rights enumerated in paragraphs (1) through (16).

For more information on hate crimes, please visit oag.ca.gov/hatecrimes.





**EXHIBIT 2**

3/20/26, 10:12 PM                 Know Your Rights | State of California - Department of Justice - Office of the Attorney General

 **Subscribe to Our Newsletter**          Enter your email        Subscribe


## ROB BONTA
*Attorney General*

# Know Your Rights

**Statement of the Attorney General**

In *Mirabelli v. Olson*, No. 3:23-cv-00768, a lawsuit brought by parents and teachers in the California public school system, the U.S. District Court for the Southern District of California issued an Order Granting Plaintiffs' Motion for Class-Wide Permanent Injunction. Among other things, the Order requires the Attorney General to include a statement drafted by the district court in any "state-created or approved instruction on the gender-related rights of student[s] and faculty." D.Ct. Dkt. 308 at 2. The Attorney General appealed the district court's decision, and the U.S. Court of Appeals for the Ninth Circuit stayed the Order pending appeal. On March 2, 2026, however, the U.S. Supreme Court vacated the stay entered by the Ninth Circuit with respect to the parent plaintiffs. See *Mirabelli v. Bonta*, 2026 WL 575049 (U.S. Mar. 2, 2026). As a result, the district court's Order is in effect with respect to the parent plaintiffs' claims and stayed with respect to the teacher plaintiffs' claims. In the Attorney General's view, the statement required by the district court in its Order does not fully reflect the reasoning of the Supreme Court's opinion. For example, the statement required by the district court does not mention the ability of public-school employees to "preclud[e] disclosure to parents who would engage in abuse." *Id.* at *3. The statement could also be interpreted to suggest that public-school employees have an affirmative duty to disclose

information when the Supreme Court's order is limited to "parents who object to the challenged [disclosure] policies or seek religious exemptions." *Id.* Nonetheless, until the Attorney General is able to obtain further clarification or modification of the district court's Order, the Attorney General is adding the required statement to this publication as of March 05, 2026.

**Required Statement of the District Court:**

**"Parents and guardians have a federal constitutional right to be informed if their public school student child expresses gender incongruence. Teachers and school staff have a federal constitutional right to accurately inform the parent or guardian of their student when the student expresses gender incongruence. These federal constitutional rights are superior to any state or local laws, state or local regulations, or state or local policies to the contrary."**

# LGBTQ+ Discrimination Rights

**You have the right to access and utilize public accommodations:** In the State of California, it is illegal to discriminate against people using public accommodations on the basis of sexual orientation or gender identity.

**You have the right to use the restroom consistent with your gender identity:** You have the right to use the restroom consistent with your gender identity both in public settings, like schools, and at your workplace. As an employee in California, you have a right to safe and appropriate restroom facilities. Your employer cannot dictate which restroom you use. If your place of employment has single-stall restrooms, they must be labeled as "All Gender," "Unisex," "Gender Neutral," or something similar.

**You have the right to rent property without fear of discrimination in California.**

The federal Fair Housing Act prohibits sex discrimination by most landlords and, as the Supreme Court held in 2020 (Bostock v. Clayton County), discrimination on the basis of sexual orientation and gender identity is sex discrimination. Thus, the Fair Employment and Housing Act prohibits discrimination on the basis of sexual orientation or gender identity. Housing discrimination against people with HIV/AIDS, or people perceived to have HIV/AIDS, is also illegal under the Fair Housing Act's protections against disability discrimination.

Violations of California's Fair Employment and Housing Act include:

- Refusal to sell, rent, or lease rooms, apartments, condos or houses to protected individuals
- Refusal to negotiate for the sale, rental, or lease of housing
- Representation that a housing accommodation is not available for inspection, sale, or rental when it is in fact available
- Denial of a home loan or homeowner's insurance
- Cancellation or termination of a sale or rental agreement
- Policies, practices, terms, or conditions that result in unequal access to housing or housing-related services
- Offering inferior terms, conditions, privileges, facilities or services in connection with the housing accommodation
- Sexual harassment involving unwanted sexual advances or requiring sexual favors for housing rights or privileges
- Refusal to permit, at a disabled tenant's expense, reasonable modifications when necessary to accommodate a disability
- Refusal to make reasonable accommodations in housing rules, policies, practices, or services where necessary to afford a disabled person equal opportunity to use and enjoy a dwelling
- Retaliation against someone filing a complaint

- Overly restrictive rules limiting the activities of daily life for families with children, including where children are allowed to play

**You have the right to receive service, regardless of the provider's religion.** This includes wedding services, medical care, and child welfare services. California has banned religious exemption laws.

**You have the right to a discrimination-free workplace.** Both the California Fair Employment and Housing Act (FEHA) and Title VII of the federal Civil Rights Act (Title VII) make it illegal for an employer to fire, demote, fail to hire, fail to promote, harass, or otherwise discriminate against you (such as by paying a lower wage or denying benefits that other workers receive) because of your sexual orientation, gender identity, and/or gender expression.

While the majority of employees in California are covered under these laws, there are a few types of employees that are exempt from the laws:

- Certain employees of religious entities like churches and mosques; and
- Employees of very small employers. California discrimination protections described here apply to entities with at least 5 employees (and the harassment provisions apply to every entity, even if you are the only employee); and federal discrimination protections apply to entities with at least 15 employees.

**You have the right to learn about and teach LGBTQ+ history.** Education Code Section 51204.5 prescribes the inclusion of the contributions of various groups in the history of California and the United States. This section includes: both men and women, Native Americans, African Americans, Mexican Americans, Asian Americans, Pacific Islanders, European Americans, lesbian, gay, bisexual, and transgender Americans, persons with disabilities, and members of other ethnic and cultural groups,

to the economic, political, and social development of California and the United States of America, with particular emphasis on portraying the role of these groups in contemporary society.

**You have the right to discuss LGBTQ+ issues and topics in school** under Section 48907 of the California Education Code. In addition, under Section 48950, no public school, charter school, or non-religious private high school can discipline you for talking about being LGBTQ or for discussing LGBTQ issues.

**You have the right to disclose – or not disclose - your gender identity on your own terms, regardless of your age.** Your school, whether public or private, doesn't have the right to "out" you as LGBTQ+ to anyone without your permission, including your parents. Under the California and U.S. constitutions, you have a protected right to privacy, which includes the right to keep your sexual orientation, gender identity or that you are transgender private (what courts call a "reasonable expectation of privacy"). In other words, you have the right to control to what extent and to whom you disclose highly personal information about your sexual orientation or gender identity. This means that even if you are "out" about your sexual orientation or gender identity at school, if you're not 'out' to your parents at home, and you can reasonably expect that they're not going to find out, then school staff can't tell your family that you are LGBTQ+ without your permission. Being open about your sexuality in school doesn't mean you automatically give up your right to privacy outside school.

However, under some limited circumstances your school can tell your parents something about your sexual orientation or gender identity—but only if they have a very good reason for doing so. It really depends on the circumstances. But they can't do it just to punish you, harass you, discriminate against you, or retaliate against you for complaining about something. For example, if you complain to the principal about a teacher making or allowing anti- LGBTQ+ comments in class, they can't then call your

parents (or threaten to call them) and discuss anything about your actual or perceived sexual orientation. If your principal or teachers are threatening to "out" you to your parents and you need advice, give us a call. You should also explain your desire and your right to keep this information private.

**You have the right to play on a sports team that aligns with your gender identity.**

**You have the right to services, activities, and programs in the California Juvenile Justice System.**

**You have the right to refuse and prosecute conversion therapy providers in California.** Conversion therapy for LGBTQ+ youth is illegal in California.

**You have the right to have your gender-affirming care covered by your private or public health insurance plan.** Under California law, employer-provided health plans and Medi-Cal must cover medically necessary gender-affirming care just like they cover other medically necessary treatments.

**You have the right to have your same-sex spouse or registered domestic partner covered by your health insurance plan.** Under California law, same-sex spouses and registered domestic partners are entitled to the same health care coverage as different-sex spouses.

**You have the right to request that your California driver's license, birth certificate, and death certificate have a gender marker other than "M" or "F".** California allows residents to be identified by a gender marker other than "F" or "M" on their driver's license. It is also the first State to allow a nonbinary gender marker on birth certificates. You can also choose "bride," "groom," or "neither" on your marriage certificate.

**You have the right to serve on a jury.** California does not allow discrimination based on sexual orientation or gender.

**You have the right to donate blood and plasma.**

**You do NOT have the right to use a "panic defense" in murder cases (i.e. argue your way to a lesser charge of manslaughter by expressing your discomfort with, surprise at, or fear of a victim's sexual orientation or gender identity).** In September 2014, California became the first state in the U.S. to officially ban the use of "trans panic" and "gay panic" defenses in court.

Office of the Attorney General     Accessibility     Privacy Policy     Conditions of Use     Disclaimer

© 2026 DOJ

**EXHIBIT 3**

    Menu    **Give**

**KNOW YOUR RIGHTS**

# Know Your Rights - Mirabelli v. Bonta FAQ

Last updated: March 19, 2026 06:35 am

**Share this page**

 



# Mirabelli SCOTUS Per Curiam Opinion FAQ

- California can and must continue to support all young people's right to be themselves, at school and beyond, despite the Supreme Court's March 2 per curiam order in Mirabelli v. Bonta, which was preliminary and not a final resolution of the case.

- Students of all races, backgrounds, sexual orientations, and genders deserve to feel safe, supported, and affirmed at school—and trans and nonbinary students are no different.

## Case Background

- *Mirabelli v. Bonta* is a federal lawsuit filed in April 2023 in California. The Plaintiffs are teachers and parents bringing free speech, free exercise, and due process claims to challenge California laws and policies protecting transgender and gender nonconforming students from mandatory disclosure of gender-identity information to parents without the student's consent. The lawsuit is against officials at Escondido Unified School District, State Superintendent Tony Thurmond and members of the California State Board of Education, and Attorney General Rob Bonta.
- In December 2025, the district court granted Plaintiffs' motion for summary judgment and issued a permanent injunction blocking the policies that prevent forced outing. The injunction was stayed by the Ninth Circuit shortly thereafter pending appeal; however, Plaintiffs sought emergency relief from the U.S. Supreme Court.
- In March 2026, the U.S. Supreme Court issued a per curiam order allowing the permanent injunction to go partially back into effect during the appeal process as to the parent plaintiffs. This means that for now, the policies protecting youth from forced outing cannot be enforced against parents who object to them. The Court found that the parent plaintiffs are likely to succeed on their free exercise and substantive due process claims.

- The case will continue on appeal before the Ninth Circuit.

# What did the Supreme Court's Per Curiam Order Do?

- In its March 2 interim order, the Supreme Court revived the portions of the District Court's December 2025 ruling as to parents only. The order does not address the claims of teachers who object to California law on religious grounds.
- The Court did not resolve ultimate constitutional issues, which remain pending before the Ninth Circuit.
- The order narrowly addresses the rights of parents who object to a school's affirmation of a student's gender identity that differs from their sex assigned at birth without parental consent. The Court concluded that those parents will likely be able to succeed in their free exercise and due process claims against California policies that prohibit schools from notifying parents of a student's "gender transition" at school without the student's consent. Although the Court did not define the term "gender transition," it cited a student's request to a school to use names and pronouns different than those the student uses at home.
- The Court also noted, however, that "the State's interest in [student] safety could be served by a policy that allows religious exemptions while precluding gender-identity disclosure to parents who would engage in abuse."
- This decision is especially pernicious both because the Court acted in an "emergency" posture, without allowing California to present a full evidentiary record or be heard

in an oral argument, and also because it comes at a time when trans and nonbinary youth and their families are under siege from a coordinated series of political attacks on their health care, sports participation, and very existence.

## Does the Court's Order Change California Law?

- California law still requires that schools affirm students' gender identity and this has not changed. Schools must also continue to comply with existing antidiscrimination protections and inclusive education laws.
- The law that California enacted in 2024—the SAFETY Act (AB 1955)—is also still in effect, so it remains illegal for any California school district to adopt a blanket policy mandating the outing of trans and nonbinary students to their parents without their consent.
- The Court's order also did not recognize any constitutional right of teachers or other school staff to out students to their parents or anyone else based on their perception of the student.

## What Should Schools Do?

- Schools can and must continue to affirm trans and nonbinary students to the best of their ability. While the impact of the Court's preliminary order will become clearer after the appeal is resolved on the merits, California law might now be understood to allow parents

a right to object if their student asks a school for support in gender transitioning.

- The Court did recognize that it may not be safe for all students to come out at home and acknowledged that schools can preclude disclosure to parents where they have concerns parents may engage in abuse. Coming out is a deeply personal process that every person deserves the right to pursue at their own pace. Families may react in a variety of ways to this process, and forcing a student to come out before they are ready can cause serious harm. While many families are immediately ready to be supportive, others may react in ways that could lead to serious trauma, harmful responses like conversion therapy, or even escalation to violence.

