Charles S. LiMandri, SBN 110841
  cslimandri@limandri.com
Paul M. Jonna, SBN 265389
  pjonna@limandri.com
Jeffrey M. Trissell, SBN 292480
  jtrissell@limandri.com
William T. Duke, SBN 361823
  wduke@limandri.com
LiMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Telephone: (858) 759-9930
Facsimile: (858) 759-9938

Peter Breen, *pro hac vice*
  pbreen@thomasmorsociety.org
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

ELIZABETH MIRABELLI, an individual, on behalf of herself and all others similarly situated; LORI ANN WEST, an individual, on behalf of herself and all others similarly situated; et al.,

Plaintiffs,

v.

MARK OLSON, in his official capacity as President of the EUSD Board of Education, et al.,

Defendants.

Case No.: 3:23-cv-0768-BEN-VET

**DECLARATION OF ERIN FRIDAY, ESQ., IN SUPPORT OF PLAINTIFF'S OPPOSITION TO STATE DEFENDANTS' EX PARTE APPLICATION TO MODIFY THE PERMANENT INJUNCTION**

Judge:          Hon. Roger T. Benitez
Courtroom:    5A

DECLARATION OF ERIN FRIDAY, ESQ. ISO OPPOSITION TO
DEFENDANTS' EX PARTE APPLICATION TO MODIFY THE PERMANENT INJUNCTION

I, C. Erin Friday declare as follows:

1. I am an adult over 18 years of age and an attorney duly licensed to practice law before all courts of the State of California and various federal courts inclusive of the Ninth Circuit.

2. I am the President of Our Duty-USA, a nationwide nonprofit, nonpartisan, non-religious advocacy group comprised of parents of formerly and currently trans-identified children, minors, and adults and detransitioners.

3. I am an expert in secret social transitions at schools both in California and across the nation, and I have spoken on the issue in numerous news programs and major podcasts. I have also been involved in documentaries on this issue. My work on secret social transition plans and the weaponization of child welfare agencies has been published in the Wall Street Journal and other major publications. Attached as **Exhibit A** is the recent article I co-authored on the government overreach into parents' fundamental rights to raise their child in alignment with his or her sex, which was published in the Wall Street Journal on February 27, 2026.

4. I was the sponsor of Assembly Bill 1314, the parental notification bill authored by Assemblyman Bill Essayli, that would have required schools to notify parents when the school is socially transitioning their child—either by the use of new names and/or pronouns that do not align with the child's sex, use of sex-separated spaces that do not align with the child's sex, and alterations to the child's records to reflect a gender that does not align with the child's sex.

5. Following the failure of the bill to be assigned a hearing, the Assembly Member and I, along with other counsel, drafted school board policies that reflected the notification requirements of the bill. I assisted in the lawsuit filed against Chino Valley School District by Attorney General Rob Bonta after the school passed the parental notification policy. I also consulted with a number of school boards across California on the issue.

///

DECLARATION OF ERIN FRIDAY, ESQ. ISO OPPOSITION TO
DEFENDANTS' EX PARTE APPLICATION TO MODIFY THE PERMANENT INJUNCTION

6. Additionally, I sponsored legislation last year that would ensure that child welfare agencies cannot investigate parents for simply choosing to raise their child according to his or her sex. Assembly Member Leticia Castillo was the author of Assembly Bill 579. The bill was named after Yaeli Martinez—a child who was taken from her loving mother by child welfare services because the mother was affirming her daughter's sex and refused to call her a boy. The school counselor contacted the Department of Family and Child Services, and the child was removed from the home. The claims of physical and emotional abuse were unfounded, but it was too late. Yaeli knelt in front of an oncoming train and ended her life.

7. As a parent, I was directly affected by California's secret social transition plans and weaponization of child welfare services to coerce parents to "affirm" their child's rejection of their bodies. My daughter attended Design Tech High School ("D-Tech"), a public charter school in the Sequoia Union High School District ("SUHSD").

8. In August 2020, I discovered that the teachers at D-Tech had been socially transitioning my daughter in secret without the consent of her father or me.

9. Because California had shut down all of the schools in response to the Covid-19 pandemic, my daughter had not met any of her teachers in person, and was attending school online while in my home. I was able to hear teachers and school staff refer to my daughter as a male, using a male name and pronouns to address her.

10. I contacted the D-Tech Administration and voiced my deep displeasure with its unilateral decision to socially transition my then-14-year-old daughter. I reminded them that I was the parent and the person empowered with the upbringing and naming of my child. In response, the school administrator stated that the school was required to use my daughter's chosen name and pronouns under AB1266. (Assembly Bill 1266 that is codified in Cal. Educ. Code § 221.5.) Worse, the school also stated that it would continue to use my daughter's chosen name and pronouns regardless of any of my directives.

DECLARATION OF ERIN FRIDAY, ESQ. ISO OPPOSITION TO
DEFENDANTS' EX PARTE APPLICATION TO MODIFY THE PERMANENT INJUNCTION

11.    Within days of my phone call to D-Tech, a social worker from child protective services came to my home without notice, followed by a police officer.

12.    D-Tech admitted to sending child protective services to my home, and claimed that it was worried about my daughter committing suicide.

13.    My interactions with the school made it clear that D-Tech considered me the problem because I assuredly know that I gave birth to a female child and that no human being can have a male brain trapped in a female body. I unenrolled my daughter from D-Tech and enrolled her in private school.

14.    Our family did not affirm our daughter's confusion, but instead addressed the outside influences and mental health issues that drove her to reject reality. She shed the false identity and now lives as an adult—safe from having undergone any sex-rejecting interventions.

15.    Since this experience, I have spoken with nearly 500 parents of children who have adopted a transgender identity. I continue to receive calls from all over the country about CPS threatening to take children away from parents who raise their children in accordance with their sex.

16.    I am aware of families in Georgia, Ohio, Arizona, Washington, Washington D.C., Oregon, Montana, Indiana, Maine, Illinois and Colorado who have lost custody of their children for believing in biological reality. I have helped advise these parents during these difficult times, and connected them with legal counsel when they have been threatened by child welfare agencies.

17.    I am currently providing information to the United States Health and Human Services with documentation and evidence on how child welfare agencies are being used to coerce parents to affirm an identity that carries with it enormous irreversible harms to the body. For example, I have taken a minor's counsel course that instructed lawyers that the preferred custodial parent in a legal separation is the parent who affirms the child's gender transition. Attached as **Exhibit B** is a redacted letter from a case worker advising just that.

DECLARATION OF ERIN FRIDAY, ESQ. ISO OPPOSITION TO
DEFENDANTS' EX PARTE APPLICATION TO MODIFY THE PERMANENT INJUNCTION

18.    I am not aware of any parent who physically abused their child or abandoned their child because they discovered that their child was suffering from gender dysphoria. I do know children who have been encouraged to run-away, even my own, by transgender activists and even school counselors, to escape their parents' refusal to consent to sex-rejecting interventions.

19.    I know hundreds of parents whose children adopted transgender identities and dropped the identities as they matured—some before and after undergoing sex-rejecting interventions.

20.    The sheer fact that school is asking the child whether it is "safe" to permit the parents to know of the child's sex-rejecting identity influences the child to believe that his or her parents could be "dangerous" if they know. Schools are riddled with "safe space" signs and statements, and these statements can propagate an irrational fear by a child that their parents are unsafe but the school employees are the safe ones.

21.    Children, even teenagers, will not understand that by triggering the school to contact a child protective services agency because of their inorganic fear can result in them being immediately removed from the home and rehoused with strangers, or in a facility where they can share a room with another child of a different sex. The child may not be able to comprehend that they may be permanently removed from their family on the basis of nerves in sharing with their parents that they are distressed over their body.

22.    Should this Court encourage school employees to contact child welfare services merely because a child is afraid of how his or her parent would react to the child's pronouncement that he or she is suffering from gender dysphoria or gender confusion, parents will face a substantial risk of losing their child on the basis of unsubstantiated emotional distress, either temporarily or permanently, while the dependency courts adjudicate the issue. These matters can take years to resolve and,

DECLARATION OF ERIN FRIDAY, ESQ. ISO OPPOSITION TO
DEFENDANTS' EX PARTE APPLICATION TO MODIFY THE PERMANENT INJUNCTION

in the interim, the child will be housed in a facility or home based upon their gender identity, not sex, where their transgender identity must be affirmed.

23. Additionally, parents may not have the financial means to contest the claims of abuse, or may be unable to locate experienced counsel to represent them. Final disposition of cases is often dragged out until the child reaches the age of majority.

24. This court should not advance the notion that parents are presumptively abusive because their child is unsure of how their parents will react to their distress over their sex. Nor should this court issue an order that places parental rights in limbo while they have to defend against an emotional abuse claim. This is moving the parents from the pan into the fire.

25. Attached as **Exhibits C and D** are two amicus briefs that discuss how government entities, including schools, are being used to force parents to either submit to "transitioning" their child or lose custody.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed on this 27th day of March 2026 in Redwood City, California.

C. Erin Friday, Esq.

DECLARATION OF ERIN FRIDAY, ESQ. ISO OPPOSITION TO
DEFENDANTS' EX PARTE APPLICATION TO MODIFY THE PERMANENT INJUNCTION

**EXHIBIT A**

# States Rip Families Apart to Serve

**By Laura Bryant Hanford
And Erin Friday**

"Fifteen years ago if somebody was up here and said that, they'd say 'What's wrong with him?'" President Trump said Tuesday in his State of the Union address. Said what? "Surely we can all agree no state can be allowed to rip children from their parents' arms and transition them to a new gender against the parents' will." When Democratic lawmakers declined to stand in assent to that statement, the president declared: "These people are crazy."

Mr. Trump had introduced Sage Blair, 19, and her adopted mother (and biological paternal grandmother), Michele. Their story is unbelievable—and part of a horrifying trend.

Sage was 14 and a high-school freshman when she declared she was a boy. Her Virginia school "transitioned" her without informing Michele. The school counselor told her to use the boys' bathroom, where she was assaulted. Police and school officials met with Sage without her parents, warning she could be sued for making the hyperbolic statement that "all the boys are rapists." Fearing harm to her family, Sage ran away. She was kidnapped by a sex trafficker.

When the Federal Bureau of Investigation rescued Sage in Maryland, a state judge denied Ms. Blair and her husband all contact with their traumatized daughter and withheld custody on claims of abuse related to "misgendering." The judge ordered her to be housed in a group home for high-risk male teens and young adults. Sage ran away again, only to be abducted by another trafficker and exploited for months until Texas law-enforcement officers found her and returned her to her mother. Why did she claim to be a boy? "Everybody was doing it," Sage later explained, "I just wanted to have friends."

The child-welfare system has been hijacked through federally and state-funded programs to classify parents as abusive if they don't accept their children's assertions that they are members of the opposite sex. Several liberal states have codified this view into law. Washington enacted legislation permitting children as young as 13 to leave their homes and not be returned to their parents if they are seeking sex-rejecting medical interventions. Colorado lawmakers have repeatedly introduced bills that would require courts in custody disputes to favor a parent who "affirms" his child's trans identity.

Even when courts determine no child abuse has occurred, children are being removed from homes through networks of runaway shelters and nonprofits. Nonfamilial adults are hiding children who are confused about their sex, and child-welfare departments extend investigations until the child turns 18, rendering the cases moot.

Many states permit or require that foster placements and residential facilities affirm a child's "gender identity" and consent to medical interventions. That sends a message that the foster-care system offers an exit from parental authority.

The mantra offered to parents is no longer "would you rather have a dead daughter or a living son?" It is "would you rather lose custody of your child, or 'transition' her?" Sage Blair's story is far from unique, and its ending is a relatively happy one.

In Connecticut, Elvira Sayed faced child-abuse proceedings for declining to affirm that her daughter was a boy. Before the case was resolved, the daughter turned 18 and cut off contact with Ms. Sayed. The young lady died by suicide shortly after be-

## The case of Sage Blair, which Trump highlighted, is unbelievable—and part of a horrifying trend.

ginning testosterone treatment. Her body wasn't discovered for four days.

Connecticut also removed Charles Smith's daughter from his home for refusing to treat her as male. She had severe psychiatric co-morbidities and had carved up her body from her arms to her feet, but the state viewed her transgender identity as paramount. They took and placed her

# Unsurprisingly, Netfli



**BUSINESS WORLD**
*By Holman W. Jenkins, Jr.*

Why buy the cow when you can get the milk for free? Especially when it's an extremely high-maintenance cow?

This question, often raised in a more distasteful context, also applied to Netflix in its then-pending acquisition of the Warner Bros. Discovery film and video cornucopia, which it abandoned Thursday.

