ROB BONTA
Attorney General of California
DARRELL W. SPENCE
Supervising Deputy Attorney General
JENNIFER A. BUNSHOFT (SBN 197306)
Deputy Attorney General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94012-7004
 Telephone:  (415) 510-3377
 Fax:  (415) 703-5480
 E-mail:  Jennifer.Bunshoft@doj.ca.gov
*Attorneys for State Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ELIZABETH MIRABELLI, an Individual, and LORI ANN WEST, an individual,**<br><br>Plaintiffs,<br><br>v.<br><br>**MARK OLSON, in his official capacity as President of the EUSD Board of Education, et al.,**<br><br>Defendants. | 3:23-cv-00768-BAS-VET<br><br>**STATE DEFENDANTS' NOTICE OF APPEAL OF ORDER ON EX PARTE MOTION TO MODIFY INJUNCTION ORDER**<br><br>Judge:  The Honorable Cynthia Bashant<br>Trial Date:  None Set<br>Action Filed:  4/27/2023 |

Defendants Rob Bonta, in his official capacity as Attorney General of California, Tony Thurmond, in his official capacity as California Superintendent of Public Instruction, and the State Board of Education Members in their official capacities (collectively, State Defendants) hereby file this protective notice of appeal to the U.S. Court of Appeals for the Ninth Circuit to appeal the ruling from the bench issued by the Honorable Roger T. Benitez, United States District Court for the Southern District of California, on March 30, 2026, denying State Defendants' Ex Parte Motion to Modify the Injunction Order.  By minute order,

Notice of Appeal of Order on Ex Parte Motion to Modify Injunction Order
(3:23-cv-00768-BAS-VET)

dated April 2, 2026, the Court confirmed that "Judge Benitez ruled from the bench" at the hearing on the Motion to Modify.  D. Ct Dkt. 365.

The transcript of the March 30, 2026 hearing, where Judge Benitez issued his ruling from the bench, and the April 2, 2026 minute order are attached hereto, along with a list of parties and counsel as required.

Dated:  April 10, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
DARRELL W. SPENCE
Supervising Deputy Attorney General

*/s/ Jennifer A. Bunshoft*

JENNIFER A. BUNSHOFT
Deputy Attorney General
*Attorneys for State Defendants*

2

**NAMES OF ALL PARTIES AND COUNSEL**

**Appellants:**

1. Rob Bonta, in his official capacity as Attorney General of California

2. Tony Thurmond, in his official capacity as California Superintendent of Public Instruction

3. Linda Darling Hammond, in her official capacity as President of the California State Board of Education

4. Cynthia Glover Woods, in her official capacity as Vice President of the California State Board of Education

5. Francisco Escobedo, in his official capacity as a member of the California State Board of Education

6. Brenda Lewis, in her official capacity as a member of the California State Board of Education

7. James J. McQuillen, in his official capacity as a member of the California State Board of Education

8. Sharon Olken, in her official capacity as a member of the California State Board of Education

9. Gabriela Orozco Gonzalez, in her official capacity as a member of the California State Board of Education

10. Kim Patillo Brownson, in her official capacity as a member of the California State Board of Education

11. Haydee Rodriguez, in her official capacity as a member of the California State Board of Education

12. Alison Yoshimoto-Towery, in her official capacity as a member of the California State Board of Education

13. Anya Ayyappan, in her official capacity as a member of the California State Board of Education

3

**Counsel for Appellants:**

ROB BONTA
Attorney General of California
Darrell W. Spence
Supervising Deputy Attorney General
Jennifer A. Bunshoft (SBN 197306)
Deputy Attorney General

  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94012-7004
  Telephone:  (415) 510-3377
  Fax:  (415) 703-5480
  E-mail:      Darrell.Spence@doj.ca.gov
               Jennifer.Bunshoft@doj.ca.gov

Counsel for all Appellants


**Appellees:**

Elizabeth Mirabelli

Lori Ann West

Jane Roe

Jane Boe

John Poe

Jane Poe

John Doe

Jane Doe

Notice of Appeal of Order on Ex Parte Motion to Modify Injunction Order
(3:23-cv-00768-BAS-VET)

**Counsel for Appellees:**

Charles S. LiMandri, SBN 110841
cslimandri@limandri.com
Paul M. Jonna, SBN 265389
pjonna@limandri.com
Jeffrey M. Trissell, SBN 292480
jtrissell@limandri.com
LiMANDRI & JONNA LLP
P.O. Box 9120
Rancho Santa Fe, CA 92067
Telephone: (858) 759-9930
Facsimile: (858) 759-9938

Thomas Brejcha, pro hac vice*
tbrejcha@thomasmoresociety.org
Peter Breen, pro hac vice*
pbreen@thomasmorsociety.org
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Telephone: (312) 782-1680

Counsel for all Appellees

Notice of Appeal of Order on Ex Parte Motion to Modify Injunction Order
(3:23-cv-00768-BAS-VET)

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

ELIZABETH MIRABELLI, an
individual, et al.,

                    Plaintiffs,

        v.

MARK OLSON, in his official
capacity as President of the EUSD
Board of Education, et al.,

                    Defendants.
_____

) No. 3:23-cv-00768-BEN-VET
)
)
)
) March 30, 2026
)
) 10:31 a.m.
)
)
)
) Courtroom 5A
)
) San Diego, California

TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE ROGER T. BENITEZ, DISTRICT JUDGE

COURT REPORTER:          ADRIAN DALE BAULE, RMR, CRR, CSR
                         United States District Court
                         333 West Broadway, Suite 420
                         San Diego, California 92101
                         adrian_baule@casd.uscourts.gov

Reported by Stenotype; Transcribed by Computer.

APPEARANCES:

For Plaintiffs:          LiMANDRI & JONNA LLP
                         BY:  PAUL M. JONNA, ESQ.
                              JEFFREY M. TRISSELL, ESQ.
                         P.O. Box 9120
                         Rancho Santa Fe, California 92067
                         (858)759-9930; (858)759-9948
                         pjonna@limandri.com;
                         jtrissell@limandri.com

                         THOMAS MORE SOCIETY
                         BY:  PETER BREEN, ESQ.
                         309 W. Washington St., Ste. 1250
                         Chicago, Illinois 60606
                         (312)782-1680
                         pbreen@thomasmoresociety.org


For State Defendants:    ROB BONTA
                         Attorney General of California
                         BY:  DARRELL W. SPENCE, ESQ.
                              Supervising Deputy Attorney
                              General
                         1300 I Street, Suite 125
                         Sacramento, California 95814
                         (916)210-6089
                         darrell.spence@doj.ca.gov

                         BY:  JENNIFER A. BUNSHOFT, ESQ.
                              Deputy Attorney General
                         455 Golden Gate Avenue, Suite 11000
                         San Francisco, California 94102
                         (415)510-3377
                         jennifer.bunshoft@doj.ca.gov;

San Diego, California, Monday, March 30, 2026, 10:31 a.m.

(In open court.)

THE CLERK:  All rise.

This United States District Court in and for the Southern District of California is now in session.  The Honorable Roger T. Benitez is now presiding.

You may be seated and come to order.

THE COURT:  Good morning.

MR. JONNA:  Good morning, Your Honor.

MS. BUNSHOFT:  Good morning.

THE CLERK:  1 on calendar, 23-cv-0768, *Mirabelli, et al. vs. Olson, et al.*, motion hearing.

THE COURT:  All right.  Counsel, please register your appearances for the record, spelling your last name for my court reporter, starting with the plaintiffs, please.

MR. JONNA:  Good morning, Your Honor.  Paul Jonna for the plaintiffs.  J-O-N-N-A.

MR. TRISSELL:  Jeffrey Trissell for the plaintiffs. T-R-I-S-S-E-L-L.

MR. BREEN:  And Peter Breen of the Thomas More Society, B-R-E-E-N, for the plaintiffs.

MS. BUNSHOFT:  Good morning, Your Honor.  Jennifer Bunshoft on behalf of the state defendants.  That's B as in "boy," U-N-S-H-O, F as in "Frank," T as in "Tom."  And with me is my colleague, Darrell Spence, S-P-E-N-C-E.

THE COURT: Okay. So we're here this morning because, as I recall, I issued an injunction in this case. The Ninth Circuit then stayed my injunction. The Supreme Court then vacated the injunction -- I'm sorry -- vacated the stay. And the state, apparently, has asked that I somehow or another modify the injunction.

And so the state filed its motion. Then there was a reply -- or an opposition, and then there was a reply, and now there is a sur-reply. I have read all of that, by the way, just so that you know. So I'm somewhat familiar with what's going on.

I'm going to give you each 20 -- each side 20 minutes to -- or you don't have to take all 20 minutes, but that's what I'm going to give you anyway -- to argue your positions and to tell me why you think I should do whatever it is that you want me to do.

So Ms. Bunshoft, if -- since you were the ones who -- you filed the motion, I'll let you go first.

MS. BUNSHOFT: Thank you, Your Honor.

So state defendants filed the request to modify the injunction based on the Supreme Court's per curiam order. It's a very narrow request with two respects, simply looking at the Supreme Court's decision and making sure that the injunction accurately reflects it. And the two areas are the -- the -- basically, to protect children from abuse that -- where

teachers are reasonably certain that abuse will occur in a particular case, specifically because the -- if the school district is required to share information that they believe will lead to abuse of the child, you know, that is something that the Supreme Court, when it was looking at whether the state's policy was narrowly tailored, said, well, it's not because the state could preclude the disclosure to parents who would engage in abuse.

So that was the state's intent, is to make sure that that understanding of the Supreme Court is reflected in the Court's injunction so that districts don't feel like when they are -- you know, have reasonable suspicion that abuse will occur if the parents find out this information, they're not forced to cause that harm.

And the concern of what Plaintiffs are prosing is that the harm -- they wouldn't -- the teachers would have to make the disclosure, and then only after abuse has occurred could they then do something about it, which puts them in a terrible position of being the ones to cause the abuse, you know.

Because in the normal circumstance, you know, a teacher maybe sees a student who comes to school, maybe has a bruise, and they say, okay, there may have been some abuse. But here, there hasn't been abuse because -- precisely because the information has not been shared, and it is the sharing of

the information.  And that was what the state is trying to avoid, that circumstance, in asking Your Honor to modify the injunction to keep that horrible situation from happening as a result of the injunction.