- Schools should continue to play a role in supporting students working towards family support. Simply relying on mandatory reporting laws and removals to the foster system—as the Court's order suggests—subjects trans and nonbinary young people to serious additional harm and trauma. Schools should use every tool at their disposal to help trans and nonbinary students live safely with their families rather than entering the foster system, including supporting those whose families are not immediately affirming.

- Schools must continue to comply with California's LGBTQ+ competency training requirements. The Supreme Court mischaracterized the PRISM program. California law requires that certificated school staff serving 7th-12th grade students receive LGBTQ+ cultural competency training to ensure that students of all backgrounds feel supported and connected at school. While this training must meet rigorous requirements, school districts have discretion in selecting which

curriculum they use to satisfy the requirements. The state-created PRISM curriculum is free and meets all requirements, but it is only one option for training educators.

# What Should We All Do?

- This decision will make it more difficult for some students to be fully themselves in the classroom and heighten stress for young people who are trans, nonbinary, or questioning their gender. Mustering support for these young people is critically important. We need to invest in more of the resources trans and nonbinary young people need, at school and beyond— from library books and curricular materials reflective of their experience, to LGBTQ+ community centers providing support groups and other safe spaces, to affirming mental health care.
  We need to maximize students' access to Genders & Sexualities Alliances and similar student-led clubs that foster a sense of supportive community and are proven to improve educational outcomes.
  We need to ensure young people have clear information about the implications of coming out at school. It is critical that youth understand their privacy and disclosure rights at school so they can make informed decisions about when, where, and with whom to come out.
  Adult allies need to show and explicitly tell the young people in our lives that they can trust us to stand up for their rights, safety, and dignity regardless of their gender identity, even and especially when times get tough.

- While the Court may have limited the amount of support schools can provide for students with nonaffirming parents, other students continue to have the right to respect one another's names and pronouns, including at school. Nothing in the Court's order precludes that continued dignity for transgender students.

# Related Issues

Gender, Sexuality, & Reproductive Justice Project

View All Issues

# STAY INFORMED

Sign up to be the first to hear about how to take action.

Email *

ZIP code *

Sign Up

By completing this form, I agree to receive occasional emails per the terms of the ACLU's privacy statement.

Search 🔍

## Request Assistance

**Press**

**Contact**

**Shop**

**Donate**

  

© 2026 ACLU of Southern California

User Agreement    Privacy Statement    Website Accessibility

**EXHIBIT 4**

No 25A810

## In The Supreme Court of the United States

ELIZABETH MIRABELLI, *et. al.*

*Applicants,*

v.

ROB BONTA, Attorney General of California, *et.al.*

On Emergency Application To Vacate Interlocutory Stay Order Issued By The
United States Court Of Appeals For The Ninth Circuit

Brief of Child & Parental Rights Campaign, Inc. and
Our Duty USA as Amici Curiae in Support of Applicants

Erin Friday
OUR DUTY - USA
P.O. Box 442
San Carlos, CA 94070

Mary E. McAlister
Counsel of Record
Vernadette R. Broyles
Kevin R. Smith
CHILD & PARENTAL RIGHTS CAMPAIGN
5425 Peachtree Pkwy, Suite 110
Norcross, GA 30092
(770) 448-4525 mmcalister@childparentrights.org
Attorneys for Amici Curiae

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................i

TABLE OF AUTHORITIES ..........................................................................ii

INTRODUCTION AND INTEREST OF AMICI CURIAE......................................... 1

SUMMARY OF ARGUMENT ....................................................................... 2

ARGUMENT .............................................................................................. 4

I.    The Stay Requires School Employees to Continue to Violate Parental Rights as Part of a Concerted Plan to Prevent Parents From Exercising Their Rights To Direct the Upbringing Of Their Children................................................ 4

II.    Basing Government Policies on a Presumption that Parents of Children Experiencing an Identity Crisis Are Unsafe is Unconstitutional. ........................ 10

III.    Respondents' Own Words Demonstrate that Parents Must Be Notified of their Child's Sex-Rejection while at School for the Safety and Well-Being of the Child. ...................................................................................................... 12

IV.    Amici's Stories of California Parents Illustrate the Danger of Schools Engaging in the Social Transition of Children Without Parental Involvement.... 14

    A.    Erin Friday, President of Our Duty............................................... 14

    B.    Abigail Martinez..................................................................... 16

    C.    Lydia McLaughlin ................................................................... 17

    D.    Sue Y..................................................................................... 18

    E.    Jessica E................................................................................. 19

    F.    Lisa Mullins ........................................................................... 19

    G.    Beth Bourne............................................................................ 21

    H.    Aurora Regino ........................................................................ 22

    I.    Jessica Konen.......................................................................... 23

CONCLUSION........................................................................................... 24

**TABLE OF AUTHORITIES**

**Cases**

*Blair v. Appomattox Cnty. Sch. Bd.*, 147 F.4th 484 (4th Cir. 2025). ......................... 15

*Cal. Dep't of Educ. v. Rocklin Unified Sch. Dist.*, No. S-CV-0052605 (Cal. Super. Ct., Placer Cnty., Apr. 10, 2024); ........................................................................ 7

*Foote v. Ludlow Sch. Comm.*, 128 F.4th 336 (1st Cir. 2025) .................................. 3, 4

*Kaltenbach v. Hilliard City Sch.*, 730 F. Supp. 3d 699 (S.D. Ohio 2024) .................. 13

*Konen v. Caldeira*, No. 22-cv-1813 (Cal. Super. Ct. Monterey Cnty., June 27, 2022), *removed* to No. 5:22-cv-5195 (N.D. Cal., Sept. 12, 2022) ......................................... 6

*Lee v. Poudre, Dist. R-1*, 135 F.4th 924 (10th Cir. 2025) ........................................ 13

*Littlejohn v. School Bd. of Leon Cnty., Fla.,* 132 F.4th 1232 (11th Cir. 2025) ........ 3, 4

*Mahmoud v. Taylor*, 606 U.S. 522 (2025) ................................................................. 2

*Parham v. J.R.*, 442 U.S. 584 (1979) ....................................................................... 11

*People ex rel. Bonta v. Chino Valley Unified Sch. Dist.*, No. CIV SB 2317301 (Cal. Super. Ct., San Bernardino Cnty., Aug. 28, 2023) ............................................. 7, 13

*Perez v. Broskie*, No. 3:22-cv-83 (M.D. Fla. Sept. 30, 2022) ................................... 13

*Regino v. Staley*, 133 F.4th 951 (9th Cir. 2025) ...................................................... 22

*Ricard v. USD 475 Geary Cnty., KS Sch.*, No. 522-CV-04015HLTGEB, 2022 WL 1471372, at *8 (D. Kan. May 9, 2022) ................................................................... 12

*S.E. v. Grey*, 782 F. Supp. 3d 939 (S.D. Cal. 2025) ................................................... 9

*Santosky v. Kramer*, 455 U.S. 745 (1982) ............................................................... 12

*Troxel v. Granville*, 530 U.S. 57 (2000) ............................................................... 3, 11

*United States v. Skrmetti*, 605 U.S. 495 (2025) ...................................................... 11

**Statutes**

2024 Cal. Stat. ch. 95 ................................................................................................. 7

Cal. Educ. Code §281.3(c) ............................................................................ 8

Cal. Educ. Code §44932(a)(4) ...................................................................... 5

Cal. Family Code §3427 ............................................................................. 15

Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. §1232g ............... 14

Wash. Rev. Code §13.32A.082 .................................................................... 15

**Other Authorities**

Arcadia Unified School District, *Policy Bulletin: Transgender Students – Ensuring Equity and Nondiscrimination* (Apr. 16, 2015), ................................... 116

Asaf Orr et al., *Schools in Transition - A Guide for Supporting Transgender Students in K-12 Schools,* (Aug. 3, 2015), ................................................. 9

Brad Jones, *California School District Emails Reveal Students Were Secretly Gender Transitioned*, EPOCH TIMES (Mar. 17, 2023) .............................................. 6

Brad Jones, *Parent Group to Sue California Official Over Alleged Misleading Ballot Title,* CALIFORNIA INSIDER, (Jan. 8, 2024) ............................................... 7

Brief for Amicus Curiae Our Duty Supporting Respondents and Affirmance in *United States v. Skrmetti*, 605 U.S. 495 (2025) (No. 23-477) . ......................... 2

Brief for Amici Curiae Our Duty-USA and Colorado Principled Physicians *Supporting Petitioner* in *Foote v. Ludlow, No.* 25-77 ................................... 3

Brief of Amicus Curiae Abigail Martinez in Support of Respondents in *United States v. Skrmetti*, 605 U.S. 495 (2025) (No. 23-477) ................................. 16

California Family Council, *Senator Scott Wiener Calls Parents Who Want Parent's Rights "Nasty People"*, YouTube (June 3, 2024), ......................................... 7

Colin Wright, *BREAKING: New Documents Reveal Shocking Surge in Trans-Identified Students in Davis, CA Schools*, Reality's Last Stand (Jan. 17, 2023)... 21

Defending Education, *List of School District Transgender – Gender Nonconforming Student Policies*(last updated Apr. 21, 2025) ......................................... 6

Erin Brewer et al., TRANSING OUR CHILDREN 132 (2021 .............................. 8

Greg Burt, *CA Legislative Leader Still Refuses to Allow Hearing on Parent Notification*, Cal. Family Council (Jan. 7, 2024) ..................................... 7

J.L. Herman et al., (*How Many Adults and Youth Identity as Transgender in the United States?,* The Williams Institute, UCLA Sch. of Law (Aug. 2025) .............. 10

iii

J.L. Herman, et al., *Age of Individuals Who Identify as Transgender in the United States*, The Williams Institute, UCLA Sch. of Law (Jan. 2017) ............................. 10

Kelci Hobson, *A Call to Action: LGBTQ+ Youth Need Inclusive Sex Education*, SIECUS (May 25, 2021), ......................................................................... 8

Los Angeles County Office of Education, *PRISM Advisory Committee Gather to Review PRISM Program Course Content*, (Aug. 7, 2023), ........................................ 8

Robin Respaut et al., *Putting Numbers on the Rise in Children Seeking Gender Care*, REUTERS (Oct. 6, 2022), .............................................................................. 10

SoCal Daily Pulse, *Irvine Unified Implements Disturbing Policy of Lying to Parents about Secretive Gender Support Plans* ..................................................................... 8

Teny Sahakian, *Abigail Shrier: Audio Exposes California Teacher's Efforts to Subvert Parents and Recruit Kids to LGBTQ+ Clubs*, FOX NEWS (Nov. 19, 2021).. 6

U.S. Dep't. of Health and Human Servs., *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* (Nov. 19, 2025) ........................................... 5

**INTRODUCTION AND INTEREST OF AMICI CURIAE[1]**

Child & Parental Rights Campaign, Inc. (CPRC) is a nonprofit, public-interest law firm that represents parents like parent Applicants across the country in challenging governmental actions that threaten parental rights, including, as is true here, legislation and administrative regulations that intentionally withhold from parents vital information regarding their children's upbringing and well-being. In particular, CPRC represents parents who have challenged school district policies, which like the policy and statute at issue here, conceal from parents that their children are being treated as something other than their sex at school, including the use of alternate names and pronouns and permitted use of opposite sex privacy facilities.

Our Duty-USA ("Our Duty") is a nonprofit whose members across the United States have varied political backgrounds (although it skews left), ethnicities, and sexual orientations, but share the experience of raising children who formerly rejected or currently reject their sex. Members have had schools secretly socially transition their children, deceive them when they inquire about their children's identities, refuse to comply with their demands to cease affirming their child's rejection of their sex, and report them to child welfare agencies for refusing to endorse their child's sex rejection.

---

[1]    Under Rule 37.6 of the Rules of this Court, amici state that this brief was not authored in whole or in part by counsel for any party and no person or entity other than amici curiae or their counsel has made a monetary contribution toward the brief's preparation or submission.

1

Based on experiences with their own children and clients, Amici have personal knowledge that the adoption of transgender identities is a maladaptive coping mechanism often stemming from, *inter alia*, autism, trauma, internalized homophobia, sexual abuse, other mental health ailments, exposure to pornography, and social contagion.[2] Amici know that children can and often do suffer from identity crises, including gender dysphoria, however, no child is born a different "gender" as their sex (i.e., "transgender"), as even the proponents of the ideology that endorses this belief cannot cogently define these terms nor point to a biological source of such discordance. Likewise, the term "cisgender" is repugnant to biological reality and reason, as it creates an illusion that there are children who were "born in the wrong body."

## SUMMARY OF ARGUMENT

Until recently, the facts that sex is biological and immutable were considered universal truths. *See Mahmoud v. Taylor*, 606 U.S. 522, 583 (2025) (Thomas J., concurring) (stating that the concept of "gender identity" is a recent phenomenon"). No parental right is more essential than the authority to raise one's child as his/her sex – a fundamental dimension of human existence. Parents in California (and nation-wide) confront state and school district policies and laws that mandate school deception regarding children's identity confusion.[3] These laws and policies either

---

[2]    *See* Brief for Amicus Curiae Our Duty Supporting Respondents and Affirmance at 8–15 in *United States v. Skrmetti*, 605 U.S. 495 (2025) (No. 23-477) (hereinafter "Skrmetti Brief").