Netflix now says Warner would have been "nice to have" but not a "must have." The company's choice to walk away showed it was financially "disciplined."

The New York Times and Bloomberg used the same word for Netflix's withdrawal: stunning. But it wasn't stunning if you followed Netflix's stock price. Investors hated the deal from the get-go, knocking $150 billion off Netflix's $500 billion market cap. It wasn't stunning either if you actually thought about what Netflix ownership would entail: a complexifier and time-suck for management, disproportionate to any value that controlling Warner Bros. would provide.

I won't rehearse the arguments made here three months ago and alluded to again last week. Given all the conflicts that owning Warner Bros. would have entailed, every director, producer and actor in Hollywood would have been screaming "anticompetitive" anytime Netflix made a decision they didn't like.

Worse were the incentives. Netflix is the utility streamer, where all producers want their shows to turn up sooner or later. Netflix itself, overly algorithmic, benefits from freestanding producers whose shows succeed by being, you know, good. In Netflix's hands, the temptation to despoil the peerless Warner brands (Batman, Game of Thrones, Bugs Bunny, etc.) for AI slop would have been disturbingly large.

Add that politically, winning the necessary approvals would have been an uphill fight. Democrats and Republicans were already carping. Stupidly, board member and former Obama official Susan Rice chose this moment to bait President

# THE WALL STREET JOURNAL

PUBLISHED SINCE 1889 BY DOW JONES & COMPANY

**Lachlan Murdoch**
*Executive Chairman, News Corp*

**Rupert Murdoch**
*Chairman Emeritus, News Corp*

**Emma Tucker**
*Editor in Chief*

**Robert Thomson**
*Chief Executive Officer, News Corp*

**Almar Latour**
*Chief Executive Officer and Publisher*

Liz Harris, *Managing Editor*
David Crow, *Deputy Editor in Chief*
Aja Whitaker-Moore, *Deputy Editor in Chief*
Sarah Ball, *Features*; Elena Cherney, *Senior Editor*; Dan Colarusso, *Business, Finance, Economics*; Chip Cummins, *Newswires*; Taneth Evans, *Digital*; Gordon Fairclough, *World*; Alex Martin, *Print & Writing*; Bruce Orwall, *Enterprise*; Damian Paletta, *Washington*; Philana Patterson, *Audio*; Christopher S. Stewart, *Investigations*;

DOW JONES MANAGEMENT:
Mae M. Cheng, *EVP, General Manager, Events and Luxury Portfolios*; Jason P. Conti, *General Counsel, Chief Compliance Officer*; Dianne DeSevo, *Chief People Officer*; Artem Fishman, *Chief Technology Officer*; Lisa Fitzpatrick, *General Manager, Dow Jones Industries*; M. Scott Havens, *Chief Growth Officer*; Dan Shar, *EVP, General Manager, Wealth & Investing*; Ashok Sinha, *Chief Communications Officer*; Josh Stinchcomb, *EVP & Chief Revenue Officer, WSJ | Barron's Group*

# Transgender Ideology

with an "affirming" gay couple.

California removed Andriy and Alexandra Lyashchencko's daughter for not treating her as male. The state placed her in an "affirming" foster home, where she shares a bedroom with a teenage boy. Oregon investigated Ashly Wallace four times for alleged abuse for not affirming her trans-identified daughter. She was cleared each time. Her daughter had used Oregon's shelter system designed for homeless youth to avoid a mother who never abandoned her.

In Washington state, Jodie and David Holman's daughter used free nonprofit legal services to leave home and was placed with an unvetted stranger. The parents weren't found to be abusive, and their daughter was eventually returned. But she subsequently fled again and has been missing for months.

Vernadette Broyles, Sage's lawyer, says that ideologues have used laws designed to protect children as a cover for their abuse: "Confidentiality requirements governing child-welfare proceedings conceal the full extent to which the child welfare apparatus is being used to investigate, coerce and separate children from their parents who decline to affirm their children's rejection of their sex."

State legislatures have begun to respond. Texas, North Carolina and Indiana have enacted laws clarifying that raising children consistent with their sex doesn't constitute child abuse. Lawmakers in Ohio, Georgia and New Hampshire are taking up similar measures. Democrats have killed similar measures in Virginia each year since Sage's Law was introduced in 2023 and refused even to hold a hearing for Yaeli's Law in California. Yaeli's Law is named for a teenage girl who died by suicide after the state removed her from her family because her mother refused to "transition" her.

Mr. Trump's recognition of the Blairs at the State of the Union signals that the federal government is prepared to examine how the child-welfare infrastructure has been turned against the children it was designed to protect.

*Ms. Hanford is a senior policy analyst at the Heritage Foundation. Ms. Friday is a lawyer and president of Our Duty USA.*

# ix Bails Out on Its Bid

providing ammunition for when the company turns to rallying its political allies to sandbag Paramount's bid.

Let it also be said that Netflix would likely have prevailed in court and, contrary to some pundits, if Warner was worth buying it was worth a three-year court fight because during that three years a rival wouldn't have had the benefit of Warner ownership.

## In suggesting the price was a smidge too high, the streamer tells us it never really lusted after Warner.

The real howler, though, is Netflix's claim that it's acting now on some uncannily fine-toothed financial appraisal. Boy, Netflix must employ some clairvoyant accountants. Its number crunchers apparently judged the deal a winner for Netflix at a Paramount-equivalent price of $30 a share but a loser at $31. Knowing with such calibrated exactitude what Harry Potter etc. would be worth to Netflix until the end of time is quite a feat.

As implied here all along, Netflix's real triumph was driving up the price Paramount had to pay and saddling the newcomer with enough debt to hobble any challenge to Net-

Other questions now come to the fore. Paramount partisans assured investors their version of a Warner Bros. Discovery takeover would receive speedy and unconditional approval from the Trump administration. This is a bet on Mr. Trump's loyalty, always an uncertain quantum, never mind Trump-placating gestures from the Ellisons too numerous to list, from hiring Bari Weiss to remake CBS News (and doing a good job of it) to putting Trump critic Stephen Colbert on the road to cancellation.

After all, CNN will come under the same management now as Trump-friendlier CBS. We'll see if Netflix clout is mobilized to stir up trouble and sink Paramount's deal. Still, progressives shouldn't overdo their fretting about an alleged MAGA takeover. When the Ellisons have the necessary approvals, expect them to cut a more neutral path politically. They have every reason to mollify the Hollywood crowd to extract full value from their merged empire.

Hollywood personalities never liked either acquisition, of course. Consolidation means less leverage in negotiating their next deal. California's attorney general threatened either buyer with rough sledding. The California types risk being overly provincial here, as if movie and TV production aren't already being dispersed to global production centers and, indeed,

**EXHIBIT B**



Department of Human Services Logo & Address

CO

[Date] 2025

Parent Address

Dear [Parent]

The family assessment concerning [Minor Child] being closed as of January 2nd, 2025. The purpose of this letter is to inform you of the conclusions and recommendations of the family assessment.

The following strengths were identified: [Parent] has realistic expectations of [Minor] family has a strong support system they can rely on, and [Parent] is willing to use resources necessary to protect [Minor] as needed.

The Department identified the following risk factor(s) as sources of concern [Minor's] running away and expressing thoughts of self-harm, leading to hospitalization due to [Parent's] treatment of him and lack of support for his gender identity.

The Department recommends:
- [Parent] and the family will be affirming of [Minor's] chosen gender identity.
- [Parent] will not make negative comments regarding [Minor's] gender expression, such as remarks about his male clothing and products, or comparing his transition to something derogatory.
- [Parent] will allow [Minor] to go to a friend's house if he feels he needs space from home, as long as [Minor] informs [Parent] of his location and what time he will return.
- [Parent] and [Minor] will attend family therapy together to create a better understanding between each other and support as they navigate [Minor's] transition.
- [Parent] will visit the Rainbow Youth Center to educate [Minor] about gender transition and find resources to support [Minor] a parent during the process.

Please call me if you have any questions or concerns. I can be reached at [redacted].

Sincerely,

[Case Worker]

Enclosure: Conflict Resolution Process Letter

**EXHIBIT C**

**No. 25-840**

In the Supreme Court of the United States

INTERNATIONAL PARTNERS FOR ETHICAL CARE, ET AL.,

*Petitioners*,

*v.*

BOB FERGUSON, GOVERNOR OF WASHINGTON, ET AL.,

*Respondents.*

On Petition for a Writ of Certiorari to
the United States Court of Appeals
for the Ninth Circuit

**BRIEF FOR *AMICI CURIAE*
OUR DUTY–USA AND CHILD & PARENTAL
RIGHTS CAMPAIGN IN SUPPORT OF
PETITIONERS**

C. ERIN FRIDAY
OUR DUTY - USA
P.O. Box 442
San Carlos, CA
94070

MARY E. MCALISTER
*Counsel of Record*
Vernadette R. Broyles
Kevin R. Smith
CHILD & PARENTAL RIGHTS
CAMPAIGN
5425 Peachtree Pkwy, Suite 110
Norcross, GA 30092
(770) 448-4525
mmcalister@childparentrights.org

*Counsel for Amici Curiae*

i
## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................... iii

INTRODUCTION AND INTEREST OF *AMICI CURIAE* ................................................1

SUMMARY OF ARGUMENT....................................2

ARGUMENT .........................................................6

   I.   Washington's Statutory Scheme Infringes Parents' Fundamental Right to Direct the Upbringing of Their Children. ........................6

      A.   The Law Is Unconstitutional on Its Face. .......................................................6

      B.   The Law Is Unconstitutional As Applied to Fit Parents Who Disagree with State Ideology. ................................9

   II.   Washington's Laws Violate the Fourteenth Amendment by Depriving Parents of Their Fundamental Rights Without Procedural Due Process.................................................12

      A.   The Law Is Unconstitutional for Failing to Provide Any Pre-Deprivation Process..................................................12

      B.   Application of the *Mathews v. Eldridge* Factors Confirms the Procedural Due Process Violation..................................14

   III.   The Ninth Circuit's Standing Analysis Creates a Chilling Effect on Parental Rights.........................................................16

ii

IV.  Amicus Our Duty Members' Stories Show
the Real Harms of Washington's Statutory
Scheme. ...................................................... 18

Julie Barrett ................................................ 18

Diana L. ....................................................... 20

Kristina S. .................................................... 21

Brooke G. ..................................................... 22

Katie S. ........................................................ 24

CONCLUSION ......................................................... 27

iii
# TABLE OF AUTHORITIES

**Cases**

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398
(2013)..................................................................17

*Cleveland Bd. of Ed. v. Loudermill*, 470 U.S.
532(1985)............................................................12

*FEC v. Ted Cruz for Senate*, 596 U.S. 289
(2022)..................................................................5

*International Partners for Ethical Care Inc v.
Ferguson*, 146 F.4th 841 (9th Cir. 2025)...............16

*International Partners for Ethical Care, Inc. v.
Ferguson*, 161 F.4th 604 (9th Cir. 2025).....6, 11, 17

*Lujan v. Defenders of Wildlife*, 504 U.S. 555,
(1992)..................................................................16

*Massachusetts v. EPA*, 549 U.S. 497 (2007) .............17

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ...........5, 14

*Parham v. J.R.*, 442 U.S. 584 (1979) ............3, 7, 8, 15

*Prince v. Massachusetts* 321 U.S. 158 (1944) .............7

*Ram v. Rubin*, 118 F.3d 1306 (9th Cir. 1997). ......6, 17

*Santosky v. Kramer*, 455 U.S. 745 (1982)..................15

*Smith v. Seibly*, 431 P.2d 719 (Wash. 1967).............23

*Stanley v. Illinois*, 405 U.S. 645 (1972) ... 4, 9, 13, 15, 16

*Troxel v. Granville*, 530 U.S. 57 (2000) ........ 2, 6-9, 12

*United States v. Skrmetti,* 605 U.S. 495 (2025)........16

iv

## Statutes

SB5599, 68th Leg., Reg. Sess. (Wash. 2023) ..............3

WASH. REV. CODE § 13.32A.082..............3-5, 11, 13, 14

WASH. REV. CODE § 48.43.005 ..................................23

WASH. REV. CODE § 48.43.505 ..................................23

WASH. REV. CODE §70.02.010 ....................................2

WASH. REV. CODE § 71.34.500 ..................................23

WASH. REV. CODE § 71.34.530 ..................................23

WASH.REV. CODE §74.09.675............................2, 4, 11

## Other Authorities

Abigail Shrier, *When the State Comes for Your
    Kids: Social Workers, Youth Shelters, and
    the Threat to Parental Rights*, CITY
    JOURNAL, June 8, 2021 ..............................18, 25, 26

House Floor Debate on SB 5599 (Apr. 12,
    2023) (statement of Rep. Jamila Taylor) ................9

Michael Torres, *We Thought She Was a Great
    Teacher*, CITY JOURNAL, Winter 2024 ...................26

Senate Floor Debate on SB 5599 (Mar. 1,
    2023) (statement of Sen. Marko Liias) ...................9

Wash. State Dep't of Child., Youth & Fams.,
    *Admin. Policy* ch. 6.04 (Oct. 20, 2022) ..................23

## Regulations

182 WASH. ADMIN. CODE 505-0211 (2024) ................23

1

## INTRODUCTION AND
## INTEREST OF *AMICI CURIAE*[1]

Our Duty-USA ("Our Duty") is a nonprofit whose members across the United States have varied political backgrounds, ethnicities, and sexual orientations, but share the experience of raising children who formerly or currently reject their sex. Members have had schools secretly socially transition their children, deceive them when they inquire about their children's identities, refuse to comply with their demands to cease affirming their child's rejection of their sex, and report them to child welfare agencies for refusing to endorse their child's sex rejection. As detailed below, some Our Duty members are directly affected by the Washington legislative scheme at issue in this case.