The state did also provide a less preferred but an alternate proposal which would simply affect the -- you know, essentially, it's a matter of timing.  It would be to rather than make the disclosure first to the parents and then have to wait for abuse to happen, that they would be able to directly contact Child Protective Services or, you know, other relevant law enforcement authority to report the suspected abuse that may -- would occur and then be able to have --

THE COURT:  Can I stop you for just a second?

What is there in my injunction that would prevent a teacher from contacting, say, CPS before disclosing?

MS. BUNSHOFT:  Well, it doesn't -- it basically says that they must disclose and then -- this --

THE COURT:  Right.  I understand that.

MS. BUNSHOFT:  It's not clear.  I mean, could the Court make it clear in the injunction that that would not need to happen?  I mean, there would need to be some delay --

THE COURT:  But what is there -- what is there in my injunction that prevents a teacher from contacting CPS if they really have reason to believe that a child is going to be abused?  Okay?  What is there in my injunction that would

prevent them from contacting CPS before they disclose?

MS. BUNSHOFT:  Well, the idea is that they would not have to make the disclosure, that the disclosure would happen through the process, through Child Protective Services contacting the parent.  So it wouldn't be the school contacting the parent; it would be contacting Child Protective Services, which then would start the process through which the parent would, of course, be informed because they would have a due process right and information about that.

And so, you know, it's not clear from the language here --

THE COURT:  Well --

MS. BUNSHOFT:  -- districts may --

THE COURT:  -- so if you --

MS. BUNSHOFT:  -- believe they're not permitted to do so.

THE COURT:  If you -- if you look at my summary judgment order, I think I went through five possible scenarios, and one of the scenarios I mentioned was the use of California laws for protecting children who are abused.  Right?  Do you recall I said that?

MS. BUNSHOFT:  That is -- that is correct, Your Honor.

THE COURT:  So I don't see anything in my injunction that would stop a teacher from -- if the teacher really felt

that a child was --

I don't know how you decide that a child's going to be abused. I mean, this is not like *Minority Report* where we, somehow or another, are going to look into the future. I don't know how you do that. I honestly don't. And that's not for me to decide or to figure out.

I do know that if a child is abused once the disclosure has occurred, there is a process for it to occur. Right?

Now, assuming that it happens that the teacher really is concerned about abuse happening, I don't know if there is a procedure that allows a teacher to somehow conjure up this thought that the child is going to be abused. I don't know if California law so provides. If it does, there's nothing in my injunction that prohibits a teacher from pursuing lawful approaches to either avoiding or resolving possible abuse. I just don't see it.

Anyway, go ahead. I'm sorry. I interrupted you.

MS. BUNSHOFT: Yeah. The issue, I think, is the timing, because if it's a simultaneous disclosure --

And, you know, school district policies have often required, you know, disclosure within X amount of, you know, hours or days of -- of determining, you know, if a child makes a request, for instance, to use different names and pronouns.

And so here, if there isn't adequate time to make the

report to the relevant agency and have them marshal their resources to take care of it and to have a process in place to avoid the abuse once the parents know, that -- I think that is -- that is the issue here.

So if a school is told, oh, well, we have to disclose within 24 hours, the system to protect the child may not be in place yet, and so that child could be in danger before they have adequate support and, you know, the process is in motion to protect that child.

So it's really more of a timing issue.  The parents will get notice, ultimately, but at least, you know, say that -- say it's a circumstance where the parent's going to kick the child out of the house, which would constitute neglect, the child would then -- without a process in place, that child could be in grave danger being on the street, could have, you know -- be at risk of harm from other people who could take advantage of them.  So without -- without something in place to take care of that, that puts the child at risk.

So it's more of a question of when does the -- when do the parents know, and is there going to be time for the -- for the system to have been put in place to provide the necessary protections if, you know, the worst-case scenario happens.

THE COURT:  Can you think of any other situation where, under California law, a parent can be denied of a

substantial constitutional right on the basis that someone is speculating that something could or might happen?

MS. BUNSHOFT:  Well, here, again, it wouldn't be mere speculation.  There would have to be, you know, a reasonable belief that -- that this would occur.

THE COURT:  Can you tell me what that would look like and who would make the decision?

MS. BUNSHOFT:  Well, in the first respect to teachers, teachers are trained mandatory reporters.  So there's -- you know, we set -- had a link to the Department of Education's website.

THE COURT:  Sure.  So a teacher knows that if a child comes to school with a bruise, that may be an indication that the child is being abused.  Right?

MS. BUNSHOFT:  Right.

THE COURT:  If a child comes to school dirty, you know, unkept, the teacher may be able to see that the child is being abused.

But can you tell me of a situation where a teacher can sort of say, "You know, I think this child is going to be beaten with a belt where it leaves marks on the child before it happens" or "We think this child is going to be neglected, is not going to be fed, is not going to be given the appropriate clothing, et cetera, before it happens"?  Can you think of anything anywhere in the California law that provides for this

sort of -- again, I address *Minority Report* -- we're sort of, like, thinking that people are thinking about committing crimes.  Right?  So here we're thinking that if we disclose, this child is going to be abused.

MS. BUNSHOFT:  I think -- well, first of all, I'm not an expert in this, but certainly, there are -- there's training and there's standards, and if -- there could be.  Again --

THE COURT:  So what would it be, though?  See, I'm trying to figure out what would it be?  Would it be, what --

MS. BUNSHOFT:  I mean, a child could say, you know, "If" -- "If X happens or if my parents find out X, they will harm me."  You know, it doesn't -- it's not necessarily about disclosure of parental information if there's a credible risk or a credible threat that is --

I mean, again, the -- there's standards set forth under the Penal Code if the parent -- if the teacher believes that something will happen and it is not, in fact, the case, I mean, there's a system set up to look at the circumstances. And -- and so if it's found that -- that there wasn't the risk that the teacher credibly believed there was of harm, or of, you know, neglect, that is something that would be determined through the process.

So here, I think, also, it's just a very unusual circumstance where the school district would be forced to make a disclosure that would lead to the likely abuse or neglect.

That's not the -- that's highly unusual.  I'm not aware of other circumstances where there would be, you know, a requirement for a school to disclose something that they believe would put that child in harm.

So I think that's -- that's why this is probably not -- it's unusual, and that's why we want to make sure that because of this unusual circumstance of the school district having to make a disclosure that -- that --

And this is not in every case, by any means.  This would really just be in those circumstances where there is a reasonable basis to believe there would be abuse, that that would be --

THE COURT:  So you're essentially leaving it to a teacher to decide whether or not a child is going to be abused as opposed to has been abused.

MS. BUNSHOFT:  By looking at the same factors that would otherwise apply with respect to, you know, mandatory reporting and its training.

THE COURT:  But that's not necessarily so.

As I pointed out, a child comes to school with a bruise.  Now you've got objective evidence that the child may, may, may have been abused, in which case you go to the Child Protective Services, and then they do what they do, and it's decided whether or not there really is abuse that's going on.  And, then, if there is, there's lots of things they can do like

counseling and all sorts of stuff.  Right?  But that's because they've seen objective evidence.

But if your position is that if a child simply comes in and says, "Oh, my gosh, if you tell me parents that, you know, I'm choosing to use a pronoun or a different name or to use a different bathroom, I'm going to get killed."  Right?  If that's the standard, well, that seems like a pretty slim -- I mean, I'm not saying that perhaps California law would allow reporting of that.  I don't know because I'm not that familiar with -- I mean, I've read Penal Code Section 11 -- what is it, 11166, and I'm sort of familiar with that, but I don't know if that would be allowed.  But that's very different, right, than speculating or -- you know, or coming up with --

I mean, I'm sure you remember -- no, you don't remember because you're probably too young to remember.  But there was time when the McMartin school hysteria was going on. Not that child abuse does not occur.  Don't get me wrong.  I fully understand that it does, and I fully agree that it needs to be dealt with.  But there was a time when the McMartin hysteria was going on and the Glendale community child care -- and there was several others in about that time -- where kids were reporting abuse, right, and there was all this stuff, and there were -- and the people were tried -- they were charged with criminal offenses.  They were tried.  As I recall, almost none -- perhaps none of them were convicted, the reason being

MIRABELLI, ET AL. V. OLSON, ET AL. - 03/30/2026

because kids -- as was found during that time, kids can be manipulated, intentionally or unintentionally, by simply the way the question that's posed to them, the way it's phrased.

So my point is simply this, that you can have a child say something that's not accurate. It may be something that they have conjured up or something --

One of the amicus briefs, for example, I remember -- I can't think of the amicus brief --

Mr. Jonna, you attached it as an exhibit to, I think it was your opposition.

-- where there were bunch of girls who got on social media, and they all decided that they were going to change their sex and their names. Right? So you got a young girl who, you know, their group of little friends get together. They've been watching/reading social media. And now they all decide that it's cool to change their sex. Right? And then -- or gender or whatever. And then they go to school, and then they tell the teacher, "Oh, I want to change my name, my pronouns, and if you tell my parents, they're going to kill me." Right?

And you're saying that under those circumstances, the parents should not be told. Right?

MS. BUNSHOFT: I think it's a case-by-case determination. So --

THE COURT: Who's going to make the --

MS. BUNSHOFT:  -- maybe in that circumstance, the teacher would not see that there was a real risk that was in -- that was presented in that particular case based on that particular child and what they were saying.

But then there may be a time where a child is communicating that their parent will, in fact, be abusive towards them or kick them out of their house if they find out that information.  And I'm not aware of anything that says that teachers are not able to give credence to what children report to them if it's -- if they find it to be credible --

THE COURT:  Okay.  So let's assume --

MS. BUNSHOFT:  -- or that there's any --

THE COURT:  -- let's assume that's true.

Now, I don't agree with you.  I mean, I come from a long line of teachers, and I know that teachers are fallible just like the rest of us.  They have their own biases.  They have their own subconscious, implied biases and their own views of things and so on, and their judgment may be clouded by some of that.  Okay?

But let's assume that you're right, that a teacher can simply look at a child, listen to a child and say, yes, there's going to be abuse.  There's a remedy, and the remedy is they contact -- they immediately pick up the phone, they call CPS, and they say, "Hey, I've got a child.  This child, I think, is going to be abused.  Can you take care of it?"  CPS

will be there in a heartbeat.  I know because I've had cases where CPS has been involved before.  They'll be there in a heartbeat.