[3]    Currently, there have been over 31 lawsuits filed across the country against school districts requesting courts to restore parental rights to raise their children as their sex and control their mental health treatment, including two cases with

2

require school employees to withhold information from parents or leave disclosure to the employee's discretion based upon that employee's opinion as to whether the parent is worthy of knowing. California schools also refuse to honor parental directives to treat children according to their sex. This government interference is contrary to long-standing constitutional principles. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."). Parents need immediate relief from this governmental intrusion into parental rights to reverse the effects of the social contagion and influence of trusted adults who captivate those children who may not fit neatly in the stereotypes expected of their sex.[4]

California has systematically implemented the transgender ideology with policies throughout its school system, including the one at issue here, resulting in an unnatural and substantial increase in students rejecting their sex (identifying as "transgender"). The Appellate Court abandoned over 100 years of precedent protecting parental rights to direct the upbringing of their children by permitting schools to exclude parents from decisions about their child's identity based solely on

---

petitions for certification pending, including *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 346–47 (1st Cir. 2025) *pet. for cert. filed*, No. 25-77 (July 18, 2025) and *Littlejohn v. School Bd. of Leon Cnty., Fla.,* 132 F.4th 1232, 1242–43 (11th Cir. 2025), *pet. for cert. filed,* No. 25-259 (Sep. 3, 2025); *see also* Brief for Amici Curiae Our Duty-USA and Colorado Principled Physicians Supporting Petitioner in *Foote v. Ludlow, No. 25-77.*

[4]    *See Skrmetti* Brief at 8–15.

3

speculation of potential harm or parental disagreement with the government's chosen approach for their confused child.

This Court's intervention is urgently needed. Lower courts are in disarray, with a deepening conflict over the application of parental rights in this context. Cases like *Foote v. Ludlow Sch. Committee*, 128 F.4th 336 (1st Cir. 2025), *pet. for cert. filed*, No. 25-77 (July 18, 2025) and *Littlejohn v. School Bd. of Leon Cnty.*, 132 F.4th 1232 (11th Cir. 2025), *pet. for cert. filed*, No. 25-259 (Sep. 3, 2025), currently pending before this Court and presenting similar questions, demonstrate the growing national importance of this issue and the inconsistent and unjust outcomes for families. Unless this Court acts expeditiously, school policies of secrecy that replace parental guidance with a state-enforced ideology will continue and countless more children will be convinced to reject their sex and to undergo life-altering interventions on their disease-free bodies. Time is of the essence for the nation's children. This Court should vacate the stay and reinstate the district court's injunction and grant certiorari on all three cases, Foote, Littlejohn and Mirabelli.

**ARGUMENT**

I.     **The Stay Requires School Employees to Continue to Violate Parental Rights as Part of a Concerted Plan to Prevent Parents From Exercising Their Rights To Direct the Upbringing Of Their Children.**

The Ninth Circuit egregiously erred in staying the injunction which permits longstanding violations of parental rights that are tearing families apart and irreversibly harming children to continue in California unabated. The Appellate Court has acted contrary to the Constitution and decades of precedent in ruling that school employees must continue to:

4

1. Lie to parents; [5]

2. Prevent the parent from accessing educational records of the child;

3. Actively deceive parents by switching between names and pronouns when speaking to the parents;

4. Ignore parents' directives to treat their child as his/her sex – i.e., refer to their child by his/her legal name and use pronouns that align with his/her sex;

5. Force employees to violate their religious beliefs and moral consciences and violate California law[6] by deceiving parents about their child's sex-rejecting interventions while requiring them to use the child's chosen pronouns and name; and

6. Not be instructed of parents' rights to be involved and participate in the decision to socially transition his/her child, a decision that will most likely decide the future course of the child's sexual health.[7]

Applicants' Emergency Application to Vacate Interlocutory Stay Order at App. 23a-25a, *Mirabelli v. Bonta*, No. 25A810 (S. Ct. filed Jan. 8, 2026) ("Appl.").

---

[5]    Pursuant to Cal. Educ. Code §44932(a)(4), permanent school employees can be terminated for dishonesty.

[6]    *See* Note 5.

[7]    *See* U.S. Dep't. of Health and Human Servs., *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, 14, 89 (Nov. 19, 2025) (noting that the risks of medical transition include "infertility/sterility, sexual dysfunction" and that social transition has a strong association with later use of such medical interventions).

5

School policies keeping secrets from parents about their child experiencing sex-rejecting feelings are ubiquitous in California.[8] Since at least 2021, California parents have been desperately fighting to simply be notified when the school begins to take steps to affirm their child's sex-related confusion. The first lawsuit was filed after a leaked video showed that teachers were spying on children as a recruitment method for their transgender club.[9] Efforts to halt the secrecy and restore parental rights have been thwarted by the Legislature, Respondent Bonta, and the California Department of Education ("CDE") at every turn. For example, in 2023 when Our Duty proposed and sponsored legislation that would have required parental notification, legislators refused to even schedule a committee hearing, killing the bill before

---

[8]     *See* Defending Education, *List of School District Transgender – Gender Nonconforming Student Policies* (last updated Apr. 21, 2025) https://defendinged.org/investigations/list-of-school-district-transgender-gender-nonconforming-student-policies (reporting that secret social transitions policies have been adopted at least 21,314 schools affecting approximately 12 million students); Brad Jones, *California School District Emails Reveal Students Were Secretly Gender Transitioned*, EPOCH TIMES (Mar. 17, 2023, updated May 5, 2023), https://www.theepochtimes.com/us/california-school-district-emails-reveal-students-were-secretly-gender-transitioned-5131093 (reporting that Newport-Mesa Unified School District had 23 secret social transition plans, 8 of which were for elementary students); *see also,* Note 20.

[9]     *See Konen v. Caldeira*, No. 22-cv-1813 (Cal. Super. Ct. Monterey Cnty., June 27, 2022), *removed* to No. 5:22-cv-5195 (N.D. Cal., Sept. 12, 2022) (a case in which an eleven-year-old female was socially transitioned without parental knowledge at school and in which two teachers were recorded revealing how they "stalked" students' communications to recruit members for their transgender club); Teny Sahakian, *Abigail Shrier: Audio Exposes California Teacher's Efforts to Subvert Parents and Recruit Kids to LGBTQ+ Clubs*, FOX NEWS (Nov. 19, 2021), https://www.foxnews.com/us/abigail-shrier-audio-exposes-california-teachers-efforts-to-subvert-parents-and-recruit-kids-to-lgbtq-clubs.

6

parents could publicly voice their support.[10] School board efforts to implement parental notification policies have faced active opposition from Respondents Bonta and CDE. School boards were threatened and, in some cases, sued by the state for trying to provide parents with notice when their children were rejecting their sex.[11] A parent coalition attempted to qualify a ballot initiative to rectify the gross abrogation of parental rights, but Respondent Bonta wielded his power once again to interfere with that attempt. Finally, to guarantee that the secrets continue, the Legislature passed and Governor Newsom signed AB1955,[12] which codified that no school can adopt a policy requiring parental involvement when their child is rejecting his/her sex.[13] When announcing AB1955, Sen. Scott Wiener claimed that "LGBTQ kids" are **his kids** —that is, the government's kids, a claim that could come to fruition if the courts do not re-establish parental rights to raise a child as his/her sex.[14]

---

[10] Greg Burt, *CA Legislative Leader Still Refuses to Allow Hearing on Parent Notification*, Cal. Family Council (Jan. 7, 2024), https://www.californiafamily.org/2024/01/ca-legislative-leader-still-refuses-to-allow-hearing-on-parent-notification/.

[11] *See, e.g., People ex rel. Bonta v. Chino Valley Unified Sch. Dist.*, No. CIV SB 2317301 (Cal. Super. Ct., San Bernardino Cnty., Aug. 28, 2023); *Cal. Dep't of Educ. v. Rocklin Unified Sch. Dist.*, No. S-CV-0052605 (Cal. Super. Ct., Placer Cnty., Apr. 10, 2024); Cal. Dep't of Justice, *Legal Alert – Forced Disclosure Polices re: Transgender and Gender Nonconforming Students* (Jan. 10, 2024), https://oag.ca.gov/system/files/attachments/press-docs/Legal%20Alert%20re%20Forced%20Outing%20Policies.1.10.24_0.pdf.

[12] 2024 Cal. Stat. Ch. 95 (creating Cal. Educ. Code §§ 220.1, 220.3, 220.5).

[13] Brad Jones, *Parent Group to Sue California Official Over Alleged Misleading Ballot Title,* CALIFORNIA INSIDER,(Jan. 8, 2024, updated Nov. 27, 2024), https://californiainsider.com/california-news/parent-group-to-sue-california-official-over-alleged-misleading-ballot-title-summary-5560682.

[14] California Family Council, *Senator Scott Wiener Calls Parents Who Want Parent's Rights "Nasty People"*, YouTube (June 3, 2024), https://www.youtube.com/watch?v=dUAuHPC8AHI.

Actions by the Legislature and Respondents reveal a clear goal to use schools to actively promote gender confusion in children and prevent parents from responding in any way other than to "affirm" the confusion. By deliberately hiding the child's gender confusion from the parents, state actors make it all but impossible for reality-based or religious parents to direct their child toward coming to terms with their sexed body and away from chemically castrating drugs, a lifetime of taking wrong sex hormones, or surgeries that remove healthy body parts to create an appearance that differs from their sex.

To help achieve the goal, CDE partnered with Gender Spectrum and Human Rights Campaign ("HRC"),[15] two of the nation's most prominent organizations that advocate for sex-rejection in children, to create the PRISM program, its mandated "cultural competency" training.[16] Gender Spectrum has a toolkit describing entry points for gender ideology into the schools, including:

- "Instructional Entry Point: Getting gender ideology into every single classroom;"

- "Institutional Entry Point: Putting into place policies that solidify gender ideology as a permanent fixture in schools."[17]

---

[15] Kelci Hobson, *A Call to Action: LGBTQ+ Youth Need Inclusive Sex Education*, SIECUS (May 25, 2021), https://siecus.org/a-call-to-action-lgbtq-youth-need-inclusive-sex-education/ (noting that the Human Rights Campaign (HRC) boasts that it has educated over 11 million students).

[16] *See* Cal. Educ. Code §281.3(c); 75a; Los Angeles County Office of Education, *PRISM Advisory Committee Gather to Review PRISM Program Course Content*, (Aug. 7, 2023), https://www.lacoe.edu/news/2023-08-07-prism-advisory-committee-meeting.

[17] Erin Brewer *et al.,* TRANSING OUR CHILDREN 132 (2021).

Gender Spectrum and HRC are also sponsors of *Schools in Transition*, a guide published in 2015.[18] The guide contains a sample Gender Transition Plan[19] that is confidential between the school and the student to the exclusion of their parents. Many school districts have implemented these plans.[20]

 *Schools in Transition* instructs that:

> [T]here are many activities and lessons that can effectively **scaffold a student's gender transition**. . . while some may assume that elementary students are too young to discuss these issues, experience from schools across the country say otherwise. In fact, in most cases **younger students are much more flexible in their thinking** and capacity for understanding a peer's assertion of their authentic gender.[21]

In other words, schools should be scaffolding – pushing students towards next steps of transition and "get them when they are young," all without parental knowledge. An example of how this plays out is seen in an elementary school in Encinitas School District that arranged for a "buddy program" that required that fifth graders read transgender-themed books to their kindergarten "buddies," *i.e.,* peer to peer indoctrination, without parental knowledge.[22]

---

[18]    Asaf Orr et al., *Schools in Transition - A Guide for Supporting Transgender Students in K-12 Schools,* (Aug. 3, 2015), https://www.nclrights.org/wp-content/uploads/2015/08/Schools-in-Transition-2015-Online.pdf. ("Schools in Transition")

[19]    *Id.* at 52 - 59.

[20]    *See. also* SoCal Daily Pulse, *Irvine Unified Implements Disturbing Policy of Lying to Parents about Secretive Gender Support Plans* (n.d.), https://socaldailypulse.com/post/irvine-unified-implements-disturbing-policy-of-lying-to-parents-about-secretive-gender-support-plans/ (describing a public records request that revealed collaboration of school, LGBTQ groups and gender clinics, and more than 100 social transition plans at the Irvine School District).

[21]    *Schools in Transition, supra* n. 18*,* at 15.

[22]    *S.E. v. Grey*, 782 F. Supp. 3d 939, 945-46 (S.D. Cal. 2025), *appeal dismissed* (9th Cir. Nov. 19, 2025).

The effect of these techniques is best demonstrated by the extraordinary jump in the number of youth adopting a transgender identity. The percentage of California youth ages 13-17 identifying as "transgender" nearly quadrupled from 0.85% in 2017 to 3.15% in 2025.[23] California youth ages 6 to 17 receiving a gender dysphoria diagnosis tripled between 2017 and 2021.[24]

Far from merely implementing law and policy, Respondents have employed aggressive and often stealth tactics to usurp parental rights to direct the upbringing of their children to pursue the agenda of encouraging children to reject their sex. Parental rights are being irreparably harmed as long as the injunction issued by the lower court remains stayed and Respondents permitted to continue their efforts unabated.