Child & Parental Rights Campaign, Inc. (CPRC) is a nonprofit, public-interest law firm that represents parents like Petitioner parents across the country in challenging governmental actions that threaten parental rights, including, as is true here, a statutory scheme to hide children who assert a discordant "gender identity" from fit parents. CPRC represents parents who have challenged policies which conceal from parents that their children are being treated as something other than their sex at school or who have lost custody of their gender confused child to child protective services. The

---

[1]    All parties were timely notified of the filing of this brief. This brief was not authored in whole or in part by counsel for any party and no person or entity other than *amici curiae* or their counsel has made a monetary contribution toward the brief's preparation or submission.

2

Washington statute at issue here presents an even more dangerous scenario for parental rights as parents can be denied custody of their children without due process if they fail to "affirm" their child's asserted discordant "gender identity."

## SUMMARY OF ARGUMENT

Washington's 2023 revisions to its Family Reconciliation Act ("FRA") eviscerate the fundamental right of Washington parents to direct the care and upbringing of their children, "perhaps the oldest of the fundamental liberty interests" this Court has acknowledged. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Washington has made that fundamental right contingent upon parents agreeing with the state's viewpoint on the controversial topic of providing "gender-affirming treatment"[2] to children experiencing confusion about their sex. Parents who do not agree with their child's request for such treatment stand to lose custody of their child in favor of a state-licensed youth shelter and the Department of Children Youth and Families ("DCYF") with no due process. Under Washington's legislative scheme, parents are no longer the guardians of their children's health but are obstacles to be circumvented to fulfill

---

[2]    Washington law defines "[G]ender-affirming treatment" as "a service or product that a health care provider *** prescribes to an individual to support and affirm the individual's gender identity." WASH.REV.CODE §74.09.675(3). This includes physical or mental health services, §70.02.010(15), including "[f]acial feminization surgeries"; "facial gender-affirming treatment"; "tracheal shaves, hair electrolysis," "mastectomies, breast reductions, breast implants, or any combination of gender-affirming procedures," §74.09.675(2)(b).

3

the child's request and the state's agenda to facilitate "gender affirming" treatment.

Prior to 2023, Washington's FRA required that a licensed youth shelter housing a runaway minor notify the child's parents within 72 hours and to provide parents with the child's location, a description of the child's physical and emotional condition and the circumstances of the youth's contact with the shelter. WASH. REV. CODE § 13.32A.082 (1)(b)(i), (2)(c) (2013). The only exception to the mandatory parental notification requirement was "compelling reasons," narrowly defined as circumstances indicating that notification would subject the minor to abuse or neglect. That framework respected the presumption that fit parents act in their children's best interests while permitting state intervention only when genuine danger existed. *Id., See Parham v. J.R.*, 442 U.S. 584, 602 (1979)

The 2023 amendments to the FRA radically altered the rights and obligations governing runaway youth who say they are experiencing confusion about their sex, transforming a framework that respected parental rights into one that supplants them unless the parents adhere to the state's viewpoint on "gender affirming treatment." SB5599, 68th Leg., Reg. Sess. (Wash. 2023). SB5599 expanded the definition of "compelling reasons" to delay (or deny) parental notice to also include "[w]hen a minor is seeking or receiving protected health care services" and expanded the definition of "protected health care services" to include "gender-affirming treatment[.]" WASH. REV. CODE §§13.32A.082(2)(c)(ii), (2)(d) (2023). By defining a minor's pursuit of "protected health care services,"

4

including "gender affirming treatment," as a *per se* "compelling reason" to bypass parental notification, the State created an irrebuttable presumption that non-affirming parents are dangerous, equating disagreement over controversial medical interventions with abuse or neglect, and authorizing intrusions into both physical and legal custody without any individualized finding of unfitness, even in cases involving concededly fit, loving parents. That is precisely the kind of practice this Court condemned in *Stanley v. Illinois*, 405 U.S. 645, 651–53, 656–57 (1972) where the State purported to dispense with individualized hearings and simply assume that an unwed father was unfit when fundamental family integrity and custodial rights were at stake.

Under SB 5599 shelters must notify DCYF instead of parents when a minor seeks or receives "protected health care services," now defined to include surgeries, hormones, and behavioral health services intended to affirm a child's gender identity. WASH. REV. CODE §§ 13.32A.082 (2)(c)(ii), (2)(d), 74.09.675. DCYF is required to make a "good faith attempt" to notify the parent, but not to tell the parent where the child is or provide information on the child's physical and emotional condition or to return the child pending investigation. Instead, DCYF is to "offer services to the youth and the family designed to resolve the conflict, including offering family reconciliation services, and accomplish a reunification of the family." WASH. REV. CODE § 13.32A.082(3)(a). DCYF must also "offer to make referrals on behalf of the minor for appropriate behavioral health services; and [o]ffer services designed to resolve the conflict and

5

accomplish a reunification of the family." WASH. REV. CODE §§ 13.32A.082(3)(b).

In practice, this scheme authorizes the State to conceal children from fit parents, assume decision-making authority over medical and psychological care, and condition reunification on compliance with State-managed "conflict resolution," all without prior notice, a hearing, or any judicial finding of abuse or neglect. *See* WASH. REV. CODE §§ 13.32A.082(1)(b)(i), (2)(c)(ii), (3)(a)–(b). As a result, parents may be excluded from any decision-making and even any contact with their child for extended periods while the State facilitates potentially irreversible medical interventions. Under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the parents' fundamental interest and the severe risk of erroneous deprivation far outweigh any generalized state interest, demonstrating that the revised statutes violate procedural due process.

The Ninth Circuit's ruling upholding the lower court's conclusion that the parents lacked standing because their alleged injuries were "self-inflicted" misconstrues standing doctrine and the nature of the injury and assumes, without authority, that parents inflict injury when they choose to raise their child as their sex. See *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 296-298 (2022) (The Court squarely rejects the idea that a plaintiff's injury is "self-inflicted" merely because a plaintiff engaged in conduct that triggered the challenged restriction). Parents are the express objects of a statutory scheme designed to sideline "non-affirming" parents. The panel's decision conflicts with this Court's precedents and the Ninth Circuit's

6

own parental rights cases, leaving parents with no meaningful way to invoke pre-deprivation protections before their rights are effectively eviscerated. See *International Partners for Ethical Care, Inc. v. Ferguson*, 161 F.4th 604, 608-612 (9th Cir. 2025) (VanDyke, J., dissenting from denial of reh'g *en banc*); *Ram v. Rubin*, 118 F.3d 1306, 1310–11 (9th Cir. 1997).

This Court's intervention is necessary to preserve parents' fundamental rights to direct the upbringing of their children, restore parents' procedural due process rights, reaffirm the sanctity of the parent-child relationship, and ensure that fit and loving parents remain the primary guardians of their children.

## ARGUMENT

## I.  Washington's Statutory Scheme Infringes Parents' Fundamental Right to Direct the Upbringing of Their Children.

### A. The Law Is Unconstitutional on Its Face.

As was true of the Washington statute struck down in *Troxel,* the legislative scheme here is an unconstitutional infringement on Petitioner parents' fundamental right to make decisions concerning the care, custody, and control of their children. *Troxel*, 530 U.S. at 72. Respondents have turned this Court's long-standing precedent on the primacy of parental rights on its head by enacting a presumption that parents who do not adhere to the state's viewpoint on "gender-affirming treatment" are unfit and their children the mere creatures of the state.

7

In *Troxel,* this Court confirmed the long history of recognizing parental rights as fundamental, in conformance with its statement in *Prince v. Massachusetts* that "it is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." 321 U.S. 158, 166 (1944). This Court held:

> [O]ur constitutional system long ago rejected any notion that a child is the mere creature of the State and, on the contrary, asserted that parents generally have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations ... The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.

*Troxel,* 530 U.S. at 68 (quoting *Parham* 442 U.S. at 602). "Accordingly, so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions

8

concerning the rearing of that parent's children." *Id.* at 68-70.

As was true of the decisional framework in *Troxel,* the framework adopted by the Washington legislature here "directly contravenes the traditional presumption that a fit parent will act in the best interest of his or her child" and violates the parents' fundamental rights. *Id.* at 69-70. By adding a minor's pursuit of "protected health care services" that includes "gender affirming treatment" to the list of "compelling reasons," the State has enacted a procedural presumption that a parent is unfit for merely disagreeing with the state's viewpoint on "gender-affirming treatment." This presumption strips that parent of his or her authority over medical decision-making and equates refusal to consent to "gender affirming treatment" to abuse or neglect. With no judicial determination that the parent is unable to adequately care for his or her children, Washington has supplanted fit parents with the State in the very domain where parental authority is strongest: decisions about profound medical and psychological interventions. As this Court said in *Stanley*, 405 U.S. at 657, such bypassing of an individualized judicial determination of fitness for a procedural presumption cannot stand. Absent a judicial determination of unfitness, parents "retain a substantial, if not the dominant, role" in medical and mental health decision-making. *Parham,* 442 U.S. at 604.

There is no set of circumstances under which a State may constitutionally presume that a parent is abusive or neglectful solely because he or she declines

9

to endorse the State's preferred "gender affirming" protocol for a child. Under this Court's precedents, the State's interest becomes compelling enough to override the decisions of fit parents only when a court has made an individualized finding of unfitness—not when the legislature simply declares that a particular ideological disagreement constitutes harm. *See Stanley,* 405 U.S. at 657-58, *Troxel,* 530 U.S. at 69-70. Washington's revised FRA is an unconstitutional infringement on fundamental parental rights that should be addressed by this Court.

## B. The Law Is Unconstitutional As Applied to Fit Parents Who Disagree with State Ideology.

As applied, the revisions to Washington's FRA target and disempower fit parents like Petitioners who decline to adhere to the State's agenda. The legislative history shows that the revisions are operating exactly as the Legislature intended. Sponsors of the revisions to the FRA repeatedly described the need to overcome parental opposition to "gender-affirming treatment." Proponents of the bill frequently framed recalcitrant parents as the problem SB 5599 was designed to solve. *See* App.93a–97a; Senate Floor Debate on SB 5599 (Mar. 1, 2023) (statement of Sen. Marko Liias); House Floor Debate on SB 5599 (Apr. 12, 2023) (statement of Rep. Jamila Taylor). For example, Sen. Marko Liias referred to the "opposition and hostility from their family" children seeking these services would face and how "a family is standing between their young person and essential health care services." *See* App.93a–97a; Senate Floor

10

Debate on SB 5599 (Mar. 1, 2023) (statement of Sen. Marko Liias).

As Petitioner parents alleged in their Verified Complaint, the revisions are chilling Petitioners' exercise of their fundamental rights to direct the upbringing of their children. (App. 70a-77a). As fit parents who have never been found abusive or neglectful, Petitioners are being punished for ideological disagreement with the State's preferred medical orthodoxy. Petitioners have children with gender dysphoria, including children who have previously run away or been socially transitioned at school, and they seek to raise their children in accordance with their sex. Because the statute specifically targets runaway minors "seeking or receiving protected health care services," including "gender affirming treatment," these parents face a state-created threat. Ordinary discipline, disagreement, or refusal to submit to the belief that their child is born wrong may prompt their children to flee to a licensed shelter that will conceal them and trigger DCYF's intervention. Once in DCYF's care and control, the child can obtain sex-rejecting interventions. (*See* Note 5) And should DCYF conclude that the non-affirming parents should lose custody, the assigned guardian can consent to medical treatments opposed by the otherwise fit parents. As a result, their parenting decisions are overridden and their speech chilled. They refrain from trying to return their children to comfort in their sex so that they can avoid the extreme medical impacts of sex-rejecting interventions, lest they trigger the statutory pathway that will remove their vulnerable child from their home. *See* App. 70a-77a, *International Partners*

11

*for Ethical Care, Inc. v. Ferguson*, 161 F.4th at 608
(VanDyke, J., dissenting from denial of reh'g *en banc*).