Now, the disclosure, whenever it happens, however it happens, to the -- to the parents is going to be -- so if CPS really believes that what the teacher has said is credible enough for them to take action, they will take action before the disclosure occurs.  Okay?

On the other hand, if they believe that, no, that, you know, this is just a child who, you know, is imagining things, to not disclose to the parent would be a denial of the parents' substantial First Amendment and possibly the Fourteenth Amendments right as well.

Anyway.  So go ahead.  I'm still listening.

MS. BUNSHOFT:  If CPS -- I mean, in the scenario you said, if CPS were to determine that there was not a credible threat of abuse, then there could be a disclosure.  It's just a -- it's a question of timing to allow that process to occur before --

I mean, here's the real upshot of saying that -- that the notification has to happen first and then teachers --

THE COURT:  Well, I don't think I ever said that.  I don't think I ever said that.  I don't think my injunction says anything about when the notification -- that the notification must happen before CPS is contacted.

MS. BUNSHOFT:  So could the -- in the scenario, would it be consistent with Your Honor's injunction that there could be a delay in the parents being notified to permit adequate time for CPS to act and investigate?

THE COURT:  Well, the delay is instantaneous.  The delay is the minute that a teacher forms -- the minute that a teacher forms -- I'm assuming that this is consistent with California law.  I don't -- I don't know that to be the case because I am not a family law expert.  But I'm assuming that the minute that a teacher -- the teacher believes that disclosure is going to result in abuse -- which, again, I think, is really -- I mean, that's a really interesting slippery slope, because we're now back to anticipating or conjecturing or whatever, you know, imagining that abuse is going to occur.  Right?  But the minute that they -- that the teacher is in the position where he or she thinks that the child is going to be harmed, then, you know, they pick up the phone.  They contact CPS.  CPS is going to come.  CPS is then immediately going to start whatever it is they're going to do.  And then disclosure is going to occur, I think.

Anyway.

MS. BUNSHOFT:  I mean, would Your Honor be willing to modify the injunction?  Because that's -- I think that's essentially the alternate proposal that the defendants had in their papers, was -- was just that, that -- that you would

contact CPS, and then through that process, the parent would get the information. This is not saying parents won't get that information. Of course, through that process, that would occur.

So that's what we're asking, because, you know, the clarification for the districts is important so they understand what they can and cannot do pursuant to the injunction. Because, you know, I think we don't [sic] want to avoid, again, telling -- having the child be abused and then saying, okay, now we can do something about it. As the Supreme Court said, everyone agrees the children's safety is the overriding equity. So whatever it takes to protect that, that is -- that is what the state is asking for. And that was the very narrow request that the state has with respect to the injunction.

The second point, and it's a much simpler one, is in Your Honor's notice that is required, the second sentence talks about the rights of teachers. That is stayed. The Court's finding that teachers' First Amendment rights have been violated by the state's policy was stayed by the Ninth Circuit, and the Supreme Court declined to reverse the stay. And so because this is something that needs to be posted, that is why the state is asking for that second sentence to be removed should, at the end of this --

THE COURT: Well, the --

MS. BUNSHOFT: -- whole process --

THE COURT:  -- the Supreme Court -- the Supreme Court addressed the parents -- the parents' rights, not the teachers' rights.

I suppose -- I suppose that the way that fits in is this:  If you have a federal constitutional right, a school district or the state cannot pass or adopt laws that compel state, county, city, or other employees to violate people's constitutional rights.  So I suppose that it's sort of a --

So for example, you know, if we think back -- we think back to the South back in the days when -- I just came back from Birmingham and went to the 16th Street church and was reminded of the horrible abuses that occurred in those days. So there's an Eighth Amendment prohibition against cruel and unusual punishment.  Right?

So suppose, for example, that the chief of police said, "Eh, you know what?  No matter they do, sick those dog on those people.  Don't worry about it.  Just sick the dogs on them even if they're not doing anything wrong."  Right? There's no -- there's no police officer that would comply -- would comply with that -- with that order, right, because it would be compelling that officer to violate someone's constitutional rights.

I think the same is true here.  The same is true to the extent that, you know, the school districts tell -- tells teachers, Hey, don't tell parents.  You know, this doesn't

apply to you, so don't tell parents.  I think they'd be violating what I think all of us -- maybe not the state, but certainly, the Supreme Court and I -- agree is the parents' constitutional right to the care, custody, and control of their children.

MS. BUNSHOFT:  Your Honor, yes.  The Court has -- the Supreme Court lifted the stay as it relates to parents' constitutional rights.

THE COURT:  Agree.

MS. BUNSHOFT:  But let's look at the sentence that we're talking about.  It says, "Teachers and school staff have a federal constitutional right to accurately inform the parent or guardian of their student when the student expresses gender incongruence."  That -- that's not talking about the parents' rights; it's talking about teachers' and school staff's rights.  The Court did find that they have First Amendment rights.  That was stayed by the Ninth Circuit, and the Supreme Court did not lift the stay as it relates to the teachers' and school staff's rights.  So that is -- so to require that notice to be posted when there is a stay in place would seem to violate that stay.

THE COURT:  But if -- but if -- but if teachers -- so then the parents' rights to know about something that's significant and could affect their children's lives and their lives in a very significant and perhaps irrevocable way, right, if teachers didn't disclose, then the parents' rights would

become meaningless.  It would become -- you know, the whole thing would be -- would be a game, because, then, the teachers would simply be able to say, "Hey, you know what?  We don't have to comply with the parents' First and Fourteenth Amendment rights.  We don't have to" -- "we don't have to disclose."  And that's the only reason why I put that in there.

And so I think --

Anyway.  So go ahead.

MS. BUNSHOFT:  Well, that's -- I'm sorry, Your Honor. I just -- this is not about whether teachers need to disclose to further parents' constitutional rights.  This is a statement saying that -- that teachers and school staff have a federal constitutional right.  That has been stayed.  We are asking that --

THE COURT:  So why do I need to do anything about it? It's been stayed.

MS. BUNSHOFT:  Because this is in the section of the injunction that says, "Defendants shall include in a prominent place in PRISM training materials, and any other state-created or approved instruction on the gender-related rights of student and faculty, the following statement."  So this is requiring that banner, and this is the content of what that banner says.

So now the state defendants are in the position of having to post a banner that includes a statement saying that teachers have rights -- these First Amendment, constitutionally

protected rights, that -- where that finding -- that -- that judgment by the Court has -- is on appeal and that has been stayed.

Now, maybe after the end of the appeal, the parent -- teachers will be determined to have the constitutional rights, but that is not where we are.  So to require -- to require a banner saying they have rights when that is stayed -- when that finding is stayed --

THE COURT:  Right.  But that's been stayed.

MS. BUNSHOFT:  Right.  So then -- so we are asking that the banner that the state defendants must include now does not have that second sentence.  Remove that second sentence until and unless --

THE COURT:  But the Ninth Circuit has not found that teachers do not have a constitutional right.

MS. BUNSHOFT:  It's held that that finding is stayed --

THE COURT:  Correct.

MS. BUNSHOFT:  -- but that the -- right.  So -- so --

THE COURT:  That's correct.

MS. BUNSHOFT:  So teachers looking at this will say, We have a constitutional right now to do X, Y, or Z, but that finding has been stayed.  They have not prevailed on that because that aspect of the injunction has been stayed.  That is why we are asking that now, while it is stayed, it is not

required to be posted in notice, because it is not accurately informing the -- what the -- what the current state of the law is because that aspect of the injunction has been stayed.

THE COURT:  But neither the Ninth Circuit nor the Supreme Court has yet ruled that parents do not have that right.

MS. BUNSHOFT:  We're not talking about parents.

THE COURT:  I mean teachers, that teachers do not have that right.

MS. BUNSHOFT:  They have stayed that.  They have stayed that.

THE COURT:  I understand.  I made my ruling.  I made my findings.  The Ninth Circuit has stayed my injunction.  The Supreme Court has vacated the Ninth Circuit's stay with regards to the parents.

MS. BUNSHOFT:  Yes.

THE COURT:  There is no reason for me to change my injunction.

Now, the Ninth Circuit may choose to do something else, and I have no doubt they will.  Okay?  But they may choose to do something else.  But for me to concede that teachers do not have the rights that I have said that they have is a different story altogether.

Is there anything else you wanted to say?

MS. BUNSHOFT:  Well, then, if that is the case, may

the state explain that that part has been stayed when it posts its banner?  Because they -- Plaintiffs are complaining about that, because that is what -- for instance, the attorney general on the website says that -- that the attorney general is seeking modification in light of the Supreme Court order because that aspect of the injunction has been stayed as it relates to teachers' rights.  But otherwise, it's creating misinformation --

THE COURT:  Can I ask you a question?

MS. BUNSHOFT:  -- communications to the school districts.

THE COURT:  What's -- I don't understand.  Why is this such a big issue?  Let's forget -- let's forget if you agree that the Supreme Court, the highest court in the land, has read my injunction and has agreed, at least for now anyway, with what I said, that is, that parents have a right to be informed of matters that affect the care, custody, and control of their children, including mental health, including religious matters.  Okay?  Wouldn't a teacher -- if that is true, if that is true, if what I've just said is true -- which it is, unquestionably -- wouldn't a teacher have an obligation by virtue of that to report it to the parents regardless, regardless of anything else?

MS. BUNSHOFT:  Well, the -- the order is -- is for the benefit of the class, and the class is made up of parents

who object.

What if there's a circumstance where there's a teacher who says, "Based on my religion, I need to tell the parents," but the parents, they don't want that information from the school; they want to hear it from their child? So they are not among the class who object to the policies. They're good with the policy. So what then?

THE COURT: But it's the students -- it's the -- it's the children's -- the parents, their rights, that we're talking about. Right?

So remember how we got started down this road. I mean, this thing started out because the state, Mr. Bonta and Mr. Thurmond, said, "Hey, we've got nothing to do with this. This is not a problem for us." And we've had this long, convoluted, what I call "hide the ball" type of litigation that has been -- has gone on by the state all this time. So I had to issue an injunction because I didn't really know what exactly the state was arguing or doing or what laws precisely you were -- you were saying.