## II. Basing Government Policies on a Presumption that Parents of Children Experiencing an Identity Crisis Are Unsafe is Unconstitutional.

The Appellate Court's ruling rests, in part, on the insidious and unconstitutional presumption that parents categorically cannot be trusted to know their child is identifying as "transgender." This presumption contradicts Amici's experiences and turns a foundational principal of American law, that "the

---

[23]    J.L. Herman, *et al., Age of Individuals Who Identify as Transgender in the United States*, The Williams Institute, UCLA Sch. of Law (Jan. 2017), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Age-Trans-Individuals-Jan-2017.pdf; J.L. Herman *et al., (How Many Adults and Youth Identity as Transgender in the United States?,* The Williams Institute, UCLA Sch. of Law (Aug. 2025). https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Pop-Update-Aug-2025.pdf.

[24]    Robin Respaut *et al., Putting Numbers on the Rise in Children Seeking Gender Care,* REUTERS (Oct. 6, 2022), https://www.reuters.com/investigates/special-report/usa-transyouth-data/.

10

natural bonds of affection lead parents to act in the best interests of their children," on its head. *Parham v. J.R.*, 442 U.S. 584, 602 (1979). The Court's precedents operate on a "presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Id.* The state cannot simply cast this presumption aside based on a generalized fear or an ideological disagreement with a parent's views on "gender." As this Court stated in *Parham*, "[t]he statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition." *Id.* at 603 (emphasis in original).

Schools cannot create a state-dictated treatment of children who reject their sex. Nor can they force parents to accept that their children are "transgender" and affirm that the sex-rejecting identity is natural, consistent with their religious beliefs, and in the child's best interest. "Simply because the decision of a parent is not agreeable to a child or because it involves risks does not automatically transfer the power to make that decision from the parents to [the state]." *Parham,* 442 U.S. at 603. "The Due Process Clause does not permit a state to infringe on the fundamental right of parents to make the child rearing decision simply because [the government] believes a 'better decision' could be made." *Troxel,* 530 U.S. at 72-73.

Moreover, as this Court recognized in *United States v. Skrmetti*, 605 U.S. 495, 504-505 (2025), the appropriate treatment for children who reject their sex is hotly contested. This fact alone makes clear that parental involvement in decision-making about this fundamental aspect of their child's upbringing is essential.

11

As the district court stated in *Ricard v. USD 475 Geary County, KS Schools*, even if some parents are not supportive of their child's sex-rejecting identity, "whether the District likes it or not, th[e] constitutional right [of parents to raise their children] includes the right of a parent to have an opinion and to have a say in what a minor child is called and by what pronouns they are referred." No. 522-CV-04015HLTGEB, 2022 WL 1471372, at *8 (D. Kan. May 9, 2022).

California has created a shadow process that deprives parents of legal authority devoid of any due process. School officials (and the child) decide, surreptitiously, if the parents are "safe" enough to be brought into the secret that everyone at the school likely already knows. This severance of parental rights to guide their child through a gender identity crisis lacks the "fundamentally fair procedures" required by law. *See Santosky v. Kramer*, 455 U.S. 745 (1982). Government has never before so blatantly intruded into parental rights, showing clear distrust and disdain for parents who do not ascribe to the ideology of "gender identity" while making life-altering decisions about their children. Staying the injunction permits this unprecedented usurpation of parental rights to continue unabated.

III. **Respondents' Own Words Demonstrate that Parents Must Be Notified of their Child's Sex-Rejection while at School for the Safety and Well-Being of the Child.**

The Appellate Court opined that Respondents do not "categorically forbid disclosure of a child's adoption of a "transgender" identity while at school. Setting aside the overwhelming evidence that Respondents did, had, and continue to, instruct schools to deceive parents, Respondents' own statements provide the evidence which

12

demonstrates that in reality every parent *should* be informed about their child's identity struggles.

In his complaint in *People ex rel. Bonta v. Chino Valley Unified Sch. Dist.*, No. CIV SB 2317301 (Cal. Super. Ct., San Bernardino Cnty., Aug. 28, 2023), Respondent Bonta stated that 86 percent of "transgender" youth have considered suicide and 56 percent have attempted it.[25] Thus, Respondent himself provides the unquestionable justification for requiring parent involvement, as do other cases including the experience of the Poes, whose own daughter attempted suicide while the school was secretly treating her as a boy.[26] If children who adopt a "trans-identity" are more susceptible to suicidality, informing parents who do not take breaks from their children over holidays, summers, or after 3 p.m. is imperative.

---

[25]    Complaint at 6–7, *People ex rel. Bonta v. Chino Valley Unified Sch. Dist.*, No. CIV SB 2317301 (Cal. Super. Ct. San Bernardino Cnty., Aug. 28, 2023), https://oag.ca.gov/system/files/attachments/press-docs/Stamped%20-%20CVUSD%20Complaint.pdf.

[26]    *See also, Perez v. Broskie*, No. 3:22-cv-83 (M.D. Fla. Sept. 30, 2022) (Florida school hid female twelve-year-old's sex confusion while affirming her male identity, until she attempted suicide a second time at school); *Kaltenbach v. Hilliard City Sch.*, 730 F. Supp. 3d 699, 701 (S.D. Ohio 2024), *appeal dismissed*, No. 24-3336, 2025 WL 1147577 (6th Cir. Mar. 27, 2025) (It was not until the female student attempted suicide that the school informed the parent that it had been treating her as a boy.); *Lee v. Poudre, Dist. R-1*, 135 F.4th 924, 929 (10th Cir. 2025), *cert denied*, No. 25-89 (Oct. 14, 2025) (wherein the middle school student attempted suicide while being secretly socially transitioned at school.)

13

IV.    **Amici's Stories of California Parents Illustrate the Danger of Schools Engaging in the Social Transition of Children Without Parental Involvement.[27]**

Through these vignettes of parents from different school districts, the pattern of California schools' active indoctrination, participation and deception in promoting the adoption of "transgender identities" is evident, as is the destructive effect on a child. Fortunately, each of the children presented below avoided a life on synthetic hormones and sterilization.[28]

### A.    Erin Friday, President of Our Duty

Erin's daughter, P., was eleven when, following sex-ed class, she and her entire friend group each chose a new identity. P. shifted through a myriad of identities, ultimately choosing "transgender" at thirteen. Her friends' identities likewise morphed.

During P.'s online freshman year, Erin overheard teachers using a male name and pronouns. Erin was told by the school that per AB1266, the school was required to follow her daughter's request while not informing the parents. The school stated that it was a "safe space" for P. while indicating Erin was "unsafe" by calling Child Protective Services ("CPS").

Erin removed P. from school and requested records pursuant to FERPA[29] to test whether the school would produce the social transition plan or evidence that it was socially transitioning her daughter; it did not.

---

[27]    Some pseudonyms are used to protect families from the animus often directed at those who resist sex-rejecting transitions.

[28]    The effect of the puberty blockers on Sue Y. 's daughter's fertility is unknown.

[29]    Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. §1232g.

14

After getting needed support, P. ceased rejecting her sex and now accepts her body as an adult.

Erin has been contacted by hundreds of parents whose children suddenly adopt sex-rejecting identities and who battle schools to stop social transitions. Many parents fear objecting or even asking if their child is being transitioned, due to the risk of having CPS called against them. Parents report school counselors are convincing students they are "transgender" and that schools relentlessly push transgenderism in the classroom.

Erin advises parents to unenroll from public schools if possible and homeschool. She suggests families move to other states, though secrecy policies are nearly ubiquitous. Teachers and school board members who disapprove of indoctrinating students and deceiving parents also contact Erin seeking advice on combating secrecy policies. The teachers voice confusion as to what the law requires—whether they can be honest with parents or must lie, so most stay silent for fear of retaliation.

Erin's experience with nearly 500 parents shows they do not reject their gender-confused children. Rather, children run away, with some schools, LGBTQ centers, and laws encouraging them to seek "chosen families." *See, e.g.,* Cal. Family Code §3427; Wash. Rev. Code §13.32A.082; *Blair v. Appomattox Cnty. Sch. Bd.*, 147 F.4th 484 (4th Cir. 2025).

15

### B.    Abigail Martinez[30]

The avoidable tragic story of Abigail and her daughter, Yaeli, began in earnest as Yaeli began high school after a difficult middle school experience riddled with bullying.  Yaeli, looking for a place to fit in, found friendship with a sex-rejecting older female student, who directed her to the school's LGBTQ club. Yaeli joined without Abigail's knowledge. Through the club, Yaeli was readily persuaded that her growing severe depression could be resolved if she "transitioned." Yaeli shed her feminine appearance and the public high school, in keeping with its policy, treated Yaeli as a boy without consulting Abigail.[31] Abigail sought help for her suffering daughter from the school's psychologist, unaware that the psychologist was actually working to solidify Yaeli's sex-rejecting identity, and against Abigail.

When Yaeli attempted suicide, the school's principal met Abigail at the hospital demanding that she call Yaeli her chosen male name, asking "why can't she just capitulate?" But Abigail knew that Yaeli's mental health issues were not because Abigail was not affirming her confusion, but that the adoption of a male identity was a symptom of her depression. The school and a "trans" friend's parent continued their coercive tactics against Abigail, even temporarily "kidnapping" Yaeli as Abigail searched frantically for her missing daughter. Lead by the school psychologist into

---

[30]    *See also* Brief of Amicus Curiae Abigail Martinez in Support of  Respondents in *United States v. Skrmetti*, 605 U.S. 495 (2025) (No. 23-477).

[31]    Arcadia Unified School District, *Policy Bulletin: Transgender Students – Ensuring    Equity    and    Nondiscrimination*    (Apr.    16,    2015), https://1.cdn.edl.io/hvDPd240Xzy6VJBaj4vFtbmPZi0s9TJ9hfayeEx4lcQOX4Ps.pdf.

using CPS to get sex-rejecting interventions, Yaeli filed false claims of physical and mental abuse, and she was removed from her mother and three siblings' home.

While CPS quickly cleared Abigail of physical abuse, the emotional abuse claims lingered. While in state custody, Yaeli was placed on testosterone and cycled through foster homes and facilities, sleeping on couches and living in abject poverty. Abigail was granted limited supervised visits with Yaeli but she was forbidden to discuss the harms of sex-rejecting interventions or her faith. After Yaeli spent approximately three years in state custody because Abigail chose to raise her daughter as her sex, Abigail was absolved of all abuse claims. But it was too late. Yaeli's physical suffering from the effects of testosterone in her tiny female body was too much, and she stood in front of an on-coming train. The State Defendants and school set Yaeli's death in motion.

### C. Lydia McLaughlin

After Lydia's daughter T. adopted a "transgender" identity despite having no prior body discomfort, she started self-harming. T.'s public high school solidified her sex-rejecting identity with lessons about "transgenderism" while repeatedly using T.'s desired male name and pronouns. By happenstance, Lydia discovered the school was socially transitioning T.

Lydia demanded teachers stop referring to her daughter as male. The teachers assured her they would, but they lied. Afterwards, the principal told T. that her transgender identity would be their secret, colluding against Lydia. Lydia made a FERPA request to determine if the school was continuing to defy her instruction, but

the school refused to provide T's records. After engaging counsel, the school provided the records evidencing that indeed the school was continuing to socially transition T.

As T. fell deeper into the identity, she wore a breast binder and developed an explosive temper. T. accused her parents of abuse and developed an eating disorder. Despite T.'s vitriol, Lydia refused to "affirm" her "trans-identity", knowing the danger of surrendering to her daughter's maladaptive identity. T., now a college student, has completely dropped her trans identity.

**D. Sue Y.**

When Sue Y.'s daughter G. turned 12, her demeanor changed. G. dressed in dark, oversized clothes, became agitated, and suicidal. Amidst these changes, G. announced she was "transgender".

Sue promptly took G. to a Kaiser gender clinic. Outside her mother's presence, a clinician told G. about hormonal treatments and surgeries "to make her authentic." The clinic then told Sue she had to choose between "a dead daughter or a live son." Terrified, Sue followed the clinic's advice and placed G. on puberty blockers and directed G.'s school to cooperate with the social transition, which it did. Sue committed to G.'s "transition" for years, but G.'s mental health deteriorated. G. was self-harming, suicidal, borderline anorexic, and in and out of psychiatric hospitals.

After an out-of-state psychiatrist advised that G.'s distress stemmed from mental illness, Sue stopped the blockers and stopped affirming the male identity. The school counselor was furious when Sue instructed her to stop referring to G. as a boy and called CPS, asserting that raising G. as her sex was abuse. Sue removed G. from public school. G. is now a well-adjusted adult woman who embraces her female sex.