The intrusion is all the more egregious in light of
the nature of the interventions being instituted
without parental input. As described in WASH. REV.
CODE § 74.09.675(2)(3), the "gender affirming
treatment" can include irreversible surgical and life-
altering medical interventions. The state's usurpation
of parental authority is unconscionable given the
grave and permanent consequences of the
interventions it authorizes. WASH. REV. CODE §
74.09.675(2)(3) defines "gender affirming treatment"
to include double mastectomies and  genital surgeries
administered to minors without parental consent.
Supplanting parents' choice to raise their child as his
or her sex strikes at the very heart of parental
decision-making authority, leaving life-altering
decisions for minor children to state actors with no
judicial intervention.

Reunification—if it occurs at all—comes too late.
By the time parents regain custody of children who
have exploited WASH. REV. CODE § 13.32A.082's
shelter and harboring of a runaway provisions,
irreversible medical interventions may have already
been performed. Parents are left to cope with
permanent, life-altering consequences of decisions
made by others without their consent. This
unconscionable deprivation of fundamental parental
rights cannot be justified by the respondents'
ideological goals.

12

## II. Washington's Laws Violate the Fourteenth Amendment by Depriving Parents of Their Fundamental Rights Without Procedural Due Process.

The Fourteenth Amendment's Due Process Clause requires "notice and opportunity for hearing appropriate to the nature of the case" before the government may infringe upon a protected liberty interest. *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542 (1985). Washington's statutory scheme authorizes the deprivation of parents' fundamental right to care, custody and control of their children, one of the "oldest of the fundamental liberty interests" recognized by this Court, *Troxel*, 530 U.S. at 65, without providing any pre-deprivation process.

Under Washington's revised FRA state-licensed shelters and DCYF may deprive parents of physical and legal custody by concealing the child and assuming decision-making authority over "protected health care services" with no notice to parents or opportunity to be heard. The law is unconstitutional on its face and as applied to Petitioners.

### A. The Law Is Unconstitutional for Failing to Provide Any Pre-Deprivation Process.

On its face, the amended FRA creates an established state procedure for depriving an entire class of parents of their fundamental rights without any pre-deprivation legal safeguards. By expanding what constitutes "compelling reasons" to include when a minor is "seeking or receiving protected health

13

care services," including "gender affirming treatment," the statute creates a legislative presumption that a parent who does not consent to sex-rejecting interventions is abusive or neglectful. Instead of providing parents with a constitutionally required notice and an individualized hearing on parental fitness, the revised FRA bypasses parental notification altogether. The shelter instead notifies DCYF when a runaway minor is seeking sex-rejecting interventions. WASH. REV. CODE §§ 13.32A.082 (1)(b)(i), (2)(c)(ii), 2(d).

Washington has created the same kind of "procedure by presumption" to determine whether parents will retain their fundamental right to the care, custody and control of their children that this Court condemned in *Stanley*, 405 U.S. at 656–57. As was true in *Stanley*, Washington is depriving parents of their fundamental rights without any judicial process to determine that they are unfit to exercise those rights, a result the *Stanley* Court found "repugnant" to due process. *Id.* at 653. "Procedure by presumption is always cheaper and easier than individualized determination" *Id.* at 656. However, when the presumption forecloses the ability for the parent to be found fit to exercise his rights, "it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand." *Id.* at 656-57.

The same must be true here where the State displaces parental custody before it even attempts notice. The statutory trigger operates without any prior judicial determination that the parents are unfit or that notifying them would endanger the child.

14

Parents are displaced based solely on a child's unilateral statement to shelter staff or other third parties that he or she is "seeking or receiving protected health care services." *See* WASH. REV. CODE § 13.32A.082(1)(b)(i), (3)(a). Because the statute authorizes deprivation of parental rights without any pre-deprivation notice or hearing, it violates procedural due process on its face.

### B. Application of the *Mathews v. Eldridge* Factors Confirms the Procedural Due Process Violation.

The nature of the process due in particular proceedings turns on a balancing of three factors: 1) the private interests affected by the proceeding; 2) the risk of error created by the State's chosen procedure; and 3) the countervailing governmental interest supporting use of the challenged procedure. *Mathews v. Eldridge*, 424 U.S. at 335. Balancing those factors in this case confirms that the statutory scheme violates procedural due process.

First, the private interest here is paramount. Few state actions are as severe as interference with the parent-child relationship. *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). Although Washington has not formally instituted deprivation proceedings or a court entered a termination decree, concealing children for extended periods while assuming unilateral authority over irreversible medical interventions operates as a *de facto* termination of parental rights for as long as the State maintains control. It is, in practical effect, the kind of "severe

15

and…irreversible" intrusion on the family that this Court has associated with termination proceedings. *See id.*

The combination of concealment, prolonged stage-managed separation, and control over a child's access to sex-rejecting treatments means that, for as long as the statutory trigger is engaged, the core incidents of custody are effectively transferred from the parents to the State. Parents are stripped of the physical possession of their child and the authority to make consequential medical and psychological decisions even though no court has found them unfit. That severity of intrusion places Washington's scheme squarely within the category of state actions that demand the most stringent procedural safeguards

Second, the risk of erroneous deprivation is extreme. Washington's laws operate on a blanket presumption that "non-affirming" parents are dangerous, a "procedure by presumption" that "needlessly risks running roughshod over the important interests of both parent and child." *Stanley*, 405 U.S. at 657. The State is facilitating potentially irreversible medical or surgical treatments for a minor who claims a transgender identity contrary to the judgment of fit parents whom the Constitution presumes act in their children's best interests. *See Parham*, 442 U.S. at 602. The probable value of additional safeguards, such as timely notice and an opportunity for an individualized hearing before parental authority is displaced, is immense, because they are the only means of ensuring that the child's

16

circumstances and the parents' fitness are actually evaluated. *See Stanley*, 405 U.S. at 656–57.

Third, the State's interest is at its weakest when it seeks to interfere with the decisions of fit parents, and it "registers no gain towards its declared goals when it separates children from the custody of fit parents." *Stanley*, 405 U.S. at 652–53. The state's interest is particularly weak here where the state is not, as was true in *United States v. Skrmetti,* 605 U.S. 495 (2025), exercising its legitimate authority to regulate the medical profession in a way that might affect parental rights. Instead of exercising its legitimate authority to regulate medicine, Washington is interfering with parental decision-making solely to pursue a state-imposed ideological agenda.

That kind of legislative decree contravenes precedent. Washington cannot transform ideological disagreement into a compelling interest that justifies suspending the fundamental rights of fit parents.

## III. The Ninth Circuit's Standing Analysis Creates a Chilling Effect on Parental Rights.

The Ninth Circuit panel mischaracterized Petitioners' injuries as "self-inflicted." *International Partners for Ethical Care Inc v. Ferguson*, 146 F.4th 841, 849 (9th Cir. 2025). However, the parents are not choosing to cabin their conduct and speech but are responding to a coercive statutory scheme that expressly subordinates their rights. When, as is true here, the plaintiff is an object of the action (or forgone action) at issue "there is ordinarily little question that the action or inaction has caused him injury". *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992).

17

Here, Washington has deliberately constructed a framework that makes the ordinary exercise of parental authority, including  refusal to consent to sex-rejecting interventions, dangerous by routing disfavored families into a pathway of concealment and State-directed intervention. The resulting chilling of Petitioners' parenting and compelled self-censorship are therefore present injuries fairly traceable to the statute's coercive design, not voluntary choices that somehow defeat Article III standing. *See International Partners for Ethical Care*, 161 F.4th at 609-611 (VanDyke, J., dissenting from denial of reh'g *en banc*).

The panel also improperly dismissed the substantial risk of future harm. Petitioners' children have already exhibited gender dysphoria, and the statute creates concrete incentives for children to run away to obtain treatment they believe they want. This substantial risk of *de facto* loss of custody suffices for standing. See *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (a "substantial risk" of harm can satisfy the injury in fact requirement); *Massachusetts v. EPA*, 549 U.S. 497, 521–25 & n.23 (2007) (recognizing standing based on risk of serious future injury).

Finally, the decision conflicts with the Ninth Circuit's own parental rights jurisprudence affirming that the State may not interfere with the fundamental right of parents to the care and custody of their children without pre-deprivation notice and a hearing. In *Ram v. Rubin*, the court concluded that it was clearly established that due process required notice and a hearing before the state interfered with

18

a parent's custodial rights. 118 F.3d at 1310–11. By denying standing to parents in the disfavored category of "non-affirming" until after their children have been concealed and their rights have been gravely impaired, the panel nullified those protections.

This Court's review is necessary to make clear that courts cannot use Article III standing to shield a statutory scheme that prospectively abolishes fundamental parental rights without due process of law.

## IV.  Amicus Our Duty Members' Stories Show the Real Harms of Washington's Statutory Scheme.

Stories from Our Duty members illustrate how Washington's statutory framework and related policies operate in practice: they separate children from fit parents and pressure families to "affirm" discordant gender identities under the constant threat of DCYF intervention, producing the very coercion, family fragmentation, and *de facto* loss of custody described above.

### Julie Barrett[3]

Julie Barrett's twin daughters, H1 and H2. experienced unspeakable sexual trauma as young children.  Unsurprisingly, the trauma resulted in severe mental health issues. H1 began to act out

---

[3] Abigail Shrier, *When the State Comes for Your Kids: Social Workers, Youth Shelters, and the Threat to Parental Rights*, CITY JOURNAL, June 8, 2021, https://www.city-journal.org/article/when-the-state-comes-for-your-kids.

19

during Covid lockdowns when she was 14. During youth group at her church, H1. informed her pastor that she was suicidal, and she was brought to Seattle Children's Hospital. Julie expected that the hospital would partner with her to get H1 the help that she needed but because of Washington's laws permitting minors aged 13 and older to decide their own inpatient treatment, H1 discharged herself to a homeless youth shelter ("Center").

Julie's attempts to contact her daughter were blocked by the Center, where an unlicensed social worker helped H1 engage an attorney from Legal Counsel for Youth and Children to fill out a petition for Child in Need of Services that would shift legal guardianship to the Center. Reunification was clearly not the goal.

Neither the hospital nor the Center called DCYF to report suspected child abuse. The Center seized control of the child without any due process. Julie had to engage the police to forcibly extract H1 from the Center. Ultimately, Julie placed H1 in various out-of-state inpatient facilities, not trusting Washington. While the healing process had additional impediments, H1 is an adult and with the help of her mother, is living independently and working on getting her GED.

H2 also struggled and due to her autism and other mental health issues, had an individualized education program. The same Center that interfered with H1's relationship with her family held a presentation for H2's class about transgender identities, distributing "goodie bags" including the number for the Center. H2 then adopted a transgender identity which was supported by the

20

school without Julie's knowledge. H2 acknowledged that she did it because "trans" students were given favored status in the class. Julie removed H2 from school, but her mental health continued to decline. H2 used the Center's number when she was angry about having to clean her room. Julie was able to intervene before the Center got H2 in its clutches and enrolled her in an out-of-state program for troubled teens.

H2, now 19, holds a job and is in technical school. Julie never had any charges filed against her for child abuse, but Washington's child-shelter system treated her as unfit trying to wrangle her children with no due process.

### Diana L.[4]

Diana L. and her family live in Washington. When her daughter T. was age 13, Diana discovered that T.'s school had been secretly socially transitioning her, using pronouns and a name that did not align with her sex. The school counselor had lunches with T. and her other trans-identified friends during which she solidified T.'s self-rejection. T. expressed fear that if her parents learned of her identity she risked rejection and harm, a sentiment with no factual basis. Diana unenrolled her from the school, knowing that she risked being reported to DCYF for not affirming T., who not only was suffering from gender dysphoria but obsessive-compulsive disorder.

T. was also being coached online that running away would be a solution to non-affirming parents.

---

[4]    To protect against potential child welfare intervention, some Our Duty members employ pseudonyms.