Because certainly, the privacy law -- there's nothing wrong with the privacy laws. There's nothing wrong with the antidiscrimination laws. Those are perfectly good laws. I mean, there's not a thing wrong with those. It's the way that the state -- well, the state said it was not enforcing these policies, right, of nondisclosure. At first, they said, "Oh,

we've got nothing to do with this.  You know, let us go."

Right?  Turned out to be, you know, frankly a -- let's see.

Let me try to be kind of generous -- a misstatement.  Okay?

As it turned out --

MS. BUNSHOFT:  Your Honor, there are separate defendants.  It was the attorney general who was saying that they didn't -- they didn't issue the FAQ.  And we don't need to belabor the point, but there are --

THE COURT:  So my point is this --

MS. BUNSHOFT:  -- separate defendants.

THE COURT:  -- my point is this:  If parents have a right -- if parents have a right to know, doesn't, then, a teacher have an obligation to disclose it to the parents?  It's kind of like what I was saying earlier.  You cannot violate someone's constitutional rights.  So if a parent wants to be informed, right, if a parent wants to be informed, a teacher has an obligation to disclose it.

There's an exception, an exception we've talked about already at length.  The exception is this -- the Supreme Court pointed it out.  I pointed it out -- if a teacher believes that a child is being abused, the teacher can then initiate proceedings, whether it's under Penal Code Section 11166 or some other statute.  That's what they can do.  But they cannot -- but a teacher has an obligation to disclose to the parents that their child is experiencing gender incongruity,

because otherwise, it's nullifying the parents' First and Fourteenth Amendment rights, as I found and as, I think, the Supreme Court has agreed.

So all that my notice says is, look, you've got -- you've got a right to disclose this. You've got -- you've got a right to disclose.

Just like, for example, I gave you the circumstance of the law enforcement officer in the South who sicked dogs on demonstrators during the civil rights movements. That officer has a right to say, "No, I'm not doing that. I will not sick the dogs on these people." A teacher has a right to say, "I'm going to tell the parents, because if I don't tell the parents, I'm violating the parents' First and Fourteenth Amendment rights."

MS. BUNSHOFT: Yes, Your Honor. That -- I agree if -- with the Court's finding that -- that parents have First and Fourteenth Amendment rights. The teachers, in the circumstances you described with the exception you described, would have an obligation. That is -- but the source of that is not the -- not the teachers' First Amendment rights. That is the only clarification we are making.

THE COURT: I disagree. I've issued my order. I issued my injunction. It has been stayed. That part, I guess, from what you're saying, has been stayed.

MS. BUNSHOFT: Okay.

THE COURT:  Okay?

MS. BUNSHOFT:  And one other point.  Just for the record, we -- we do object to Plaintiffs' late-filed supplemental opposition and three declarations on Saturday before, you know, a Monday morning hearing.  We also oppose it because it would substantially alter the -- the injunction and the record and the evidence before not only this Court, but before the Ninth Circuit and the Supreme Court.  So we --

THE COURT:  Tell me -- tell me -- tell me how.  I'm not sure I fully understand what you're saying.

MS. BUNSHOFT:  Because they -- I mean, they've submitted declarations with, you know, discussion of, like, evidence and other things that were simply not before the Court.  And Plaintiffs themselves cited case law that says that it would be inappropriate to modify an injunction in a way that would materially alter the status of the case on appeal.  And here, they're seeking to introduce all sorts of new facts in evidence.

It's -- and it's not even their motion.  This is -- they're opposing our motion.  So they didn't even file their own motion to modify the -- the injunction.

And so they say, you know, if the Court is disinclined to grant the relief which we're requesting, which seems to be the case, then they say that -- you know, they oppose it.  And then we would object to any -- any modification

that they're requesting for, you know, the reasons stated.

And, you know, it's full of hearsay.  And we haven't had an adequate chance to even respond or talk to our clients about it because it was filed on a Saturday right before the hearing.

THE COURT:  I read it.

Okay.  I've got one other question for you.

MS. BUNSHOFT:  Yes.

THE COURT:  Can you -- can you answer this for me?

I -- you know, I've been a judge for almost 30 years.  I've seen a lot of water now under the bridge.  I have never ever in my lifetime or in my career ever seen a lower court be asked to clarify a higher court's decision.

So for example, I can't imagine Mr. Jonna coming to me as a trial court and saying, "Look, Judge, the Ninth Circuit stayed your injunction, but you should modify their stay because X, Y, and Z."  I've never seen that happen.  I don't know if it can happen.  If it can happen, it would make -- it would make litigation very, very interesting.

But, essentially, the state is asking me to modify the Supreme Court's decision.

So the Supreme Court made a pretty -- I mean, it's a -- I think --

Now, look, the language, we can argue about a's and the's and and's and shall's and must.  I remember, as a young lawyer, somebody said to me, "Lawyers reduce arguments to words

and then argue about what the words mean."  We can -- we can argue about how clear the Supreme Court's decision is.  I think it's pretty clear.

But why not go to the Supreme Court -- I think, what is it, Rule 44.1, I think it is, or 44 -- go to them and say, "Hey, we don't understand what your ruling says.  How about clarifying it?"  Instead, you come down to me.  I'm just a lowly district court judge.  Why are you asking me to somehow or another modify what the Supreme Court has said?

MS. BUNSHOFT:  I think we're not trying to ask Your Honor to modify what the Supreme Court said.  We're trying to take what the Supreme Court said and make sure it's reflected in the injunction.  And specifically, this is all about the language that says, "The state's interest in safety could be served by a policy that allows religious exemptions while precluding gender identity disclosure to parents who would engage in abuse."  And it was simply saying that's important because, as the Supreme Court said, everyone agrees that children's safety is the overriding equity.  And so that is -- we're just trying to make sure that children are not harmed, which I don't think is Your Honor's intent --

THE COURT:  I would hope not.

MS. BUNSHOFT:  -- but we don't want that to happen, and that is why -- and it may seem like we are causing all sorts of drama, but we really just want to make sure that --

that the districts are not left with the impression that they are powerless in circumstances where they genuinely fear that there will be abuse as a result of making disclosures.

THE COURT:  I left it back on my desk.  I don't have it before me.  But there is a -- there is a -- there is a section of the Supreme Court's order that clearly talks about two things:  Number one, the parents' constitutional rights. And also mentions that where the parent is unfit, that there's a process by which that can be dealt with, which is my understanding, has always been my understanding, was never my intent to say that, of course, you know, someone would be forbidden from pursuing, you know, statutes and laws and rules and regulations that would prevent someone from reporting a child being abused.

I don't know about -- I don't know about possible future abuse.  I don't know that the law allows for that. Maybe it does.  I don't know.  If it does, great.  But I don't know that it does, because it basically puts -- there's really no standards for it, who's got the training and so on and so forth.  But I don't care about that.  It's not my -- it's not my -- it's not in my bailiwick.

But I thought the Supreme Court -- I don't have it in front of me, but if you -- but if you look, you'll find that there are two sentences, as I recall -- one follows the other -- that makes it very clear -- as I recall, it's towards

the end of that first section that they -- that they talk about it -- and it says something about, you know, we need to protect the kids, and this injunction does exactly that.  It allows for parents who object to object.  It also provides for children to be protected from unfit parents.

MS. BUNSHOFT:  Yes.

THE COURT:  I thought it was pretty clear.

MS. BUNSHOFT:  There is such language.

THE COURT:  There is; right?

MS. BUNSHOFT:  Yes.

THE COURT:  Yeah.  That's what I understood.

So anyway.  Anything else?

MR. SPENCE:  Your Honor, may I add one more thing?

And again, to kind of answer your last question, we made the motion in the Ninth Circuit, and the Ninth Circuit basically directed us to bring it here.  So that's why it's before you today.

THE COURT:  No.  I know that.  I know that.  I know that.  I'm just kind of wondering.  It was just a general question.  I had never seen it done before.  And I thought, well, that's an interesting proposition.  Maybe I'll issue an injunction that says, you know, "The Supreme Court was wrong when it said X, Y, and Z.  I think it should only be X, Y, and not Z.  And so, therefore, I'm" -- yeah.  I'm sure that would be -- that would look really good on my way out of my judiciary

career for me to say something like that.

Mr. Jonna.

MR. JONNA:  Thank you, Your Honor.

It's quite clear that the Court clearly understands the issues today.  I do think, though, because of the importance of this request and the -- I don't interpret this as a narrow request; I interpret this as a very significant request.  I want to explain why.  So I do want to go through -- I want to use the time that the Court has allotted here for 20 minutes and go through --

THE COURT:  Can you make it shorter?  I've read --

MR. JONNA:  Yeah.

THE COURT:  -- all the -- everything you filed.

MR. JONNA:  I can and I will.  However, I'm just concerned that this -- this is going to be raised in the Ninth Circuit, and so I do want a robust record.  But I'll --

THE COURT:  Do you want to bet?

MR. JONNA:  Yeah.  It's -- I will just, you know --

Okay.  So Your Honor, I think what we're dealing with here is there's a default process that exists under California law, and they don't want that process.  They want special rules.  They want teachers to be able to determine on a case-by-case basis.  The people that started this mess and that are the defendants in this case want to be the people who decide how to handle basically --

THE COURT:  Well, but they do that anyway, don't they, Mr. Jonna?  I mean, this --

I mean, again, I told you I just -- I come from a long line of teachers.  And if a teacher sees that a child is being abused, right, they're not making a judgment that the child is being abused; they're making a judgment that the child appears -- that there are -- that there are objective reasons to believe that the child is being abused.  That happens today.  That happens now.  And it should.  And it should.  Right?

MR. JONNA:  Well, that's not -- that's not what they're talking about.  They don't -- we're not talking about that.  They want a special rule from this Court that they don't have to make the disclosures if they reasonably think maybe some time in the future, the kid will be abused.  And that's --

THE COURT:  Yeah.  I know.  I heard that.

MR. JONNA:  -- that's a special rule.

THE COURT:  And that's why I argued with them.

MR. JONNA:  Right.