18

### E.  Jessica E.

At age 13, Jessica E.'s daughter M. was subjected to California's mandated sex education curriculum, exposing her to a wide range of sexual and so-called gender identities. Following class, her friends each selected non-straight labels. M. chose "bisexual" and shortly thereafter began cutting herself. The next year, because M. dressed in "Anime-themed" clothes—sometimes a sign of identity crisis—the school counselor invited her to meet trans-identifying older students. Through these meetings and private counseling without parental consent, M.'s identity shifted to "transgender."

M. informed her mother about her new identity and her mental health plummeted. Jessica discovered M. had been obsessively consuming "transgender" content on social media while being affirmed in her newly adopted identity by the school without parental consent.

Jessica removed her phone access and unenrolled her from school. The school counselor, however, refused to cease indoctrinating M. and even tried contacting M. through her brother. Jessica then unenrolled her son and moved to Arizona. M., now a high school graduate, shed her "transgender" identity and her mental health improved. M. is both angry and embarrassed that she rejected biological reality as she embarks on a career as a firefighter.

### F. Lisa Mullins

Lisa's daughter M. struggled in middle school as she gained significant weight due to a medical condition. M. was artsy and disliked sports, pushing her out of the

19

"cool" group. When she started high school during COVID-19 lockdowns, she lost all peer interactions.

M. turned to the internet, falling into the transgender world, consuming Anime with transgender themes, YouTube, and TikTok. She changed markedly, wearing cartoon-like makeup, shaving her eyebrows, and changing her bedroom décor to witchcraft imagery. She also started cutting. Worried, Lisa listened to online classes and became alarmed by overt sexual themes with no educational value. She heard the teacher asking whether M. would be comfortable masturbating in a room with another person or engaging in anal sex. Lisa also heard classes espousing transgenderism.

M. began decompensating and cut herself so deeply it required an emergency room visit. A psychiatrist diagnosed M. with depression and anxiety and prescribed medication.

Lisa then discovered M. had changed her name and pronouns at school, using "they/them" and flipping her name regularly between male and female. The school adopted every change without question as M. circulated through myriad sex-rejecting identities.

Lisa met with school officials demanding they stop treating M. as a boy. The school refused, informing Lisa that M. controlled her name and pronouns. But when M. asked teachers to use her real name, they still used M.'s "trans" names, as did the school counselor. Lisa believes the school's goal was exerting power over "bigots and transphobes" like her.

20

Lisa toured the school, photographing how the Wellness Center enticed students with an "Explore Me" box filled with "trans" tape for binding breasts or penises or creating a fake penis "bulge." It also provided free breast binders.

In college, M. shed her transgender identities, her mental health issues subsided, and her feminine appearance returned. Lisa's family ultimately fled California to safeguard her other child from school systems that deceive parents.

### G. Beth Bourne

Beth is the mother of S., a 20-year-old female who began identifying as a transgender boy at age 13 after a series of other LGBTQ identities. Beth surmises that S. wanted to present as a boy to shield herself from the type of terrible sexual assault suffered by her best friend in sixth grade. S. also has long-standing mental health issues that worsened as her identity crisis emerged. A significant contributing factor to S.'s adoption of a transgender identity was her school - Davis Joint Unified High School, that has one in twenty-five students identifying as transgender, 2.8 times the national average.[32] The school was encouraging and counseling Beth that S.'s cutting and anxiety would resolve if she would treat S. as a boy. At first Beth listened to the "experts" in her desperation to help her child, but over time was alarmed to that her daughter's medical team suggested that her mentally unstable daughter undergo life-changing sex-rejecting interventions before she could even drive a car. The school counselor habitually pressured Beth to move forward in S.'s

---

[32] Colin Wright, *BREAKING: New Documents Reveal Shocking Surge in Trans-Identified Students in Davis, CA Schools*, Reality's Last Stand (Jan. 17, 2023), https://www.realityslaststand.com/p/breaking-new-documents-reveal-shocking.

"transition" creating a wedge between mother and child, while at the same time providing a basis for S.'s affirming father to obtain complete control over the rearing of S.  In an extraordinary act of selflessness, Beth gave up visitation with S. to her ex-husband in exchange for a prohibition of sex-rejecting interventions while S. was still a minor, giving her time to mature.

Now, an adult, S. has not medicalized and is showing signs of desistence, moving from trans to non-binary, wearing normal bras instead of breast binders, wearing dresses and typical female make up, and changing her name from a clearly male name to a typical feminine one. Tragically, the chasm created by the systematic encouragement of school and medical providers that S. was "trans" has not been bridged, and S. has no direct contact with Beth.

### H.  Aurora Regino[33]

When Aurora's daughter was 12 years old, she experienced some traumatic events in her life. Her father was in a debilitating car accident that rendered him brain damaged. In 5th grade, her beloved grandfather passed away, Aurora was battling breast cancer, and A.S. started puberty early.

A.S., feeling distressed at the changes to both her home life and body, turned to her school counselor for solace. The school counselor had encouraged students in A.S.'s class to explore their identities and consider whether they felt like they were not the "gender" associated with their sex. The school counselor had told students that this feeling was normal, and they should embrace the feeling if they had it.

---

[33]    *See also Regino v. Staley*, 133 F.4th 951, 958 (9th Cir. 2025).

The counselor invited A.S. to an "arts and crafts" group. After one of the meetings, A.S. told the school counselor she felt like a boy. The counselor sprang into action. She asked A.S. if she had a boy's name she wanted the teachers to use. A.S. felt pressured by the school counselor and said she did.

A.S.'s teachers clandestinely started to refer to her as a boy, with a boy's name and male pronouns. The "arts-and-crafts club" became a club for indoctrination. The school counselor began discussing gender and sexuality in depth with the 12-year-old girls. Without her mother's permission, A.S. was meeting with the school counselor and being further coached into her transgender belief. The counselor also told A.S. about binding her breasts and "top surgery."

A.S. told the counselor that she wanted her mom to know about what was going on. The counselor encouraged her to keep it a secret. Finally, A.S. told her grandmother, and she in turn told Aurora.

The school evaded Aurora's subsequent inquiries, telling her—falsely—that it was required by law to keep its actions secret from her. A.S.'s belief that she was really a boy subsided after leaving the offending school.

### I.    Jessica Konen[34]

Jessica is the mother of M., a female. When M. was 11, in 2019, a friend invited her to a Gender Sexuality Club ("GSA"). She quit but rejoined when a teacher personally invited her back. When the Club teachers asked her for her sexuality, to conform M. said she was bisexual, even though she did not understand the meaning

---

[34]    *See* Note 9.

of the term. The teachers convinced her that she was actually a transgender boy and instructed her to choose a male name. The school then called her the male name and created a secret gender support plan that noted that M.'s parent should not be told. M.'s mental health declined.

M.'s club teachers were then caught on tape at a California Teachers Association meeting admitting how they circumvent parents and look at student's Google searches to find members for their club. Jessica discovered that the teachers counseled other teachers to use creative names to mask the true purpose of the GSA clubs, as they had done.

Jessica disenrolled M. from the offending school, and M.'s mental health steadily improved. M. then ceased identifying as "transgender."

## CONCLUSION

For the forementioned reasons, Amici Curiae respectfully asks this Court to vacate the Ninth Circuit's interlocutory order staying the district court's injunction until disposition of any petition for certiorari.

January 21, 2026

|  | */s/Mary E. McAlister* |
| Erin Friday | Mary E. McAlister |
| OUR DUTY - USA | Counsel of Record |
| P.O. Box 442 | Vernadette R. Broyles |
| San Carlos, CA 94070 | Kevin R. Smith |
|  | CHILD & PARENTAL RIGHTS CAMPAIGN |
|  | 5425 Peachtree Pkwy, Suite 110 |
|  | Norcross, GA 30092 |
|  | (770) 448-4525 mmcalister@childparentrights.org |
|  | Attorneys for Amici Curiae |

24

**EXHIBIT 5**

No. 25-3826

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

CITY OF HUNTINGTON BEACH, *et al.*,
*Plaintiffs-Appellants*,

v.

GAVIN NEWSOM, *et al.*,
*Defendants-Appellees*.

———————————

**On Appeal from the United States District Court**
**for the Central District of California**
No. 8:24-cv-02017-CBM (JDEx)
Hon. Consuelo B. Marshall, District Judge

———————————

## DEFENDANTS-APPELLEES' SUPPLEMENTAL BRIEF
———————————

ROB BONTA
  *Attorney General of California*
SAMUEL T. HARBOURT
  *Solicitor General of California*
HELEN H. HONG
  *Principal Deputy Solicitor General*
CHERYL L. FEINER
  *Senior Assistant Attorney General*
JOSHUA A. KLEIN
  *Supervising Deputy Solicitor*
    *General*

JULIE VEROFF
  *Deputy Solicitor General*
DARRELL W. SPENCE
  *Supervising Deputy Attorney General*
JENNIFER A. BUNSHOFT
KEVIN L. QUADE
  *Deputy Attorneys General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
 (415) 510-3776
Julie.Veroff@doj.ca.gov
 *Attorneys for Defendants-Appellees*

March 13, 2026

## INTRODUCTION

On March 3, 2026, this Court ordered the parties to file simultaneous supplemental briefs addressing the impact, if any, of the Supreme Court's emergency docket decision in *Mirabelli v. Bonta*, No. 25A810, 607 U.S. __, 2026 WL 575049 (U.S. Mar. 2, 2026), on the issues presented in this case. *See* Dkt. 54. As explained below, that decision does nothing to disturb the arguments advanced in defendants' answering brief that the City of Huntington Beach lacks standing under longstanding circuit precedent and that the parent plaintiffs have failed to adequately allege—let alone demonstrate—that the future injuries they assert are fairly traceable to AB 1955 and would be redressed by a decision invalidating AB 1955. *See* Dkt. 26 at 15-17, 29-35.

*Mirabelli* also introduces additional justiciability problems into this case. The Supreme Court's order in *Mirabelli* effectively affords the parent plaintiffs the relief they seek. Because plaintiffs can obtain relief under the expansive class-wide permanent injunction in *Mirabelli*, any remaining controversy in this case is purely academic. If the Court does not affirm dismissal for lack of standing, the Court should thus hold this case in abeyance pending final resolution of *Mirabelli*. If the *Mirabelli* injunction remains in place, the Court can affirm dismissal on justiciability grounds. Finally, if the Court concludes that it has jurisdiction to

1

reach the merits, the reasoning in the Supreme Court's opinion supports dismissal of plaintiffs' substantive due process claims.

## STATEMENT

As the Court is aware from briefing and argument, this case involves a challenge by the City of Huntington Beach and a group of parents to Sections 5 and 6 of California's Assembly Bill 1955.  *See, e.g.*, Dkt. 26 at 8-9.  The parents allege that Sections 5 and 6, as related to gender identity and gender expression, violate their substantive due process rights and impose an unconstitutional condition on access to public education; the City alleges a Declaratory Judgment Act claim.  *Id.* at 8.  The "two challenged provisions only prohibit *mandatory* reporting policies or directives."  Dkt. 42 at 6.  They do not "forbid[] a school employee from deciding to disclose such information to a parent in a given case, even without the child's consent."  *Id.*  Nor do they "forbid a school district from adopting a policy that employees *may* elect to make such disclosures."  *Id.*

*Mirabelli*, by contrast, does not involve a challenge to AB 1955.  *See Mirabelli v. Olson*, 2025 WL 3713588, at *4 (S.D. Cal. Dec. 22, 2025) ("this case is not about the recently enacted California Assembly Bill 1955").  Rather, the parent and teacher plaintiffs in that action challenged various *other* state laws—including the Privacy Clause of the California Constitution, Cal. Const. art. I, § 1—on substantive due process, free exercise, and free speech grounds.  *See* 2025

2

WL 3713588, at *1, 3-4. After the district court certified the case as a class action, granted summary judgment to the plaintiffs, and ordered a class-wide permanent injunction, a panel of this Court granted the defendants' motion for a stay pending appeal. *See Mirabelli v. Bonta*, 2026 WL 44874 (9th Cir. Jan. 5, 2026). The plaintiffs then filed an emergency application to vacate the stay with the Supreme Court, which granted the application with respect to the parents' claims and denied the application with respect to the teachers' claims. *See Mirabelli*, 607 U.S. at __, 2026 WL 575049, at *3. In a per curiam opinion, the Supreme Court accepted the plaintiffs' characterization of the challenged state policies as "conceal[ing] . . . information from parents" and "facilitat[ing] a degree of gender transitioning during school hours." *Id.* at *3; *see also id.* *1-2. Applying the four-factor test governing stay applications, the Supreme Court explained that it had concluded that the parent plaintiffs likely have standing and are likely to succeed on their free exercise and substantive due process claims. *Id.* at *2-3. But it did not make a final determination as to those questions. *See id.* at *4 (Barrett, J., concurring) ("The word 'likely' is important, because it reflects that our assessment is preliminary.").

## ARGUMENT

1.  a.  There is no political subdivision plaintiff in *Mirabelli*, so the Supreme Court's per curiam opinion in *Mirabelli* does nothing to disturb the conclusion that

the City of Huntington Beach lacks standing under longstanding circuit precedent.