21

Diana learned that at least two of T.'s female friends were also adopting male identities. Diana blocked T.'s internet access after seeing T.'s obsession with transgenderism. Predictably, T. re-identified with her sex (as did one of T.'s friends whose parents also unenrolled them from the school). Diana has younger daughters and, fearing the aggressive transgenderism push in Washington, explored moving.

**Kristina S.**

Kristina S. and her family resided in Washington until 2022, when they relocated due to concerns regarding their minor daughter Z.'s transgender identification and Washington's parental authority laws. Z., exposed to gender identity concepts through internet content, peers, and Anime subculture, experienced sudden-onset gender dysphoria during early adolescence with no prior childhood indicators.

Z. initially concealed her transgender identification while obtaining parental consent for menstrual suppression. At age 12, Z. requested male pronouns and name usage, to which her parents briefly complied. Z. subsequently requested a chest binder, a precursor to a radical mastectomy.

Following the suicide of a peer in the school's Rainbow Club, Kristina researched gender identity issues. She also discovered Z. had been consuming transgender-affirming YouTube content, using exclusively male identification at school, and avoiding all restroom facilities out of fear. Kristina then shared her research findings with Z., including material addressing transition-related harms.

22

After the family relocated from Washington, separating her from her peer group, Z., now almost an adult, gradually discontinued her transgender identity.

**Brooke G.**

Prior to age 12, Brooke G.'s daughter A. demonstrated typical adolescent development, maintaining strong academic performance, participating in athletics, engaging in multiple hobbies, and sustaining an active social network. When school closures occurred due to COVID-19, A.'s online activity increased, including TikTok usage.

Shortly after A.'s thirteenth birthday, she presented her parents with a written declaration of an obviously fabricated childhood narrative of having a male identity. A. requested "transition," including surgical intervention and to stop using her given name and sex-based pronouns.

In eighth grade, A.'s public school counselor met with A. without parental notification or consent, completed administrative forms changing A.'s name and sex designation in school records. School personnel subsequently adopted male nomenclature and pronouns for A. and mandated student compliance. The school inquired whether A. was suicidal, which was a concern A. had not previously expressed.

Following the school's secret social transition, A.'s behavior deteriorated significantly. Academic performance declined, and she engaged in property vandalism, insubordination toward educators, theft from peers, and self-harm. A. deliberately terminated

23

existing friendships, discontinued athletic and hobby participation, and discarded personal possessions.

In response, Brooke restricted A.'s internet access, mandated daily outdoor activities, and increased family socialization efforts. Brooke secured therapeutic services focused on identifying underlying depression rather than gender affirmation. Brooke withdrew A. from school when it refused to treat A. as a female.

Brooke's strategy resulted in A.'s return to her previous beneficial behavior patterns and reestablishment of comfort with her sex. A. now views her transgender identification with regret. Brooke subsequently learned that a former peer, who was trans-identified, had been encouraging A. to run away from home. This would have granted A. an opportunity to obtain sex-rejecting interventions without parental consent, pursuant to Washington's RFA law, especially when DCYF takes custody from the parents.[5]

---

[5] *See* Wash. State Dep't of Child., Youth & Fams., *Admin. Policy* ch. 6.04 (Oct. 20, 2022), https://www.dcyf.wa.gov/sites/default/files/pdf/Admin-6.04.pdf (requiring DCYF to "[a]ssist children, youth, and young adults" who are "[s]eeking affirming medical, behavioral, and mental health services"); see also WASH. REV. CODE §§ 71.34.500, .530 (permitting minors age thirteen and older to obtain inpatient and outpatient mental health treatment without parental consent); WASH. REV. CODE §§ 48.43.005, .505 (defining minors who may obtain health care without parental consent as "protected individuals" and requiring insurers to restrict disclosure of gender-affirming care to policyholders); *Smith v. Seibly*, 431 P.2d 719, 723 (Wash. 1967) (recognizing Washington's mature minor doctrine); 182 WASH. ADMIN. CODE 505-0211 (2024) WASH. REV. CODE § 7.70.065(2)(a)(ii (authorizing Apple Health coverage for sex-related medical interventions for minors and permitting

24

**Katie S.**

In 2020, during sixth grade, Katie's daughter B. adopted a "non-binary" identity. Katie initially believed this identity crisis to be a developmental fad; however, the identity evolved to a transgender male identification. Upon return to in-person instruction during B.'s eighth-grade year following COVID-19 school closures, B. experienced significant mental health deterioration, with documented symptoms including severe anxiety, depression, and impaired academic functioning and school participation.

Katie retained a therapist for B. who without knowledge or consent employed a transgender-affirming treatment approach. The therapist coached B. on disclosure strategies to parents, recommended parental use of chosen name and pronouns, and suggested parental participation in transgender advocacy support groups. Both parents refused to advance the child's false identity.

B.'s mental health continued to deteriorate, resulting in additional diagnoses of Attention-Deficit/Hyperactivity Disorder and anxiety disorder secondary to Obsessive-Compulsive Disorder. These conditions necessitated withdrawal from traditional school enrollment, psychotropic medication, and a partial hospitalization treatment program. Despite documented comorbid mental health conditions, the healthcare providers continued to cement the maladaptive "transgender" identity.

---

DCYF to assume medical decision-making authority for children in care).

25

B's parents privately disagreed with affirming her trans identity but refrained from expressing this position to providers, recognizing the potential custody implications under Washington law. Following a suicide attempt and a provider's suggestion for hormone therapy, Katie and her husband determined that accessing appropriate care was not feasible within Washington. Recognizing the risk of state intervention and potential loss of custody, Katie relocated with B. to Georgia, splitting the family into two units.

Since relocating to Georgia, B.'s identity has regressed from transgender to non-binary, concurrent with improvement in overall mental health status. B. recently disclosed to Katie that had she remained in Washington, she had planned to run away with another female peer presenting with sex rejection.

Our Duty's members' experiences are not outliers. A Pakistani immigrant father fled with his family from Washington after Seattle Children's Hospital recommended that he take his very distressed neurodivergent teenage son to a gender clinic in 2020. Fortunately, the father was counseled by an attorney and a trusted psychiatrist to feign support of his son's newly acquired "transgender" identity to regain control over his son's medical treatment and avoid DCYF attempting to sever his parental rights.[6]

In 2019, a then-16-year-old daughter who struggled with an eating disorder, had other mental health issues and had adopted a "transgender identity" at age 13 following a sexual assault in

---

[6]    *See* note 3.

26

elementary school, was admitted into a Washington State hospital due to a suicide attempt. Her parents explained to the hospital's social worker that they were not affirming her transgender identity. A kind nurse warned the parents that the hospital's social worker was working to remove their control over the child. To dodge child welfare's involvement, the parents immediately took their daughter home. The young girl ultimately stopped identifying as transgender.[7]

An Indian family went into hiding when they discovered that their daughter's Washington teacher was aggressively promoting the transgender identity foisted upon her. While the family was on the run, the school administrator contacted the parents, querying them about their whereabouts. The teacher who had been promoting the transgender identity emailed the minor that she could come live with her. The family fled back to India.[8]

These experiences are the foreseeable and intended operation of Washington's statutory scheme as applied to fit, "non-affirming" parents. They underscore that the constitutional injuries are not abstract because they have already forced families to flee the State, split households, and endure *de facto* loss of custody and decision-making authority over their own children.

---

[7]    *Id.*

[8]    Michael Torres, *We Thought She Was a Great Teacher*, CITY JOURNAL, Winter 2024, https://www.city-journal.org/article/we-thought-she-was-a-great-teacher.

27

## CONCLUSION

For the foregoing reasons, this Court should grant the Petition for a Writ of Certiorari.

February 17, 2026

MARY E. MCALISTER
*Counsel of Record*
Vernadette R. Broyles
Kevin R. Smith
CHILD & PARENTAL RIGHTS CAMPAIGN
5425 Peachtree Pkwy, Suite 110
Norcross, GA 30092
(770) 448-4525
mmcalister@childparentrights.org

C. ERIN FRIDAY
OUR DUTY - USA
P.O. BOX 442
San Carlos, CA 94070
*Counsel for Amici Curiae*

**EXHIBIT D**

**No. 25-840**

# In the
# Supreme Court of the United States

INTERNATIONAL PARTNERS FOR ETHICAL CARE, INC.;
ADVOCATES PROTECTING CHILDREN; ET AL.,
*Petitioners,*

v.

ROBERT FERGUSON, GOVERNOR OF WASHINGTON,
IN HIS OFFICIAL CAPACITY, ET AL.,
*Respondents.*

ON PETITION FOR WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**BRIEF OF *AMICI CURIAE*
JODIE AND DAVID HOLMAN,
ASHLY WALLACE AND LGB COURAGE
COALITION SUPPORTING PETITIONERS**

ERIN FRIDAY
OUR DUTY–USA
P.O. Box 442
San Carlos, CA 94070
(415) 577-9271
erin@ourduty.group

DANIEL J. CRAGG
  *Counsel of Record*
ECKLAND & BLANDO LLP
100 Washington Avenue S.
Suite 1500
Minneapolis, MN 55401
(612) 236-0160
dcragg@ecklandblando.com

*Attorney for Amici Curiae*

ii

# TABLE OF CONTENTS

TABLE OF AUTHORITIES........................................ iii

INTRODUCTION AND INTEREST OF *AMICI CURIAE* ...............................................................1

SUMMARY OF ARGUMENT.....................................3

ARGUMENT.............................................................4

I.    Washington's Laws Unconstitutionally Presume that Parents Who Want to Raise Their Child as Their Sex Are Unfit............. 4

II.    The Holmans' and Wallace's Heartbreaking Stories Illustrate the Disastrous Results When Government Actions Remove a Child From Fit Parents to Advance the Transgender Agenda. ............8

    A.    Jodie and David Holman .........................8

    B.    Ashly Wallace.......................................15

III.    Washington State's Medical Community's Pro Sex-Rejecting Interventions Harm Children and Families—Interventions That Are Of Low Efficacy.................................................19

    A.    Washington's Major Hospital Systems Are Captured by the Transgender Agenda.............................19

    B.    Jamie Reed's Whistleblowing Reveals Systemic Abuses in Pediatric Gender Medicine....................24

CONCLUSION .......................................................27

iii

## TABLE OF AUTHORITIES

**Cases** ............................................................**Page(s)**

*Parham v. J.R.*, 442 U.S. 584, 602 (1979) ...................8

*Troxel v. Granville*, 530 U.S. 57, 72-73 (2000) ............8

*Smith v. Seibly*, 431 P.2d 719, 720 (1967)...................7

**Statutes**

Federal: 42 U.S.C. §§ 11431-11435 (McKinney-
   Vento Homeless Assistance Act) ............................19

RCW § 48.43.505 .....................................................7

RCW § 48.43.005 .....................................................7

RCW § 71.34.500 . ....................................................6

RCW § 71.34.530 .....................................................7

Wash. Admin. Code § 182-531-1675 ..........................7

Wash. Rev. Code § 7.70.065(2)(a)(ii) ..........................7

Wash. Rev. Code § 13.32A.082 ......................1, 3, 7, 16

Washington State's DCYF Administrative
   Policy, Chapter 6.04, Oct. 20, 2022..........................7

**Other Authorities**

Affidavit of Jamie Reed to Missouri Attorney
   General...............................................................27

American Society of Plastic Surgeons, Position
   Statement on Gender-Related Procedures
   (Feb. 3, 2026).........................................................4

iv

Ari Hoffman, EXCLUSIVE: Seattle Public
Schools Sees 853 Percent Increase… POST
MILLENNIAL (Oct. 20, 2022) ...............................26

Cheryl Murfin, Mary Bridge Children's
Hospital closes gender-affirming care clinic,
SEATTLE'S CHILD.........................................23, 24

Colin Wright, Contagion Hypothesis, WALL
STREET JOURNAL (Oct. 29, 2025)......................25

David Urbanski, THE BLAZE (July 1, 2021) .....10, 11

Department of Health and Human Services,
Treatment for Pediatric Gender Dysphoria,
Review of Evidence (Nov. 19, 2025) ...................4, 22

Douglas S. Diekma, Adolescent Brain
Development and Medical Decision-making,
146 Pediatrics S18, S21 (2020)...............................21

Hilary Cass, Independent Review of Gender
Identity Services for Children… Final Report
(April 2024) ...........................................................25

Jody L. Herman et al., Age of Individuals Who
Identify as Transgender in the United
States, UCLA Williams Inst. (2017) ......................25

Jody L. Herman et al., How many adults and
Youth Identify as Transgender…, UCLA
Williams Inst. (2017, 2025) ...................................25

Leor Sapir, 'We're All Just Winging It': What
the Gender Doctors say in Private, THE
FREE PRESS (Dec. 3, 2025) .................................21

v

Lisa Littman, Parent Reports of Adolescents…
Rapid Onset of Gender Dysphoria, PLOS
ONE (2018, 2019)....................................................25

Mia Hughes, The WPATH Files, Env't
Progress (Mar. 4, 2024) .........................................21

Paige Twenter, AMA clarifies position on
gender-affirming surgeries for minors,
BECKER'S CLINICAL LEADERSHIP
(2026)......................................................................5

Ross O'Keefe, HHS launches investigation into
Seattle Children's Hospital… WASH.
EXAMINER (Jan. 2026).........................................22

Samuel Veissiére, Why is Transgender Identity
on the Rise…, Psychology Today (Nov. 28,
2018) .......................................................................25

Tamara Pietzke, I was told to approve all teen
gender transition. I refused, THE FREE
PRESS (Feb. 2, 2024)......................................22, 23

TeamChild.org, Our Approach; Communities
in Schools/CISWA websites....................................14

Vivian McCall, The Stranger, Seattle
Children's Has Again Stopped Providing
Gender-Affirming Care… (Apr. 17, 2025) .............22

## INTRODUCTION AND
## INTEREST OF *AMICI CURIAE*[1]

Amici Curiae Jodie and David Holman are grieving parents whose family was devastated by the application of Washington laws at issue in this action, Wash. Rev. Codes §§ 13.32A.082(2)(c)(i)[2] and 74.09.675(3). Their daughter, age 15, who suffers from a myriad of mental health issues as well as an identity crisis, has been missing since November 2025. The impetus for her disappearance stems from her adoption of a transgender identity and a coordinated effort by various government entities, including her public school and quasi-government actors, to sever parental control over the very troubled teenager because the Holmans would not treat their daughter as male.