THE COURT:  So -- but if they do think -- I mean, I don't know if California law would allow or tolerate this, but I think there's a process.  If they thought -- if the law allowed and if they thought, reasonably believed that a child was going to be abused, there's a process.  The process is you go to CPS and you say, "Hey, I think this child is going to be abused."  Then the child is going to begin -- or CPS is going

to begin doing whatever it is they're doing.  Right?  And hopefully, they won't abuse.

Because again, I mean, I've had cases where I've seen CPS folks who they themselves -- remember what I said about the McMartin/Glendale community.  Okay?  I mean, there are some CPS folks who have this implied, subconscious bias of a way where they see an abuser behind every door.  Right?

And CPS is going to do what they do.  They're going to do their investigation.  Hopefully, they're going to do it in a fair and impartial manner.  And, then, if they really do believe that there's going to be abuse, right, then --

MR. JONNA:  Well, that's --

THE COURT:  -- disclosure is going to occur.

MR. JONNA:  Right.  There's a couple of things, though.

First of all, Ms. Bunshoft talks about the fact that teachers are trained mandatory reporters.  And the Court specifically referenced the mandatory reporting statute, California Penal Code 11166, which only requires a report to be made if the reporter knows or reasonably suspects that -- that the child has been the victim of child abuse or neglect.  There's nothing in the law that says they're required to make a report if they reasonably believe they might be.  So that's point one.  There's no -- they're not required to report abuse in the scenario that they're focused on today.  Number one.

There are provisions in the --

THE COURT:  But is there anything -- is there anything, Mr. Jonna, that would prevent them from doing it?

MR. JONNA:  I'm not sure --

THE COURT:  I mean, that's what -- see, this is -- this is -- 11166 compels --

MR. JONNA:  Right.

THE COURT:  -- but is there anything that would forbid them from doing it if they reasonably believed that it was going to occur?

MR. JONNA:  I'm not sure if there is.

However -- this is really important -- they -- this is going to be subject to massive abuse.  If there's special language written in this injunction that they want, that basically gives them a carve-out from the injunction.  Well, if the teacher reasonably believes the kid is going to be subject to abuse, you make a -- you make a report to CPS.

Well, that's why we submitted the declaration of Erin Friday, who, by the way, flew down from San Francisco to be here today.  She's sitting right here, Your Honor, and she -- she is willing to speak to the Court if the Court wants to hear from her.

But this is what happens in these cases, is, tragically, kids that are suffering from this gender incongruence often times are encouraged to get what they want

through claims to CPS about -- about their parents. And -- and basically, this would create a back door to the injunction by basically encouraging teachers, whether it's forbidden or not -- but they're asking for language in this order. If you look at what they're saying, the language they want would basically invite reports to CPS so that they don't have to make a disclosure.

And by the way, that's another important point, which is they want this Court to write that once they make a report, the disclosure doesn't have to be made to the parents, which is contrary to California law and to the federal law. We cite -- and that's what is addressed in the declaration of Mr. McMillan, which is that the right to information doesn't cease because some unsubstantiated report is made to CPS. The parents' rights are only -- can only be infringed in that significant manner if there's been some determination through a process.

They're asking -- they're asking for something significant. They're saying, We want this carve-out so that we don't have to make the disclosure based on some teachers' reasonable suspicion, and while that report is pending with CPS, the parents never find out.

And by the way, we know what happens in that situation. It's addressed in that amicus brief that I think the Court read and in Ms. Friday's declaration. The kid gets

put into state custody.  The kid gets there.  The parents lose custody.  The kid gets their sex-rejecting treatment.  And in the case of Abigail [sic] Martinez, who's specifically referenced in Erin Friday's amicus brief and in her declaration, she took her life while she was in state custody.

THE COURT:  But, Mr. Jonna, look, I can't -- I'm a judge.

(Pause.)

We just watched all the "No Kings" demonstrations out there.  Okay?  I'm not a king.  I can only do so much.  I can't -- I can only solve so many problems.  And it's my personal philosophy that I only solve the problems that are before me.  I don't go out looking for other problems.

What you're alluding to is a serious risk.  I understand.  That's why I mentioned the McMartin -- the McMartin case where people were reporting abuse, and it turned out that the kids, by way of questioning, were being made -- suggested to report abuse.  It turned out that none of those people were ever convicted.  There was no abuse that was ever found.  The same thing with Glendale.  I think there were other -- other groups.

Yes, this can be abused.  It can be abused.  But you know how that's dealt with?  That's dealt with at the ballot box.  If the parents really, really believe -- I mean, I realize there's a supermajority in Sacramento -- but if the

parents really want to protect their rights, if they care enough about their rights, they will deal with this issue at the ballot box, not here, not with me.

MR. JONNA:  I totally agree, Your Honor.  I don't think -- I mean, obviously, our position, as the Court has noted in -- if -- through reading the papers, is that there's nothing that the Court needs to do.  The Court's injunction is perfectly fine the ways it is.  The Supreme Court -- all of these arguments that we're hearing today and the arguments that -- all this rhetoric about that there needs to be a carve-out, all these arguments were made to the Supreme Court. The Supreme Court specifically --

And I -- I don't know -- I saw the Court looking at the clock.  Do I have time to go through some points or --

THE COURT:  Yeah.  Yeah, yeah.  Go ahead.

MR. JONNA:  So --

THE COURT:  I'll stop you.

MR. JONNA:  Okay.

So first of all, when the Supreme Court stated that the injunction in this case allows California to shield parents from -- sorry -- shield children from unfit parents by enforcing child abuse laws and removing children from parental custody in appropriate cases -- now, this is the language that I think needs to be examined for a second -- what does it mean when the Supreme Court says "unfit parents"?  Is it parents

that a teacher reasonably believes to be unfit, or is it parents that have been determined to be unfit?  They talk specifically about removing children from custody.  That's -- that's actually -- that's through a process.  That's the conclusion of a process.

THE COURT:  But I think what Ms. Bunshoft was alluding to and what I was alluding to -- I don't know if California law really allows you to speculate and to conjecture that someone -- you know, that some parent maybe is going to beat a child with a belt and leave marks -- I think that's -- I think that's the -- as I recall, that's the last standard for physical abuse, that I seem to recall, was that it leaves physical marks or something -- or that a parent may be going to sexually abuse the child or use the child for child pornography or is going to kick the child out of the house.  I don't know if the law allows for that.  I'm not a family law expert. Okay?

But it does make sense to me that what Ms. Bunshoft is saying -- and there's nothing in my injunction that would prohibit this -- and that is if the law allows, and if a teacher reasonably believes that a child would be abused, if it was disclosed to the parent, I would think that the appropriate way to deal with that would be to pick up the phone, call CPS, say, "Hey, I need someone over here right now because I have this child that I think is going to be abused, and I need for

you to deal with this."  At that point in time, due process would begin.  The parents would be given notice.  They would be given an opportunity to move forward.  Or, on the other hand, CPS would come and talk to the teacher and say, "You know, you're seeing" -- "you're seeing ghosts behind every doors, and no, there's no reason for us to get involved."

I think there's a process.  And that's what the Supreme Court was talking about.  Whatever the -- whatever the process is that currently exists, right, that would determine that a child -- that a parent is unfit, right, whatever that process is, there's nothing in my injunction that would prevent that process from going forward.  I want kids -- it doesn't matter whether it's a transgender kid or a cisgender kid; I want them to be protected while, at the same time, I want the parents' constitutional rights not to be abridged.

MR. JONNA:  Right.  So that process that the Court described -- well, I mean, I think what we're talking about is the default process pursuant to state law, and -- and we're not going to spell that out for the purposes of the injunction.  But it does -- if there are modifications to the injunction, if there are, it does raise questions about, then, do those parents who have had these allegations made against them, do they no longer have the right, under this injunction, to object to the school referring to their child as a -- the opposite sex?  I mean, I would -- and I would say, very clearly, that's

not the case under Fourteenth Amendment jurisprudence because their parental rights have not been terminated based on an allegation.

So if -- if -- under this injunction, parents have the right to be informed but also to object to this -- to their children being treated as the opposite gender in school.

So if they -- if they make a report to CPS, that does not terminate those rights.  That's the point that I think -- and again, that's -- that's a point that I think -- since they're raising this issue, that's a point that we would say is important to be -- to confirm, which is that the mere fact that they made a report of future, possible, speculative abuse does not terminate their right to receive the information, and it does not terminate the right to object to the social transition of their child at school.

THE COURT:  I don't think there's anything in my injunction that would affect that one way or the other.  I mean, my injunction is pretty clear.  What the Supreme Court has said is pretty clear, in my opinion.

MR. JONNA:  We -- we cited cases, Your Honor, that parental rights can't be overridden based on a reasonable belief that a parent would someday abuse their children.  And absent a court order, they can't be overridden unless, quote -- this is *Wallis* -- there is specific, articulable evidence that provides reasonable cause to believe that a child is in

imminent danger of abuse.  But even then, the scope and degree of the state interference can extend no further than justified by the alleged exigency.

So there are other -- the other thing, too, in our -- I think the Court is leaning towards the direction of not changing any of the language, but I do want to point out this -- we put in the proposed language that we submitted the need to explain what is not abuse, and -- because -- because California -- the state defendants' experts have stated that it's never okay to say no to a gender transition and that affirming --

THE COURT:  But that specific issue -- I made that finding because of the way this was put to me by the state.  So I'm -- I made the finding that simply because a parent objects to a child's decision to transition, that that is not abuse.  I don't think I need to go any further.  I'm not going to go through and try and spell out, you know, if --

Look, is there not a parent -- well, I shouldn't say this -- but is there not a parent who has never said to their child, "If you do that again, I'm going to kill you"?  Right? Well, of course, we all know they don't mean that.  Right?

Now, if that is what the teacher is going to take as -- as meaning -- as abuse, well, you know -- but that's something that has to be litigated in the state courts or in the federal courts somewhere else, but not here, not now.

Okay?

MR. JONNA:  No.  I get it.  Your Honor already stated in the summary judgment ruling, quote, "Disagreement is not abuse, and the Court so finds."

THE COURT:  I agree.  I wholeheartedly agree.

MR. JONNA:  I don't -- you know, I think it was critically important to submit those two declarations.  I hope the Court does not strike them from the record, because let me explain why.

THE COURT:  I'm not going to strike anything from the record.  The record is what it is.  I've considered it, and I'm ready to move on.