*See, e.g., City of S. Lake Tahoe v. Cal. Tahoe Reg'l Plan. Agency*, 625 F.2d 231,

233-234 (9th Cir. 1980); *see also* Dkt. 26 at 15-17.  Indeed, the Supreme Court

recently denied a petition for certiorari filed by the City in another case presenting

the question whether political subdivisions have standing to sue their parent State

in federal court on federal constitutional grounds.  *See City of Huntington Beach v.*

*Newsom*, No. 25-337 (cert. denied Feb. 23, 2026).

b.  The Supreme Court's per curiam opinion also does nothing to disturb the

conclusion that the parent plaintiffs here lack standing.  The California

Constitution's Privacy Clause—the central state law at issue in *Mirabelli*—

operates differently from AB 1955.  Whereas AB 1955 does not "forbid[] a school

employee from deciding to disclose" a student's gender identity or gender

expression "to a parent in a given case," Dkt. 42 at 6, the Privacy Clause would in

some circumstances prohibit school officials from disclosing information about a

student's gender identity to a parent.[1]

---

[1] In describing the scope of state privacy protections, this brief relies on
interpretations of state law previously announced by the Attorney General.
California's appellate courts have not had occasion to address the application of
privacy rights under the state constitution in this context.  *See* Cal. Dep't of Justice,
*Legal Alert: Forced Disclosure Policies*, OAG-2024-02 (Jan. 11, 2024),
https://tinyurl.com/5ahvubyz (Legal Alert) (explaining Attorney General's position
that minors have a constitutionally protected privacy interest under state law in
information about their gender identity and that such information may not be

(continued…)

4

In holding that the parent class members likely had standing in *Mirabelli*, the Supreme Court pointed to its recent decision in *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100 (2025). *See* 607 U.S. at __, 2026 WL 575049, at *3. In *Diamond*, 606 U.S. at 120, "commonsense economic inferences" and other evidence made it "sufficiently 'predictable' that invalidating [the challenged] regulations would likely redress the [plaintiffs'] injury."

That is not the case here. As this Court has recognized on multiple occasions, *see* Dkt. 42 at 6; Dkt. 53 at 1-2, "causation and redressability" in this action "depend on how regulated third parties not before the court will act in response to the government regulation or judicial relief," *Diamond*, 606 U.S. at 112.[2] Specifically, as this Court has already instructed, to establish causation and redressability, parent plaintiffs must "present evidence indicating that, in the absence of AB 1955's prohibition on mandatory policies or directives, such information would otherwise be disclosed to them"—that is, "in the absence of AB

---

disclosed where (1) the particular minor has a reasonable expectation of privacy in the particular circumstances, and (2) no compelling interest justifies disclosure).

[2] In cases in which the relevant standing analysis turns on predictions about the actions of third parties not before the court, it cannot fairly be said that the plaintiffs are "objects of" the challenged law. *Contra Mirabelli*, 607 U.S. at __, 2026 WL 575049, at *3 (stating that parent plaintiffs were "objects of the challenged policies"); *cf. Diamond*, 606 U.S. at 114 (observing that plaintiffs "might be considered an object of the [challenged] regulations," and if so, there would be "little question" that causation and redressability requirements would be satisfied).

1955, their school districts would employ mandatory reporting policies or directives concerning gender identity or gender expression." Dkt. 42 at 6-7. Plaintiffs have not made that showing. *See* Dkt. 42 at 7; Dkt. 53 at 2; *see also* Dkt. 26 at 29-35.

2.  Apart from standing, this case now involves additional justiciability problems. The Supreme Court's order reinstated the *Mirabelli* injunction as to the parent class, which broadly extends to all parents of California public-school students "who object to the challenged policies." *Mirabelli*, 607 U.S. at __, 2026 WL 575049, at *3. Because the parent plaintiffs here are members of that class and can obtain effective relief under the *Mirabelli* injunction, there is not currently any need for the Court to expend further judicial resources in resolving this case. If the Court is not prepared to dismiss based on standing at this juncture, the Court should hold the case in abeyance pending a final decision in *Mirabelli* and then order dismissal on either standing grounds or the grounds discussed below. *See generally Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999) (courts may resolve threshold justiciability issues in any order).

The parent plaintiffs in this action want to know if their children display symptoms of gender dysphoria at school, and they want to provide their consent before a school official uses a name and pronouns requested by their children. *See, e.g.*, 4-ER-643, 4-ER-694, 4-ER-698-701. The parents filed this lawsuit for

6

injunctive relief to prevent the Attorney General and the State Superintendent of

Public Instruction from interfering in their ability to do so.  4-ER-660.  Now, under

the terms of the *Mirabelli* injunction, if a parent asks their child's teacher whether

their child is expressing symptoms of gender dysphoria at school, or directs that a

teacher must only use their child's legal name and pronouns, the defendants here

cannot enforce or implement state law in any way that would prevent the teacher

from providing the requested information or from using the child's legal name and

pronouns.  *See Mirabelli v. Olson*, No. 3:23-cv-00768, Dkt. 308 (S.D. Cal. Dec.

22, 2025).[3]  Because the class certified in *Mirabelli* includes the parent plaintiffs

here, *see id.*, Dkt. 286 at 13 (S.D. Cal. Oct. 15, 2025), plaintiffs can obtain the

practical relief they seek under the *Mirabelli* injunction.

There are two ways to think about the justiciability-related consequences of

the Supreme Court's decision to allow the *Mirabelli* injunction to take effect in

---

[3] Specifically, the *Mirabelli* injunction prohibits the defendants in this action from implementing or enforcing "any . . . provision of California law" that would "permit or require any employee in the California state-wide education system [to] mislead[] the parent or guardian of a minor child in the education system about their child's gender presentation at school"; "permit or require any employee in the California state-wide education system to use a name or pronoun to refer to that child that do not match the child's legal name and natal pronouns, where a child's parent or legal guardian has communicated their objection to such use"; "or in any way interfere with a" school official "from communicating to parents that his, her, or their child has manifested a form of gender incongruity such as changing preferred names or pronouns." *Mirabelli v. Olson*, No. 3:23-cv-00768, Dkt. 308 at 1-2 (S.D. Cal. Dec. 22, 2025).

relevant part. Either leads to the same result. First, "[a] court may choose not to exercise its jurisdiction when another court having jurisdiction over the same matter has entertained it and can achieve the same result." *Washington v. Trump*, 145 F.4th 1013, 1025 (9th Cir. 2025) (quoting *Crawford v. Bell*, 599 F.2d 890, 893 (9th Cir. 1979)). The Court recently applied that principle in a case where a class-wide injunction granted in another case afforded plaintiffs their requested relief. *Id.* at 1025-1026. The same principle applies here: the class-wide injunction in *Mirabelli* affords plaintiffs all practical relief. And while *Mirabelli* is not yet final, the injunction in that case is currently in effect with respect to the parents' claims pending appeal. If the *Mirabelli* injunction is later overturned on appeal, the Court could proceed to resolve the issues presented in the parties' briefing here. Until that time, however, there is no practical need for the case's resolution and it would be appropriate for the Court to hold it in abeyance.

Second, "[i]ntervening judicial decisions may moot a case if they effectively end the live controversy and grant the parties the relief sought." *City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078, 1087-1088 (9th Cir. 2022). As discussed above, the class-wide injunction in *Mirabelli* grants parent plaintiffs here "the relief sought." *Id.* at 1088. If the *Mirabelli* injunction is later overturned, there could theoretically be some need to resolve this case. For now, however,

there is not.  And if the injunction ultimately remains in place in relevant part, dismissal would be appropriate.  *See id.* at 1086-1088.

3.  Finally, although the Court need not and should not reach the merits in this case, in the event it does so, the *Mirabelli* per curiam opinion would support the dismissal of plaintiffs' substantive due process claims.  The per curiam stated that parents likely have a substantive due process right "not to be shut out of participation in decisions regarding their children's mental health."  607 U.S. at __, 2026 WL 575049, at *3.  And it held that policies that "conceal" from parents the information that a child has "exhibit[ed] symptoms of gender dysphoria at school" and "facilitate a degree of gender transitioning during school hours" likely violate that right.  *Id.*  AB 1955 does not implicate or infringe any such right.  As this Court has recognized, AB 1955 does not "forbid[] a school employee from deciding to disclose such information to a parent in a given case," nor does it "forbid a school district from adopting a policy that employees *may* elect to make such disclosures."  Dkt. 42 at 6.  A prohibition on "*mandatory* reporting policies or directives," *id.*, which is all that the challenged sections of AB 1955 involve, is simply not a requirement that parents be "shut out of" any "decisions regarding their children's mental health," 607 U.S. at __, 2026 WL 575049, at *3.

9

## CONCLUSION

For the reasons explained above and in defendants' answering brief, *see* Dkt. 26, the Court should either affirm the district court's dismissal for lack of standing now or hold the appeal in abeyance pending final resolution of *Mirabelli* and then affirm the district court's dismissal.

Dated:  March 13, 2026                    Respectfully submitted,

_s/ Julie Veroff_

ROB BONTA
  *Attorney General of California*
SAMUEL T. HARBOURT
  *Solicitor General*
HELEN H. HONG
  *Principal Deputy Solicitor General*
CHERYL L. FEINER
  *Senior Assistant Attorney General*
JOSHUA A. KLEIN
  *Supervising Deputy Solicitor General*
JULIE VEROFF
  *Deputy Solicitor General*
DARRELL W. SPENCE
  *Supervising Deputy Attorney General*
JENNIFER A. BUNSHOFT
KEVIN L. QUADE
  *Deputy Attorneys General*

  *Attorneys for Defendants-Appellees*

10

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-3826

I am the attorney or self-represented party.

**This brief contains 2,335 words,** including 0 words manually counted in any

visual images, and excluding the items exempted by FRAP 32(f). The brief's type

size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[X] complies with the length limit designated by court order dated 03/03/2026.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Julie Veroff        **Date** 03/13/2026
*(use "s/[typed name]" to sign electronically-filed documents)*

**EXHIBIT 6**

👤 by <u>Kristin Lindgren-Bruzzone</u>     🕐 <u>March 6, 2026</u>

# Supreme Court strengthens parental notification rights for gender transitions



On March 2, 2026, the U.S. Supreme Court overturned a stay issued by the Ninth Circuit Court of Appeals in _Mirabelli v. Bonta_, reactivating a lower court order that **directs the State of California to refrain from permitting or requiring schools to maintain confidentiality of information about student gender presentation.** In the underlined emergency order, the Court stated that the parents in the case — a class of parents who object to state policies around student privacy or policies they feel violate their religious freedom — had a likelihood of prevailing on their appeal. The Court did not grant relief to the teacher plaintiffs in the case. This article contains a summary of the decision, a list of actions for local educational agencies and a set of additional key takeaways.

The Court's order (which was an unsigned underlined Per Curiam order) was unique, in that the Court typically does not issue written opinions when granting emergency orders of this type. The Court went through the elements of what is required for a party to obtain a stay and determined that the Ninth Circuit erroneously granted the stay of the lower court's order. The Court noted that the parents were likely to prevail on their appeal based on their First Amendment right to religious freedom and their 14th Amendment right to substantive due process, which provides them the right to "direct the upbringing and medical care of their children." The Court also held that the parents would be harmed by enforcing the stay while the appeal is considered but did not address any potential harm to students that could result from the immediate enforcement of the district court's order. The Court approved the district court's certification of a class action, though did not provide any analysis for that holding, and determined that any parents who "object to the challenged policies or seek religious exemptions" had standing in the appeal.

As to the First Amendment claim, the Court cited its earlier decision in _Mahmoud v. Taylor_, which required LEAs to provide parents with the ability to opt out of curriculum that violates their religious beliefs. _Mahmoud_ requires a court to apply "strict scrutiny" when ruling on complaints by parents that their religious rights have been violated in the school setting, which is the highest standard available and the most difficult to successfully challenge. While the Ninth Circuit believed that _Mahmoud_ only applied to curriculum, the Supreme Court expanded _Mahmoud_'s reach, stating that it applies to any religious claim in a school setting. As to whether the state's interest in setting the policy in question, which included student privacy

and safety, was "compelling" or constitutionally sufficient to withstand the required standard of scrutiny, the Court held that the state's policies were not narrowly tailored enough to meet that interest and yet protect parents' First Amendment rights. The Court opined that a policy that allows religious exemptions "while precluding gender-identity disclosure to parents who would engage in abuse," however, would be narrow enough. The Court did not offer any insight into how LEAs would know that such parents would engage in abuse.

As to the 14th Amendment claim, the Court indicated that it believes that all students with gender incongruence are suffering from the medical condition of gender dysphoria. The Court noted that, based on previous precedent, parents have a right to participate in their children's medical care; thus, policies that restrict parents from information about a student's gender incongruence likely violate the parents' rights to direct the upbringing and education of their children. Interestingly, the district court relied on the 14th Amendment right to substantive due process — a legal theory that holds that the due process clause of the 14th Amendment protects fundamental constitutional rights from government interference — a doctrine that this Supreme Court has often been reluctant to enforce or rely on. However, in this case, while it did not use the term "substantive due process," the Court's 14th Amendment argument relied on that doctrine.