Amicus Curiae Ashly Wallace's daughter adopted a transgender identity when she was a young teenager. Wallace, who was never found to be an unfit parent, *de facto* lost custody of her daughter as her daughter claimed to be homelessness and used all of the welfare systems to escape a family who refused to treat her as a male.

Amicus LGB Courage Coalition is a lesbian and gay advocacy group committed to promoting evidence-based medical care, ending the medicalization of

---

[1] This brief was not authored in whole or in part by counsel for any party and no person or entity other than *amici curiae* or their counsel has made a monetary contribution toward the brief's preparation or submission. All parties received 10-day advance notice of the filing of this brief.

[2] Effective July 23, 2023.

2

gender nonconformity, safeguarding homosexual rights, and building a healthy pathway back for lesbian, gay, and bisexual individuals who have undergone medicalization while identifying as trans. The Courage Coalition is motivated by the understanding that gender transition is based on regressive stereotypes that target those who do not conform to traditional sex-based norms, including many gays, lesbians, and autistic youth. The Courage Coalition knows that no child should be subjected to the material harms caused by puberty blockers, cross-sex hormones, and sex-rejecting surgeries. Nor should families be coerced into affirming the false notion that their child is a sex other than that which he or she was born.

The Courage Coalition was founded by Jamie Reed, the whistleblower from the Washington University Pediatric Transgender Center ("Center") at St. Louis Children's Hospital. Ms. Reed's testimony to the Missouri Attorney General in 2023 prompted the enactment of a state law banning gender transition procedures for minors and the Center's closing.

As Ms. Reed has testified numerous times in legislative hearings across the country, she was once a "true believer" that sex-rejecting medical interventions helped children and gender nonconforming adults. However, during her time at the Center, she witnessed that in many cases, pediatric gender medicine caused permanent harm to the very children the Center claimed to help.

3

## SUMMARY OF ARGUMENT

The Ninth Circuit erroneously held that petitioner parents who have gender dysphoric children and a fear that their children may runaway including—parents whose child has, or has been encouraged, to run away—lack standing to challenge Wash. Rev. Code §13.32A.082, to avoid deciding the question that is at the heart of parental rights: do parents have a right to raise their children in conformity with their sex?[3] As they currently stand, Washington laws force parents into an untenable position: either default to "transitioning" a distressed child or lose custody, either through direct interference by the Department of Children, Youth & Families ("DCYF") or indirectly through Washington's child welfare and medical systems. Child welfare systems were designed to protect abused and homeless children, not to remove troubled children from their own parents who seek to address their minor child's underlying mental health issues rather than default to encouraging that child to undergo life-altering measures to change their appearance. No human has changed sex.

---

[3] Currently, there have been over 31 lawsuits filed nationwide against school districts requesting courts to restore parental rights to raise children as their sex and control their health treatment, including three cases with petitions for certiorari pending, including *Mirabelli v. Bonta*, 2026 WL 44874 (9th Cir. Jan. 5. 2026) *emergency appl. & pet. for cert. filed*, No. 25-8056 (Jan. 8. 2026); *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 346-47 (1st Cir. 2025) *pet. cert. filed*, No., 25-77 (July 22, 2025); *Littlejohn v. School Bd. of Leon Cnty.*, Fla., 132 F.4th 1232, 1242-43 (11th Cir. 2025), *pet. for cert. filed*, No. 25-259 (Sep. 5, 2025).

4

The horrifying effect of Washington's laws are exemplified through the Holmans' and Ashly Wallace's tragic stories. While the all-consuming grief felt by these parents cannot ever be adequately described, these stories reflect how the current state systems allow for, promote, and essentially require sex-rejecting care.

## ARGUMENT

### I. Washington's Laws Unconstitutionally Presume that Parents Who Want to Raise Their Child as Their Sex Are Unfit.

Washington has engineered its child welfare programs to operate as a pipeline to sex-rejecting interventions—interventions whose efficacy and appropriateness are extremely suspect, as made clear by the Department of Health and Human Services,[4] the closure of more than 40 pediatric gender clinics at hospitals,[5] the American Society of Plastic Surgeons' ("ASPS") recent Position Statement on "gender medicine" for minors,[6] and the American Medical

---

[4] Depart. of Health and Human Servs., Treatment for Pediatric Gender Dysphoria, Review of Evidence and Best Practices, Nov. 19, 2025 at 69-70,252 ["HHS Review"].

[5] Theresa Gaffney, *Amid Federal Pressure, More Hospitals Stop Gender-Affirming Care for Minors*, STAT NEWS, Feb. 5, 2026, https://www.statnews.com/2026/02/05/hospitals-stop-gender-care-minors-trump-administration-pressure/.

[6] Am. Soc'y of Plastic Surgeons, *Position Statement on Gender-Related Procedures for Patients with Gender Dysphoria*, (Feb. 3, 2026), https://www.plasticsurgery.org/documents/health-policy/positions/2026-gender-surgery-children-adolescents.pdf.

5

Association's withdrawal of its support for sex-rejecting surgeries on minors.[7]

ASPS's position paper states:

[T]he overall evidence base for gender-related endocrine and surgical interventions is low certainty, and in light of recent publications reporting very low/low certainty of evidence regarding mental health outcomes, along with emerging concerns about potential long-term harms and the irreversible nature of surgical interventions in a developmentally vulnerable population, ASPS concludes **there is insufficient evidence demonstrating a favorable risk-benefit ratio for the pathway of gender-related endocrine and surgical interventions in children and adolescents**.[8]

When it comes to gender-confused kids, all roads lead to "medical transition" in Washington. Once a child says she or he is transgender, no barriers exist to instantiating that belief through medical intervention. When the State began passing legislation to provide care for abused or abandoned children, its focus was on the best interest of the child, with an eye towards

---

[7] Paige Twenter, *AMA Clarifies Position on Gender-Affirming Surgeries for minors,* BECKER'S CLINICAL LEADERSHIP, Feb. 5, 2026, https://www.beckershospitalreview.com/quality/patient-safety-outcomes/ama-alters-position-on-gender-affirming-surgeries-for-minors/.

[8] See *id,* Note 6 (emphasis added).

6

reunification with the parents. Providing shelter, food, and a safe place for children is a laudable goal. But that goal has been sidelined, as the State considers parents who refuse to "transition" their distressed children to be unfit, and the system now allows children of non-consenting parents to utilize the welfare network to circumvent any attempts by their parents to protect their children from inflicting permanent harm to their bodies.

Washington's laws and policies, taken as a whole, make it nearly impossible for parents to direct the upbringing of their children to be raised as his or her sex once the child states that he or she is "transgender." A myriad of laws and policies exist to thwart  parents' wishes for their children to grow up whole, without experimental and destructive wrong-sex hormones and irreversible surgeries. *See Smith v. Seibly*, 431 P.2d 719, 720 (Wash. 1967) (Washington's mature minors doctrine); Wash. Rev. Code §71.34.500 (minors 13 and older can, without parental consent, obtain inpatient mental health treatment); Wash. Rev. Code §71.34.530 (minors 13 and older can, without parental consent, obtain outpatient mental health treatments); Wash. Rev. Code §48.43.005 and Wash. Rev. Code  §48.43.505 (minors who may obtain health care without parental consent are "protected individual" for which insurers must protect disclosure to policyholder of their "gender affirming care"); *see also* Wash. Admin. Code §182-505-0211 (2024)  and Wash. Rev. Code §7.70.065(2)(a)(ii) (Apple Health—Washington's Medicaid program—provides sex-rejecting interventions for minors and DCYF can take the medical control of a child under its care).

7

With the passage of Wash. Rev. Code §13.32A.082, the State makes a parent's refusal to "transition" their child tantamount to child abuse. The runaway child seeking "affirmation" is not returned to the parents and is instead removed from the parents' care, either through DCYF or the network of shelters. Once a child enters the DCYF system, there are no voices cautioning against life-changing alterations to her body. *See* Washington State's DCYF Administrative Policy, Chapter 6.04, Oct. 20, 2022 (DCYF must "[a]ssist children, youth, and young adults when they are: i. Seeking affirming medical, behavioral, and mental health services. . . [r]eferring to gender-affirming services, including medical care, as approved by Medicaid.").[9] These laws can only be described as state-sanctioned kidnapping, as they are designed to take minors from parents without justifiable provocation (such as abuse or neglect), emancipate a child without any due process for parents, and hand over medical control of children, age 13 and above, to the child, a guardian not sanctioned by the parents, or the courts.

Laws that remove parents who refuse to affirm their child's transgender identity are based upon the insidious and unconstitutional presumption that parents categorically cannot be trusted to raise a child who identifies as "transgender" and that the only acceptable way to raise a trans-identified child is to allow such child to live out that status in any way he or she chooses. This presumption contradicts a foundational principle of American law: the "natural

---

[9] Wash. Dep't of Child., Youth & Fam. Admin, Policy 6.04 at 2,4 (2024); https://www.dcyf.wa.gov/sites/default/files/pdf/Admin -6.04.pdf.

8

bonds of affection lead parents to act in the best interests of their children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979). The Court's precedents operate on a "presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Id.* The state cannot simply cast this presumption aside based on a generalized fear or an ideological disagreement with a parent's views on "gender." As stated in *Parham*, "[t]he statist notion that governmental power should supersede parental authority in all cases because some parents abuse and neglect children is repugnant to American tradition." *Id.* at 603 (emphasis in original). "The Due Process Clause does not permit a state to infringe on the fundamental right of parents to make child rearing decisions simply because [the government] believes a 'better decision' could be made." *Troxel v. Granville*, 530 U.S. 57, 72-73 (2000).

## II. The Holmans' and Wallace's Heartbreaking Stories Illustrate the Disastrous Results When Government Actions Remove a Child From Fit Parents to Advance the Transgender Agenda.

### A. Jodie and David Holman

Jodie and David Holman lived in Washington State most of their lives.. David is an accomplished veteran of the Green Berets, having deployed on three operations as well as serving in the National Guard. Jodie is obtaining her Master's Degree in museum studies. They have three children: two boys and a girl.

9

In 2025, the Holmans fled to Texas because Washington state was interfering with their efforts to effectively help their middle child, 16-year-old Eleanor, who was struggling with mental health issues and had adopted a transgender identity. Shortly after that, on November 28, 2025, Eleanor ran away from home and has been missing ever since. Her parents do not know if she is in Washington, has been sex-trafficked or is even still alive. What they do know is that her adoption of a transgender identity and Washington's anti-parental rights laws and policies helped pave the way for Eleanor's disappearance.

Before moving to Texas, state and quasi-state actors in Washington employed aggressive tactics, using the child welfare system, to undermine the Holmans' parental rights because they refused to affirm Eleanor's maladaptive trans identity.