MR. JONNA:  So if the Court has read the McMillan declaration, I'm not going to address that.  I do think it raises important points about the practical constraints with what the state is asking for.

Let me talk really quickly about the notice that they're -- the notice language.  The Supreme Court specifically referred to the notice in its -- in its order, and it chose not to disturb it.  On page 3 of the opinion, the Supreme Court wrote the following:

The injunction "compels Defendants to include in state-created or approved instructional materials a notice of the rights protected by the injunction."

So if the Supreme Court saw the notice as part of the

injunction and chose no to disturb it, I'm not sure why the Ninth Circuit or this Court would -- would want to override what the Supreme Court concluded.

And that same goes with the first point about this abusive exceptions.  The Supreme Court heard all these arguments and chose to vacate the stay and keep the -- this Court's injunction in place without rewriting it or adding any carve-out language.

The -- you know, there was a really important point that was mentioned in their papers but which I didn't hear addressed today, so I don't know if it's been waived.  But they took issue with the first sentence of the notice, and I wanted to address that if they're taking still issue with the first sentence.

Or is that no longer --

MR. SPENCE:  Everything in our papers is --

MR. JONNA:  So --

MR. SPENCE:  -- it's in the record.

MR. JONNA:  -- the first sentence of the notice -- this is a very confusing argument, Your Honor, so I do want to mention it briefly because it's actually very important.  The first sentence of the notice says, "Parents and guardians have a federal constitutional right to be informed if their public school student child expresses gender incongruence."

They have asked in their motion to strike that

Case 3:23-cv-00768-BAS-VET   Document 370   Filed 04/10/26   PageID.20127   Page 51 of 78
MIRABELLI, ET AL. V. OLSON, ET AL. - 03/30/2026

46

language.  And yet, why are we here today?  We're here today because they want a carve-out exception for the times that they need to provide notice.

So listen to how contradictory that is.  They're here in court saying, "Give us a carve-out for times we don't want to provide notice."  And they're also saying, "This Court's order doesn't require us to provide notice."  They've literally taken both positions.

So the -- it's very obvious, when you look at the -- this Court's order and the Supreme Court's order, under the *Mahmoud* case, parents have the right to opt out and object to these policies, and they can't do that without having notice.

And -- and the injunction orders itself, Paragraph 1 specifically, makes it clear that schools are no longer allowed to use two sets of pronouns; one with the parents and one with the student.  In order to do that, they're going to have to provide notice.  So that first sentence absolutely is critical and should not be stricken.

As to the teacher claims, I think the Court completely understands the issue.  I really don't want to mention it.  However, I will say, again, the Supreme Court saw that language in the notice about the teacher claims and chose not to disturb it, because they realized, probably, what the California School Board Association realized, which is that with the injunction in place for parents, teachers obtain the

relief they needed as well.  The parents have an injunction guaranteeing them to right -- the right to receive this information, which means teachers have a right to provide it.

And --

THE COURT:  I think that's accurate.

MR. JONNA:  And the Ninth Circuit, by the way, also recognized in its order that the rights of teachers rise and fall on parents' rights.

So I do want to say that we think it's highly improper for the attorney general to be providing a prefatory statement before the notice.  I don't know if the Court saw that, but it's almost longer -- actually, it is longer than the notice, explaining all the reasons why the notice is wrong.  I mean, I don't think that's --

And on top of that, to add -- to add to that, I was amazed to learn that on the attorney general's website, he still has the statement -- I was actually really surprised to see this.  This is on the attorney general's website:

"Today you have the right to disclose or not disclose your gender identity on your own terms regardless of your age.  Your school, whether public or private, doesn't have the right to out you as LGBTQ+ to anyone without your permission, including your parents."

They still say this.  On their website -- on that same website, they provide the notice.

THE COURT:  Let me ask you.  Mr. Spence, Ms. Bunshoft, is that true?  Are you still telling -- you still telling kids that they have the right to not disclose to their parents?

MS. BUNSHOFT:  There's a -- there's a banner.  So what they did is put the banner above that which qualifies the entirety of -- they didn't change the document.  They added the banner saying that -- that the -- that this Court has issued an injunction with the statement, so --

THE COURT:  Why would you even have that?  If I've issued an injunction, the injunction has been upheld by the Supreme Court, so far, why would you even say that?  You're just confusing -- it sounds to me -- I mean, I'm sorry, but it sounds to me like you're kind of trying to confuse people by putting an inconsistent statement that appears to me to be directly inconsistent with what I said in my injunction and what the Supreme Court seems to be agreeing with.  Why would you do that?

MS. BUNSHOFT:  The understanding was that by placing the banner saying that there has -- that this has been ruled by this Court and it's under appeal, that the --

THE COURT:  Why would you put that in there?

You know, have you ever heard the expression of talking out of both sides of your mouth?  It almost sounds to me like whatever it is you're doing, you're doing exactly that.

And when you do that, it almost sounds to me like you're actually trying to encourage people to violate this Court's injunction and the Supreme Court's vacating of my stay.  I would think that you would want to strike all of that.

I remember having this very same -- this very same kind of thing go on with the PRISM issue where you say one thing in one place and something else in the other, which are kind of contradictory, and if you're reading them, it would lead someone to be confused.  And, therefore, if you are inclined to want to take one position versus the other position, then you would say, "Yeah, but see, it says over here that, yes, we don't" -- "you know, you as a child have a right to not disclose even if your parents object."

MS. BUNSHOFT:  I mean, there's a statement.  So the statement of the attorney general with the district court applies to materials that already existed on the website.  So it is there before every single document to say this is -- this is the -- this is what is accurate now, that -- that -- that the district court says, "Parents and guardians have a federal constitutional right to be informed if their public school child expresses gender incongruence," and then followed by the sentence that -- that we have asked about, which is, "Teachers and school staff have a federal constitutional right to accurately inform the parent or guardian of their student when the student expresses gender incongruence.  These federal

constitutional rights are superior to any state or local law, state or local regulation, or state or local polices."  That is what appears with the, you know, prefatory statement of the attorney general which explains the litigation before --

So if -- we didn't understand your Court's order to say that every single document needs to be taken down.  That is why there is --

THE COURT:  Oh, of course not.

MS. BUNSHOFT:  -- the banner.

THE COURT:  But certainly, I wouldn't think you'd want to publish something that is inconsistent or in violation of my order.  But that's not before me today, and I'm not about to deal with it.

Mr. Jonna, is there anything else?

MR. JONNA:  Yes, Your Honor.  I'll just be brief here.

THE COURT:  Okay.

MR. JONNA:  This is actually an important point that I have some -- I want to address only if -- only if there's -- if the Court is interested in hearing about it.  I do think it's important, though, so --

THE COURT:  What is it?

MR. JONNA:  They made another very concerning claim in their reply brief.  And I do want to clear the record on this, because I have a feeling this is going to be brought up

to the Ninth Circuit.  And the Court hasn't addressed it today, and they haven't brought it up today, but it's the elephant in the room.

THE COURT:  Yeah.  No.  That's not true, and I'm not --

MR. JONNA:  Okay.

THE COURT:  -- and I'm not going to do anything about that.

MR. JONNA:  Okay.

THE COURT:  It was a question about -- I mean, my -- gosh, I can't think of why my order couldn't be any clearer.  I said that parents, based on longstanding, longstanding, longstanding Supreme Court decisions, which I read and I understood -- and I'm sorry that perhaps some other folks didn't understand it -- the Supreme Court has said that as a result of long, long, long tradition, that parents have the right to the custody, care, and control of their children, including mental health, physical health.  And therefore, they are entitled to --

If -- if parents were not compelled to send kids to school, we might be talking about something different, perhaps.  But kids are compelled to go to school, unless they're wealthy and they can go to a private school or they can homeschool.

Right?  But kids are compelled to go to school.

And when the schools, when the state takes upon itself the obligation to have the trust of the parents to take care of their kids during school hours, okay, they have an obligation, in my mind, to provide that information to parents that affects their care, custody, and control, particularly something as important as whether or not they may be experiencing gender incongruity.  There's nothing in my order that was limited to pronouns or names.

Is there anything else?

MR. JONNA:  So all I'll say is, only if it's helpful to Your Honor, I have references to the Supreme Court's order, even the Ninth Circuit's order, and in this Court's order about -- substantiating what the Court just said.  If it would be helpful --

THE COURT:  No.

MR. JONNA:  -- I can provide references for the record.

THE COURT:  No, no.  I don't need it.  I don't need it.

MR. JONNA:  Okay.  All right.

The only other thing is -- the last thing is, if the Court is inclined -- I get the sense the Court is not changing its injunction -- if the Court is inclined to consider changing its injunction, I would be happy to walk the Court through our

proposed language and explain why it's good.

THE COURT:  No, no.

MR. JONNA:  Okay.  All right.

Your Honor, I just want to say thank you to this Court for the time and care and attention that's been devoted to this case.  And I want to apologize on behalf of both sides for the fact that we have to use the Court's resources on so many unnecessary --

THE COURT:  That's what I get paid for.

MR. JONNA:  Thank you, Your Honor.

THE COURT:  Ms. Bunshoft, I want to ask you a couple of questions that are kind of -- have been troubling me in this case from the very beginning.

The state with its policy seems to be encouraging students to trust teachers.  Right?

MS. BUNSHOFT:  With -- so the idea --

THE COURT:  When the child feels like, perhaps, for whatever reason, whether it's because of social media or because it's internal or whatever, and the child feels that they need to talk to the teacher or an administrator, the policy is we want -- and I think there's -- I recall reading something to this effect somewhere that the state wants the kids to trust the teachers.  Is that right?

MS. BUNSHOFT:  That's a very broad statement.

I think that -- that, yes, teachers in all contexts

can serve as an important role and function for students and maybe someone to whom they feel they can confide information in a way, you know, because it's -- the relationship is important, but not nearly as important as a parental relationship.

So for instance, if a student may be gay and they're not ready to tell their parents, maybe that's -- that's something where they can, like, role play or get some information or strategies about how they might have that important conversation.  Or if a student is worried about a test or exam, they can go talk to teachers.

So, I mean, I don't know that it's specific to only one context.  But sure, of course, teachers play an important role in students' lives.

THE COURT:  But your point is you want the kids to trust the teachers.  Right?