Importantly for LEAs, the district court order that is now effective again — applying to parents only — directs the state, and "those persons in active concert or participation with" the state to refrain from enforcing any laws, guidance, training or other policies that would do any of the following:

- Permit or require any employee in the California statewide education system to mislead a parent or guardian of a minor child about the child's gender presentation at school, including lying to a parent, refusing to provide information when asked, refusing to provide student records, and allowing students to go by something other than their legal name and pronouns assigned at birth, if a parent objects.
- Permit or require anyone in the California statewide education system to use a name or pronoun to refer to any child that does not match the child's legal name and pronouns, where the parent or guardian has objected to such use.

**There are no exceptions to the requirements above.** The state must also include disclaimer language in any training materials, which provides, in summary, that parents have the constitutional right to be informed if their child expresses gender incongruence at school. (Certain parts of the disclaimer language applies to teachers, so that language is likely stayed. However, the California Department of Education [CDE] has included the entirety of the language as an amendment to its Assembly Bill 1955 guidance.)

The district court's order applies to all LEAs because it prohibits the state from permitting or requiring LEAs to engage in the conduct above and also applies its directive to "those persons in active concert or participation with them," which would include LEAs.

While the Court did not indicate which parts of the district court's order are operative based on its granting of relief to the parents but not the teachers, it is the understanding of CSBA's Legal Department that the above listed requirements are the currently effective parts of the order as they apply to parents. Other parts specific to teachers or employees — numbers 1 (c) and (d) and a portion of the statement at number 3 in the district court's order — remain stayed.

**LEAs should consult with legal counsel regarding how to interpret the decision, but might want to consider the following:**

- If asked by a parent or guardian, refrain from misrepresenting information about a student's gender presentation or incongruence.
- Be aware of parents who have stated an objection to the use of certain names and pronouns for their students as the Court's order requires LEAs to respect these objections. LEAs may receive notification from parents that they object and should be prepared to notify staff of such objections.
- LEAs that have policies that require staff to use a different set of preferred pronouns or names when speaking with a parent or guardian than is being used at school to conceal a student's gender presentation are not legally compliant.
- If a school has told a student they will keep that student's gender presentation or incongruence confidential from the parent or guardian, that student should be

notified of the change in law. (It has always been the case that this information could be revealed if the parent made a student record request.)

- Maintain student confidentiality of student information from persons other than parents or guardians.
- Train staff on this change in the law.
- Review existing policies with legal counsel.

There are several additional **key takeaways** from both the Supreme Court decision and the district court order:

- The Supreme Court upheld the district court's certification of a class action, which applies the decision to any parent in California that objects to the policies or seeks a religious exemption from them.
- This order likely affects all LEAs because the state is unable to *permit* or require them to engage in the conduct prohibited by the order and the order applies to any persons in active concert or participation with the state defendants, including CDE, which likely includes LEA staff. In addition, it is likely that every LEA has or at some point will have at least one parent who objects to the policies.
- The teacher plaintiffs will likely receive the relief they sought, even though the district court's specific order as to them is still stayed. Because the parent's rights prohibit the state from permitting or requiring teachers to keep information about student gender presentation private from parents or guardians, the teachers will be able to disclose the information.
- AB 1955, the law that prohibits LEAs from instituting blanket policies that require LEA employees to "disclose any information related to a pupil's sexual orientation, gender identity, or gender expression to any other person without the pupil's consent unless otherwise required by state or federal law" was not overturned. Despite some reporting, the district court specifically did not overturn AB 1955, and the Court did not reference AB 1955 in its order.
- Neither court indicated that minor students have any right to privacy or religious freedom at least in relation to their parents or guardians. However, it is likely that students still have a right of privacy with respect to non-parents.
- Neither court addressed a situation where individual parents or guardians, such as in the case of divorce, have different beliefs about gender and sex or different religious beliefs and do not want to have their child's gender incongruence

disclosed to the other parent.

The appeal will now continue in the Ninth Circuit. While the Per Curiam Order is not a final order, the dissent expressed worry that the order would be considered to be a final order on the merits. Certainly, the Ninth Circuit will take notice of the Court's language in making its decision on the appeal. For example, the order's expansion of *Mahmoud* will have to be taken into account in future rulings. The concurrence stated that the purpose of the lengthy emergency order was transparency, not to issue a final ruling on the matter.

LEAs should consult CSBA's District and County Office of Education Legal Services at legalservices@csba.org or their legal counsel regarding their obligations under the district court's decision. CSBA is currently reviewing its GAMUT sample policies and will provide updates as appropriate.

Share:



**EXHIBIT 7**

No. 25-8056

# In the United States Court of Appeals for the Ninth Circuit

ELIZABETH MIRABELLI, an individual, on behalf
of herself and all others similarly situated; LORI
ANN WEST, an individual, on behalf of herself
and all others similarly situated, et al.,
Plaintiffs-Appellees,

v.

ROB BONTA, in his official capacity as
the Attorney General of California, et al.,
Defendants-Appellants.

Appeal from the United States District Court
for the Southern District of California
Honorable Roger T. Benitez
(3:23-cv-768-BEN)

## PLAINTIFFS-APPELLEES'
## SUPPLEMENTAL BRIEF

CHARLES S. LIMANDRI
PAUL M. JONNA
JEFFREY M. TRISSELL
**LiMANDRI & JONNA LLP**
Post Office Box 9120
Rancho Santa Fe, CA 92067
(858) 759-9930
*pjonna@limandri.com*

PETER BREEN
MICHAEL MCHALE
CHRISTOPHER J.F. GALIARDO
**THOMAS MORE SOCIETY**
309 W. Washington St., Ste. 1250
Chicago, IL 60606
(312) 782-1680
*pbreen@thomasmoresociety.org*

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

SUPPLEMENTAL BRIEF ................................................................1

   I.   Legal Background: Precedent on Precedent. ............................1

   II.  The Supreme Court's Opinion Effectively Resolves
       All Questions in this Case. .......................................................4

CERTIFICATE OF COMPLIANCE.......................................................12

CERTIFICATE OF SERVICE.................................................................13

# TABLE OF AUTHORITIES

*Cases:*

*Akers v. McGinnis,*
   352 F.3d 1030 (6th Cir. 2003) ..........................................................8

*Bolden-Hardge v. Off. of Cal. State Controller,*
   63 F.4th 1215 (9th Cir. 2023)..........................................................8

*Bucklew v. Precythe,*
   587 U.S. 119 (2019) ....................................................................3, 5

*Danville Christian Acad., Inc. v. Beshear,*
   141 S. Ct. 527 (2020) .......................................................................7

*Dep't of Homeland Sec. v. D.V.D.,*
   145 S. Ct. 2627 (2025) ................................................................ 1, 9

*Doe v. San Diego Unified Sch. Dist.,*
   142 S. Ct. 1099 (2022) .....................................................................7

*Gateway City Church v. Newsom,*
   141 S. Ct. 1460 (2021) .....................................................................2

*Hutto v. Davis,*
   454 U.S. 370 (1982) .........................................................................1

*Ill. State Bd. of Elections v. Socialist Workers Party,*
   440 U.S. 173 (1979) .........................................................................2

*In re Sanford Fork & Tool Co.*,
    160 U.S. 247 (1895) ........................................................................ 1

*Ind. State Police Pension Tr. v. Chrysler LLC*,
    556 U.S. 960 (2009) ........................................................................ 3

*Labrador v. Poe*,
    144 S. Ct. 921 (2024) ...................................................................... 4

*Lee v. Poudre Sch. Dist. R-1*,
    135 F.4th 924 (10th Cir. 2025) ...................................................... 7

*Mahmoud v. Taylor*,
    606 U.S. 522 (2025) ................................................................... 3, 5

*Mirabelli v. Bonta*,
    146 S. Ct. 797 (2026) ............................................................. passim

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
    145 S. Ct. 2658 (2025) .................................................................... 1

*Parham v. J.R.*,
    442 U.S. 584 (1979) ........................................................................ 6

*Priests for Life v. U.S. Dep't of Health & Hum. Servs.*,
    808 F.3d 1 (D.C. Cir. 2015) ........................................................... 3

*Rodriguez v. Newsom*,
    974 F.3d 998 (9th Cir. 2020) ......................................................... 3

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020) .......................................................................... 2

*Romer v. Evans*,
    517 U.S. 620 (1996) ........................................................................ 8

*S. Bay United Pentecostal Church v. Newsom*,
    141 S. Ct. 716 (2021) .................................................................. 2, 3

*Sherbert v. Verner*,
    374 U.S. 398 (1963) ........................................................................ 8

*Spector Motor Serv. v. Walsh*,
    139 F.2d 809 (2d Cir. 1943) ........................................................... 2

*Stanley v. Illinois,*
    405 U.S. 645 (1972) ...................................................................7

*Troxel v. Granville,*
    530 U.S. 57 (2000) ................................................................6, 7

*Vukasovich, Inc. v. Comm'r,*
    790 F.2d 1409 (9th Cir. 1986) .......................................... 1, 2

*Washington v. Trump,*
    145 F.4th 1013 (9th Cir. 2025)...................................................8

*Yeshiva Univ. v. Yu Pride All.,*
    143 S. Ct. 1 (2022) .............................................................7

*Ysursa v. Pocatello Educ. Ass'n,*
    555 U.S. 353 (2009) ...........................................................8

### Statutes & Rules:

9th Cir. R. 3-6(a)...............................................................1

Cal. Code Regs. tit. 2, §11034(h) .................................................9

Cal. Code Regs. tit. 22, §83001(g)(2) .........................................9

Cal. Educ. Code §221.5(f) ........................................................9

Fed. R. App. P. 32(g)(1) ...........................................................12

### Other Authorities:

CSBA, *Supreme Court Strengthens parental notification
    rights for gender transitions* (Mar. 6, 2026).....................................9

Supplemental Brief, *City of Huntington Beach v. Newsom,*
    No. 25-3826, Dkt.55 (9th Cir. Mar. 13, 2026) ................................10

Trevor N. McFadden & Vetan Kapoor, *The Precedential
    Effects of the Supreme Court's Emergency Stays,*
    44 Harv. J.L. & Pub. Pol'y 827 (2021) ..........................................2

## SUPPLEMENTAL BRIEF

This Court has ordered the parties to submit supplemental briefing "addressing the impact of the Supreme Court's order … on the issues presented in this case." Dkt.20. As explained below, the specific holdings in the Supreme Court's order have effectively resolved the disputed issues in the case, making this case ripe for summary affirmance due to an "intervening court decision." 9th Cir. R. 3-6(a).

### I.    Legal Background: Precedent on Precedent.

The holdings of the Supreme Court are final and definitive. "[A]ny matter 'disposed of by' decree of this Court must be carried 'into execution, according to the mandate,' by the courts below." *Dep't of Homeland Sec. v. D.V.D.*, 145 S. Ct. 2627, 2630 (2025) (quoting *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895)). "[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts." *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2663 (2025) (Gorsuch, J., concurring) (quoting *Hutto v. Davis*, 454 U.S. 370, 375 (1982)).

In following the precedent of the Supreme Court, the law of this circuit provides that "the courts of appeal should decide cases according to their reasoned view of the way Supreme Court would decide the pending case today." *Vukasovich, Inc. v. Comm'r*, 790 F.2d 1409, 1416 (9th Cir. 1986). Thus, "[t]he measure of its duty is to divine, as best it can, what would be the event of an appeal in the case before [the Supreme

1

Court]." *Id.* (quoting *Spector Motor Serv. v. Walsh*, 139 F.2d 809, 823 (2d Cir. 1943) (L. Hand, J., dissenting)). Under this rule, the Supreme Court's interim orders "should be especially compelling. After all, these orders are a very recent, and thus highly indicative, insight into the Court's likely resolution of the issue on the merits." Trevor N. McFadden & Vetan Kapoor, *The Precedential Effects of the Supreme Court's Emergency Stays*, 44 Harv. J.L. & Pub. Pol'y 827, 844 (2021).

The Supreme Court recently confirmed as much during the COVID-19 pandemic. In *Roman Catholic Diocese of Brooklyn v. Cuomo*, the Court issued a brief *per curiam* opinion granting emergency relief to residents of New York whose constitutional rights were being violated. 592 U.S. 14 (2020). Despite its emergency nature, five Justices later made clear that it should have been followed by this Court with respect to a similar lawsuit in California. *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 719 (2021) (Statement of Gorsuch, J., joined by Thomas and Alito, JJ.) ("Today's order should have been needless; the lower courts in these cases should have followed the extensive guidance this Court already gave."); *id.* at 717 (Barrett, J., concurring, joined by Kavanaugh, J.) ("I agree with Justice GORSUCH'S statement [in relevant part]"). And then again, in response to another COVID-19 lawsuit in California, the Court granted emergency relief on the basis that the "outcome is clearly dictated" by the *South Bay* emergency order. *Gateway City Church v. Newsom*, 141 S. Ct. 1460 (2021).