*Photo of Eleanor, courtesy of the Holmans*

Eleanor's personal history is complex. The Holmans discovered that, as a toddler, Eleanor was subjected to sexual trauma. (The perpetrator was imprisoned.) Because of this horrific experience, the

10

Holmans anticipated that Eleanor would need substantial mental health support, especially as she entered puberty. That prediction came true.

In 2019, as Eleanor began school at the Puyallup School District, her mental health began spiraling downward. Around that time, Jodie discovered that Eleanor was exposed to highly sexualized material, including books with transgender themes at the school library.[10]

Eleanor's pain became increasingly evident. Her failure to make friends resulted in her resorting to unhealthy attention-seeking antics. Covid-19 lockdowns in 2020, further exacerbated Eleanor's loneliness, and she turned to the internet to find friends and caused mischief, hacking into the school's computer system. When school resumed in person, Eleanor established a close relationship with her school's mental health counselor, whom the Holmans mistakenly believed had been partnering with them to help Eleanor cope with her depression, ADHD, trauma, and behavioral issues.

The Holmans later learned that the counselor had actually been putting Eleanor in harm's way by encouraging her transgender identity. Eleanor had a safety plan to reduce suicide risks, she was cutting

---

[10] In fact, Puyallup made the news for a book it made available to students that celebrated and normalized transgenderism and the removal of healthy breasts. David Urbanski, *Elementary School Promotes Transgender 'Top Surgery' Book for Pride Month. Then the Complaints Come Rolling in.* THE BLAZE, (July 1, 2021); https://www.theblaze.com/news/elementary-school-transgender-top-surgery-book.

11

herself, and had begun to frequently run away. The safety plan was supposed to include close monitoring of Eleanor's whereabouts because of her propensity to run away. The school counselor, however, ignored this, giving Eleanor brochures for transgender support clinics and encouraging her to  visit during school hours, without telling her parents. When Jodie discovered this and confronted her, the counselor insisted that she had every right to provide the transgender resources to Eleanor.

When Eleanor claimed to be a boy trapped in a female's body, following a period of asserting that she was a lesbian—an identity with which the Holmans took no issue —the Holmans initially went along with the transgender identity, even though they never ascribed to the notion that their daughter, or any child, is born in the wrong body and understood that the identity crisis was another maladaptive behavior stemming from Eleanor's extensive mental health issues. However, since the Holmans were primarily focused on stabilizing Eleanor's behavior, they went along with Eleanor's male identity for roughly a year. But the Holmans eventually concluded that treating Eleanor as a boy only exacerbated her distress, and they stopped playing along.

The Holmans asked that the school stop encouraging Eleanor's transgender identity and support their chosen measures to treat her mental health crisis, but the school continued to advance Eleanor's belief that she was really a boy. Eleanor took advantage of the special treatment at the school for "transgender" students, using the single-use  "trans" bathroom to use drugs. The identity affected Eleanor's ability to connect with peers, limiting her friendships

12

to other "trans-identified students" who influenced each other to enable their beliefs.

In December 2024, the school likely notified DCYF that Eleanor was being abused by her parents. Eleanor, herself, called DCYF to report her parents multiple times, often claiming that Jodie had physically abused her. Each DCYF investigation concluded with no finding of abuse or neglect by either parent. During this protracted mental health crisis, the Holmans continued to use Catholic Community Services, Wraparound with Intensive Services, and therapists to try to stabilize Eleanor.

In January 2025, Eleanor ran away again, and by this point, she had been in and out of hospitals close to thirty times. During all of those visits, none of the hospital staff, who are mandated reporters, contacted DCYF with any allegations of parental abuse. In March 2025, after another episode of Eleanor running away, she met Jeanne Shepherd at EgyHop homeless outreach center.[11] Shepherd provided Eleanor the pathway to extricate herself from her non-affirming family.

Shepherd introduced Eleanor to TeamChild, a law firm  partially funded by the State that represents minors in juvenile and dependency cases. TeamChild, which has a relationship with DCYF and Puyallup School District through  Communities in Schools

---

[11] Emma Goldman Youth & Homeless Outreach Program, https://www.egyhop.org (last visited Feb. 11, 2026).

13

("CISWA"),[12] worked tirelessly to "emancipate" Eleanor from her parents. TeamChild's stated strategy in its representation of minors is to follow the lead of the child: "[y]oung people are the experts about their own lived experiences and needs, and they are centered in [TeamChild's] legal services. Youth prioritize their goals and call the shots about decisions that impact their lives."[13]

TeamChild aggressively adhered to its mission in Eleanor's case, petitioning the court on April 24, 2025, on Eleanor's behalf, for an Emergency Minor Guardianship ("EMG"). Fortunately, the restraining order was not granted, but the court placed Eleanor under the control of Shepherd, a virtual stranger who was completely unvetted and who lived with other unvetted adults (a vice-principal from Puyallup who identifies as transgender attended the hearing to support the removal of Eleanor from her parents' home).

The Holmans fought strenuously to get their vulnerable daughter back.  They wanted her removed from the home with complete strangers.  They had reason to fear that some members of the household may have been planning on trafficking Eleanor. Shepherd had requested Eleanor's passport and had been permitting  an adult male with a criminal record to transport Eleanor around town. Notably, over the

---

[12] Eleanor's TeamChild counsel was Demetri Heliotis, who is also a board member of CISWA. See Demetri Heliotis, Communities in Schools, https://tacoma.ciswa.org/person/demetri-heliotis/ (last visited Feb. 11, 2026).

[13] *Our Approach*, TeamChild, https://www.teamchild.org/our-approach (last visited Feb. 11,2026).

14

period of placement with Shepherd, Eleanor did not attend school—hardly a sign of a healthy or safe guardianship.

On May 21, 2025, the commissioner deciding Eleanor's fate properly denied the petition to extend the EMG, returning Eleanor to her parents. But that night, Eleanor, who had access to marijuana and Benadryl at Shepherd's home, ingested both in another attempt to take her life and to create a pretext to try again to be removed from her parents. Eleanor was hospitalized again. Her TeamChild's attorney, Demetri Heliotis, appeared at the hospital during Eleanor's stay, confusing the staff as to who had medical authority over her.

The Holmans successfully got Eleanor back but reached the undeniable conclusion that if they stayed in Washington, state actors and quasi-state actors would continue to interfere with their family, continue to make false claims of abuse, and use every possible avenue to remove Eleanor from their care. Thus, they moved, at great expense, to Texas, and enrolled her into an inpatient facility in Utah. The attorney for TeamChild attempted to contact Eleanor there. Ultimately, the Utah facility informed the Holmans that they were unable to care for Eleanor's acute mental health issues, and she was transferred to a facility in Louisiana. TeamChild once again managed to contact Eleanor—contact which her mental health team noted disrupted her progress.

After months of acute inpatient treatment, Eleanor returned to her family in Texas. But within two weeks of her arrival at home, she disappeared. Thus, the interlopers were finally successful in placing

15

this child into unspeakable danger, all because the parents would not submit to her trans-identity. No one from TeamChild, the Puyallup School District, nor Shepherd, her court-appointed temporary guardian, has cooperated with the parents in their search for Eleanor.

If Eleanor is in Washington, the Holmans do not expect that any of Washington's shelters or "chosen families" will contact them, because Wash. Rev. Code §13.32A.082 permits them to bypass the parents and report directly to DCYF. Nor is there any readily available recourse against those who influenced Eleanor to run. No private right of action otherwise exists against the shelters in this instance.[14]

## B. Ashly Wallace

Ashly Wallace's case parallels that of the Holman family, except it occurred in Oregon. Like the Holmans' child, Ashly's minor daughter Wynter also disappeared with the assistance of state systems.

Wynter's childhood was unremarkable except for difficulties with peer relationships. She was frequently bullied and sought acceptance through mimicking her peers' mental health issues. Still, she struggled to make friends, and when the pandemic forced social isolation, she turned to the internet for companionship, where she was heavily influenced by numerous pro-transgender videos. By the time Wynter entered eighth grade in 2021, many in her peer group adopted transgender identities, and she followed suit.

---

[14] See Wash. Rev. Code §13.32A.085.

16

Around the same time that she began identifying as male. Wynter's demeanor changed markedly. Initially, Ashly dismissed 13-year-old Wynter's obsession with LGBTQ topics as a passing developmental phase. However, the connection between Wynter's aberrant agitated state and her adoption of a transgender identity eventually became undeniable. Moreover, Ashly discovered an unfamiliar phone in Wynter's room containing sexual content, a topless photo of a minor, and indications of marijuana usage.[15] Wynter's erratic behavior escalated as she started high school.

Ashly sought professional help, but the professionals only directed her to affirm Wynter's identity. Unbeknownst to Ashly at that time, Wynter's school had been helping drive her transgender identity by enrolling her in a trans support club, inviting her to engage in confidential affirming therapy, and conspiring to socially transition Wynter. At 15, Wynter began dropping hints to her mother about wanting to emancipate while obsessively logging every instance when her mother and stepfather referred to her using female pronouns. After a heated argument between Wynter and Ashly over Wynter's identity, Wynter ran away to an affirming friend's house. A state and federally sponsored crisis resolution mediator advised Ashly to authorize Wynter's temporary stay at Looking Glass Community Services Station 7 ("Station 7") shelter to give her some space. Station 7, an organization funded

---

[15] Ashly contacted the police about the images but her concerns were dismissed.

17

largely by Medicaid[16], partners with the Oregon Department of Education[17] and explicitly provides "LGBTQIA+ affirming care" inserted itself into the Wallace family.[18]

Around the same time, Ashly permitted Wynter to take music lessons at Youth Era, a self-proclaimed safe space for LGBTQ teens[19] promoted by the Oregon Health Authority.[20] But when Wynter's brother and stepfather went looking for her at Youth Era during another runaway attempt, the state-sponsored center

---

[16] Ben Botkin, *Federal Funding Aids Looking Glass Efforts to Reach Youth in Cottage Grove*, LOOKOUT EUGENE-SPRINGFIELD, (May 28, 2025), (Looking Glass gets 65% to 75% of its budget from Medicaid),https://lookouteugenespringfield.com/story/government-politics/2025/05/28/federal-funding-aids-looking-glass-efforts-to-reach-youth-in-cottage-grove/.

[17] Tyler Mack, *Inaugural Pride Fest at Riverfront School Brings Smiles, Tacos and Shave Ice*, Looking Glass Cmty. Servs, (Jun. 9, 2025), https://www.lookingglass.us/blog/2025/6/9/inaugural-pride-fest-at-riverfront-school-brings-smiles-tacos-and-shave-ice; *see also* Oregon Department of Education, letter to Looking Glass Center Point School, dated Jun. 2, 2023, https://lesd.k12.or.us/wp-content/uploads/2024/05/Centerpoint-Site-Observation.pdf. (last reviewed Feb. 11, 2026.)

[18] *Looking Glass Community Services,* https://rehabs.org/looking-glass-community-services/. (last visited Feb. 11, 2026).

[19] Kim Martin, OREGON LGBTQ PHYSICAL AND MENTAL HEALTH RESOURCES – THE REGISTER-GUARD, LGBT BREAKING, (Jul 3, 2022), https://www.gaynewstoday.com/oregon-lgbtq-physical-and-mental-health-resources-the-register-guard/.

[20] Or. Health Auth., *Supports for Youth and Young Adults* https://www.oregon.gov/oha/hsd/bh-child-family/pages/youth.aspx (last visited Feb. 11, 2026).

18

refused to allow them to see Wynter, showing no respect for the familial bond.

Ashly ceased affirming Wynter as a boy and enrolled her in a charter school in which the students wore uniforms and were all referred to by their last names. However, Wynter had been coached by her trans-identifying peers to use Oregon's Department of Human Services to emancipate herself from her family and get placed with trans-identifying friends. Wynter began making claims of abuse against her mother and stepfather. In total, four separate investigations spanning from 2022 to 2024 were conducted against the parents; three were determined to be unfounded. Ashly does not know the disposition of the fourth investigation because she refused to cooperate. By that time, Wynter had run away and had not lived with the family for more than a year. Wynter also used the McKinney-Vento Homeless Assistance Act[21] to enroll herself in school, claiming that she was abandoned. Ashly's calls to the school explaining that the parents had never relinquished control over Wynter were ignored.

Wynter learned to navigate the system by claiming homelessness and alleging rejection and abandonment by her family, despite Ashly's continuous efforts to bring her home. None of the police, schools, or shelters assisted Ashly with reunification; instead, they aided Wynter's *de facto* emancipation without any evidence of abuse or abandonment by her parents. Ashly has not heard

---

[21] 42 U.S.C. §§ 11431-11435.