MS. BUNSHOFT:  I mean, I think that would certainly be a benefit for -- of course, teachers -- some students feel more trusting of certain teachers or connect more with certain teachers than others.

THE COURT:  Okay.

But you would agree that in the cases where a child, say, goes to a teacher, "Teacher, I think I am transgender" or "I am transgender" or "I want to change my name or my pronouns, but my parents aren't going to like that" or "my parents are going to kill me," you would agree with me, would you not,

that, in essence, what you're doing is you are -- the state is encouraging a policy where students are encouraged to trust teachers and to disregard parental, perhaps, religious or moral views; right?

MS. BUNSHOFT:  I don't think that's necessarily the case.

THE COURT:  Well, not necessarily, but that is the case.  Right?

By definition, if a teacher -- if a child goes to a -- to a teacher and says, "I want to change my names or pronouns.  My parents don't want to" -- "don't think it's right.  I shouldn't do it," and the teacher says to the child, "Don't worry about it.  We won't tell your parents," that essentially is telling the child, "We will disregard your parents" -- "your parents' moral or religious views."  Right?

MS. BUNSHOFT:  It depends if the child says that that's the basis.  I mean, in that scenario, you're assuming that it is a religious basis.

THE COURT:  Well, doesn't matter.  Doesn't matter.

MS. BUNSHOFT:  And maybe the child doesn't -- or maybe the child doesn't know.

I mean, I think -- I think it's just a lot more nuanced --

THE COURT:  No, no, no.  But you're --

MS. BUNSHOFT:  -- than this.  I mean, the nuance can

be -- and we've -- talking -- you know, as I was working on declarations and talking to people who are involved in this field, often times it's just a matter of timing. It's -- the child is trying to try on a new identity. It's -- they're not quite sure they're ready to tell their parents. They maybe don't want to tell their parents if it turns out that that's not an identity they're comfortable in, and they're just looking for a safe space to try things out. So it's not -- it's not about, like, "I never want to tell my parents." It's really just having -- having an opportunity.

So it's not so black and white, as Your Honor is presenting it. And it's not like the state sat down and said, you know, teachers are more important and the parental relationship isn't important. Of course, the parental relationship is important.

It's also important for parents who don't want to hear this information --

THE COURT: Just --

MS. BUNSHOFT: -- from the school, you know, that they want to hear it from their kid. But the school can be helpful in that process.

So there's quite a lot of nuance, Your Honor. So it's very hard to answer your question as a black-and-white --

THE COURT: No. No, it's not. It's easy. It's easy.

If a child comes to a teacher and says, "I want to change my pronouns, I want to change my name, but my parents don't want me to do that," your policy is that you want the kids to trust the teacher who will then tell them, "Don't worry about what your parents have to say because here, you have a safe space, and here, we're going to do what you want."

MS. BUNSHOFT:  Well, again --

THE COURT:  That's what I'm hearing.

MS. BUNSHOFT:  Your Honor, also -- and this has been lost in this case, I think -- but the -- at least the AG's guidance has been that -- that the school district can tell if there's a compelling need to do so.  So if that teacher felt like the student is having a severe mental health crisis, or this is something where the parents really need to be informed in the best interest of the child, then there's nothing in the state's policy that says they cannot inform, even if the child doesn't want them to.

THE COURT:  The other thing that your policy does is that it encourages or it teaches kids that it's okay for them to have a secret, a secret between a child and the teacher or the child and the counselor, that, We're not going to tell your parents.  Right?

MS. BUNSHOFT:  Well, I think in counseling, that's -- that's a common thing, because -- because that is a safe space for children to share things that they may not share with their

teacher.  I don't think that's a novel concept.  That's --
that's -- therapy is like that.  That's an important thing to
be able to --

THE COURT:  Well, particularly with regards to
teachers --

MS. BUNSHOFT:  -- have some privacy.

THE COURT:  Let's limit this -- let's just try for a
moment to limit this to teachers.

So you would agree that what the state is basically
doing is that it's telling kids, "We want you to learn that you
can have this little secret between you and the teacher that we
won't tell your parents."  Right?

MS. BUNSHOFT:  Again, I don't think it's that
straightforward.  But yes, if a child expresses concern about
telling their parents, and there's not a compelling need to
tell them, this -- under this state's policy, the teacher would
not be forced to tell the parents that --

THE COURT:  Let me just say -- I only have so much
time, so let me just say I think this is a very dangerous
policy.  It's a very dangerous policy.  Because there are many
kinds of abuse, and some of the abuses that we see are abuses
where kids have a vulnerable, perhaps unstable family life.
They are led to trust someone other than the parents, and
they're taught that it's okay to have little secrets that the
parents don't know about.

So I don't know why the state -- I mean, this is -- you're going to get this whether -- what was it I once heard -- you're going to get this whether you like it or not.  Okay?  I think that's the policy of the state.  We're going to push this whether we like it or not.  I think it's a very dangerous policy.  But I'm going to say --

MS. BUNSHOFT:  Again, I don't think that's really, truly the state's policy exactly.  But again, we don't need to belabor the point.

I do want to say, and I won't get into it, that they made a number of misrepresentations about what the state's position is, but that's in our papers --

THE COURT:  All right.

MS. BUNSHOFT:  -- if the Court is interested.

THE COURT:  So here's the way I see this.  The object -- the object of the state's policy is to protect kids who are experiencing symptoms of gender incongruity because parents may abuse them.  But your experts, the state's experts, testified -- although sometimes it took some real pulling of teeth, if you will, for them to agree -- that simply because a parent disagrees, that's not abuse, and I so found.

Your experts also said that most parents, most parents want what's best for their kids.  Most parents want what's best for their kids.

And your experts also testified that it is not

uncommon -- not uncommon for parents to not react favorably to hearing that their child is expressing gender incongruity. That's your experts, the state's experts, who said all of this.

MS. BUNSHOFT:  Yes, Your Honor.  We -- we put that in our reply papers --

THE COURT:  Yeah.

MS. BUNSHOFT:  -- to counteract their argument that our experts said --

THE COURT:  Got it.

MS. BUNSHOFT:  -- that somehow mere disagreement was abuse.

THE COURT:  Got it.

So I think where we are is this, and this is the way I've looked at this case sort of from the very beginning.

I tend to very often take a piece of paper, draw a line down the middle, and I put the benefits and the burdens on one side, the benefits and burdens on the other side.

And so I did the same thing in this case.  And I thought, okay.  So let's see.  So what are the -- what are the risks to a child if their gender incongruity is not disclosed to the parent?  Well, the risks are, for example, the child may commit suicide; a child may attempt to commit suicide; the child may run away; and the child may be physically abused, meaning they may be beaten, perhaps.

But then I went to the other side of the page, and on

the other side of the page, I found that the risks to a child when their gender incongruity is not disclosed to the parent are this:  The child may commit suicide; a child may attempt to commit suicide; a child may run away.

And my conclusions, of course, are supported by plenty of evidence on the record.

We know, for example, the Poe child, the Poe child, the parents were not told.

There was the boy who thought that because he liked pink, he was a girl.  All right?

There was the Regino case.  The Regino case is kind of -- was troubling for me, by the way.  And I think when you think about this, maybe you'll understand what I'm saying.  I'm going to -- I'm basically quoting from the Ninth Circuit opinion.  Judge Christensen [sic] wrote it, as I recall.  I thought she did an excellent job with it.  She said this.  This is what she reported.

She reported that there was this girl.  This girl was experiencing depression and anxiety.  She goes to her counselor and says that "I'm experiencing depression and anxiety because my grandfather that I was very close to died recently.  My mother was going through cancer treatment."  Then -- and this -- again, I'm just using the Ninth Circuit's language; it's not mine -- the counselor addressed gender issues, and then the child said, "Oh, yeah.  Guess what?  I'm transgender."

Eventually, as it turned out, fortunately for that child, her gender incongruity was disclosed to the grandmother who disclosed it to the mother. The girl went to therapy. Guess what? She decided she wasn't transgender after all.

You see the risks, the risks to a child when a gender incongruity is not disclosed to the parent?

So just as there are risks to the child if it is disclosed, there are risks to the child if it's not disclosed. Okay? That's the way I've been seeing this. But there are some additional risks that when there's not -- no disclosure also occur.

So again, as in the Regino case, there are comorbidities or existing morbidities, and I think Dr. Szajnberg testified to this with regards to the Poe girl. There are these other things that are underlying, perhaps what's causing them to think that they're transgender, that we will never know about unless and until they're addressed. And the only way they can be addressed is if the parents are given the opportunity to seek mental health treatment for that child. Okay?

So there's that additional risk for the children who whose parents are not told about the child's gender incongruity.

And then there's the big risk -- and here's the big risk -- to the parents, that is, because when that child

commits suicide, attempts to commit suicide, runs away, or is not treated for underlying comorbidities, or continues to believe that he or she is transgender when he or she is not, it is the parents who suffer the consequences of that decision. You see?

So when the Poe child attempted to commit suicide, had she succeeded, it would have been the parents who would have lived with that decision.  Mr. Bonta wasn't sitting at bedside there with that girl.  Mr. Thurmond was not sitting at the bedside with that girl.  The teacher was not sitting at the bedside with that girl.  The principal was not sitting at the bedside with that girl.  And had she succeeded, it would have been the parents who would have lived with that for the rest of their lives when they could've done something about it if, if they had been told ahead of time.

MS. BUNSHOFT:  In that --

THE COURT:  No, no.  I'm not asking for a comment. You've --

MS. BUNSHOFT:  Okay.

THE COURT:  I've let you say what you want to say. I'm now saying what I think.

So this is why I have made my decision the way I have.  Because, yes, there are risks on both sides.  There's no question, no question.  There are risks on both sides.  But in my opinion, it is better, consistent with the law, not because

I made it up, not because I made it up, but because it is consistent with the law as it has been stated by the Supreme Court very clearly, before and now, that it is the parents who have the right to make decisions about the custody, care, and control of their children.

Those teachers, those administrators, Mr. Bonta, Mr. Thurmond, when the -- when the semester is over, those kids are gone. It's not their problem anymore. But for the parents, that continues to be their problem. You see? And so this is very, very troubling. Not only do they -- the kids suffer consequences, but the parents also suffer consequences.

I want to make a couple of comments, because it has come up and I just want to address this.