2

In interpreting the Court's summary *orders*, "the precedential effect of a summary [order] can extend no farther than the precise issues presented and *necessarily* decided by those actions," and "no more may be read into our action than was essential to sustain that [order]." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 182-83 (1979) (emphasis added) (cleaned up). This means that a summary *grant* of relief without explanation is binding precedent, albeit limited in scope, *Rodriguez v. Newsom*, 974 F.3d 998, 1005 (9th Cir. 2020), and a summary *denial* of relief provides no precedent. *Ind. State Police Pension Tr. v. Chrysler LLC*, 556 U.S. 960, 960 (2009).

In contrast, in interpreting the Court's summary *opinions*, they provide "extensive guidance" that lower courts are expected to follow. *S. Bay*, 141 S. Ct. at 719 (Statement of Gorsuch, J.). This is because "just as binding as th[e] holding is the reasoning underlying it." *Bucklew v. Precythe*, 587 U.S. 119, 136 (2019). Indeed, many of the Court's opinions deal with preliminary determinations. *See, e.g.*, *Mahmoud v. Taylor*, 606 U.S. 522, 546 (2025) ("we hold that the parents are likely to succeed"). Further, courts must view an emergency order as an "extremely strong signal[]" because relief "under the All Writs Act … is appropriate only where the legal rights at issue are indisputably clear." *Priests for Life v. U.S. Dep't of Health & Hum. Servs.*, 808 F.3d 1, 25 (D.C. Cir. 2015) (Kavanaugh, J., dissenting) (cleaned up).

## II.    The Supreme Court's Opinion Effectively Resolves All Questions in this Case.

**1.** On March 2, 2026, the Supreme Court issued a substantively thorough opinion vacating this Court's stay of the district court's permanent injunction with respect to parents. *Mirabelli v. Bonta*, 146 S. Ct. 797 (2026). Despite comments from the concurring and dissenting opinions, the majority opinion is dispositive.

To begin, commenting on the opinion's comprehensiveness, Justice Kagan described it as "*designed* to conclusively resolve the dispute" and lamented that "no one—in particular, neither a state official nor a lower court—is apt to read the Court's *per curiam*, brusque though it is, as anything less than a conclusive merits judgment." *Id.* at 806-07 (Kagan, J., dissenting) (emphasis added). Justice Barrett (joined by Chief Justice Roberts and Justice Kavanaugh) then responded that the opinion's grant of emergency relief was "not a sign of the Court's '*impatience'* to reach the merits," but rather "reflect[ed] the Court's judgment about the risk of irreparable harm to the parents." *Id.* at 805 (Barrett, J., concurring, joined by Roberts, C.J., and Kavanaugh, J.) (emphasis added).

Indeed, as Justice Kavanaugh has explained elsewhere (joined by Justice Barrett), where "the harms and equities are very weighty on both sides[,] … [the Supreme] Court has little choice but to decide the emergency application by assessing likelihood of success on the merits." *Labrador v. Poe*, 144 S. Ct. 921, 930-32 (2024) (Kavanaugh, J., concurring). And while rejecting the charge that the opinion's scope was

4

deviously "designed," Justice Barrett did conclude that "[t]he parent-applicants are likely to succeed on the merits under a straightforward application" of Supreme Court caselaw and that "the benefits of explanation win out here" because "[t]he Ninth Circuit (following the Sixth Circuit) significantly misunderstood" that caselaw. *Mirabelli*, 146 S. Ct. at 804-05 (Barrett, J., concurring).

Thus, because the reasoning of the Court is binding, *Bucklew*, 587 U.S. at 136, the question presented to this Court is whether there is any issue presented by the record here—which the Supreme Court took nearly two months to consider—that was not effectively decided in *Mirabelli v. Bonta*, 146 S. Ct. 797 (2026). There isn't.

**2.** With respect to the parents' claims, the Supreme Court first held that "California's policies likely trigger strict scrutiny under [the Free Exercise Clause] because they substantially interfere with the 'right of parents to guide the religious development of their children.'" *Id.* at 802 (quoting *Mahmoud*, 606 U.S. at 559). The Court rejected the view that *Mahmoud* is "a narrow decision focused on uniquely coercive 'curricular requirements.'" *Id.* (quoting Dkt.13 at 10-11). Instead, it recognized that California is "impos[ing] the kind of burden on religious exercise that [we] found unacceptable"—and it is doing so in degree "greater than the introduction of LGBTQ story books we considered sufficient strict scrutiny in *Mahmoud*." *Id.*; *see also id.* at 805 (Barrett, J, concurring) (the Court's *per curiam* opinion is a "general course correction" on *Mahmoud*).

5

Thus, following *Mirabelli*, this Court is effectively required to affirm the district court's holding to the same effect.

On strict scrutiny, the Court held that California lacks a compelling interest because its "policies cut out the primary protectors of children's best interests: their parents." *Id.* (citing *Troxel v. Granville*, 530 U.S. 57, 68-69 (2000) (plurality)). In so holding, the Supreme Court effectively reaffirmed its precedent that "absent a *finding* of neglect or abuse, … the traditional presumption that the parents act in the best interests of their child should apply." *Parham v. J.R.*, 442 U.S. 584, 604 (1979) (emphasis added). Similarly, the Court also held that California likely has more narrowly tailored means of protecting vulnerable children. *Mirabelli*, 146 S. Ct. at 803. Again, that reason again effectively requires affirming the district court's analysis finding the same.

Turning to Substantive Due Process, the Supreme Court continued, holding that "[t]he same is true for the subclass of parents who object to those policies on due process grounds" because "[g]ender dysphoria is a condition that has an important bearing on a child's mental health." *Id.* (citing *Parham*, 442 U.S. at 602). The Court recognized that by "conceal[ing]" from parents "information" about their child's manifestation of "symptoms of gender dysphoria at school" and "facilitat[ing] a degree of gender transitioning during school hours," California is "likely violat[ing] parents' rights to direct the upbringing and education of their children." *Id.* Again, that analysis and conclusion

6

effectively require affirming the district court's similar holding on the same issue.

Notably, the Court did not repeat or refer back to its strict scrutiny analysis. *Id.* This is presumably because, by flipping the presumption of parental fitness on its head, California's regime became facially invalid. *See Stanley v. Illinois*, 405 U.S. 645, 654 (1972) (holding statute invalid that presumed all unwed fathers were unfit despite the fact some unwed fathers are unfit); *Troxel*, 530 U.S. at 77 (Souter, J., concurring) ("I concur in the … facial invalidation"); *see also Lee v. Poudre Sch. Dist. R-1*, 135 F.4th 924, 937-38 & n.1 (10th Cir. 2025) (McHugh, J., concurring).

**3.** With respect to the teachers' claims, as stated, the Supreme Court's *denial* of summary relief is indicative of nothing at all. Emergency relief could have been denied for any number of reasons including as unnecessary. *E.g.*, *Yeshiva Univ. v. Yu Pride All.*, 143 S. Ct. 1 (2022); *Doe v. San Diego Unified Sch. Dist.*, 142 S. Ct. 1099 (2022); *Danville Christian Acad., Inc. v. Beshear*, 141 S. Ct. 527 (2020).

On the teachers' Free Exercise claim, this Court's initial stay order quoted the district court's preliminary injunction order to find that there was no actual conflict between the teachers' religious beliefs and California's policies. *See* Dkt.13 at 11 (quoting 1-Plt.Exs-161). But on summary judgment, California did not make any such argument and the district court found undisputed that there was a conflict. *See* 4-Plt.Exs-777-84; 1-Plt.Exs-52-58. Indeed, this Court has cautioned against over-

7

scrutinizing assertions of religious conflict, *Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1223-24 (9th Cir. 2023), and each teacher offered sworn testimony of such a conflict. 4-Plt.Exs-968-70; 5-Plt.Exs-1173-74; 5-Plt.Exs-1226-38. Once such a conflict is established, as this Court recognized, the rights of teachers "rises and falls on parents' rights." Dkt.13 at 12.

The district court held that strict scrutiny applied to the teachers' Free Exercise claims because of the exclusion policy's standardless nature, 1-Plt.Exs-55-57, and held that teachers could not be compelled to violate parents' rights upon raising a Free Speech objection. 1-Plt.Exs-558-59. Regardless of whether this Court agrees that the policy is neutral and generally applicable under the Free Exercise clause, as the district court recognized, objections to government regulations are always at least subject to rational basis review. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 359 (2009); *Sherbert v. Verner*, 374 U.S. 398, 406 (1963); *see Akers v. McGinnis*, 352 F.3d 1030, 1037 (6th Cir. 2003) (government employer). Under that standard, the regulation must have "a rational relation to *legitimate* state interests." *Romer v. Evans*, 517 U.S. 620, 631 (1996) (emphasis added). But, as an obvious tautology, California has "no legitimate interest in enforcing an Order that is likely unconstitutional." *Washington v. Trump*, 145 F.4th 1013, 1037 (9th Cir. 2025).

Indeed, the California School Boards Association—the author of the gender secrecy policy at issue in this case (AR 5145.3), *see* 1-Plt.Exs-17—

8

is advising schools that "[t]he teacher plaintiffs will likely receive the relief they sought." In full, the CSBA wrote:

> The teacher plaintiffs will likely receive the relief they sought, even though the district court's specific order as to them is still stayed. Because the parent's rights prohibit the state from permitting or requiring teachers to keep information about student gender presentation private from parents or guardians, the teachers will be able to disclose the information.

CSBA, *Supreme Court Strengthens parental notification rights for gender transitions* (Mar. 6, 2026), https://blog.csba.org/mirabelli-march26/.

**4.** Lastly, with respect to the scope of the district court's injunction, the Supreme Court was clear that class certification was proper. *Mirabelli*, 146 S. Ct. at 803. But California argues that there is ambiguity in whether it has a "mandatory 'see something, say something' obligation in all circumstances." Dkt.24 at 6. As Plaintiffs noted in opposition, California's motion for clarification should have been directed to the Supreme Court. *See Dep't of Homeland Sec.*, 145 S. Ct. at 2629-30. However, California's purported confusion is easily cleared up.

Under California law, public schools may not discriminate based on gender identity, which includes exclusion from sex-segregated facilities due to biological sex and misgendering—i.e., the core aspects of a social transition. Cal. Educ. Code §221.5(f); Cal. Code Regs. tit. 2, §11034(h). "Gender identity" is defined as an "individual's *stated* gender identity … without regard to any contrary statement by any other person." Cal. Code Regs. tit. 22, §83001(g)(2) (emphasis added). Thus, under California law,

9

a child is treated as transgender only if she *claims to be transgender*—not because a teacher notices some gender non-conforming behavior. And if a child claims to be transgender, such that a social transition is required under California law, then that social transition cannot occur absent parental notice and consent.

Oddly, in another case before this Court, California argued that the Supreme Court's opinion has no effect on AB 1955 because it merely bans "mandatory reporting policies," and the Supreme Court's opinion merely prohibits affirmatively "shut[ting] out" parents via "conceal[ment]." Supplemental Brief, *City of Huntington Beach v. Newsom*, No. 25-3826, Dkt.55 (9th Cir. Mar. 13, 2026). But because the Court held that the Fourteenth Amendment prohibits facilitating a child's gender transition without parental consent, and California law defines failing to do so as discrimination, schools are effectively mandated to report such information to parents in order to inquire about their consent. AB 1955 *forbids* precisely such mandatory communication to parents—and is thus effectively unconstitutional under *Mirabelli*.

\*　　\*　　\*

The Supreme Court's holding that California's challenged exclusion policies likely violate parents' free exercise and due process rights requires affirming the district court's holding to the same effect. Because the teachers' claims are derivative of the parents', their claims are likewise effectively resolved by the Supreme Court's opinion.

10

Accordingly, this case is ripe for expeditious resolution. The Court should issue an order to show cause re: summary affirmance, or at least summarily affirm at to the parents' claims, and order mediation as to the teachers' claims and potentially remand (or otherwise issue a temporary stay and require settlement discussions).

Respectfully submitted,

Dated: March 16, 2026    By: */s/ Paul M. Jonna*
Charles S. LiMandri
Paul M. Jonna
Jeffrey M. Trissell
William T. Duke
LiMANDRI & JONNA LLP
Post Office Box 9120
Rancho Santa Fe, CA 92067
Telephone: (858) 759-9930

Peter Breen
Michael McHale
Christopher J.F. Galiardo
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
(312) 782-1680

*Counsel for Plaintiffs-Appellees*

11

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), I hereby certify that the foregoing document satisfies the type-volume requirements set out in this Court's order dated March 4, 2026, as it contains 2,499 words, and was prepared using Microsoft Word in Century Schoolbook, 14-point font, a proportionally spaced typeface.

/s/ *Paul M. Jonna*
Paul M. Jonna

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system. I certify that all participants in the case are registered ACMS users and that service will be accomplished by the appellate ACMS system and by email to all counsel of record.

*/s/ Paul M. Jonna*
Paul M. Jonna

13