19

from Wynter, now an adult, for more than a year, but has reason to believe that Wynter did not graduate high school and that she was placed on testosterone while she was still a minor without her parents' consent.

## III. Washington State's Medical Community's Pro Sex-Rejecting Interventions Harm Children and Families—Interventions That Are Of Low Efficacy.

Washington State has adopted the most aggressive laws, tactics, and policies in the country to ensure that minors who claim to have gender dysphoria are medicalized.

### A. Washington's Major Hospital Systems Are Captured by the Transgender Agenda

An article authored by three physicians, two from Seattle Children's Hospital, published by the American Academy of Pediatrics ("AAP") in 2023 is characteristic of Washington's attitude towards trans-identifying children. The article claims that denial by providers for children sex-rejecting interventions—puberty blockers, cross-sex hormones, and surgeries—is medical neglect and emotional abuse, and by implication, parents who refuse to consent to sex-rejecting interventions are abusive. On the other hand, Seattle Children's gender clinic appears to have overlooked another Seattle Children's physician's article that highlighted the unsurprising inability of youth to understand long-term consequences in medical care. That research paper states that "[a]dolescents appear to focus more on the immediate benefits (a socioemotional brain system function [that

20

develops during puberty]) than the future costs of risky behavior (a cognitive-control brain system function [that matures in the mid to late 20s]), a finding that is exacerbated in the presence of peers."[22] Even the World Professional Association of Transgender Health ("WPATH"), the most prominent organization known for aggressively promoting sex-rejecting interventions on confused children recognized the inability of minors to understand what they are consenting to. Dr. Dan Metzger of WPATH stated, "it's always a good theory that you talk about fertility preservation with a 14-year-old, but I know I'm talking to a blank wall," adding that children "don't yet understand what they are sacrificing."[23] WPATH's clinicians were also recorded admitting that they are "just winging it" when it comes to treating gender confused kids.[24]

Seattle Children's pediatric gender clinic recently stopped, then started, then stopped *again* offering sex-rejecting surgeries to children,[25] despite the assertion

---

[22] Douglas S. Diekman, *Adolescent Brain Development and Medical Decision-making*, 146 Pediatrics, S18, S21 (2020).

[23] Mia Hughes, *The WPATH Files, Pseudoscientific Surgical and Hormonal Experiments on Children, Adolescents, and Vulnerable Adults*, Env't Progress 12 (Mar. 4, 2024), https://environmentalprogress.org/big-news/wpath-files.

[24] Leor Sapir, *'We're All Just Winging It': What the Gender Doctors Say in Private*, THE FREE PRESS, (Dec. 3, 2025), https://www.thefp.com/p/were-all-just-winging-it-what-the

[25] Vivian McCall, *Seattle Children's Has Again Stopped Providing Gender-Affirming Care for Trans People Under 19*, The Stranger, (Apr. 17, 2025), https://www.thestranger.com/news/2025/04/17/80016692/seattle-childrens-has-again-stopped-providing-gender-affirming-surgery-for-trans-people-under-19.

21

by some of its doctors that to do so is child abuse and medical neglect. It is, however, continuing to damage a child's entrance into puberty with castration drugs and providing cross-sex hormones to minors despite the complete lack of evidence that these treatments benefit children who are distressed about their sex.[26] Notably, Seattle Children's is currently under investigation by the United States Department of Health and Human Services for its sex-rejecting treatments on minors.[27]

But Seattle Children's was hardly alone in fueling the exponential rise of children adopting transgender identities in Washington. The MultiCare Health System in Tacoma, Washington ("MultiCare") is also a major promoter of pediatric gender medicalization.

MultiCare employed Tamara Pietzke, a licensed clinical social worker and therapist. In 2024, Pietzke "blew the whistle" on the harmful practices she witnessed with pediatric patients at MultiCare.[28] Pietzke was alarmed that she was told to cast aside her mental health training and affirm every child's transgender identity irrespective of the comorbidities or inanity of the identity. One such patient, a female,

---

[26] HHS Review at 79, see also, Notes 5-7.

[27] Ross O'Keefe, *HHS Launches Investigation into Seattle Children's Hospital over transgender surgeries for minors*, WASH. EXAMINER, (Dec. 26,. 2025), https://www.msn.com/en-us/health/other/hhs-launches-investigation-into-seattle-children-s-hospital-over-transgender-surgeries-for-minors/ar-AA1T6bkZ.

[28] Tamara Pietzke, *I Was Told to Approve All Teen Gender Transition. I refused*, THE FREE PRESS,( Feb. 2. 2024), https://www.thefp.com/p/i-refused-to-approve-all-teen-gender-transitions.

22

aged 16, cycled through identities landing on xenogender, which is a gender that is "beyond the understanding of a human." Her particular identity was that of a wounded dog. The child wanted hormones to effectuate her "transgender" identity. Unbelievably, the clinic approved the hormones.[29]

Pietzke watched as the Mary Bridge Gender Health Clinic, part of MultiCare, prescribed testosterone to a minor whose mental health issues included autism, anxiety, gender dysphoria, depression, and other mental disorders. None of those severe comorbid ailments were considered impediments to that child "transitioning." Pietzke learned that, far from aiding the young girl, the hormones seemed to cause her mental health to decline to the point where she isolated in her room, barely ever leaving it. Notably, Mary Bridge has closed its pediatric gender clinic.[30]

When Pietzke raised the alarm about a very disturbed child being recommended for cross-sex hormones, MultiCare reassigned the patient to another therapist. The patient at issue had been a victim of childhood sexual assaults, severe abuse by her bipolar mother, exposure to violent pornography, and had diagnoses of depression, anxiety, post-traumatic stress disorder, and intermittent explosive disorder. The disturbed child rocked herself and

---

[29] *Id.*

[30] Cheryl Murfin, et al., *Mary Bridge Children's Hospital Closes Gender-Affirming Care Clinic*, SEATTLE'S CHILD, (Jan. 29, 2026). https://www.seattleschild.com/mary-bridge-gender-affirming-care-clinic-closure/

23

informed Pietzke that sometimes she would "age-regress" by "watching Teletubbies and sucking on a pacifier," but none of these red flags were sufficient to convince the providers that performing sex-rejecting interventions on the vulnerable child.[31]

Given the focus of these and other institutions on medicalizing children who are suffering from sex-related distress, it is unsurprising that Washington has experienced a nearly 400 percent increase over a span of 8 years of children ages 13 to 17 identifying as transgender.[32,33] It seems clear that this growth is inorganic and a result of institutional promotion of a social contagion.[34] One Seattle school district reported

---

[31] *See* Note 28.

[32] Jody L. Herman et al. *Age of Individuals Who Identity as Transgender in the United States*, UCLA Sch. of L. Williams Inst. (Jan. 2017) at 5, https://williamsinstitute.law.ucla.edu/wp-content/uploads/Age-Trans-Individuals-Jan-2017.pdf.

[33] Jody L. Herman et al. *How many adults and Youth Identify as Transgender in the United States?* UCLA Sch. of L. Williams Inst. (Jan. 2017) at 13, https://williamsinstitute.law.ucla.edu/wp content/uploads/Trans-Pop-Update-Aug-2025.pdf.

[34] *See* HHS Review at 69-70-252; Colin Wright, *Contagion Hypothesis, The Share of Young People Claiming Another 'Gender Identity' Exploded. Now Surveys Show it Is Receding*, WALL STREET JOURNAL, Oct. 29, 2025, https://www.wsj.com/opinion/evidence-backs-the-transgender-social-contagion-hypothesis-40937876; Lisa Littman, *Parent Reports of Adolescents and Young Adults Perceived to Show Signs of a Rapid Onset of Gender Dysphoria*, 13 Pub. Lib'y Sci. e0202330, at 1 (2018), unrelated correction issued, 14 PLOSONE e0214157 (2019); *see also* Samuel Veissiére, *Why is Transgender Identity on the Rise Among Teens?*, Psych. Today (Nov. 28, 2018), https://www.psychologytoday.com/us/blog/culture-mind-and-brain/201811/why-is-transgender-identity-the-rise-among-teens (expected rate of gender

24

an 853 percent increase in non-binary identities from 2019 to 2022, including 30 kindergarteners through third graders. [35]

### B. Jamie Reed's Whistleblowing Reveals Systemic Abuses in Pediatric Gender Medicine

Jamie Reed is a lesbian, a clinical research professional, and also a former employee of a pediatric gender center affiliated with Washington University School of Medicine and St. Louis Children's Hospital. She holds a Master of Science in Clinical Research Management and was employed at the Center as a case manager and research coordinator. Her responsibilities included coordination of patient care, regulatory and research oversight, and direct involvement in the intake and management of pediatric patients. Ms. Reed became a whistleblower after observing what she believed to be systemic deviations from accepted medical, ethical, and legal standards in the treatment of minors, including failures related to informed consent, custody verification, and the handling of children involved in foster care and court proceedings. After raising concerns internally without remediation, she

---

dysphoria is 0.005-.014% for males and 0.002-.003% for females); Hilary Cass, *Independent Review of Gender Identity Services for Children and Young People: Final Report* 86 (April 2024), https://cass.independent-review.uk/home/publications/final-report/ (sex-ratio flipped from predominantly males to females now making up 73% of trans-identified youth).

[35] Ari Hoffman, *EXCLUSIVE: Seattle Public Schools Sees 853 Percent Increase in 'Non-Binary' Students Over 3 Years*, Post Millennial (Oct. 20, 2022), https://thepostmillennial.com/exclusive-seattle-public-schools-sees-853-percent-increase-in-non-binary-students-over-3-years.

25

documented her observations in a sworn affidavit and subsequently provided public testimony regarding the practices she witnessed.

The clinicians at the Center routinely aligned themselves with the "affirming" parent in situations involving custody disputes, shared guardianship, or parental disagreements in which one parent did not wish to medicalize the child. As set forth in Ms. Reed's sworn affidavit and public statements, staff were discouraged from requesting or reviewing custody agreements because, as she was told, possession of such documents would require compliance with their legal limitations, and the clinic wanted nothing to impede medical "transition" of the child.[36] Ms. Reed has further described a culture in which non-affirming parents were characterized as obstacles to care, while affirming parents were supported in advancing medical pathways for minors even where legal authority to consent was unclear or contested. In at least one case described publicly by Ms. Reed, a physician affiliated with the Center testified in a custody proceeding and was subsequently granted medical decision-making authority over the child, effectively displacing *both* non-consenting parents. Ms. Reed stated that this outcome was inconsistent with prevailing ethical standards and legal recommendations governing the role of treating physicians in custody disputes.

Ms. Reed has also stated that the Center's involvement extended beyond clinical encounters and

---

[36] Affidavit of Jamie Reed to Missouri Attorney General, https://ago.mo.gov/wp-content/uploads/2-07-2023-reed-affidavit-signed.pdf.

26

into court-adjacent systems responsible for children in state care. According to Ms. Reed, she and a clinical nurse participated in training sessions with Court Appointed Special Advocates (CASA), deputy juvenile officers, and court staff, during which participants were instructed that "affirmation" is the only appropriate response to gender-distressed youth in foster care and custody contexts. Ms. Reed described these trainings as conveying an expectation that court-involved professionals defer to an affirming framework when evaluating the needs and expressed identities of minors, including those whose parents, guardians, or assigned caseworkers expressed reservations or opposition.

Ms. Reed has described similar training and guidance being provided to staff at residential treatment facilities housing foster youth and other court-involved minors. These trainings present an "affirmation-only" pathway as the appropriate standard for youth in residential placements, regardless of unresolved custody questions or parental disagreement. In her public accounts, Ms. Reed also stated that staff at the Center, including herself, coached some youth on how to access medicalized gender pathways to bypass parents' refusal to consent. Taken together, Ms. Reed's sworn and public statements describe a pattern in which medical personnel and affiliated staff became actively involved in shaping custody-related outcomes and access to treatment for foster and court-involved youth, extending beyond the provision of neutral medical care.

27

In Washington state and other states with similar child welfare laws and schemes, parents are now faced with the question: would you rather subject your child to sex rejecting interventions or lose custody?

## CONCLUSION

For the aforementioned reasons, Amici Curiae respectfully ask this Court to grant the petition for certiorari.

Respectfully submitted,

DANIEL CRAGG
  *Counsel of Record*
ECKLAND & BLANDO
100 Washington Avenue S
Suite 1500
Minneapolis, MN 55401
(612) 236-0160
dcragg@ecklandblando.com

C. ERIN FRIDAY
OUR DUTY–USA
P.O. Box 442
San Carlos, CA 94070
(415) 577-9271
erin@ourduty.group

*Counsel for Amicus Curiae*