So somewhere along the line, I think the state talked about the fact that the Supreme Court talked about gender dysphoria, I seem to recall. So every expert that I have read leads me to conclude -- well, and by definition, by definition, gender dysphoria is not something that happens with a snap of the fingers. It's not something like someone wakes up in the morning and says, "Hey, guess what? I've got gender dysphoria." Gender dysphoria is an evolving process. There's a start and there's a point at which it becomes a diagnosable condition. Okay?

A teacher has no way, no way of knowing whether when a child expresses gender incongruity, whether that child is at

the beginning or at the end of the gender dysphoria.  Okay?  And that child may never, because that child may really be transgender.  I mean, we can argue about whether there is or there isn't.  I don't care.  But it may be that that child really is transgender and will never develop gender dysphoria.  But we don't know.

So I think when the Supreme Court was talking about gender dysphoria, they were talking about the condition of gender dysphoria, which is not a condition that develops overnight.  Okay?  Which is why it's so important that parents be told at the earliest opportunity that their child, whether it is name, pronoun, wants to use a different sex bathroom, wants to wear different clothes, whatever it is that shows a manifestation that that child either is or may be about to experience gender dysphoria.  That's why it's so important that parents learn as quickly as possible so that they can deal with it.

(Pause.)

I have held that parents have a substantial constitutional right, A, to raise -- to the custody, care, and control of their children.  "Care," I believe, includes religious upbringing.  It also includes other decisions, whether it be health care or whatever.  So I think it's true that they have a substantial, either First Amendment or Fourteenth Amendment, right to raise their kids.

I can think of no other constitutional right that allows for the deprivation of that right without due process. I can't think of any other constitutional right that allows for a parent to be denied his or her or their constitutional right to raise their children without notice and an opportunity to be heard.

And what has troubled me about the state's position all along is that it seems to be asking to do precisely that, to deprive the parents of the opportunity to make those important decisions about their kids without notice and without an opportunity to be heard.

Frankly, it's -- I see it as sort of as a disrespect to parents, an attack on parents, a broad-brush attack on parents. We can't trust parents to do what most parents will do, according to your experts. I think -- frankly, I think that's a reprehensible position for the state to make -- or take, to say that we should somehow or another trust teachers about kids more than we trust the parents.

I don't know. I sometimes think back and I say, you know, long before we had government, long before this country was even formed, we had parents that raised their kids. We don't need government; we need parents. I mean, unless we get into, you know, Huxley's *Brave New World* territory, I suppose. But we need parents, but we don't need government. So -- notwithstanding James Madison's *Federalist Papers* to the

contrary.

So I think that it's important, it's important. And I don't know why the state is fighting this so hard. I don't understand this. I've --

By the way, Bob, we did file an order on the attorneys' fees; right?

THE LAW CLERK: Not yet.

THE COURT: Not yet.

You're going to get a lot of money because you've earned it. All right? And largely because the state has taken positions, I just don't understand, has made this litigation very difficult, much more difficult than it ever had to be.

You know, I think about it this way. What is so difficult, what is so difficult about at the beginning of the year or at the semester, sending a notice to the parents -- obviously, with a notice that says, you know, You may waive your rights, et cetera, et cetera -- advising them of what their rights are and then asking them to -- asking them a simple question: Do you wish to be informed if your child experiences symptoms of gender incongruity such as wanting to change their name, pronouns, use other sex bathrooms, wear clothing of another sex? Yes, no? There you have it.

And now, those parents that don't care, they're not going to return -- they're not going to return the questionnaire. Or they're going to say, No. I don't care, you

know, if my child wants, whatever, whatever, you know, my five-, my seven-, my eight-, nine-year-old, my -- they want to -- they want to change their names or pronouns. I don't care. I don't care. But there's going to be parents who are going to say, Yeah, I'd like to know.

I don't understand why the state is taking such an intransigent position on an issue that should be so, so simple and so obvious, consistent with Supreme Court prior holdings.

(Pause.)

So I have heard all of the arguments. I've read all of your papers. I thought when I issued my injunction that it was pretty clear. My law clerks here sitting to my right, they thought -- they're way smarter than I am. They read them. They thought that it was pretty clear.

I think the Supreme Court even in dissent -- you know, the dissent had a problem with the issue of the whiplash. Right? But they didn't have a problem with the issue of parental rights. I think Justice Kagan pointed out that the state may have gone too far, as I believe that was her language. And I do too. I think the state's gone too far.

And so after having said all of that, after having read all of your papers, I see no reason for me to change anything. If you think it should be changed, let the Ninth Circuit do it. I'm sure that, you know, they're smarter than I am. I'm sure that they'll figure out a way to correct me. It

69

wouldn't be the first time.  Or maybe you can go to the Supreme Court under Rule 44 and say, Hey, we didn't understand your order.  Would you change it?  And maybe they will.

But frankly, I think my order, my injunction, my notice does precisely what I intend it to do, which is to protect kids, to protect kids and to protect parents and their fundamental right to the care, custody, and control of their children.

And so with that, I want to thank you all.  I realize that this has been a contentious issue, a contentious piece of litigation.  I think, perhaps, it's been made more complicated than it really needed to be.

I remember at the very beginning of the litigation, I offered the state an opportunity to enter into a consent decree, in which case we could have negotiated some kind of language that would perhaps be more liking to the state.  My offer was declined.  State not only said no; they said heck no. And so here we are.

But I think you have all done as good a job as you possibly could in representing your clients.  And with that, I thank you.  And this hearing is concluded.

MR. JONNA:  Thank you, Your Honor.

MS. BUNSHOFT:  Thank you, Your Honor.

(Proceedings concluded at 12:13 p.m.)

//

C E R T I F I C A T E

I, Adrian Dale Baule, certify that I am a duly qualified and acting Official Court Reporter for the United States District Court; that the foregoing is a true and accurate transcript of the proceedings as taken by me in the above-entitled matter on March 30, 2026; and that the format used complies with the rules and requirements of the United States Judicial Conference.

Date:  April 3, 2026

_____

Adrian Dale Baule, RMR, CRR, CSR
U.S. Official Court Reporter

**Subject: Activity in Case 3:23-cv-00768-BEN-VET Mirabelli et al v. Olson et al Motion Hearing**

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

## Southern District of California

## Notice of Electronic Filing

The following transaction was entered on 03/31/2026 at 3:05:15 PM PDT and filed on 03/30/2026

| | |
|---|---|
| **Case Name:** | Mirabelli et al v. Olson et al |
| **Case Number:** | 3:23-cv-00768-BEN-VET |
| **Filer:** | |
| **WARNING: CASE CLOSED on 12/22/2025** | |
| **Document Number:** | 365 (No document attached) |

**Docket Text:**

**Minute Entry for proceedings held before Judge Roger T. Benitez: Motion Hearing held on 3/30/2026 re [358] Ex Parte MOTION to Modify Injunction Order. (Court Reporter/ECR Adrian Baule). (Plaintiff Attorney Peter Christopher Breen, Paul Michael Jonna, Jeffrey M. Trissell). (Defendant Attorney Darrell Spencer, Jennifer Ann Bunshoft). (no document attached) (gxr) Modified on 4/2/2026 removing verbiage that court will issue written order...Judge Benitez ruled from the bench (gxr).**

**3:23-cv-00768-BEN-VET Notice has been electronically mailed to:**

Daniel R Shinoff      dshinoff@as7law.com, bfregoso@as7law.com, ddavis@as7law.com, jestrada@as7law.com, lcambronero@as7law.com, mfrazer@as7law.com, nlay@as7law.com

Jack M Sleeth, Jr      jsleeth@as7law.com, nlay@as7law.com

Charles S. LiMandri      cslimandri@limandri.com, jtrissell@limandri.com, kdenworth@limandri.com

Darin Lee Wessel      darin.wessel@doj.ca.gov, Graciela.Lopez@doj.ca.gov

Andrew Z. Edelstein      andrew.edelstein@doj.ca.gov

Darrell Warren Spence      darrell.spence@doj.ca.gov, christopher.irby@doj.ca.gov

Paul Michael Jonna      pjonna@limandri.com, jtrissell@limandri.com, kdenworth@limandri.com, roakley@limandri.com

Leonard Bruce Garfinkel      lgarfinkel@cde.ca.gov

Emmanuelle Soichet      Emmanuelle.Soichet@doj.ca.gov, Claudine.Santos@doj.ca.gov

Virginia Gay Cale      vcale@cde.ca.gov

Jeffrey M. Trissell      jtrissell@limandri.com

Christopher N. Mandarano      cmandarano@cde.ca.gov

Kevin Lee Quade      kevin.quade@doj.ca.gov

Paul Ray Gant      pgant@cde.ca.gov, tmcclory@cde.ca.gov

Shatti Afshana Hoque      shatti.hoque@doj.ca.gov, Stephanie.AtwoodBell@doj.ca.gov

Jennifer Ann Bunshoft      jennifer.bunshoft@doj.ca.gov, adriana.trujillo@doj.ca.gov

Peter Christopher Breen      pbreen@thomasmoresociety.org, docketing@thomasmoresociety.org

Hannah Naylor      hannah.naylor@doj.ca.gov, ashley.muniz@doj.ca.gov, julie.trin@doj.ca.gov, karina.ramirez@doj.ca.gov

Katherine Bruck      katherine.bruck@doj.ca.gov, Avery.Luo@doj.ca.gov

**3:23-cv-00768-BEN-VET Notice has been delivered by other means to:**

Rebecca Patricia Feil

California Department of Education

1430 N Street

Suite 5319

Sacramento, CA 95814-5901

The following document(s) are associated with this transaction:

*This is a re-generated NEF. Created on 4/2/2026 at 9:40 AM PDT*

# CERTIFICATE OF SERVICE

Case Name:   **Mirabelli et al. v. Olson, et al.**        No.   **3:23-cv-00768-BAS-VET**

I hereby certify that on <u>April 10, 2026</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**STATE DEFENDANTS' NOTICE OF APPEAL OF ORDER ON EX PARTE MOTION TO MODIFY INJUNCTION ORDER**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>April 10, 2026</u>, at Sacramento, California.

|  |  |
|---|---|
| Christopher R. Irby | *S/ Christopher R. Irby* |
| Declarant | Signature |

SA2024300204
39682804.docx